ACCEPTED
12-14-00220-CV
TWELFTH COURT OF APPEALS
TYLER, TEXAS
9/4/2015 3:01:53 PM
Pam Estes
CLERK

**ORAL ARGUMENT REQUESTED**

No. 12-14-00220-CV

FILED IN
12th COURT OF APPEALS
TYLER, TEXAS
9/4/2015 3:01:53 PM
PAM ESTES
Clerk

_____

# COURT OF APPEALS

for the

## TWELFTH DISTRICT OF TEXAS

Tyler, Texas

_____

**EAST TEXAS MEDICAL CENTER GILMER**
Appellant,

v.

**BIRDER PORTER**
Appellee.

_____

Appeal from Cause No. 697-13
115th District Court, Upshur County, Texas
Honorable Lauren Parish, Presiding Judge

_____

**APPELLANT'S SUPPLEMENTAL BRIEF ON APPLICATION OF**
*ROSS v. ST. LUKE'S EPISCOPAL HOSPITAL*

_____

Russell G. Thornton
THIEBAUD REMINGTON THORNTON BAILEY LLP
Two Energy Square
4849 Greenville Avenue, Suite 1150
Dallas, Texas 75206
(214) 954-2200 – Telephone
(214) 754-0999 – Telecopier

ATTORNEYS FOR DEFENDANT – APPELLANT
EAST TEXAS MEDICAL CENTER GILMER

September 4, 2015

# TABLE OF CONTENTS

INDEX OF AUTHORITIES ...............................................................................iv

SUMMARY OF ARGUMENT ........................................................................2

ARGUMENT ...................................................................................................6

    I.      Limited Scope and Application of *Ross* ................................6
    II.     Appellee's Claim Is An HCLC Under *Ross* ......................7
    III.    Substantive Nexus to Health Care Exists ...........................16

CONCLUSION ..............................................................................................21

PRAYER ........................................................................................................24

CERTIFICATE OF COMPLIANCE ..........................................................25

CERTIFICATE OF SERVICE .....................................................................26

APPENDIX ...................................................................... INDEX TAB

    1.      *Ross v. St. Luke's Episcopal Hosp.,* 462 S.W.3d 496 (Tex. 2015)

    2.      *Loaisiga v. Cerda,* 379 S.W.3d 248 (Tex. 2012)

    3.      *Yamada v. Friend,* 335 S.W.3d 192 (Tex. 2010)

    4.      42 C.F.R., §§482.1 and 482.11

    5.      42 C.F.R., §482.21

    6.      42 C.F.R., §§482.41 and 482.42

    7.      25 TEX. ADMIN. CODE, §133.1

    8.      25 TEX. ADMIN. CODE, §133.41

    9.      25 TEX. ADMIN. CODE, §133.142

i

10.   TEXAS HEALTH & SAFETY CODE, Chapter 241

11.   Excerpts from the CMS State Operations Manual, Appendix A, Survey Protocol, Regulations and Interpretive Guidelines for Hospitals. (This is a 510-page document, a complete copy of which is available at – https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/som107ap_a_hospitals.pdf)

12.   Centers for Medicare & Medicaid Services, Hospital Infection Control Worksheet (accessed from and available at – https://www.cms.gov/Medicare/Provider-Enrollment-and-Certification/SurveyCertificationGenInfo/Downloads/Survey-and-Cert-Letter-15-12-Attachment-1.pdf)

13.   Rutala WA, Weber DJ, and the Healthcare Infection Control Practices Advisory Committee, *Guideline for Disinfection and Sterilization in Healthcare Facilities, 2008,* U.S. Department of Health and Human Services, Centers for Disease Control and Prevention (2008)

14.   Sehulster LM, Chinn RYW, Ardino MJ, Carpenter J, et al., *Guidelines for Environmental Infection Control in Health-Care Facilities,* U.S. Department of Health and Human Services, Centers for Disease Control and Prevention (2003)

15.   Occupational Safety & Health Administration, Hospital eTool (accessed from and available at – https://www.osha.gov/SLTC/etools/hospital/)

16.   Occupational Safety & Health Administration, Housekeeping, Hospital eTool (accessed from and available at – https://www.osha.gov/SLTC/etools/hospital/housekeeping/housekeeping.html)

17.   Occupational Safety & Health Administration, Healthcare Wide Hazards Slips, Trips and Falls, Hospital eTool (accessed from and available at – https://www.osha.gov/SLTC/etools/hospital/hazards/slips/slips.html)

18. Joint Commission Standards, Chapter EC.01.01.01; Chapter EC.02.01.01

# INDEX OF AUTHORITIES

## TEXAS SUPREME COURT CASES

*Garland Community Hosp. v. Rose*,
156 S.W.3d 541 (Tex. 2004) ........................................................................19, 20

*Harris Methodist Fort Worth v. Ollie,*
342 S.W.3d 525 (Tex. 2011) ...............................................................................16

*Loaisiga v. Cerda,*
379 S.W.3d 248 (Tex. 2012) .........................................................................16, 19

*Ross v. St. Luke's Episcopal Hosp.,*
462 S.W.3d 496 (Tex. 2015) ...........................................................6, 7, 8, 16, 19, 22

*Texas West Oaks Hospital, L.P. v. Williams,*
371 S.W.3d 171 (Tex. 2012) ...............................................................................16

*Yamada v. Friend,*
335 S.W.3d 192 (Tex. 2010) .........................................................................17, 20

## TEXAS COURTS OF APPEALS CASES

*Baylor All Saints v. Martin*,
340 S.W.3d 529 (Tex. App.—Fort Worth 2011, no pet.) ......................................18

*Christus Health Southeast Texas v. Lanham,*
2007 Tex. App. LEXIS 1103 (Tex. App.—Beaumont)(Jan. 11, 2007)(no pet.)(mem. op.) ........................................................................................................................19

*Denton Regional Medical Center v. LaCroix,*
947 S.W.2d 941 (Tex. App.—Fort Worth 1997, writ dism'd by agr.) ...................18

*Hightower v. Baylor University Medical Center,*
348 S.W.3d 512 (Tex. App.—Dallas 2011, pet. denied) ......................................18

*Kraus v. Alamo Nat'l Bank*,
586 S.W.2d 202 (Tex. Civ. App.—Waco 1979), *aff'd on o.g.*, 616 S.W.2d 908
(Tex. 1981) ...................................................................................................18

*Methodist Hospital of Dallas v. King,*
365 S.W.3d 847 (Tex. App.—Dallas 2012, no pet.) .............................................18

*Sanchez v.* Martin,
378 S.W.3d 581 (Tex. App.—Dallas 2012, no pet.) .............................................18

## FEDERAL STATUTORY PROVISIONS

42 C.F.R.., §482.1(a)(1) .......................................................................................9

42 C.F.R.., §482.11(a) ..........................................................................................9

42 C.F.R., §482.21(e)(1) ......................................................................................9

42 C.F.R., §482.21(e)(3) ......................................................................................9

42 C.F.R., §482.41(a) ...........................................................................................9

42 C.F.R., §482.41(c)(2) .......................................................................................9

42 C.F.R., § 482.42 ..............................................................................................10

## TEXAS STATUTORY PROVISIONS

25 TEX. ADMIN. CODE, §133.1(a) ........................................................................10

25 TEX. ADMIN. CODE, §133.41(g) .......................................................................10

25 TEX. ADMIN. CODE, §133.142 .........................................................................10

TEXAS HEALTH & SAFETY CODE, §241.002 ..........................................................10

TEXAS HEALTH & SAFETY CODE, §241.026(a)(3) ..................................................10

TEXAS HEALTH & SAFETY CODE, §241.026(a)(5) ......................................................10

## MISCELLANEOUS MATERIALS

CMS State Operations Manual, Appendix A, Survey Protocol, Regulations and Interpretive Guidelines for Hospitals ..............................................................11, 12

Centers for Medicare & Medicaid Services, Hospital Infection Control Worksheet ............................................................................................................................11

Joint Commission Standards, Chapter EC.01.01.01 ...............................................14

Joint Commission Standards, Chapter EC.02.01.01 ...............................................15

Occupational Safety & Health Administration, Healthcare Wide Hazards Slips, Trips and Falls, Hospital eTool ...................................................................13, 14

Occupational Safety & Health Administration, Hospital eTool ...........................13

Occupational Safety & Health Administration, Housekeeping, Hospital eTool 13, 14

Rutala WA, Weber DJ, and the Healthcare Infection Control Practices Advisory Committee, *Guideline for Disinfection and Sterilization in Healthcare Facilities, 2008,* U.S. Department of Health and Human Services, Centers for Disease Control and Prevention (2008) ..................................................................................12, 13

Sehulster LM, Chinn RYW, Ardino MJ, Carpenter J, et al., *Guidelines for Environmental Infection Control in Health-Care Facilities,* U.S. Department of Health and Human Services, Centers for Disease Control and Prevention (2003) ............................................................................................................................12, 13

No. 12-14-00220-CV

_____

## COURT OF APPEALS

for the

TWELFTH DISTRICT OF TEXAS

Tyler, Texas

_____

### EAST TEXAS MEDICAL CENTER GILMER
*Appellant,*

v.

### BIRDER PORTER
*Appellee.*

_____

Appeal from Cause No. 697-13
115th Judicial District Court, Upshur County, Texas
Honorable Lauren Parish, Presiding Judge

_____

**TO THE TWELFTH COURT OF APPEALS:**

Appellant East Texas Medical Center Gilmer, defendant in Cause No. 697-13 in the 115th Judicial District Court of Upshur County, Texas, Honorable Lauren Parish presiding, pursuant to this Court's August 4, 2015 order, respectfully submits its Supplemental Brief on Application of *Ross v. St. Luke's Episcopal Hospital.* Appellee is Birder Porter, Plaintiff in the district court.

**1**

## SUMMARY OF ARGUMENT

On August 6, 2015, the Twelfth Court of Appeals ordered Appellant East Texas Medical Center Gilmer ("ETMCG") to submit additional briefing "on whether Birder Porter's claim is a 'health care liability claim' in light of ***Ross v. St. Luke's Episcopal Hosp.,*** No. 13-0439, 2105 WL 2009744 (Tex. May 1, 2015) and its progeny" within 30 days (emphasis in Order). Pursuant to this order, ETMCG submits this Supplemental Brief on Application of *Ross v. St. Luke's Episcopal Hospital*.

Based on existing pertinent Texas Supreme Court authority, including *Ross v. St. Luke's Episcopal Hosp.*, 462 S.W.3d 496 (Tex. 2015), Appellee's claim against ETMCG is a health care liability claim ("HCLC"), as defined in Chapter 74 of the TEXAS CIVIL PRACTICE & REMEDIES CODE ("Chapter 74").

Review of the *Ross* opinion shows that it is not controlling here because there were two situations absent from *Ross* that are present here. The Texas Supreme Court was forced to address and evaluate whether Ross' claims were health care liability claims ("HCLC") in *Ross* because St. Luke's Episcopal Hospital did not argue that the incident at hand occurred in an area where patients might be when receiving medical services, and because St. Luke's did not argue that the area where the incident occurred was subject to any particular maintenance

2

or cleanliness standards related to the provision of health care or related to patient safety.

In contrast to *Ross*, Appellee admits that this incident occurred in the ETMCG emergency room and that she was in the emergency room that day seeking medical services. Thus, in contrast to *Ross,* it cannot be disputed that the underlying incident occurred in a location patients could be when receiving medical services. Also in contrast to *Ross,* is the fact that the ETMCG emergency room is subject to a number of cleanliness and maintenance standards that are related to the provision of health care and related to patient safety. For these reasons, *Ross* really does not apply to this appeal.

Appellee's claim is an HCLC even if this Court applies *Ross* and evaluates this matter pursuant to the guidance provided in *Ross*. Two key points came out of *Ross* in connection with evaluating whether or not a claim like this is an HCLC. One, *Ross* provided seven non-exclusive factors for courts to consider in evaluation of whether a claim is an HCLC. Five of these sevens factors are present here when one applies the legal framework within which hospitals like ETMCG have to operate and the facts of this case to the seven factors set forth in *Ross*.

More importantly, however, is the fact that in *Ross* the Texas Supreme Court held that when evaluating whether a safety-based claim is an HCLC the "pivotal issue" is whether or not the standards on which the claim are based implicates a

hospital's duties as a health care provider, as well as the fact that the Texas Supreme Court did not abrogate its prior decisions regarding the general considerations courts must apply when evaluating whether a claim is an HCLC. Specifically, disposition of this appeal is also controlled by the Texas Supreme Court's opinions, in *Harris Methodist Fort Worth v. Ollie,* 432 S.W.3d 525 (Tex. 2011), *Texas West Oaks Hospital, L.P. v. Williams,* 371 S.W.3d 171 (Tex. 2012), *Loaisiga v. Cerda,* 379 S.W.3d 248 (Tex. 2012), *Yamada v. Friend,* 335 S.W.3d 192 (Tex. 2010), and *Garland Community Hosp. v. Rose*, 156 S.W.3d 541 (Tex. 2004).

*Ollie* establishes that a slip-and-fall can be an HCLC. *Texas West Oaks Hospital* establishes that that a safety-based HCLC – like this matter – does not have to be directly related to the provision of health care. *Loaisiga* and *Yamada* establish that an HCLC exists if the underlying facts could support a claim that the defendant health care provider departed from safety standards related to health care, even if that specific allegation is not made. *Rose* establishes that accepted standards of health care exist if a hospital's conduct is governed by federal and state law, as well as regulatory guidelines.

The CODE OF FEDERAL REGULATIONS and the TEXAS ADMINISTRATIVE CODE place cleanliness and maintenance requirements on hospitals like ETMCG pertinent to the claim Appellee asserts against ETMCG. In addition, federal

guidelines and guidelines from The Joint Commission (an entity that accredits and certifies hospitals like ETMCG) also place cleanliness and maintenance requirements on hospitals like ETMCG that are pertinent to Appellee's claim. Because these accepted standards that relate to health care could provide the basis of a claim against ETMCG under the facts alleged, Appellee's claim against ETMCG is an HCLC based on existing *stare decisis* from the Texas Supreme Court.

As such, even if the Court determines that *Ross* is controlling or applicable, Appellee's claim against ETMCG is an HCLC. It is for these additional reasons that the decision of the trial court should be reversed and that Appellee's claims against ETMCG should be dismissed with prejudice.

## I. LIMITED SCOPE AND APPLICATION OF *ROSS*:

A careful consideration and reading of *Ross* reveals two circumstances that significantly distinguish it from this case and render *Ross* inapplicable here. In *Ross*, the Texas Supreme Court stated it was required to address the question of whether Ross's claims against St. Luke's were HCLCs because of two factors absent from that matter that are present here. First, St. Luke's did not claim "that the area where Ross fell was a patient care area or an area where patients possibly would be in the course of the hospital's providing services to them." *Ross,* 462 S.W.3d at 503. Second, St. Luke's did not argue that the area of the hospital where Ross fell "had to meet particular cleanliness or maintenance standards related to the provision of health care or patient safety." *Id.*

Because there was no claim the incident occurred in an area where patients might be and because there was no reference to any particular maintenance standards specifically applicable to St. Luke's and related to patient safety, the Texas Supreme Court in *Ross* was forced to address "the question of whether Ross's claims are ***nevertheless*** HCLCs, as the hospital would have us hold." *Id.* at 503-504. (emphasis added). The situation in *Ross* is not the situation here.

First, Appellee not only admits that she fell in the ETMCG emergency room, she admits that she was in the ETMCG emergency room at that time because she

was "seeking treatment" (CR 23). Second, as shown below, ETMCG is required "to meet particular cleanliness or maintenance standards related to the provision of health care or patient safety" set forth in federal law, Texas law, federal agency regulations, and requirements of The Joint Commission, an accrediting and certification agency. For these reasons, Appellee's claim is an HCLC. The Tyler Court of Appeals has no need to go further to evaluate under *Ross* why, "nevertheless," Appellee's claim is an HCLC.

## II. Appellee's Claim Is An HCLC Under *Ross*:

Even if this matter is evaluated under the guidance provided in *Ross,* Appellee's claim against ETMCG is an HCLC. In *Ross*, the Texas Supreme Court provided seven non-exclusive factors to be used by courts in evaluation of whether a claim was an HCLC. *Id.* at 505.

In *Ross*, the Texas Supreme Court also reduced evaluation of whether a safety standards-based claim is an HCLC down to whether or not there is "a substantive nexus between the safety standards allegedly violated and the provision of health care." *Id.* at 504. The Texas Supreme Court went on to state "the pivotal issue in a safety standards-based claim is whether the standards on which the claim is based implicate the defendant's duties as a health care provider, including its duties to provide for patient safety." *Id.* at 505.

### A. Seven Non-Exclusive Factors:

Five of the seven non-exclusive considerations provided in *Ross* that can be used to determine whether or not a safety standards claim is an HCLC exist here. These five factors are whether the alleged negligence (1) occurred in connection with tasks related to protecting patients from harm, (2) occurred in a location that patients might be, (3) occurred in connection with seeking or receiving health care, (4) is based on safety standards arising from professional duties owed by a health care provider, and (5) occurred in connection with a failure "to take action necessary to comply with safety-related requirements set for health care providers by governmental or accrediting agencies." *Id.* at 505.

Factors (2) and (3) are present here because Appellee admits her fall occurred in the ETMCG emergency room and that she was in the emergency room "seeking treatment" at the time (CR 23). Factors (1), (4), and (5) are present here because – as shown below – the maintenance of ETMCG's premises is subject to requirements set by federal law, Texas law, federal regulations, and accrediting agency regulations that relate to the provision of health care and patient safety.

#### 1. Federal Law Requirements:

Under federal law, the Centers for Medicare & Medicaid Services ("CMS") have promulgated standards that must be met for participating hospitals. *See,*

42 C.F.R., §§482.1(a)(1), 482.11(a)(Appendix 4).  Subpart C of this statute provides specific hospital functions that are conditions for participation.

Pertinent to this case are Sections 482.21, 482.41, and 482.42 of Subpart C.  Section 482.21 requires not only that hospitals have "an ongoing program for quality improvement and patient safety," but also that "clear expectations for safety are established by hospital executives."  42 C.F.R., §482.21(e)(1), (3) (Appendix 5, page 2).

Section 482.41 of Title 42 of the CODE OF FEDERAL REGULATIONS establishes requirements related to the "physical environment" of a hospital.  The first sentence of this regulation requires that hospitals be "maintained to ensure the safety of the patient…"  Within this regulation, it is specifically required that "the physical plant and overall hospital environment must be developed and maintained in such a manner that the safety and well-being of patients are assured."  42 C.F.R., §482.41(a)(Appendix 6, page 1).  Hospitals must also "be maintained to ensure an acceptable level of safety and quality."  42 C.F.R., §482.41(c)(2)(Appendix 6, page 2).

Section 482.42 of the CODE OF FEDERAL REGULATIONS requires an infection control program also be in place and followed.  42 C.F.R., §482.42 (Appendix 6, page 2).  One cannot dispute that a hospital's infection control program relates to both the provision of health care and patient safety.  The significance of an

infection control program and its relevance to maintenance of the floors at ETMCG will be shown below.

## 2. Texas Law Requirements:

Texas law imposes requirements on hospitals in order for them to be licensed to operate. 25 TEX. ADMIN. CODE, §133.1(a) (Appendix 7); TEXAS HEALTH & SAFETY CODE, §241.002 (Appendix 10, page 1). Under this set of laws, Texas hospitals are required to "provide a sanitary environment to avoid sources and transmission of infections and communicable diseases." 25 TEX. ADMIN. CODE, §133.41(g)(Appendix 8, page 21) *See also,* TEXAS HEALTH & SAFETY CODE, §241.026(a)(3)(Appendix 10, page 9). Hospitals are also required to appoint a safety committee and safety officer and to take steps to promote general safety in the facility. 25 TEX. ADMIN. CODE, §133.142 (Appendix 9).

Texas law also requires that hospitals comply with "federal laws affecting the health, safety, and rights of hospital patients." TEXAS HEALTH & SAFETY CODE, §241.026(a)(5)(Appendix 10, page 9). As such, Texas law requires that hospitals like ETMCG follow the CODE OF FEDERAL REGULATION provisions discussed above.

### 3. CMS Surveys and Applicable CDC and OSHA Regulations and Guidelines:

CMS performs unannounced surveys of participating hospitals to determine if they are in compliance with federal law (Appendix 11, pages 3-4).[1] In evaluation of whether a facility is properly maintained, as required under C.F.R., §482.41, surveyors must "verify that the condition of the hospital is maintained in a manner to assure the safety and well being of patients (e.g., condition [of] ceilings, walls, ***and floors,*** presence of patient hazards, etc.)" (Appendix 11, page 7) (emphasis added).

In evaluation of the infection control program required by 42 C.F.R., §482.42, hospital surveyors must determine if the hospital "[m]aintains a sanitary environment" and if the hospital has and follows an infection control program (Appendix 11, pages 10-11, 14). Facility housekeeping and maintenance must be included in and monitored as part of a proper infection control program (Appendix 11, page 17). CMS provides surveyors a worksheet to track a hospital's infection control compliance (Appendix 12). The CMS infection control worksheet requires surveyors to specifically evaluate and assess a hospital's housekeeping services like cleaning floors in patient care areas (Appendix 12, page 16). Under

---

[1] *See,* 2015 CMS State Operations Manual, Appendix A – Survey Protocol, Regulations and Interpretive Guidelines for Hospitals (Appendix 11)(excerpts only are provided of this 510-page document in Appendix 11)(a complete copy of this document is available at - https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/som107ap_a_hospitals.pdf).

Rule 201(b)(2) of the TEXAS RULES OF EVIDENCE, ETMCG requests the Court take judicial notice of these regulatory compliance materials.

When evaluating a facility's infection control program, surveyors are instructed that such a program should be conducted in accordance with nationally recognized practices and guidelines, such as practices and guidelines promulgated by the Centers for Disease Control and Prevention ("CDC") and the U.S. Occupational Health and Safety Administration ("OHSA") (Appendix 11, pages 13, 17). Surveyors are also informed that hospital emergency departments provide special challenges in infection control (Appendix 11, page 18). ETMCG requests that under Rule 201(b)(2), the Court take judicial notice of the fact that the Centers for Disease Control and the Centers for Medicare & Medicaid Services are agencies within the United States Department of Health & Human Services.[2] ETMCG also requests that judicial notice be taken of the fact that OSHA is an agency of the United States Department of Labor.[3]

The CDC has promulgated two sets of guidelines that apply to infection control in hospitals like ETMCG. These are (1) the Guideline for Disinfection and Sterilization in Healthcare Facilities 2008 (Appendix 13) and (2) the Guidelines for Environmental Infection Control in Health-Care Facilities, published in 2003 (Appendix 14).

---

[2] *See,* HHS Organizational Chart (available at – http://www.hhs.gov/about/agencies/orgchart/index.html).
[3] See, Department of Labor agencies (available at – http://www.dol.gov/dol/organization.htm)

The CDC Guidelines recognize that hospital floors are a source of microorganism and blood-borne pathogen contamination (Appendix 13, page 23, 29). Significantly, the Guidelines also recognize that removal of these pathogens "is a component in controlling health-care-associated infections" (Appendix 13, page 29). Both Guidelines address cleaning hospital floors in order to prevent them from serving as a source of health-care associated infections (Appendix 13, pages 11, 12, 23, 30; Appendix 14, pages 74-75). The CDC also cautions that improper mopping procedure in a hospital "actually can spread heavy microbial contamination throughout the health-care facility" (Appendix 13, page 12).

Based on these underlying facts and concerns, the CDC Guidelines provide floor care recommendations "to reduce rates of health-care-associated infections…" (*See,* Appendix 13, page 83). These recommendations address (1) when hospital floors should be cleaned, (2) the specific types of solutions to be used, (3) how frequently the floor mopping solution should be changed, and (4) the decontamination of mops (Appendix 13, pages 84-85; Appendix 14, pages 133-135).

A summary of OSHA guidelines applicable to health care facilities like ETMCG is available on line through its "Hospital eTool" (Appendix 15). Specific items addressed by OSHA through its Hospital eTool include "Housekeeping" (Appendix 16) and "Slips, Trips and Falls" (Appendix 17). Similar to the CDC

guidelines, the OSHA guidelines require hospitals maintain a sanitary environment and they provide recommendations about when floors should be cleaned and how they should be cleaned (Appendix 16, 17). Based on these materials, one cannot dispute that floor care at a hospital like ETMCG is related to the provision of health care and patient safety; specifically it is related to infection control.

ETMCG requests that under Rule 201(b)(2) of the TEXAS RULES OF EVIDENCE, the Court take judicial notice of these applicable CDC and OSHA guidelines.

### 4. Joint Commission Regulations and Guidelines:

The Joint Commission also places safety-based requirements on hospitals related to health care and patient safety. ETMCG requests that under Rule 201(b)(2) of the TEXAS RULES OF EVIDENCE, the Court take judicial notice of the fact that The Joint Commission is a nationwide accrediting and certification agency.[4]

Under Joint Commission standards, hospitals are evaluated in regard to management of "[t]he environmental safety of patients and everyone else who enters the hospital's facilities," as well as "[t]he security of everyone who enters the hospital's facilities." Joint Commission Standard, Chapter EC.01.01.01, Elements of Performance 3 and 4)(Appendix 18, page 1). The Joint Commission

---

[4] *See, http://www.jointcommission.org/about_us/about_the_joint_commission_main.aspx.*

also evaluates whether a hospital "identifies safety and security risks associated with the environment of care that could affect patients, staff and other people coming to the hospital's facilities," whether a hospital "takes action to minimize or eliminate identified safety and security risks in the physical environment," and whether a hospital "maintains all grounds…" Joint Commission Standard, Chapter EC.02.01.01, Elements of Performance 1, 3 and 5 (Appendix 18, page 3).

## 5. Conclusion:

After consideration and review of the laws, regulations, agency guidelines and accreditation guidelines applicable to ETMCG in maintaining its facilities in general and its floors specifically, one cannot question that ETMCG was required to meet particular cleanliness and maintenance standards related to the provision of health care and patient safety in its emergency room where Appellee fell. When the existence of these applicable laws, regulations and guidelines is combined with the fact that Appellee fell in an area where patients could be receiving treatment at ETMCG and with the fact that Appellee was in the ETMCG emergency room that day seeking treatment; it is clear Appellee's claim against ETMCG is an HCLC under the seven non-exclusive factors provided by the Texas Supreme Court in *Ross*.

**III. Substantive Nexus to Health Care Exists:**

When the Texas Supreme Court in *Ross* cited to its earlier opinion in *Harris Methodist Fort Worth v. Ollie,* 342 S.W.3d 525 (Tex. 2011) – a slip-and-fall case – without abrogating that opinion, the Court recognized and affirmed that a slip-and-fall at a hospital like ETMCG can still be an HCLC. *Ross*, 462 S.W.3d at 502. *See also, Ollie*, 342 S.W.3d at 527. In *Ross*, the Texas Supreme Court also expressly recognized its holding in *Texas West Oaks Hospital, L.P. v. Williams,* 371 S.W.3d 171 (Tex. 2012) that a safety-based HCLC did not need "to be directly related to the provision of health care" and that this part of its holding in *Texas West Oaks Hospital* is still good law "entitled to *stare decisis* treatment." *Ross*, 462 S.W.3d at 502. *See also, Texas West Oaks Hosp.*, 371 S.W.3d at 186.

In *Ross*, the Texas Supreme Court also recognized and reiterated its holding in *Loaisiga v.* Cerda, 379 S.W.3d 248 (Tex. 2012), when it stated that "if the facts underlying a claim *could* support claims against a physician or health care provider for departures from accepted standards of medical care, health care, or safety or professional or administrative services directly related to health care, the claims are HCLCs regardless of whether plaintiff alleged the defendants were liable for breach of the standards." *Ross,* 462 S.W.3d at 503 (emphasis in original)(citing *Loaisiga v. Cerda,* 379 S.W.3d 248, 255 (Tex. 2012)).

Finally, in *Ross* the court did not abrogate or modify its earlier opinion in *Yamada v. Friend,* 335 S.W.3d 192 (Tex. 2010). This is significant in the evaluating and deciding this appeal because the Texas Supreme Court in *Yamada* held that "claim-splitting" was not allowed by claimants in an effort to circumvent application of Chapter 74 of the TEXAS CIVIL PRACTICE & REMEDIES CODE. In particular, in *Yamada* the Texas Supreme Court held that in circumstances where there is one set of operative facts, a claimant cannot elect to pursue a claim not covered by Chapter 74 if that claim also falls within the ambit of Chapter 74. Specifically, the Texas Supreme Court stated in *Yamada*:

> When the underlying facts are encompassed by provisions of the TMLA [Chapter 74] in regard to a defendant, then all claims against that defendant based on those facts must be brought as health care liability claims. Application of the TMLA cannot be avoided by artfully pleading around it or splitting claims into both health care liability claims and other types of claims such as ordinary negligence claims.

*Id.* at 193-94.

These holdings and rulings by the Texas Supreme Court are significant in the evaluation and resolution of this appeal because ETMCG has shown above that federal and state law, as well as federal and Joint Commission regulations, apply to the maintenance of its floors and that these requirements relate to the provision of health care and patient safety because they involve infection control. As such, based on the underlying facts of this case and these applicable laws and regulations, Appellee could have elected to pursue an HCLC against ETMCG

**17**

based on its alleged failure to comply with these laws and regulations. For that reason, based on the above Texas Supreme Court authority, Appellee's claim against ETMCG is an HCLC.

Support for ETMCG's position on this point also comes from two additional facts established by Texas case law. First, under Texas law the statutes and regulations that apply to ETMCG in maintenance of its floors and premises provide evidence of the standard of care applicable to ETMCG. *See, Denton Regional Medical Center v. LaCroix,* 947 S.W.2d 941, 951 n.7 (Tex. App.—Fort Worth 1997, writ dism'd by agr.)(Joint Commission guidelines can be viewed as providing evidence of a hospital's standard of care). *See also*, *Kraus v. Alamo Nat'l Bank*, 586 S.W.2d 202, 208 (Tex. Civ. App.—Waco 1979), *aff'd on o.g.*, 616 S.W.2d 908 (Tex. 1981)(similar holding regarding OSHA regulations).

Second, and even more significant, is the fact that CMS, CDC and Joint Commission guidelines and regulations have been cited and utilized by claimants to establish the standard of applicable to hospitals and breaches of that standard of care in Chapter 74 expert reports. *See, Sanchez v.* Martin, 378 S.W.3d 581, 593 (Tex. App.—Dallas 2012, no pet.)(use of CDC guidelines); *Methodist Hospital of Dallas v. King*, 365 S.W.3d 847, 851 (Tex. App.—Dallas 2012, no pet.)(use of CMS and Joint Commission requirements); *Hightower v. Baylor University Medical Center*, 348 S.W.3d 512, 517, 518 (Tex. App.—Dallas 2011, pet.

denied)(use of CDC guidelines); *Baylor All Saints v. Martin*, 340 S.W.3d 529, 533-34 (Tex. App.—Fort Worth 2011, no pet.); *Christus Health Southeast Texas v. Lanham*, 2007 Tex. App. LEXIS 1103 \*4 (Tex. App.—Beaumont)(Jan. 11, 2007)(no pet.)(mem. op.)(use of Joint Commission standards).

Finally, in 2004 the Texas Supreme Court held that accepted standards of health care exist and are at issue when a hospital's conduct is governed by a combination of existing federal law, state law and Joint Commission regulations. *See*, *Garland Community Hosp. v. Rose*, 156 S.W.3d 541, 546 (Tex. 2004)(existence of applicable federal and state law, as well as Joint Commission guidelines make a negligent credentialing claim against a hospital an HCLC because "accepted standards of…health care" are involved). As shown above, ETMCG's actions at issue here are governed by applicable federal and state law and Joint Commission guidelines. For this reason, ETMCG's conduct here involves accepted standards of health care.

Not only does this authority bolster ETMCG's position that Appellee alleges an HCLC against it under *Ross*, this authority establishes without question that under the facts of this case Appellee could have asserted an HCLC against ETMCG based on violation of these accepted standards of health care and safety directly related to its duties as a hospital. In light of the Texas Supreme Court's holdings and rulings in *Ross*, *Loaisiga*, *Yamada*, and *Rose,* there can be no doubt

that Appellee's claim against ETMCG is an HCLC. *See, Ross*, 462 S.W.3d at 502-203; *Loaisga*, 379 S.W.3d at 255 (claim is an HCLC if the underlying facts could support a claim of departure from accepted standards of safety); *Yamada*, 335 S.W.3d at 193 (one set of facts cannot give rise to both an HCLC and an ordinary negligence claim); *Rose*, 156 S.W.3d at 546 (network of applicable federal and state law and Joint Commission regulations create applicable existing standards of health care). For these reasons, Appellee's claim against ETMCG is an HCLC.

## CONCLUSION

In its recent decision in *Ross*, the Texas Supreme Court provided trial courts and courts of appeals guidance to assist in the evaluation of whether a safety-based claim against a hospital like ETMCG is an HCLC under Chapter 74. In *Ross*, the Texas Supreme Court provided seven non-exclusive factors for courts to use in determining whether such a claim is an HCLC. Five of the Texas Supreme Court's seven non-exclusive factors are present here when one considers the underlying circumstances and facts. As such, Appellee's claim against ETMCG is an HCLC.

The fact of the matter is, however, that *Ross* is really not applicable to this matter because the very reasons the Texas Supreme Court had to evaluate *Ross* and come up with the above-referenced seven non-exclusive factors to determine if the claims there were HCLCs are not present here. Specifically, in *Ross* there was no claim that the incident occurred in an area where patients might be receiving treatment and there was no claim that certain cleanliness and maintenance standards were applicable to location of the incident that arose out of the defendant hospital's duties as a health care provider. That is not the situation here.

First, Appellee admits her fall occurred in the ETMCG emergency room. One cannot question that the emergency room at ETMCG is a location where patients might be receiving treatment at ETMCG. Second, ETMCG has shown that there are a number of cleanliness and maintenance standards applicable to its

premises that relate to the provision of health care and patient safety. These standards involve infection control and come from federal law, Texas law, federal regulatory agency regulations and guidelines, and accrediting entity guidelines. Finally, unlike in *Ross*, Appellee was in the ETMCG emergency room at the time of this incident "seeking" medical care. She was not at the hospital as a visitor.

Most important, however, is the fact that the Texas Supreme Court in *Ross* did not abrogate or modify its prior opinions in *Texas West Oaks Hospital*, *Loaisiga*, *Ollie*, *Yamada*, and *Rose*. In fact, the Texas Supreme Court directly stated that its holding in *Texas West Oaks* that safety-related HCLCs did not need to be directly related to the provision health care was still good law and entitled to *stare decisis*, and reiterated its holding in *Loaisiga* that if the facts underlying a claim **could** support a claim that a physician or health care providers departed from accepted standards of safety, the claim was an HCLC regardless of whether or not plaintiff specifically alleged liability based on a breach of those standards. *Ross*, 462 S.W.3d at 502, 503-504. These actions are important not only because Appellee's claim can be an HCLC even though it is not directly related to the provision of health care, but more significantly because the touchstone issue in determining whether or not Appellee's claim is an HCLC remains whether, based on the underlying facts, a claim could be made that ETMCG departed from accepted standards of safety.

ETMCG has established through existing case law the fact that Appellee could have elected to proceed with an HCLC against ETMCG. Appellee could have asserted an HCLC against ETMCG based on its failure to comply with applicable federal and state law, as well as federal agency regulations and guidelines and accrediting organization guidelines. Existing Texas case law shows us that these laws, regulations and standards have previously been used to establish the standard of care applicable to a hospital like ETMCG in similar situations and that existence of these laws and guidelines create accepted standards of health care applicable to hospitals like ETMCG. Since Appellee could have maintained an HCLC against ETMCG based on this applicable federal law, state law, and regulatory guidelines, one cannot dispute and must conclude based on existing Texas Supreme Court authority that Appellee's claim against ETMCG is an HCLC under Chapter 74 of the TEXAS CIVIL PRACTICE & REMEDIES CODE.

For these reasons the trial court erred in denying ETMCG's Chapter 74 motion to dismiss. Accordingly, the Twelfth Court of Appeals should reverse the trial court's denial of ETMCG's motion to dismiss and should dismiss Appellee's claims against ETMCG with prejudice.

## PRAYER

Because the trial court erred in denying Appellant East Texas Medical Center Gilmer's Motion to Dismiss, Appellant requests that this Twelfth District Court of Appeals:

1. Reverse the trial court's denial of East Texas Medical Center Gilmer's Motion to Dismiss (CR 36, Appendix "A");

2. Dismiss with prejudice Appellee's claim against East Texas Medical Center Gilmer, and:

3. Remand this matter to the trial court for further proceedings consistent with the above actions.

Respectfully Submitted,

THIEBAUD REMINGTON THORNTON BAILEY, LLP

By:/s/Russell G. Thornton
**RUSSELL G. THORNTON**
State Bar Card No. 19982850

4849 Greenville Avenue
Suite 1150
Dallas, Texas 75206
(214) 954-2200
(214) 754-0999 (Fax)
rthornton@trtblaw.com

24

## CERTIFICATE OF COMPLIANCE

Pursuant to TEXAS RULES OF APPELLATE PROCEDURE 9.4(i)(3) Appellant certifies that its Supplemental Brief on Application of *Ross v. St. Luke's Episcopal Hospital*, filed on September 4, 2015, in the Twelfth Court of Appeals, contains **4,793** words.

/s/Russell G. Thornton
**RUSSELL G. THORNTON**

# CERTIFICATE OF SERVICE

The undersigned certifies that on the **4th** day of **September, 2015**, a true and

correct copy of the foregoing document was delivered to counsel listed below:

> **VIA E-SERVE &/OR CMRRR:**
> Mr. Michael Bernoudy
> THE BERNOUDY LAW FIRM
> 2400 W. Grand Avenue
> Marshall, Texas  75670
> mlbjr@bernoudylawfirm.com

/s/Russell G. Thornton
**RUSSELL G. THORNTON**

# APPENDIX

# APPENDIX – "1"



1 of 1098 DOCUMENTS

## LEZLEA ROSS, PETITIONER, v. ST. LUKE'S EPISCOPAL HOSPITAL, RESPONDENT

### NO. 13-0439

### SUPREME COURT OF TEXAS

*462 S.W.3d 496; 2015 Tex. LEXIS 361; 58 Tex. Sup. J. 766; 58 Tex. Sup. J. 802*

**November 5, 2014, Argued**
**May 1, 2015, Opinion Delivered**

**PRIOR HISTORY:** [**1] ON PETITION FOR REVIEW FROM THE COURT OF APPEALS FOR THE FOURTEENTH DISTRICT OF TEXAS.
*Ross v. St. Luke's Episcopal Hosp., 459 S.W.3d 617, 2013 Tex. App. LEXIS 2796 (Tex. App. Houston 14th Dist., Mar. 19, 2013)*

**COUNSEL:** For The Texas Trial Lawyers Association (TTLA), Amicus Curiae: Michael G. Guajardo, Guajardo & Marks, LLP, Dallas TX; Peter M. Kelly, Kelly, Durham & Pittard, L.L.P., Houston TX.

For Ross, Lezlea, Petitioner: Harold Kenneth 'Ken' Tummel, Tummel & Casso, Edinburg TX; Sean Michael Reagan, Leyh Payne & Mallia PLLC, Houston TX.

For St. Luke's Episcopal Hospital, Respondent: Charles Creighton Carr II, Manning, Gosda & Arredondo, L.L.P., Houston TX; Elizabeth Dale Burrus, Kroger | Burrus, Houston TX; Gregory Alan Schlak, Manning, Gosda & Arredondo, L.L.P., Houston TX; Lauren Nelson, Kroger| Burrus, Houston TX; Marsha A. Bradley, Kroger | Burrus, Houston TX.

**JUDGES:** JUSTICE JOHNSON delivered the opinion of the Court. JUSTICE LEHRMANN filed a concurring opinion, in which JUSTICE DEVINE joined. JUSTICE BROWN did not participate in the decision.

**OPINION BY:** Phil Johnson

**OPINION**

[*498] In this case a visitor to St. Luke's Episcopal Hospital sued the hospital on a premises liability the-ory after she slipped and fell near the lobby exit doors. The issue is whether her suit is a health care liability claim under the Texas Medical Liability Act. *See* TEX. [**2] CIV. PRAC. & REM. CODE ch. 74. The trial court and court of appeals concluded that it is. We hold that it is not, because the record does not demonstrate a relationship between the safety standards she alleged the hospital breached--standards for maintaining the floor inside the lobby exit doors--and the provision of health care, other than the location of the occurrence and the hospital's status as a health care provider.

We reverse and remand to the trial court for further proceedings.

[*499] **I. Background**

Lezlea Ross accompanied a friend who was visiting a patient in St. Luke's Episcopal Hospital. Ross was leaving the hospital through the lobby when, as she approached the exit doors, she slipped and fell in an area where the floor was being cleaned and buffed. She sued St. Luke's and Aramark Management Services, a company that contracted with the hospital to perform maintenance services, on a premises liability theory. Aramark is not a party to this appeal.

After Ross filed suit we decided *Texas West Oaks Hospital, L.P. v. Williams, 371 S.W.3d 171 (Tex. 2012).* There we held, in part, that when a safety standards-based claim is made against a health care provider, the Texas Medical Liability Act (TMLA), TEX. CIV. PRAC. & REM. CODE ch. 74, does not require the safety [**3] standards to be directly related to the provision of health care in order for the claim to be a health care liability claim (HCLC). *Williams, 371 S.W.3d at 186.* Relying on *Williams*, the hospital asserted that Ross's claim

was an HCLC and moved for dismissal of her suit because she failed to serve an expert report. *See TEX. CIV. PRAC. & REM. CODE § 74.351(a), (b)* (requiring dismissal of an HCLC if a claimant fails to timely serve an expert report); *Williams, 371 S.W.3d at 186.*

The trial court granted the motion to dismiss. The court of appeals affirmed. *Ross v. St. Luke's Episcopal Hosp., 459 S.W.3d 617, 2013 Tex. App. LEXIS 2796 (Tex. App.--Houston [14th Dist.] 2013).* The appeals court concluded that under *Williams* it is not necessary for any connection to exist between health care and the safety standard on which a claim is based in order for the claim to come within the TMLA. *Id. at    , 2013 Tex. App. LEXIS 2796.*

Ross asserts that the lower courts erred because claims based on departures from "accepted standards of safety" do not come within the provisions of the TMLA unless there is at least some connection between the standards underlying the allegedly negligent actions and the provision of health care, even if they are not *directly* related. She then argues that her claims are not HCLCs because the hospital's alleged negligence is completely unrelated to the provision of health care.

The hospital [**4] responds with three arguments. It first urges that we lack jurisdiction. *See TEX. GOV'T CODE § 22.001(a)(2), (3), (6).* It next asserts that even if we have jurisdiction, Ross waived the issue of whether her claim is an HCLC because she failed to properly brief and urge it in the court of appeals. Third, the hospital addresses the merits by asserting that the court of appeals correctly held that a safety standards-based claim need not be related to health care to fall within the TMLA's provisions, but in any event Ross's claims are related to accepted standards of patient safety because she fell inside the hospital.

We first address our jurisdiction. *See Rusk State Hosp. v. Black, 392 S.W.3d 88, 95 (Tex. 2012)* (noting that if a court does not have jurisdiction, its opinion addressing any issues other than its jurisdiction is advisory).

## II. Jurisdiction

*Texas Civil Practice and Remedies Code § 51.014(a)(10)* permits an appeal from an interlocutory order granting relief sought by a motion to dismiss an HCLC for failure to file an expert report. Generally, the court of appeals' judgment is final on interlocutory appeals. *See TEX. GOV'T CODE § 22.225(b)(3).* However, we have jurisdiction if the justices of the court of appeals disagree on a question of law material to the decision, or if a court of appeals holds differently from a prior [**5] decision [*500] of another court of appeals or this Court. *Id. § 22.225(c).*

Ross asserts that this Court has jurisdiction because the court of appeals' opinion in this case conflicts with *Good Shepherd Medical Center-Linden, Inc. v. Twilley, 422 S.W.3d 782 (Tex. App.--Texarkana 2013, pet. denied).* In that case, Bobby Twilley, the director of plant operations for a medical center, asserted premises liability claims against his employer after he fell from a ladder and also tripped over a mound of hardened cement. *Id. at 783.* The medical center moved for dismissal under the TMLA because Twilley failed to file an expert report. *Id. at 783-84.* The trial court denied the motion and the medical center appealed, arguing that even though Twilley's claims were unrelated to the provision of health care, under *Williams* they still fell within the ambit of the TMLA. The court of appeals interpreted *Williams* as holding that a safety standards-based claim need not be directly related to the provision of health care to be an HCLC. *Id. at 789.* The court stated, however, that it did not understand *Williams* to hold that a safety standards claim falls under the TMLA when the claim is completely untethered from health care. *Id.* The appeals court concluded that at least an indirect relationship between the claim and health care is required and, because Twilley's [**6] claims did not have such a relationship, an expert report was not required. *Id. at 785.*

In this case the court of appeals held that under *Williams* "a connection between the act or omission and health care is unnecessary for purposes of determining whether Ross brings an HCLC." *Ross,    S.W.3d at    , 2013 Tex. App. LEXIS 2796.* The hospital asserts that the decision of the court of appeals and *Twilley* do not conflict. But, for purposes of our jurisdiction, one court holds differently from another when there is inconsistency in their decisions that should be clarified to remove unnecessary uncertainty in the law. *TEX. GOV'T CODE § 22.001(e).* As other courts of appeals have noted, *Ross* and *Twilley* are inconsistent in their interpretations of *Williams* and the TMLA, leaving uncertainty in the law regarding whether a safety standards-based claim must be related to health care. *See, e.g., Weatherford Tex. Hosp. Co. v. Smart, 423 S.W.3d 462, 467-68 (Tex. App.--Fort Worth 2014, pet. filed); DHS Mgmt. Servs., Inc. v. Castro, 435 S.W.3d 919, 922 & n.3 (Tex. App.--Dallas 2014, no pet.).* That being so, we have jurisdiction and move to the hospital's waiver claim.

## III. Waiver

The hospital argues that Ross waived any challenge to her claim being classified as an HCLC by failing to argue the point or cite relevant authority in the court of appeals. We disagree.

A brief in the court of appeals "must contain a clear and concise argument for the contentions made, [**7] with appropriate citations to authorities and to the rec-

ord." *TEX. R. APP. P. 38.1(i)*. Failure to provide citations or argument and analysis as to an appellate issue may waive it. *See ERI Consulting Eng'rs, Inc. v. Swinnea, 318 S.W.3d 867, 880 (Tex. 2010)*.

In her court of appeals brief, Ross discussed the purpose of the TMLA and asserted that classifying her claim as an HCLC would conflict with the Government Code. *See TEX. GOV'T CODE § 311.021(3)* (providing that when a statute is enacted, there is a presumption that "a just and reasonable result is intended"). The court of appeals implicitly determined that Ross's citations and argument were enough to avoid waiver because it addressed the issue. *See Republic Underwriters Ins. Co. v. Mex-Tex, Inc., 150 S.W.3d 423, 427* [*501] *(Tex. 2004)* (concluding that an argument in the court of appeals was not waived and noting that "we have instructed the courts of appeals to construe the Rules of Appellate Procedure reasonably, yet liberally, so that the right to appeal is not lost by imposing requirements not absolutely necessary to effect the purpose of a rule" (quoting *Verburgt v. Dorner, 959 S.W.2d 615, 616-17 (Tex. 1997)*)). We agree with the court of appeals that Ross did not waive the issue.

## IV. Health Care Liability Claims

The merits of the appeal require us to review the lower courts' construction of the TMLA. Under such circumstances our review is *de novo, Williams, 371 S.W.3d at 177*, and our goal [**8] is to give effect to legislative intent. *Certified EMS, Inc. v. Potts, 392 S.W.3d 625, 631 (Tex. 2013)*. In determining that intent we look first and foremost to the language of the statute. *City of Rockwall v. Hughes, 246 S.W.3d 621, 625 (Tex. 2008)*. We construe a statute's words according to their plain and common meaning unless they are statutorily defined otherwise, a different meaning is apparent from the context, or unless such a construction leads to absurd or nonsensical results. *See Tex. Lottery Comm'n v. First State Bank of DeQueen, 325 S.W.3d 628, 635 (Tex. 2010)*. Determining legislative intent requires that we consider the statute as a whole, reading all its language in context, and not reading individual provisions in isolation. *See Union Carbide Corp. v. Synatzske, 438 S.W.3d 39, 51 (Tex. 2014)*.

The TMLA defines a health care liability claim as:

> a cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care, which proximately results in injury to or death of a claimant, whether

the claimant's claim or cause of action sounds in tort or contract.

*TEX. CIV. PRAC. & REM. CODE § 74.001(a)(13)*. This Court construed "safety" under the prior statute according to its common meaning as "the condition of being 'untouched by danger; not exposed to danger; secure [**9] from danger, harm or loss.'" *Diversicare Gen. Partner, Inc. v. Rubio, 185 S.W.3d 842, 855 (Tex. 2005)* (quoting BLACK'S LAW DICTIONARY 1336 (6th ed. 1990)). We also recognized that the Legislature's inclusion of the word "safety" in the statute expanded the statute's scope beyond what it would be if the statute only included the terms medical care and health care. *Id.* The Court explained its disagreement with the position of Chief Justice Jefferson who, in a concurring opinion, argued that some of the patient's claims arising from an assault by another patient were premises liability claims:

> Rubio is not complaining about an unlocked window that gave an intruder access to the facility or a rickety staircase that gave way under her weight. All of her claims arise from acts or omissions that are inseparable from the provision of health care. We do not distinguish Rubio's health care claims from premises liability claims "simply because the landowner is a health care provider" but because the gravamen of Rubio's complaint is the alleged failure of Diversicare to implement adequate policies to care for, supervise, and protect its residents who require special, medical care.

*Id. at 854.*

The Legislature added the phrase "or professional or administrative services directly [**10] related to health care" to the definition [*502] of health care liability claim in 2003. *Compare* Act of May 30, 1977, 65th Leg., R.S., ch. 817, § 1.03(a)(4), 1977 Tex. Gen. Laws 2039, 2041, *repealed by* Act of June 2, 2003, 78th Leg., ch. 204, § 10.09, 2003 Tex. Gen. Laws 847, 884 (absence of language), *with TEX. CIV. PRAC. & REM. CODE § 74.001(a)(13)* (language added). After that statutory amendment we addressed the "safety" part of the definition in *Omaha Healthcare Ctr., L.L.C. v. Johnson, 344 S.W.3d 392 (Tex. 2011)*, and *Harris Methodist Fort Worth v. Ollie, 342 S.W.3d 525 (Tex. 2011)*. Although the claims in both cases alleged general negligence, they were HCLCs because the underlying nature of the claims involved violations of safety standards directly related to the provision of health care, including protecting patients. *Johnson, 344 S.W.3d at 394-95* (nursing home

patient's death caused by a brown recluse spider); *Ollie, 342 S.W.3d at 527* (post-operative patient's slip and fall on a wet bathroom floor). But given that the claims were based on injuries to patients and *were* directly related to the provision of health care, we did not address the issue of whether safety standard-based claims *must* be directly related to health care in order for them to be HCLCs. *Johnson, 344 S.W.3d at 394 n.2; Ollie, 342 S.W.3d at 527 n.2.*

The next year we considered whether a psychiatric technician's claims for injuries in an altercation with a patient were HCLCs. *Williams, 371 S.W.3d at 181.* In reaching our decision [**11] we specifically and separately analyzed both whether the claims were based on the health care provider's allegedly departing from standards for health care, and whether they were also based on its allegedly departing from standards for safety. *Id. at 180-86.* Regarding the safety standards issue, we reviewed the definition of HCLC and determined that the phrase "directly related to health care" modified the terms immediately before it--professional or administrative services--but not the word safety. *Id. at 185.* We said that "Williams'[s] claims are indeed for departures from accepted standards of safety. We conclude that the safety component of HCLCs need not be directly related to the provision of health care and that Williams'[s] claims against West Oaks implicate this prong of HCLCs." *Id. at 186.* Because we also concluded that Williams's claims were HCLCs because they were for departures from health care standards, our decision that his claims were HCLCs rested on alternative holdings that are both entitled to *stare decisis* treatment: the claims were for departures from health care standards and they were for departures from safety standards. *Id.; see State Farm Mut. Auto. Ins. Co. v. Lopez, 156 S.W.3d 550, 554 (Tex. 2004)* (distinguishing alternative holdings from dictum).

The [**12] purpose of the TMLA's expert report requirement is not to have claims dismissed regardless of their merits, but rather it is to identify and deter frivolous claims while not unduly restricting a claimant's rights. *Scoresby v. Santillan, 346 S.W.3d 546, 554 (Tex. 2011).* And the Legislature did not intend for the expert report requirement to apply to every claim for conduct that occurs in a health care context. *See Loaisiga v. Cerda, 379 S.W.3d 248, 258 (Tex. 2012).* For example, in *Loaisiga* patients claimed that a doctor improperly touched them during the course of medical exams and thereby assaulted them. *379 S.W.3d at 253.* The trial court concluded that the claim was not an HCLC and the court of appeals affirmed. *Id. at 254.* We pointed out that the statutory definition of "health care" is broad ("any act or treatment performed or furnished, or that should have been performed or furnished, by any health care provider for, to, or on behalf of a patient [*503] during the patient's

medical care, treatment, or confinement" *TEX. CIV. PRAC. & REM. CODE § 74.001(a)(10)*), and that if the facts underlying a claim *could* support claims against a physician or health care provider for departures from accepted standards of medical care, health care, or safety or professional or administrative services directly related to health care, the claims [**13] were HCLCs regardless of whether the plaintiff alleged the defendants were liable for breach of the standards. *See Loaisiga, 379 S.W.3d at 255.* But that being so, we further explained:

> we fail to see how the Legislature could have intended the requirement of an expert report to apply under circumstances where the conduct of which a plaintiff complains is wholly and conclusively inconsistent with, and thus separable from, the rendition of "medical care, or health care, or safety or professional or administrative services directly related to health care" even though the conduct occurred in a health care context. *See TEX. CIV. PRAC. & REM. CODE § 74.001(a)(13); see also TEX. GOV'T CODE § 311.021* ("In enacting a statute, it is presumed that . . . a just and reasonable result is intended . . . .").

*Id. at 257.* Our reasoning led to the conclusion that a patient's claim against a medical provider for assault during a medical examination is not an HCLC if the only possible relationship between the alleged improper conduct and the rendition of medical services or health care was the setting in which the conduct took place. *Id.*

In this case, the hospital advances two positions in support of the lower courts' rulings and its assertion that Ross's claim is [**14] an HCLC. First, it addresses slip and fall claims generally, and says that any slip and fall event within a hospital is directly related to health care because it necessarily is related to the safety of patients. Second, it focuses on Ross's claim specifically and argues that her claim is related to health care because she alleges the hospital breached standards applicable to maintaining a safe environment for patients. We disagree with both positions.

As to the hospital's first contention, even though the claims in *Loaisiga* were by a patient and the nature of the claims differ from Ross's safety standards-based claim, the principle we explicated there applies here. A safety standards-based claim does not come within the TMLA's provisions just because the underlying occurrence took place in a health care facility, the claim is against a health care provider, or both. *See Loaisiga, 379 S.W.3d at 257.*

As to its second contention, Ross alleged that the hospital failed to exercise reasonable care in making the floor safe. The standards Ross says the hospital breached regarding maintenance of its floor may be the same as the hospital's standards for maintaining a safe environment in patient care areas--but those may [**15] also be the same standards many businesses generally have for maintaining their floors. And the hospital does not claim, nor does the record show, that the area where Ross fell was a patient care area or an area where patients possibly would be in the course of the hospital's providing health care services to them. Nor does the hospital reference support in the record for the position that the area had to meet particular cleanliness or maintenance standards related to the provision of health care or patient safety. *See Ollie, 342 S.W.3d at 527* ("[S]ervices a hospital provides its patients necessarily include those services required to meet patients' fundamental needs such as cleanliness . . . and safety."). Which leads to the question of whether [*504] Ross's claims are nevertheless HCLCs, as the hospital would have us hold.

The TMLA does not specifically state that a safety standards-based claim falls within its provisions only if the claim has some relationship to the provision of health care other than the location of the occurrence, the status of the defendant, or both. But the Legislature must have intended such a relationship to be necessary, given the legislative intent explicitly set out in the TMLA and the context [**16] in which "safety" is used in the statute. We said as much in *Loaisiga, 379 S.W.3d at 257*. Even though the statute's phrase "directly related to health care" does not modify its reference to safety standards, that reference occurs within a specific context, which defines an HCLC to be "a cause of action against a health care provider or physician for [a] treatment, [b] lack of treatment, [c] or other claimed departure from accepted standards of medical care, or health care, or safety." *TEX. CIV. PRAC. & REM. CODE § 74.001(a)(13)*. Where the more specific items, [a] and [b], are followed by a catchall "other," [c], the doctrine of *ejusdem generis* teaches that the latter must be limited to things like the former.[1] And here, the catchall "other" itself refers to standards of "medical care" or "health care" or "safety." Considering the purpose of the statute, the context of the language at issue, and the rule of *ejusdem generis*, we conclude that the safety standards referred to in the definition are those that have a substantive relationship with the providing of medical or health care. And if it were not so, the broad meaning of "safety" would afford defendant health care providers a special procedural advantage in the guise of requiring [**17] plaintiffs to file expert reports in their suits regardless of whether their cause of action implicated the provision of medical or health care. We do not believe the Legislature intended the statute to have such arbitrary results. *See TEX. GOV'T CODE § 311.021* ("In enacting a statute, it is presumed that . . . a just and reasonable result is intended . . . ."); *Synatzske, 438 S.W.3d at 54* (declining to attribute to the Legislature an intent to require a meaningless, arbitrary procedural hurdle for injured persons to bring suit).

> 1 *Hilco Elec. Co-op. v. Midlothian Butane Gas Co., 111 S.W.3d 75, 81 (Tex. 2003)* ("[T]he rule of *ejusdem generis* . . . provides that when words of a general nature are used in connection with the designation of particular objects or classes of persons or things, the meaning of the general words will be restricted to the particular designation."); *see also* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 199 (2012) ("Where general words follow an enumeration of two or more things, they apply only to persons or things of the same general kind or class specifically mentioned.").

Thus, we conclude that for a safety standards-based claim to be an HCLC there must be a substantive nexus between the safety standards allegedly violated and the provision of [**18] health care. And that nexus must be more than a "but for" relationship. That is, the fact that Ross, a visitor and not a patient, would not have been injured but for her falling inside the hospital is not a sufficient relationship between the standards Ross alleges the hospital violated and the hospital's health care activities for the claim to be an HCLC. As we recognized in *Loaisiga*, "[i]n some instances the only possible relationship between the conduct underlying a claim and the rendition of medical services or healthcare will be the healthcare setting (*i.e.*, the physical location of the conduct in a health care facility), the defendant's status as a doctor or health care provider, or both." *379 S.W.3d at 256*. But although the mere location of an injury in a health care facility or in a health care setting [*505] does not bring a claim based on that injury within the TMLA so that it is an HCLC, the fact that the incident could have occurred outside such a facility or setting does not preclude the claim from being an HCLC. The pivotal issue in a safety standards-based claim is whether the standards on which the claim is based implicate the defendant's duties as a health care provider, including its duties [**19] to provide for patient safety.

As this case demonstrates, the line between a safety standards-based claim that is not an HCLC and one that is an HCLC may not always be clear. But certain non-exclusive considerations lend themselves to analyzing whether such a claim is substantively related to the defendant's providing of medical or health care and is therefore an HCLC:

1. Did the alleged negligence of the defendant occur in the course of the defendant's performing tasks with the purpose of protecting patients from harm;

2. Did the injuries occur in a place where patients might be during the time they were receiving care, so that the obligation of the provider to protect persons who require special, medical care was implicated;

3. At the time of the injury was the claimant in the process of seeking or receiving health care;

4. At the time of the injury was the claimant providing or assisting in providing health care;

5. Is the alleged negligence based on safety standards arising from professional duties owed by the health care provider;

6. If an instrumentality was involved in the defendant's alleged negligence, was it a type used in providing health care; or

7. Did the alleged negligence occur [**20] in the course of the defendant's taking action or failing to take action necessary to comply with safety-related requirements set for health care providers by governmental or accrediting agencies?

Measuring Ross's claim by the foregoing considerations, it is clear that the answer to each is "no." The record does not show that the cleaning and buffing of the floor near the exit doors was for the purpose of protecting patients. Nor does the record reflect that the area where Ross fell was one where patients might be during their treatment so that the hospital's obligation to protect patients was implicated by the condition of the floor at that location. Ross was not seeking or receiving health care, nor was she a health care provider or assisting in providing health care at the time she fell. There is no evidence the negligence alleged by Ross was based on safety standards arising from professional duties owed by the hospital as a health care provider. There is also no evidence that the equipment or materials used to clean and buff the floor were particularly suited to providing for the safety of patients, nor does the record demonstrate that the cleaning and buffing of the floor near [**21] the exit doors was to comply with a safety-related requirement set for health care providers by a governmental or accrediting authority.

## V. Conclusion

Under this record Ross's claim is based on safety standards that have no substantive relationship to the hospital's providing of health care, so it is not an HCLC. Because her claim is not an HCLC, she was not required to serve an expert report to avoid dismissal of her suit. We reverse the judgment of the court of appeals and [*506] remand the case to the trial court for further proceedings.

Phil Johnson Justice

**OPINION DELIVERED:** May 1, 2015

**CONCUR BY:** Debra H. Lehrmann

## CONCUR

JUSTICE LEHRMANN, joined by JUSTICE DEVINE, concurring.

I join the Court's opinion and agree that the claims asserted in this case have no connection to the provision of health care. I write separately, however, to emphasize my concern that a statute intended to address the insurance crisis stemming from the volume of frivolous medical-malpractice lawsuits has become a nebulous barrier to what were once ordinary negligence suits brought by plaintiffs alleging no breach of any professional duty of care.

In *Texas West Oaks Hospital, LP v. Williams*, the Court held that a plaintiff's claim against [**22] a physician or health care provider may constitute a health care liability claim subject to the Texas Medical Liability Act even where no patient--physician or patient--health-care-provider relationship exists between the parties. *371 S.W.3d 171, 177-78 (Tex. 2012)*. In my dissent in that case, I disagreed with the Court's holding "that the mere peripheral involvement of a patient transforms an ordinary negligence claim into a health care claim." *Id. at 194-95* (Lehrmann, J., dissenting). I lamented what I viewed as the Court's departure from the importance we had previously placed on the relationship between health care providers and their patients in concluding that a patient's claims were covered by the Act. *Id. at 196-97* (citing *Diversicare Gen. Partner, Inc. v. Rubio, 185 S.W.3d 842 (Tex. 2005)*). The consequences of that departure are evident in cases like this, in which defendants who happen to be health care providers seek the protections of the Medical Liability Act with respect to claims that have nothing to do with medical liability.

The Court holds, and I agree, that a cause of action against a health care provider for a departure from safety standards is a health care liability claim only if it has a "substantive relationship" with the provision of medical or health care.[2]    S.W.3d at   . I write separately to

emphasize [**23] the significance of the third and fifth factors, which consider whether the claimant was in the process of seeking or receiving health care at the time of the injury and whether the alleged negligence was based on safety standards arising from professional duties owed by the health care provider.

> 2 "Substantive" is defined as "considerable in amount or numbers: substantial." WEBSTER'S THIRD NEW INT'L DICTIONARY 2280 (2002).

As we recognized in *Diversicare*, the duty of care that health care providers owe to their patients is fundamentally different from the duty of care owed to, say, employees or visitors. *185 S.W.3d at 850-51* ("The obligation of a health care facility to its patients is not the same as the general duty a premises owner owes to invitees."). To that end, when we held in *Diversicare* that a nursing home resident's claim that she was sexually assaulted by another resident was a health care liability claim, we rejected the argument that the claim should be treated the same as that of a visitor who had been assaulted at the facility precisely because of the distinct nature of those duties. *Id.* We also distinguished the circumstances at issue in that case from hypothetical claims involving an "unlocked [**24] window that gave an intruder access to the facility" and a "rickety staircase [*507] that gave way," which we implied would not constitute health care liability claims. *Id. at 854*. These statements are consistent with our recognition that health care liability claims involve a "specialized standard of care" that is established by expert testimony. *Garland Cmty. Hosp. v. Rose, 156 S.W.3d 541, 546 (Tex. 2004); see also Jackson v. Axelrad, 221 S.W.3d 650, 655 (Tex. 2007)* (explaining that a physician's duty of care owed to a patient is that of "a reasonable and prudent member of the medical profession . . . under the same or similar circumstances" (quoting *Hood v. Phillips, 554 S.W.2d 160, 165 (Tex. 1977)*)).

In my view, focusing a safety-standards claim on the duty health care providers owe to their patients ensures that *Diversicare*'s hypothetical visitor-assault and rickety-staircase claims do not fall under the Medical Liability Act's umbrella. It also ensures that a covered cause of action will "implicate[] the provision of medical or health care" in accordance with the Court's holding in this case. S.W.3d at . With these considerations in mind, I respectfully join the Court's opinion and judgment.

Debra H. Lehrmann

Justice

**OPINION DELIVERED:** May 1, 2015

# APPENDIX – "2"



**RAUL ERNESTO LOAISIGA, M.D., AND RAUL ERNESTO LOAISIGA, M.D., P.A., PETITIONERS, v. GUADALUPE CERDA, INDIVIDUALLY AND AS NEXT FRIEND OF MARISSA CERDA, A MINOR, AND CINDY VELEZ, RESPONDENTS**

NO. 10-0928

**SUPREME COURT OF TEXAS**

*379 S.W.3d 248; 2012 Tex. LEXIS 736; 55 Tex. Sup. J. 1373*

**February 29, 2012, Argued**
**August 31, 2012, Opinion Delivered**

**SUBSEQUENT HISTORY:** Released for Publication October 12, 2012.

**PRIOR HISTORY:** [**1]
ON PETITION FOR REVIEW FROM THE COURT OF APPEALS FOR THE THIRTEENTH DISTRICT OF TEXAS.
*Loaisiga v. Cerda, 2010 Tex. App. LEXIS 6326 (Tex. App. Corpus Christi, Aug. 5, 2010)*

**COUNSEL:** For Sunshine Pediatrics LLP, Other interested party: Michael Raphael Cowen, The Cowen Law Group, PC, Brownsville TX.

For Loaisiga, M.D., Raul Ernesto and Raul Ernesto Loaisiga, M.D., P.A., Petitioners: , Escobar Law Firm, PLLC, McAllen TX; Carlos EscobarGilberto Hinojosa, Gilberto Hinojosa & Associates PC, Brownsville TX.

For Cerda, Guadalupe, Individually and as next friend of Marissa Cerda, Minor, and Cindy Velez., Respondent: Benigno (Trey) Martinez III, Martinez Barrera & Martinez LLP, Brownsville TX; Brendan K. McBride, The McBride Law Firm, San Antonio TX; Stephanie Elaine Burnett, The Law Office of Benigno (Trey) Martinez, P.L.L.C., Brownsville, TX.

**JUDGES:** JUSTICE JOHNSON delivered the opinion of the Court in which CHIEF JUSTICE JEFFERSON, JUSTICE WAINWRIGHT, JUSTICE GREEN, and JUSTICE GUZMAN joined, and in Parts I through V.A. and VI.A. of which JUSTICE WILLETT joined. JUS-

TICE HECHT filed a concurring and dissenting opinion, in which JUSTICE MEDINA joined. JUSTICE WILLETT filed a concurring and dissenting opinion. JUSTICE LEHRMANN filed a concurring and dissenting opinion.

**OPINION BY:** Phil Johnson

**OPINION**

[*252] The Texas Medical [**2] Liability Act (TMLA) requires plaintiffs asserting health care liability claims (HCLCs) to timely serve each defendant with an expert report meeting certain requirements. In this case we consider whether claims that a doctor assaulted patients by exceeding the proper scope of physical examinations are subject to the TMLA's expert report requirements.

Two female patients sued a medical doctor, the professional association bearing his name, and a clinic, alleging the doctor assaulted the patients by groping their breasts while examining them for sinus and flu symptoms. Although they maintained that the claims were not HCLCs, the patients served the doctor and professional association with reports from a physician who, based only on the assumption that allegations in the plaintiffs' pleadings were true, opined that the defendant doctor's alleged actions did not fall within any appropriate standard of care. The defendants argued that the claims were HCLCs and moved for dismissal of the suit on the basis that the reports were deficient. The trial court denied the motions. The court of appeals held that the claims were not HCLCs, expert reports were not required, and af-

firmed the trial court's [**3] order without considering the reports' adequacy.

We hold that the TMLA creates a rebuttable presumption that a patient's claims against a physician or health care provider based on facts implicating the defendant's conduct during the patient's care, treatment, or confinement are HCLCs. The record before us does not rebut the presumption as it relates to the TMLA's expert report requirements, nor are the expert reports served by the plaintiffs adequate under the TMLA. We reverse the judgment of the court of appeals and remand the case to the trial court for further proceedings.

## I. Background

Guadalupe Cerda, individually and as next friend of her daughter Marissa Cerda, and Cindy Velez (collectively, the plaintiffs) sued Raul Ernesto Loaisiga, M.D., [*253] Raul Ernesto Loaisiga, M.D., P.A. (hereinafter, the P.A.), and Sunshine Pediatrics, LLP. The plaintiffs' claims are based on two separate incidents. Guadalupe alleges that she took Marissa, then age seventeen, to Sunshine Pediatrics for treatment of a sinus problem. According to the pleadings, Dr. Loaisiga examined Marissa and "under the guise of listening to [Marissa's] heart through the stethoscope . . . cupped [Marissa's] breast with the [**4] palm of his hand." Velez, who was employed as a nurse at Sunshine Pediatrics, alleges that Dr. Loaisiga offered to examine her when she arrived at work with flu-like symptoms. She further alleges that during the examination Dr. Loaisiga had her take off her upper garment, then "he undid her bra from the front . . . [and] palmed her breast with one hand during his entire examination."

The plaintiffs sued for assault, medical negligence, negligence, gross negligence, and intentional infliction of emotional distress. They allege that Dr. Loaisiga knew or reasonably should have believed that Marissa and Velez would regard his touching of their breasts as offensive or provocative and Sunshine Pediatrics breached its duty and the appropriate standard of care by allowing Dr. Loaisiga to fondle them. The plaintiffs assert that although the case is actually for assault, in an "abundance of caution and in the alternative," they claim Dr. Loaisiga's actions "fell below the standard of care" for a doctor treating female patients. The pleadings of medical negligence specifically reference "Chapter 74 of the CPRC"--the TMLA. See TEX. CIV. PRAC. & REM. CODE §§ 74.001-.507. The plaintiffs pray for judgment [**5] against the three defendants, but they do not specifically allege any type of claim, either direct or vicarious, against the P.A.

Within 120 days after filing their petition, the plaintiffs served Dr. Loaisiga and the P.A. with a report and curriculum vitae from Michael R. Kilgore, M.D., a family practitioner. See id. § 74.351(a), (b). Dr. Kilgore stated in the report that he had reviewed the plaintiffs' petition. He recited allegations from the petition and stated that if they were true, then Dr. Loaisiga's actions were not within any appropriate standard of care, comprised an assault, and harmed the plaintiffs. In a supplemental report, Dr. Kilgore stated that the opinions he expressed as to Dr. Loaisiga also applied to the P.A.

Dr. Loaisiga and the P.A. filed objections to the reports and motions to dismiss. They argued that the reports were deficient because they failed to (1) implicate conduct of either Dr. Loaisiga or the P.A., (2) set out the applicable standard of care, (3) identify a breach of the standard of care, or (4) identify how the actions of Dr. Loaisiga or the P.A. proximately caused the alleged injuries. The motions also asserted that Dr. Kilgore's report was "based [**6] upon pure speculation and assumption" and Dr. Kilgore, as a family practitioner, was not qualified to render an expert opinion regarding Dr. Loaisiga's conduct as a pediatrician. The P.A. separately argued that neither the original nor the supplemental report addressed any theories of liability as to it and, in any event, the supplemental report was deficient because it gave no explanation of why the opinions in the original report applied to the P.A. The plaintiffs' response to each motion maintained that Dr. Kilgore's reports were adequate; Dr. Loaisiga was acting both individually and as the P.A., so there was no difference between the actions of the two; and Dr. Kilgore's reports were directed to both. In the alternative, the plaintiffs requested thirty-day extensions to cure any defects in the reports. See id. § 74.351(c) (stating that if an expert report is not timely served "because the elements of the report are [*254] found deficient, the court may grant one 30-day extension to the claimant in order to cure the deficiency").

The trial court held a hearing on the motions to dismiss and denied them without stating why. Dr. Loaisiga and the P.A. appealed. See id. § 51.014(a)(9) (permitting [**7] immediate appeal of a trial court order denying all or part of a motion to dismiss for failure to serve an expert report in an HCLC). The court of appeals affirmed. ___ S.W.3d ___. The court reasoned that the plaintiffs were not required to file expert reports because their claims against Dr. Loaisiga are assault claims, not HCLCs. See id. at ___. It did not reach the question of whether Dr. Kilgore's reports were deficient. The court also concluded that the TMLA does not apply to the plaintiffs' claims against the P.A. because the plaintiffs refer to the P.A. only in the introductory part of their pleadings and do not assert liability claims against it. See id. at ___.

We granted the petition for review of Dr. Loaisiga and the P.A. 55 Tex. Sup. Ct. J. 145 (Dec. 16, 2011). Before turning to the parties' arguments on the merits, we

address our jurisdiction to consider this interlocutory appeal.

## II. Jurisdiction

Texas appellate courts generally have jurisdiction only over final judgments. *Bally Total Fitness Corp. v. Jackson, 53 S.W.3d 352, 355 (Tex. 2001)*. But an exception exists for certain interlocutory orders. *See* TEX. CIV. PRAC. & REM. CODE § 51.014(a); *Jackson, 53 S.W.3d at 355*. Section 51.014(a) [**8] provides in relevant part:

> A person may appeal from an interlocutory order of a district court, county court at law, or county court that:
>
> . . .
>
> (9) denies all or part of the relief sought by a motion under *Section 74.351(b)*, except that an appeal may not be taken from an order granting an extension under *Section 74.351*.

*TEX. CIV. PRAC. & REM. CODE § 51.014(a)(9)*.

A court of appeals' judgment ordinarily is conclusive when an interlocutory appeal is taken pursuant to *section 51.014(a)(9)*. *See* TEX. GOV'T CODE § 22.225(b)(3). However, we may consider an interlocutory appeal when the court of appeals' decision creates an inconsistency in the law that should be clarified to remove unnecessary uncertainty and unfairness to litigants. *Id. §§ 22.001(a)(2), (e); 22.225(c), (e)*. This case involves an issue on which the courts of appeals have issued inconsistent decisions. *Compare* ___ S.W.3d at ___ (holding that a doctor's alleged fondling of the plaintiffs' breasts during medical examinations could not feasibly be explained as a necessary part of medical treatment and therefore does not give rise to an HCLC), *with Vanderwerff v. Beathard, 239 S.W.3d 406, 409 (Tex. App.--Dallas 2007, no pet.)* (concluding [**9] that a chiropractor's alleged rubbing of a plaintiff's genitals during a chiropractic examination gave rise to an HCLC because whether the chiropractor's actions were within the scope of a chiropractic examination could not be answered without reference to the standard of care required of a chiropractic provider). We have jurisdiction to resolve this issue. *TEX. GOV'T CODE § 22.001(a)(2)*.

## III. Health Care Liability Claims

### A. General

Determining whether claims are HCLCs requires courts to construe the TMLA. We review issues of statutory interpretation [*255] de novo. *Molinet v. Kimbrell, 356 S.W.3d 407, 411 (Tex. 2011)*.

The TMLA defines an HCLC as:

> a cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care, which proximately results in injury to or death of a claimant, whether the claimant's claim or cause of action sounds in tort or contract.

*TEX. CIV. PRAC. & REM. CODE § 74.001(a)(13)*. According to its definition, an HCLC has three elements: (1) the defendant is a health care provider or physician; [**10] (2) the claimant's cause of action is for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, health care, or safety or professional or administrative services directly related to health care; and (3) the defendant's alleged departure from accepted standards proximately caused the claimant's injury or death. *Marks v. St. Luke's Episcopal Hosp., 319 S.W.3d 658, 662 (Tex. 2010)* (plurality opinion).

This case focuses on the second element which concerns the nature of a claimant's "cause of action" and the definitions of medical care, health care, safety and professional or administrative services directly related to health care. *See* TEX. CIV. PRAC. & REM. CODE § 74.001(a)(13). The TMLA does not define the term "cause of action," but the generally accepted meaning of that phrase refers to the "'fact or facts entitling one to institute and maintain an action, which must be alleged and proved in order to obtain relief.'" *In re Jorden, 249 S.W.3d 416, 421 (Tex. 2008)* (quoting *A.H. Belo Corp. v. Blanton, 133 Tex. 391, 129 S.W.2d 619, 621 (1939))*. "Health care" is broadly defined as "any act . . . performed . . . by any health care provider for [or] to . . . a [**11] patient during the patient's medical care, treatment, or confinement." *TEX. CIV. PRAC. & REM. CODE § 74.001(a)(10)*. And "medical care" is defined as "any act defined as practicing medicine under *Section 151.002, Occupations Code*, performed or furnished, or which should have been performed, by one licensed to practice medicine in this state for, to, or on behalf of a patient during the patient's care, treatment, or confinement." *Id. § 74.001(a)(19)*. The Occupations Code, in turn, defines "practicing medicine" as "the diagnosis, treatment, or offer to treat a mental or physical disease or disorder or a physical deformity or injury by any system or method, or the attempt to effect cures of those conditions by a person who . . . publicly professes to be a physician." *TEX. OCC. CODE § 151.002(a)(13)*.

Analysis of the second element--the cause of action--focuses on the facts underlying the claim, not the form of, or artfully-phrased language in, the plaintiff's pleadings describing the facts or legal theories asserted. *See, e.g., Yamada v. Friend, 335 S.W.3d 192, 196-97 (Tex. 2010); Diversicare Gen. Partner, Inc. v. Rubio, 185 S.W.3d 842, 847, 854 (Tex. 2005).* We have previously determined that [**12] a claim based on one set of facts cannot be spliced or divided into both an HCLC and another type of claim. *See Yamada, 335 S.W.3d at 197; Diversicare, 185 S.W.3d at 854.* It follows that claims premised on facts that *could* support claims against a physician or health care provider for departures from accepted standards of medical care, health care, or safety or professional or administrative services directly related to health care are HCLCs, regardless of whether the plaintiff alleges the defendant is liable for breach of any of those standards. *See TEX. CIV. PRAC. & REM. CODE § 74.001(a)(13).*

[*256] The broad language of the TMLA evidences legislative intent for the statute to have expansive application. *See, e.g., TEX. CIV. PRAC. & REM. CODE § 74.001(a)(10)* (defining "health care" to include "*any* act . . . by *any* health care provider for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement." (emphasis added)); *see also Molinet, 356 S.W.3d at 411* (noting that when interpreting statutes we strive to ascertain and give effect to the Legislature's intent). The breadth of the statute's text essentially creates a presumption that a claim is an HCLC if it [**13] is against a physician or health care provider and is based on facts implicating the defendant's conduct during the course of a patient's care, treatment, or confinement. *See Marks, 319 S.W.3d at 662.* But the presumption is necessarily rebuttable. In some instances the only possible relationship between the conduct underlying a claim and the rendition of medical services or healthcare will be the healthcare setting (*i.e.,* the physical location of the conduct in a health care facility), the defendant's status as a doctor or health care provider, or both.

## B. Assaults and the TMLA

The elements of a civil assault mirror those of a criminal assault. *See Waffle House, Inc. v. Williams, 313 S.W.3d 796, 801 n.4 (Tex. 2010).* Under the Penal Code, an assault occurs if a person:

(1) intentionally, knowingly, or recklessly causes bodily injury to another, including the person's spouse;

(2) intentionally or knowingly threatens another with imminent bodily injury, including the person's spouse; or

(3) intentionally or knowingly causes physical contact with another when the person knows or should reasonably believe that the other will regard the contact as offensive or provocative.

*TEX. PENAL CODE § 22.01(a).* [**14] As relevant to the case before us, an assault occurs if a person "intentionally or knowingly causes physical contact with another when the person knows or should reasonably believe that the other will regard the contact as offensive or provocative." *Id. § 22.01(a)(3).*

Distinguishing between claims to which the TMLA applies and those to which it does not apply can be difficult when the plaintiff alleges an assault took place during a physical examination to which the patient consented. The scope of medical examinations generally are informed, and largely guided, by a combination of the patient's complaints and the examiner's training and professional judgment. During an examination for the purpose of diagnosing or treating a patient's condition, a medical or health care provider almost always will touch the patient intentionally. Frequently, examinations involve examiners touching the patient's body in places and in ways that would be assaults were it not for the actual or implied consent of the patient in the context of the medical or health care relationship. And the examiner may need to examine parts of the patient's body that might not be anticipated by a person without medical or [**15] health care training. Such a situation is demonstrated by *Vanderwerff*, a case in which no expert report was filed. There, Kristina Beathard sought treatment from Eric Vanderwerff, a chiropractor, complaining of pain in various parts of her body. *239 S.W.3d at 407.* Beathard later sued Vanderwerff, alleging that "during the course of a routine examination of her knee" he rubbed her genitals. *Id. at 409.* The trial court denied Vanderwerff's motion to dismiss for Beathard's failure to serve an expert report, but the court of appeals reversed. *Id.* In doing so, it noted that Beathard had marked an anatomical drawing to show her areas of pain, and those markings indicated she was having pain not only in her neck, wrists, ankle, and left knee, but also running from her knee to her upper thigh. [*257] *Id.* The court of appeals set out the issue and its conclusion as follows:

The threshold questions raised by Beathard's pleadings are whether she consented to treatment and whether Vanderwerff's examination was within the scope of a chiropractic examination. Was the examination a "routine" examination as Beathard contends? These questions cannot be answered without reference to

the standard of care required [**16] of a chiropractic provider.

*Id.* In essence, the court of appeals recognized that an expert report was necessary because Vanderwerff's conduct in the overall context of the chiropractic examination could have been part of the care he was rendering pursuant to Beathard's consent to be examined and treated for pain which, in part, she reported extended from her knee to the upper thigh.

In balancing the respective rights of and burdens on claimants and medical and healthcare defendants, the Legislature has determined that requiring claimants to bear the expense of obtaining and serving expert reports early in HCLCs is preferable to having parties incur substantial expense and devote considerable time to developing claims through discovery and trial preparation before a trial court determines which ones are meritless. *See Scoresby, 346 S.W.3d at 552, 556; Palacios, 46 S.W.3d at 877.* However, we fail to see how the Legislature could have intended the requirement of an expert report to apply under circumstances where the conduct of which a plaintiff complains is wholly and conclusively inconsistent with, and thus separable from, the rendition of "medical care, or health care, or safety or professional [**17] or administrative services directly related to health care" even though the conduct occurred in a health care context. *See TEX. CIV. PRAC. & REM. CODE § 74.001(a)(13); see also TEX. GOV'T CODE § 311.021* ("In enacting a statute, it is presumed that . . . a just and reasonable result is intended . . . .").

We conclude that a claim against a medical or health care provider for assault is not an HCLC if the record conclusively shows that (1) there is no complaint about any act of the provider related to medical or health care services other than the alleged offensive contact, (2) the alleged offensive contact was not pursuant to actual or implied consent by the plaintiff, and (3) the only possible relationship between the alleged offensive contact and the rendition of medical services or healthcare was the setting in which the act took place. *See Murphy v. Russell, 167 S.W.3d 835, 838 (Tex. 2005)* (per curiam) (holding that a plaintiff's battery claim was an HCLC because "[t]here may [have] be[en] reasons for providing treatment without specific consent that do not breach any applicable standard of care[, and] [t]he existence or non-existence of such reasons is necessarily the subject of [**18] expert testimony"); *Buck v. Blum, 130 S.W.3d 285, 289-90 (Tex. App.--Houston [14th Dist.] 2004, no pet.)* (concluding that a neurologist's conduct was not in the course and scope of his employment when a patient complained that the neurologist placed his penis instead

of a metal weight in the patient's hand during a neurological examination).

## IV. Expert Reports

The TMLA's expert report requirements do not require a trial court to make a merits determination regarding whether the claim is an HCLC. *See Murphy, 167 S.W.3d at 838* (explaining that the [*258] requirement is a threshold over which a plaintiff must proceed); *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios, 46 S.W.3d 873, 878 (Tex. 2001)* ("[T]he expert report must represent only a good-faith effort to provide a fair summary of the expert's opinions. A report need not marshal all the plaintiff's proof, but it must include the expert's opinion on each of the elements identified in the statute."). Nor does a determination that the TMLA's expert report requirements apply to a claim affect other matters such as whether a physician or health care provider may be subject to professional sanctions or criminal prosecution for the conduct [**19] on which a plaintiff bases a claim. *See Vanderwerff, 239 S.W.3d at 407 n.1* (noting that in addition to a civil case alleging sexual assault against a chiropractor for rubbing the patient's genitals during an examination, a criminal complaint was filed against the defendant). The requirements are meant to identify frivolous claims and reduce the expense and time to dispose of any that are filed. *See Scoresby v. Santillan, 346 S.W.3d 546, 554 (Tex. 2011)* ("The purpose of the expert report requirement is to deter frivolous claims, not to dispose of claims regardless of their merits." (citation omitted)); *see also TEX. CIV. PRAC. & REM. CODE § 74.351(k), (t)* (providing that an expert report is not admissible in and shall not be used during depositions, trial, or other proceedings, nor shall it be referred to for any purpose absent the plaintiff's using it in a way other than serving it pursuant to the 120-day service requirement of *section 74.351(a)); id. § 74.351(s)* (limiting discovery until the expert report and curriculum vitae of the expert have been served).

In *Palacios* we held that the TMLA's language requires a trial court to determine a report's adequacy from its four corners. *46 S.W.3d at 878.* [**20] The statute does not similarly limit what a trial court may consider when the question is whether a claim is subject to the TMLA's expert report requirements. Thus, when making that determination courts should consider the entire court record, including the pleadings, motions and responses, and relevant evidence properly admitted. This could include, but is not limited to, reports such as those the plaintiffs served here, medical records regarding examination or treatment of the plaintiff, if any, and the defendant's pleadings and explanation for how the contact at issue was part of medical care, or health care, or safety

or professional or administrative services directly related to health care.

In light of the foregoing, we turn to the parties' contentions. We address the defendants separately, beginning with Dr. Loaisiga.

## V. Dr. Loaisiga

### A. Was an Expert Report Required

Dr. Loaisiga argues that the plaintiffs were required to file an expert report because the alleged assaults occurred during the course of his administering medical services and all his actions were inseparable from the rendition of those medical services. The plaintiffs urge that, as the court of appeals held, their [**21] assault claims are not subject to the TMLA's expert report requirements because Dr. Loaisiga's acts do not implicate medical or health care services, regardless of whether medical treatment was occurring at the time of the assaults. Rather, they say the alleged acts of assault are so inconsistent with the medical services Dr. Loaisiga was rendering, that the TMLA does not apply. In analyzing these arguments, we consider the entire record before the trial court and the overall context of the plaintiffs' suit, including the nature of the factual allegations in their pleadings, [*259] Dr. Loaisiga's contentions, and the motions to dismiss and responses.

We look first to the pleadings. The plaintiffs' pleadings contain allegations that except for Dr. Loaisiga's touching of their breasts, the examinations were routine. The pleadings do not assert a lack of proper care by Dr. Loaisiga other than his touching of their breasts. Further, the plaintiffs' brief on the merits posits that their pleadings made "no factual allegations that they were injured by any deficiencies in the medical care provided by Dr. Loaisiga."

The plaintiffs' claims are qualitatively similar to the claims in *Vanderwerff. See* 239 *S.W.3d* at 407. [**22] Like the plaintiff in *Vanderwerff*, the plaintiffs here allege an examining doctor inappropriately touched parts of their bodies during the course of otherwise routine examinations. *See id.* But because the determination of whether the plaintiffs were required to serve an expert report is to be made based on the whole record, we must also consider other relevant documents in the record and Dr. Loaisiga's contentions. In that regard, this case is distinguishable from *Vanderwerff.*

One distinguishing factor is that the plaintiff in *Vanderwerff* did not serve an expert report. Here the plaintiffs served a report that stated, in part:

> During a routine "sick" visit with a physician, a stethoscope may be utilized

to listen to the heartbeat of the patient. However, in all applicable medical standards of care, it is unnecessary that a patient remove their brazier, nor is it necessary to cup, palm or touch the breast of a female patient either with the hand holding the stethoscope or the other hand not holding the instrument to listen to a heart beat.

Another distinction is that the record in *Vanderwerff* contained an anatomical drawing on which the plaintiff indicated to the chiropractor that she [**23] had pain running from her knee to her upper thigh. *Id. at 409.* Based on that document, the court of appeals recognized that the chiropractor's touching of, or near, the patient's genitals could have been part of the examination. *See id.* Here, the record does not contain any documents other than the plaintiffs' pleadings to shed light on the plaintiffs' symptoms or their complaints to Dr. Loaisiga. As discussed in more detail below, apart from allegations in the plaintiffs' pleadings, Dr. Kilgore's reports make no reference to the plaintiffs' medical records or the complaints they made to Dr. Loaisiga in the clinical setting.

The substance of the plaintiffs' complaint is that Dr. Loaisiga's conduct exceeded the scope of the examinations to which they consented, and Dr. Kilgore's report shows that it is unnecessary for a physician to touch a female patient's breasts during routine examinations of the type Dr. Loaisiga was performing. But even taken together, these aspects of the record do not conclusively rebut the presumptive application of the TMLA's expert report requirements. The lack of information to give context to Dr. Loaisiga's actions during the examinations—such as medical [**24] records, if any, reference to the medical records by Dr. Kilgore in his reports, or other information regarding the plaintiffs' symptoms and complaints to Dr. Loaisiga—prevents the plaintiffs from showing conclusively that the only relationship between the alleged touching of their breasts and Dr. Loaisiga's rendition of medical services was the physical location of the examinations at the offices of Sunshine Pediatrics and his status as a doctor or health care provider.

We conclude that the record does not contain sufficient information to conclusively show that Dr. Loaisiga's conduct [*260] could not have been part of the examination he was performing. But because we are clarifying the standard for whether claims are subject to the TMLA's expert report requirements and the plaintiffs maintain that theirs are not, we conclude it is appropriate to remand the case to the trial court for further proceedings regarding that issue. *See Low v. Henry, 221 S.W.3d*

*609, 621 (Tex. 2007)* (remanding "to allow the parties to present evidence responsive to our guidelines").

## B. Adequacy of the Reports

The court of appeals did not consider whether Dr. Kilgore's reports are adequate to meet the requirements of [**25] *section 74.351* because it concluded that no expert reports were necessary.    S.W.3d at    . If, on remand, the trial court determines expert reports are necessary under the TMLA, the adequacy of Dr. Kilgore's reports must be determined. Dr. Loaisiga preserved the adequacy issue in the courts below and briefed and argued it here. Therefore, without expressing any opinion as to whether the TMLA's expert report requirements will ultimately apply to this case, in the interest of judicial efficiency we address whether Dr. Kilgore's reports comply with the TMLA's requirements. *See TEX. R. APP. P. 53.4; Reid Road Mun. Util. Dist. No. 2 v. Speedy Stop Food Stores, Ltd., 337 S.W.3d 846, 855 (Tex. 2011).*

When a document purporting to be an expert report is timely served in an HCLC and is properly challenged, the trial court

> shall grant a motion challenging the adequacy of an expert report only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply with the definition of an expert report in Subsection (r)(6).

*TEX. CIV. PRAC. & REM. CODE § 74.351(l).* To qualify as an objective good faith effort the report must (1) inform the defendant [**26] of the specific conduct the plaintiff questions, and (2) provide a basis for the trial court to conclude that the plaintiff's claims have merit. *Scoresby, 346 S.W.3d at 556* (citing *Palacios, 46 S.W.3d at 879*). A report meets the minimum qualifications for an expert report under the statute "if it contains the opinion of an individual with expertise that the claim has merit, and if the defendant's conduct is implicated." *Id. at 557.* If a report meets these qualifications but is deficient, and an extension to cure is requested, the trial court may grant one thirty-day extension to cure the deficiencies. *See TEX. CIV. PRAC. & REM. CODE § 74.351(c).* But if a report does not meet the standard set in *Scoresby,* it is not an expert report under the statute, and the trial court must dismiss the plaintiff's claims if the defendant has properly moved for dismissal. *TEX. CIV. PRAC. & REM. CODE § 74.351(b).*

Dr. Loaisiga advances three arguments why the case should be dismissed if the TMLA's expert report requirements apply. The arguments all substantively rely on his position that Dr. Kilgore's reports cannot be good faith attempts to provide expert reports because they merely assume the truth of [**27] what is in the plaintiffs' pleadings. Dr. Loaisiga first argues that Dr. Kilgore's assuming the truth of the plaintiffs' pleadings results in the reports being wholly speculative because the pleadings are merely unverified allegations. He also asserts that the reports (1) improperly require the trial court to assume facts outside their four corners and (2) do not in good faith identify and state the breach and causation elements required to be contained in expert reports because they are conditioned on certain facts being true. In response, the plaintiffs maintain that Dr. [*261] Kilgore was entitled to rely on their pleadings as true. They posit that whether their allegations are credible is a matter for the jury to decide, not a matter for the trial judge in passing on whether the reports are a good faith effort to comply with the TMLA requirements. To a certain extent we agree with both parties.

The fact that pleadings are not verified does not relieve attorneys and parties from their obligation to avoid including groundless or bad faith allegations in them. To the contrary, including such allegations in pleadings is sanctionable. *See TEX. R. CIV. P. 13.* Thus, we do not see why an expert, [**28] in formulating an opinion, should be precluded from considering and assuming the validity of matters set out in pleadings in the suit, absent a showing that the pleadings are groundless or in bad faith or rebutted by evidence in the record.

On the other hand, the purpose of an expert report is to give the trial court sufficient information within the four corners of the report to determine if the plaintiff's claim has merit. *Scoresby, 346 S.W.3d at 554, 556.* If an expert could formulate an adequate expert report by merely reviewing the plaintiff's pleadings and assuming them to be true, then artful pleading could neutralize the Legislature's requirement that expert reports demonstrate the plaintiff's claims have merit. *See id.* That is because the facts and circumstances alleged in the plaintiff's pleadings might omit or misstate, inadvertently or otherwise, matters critical to a valid expert opinion. An expert report based only on the plaintiff's pleadings could mask the context of the medical services or health care rendered. Significant matters involved in the rendition of the care, such as the patient's complaints or the health care provider's findings, could warrant investigation [**29] and examination beyond that which might otherwise seem to have been appropriate, yet be unknown to the expert. If such matters were not in the plaintiff's pleadings the expert would not have considered them, the expert report would not reference them, and because they are outside the four corners of the report, the trial court could not consider them in deciding whether the plain-

tiff's claims have merit. That is not what we believe the Legislature intended. *See id. at 552-54.*

We conclude that in formulating an adequate expert report under *section 74.351*, an expert may consider and rely on the plaintiff's pleadings, but the expert must consider more than the pleadings. How much more will depend on the particular circumstances of the claim. But we fail to see how in most instances, and particularly in claims involving the scope of an examination, an expert report could be adequate unless the expert at least considered and commented on the patient's medical records to the extent the records and their contents--or lack of appropriate contents--are relevant to the expert's opinion.

In this case Dr. Kilgore's reports and curriculum vitae demonstrate that he is a trained and practicing physician. [**30] He has sufficient expertise in the medical field to be qualified to provide an adequate expert report. *See Scoresby, 346 S.W.3d at 557.* The reports also demonstrate that he is of the opinion the plaintiffs' claims have merit. *See id.* But his failure to consider any matters other than the plaintiffs' pleadings in formulating his opinion make his existing reports inadequate to comply with *section 74.351*'s expert report requirements. On the other hand, we disagree with Dr. Loaisiga's position that the deficiencies in Dr. Kilgore's reports require dismissal of the plaintiffs' claims against him. The reports meet the standard set out in *Scoresby*, and the [*262] plaintiffs requested a thirty-day extension to cure defects in them in the event they were deficient. Accordingly, if on remand the trial court determines that the TMLA's expert report requirements apply to this case, the court should consider the plaintiffs' request for an extension of time to cure deficiencies in the reports as to Dr. Loaisiga. *See id.*

## VI. The P.A.

### A. Was an Expert Report Required

The plaintiffs' petition names the P.A. as a defendant and prays for judgment against it, but the pleading does not mention the P.A. otherwise. [**31] The court of appeals concluded that the TMLA did not apply to the P.A., given the lack of "allegations of medical negligence or otherwise" against the P.A. ___ S.W.3d at ___. We disagree with that conclusion.

The court of appeals focused on the latter part of the first sentence of *section 74.351(a)*, emphasizing the requirement of an expert report "for each physician or health care provider *against whom a liability claim is asserted*." ___ S.W.3d at ___ (quoting *TEX. CIV. PRAC. & REM. CODE § 74.351(a)*). However, that portion of the statute's text must be read in conjunction with the words that surround it. *See Omaha Healthcare Ctr., LLC v. Johnson, 344 S.W.3d 392, 395 (Tex. 2011)* (explaining

that we interpret statutory text according to its plain meaning and context unless such a construction leads to absurd or nonsensical results). The beginning of the sentence the court of appeals quoted refers to "a health care liability claim." *TEX. CIV. PRAC. & REM. CODE § 74.351(a)*. Reading the sentence as a whole shows that "a liability claim" is merely an abbreviated reference to "a health care liability claim," which is elsewhere defined in the TMLA as "a cause of action." *Id. § 74.001(a)(13)*; [**32] *see also Mokkala v. Mead, 178 S.W.3d 66, 71 (Tex. App.--Houston [14th Dist.] 2005, pet. denied)* ("A 'health care liability claim' is a 'cause of action,' not a lawsuit."). And as we have explained, a "cause of action" means the "fact or facts entitling one to institute and maintain an action, which must be alleged and proved in order to obtain relief." *In re Jorden, 249 S.W.3d at 421* (citation omitted). Therefore, the expert report requirements are triggered when a plaintiff names a person or entity as a defendant and seeks to obtain relief from that defendant based on facts that possibly implicate the TMLA.

This construction of the statute furthers the purpose of the expert report requirements. *See Scoresby, 346 S.W.3d at 554; see also Molinet, 356 S.W.3d at 411* (stating that our objective in construing a statute is to ascertain and give effect to the Legislature's intent). If a plaintiff could name and seek judgment against a medical or health care provider based on facts that fall within the TMLA's coverage without triggering the 120-day deadline for serving an expert report, it would open the door to artful pleading and undermine the Legislature's goal of accelerating the disposition [**33] of non-meritorious HCLCs. *See Scoresby, 346 S.W.3d at 554; Diversicare, 185 S.W.3d at 854.*

In this case the plaintiffs made the P.A. a party to the case and sought judgment against it based on no facts other than those underlying their claims against Dr. Loaisiga. The P.A. is named after Dr. Loaisiga, and he has not disputed the plaintiffs' allegation that he was and is its sole officer and director. The plaintiffs' response to the P.A.'s motion to dismiss alleged that Dr. Loaisiga acted both individually and as the P.A. when he assaulted the plaintiffs and there "is no differentiation between the two."

[*263] As we discuss above, the determination of whether a plaintiff's expert report is adequate is not a merits determination, but rather a preliminary determination designed to expeditiously weed out claims that have no merit. In this case the pleadings and record were sufficient to make the plaintiffs' claims as to the P.A. clear: they claimed it was vicariously liable for Dr. Loaisiga's conduct. The P.A. could have excepted to and sought clarification of the pleadings if it desired to have them clarified, but it did not do so.

We conclude that if the plaintiffs' claims assert HCLCs, then [**34] the TMLA's expert report requirements apply to the claims against the P.A. just as they do to the claims against Dr. Loaisiga individually.

## B. Adequacy of the Reports

The court of appeals did not consider whether Dr. Kilgore's reports are adequate to meet the requirements of *section 74.351* as to the P.A.     S.W.3d at    . We address the issue for the same reasons expressed above as to Dr. Loaisiga. *See TEX. R. APP. P. 53.4; Reid Road Mun. Util. Dist. No. 2, 337 S.W.3d at 855.*

Dr. Kilgore stated in his September 3, 2009 report that "[a]ll opinions expressed and contained in my previous report are adopted in this supplemental report and are also applicable to [the P.A.]." His previous report demonstrated that he is a trained and practicing physician who holds the opinion that Dr. Loaisiga's conduct is implicated and the plaintiffs' claims against Dr. Loaisiga have merit. *See supra* Part V.B. But, as we explain above, Dr. Kilgore's previous report is not adequate to comply with *section 74.351* because he considered only the plaintiffs' pleadings in formulating his opinions. By adopting the previous report, the supplemental report meets the minimal standard set out in *Scoresby*, just as the [**35] original report did, but it is deficient as to the P.A., just as the original report was deficient as to Dr. Loaisiga. So, if on remand the plaintiffs' claims are determined to be HCLCs subject to the TMLA's expert report requirements, the trial court should consider the plaintiffs' request for an extension of time to cure the reports as to the P.A. *See TEX. CIV. PRAC. & REM. CODE § 74.351(c).*

## VII. Conclusion

We reverse the judgment of the court of appeals. We remand the case to the trial court for further proceedings in accordance with this opinion. *See id.; Scoresby, 346 S.W.3d at 557.*

Phil Johnson

Justice

**OPINION DELIVERED:** August 31, 2012

**CONCUR BY:** Nathan L. Hecht (In Part); Don R. Willett (In Part); Debra H. Lehrmann

**DISSENT BY:** Nathan L. Hecht (In Part); Don R. Willett (In Part); Debra H. Lehrmann

## DISSENT

JUSTICE HECHT, joined by JUSTICE MEDINA, concurring in part and dissenting in part.

Principal among the Legislature's stated purposes in enacting the Medical Liability Act was decreasing the cost of health care liability claims without unduly restricting a claimant's rights.[1] But disagreements [*264] over the Act's expert report requirement,[2] which is merely intended to weed out frivolous claims early on,[3] have resulted [**36] in protracted pretrial proceedings and multiple interlocutory appeals, threatening to defeat the Act's purpose by increasing costs and delay that do nothing to advance claim resolution. In an effort to staunch this waste of time and money, we have tried to minimize the grounds for such disagreements. We have held that the standard for adequacy of a report is lenient,[4] and that leave to cure any deficiencies in a report must be freely given.[5] As a result, objections and appeals should be fewer.

1   Act of June 2, 2003, 78th Leg., R.S., ch. 204, §§ 10.01, 10.11(b) (2), (3), 2003 Tex. Gen. Laws 847, 864, 884-885 (adopting the Medical Liability Act as Chapter 74 of the Texas Civil Practice & Remedies Code, and providing that "it is the purpose of [the Act] to improve and modify the system by which health care liability claims are determined in order to . . . decrease the cost of those claims and . . . do so in a manner that will not unduly restrict a claimant's rights . . . ."); *see also Scoresby v. Santillan, 346 S.W.3d 546, 552 (Tex. 2011)* ("Fundamentally, the goal of [the Act] has been to make health care in Texas more available and less expensive by reducing the cost of health care liability [**37] claims.").
2   The Act requires that within 120 days of filing suit, a claimant must serve a defendant with an expert report setting out the applicable standard of care, how the defendant breached it, and how that breach caused the claimant's damages. *TEX. CIV. PRAC. & REM. CODE § 74.351(a), (r)(6).*
3   *Scoresby, 346 S.W.3d at 552* (stating that the Act seeks "to deter frivolous lawsuits by requiring a claimant early in litigation to produce the opinion of a suitable expert that his claim has merit").
4   *Id. at 549* ("[A] document qualifies as an expert report if it contains a statement of opinion by an individual with expertise indicating that the claim asserted by the plaintiff against the defendant has merit. An individual's lack of relevant qualifications and an opinion's inadequacies are deficiencies the plaintiff should be given an opportunity to cure if it is possible to do so. This lenient standard avoids the expense and delay of multiple interlocutory appeals and assures a claimant a fair opportunity to demonstrate that his claim is not frivolous.").

5   *Id.* ("[The Act] authorizes the trial court to give a plaintiff who meets the 120-day deadline an additional thirty days in which to cure   [**38] a 'deficiency' in the elements of the report. The trial court should err on the side of granting the additional time and must grant it if the deficiencies are curable." (footnotes omitted)).

With the same goal in mind, the Court today tackles the issue of when an expert report is required. The Court concludes that "[t]he breadth of the statute's text essentially creates a presumption that a claim is an HCLC if it is against a physician or health care provider and is based on facts implicating the defendant's conduct during the course of a patient's care, treatment, or confinement."[6] I agree that the Act creates such a presumption and that it is, as the Court says, "necessarily rebuttable".[7]

6   *Ante* at   .
7   *Ante* at   .

For the claimant who contends his claim is not an HCLC, obtaining an expert report should not present a major obstacle, as this case illustrates. The expert report here says, in essence, that sexual assault is not a part of health care. One need not turn to the Mayo Clinic for such an opinion. An expert report, as we have interpreted it, is a low threshold a person claiming against a health care provider must cross merely to show that his claim is not frivolous. Occasionally   [**39] there will be cases -- this may be one -- in which an expert report is required even though evidence later shows that the claim is not an HCLC. While the requirement is thus not perfect, it is nevertheless a reasonable effort by the Legislature to address what it found to be a crisis in HCLCs. But the Act's limitations on damages and other restrictions are far more severe. A conclusion made early in the case that an expert report must be produced does not preclude a later determination, after the   [*265]   case is more fully developed, that the Act's provisions do not apply after all.

The claimants in this case proceeded exactly as they should have. Insisting that their claims are not HCLCs but claims for assault, they nevertheless produced an expert report. I agree with the Court that the expert could not rely entirely on the claimants' petition. A requirement that an expert do no more than opine that a pleaded claim, if true, has merit would do little to forestall frivolous claims. In most instances, medical records will be enough to support an expert's opinion. In this case, it seems unlikely that a chart notation, "groped patient unnecessarily", will be found, and the expert may need to base   [**40] his opinion on an interview with the claimants. In any event, the deficiency should be simple to cure. The expert's review of records showing that the claimants' medical or physical conditions did not warrant

the alleged touching will suffice. Thus, it is unnecessary for the Court to allow the claimants on remand to attempt to show, again, that an expert report is not required. The Court's suggestion that they might succeed contradicts the standard the Court announces. I would not allow further proceedings on the issue and risk another appeal. In all other respects, I join the Court's opinion.

Nathan L. Hecht

Justice

Opinion delivered: August 31, 2012

JUSTICE WILLETT, concurring in part and dissenting in part.

I join today's well-reasoned decision save one quibble: Because I find Parts V.B and VI.B of the Court's opinion advisory--and thus inadvisable--I respectfully dissent from those sections.

Today the Court clarifies the standard for defining a healthcare liability claim (HCLC) and remands so the trial court can apply our new guidance. So far so good. *If* the trial court concludes these claims are *not* HCLCs, then no expert report is necessary. The Court, however, proceeds to (p)review the   [**41] reports' sufficiency just in case the trial court goes the other way.

This analysis is premature. The trial court hasn't even applied our new test to determine whether these are HCLCs in the first place. I wouldn't short-circuit its review by pre-deciding an issue that might never need deciding at all and that might benefit immensely from lower-court analysis.

As a judiciary, our constitutional role dictates that we decide concrete cases and not dispense contingent advice. "[T]he judicial power does not embrace the giving of advisory opinions,"[1] and prudent development of the law requires that courts refrain from speculating on situations that may never arise.

1   *Firemen's Ins. Co. of Newark, N.J. v. Burch,*
442 S.W.2d 331, 333 (Tex. 1968).

The Court's motivation, of course, is commendable: to advance judicial efficiency and squeeze out inordinate delay. But unless and until the lower courts conclude that plaintiffs' claims are indeed HCLCs, I would not suggest a premature predecision that presupposes--if not predestines--a certain lower-court path.

Don R. Willett

Justice

**OPINION DELIVERED**: August 31, 2012

JUSTICE LEHRMANN, concurring and dissenting.

Whether a claim against a health care provider [**42] is a health care liability claim is a knotty issue this Court has repeatedly struggled with. *See, e.g., Tex. W. Oaks Hosp., LP v. Williams, 371 S.W.3d 171, 2012 Tex. LEXIS 561, 2012 WL 2476807 (Tex. 2012); St. David's Healthcare P'ship v. Esparza, 348 S.W.3d 904 (Tex. 2011); Omaha Healthcare Ctr., LLC v. Johnson, 344 S.W.3d 392 (Tex. 2011); Diversicare Gen. Partner, Inc. v. Rubio, 185 S.W.3d 842 (Tex. 2005).* Claims alleging that a [*266] physician's actions in examining a patient amounted to an assault can be particularly confounding, for the reasons the Court discusses: the physical examination of a patient necessarily involves touching, which may be uncomfortable, unexpected, and misunderstood. I concur in the Court's judgment remanding this case to allow the plaintiffs an opportunity to establish that their assault claims are not health care liability claims. I write separately, however, because I believe the Court places too onerous a burden on claimants by requiring them to conclusively establish that their claims are not health care liability claims. I would require a claimant to satisfy a standard comparable to a "clear and convincing" standard of proof. Under that standard, a trial court should require a [**43] claimant asserting claims against a health care provider arising in the context of the delivery of medical services to file an expert report unless the record justifies a firm conviction or belief that the claims presented are not health care liability claims.

Unquestionably, the Legislature intended to alleviate what it deemed a "health care liability crisis" when it enacted the Texas Medical Liability Act, *TEX. CIV. PRAC. & REM. CODE §§ 74.001-.507.* Accordingly, I agree that claims arising in the context of the delivery of health care services are presumptively health care liability claims. But, as the Court recognizes, nothing in the Act signals an intent to shield physicians from liability for sexual assaults or similar intentional misconduct. I fear that the requirement the Court imposes, that a claimant conclusively establish that a claim is not a health care liability claim in order to rebut the Act's presumptive application, may force assault victims to submit expert reports or see their cases dismissed.

In describing the expert report requirement imposed by the Act's predecessor, we have noted on more than one occasion that claimants are not required to marshal their proof to [**44] comply with the statute. *Bowie Mem'l Hosp. v. Wright, 79 S.W.3d 48, 52 (Tex. 2002); Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios, 46 S.W.3d 873, 878 (Tex. 2001).* The policy underlying the expert report requirement in the current Act remains unchanged; not to shield health care providers from legitimate claims, but to weed out frivolous claims at an early stage, before the parties and the courts have expended extensive resources. *Scoresby v. Santillan, 346 S.W.3d 546, 554 (Tex. 2011).* It makes sense not to place a heavy burden on claimants early in the process, in part, because the Act greatly restricts the discovery that is available before an expert report is filed. *TEX. CIV. PRAC. & REM. CODE § 74.351(s).* In my view, the Court's imposition of a requirement that claimants conclusively establish that their allegations do not amount to health care liability claims is inconsistent with those considerations.

In light of the Act's purposes and its broad application, I agree that claimants must to do more than establish that their claims are plausibly, or even likely, not health care liability claims. But I would not go so far as the Court. Instead, I would hold that plaintiffs [**45] whose claims arise in the medical context are not required to provide expert reports if the record justifies a firm belief or conviction that the claims are not health care liability claims. This is essentially the same as the burden of proof required to terminate parental rights. *See Santosky v. Kramer, 455 U.S. 745, 769, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); In re G.M., 596 S.W.2d 846, 847 (Tex. 1980).* Surely a burden sufficient to protect parents' constitutional rights in raising their children should be sufficiently stringent to protect any interest medical providers might enjoy in having a cause of action alleging assault [*267] proceed as a health care liability claim. Accordingly, I respectfully concur in the Court's judgment but disagree with the standard the Court imposes.

Debra H. Lehrmann

Justice

**OPINION DELIVERED:** August 31, 2012

# APPENDIX – "3"



**ROY KENJI YAMADA, M.D., PETITIONER, v. LAURA FRIEND, INDIVIDU-
ALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF SARAH
ELIZABETH FRIEND, DECEASED, AND LUTHER FRIEND, INDIVIDUALLY,
RESPONDENTS**

NO. 08-0262

**SUPREME COURT OF TEXAS**

*335 S.W.3d 192; 2010 Tex. LEXIS 1012; 54 Tex. Sup. J. 382*

**March 10, 2009, Argued
December 17, 2010, Opinion Delivered**

**SUBSEQUENT HISTORY:** Released for Publication January 28, 2011.

**PRIOR HISTORY:** [**1]
ON PETITION FOR REVIEW FROM THE COURT OF APPEALS FOR THE SECOND DISTRICT OF TEXAS.
*Yamada v. Friend,* 335 S.W.3d 201, 2008 Tex. App. LEXIS 1680 (Tex. App. Fort Worth, Feb. 28, 2008)

**COUNSEL:** For ROY KENJI YAMADA, M.D., PETITIONER: Mr. J. Kevin Carey, Carey Law Firm, Fort Worth, TX; Ms. Bonnie Susan Bleil, Law Office of Bleil & King, Fort Worth, TX.

For LAURA FRIEND, RESPONDNET: Mr. Darrell L. Keith, Ms. Courtney Shannon Keith, Ms. Arin Kay Schall, Keith Law Firm, P.C., Fort Worth, TX; Mr. Jeffrey H. Kobs, Kobs, Haney & Hundley, LLP, Fort Worth, TX.

For City of North Richland Hills, OTHER: Mr. George A. Staples Jr., Taylor Olson Adkins Sralla & Elam, Fort Worth, TX.

For Jeff Ellis, OTHER: Mr. Russell Ramsey, Ramsey & Murray, Houston, TX.

**JUDGES:** JUSTICE JOHNSON delivered the opinion of the Court.

**OPINION BY:** Phil Johnson

**OPINION**

[*193] In this appeal we address whether claims against a health care provider based on one set of underlying facts can be brought as both health care liability claims subject to the Texas Medical Liability Act (TMLA) and ordinary negligence claims not subject to the TMLA. We hold that they cannot.

Sarah Friend collapsed at a water park and later died. As a result of her death her parents sued several parties, including Roy Yamada, M.D. Sarah's parents alleged that Dr. Yamada negligently advised the water park about safety procedures and placement of defibrillators. They did not file an expert report as is required by the TMLA for health care liability claims.

The court of appeals held that the Friends' allegations that Dr. Yamada's actions violated medical standards of care were health care liability claims and the Friends were required to comply with provisions of the TMLA as to those claims. The Friends do not dispute that holding. The court also held, however, that the Friends' allegations that the same actions by Dr. Yamada violated ordinary standards [**2] of care and were not subject to the TMLA.

We hold that because all the claims against Dr. Yamada were based on the same underlying facts, they must be dismissed because the Friends did not timely file an expert report. When the underlying facts are encompassed by provisions of [*194] the TMLA in regard to a defendant, then all claims against that defendant based on those facts must be brought as health care liability

claims. Application of the TMLA cannot be avoided by artfully pleading around it or splitting claims into both health care liability claims and other types of claims such as ordinary negligence claims.

## I. Background

### A. Trial Court

The city of North Richland Hills owns and operates North Richland Hills Family Water Park. In July 2004, twelve-year-old Sarah Friend was waiting in line for one of the water park rides when she collapsed. Personnel from the water park and North Richland Hills Fire Department administered emergency aid and she was then transported to a hospital where she died from a heart condition.

Sarah's mother and father, Laura [1] and Luther Friend, sued the City and several individual defendants. They alleged that Sarah's death was proximately caused by the defendants' [**3] failure to timely and properly evaluate and care for her after she collapsed. The Friends' allegations focused on the failure of water park personnel to use an automated external defibrillator (AED) in attending to Sarah.

> 1   Laura sued individually and as representative of Sarah's estate.

The Friends eventually joined Dr. Yamada as a defendant. They alleged that he (1) was a licensed medical doctor who specialized in emergency medicine; (2) "had a duty to exercise ordinary care and act as an emergency medicine physician of reasonable and ordinary prudence under the same or similar circumstances"; (3) "was responsible for and provided medical consultative advice and recommendations to and for the various safety practices and procedures" at the water park prior to and as of the date Sarah collapsed; (4) "had a duty under Texas law to exercise ordinary care and act as an emergency medicine physician of reasonable and ordinary prudence" in providing services to the water park; and (5) breached "that duty" by (a) failing to timely, properly, and adequately provide services to the water park and (b) committing "other acts or omissions of negligence or wrongdoing." There was never a doctor-patient [**4] relationship between Dr. Yamada and Sarah.

The Friends did not file an expert report pursuant to *Texas Civil Practice and Remedies Code section 74.351* after they sued Dr. Yamada, so he filed a motion to dismiss. *See* TEX. CIV. PRAC. & REM. CODE § 74.351(a), (b). The Friends' response specified that their claims were based on Dr. Yamada's provision of medical consultative advice and recommendations in regard to various safety practices and procedures at the water park. The trial court denied Dr. Yamada's motion and he appealed. *See id. § 51.014(a)(9)* (authorizing interlocutory appeal from an order denying a motion to dismiss for lack of an expert report).

### B. Court of Appeals

The court of appeals noted that the only alleged acts or omissions on which the Friends based their claims against Dr. Yamada were his failure to properly provide advice and recommendations to the City about its safety practices, including the placement and maintenance of AEDs.     S.W.3d     ,     . It determined that the pleadings stated claims for negligence based on breach of an emergency medicine physicians' standard of care, but also stated claims for ordinary negligence. *Id.* at     . The appeals court reasoned that [**5] medical testimony is not required to establish [*195] the proper placement of AED devices, thus such claims were not health care liability claims because the alleged negligence was not based on advice directly related to acts performed or furnished by a health care provider to Sarah during her medical care, treatment, or confinement. The court held that the trial court properly refused to dismiss the claims based on allegations of ordinary negligence. *Id.* at     . However, the court also held that the pleadings alleging Dr. Yamada gave negligent advice about where to locate AEDs were health care liability claims to the extent they alleged Dr. Yamada had a duty to act as an emergency physician under the circumstances and he breached that duty. The court held that the Friends' failure to file an expert report required dismissal of the claims based upon allegations of breach of an emergency room physician's standard of care. *Id.* at     . Thus, the court of appeals held that the same acts and omissions by Dr. Yamada formed the basis of both health care and non-health care claims based on pleadings alleging that the acts and omissions breached different standards of care.

### C.  [**6] Positions of the Parties

The Friends did not file a petition for review. But Dr. Yamada did and we granted it. *52 Tex. Sup. Ct. J. 331, 333 (Feb. 13, 2009).*

Dr. Yamada asserts that the court of appeals erred in two ways. First, he argues the court construed the definition of health care liability claim based on a breach of accepted standards of safety too narrowly. Second, he asserts the court impermissibly allowed "claim splitting" by holding that the same underlying facts gave rise to an ordinary negligence claim, which the court held could continue, and a health care liability claim, which the court dismissed. The difference between the claims, Dr. Yamada urges, is nothing more than artful pleading.

In their brief, the Friends specify that Dr. Yamada's connection to Sarah's death was his consultative services in regard to placement of life-saving devices such as the AEDs. They do not dispute the court of appeals' characterization of their claims as alleging only that Dr. Yamada failed to properly provide advice and recommendations to the City about its safety practices. And they agree that the court of appeals "correctly . . . reversed the trial court's order denying Petitioner Dr. [**7] Yamada's motion to dismiss [their] claims that are based on a standard of medical care and dismissed those claims with prejudice." However, they argue that their ordinary negligence claim should not be dismissed because it is not in essence a health care liability claim. The Friends first assert that their ordinary negligence claim is not for breach of standards of medical care or health care as those terms are defined in the TMLA. Next, they argue that to be a health care liability claim for breach of an accepted standard of safety under the TMLA, the claim must be for an act or omission directly related to health care, which their ordinary negligence claim is not. *See* TEX. CIV. PRAC. & REM. CODE § 74.001(a)(13).

We agree with Dr. Yamada in part. [2] The court of appeals' holding that the Friends asserted health care liability claims against Dr. Yamada is unchallenged and all their claims were based on the same facts. The Friends' claims against [*196] Dr. Yamada cannot be split into health care and non-health care claims by pleading that his actions violated different standards of care; all their claims must be dismissed.

> 2    Our decision makes it unnecessary to consider whether the court of appeals [**8] properly construed the TMLA's language regarding breaches of accepted standards of safety. It is also unnecessary to consider the effect, if any, of the lack of a doctor-patient relationship between Dr. Yamada and Sarah.

## II. Claims Under the TMLA

The TMLA requires the trial court to dismiss a suit asserting health care liability claims against a physician or health care provider if the plaintiff does not timely file an expert report as to that defendant. *Id. § 74.351.* The TMLA defines "health care liability claim" as

> [A] cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care, which proximately results in injury to or death of a claimant,

whether the claimant's claim or cause of action sounds in tort or contract.

*Id. § 74.001(a)(13).*

Whether a claim is a health care liability claim depends on the underlying nature of the claim being made. *Garland Cmty. Hosp. v. Rose, 156 S.W.3d 541, 543 (Tex. 2004)* (addressing former TEX. REV. CIV. STAT. art. 4590i, *repealed by* Act of June 2, 2003, 78th [**9] Leg., ch. 204, § 10.09, 2003 Tex. Gen. Laws 847, 884). Artful pleading does not alter that nature. *Diversicare Gen. Partner, Inc. v. Rubio, 185 S.W.3d 842, 854 (Tex. 2005)*; *Garland Cmty. Hosp., 156 S.W.3d at 543.*

## III. Discussion

In *Diversicare*, Maria Rubio was the victim of a sexual assault at a nursing home. *185 S.W.3d at 845.* Rubio filed suit against the nursing home based in part on claims that the home failed to hire and train appropriate personnel to monitor Rubio, failed to provide twenty-four-hour nursing services from a sufficient number of qualified nursing personnel to meet her nursing needs, hired incompetent staff who were unqualified to care for her, and failed to establish and implement appropriate safety policies to protect its residents. *Id.* The concurring and dissenting justices in *Diversicare* concluded that Rubio asserted a premises liability claim against the nursing home independent of her health care liability claim. *Id. at 857-58* (Jefferson, C.J., concurring in part, and dissenting in part) (pointing to Rubio's claims that the home failed to protect her by failing to implement safety precautions and establish appropriate corporate safety, training, and staffing [**10] policies); *id. at 861-66* (O'Neill, J., dissenting) (construing Rubio's claim that the facility failed to use ordinary care to protect her from a known danger to be a premises liability claim). The Court rejected the view that Rubio could allege a claim for premises liability independent of her healthcare liability claim because it "would open the door to splicing health care liability claims into a multitude of other causes of action with standards of care, damages, and procedures contrary to the Legislature's explicit requirements. It is well settled that such artful pleading and recasting of claims is not permitted." *Id. at 854*; *see also Murphy v. Russell, 167 S.W.3d 835, 838 (Tex. 2005)* ("[A] claimant cannot escape the Legislature's statutory scheme by artful pleading."); *Garland Cmty. Hosp., 156 S.W.3d at 543* ("Plaintiffs cannot use artful pleading to avoid the MLIIA's requirements when the essence of the suit is a health care liability claim.").

Because the Friends do not challenge the court of appeals' holding that their claims against Dr. Yamada are in part health care liability claims and based on facts

covered by the TMLA, the question before us is whether claims based on the [**11] [*197] same facts can alternatively be maintained as ordinary negligence claims. We hold that they cannot.

Despite agreeing that the court of appeals correctly dismissed their health care liability claims based on the acts and omissions of Dr. Yamada, the Friends allege that his conduct can also be measured by ordinary standards of care as opposed to standards that require specific expertise in health care. But it would be hard to find a health care liability claim in which some action by the health care provider or physician arguably would not be within the common knowledge of jurors, and thus would support a claim for ordinary negligence. This case is a prime example of such a claim. The Friends assert that the same actions and omissions by Dr. Yamada are governed by both standards requiring expert testimony to establish--one of the factors that can be considered in determining whether a claim is a health care liability claim--and standards that do not require expert testimony.

The Friends reference other examples in their brief. In *Institute for Women's Health, P.L.L.C. v. Imad, 2006 Tex. App. Lexis 1182 (Tex. App.--San Antonio Feb. 15, 2006, no pet.)*, an embryologist dropped a tray of embryos [**12] and destroyed all of them except one. The Friends note their agreement with the holding that the claims against the embryologist were health care liability claims because the specific acts and omissions of the embryologist were an inseparable part of the health and medical transaction. But even though the carrying of the tray was an inseparable part of the health and medical services, the care required in carrying a tray of embryos without dropping it could have been asserted as ordinary negligence because the care required to carry a tray--whether one carrying embryos or something else such as a child's lunch--is not generally outside the common knowledge of jurors.

The Friends also reference *Valley Baptist Medical Center v. Azua, 198 S.W.3d 810 (Tex. App.--Corpus Christi 2006, no pet.)*. There a hospital employee was assisting a patient into a wheelchair. The employee allegedly failed to block the wheels of the wheelchair and the patient was injured when the wheelchair moved as the patient was attempting to sit in it. *Id. at 814*. It certainly could be argued, as Azua did, that expert testimony is not necessary to establish the need to secure a wheelchair so it will not move when an ill [**13] pa-

tient tries to sit down in it. Nevertheless, the Friends note their agreement with the court of appeals' holding that the Azua's claim, although pled as an ordinary negligence claim, was a health care liability claim. *Id.*

Clearly, particular actions or omissions underlying health care liability claims can be highlighted and alleged to be breaches of ordinary standards of care. But if the same underlying facts are allowed to give rise to both types of claims, then the *TMLA* and its procedures and limitations will effectively be negated. Plaintiffs will be able to entirely avoid application of the TMLA by carefully choosing the acts and omissions on which to base their claims and the language by which they assert the claims.

Our prior decisions are to the effect that if the gravamen or essence of a cause of action is a health care liability claim, then allowing the claim to be split or spliced into a multitude of other causes of action with differing standards of care, damages, and procedures would contravene the Legislature's explicit requirements. *Diversicare, 185 S.W.3d at 854*. Those decisions dictate the outcome here. The Friends' allegations that Dr. Yamada's actions breached ordinary [**14] standards of care did [*198] not change either the substantive basis or the nature of the claims.

## IV. Conclusion

Based on the unchallenged holding of the court of appeals that the Friends' claims based on Dr. Yamada's actions encompassed health care liability claims, all their claims should have been dismissed because they did not file an expert report. We affirm the court of appeals' judgment to the extent it reversed the trial court's order and dismissed some of the Friends' claims. We reverse the court of appeals' judgment to the extent it affirmed the trial court's order denying Dr. Yamada's motion to dismiss. Because Dr. Yamada requested his attorney's fees and costs in the trial court under *Texas Civil Practice and Remedies Code section 74.351(b)(1)*, we remand to that court with instructions to dismiss all the Friends' claims against Dr. Yamada and consider his request for attorney's fees and costs.

Phil Johnson

Justice

**OPINION DELIVERED**: December 17, 2010

# APPENDIX – "4"

AUTHORITY: Secs. 1102, 1871 and 1881 of the Social Security Act (42 U.S.C. 1302, 1395hh, and 1395rr), unless otherwise noted.

SOURCE: 51 FR 22042, June 17, 1986, unless otherwise noted.

## Subpart A—General Provisions

### § 482.1　Basis and scope.

(a) *Statutory basis.* (1) Section 1861(e) of the Act provides that—

(i) Hospitals participating in Medicare must meet certain specified requirements; and

(ii) The Secretary may impose additional requirements if they are found necessary in the interest of the health and safety of the individuals who are furnished services in hospitals.

(2) Section 1861(f) of the Act provides that an institution participating in Medicare as a psychiatric hospital must meet certain specified requirements imposed on hospitals under section 1861(e), must be primarily engaged in providing, by or under the supervision of a physician, psychiatric services for the diagnosis and treatment of mentally ill persons, must maintain clinical records and other records that the Secretary finds necessary, and must meet staffing requirements that the Secretary finds necessary to carry out an active program of treatment for individuals who are furnished services in the hospital. A distinct part of an institution can participate as a psychiatric hospital if the institution meets the specified 1861(e) requirements and is primarily engaged in providing psychiatric services, and if the distinct part meets the records and staffing requirements that the Secretary finds necessary.

(3) Sections 1861(k) and 1902(a)(30) of the Act provide that hospitals participating in Medicare and Medicaid must have a utilization review plan that meets specified requirements.

(4) Section 1883 of the Act sets forth the requirements for hospitals that provide long term care under an agreement with the Secretary.

(5) Section 1905(a) of the Act provides that "medical assistance" (Medicaid) payments may be applied to various hospital services. Regulations interpreting those provisions specify that hospitals receiving payment under Medicaid must meet the requirements for participation in Medicare (except in the case of medical supervision of nurse-midwife services. See §§ 440.10 and 440.165 of this chapter.).

(b) *Scope.* Except as provided in subpart A of part 488 of this chapter, the provisions of this part serve as the basis of survey activities for the purpose of determining whether a hospital qualifies for a provider agreement under Medicare and Medicaid.

[51 FR 22042, June 17, 1986, as amended at 60 FR 50442, Sept. 29, 1995]

### § 482.2　Provision of emergency services by nonparticipating hospitals.

(a) The services of an institution that does not have an agreement to participate in the Medicare program may, nevertheless, be reimbursed under the program if—

(1) The services are emergency services; and

(2) The institution meets the requirements of section 1861(e) (1) through (5) and (7) of the Act. Rules applicable to emergency services furnished by nonparticipating hospitals are set forth in subpart G of part 424 of this chapter.

(b) Section 440.170(e) of this chapter defines emergency hospital services for purposes of Medicaid reimbursement.

[51 FR 22042, June 17, 1986, as amended at 53 FR 6648, Mar. 2, 1988]

## Subpart B—Administration

### § 482.11　Condition of participation: Compliance with Federal, State and local laws.

(a) The hospital must be in compliance with applicable Federal laws related to the health and safety of patients.

(b) The hospital must be—

(1) Licensed; or

(2) Approved as meeting standards for licensing established by the agency of the State or locality responsible for licensing hospitals.

(c) The hospital must assure that personnel are licensed or meet other applicable standards that are required by State or local laws.

# APPENDIX – "5"



his or her other rights under this section.

(2) Inform each patient (or support person, where appropriate) of the right, subject to his or her consent, to receive the visitors whom he or she designates, including, but not limited to, a spouse, a domestic partner (including a same-sex domestic partner), another family member, or a friend, and his or her right to withdraw or deny such consent at any time.

(3) Not restrict, limit, or otherwise deny visitation privileges on the basis of race, color, national origin, religion, sex, gender identity, sexual orientation, or disability.

(4) Ensure that all visitors enjoy full and equal visitation privileges consistent with patient preferences.

[71 FR 71426, Dec. 8, 2006, as amended at 75 FR 70844, Nov. 19, 2010]

## Subpart C—Basic Hospital Functions

### § 482.21 Condition of participation: Quality assessment and performance improvement program.

The hospital must develop, implement, and maintain an effective, ongoing, hospital-wide, data-driven quality assessment and performance improvement program. The hospital's governing body must ensure that the program reflects the complexity of the hospital's organization and services; involves all hospital departments and services (including those services furnished under contract or arrangement); and focuses on indicators related to improved health outcomes and the prevention and reduction of medical errors. The hospital must maintain and demonstrate evidence of its QAPI program for review by CMS.

(a) *Standard: Program scope.* (1) The program must include, but not be limited to, an ongoing program that shows measurable improvement in indicators for which there is evidence that it will improve health outcomes and identify and reduce medical errors.

(2) The hospital must measure, analyze, and track quality indicators, including adverse patient events, and other aspects of performance that assess processes of care, hospital service and operations.

(b) *Standard: Program data.* (1) The program must incorporate quality indicator data including patient care data, and other relevant data, for example, information submitted to, or received from, the hospital's Quality Improvement Organization.

(2) The hospital must use the data collected to—

(i) Monitor the effectiveness and safety of services and quality of care; and

(ii) Identify opportunities for improvement and changes that will lead to improvement.

(3) The frequency and detail of data collection must be specified by the hospital's governing body.

(c) *Standard: Program activities.* (1) The hospital must set priorities for its performance improvement activities that—

(i) Focus on high-risk, high-volume, or problem-prone areas;

(ii) Consider the incidence, prevalence, and severity of problems in those areas; and

(iii) Affect health outcomes, patient safety, and quality of care.

(2) Performance improvement activities must track medical errors and adverse patient events, analyze their causes, and implement preventive actions and mechanisms that include feedback and learning throughout the hospital.

(3) The hospital must take actions aimed at performance improvement and, after implementing those actions, the hospital must measure its success, and track performance to ensure that improvements are sustained.

(d) *Standard: Performance improvement projects.* As part of its quality assessment and performance improvement program, the hospital must conduct performance improvement projects.

(1) The number and scope of distinct improvement projects conducted annually must be proportional to the scope and complexity of the hospital's services and operations.

(2) A hospital may, as one of its projects, develop and implement an information technology system explicitly designed to improve patient safety and quality of care. This project, in its initial stage of development, does not

13

need to demonstrate measurable improvement in indicators related to health outcomes.

(3) The hospital must document what quality improvement projects are being conducted, the reasons for conducting these projects, and the measurable progress achieved on these projects.

(4) A hospital is not required to participate in a QIO cooperative project, but its own projects are required to be of comparable effort.

(e) *Standard: Executive responsibilities.* The hospital's governing body (or organized group or individual who assumes full legal authority and responsibility for operations of the hospital), medical staff, and administrative officials are responsible and accountable for ensuring the following:

(1) That an ongoing program for quality improvement and patient safety, including the reduction of medical errors, is defined, implemented, and maintained.

(2) That the hospital-wide quality assessment and performance improvement efforts address priorities for improved quality of care and patient safety; and that all improvement actions are evaluated.

(3) That clear expectations for safety are established.

(4) That adequate resources are allocated for measuring, assessing, improving, and sustaining the hospital's performance and reducing risk to patients.

(5) That the determination of the number of distinct improvement projects is conducted annually.

[68 FR 3454, Jan. 24, 2003]

### § 482.22 Condition of participation: Medical staff.

The hospital must have an organized medical staff that operates under bylaws approved by the governing body and is responsible for the quality of medical care provided to patients by the hospital.

(a) *Standard: Composition of the medical staff.* The medical staff must be composed of doctors of medicine or osteopathy and, in accordance with State law, may also be composed of other practitioners appointed by the governing body.

(1) The medical staff must periodically conduct appraisals of its members.

(2) The medical staff must examine credentials of candidates for medical staff membership and make recommendations to the governing body on the appointment of the candidates.

(3) When telemedicine services are furnished to the hospital's patients through an agreement with a distant-site hospital, the governing body of the hospital whose patients are receiving the telemedicine services may choose, in lieu of the requirements in paragraphs (a)(1) and (a)(2) of this section, to have its medical staff rely upon the credentialing and privileging decisions made by the distant-site hospital when making recommendations on privileges for the individual distant-site physicians and practitioners providing such services, if the hospital's governing body ensures, through its written agreement with the distant-site hospital, that all of the following provisions are met:

(i) The distant-site hospital providing the telemedicine services is a Medicare-participating hospital.

(ii) The individual distant-site physician or practitioner is privileged at the distant-site hospital providing the telemedicine services, which provides a current list of the distant-site physician's or practitioner's privileges at the distant-site hospital.

(iii) The individual distant-site physician or practitioner holds a license issued or recognized by the State in which the hospital whose patients are receiving the telemedicine services is located.

(iv) With respect to a distant-site physician or practitioner, who holds current privileges at the hospital whose patients are receiving the telemedicine services, the hospital has evidence of an internal review of the distant-site physician's or practitioner's performance of these privileges and sends the distant-site hospital such performance information for use in the periodic appraisal of the distant-site physician or practitioner. At a minimum, this information must include all adverse events that result from the telemedicine services provided by the distant-site physician or practitioner

14

# APPENDIX – "6"

professional services provided, to determine medical necessity and to promote the most efficient use of available health facilities and services.

§ 482.41 Condition of participation: Physical environment.

The hospital must be constructed, arranged, and maintained to ensure the safety of the patient, and to provide facilities for diagnosis and treatment and for special hospital services appropriate to the needs of the community.

(a) *Standard: Buildings.* The condition of the physical plant and the overall hospital environment must be developed and maintained in such a manner that the safety and well-being of patients are assured.

(1) There must be emergency power and lighting in at least the operating, recovery, intensive care, and emergency rooms, and stairwells. In all other areas not serviced by the emergency supply source, battery lamps and flashlights must be available.

(2) There must be facilities for emergency gas and water supply.

(b) *Standard: Life safety from fire.* (1) Except as otherwise provided in this section—

(i) The hospital must meet the applicable provisions of the 2000 edition of the Life Safety Code of the National Fire Protection Association. The Director of the Office of the Federal Register has approved the NFPA 101® 2000 edition of the Life Safety Code, issued January 14, 2000, for incorporation by reference in accordance with 5 U.S.C. 552(a) and 1 CFR part 51. A copy of the Code is available for inspection at the CMS Information Resource Center, 7500 Security Boulevard, Baltimore, MD or at the National Archives and Records Administration (NARA). For information on the availability of this material at NARA, call 202–741–6030, or go to: *http://www.archives.gov/ federal_register/ code_of_federal_regulations/ ibr_locations.html.* Copies may be obtained from the National Fire Protection Association, 1 Batterymarch Park, Quincy, MA 02269. If any changes in this edition of the Code are incorporated by reference, CMS will publish notice in the FEDERAL REGISTER to announce the changes.

(ii) Chapter 19.3.6.3.2, exception number 2 of the adopted edition of the LSC does not apply to hospitals.

(2) After consideration of State survey agency findings, CMS may waive specific provisions of the Life Safety Code which, if rigidly applied, would result in unreasonable hardship upon the facility, but only if the waiver does not adversely affect the health and safety of the patients.

(3) The provisions of the Life Safety Code do not apply in a State where CMS finds that a fire and safety code imposed by State law adequately protects patients in hospitals.

(4) Beginning March 13, 2006, a hospital must be in compliance with Chapter 19.2.9, Emergency Lighting.

(5) Beginning March 13, 2006, Chapter 19.3.6.3.2, exception number 2 does not apply to hospitals.

(6) The hospital must have procedures for the proper routine storage and prompt disposal of trash.

(7) The hospital must have written fire control plans that contain provisions for prompt reporting of fires; extinguishing fires; protection of patients, personnel and guests; evacuation; and cooperation with fire fighting authorities.

(8) The hospital must maintain written evidence of regular inspection and approval by State or local fire control agencies.

(9) Notwithstanding any provisions of the 2000 edition of the Life Safety Code to the contrary, a hospital may install alcohol-based hand rub dispensers in its facility if—

(i) Use of alcohol-based hand rub dispensers does not conflict with any State or local codes that prohibit or otherwise restrict the placement of alcohol-based hand rub dispensers in health care facilities;

(ii) The dispensers are installed in a manner that minimizes leaks and spills that could lead to falls;

(iii) The dispensers are installed in a manner that adequately protects against inappropriate access;

(iv) The dispensers are installed in accordance with chapter 18.3.2.7 or chapter 19.3.2.7 of the 2000 edition of the Life Safety Code, as amended by NFPA Temporary Interim Amendment

24

00-1(101), issued by the Standards Council of the National Fire Protection Association on April 15, 2004. The Director of the Office of the Federal Register has approved NFPA Temporary Interim Amendment 00-1(101) for incorporation by reference in accordance with 5 U.S.C. 552(a) and 1 CFR part 51. A copy of the amendment is available for inspection at the CMS Information Resource Center, 7500 Security Boulevard, Baltimore, MD and at the Office of the Federal Register, 800 North Capitol Street NW., Suite 700, Washington, DC. Copies may be obtained from the National Fire Protection Association, 1 Batterymarch Park, Quincy, MA 02269; and

(v) The dispensers are maintained in accordance with dispenser manufacturer guidelines.

(c) *Standard: Facilities.* The hospital must maintain adequate facilities for its services.

(1) Diagnostic and therapeutic facilities must be located for the safety of patients.

(2) Facilities, supplies, and equipment must be maintained to ensure an acceptable level of safety and quality.

(3) The extent and complexity of facilities must be determined by the services offered.

(4) There must be proper ventilation, light, and temperature controls in pharmaceutical, food preparation, and other appropriate areas.

[51 FR 22042, June 17, 1986, as amended at 53 FR 11509, Apr. 7, 1988; 68 FR 1386, Jan. 10, 2003; 69 FR 49267, Aug. 11, 2004; 70 FR 15238, Mar. 25, 2005; 71 FR 55340, Sept. 22, 2006]

§482.42 Condition of participation: Infection control.

The hospital must provide a sanitary environment to avoid sources and transmission of infections and communicable diseases. There must be an active program for the prevention, control, and investigation of infections and communicable diseases.

(a) *Standard: Organization and policies.* A person or persons must be designated as infection control officer or officers to develop and implement policies governing control of infections and communicable diseases.

(1) The infection control officer or officers must develop a system for identifying, reporting, investigating, and controlling infections and communicable diseases of patients and personnel.

(2) The infection control officer or officers must maintain a log of incidents related to infections and communicable diseases.

(b) *Standard: Responsibilities of chief executive officer, medical staff, and director of nursing services.* The chief executive officer, the medical staff, and the director of nursing services must—

(1) Ensure that the hospital-wide quality assurance program and training programs address problems identified by the infection control officer or officers; and

(2) Be responsible for the implementation of successful corrective action plans in affected problem areas.

§482.43 Condition of participation: Discharge planning.

The hospital must have in effect a discharge planning process that applies to all patients. The hospital's policies and procedures must be specified in writing.

(a) *Standard: Identification of patients in need of discharge planning.* The hospital must identify at an early stage of hospitalization all patients who are likely to suffer adverse health consequences upon discharge if there is no adequate discharge planning.

(b) *Standard: Discharge planning evaluation.* (1) The hospital must provide a discharge planning evaluation to the patients identified in paragraph (a) of this section, and to other patients upon the patient's request, the request of a person acting on the patient's behalf, or the request of the physician.

(2) A registered nurse, social worker, or other appropriately qualified personnel must develop, or supervise the development of, the evaluation.

(3) The discharge planning evaluation must include an evaluation of the likelihood of a patient needing post- hospital services and of the availability of the services.

(4) The discharge planning evaluation must include an evaluation of the likelihood of a patient's capacity for self-care or of the possibility of the patient being cared for in the environment

25

# APPENDIX – "7"

<<Prev Rule                                                                    Next Rule>>

# Texas Administrative Code

| | |
|---|---|
| TITLE 25 | HEALTH SERVICES |
| PART 1 | DEPARTMENT OF STATE HEALTH SERVICES |
| CHAPTER 133 | HOSPITAL LICENSING |
| SUBCHAPTER A | GENERAL PROVISIONS |
| RULE §133.1 | Purpose |

(a) The purpose of this chapter is to implement the Health and Safety Code, Chapter 241, which requires general and special hospitals to be licensed by the Department of State Health Services.

(b) This chapter provides procedures for obtaining a hospital license; minimum standards for hospital functions and services; patient rights standards; discrimination or retaliation standards; patient transfer and other policy and protocol requirements; reporting, posting and training requirements relating to abuse and neglect; standards for voluntary agreements; waiver provisions; inspection and investigation procedures; enforcement standards; fire prevention and protection requirements; general safety standards; physical plant and construction requirements for existing and new hospitals, and mobile transportable and relocatable units; and standards for the preparation, submittal, review and approval of construction documents.

(c) Compliance with this chapter does not constitute release from the requirements of other applicable federal, state, or local laws, codes, rules, regulations and ordinances. This chapter must be followed where it exceeds other codes and ordinances.

**Source Note:** The provisions of this §133.1 adopted to be effective June 21, 2007, 32 TexReg 3587

# APPENDIX – "8"

<<Prev Rule                                                   Next Rule>>

# Texas Administrative Code

| | |
|---|---|
| TITLE 25 | HEALTH SERVICES |
| PART 1 | DEPARTMENT OF STATE HEALTH SERVICES |
| CHAPTER 133 | HOSPITAL LICENSING |
| SUBCHAPTER C | OPERATIONAL REQUIREMENTS |
| RULE §133.41 | Hospital Functions and Services |

(a) Anesthesia services. If the hospital furnishes anesthesia services, these services shall be provided in a well-organized manner under the direction of a qualified physician in accordance with the Medical Practice Act and the Nursing Practice Act. The hospital is responsible for and shall document all anesthesia services administered in the hospital.

  (1) Organization and staffing. The organization of anesthesia services shall be appropriate to the scope of the services offered. Only personnel who have been approved by the facility to provide anesthesia services shall administer anesthesia. All approvals or delegations of anesthesia services as authorized by law shall be documented and include the training, experience, and qualifications of the person who provided the service.

  (2) Delivery of services. Anesthesia services shall be consistent with needs and resources. Policies on anesthesia procedure shall include the delineation of pre-anesthesia and post-anesthesia responsibilities. The policies shall ensure that the following are provided for each patient.

    (A) A pre-anesthesia evaluation by an individual qualified to administer anesthesia under paragraph (1) of this subsection shall be performed within 48 hours prior to surgery.

    (B) An intraoperative anesthesia record shall be provided. The record shall include any complications or problems occurring during the anesthesia including time, description of symptoms, review of affected systems, and treatments rendered. The record shall correlate with the controlled substance administration record.

    (C) A post-anesthesia follow-up report shall be written by the person administering the anesthesia before transferring the patient from the post-anesthesia care unit and shall include evaluation for recovery from anesthesia, level of activity, respiration, blood pressure, level of consciousness, and patient's oxygen saturation level.

      (i) With respect to inpatients, a post-anesthesia evaluation for proper anesthesia recovery shall be performed after transfer from the post-anesthesia care unit and within 48 hours after surgery by the person administering the anesthesia, registered nurse (RN), or physician in accordance with policies and procedures approved by the medical staff and using criteria written in the medical staff bylaws for postoperative monitoring of anesthesia.

      (ii) With respect to outpatients, immediately prior to discharge, a post-anesthesia evaluation for proper anesthesia recovery shall be performed by the person administering the anesthesia, RN, or physician in accordance with policies and procedures approved by the medical staff and using criteria written in the medical staff bylaws for postoperative monitoring of anesthesia.

1

(b) Chemical dependency services.

(1) Chemical dependency unit. A hospital may not admit patients to a chemical dependency services unit unless the unit is approved by the Department of State Health Services (department) as meeting the requirements of §133.163(q) of this title (relating to Spatial Requirements for New Construction).

(2) Admission criteria. A hospital providing chemical dependency services shall have written admission criteria that are applied uniformly to all patients who are admitted to the chemical dependency unit.

(A) The hospital's admission criteria shall include procedures to prevent the admission of minors for a condition which is not generally recognized as responsive to treatment in an inpatient setting for chemical dependency services.

(i) The following conditions are not generally recognized as responsive to treatment in a treatment facility for chemical dependency unless the minor to be admitted is qualified because of other disabilities, such as:

(I) cognitive disabilities due to intellectual disability;

(II) learning disabilities; or

(III) psychiatric disorders.

(ii) A minor may be qualified for admission based on other disabilities which would be responsive to chemical dependency services.

(iii) A minor patient shall be separated from adult patients.

(B) The hospital shall have a preadmission examination procedure under which each patient's condition and medical history are reviewed by a member of the medical staff to determine whether the patient is likely to benefit significantly from an intensive inpatient program or assessment.

(C) A voluntarily admitted patient shall sign an admission consent form prior to admission to a chemical dependency unit which includes verification that the patient has been informed of the services to be provided and the estimated charges.

(3) Compliance. A hospital providing chemical dependency services in an identifiable unit within the hospital shall comply with Chapter 448, Subchapter B of this title (relating to Standard of Care Applicable to All Providers).

(c) Comprehensive medical rehabilitation services.

(1) Rehabilitation units. A hospital may not admit patients to a comprehensive medical rehabilitation services unit unless the unit is approved by the department as meeting the requirements of §133.163(z) of this title.

(2) Equipment and space. The hospital shall have the necessary equipment and sufficient space to implement the treatment plan described in paragraph (7)(C) of this subsection and allow for adequate care. Necessary equipment is all equipment necessary to comply with all parts of the written

2

treatment plan. The equipment shall be on-site or available through an arrangement with another provider. Sufficient space is the physical area of a hospital which in the aggregate, constitutes the total amount of the space necessary to comply with the written treatment plan.

(3) Emergency requirements. Emergency personnel, equipment, supplies and medications for hospitals providing comprehensive medical rehabilitation services shall be as follows.

(A) A hospital that provides comprehensive medical rehabilitation services shall have emergency equipment, supplies, medications, and designated personnel assigned for providing emergency care to patients and visitors.

(B) The emergency equipment, supplies, and medications shall be properly maintained and immediately accessible to all areas of the hospital. The emergency equipment shall be periodically tested according to the policy adopted, implemented and enforced by the hospital.

(C) At a minimum, the emergency equipment and supplies shall include those specified in subsection (e)(4) of this section.

(D) The personnel providing emergency care in accordance with this subsection shall be staffed for 24-hour coverage and accessible to all patients receiving comprehensive medical rehabilitation services. At least one person who is qualified by training to perform advanced cardiac life support and administer emergency drugs shall be on duty each shift.

(E) All direct patient care licensed personnel shall maintain current certification in cardiopulmonary resuscitation (CPR).

(4) Medications. A rehabilitation hospital's governing body shall adopt, implement and enforce policies and procedures that require all medications to be administered by licensed nurses, physicians, or other licensed professionals authorized by law to administer medications.

(5) Organization and Staffing.

(A) A hospital providing comprehensive medical rehabilitation services shall be organized and staffed to ensure the health and safety of the patients.

(i) All provided services shall be consistent with accepted professional standards and practice.

(ii) The organization of the services shall be appropriate to the scope of the services offered.

(iii) The hospital shall adopt, implement and enforce written patient care policies that govern the services it furnishes.

(B) The provision of comprehensive medical rehabilitation services in a hospital shall be under the medical supervision of a physician who is on duty and available, or who is on-call 24 hours each day.

(C) A hospital providing comprehensive medical rehabilitation services shall have a medical director or clinical director who supervises and administers the provision of comprehensive medical rehabilitation services.

3

(i) The medical director or clinical director shall be a physician who is board certified or eligible for board certification in physical medicine and rehabilitation, orthopedics, neurology, neurosurgery, internal medicine, or rheumatology as appropriate for the rehabilitation program.

(ii) The medical director or clinical director shall be qualified by training or at least two years training and experience to serve as medical director or clinical director. A person is qualified under this subsection if the person has training and experience in the treatment of rehabilitation patients in a rehabilitation setting.

(6) Admission criteria. A hospital providing comprehensive medical rehabilitation services shall have written admission criteria that are applied uniformly to all patients who are admitted to the comprehensive medical rehabilitation unit.

(A) The hospital's admission criteria shall include procedures to prevent the admission of a minor for a condition which is not generally recognized as responsive to treatment in an inpatient setting for comprehensive medical rehabilitation services.

(i) The following conditions are not generally recognized as responsive to treatment in an inpatient setting for comprehensive medical rehabilitation services unless the minor to be admitted is qualified because of other disabilities, such as:

(I) cognitive disabilities due to intellectual disability;

(II) learning disabilities; or

(III) psychiatric disorders.

(ii) A minor may be qualified for admission based on other disabilities which would be responsive to comprehensive medical rehabilitation services.

(B) The hospital shall have a preadmission examination procedure under which each patient's condition and medical history are reviewed by a member of the medical staff to determine whether the patient is likely to benefit significantly from an intensive inpatient program or assessment.

(7) Care and services.

(A) A hospital providing comprehensive medical rehabilitation services shall use a coordinated interdisciplinary team which is directed by a physician and which works in collaboration to develop and implement the patient's treatment plan.

(i) The interdisciplinary team for comprehensive medical rehabilitation services shall have available to it, at the hospital at which the services are provided or by contract, members of the following professions as necessary to meet the treatment needs of the patient:

(I) physical therapy;

(II) occupational therapy;

(III) speech-language pathology;

(IV) therapeutic recreation;

4

(V) social services and case management;

(VI) dietetics;

(VII) psychology;

(VIII) respiratory therapy;

(IX) rehabilitative nursing;

(X) certified orthotics;

(XI) certified prosthetics;

(XII) pharmaceutical care; and

(XIII) in the case of a minor patient, persons who have specialized education and training in emotional, mental health, or chemical dependency problems, as well as the treatment of minors.

(ii) The coordinated interdisciplinary team approach used in the rehabilitation of each patient shall be documented by periodic entries made in the patient's medical record to denote:

(I) the patient's status in relationship to goal attainment; and

(II) that team conferences are held at least every two weeks to determine the appropriateness of treatment.

(B) An initial assessment and preliminary treatment plan shall be performed or established by the physician within 24 hours of admission.

(C) The physician in coordination with the interdisciplinary team shall establish a written treatment plan for the patient within seven working days of the date of admission.

(i) Comprehensive medical rehabilitation services shall be provided in accordance with the written treatment plan.

(ii) The treatment provided under the written treatment plan shall be provided by staff who are qualified to provide services under state law. The hospital shall establish written qualifications for services provided by each discipline for which there is no applicable state statute for professional licensure or certification.

(iii) Services provided under the written treatment plan shall be given in accordance with the orders of physicians, dentists, podiatrists or practitioners who are authorized by the governing body, hospital administration, and medical staff to order the services, and the orders shall be incorporated in the patient's record.

(iv) The written treatment plan shall delineate anticipated goals and specify the type, amount, frequency, and anticipated duration of service to be provided.

Cont'd...

5

Next Page          Previous Page

List of Titles          Back to List

HOME | TEXAS REGISTER | TEXAS ADMINISTRATIVE CODE | OPEN MEETINGS

<<Prev Rule

Next Rule>>

# Texas Administrative Code

|  |  |
|---|---|
| TITLE 25 | HEALTH SERVICES |
| PART 1 | DEPARTMENT OF STATE HEALTH SERVICES |
| CHAPTER 133 | HOSPITAL LICENSING |
| SUBCHAPTER C | OPERATIONAL REQUIREMENTS |
| RULE §133.41 | Hospital Functions and Services |

(v) Within 10 working days after the date of admission, the written treatment plan shall be provided. It shall be in the person's primary language, if practicable. What is or would have been practicable shall be determined by the facts and circumstances of each case. The written treatment plan shall be provided to:

(I) the patient;

(II) a person designated by the patient; and

(III) upon request, a family member, guardian, or individual who has demonstrated on a routine basis responsibility and participation in the patient's care or treatment, but only with the patient's consent unless such consent is not required by law.

(vi) The written treatment plan shall be reviewed by the interdisciplinary team at least every two weeks.

(vii) The written treatment plan shall be revised by the interdisciplinary team if a comprehensive reassessment of the patient's status or the results of a patient case review conference indicates the need for revision.

(viii) The revision shall be incorporated into the patient's record within seven working days after the revision.

(ix) The revised treatment plan shall be reduced to writing in the person's primary language, if practicable, and provided to:

(I) the patient;

(II) a person designated by the patient; and

(III) upon request, a family member, guardian, or individual who has demonstrated on a routine basis responsibility and participation in the patient's care or treatment, but only with the patient's consent unless such consent is not required by law.

(8) Discharge and continuing care plan. The patient's interdisciplinary team shall prepare a written continuing care plan that addresses the patient's needs for care after discharge.

(A) The continuing care plan for the patient shall include recommendations for treatment and care and information about the availability of resources for treatment or care.

7

(B) If the patient's interdisciplinary team deems it impracticable to provide a written continuing care plan prior to discharge, the patient's interdisciplinary team shall provide the written continuing care plan to the patient within two working days after the date of discharge.

(C) Prior to discharge or within two working days after the date of discharge, the written continuing care plan shall be provided in the person's primary language, if practicable, to:

(i) the patient;

(ii) a person designated by the patient; and

(iii) upon request, to a family member, guardian, or individual who has demonstrated on a routine basis responsibility and participation in the patient's care or treatment, but only with the patient's consent unless such consent is not required by law.

(d) Dietary services. The hospital shall have organized dietary services that are directed and staffed by adequate qualified personnel. However, a hospital that has a contract with an outside food management company or an arrangement with another hospital may meet this requirement if the company or other hospital has a dietitian who serves the hospital on a full-time, part-time, or consultant basis, and if the company or other hospital maintains at least the minimum requirements specified in this section, and provides for the frequent and systematic liaison with the hospital medical staff for recommendations of dietetic policies affecting patient treatment. The hospital shall ensure that there are sufficient personnel to respond to the dietary needs of the patient population being served.

(1) Organization.

(A) The hospital shall have a full-time employee who is qualified by experience or training to serve as director of the food and dietetic service, and be responsible for the daily management of the dietary services.

(B) There shall be a qualified dietitian who works full-time, part-time, or on a consultant basis. If by consultation, such services shall occur at least once per month for not less than eight hours. The dietitian shall:

(i) be currently licensed under the laws of this state to use the titles of licensed dietitian or provisional licensed dietitian, or be a registered dietitian;

(ii) maintain standards for professional practice;

(iii) supervise the nutritional aspects of patient care;

(iv) make an assessment of the nutritional status and adequacy of nutritional regimen, as appropriate;

(v) provide diet counseling and teaching, as appropriate;

(vi) document nutritional status and pertinent information in patient medical records, as appropriate;

(vii) approve menus; and

**8**

(viii) approve menu substitutions.

(C) There shall be administrative and technical personnel competent in their respective duties. The administrative and technical personnel shall:

(i) participate in established departmental or hospital training pertinent to assigned duties;

(ii) conform to food handling techniques in accordance with paragraph (2)(E)(viii) of this subsection;

(iii) adhere to clearly defined work schedules and assignment sheets; and

(iv) comply with position descriptions which are job specific.

(2) Director. The director shall:

(A) comply with a position description which is job specific;

(B) clearly delineate responsibility and authority;

(C) participate in conferences with administration and department heads;

(D) establish, implement, and enforce policies and procedures for the overall operational components of the department to include, but not be limited to:

(i) quality assessment and performance improvement program;

(ii) frequency of meals served;

(iii) nonroutine occurrences; and

(iv) identification of patient trays; and

(E) maintain authority and responsibility for the following, but not be limited to:

(i) orientation and training;

(ii) performance evaluations;

(iii) work assignments;

(iv) supervision of work and food handling techniques;

(v) procurement of food, paper, chemical, and other supplies, to include implementation of first-in first-out rotation system for all food items;

(vi) ensuring there is a four-day food supply on hand at all times;

(vii) menu planning; and

(viii) ensuring compliance with §§229.161 - 229.171 of this title (relating to Texas Food Establishments).

9

(3) Diets. Menus shall meet the needs of the patients.

(A) Therapeutic diets shall be prescribed by the physician(s) responsible for the care of the patients. The dietary department of the hospital shall:

(i) establish procedures for the processing of therapeutic diets to include, but not be limited to:

(I) accurate patient identification;

(II) transcription from nursing to dietary services;

(III) diet planning by a dietitian;

(IV) regular review and updating of diet when necessary; and

(V) written and verbal instruction to patient and family. It shall be in the patient's primary language, if practicable, prior to discharge. What is or would have been practicable shall be determined by the facts and circumstances of each case;

(ii) ensure that therapeutic diets are planned in writing by a qualified dietitian;

(iii) ensure that menu substitutions are approved by a qualified dietitian;

(iv) document pertinent information about the patient's response to a therapeutic diet in the medical record; and

(v) evaluate therapeutic diets for nutritional adequacy.

(B) Nutritional needs shall be met in accordance with recognized dietary practices and in accordance with orders of the physician(s) or appropriately credentialed practitioner(s) responsible for the care of the patients. The following requirements shall be met.

(i) Menus shall provide a sufficient variety of foods served in adequate amounts at each meal according to the guidance provided in the Recommended Dietary Allowances (RDA), as published by the Food and Nutrition Board, Commission on Life Sciences, National Research Council, Tenth edition, 1989, which may be obtained by writing the National Academies Press, 500 Fifth Street, NW Lockbox 285, Washington, D.C. 20055, telephone (888) 624-8373.

(ii) A maximum of 15 hours shall not be exceeded between the last meal of the day (i.e. supper) and the breakfast meal, unless a substantial snack is provided. The hospital shall adopt, implement, and enforce a policy on the definition of "substantial" to meet each patient's varied nutritional needs.

(C) A current therapeutic diet manual approved by the dietitian and medical staff shall be readily available to all medical, nursing, and food service personnel. The therapeutic manual shall:

(i) be revised as needed, not to exceed 5 years;

(ii) be appropriate for the diets routinely ordered in the hospital;

(iii) have standards in compliance with the RDA;

(iv) contain specific diets which are not in compliance with RDA; and

10

(v) be used as a guide for ordering and serving diets.

(e) Emergency services. All licensed hospital locations, including multiple-location sites, shall have an emergency suite that complies with §133.161(a)(1)(A) of this title (relating to Requirements for Buildings in Which Existing Licensed Hospitals are Located) or §133.163(f) of this title, and the following.

(1) Organization. The organization of the emergency services shall be appropriate to the scope of the services offered.

(A) The services shall be organized under the direction of a qualified member of the medical staff who is the medical director or clinical director.

(B) The services shall be integrated with other departments of the hospital.

(C) The policies and procedures governing medical care provided in the emergency suite shall be established by and shall be a continuing responsibility of the medical staff.

(D) Medical records indicating patient identification, complaint, physician, nurse, time admitted to the emergency suite, treatment, time discharged, and disposition shall be maintained for all emergency patients.

(E) Each freestanding emergency medical care facility shall advertise as an emergency room. The facility shall display notice that it functions as an emergency room.

(i) The notice shall explain that patients who receive medical services will be billed according to comparable rates for hospital emergency room services in the same region.

(ii) The notice shall be prominently and conspicuously posted for display in a public area of the facility that is readily available to each patient, managing conservator, or guardian. The postings shall be easily readable and consumer-friendly. The notice shall be in English and in a second language appropriate to the demographic makeup of the community served.

(2) Personnel.

(A) There shall be adequate medical and nursing personnel qualified in emergency care to meet the written emergency procedures and needs anticipated by the hospital.

(B) Except for comprehensive medical rehabilitation hospitals and pediatric and adolescent hospitals that generally provide care that is not administered for or in expectation of compensation:

(i) there shall be on duty and available at all times at least one person qualified as determined by the medical staff to initiate immediate appropriate lifesaving measures; and

(ii) in general hospitals where the emergency treatment area is not contiguous with other areas of the hospital that maintain 24 hour staffing by qualified staff (including but not limited to separation by one or more floors in multiple-occupancy buildings), qualified personnel must be physically present in the emergency treatment area at all times.

(C) Except for comprehensive medical rehabilitation hospitals and pediatric and adolescent hospitals that generally provide care that is not administered for or in expectation of compensation,

11

the hospital shall provide that one or more physicians shall be available at all times for emergencies, as follows.

(i) General hospitals, except for hospitals designated as critical access hospitals (CAHs) by the Centers for Medicare & Medicaid Services (CMS), located in counties with a population of 100,000 or more shall have a physician qualified to provide emergency medical care on duty in the emergency treatment area at all times.

Cont'd...

Next Page          Previous Page

List of Titles          Back to List

HOME | TEXAS REGISTER | TEXAS ADMINISTRATIVE CODE | OPEN MEETINGS

**12**

<<Prev Rule

Next Rule>>

# Texas Administrative Code

| | |
|---|---|
| TITLE 25 | HEALTH SERVICES |
| PART 1 | DEPARTMENT OF STATE HEALTH SERVICES |
| CHAPTER 133 | HOSPITAL LICENSING |
| SUBCHAPTER C | OPERATIONAL REQUIREMENTS |
| RULE §133.41 | Hospital Functions and Services |

(ii) Special hospitals, hospitals designated as CAHs by the CMS, and general hospitals located in counties with a population of less than 100,000 shall have a physician on-call and able to respond in person, or by radio or telephone within 30 minutes.

(D) Schedules, names, and telephone numbers of all physicians and others on emergency call duty, including alternates, shall be maintained. Schedules shall be retained for no less than one year.

(3) Supplies and equipment. Adequate age appropriate supplies and equipment shall be available and in readiness for use. Equipment and supplies shall be available for the administration of intravenous medications as well as facilities for the control of bleeding and emergency splinting of fractures. Provision shall be made for the storage of blood and blood products as needed. The emergency equipment shall be periodically tested according to the policy adopted, implemented and enforced by the hospital.

(4) Required emergency equipment. At a minimum, the age appropriate emergency equipment and supplies shall include the following:

(A) emergency call system;

(B) oxygen;

(C) mechanical ventilatory assistance equipment, including airways, manual breathing bag, and mask;

(D) cardiac defibrillator;

(E) cardiac monitoring equipment;

(F) laryngoscopes and endotracheal tubes;

(G) suction equipment;

(H) emergency drugs and supplies specified by the medical staff;

(I) stabilization devices for cervical injuries;

(J) blood pressure monitoring equipment; and

(K) pulse oximeter or similar medical device to measure blood oxygenation.

13

(5) Participation in local emergency medical service (EMS) system.

(A) General hospitals shall participate in the local EMS system, based on the hospital's capabilities and capacity, and the locale's existing EMS plan and protocols.

(B) The provisions of subparagraph (A) of this paragraph do not apply to a comprehensive medical rehabilitation hospital or a pediatric and adolescent hospital that generally provides care that is not administered for or in expectation of compensation.

(6) Emergency services for survivors of sexual assault. This section does not affect the duty of a health care facility to comply with the requirements of the federal Emergency Medical Treatment and Active Labor Act of 1986 (42 U.S.C. §1395dd) that are applicable to the facility.

(A) The hospital shall develop, implement and enforce policies and procedures to ensure that, except as otherwise provided by subparagraph (C) of this paragraph, after a sexual assault survivor presents to the hospital following a sexual assault, the hospital shall provide the care specified under subparagraph (D) of this paragraph.

(B) A facility that is not a health care facility designated in a community-wide plan as the primary health care facility in the community for treating sexual assault survivors shall inform the survivor that:

(i) the facility is not the designated facility and provide to the survivor the name and location of the designated facility; and

(ii) the survivor is entitled, at the survivor's option:

(I) to receive the care described by subparagraph (D) of this paragraph at that facility, subject to subparagraph (D)(i) of this paragraph; or

(II) to be stabilized and to be transferred to and receive the care described by subparagraph (D) of this paragraph at a health care facility designated in a community-wide plan as the primary health care facility in the community for treating sexual assault survivors.

(C) If a sexual assault survivor chooses to be transferred under subparagraph (B)(ii)(II) of this paragraph, after obtaining the survivor's written, signed consent to the transfer, the facility shall stabilize and transfer the survivor to a health care facility in the community designated in a community-wide plan as the health care facility for treating sexual assault survivors, where the survivor will receive the care specified under subparagraph (D) of this paragraph.

(D) A hospital providing care to a sexual assault survivor shall provide the survivor with the following:

(i) subject to subparagraph (G) of this paragraph, a forensic medical examination in accordance with Government Code, Chapter 420, Subchapter B, when the examination has been requested by a law enforcement agency under Code of Criminal Procedure, Article 56.06, or is conducted under Code of Criminal Procedure, Article 56.065. If a sexual assault survivor is age 18 or older and has not reported the assault to a law enforcement agency, a hospital shall provide this forensic medical examination, when the sexual assault survivor has arrived at the facility not later than 96 hours after the time the assault occurred and has consented to the examination;

**14**

(ii) a private area, if available, to wait or speak with the appropriate medical, legal, or sexual assault crisis center staff or volunteer until a physician, nurse, or physician assistant is able to treat the survivor;

(iii) access to a sexual assault program advocate, if available, as provided by Code of Criminal Procedure, Article 56.045;

(iv) the information form required by Health and Safety Code, §323.005;

(v) a private treatment room, if available;

(vi) if indicated by the history of contact, access to appropriate prophylaxis for exposure to sexually transmitted infections; and

(vii) the name and telephone number of the nearest sexual assault crisis center.

(E) The hospital must obtain documented consent before providing the forensic medical examination and treatment.

(F) Upon request, the hospital shall submit to the department its plan for the provision of service to sexual assault survivors. The plan must describe how the hospital will ensure that the services required under subparagraph (D) of this paragraph will be provided.

(i) The hospital shall submit the plan by the 60th day after the department makes the request.

(ii) The department will approve or reject the plan not later than the 120th day following the submission of the plan.

(iii) If the department is not able to approve the plan, the department will return the plan to the hospital and will identify the specific provisions of statutes or rules with which the hospital's plan failed to comply.

(iv) The hospital shall correct and resubmit the plan to the department for approval not later than the 90th day after the plan is returned to the hospital.

(G) A person may not perform a forensic examination on a sexual assault survivor unless the person has the basic training described by Health and Safety Code, §323.0045, or the equivalent education and training.

(H) Basic Sexual Assault Forensic Evidence Collection Training.

(i) A person who performs a forensic examination on a sexual assault survivor must have at least basic forensic evidence collection training or the equivalent education.

(ii) A person who completes a continuing medical or nursing education course in forensic evidence collection that is approved or recognized by the appropriate licensing board is considered to have basic sexual assault forensic evidence training for purposes of this chapter.

(iii) Each health care facility that has an emergency department and that is not a health care facility designated in a community-wide plan as the primary health care facility in the community for

**15**

treating sexual assault survivors shall develop a plan to train personnel on sexual assault forensic evidence collection.

(I) Sexual Assault Survivors Who Are Minors. This chapter does not affect participating entities of children's advocacy centers under Family Code, Chapter 264, Subchapter E, or the working protocols set forth by their multidisciplinary teams to ensure access to specialized medical assessments for sexual assault survivors who are minors. To the extent of a conflict with Family Code, Chapter 264, Subchapter E, that subchapter controls.

(f) Governing body.

(1) Legal responsibility. There shall be a governing body responsible for the organization, management, control, and operation of the hospital, including appointment of the medical staff. For hospitals owned and operated by an individual or by partners, the individual or partners shall be considered the governing body.

(2) Organization. The governing body shall be formally organized in accordance with a written constitution and bylaws which clearly set forth the organizational structure and responsibilities.

(3) Meeting records. Records of governing body meetings shall be maintained.

(4) Responsibilities relating to the medical staff.

(A) The governing body shall ensure that the medical staff has current bylaws, rules, and regulations which are implemented and enforced.

(B) The governing body shall approve medical staff bylaws and other medical staff rules and regulations.

(C) In hospitals that provide obstetrical services, the governing body shall ensure that the hospital collaborates with physicians providing services at the hospital to develop quality initiatives, through the adoption, implementation, and enforcement of appropriate hospital policies and procedures, to reduce the number of elective or nonmedically indicated induced deliveries or cesarean sections performed at the hospital on a woman before the 39th week of gestation.

(D) In hospitals that provide obstetrical services, the governing body shall ensure that the hospital implements a newborn audiological screening program, consistent with the requirements of Health and Safety Code, Chapter 47 (Hearing Loss in Newborns), and performs, either directly or through a referral to another program, audiological screenings for the identification of hearing loss on each newborn or infant born at the facility before the newborn or infant is discharged. These audiological screenings are required to be performed on all newborns or infants before discharge from the facility unless:

(i) a parent or legal guardian of the newborn or infant declines the screening;

(ii) the newborn or infant requires emergency transfer to a tertiary care facility prior to the completion of the screening;

(iii) the screening previously has been completed; or

**16**

(iv) the newborn was discharged from the facility not more than 10 hours after birth and a referral for the newborn was made to another program.

(E) In hospitals that provide obstetrical services, the governing body shall adopt, implement, and enforce policies and procedures related to the testing of any newborn for critical congenital heart disease (CCHD) that may present themselves at birth. The facility shall implement testing programs for all infants born at the facility for CCHD. In the event that a newborn is presented at the emergency room following delivery at a birthing center or a home birth that may or may not have been assisted by a midwife, the facility shall ascertain if any testing for CCHD had occurred and, if not, shall provide the testing necessary to make such determination. The rules concerning the CCHD procedures and requirements are described in §§37.75 - 37.79 of this title.

(F) The governing body shall determine, in accordance with state law and with the advice of the medical staff, which categories of practitioners are eligible candidates for appointment to the medical staff.

(i) In considering applications for medical staff membership and privileges or the renewal, modification, or revocation of medical staff membership and privileges, the governing body must ensure that each physician, podiatrist, and dentist is afforded procedural due process.

(I) If a hospital's credentials committee has failed to take action on a completed application as required by subclause (VIII) of this clause, or a physician, podiatrist, or dentist is subject to a professional review action that may adversely affect his medical staff membership or privileges, and the physician, podiatrist, or dentist believes that mediation of the dispute is desirable, the physician, podiatrist, or dentist may require the hospital to participate in mediation as provided in Civil Practice and Remedies Code (CPRC), Chapter 154. The mediation shall be conducted by a person meeting the qualifications required by CPRC §154.052 and within a reasonable period of time.

(II) Subclause (I) of this clause does not authorize a cause of action by a physician, podiatrist, or dentist against the hospital other than an action to require a hospital to participate in mediation.

(III) An applicant for medical staff membership or privileges may not be denied membership or privileges on any ground that is otherwise prohibited by law.

(IV) A hospital's bylaw requirements for staff privileges may require a physician, podiatrist, or dentist to document the person's current clinical competency and professional training and experience in the medical procedures for which privileges are requested.

Cont'd...



<<Prev Rule

Next Rule>>

# Texas Administrative Code

| | |
|---|---|
| TITLE 25 | HEALTH SERVICES |
| PART 1 | DEPARTMENT OF STATE HEALTH SERVICES |
| CHAPTER 133 | HOSPITAL LICENSING |
| SUBCHAPTER C | OPERATIONAL REQUIREMENTS |
| RULE §133.41 | Hospital Functions and Services |

(V) In granting or refusing medical staff membership or privileges, a hospital may not differentiate on the basis of the academic medical degree held by a physician.

(VI) Graduate medical education may be used as a standard or qualification for medical staff membership or privileges for a physician, provided that equal recognition is given to training programs accredited by the Accreditation Council for Graduate Medical Education and by the American Osteopathic Association.

(VII) Board certification may be used as a standard or qualification for medical staff membership or privileges for a physician, provided that equal recognition is given to certification programs approved by the American Board of Medical Specialties and the Bureau of Osteopathic Specialists.

(VIII) A hospital's credentials committee shall act expeditiously and without unnecessary delay when a licensed physician, podiatrist, or dentist submits a completed application for medical staff membership or privileges. The hospital's credentials committee shall take action on the completed application not later than the 90th day after the date on which the application is received. The governing body of the hospital shall take final action on the application for medical staff membership or privileges not later than the 60th day after the date on which the recommendation of the credentials committee is received. The hospital must notify the applicant in writing of the hospital's final action, including a reason for denial or restriction of privileges, not later than the 20th day after the date on which final action is taken.

(ii) The governing body is authorized to adopt, implement and enforce policies concerning the granting of clinical privileges to advanced practice nurses and physician assistants, including policies relating to the application process, reasonable qualifications for privileges, and the process for renewal, modification, or revocation of privileges.

(I) If the governing body of a hospital has adopted, implemented and enforced a policy of granting clinical privileges to advanced practice nurses or physician assistants, an individual advanced practice nurse or physician assistant who qualifies for privileges under that policy shall be entitled to certain procedural rights to provide fairness of process, as determined by the governing body of the hospital, when an application for privileges is submitted to the hospital. At a minimum, any policy adopted shall specify a reasonable period for the processing and consideration of the application and shall provide for written notification to the applicant of any final action on the application by the hospital, including any reason for denial or restriction of the privileges requested.

**18**

(II) If an advanced practice nurse or physician assistant has been granted clinical privileges by a hospital, the hospital may not modify or revoke those privileges without providing certain procedural rights to provide fairness of process, as determined by the governing body of the hospital, to the advanced practice nurse or physician assistant. At a minimum, the hospital shall provide the advanced practice nurse or physician assistant written reasons for the modification or revocation of privileges and a mechanism for appeal to the appropriate committee or body within the hospital, as determined by the governing body of the hospital.

(III) If a hospital extends clinical privileges to an advanced practice nurse or physician assistant conditioned on the advanced practice nurse or physician assistant having a sponsoring or collaborating relationship with a physician and that relationship ceases to exist, the advanced practice nurse or physician assistant and the physician shall provide written notification to the hospital that the relationship no longer exists. Once the hospital receives such notice from an advanced practice nurse or physician assistant and the physician, the hospital shall be deemed to have met its obligations under this section by notifying the advanced practice nurse or physician assistant in writing that the advanced practice nurse's or physician assistant's clinical privileges no longer exist at that hospital.

(IV) Nothing in this clause shall be construed as modifying Subtitle B, Title 3, Occupations Code, Chapter 204 or 301, or any other law relating to the scope of practice of physicians, advanced practice nurses, or physician assistants.

(V) This clause does not apply to an employer-employee relationship between an advanced practice nurse or physician assistant and a hospital.

(G) The governing body shall ensure that the hospital complies with the requirements concerning physician communication and contracts as set out in Health and Safety Code, §241.1015 (Physician Communication and Contracts).

(H) The governing body shall ensure the hospital complies with the requirements for reporting to the Texas Medical Board the results and circumstances of any professional review action in accordance with the Medical Practice Act, Occupations Code, §160.002 and §160.003.

(I) The governing body shall be responsible for and ensure that any policies and procedures adopted by the governing body to implement the requirements of this chapter shall be implemented and enforced.

(5) Hospital administration. The governing body shall appoint a chief executive officer or administrator who is responsible for managing the hospital.

(6) Patient care. In accordance with hospital policy adopted, implemented and enforced, the governing body shall ensure that:

(A) every patient is under the care of:

(i) a physician. This provision is not to be construed to limit the authority of a physician to delegate tasks to other qualified health care personnel to the extent recognized under state law or the state's regulatory mechanism;

(ii) a dentist who is legally authorized to practice dentistry by the state and who is acting within the scope of his or her license; or

19

(iii) a podiatrist, but only with respect to functions which he or she is legally authorized by the state to perform.

(B) patients are admitted to the hospital only by members of the medical staff who have been granted admitting privileges;

(C) a physician is on duty or on-call at all times;

(D) specific colored condition alert wrist bands that have been standardized for all hospitals licensed under Health and Safety Code, Chapter 241, are used as follows:

(i) red wrist bands for allergies;

(ii) yellow wrist bands for fall risks; and

(iii) purple wrist bands for do not resuscitate status;

(E) the governing body shall consider the addition of the following optional condition alert wrist bands. This consideration must be documented in the minutes of the meeting of the governing body in which the discussion was held:

(i) green wrist bands for latex allergy; and

(ii) pink wrist bands for restricted extremity; and

(F) the governing body shall adopt, implement, and enforce a policy and procedure regarding the removal of personal wrist bands and bracelets as well as a patient's right to refuse to wear condition alert wrist bands.

(7) Services. The governing body shall be responsible for all services furnished in the hospital, whether furnished directly or under contract. The governing body shall ensure that services are provided in a safe and effective manner that permits the hospital to comply with applicable rules and standards. At hospitals that have a mental health service unit, the governing body shall adopt, implement, and enforce procedures for the completion of criminal background checks on all prospective employees that would be considered for assignment to that unit, except for persons currently licensed by this state as health professionals.

(8) Nurse Staffing. The governing body shall adopt, implement and enforce a written nurse staffing policy to ensure that an adequate number and skill mix of nurses are available to meet the level of patient care needed. The governing body policy shall require that hospital administration adopt, implement and enforce a nurse staffing plan and policies that:

(A) require significant consideration be given to the nurse staffing plan recommended by the hospital's nurse staffing committee and the committee's evaluation of any existing plan;

(B) are based on the needs of each patient care unit and shift and on evidence relating to patient care needs;

(C) ensure that all nursing assignments consider client safety, and are commensurate with the nurse's educational preparation, experience, knowledge, and physical and emotional ability;

**20**

(D) require use of the official nurse services staffing plan as a component in setting the nurse staffing budget;

(E) encourage nurses to provide input to the nurse staffing committee relating to nurse staffing concerns;

(F) protect from retaliation nurses who provide input to the nurse staffing committee; and

(G) comply with subsection (o) of this section.

(9) Photo identification badge. The governing body shall adopt a policy requiring employees, physicians, contracted employees, and individuals in training who provide direct patient care at the hospital to wear a photo identification badge during all patient encounters, unless precluded by adopted isolation or sterilization protocols. The badge must be of sufficient size and worn in a manner to be visible and must clearly state:

(A) at minimum the individual's first or last name;

(B) the department of the hospital with which the individual is associated;

(C) the type of license held by the individual, if applicable under Title 3, Occupations Code; and

(D) the provider's status as a student, intern, trainee, or resident, if applicable.

(g) Infection control. The hospital shall provide a sanitary environment to avoid sources and transmission of infections and communicable diseases. There shall be an active program for the prevention, control, and surveillance of infections and communicable diseases.

(1) Organization and policies. A person shall be designated as infection control professional. The hospital shall ensure that policies governing prevention, control and surveillance of infections and communicable diseases are developed, implemented and enforced.

(A) There shall be a system for identifying, reporting, investigating, and controlling health care associated infections and communicable diseases between patients and personnel.

(B) The infection control professional shall maintain a log of all reportable diseases and health care associated infections designated as epidemiologically significant according to the hospital's infection control policies.

(C) A written policy shall be adopted, implemented and enforced for reporting all reportable diseases to the local health authority and the Infectious Disease Surveillance and Epidemiology Branch, Department of State Health Services, Mail Code 2822, P.O. Box 149347, Austin, Texas 78714-9347, in accordance with Chapter 97 of this title (relating to Communicable Diseases), and Health and Safety Code, §§98.103, 98.104, and 98.1045 (relating to Reportable Infections, Alternative for Reportable Surgical Site Infections, and Reporting of Preventable Adverse Events).

(D) The infection control program shall include active participation by the pharmacist.

(2) Responsibilities of the chief executive officer (CEO), medical staff, and chief nursing officer (CNO). The CEO, the medical staff, and the CNO shall be responsible for the following.

**21**

(A) The hospital-wide quality assessment and performance improvement program and training programs shall address problems identified by the infection control professional.

(B) Successful corrective action plans in affected problem areas shall be implemented.

(3) Universal precautions. The hospital shall adopt, implement, and enforce a written policy to monitor compliance of the hospital and its personnel and medical staff with universal precautions in accordance with HSC Chapter 85, Acquired Immune Deficiency Syndrome and Human Immunodeficiency Virus Infection.

(h) Laboratory services. The hospital shall maintain directly, or have available adequate laboratory services to meet the needs of its patients.

(1) Hospital laboratory services. A hospital that provides laboratory services shall comply with the Clinical Laboratory Improvement Amendments of 1988 (CLIA 1988), in accordance with the requirements specified in 42 Code of Federal Regulations (CFR), §§493.1 - 493.1780. CLIA 1988 applies to all hospitals with laboratories that examine human specimens for the diagnosis, prevention, or treatment of any disease or impairment of, or the assessment of the health of, human beings.

(2) Contracted laboratory services. The hospital shall ensure that all laboratory services provided to its patients through a contractual agreement are performed in a facility certified in the appropriate specialties and subspecialties of service in accordance with the requirements specified in 42 CFR Part 493 to comply with CLIA 1988.

(3) Adequacy of laboratory services. The hospital shall ensure the following.

Cont'd...

Next Page          Previous Page

List of Titles          Back to List

# Texas Administrative Code

| TITLE 25 | HEALTH SERVICES |
|---|---|
| PART 1 | DEPARTMENT OF STATE HEALTH SERVICES |
| CHAPTER 133 | HOSPITAL LICENSING |
| SUBCHAPTER C | OPERATIONAL REQUIREMENTS |
| RULE §133.41 | Hospital Functions and Services |

(A) Emergency laboratory services shall be available 24 hours a day.

(B) A written description of services provided shall be available to the medical staff.

(C) The laboratory shall make provision for proper receipt and reporting of tissue specimens.

(D) The medical staff and a pathologist shall determine which tissue specimens require a macroscopic (gross) examination and which require both macroscopic and microscopic examination.

(E) When blood and blood components are stored, there shall be written procedures readily available containing directions on how to maintain them within permissible temperatures and including instructions to be followed in the event of a power failure or other disruption of refrigeration. A label or tray with the recipient's first and last names and identification number, donor unit number and interpretation of compatibility, if performed, shall be attached securely to the blood container.

(F) The hospital shall establish a mechanism for ensuring that the patient's physician or other licensed health care professional is made aware of critical value lab results, as established by the medical staff, before or after the patient is discharged.

(4) Chemical hygiene. A hospital that provides laboratory services shall adopt, implement, and enforce written policies and procedures to manage, minimize, or eliminate the risks to laboratory personnel of exposure to potentially hazardous chemicals in the laboratory which may occur during the normal course of job performance.

(i) Linen and laundry services. The hospital shall provide sufficient clean linen to ensure the comfort of the patient.

(1) For purposes of this subsection, contaminated linen is linen which has been soiled with blood or other potentially infectious materials or may contain sharps. Other potentially infectious materials means:

(A) the following human body fluids: semen, vaginal secretions, cerebrospinal fluid, synovial fluid, pleural fluid, pericardial fluid, peritoneal fluid, amniotic fluid, saliva in dental procedures, any body fluid that is visibly contaminated with blood, and all body fluids in situations where it is difficult or impossible to differentiate between body fluids;

(B) any unfixed tissue or organ (other than intact skin) from a human (living or dead); and

**23**

(C) Human Immunodeficiency Virus (HIV)-containing cell or tissue cultures, organ cultures, and HIV or Hepatitis B Virus (HBV)-containing culture medium or other solutions; and blood, organs, or other tissues from experimental animals infected with HIV or HBV.

(2) The hospital, whether it operates its own laundry or uses commercial service, shall ensure the following.

(A) Employees of a hospital involved in transporting, processing, or otherwise handling clean or soiled linen shall be given initial and follow-up in-service training to ensure a safe product for patients and to safeguard employees in their work.

(B) Clean linen shall be handled, transported, and stored by methods that will ensure its cleanliness.

(C) All contaminated linen shall be placed and transported in bags or containers labeled or color-coded.

(D) Employees who have contact with contaminated linen shall wear gloves and other appropriate personal protective equipment.

(E) Contaminated linen shall be handled as little as possible and with a minimum of agitation. Contaminated linen shall not be sorted or rinsed in patient care areas.

(F) All contaminated linen shall be bagged or put into carts at the location where it was used.

(i) Bags containing contaminated linen shall be closed prior to transport to the laundry.

(ii) Whenever contaminated linen is wet and presents a reasonable likelihood of soak-through of or leakage from the bag or container, the linen shall be deposited and transported in bags that prevent leakage of fluids to the exterior.

(iii) All linen placed in chutes shall be bagged.

(iv) If chutes are not used to convey linen to a central receiving or sorting room, then adequate space shall be allocated on the various nursing units for holding the bagged contaminated linen.

(G) Linen shall be processed as follows:

(i) If hot water is used, linen shall be washed with detergent in water with a temperature of at least 71 degrees Centigrade (160 degrees Fahrenheit) for 25 minutes. Hot water requirements specified in Table 5 of §133.169(e) of this title (relating to Tables) shall be met.

(ii) If low-temperature (less than or equal to 70 degrees Centigrade) (158 degrees Fahrenheit) laundry cycles are used, chemicals suitable for low-temperature washing at proper use concentration shall be used.

(iii) Commercial dry cleaning of fabrics soiled with blood also renders these items free of the risk of pathogen transmission.

(H) Flammable liquids shall not be used to process laundry, but may be used for equipment maintenance.

**24**

(j) Medical record services. The hospital shall have a medical record service that has administrative responsibility for medical records. A medical record shall be maintained for every individual who presents to the hospital for evaluation or treatment.

(1) The organization of the medical record service shall be appropriate to the scope and complexity of the services performed. The hospital shall employ or contract with adequate personnel to ensure prompt completion, filing, and retrieval of records.

(2) The hospital shall have a system of coding and indexing medical records. The system shall allow for timely retrieval by diagnosis and procedure, in order to support medical care evaluation studies.

(3) The hospital shall adopt, implement, and enforce a policy to ensure that the hospital complies with HSC, Chapter 241, Subchapter G (Disclosure of Health Care Information).

(4) The medical record shall contain information to justify admission and continued hospitalization, support the diagnosis, reflect significant changes in the patient's condition, and describe the patient's progress and response to medications and services. Medical records shall be accurately written, promptly completed, properly filed and retained, and accessible.

(5) Medical record entries must be legible, complete, dated, timed, and authenticated in written or electronic form by the person responsible for providing or evaluating the service provided, consistent with hospital policies and procedures.

(6) All orders (except verbal orders) must be dated, timed, and authenticated the next time the prescriber or another practitioner who is responsible for the care of the patient and has been credentialed by the medical staff and granted privileges which are consistent with the written orders provides care to the patient, assesses the patient, or documents information in the patient's medical record.

(7) All verbal orders must be dated, timed, and authenticated within 96 hours by the prescriber or another practitioner who is responsible for the care of the patient and has been credentialed by the medical staff and granted privileges which are consistent with the written orders.

(A) Use of signature stamps by physicians and other licensed practitioners credentialed by the medical staff may be allowed in hospitals when the signature stamp is authorized by the individual whose signature the stamp represents. The administrative offices of the hospital shall have on file a signed statement to the effect that he or she is the only one who has the stamp and uses it. The use of a signature stamp by any other person is prohibited.

(B) A list of computer codes and written signatures shall be readily available and shall be maintained under adequate safeguards.

(C) Signatures by facsimile shall be acceptable. If received on a thermal machine, the facsimile document shall be copied onto regular paper.

(8) Medical records (reports and printouts) shall be retained by the hospital in their original or legally reproduced form for a period of at least ten years. A legally reproduced form is a medical record retained in hard copy, microform (microfilm or microfiche), or other electronic medium. Films, scans, and other image records shall be retained for a period of at least five years. For retention purposes, medical records that shall be preserved for ten years include:

25

(A) identification data;

(B) the medical history of the patient;

(C) evidence of a physical examination, including a health history, performed no more than 30 days prior to admission or within 24 hours after admission. The medical history and physical examination shall be placed in the patient's medical record within 24 hours after admission;

(D) an updated medical record entry documenting an examination for any changes in the patient's condition when the medical history and physical examination are completed within 30 days before admission. This updated examination shall be completed and documented in the patient's medical record within 24 hours after admission;

(E) admitting diagnosis;

(F) diagnostic and therapeutic orders;

(G) properly executed informed consent forms for procedures and treatments specified by the medical staff, or by federal or state laws if applicable, to require written patient consent;

(H) clinical observations, including the results of therapy and treatment, all orders, nursing notes, medication records, vital signs, and other information necessary to monitor the patient's condition;

(I) reports of procedures, tests, and their results, including laboratory, pathology, and radiology reports;

(J) results of all consultative evaluations of the patient and appropriate findings by clinical and other staff involved in the care of the patient;

(K) discharge summary with outcome of hospitalization, disposition of care, and provisions for follow-up care; and

(L) final diagnosis with completion of medical records within 30 calendar days following discharge.

(9) If a patient was less than 18 years of age at the time he was last treated, the hospital may authorize the disposal of those medical records relating to the patient on or after the date of his 20th birthday or on or after the 10th anniversary of the date on which he was last treated, whichever date is later.

(10) The hospital shall not destroy medical records that relate to any matter that is involved in litigation if the hospital knows the litigation has not been finally resolved.

(11) The hospital shall provide written notice to a patient, or a patient's legally authorized representative, that the hospital may authorize the disposal of medical records relating to the patient on or after the periods specified in this section. The notice shall be provided to the patient or the patient's legally authorized representative not later than the date on which the patient who is or will be the subject of a medical record is treated, except in an emergency treatment situation. In an emergency treatment situation, the notice shall be provided to the patient or the patient's legally authorized representative as soon as is reasonably practicable following the emergency treatment situation.

26

(12) If a licensed hospital should close, the hospital shall notify the department at the time of closure the disposition of the medical records, including the location of where the medical records will be stored and the identity and telephone number of the custodian of the records.

(k) Medical staff.

(1) The medical staff shall be composed of physicians and may also be composed of podiatrists, dentists and other practitioners appointed by the governing body.

(A) The medical staff shall periodically conduct appraisals of its members according to medical staff bylaws.

(B) The medical staff shall examine credentials of candidates for medical staff membership and make recommendations to the governing body on the appointment of the candidate.

(2) The medical staff shall be well-organized and accountable to the governing body for the quality of the medical care provided to patients.

(A) The medical staff shall be organized in a manner approved by the governing body.

(B) If the medical staff has an executive committee, a majority of the members of the committee shall be doctors of medicine or osteopathy.

(C) Records of medical staff meetings shall be maintained.

(D) The responsibility for organization and conduct of the medical staff shall be assigned only to an individual physician.

(E) Each medical staff member shall sign a statement signifying they will abide by medical staff and hospital policies.

(3) The medical staff shall adopt, implement, and enforce bylaws, rules, and regulations to carry out its responsibilities. The bylaws shall:

(A) be approved by the governing body;

(B) include a statement of the duties and privileges of each category of medical staff (e.g., active, courtesy, consultant);

(C) describe the organization of the medical staff;

Cont'd...

Next Page          Previous Page

List of Titles          Back to List



HOME | TEXAS REGISTER | TEXAS ADMINISTRATIVE CODE | OPEN MEETINGS

27

<<Prev Rule

Next Rule>>

# Texas Administrative Code

| | |
|---|---|
| TITLE 25 | HEALTH SERVICES |
| PART 1 | DEPARTMENT OF STATE HEALTH SERVICES |
| CHAPTER 133 | HOSPITAL LICENSING |
| SUBCHAPTER C | OPERATIONAL REQUIREMENTS |
| RULE §133.41 | Hospital Functions and Services |

(D) describe the qualifications to be met by a candidate in order for the medical staff to recommend that the candidate be appointed by the governing body;

(E) include criteria for determining the privileges to be granted and a procedure for applying the criteria to individuals requesting privileges; and

(F) include a requirement that a physical examination and medical history be done no more than 30 days before or 24 hours after an admission for each patient by a physician or other qualified practitioner who has been granted these privileges by the medical staff. The medical history and physical examination shall be placed in the patient's medical record within 24 hours after admission. When the medical history and physical examination are completed within the 30 days before admission, an updated examination for any changes in the patient's condition must be completed and documented in the patient's medical record within 24 hours after admission.

(l) Mental health services.

(1) Mental health services unit. A hospital may not admit patients to a mental health services unit unless the unit is approved by the department as meeting the requirements of §133.163(q) of this title.

(2) Admission criteria. A hospital providing mental health services shall have written admission criteria that are applied uniformly to all patients who are admitted to the service.

(A) The hospital's admission criteria shall include procedures to prevent the admission of minors for a condition which is not generally recognized as responsive to treatment in an inpatient setting for mental health services.

(i) The following conditions are not generally recognized as responsive to treatment in a hospital unless the minor to be admitted is qualified because of other disabilities, such as:

(I) cognitive disabilities due to intellectual disability; or

(II) learning disabilities.

(ii) A minor may be qualified for admission based on other disabilities which would be responsive to mental health services.

(B) The medical record shall contain evidence that admission consent was given by the patient, the patient's legal guardian, or the managing conservator, if applicable.

**28**

(C) The hospital shall have a preadmission examination procedure under which each patient's condition and medical history are reviewed by a member of the medical staff to determine whether the patient is likely to benefit significantly from an intensive inpatient program or assessment.

(D) A voluntarily admitted patient shall sign an admission consent form prior to admission to a mental health unit which includes verification that the patient has been informed of the services to be provided and the estimated charges.

(3) Compliance. A hospital providing mental health services shall comply with the following rules administered by the department. The rules are:

(A) Chapter 411, Subchapter J of this title (relating to Standards of Care and Treatment in Psychiatric Hospitals);

(B) Chapter 404, Subchapter E of this title (relating to Rights of Persons Receiving Mental Health Services);

(C) Chapter 405, Subchapter E of this title (relating to Electroconvulsive Therapy (ECT));

(D) Chapter 414, Subchapter I of this title (relating to Consent to Treatment with Psychoactive Medication--Mental Health Services); and

(E) Chapter 415, Subchapter F of this title (relating to Interventions in Mental Health Programs).

(m) Mobile, transportable, and relocatable units. The hospital shall adopt, implement and enforce procedures which address the potential emergency needs for those inpatients who are taken to mobile units on the hospital's premises for diagnostic procedures or treatment.

(n) Nuclear medicine services. If the hospital provides nuclear medicine services, these services shall meet the needs of the patients in accordance with acceptable standards of practice and be licensed in accordance with §289.256 of this title (relating to Medical and Veterinary Use of Radioactive Material).

(1) Policies and procedures. Policies and procedures shall be adopted, implemented, and enforced which will describe the services nuclear medicine provides in the hospital and how employee and patient safety will be maintained.

(2) Organization and staffing. The organization of the nuclear medicine services shall be appropriate to the scope and complexity of the services offered.

(A) There shall be a medical director or clinical director who is a physician qualified in nuclear medicine.

(B) The qualifications, training, functions, and responsibilities of nuclear medicine personnel shall be specified by the medical director or clinical director and approved by the medical staff.

(3) Delivery of services. Radioactive materials shall be prepared, labeled, used, transported, stored, and disposed of in accordance with acceptable standards of practice and in accordance with §289.256 of this title.

**29**

(A) In-house preparation of radiopharmaceuticals shall be by, or under, the direct supervision of an appropriately trained licensed pharmacist or physician.

(B) There shall be proper storage and disposal of radioactive materials.

(C) If clinical laboratory tests are performed by the nuclear medicine services staff, the nuclear medicine staff shall comply with CLIA 1988 in accordance with the requirements specified in 42 CFR Part 493.

(D) Nuclear medicine workers shall be provided personnel monitoring dosimeters to measure their radiation exposure. Exposure reports and documentation shall be available for review.

(4) Equipment and supplies. Equipment and supplies shall be appropriate for the types of nuclear medicine services offered and shall be maintained for safe and efficient performance. The equipment shall be inspected, tested, and calibrated at least annually by qualified personnel.

(5) Records. The hospital shall maintain signed and dated reports of nuclear medicine interpretations, consultations, and procedures.

(A) The physician approved by the medical staff to interpret diagnostic procedures shall sign and date the interpretations of these tests.

(B) The hospital shall maintain records of the receipt and disposition of radiopharmaceuticals until disposal is authorized by the department's Radiation Safety Licensing Branch in accordance with §289.256 of this title.

(C) Nuclear medicine services shall be ordered only by an individual whose scope of state licensure and whose defined staff privileges allow such referrals.

(o) Nursing services. The hospital shall have an organized nursing service that provides 24-hour nursing services as needed.

(1) Organization. The hospital shall have a well-organized service with a plan of administrative authority and delineation of responsibilities for patient care.

(A) Nursing services shall be under the administrative authority of a chief nursing officer (CNO) who shall be an RN and comply with one of the following:

(i) possess a master's degree in nursing;

(ii) possess a master's degree in health care administration or business administration;

(iii) possess a master's degree in a health-related field obtained through a curriculum that included courses in administration and management; or

(iv) be progressing under a written plan to obtain the nursing administration qualifications associated with a master's degree in nursing. The plan shall:

(I) describe efforts to obtain the knowledge associated with graduate education and to increase administrative and management skills and experience;

**30**

(II) include courses related to leadership, administration, management, performance improvement and theoretical approaches to delivering nursing care; and

(III) provide a time-line for accomplishing skills.

(B) The CNO in hospitals with 100 or fewer licensed beds and located in counties with a population of less than 50,000, or in hospitals that have been certified by the Centers for Medicare and Medicaid Services as critical access hospitals in accordance with the Code of Federal Regulations, Title 42, Volume 3, Part 485, Subpart F, §485.606(b), shall be exempted from the requirements in subparagraph (A)(i) - (iv) of this paragraph.

(C) The CNO shall be responsible for the operation of the services, including determining the types and numbers of nursing personnel and staff necessary to provide nursing care for all areas of the hospital.

(D) The CNO shall report directly to the individual who has authority to represent the hospital and who is responsible for the operation of the hospital according to the policies and procedures of the hospital's governing board.

(E) The CNO shall participate with leadership from the governing body, medical staff, and clinical areas, in planning, promoting and conducting performance improvement activities.

(2) Staffing and delivery of care.

(A) The nursing services shall adopt, implement and enforce a procedure to verify that hospital nursing personnel for whom licensure is required have valid and current licensure.

(B) There shall be adequate numbers of RNs, licensed vocational nurses (LVNs), and other personnel to provide nursing care to all patients as needed.

(C) There shall be supervisory and staff personnel for each department or nursing unit to provide, when needed, the immediate availability of an RN to provide care for any patient.

(D) An RN shall be on duty in each building of a licensed hospital that contains at least one nursing unit where patients are present. The RN shall supervise and evaluate the nursing care for each patient and assign the nursing care to other nursing personnel in accordance with the patient's needs and the specialized qualifications and competence of the nursing staff available.

(E) The nursing staff shall develop and keep current a nursing plan of care for each patient which addresses the patient's needs.

(F) The hospital shall establish a nurse staffing committee as a standing committee of the hospital. The committee shall be established in accordance with Health and Safety Code (HSC), §§161.031 - 161.033, to be responsible for soliciting and receiving input from nurses on the development, ongoing monitoring, and evaluation of the staffing plan. As provided by HSC, §161.032, the hospital's records and review relating to evaluation of these outcomes and indicators are confidential and not subject to disclosure under Government Code, Chapter 552 and not subject to disclosure, discovery, subpoena or other means of legal compulsion for their release. As used in this subsection, "committee" or "staffing committee" means a nurse staffing committee established under this subparagraph.

31

(i) The committee shall be composed of:

(I) at least 60% registered nurses who are involved in direct patient care at least 50% of their work time and selected by their peers who provide direct care during at least 50% of their work time;

(II) at least one representative from either infection control, quality assessment and performance improvement or risk management;

(III) members who are representative of the types of nursing services provided at the hospital; and

(IV) the chief nursing officer of the hospital who is a voting member.

(ii) Participation on the committee by a hospital employee as a committee member shall be part of the employee's work time and the hospital shall compensate that member for that time accordingly. The hospital shall relieve the committee member of other work duties during committee meetings.

(iii) The committee shall meet at least quarterly.

(iv) The responsibilities of the committee shall be to:

(I) develop and recommend to the hospital's governing body a nurse staffing plan that meets the requirements of subparagraph (G) of this paragraph;

(II) review, assess and respond to staffing concerns expressed to the committee;

(III) identify the nurse-sensitive outcome measures the committee will use to evaluate the effectiveness of the official nurse services staffing plan;

(IV) evaluate, at least semiannually, the effectiveness of the official nurse services staffing plan and variations between the plan and the actual staffing; and

(V) submit to the hospital's governing body, at least semiannually, a report on nurse staffing and patient care outcomes, including the committee's evaluation of the effectiveness of the official nurse services staffing plan and aggregate variations between the staffing plan and actual staffing.

(G) The hospital shall adopt, implement and enforce a written official nurse services staffing plan. As used in this subsection, "patient care unit" means a unit or area of a hospital in which registered nurses provide patient care.

(i) The official nurse services staffing plan and policies shall:

Cont'd...

Next Page          Previous Page



<<Prev Rule                                                                              Next Rule>>

# Texas Administrative Code

| | |
|---|---|
| TITLE 25 | HEALTH SERVICES |
| PART 1 | DEPARTMENT OF STATE HEALTH SERVICES |
| CHAPTER 133 | HOSPITAL LICENSING |
| SUBCHAPTER C | OPERATIONAL REQUIREMENTS |
| RULE §133.41 | Hospital Functions and Services |

(I) require significant consideration to be given to the nurse staffing plan recommended by the hospital's nurse staffing committee and the committee's evaluation of any existing plan;

(II) be based on the needs of each patient care unit and shift and on evidence relating to patient care needs;

(III) require use of the official nurse services staffing plan as a component in setting the nurse staffing budget;

(IV) encourage nurses to provide input to the nurse staffing committee relating to nurse staffing concerns;

(V) protect from retaliation nurses who provide input to the nurse staffing committee; and

(VI) comply with subsection (o) of this section.

(ii) The plan shall:

(I) set minimum staffing levels for patient care units that are:

(-a-) based on multiple nurse and patient considerations including:

(-1-) patient characteristics and number of patients for whom care is being provided, including number of admissions, discharges and transfers on a unit;

(-2-) intensity of patient care being provided and variability of patient care across a nursing unit;

(-3-) scope of services provided;

(-4-) context within which care is provided, including architecture and geography of the environment, and the availability of technology; and

(-5-) nursing staff characteristics, including staff consistency and tenure, preparation and experience, and the number and competencies of clinical and non-clinical support staff the nurse must collaborate with or supervise.

(-b-) determined by the nursing assessment and in accordance with evidence-based safe nursing standards; and

33

(-c-) recalculated at least annually, or as necessary;

(II) include a method for adjusting the staffing plan shift to shift for each patient care unit based on factors, such as, the intensity of patient care to provide staffing flexibility to meet patient needs;

(III) include a contingency plan when patient care needs unexpectedly exceed direct patient care staff resources;

(IV) include how on-call time will be used;

(V) reflect current standards established by private accreditation organizations, governmental entities, national nursing professional associations, and other health professional organizations and should be developed based upon a review of the codes of ethics developed by the nursing profession through national nursing organizations;

(VI) include a mechanism for evaluating the effectiveness of the official nurse services staffing plan based on patient needs, nursing sensitive quality indicators, nurse satisfaction measures collected by the hospital and evidence based nurse staffing standards. At least one from each of the following three types of outcomes shall be correlated to the adequacy of staffing:

(-a-) nurse-sensitive patient outcomes selected by the nurse staffing committee, such as, patient falls, adverse drug events, injuries to patients, skin breakdown, pneumonia, infection rates, upper gastrointestinal bleeding, shock, cardiac arrest, length of stay, or patient readmissions;

(-b-) operational outcomes, such as, work-related injury or illness, vacancy and turnover rates, nursing care hours per patient day, on-call use, or overtime rates; and

(-c-) substantiated patient complaints related to staffing levels;

(VII) incorporate a process that facilitates the timely and effective identification of concerns about the adequacy of the staffing plan by the nurse staffing committee established pursuant to subparagraph (F) of this paragraph. This process shall include:

(-a-) a prohibition on retaliation for reporting concerns;

(-b-) a requirement that nurses report concerns timely through appropriate channels within the hospital;

(-c-) orientation of nurses on how to report concerns and to whom;

(-d-) encouraging nurses to provide input to the committee relating to nurse staffing concerns;

(-e-) review, assessment, and response by the committee to staffing concerns expressed to the committee;

(-f-) a process for providing feedback during the committee meeting on how concerns are addressed by the committee established under subparagraph (F) of this paragraph; and

(-g-) use of the nurse safe harbor peer review process pursuant to Occupations Code, §303.005;

**34**

(VIII) include policies and procedures that require:

(-a-) orientation of nurses and other personnel who provide nursing care to all patient care units to which they are assigned on either a temporary or permanent basis;

(-b-) that the orientation of nurses and other personnel and the competency to perform nursing services is documented in accordance with hospital policy;

(-c-) that nursing assignments be congruent with documented competency; and

(IX) be used by the hospital as a component in setting the nurse staffing budget and guiding the hospital in assigning nurses hospital wide.

(iii) The hospital shall make readily available to nurses on each patient care unit at the beginning of each shift the official nurse services staffing plan levels and current staffing levels for that unit and that shift.

(iv) There shall be a semiannual evaluation by the staffing committee of the effectiveness of the official nurse services staffing plan and variations between the staffing plan and actual staffing. The evaluation shall consider the outcomes and nursing-sensitive indicators as set out in clause (ii)(VI) of this subparagraph, patient needs, nurse satisfaction measures collected by the hospital, and evidence based nurse staffing standards. This evaluation shall be documented in the minutes of the committee established under subparagraph (F) of this paragraph and presented to the hospital's governing body. Hospitals may determine whether this evaluation is done on a unit or facility level basis. To assist the committee with the semiannual evaluation, the hospital shall report to the committee the variations between the staffing plan and actual staffing. This report of variations shall be confidential and not subject to disclosure under Government Code, Chapter 552 and not subject to disclosure, discovery, subpoena or other means of legal compulsion for their release.

(v) The staffing plan shall be retained for a period of two years.

(H) Nonemployee licensed nurses who are working in the hospital shall adhere to the policies and procedures of the hospital. The CNO shall provide for the adequate orientation, supervision, and evaluation of the clinical activities of nonemployee nursing personnel which occur within the responsibility of the nursing services.

(I) The hospital shall annually report to the department on:

(i) whether the hospital's governing body has adopted a nurse staffing policy;

(ii) whether the hospital has established a nurse staffing committee that meets the membership requirements of subparagraph (F) of this paragraph;

(iii) whether the nurse staffing committee has evaluated the hospital's official nurse services staffing plan and has reported the results of the evaluation to the hospital's governing body; and

(iv) the nurse-sensitive outcome measures the committee adopted for use in evaluating the hospital's official nurse services staffing plan.

(3) Mandatory overtime. The hospital shall adopt, implement and enforce policies on use of mandatory overtime.

35

(A) As used in this subsection:

(i) "on-call time" means time spent by a nurse who is not working but who is compensated for availability; and

(ii) "mandatory overtime" means a requirement that a nurse work hours or days that are in addition to the hours or days scheduled, regardless of the length of a scheduled shift or the number of scheduled shifts each week. Mandatory overtime does not include prescheduled on-call time or time immediately before or after a scheduled shift necessary to document or communicate patient status to ensure patient safety.

(B) A hospital may not require a nurse to work mandatory overtime, and a nurse may refuse to work mandatory overtime.

(C) This section does not prohibit a nurse from volunteering to work overtime.

(D) A hospital may not use on-call time as a substitute for mandatory overtime.

(E) The prohibitions on mandatory overtime do not apply if:

(i) a health care disaster, such as a natural or other type of disaster that increases the need for health care personnel, unexpectedly affects the county in which the nurse is employed or affects a contiguous county;

(ii) a federal, state, or county declaration of emergency is in effect in the county in which the nurse is employed or is in effect in a contiguous county;

(iii) there is an emergency or unforeseen event of a kind that:

(I) does not regularly occur;

(II) increases the need for health care personnel at the hospital to provide safe patient care; and

(III) could not prudently be anticipated by the hospital; or

(iv) the nurse is actively engaged in an ongoing medical or surgical procedure and the continued presence of the nurse through the completion of the procedure is necessary to ensure the health and safety of the patient. The nurse staffing committee shall ensure that scheduling a nurse for a procedure that could be anticipated to require the nurse to stay beyond the end of his or her scheduled shift does not constitute mandatory overtime.

(F) If a hospital determines that an exception exists under subparagraph (E) of this paragraph, the hospital shall, to the extent possible, make and document a good faith effort to meet the staffing need through voluntary overtime, including calling per diems and agency nurses, assigning floats, or requesting an additional day of work from off-duty employees.

(G) A hospital may not suspend, terminate, or otherwise discipline or discriminate against a nurse who refuses to work mandatory overtime.

36

(4) Drugs and biologicals. Drugs and biologicals shall be prepared and administered in accordance with federal and state laws, the orders of the individuals granted privileges by the medical staff, and accepted standards of practice.

(A) All drugs and biologicals shall be administered by, or under supervision of, nursing or other personnel in accordance with federal and state laws and regulations, including applicable licensing rules, and in accordance with the approved medical staff policies and procedures.

(B) All orders for drugs and biologicals shall be in writing, dated, timed, and signed by the individual responsible for the care of the patient as specified under subsection (f)(6)(A) of this section. When telephone or verbal orders must be used, they shall be:

(i) accepted only by personnel who are authorized to do so by the medical staff policies and procedures, consistent with federal and state laws;

(ii) dated, timed, and authenticated within 96 hours by the prescriber or another practitioner who is responsible for the care of the patient and has been credentialed by the medical staff and granted privileges which are consistent with the written orders; and

(iii) used infrequently.

(C) There shall be a hospital procedure for immediately reporting transfusion reactions, adverse drug reactions, and errors in administration of drugs to the attending physician and, if appropriate, to the hospital-wide quality assessment and performance improvement program.

(5) Blood transfusions.

(A) Transfusions shall be prescribed in accordance with hospital policy and administered in accordance with a written protocol for the administration of blood and blood components and the use of infusion devices and ancillary equipment.

(B) Personnel administering blood transfusions and intravenous medications shall have special training for this duty according to written, adopted, implemented and enforced hospital policy.

(C) Blood and blood components shall be transfused through a sterile, pyrogen-free transfusion set that has a filter designed to retain particles potentially harmful to the recipient.

(D) The patient must be observed during the transfusion and for an appropriate time thereafter for suspected adverse reactions.

(E) Pretransfusion and posttransfusion vital signs shall be recorded.

(F) When warming of blood is indicated, this shall be accomplished during its passage through the transfusion set. The warming system shall be equipped with a visible thermometer and may have an audible warning system. Blood shall not be warmed above 42 degrees Celsius.

Cont'd...

Next Page          Previous Page

List of Titles | Back to List

**HOME** | **TEXAS REGISTER** | **TEXAS ADMINISTRATIVE CODE** | **OPEN MEETINGS**

**38**

<<Prev Rule                                                      Next Rule>>

# Texas Administrative Code

|              |                                    |
|--------------|------------------------------------|
| TITLE 25     | HEALTH SERVICES                    |
| PART 1       | DEPARTMENT OF STATE HEALTH SERVICES |
| CHAPTER 133  | HOSPITAL LICENSING                 |
| SUBCHAPTER C | OPERATIONAL REQUIREMENTS           |
| RULE §133.41 | Hospital Functions and Services    |

(G) Drugs or medications, including those intended for intravenous use, shall not be added to blood or blood components. A 0.9% sodium chloride injection, United States Pharmacopeia, may be added to blood or blood components. Other solutions intended for intravenous use may be used in an administration set or added to blood or blood components under either of the following conditions:

(i) they have been approved for this use by the Federal Drug Administration; or

(ii) there is documentation available to show that addition to the component involved is safe and efficacious.

(H) There shall be a system for detection, reporting and evaluation of suspected complications of transfusion. Any adverse event experienced by a patient in association with a transfusion is to be regarded as a suspected transfusion complication. In the event of a suspected transfusion complication, the personnel attending the patient shall notify immediately a responsible physician and the transfusion service and document the complication in the patient's medical record. All suspected transfusion complications shall be evaluated promptly according to an established procedure.

(I) Following the transfusion, the blood transfusion record or a copy shall be made a part of the patient's medical record.

(6) Reporting and peer review of a vocational or registered nurse. A hospital shall adopt, implement, and enforce a policy to ensure that the hospital complies with the Occupations Code §§301.401 - 301.403, 301.405 and Chapter 303 (relating to Grounds for Reporting Nurse, Duty of Nurse to Report, Duty of Peer Review Committee to Report, Duty of Person Employing Nurse to Report, and Nursing Peer Review respectively), and with the rules adopted by the Board of Nurse Examiners in 22 TAC §217.16 (relating to Minor Incidents), §217.19 (relating to Incident-Based Nursing Peer Review and Whistleblower Protections), and §217.20 (relating to Safe Harbor Peer Review for Nurses and Whistleblower Protections).

(7) Policies and procedures related to workplace safety.

(A) The hospital shall adopt, implement and enforce policies and procedures related to the work environment for nurses which:

(i) improve workplace safety and reduce the risk of injury, occupational illness, and violence; and

(ii) increase the use of ergonomic principles and ergonomically designed devices to reduce injury and fatigue.

39

(B) The policies and procedures adopted under subparagraph (A) of this paragraph, at a minimum, must include:

(i) evaluating new products and technology that incorporate ergonomic principles;

(ii) educating nurses in the application of ergonomic practices;

(iii) conducting workplace audits to identify areas of risk of injury, occupational illness, or violence and recommending ways to reduce those risks;

(iv) controlling access to those areas identified as having a high risk of violence; and

(v) promptly reporting crimes committed against nurses to appropriate law enforcement agencies.

(8) Safe patient handling and movement practices.

(A) The hospital shall adopt, implement and enforce policies and procedures to identify, assess, and develop strategies to control risk of injury to patients and nurses associated with the lifting, transferring, repositioning, or movement of a patient.

(B) The policies and procedures shall establish a process that, at a minimum, includes the following:

(i) analysis of the risk of injury to both patients and nurses posed by the patient handling needs of the patient populations served by the hospital and the physical environment in which patient handling and movement occurs;

(ii) education of nurses in the identification, assessment, and control of risks of injury to patients and nurses during patient handling;

(iii) evaluation of alternative ways to reduce risks associated with patient handling, including evaluation of equipment and the environment;

(iv) restriction, to the extent feasible with existing equipment and aids, of manual patient handling or movement of all or most of a patient's weight to emergency, life-threatening, or otherwise exceptional circumstances;

(v) collaboration with and annual report to the nurse staffing committee;

(vi) procedures for nurses to refuse to perform or be involved in patient handling or movement that the nurse believes in good faith will expose a patient or a nurse to an unacceptable risk of injury;

(vii) submission of an annual report to the governing body on activities related to the identification, assessment, and development of strategies to control risk of injury to patients and nurses associated with the lifting, transferring, repositioning, or movement of a patient; and

(viii) development of architectural plans for constructing or remodeling a hospital or a unit of a hospital in which patient handling and movement occurs, with consideration of the feasibility of incorporating patient handling equipment or the physical space and construction design needed to incorporate that equipment at a later date.

**40**

(p) Outpatient services. If the hospital provides outpatient services, the services shall meet the needs of the patients in accordance with acceptable standards of practice.

(1) Organization. Outpatient services shall be appropriately organized and integrated with inpatient services.

(2) Personnel.

(A) The hospital shall assign an individual to be responsible for outpatient services.

(B) The hospital shall have appropriate physicians on staff and other professional and nonprofessional personnel available.

(q) Pharmacy services. The hospital shall provide pharmaceutical services that meet the needs of the patients.

(1) Compliance. The hospital shall provide a pharmacy which is licensed, as required, by the Texas State Board of Pharmacy. Pharmacy services shall comply with all applicable statutes and rules.

(2) Organization. The hospital shall have a pharmacy directed by a licensed pharmacist.

(3) Medical staff. The medical staff shall be responsible for developing policies and procedures that minimize drug errors. This function may be delegated to the hospital's organized pharmaceutical services.

(4) Pharmacy management and administration. The pharmacy or drug storage area shall be administered in accordance with accepted professional principles.

(A) Standards of practice as defined by state law shall be followed regarding the provision of pharmacy services.

(B) The pharmaceutical services shall have an adequate number of personnel to ensure quality pharmaceutical services including emergency services.

(i) The staff shall be sufficient in number and training to respond to the pharmaceutical needs of the patient population being served. There shall be an arrangement for emergency services.

(ii) Employees shall provide pharmaceutical services within the scope of their license and education.

(C) Drugs and biologicals shall be properly stored to ensure ventilation, light, security, and temperature controls.

(D) Records shall have sufficient detail to follow the flow of drugs from entry through dispensation.

(E) There shall be adequate controls over all drugs and medications including the floor stock. Drug storage areas shall be approved by the pharmacist, and floor stock lists shall be established.

(F) Inspections of drug storage areas shall be conducted throughout the hospital under pharmacist supervision.

**41**

(G) There shall be a drug recall procedure.

(H) A full-time, part-time, or consulting pharmacist shall be responsible for developing, supervising, and coordinating all the activities of the pharmacy services.

(i) Direction of pharmaceutical services may not require on-premises supervision but may be accomplished through regularly scheduled visits in accordance with state law.

(ii) A job description or other written agreement shall clearly define the responsibilities of the pharmacist.

(I) Current and accurate records shall be kept of the receipt and disposition of all scheduled drugs.

(i) There shall be a record system in place that provides the information on controlled substances in a readily retrievable manner which is separate from the patient record.

(ii) Records shall trace the movement of scheduled drugs throughout the services, documenting utilization or wastage.

(iii) The pharmacist shall be responsible for determining that all drug records are in order and that an account of all scheduled drugs is maintained and reconciled with written orders.

(5) Delivery of services. In order to provide patient safety, drugs and biologicals shall be controlled and distributed in accordance with applicable standards of practice, consistent with federal and state laws.

(A) All compounding, packaging, and dispensing of drugs and biologicals shall be under the supervision of a pharmacist and performed consistent with federal and state laws.

(B) All drugs and biologicals shall be kept in a secure area, and locked when appropriate.

(i) A policy shall be adopted, implemented, and enforced to ensure the safeguarding, transferring, and availability of keys to the locked storage area.

(ii) Drugs listed in Schedules II, III, IV, and V of the Comprehensive Drug Abuse Prevention and Control Act of 1970 shall be kept locked within a secure area.

(C) Outdated, mislabeled, or otherwise unusable drugs and biologicals shall not be available for patient use.

(D) When a pharmacist is not available, drugs and biologicals shall be removed from the pharmacy or storage area only by personnel designated in the policies of the medical staff and pharmaceutical service, in accordance with federal and state laws.

(i) There shall be a current list of individuals identified by name and qualifications who are designated to remove drugs from the pharmacy.

(ii) Only amounts sufficient for immediate therapeutic needs shall be removed.

(E) Drugs and biologicals not specifically prescribed as to time or number of doses shall automatically be stopped after a reasonable time that is predetermined by the medical staff.

42

(i) Stop order policies and procedures shall be consistent with those of the nursing staff and the medical staff rules and regulations.

(ii) A protocol shall be established by the medical staff for the implementation of the stop order policy, in order that drugs shall be reviewed and renewed, or automatically stopped.

(iii) A system shall be in place to determine compliance with the stop order policy.

(F) Drug administration errors, adverse drug reactions, and incompatibilities shall be immediately reported to the attending physician and, if appropriate, to the hospital-wide quality assessment and performance improvement program. There shall be a mechanism in place for capturing, reviewing, and tracking medication errors and adverse drug reactions.

(G) Abuses and losses of controlled substances shall be reported, in accordance with applicable federal and state laws, to the individual responsible for the pharmaceutical services, and to the chief executive officer, as appropriate.

(H) Information relating to drug interactions and information on drug therapy, side effects, toxicology, dosage, indications for use, and routes of administration shall be immediately available to the professional staff.

(i) A pharmacist shall be readily accessible by telephone or other means to discuss drug therapy, interactions, side effects, dosage, assist in drug selection, and assist in the identification of drug induced problems.

(ii) There shall be staff development programs on drug therapy available to facility staff to cover such topics as new drugs added to the formulary, how to resolve drug therapy problems, and other general information as the need arises.

(I) A formulary system shall be established by the medical staff to ensure quality pharmaceuticals at reasonable costs.

(r) Quality assessment and performance improvement. The governing body shall ensure that there is an effective, ongoing, hospital-wide, data-driven quality assessment and performance improvement (QAPI) program to evaluate the provision of patient care.

(1) Program scope. The hospital-wide QAPI program shall reflect the complexity of the hospital's organization and services and have a written plan of implementation. The program must include an ongoing program that shows measurable improvements in the indicators for which there is evidence that they will improve health outcomes, and identify and reduce medical errors.

(A) All hospital departments and services, including services furnished under contract or arrangement shall be evaluated.

(B) Health care associated infections shall be evaluated.

Cont'd...

Next Page          Previous Page

List of Titles

Back to List

HOME | TEXAS REGISTER | TEXAS ADMINISTRATIVE CODE | OPEN MEETINGS

44

<<Prev Rule                                                                                      Next Rule>>

# Texas Administrative Code

|              |                                        |
|--------------|----------------------------------------|
| TITLE 25     | HEALTH SERVICES                        |
| PART 1       | DEPARTMENT OF STATE HEALTH SERVICES    |
| CHAPTER 133  | HOSPITAL LICENSING                     |
| SUBCHAPTER C | OPERATIONAL REQUIREMENTS               |
| RULE §133.41 | Hospital Functions and Services        |

(C) Medication therapy shall be evaluated.

(D) All medical and surgical services performed in the hospital shall be evaluated as they relate to appropriateness of diagnosis and treatment.

(E) The program must measure, analyze and track quality indicators, including adverse patients' events, and other aspects of performance that assess processes of care, hospital services and operations.

(F) Data collected must be used to monitor the effectiveness and safety of service and quality of care, and to identify opportunities for changes that will lead to improvement.

(G) Priorities must be established for performance improvement activities that focus on high-risk, high-volume, or problem-prone areas, taking into consideration the incidence, prevalence and severity of problems in those areas, and how health outcomes and quality of care may be affected.

(H) Performance improvement activities which affect patient safety, including analysis of medical errors and adverse patient events, must be established, and preventive actions implemented.

(I) Success of actions implemented as a result of performance improvement activities must be measured, and ongoing performance must be tracked to ensure improvements are sustained.

(2) Responsibility and accountability. The hospital's governing body, medical staff and administrative staff are responsible and accountable for ensuring that:

(A) an ongoing program for quality improvement is defined, implemented and maintained, and that program requirements are met;

(B) an ongoing program for patient safety, including reduction of medical errors, is defined, implemented and maintained;

(C) the hospital-wide QAPI efforts address priorities for improved quality of care and patient safety, and that all improvement actions are evaluated; and

(D) adequate resources are allocated for measuring, assessing, improving and sustaining the hospital's resources, and for reducing risk to patients.

(3) Medically-related patient care services. The hospital shall have an ongoing plan, consistent with available community and hospital resources, to provide or make available social work,

45

psychological, and educational services to meet the medically-related needs of its patients. The hospital also shall have an effective, ongoing discharge planning program that facilitates the provision of follow-up care.

(A) Discharge planning shall be completed prior to discharge.

(B) Patients, along with necessary medical information, shall be transferred or referred to appropriate facilities, agencies, or outpatient services, as needed for follow-up or ancillary care.

(C) Screening and evaluation before patient discharge from hospital. In accordance with 42 Code of Federal Regulations (CFR), Part 483, Subpart C (relating to Requirements for Long Term Care Facilities) and the rules of the Department of Aging and Disability Services (DADS) set forth in 40 TAC Chapter 17 (relating to Preadmission Screening and Resident Review (PASRR)), all patients who are being considered for discharge from the hospital to a nursing facility shall be screened, and if appropriate, evaluated, prior to discharge by the hospital and admission to the nursing facility to determine whether the patient may have a mental illness, intellectual disability or developmental disability. If the screening indicates that the patient has a mental illness, intellectual disability or developmental disability, the hospital shall contact and arrange for the local mental health authority designated pursuant to Health and Safety Code, §533.035, to conduct prior to hospital discharge an evaluation of the patient in accordance with the applicable provisions of the PASRR rules. The purpose of PASRR is:

(i) to ensure that placement of the patient in a nursing facility is necessary;

(ii) to identify alternate placement options when applicable; and

(iii) to identify specialized services that may benefit the person with a diagnosis of mental illness, intellectual disability, or developmental disability.

(4) Implementation. The hospital must take actions aimed at performance improvement and, after implementing those actions, the hospital must measure its success, and track performance to ensure that improvements are sustained.

(s) Radiology services. The hospital shall maintain, or have available, diagnostic radiologic services according to needs of the patients. All radiology equipment, including X-ray equipment, mammography equipment and laser equipment, shall be licensed and registered as required under Chapter 289 of this title (relating to Radiation Control). If therapeutic services are also provided, the services, as well as the diagnostic services, shall meet professionally approved standards for safety and personnel qualifications as required in §§289.227, 289.229, 289.230 and 289.231 of this title (relating to Registration Regulations). In a special hospital, portable X-ray equipment may be acceptable as a minimum requirement.

(1) Policies and procedures. Policies and procedures shall be adopted, implemented and enforced which will describe the radiology services provided in the hospital and how employee and patient safety will be maintained.

(2) Safety for patients and personnel. The radiology services, particularly ionizing radiology procedures, shall minimize hazards to patients and personnel.

(A) Proper safety precautions shall be maintained against radiation hazards. This includes adequate radiation shielding, safety procedures and equipment maintenance and testing.

**46**

(B) Inspection of equipment shall be made by or under the supervision of a licensed medical physicist in accordance with §289.227(o) of this title (relating to Use of Radiation Machines in the Healing Arts). Defective equipment shall be promptly repaired or replaced.

(C) Radiation workers shall be provided personnel monitoring dosimeters to measure the amount of radiation exposure they receive. Exposure reports and documentation shall be available for review.

(D) Radiology services shall be provided only on the order of individuals granted privileges by the medical staff.

(3) Personnel.

(A) A qualified full-time, part-time, or consulting radiologist shall supervise the ionizing radiology services and shall interpret only those radiology tests that are determined by the medical staff to require a radiologist's specialized knowledge. For purposes of this section a radiologist is a physician who is qualified by education and experience in radiology in accordance with medical staff bylaws.

(B) Only personnel designated as qualified by the medical staff shall use the radiology equipment and administer procedures.

(4) Records. Records of radiology services shall be maintained. The radiologist or other individuals who have been granted privileges to perform radiology services shall sign reports of his or her interpretations.

(t) Renal dialysis services.

(1) Hospitals may provide inpatient dialysis services without an additional license under HSC Chapter 251. Hospitals providing outpatient dialysis services shall be licensed under HSC Chapter 251.

(2) Hospitals may provide outpatient dialysis services when the governor or the president of the United States declares a disaster in this state or another state. The hospital may provide outpatient dialysis only during the term of the disaster declaration.

(3) Equipment.

(A) Maintenance and repair. All equipment used by a facility, including backup equipment, shall be operated within manufacturer's specifications, and maintained free of defects which could be a potential hazard to patients, staff, or visitors. Maintenance and repair of all equipment shall be performed by qualified staff or contract personnel.

(i) Staff shall be able to identify malfunctioning equipment and report such equipment to the appropriate staff for immediate repair.

(ii) Medical equipment that malfunctions must be clearly labeled and immediately removed from service until the malfunction is identified and corrected.

(iii) Written evidence of all maintenance and repairs shall be maintained.

47

(iv) After repairs or alterations are made to any equipment or system, the equipment or system shall be thoroughly tested for proper operation before returning to service. This testing must be documented.

(v) A facility shall comply with the federal Food, Drug, and Cosmetic Act, 21 United States Code (USC), §360i(b), concerning reporting when a medical device as defined in 21 USC §321(h) has or may have caused or contributed to the injury or death of a patient of the facility.

(B) Preventive maintenance. A facility shall develop, implement and enforce a written preventive maintenance program to ensure patient care related equipment used in a facility receives electrical safety inspections, if appropriate, and maintenance at least annually or more frequently as recommended by the manufacturer. The preventive maintenance may be provided by facility staff or by contract.

(C) Backup machine. At least one complete dialysis machine shall be available on site as backup for every ten dialysis machines in use. At least one of these backup machines must be completely operational during hours of treatment. Machines not in use during a patient shift may be counted as backup except at the time of an initial or an expansion survey.

(D) Pediatric patients. If pediatric patients are treated, a facility shall use equipment and supplies, to include blood pressure cuffs, dialyzers, and blood tubing, appropriate for this special population.

(E) Emergency equipment and supplies. A facility shall have emergency equipment and supplies immediately accessible in the treatment area.

(i) At a minimum, the emergency equipment and supplies shall include the following:

(I) oxygen;

(II) mechanical ventilatory assistance equipment, to include airways, manual breathing bag, and mask;

(III) suction equipment;

(IV) supplies specified by the medical director;

(V) electrocardiograph; and

(VI) automated external defibrillator or defibrillator.

(ii) If pediatric patients are treated, the facility shall have the appropriate type and size emergency equipment and supplies listed in clause (i) of this subparagraph for this special population.

(iii) A facility shall establish, implement, and enforce a policy for the periodic testing and maintenance of the emergency equipment. Staff shall properly maintain and test the emergency equipment and supplies and document the testing and maintenance.

(F) Transducer protector. A transducer protector shall be replaced when wetted during a dialysis treatment and shall be used for one treatment only.

48

(4) Water treatment and dialysate concentrates.

(A) Compliance required. A facility shall meet the requirements of this section. A facility may follow more stringent requirements than the minimum standards required by this section.

(i) The facility administrator and medical director shall each demonstrate responsibility for the water treatment and dialysate supply systems to protect hemodialysis patients from adverse effects arising from known chemical and microbial contaminates that may be found in improperly prepared dialysate, to ensure that the dialysate is correctly formulated and meets the requirements of all applicable quality standards.

(ii) The facility administrator and medical director must assure that policies and procedures related to water treatment and dialysate are understandable and accessible to the operator(s) and that the training program includes quality testing, risks and hazards of improperly prepared concentrate and bacterial issues.

(iii) The facility administrator and medical director must be informed prior to any alteration of, or any device being added to, the water system.

(B) Water treatment. These requirements apply to water intended for use in the delivery of hemodialysis, including the preparation of concentrates from powder at a dialysis facility and dialysate.

(i) The design for the water treatment system in a facility shall be based on considerations of the source water for the facility and designed by a water quality professional with education, training, or experience in dialysis system design.

(ii) When a public water system supply is not used by a facility, the source water shall be tested by the facility at monthly intervals in the same manner as a public water system as described in 30 TAC §290.104 (relating to Summary of Maximum Contaminant Levels, Maximum Residual Disinfectant Levels, Treatment Techniques, and Action Levels), and §290.109 (relating to Microbial Contaminants) as adopted by the Texas Commission on Environmental Quality (TCEQ).

Cont'd...

Next Page          Previous Page

List of Titles              Back to List

HOME | TEXAS REGISTER | TEXAS ADMINISTRATIVE CODE | OPEN MEETINGS

**49**

# Texas Administrative Code

| TITLE 25 | HEALTH SERVICES |
|---|---|
| PART 1 | DEPARTMENT OF STATE HEALTH SERVICES |
| CHAPTER 133 | HOSPITAL LICENSING |
| SUBCHAPTER C | OPERATIONAL REQUIREMENTS |
| RULE §133.41 | Hospital Functions and Services |

(iii) The physical space in which the water treatment system is located must be adequate to allow for maintenance, testing, and repair of equipment. If mixing of dialysate is performed in the same area, the physical space must also be adequate to house and allow for the maintenance, testing, and repair of the mixing equipment and for performing the mixing procedure.

(iv) The water treatment system components shall be arranged and maintained so that bacterial and chemical contaminant levels in the product water do not exceed the standards for hemodialysis water quality described in §4.2.1 (concerning Water Bacteriology) and §4.2.2 (concerning Maximum Level of Chemical Contaminants) of the American National Standard, Water Treatment Equipment for Hemodialysis Applications, August 2001 Edition, published by the Association for the Advancement of Medical Instrumentation (AAMI). All documents published by the AAMI as referenced in this section may be obtained by writing the following address: 1110 North Glebe Road, Suite 220, Arlington, Virginia 22201.

(v) Written policies and procedures for the operation of the water treatment system must be developed and implemented. Parameters for the operation of each component of the water treatment system must be developed in writing and known to the operator. Each major water system component shall be labeled in a manner that identifies the device; describes its function, how performance is verified and actions to take in the event performance is not within an acceptable range.

(vi) The materials of any components of water treatment systems (including piping, storage, filters and distribution systems) that contact the purified water shall not interact chemically or physically so as to affect the purity or quality of the product water adversely. Such components shall be fabricated from unreactive materials (e.g. plastics) or appropriate stainless steel. The use of materials that are known to cause toxicity in hemodialysis, such as copper, brass, galvanized material, or aluminum, is prohibited.

(vii) Chemicals infused into the water such as iodine, acid, flocculants, and complexing agents shall be shown to be nondialyzable or shall be adequately removed from product water. Monitors or specific test procedures to verify removal of additives shall be provided and documented.

(viii) Each water treatment system shall include reverse osmosis membranes or deionization tanks and a minimum of two carbon tanks in series. If the source water is from a private supply which does not use chlorine/chloramine, the water treatment system shall include reverse osmosis membranes or deionization tanks and a minimum of one carbon tank.

**50**

(I) Reverse osmosis membranes. Reverse osmosis membranes, if used, shall meet the standards in §4.3.7 (concerning Reverse Osmosis) of the American National Standard, Water Treatment Equipment for Hemodialysis Applications, August 2001 Edition, published by the AAMI.

(II) Deionization systems.

(-a-) Deionization systems, if used, shall be monitored continuously to produce water of one megohm-centimeter (cm) or greater specific resistivity (or conductivity of one microsiemen/cm or less) at 25 degrees Celsius. An audible and visual alarm shall be activated when the product water resistivity falls below this level and the product water stream shall be prevented from reaching any point of use.

(-b-) Patients shall not be dialyzed on deionized water with a resistivity less than 1.0 megohm-cm measured at the output of the deionizer.

(-c-) A minimum of two deionization (DI) tanks in series shall be used with resistivity monitors including audible and visual alarms placed pre and post the final DI tank in the system. The alarms must be audible in the patient care area.

(-d-) Feed water for deionization systems shall be pretreated with activated carbon adsorption, or a comparable alternative, to prevent nitrosamine formation.

(-e-) If a deionization system is the last process in a water treatment system, it shall be followed by an ultrafilter or other bacteria and endotoxin reducing device.

(III) Carbon tanks.

(-a-) The carbon tanks must contain acid washed carbon, 30-mesh or smaller with a minimum iodine number of 900.

(-b-) A minimum of two carbon adsorption beds shall be installed in a series configuration.

(-c-) The total empty bed contact time (EBCT) shall be at least ten minutes, with the final tank providing at least five minutes EBCT. Carbon adsorption systems used to prepare water for portable dialysis systems are exempt from the requirement for the second carbon and a ten minute EBCT if removal of chloramines to below 0.1 milligram (mg)/1 is verified before each treatment.

(-d-) A means shall be provided to sample the product water immediately prior to the final bed (s). Water from this port(s) must be tested for chlorine/chloramine levels immediately prior to each patient shift.

(-e-) All samples for chlorine/chloramine testing must be drawn when the water treatment system has been operating for at least 15 minutes.

(-f-) Tests for total chlorine, which include both free and combined forms of chlorine, may be used as a single analysis with the maximum allowable concentration of 0.1 mg/liter (L). Test results of greater than 0.5 parts per million (ppm) for chlorine or 0.1 ppm for chloramine from the port between the initial tank(s) and final tank(s) shall require testing to be performed at the final exit and replacement of the initial tank(s).

**51**

(-g-) In a system without a holding tank, if test results at the exit of the final tank(s) are greater than the parameters for chlorine or chloramine described in this subclause, dialysis treatment shall be immediately terminated to protect patients from exposure to chlorine/chloramine and the medical director shall be notified. In systems with holding tanks, if the holding tank tests <1 mg/L for total chlorine, the reverse osmosis (RO) may be turned off and the product water in the holding tank may be used to finish treatments in process. The medical director shall be notified.

(-h-) If means other than granulated carbon are used to remove chlorine/chloramine, the facility's governing body must approve such use in writing after review of the safety of the intended method for use in hemodialysis applications. If such methods include the use of additives, there must be evidence the product water does not contain unsafe levels of these additives.

(ix) Water softeners, if used, shall be tested at the end of the treatment day to verify their capacity to treat a sufficient volume of water to supply the facility for the entire treatment day and shall be fitted with a mechanism to prevent water containing the high concentrations of sodium chloride used during regeneration from entering the product water line during regeneration.

(x) If used, the face(s) of timer(s) used to control any component of the water treatment or dialysate delivery system shall be visible to the operator at all times. Written evidence that timers are checked for operation and accuracy each day of operation must be maintained.

(xi) Filter housings, if used during disinfectant procedures, shall include a means to clear the lower portion of the housing of the disinfecting agents. Filter housings shall be opaque.

(xii) Ultrafilters, or other bacterial reducing filters, if used, shall be fitted with pressure gauges on the inlet and outlet water lines to monitor the pressure drop across the membrane. Ultrafilters shall be included in routine disinfection procedures.

(xiii) If used, storage tanks shall have a conical or bowl shaped base and shall drain from the lowest point of the base. Storage tanks shall have a tight-fitting lid and be vented through a hydrophobic 0.2 micron air filter. Means shall be provided to effectively disinfect any storage tank installed in a water distribution system.

(xiv) Ultraviolet (UV) lights, if used, shall be monitored at the frequency recommended by the manufacturer. A log sheet shall be used to record monitoring.

(xv) Water treatment system piping shall be labeled to indicate the contents of the pipe and direction of flow.

(xvi) The water treatment system must be continuously monitored during patient treatment and be guarded by audible and visual alarms which can be seen and heard in the dialysis treatment area should water quality drop below specific parameters. Quality monitor sensing cells shall be located as the last component of the water treatment system and at the beginning of the distribution system. No water treatment components that could affect the quality of the product water as measured by this device shall be located after the sensing cell.

(xvii) When deionization tanks do not follow a reverse osmosis system, parameters for the rejection rate of the membranes must assure that the lowest rate accepted would provide product water in compliance with §4.2.2 (concerning Maximum Level of Chemical Contaminants) of the

52

American National Standard, Water Treatment Equipment for Hemodialysis Applications, August 2001 Edition published by the AAMI.

(xviii) A facility shall maintain written logs of the operation of the water treatment system for each treatment day. The log book shall include each component's operating parameter and the action taken when a component is not within the facility's set parameters.

(xix) Microbiological testing of product water shall be conducted.

(I) Frequency. Microbiological testing shall be conducted monthly and following any repair or change to the water treatment system. For a newly installed water distribution system, or when a change has been made to an existing system, weekly testing shall be conducted for one month to verify that bacteria and endotoxin levels are consistently within the allowed limits.

(II) Sample sites. At a minimum, sample sites chosen for the testing shall include the beginning of the distribution piping, at any site of dialysate mixing, and the end of the distribution piping.

(III) Technique. Samples shall be collected immediately before sanitization/disinfection of the water treatment system and dialysis machines. Water testing results shall be routinely trended and reviewed by the medical director in order to determine if results seem questionable or if there is an opportunity for improvement. The medical director shall determine if there is a need for retesting. Repeated results of "no growth" shall be validated via an outside laboratory. A calibrated loop may not be used in microbiological testing of water samples. Colonies shall be counted using a magnifying device.

(IV) Expected results. Product water used to prepare dialysate, concentrates from powder, or to reprocess dialyzers for multiple use, shall contain a total viable microbial count less than 200 colony forming units (CFU)/millimeter (ml) and an endotoxin concentration less than 2 endotoxin units (EU)/ml. The action level for the total viable microbial count in the product water shall be 50 CFU/ml and the action level for the endotoxin concentration shall be 1 EU/ml.

(V) Required action for unacceptable results. If the action levels described at subclause (IV) of this clause are observed in the product water, corrective measures shall be taken promptly to reduce the levels into an acceptable range.

(VI) Records. All bacteria and endotoxin results shall be recorded on a log sheet in order to identify trends that may indicate the need for corrective action.

(xx) If ozone generators are used to disinfect any portion of the water or dialysate delivery system, testing based on the manufacturer's direction shall be used to measure the ozone concentration each time disinfection is performed, to include testing for safe levels of residual ozone at the end of the disinfection cycle. Testing for ozone in the ambient air shall be conducted on a periodic basis as recommended by the manufacturer. Records of all testing must be maintained in a log.

(xxi) If used, hot water disinfection systems shall be monitored for temperature and time of exposure to hot water as specified by the manufacturer. Temperature of the water shall be recorded at a point furthest from the water heater, where the lowest water temperature is likely to occur. The water temperature shall be measured each time a disinfection cycle is performed. A record that verifies successful completion of the heat disinfection shall be maintained.

**53**

(xxii) After chemical disinfection, means shall be provided to restore the equipment and the system in which it is installed to a safe condition relative to residual disinfectant prior to the product water being used for dialysis applications.

(xxiii) Samples of product water must be submitted for chemical analysis every six months and must demonstrate that the quality of the product water used to prepare dialysate or concentrates from powder, meets §4.2.2 (concerning Maximum Level of Chemical Contaminants) of the American National Standard, Water Treatment Equipment for Hemodialysis Applications, August 2001 Edition, published by the AAMI.

(I) Samples for chemical analysis shall be collected at the end of the water treatment components and at the most distal point in each water distribution loop, if applicable. All other outlets from the distribution loops shall be inspected to ensure that the outlets are fabricated from compatible materials. Appropriate containers and pH adjustments shall be used to ensure accurate determinations. New facilities or facilities that add or change the Cont'd...

Next Page          Previous Page

| List of Titles | Back to List |
|---|---|

**HOME** | **TEXAS REGISTER** | **TEXAS ADMINISTRATIVE CODE** | **OPEN MEETINGS**

54

<<Prev Rule

Next Rule>>

# Texas Administrative Code

| | |
|---|---|
| TITLE 25 | HEALTH SERVICES |
| PART 1 | DEPARTMENT OF STATE HEALTH SERVICES |
| CHAPTER 133 | HOSPITAL LICENSING |
| SUBCHAPTER C | OPERATIONAL REQUIREMENTS |
| RULE §133.41 | Hospital Functions and Services |

configuration of the water distribution system must draw samples at the most distal point for each water distribution loop, if applicable, on a one time basis.

(II) Additional chemical analysis shall be submitted if substantial changes are made to the water treatment system or if the percent rejection of a reverse osmosis system decreased 5.0% or more from the percent rejection measured at the time the water sample for the preceding chemical analysis was taken.

(xxiv) Facility records must include all test results and evidence that the medical director has reviewed the results of the water quality testing and directed corrective action when indicated.

(xxv) Only persons qualified by the education or experience may operate, repair, or replace components of the water treatment system.

(C) Dialysate.

(i) Quality control procedures shall be established to ensure ongoing conformance to policies and procedures regarding dialysate quality.

(ii) Each facility shall set all hemodialysis machines to use only one family of concentrates. When new machines are put into service or the concentrate family or concentrate manufacturer is changed, samples shall be sent to a laboratory for verification.

(iii) Prior to each patient treatment, staff shall verify the dialysate conductivity and pH of each machine with an independent device.

(iv) Bacteriological testing shall be conducted.

(I) Frequency. Responsible facility staff shall develop a schedule to ensure each hemodialysis machine is tested quarterly for bacterial growth and the presence of endotoxins. Hemodialysis machines of home patients shall be cultured monthly until results not exceeding 200 CFU/ml are obtained for three consecutive months, then quarterly samples shall be cultured.

(II) Acceptable limits. Dialysate shall contain less than 200 CFU/ml and an endotoxin concentration of less than 2 EU/ml. The action level for total viable microbial count shall be 50 CFU/ml and the action level for endotoxin concentration shall be 1 EU/ml.

55

(III) Action to be taken. Disinfection and retesting shall be done when bacterial or endotoxin counts exceed the action levels. Additional samples shall be collected when there is a clinical indication of a pyrogenic reaction and/or septicemia.

(v) Only a licensed nurse may use an additive to increase concentrations of specific electrolytes in the acid concentrate. Mixing procedures shall be followed as specified by the additive manufacturer. When additives are prescribed for a specific patient, the container holding the prescribed acid concentrate shall be labeled with the name of the patient, the final concentration of the added electrolyte, the date the prescribed concentrate was made, and the name of the person who mixed the additive.

(vi) All components used in concentrate preparation systems (including mixing and storage tanks, pumps, valves and piping) shall be fabricated from materials (e.g., plastics or appropriate stainless steel) that do not interact chemically or physically with the concentrate so as to affect its purity, or with the germicides used to disinfect the equipment. The use of materials that are known to cause toxicity in hemodialysis such as copper, brass, galvanized material and aluminum is prohibited.

(vii) Facility policies shall address means to protect stored acid concentrates from tampering or from degeneration due to exposure to extreme heat or cold.

(viii) Procedures to control the transfer of acid concentrates from the delivery container to the storage tank and prevent the inadvertent mixing of different concentrate formulations shall be developed, implemented and enforced. The storage tanks shall be clearly labeled.

(ix) Concentrate mixing systems shall include a purified water source, a suitable drain, and a ground fault protected electrical outlet.

(I) Operators of mixing systems shall use personal protective equipment as specified by the manufacturer during all mixing processes.

(II) The manufacturer's instructions for use of a concentrate mixing system shall be followed, including instructions for mixing the powder with the correct amount of water. The number of bags or weight of powder added shall be determined and recorded.

(III) The mixing tank shall be clearly labeled to indicate the fill and final volumes required to correctly dilute the powder.

(IV) Systems for preparing either bicarbonate or acid concentrate from powder shall be monitored according to the manufacturer's instructions.

(V) Concentrates shall not be used, or transferred to holding tanks or distribution systems, until all tests are completed.

(VI) If a facility designs its own system for mixing concentrates, procedures shall be developed and validated using an independent laboratory to ensure proper mixing.

(x) Acid concentrate mixing tanks shall be designed to allow the inside of the tank to be rinsed when changing concentrate formulas.

(I) Acid mixing systems shall be designed and maintained to prevent rust and corrosion.

56

(II) Acid concentrate mixing tanks shall be emptied completely and rinsed with product water before mixing another batch of concentrate to prevent cross contamination between different batches.

(III) Acid concentrate mixing equipment shall be disinfected as specified by the equipment manufacturer or in the case where no specifications are given, as defined by facility policy.

(IV) Records of disinfection and rinsing of disinfectants to safe residual levels shall be maintained.

(xi) Bicarbonate concentrate mixing tanks shall have conical or bowl shaped bottoms and shall drain from the lowest point of the base. The tank design shall allow all internal surfaces to be disinfected and rinsed.

(I) Bicarbonate concentrate mixing tanks shall not be prefilled the night before use.

(II) If disinfectant remains in the mixing tank overnight, this solution must be completely drained, the tank rinsed and tested for residual disinfectant prior to preparing the first batch of that day of bicarbonate concentrate.

(III) Unused portions of bicarbonate concentrate shall not be mixed with fresh concentrate.

(IV) At a minimum, bicarbonate distribution systems shall be disinfected weekly. More frequent disinfection shall be done if required by the manufacturer, or if dialysate culture results are above the action level.

(V) If jugs are reused to deliver bicarbonate concentrate to individual hemodialysis machines:

(-a-) jugs shall be emptied of concentrate, rinsed and inverted to drain at the end of each treatment day;

(-b-) at a minimum, jugs shall be disinfected weekly, more frequent disinfection shall be considered by the medical director if dialysate culture results are above the action level; and

(-c-) following disinfection, jugs shall be drained, rinsed free of residual disinfectant, and inverted to dry. Testing for residual disinfectant shall be done and documented.

(xii) All mixing tanks, bulk storage tanks, dispensing tanks and containers for single hemodialysis treatments shall be labeled as to the contents.

(I) Mixing tanks. Prior to batch preparation, a label shall be affixed to the mixing tank that includes the date of preparation and the chemical composition or formulation of the concentrate being prepared. This labeling shall remain on the mixing tank until the tank has been emptied.

(II) Bulk storage/dispensing tanks. These tanks shall be permanently labeled to identify the chemical composition or formulation of their contents.

(III) Single machine containers. At a minimum, single machine containers shall be labeled with sufficient information to differentiate the contents from other concentrate formulations used in the facility and permit positive identification by users of container contents.

57

(xiii) Permanent records of batches produced shall be maintained to include the concentrate formula produced, the volume of the batch, lot number(s) of powdered concentrate packages, the manufacturer of the powdered concentrate, date and time of mixing, test results, person performing mixing, and expiration date (if applicable).

(xiv) If dialysate concentrates are prepared in the facility, the manufacturers' recommendations shall be followed regarding any preventive maintenance. Records shall be maintained indicating the date, time, person performing the procedure, and the results (if applicable).

(5) Prevention requirements concerning patients.

(A) Hepatitis B vaccination.

(i) With the advice and consent of a patient's attending nephrologist, facility staff shall make the hepatitis B vaccine available to a patient who is susceptible to hepatitis B, provided that the patient has coverage or is willing to pay for vaccination.

(ii) The facility shall make available to patients literature describing the risks and benefits of the hepatitis B vaccination.

(B) Serologic screening of patients.

(i) A patient new to dialysis shall have been screened for hepatitis B surface antigen (HBsAg) within one month before or at the time of admission to the facility or have a known hepatitis B surface antibody (anti-HBs) status of at least 10 milli-international units per milliliter no more than 12 months prior to admission. The facility shall document how this screening requirement is met.

(ii) Repeated serologic screening shall be based on the antigen or antibody status of the patient.

(I) Monthly screening for HBsAg is required for patients whose previous test results are negative for HBsAg.

(II) Screening of HBsAg-positive or anti-HBs-positive patients may be performed on a less frequent basis, provided that the facility's policy on this subject remains congruent with Appendices i and ii of the National Surveillance of Dialysis Associated Disease in the United States, 2000, published by the United States Department of Health and Human Services.

(C) Isolation procedures for the HBsAg-positive patient.

(i) The facility shall treat patients positive for HBsAg in a segregated treatment area which includes a hand washing sink, a work area, patient care supplies and equipment, and sufficient space to prevent cross-contamination to other patients.

(ii) A patient who tests positive for HBsAg shall be dialyzed on equipment reserved and maintained for the HBsAg-positive patient's use only.

(iii) When a caregiver is assigned to both HBsAg-negative and HBsAg-positive patients, the HBsAg-negative patients assigned to this grouping must be Hepatitis B antibody positive. Hepatitis B antibody positive patients are to be seated at the treatment stations nearest the isolation station and be assigned to the same staff member who is caring for the HBsAg-positive patient.

**58**

   (iv) If an HBsAg-positive patient is discharged, the equipment which had been reserved for that patient shall be given intermediate level disinfection prior to use for a patient testing negative for HBsAg.

   (v) In the case of patients new to dialysis, if these patients are admitted for treatment before results of HBsAg or anti-HBs testing are known, these patients shall undergo treatment as if the HBsAg test results were potentially positive, except that they shall not be treated in the HBsAg isolation room, area, or machine.

   (I) The facility shall treat potentially HBsAg-positive patients in a location in the treatment area which is outside of traffic patterns until the HBsAg test results are known.

   (II) The dialysis machine used by this patient shall be given intermediate level disinfection prior to its use by another patient.

   (III) The facility shall obtain HBsAg status results of the patient no later than three days from admission.

(u) Respiratory care services. The hospital shall meet the needs of the patients in accordance with acceptable standards of practice.

   (1) Policies and procedures shall be adopted, implemented, and enforced which describe the provision of respiratory care services in the hospital.

   (2) The organization of the respiratory care services shall be appropriate to the scope and complexity of the services offered.

   (3) There shall be a medical director or clinical director of respiratory care services who is a physician with the knowledge, experience, and capabilities to supervise and administer the services properly. The medical director or clinical director may serve on either a full-time or part-time basis.

   (4) There shall be adequate numbers of respiratory therapists, respiratory therapy technicians, and other personnel who meet the qualifications specified by the medical staff, consistent with the state law.

   (5) Personnel qualified to perform specific procedures and the amount of supervision required for personnel to carry out specific procedures shall be designated in writing.

   (6) If blood gases or other clinical laboratory tests are performed by the respiratory care services staff, the respiratory care staff shall comply with CLIA 1988 in accordance with the requirements specified in 42 CFR, Part 493.

Cont'd...



<<Prev Rule                                                              Next Rule>>

# Texas Administrative Code

|              |                                       |
| ------------ | ------------------------------------- |
| TITLE 25     | HEALTH SERVICES                       |
| PART 1       | DEPARTMENT OF STATE HEALTH SERVICES   |
| CHAPTER 133  | HOSPITAL LICENSING                    |
| SUBCHAPTER C | OPERATIONAL REQUIREMENTS              |
| RULE §133.41 | Hospital Functions and Services       |

(7) Services shall be provided only on, and in accordance with, the orders of a physician.

(v) Sterilization and sterile supplies.

(1) Supervision. The sterilization of all supplies and equipment shall be under the supervision of a person qualified by education, training and experience. Staff responsible for the sterilization of supplies and equipment shall participate in a documented continuing education program; new employees shall receive initial orientation and on-the-job training.

(2) Equipment and procedures.

(A) Sterilization. Every hospital shall provide equipment adequate for sterilization of supplies and equipment as needed. Equipment shall be maintained and operated to perform, with accuracy, the sterilization of the various materials required.

(B) Written policy. Written policies and procedures for the decontamination and sterilization activities performed shall be adopted, implemented and enforced. Policies shall include the receiving, cleaning, decontaminating, disinfecting, preparing and sterilization of reusable items, as well as those for the assembly, wrapping, storage, distribution and quality control of sterile items and equipment. These written policies shall be reviewed at least every other year and approved by the infection control practitioner or committee.

(C) Separation. Where cleaning, preparation, and sterilization functions are performed in the same room or unit, the physical facilities, equipment, and the policies and procedures for their use, shall be such as to effectively separate soiled or contaminated supplies and equipment from the clean or sterilized supplies and equipment. Hand washing facilities shall be provided and a separate sink shall be provided for safe disposal of liquid waste.

(D) Labeling. All containers for solutions, drugs, flammable solvents, ether, alcohol, and medicated supplies shall be clearly labeled to indicate contents. Those which are sterilized by the hospital shall be labeled so as to be identifiable both before and after sterilization. Sterilized items shall have a load control identification that indicates the sterilizer used, the cycle or load number, and the date of sterilization.

(E) Preparation for sterilization.

(i) All items to be sterilized shall be prepared to reduce the bioburden. All items shall be thoroughly cleaned, decontaminated and prepared in a clean, controlled environment.

**60**

(ii) All articles to be sterilized shall be arranged so all surfaces will be directly exposed to the sterilizing agent for the prescribed time and temperature.

(F) Packaging. All wrapped articles to be sterilized shall be packaged in materials recommended for the specific type of sterilizer and material to be sterilized.

(G) External chemical indicators.

(i) External chemical indicators, also known as sterilization process indicators, shall be used on each package to be sterilized, including items being flash sterilized to indicate that items have been exposed to the sterilization process.

(ii) The indicator results shall be interpreted according to manufacturer's written instructions and indicator reaction specifications.

(iii) A log shall be maintained with the load identification, indicator results, and identification of the contents of the load.

(H) Biological indicators. Biological indicators are commercially-available microorganisms (e.g., United States Food and Drug Administration (FDA) approved strips or vials of Bacillus species endospores) which can be used to verify the performance of waste treatment equipment and processes (or sterilization equipment and processes).

(i) The efficacy of the sterilizing process shall be monitored with reliable biological indicators appropriate for the type of sterilizer used.

(ii) Biological indicators shall be included in at least one run each week of use for steam sterilizers, at least one run each day of use for low-temperature hydrogen peroxide gas sterilizers, and every load for ethylene oxide (EO) sterilizers.

(iii) Biological indicators shall be included in every load that contains implantable objects.

(iv) A log shall be maintained with the load identification, biological indicator results, and identification of the contents of the load.

(v) If a test is positive, the sterilizer shall immediately be taken out of service.

(I) Implantable items shall be recalled and reprocessed if a biological indicator test (spore test) is positive.

(II) All available items shall be recalled and reprocessed if a sterilizer malfunction is found and a list of those items not retrieved in the recall shall be submitted to infection control.

(III) A malfunctioning sterilizer shall not be put back into use until it has been serviced and successfully tested according to the manufacturer's recommendations.

(I) Sterilizers.

(i) Steam sterilizers (saturated steam under pressure) shall be utilized for sterilization of heat and moisture stable items. Steam sterilizers shall be used according to manufacturer's written instructions.

**61**

(ii) EO sterilizers shall be used for processing heat and moisture sensitive items. EO sterilizers and aerators shall be used and vented according to the manufacturer's written instructions.

(iii) Flash sterilizers shall be used for emergency sterilization of clean, unwrapped instruments and porous items only.

(J) Disinfection.

(i) Written policies, approved by the infection control committee, shall be adopted, implemented and enforced for the use of chemical disinfectants.

(ii) The manufacturer's written instructions for the use of disinfectants shall be followed.

(iii) An expiration date, determined according to manufacturer's written recommendations, shall be marked on the container of disinfection solution currently in use.

(iv) Disinfectant solutions shall be kept covered and used in well-ventilated areas.

(v) Chemical germicides that are registered with the United States Environmental Protection Agency as "sterilants" may be used either for sterilization or high-level disinfection.

(vi) All staff personnel using chemical disinfectants shall have received training on their use.

(K) Performance records.

(i) Performance records for all sterilizers shall be maintained for each cycle. These records shall be retained and available for review for a minimum of five years.

(ii) Each sterilizer shall be monitored continuously during operation for pressure, temperature, and time at desired temperature and pressure. A record shall be maintained and shall include:

(I) the sterilizer identification;

(II) sterilization date;

(III) cycle number;

(IV) contents of each load;

(V) duration and temperature of exposure phase (if not provided on sterilizer recording charts);

(VI) identification of operator(s);

(VII) results of biological tests and dates performed;

(VIII) time-temperature recording charts from each sterilizer;

(IX) gas concentration and relative humidity (if applicable); and

(X) any other test results.

(L) Storage of sterilized items.

**62**

(i) Sterilized items shall be transported so as to maintain cleanliness and sterility and to prevent physical damage.

(ii) Sterilized items shall be stored in well-ventilated, limited access areas with controlled temperature and humidity.

(iii) The hospital shall adopt, implement and enforce a policy which describes the mechanism used to determine the shelf life of sterilized packages.

(M) Preventive maintenance. Preventive maintenance of all sterilizers shall be performed according to individual adopted, implemented and enforced policy on a scheduled basis by qualified personnel, using the sterilizer manufacturer's service manual as a reference. A preventive maintenance record shall be maintained for each sterilizer. These records shall be retained at least two years and shall be available for review.

(w) Surgical services. If a hospital provides surgical services, the services shall be well-organized and provided in accordance with acceptable standards of practice. If outpatient surgical services are offered, the services shall be consistent in quality with inpatient care in accordance with the complexity of services offered. A special hospital may not offer surgical services.

(1) Organization and staffing. The organization of the surgical services shall be appropriate for the scope of the services offered.

(A) The operating rooms shall be supervised by an experienced RN or physician.

(B) Licensed vocational nurses (LVNs) and surgical technologists (operating room technicians) may serve as scrub nurses or technologists under the supervision of an RN.

(C) Circulating duties in the operating room must be performed by qualified RNs. In accordance with approved medical staff polices and procedures, LVNs and surgical technologists may assist in circulatory duties under the direct supervision of a qualified RN circulator.

(D) Surgical privileges shall be delineated for all physicians, podiatrists, and dentists performing surgery in accordance with the competencies of each. The surgical services shall maintain a roster specifying the surgical privileges of each.

(E) If the facility employs surgical technologists, the facility shall adopt, implement, and enforce policies and procedures to comply with Health and Safety Code, Chapter 259 (relating to Surgical Technologists at Health Care Facilities).

(2) Delivery of service. Surgical services shall be consistent with needs and resources. Written policies governing surgical care which are designed to ensure the achievement and maintenance of high standards of medical practice and patient care shall be adopted, implemented and enforced.

(A) There shall be a complete medical history and physical examination, as required under subsection (k)(3)(F) of this section, in the medical record of every patient prior to surgery, except in emergencies. If this has been dictated, but not yet recorded in the patient's medical record, there shall be a statement to that effect and an admission note in the record by the individual who admitted the patient.

**63**

(B) A properly executed informed consent form for the operation shall be in the patient's medical record before surgery, except in emergencies.

(C) The following equipment shall be available in the operating room suites:

(i) communication system;

(ii) cardiac monitor;

(iii) resuscitator;

(iv) defibrillator;

(v) aspirator; and

(vi) tracheotomy set.

(D) There shall be adequate provisions for immediate postoperative care.

(E) The operating room register shall be complete and up-to-date. The register shall contain, but not be limited to, the following:

(i) patient's name and hospital identification number;

(ii) date of operation;

(iii) operation performed;

(iv) operating surgeon and assistant(s);

(v) type of anesthesia used and name of person administering it;

(vi) time operation began and ended;

(vii) time anesthesia began and ended;

(viii) disposition of specimens;

(ix) names of scrub and circulating personnel;

(x) unusual occurrences; and

(xi) disposition of the patient.

(F) An operative report describing techniques, findings, and tissue removed or altered shall be written or dictated immediately following surgery and signed by the surgeon.

(x) Therapy services. If the hospital provides physical therapy, occupational therapy, audiology, or speech pathology services, the services shall be organized and staffed to ensure the health and safety of patients.

**64**

(1) Organization and staffing. The organization of the services shall be appropriate to the scope of the services offered.

(A) The director of the services shall have the necessary knowledge, experience, and capabilities to properly supervise and administer the services.

(B) Physical therapy, occupational therapy, speech therapy, or audiology services, if provided, shall be provided by staff who meet the qualifications specified by the medical staff, consistent with state law.

(2) Delivery of services. Services shall be furnished in accordance with a written plan of treatment. Services to be provided shall be consistent with applicable state laws and regulations, and in accordance with orders of the physician, podiatrist, dentist or other licensed practitioner who is authorized by the medical staff to order the services. Therapy orders shall be incorporated in the patient's medical record.

Cont'd...

Next Page        Previous Page

| List of Titles | Back to List |
|---|---|

**HOME** | **TEXAS REGISTER** | **TEXAS ADMINISTRATIVE CODE** | **OPEN MEETINGS**

**65**

<<Prev Rule

Next Rule>>

# Texas Administrative Code

| | |
|---|---|
| TITLE 25 | HEALTH SERVICES |
| PART 1 | DEPARTMENT OF STATE HEALTH SERVICES |
| CHAPTER 133 | HOSPITAL LICENSING |
| SUBCHAPTER C | OPERATIONAL REQUIREMENTS |
| RULE §133.41 | Hospital Functions and Services |

(y) Waste and waste disposal.

(1) Special waste and liquid/sewage waste management.

(A) The hospital shall comply with the requirements set forth by the department in §§1.131 - 1.137 of this title (relating to Definition, Treatment, and Disposition of Special Waste from Health Care-Related Facilities) and the TCEQ requirements in 30 TAC §330.1207 (relating to Generators of Medical Waste).

(B) All sewage and liquid wastes shall be disposed of in a municipal sewerage system or a septic tank system permitted by the TCEQ in accordance with 30 TAC Chapter 285 (relating to On-Site Sewage Facilities).

(2) Waste receptacles.

(A) Waste receptacles shall be conveniently available in all toilet rooms, patient areas, staff work areas, and waiting rooms. Receptacles shall be routinely emptied of their contents at a central location(s) into closed containers.

(B) Waste receptacles shall be properly cleaned with soap and hot water, followed by treatment of inside surfaces of the receptacles with a germicidal agent.

(C) All containers for other municipal solid waste shall be leak-resistant, have tight-fitting covers, and be rodent-proof.

(D) Nonreusable containers shall be of suitable strength to minimize animal scavenging or rupture during collection operations.

**Source Note:** The provisions of this §133.41 adopted to be effective June 21, 2007, 32 TexReg 3587; amended to be effective December 9, 2010, 35 TexReg 10716; amended to be effective November 11, 2012, 37 TexReg 8809; amended to be effective May 24, 2013, 38 TexReg 3001; amended to be effective September 14, 2014, 39 TexReg 7140

Next Page          Previous Page

| List of Titles | Back to List |
|---|---|

HOME | TEXAS REGISTER | TEXAS ADMINISTRATIVE CODE | OPEN MEETINGS

67

# APPENDIX – "9"

<<Prev Rule                                                                     Next Rule>>

# Texas Administrative Code

| | |
|---|---|
| TITLE 25 | HEALTH SERVICES |
| PART 1 | DEPARTMENT OF STATE HEALTH SERVICES |
| CHAPTER 133 | HOSPITAL LICENSING |
| SUBCHAPTER H | FIRE PREVENTION AND SAFETY REQUIREMENTS |
| RULE §133.142 | General Safety |

(a) Safety committee. Each hospital shall have a multidisciplinary safety committee. The hospital chief executive officer (CEO) shall appoint the chairman and members of the safety committee.

(1) Safety officer. The CEO shall appoint a safety officer who is knowledgeable in safety practices in health care facilities. The safety officer shall be a member of the safety committee, and shall carry out the functions of the safety program.

(2) Safety committee meetings. The safety committee shall meet as required by the chairman, but not less than quarterly. Written minutes of each meeting shall be retained for at least one year.

(3) Safety activities.

(A) Incident reports. The safety committee shall establish an incident reporting system which includes a mechanism to ensure that all incidents recorded in safety committee minutes are evaluated, and documentation is provided to show follow-up and corrective actions.

(B) Safety policies and procedures. Safety policies and procedures for each department or service shall be developed, implemented and enforced.

(C) Safety training and continuing education. Safety training shall be established as part of new employee orientation and in the continuing education of all employees.

(4) Written authority. The authority of the safety committee to take action when conditions exist that are a possible threat to life, health, or building damage, shall be defined in writing and approved by the governing body.

(b) Safety manual. Each department or service shall have a safety policy and procedure manual within their own area that becomes a part of the overall facility safety manual.

(c) Emergency communication system. An emergency communication system shall be provided in each facility. The system shall be self-sufficient and capable of operating without reliance on the building's service or emergency power supply. Such system shall have the capability of communicating with the available community or state emergency networks, including police and fire departments.

**Source Note:** The provisions of this §133.142 adopted to be effective June 21, 2007, 32 TexReg 3587

Next Page          Previous Page

# APPENDIX – "10"

HEALTH AND SAFETY CODE

TITLE 4. HEALTH FACILITIES

SUBTITLE B. LICENSING OF HEALTH FACILITIES

CHAPTER 241. HOSPITALS

SUBCHAPTER A. GENERAL PROVISIONS

Sec. 241.001.   SHORT TITLE.   This chapter may be cited as the Texas Hospital Licensing Law.

Acts 1989, 71st Leg., ch. 678, Sec. 1, eff. Sept. 1, 1989.


Sec. 241.002.   PURPOSE.   The purpose of this chapter is to protect and promote the public health and welfare by providing for the development, establishment, and enforcement of certain standards in the construction, maintenance, and operation of hospitals.

Acts 1989, 71st Leg., ch. 678, Sec. 1, eff. Sept. 1, 1989.


This section was amended by the 84th Legislature. Pending publication of the current statutes, see S.B. 219, 84th Legislature, Regular Session, for amendments affecting this section.

Sec. 241.003.   DEFINITIONS.   In this chapter:
(1)   "Advanced practice nurse" means a registered nurse recognized as an advanced practice nurse by the Texas Board of Nursing.
(2)   "Board" means the Texas Board of Health.
(3)   "Comprehensive medical rehabilitation hospital" means a general hospital that specializes in providing comprehensive medical rehabilitation services, including surgery and related ancillary services.
(4)   "Department" means the Texas Department of Health.
(5)   "General hospital" means an establishment that:
(A)   offers services, facilities, and beds for use for more than 24 hours for two or more unrelated individuals requiring diagnosis, treatment, or care for illness, injury, deformity, abnormality, or pregnancy;  and
(B)   regularly maintains, at a minimum, clinical laboratory services, diagnostic X-ray services, treatment facilities including surgery or obstetrical care or both, and other definitive medical or surgical treatment of similar extent.
(6)   "Governmental unit" means a political subdivision of the state,

including a hospital district, county, or municipality, and any department, division, board, or other agency of a political subdivision.

(7)   "Hospital" includes a general hospital and a special hospital.

(8)   "Medical staff" means a physician or group of physicians and a podiatrist or a group of podiatrists who by action of the governing body of a hospital are privileged to work in and use the facilities of a hospital for or in connection with the observation, care, diagnosis, or treatment of an individual who is, or may be, suffering from a mental or physical disease or disorder or a physical deformity or injury.

(9)   "Pediatric and adolescent hospital" means a general hospital that specializes in providing services to children and adolescents, including surgery and related ancillary services.

(10)   "Person" means an individual, firm, partnership, corporation, association, or joint stock company, and includes a receiver, trustee, assignee, or other similar representative of those entities.

(11)   "Physician" means a physician licensed by the Texas State Board of Medical Examiners.

(12)   "Physician assistant" means a physician assistant licensed by the Texas State Board of Physician Assistant Examiners.

(13)   "Podiatrist" means a podiatrist licensed by the Texas State Board of Podiatric Medical Examiners.

(14)   Repealed by Acts 2005, 79th Leg., Ch. 1286, Sec. 2, eff. September 1, 2005.

(15)   "Special hospital" means an establishment that:

(A)   offers services, facilities, and beds for use for more than 24 hours for two or more unrelated individuals who are regularly admitted, treated, and discharged and who require services more intensive than room, board, personal services, and general nursing care;

(B)   has clinical laboratory facilities, diagnostic X-ray facilities, treatment facilities, or other definitive medical treatment;

(C)   has a medical staff in regular attendance;   and

(D)   maintains records of the clinical work performed for each patient.

Acts 1989, 71st Leg., ch. 678, Sec. 1, eff. Sept. 1, 1989.   Amended by Acts 1995, 74th Leg., ch. 965, Sec. 79, eff. Sept. 1, 1995;   Acts 1997, 75th Leg., ch. 43, Sec. 1, eff. May 7, 1997;   Acts 1997, 75th Leg., ch. 623, Sec. 2, eff. Sept. 1, 1997;   Acts 1999, 76th Leg., ch. 428, Sec. 1, eff. Sept. 1, 1999. Amended by:
    Acts 2005, 79th Leg., Ch. 1286 (H.B. 2471), Sec. 2, eff. September 1, 2005.
    Acts 2007, 80th Leg., R.S., Ch. 889 (H.B. 2426), Sec. 67, eff. September 1,

2007.

Sec. 241.004. EXEMPTIONS. This chapter does not apply to a facility:

    (1) licensed under Chapter 242 or 577;

    (2) maintained or operated by the federal government or an agency of the federal government; or

    (3) maintained or operated by this state or an agency of this state.

Acts 1989, 71st Leg., ch. 678, Sec. 1, eff. Sept. 1, 1989. Amended by Acts 1991, 72nd Leg., ch. 76, Sec. 16, eff. Sept. 1, 1991.

Sec. 241.005. EMPLOYMENT OF PERSONNEL. The department may employ stenographers, inspectors, and other necessary assistants in carrying out the provisions of this chapter.

Acts 1989, 71st Leg., ch. 678, Sec. 1, eff. Sept. 1, 1989.

This section was amended by the 84th Legislature. Pending publication of the current statutes, see S.B. 219, 84th Legislature, Regular Session, for amendments affecting this section.

Sec. 241.006. COORDINATION OF SIGNAGE REQUIREMENTS IMPOSED BY STATE AGENCIES. (a) The department is authorized to review current and proposed state rules issued by the department or by other state agencies that mandate that a hospital place or post a notice, poster, or sign in a conspicuous place or in an area of high public traffic, concerning the rights of patients or others or the responsibilities of the hospital, which is directed at patients, patients' families, or others. The purpose of this review shall be to coordinate the placement, format, and language contained in the required notices in order to:

    (1) eliminate the duplication of information;

    (2) reduce the potential for confusion to patients, patients' families, and others; and

    (3) reduce the administrative burden of compliance on hospitals.

    (b) Notwithstanding any other law, this section applies to all notices, posters, or signs described in Subsection (a).

Added by Acts 1995, 74th Leg., ch. 965, Sec. 3, eff. June 16, 1995.

Sec. 241.007. COMPLIANCE WITH CERTAIN REQUIREMENTS REGARDING SONOGRAM BEFORE ABORTION. A hospital shall comply with Subchapter B, Chapter 171.

Added by Acts 2011, 82nd Leg., R.S., Ch. 73 (H.B. 15), Sec. 6, eff. September 1,

2011.

Sec. 241.008. INDUCED DELIVERIES OR CESAREAN SECTIONS BEFORE 39TH WEEK. A hospital that provides obstetrical services shall collaborate with physicians providing services at the hospital to develop quality initiatives to reduce the number of elective or nonmedically indicated induced deliveries or cesarean sections performed at the hospital on a woman before the 39th week of gestation.

Added by Acts 2011, 82nd Leg., R.S., Ch. 299 (H.B. 1983), Sec. 2, eff. September 1, 2011.
Redesignated from Health and Safety Code, Section 241.007 by Acts 2013, 83rd Leg., R.S., Ch. 161 (S.B. 1093), Sec. 22.001(25), eff. September 1, 2013.


This section was amended by the 84th Legislature. Pending publication of the current statutes, see S.B. 219 and S.B. 1753, 84th Legislature, Regular Session, for amendments affecting this section.

Sec. 241.009. PHOTO IDENTIFICATION BADGE REQUIRED. (a) In this section:
(1) "Health care provider" means a person who provides health care services at a hospital as a physician, as an employee of the hospital, under a contract with the hospital, or in the course of a training or educational program at the hospital.
(2) "Hospital" means a hospital licensed under this chapter.
(b) A hospital shall adopt a policy requiring a health care provider providing direct patient care at the hospital to wear a photo identification badge during all patient encounters, unless precluded by adopted isolation or sterilization protocols. The badge must be of sufficient size and worn in a manner to be visible and must clearly state:
(1) at minimum the provider's first or last name;
(2) the department of the hospital with which the provider is associated;
(3) the type of license held by the provider, if the provider holds a license under Title 3, Occupations Code; and
(4) if applicable, the provider's status as a student, intern, trainee, or resident.

Added by Acts 2013, 83rd Leg., R.S., Ch. 108 (S.B. 945), Sec. 1, eff. January 1, 2014.


SUBCHAPTER B. HOSPITAL LICENSES

Sec. 241.021. LICENSE REQUIRED. A person or governmental unit, acting

severally or jointly with any other person or governmental unit, may not establish, conduct, or maintain a hospital in this state without a license issued under this chapter.

Acts 1989, 71st Leg., ch. 678, Sec. 1, eff. Sept. 1, 1989.

This section was amended by the 84th Legislature. Pending publication of the current statutes, see S.B. 219, 84th Legislature, Regular Session, for amendments affecting this section.

Sec. 241.022. LICENSE APPLICATION. (a) An application for a license must be made to the department on a form provided by the department.

(b) The application must contain:

(1) the name and social security number of the sole proprietor, if the applicant is a sole proprietor;

(2) the name and social security number of each general partner who is an individual, if the applicant is a partnership;

(3) the name and social security number of any individual who has an ownership interest of more than 25 percent in the corporation, if the applicant is a corporation; and

(4) any other information that the department may reasonably require.

(c) The department shall require that each hospital show evidence that:

(1) at least one physician is on the medical staff of the hospital, including evidence that the physician is currently licensed;

(2) the governing body of the hospital has adopted and implemented a patient transfer policy in accordance with Section 241.027; and

(3) if the governing body has chosen to implement patient transfer agreements, it has implemented the agreements in accordance with Section 241.028.

(d) The application must be accompanied by:

(1) a copy of the hospital's current patient transfer policy;

(2) a nonrefundable license fee;

(3) copies of the hospital's patient transfer agreements, unless the filing of copies has been waived by the hospital licensing director in accordance with the rules adopted under this chapter; and

(4) a copy of the most recent annual fire safety inspection report from the fire marshal in whose jurisdiction the hospital is located.

(e) The department may require that the application be approved by the local health authority or other local official for compliance with municipal ordinances on building construction, fire prevention, and sanitation. A hospital located outside the limits of a municipality shall comply with

corresponding state laws.

(f)   The department shall post on the department's Internet website a list of all of the individuals named in applications as required by Subsections (b)(1)-(3).  The department may not post on its Internet website a social security number of an individual required to be named in an application under Subsections (b)(1)-(3).

Acts 1989, 71st Leg., ch. 678, Sec. 1, eff. Sept. 1, 1989.  Amended by Acts 1991, 72nd Leg., ch. 14, Sec. 82, eff. Sept. 1, 1991;  Acts 1993, 73rd Leg., ch. 584, Sec. 1, eff. Sept. 1, 1993.
Amended by:
    Acts 2005, 79th Leg., Ch. 1161 (H.B. 3357), Sec. 1, eff. September 1, 2005.


This section was amended by the 84th Legislature. Pending publication of the current statutes, see S.B. 219, 84th Legislature, Regular Session, for amendments affecting this section.

Sec. 241.023.  ISSUANCE OF LICENSE.  (a)  On receiving a license application and the license fee, the department shall issue a license if it finds that the applicant and the hospital comply with this chapter and the rules or standards adopted under this chapter.

(b)   A license may be renewed annually after payment of the required fee and submission of an application for license renewal that contains the information required by Section 241.022(b).

(c)   Except as provided by Subsection (c-1), the department may issue a license only for the premises of a hospital and person or governmental unit named in the application.

(c-1)   The department may issue one license for multiple hospitals if:

(1)   all buildings in which inpatients receive hospital services and inpatient services of each of the hospitals to be included in the license are subject to the control and direction of the same governing body;

(2)   all buildings in which inpatients receive hospital services are within a 30-mile radius of the main address of the applicant;

(3)   there is integration of the organized medical staff of each of the hospitals to be included in the license;

(4)   there is a single chief executive officer for all of the hospitals who reports directly to the governing body and through whom all administrative authority flows and who exercises control and surveillance over all administrative activities of the hospital;

(5)   there is a single chief medical officer for all of the hospitals who reports directly to the governing body and who is responsible for all

medical staff activities of the hospital;

   (6) each building of a hospital to be included in the license that is geographically separate from other buildings of the same hospital contains at least one nursing unit for inpatients, unless providing only diagnostic or laboratory services, or a combination of diagnostic or laboratory services, in the building for hospital inpatients; and

   (7) each hospital that is to be included in the license complies with the emergency services standards:

    (A) for a general hospital, if the hospital provides surgery or obstetrical care or both; or

    (B) for a special hospital, if the hospital does not provide surgery or obstetrical care.

  (c-2) The hospital licensing director may recommend a waiver of the requirement of Subsection (c-1)(7) for a hospital if another hospital that is to be included in the license:

   (1) complies with the emergency services standards for a general hospital; and

   (2) is in close geographic proximity to the hospital.

  (c-3) The executive commissioner of the Health and Human Services Commission shall adopt rules to implement the waiver provision of Subsection (c-2). The rules must provide for a determination by the department that the waiver will facilitate the creation or operation of the hospital seeking the waiver and that the waiver is in the best interest of the individuals served or to be served by the hospital.

  (d) Subject to Subsection (e), a license issued under this section for a hospital includes each outpatient facility that is not separately licensed, that is located apart from the hospital, and for which the hospital has submitted to the department:

   (1) a copy of a fire safety survey that is dated not earlier than one year before the submission date indicating approval by:

    (A) the local fire authority in whose jurisdiction the outpatient facility is located; or

    (B) the nearest fire authority, if the outpatient facility is located outside of the jurisdiction of a local fire authority; and

   (2) if the hospital is accredited by the Joint Commission on Accreditation of Healthcare Organizations or the American Osteopathic Association, a copy of documentation from the accrediting body showing that the outpatient facility is included within the hospital's accreditation.

  (e) Subsection (d) applies only if the federal Department of Health and Human Services, Health Care Financing Administration, or Office of Inspector

General adopts final or interim final rules requiring state licensure of outpatient facilities as a condition of the determination of provider-based status for Medicare reimbursement purposes.

(f)  A license may not be transferred or assigned without the written approval of the department.

(g)  A license shall be posted in a conspicuous place on the licensed premises.

Acts 1989, 71st Leg., ch. 678, Sec. 1, eff. Sept. 1, 1989.  Amended by Acts 1999, 76th Leg., ch. 1411, Sec. 2.01, eff. Sept. 1, 1999.
Amended by:
    Acts 2005, 79th Leg., Ch. 1161 (H.B. 3357), Sec. 2, eff. September 1, 2005.
    Acts 2005, 79th Leg., Ch. 1286 (H.B. 2471), Sec. 1, eff. September 1, 2005.


This section was amended by the 84th Legislature. Pending publication of the current statutes, see S.B. 219, 84th Legislature, Regular Session, for amendments affecting this section.

Sec. 241.024.  HOSPITAL LICENSING DIRECTOR.  (a)  The commissioner of health shall appoint, with the advice and consent of the board, a person to serve as hospital licensing director.

(b)  A person appointed as the hospital licensing director must:

(1)  have at least five years experience or training, or both, in the field of hospital administration;

(2)  be of good moral character;  and

(3)  have been a resident of this state for at least three years.

(c)  The hospital licensing director shall administer this chapter and is directly responsible to the department.

Acts 1989, 71st Leg., ch. 678, Sec. 1, eff. Sept. 1, 1989.


This section was amended by the 84th Legislature. Pending publication of the current statutes, see S.B. 219, 84th Legislature, Regular Session, for amendments affecting this section.

Sec. 241.025.  LICENSE FEES.  (a)  The department shall charge each hospital an annual license fee for an initial license or a license renewal.

(b)  The board by rule shall adopt the fees authorized by Subsection (a) according to a schedule under which the number of beds in the hospital determines the amount of the fee.  The fee may not exceed $15 a bed.  A minimum license fee may be established.  The minimum fee may not exceed $1,000.

(c)  A fee adopted under this chapter must be based on the estimated cost

to and level of effort expended by the department to conduct the activity for which the fee is imposed.

(d)   All license fees collected shall be deposited in the state treasury to the credit of the department to administer and enforce this chapter.   These fees are hereby appropriated to the department.

(e)   Notwithstanding Subsection (d), to the extent that money received from the fees collected under this chapter exceeds the costs to the department to conduct the activity for which the fee is imposed, the department may use the money to administer Chapter 324 and similar laws that require the department to provide information related to hospital care to the public.   The department may not consider the costs of administering Chapter 324 or similar laws in adopting a fee imposed under this section.

Acts 1989, 71st Leg., ch. 678, Sec. 1, eff. Sept. 1, 1989.   Amended by Acts 1993, 73rd Leg., ch. 584, Sec. 3, eff. Sept. 1, 1993;   Acts 1999, 76th Leg., ch. 1411, Sec. 2.02, eff. Sept. 1, 1999.
Amended by:
   Acts 2007, 80th Leg., R.S., Ch. 997 (S.B. 1731), Sec. 4, eff. September 1, 2007.


This section was amended by the 84th Legislature. Pending publication of the current statutes, see S.B. 219, 84th Legislature, Regular Session, for amendments affecting this section.

Sec. 241.026.   RULES AND MINIMUM STANDARDS.   (a)   The board shall adopt and enforce rules to further the purposes of this chapter.   The rules at a minimum shall address:
        (1)   minimum requirements for staffing by physicians and nurses;
        (2)   hospital services relating to patient care;
        (3)   fire prevention, safety, and sanitation requirements in hospitals;
        (4)   patient care and a patient bill of rights;
        (5)   compliance with other state and federal laws affecting the health, safety, and rights of hospital patients; and
        (6)   compliance with nursing peer review under Subchapter I, Chapter 301, and Chapter 303, Occupations Code, and the rules of the Texas Board of Nursing relating to peer review.

(b)   In adopting rules, the board shall consider the conditions of participation for certification under Title XVIII of the Social Security Act (42 U.S.C. Section 1395 et seq.) and the standards of the Joint Commission on Accreditation of Healthcare Organizations and will attempt to achieve consistency with those conditions and standards.

(c)   Upon the recommendation of the hospital licensing director and the council, the board by order may waive or modify the requirement of a particular provision of this Act or minimum standard adopted by board rule under this section to a particular general or special hospital if the board determines that the waiver or modification will facilitate the creation or operation of the hospital and that the waiver or modification is in the best interests of the individuals served or to be served by the hospital.

(d)   The board shall adopt rules establishing procedures and criteria for the issuance of the waiver or modification order.  The criteria must include at a minimum a statement of the appropriateness of the waiver or modification against the best interests of the individuals served by the hospital.

(e)   If the board orders a waiver or modification of a provision or standard, the licensing record of the hospital granted the waiver or modification shall contain documentation to support the board's action.  The board's rules shall specify the type and specificity of the supporting documentation that must be included.

(f)   A comprehensive medical rehabilitation hospital or a pediatric and adolescent hospital shall have an emergency treatment room but is not required to have an emergency department.

Acts 1989, 71st Leg., ch. 678, Sec. 1, eff. Sept. 1, 1989.  Amended by Acts 1991, 72nd Leg., ch. 350, Sec. 1, eff. Aug. 26, 1991;  Acts 1993, 73rd Leg., ch. 584, Sec. 4, eff. Sept. 1, 1993;  Acts 1997, 75th Leg., ch. 43, Sec. 2, eff. May 7, 1997;  Acts 1997, 75th Leg., ch. 617, Sec. 2, eff. Sept. 1, 1997;  Acts 1997, 75th Leg., ch. 623, Sec. 3, eff. Sept. 1, 1997;  Acts 2001, 77th Leg., ch. 1420, Sec. 14.786, eff. Sept. 1, 2001.
Amended by:
     Acts 2007, 80th Leg., R.S., Ch. 889 (H.B. 2426), Sec. 68, eff. September 1, 2007.


Sec. 241.0262.   CIRCULATING DUTIES FOR SURGICAL SERVICES.   Circulating duties in the operating room must be performed by qualified registered nurses. In accordance with approved medical staff policies and procedures, licensed vocational nurses and surgical technologists may assist in circulatory duties under the direct supervision of a qualified registered nurse circulator.

Added by Acts 2005, 79th Leg., Ch. 966 (H.B. 1718), Sec. 2, eff. September 1, 2005.


Sec. 241.0263.   RECOMMENDATIONS RELATING TO MISSING INFANTS.   (a)   The department shall recommend hospital security procedures to:

(1)   reduce the likelihood of infant patient abduction;   and

(2)   aid in the identification of missing infants.

(b)   In making recommendations, the department shall consider hospital size and location and the number of births at a hospital.

(c)   The procedures recommended by the department under Subsection (a)(1) may include:

(1)   controlling access to newborn nurseries;

(2)   expanding observation of newborn nurseries through the use of video cameras;   and

(3)   requiring identification for hospital staff and visitors as a condition of entrance to newborn nurseries.

(d)   The procedures recommended by the department under Subsection (a)(2) may include:

(1)   footprinting, photographing, or writing descriptions of infant patients at birth;   and

(2)   obtaining umbilical cord blood samples for infant patients born at the hospital and storing the samples for genetic testing purposes.

(e)   Each hospital licensed under this chapter shall consider implementing the procedures recommended under this section.

Added by Acts 1997, 75th Leg., ch. 314, Sec. 1, eff. Sept. 1, 1997.


This section was amended by the 84th Legislature. Pending publication of the current statutes, see S.B. 219, 84th Legislature, Regular Session, for amendments affecting this section.

Sec. 241.0265.   STANDARDS FOR CARE FOR MENTAL HEALTH AND CHEMICAL DEPENDENCY.   (a)   The care and treatment of a patient receiving mental health services in a facility licensed by the department under this chapter or Chapter 577 are governed by the standards adopted by the Texas Department of Mental Health and Mental Retardation to the same extent as if the standards adopted by that department were rules adopted by the board under this chapter or Chapter 577.

(b)   The care and treatment of a patient receiving chemical dependency treatment in a facility licensed by the department under this chapter are governed by the same standards that govern the care and treatment of a patient receiving treatment in a treatment facility licensed under Chapter 464 and that are adopted by the Texas Commission on Alcohol and Drug Abuse, to the same extent as if the standards adopted by the commission were rules adopted by the board under this chapter.

(c)   The department shall enforce the standards provided by Subsections (a)

and (b). A violation of a standard is subject to the same consequence as a violation of a rule adopted by the board under this chapter or Chapter 577. The department is not required to enforce a standard if the enforcement violates a federal law, rule, or regulation.

Added by Acts 1993, 73rd Leg., ch. 573, Sec. 3.02, eff. Sept. 1, 1993.

This section was amended by the 84th Legislature. Pending publication of the current statutes, see S.B. 219, 84th Legislature, Regular Session, for amendments affecting this section.

Sec. 241.027. PATIENT TRANSFERS. (a) The board shall adopt rules to govern the transfer of patients between hospitals that do not have a transfer agreement and governing services not included in transfer agreements.

(b) The rules must provide that patient transfers between hospitals be accomplished through hospital policies that result in medically appropriate transfers from physician to physician and from hospital to hospital by providing:

(1) for notification to the receiving hospital before the patient is transferred and confirmation by the receiving hospital that the patient meets the receiving hospital's admissions criteria relating to appropriate bed, physician, and other services necessary to treat the patient;

(2) for the use of medically appropriate life support measures that a reasonable and prudent physician exercising ordinary care in the same or a similar locality would use to stabilize the patient before the transfer and to sustain the patient during the transfer;

(3) for the provision of appropriate personnel and equipment that a reasonable and prudent physician exercising ordinary care in the same or a similar locality would use for the transfer;

(4) for the transfer of all necessary records for continuing the care for the patient; and

(5) that the transfer of a patient not be predicated on arbitrary, capricious, or unreasonable discrimination because of race, religion, national origin, age, sex, physical condition, or economic status.

(c) The rules must require that if a patient at a hospital has an emergency medical condition which has not been stabilized, the hospital may not transfer the patient unless:

(1) the patient or a legally responsible person acting on the patient's behalf, after being informed of the hospital's obligations under this section and of the risk of transfer, in writing requests transfer to another medical facility;

(2)   a licensed physician has signed a certification, which includes a summary of the risks and benefits, that, based on the information available at the time of transfer, the medical benefits reasonably expected from the provision of appropriate medical treatment at another medical facility outweigh the increased risks to the patient and, in the case of labor, to the unborn child from effecting the transfer;  or

(3)   if a licensed physician is not physically present in the emergency department at the time a patient is transferred, a qualified medical person has signed a certification described in Subdivision (2) after a licensed physician, in consultation with the person, has made the determination described in such clause and subsequently countersigns the certificate.

(d)   The rules also shall provide that a public hospital or hospital district shall accept the transfer of its eligible residents if the public hospital or hospital district has appropriate facilities, services, and staff available for providing care to the patient.

(e)   The rules must require that a hospital take all reasonable steps to secure the informed refusal of a patient or of a person acting on the patient's behalf to a transfer or to related examination and treatment.

(f)   The rules must recognize any contractual, statutory, or regulatory obligations that may exist between a patient and a designated or mandated provider as those obligations apply to the transfer of emergency or nonemergency patients.

Acts 1989, 71st Leg., ch. 678, Sec. 1, eff. Sept. 1, 1989.  Amended by Acts 1991, 72nd Leg., ch. 14, Sec. 83, eff. Sept. 1, 1991;  Acts 1993, 73rd Leg., ch. 584, Sec. 5, eff. Sept. 1, 1993.

Sec. 241.028.  TRANSFER AGREEMENTS.  (a)  If hospitals execute a transfer agreement that is consistent with the requirements of this section, all patient transfers between the hospitals are governed by the agreement.

(b)   The hospitals shall submit the agreement to the department for review for compliance with the requirements of this section.  The department shall complete the review of the agreement within 30 days after the date the agreement is submitted by the hospitals.

(c)   At a minimum, a transfer agreement must provide that:

(1)   transfers be accomplished in a medically appropriate manner and comply with Sections 241.027(b)(2) through (5) and Section 241.027(c);

(2)   the transfer or receipt of patients in need of emergency care not be based on the individual's inability to pay for the services rendered by the transferring or receiving hospital;

(3)   multiple transfer agreements be entered into by a hospital based

on the type or level of medical services available at other hospitals;

     (4)   the hospitals recognize the right of an individual to request transfer to the care of a physician and hospital of the individual's choice;

     (5)   the hospitals recognize and comply with the requirements of Chapter 61 (Indigent Health Care and Treatment Act) relating to the transfer of patients to mandated providers;  and

     (6)   consideration be given to availability of appropriate facilities, services, and staff for providing care to the patient.

     (d)  If a hospital transfers a patient in violation of Subsection (c)(1), (2), (4), (5), or (6), relating to required provisions for a transfer agreement, the violation is a violation of this chapter.

Acts 1989, 71st Leg., ch. 678, Sec. 1, eff. Sept. 1, 1989.  Amended by Acts 1991, 72nd Leg., ch. 14, Sec. 84, eff. Sept. 1, 1991;  Acts 1993, 73rd Leg., ch. 584, Sec. 6, eff. Sept. 1, 1993.


     Sec. 241.029.  POLICIES AND PROCEDURES RELATING TO WORKPLACE SAFETY.  (a) The governing body of a hospital shall adopt policies and procedures related to the work environment for nurses to:

     (1)   improve workplace safety and reduce the risk of injury, occupational illness, and violence;  and

     (2)   increase the use of ergonomic principles and ergonomically designed devices to reduce injury and fatigue.

     (b)  The policies and procedures adopted under Subsection (a), at a minimum, must include:

     (1)   evaluating new products and technology that incorporate ergonomic principles;

     (2)   educating nurses in the application of ergonomic practices;

     (3)   conducting workplace audits to identify areas of risk of injury, occupational illness, or violence and recommending ways to reduce those risks;

     (4)   controlling access to those areas identified as having a high risk of violence;  and

     (5)   promptly reporting crimes committed against nurses to appropriate law enforcement agencies.

Added by Acts 2003, 78th Leg., ch. 876, Sec. 13, eff. June 20, 2003.


## SUBCHAPTER C. ENFORCEMENT

This section was amended by the 84th Legislature. Pending publication of the current statutes, see S.B. 219, 84th Legislature, Regular Session, for amendments affecting this section.

Sec. 241.051. INSPECTIONS. (a) The department may make any inspection, survey, or investigation that it considers necessary. A representative of the department may enter the premises of a hospital at any reasonable time to make an inspection, a survey, or an investigation to assure compliance with or prevent a violation of this chapter, the rules adopted under this chapter, an order or special order of the commissioner of health, a special license provision, a court order granting injunctive relief, or other enforcement procedures. The department shall maintain the confidentiality of hospital records as applicable under state or federal law.

(b) The department or a representative of the department is entitled to access to all books, records, or other documents maintained by or on behalf of the hospital to the extent necessary to enforce this chapter, the rules adopted under this chapter, an order or special order of the commissioner of health, a special license provision, a court order granting injunctive relief, or other enforcement procedures.

(c) By applying for or holding a hospital license, the hospital consents to entry and inspection of the hospital by the department or a representative of the department in accordance with this chapter and the rules adopted under this chapter.

(d) All information and materials obtained or compiled by the department in connection with a complaint and investigation concerning a hospital are confidential and not subject to disclosure under Section 552.001 et seq., Government Code, and not subject to disclosure, discovery, subpoena, or other means of legal compulsion for their release to anyone other than the department or its employees or agents involved in the enforcement action except that this information may be disclosed to:

(1) persons involved with the department in the enforcement action against the hospital;

(2) the hospital that is the subject of the enforcement action, or the hospital's authorized representative;

(3) appropriate state or federal agencies that are authorized to inspect, survey, or investigate hospital services;

(4) law enforcement agencies; and

(5) persons engaged in bona fide research, if all individual-identifying and hospital-identifying information has been deleted.

(e) The following information is subject to disclosure in accordance with Section 552.001 et seq., Government Code:

(1) a notice of alleged violation against the hospital, which notice shall include the provisions of law which the hospital is alleged to have violated, and a general statement of the nature of the alleged violation;

(2) the pleadings in the administrative proceeding; and

(3) a final decision or order by the department.

Acts 1989, 71st Leg., ch. 678, Sec. 1, eff. Sept. 1, 1989. Amended by Acts 1993, 73rd Leg., ch. 584, Sec. 8, eff. Sept. 1, 1993; Acts 1999, 76th Leg., ch. 1444, Sec. 15, eff. Aug. 30, 1999.


Sec. 241.052. COMPLIANCE WITH RULES AND STANDARDS. (a) A hospital that is in operation when an applicable rule or minimum standard is adopted under this chapter must be given a reasonable period within which to comply with the rule or standard.

(b) The period for compliance may not exceed six months, except that the department may extend the period beyond six months if the hospital sufficiently shows the department that it requires additional time to complete compliance with the rule or standard.

Acts 1989, 71st Leg., ch. 678, Sec. 1, eff. Sept. 1, 1989.


This section was amended by the 84th Legislature. Pending publication of the current statutes, see S.B. 219, 84th Legislature, Regular Session, for amendments affecting this section.

Sec. 241.053. DENIAL OF APPLICATION, SUSPENSION, REVOCATION, PROBATION, OR REISSUANCE OF LICENSE. (a) The department, after providing notice and an opportunity for a hearing to the applicant or license holder, may deny, suspend, or revoke a hospital's license if the department finds that the hospital:

(1) failed to comply with:

(A) a provision of this chapter;

(B) a rule adopted under this chapter;

(C) a special license condition;

(D) an order or emergency order by the commissioner of health; or

(E) another enforcement procedure permitted under this chapter;

(2) has a history of noncompliance with the rules adopted under this chapter relating to patient health, safety, and rights which reflects more than nominal noncompliance; or

(3) has aided, abetted, or permitted the commission of an illegal act.

(b) A hospital whose license is suspended or revoked may apply to the department for the reissuance of a license. The department may reissue the license if the department determines that the hospital has corrected the conditions that led to the suspension or revocation of the hospital's license, the initiation of enforcement action against the hospital, the assessment of administrative penalties, or the issuance of a court order enjoining the

hospital from violations or assessing civil penalties against the hospital. A hospital whose license is suspended or revoked may not admit new patients until the license is reissued.

(c)  A hospital must apply for reissuance in the form and manner required in the rules adopted under this chapter.

(d)  Administrative hearings required under this section shall be conducted under the board's formal hearing rules and the contested case provisions of Chapter 2001, Government Code.

(e)  Judicial review of a final decision by the department is by trial de novo in the same manner as a case appealed from the justice court to the county court. The substantial evidence rule does not apply.

(f)  If the department finds that a hospital is in repeated noncompliance under Subsection (a) but that the noncompliance does not endanger public health and safety, the department may schedule the hospital for probation rather than suspending or revoking the hospital's license. The department shall provide notice to the hospital of the probation and of the items of noncompliance not later than the 10th day before the date the probation period begins. The department shall designate a period of not less than 30 days during which the hospital will remain under probation. During the probation period, the hospital must correct the items that were in noncompliance and report the corrections to the department for approval.

(g)  The department may suspend or revoke the license of a hospital that does not correct items that were in noncompliance or that does not comply with the applicable requirements within the applicable probation period.

Acts 1989, 71st Leg., ch. 678, Sec. 1, eff. Sept. 1, 1989. Amended by Acts 1993, 73rd Leg., ch. 584, Sec. 9, eff. Sept. 1, 1993;  Acts 1993, 73rd Leg., ch. 705, Sec. 3.01, eff. Sept. 1, 1993;  Acts 1995, 74th Leg., ch. 76, Sec. 5.95(51), eff. Sept. 1, 1995;  Acts 2003, 78th Leg., ch. 802, Sec. 1, 2, eff. June 20, 2003.


This section was amended by the 84th Legislature. Pending publication of the current statutes, see S.B. 219, 84th Legislature, Regular Session, for amendments affecting this section.

Sec. 241.0531.  COMMISSIONER'S EMERGENCY ORDERS.  (a)  Following notice to the hospital and opportunity for hearing, the commissioner of health or a person designated by the commissioner may issue an emergency order, either mandatory or prohibitory in nature, in relation to the operation of a hospital licensed under this chapter if the commissioner or the commissioner's designee determines that the hospital is violating or threatening to violate this chapter, a rule

adopted pursuant to this chapter, a special license provision, injunctive relief issued pursuant to Section 241.054, an order of the commissioner or the commissioner's designee, or another enforcement procedure permitted under this chapter and the provision, rule, license provision, injunctive relief, order, or enforcement procedure relates to the health or safety of the hospital's patients.

(b) The department shall send written notice of the hearing and shall include within the notice the time and place of the hearing. The hearing must be held within 10 days after the date of the hospital's receipt of the notice.

(c) The hearing shall not be governed by the contested case provisions of Chapter 2001, Government Code but shall instead be held in accordance with the board's informal hearing rules.

(d) The order shall be effective on delivery to the hospital or at a later date specified in the order.

Added by Acts 1993, 73rd Leg., ch. 584, Sec. 10, eff. Sept. 1, 1993. Amended by Acts 1995, 74th Leg., ch. 76, Sec. 5.95(51), eff. Sept. 1, 1995.


This section was amended by the 84th Legislature. Pending publication of the current statutes, see S.B. 219, 84th Legislature, Regular Session, for amendments affecting this section.

Sec. 241.054. VIOLATIONS; INJUNCTIONS. (a) The department shall:

(1) notify a hospital of a finding by the department that the hospital is violating or has violated this chapter or a rule or standard adopted under this chapter; and

(2) provide the hospital an opportunity to correct the violation.

(b) After the notice and opportunity to comply, the commissioner of health may request the attorney general or the appropriate district or county attorney to institute and conduct a suit for a violation of this chapter or a rule adopted under this chapter.

(c) The department may petition a district court for a temporary restraining order to restrain a continuing violation if the department finds that the violation creates an immediate threat to the health and safety of the patients of a hospital.

(d) On his own initiative, the attorney general, a district attorney, or a county attorney may maintain an action in the name of the state for a violation of this chapter or a rule adopted under this chapter.

(e) The district court shall assess the civil penalty authorized by Section 241.055, grant injunctive relief, or both, as warranted by the facts. The injunctive relief may include any prohibitory or mandatory injunction

warranted by the facts, including a temporary restraining order, temporary injunction, or permanent injunction.

(f)  The department and the party bringing the suit may recover reasonable expenses incurred in obtaining injunctive relief, civil penalties, or both, including investigation costs, court costs, reasonable attorney fees, witness fees, and deposition expenses.

(g)  Venue may be maintained in Travis County or in the county in which the violation occurred.

(h)  Not later than the seventh day before the date on which the attorney general intends to bring suit on his own initiative, the attorney general shall provide to the department notice of the suit.  The attorney general is not required to provide notice of a suit if the attorney general determines that waiting to bring suit until the notice is provided will create an immediate threat to the health and safety of a patient.  This section does not create a requirement that the attorney general obtain the permission of a referral from the department before filing suit.

(i)  The injunctive relief and civil penalty authorized by this section and Section 241.055 are in addition to any other civil, administrative, or criminal penalty provided by law.

Acts 1989, 71st Leg., ch. 678, Sec. 1, eff. Sept. 1, 1989.  Amended by Acts 1993, 73rd Leg., ch. 705, Sec. 3.02, eff. Sept. 1, 1993.


Sec. 241.055.  CIVIL PENALTY.  (a)  A hospital shall timely adopt, implement, and enforce a patient transfer policy in accordance with Section 241.027.  A hospital may implement patient transfer agreements in accordance with Section 241.028.

(b)  A hospital that violates Subsection (a), another provision of this chapter, or a rule adopted or enforced under this chapter is liable for a civil penalty of not more than $1,000 for each day of violation and for each act of violation.  A hospital that violates this chapter or a rule or order adopted under this chapter relating to the provision of mental health, chemical dependency, or rehabilitation services is liable for a civil penalty of not more than $25,000 for each day of violation and for each act of violation.

(c)  In determining the amount of the penalty, the district court shall consider:

(1)  the hospital's previous violations;

(2)  the seriousness of the violation, including the nature, circumstances, extent, and gravity of the violation;

(3)  whether the health and safety of the public was threatened by the violation;

(4)   the demonstrated good faith of the hospital;   and

(5)   the amount necessary to deter future violations.

(d)   A penalty collected under this section by the attorney general shall be deposited to the credit of the general revenue fund.   A penalty collected under this section by a district or county attorney shall be deposited to the credit of the general fund of the county in which the suit was heard.

Acts 1989, 71st Leg., ch. 678, Sec. 1, eff. Sept. 1, 1989.   Amended by Acts 1991, 72nd Leg., ch. 14, Sec. 86, eff. Sept. 1, 1991;   Acts 1993, 73rd Leg., ch. 584, Sec. 11, eff. Sept. 1, 1993;   Acts 1993, 73rd Leg., ch. 705, Sec. 3.03, eff. Sept. 1, 1993.


Sec. 241.056.   SUIT BY PERSON HARMED.   (a)   A person who is harmed by a violation under Section 241.028 or 241.055 may petition a district court for appropriate injunctive relief.

(b)   Venue for a suit brought under this section is in the county in which the person resides or, if the person is not a resident of this state, in Travis County.

(c)   The person may also pursue remedies for civil damages under common law.

Acts 1989, 71st Leg., ch. 678, Sec. 1, eff. Sept. 1, 1989.   Amended by Acts 1991, 72nd Leg., ch. 14, Sec. 87, eff. Sept. 1, 1991;   Acts 1993, 73rd Leg., ch. 584, Sec. 12, eff. Sept. 1, 1993.


Sec. 241.057.   CRIMINAL PENALTY.   (a)   A person commits an offense if the person establishes, conducts, manages, or operates a hospital without a license.

(b)   An offense under this section is a misdemeanor punishable by a fine of not more than $100 for the first offense and not more than $200 for each subsequent offense.

(c)   Each day of a continuing violation constitutes a separate offense.

Acts 1989, 71st Leg., ch. 678, Sec. 1, eff. Sept. 1, 1989.


This section was amended by the 84th Legislature. Pending publication of the current statutes, see S.B. 219, 84th Legislature, Regular Session, for amendments affecting this section.

Sec. 241.058.   MINOR VIOLATIONS.   (a)   This chapter does not require the commissioner of health or a designee of the commissioner to report a minor violation for prosecution or the institution of any other enforcement proceeding authorized under this chapter, if the commissioner or a designee of the

commissioner determines that prosecution or enforcement is not in the best interests of the persons served or to be served by the hospital.

(b)　For the purpose of this section, a "minor violation" means a violation of this chapter, the rules adopted under this chapter, a special license provision, an order or emergency order issued by the commissioner of health or the commissioner's designee, or another enforcement procedure permitted under this chapter by a hospital that does not constitute a threat to the health, safety, and rights of the hospital's patients or other persons.

Added by Acts 1993, 73rd Leg., ch. 584, Sec. 13, eff. Sept. 1,1993.

Sec. 241.0585.　RECOVERY OF COSTS.　If the attorney general brings an action to enforce an administrative penalty assessed under Section 241.058 and the court orders the payment of the penalty, the attorney general may recover reasonable expenses incurred in the investigation, initiation, or prosecution of the enforcement suit, including investigative costs, court costs, reasonable attorney fees, witness fees, and deposition expenses.

Added by Acts 1993, 73rd Leg., ch. 705, Sec. 3.041, eff. Sept. 1, 1993.

This section was amended by the 84th Legislature. Pending publication of the current statutes, see S.B. 219, 84th Legislature, Regular Session, for amendments affecting this section.

Sec. 241.059.　ADMINISTRATIVE PENALTY.　(a)　The commissioner of health may assess an administrative penalty against a hospital that violates this chapter, a rule adopted pursuant to this chapter, a special license provision, an order or emergency order issued by the commissioner or the commissioner's designee, or another enforcement procedure permitted under this chapter.　The commissioner shall assess an administrative penalty against a hospital that violates Section 166.004.

(b)　In determining the amount of the penalty, the commissioner of health shall consider:

　　(1)　the hospital's previous violations;

　　(2)　the seriousness of the violation;

　　(3)　any threat to the health, safety, or rights of the hospital's patients;

　　(4)　the demonstrated good faith of the hospital;　and

　　(5)　such other matters as justice may require.

(c)　The penalty may not exceed $1,000 for each violation, except that the penalty for a violation of Section 166.004 shall be $500. Each day of a continuing violation, other than a violation of Section 166.004, may be

considered a separate violation.

(d)   When it is determined that a violation has occurred the commissioner of health shall issue a report that states the facts on which the determination is based and the commissioner's recommendation on the imposition of a penalty, including a recommendation on the amount of the penalty.

(e)   Within 14 days after the date the report is issued, the commissioner of health shall give written notice of the report to the person, delivered by certified mail.  The notice must include a brief summary of the alleged violation and a statement of the amount of the recommended penalty and must inform the person that the person has a right to a hearing on the occurrence of the violation, the amount of the penalty, or both the occurrence of the violation and the amount of the penalty.

(f)   Within 20 days after the date the person receives the notice, the person in writing may accept the determination and recommended penalty of the commissioner of health or may make a written request for a hearing on the occurrence of the violation, the amount of the penalty, or both the occurrence of the violation and the amount of the penalty.

(g)   If the person accepts the determination and recommended penalty of the commissioner of health, the commissioner by order shall impose the recommended penalty.

(h)   If the person requests a hearing or fails to respond timely to the notice, the commissioner of health shall set a hearing and give notice of the hearing to the person.  The hearing shall be held by the department.  The person conducting the hearing shall make findings of fact and conclusions of law and promptly issue to the commissioner a proposal for a decision about the occurrence of the violation and the amount of the penalty.  Based on the findings of fact, conclusions of law, and proposal for a decision, the commissioner by order may find that a violation has occurred and impose a penalty or may find that no violation occurred.

(i)   The notice of the commissioner of health's order given to the person under Chapter 2001, Government Code must include a statement of the right of the person to judicial review of the order.

(j)   Within 30 days after the date the commissioner of health's order is final as provided by Subchapter F, Chapter 2001, Government Code, the person shall:

(1)   pay the amount of the penalty;

(2)   pay the amount of the penalty and file a petition for judicial review contesting the occurrence of the violation, the amount of the penalty, or both the occurrence of the violation and the amount of the penalty;  or

(3)   without paying the amount of the penalty, file a petition for

judicial review contesting the occurrence of the violation, the amount of the penalty, or both the occurrence of the violation and the amount of the penalty.

(k)  Within the 30-day period, a person who acts under Subsection (j)(3) may:

(1)  stay enforcement of the penalty by:

(A)  paying the amount of the penalty to the court for placement in an escrow account;  or

(B)  giving to the court a supersedeas bond that is approved by the court for the amount of the penalty and that is effective until all judicial review of the board's order is final;  or

(2)  request the court to stay enforcement of the penalty by:

(A)  filing with the court a sworn affidavit of the person stating that the person is financially unable to pay the amount of the penalty and is financially unable to give the supersedeas bond;  and

(B)  giving a copy of the affidavit to the commissioner of health by certified mail.

(l)  When the commissioner of health receives a copy of an affidavit under Subsection (k)(2), he may file with the court, within five days after the date the copy is received, a contest to the affidavit.  The court shall hold a hearing on the facts alleged in the affidavit as soon as practicable and shall stay the enforcement of the penalty on finding that the alleged facts are true. The person who files an affidavit has the burden of proving that the person is financially unable to pay the amount of the penalty and to give a supersedeas bond.

(m)  If the person does not pay the amount of the penalty and the enforcement of the penalty is not stayed, the commissioner of health may refer the matter to the attorney general for collection of the amount of the penalty.

(n)  Judicial review of the order of the commissioner of health:

(1)  is instituted by filing a petition as provided by Subchapter G, Chapter 2001, Government Code;  and

(2)  is under the substantial evidence rule.

(o)  If the court sustains the occurrence of the violation, the court may uphold or reduce the amount of the penalty and order the person to pay the full or reduced amount of the penalty.  If the court does not sustain the occurrence of the violation, the court shall order that no penalty is owed.

(p)  When the judgment of the court becomes final, the court shall proceed under this subsection.  If the person paid the amount of the penalty and if that amount is reduced or is not upheld by the court, the court shall order that the appropriate amount plus accrued interest be remitted to the person within 30 days after the judgment of the court becomes final.  The rate of the interest is

the rate charged on loans to depository institutions by the New York Federal Reserve Bank, and the interest shall be paid for the period beginning on the date the penalty was paid and ending on the date the penalty is remitted.  If the person gave a supersedeas bond and if the amount of the penalty is not upheld by the court, the court shall order the release of the bond.  If the person gave a supersedeas bond and if the amount of the penalty is reduced, the court shall order the release of the bond after the person pays the amount.

(q)  A penalty collected under this section shall be remitted to the comptroller for deposit in the general revenue fund.

(r)  All proceedings under this section are subject to Chapter 2001, Government Code.

Added by Acts 1993, 73rd Leg., ch. 584, Sec. 14, eff. Sept. 1, 1993.  Amended by Acts 1995, 74th Leg., ch. 76, Sec. 5.95(51), (53), (55), (60), eff. Sept. 1, 1995;  Acts 1999, 76th Leg., ch. 450, Sec. 2.03, eff. Sept. 1, 1999.


This section was amended by the 84th Legislature. Pending publication of the current statutes, see S.B. 219, 84th Legislature, Regular Session, for amendments affecting this section.

Sec. 241.060.  ADMINISTRATIVE PENALTY FOR MENTAL HEALTH, CHEMICAL DEPENDENCY, OR REHABILITATION SERVICES.  (a)  The board may impose an administrative penalty against a person licensed or regulated under this chapter who violates this chapter or a rule or order adopted under this chapter relating to the provision of mental health, chemical dependency, or rehabilitation services.

(b)  The penalty for a violation may be in an amount not to exceed $25,000.  Each day a violation continues or occurs is a separate violation for purposes of imposing a penalty.

(c)  The amount of the penalty shall be based on:

(1)  the seriousness of the violation, including the nature, circumstances, extent, and gravity of any prohibited acts, and the hazard or potential hazard created to the health, safety, or economic welfare of the public;

(2)  enforcement costs relating to the violation;

(3)  the history of previous violations;

(4)  the amount necessary to deter future violations;

(5)  efforts to correct the violation;  and

(6)  any other matter that justice may require.

(d)  If the commissioner determines that a violation has occurred, the commissioner may issue to the board a report that states the facts on which the

determination is based and the commissioner's recommendation on the imposition of a penalty, including a recommendation on the amount of the penalty.

(e) Within 14 days after the date the report is issued, the commissioner shall give written notice of the report to the person. The notice may be given by certified mail. The notice must include a brief summary of the alleged violation and a statement of the amount of the recommended penalty and must inform the person that the person has a right to a hearing on the occurrence of the violation, the amount of the penalty, or both the occurrence of the violation and the amount of the penalty.

(f) Within 20 days after the date the person receives the notice, the person in writing may accept the determination and recommended penalty of the commissioner or may make a written request for a hearing on the occurrence of the violation, the amount of the penalty, or both the occurrence of the violation and the amount of the penalty.

(g) If the person accepts the determination and recommended penalty of the commissioner, the board by order shall approve the determination and impose the recommended penalty.

(h) If the person requests a hearing or fails to respond timely to the notice, the commissioner shall set a hearing and give notice of the hearing to the person. The administrative law judge shall make findings of fact and conclusions of law and promptly issue to the board a proposal for a decision about the occurrence of the violation and the amount of a proposed penalty. Based on the findings of fact, conclusions of law, and proposal for a decision, the board by order may find that a violation has occurred and impose a penalty or may find that no violation occurred.

(i) The notice of the board's order given to the person under Chapter 2001, Government Code must include a statement of the right of the person to judicial review of the order.

(j) Within 30 days after the date the board's order is final as provided by Subchapter F, Chapter 2001, Government Code, the person shall:

(1) pay the amount of the penalty;

(2) pay the amount of the penalty and file a petition for judicial review contesting the occurrence of the violation, the amount of the penalty, or both the occurrence of the violation and the amount of the penalty; or

(3) without paying the amount of the penalty, file a petition for judicial review contesting the occurrence of the violation, the amount of the penalty, or both the occurrence of the violation and the amount of the penalty.

(k) Within the 30-day period, a person who acts under Subsection (j)(3) may:

(1) stay enforcement of the penalty by:

(A) paying the amount of the penalty to the court for placement in an escrow account; or

(B) giving to the court a supersedeas bond that is approved by the court for the amount of the penalty and that is effective until all judicial review of the board's order is final; or

(2) request the court to stay enforcement of the penalty by:

(A) filing with the court a sworn affidavit of the person stating that the person is financially unable to pay the amount of the penalty and is financially unable to give the supersedeas bond; and

(B) giving a copy of the affidavit to the commissioner by certified mail.

(l) The commissioner on receipt of a copy of an affidavit under Subsection (k)(2) may file with the court within five days after the date the copy is received a contest to the affidavit. The court shall hold a hearing on the facts alleged in the affidavit as soon as practicable and shall stay the enforcement of the penalty on finding that the alleged facts are true. The person who files an affidavit has the burden of proving that the person is financially unable to pay the amount of the penalty and to give a supersedeas bond.

(m) If the person does not pay the amount of the penalty and the enforcement of the penalty is not stayed, the commissioner may refer the matter to the attorney general for collection of the amount of the penalty.

(n) Judicial review of the order of the board:

(1) is instituted by filing a petition as provided by Subchapter G, Chapter 2001, Government Code; and

(2) is under the substantial evidence rule.

(o) If the court sustains the occurrence of the violation, the court may uphold or reduce the amount of the penalty and order the person to pay the full or reduced amount of the penalty. If the court does not sustain the occurrence of the violation, the court shall order that no penalty is owed.

(p) When the judgment of the court becomes final, the court shall proceed under this subsection. If the person paid the amount of the penalty and if that amount is reduced or is not upheld by the court, the court shall order that the appropriate amount plus accrued interest be remitted to the person. The rate of the interest is the rate charged on loans to depository institutions by the New York Federal Reserve Bank, and the interest shall be paid for the period beginning on the date the penalty was paid and ending on the date the penalty is remitted. If the person gave a supersedeas bond and if the amount of the penalty is not upheld by the court, the court shall order the release of the bond. If the person gave a supersedeas bond and if the amount of the penalty is

reduced, the court shall order the release of the bond after the person pays the amount.

(q)   A penalty collected under this section shall be remitted to the comptroller for deposit in the general revenue fund.

(r)   All proceedings under this section are subject to Chapter 2001, Government Code.

Added by Acts 1993, 73rd Leg., ch. 705, Sec. 3.04, eff. Sept. 1, 1993.  Amended by Acts 1995, 74th Leg., ch. 76, Sec. 5.95(49), (53), (59), eff. Sept. 1, 1995.  Renumbered from Health & Safety Code Sec. 241.058 by Acts 1995, 74th Leg., ch. 76, Sec. 17.01(22), eff. Sept. 1, 1995.

## SUBCHAPTER E. STAFF, RECORDS, AND PLAN REVIEWS

This section was amended by the 84th Legislature. Pending publication of the current statutes, see S.B. 219, 84th Legislature, Regular Session, for amendments affecting this section.

Sec. 241.101.   HOSPITAL AUTHORITY CONCERNING MEDICAL STAFF.   (a)   Except as otherwise provided by this section and Section 241.102, this chapter does not change the authority of the governing body of a hospital, as it considers necessary or advisable, to:

(1)   make rules, standards, or qualifications for medical staff membership;   or

(2)   grant or refuse to grant membership on the medical staff.

(b)   This chapter does not prevent the governing body of a hospital from adopting reasonable rules and requirements in compliance with this chapter relating to:

(1)   qualifications for any category of medical staff appointments;

(2)   termination of appointments;   or

(3)   the delineation or curtailment of clinical privileges of those who are appointed to the medical staff.

(c)   The process for considering applications for medical staff membership and privileges or the renewal, modification, or revocation of medical staff membership and privileges must afford each physician, podiatrist, and dentist procedural due process that meets the requirements of 42 U.S.C. Section 11101 et seq., as amended.

(d)   If a hospital's credentials committee has failed to take action on a completed application as required by Subsection (k), or a physician, podiatrist, or dentist is subject to a professional review action that may adversely affect his medical staff membership or privileges, and the physician, podiatrist, or dentist believes that mediation of the dispute is desirable, the physician,

podiatrist, or dentist may require the hospital to participate in mediation as provided in Chapter 154, Civil Practice and Remedies Code. The mediation shall be conducted by a person meeting the qualifications required by Section 154.052, Civil Practice and Remedies Code, and within a reasonable period of time.

(e) Subsection (d) does not authorize a cause of action by a physician, podiatrist, or dentist against the hospital other than an action to require a hospital to participate in mediation.

(f) An applicant for medical staff membership or privileges may not be denied membership or privileges on any ground that is otherwise prohibited by law.

(g) A hospital's bylaw requirements for staff privileges may require a physician, podiatrist, or dentist to document the person's current clinical competency and professional training and experience in the medical procedures for which privileges are requested.

(h) In granting or refusing medical staff membership or privileges, a hospital may not differentiate on the basis of the academic medical degree held by a physician.

(i) Graduate medical education may be used as a standard or qualification for medical staff membership or privileges for a physician, provided that equal recognition is given to training programs accredited by the Accreditation Council on Graduate Medical Education and by the American Osteopathic Association.

(j) Board certification may be used as a standard or qualification for medical staff membership or privileges for a physician, provided that equal recognition is given to certification programs approved by the American Board of Medical Specialties and the Bureau of Osteopathic Specialists.

(k) A hospital's credentials committee shall act expeditiously and without unnecessary delay when a licensed physician, podiatrist, or dentist submits a completed application for medical staff membership or privileges. The hospital's credentials committee shall take action on the completed application not later than the 90th day after the date on which the application is received. The governing body of the hospital shall take final action on the application for medical staff membership or privileges not later than the 60th day after the date on which the recommendation of the credentials committee is received. The hospital must notify the applicant in writing of the hospital's final action, including a reason for denial or restriction of privileges, not later than the 20th day after the date on which final action is taken.

Acts 1989, 71st Leg., ch. 678, Sec. 1, eff. Sept. 1, 1989. Amended by Acts 1995, 74th Leg., ch. 77, Sec. 1, eff. May 11, 1995; Acts 1999, 76th Leg., ch. 159, Sec. 1, eff. May 21, 1999; Acts 2001, 77th Leg., ch. 1175, Sec. 1, eff.

June 15, 2001.

Sec. 241.1015. PHYSICIAN COMMUNICATION AND CONTRACTS. (a) A hospital, whether by contract, by granting or withholding staff privileges, or otherwise, may not restrict a physician's ability to communicate with a patient with respect to:

(1) the patient's coverage under a health care plan;

(2) any subject related to the medical care or health care services to be provided to the patient, including treatment options that are not provided under a health care plan;

(3) the availability or desirability of a health care plan or insurance or similar coverage, other than the patient's health care plan; or

(4) the fact that the physician's staff privileges or contract with a hospital or health care plan have terminated or that the physician will otherwise no longer be providing medical care or health care services at the hospital or under the health care plan.

(b) A hospital, by contract or otherwise, may not refuse or fail to grant or renew staff privileges, or condition staff privileges, based in whole or in part on the fact that the physician or a partner, associate, or employee of the physician is providing medical or health care services at a different hospital or hospital system.

(c) A hospital may not contract to limit a physician's participation or staff privileges or the participation or staff privileges of a partner, associate, or employee of the physician at a different hospital or hospital system.

(d) This section does not prevent a hospital from entering into contracts with physicians to ensure physician availability and coverage at the hospital or to comply with regulatory requirements or quality of care standards established by the governing body of the hospital.

(e) This section does not prevent the governing body of a hospital from:

(1) limiting the number of physicians granted medical staff membership or privileges at the hospital based on a medical staff development plan that is unrelated to a physician's professional or business relationships or associations including those with another physician or group of physicians or to a physician or a partner, associate, or employee of a physician having medical staff membership or privileges at another hospital or hospital system; or

(2) limiting the ability of hospital medical directors to contract with or hold medical staff memberships or clinical privileges at different hospitals or hospital systems provided that such limitations do not extend to the medical directors' professional or business relationships or associations

including those with another physician, group of physicians, or other health care providers, other than hospitals or hospital systems.

(f)  A contract provision that violates this section is void.

(g)  In this section, "health care plan" has the meaning assigned by Section 843.002, Insurance Code, and "hospital medical directors" means physicians who have been employed by or are under contract with a hospital to manage a clinical department or departments of the hospital.

Added by Acts 1997, 75th Leg., ch. 735, Sec. 2, eff. Sept. 1, 1997.  Amended by Acts 2003, 78th Leg., ch. 1276, Sec. 10A.526, eff. Sept. 1, 2003.

Sec. 241.102.  AUTHORIZATIONS AND RESTRICTIONS IN RELATION TO PHYSICIANS AND PODIATRISTS.  (a)  This chapter does not authorize a physician or podiatrist to perform medical or podiatric acts that are beyond the scope of the respective license held.

(b)  This chapter does not prevent the governing body of a hospital from providing that:

(1)  a podiatric patient be coadmitted to the hospital by a podiatrist and a physician;

(2)  a physician be responsible for the care of any medical problem or condition of a podiatric patient that may exist at the time of admission or that may arise during hospitalization and that is beyond the scope of the podiatrist's license;  or

(3)  a physician determine the risk and effect of a proposed podiatric surgical procedure on the total health status of the patient.

(c)  An applicant for medical staff membership may not be denied membership solely on the ground that the applicant is a podiatrist rather than a physician.

(d)  This chapter does not automatically entitle a physician or a podiatrist to membership or privileges on a medical staff.

(e)  The governing body of a hospital may not require a member of the medical staff to involuntarily:

(1)  coadmit patients with a podiatrist;

(2)  be responsible for the care of any medical problem or condition of a podiatric patient;  or

(3)  determine the risk and effect of any proposed podiatric procedure on the total health status of the patient.

Acts 1989, 71st Leg., ch. 678, Sec. 1, eff. Sept. 1, 1989.

Sec. 241.103.  PRESERVATION OF RECORDS.  (a)  A hospital may authorize the

disposal of any medical record on or after the 10th anniversary of the date on which the patient who is the subject of the record was last treated in the hospital.

(b)   If a patient was younger than 18 years of age when the patient was last treated, the hospital may authorize the disposal of medical records relating to the patient on or after the date of the patient's 20th birthday or on or after the 10th anniversary of the date on which the patient was last treated, whichever date is later.

(c)   The hospital may not destroy medical records that relate to any matter that is involved in litigation if the hospital knows the litigation has not been finally resolved.

(d)   A hospital shall provide written notice to a patient, or a patient's legally authorized representative as that term is defined by Section 241.151, that the hospital, unless the exception in Subsection (c) applies, may authorize the disposal of medical records relating to the patient on or after the periods specified in this section.   The notice shall be provided to the patient or the patient's legally authorized representative not later than the date on which the patient who is or will be the subject of a medical record is treated, except in an emergency treatment situation.   In an emergency treatment situation, the notice shall be provided to the patient or the patient's legally authorized representative as soon as is reasonably practicable following the emergency treatment situation.

Acts 1989, 71st Leg., ch. 678, Sec. 1, eff. Sept. 1, 1989.
Amended by:
     Acts 2011, 82nd Leg., R.S., Ch. 466 (H.B. 118), Sec. 1, eff. September 1, 2011.


     This section was amended by the 84th Legislature. Pending publication of the current statutes, see S.B. 219, 84th Legislature, Regular Session, for amendments affecting this section.

     Sec. 241.104.   HOSPITAL PLAN REVIEWS.   (a)   The board by rule shall adopt fees for hospital plan reviews according to a schedule based on the estimated construction costs.
     (b)   The fee schedule may not exceed the following:

| Cost of Construction | Fee |
|---|---|
| (1)   $ 100,000 or less | $ 500 |
| (2)   $ 100,001 - $ 600,000 | $1,500 |

(3)   $ 600,001 - $ 2,000,000

$3,000

(4)   $ 2,000,001 - $ 5,000,000

$4,500

(5)   $ 5,000,001 - $10,000,000

$6,000

(6)   $ 10,000,001 and over

$7,500

(c)   The department shall charge a fee for field surveys of construction plans reviewed under this section.   The board by rule shall adopt a fee schedule for the surveys that provides a minimum fee of $500 and a maximum fee of $1,000 for each survey conducted.

Acts 1989, 71st Leg., ch. 678, Sec. 1, eff. Sept. 1, 1989.   Amended by Acts 1993, 73rd Leg., ch. 584, Sec. 15, eff. Sept. 1, 1993;   Acts 1999, 76th Leg., ch. 1411, Sec. 2.03, eff. Sept. 1, 1999.


Sec. 241.105.   HOSPITAL PRIVILEGES FOR ADVANCED PRACTICE NURSES AND PHYSICIAN ASSISTANTS.   (a)   The governing body of a hospital is authorized to establish policies concerning the granting of clinical privileges to advanced practice nurses and physician assistants, including policies relating to the application process, reasonable qualifications for privileges, and the process for renewal, modification, or revocation of privileges.

(b)   If the governing body of a hospital has adopted a policy of granting clinical privileges to advanced practice nurses or physician assistants, an individual advanced practice nurse or physician assistant who qualifies for privileges under that policy shall be entitled to certain procedural rights to provide fairness of process, as determined by the governing body of the hospital, when an application for privileges is submitted to the hospital.   At a minimum, any policy adopted shall specify a reasonable period for the processing and consideration of the application and shall provide for written notification to the applicant of any final action on the application by the hospital, including any reason for denial or restriction of the privileges requested.

(c)   If an advanced practice nurse or physician assistant has been granted clinical privileges by a hospital, the hospital may not modify or revoke those privileges without providing certain procedural rights to provide fairness of process, as determined by the governing body of the hospital, to the advanced practice nurse or physician assistant.   At a minimum, the hospital shall provide the advanced practice nurse or physician assistant written reasons for the modification or revocation of privileges and a mechanism for appeal to the

appropriate committee or body within the hospital, as determined by the governing body of the hospital.

(d)   If a hospital extends clinical privileges to an advanced practice nurse or physician assistant conditioned on the advanced practice nurse or physician assistant having a sponsoring or collaborating relationship with a physician and that relationship ceases to exist, the advanced practice nurse or physician assistant and the physician shall provide written notification to the hospital that the relationship no longer exists.   Once the hospital receives such notice from an advanced practice nurse or physician assistant and the physician, the hospital shall be deemed to have met its obligations under this section by notifying the advanced practice nurse or physician assistant in writing that the advanced practice nurse's or physician assistant's clinical privileges no longer exist at that hospital.

(e)   Nothing in this section shall be construed as modifying Subtitle B, Title 3, Occupations Code, Chapter 204 or 301, Occupations Code, or any other law relating to the scope of practice of physicians, advanced practice nurses, or physician assistants.

(f)   This section does not apply to an employer-employee relationship between an advanced practice nurse or physician assistant and a hospital.

Added by Acts 1999, 76th Leg., ch. 428, Sec. 2, eff. Sept. 1, 1999.   Amended by Acts 2001, 77th Leg., ch. 1420, Sec. 14.787, eff. Sept. 1, 2001.

SUBCHAPTER F. MEDICAL REHABILITATION SERVICES

Sec. 241.121.   DEFINITION.   In this subchapter, "comprehensive medical rehabilitation" means the provision of rehabilitation services that are designed to improve or minimize a person's physical or cognitive disabilities, maximize a person's functional ability, or restore a person's lost functional capacity through close coordination of services, communication, interaction, and integration among several professions that share the responsibility to achieve team treatment goals for the person.

Added by Acts 1993, 73rd Leg., ch. 707, Sec. 1, eff. Sept. 1, 1993.

Sec. 241.122.   LICENSE REQUIRED.   Unless a person has a license issued under this chapter, a person other than an individual may not provide inpatient comprehensive medical rehabilitation to a patient who requires medical services that are provided under the supervision of a physician and that are more intensive than nursing facility care and minor treatment.

Added by Acts 1993, 73rd Leg., ch. 707, Sec. 1, eff. Sept. 1, 1993.

This section was amended by the 84th Legislature. Pending publication of the current statutes, see S.B. 219, 84th Legislature, Regular Session, for amendments affecting this section.

Sec. 241.123.   REHABILITATION SERVICES STANDARDS.   (a)   The board by rule shall adopt standards for the provision of rehabilitation services by a hospital to ensure the health and safety of a patient receiving the services.

(b)   The standards adopted by the board at a minimum shall require a hospital that provides comprehensive medical rehabilitation:

(1)   to have a director of comprehensive medical rehabilitation who is:

(A)   a licensed physician;

(B)   either board certified or eligible for board certification in a medical specialty related to rehabilitation;   and

(C)   qualified by training and experience to serve as medical director;

(2)   to have medical supervision by a licensed physician for 24 hours each day;   and

(3)   to provide appropriate therapy to each patient by an interdisciplinary team consisting of licensed physicians, rehabilitation nurses, and therapists as are appropriate for the patient's needs.

(c)   An interdisciplinary team for comprehensive medical rehabilitation shall be directed by a licensed physician.   An interdisciplinary team for comprehensive medical rehabilitation shall have available to it, at the hospital at which the services are provided or by contract, members of the following professions as necessary to meet the treatment needs of the patient:

(1)   physical therapy;

(2)   occupational therapy;

(3)   speech-language pathology;

(4)   therapeutic recreation;

(5)   social services and case management;

(6)   dietetics;

(7)   psychology;

(8)   respiratory therapy;

(9)   rehabilitative nursing;

(10)   certified orthotics;   and

(11)   certified prosthetics.

(d)   A hospital shall prepare for each patient receiving inpatient rehabilitation services a written treatment plan designed for that patient's needs for treatment and care.   The board by rule shall specify a time after admission of a patient for inpatient rehabilitation services by which a hospital

must evaluate the patient for the patient's initial treatment plan and by which a hospital must provide copies of the plan after evaluation.

(e) A hospital shall prepare for each patient receiving inpatient rehabilitation services a written continuing care plan that addresses the patient's needs for care after discharge, including recommendations for treatment and care and information about the availability of resources for treatment or care. The board by rule shall specify the time before discharge by which the hospital must provide a copy of the continuing care plan. The board's rules may allow a facility to provide the continuing care plan by a specified time after discharge if providing the plan before discharge is impracticable.

(f) A hospital shall provide a copy of a treatment or continuing care plan prepared under this section to the following persons in the person's primary language, if practicable:

(1) the patient;

(2) a person designated by the patient; and

(3) as specified by board rule, family members or other persons with responsibility for or demonstrated participation in the patient's care or treatment.

(g) Rules adopted by the board under this subchapter may not conflict with a federal rule, regulation, or standard.

Added by Acts 1993, 73rd Leg., ch. 707, Sec. 1, eff. Sept. 1, 1993.


SUBCHAPTER G. DISCLOSURE OF HEALTH CARE INFORMATION

This section was amended by the 84th Legislature. Pending publication of the current statutes, see S.B. 219, 84th Legislature, Regular Session, for amendments affecting this section.

Sec. 241.151. DEFINITIONS. In this subchapter:

(1) "Directory information" means information disclosing the presence of a person who is receiving inpatient, outpatient, or emergency services from a licensed hospital, the nature of the person's injury, the person's municipality of residence, sex, and age, and the general health status of the person as described in terms of "critical," "poor," "fair," "good," "excellent," or similar terms.

(2) "Health care information" means information, including payment information, recorded in any form or medium that identifies a patient and relates to the history, diagnosis, treatment, or prognosis of a patient.

(3) "Health care provider" means a person who is licensed, certified, or otherwise authorized by the laws of this state to provide health care in the

ordinary course of business or practice of a profession.

   (4) "Institutional review board" means a board, committee, or other group formally designated by an institution or authorized under federal or state law to review or approve the initiation of or conduct periodic review of research programs to ensure the protection of the rights and welfare of human research subjects.

   (5) "Legally authorized representative" means:

    (A) a parent or legal guardian if the patient is a minor;

    (B) a legal guardian if the patient has been adjudicated incapacitated to manage the patient's personal affairs;

    (C) an agent of the patient authorized under a durable power of attorney for health care;

    (D) an attorney ad litem appointed for the patient;

    (E) a person authorized to consent to medical treatment on behalf of the patient under Chapter 313;

    (F) a guardian ad litem appointed for the patient;

    (G) a personal representative or heir of the patient, as defined by Section 3, Texas Probate Code, if the patient is deceased;

    (H) an attorney retained by the patient or by the patient's legally authorized representative; or

    (I) a person exercising a power granted to the person in the person's capacity as an attorney-in-fact or agent of the patient by a statutory durable power of attorney that is signed by the patient as principal.

Added by Acts 1995, 74th Leg., ch. 856, Sec. 1, eff. Sept. 1, 1995.  Amended by Acts 1997, 75th Leg., ch. 498, Sec. 1, eff. Sept. 1, 1997.
Amended by:
  Acts 2005, 79th Leg., Ch. 1138 (H.B. 2765), Sec. 1, eff. September 1, 2005.
  Acts 2009, 81st Leg., R.S., Ch. 1003 (H.B. 4029), Sec. 1, eff. September 1, 2009.


  Sec. 241.152.  WRITTEN AUTHORIZATION FOR DISCLOSURE OF HEALTH CARE INFORMATION.  (a)  Except as authorized by Section 241.153, a hospital or an agent or employee of a hospital may not disclose health care information about a patient to any person other than the patient or the patient's legally authorized representative without the written authorization of the patient or the patient's legally authorized representative.

  (b) A disclosure authorization to a hospital is valid only if it:

   (1) is in writing;

   (2) is dated and signed by the patient or the patient's legally authorized representative;

(3)   identifies the information to be disclosed;

(4)   identifies the person or entity to whom the information is to be disclosed;  and

(5)   is not contained in the same document that contains the consent to medical treatment obtained from the patient.

(c)   A disclosure authorization is valid until the 180th day after the date it is signed unless it provides otherwise or unless it is revoked.

(d)   Except as provided by Subsection (e), a patient or the patient's legally authorized representative may revoke a disclosure authorization to a hospital at any time.  A revocation is valid only if it is in writing, dated with a date that is later than the date on the original authorization, and signed by the patient or the patient's legally authorized representative.

(e)   A patient or the patient's legally authorized representative may not revoke a disclosure that is required for purposes of making payment to the hospital for health care provided to the patient.

(f)   A patient may not maintain an action against a hospital for a disclosure made by the hospital in good-faith reliance on an authorization if the hospital's medical record department did not have notice that the authorization was revoked.

(g)   Repealed by Acts 1997, 75th Leg., ch. 498, Sec. 5, eff. Sept. 1, 1997.

Added by Acts 1995, 74th Leg., ch. 856, Sec. 1, eff. Sept. 1, 1995.  Amended by Acts 1997, 75th Leg., ch. 498, Sec. 2, 5, eff. Sept. 1, 1997;  Acts 1999, 76th Leg., ch. 271, Sec. 1, eff. Sept. 1, 1999.


Sec. 241.153.   DISCLOSURE WITHOUT WRITTEN AUTHORIZATION.  A patient's health care information may be disclosed without the patient's authorization if the disclosure is:

(1)   directory information, unless the patient has instructed the hospital not to make the disclosure or the directory information is otherwise protected by state or federal law;

(2)   to a health care provider who is rendering health care to the patient when the request for the disclosure is made;

(3)   to a transporting emergency medical services provider for the purpose of:

(A)   treatment or payment, as those terms are defined by the regulations adopted under the Health Insurance Portability and Accountability Act of 1996 (Pub.  L. No. 104-191); or

(B)   the following health care operations described by the regulations adopted under the Health Insurance Portability and Accountability Act of 1996 (Pub.  L. No. 104-191):

          (i)   quality assessment and improvement activities;

          (ii)   specified insurance functions;

          (iii)   conducting or arranging for medical reviews; or

          (iv)   competency assurance activities;

    (4)   to a member of the clergy specifically designated by the patient;

    (5)   to a procurement organization as defined in Section 692A.002 for the purpose of making inquiries relating to donations according to the protocol referred to in Section 692A.015;

    (6)   to a prospective health care provider for the purpose of securing the services of that health care provider as part of the patient's continuum of care, as determined by the patient's attending physician;

    (7)   to a person authorized to consent to medical treatment under Chapter 313 or to a person in a circumstance exempted from Chapter 313 to facilitate the adequate provision of treatment;

    (8)   to an employee or agent of the hospital who requires health care information for health care education, quality assurance, or peer review or for assisting the hospital in the delivery of health care or in complying with statutory, licensing, accreditation, or certification requirements and if the hospital takes appropriate action to ensure that the employee or agent:

        (A)   will not use or disclose the health care information for any other purpose; and

        (B)   will take appropriate steps to protect the health care information;

    (9)   to a federal, state, or local government agency or authority to the extent authorized or required by law;

    (10)   to a hospital that is the successor in interest to the hospital maintaining the health care information;

    (11)   to the American Red Cross for the specific purpose of fulfilling the duties specified under its charter granted as an instrumentality of the United States government;

    (12)   to a regional poison control center, as the term is used in Chapter 777, to the extent necessary to enable the center to provide information and education to health professionals involved in the management of poison and overdose victims, including information regarding appropriate therapeutic use of medications, their compatibility and stability, and adverse drug reactions and interactions;

    (13)   to a health care utilization review agent who requires the health care information for utilization review of health care under Chapter 4201, Insurance Code;

    (14)   for use in a research project authorized by an institutional

review board under federal law;

   (15) to health care personnel of a penal or other custodial institution in which the patient is detained if the disclosure is for the sole purpose of providing health care to the patient;

   (16) to facilitate reimbursement to a hospital, other health care provider, or the patient for medical services or supplies;

   (17) to a health maintenance organization for purposes of maintaining a statistical reporting system as required by a rule adopted by a state agency or regulations adopted under the federal Health Maintenance Organization Act of 1973, as amended (42 U.S.C. Section 300e et seq.);

   (18) to satisfy a request for medical records of a deceased or incompetent person pursuant to Section 74.051(e), Civil Practice and Remedies Code;

   (19) to comply with a court order except as provided by Subdivision (20); or

   (20) related to a judicial proceeding in which the patient is a party and the disclosure is requested under a subpoena issued under:

    (A) the Texas Rules of Civil Procedure or Code of Criminal Procedure; or

    (B) Chapter 121, Civil Practice and Remedies Code.

Added by Acts 1995, 74th Leg., ch. 856, Sec. 1, eff. Sept. 1, 1995.  Amended by Acts 1997, 75th Leg., ch. 498, Sec. 3, eff. Sept. 1, 1997;  Acts 1997, 75th Leg., ch. 847, Sec. 1, eff. Sept. 1, 1997.
Amended by:
  Acts 2005, 79th Leg., Ch. 136 (H.B. 739), Sec. 1, eff. September 1, 2005.
  Acts 2005, 79th Leg., Ch. 337 (S.B. 1113), Sec. 1, eff. September 1, 2005.
  Acts 2009, 81st Leg., R.S., Ch. 186 (H.B. 2027), Sec. 2, eff. September 1, 2009.


  Sec. 241.1531. EXCHANGE OF INMATE'S HEALTH CARE INFORMATION. Notwithstanding any other law of this state, the health care information of a patient who is a defendant or inmate confined in a facility operated by or under contract with the Texas Department of Criminal Justice may be exchanged between health care personnel of the department and health care personnel of The University of Texas Medical Branch at Galveston or the Texas Tech University Health Sciences Center.  The authorization of the defendant or inmate is not required for the exchange of information.

Added by Acts 2005, 79th Leg., Ch. 1270 (H.B. 2195), Sec. 1, eff. June 18, 2005.

Sec. 241.154. REQUEST. (a) On receipt of a written authorization from a patient or legally authorized representative to examine or copy all or part of the patient's recorded health care information, except payment information, or for disclosures under Section 241.153 not requiring written authorization, a hospital or its agent, as promptly as required under the circumstances but not later than the 15th day after the date the request and payment authorized under Subsection (b) are received, shall:

(1) make the information available for examination during regular business hours and provide a copy to the requestor, if requested; or

(2) inform the authorized requestor if the information does not exist or cannot be found.

(b) Except as provided by Subsection (d), the hospital or its agent may charge a reasonable fee for providing the health care information except payment information and is not required to permit the examination, copying, or release of the information requested until the fee is paid unless there is a medical emergency. The fee may not exceed the sum of:

(1) a basic retrieval or processing fee, which must include the fee for providing the first 10 pages of the copies and which may not exceed $30; and

(A) a charge for each page of:

(i) $1 for the 11th through the 60th page of the provided copies;

(ii) 50 cents for the 61st through the 400th page of the provided copies; and

(iii) 25 cents for any remaining pages of the provided copies; and

(B) the actual cost of mailing, shipping, or otherwise delivering the provided copies;

(2) if the requested records are stored on microform, a retrieval or processing fee, which must include the fee for providing the first 10 pages of the copies and which may not exceed $45; and

(A) $1 per page thereafter; and

(B) the actual cost of mailing, shipping, or otherwise delivering the provided copies; or

(3) if the requested records are provided on a digital or other electronic medium and the requesting party requests delivery in a digital or electronic medium, including electronic mail:

(A) a retrieval or processing fee, which may not exceed $75; and

(B) the actual cost of mailing, shipping, or otherwise delivering the provided copies.

(c) In addition, the hospital or its agent may charge a reasonable fee

for:

      (1)   execution of an affidavit or certification of a document, not to exceed the charge authorized by Section 22.004, Civil Practice and Remedies Code;  and

      (2)   written responses to a written set of questions, not to exceed $10 for a set.

    (d)  A hospital may not charge a fee for:

      (1)   providing health care information under Subsection (b) to the extent the fee is prohibited under Subchapter M, Chapter 161;

      (2)   a patient to examine the patient's own health care information;

      (3)   providing an itemized statement of billed services to a patient or third-party payor, except as provided under Section 311.002(f);  or

      (4)   health care information relating to treatment or hospitalization for which workers' compensation benefits are being sought, except to the extent permitted under Chapter 408, Labor Code.

    (e)  Effective September 1, 1996, and annually thereafter, the fee for providing health care information as specified in this section shall be adjusted accordingly based on the most recent changes to the consumer price index as published by the Bureau of Labor Statistics of the United States Department of Labor that measures the average changes in prices of goods and services purchased by urban wage earners and clerical workers' families and single workers living alone.

    (f)  A request from a patient or legally authorized representative for payment information is subject to Section 311.002.

Added by Acts 1995, 74th Leg., ch. 856, Sec. 1, eff. Sept. 1, 1995.  Amended by Acts 1997, 75th Leg., ch. 498, Sec. 4, eff. Sept. 1, 1997;  Acts 1999, 76th Leg., ch. 610, Sec. 1, eff. Sept. 1, 1999.
Amended by:
    Acts 2009, 81st Leg., R.S., Ch. 1003 (H.B. 4029), Sec. 2, eff. September 1, 2009.


    Sec. 241.155.  SAFEGUARDS FOR SECURITY OF HEALTH CARE INFORMATION.  A hospital shall adopt and implement reasonable safeguards for the security of all health care information it maintains.

Added by Acts 1995, 74th Leg., ch. 856, Sec. 1, eff. Sept. 1, 1995.


    Sec. 241.156.  PATIENT REMEDIES.  (a)  A patient aggrieved by a violation of this subchapter relating to the unauthorized release of confidential health care information may bring an action for:

(1)   appropriate injunctive relief;   and

(2)   damages resulting from the release.

(b)   An action under Subsection (a) shall be brought in:

(1)   the district court of the county in which the patient resides or in the case of a deceased patient the district court of the county in which the patient's legally authorized representative resides;   or

(2)   if the patient or the patient's legally authorized representative in the case of a deceased patient is not a resident of this state, the district court of Travis County.

(c)   A petition for injunctive relief under Subsection (a)(1) takes precedence over all civil matters on the court docket except those matters to which equal precedence on the docket is granted by law.

Added by Acts 1995, 74th Leg., ch. 856, Sec. 1, eff. Sept. 1, 1995.


Subchapter H, consisting of Secs. 241.181 to 241.187, was added by Acts 2013, 83rd Leg., R.S., Ch. 217 (H.B. 15), Sec. 1.

For another Subchapter H, consisting of Secs. 241.181 to 241.184, added by Acts 2013, 83rd Leg., R.S., Ch. 917 (H.B. 1376), Sec. 1, see Sec. 241.181 et seq., post.

SUBCHAPTER H.   HOSPITAL LEVEL OF CARE DESIGNATIONS FOR NEONATAL AND MATERNAL CARE

This section was amended by the 84th Legislature. Pending publication of the current statutes, see S.B. 219 and S.B. 1296, 84th Legislature, Regular Session, for amendments affecting this section.

Sec. 241.181.   DEFINITIONS.   In this subchapter:

(1)   "Department" means the Department of State Health Services.

(2)   "Executive commissioner" means the executive commissioner of the Health and Human Services Commission.

Added by Acts 2013, 83rd Leg., R.S., Ch. 217 (H.B. 15), Sec. 1, eff. September 1, 2013.


This section was amended by the 84th Legislature. Pending publication of the current statutes, see S.B. 1296, 84th Legislature, Regular Session, for amendments affecting this section.

Sec. 241.182.   LEVEL OF CARE DESIGNATIONS.   (a)   The executive commissioner, in accordance with the rules adopted under Section 241.183, shall assign level of care designations to each hospital based on the neonatal and

maternal services provided at the hospital.

(b)   A hospital may receive different level designations for neonatal and maternal care, respectively.

Added by Acts 2013, 83rd Leg., R.S., Ch. 217 (H.B. 15), Sec. 1, eff. September 1, 2013.

This section was amended by the 84th Legislature. Pending publication of the current statutes, see S.B. 219, S.B. 425 and S.B. 1296, 84th Legislature, Regular Session, for amendments affecting this section.

Sec. 241.183.   RULES.   (a)   The executive commissioner, in consultation with the department, shall adopt rules:

(1)   establishing the levels of care for neonatal and maternal care to be assigned to hospitals;

(2)   prescribing criteria for designating levels of neonatal and maternal care, respectively, including specifying the minimum requirements to qualify for each level designation;

(3)   establishing a process for the assignment of levels of care to a hospital for neonatal and maternal care, respectively;

(4)   establishing a process for amending the level of care designation requirements, including a process for assisting facilities in implementing any changes made necessary by the amendments;

(5)   dividing the state into neonatal and maternal care regions;

(6)   facilitating transfer agreements through regional coordination;

(7)   requiring payment, other than quality or outcome-based funding, to be based on services provided by the facility, regardless of the facility's level of care designation; and

(8)   prohibiting the denial of a neonatal or maternal level of care designation to a hospital that meets the minimum requirements for that level of care designation.

(b)   The criteria for levels one through three of neonatal and maternal care adopted under Subsection (a)(2) may not include requirements related to the number of patients treated at a hospital.

(c)   The Health and Human Services Commission shall study patient transfers that are not medically necessary but would be cost-effective.   Based on the study under this subsection, if the executive commissioner determines that the transfers are feasible and desirable, the executive commissioner may adopt rules addressing those transfers.

(d)   Each level of care designation must require a hospital to regularly submit outcome and other data to the department as required or requested.

(e)    The criteria a hospital must achieve to receive each level of care designation must be posted on the department's Internet website.

Added by Acts 2013, 83rd Leg., R.S., Ch. 217 (H.B. 15), Sec. 1, eff. September 1, 2013.


This section was amended by the 84th Legislature. Pending publication of the current statutes, see S.B. 219 and S.B. 1296, 84th Legislature, Regular Session, for amendments affecting this section.

Sec. 241.184.    CONFIDENTIALITY; PRIVILEGE.    (a)    All information and materials submitted by a hospital to the department under Section 241.183(d) are confidential and:

(1)    are not subject to disclosure under Chapter 552, Government Code, or discovery, subpoena, or other means of legal compulsion for release to any person; and

(2)    may not be admitted as evidence or otherwise disclosed in any civil, criminal, or administrative proceeding.

(b)    The confidentiality protections under Subsection (a) apply without regard to whether the information or materials are submitted by a hospital or an entity that has an ownership or management interest in a hospital.

(c)    A state employee or officer may not be examined in a civil, criminal, or special proceeding, or any other proceeding, regarding the existence or contents of information or materials submitted to the department under Section 241.183(d).

(d)    The submission of information or materials under Section 241.183(d) is not a waiver of a privilege or protection granted under law.

(e)    The provisions of this section regarding the confidentiality of information or materials submitted by a hospital in compliance with Section 241.183(d) do not restrict access, to the extent authorized by law, by the patient or the patient's legally authorized representative to records of the patient's medical diagnosis or treatment or to other primary health records.

(f)    A department summary or disclosure, including an assignment of a level of care designation, may not contain information identifying a patient, employee, contractor, volunteer, consultant, health care practitioner, student, or trainee.

Added by Acts 2013, 83rd Leg., R.S., Ch. 217 (H.B. 15), Sec. 1, eff. September 1, 2013.


Sec. 241.185.    ASSIGNMENT OF LEVEL OF CARE DESIGNATION.    (a)    The executive commissioner, in consultation with the department, shall assign the appropriate

level of care designation to each hospital that meets the minimum standards for that level of care. The executive commissioner shall evaluate separately the neonatal and maternal services provided at the hospital and assign the respective level of care designations accordingly.

(b)   Every three years, the executive commissioner and the department shall review the level of care designations assigned to each hospital and, as necessary, assign a hospital a different level of care designation or remove the hospital's level of care designation.

(c)   A hospital may request a change of designation at any time. On request under this subsection, the executive commissioner and the department shall review the hospital's request and, as necessary, change the hospital's level of care designation.

Added by Acts 2013, 83rd Leg., R.S., Ch. 217 (H.B. 15), Sec. 1, eff. September 1, 2013.

Sec. 241.186.   HOSPITAL NOT DESIGNATED.   A hospital that does not meet the minimum requirements for any level of care designation for neonatal or maternal services:

(1)   may not receive a level of care designation for those services; and

(2)   is not eligible to receive reimbursement through the Medicaid program for neonatal or maternal services, as applicable, except emergency services required to be provided or reimbursed under state or federal law.

Added by Acts 2013, 83rd Leg., R.S., Ch. 217 (H.B. 15), Sec. 1, eff. September 1, 2013.

This section was amended by the 84th Legislature. Pending publication of the current statutes, see H.B. 3433, 84th Legislature, Regular Session, for amendments affecting this section.

Sec. 241.187.   PERINATAL ADVISORY COUNCIL.   (a)   In this section, "advisory council" means the Perinatal Advisory Council established under this section.

(b)   The advisory council consists of 17 members appointed by the executive commissioner as follows:

(1)   four physicians licensed to practice medicine under Subtitle B, Title 3, Occupations Code, specializing in neonatology:

(A)   at least two of whom practice in a Level III or IV neonatal intensive care unit; and

(B)   at least one of whom practices in a neonatal intensive care unit of a hospital located in a rural area;

(2) one physician licensed to practice medicine under Subtitle B, Title 3, Occupations Code, specializing in general pediatrics;

(3) two physicians licensed to practice medicine under Subtitle B, Title 3, Occupations Code, specializing in obstetrics-gynecology;

(4) two physicians licensed to practice medicine under Subtitle B, Title 3, Occupations Code, specializing in maternal fetal medicine;

(5) one physician licensed to practice medicine under Subtitle B, Title 3, Occupations Code, specializing in family practice who provides obstetrical care in a rural community;

(6) one registered nurse licensed under Subtitle E, Title 3, Occupations Code, with expertise in maternal health care delivery;

(7) one registered nurse licensed under Subtitle E, Title 3, Occupations Code, with expertise in perinatal health·care delivery;

(8) one representative from a children's hospital;

(9) one representative from a hospital with a Level II neonatal intensive care unit;

(10) one representative from a rural hospital;

(11) one representative from a general hospital; and

(12) one ex officio representative from the office of the medical director of the Health and Human Services Commission.

(c) To the extent possible, the executive commissioner shall appoint members to the advisory council who previously served on the Neonatal Intensive Care Unit Council established under Chapter 818 (H.B. 2636), Acts of the 82nd Legislature, Regular Session, 2011.

(d) Members of the advisory council described by Subsections (b)(1)-(11) serve staggered three-year terms, with the terms of five or six of those members expiring September 1 of each year. A member may be reappointed to the advisory council.

(e) A member of the advisory council serves without compensation but is entitled to reimbursement for actual and necessary travel expenses related to the performance of advisory council duties.

(f) The department, with recommendations from the advisory council, shall develop a process for the designation and updates of levels of neonatal and maternal care at hospitals in accordance with this subchapter.

(g) The advisory council shall:

(1) develop and recommend criteria for designating levels of neonatal and maternal care, respectively, including specifying the minimum requirements to qualify for each level designation;

(2) develop and recommend a process for the assignment of levels of care to a hospital for neonatal and maternal care, respectively;

      (3)   make recommendations for the division of the state into neonatal and maternal care regions;

      (4)   examine utilization trends relating to neonatal and maternal care; and

      (5)   make recommendations related to improving neonatal and maternal outcomes.

      (h)   In developing the criteria for the levels of neonatal and maternal care, the advisory council shall consider:

      (1)   any recommendations or publications of the American Academy of Pediatrics and the American Congress of Obstetricians and Gynecologists, including "Guidelines for Perinatal Care";

      (2)   any guidelines developed by the Society of Maternal-Fetal Medicine; and

      (3)   the geographic and varied needs of citizens of this state.

      (i)   In developing the criteria for designating levels one through three of neonatal and maternal care, the advisory council may not consider the number of patients treated at a hospital.

      (j)   The advisory council shall submit a report detailing the advisory council's determinations and recommendations to the department and the executive commissioner not later than September 1, 2015.

      (k)   The advisory council shall continue to update its recommendations based on any relevant scientific or medical developments.

      (l)   The advisory council is subject to Chapter 325, Government Code (Texas Sunset Act).  Unless continued in existence as provided by that chapter, the advisory council is abolished and this section expires September 1, 2025.

Added by Acts 2013, 83rd Leg., R.S., Ch. 217 (H.B. 15), Sec. 1, eff. September 1, 2013.

Subchapter H, consisting of Secs. 241.181 to 241.184, was added by Acts 2013, 83rd Leg., R.S., Ch. 917 (H.B. 1376), Sec. 1.

For another Subchapter H, consisting of Secs. 241.181 to 241.187, added by Acts 2013, 83rd Leg., R.S., Ch. 217 (H.B. 15), Sec. 1, see Sec. 241.181 et seq., post.

SUBCHAPTER H. FREESTANDING EMERGENCY MEDICAL CARE FACILITIES ASSOCIATED WITH LICENSED HOSPITALS

This section was amended by the 84th Legislature. Pending publication of the current statutes, see S.B. 219 and S.B. 1296, 84th Legislature, Regular Session, for amendments affecting this section.

Sec. 241.181. APPLICABILITY. This subchapter applies only to a freestanding emergency medical care facility, as that term is defined by Section 254.001, that is exempt from the licensing requirements of Chapter 254 under Section 254.052(7) or (8).

Added by Acts 2013, 83rd Leg., R.S., Ch. 917 (H.B. 1376), Sec. 1, eff. September 1, 2013.

This section was amended by the 84th Legislature. Pending publication of the current statutes, see S.B. 1296, 84th Legislature, Regular Session, for amendments affecting this section.

Sec. 241.182. ADVERTISING. A facility described by Section 241.181 may not advertise or hold itself out as a medical office, facility, or provider other than an emergency room if the facility charges for its services the usual and customary rate charged for the same service by a hospital emergency room in the same region of the state or located in a region of the state with comparable rates for emergency health care services.

Added by Acts 2013, 83rd Leg., R.S., Ch. 917 (H.B. 1376), Sec. 1, eff. September 1, 2013.

This section was amended by the 84th Legislature. Pending publication of the current statutes, see S.B. 219, S.B. 425 and S.B. 1296, 84th Legislature, Regular Session, for amendments affecting this section.

Sec. 241.183. POSTED NOTICE. Subject to Section 241.006, the department shall adopt rules for a notice to be posted in a conspicuous place in the facility described by Section 241.181 that notifies prospective patients that the facility is an emergency room and charges rates comparable to a hospital emergency room.

Added by Acts 2013, 83rd Leg., R.S., Ch. 917 (H.B. 1376), Sec. 1, eff. September 1, 2013.

This section was amended by the 84th Legislature. Pending publication of the current statutes, see S.B. 219 and S.B. 1296, 84th Legislature, Regular Session, for amendments affecting this section.

Sec. 241.184. ADMINISTRATIVE PENALTY. The commissioner of health may assess an administrative penalty under Section 241.059 against a hospital that violates this subchapter.

Added by Acts 2013, 83rd Leg., R.S., Ch. 917 (H.B. 1376), Sec. 1, eff. September

1, 2013.

# APPENDIX – "11"

# State Operations Manual
## Appendix A - Survey Protocol,
## Regulations and Interpretive Guidelines for Hospitals

### Table of Contents
*(Rev. 141, 07-10-15)*

**Transmittals for Appendix A**

### Survey Protocol

**Introduction**

Task 1 - Off-Site Survey Preparation

Task 2 - Entrance Activities

Task 3 - Information Gathering/Investigation

Task 4 - Preliminary Decision Making and Analysis of Findings

Task 5 - Exit Conference

Task 6 – Post-Survey Activities

**Psychiatric Hospital Survey Module**

**Psychiatric Unit Survey Module**

**Rehabilitation Hospital Survey Module**

**Inpatient Rehabilitation Unit Survey Module**

**Hospital Swing-Bed Survey Module**

### Regulations and Interpretive Guidelines

§482.2 Provision of Emergency Services by Nonparticipating Hospitals

§482.11 Condition of Participation: Compliance with Federal, State and Local Laws

§482.12 Condition of Participation: Governing Body

§482.13 Condition of Participation: Patient's Rights

§482.21 Condition of Participation: Quality Assessment and Performance Improvement Program

§482.22 Condition of Participation: Medical staff

§482.23 Condition of Participation: Nursing Services

§482.24 Condition of Participation: Medical Record Services

§482.25 Condition of Participation: Pharmaceutical Services

§482.26 Condition of Participation: Radiologic Services

§482.27 Condition of Participation: Laboratory Services

§482.28 Condition of Participation: Food and Dietetic Services

§482.30 Condition of Participation: Utilization Review

§482.41 Condition of Participation: Physical Environment

§482.42 Condition of Participation: Infection Control

§482.43 Condition of Participation: Discharge Planning

§482.45 Condition of Participation: Organ, Tissue and Eye Procurement

§482.51 Condition of Participation: Surgical Services

§482.52 Condition of Participation: Anesthesia Services

§482.53 Condition of Participation: Nuclear Medicine Services

§482.54 Condition of Participation: Outpatient Services

§482.55 Condition of Participation: Emergency Services

§482.56 Condition of Participation: Rehabilitation Services

§482.57 Condition of Participation: Respiratory Services

**Survey Protocol**
**Introduction**
**(Rev. 37, Issued: 10-17-08; Effective/Implementation Date: 10-17-08)**

Hospitals are required to be in compliance with the Federal requirements set forth in the Medicare Conditions of Participation (CoP) in order to receive Medicare/Medicaid payment. The goal of a hospital survey is to determine if the hospital is in compliance with the CoP set forth at 42 CFR Part 482. Also, where appropriate, the hospital must be in compliance with the PPS exclusionary criteria at 42 CFR 412.20 Subpart B and the swing-bed requirements at 42 CFR 482.66

Certification of hospital compliance with the CoP is accomplished through observations, interviews, and document/record reviews. The survey process focuses on a hospital's performance of patient-focused and organizational functions and processes. The hospital survey is the means used to assess compliance with Federal health, safety, and quality standards that will assure that the beneficiary receives safe, quality care and services.

**Regulatory and Policy Reference**

- The Medicare Conditions of Participation for hospitals are found at 42CFR Part 482.

- Survey authority and compliance regulations can be found at 42 CFR Part 488 Subpart A.

- Should an individual or entity (hospital) refuse to allow immediate access upon reasonable request to either a State Agency or CMS surveyor, the Office of the Inspector General (OIG) may exclude the hospital from participation in all Federal healthcare programs in accordance with 42 CFR 1001.1301.

- The regulatory authority for the photocopying of records and information during the survey is found at 42 CFR 489.53(a)(13).

- The CMS State Operations Manual (SOM) provides CMS policy regarding survey and certification activities.

Surveyors assess the hospital's compliance with the CoP for all services, areas and locations in which the provider receives reimbursement for patient care services billed under its provider number.

Although the survey generally occurs during daytime working hours (Monday through Friday), surveyors may conduct the survey at other times. This may include weekends and times outside of normal daytime (Monday through Friday) working hours. When the survey begins at times outside of normal work times, the survey team modifies the survey, if needed, in recognition of patients' activities and the staff available.

All hospital surveys are unannounced. Do not provide hospitals with advance notice of the survey.

**Tasks in the Survey Protocol**

Listed below, and discussed in this document, are the tasks that comprise the survey protocol for hospital.

## §482.41 Condition of Participation: Physical Environment

**The hospital must be constructed, arranged, and maintained to ensure the safety of the patient, and to provide facilities for diagnosis and treatment and for special hospital services appropriate to the needs of the community.**

**Interpretive Guidelines §482.41**

This CoP applies to all locations of the hospital, all campuses, all satellites, all provider-based activities, and all inpatient and outpatient locations.

The hospital's Facility Maintenance and hospital departments or services responsible for the hospital's buildings and equipment (both facility equipment and patient care equipment) must be incorporated into the hospital's QAPI program and be in compliance with the QAPI requirements.

**Survey Procedures §482.41**

Survey of the Physical Environment CoP should be conducted by one surveyor. However, each surveyor as he/she conducts his/her survey assignments should assess the hospital's compliance with the Physical Environment CoP. The Life Safety Code survey may be conducted separately by a specialty surveyor.

## A-0701

(Rev. 37, Issued: 10-17-08; Effective/Implementation Date: 10-17-08)
**§482.41(a) Standard: Buildings**

**The condition of the physical plant and the overall hospital environment must be developed and maintained in such a manner that the safety and well-being of patients are assured.**

**Interpretive Guidelines §482.41(a)**

The hospital must ensure that the condition of the physical plant and overall hospital environment is developed and maintained in a manner to ensure the safety and well being of patients. This includes ensuring that routine and preventive maintenance and testing activities are performed as necessary, in accordance with Federal and State laws, regulations, and guidelines and manufacturer's recommendations, by establishing maintenance schedules and conducting ongoing maintenance inspections to identify areas or equipment in need of repair. The routine and preventive maintenance and testing activities should be incorporated into the hospital's **QAPI** plan.

Assuring the safety and well being of patients would include developing and implementing appropriate **emergency preparedness** plans and capabilities. The hospital

must develop and implement a comprehensive plan to ensure that the safety and well being of patients are assured during emergency situations. The hospital must coordinate with Federal, State, and local emergency preparedness and health authorities to identify likely risks for their area (e.g., natural disasters, bioterrorism threats, disruption of utilities such as water, sewer, electrical communications, fuel; nuclear accidents, industrial accidents, and other likely mass casualties, etc.) and to develop appropriate responses that will assure the safety and well being of patients. The following issues should be considered when developing the comprehensive emergency plans(s):

- The differing needs of each location where the certified hospital operates;

- The special needs of patient populations treated at the hospital (e.g., patients with psychiatric diagnosis, patients on special diets, newborns, etc.);

- Security of patients and walk-in patients;

- Security of supplies from misappropriation;

- Pharmaceuticals, food, other supplies and equipment that may be needed during emergency/disaster situations;

- Communication to external entities if telephones and computers are not operating or become overloaded (e.g., ham radio operators, community officials, other healthcare facilities if transfer of patients is necessary, etc.);

- Communication among staff within the hospital itself;

- Qualifications and training needed by personnel, including healthcare staff, security staff, and maintenance staff, to implement and carry out emergency procedures;

- Identification, availability and notification of personnel that are needed to implement and carry out the hospital's emergency plans;

- Identification of community resources, including lines of communication and names and contact information for community emergency preparedness coordinators and responders;

- Provisions if gas, water, electricity supply is shut off to the community;

- Transfer or discharge of patients to home, other healthcare settings, or other hospitals;

- Transfer of patients with hospital equipment to another hospital or healthcare setting; and

- Methods to evaluate repairs needed and to secure various likely materials and supplies to effectuate repairs.

**Survey Procedures §482.41(a)**

- Verify that the condition of the hospital is maintained in a manner to assure the safety and well being of patients (e.g., condition or ceilings, walls, and floors, presence of patient hazards, etc.).

- Review the hospital's routine and preventive maintenance schedules to determine that ongoing maintenance inspections are performed and that necessary repairs are completed.

- Verify that the hospital has developed and implemented a comprehensive plan to ensure that the safety and well being of patients are assured during emergency situations.

# A-0702

(Rev. 37, Issued: 10-17-08; Effective/Implementation Date: 10-17-08)

**§482.41(a)(1) - There must be emergency power and lighting in at least the operating, recovery, intensive care, and emergency rooms, and stairwells. In all other areas not serviced by the emergency supply source, battery lamps and flashlights must be available.**

**Interpretive Guidelines §482.41(a)(1)**

The hospital must comply with the applicable provisions of the Life Safety Code, National Fire Protection Amendments (NFPA) 101, 2000 Edition and applicable references, such as, NFPA-99: Health Care Facilities, for emergency lighting and emergency power.

**Survey Procedures §482.41(a)(1)**

Use the Life Safety Code Survey Report Form (CMS-2786) to evaluate compliance with this item.

# A-0703

(Rev. 37, Issued: 10-17-08; Effective/Implementation Date: 10-17-08)

**§482.41(a)(2) - There must be facilities for emergency gas and water supply.**

encouraged to work with their State and local emergency response agencies to develop their plans.

The hospital must be in compliance with the Occupational Health and Safety Administration's Bloodborne Pathogens regulation at 29 CFR 1910.1030.

**Survey Procedures §482.42**

- Survey of the Infection Control Condition of Participation (CoP) should be coordinated by one surveyor. However, each surveyor should assess the hospital's compliance with the Infection Control CoP as he/she conducts his/her survey assignments.

- Determine whether there are hospital-wide policies and procedures for preventing, identifying, reporting, investigating, and controlling infections and communicable diseases of patients and hospital personnel, including contract workers and volunteers. Determine whether the infection control program can identify all hospital locations and that the policies and procedures take the various hospital locations into account.

- Determine whether the policies and procedures are implemented correctly in an active infection control program.
- Determine whether the program is hospital-wide and program specific in gathering and assessing infection and communicable disease data. Review the parameters of the active surveillance program to determine whether it is consistent with infection control standards of practice and suitable to the scope and complexity of the hospital's services.

- Throughout the hospital, observe the sanitary condition of the environment of care, noting the cleanliness of patient rooms, floors, horizontal surfaces, patient equipment, air inlets, mechanical rooms, food service activities, treatment and procedure areas, surgical areas, central supply, storage areas, etc.

- Determine whether the hospital's infection prevention and control program is integrated into its hospital-wide QAPI program.

## A-0748
**(Rev. 95, Issued: 12-12-13, Effective: 06-07-13, Implementation: 06-07-13)**

**§482.42(a) Standard:  Organization and Policies**

**A person or persons must be designated as infection control officer or officers to develop and implement policies governing control of infections and communicable diseases....**

**Interpretive Guidelines §482.42(a)**

Hospital infection control officers are often referred to as "hospital epidemiologists (HEs)," "infection control professionals (ICPs)" or "infection preventionists." CDC has defined "infection control professional" as "a person whose primary training is in either nursing, medical technology, microbiology, or epidemiology and who has acquired specialized training in infection control."

The hospital must designate in writing an individual or group of individuals as its infection control officer or officers. In designating infection control officers, hospitals should assure that the individuals so designated are qualified through education, training, experience, or certification (such as that offered by the Certification Board of Infection Control and Epidemiology Inc. (CBIC), or by the specialty boards in adult or pediatric infectious diseases offered for physicians by the American Board of Internal Medicine (for internists) and the American Board of Pediatrics (for pediatricians)). Infection control officers should maintain their qualifications through ongoing education and training, which can be demonstrated by participation in infection control courses, or in local and national meetings organized by recognized professional societies, such as APIC and SHEA.

CMS does not specify either the number of infection control officers to be designated or the number of infection control officer hours that must be devoted to the infection prevention and control programs. However, resources must be adequate to accomplish the tasks required for the infection control program. A prudent hospital would consider patient census, characteristics of the patient population, and complexity of the healthcare services it offers in determining the size and scope of the resources it commits to infection control. The CDC's HICPAC as well as professional infection control organizations such as the APIC and the SHEA publish studies and recommendations on resource allocation that hospitals may find useful.

The infection control officer(s) must develop and implement policies governing the control of infections and communicable diseases. Infection control policies should address the roles and responsibilities for infection control within the hospital; how the various hospital committees and departments interface with the infection control program; and how to prevent infectious/communicable diseases; and how to report infectious/communicable diseases to the infection control program.

**Survey Procedures §482.42(a)**

- Determine whether an infection control officer(s) is designated and has the responsibility for the infection prevention and control program.

- Review the personnel file of the infection control officer(s) to determine whether he/she is qualified through ongoing education, training, experience, or certification to oversee the infection control program.

- Determine whether the infection control officer(s) have developed and implemented hospital infection control policies.

## A-0749
**(Rev. 95, Issued: 12-12-13, Effective: 06-07-13, Implementation: 06-07-13)**

**§482.42(a)–....The infection control officer or officers must develop a system for identifying, reporting, investigating, and controlling infections and communicable diseases of patients and personnel.**

**Interpretive Guidelines §482.42(a)**

The infection control officer or officers must develop, implement and evaluate measures governing the identification, investigation, reporting, prevention and control of infections and communicable diseases within the hospital, including both healthcare–associated infections and community-acquired infections. Infection control policies should be specific to each department, service, and location, including off-site locations, and be evaluated and revised when indicated. The successful development, implementation and evaluation of a hospital-wide infection prevention and control program requires frequent collaboration with persons administratively and clinically responsible for inpatient and outpatient departments and services, as well as, non-patient-care support staff, such as maintenance and housekeeping staff.

Implicit in the infection control officer(s)' responsibility for measures to identify, investigate, report, prevent and control infections and communicable diseases are the following activities:

- Maintenance of a sanitary hospital environment;

- Development and implementation of infection control measures related to hospital personnel; hospital staff, for infection control purposes, includes all hospital staff, contract workers (e.g., agency nurses, housekeeping staff, etc), and volunteers;

- Mitigation of risks associated with patient infections present upon admission:

- Mitigation of risks contributing to healthcare-associated infections:

- Active surveillance;

- Monitoring compliance with all policies, procedures, protocols and other infection control program requirements;

- Program evaluation and revision of the program, when indicated;

- Coordination as required by law with federal, state, and local emergency preparedness and health authorities to address communicable disease threats, bioterrorism, and outbreaks;

- Complying with the reportable disease requirements of the local health authority; For example, a hospital with a comprehensive hospital-wide infection control program should have and implement policies and procedures, based as much as possible on national guidelines that address the following:

- Maintenance of a sanitary physical environment:

  ○ Ventilation and water quality control issues, including measures taken to maintain a safe environment during internal or external construction/renovation;

  ○ Maintaining safe air handling systems in areas of special ventilation, such as operating rooms, intensive care units, and airborne infection isolation rooms;

  ○ Techniques for food sanitation;

  ○ Techniques for cleaning and disinfecting environmental surfaces, carpeting and furniture;

  ○ Techniques for textiles reprocessing, storage and distribution;

  ○ Techniques for disposal of regulated and non-regulated waste; and

  ○ Techniques for pest control.

- Hospital staff-related measures:

  ○ Measures – and authority - for evaluating hospital staff immunization status for designated infectious diseases, as recommended by the CDC and its Advisory Committee on Immunization Practices (ACIP);

  ○ Policies articulating the authority and circumstances under which the hospital screens hospital staff for infections likely to cause significant infectious disease or other risk to the exposed individual, and for reportable diseases, as required under local, state, or federal public health authority;

  ○ Policies articulating when infected hospital staff are restricted from providing direct patient care and/or are required to remain away from the healthcare facility entirely;

- New employee and regular update training in preventing and controlling healthcare-associated infections and methods to prevent exposure to and transmission of infections and communicable diseases;

- Measures to evaluate staff and volunteers exposed to patients with infections and communicable disease;

- Mitigation of risks associated with patient infections present upon admission:

  - Measures for the early identification of patients who require isolation in accordance with CDC guidelines;

  - Appropriate use of personal protective equipment including gowns, gloves, masks and eye protection devices;

  - Use and techniques for "isolation" precautions as recommended by the CDC.

- Mitigation of risks contributing to healthcare-associated infections:

  - Surgery-related infection risk mitigation measures:

    - Implementing appropriate prophylaxis to prevent surgical site infection (SSI), such as a protocol to assure that antibiotic prophylaxis to prevent surgical site infection for appropriate procedures is administered at the appropriate time, done with an appropriate antibiotic, and discontinued appropriately after surgery;

    - Addressing aseptic technique practices used in surgery and invasive procedures performed outside the operating room, including sterilization of instruments;

  - Other hospital healthcare-associated infection risk mitigation measures:

    - Promotion of hand washing hygiene among staff and employees, including utilization of alcohol-based hand sanitizers;

    - Measures specific to prevention of infections caused by organisms that are antibiotic-resistant;

    - Measures specific to prevention of device-associated bloodstream infection (BSI), such as a protocol for reducing infections of central venous catheters specifying aseptic precautions for line insertions, care of inserted lines, and prompt removal when a line is no longer needed;

- Measures specific to prevention of other device-associated infections, e.g., those associated with ventilators, tube feeding, indwelling urinary catheters, etc.;

- Isolation procedures and requirements for highly immuno-suppressed patients who require a protective environment.

- Care techniques for tracheostomy care, respiratory therapy, burns and other situations that reduce a patient's resistance to infection;

- Requiring disinfectants, antiseptics, and germicides to be used in accordance with the manufacturers' instructions;

- Appropriate use of facility and medical equipment, including negative and positive pressure isolation room equipment, portable air filtration equipment, treatment booths and enclosed beds, UV lights, and other equipment used to control the spread of infectious agents;

- Adherence to nationally recognized infection prevention and control precautions, such as current CDC guidelines and recommendations, for infections/communicable diseases identified as present in the hospital; and

- Educating patients, visitors, caregivers, and staff, as appropriate, about infections and communicable diseases and methods to reduce transmission in the hospital and in the community;

- Active surveillance:

  ○ The hospital is expected to identify and track infections and communicable diseases in any of the following categories occurring throughout the hospital, whether in patients or staff (patient care staff and non-patient care staff, including employees, contract staff and volunteers). Hospitals are not required to organize their surveillance according to these categories. The categories are:

    - Healthcare-associated infections selected by the hospital's Infection Prevention and Control Program as part of a targeted surveillance strategy based on nationally recognized guidelines and periodic risk assessment;

    - Patients or staff with identified communicable diseases that local, State, or Federal health agencies require be reported;

    - Patients identified by laboratory culture as colonized or infected with multi-drug-resistant organisms (MDROs), as defined by the hospital's Infection Prevention and Control Program;

- Patients who meet CDC criteria for requiring isolation precautions (other than "Standard Precautions" or a protective environment) during their hospitalization;

- Patients or staff with signs and symptoms that have been requested be reported or recorded by local, State, or Federal health agencies; and

- Staff or patients who are known or suspected to be infected with epidemiologically-significant pathogens that are identified by the hospital or local, State, or Federal health agencies.

---

**For Information – Not Required/Not to be Cited**

Many hospitals are using automated surveillance technology (AST) or "data mining" for identification and control of hospital-acquired infections (HAI) and implementation of evidence-based infection control practices. Use of AST or similar technology is encouraged in hospitals, but is not required.

---

- Provisions to monitor compliance with all policies, procedures, protocols and other infection control program requirements;

- Provision for program evaluation and revision of the program, when indicated;

- Policies and procedures developed in coordination with federal, state, and local emergency preparedness and health authorities to address communicable disease threats, bioterrorism, and outbreaks; and

- Procedures for meeting the reporting requirements of the local health authority.

**Survey Procedures §482.42(a)**

- Determine whether the hospital has an active, hospital-wide infection control program reflecting the infection control officer responsibilities specified in the interpretive guidelines. Specifically, surveyors should determine whether the hospital:

  - Maintains a sanitary environment;

  - Develops and implements infection control measures related to hospital personnel;

  - Mitigates risks associated with patient infections present upon admission;

- Mitigates risks contributing to healthcare-associated infections (for example, observe whether staff exhibit good hand washing hygiene);

- Conducts active surveillance;

- Monitors compliance with all infection control program requirements;

- Evaluates the infection control program regularly and revises it, when indicated;

- Coordinates as required by law with federal, state, and local emergency preparedness and health authorities to address communicable disease threats, bioterrorism, and outbreaks; and

- Complies with the reportable disease requirements of the local health authority.

## A-0756
**(Rev. 95, Issued: 12-12-13, Effective: 06-07-13, Implementation: 06-07-13)**

**§482.42(b) Standard:  Responsibilities of Chief Executive Officer, Medical Staff, and Director of Nursing Services**

The chief executive officer, the medical staff, and the director of nursing must--

(1)     Ensure that the hospital-wide quality assessment and performance improvement (QAPI) program and training programs address problems identified by the infection control officer or officers; and

(2)     Be responsible for the implementation of successful corrective action plans in affected problem areas.

**Interpretive Guidelines §482.42(b)**

The chief executive officer (CEO), the medical staff and the director of nursing (DON) must ensure that the hospital-wide Quality Assessment and Performance Improvement (QAPI) program and staff in-service training programs address problems identified through the infection prevention and control program.

To reflect the importance of infection control the regulations specifically require that the hospital's QAPI and training programs must be involved in addressing problems identified by the infection control program, and hold the CEO, medical staff and DON jointly responsible for linking the infection control program with the QAPI and training programs.  Requirements for the hospital's QAPI program are found at 42 CFR 482.21.

- Verify that the hospital is in compliance with ventilation requirements for patients with contagious airborne diseases, such as tuberculosis, patients receiving treatments with hazardous chemical, surgical areas, and other areas where hazardous materials are stored.

- Verify that food products are stored under appropriate conditions (e.g., time, temperature, packaging, location) based on a nationally-accepted source such as the United States Department of Agriculture, the Food and Drug Administration, or other nationally-recognized standard.

- Verify that pharmaceuticals are stored at temperatures recommended by the product manufacturer.

- Review monitoring records for temperature to ensure that appropriate levels are maintained.

- Review humidity maintenance records for anesthetizing locations to ensure, if monitoring determined humidity levels were not within acceptable parameters, that corrective actions were performed in a timely manner to achieve acceptable levels.

## A-0747
**(Rev. 37, Issued:  10-17-08; Effective/Implementation Date:  10-17-08)**

**§482.42 Condition of Participation: Infection Control**

**The hospital must provide a sanitary environment to avoid sources and transmission of infections and communicable diseases.  There must be an active program for the prevention, control, and investigation of infections and communicable diseases.**

**Interpretive Guidelines §482.42**

This regulation requires the hospital to develop, implement, and maintain an active, hospital-wide program for the prevention, control, and investigation of infections and communicable diseases.  The National Institute of Allergy and Infectious Diseases defines an infectious disease as a change from a state of health to a state in which part or all of a host's body cannot function normally because of the presence of an infectious agent or its product.  An infectious agent is defined by the NIAID as a living or quasi-living organism or particle that causes an infectious disease, and includes bacteria, viruses, fungi, protozoa, helminthes, and prions.  NIAID defines a communicable disease as a disease associated with an agent that can be transmitted from one host to another. (NIAID website glossary)

According to the Centers for Disease Control and Prevention (CDC), healthcare-associated infections, i.e., infections that patients acquire during the course of receiving treatment for other conditions within a healthcare setting, are one of the top ten leading causes of death in the United States. The CDC estimates that there are 1.7 million healthcare-associated infections in American hospitals each year, with 99,000 associated deaths. (CDC website, Estimates of Healthcare-Associated Infections, date last modified May 30, 2007)

The hospital must provide and maintain a sanitary environment to avoid sources and transmission of infections and communicable diseases. All areas of the hospital must be clean and sanitary. This includes all hospital units, campuses and off-site locations. The infection prevention and control program must include appropriate monitoring of housekeeping, maintenance (including repair, renovation and construction activities), and other activities to ensure that the hospital maintains a sanitary environment. Examples of areas to monitor would include: food storage, preparation, serving and dish rooms, refrigerators, ice machines, air handlers, autoclave rooms, venting systems, inpatient rooms, treatment areas, labs, waste handling, surgical areas, supply storage, equipment cleaning, etc.

The hospital's program for prevention, control and investigation of infections and communicable diseases should be conducted in accordance with nationally recognized infection control practices or guidelines, as well as applicable regulations of other federal or state agencies. Examples of organizations that promulgate nationally recognized infection and communicable disease control guidelines, and/or recommendations include: the Centers for Disease Control and Prevention (CDC), the Association for Professionals in Infection Control and Epidemiology (APIC), the Society for Healthcare Epidemiology of America (SHEA), and the Association of periOperative Registered Nurses (AORN). The U.S. Occupational Health and Safety Administration (OSHA) also issues federal regulations applicable to infection control practices.

In order to prevent, control and investigate infections and communicable diseases, the hospital's program must include an active surveillance component that covers both hospital patients and personnel working in the hospital. Surveillance includes infection detection, data collection and analysis, monitoring, and evaluation of preventive interventions.

The hospital must conduct surveillance on a hospital-wide basis in order to identify infectious risks or communicable disease problems at any particular location. This does not imply "total hospital surveillance," but it does mean that hospitals must have reliable sampling or other mechanisms in place to permit identifying and monitoring infections and communicable diseases occurring throughout the hospital's various locations or departments. The hospital must document its surveillance activities, including the measures selected for monitoring, and collection and analysis methods. Surveillance activities should be conducted in accordance with recognized infection control surveillance practices, such as, for example, those utilized by the CDC's National

Healthcare Safety Net (NHSN).

The hospital must develop and implement appropriate infection control interventions to address issues identified through its detection activities, and then monitor the effectiveness of interventions through further data collection and analysis.

The hospital's infection prevention and control program must be integrated into its hospital-wide Quality Assurance and Performance Improvement (QAPI) program. (See 42 CFR 482.42(b)(1).)


# SPECIAL CHALLENGES IN INFECTION CONTROL

## MULTI-DRUG RESISTANT ORGANISMS (MDROs)

According to the Centers for Disease Control's (CDC) publication, Management of Multi-drug Resistant Organisms in Healthcare Settings 2006, http://www.cdc.gov/ncidod/dhqp/pdf/ar/mrdoGuideline2006.pdf, MDROs are microorganisms that are resistant to one or more antimicrobial agents. Options for treating patients with MDRO infections are very limited, resulting in increased mortality, as well as increased hospital length of stay and costs. During the last several decades the prevalence of MDROs in hospitals has increased steadily. Hospitals are encouraged to have mechanisms in place for the early identification of patients with targeted MDROs prevalent in their hospital and community, and for the prevention of transmission of such MDROs. When ongoing transmission of targeted MDROs in the hospital is identified, the infection prevention and control program should use this event to identify potential breaches in infection control practice.

## AMBULATORY CARE

The ambulatory care setting, including emergency departments, presents unique challenges for infection control, because: patients remain in common areas, often for prolonged periods of time, until they can be seen by a healthcare practitioner; examination or treatment rooms are turned around quickly with minimal cleaning; and infectious patients may not be recognized immediately. Furthermore, immuno-compromised patients may receive treatments in rooms among other patients who pose risks of infection.

The hospital's infection prevention and control program should be designed with these ambulatory care setting challenges in mind. After assessing the likely level of risk in its various ambulatory care settings, including off-site settings, a hospital might identify particular settings, such as the emergency department, where it would be appropriate to employ measures for screening individuals with potentially contagious diseases during their initial patient encounter, and taking appropriate control measures for those individuals who may present risk for the transmission of infectious agents by the airborne

or droplet route. Guidelines promulgated by the CDC's Healthcare Infection Control Practices Advisory Committee (HICPAC) are a resource for hospitals in developing their infection control program for ambulatory care. For example, when potentially infectious individuals are identified, prevention measures should include prompt physical separation wherever possible, implementation of respiratory hygiene/cough etiquette protocols, and/or appropriate isolation precautions based on the routes of transmission of the suspected infection.

**COMMUNICABLE DISEASE OUTBREAKS**

Community-wide outbreaks of communicable diseases (such as measles, SARS, or influenza) present many of the same issues and require many of the same considerations and strategies as other hospital infectious disease threats. If a communicable disease outbreak occurs, an understanding of the epidemiology, likely modes of transmission, and clinical course of the disease is essential for responding to and managing the event. Among the infection control issues that may need to be addressed are:

- Preventing transmission among patients, healthcare personnel, and visitors;

- Identifying persons who may be infected and exposed;

- Providing treatment or prophylaxis to large numbers of people; and

- Logistics issues (staff, medical supplies, resupply, continued operations, and capacity).

Pandemics, or very widespread and clinically serious outbreaks of an infection, present additional challenges due to the widespread effect on the availability of back-up resources that would typically be available to address an outbreak confined to a smaller geographic area. Additionally, the duration of a pandemic may present special challenges for staffing, supplies, resupply, etc. Hospitals should work with local, State, and Federal public health agencies to identify likely communicable disease threats and develop appropriate preparedness and response strategies.

**BIOTERRORISM**

Healthcare facilities would confront a set of issues similar to naturally occurring communicable disease threats when dealing with a suspected bioterrorism event. The required response is likely to differ based on whether exposure is a result of a biological release or person-to-person transmission. A variety of sources offer guidance for the management of persons exposed to likely agents of bioterrorism, including Federal agency websites (e.g., http://www.ahrq.gov/prep; http://www.usamrid.army.mil/publications/index.html; http://www.bt.cdc.gov) Because of the many similarities between man-made and naturally occurring threats, an all-hazards approach to developing emergency response plans is preferred, and hospitals are

# APPENDIX – "12"

# Centers for Medicare & Medicaid Services

## Hospital Infection Control Worksheet

Name of State Agency: 

Instructions: The following is a list of items that must be assessed during the on-site survey, in order to determine compliance with the Infection Control Condition of Participation. Items are to be assessed by a combination of observation, interviews with hospital staff, patients and their family/support persons, review of medical records, and a review of any necessary infection control program documentation. **During the survey, observations or concerns may prompt the surveyor to request and review specific hospital policies and procedures. Surveyors are expected to use their judgment and review only those documents necessary to investigate their concern(s) or to validate their observations.**

The interviews should be performed with the most appropriate staff person(s) for the items of interest, as well as with patients, family members, and support persons.

## Hospital Characteristics

1. Hospital name: 

2. CMS Certification Number (CCN): ☐☐☐☐☐☐

3. Date of site visit:

☐☐ / ☐☐ / ☐☐☐☐ to ☐☐ / ☐☐ / ☐☐☐☐

## Module 1: Infection Prevention Program

# Section 1.A. Infection Prevention Program and Resources

| Elements to be assessed | | Surveyor Notes |
|---|---|---|
| 1.A.1 The hospital has designated one or more individual(s) as its Infection Control Officer(s). | ○ Yes <br><br> ○ No | |
| 1.A.2 The hospital has evidence that demonstrates the Infection Control Officer(s) is qualified and maintain(s) qualifications through education, training, experience or certification related to infection control consistent with hospital policy. | ○ Yes <br><br> ○ No | |
| 1.A.3 The Infection Control Officer(s) can provide evidence that the hospital has developed general infection control policies and procedures that are based on nationally recognized guidelines and applicable state and federal law. | ○ Yes <br><br> ○ No | |
| **If no to any of 1.A.1 through 1.A.3, cite at 42 CFR 482.42(a) (Tag A-748)** | | |
| 1.A.4 The Infection Control Officer can provide an updated list of diseases reportable to the local and/or state public health authorities. | ○ Yes <br><br> ○ No | |
| 1.A.5 The Infection Control Officer can provide evidence that hospital complies with the reportable diseases requirements of the local health authority. | ○ Yes <br><br> ○ No | |
| **No citation risk for questions 1.A.4 and 1.A.5** | | |
| 1.A.6 The hospital has infection control policies and procedures relevant to construction, renovation, maintenance, demolition, and repair, including the requirement for an infection control risk assessment (ICRA) to define the scope of the project and need for barrier measures before a project gets underway. | ○ Yes <br><br> ○ No | |
| **If no to 1.A.6, cite at 42 CFR 482.42(a) (Tag A-748)** | | |

# Section 1.B.  Hospital QAPI Systems Related to Infection Prevention

| Elements to be assessed | | Surveyor Notes |
|---|---|---|
| The hospital infection prevention program is coordinated into the hospital QAPI program as evidenced by: | | |
| 1.B.1  The Infection Control Officer(s) can provide evidence that problems identified in the infection control program are addressed in the hospital QAPI program (i.e., development and implementation of corrective interventions, and ongoing evaluation of interventions implemented for both success and sustainability). | ○ Yes<br><br>○ No | |
| **If no to 1.B.1, cite at 42 CFR 482.21(e)(3)** (Tag A-0286) | | |
| 1.B.2  Hospital leadership, including the CEO, Medical Staff, and the Director of Nursing Services ensures the hospital implements successful corrective action plans in affected problem area(s). | ○ Yes<br><br>○ No | |
| **If no to 1.B.2, cite at 42 CFR 482.42(b)(2)** (Tag A-0756) | | |
| 1.B.3  The hospital utilizes a risk assessment process to prioritize selection of quality indicators for infection prevention and control. | ○ Yes<br><br>○ No | |
| **If no to 1.B.3, cite at 42 CFR 482.21(a)(2)** (Tag A-0267) | | |

3

# Section 1.C. Systems to Prevent Transmission of MDROs and Promote Antimicrobial Stewardship

| Elements to be assessed | | Surveyor Notes |
|---|---|---|
| 1.C.1 The hospital has policies and procedures to minimize the risk of development and transmission of multidrug-resistant organisms (MDROs) within the hospital (applicable to all persons in the hospital). | ◌ Yes<br><br>◌ No | |
| 1.C.2 Systems are in place to designate patients known to be colonized or infected with a targeted MDRO and to notify receiving units and personnel prior to movement of such patients within the hospital. | ◌ Yes<br><br>◌ No | |
| 1.C.3 Systems are in place to designate patients known to be colonized or infected with a targeted MDRO and to notify receiving healthcare facilities and personnel prior to transfer of such patient between facilities. | ◌ Yes<br><br>◌ No | |
| **If no to any part of 1.C.1 through 1.C.3, cite at 42 CFR 482.42(a) (Tag A-0749)** | | |
| 1.C.4 The hospital can provide a list of target MDROs.<br><br>Note: Hospitals should provide a list of MDROs that are targeted for infection control because they are epidemiologically important (e.g., MRSA, VRE). Please refer to CDC's Guideline for Isolation Precautions for criteria that may be used to define epidemiology important organisms:<br>http://www.cdc.gov/hicpac/pdf/isolation/Isolation2007.pdf | ◌ Yes<br><br>◌ No | |
| 1.C.5 The hospital can demonstrate the criteria used to determine epidemiologically important MDROs on their list. | ◌ Yes<br><br>◌ No | |
| 1.C.6 The hospital can provide justification for any epidemiologically important organisms not on their list and otherwise not targeted in their hospital. | ◌ Yes<br><br>◌ No<br><br>◌ N/A | |
| **No citation risk for questions 1.C.4 through 1.C.6; for information only.** | | |

| 1.C.7 The hospital has an established system(s) to ensure prompt notification to the Infection Control Officer when a novel resistance pattern based on microbiology results is detected. | ○ Yes <br><br> ○ No | |
|---|---|---|

**If no to 1.C.7, cite at 42 CFR 482.42(a)** (Tag A-0749)

| 1.C.8 Patients identified as colonized or infected with target MDROs are placed on Contact Precautions. <br><br> Note: This does not imply that hospitals are required to perform active surveillance testing to detect MDRO colonization among a specific subset or all patients. | ○ Yes <br><br> ○ No | |
|---|---|---|

**If no to 1.C.8, cite at 42 CFR 482.42(a)** (Tag A-0749)

| 1.C.9 The hospital has written policies and procedures whose purpose is to improve antibiotic use (antibiotic stewardship). | ○ Yes <br><br> ○ No | |
|---|---|---|
| 1.C.10 The hospital has designated a leader (e.g., physician, pharmacist, etc.) responsible for program outcomes of antibiotic stewardship activities at the hospital. | ○ Yes <br><br> ○ No | |
| 1.C.11 The hospital's antibiotic stewardship policy and procedures requires practitioners to document in the medical record or during order entry an indication for all antibiotics, in addition to other required elements such as does and duration. | ○ Yes <br><br> ○ No | |
| 1.C.12 The hospital has a formal procedure for all practitioners to review the appropriateness of any antibiotics prescribed after 48 hours from the initial orders (e.g., antibiotic time out). | ○ Yes <br><br> ○ No | |
| 1.C.13 The hospital monitors antibiotic use (consumption) at the unit and/or hospital level. | ○ Yes <br><br> ○ No | |

**No citation risk for 1.C.9 through 1.C.13; for information only.**

5

# Section 1.D. Infection Prevention Systems, and Training Related to Personnel

| Elements to be assessed | | Surveyor Notes |
|---|---|---|
| 1.D.1 Personnel receive job-specific training on hospital infection control practices, policies, and procedures upon hire and at regular intervals. | ○ Yes<br><br>○ No | |
| 1.D.2 The hospital infection control system trains personnel expected to have contact with blood or other potentially infectious material is anticipated on the blood borne pathogen standards upon hire, at regular intervals, and as needed. | ○ Yes<br><br>○ No | |
| 1.D.3 The hospital infection control system puts in place and monitors efforts to prevent needle sticks, sharps injuries, and other employee exposure events. | ○ Yes<br><br>○ No | |
| 1.D.4 Following an exposure incident, post-exposure evaluation and follow-up including prophylaxis as appropriate, is available to the individual and performed by or under the supervision of a practitioner.<br><br>Note: An exposure incident refers to a specific eye, mouth, other mucous membrane, non-intact skin, or parenteral contact with blood or other potentially infectious materials that result from the performance of an individual's duties. | ○ Yes<br><br>○ No | |
| 1.D.5 The hospital tracks healthcare personnel exposure events, evaluates event data, and develops corrective action plans to reduce the incidence of such events. | ○ Yes<br><br>○ No | |
| 1.D.6 The hospital infection control system ensures all personnel are screened for tuberculosis (TB) upon hire and, for those with negative results, determine ongoing TB screening criteria based upon facility/unit risk classification.<br><br>Note: Risk classification based on aggregated rates of TB test conversions are periodically reviewed by the Infection Control Officer to determine the need for modification to the screening and TB control measures due to increases or decreases in transmission. | ○ Yes<br><br>○ No | |

| | | |
|---|---|---|
| 1.D.7 The hospital infection control system ensures personnel with TB test conversions are provided with appropriate follow-up (e.g. evaluation and treatment, as needed). | ◯ Yes<br><br>◯ No | |
| 1.D.8 The hospital infection control system ensures the hospital has a respiratory protection program that details required worksite-specific procedures and elements for required respirator use. | ◯ Yes<br><br>◯ No | |
| 1.D.9 The hospital infection control system ensures that respiratory fit testing is provided at regular intervals to personnel at risk. | ◯ Yes<br><br>◯ No | |
| 1.D.10 Hospital has well-defined policies concerning contact of personnel with patients when personnel have potentially transmissible conditions.<br><br>• The hospital provides education to personnel on need for prompt reporting of illness to supervisor and/or occupational health. | ◯ Yes<br><br>◯ No | |
| **If no to any of 1.D.1 through 1.D.10, cite at 42 CFR 482.42(a)** (Tag A-0749) | | |
| 1.D.11 Personnel competency and compliance with job-specific infection prevention policies and procedures are ensured through routine training and when the Infection Control Officer has identified problems requiring additional training. | ◯ Yes<br><br>◯ No | |
| **If no to 1.D.11, cite at 42 CFR 482.42(b)** (Tag A-0756) | | |

7

| | | |
|---|---|---|
| 1.D.12 The hospital infection control system provides Hepatitis B vaccination series to all employees who have potential occupational exposure and offers post-vaccination testing for immunity after the third vaccine dose is administered. | ○ Yes<br><br>○ No | |
| 1.D.13 The hospital infection control system ensures and documents that all personnel have presumptive evidence of immunity to measles, mumps, and rubella. | ○ Yes<br><br>○ No | |
| 1.D.14 The hospital infection control system provides Tdap (tetanus toxoid, reduced diphtheria toxoid, and acellular pertussis) vaccination for all personnel who have not previously received Tdap.<br><br>Note: Tdap is not licensed for multiple administrations; therefore, after receipt of Tdap, HCP should receive Td (Tetanus diphtheria) for future booster vaccination against tetanus and diphtheria. | ○ Yes<br><br>○ No | |
| 1.D.15 The hospital infection control system ensures and documents that all personnel have evidence of immunity to varicella. | ○ Yes<br><br>○ No | |
| 1.D.16 The hospital infection control system ensures that all personnel are **offered** annual influenza vaccination. | ○ Yes<br><br>○ No | |
| **No citation risk for 1.D.12 through 1.D.16, for information only.** | | |

## Module 2: General Infection Prevention Elements - to be applied to all locations providing patient care

# Section 2.A. Hand Hygiene

| Elements to be assessed | | Surveyor Notes |
|---|---|---|
| Hand hygiene is performed in a manner consistent with hospital infection control practices, policies, and procedures to maximize the prevention of infection and communicable disease including the following:<br><br>Note: Observations for compliance with hand hygiene elements should be assessed throughout the hospital. | | |
| 2.A.1 Soap, water, and a sink are readily accessible in appropriate locations including, but not limited to, patient care areas and food and medication preparation areas.<br><br>Note: Medications should not be prepared near areas of splashing water (e.g. within 3 feet of a sink). Alternately when space is limited, a splash guard can be mounted beside the sink. | ◯ Yes<br><br>◯ No | |
| 2.A.2 Alcohol-based hand rub is readily accessible and placed in appropriate locations. The locations may include:<br><br>• Entrances to patient rooms,<br>• At the bedside,<br>• In individual pocket-sized containers carried by healthcare personnel,<br>• Staff workstations, and/or<br>• Other convenient locations. | ◯ Yes<br><br>◯ No | |
| 2.A.3 Personnel perform hand hygiene:<br><br>• Before contact with the patient<br>• Before performing an aseptic task (e.g., insertion of IV or urinary catheter) | ◯ Yes<br><br>◯ No | |

| | | |
|---|---|---|
| 2.A.4  Personnel perform hand hygiene:<br><br>• After contact with the patient<br>• After contact with blood, body fluids, or visibly contaminated surfaces<br>• After removing gloves | ◯ Yes<br><br>◯ No | |
| 2.A.5  Personnel perform hand hygiene using soap and water when hands are visibly soiled (e.g., blood, body fluids) or after caring for a patient with known or suspected *C. difficile* or norovirus during an outbreak.<br><br>Note: In all other situations, alcohol-based hand rub is preferred. | ◯ Yes<br><br>◯ No | |
| 2.A.6 Personnel do not wear artificial fingernails and/or extenders when having direct contact with patients at high risk of infection (e.g., those in intensive care units or ORs) per hospital policy. | ◯ Yes<br><br>◯ No | |
| **If no to any of 2.A.1 through 2.A.6, cite at 42 CFR 482.42(a) (Tag A-0749)** | | |

10

# Section 2.B.  Injection Practices and Sharps Safety (Medications and Infusates)

| Elements to be assessed | | Surveyor Notes | | Surveyor Notes |
|---|---|---|---|---|
| Injections are given and sharps safety is managed in a manner consistent with hospital infection control policies and procedures to maximize the prevention of infection and communicable disease including the following: | | | | |
| Note: If possible, questions in this section should be assessed through observation in two separate patient care areas or settings of the hospital. | | | ◯ Second observation not available (If selected, questions 2.B.1 – 2.B.15 RIGHT column will be blocked) | |
| 2.B.1  Injections are prepared using aseptic technique in an area that has been cleaned and is free of contamination (e.g., visible blood, or body fluids). | ◯ Yes <br><br> ◯ No <br><br> ◯ Unable to observe | | ◯ Yes <br><br> ◯ No <br><br> ◯ Unable to observe | |
| 2.B.2  Needles are used for only one patient. | ◯ Yes <br><br> ◯ No <br><br> ◯ Unable to observe | | ◯ Yes <br><br> ◯ No <br><br> ◯ Unable to observe | |
| 2.B.3  Syringes are used for only one patient (this includes manufactured prefilled syringes). | ◯ Yes <br><br> ◯ No <br><br> ◯ Unable to observe | | ◯ Yes <br><br> ◯ No <br><br> ◯ Unable to observe | |
| 2.B.4  Insulin pens are used for only one patient. | ◯ Yes <br><br> ◯ No <br><br> ◯ Unable to observe | | ◯ Yes <br><br> ◯ No <br><br> ◯ Unable to observe | |
| 2.B.5  The rubber septum on all medication vials, whether unopened or previously accessed, is disinfected with alcohol prior to piercing. | ◯ Yes <br><br> ◯ No <br><br> ◯ Unable to observe | | ◯ Yes <br><br> ◯ No <br><br> ◯ Unable to observe | |

11

| | | | | |
|---|---|---|---|---|
| 2.B.6 Medication vials are entered with a new needle.<br><br>Note: Reuse of syringes and/or needles to enter a medication vial contaminates the contents of the vial, making the vial unsafe for use on additional patients. If a surveyor sees needles or syringes being reused to enter a vial to obtain additional medication for the same patient, no citation should be made if the vial is discarded immediately. | ○ Yes<br><br>○ No<br><br>○ Unable to observe | | ○ Yes<br><br>○ No<br><br>○ Unable to observe | |
| 2.B.7 Medication vials are entered with a new syringe.<br><br>Note: Reuse of syringes and/or needles to enter a medication vial contaminates the contents of the vial making the vial unsafe for use on additional patients. If a surveyor sees needles or syringes being reused to enter a vial to obtain additional medication for the same patient, no citation should be made if the vial is discarded immediately. | ○ Yes<br><br>○ No<br><br>○ Unable to observe | | ○ Yes<br><br>○ No<br><br>○ Unable to observe | |
| 2.B.8 Medication vials labeled for single dose – single use are only used for one patient. | ○ Yes<br><br>○ No<br><br>○ Unable to observe | | ○ Yes<br><br>○ No<br><br>○ Unable to observe | |
| 2.B.9 Bags of IV solution are used for only one patient (and not as a source of flush solution for multiple patients). | ○ Yes<br><br>○ No<br><br>○ Unable to observe | | ○ Yes<br><br>○ No<br><br>○ Unable to observe | |
| 2.B.10 Medication administration tubing and connectors are used for only one patient. | ○ Yes<br><br>○ No<br><br>○ Unable to observe | | ○ Yes<br><br>○ No<br><br>○ Unable to observe | |

12

| | | | |
|---|---|---|---|
| 2.B.11 Multi-dose vials are dated when they are first opened and discarded within 28 days unless the manufacturer specifies a different (shorter or longer) beyond-use date for that opened vial.<br><br>Note: The beyond-use date is different from the expiration date printed on the vial by the manufacturer. The beyond-use date should never exceed the expiration date. The multi-dose vial can be dated by the hospital with either the date opened or the discard date as per hospital policy, as long as it is clear what the date represents and the same policy is used consistently throughout the hospital. | ○ Yes<br><br>○ No<br><br>○ Unable to observe | | ○ Yes<br><br>○ No<br><br>○ Unable to observe |
| 2.B.12 Multi-dose medication vials used for more than one patient are storedappropriatelyand do not enterthe immediate patient treatment area(e.g., operating room, patient room, anesthesia carts).<br><br>Note: If multi-dose vials enter the immediate patient treatment area, they must be dedicated for single patient use and discarded immediately after use. | ○ Yes<br><br>○ No<br><br>○ Unable to observe | | ○ Yes<br><br>○ No<br><br>○ Unable to observe |
| 2.B.13 All sharps are disposed of in puncture-resistant sharps containers. | ○ Yes<br><br>○ No | | ○ Yes<br><br>○ No |
| 2.B.14 Sharps containers are replaced when the fill line is reached. | ○ Yes<br><br>○ No | | ○ Yes<br><br>○ No |
| 2.B.15 Sharps containers are disposed of appropriately as medical waste. | ○ Yes<br><br>○ No | | ○ Yes<br><br>○ No |

**If no to any of 2.B.1 through 2.B.15, cite at 42 CFR 482.42(a) (Tag A-0749)**
     ***See notes on 2.B.6, 2.B.7, and 2.B.11 if "no" is checked.**

13

| Elements to be assessed | | Surveyor Notes | | Surveyor Notes |
|---|---|---|---|---|
| Personal protective equipment is utilized in a manner consistent with hospital infection control policies and procedures to maximize the prevention of infection and communicable disease including the following: | | | | |
| Note: If possible, observe health care personnel use of personal protective equipment in two different patient care areas or settings in hospital. | | | ○ Second observation not available (If selected, questions 2.C.1 – 2.C.7 RIGHT column will be blocked) | |
| 2.C.1  Supplies for adherence to Standard Precautions using personal protective equipment (e.g., gloves, gowns, mouth, eye, nose, and face protection) are available and located near point of use. | ○ Yes<br><br>○ No | | ○ Yes<br><br>○ No | |
| 2.C.2  Personnel wear gloves for procedures/activities where contact with blood and/or other potentially infectious materials, mucous membranes, non-intact skin or potentially contaminated intact skin could occur. | ○ Yes<br><br>◉ No | | ◉ Yes<br><br>◉ No | |
| 2.C.3  Healthcare personnel change gloves and perform hand hygiene before moving from a contaminated body site to a clean body site. | ○ Yes<br><br>○ No<br><br>○ Unable to observe | | ○ Yes<br><br>○ No<br><br>○ Unable to observe | |
| 2.C.4  Gowns are worn to prevent contamination of skin and clothing during procedures/activities where contact with blood, body fluids, secretions, or excretions could occur. | ○ Yes<br><br>○ No<br><br>○ Unable to observe | | ○ Yes<br><br>○ No<br><br>○ Unable to observe | |

| | | | | |
|---|---|---|---|---|
| 2.C.5 Gowns and gloves are removed and hand hygiene is performed:<br>• Before leaving the patient's environment (e.g. including moving to another patient). | ○ Yes<br><br>○ No | | ○ Yes<br><br>○ No | |
| 2.C.6 Appropriate mouth, nose and eye protection is worn for aerosol-generating procedures and/or procedures/activities that are likely to generate splashes or sprays of blood, body fluids, secretions or excretions. | ○ Yes<br><br>○ No<br><br>○ Unable to observe | | ○ Yes<br><br>○ No<br><br>○ Unable to observe | |
| 2.C.7 Facemasks (procedure or surgical) are worn by healthcare personnel who are placing a catheter or injecting materials into the epidural or subdural space. | ○ Yes<br><br>○ No<br><br>○ Unable to observe | | ○ Yes<br><br>○ No<br><br>○ Unable to observe | |
| **If no to any of 2.C.1 through 2.C.7, cite at 42 CFR 482.42(a) (Tag A-0749)** | | | | |

15

# Section 2.D. Environmental Services

| Elements to be assessed | | Surveyor Notes |
|---|---|---|
| Environmental service are provided in a manner consistent with hospital infection control policies and procedures to maximize the prevention of infection and communicable disease including the following: For some questions an observation may not be | | |
| 2.D.1 During environmental cleaning procedures, personnel wear appropriate PPE to prevent exposure to infectious agents or chemicals (PPE can include gloves, gowns, masks, and eye protection). | ◌ Yes<br><br>◌ No<br><br>◌ Unable to observe | |
| 2.D.2 Environmental surfaces in patient care areas are cleaned and disinfected, using an EPA-registered disinfectant on a regular basis (e.g., daily), when spills occur and when surfaces are visibly contaminated.<br><br>Note: High-touch surfaces (e.g., bed rails, over-bed table, bedside commode, lavatory surfaces in patient bathrooms) are cleaned and disinfected more frequently than minimal-touch surfaces. | ◌ Yes<br><br>◌ No<br><br>◌ Unable to observe | |
| 2.D.3 After a patient vacates a room, all visibly or potentially contaminated surfaces are thoroughly cleaned and disinfected and towels and bed linens are replaced with clean towels and bed linens. | ◌ Yes<br><br>◌ No<br><br>◌ Unable to observe | |
| 2.D.4 Cleaners and disinfectants, including disposable wipes, are used in accordance with manufacturer's instructions (e.g., dilution, storage, shelf-life, contact time). | ◌ Yes<br><br>◌ No<br><br>◌ Unable to observe | |
| 2.D.5 Separate clean (laundered if not disposable) cloths are used to clean each room and corridor. | ◌ Yes<br><br>◌ No<br><br>◌ Unable to observe | |

16

| | | |
|---|---|---|
| 2.D.6  Mop heads and cleaning cloths are laundered at least daily using appropriate laundry techniques (e.g., following manufacturer instructions when laundering microfiber items). | ○ Yes<br><br>○ No<br><br>○ Unable to observe | |
| 2.D.7  The hospital decontaminates spills of blood or other body fluids according to its policies and procedures, using appropriate EPA-registered hospital disinfectants. | ○ Yes<br><br>○ No<br><br>○ Unable to observe | |
| 2.D.8  The hospital has established and follows a schedule for areas/equipment to be cleaned/serviced regularly (e.g., HVAC equipment, refrigerators, ice machines, eye wash stations, scrub sinks). | ○ Yes<br><br>○ No | |

Laundry is processed in a manner consistent with hospital infection control policies and procedures to maximize the prevention of infection and communicable disease including the following:

| | | |
|---|---|---|
| 2.D.9  Personnel handle soiled textiles/linens with minimum agitation to avoid contamination of air, surfaces, and persons. | ○ Yes<br><br>○ No | |
| 2.D.10  Soiled textiles/linens are bagged or otherwise contained at the point of collection in leak-proof containers or bags and are not sorted or rinsed in the location of use.<br><br>Note: Covers are not needed on contaminated textile hampers in patient care areas. | ○ Yes<br><br>○ No | |
| 2.D.11  The receiving area for contaminated textiles is clearly separated from clean laundry areas and is maintained at negative pressure compared with the clean areas of the laundry in accordance with FGI (formerly AIA) construction standards in effect during the time of facility construction. | ○ Yes<br><br>○ No | |
| 2.D.12  If hospital laundry services are contracted out and performed offsite, the contract must show evidence that the contractor's laundry service meets these design standards. | ○ Yes<br><br>○ No<br><br>○ N/A | |

17

| 2.D.13 Clean textiles are packaged, transported, and stored in a manner that ensures cleanliness and protection from dust and soil. | ○ Yes<br>○ No | |
|---|---|---|

Reprocessing of non-critical items is accomplished in a manner consistent with hospital infection control policies and procedures to maximize the prevention of infection and communicable disease including the following:

| 2.D.14 Reusable noncritical patient-care devices (e.g., blood pressure cuffs, oximeter probes) are disinfected on a regular basis (e.g., after use on each patient, once daily, or once weekly) and when visibly soiled. | ○ Yes<br>○ No | |
|---|---|---|
| 2.D.15 For patients on Contact Precautions, if dedicated, disposable devices are not available, noncritical patient-care devices are disinfected after use on each patient. | ○ Yes<br>○ No | |
| 2.D.16 There is clear designation of responsibility for disinfection of reusable noncritical patient-care devices. | ○ Yes<br>○ No | |
| 2.D.17 Manufacturers' instructions for cleaning noncritical medical equipment are followed. | ○ Yes<br>○ No | |
| 2.D.18 Hydrotherapy equipment (e.g., Hubbard tanks, tubs, whirlpools, spas, birthing tanks) are drained, cleaned, and disinfected using an EPA-registered disinfectant according to manufacturer's instructions after each patient use. | ○ Yes<br>○ No<br>○ N/A | |
| **If no to any of 2.D.1 through 2.D.18, cite at 42 CFR 482.42(a)** (Tag A-0749) | | |

## Module 3: Equipment Reprocessing

# Section 3.A. Reprocessing of Semi-Critical Equipment

**Semi-critical equipment are objects that contact mucous membranes or non-intact skin and require, at a minimum, high-level disinfection prior to reuse (e.g. some endoscopes, speculums, laryngoscope blades)**

| Elements to be assessed | Surveyor Notes | Surveyor Notes |
|---|---|---|
| High-Level Disinfection (HLD) is defined as the complete elimination of all microorganisms in or on an instrument, except for small amounts of bacterial spores.<br><br>INSTRUCTIONS:<br>• Use the items in Section 3.C. "Single-Use Devices" to assess the reprocessing of any item(s) of semi-critical equipment that is (are) labeled as a single use device. Any item(s) of semi-critical equipment that is (are) labeled as a single use device must be reprocessed by a reprocessor that is registered with the FDA as a third-party reprocessor and cleared by the FDA to reprocess the specific device in question.<br><br>• For all items labeled reusable, use section 3A. | | |
| HLD of Reusable Instruments and Devices is accomplished in a manner consistent with hospital infection control policies and procedures to maximize the prevention of infection and communicable disease including: | | |
| 3.A.1  Hospital policies address steps to take when there are discrepancies between a device manufacturer's instructions and automated  high-level disinfection equipment manufacturer's instruction for completing high-level disinfection. | ◯ Yes<br><br>◯ No<br><br>◯ Unable to observe | |
| 3.A.2  Only devices labeled as reusable are reprocessed directly by the hospital onsite or offsite via a reprocessing vendor. | ◯ Yes<br><br>◯ No<br><br>◯ Unable to observe | |
| 3.A.3  All reusable semi-critical items receive at least high-level disinfection prior to reuse. | ◯ Yes<br><br>◯ No<br><br>◯ Unable to observe | |

| 3.A.4 If any high-level disinfection is performed off-site, the item(s) are decontaminated prior to off-site transport. | ○ Yes<br><br>○ No<br><br>○ Unable to observe | |
| --- | --- | --- |

**If no to any of 3.A.1 through 3.A.4, cite at 42 CFR 482.42(a)** (Tag A-0749)

| 3.A.5 Is ALL high-level disinfection done Off-site? | ○ Yes: STOP here and SKIP to Section 3.B.<br><br>○ No: Answer all questions in this Section.<br><br>NOTE: If any high-level disinfection is done onsite, complete questions 3.A.6 through 3.A.18. |
| --- | --- |

**No citation risk for 3.A.5, for information only.**

| If possible, obtain two sets of observations for the items in this section. Observe the main area for central sterilization/reprocessing services and if possible, also assess reprocessing in another area. | Central Reprocessing<br><br>○ Unable to observe elements in central reprocessing area. (If selected, questions 3.A.6 – 3.A.18 LEFT column will be blocked) | | Other Reprocessing Area<br><br>○ Unable to observe elements in non-central reprocessing setting. (If selected, questions 3.A.6 – 3.A.18 RIGHT column will be blocked) | |
| --- | --- | --- | --- | --- |
| 3.A.6 Flexible endoscopes are inspected for damage and leak tested as part of each reprocessing cycle.<br><br>(An endoscope is an instrument designed to visually examine the interior of a bodily canal or hollow organ such as the colon, bladder, or stomach) | ○ Yes<br><br>○ No<br><br>○ Unable to observe | | ○ Yes<br><br>○ No<br><br>○ Unable to observe | |
| 3.A.7 Items are thoroughly pre-cleaned according to manufacturer instructions and visually inspected for residual soil prior to high-level disinfection.<br><br>Note: For instruments with lumens (e.g., endoscopes), pre-cleaning of devices must include all channels using cleaning brushes of appropriate size. | ○ Yes<br><br>○ No<br><br>○ Unable to observe | | ○ Yes<br><br>○ No<br><br>○ Unable to observe | |

20

| | | | | |
|---|---|---|---|---|
| 3.A.8 Enzymatic cleaner or detergent is used and discarded according to manufacturer's instructions (typically after each use). | ◯ Yes<br><br>◯ No<br><br>◯ Unable to observe | | ◯ Yes<br><br>◯ No<br><br>◯ Unable to observe | |
| 3.A.9 Cleaning brushes are single-use, disposable items or, if reusable, cleaned and either high-level disinfected or sterilized (per manufacturer's instructions) at least daily. | ◯ Yes<br><br>◯ No<br><br>◯ Unable to observe | | ◯ Yes<br><br>◯ No<br><br>◯ Unable to observe | |
| 3.A.10 For chemicals used in high-level disinfection, manufacturer's instructions are followed for:<br><br>• Preparation,<br>• Testing for appropriate concentration, and<br>• Replacement (e.g., prior to expiration or loss of efficacy). | ◯ Yes<br><br>◯ No<br><br>◯ Unable to observe | | ◯ Yes<br><br>◯ No<br><br>◯ Unable to observe | |
| 3.A.11 If automated reprocessing equipment is used, the manufacturer's recommended connectors are used to assure that all endoscope channels are appropriately disinfected. | ◯ Yes<br><br>◯ No<br><br>◯ Unable to observe | | ◯ Yes<br><br>◯ No<br><br>◯ Unable to observe | |
| 3.A.12 Devices undergo disinfection for the appropriate length of time as specified by manufacturer's instructions. | ◯ Yes<br><br>◯ No<br><br>◯ Unable to observe | | ◯ Yes<br><br>◯ No<br><br>◯ Unable to observe | |
| 3.A.13 Devices undergo disinfection at the appropriate temperature as specified by manufacturer's instructions. | ◯ Yes<br><br>◯ No<br><br>◯ Unable to observe | | ◯ Yes<br><br>◯ No<br><br>◯ Unable to observe | |

21

| | | | | |
|---|---|---|---|---|
| 3.A.14  After high-level disinfection, devices are rinsed with sterile water, filtered water, or tap water followed by a rinse with 70% - 90% ethyl or isopropyl alcohol.<br><br>Note: There is no recommendation to use sterile or filtered water rather than tap water for rinsing semi-critical equipment that contact the mucous membranes of the rectum or vagina. | ○ Yes<br><br>○ No<br><br>○ Unable to observe | | ○ Yes<br><br>○ No<br><br>○ Unable to observe | |
| 3.A.15  Devices are dried thoroughly prior to reuse.<br><br>Note: For instruments with lumens (e.g., endoscopes), this includes flushing all channels with alcohol and forcing air through the channels. | ○ Yes<br><br>○ No<br><br>○ Unable to observe | | ○ Yes<br><br>○ No<br><br>○ Unable to observe | |
| 3.A.16  Routine maintenance procedures for high-level disinfection equipment are performed regularly.  (Confirm maintenance records are available.) | ○ Yes<br><br>○ No<br><br>○ Unable to observe | | ○ Yes<br><br>○ No<br><br>○ Unable to observe | |
| 3.A.17  After high-level disinfection, devices are stored in a manner to protect from damage or contamination<br><br>Note: Endoscopes must be hung in a vertical position. | ○ Yes<br><br>○ No<br><br>○ Unable to observe | | ○ Yes<br><br>○ No<br><br>○ Unable to observe | |
| 3.A.18  The hospital has a system in place to identify which endoscope was used on a patient for each procedure. | ○ Yes<br><br>○ No<br><br>○ Unable to observe | | ○ Yes<br><br>○ No<br><br>○ Unable to observe | |
| **If no to any of 3.A.6 through 3.A.18, cite at 42 CFR 482.42(a)** (Tag A-0749) | | | | |

# Section 3.B. Reprocessing of Reusable Critical Equipment, Instruments and Devices: Sterilization

**Critical equipment, instruments and devices are objects that enter sterile tissue or the vascular system and must be sterile prior to use (e.g. surgical instruments, cardiac and urinary catheters, implants, and ultrasound probes used in sterile body cavities)**

| Elements to be assessed | | Surveyor Notes |
|---|---|---|

Sterilization is a validated process used to render a product free of all forms of viable microorganisms.

INSTRUCTIONS:
- Use the items in Section 3.C. "Single-Use Devices" to assess the reprocessing of any item(s) of critical equipment that is (are) labeled as a single use device. Any item(s) of critical equipment that is (are) labeled as a single use device must be reprocessed by a reprocessor that is registered with the FDA as a third-party reprocessor and cleared by the FDA to reprocess the specific device in question.

- Add reference to single use

- If possible, obtain two sets of observations for the items in this Section: one in Central Sterile Services (CSS) and another in in a non-CSS area (e.g. GI suites, Radiology, Outpatient clinics, OB suites).

Sterilization of reusable equipment, instruments and devices is accomplished in a manner consistent with hospital infection control policies and procedures to maximize the prevention of infection and communicable disease s including the following:

| Element | Response | Notes |
|---|---|---|
| 3.B.1 Hospital policies address steps to take when there are discrepancies between a device manufacturer's instructions and the sterilizer's manufacturer's instruction for completing sterilization. | ○ Yes  ○ No | |
| 3.B.2 All reusable critical items are sterilized prior to reuse. | ○ Yes  ○ No | |
| 3.B.3 If any sterilization is performed off-site, the item(s) are decontaminated prior to off-site transport. | ○ Yes  ○ No  ○ N/A | |

**If no to any of 3.B.1 through 3.B.3, cite at 42 CFR 482.42(a) (Tag A-0749)**

23

| 3.B.4 Is ALL sterilization done off-site? | ○ Yes: STOP here and SKIP to Section 3.C<br><br>○ No: Answer all questions in this section<br><br>Note: If any sterilization is done onsite, complete questions 3.B.5 through 3.B.19 | | | |
|---|---|---|---|---|
| If possible, obtain two sets of observations for the items in this section. Observe the main area for central sterilization services and if possible, also assess sterilization in another area. | Central Sterilization Area<br><br>○ Unable to observe elements in central sterilization area. (If selected, question 3.B.5 – 3.B.19 LEFT column will be blocked) | | Other non-Central Sterilization Area<br><br>○ Unable to observe elements in non-central sterilization setting. (If selected, question 3.B.5 – 3.B.19 RIGHT column will be blocked) | |
| 3.B.5 Items are thoroughly pre-cleaned according to manufacturers' instructions and visually inspected for residual soil prior to sterilization.<br><br>Note: For instruments with lumens, pre-cleaning of devices must include all channels using cleaning brushes of appropriate size. | ○ Yes<br><br>○ No | | ○ Yes<br><br>○ No | |
| 3.B.6 Enzymatic cleaner or detergent is used and discarded according to manufacturer's instructions (typically after each use). | ○ Yes<br><br>○ No | | ○ Yes<br><br>○ No | |
| 3.B.7 Cleaning brushes are single-use, disposable items or, if reusable, cleaned and either high-level disinfected or sterilized (per manufacturer's instructions) at least daily. | ○ Yes<br><br>○ No | | ○ Yes<br><br>○ No | |
| 3.B.8 After pre-cleaning, items are appropriately wrapped-packaged for sterilization (e.g., package system selected is compatible with the sterilization process being performed, hinged instruments are open, and instruments are disassembled if indicated by the manufacturer). | ○ Yes<br><br>○ No | | ○ Yes<br><br>○ No | |
| 3.B.9 A chemical indicator (process indicator) is placed correctly in the instrument packs in every load. | ○ Yes<br><br>○ No | | ○ Yes<br><br>○ No | |
| 3.B.10 A biological indicator is used at least weekly for each sterilizer and with every load containing implantable items. | ○ Yes<br><br>○ No | | ○ Yes<br><br>○ No | |
| 3.B.11 For dynamic air removal-type sterilizers (e.g., prevacuum steam sterilizer), an air removal test (Bowie-Dick test) is performed each day the sterilizer is used to verify efficacy of air removal. | ○ Yes<br><br>○ No<br><br>○ N/A | | ○ Yes<br><br>○ No<br><br>○ N/A | |

24

| | | | | |
|---|---|---|---|---|
| 3.B.12 Sterile packs are labeled with the sterilizer used, the cycle or load number, and the date of sterilization, and, if applicable, the expiration date. | ◯ Yes<br><br>◯ No | | ◯ Yes<br><br>◯ No | |
| 3.B.13 Logs for each sterilizer cycle are current and include results from each load. | ◯ Yes<br><br>◯ No | | ◯ Yes<br><br>◯ No | |
| 3.B.14 Routine maintenance for sterilization equipment is performed regularly (confirm maintenance records are available). | ◯ Yes<br><br>◯ No | | ◯ Yes<br><br>◯ No | |
| 3.B.15 After sterilization, medical devices and instruments are stored so that sterility is not compromised. | ◯ Yes<br><br>◯ No | | ◯ Yes<br><br>◯ No | |
| 3.B.16 Sterile packages are inspected for integrity and compromised packages are repackaged and reprocessed prior to use. | ◯ Yes<br><br>◯ No | | ◯ Yes<br><br>◯ No | |
| 3.B.17 If immediate-use steam sterilization is performed, all of the following criteria are met:<br><br>• Work practices ensure proper cleaning and decontamination, inspection, and arrangement of the instruments into the recommended sterilizing trays or other containment devices before sterilization.<br><br>• Once clean, the item is placed within a container intended for immediate use.<br><br>The sterilizer cycle and parameters used are selected according to the manufacturers' instructions for use for the device, container, and sterilizer.<br><br>The sterilizer function is monitored with monitors (e.g., mechanical, chemical and biologic) that are approved for the cycle being used.<br><br>• The processed item must be transferred immediately*, using aseptic technique, from the sterilizer to the actual point of use, the sterile field in an ongoing surgical procedure. | ◯ Yes<br><br>◯ No<br><br>◯ Unable to observe | | ◯ Yes<br><br>◯ No<br><br>◯ Unable to observe | |

*"Immediate use" is defined as the shortest possible time between a sterilized item's removal from the sterilizer and its aseptic transfer to the sterile field. A sterilized item intended for immediate use is not stored for future use, nor held from one case to another.

| | | | | |
|---|---|---|---|---|
| 3.B.18  Immediate-use sterilization is NOT performed on the following devices:<br><br>• Implants (except in documented emergency situations when no other option is available).<br><br>• Post-procedure decontamination of instruments used on patients who may have Creutzfeldt-Jakob disease or similar disorders.<br><br>• Devices that have not been validated with the specific cycle employed.<br><br>• Single-use devices that are sold sterile. | ◯ Yes<br><br>◯ No | | ◯ Yes<br><br>◯ No | |
| 3.B.19  In the event of a reprocessing error/failure that could result in the transmission of infectious disease, personnel respond (i.e., recall(removal) of device and risk assessment) according to hospital policies and procedures. | ◯ Yes<br><br>◯ No | | ◯ Yes<br><br>◯ No | |
| **If no to any of 3.B.5 through 3.B.19, cite at 42 CFR 482.42(a) (Tag A-0749)** | | | | |

# Section 3.C. Single-Use Devices

| Elements to be assessed | | Surveyor Notes | | Surveyor Notes |
|---|---|---|---|---|
| Single use devices are used in a manner consistent with hospital infection control policies and procedures to maximize the prevention of infection and communicable disease including the following: | | | | |
| Note: If possible, evaluate the elements below in multiple clinical treatment or patient care areas. | | | ⬤ Second observation not available (If selected, questions 3.C.1 – 3.C.2 RIGHT column will be blocked) | |
| 3.C.1 If the hospital elects to reuse any devices labeled for single use by the manufacturer, these devices are reprocessed by an entity or a third party reprocessor that is registered with the FDA as a third-party reprocessor and cleared by the FDA to reprocess the specific device in question. The hospital has documentation from the third party reprocessor confirming this is the case. | ◯ Yes  ◯ No  ◯ N/A | | ◯ Yes  ◯ No  ◯ N/A | |
| 3.C.2 Devices labeled for single use by the manufacturer are discarded after use and not used for more than one patient if they have not been reprocessed by an approved third-party reprocessor. | ◯ Yes  ◯ No | | ◯ Yes  ◯ No | |
| **If no to 3.C.1 or 3.C.2, cite at 42 CFR 482.42(a)** (Tag A-0749) | | | | |

## Module 4: Patient Tracers

# Section 4.A. Indwelling Urinary Catheters

| Elements to be assessed | Surveyor Notes | | Surveyor Notes |
|---|---|---|---|
| Urinary catheters are inserted, accessed, and maintained in a manner consistent with hospital infection control policies and procedures to maximize the prevention of infection and communicable disease including the following: | | | |
| **Insertion:** | | | |
| 4.A.1 The hospital has guidelines for appropriate indications for urinary catheters. | ○ Yes <br><br> ○ No | | |
| **If no to 4.A.1 cite at 42 CFR 482.24(c)(2)(vi) {Tag A-0467}** | | | |
| 4.A.2 The hospital can provide evidence that only properly trained personnel are given the responsibility of inserting and maintaining urinary catheters. | ○ Yes <br><br> ○ No | | |
| **If no to 4.A.2 cite at 42 CFR 482.23(b)(5) {Tag A-0397}** | | | |
| If unable to observe any catheter insertions, skip questions 4.A.3 through 4.A.6. | ○ No observations available (If selected, ALL questions from 4.A.3 – 4.A.6 will be blocked) | ○ Second observation not available (If selected, questions 4.A.3 – 4.A.6 RIGHT column will be blocked) | |
| 4.A.3 Hand hygiene is performed before and after insertion of the urinary catheter. | ○ Yes <br><br> ○ No <br><br> ○ Unable to observe | | ○ Yes <br><br> ○ No <br><br> ○ Unable to observe |
| 4.A.4 Catheter is placed using aseptic technique and sterile equipment. | ○ Yes <br><br> ○ No <br><br> ○ Unable to observe | | ○ Yes <br><br> ○ No <br><br> ○ Unable to observe |

| | | | | |
|---|---|---|---|---|
| 4.A.5 Catheter is secured properly after insertion.<br><br>Note: This may not apply to catheters placed in the OR if the catheter is removed in the OR immediately after the procedure. | ○ Yes<br><br>○ No<br><br>○ N/A | | ○ Yes<br><br>○ No<br><br>○ N/A | |

**If no to any of 4.A.3 through 4.A.5, cite at 42 CFR 482.42(a) (Tag A-0749)**

| | | | | |
|---|---|---|---|---|
| 4.A.6 Catheter insertion and indication are documented. | ○ Yes<br><br>○ No | | ○ Yes<br><br>○ No | |

**If no to 4.A.6 cite at to 42 CFR 482.24(c)(2)(vi) (Tag A-0467)**

**Urinary catheter access and maintenance:**

| | | | | |
|---|---|---|---|---|
| 4.A.7 Hand hygiene is performed before and after manipulating catheter. | ○ Yes<br><br>○ No<br><br>○ Unable to observe | | ○ Yes<br><br>○ No<br><br>○ Unable to observe | |
| 4.A.8 Urine bag is kept below level of bladder at all times. | ○ Yes<br><br>○ No | | ○ Yes<br><br>○ No | |
| 4.A.9 Catheter tubing is unobstructed and free of kinking. | ○ Yes<br><br>○ No | | ○ Yes<br><br>○ No | |
| 4.A.10 Urine bag is emptied using aseptic technique, using a separate, clean collection container for each patient; drainage spigot does not touch collecting container. | ○ Yes<br><br>○ No<br><br>○ Unable to observe | | ○ Yes<br><br>○ No<br><br>○ Unable to observe | |

| 4.A.11 Urine samples are obtained aseptically (via needleless port for small volume). | ○ Yes <br><br> ○ No <br><br> ○ Unable to observe | | ○ Yes <br><br> ○ No <br><br> ○ Unable to observe | |
|---|---|---|---|---|
| **If no to any of 4.A.7 through 4.A.11, cite at to 42 CFR 482.42(a) (Tag A-0749)** | | | | |
| 4.A.12 Need for urinary catheters is reviewed and documented daily with prompt removal of urinary catheters no longer needed. | ○ Yes <br><br> ○ No | | ○ Yes <br><br> ○ No | |
| **No citation risk 4.A.12; for information only.** | | | | |

# Section 4.B. Central Venous Catheters

| Elements to be assessed | Surveyor Notes | | Surveyor Notes |
|---|---|---|---|
| Central venous catheters are inserted, accessed and maintained in a manner consistent with hospital infection control policies and procedures to maximize the prevention of infection and communicable disease including the following: | | | |
| **Insertion:** | | | |
| 4.B.1 The hospital can provide evidence that only properly trained personnel who demonstrate competence for insertion of central intravascular catheters are given this responsibility. | ◯ Yes<br><br>◯ No | | |
| If unable to observe any central venous catheter insertions, skip 4.B.2 through 4.B.7. | ◯ No observations available (If selected, ALL questions from 4.B.2 – 4.B.7 will be blocked) | ◯ Second observation not available (If selected, questions 4.B.2 – 4.B.7 RIGHT column will be blocked) | |
| 4.B.2 Hand Hygiene is performed before and after insertion. | ◯ Yes<br><br>◯ No<br><br>◯ Unable to observe | ◯ Yes<br><br>◯ No<br><br>◯ Unable to observe | |
| 4.B.3 Maximal barrier precautions are used for insertion (includes use of cap, mask, sterile gown, sterile gloves, and a sterile full body drape). | ◯ Yes<br><br>◯ No | ◯ Yes<br><br>◯ No | |
| 4.B.4 >0.5% chlorhexidine with alcohol is used for skin antisepsis prior to insertion (If contraindicated [e.g., neonatal population], tincture of iodine, an iodophor, or 70% alcohol can be used as alternatives). | ◯ Yes<br><br>◯ No<br><br>◯ Unable to observe | ◯ Yes<br><br>◯ No<br><br>◯ Unable to observe | |
| 4.B.5 Sterile gauze or sterile, transparent, semi-permeable dressing is used to cover catheter site (may not apply for well-healed tunneled catheters). | ◯ Yes<br><br>◯ No | ◯ Yes<br><br>◯ No | |

31

| | | | | |
|---|---|---|---|---|
| 4.B.6 If the femoral site is used for central venous catheter insertion for adults, justification for this site is in the medical record. | ◯ Yes<br><br>◯ No<br><br>◯ Unable to observe | | ◯ Yes<br><br>◯ No<br><br>◯ Unable to observe | |

**If no to any of 4.B.2 to 4.B.6, cite at 42 CFR 482.42(a) (Tag A-0749)**

| | | | | |
|---|---|---|---|---|
| 4.B.7 Central venous line insertion and indication are documented. | ◯ Yes<br><br>◯ No | | ◯ Yes<br><br>◯ No | |

**If no to 4.B.7, cite at to 42 CFR 482.24(c)(2)(vi) (Tag A-0467)**

**Accessing/Maintenance**

| | | | | |
|---|---|---|---|---|
| 4.B.8 The hospital can provide evidence that only properly trained personnel who demonstrate competence for access and maintenance of central intravascular catheters are given this responsibility. | ◯ Yes<br><br>◯ No | | | |
| If unable to observe the access or maintenance of any central venous catheters, skip 4.B.9 through 4.B.13. | ◯ No observations available (If selected, ALL questions from 4.B.9 – 4.B.13 will be blocked) | | ◯ Second observation not available (If selected, questions 4.B.9 – 4.B.13 RIGHT column will be blocked) | |
| 4.B.9 Hand hygiene is performed before and after manipulating catheter. | ◯ Yes<br><br>◯ No<br><br>◯ Unable to observe | | ◯ Yes<br><br>◯ No<br><br>◯ Unable to observe | |
| 4.B.10 Dressings that are wet, soiled, or dislodged are changed promptly. | ◯ Yes<br><br>◯ No<br><br>◯ Unable to observe | | ◯ Yes<br><br>◯ No<br><br>◯ Unable to observe | |

| 4.B.11 Dressing is changed with aseptic technique using clean or sterile gloves. | ○ Yes<br><br>○ No<br><br>○ Unable to observe | | ○ Yes<br><br>○ No<br><br>○ Unable to observe | |
|---|---|---|---|---|
| 4.B.12 Access port is scrubbed with an appropriate antiseptic (chlorhexidine, povidone iodine, an iodophor, or 70% alcohol) prior to accessing. | ○ Yes<br><br>○ No<br><br>○ Unable to observe | | ○ Yes<br><br>○ No<br><br>○ Unable to observe | |
| 4.B.13 Catheter is accessed only with sterile devices. | ○ Yes<br><br>○ No<br><br>○ Unable to observe | | ○ Yes<br><br>○ No<br><br>○ Unable to observe | |
| **If no to any of 4.B.8 to 4.B.13, cite at 42 CFR 482.42(a) (Tag A-0749)** | | | | |
| 4.B.14 Need for central venous catheters is reviewed daily and documented with prompt removal of lines when no longer needed. | ○ Yes<br><br>○ No | | | |
| **No citation risk; for information only.** | | | | |

# Section 4.C. Ventilator/Respiratory Therapy

| Elements to be assessed | Surveyor Notes | | Surveyor Notes | |
|---|---|---|---|---|
| Respiratory procedures are performed in a manner consistent with hospital infection control policies and procedures to maximize the prevention of infection and communicable disease including the following:<br><br>If no observations available, skip questions 4.C.1 through 4.C.8. | ○ No observations available (If selected, ALL questions from 4.C.1 – 4.C.8 will be blocked) | | ○ Second observation not available (If selected, questions 4.C.1 – 4.C.8 RIGHT column will be blocked) | |
| **4.C.1 through 4.C.8: General respiratory therapy practices (applies to patients with and without ventilators):** | | | | |
| 4.C.1 Hand hygiene is performed before and after contact with patient or any respiratory equipment used on patient. | ○ Yes<br><br>○ No<br><br>○ Unable to observe | | ○ Yes<br><br>○ No<br><br>○ Unable to observe | |
| 4.C.2 Gloves are worn when in contact with respiratory secretions and changed before contact with another patient, object, or environmental surface. | ○ Yes<br><br>○ No<br><br>○ Unable to observe | | ○ Yes<br><br>○ No<br><br>○ Unable to observe | |
| 4.C.3 Only sterile solution (e.g., water or saline) are used for nebulization. | ○ Yes<br><br>○ No<br><br>○ Unable to observe | | ○ Yes<br><br>○ No<br><br>○ Unable to observe | |
| 4.C.4 Single-dose vials for aerosolized medications are not used for more than one patient. | ○ Yes<br><br>○ No<br><br>○ Unable to observe | | ○ Yes<br><br>○ No<br><br>○ Unable to observe | |

| 4.C.5 If multi-dose vials for aerosolized medications are used, manufacturers' instructions for handling, storing, and dispensing the medications are followed. | ○ Yes<br><br>○ No<br><br>○ N/A<br><br>○ Unable to observe | | ○ Yes<br><br>○ No<br><br>○ N/A<br><br>○ Unable to observe | |
|---|---|---|---|---|
| 4.C.6 If multi-dose vials for aerosolized medications are used for more than one patient, they are stored appropriately and do not enter the immediate patient treatment area. | ○ Yes<br><br>○ No<br><br>○ N/A | | ○ Yes<br><br>○ No<br><br>○ N/A | |
| **If no to any of 4.C.1 to 4.C.6, cite at to 42 CFR 482.42(a) (Tag A-0749)** | | | | |
| 4.C.7 Jet nebulizers are for single patient use and are cleaned as per hospital policy, rinsed with sterile water, and air-dried between treatments on the same patient.<br><br>Note: Mesh nebulizers, which remain in the ventilator circuit and are not cleaned or disinfected, are changed at an interval recommended by manufacturer's instructions. Nebulizer/drug combination systems are cleaned and disinfected according to manufacturer's instructions. | ○ Yes<br><br>○ No | | ○ Yes<br><br>○ No | |
| **No citation risk; for information only.** | | | | |
| 4.C.8 Head of bed is elevated at an angle of 30--45 degrees, in the absence of medical contraindication(s), for patients at high risk for aspiration (e.g., a person receiving mechanically assisted ventilation and/or who has an enteral tube in place). | ○ Yes<br><br>○ No | | ○ Yes<br><br>○ No | |
| **If no to 4.C.8, cite at 42 CFR 482.42(a) (Tag A-0749)** | | | | |

| **Ventilators:** | | | | |
|---|---|---|---|---|
| Ventilators are used in a manner consistent with hospital infection control policies and procedures to maximize the prevention of infection and communicable disease including the following: | | | | |
| If no observations available, skip questions 4.C.9 through 4.C.13. | ◯ No observations available (If selected, ALL questions from 4.C.9 – 4.C.15 will be blocked) | | ◯ Second observation not available (If selected, questions 4.C.9 – 4.C.15 RIGHT column will be blocked) | |
| 4.C.9 Ventilator circuit (i.e., ventilator tubing and exhalation valve and the attached humidifier) is changed if visibly soiled or mechanically malfunctioning. | ◯ Yes <br><br> ◯ No <br><br> ◯ Unable to observe | | ◯ Yes <br><br> ◯ No <br><br> ◯ Unable to observe | |
| 4.C.10 Sterile water is used to fill humidifiers. | ◯ Yes <br><br> ◯ No | | ◯ Yes <br><br> ◯ No | |
| 4.C.11 Condensate that collects in the tubing of a mechanical ventilator is periodically drained and discarded, taking precautions not to allow condensate to drain toward the patient. | ◯ Yes <br><br> ◯ No <br><br> ◯ Unable to observe | | ◯ Yes <br><br> ◯ No <br><br> ◯ Unable to observe | |
| 4.C.12 If single-use open-system suction catheter is employed, a sterile, single-use catheter is used. | ◯ Yes <br><br> ◯ No <br><br> ◯ N/A | | ◯ Yes <br><br> ◯ No <br><br> ◯ N/A | |
| 4.C.13 Only sterile fluid is used to remove secretions from the suction catheter if the catheter is used for re-entry into the patient's lower respiratory tract. | ◯ Yes <br><br> ◯ No <br><br> ◯ Unable to observe | | ◯ Yes <br><br> ◯ No <br><br> ◯ Unable to observe | |
| **If no to any of 4.C.9 to 4.C.13, cite at 42 CFR 482.42(a) (Tag A-0749)** | | | | |

| | | | | |
|---|---|---|---|---|
| 4.C.14 Hospital has a program for sedation to be lightened daily in eligible patients. | ○ Yes<br><br>○ No | | ○ Yes<br><br>○ No | |
| 4.C.15 Assessment of readiness to wean (e.g., spontaneous breathing trials) are performed daily in eligible patients. | ○ Yes<br><br>○ No | | ○ Yes<br><br>○ No | |
| **No citation risk for 4.C.14 and 4.C.15; for information only.** | | | | |

37

# Section 4.D.  Spinal Injection Procedures

| Elements to be assessed | | Surveyor Notes |
|---|---|---|
| Spinal injection procedures are performed in a manner consistent with hospital infection control policies and procedures to maximize the prevention of infection and communicable disease including the following: | | |
| If unable to observe spinal injection procedure, skip questions 4.D.1 through 4.D.3. | ○ No observation available (If selected, questions 4.D.1 – 4.D.3 will be blocked) | |
| 4.D.1 Hand hygiene performed before and after the procedure. | ○ Yes<br><br>○ No | |
| 4.D.2 The spinal injection procedure is performed using aseptic technique and sterile equipment, including use of sterile gloves. | ○ Yes<br><br>○ No | |
| 4.D.3 Facemasks are worn by healthcare personnel who are placing a catheter or injecting materials into the epidural or subdural space. | ○ Yes<br><br>○ No | |
| If no to any of 4.D.1 to 4.D.3, cite at 42 CFR 482.42(a) (Tag A-0749) | | |

# Section 4.E. Point of Care Devices (e.g. Blood Glucose Meter, INR Monitor)

| Elements to be assessed | | Surveyor Notes | | Surveyor Notes |
|---|---|---|---|---|
| Point of care devices are used in a manner consistent with hospital infection control policies and procedures to maximize the prevention of infection and communicable disease including the following: | | | | |
| Note: One observation to be completed. If possible make a second observation in a different patient care area in the hospital. | | | ⟨ Second observation not available(If selected, questions 4.E.1 – 4.E.4 RIGHT column will be blocked) | |
| 4.E.1 Hand hygiene is performed before and after the procedure. | ⟨ Yes  ⟨ No | | ⟨ Yes  ⟨ No | |
| 4.E.2 Gloves are worn by healthcare personnel when performing the finger stick procedure to obtain the sample of blood, and are removed after the procedure (followed by hand hygiene). | ⟨ Yes  ⟨ No | | ⟨ Yes  ⟨ No | |
| 4.E.3 Finger stick devices are not used for more than one patient.  Note: This includes both the lancet and the lancet holding device. | ⟨ Yes  ⟨ No  ⟨ Unable to observe | | ⟨ Yes  ⟨ No  ⟨ Unable to observe | |
| 4.E.4 If used for more than one patient, the point-of-care testing device (e.g., blood glucose meter, INR monitor) is cleaned and disinfected after every use according to manufacturer's instructions.  Note: if manufacturer does not provide instructions for cleaning and disinfection, then the device should not be used for >1 patient. | ⟨ Yes  ⟨ No  ⟨ N/A | | ⟨ Yes  ⟨ No  ⟨ N/A | |
| If no to any of 4.E.1 to 4.E.4, cite at 42 CFR 482.42(a) (Tag A-0749) | | | | |

# Section 4.F. Isolation: Contact Precautions

| Elements to be assessed | Surveyor Notes | | Surveyor Notes | |
|---|---|---|---|---|
| Patients requiring contact isolation are identified and managed in a manner consistent with hospital infection control policies and procedures to maximize the prevention of infection and communicable disease including the following: | | | | |
| If possible, observe for compliance with Contact Precautions elements in multiple patient care areas in the hospital.<br><br>If unable to observe a patient on Contact Precautions skip elements 4.F.1 to 4.F.12. | ○ No observation available (If selected ALL questions from 4.F.1 – 4.F.12 will be blocked) | | ○ Second observation not available (If selected questions 4.F.1 – 4.F.12 RIGHT column will be blocked) | |
| 4.F.1 Patient with known or suspected infections or with evidence of syndromes that represent an increased risk for contact transmission are placed on Contact Precautions. | ○ Yes<br><br>○ No | | ○ Yes<br><br>○ No | |
| 4.F.2 Gloves and gowns are available and located near point of use. | ○ Yes<br><br>○ No | | ○ Yes<br><br>○ No | |
| 4.F.3 Signs indicating patient is on Contact Precautions are clear and visible. | ○ Yes<br><br>○ No | | ○ Yes<br><br>○ No | |
| 4.F.4 Patients on Contact Precautions are housed in single-patient rooms when possible or cohorted based on a clinical risk assessment. | ○ Yes<br><br>○ No | | ○ Yes<br><br>○ No | |
| 4.F.5 Hand hygiene is performed before entering patient care environment.<br><br>Note: Soap and water must be used when bare hands are visibly soiled (e.g., blood, body fluids) or after caring for a patient with known or suspected *C. difficile* or norovirus during an outbreak. In all other situations, alcohol-based hand rub is preferred. | ○ Yes<br><br>○ No | | ○ Yes<br><br>○ No | |

| | | | | |
|---|---|---|---|---|
| 4.F.6 Gloves and gowns are donned upon entry into the room or cubicle. | ◯ Yes<br><br>◯ No | | ◯ Yes<br><br>◯ No | |
| 4.F.7 Gloves and gowns are removed and discarded, and hand hygiene is performed before leaving the patient care environment. | ◯ Yes<br><br>◯ No | | ◯ Yes<br><br>◯ No | |
| 4.F.8 Dedicated or disposable noncritical patient-care equipment (e.g., blood pressure cuffs) is used, or if not available, then equipment is cleaned and disinfected prior to use on another patient according to manufacturers' instructions. | ◯ Yes<br><br>◯ No | | ◯ Yes<br><br>◯ No | |
| 4.F.9 The hospital limits the movement of patients on Contact Precautions outside of their room to medically necessary purposes only. | ◯ Yes<br><br>◯ No<br><br>◯ Unable to observe | | ◯ Yes<br><br>◯ No<br><br>◯ Unable to observe | |
| 4.F.10 If a patient on Contact Precautions must leave their room for medically necessary purposes, there are methods followed to communicate that patient's status and to prevent transmission of infectious disease. | ◯ Yes<br><br>◯ No<br><br>◯ Unable to observe | | ◯ Yes<br><br>◯ No<br><br>◯ Unable to observe | |
| 4.F.11 Objects and environmental surfaces in patient care areas that are touched frequently (e.g., bed rails, overbed table, bedside commode, lavatory surfaces in patient bathrooms) are cleaned and disinfected with an EPA-registered disinfectant frequently (at least daily) and when visibly soiled. | ◯ Yes<br><br>◯ No<br><br>◯ Unable to observe | | ◯ Yes<br><br>◯ No<br><br>◯ Unable to observe | |
| 4.F.12 After patient discharge, all visibly or potentially contaminated surfaces are thoroughly cleaned and disinfected and all textiles (e.g. linens and towels) are replaced with clean textiles. | ◯ Yes<br><br>◯ No<br><br>◯ Unable to observe | | ◯ Yes<br><br>◯ No<br><br>◯ Unable to observe | |

**If no to any of 4.F.1 to 4.F.12, cite at 42 CFR 482.42(a)** (Tag A-0749)

41

# Section 4.G. Isolation: Droplet Precautions

| Elements to be assessed | Surveyor Notes | | Surveyor Notes | |
|---|---|---|---|---|
| Patients requiring Droplet Precautions are identified and managed in a manner consistent with hospital infection control policies and procedures to maximize the prevention of infection and communicable disease including the following: | | | | |
| 4.G.1 Patients known or suspected to be infected with pathogens transmitted by respiratory droplets (e.g., seasonal influenza, rhinovirus, *Neisseria meningitidis*, mycoplasma) are placed on Droplet Precautions. | ○ Yes<br><br>○ No | | | |
| If possible, observe for compliance with Droplet Precautions elements in multiple patient care areas in the hospital.<br><br>If unable to observe a patient on Droplet Precautions, skip elements 4.G.2 to 4.G.9. | ○ No observation available (If selected ALL questions from 4.G.2 – 4.G.9 will be blocked) | | ○ Second observation not available (If selected questions 4.G.2 – 4.G.9 RIGHT column will be blocked) | |
| 4.G.2 Facemasks are available and located near point of use. | ○ Yes<br><br>○ No | | ○ Yes<br><br>○ No | |
| 4.G.3 Signs indicating patient is on Droplet Precautions are clear and visible. | ○ Yes<br><br>○ No | | ○ Yes<br><br>○ No | |
| 4.G.4 Patients on Droplet Precautions are housed in single-patient rooms when available or cohorted based on a clinical risk assessment. | ○ Yes<br><br>○ No | | ○ Yes<br><br>○ No | |
| 4.G.5 Hand hygiene is performed before contact with the patient. | ○ Yes<br><br>○ No | | ○ Yes<br><br>○ No | |
| 4.G.6 Personnel don facemasks upon entering the patient care environment or private room. | ○ Yes<br><br>○ No | | ○ Yes<br><br>○ No | |

42

| | | | | |
|---|---|---|---|---|
| 4.G.7 Facemask is removed and discarded and hand hygiene is performed upon leaving the patient care environment. | ○ Yes<br><br>○ No | | ○ Yes<br><br>○ No | |
| 4.G.8 The hospital limits movement of patients on Droplet Precautions outside of their rooms to medically necessary purposes only. | ○ Yes<br><br>○ No<br><br>○ Unable to observe | | ○ Yes<br><br>○ No<br><br>○ Unable to observe | |
| 4.G.9 If a patient on Droplet Precautions must leave their room for medically necessary purposes, there are methods followed to communicate that patient's status and to prevent transmission of infectious disease, including the use of a facemask by the patient if possible.<br><br>Note: The hospital may have specific policies regarding the use of PPE for pediatric patients. | ○ Yes<br><br>○ No<br><br>○ Unable to observe | | ○ Yes<br><br>○ No<br><br>○ Unable to observe | |

**If no to any of 4.G.1 to 4.G.9, cite at 42 CFR 482.42(a) (Tag A-0749)**

43

# Section 4.H. Isolation: Airborne Isolation Precautions

| Elements to be assessed | Surveyor Notes | | Surveyor Notes | |
|---|---|---|---|---|
| Patients requiring Airborne Precautions are identified and managed in a manner consistent with hospital infection control policies and procedures to maximize the prevention of infection and communicable disease including the following: | | | | |
| 4.H.1 Patients with known or suspected infectious agents that are transmitted person-to-person by the airborne route (e.g., TB, measles, chickenpox, disseminated herpes zoster) are placed on Airborne Isolation Precautions. | ○ Yes <br><br> ○ No | | | |
| If possible, observe for compliance with Airborne Isolation Precautions elements in multiple patient care areas in the hospital. <br><br> If unable to observe a patient on Airborne Isolation Precautions, skip elements 4.H.2 to 4.H.8. | ○ No observation available (If selected ALL questions from 4.H.2 – 4.H.8 will be blocked) | | ○ Second observation not available (If selected questions 4.H.2 – 4.H.8 RIGHT column will be blocked) | |
| 4.H.2 NIOSH-approved particulate respirators (N-95 or higher) are available and located near point of use. | ○ Yes <br><br> ○ No | | ○ Yes <br><br> ○ No | |
| 4.H.3 Signs indicating patient is on Airborne Isolation Precautions are clear and visible. | ○ Yes <br><br> ○ No | | ○ Yes <br><br> ○ No | |
| 4.H.4 Personnel wear a NIOSH-approved particulate respirator (N95 or higher) when entering the airborne infection isolation room (AIIR) for patients with confirmed or suspected TB. Hospital policies are followed for other pathogens requiring AIIR. | ○ Yes <br><br> ○ No | | ○ Yes <br><br> ○ No | |

| | | | | |
|---|---|---|---|---|
| 4.H.5 Hand hygiene is performed before contact with the patient. | ○ Yes<br><br>○ No | | ○ Yes<br><br>○ No | |
| 4.H.6 Patients on Airborne Precautions are housed in AIIR that meet all of the following specifications:<br>• At least 6 (existing facility) or 12 (new construction/renovation) air changes per hour or per state licensure rules;<br>• Direct exhaust of air to outside. If not possible, all air returned to air handling system or adjacent spaces is directed through HEPA filters;<br>• When AIIR is in use for a patient on Airborne Precautions, air pressure is monitored daily with visual indicators (e.g., smoke tubes, flutter strips), regardless of the presence of differential pressure sensing devices (e.g., manometers);<br>• AIIR door kept closed when not required for entry and exit<br><br>Note: If AIIR is not available, hospital policy should address patient transfer to a hospital that has an available AIIR. | ○ Yes<br><br>○ No | | ○ Yes<br><br>○ No | |
| 4.H.7 The hospital limits movement of patients on Airborne Precautions outside of their room to medically-necessary purposes. | ○ Yes<br><br>○ No<br><br>○ Unable to observe | | ○ Yes<br><br>○ No<br><br>○ Unable to observe | |
| 4.H.8 If a patient on Airborne Precautions must leave their room for medically necessary purposes, there are methods followed to communicate that patient's status and to prevent transmission of infectious disease, including the use of a facemask by the patient if possible.<br><br>Note: The hospital may have specific policies regarding the use of PPE for pediatric patients. | ○ Yes<br><br>○ No<br><br>○ Unable to observe | | ○ Yes<br><br>○ No<br><br>○ Unable to observe | |

**If no to any of 4.H.1 to 4.H.8, cite at 42 CFR 482.42(a)** (Tag A-0749)

45

# Section 4.I. Surgical Procedures

| Elements to be assessed | Surveyor Notes | | Surveyor Notes | |
|---|---|---|---|---|
| Surgical procedures are performed in a manner consistent with hospital infection control policies and procedures to maximize the prevention of infection and communicable disease including the following: | | | | |
| If unable to observe any surgical procedure, skip elements 4.I.1 to 4.I.8. | ○ No observation available (If selected ALL questions from 4.I.1 – 4.I.8 will be blocked) | | ○ Second observation not available (If selected questions 4.I.1 – 4.I.8 RIGHT column will be blocked) | |
| 4.I.1 Healthcare personnel perform a surgical scrub before donning sterile gloves for surgical procedures (in OR) using either an antimicrobial surgical scrub agent or an FDA-approved alcohol-based antiseptic surgical hand rub.<br><br>Note: If visibly soiled, hands and forearms should be prewashed with soap and water before using an alcohol-based antiseptic surgical hand rub. | ○ Yes<br><br>○ No<br><br>○ Unable to observe | | ○ Yes<br><br>○ No<br><br>○ Unable to observe | |
| 4.I.2 After surgical scrub, hands and arms are dried with a sterile towel (if applicable), and sterile surgical gown and gloves are donned in the OR. | ○ Yes<br><br>○ No<br><br>○ Unable to observe | | ○ Yes<br><br>○ No<br><br>○ Unable to observe | |
| 4.I.3 Surgical attire (e.g., scrubs) and surgical caps/hoods covering all head and facial hair are worn by all personnel and visitors in semi restricted and restricted areas.<br><br>Note: Restricted area includes ORs, procedure rooms, and the clean core (sterile supply) area. The semi restricted area includes the peripheral support areas of the surgical suite. | ○ Yes<br><br>○ No | | ○ Yes<br><br>○ No | |
| 4.I.4 Surgical masks are worn fully covering mouth and nose by all personnel in restricted areas where open sterile supplies or scrubbed personnel are located. | ○ Yes<br><br>○ No | | ○ Yes<br><br>○ No | |

| | | | | |
|---|---|---|---|---|
| 4.1.5  A fresh, clean surgical mask is worn for every procedure. | ○ Yes<br><br>○ No<br><br>○ Unable to observe | | ○ Yes<br><br>○ No<br><br>○ Unable to observe | |
| 4.1.6  Sterile drapes are used to establish sterile field. | ○ Yes<br><br>○ No<br><br>○ Unable to observe | | ○ Yes<br><br>○ No<br><br>○ Unable to observe | |
| 4.1.7  Sterile field is maintained and monitored constantly. Ensure that:<br>• Items used within sterile field are sterile.<br>• Items introduced into sterile field are opened, dispensed, and transferred in a manner to maintain sterility.<br>• Sterile field is prepared in the location where it will be used and as close as possible to time of use.<br>• Movement in or around sterile field is done in a manner to maintain sterility. | ○ Yes<br><br>○ No<br><br>○ Unable to observe | | ○ Yes<br><br>○ No<br><br>○ Unable to observe | |
| 4.1.8  Traffic in and out of OR is kept to minimum and limited to essential personnel. | ○ Yes<br><br>○ No | | ○ Yes<br><br>○ No | |

**If no to any of 4.1.1 to 4.1.8, cite at 42 CFR 482.42(a) (Tag A-0749)**

| Processes ensuring infection control in the OR are accomplished in a manner consistent with hospital infection control policies and procedures to maximize the prevention of infection and communicable disease including the following: | | |
|---|---|---|
| If the hospital does not provide any surgical services, skip 4.I.9 through 4.I.17. | ○ No surgical services (If selected, questions 4.I.9 – 4.I.17 will be blocked) | |
| 4.I.9 Cleaners and EPA-registered hospital disinfectants are used and dated in accordance with hospital policies and procedures and manufacturer's instructions (e.g., dilution, storage, shelf-life, contact time).<br><br>Note: The cleaners and disinfectants can be dated by the hospital with either the date opened or the discard date as per hospital policy, as long as it is clear what the date represents and the same policy is used consistently throughout the hospital. | ○ Yes<br><br>○ No<br><br>○ Unable to observe | |
| 4.I.10 All horizontal surfaces (e.g., furniture, surgical lights, booms, equipment) are damp dusted before the first procedure of the day using a clean, lint-free cloth and EPA-registered hospital detergent/disinfectant. | ○ Yes<br><br>○ No<br><br>○ Unable to observe | |
| 4.I.11 High touch environmental surfaces are cleaned and disinfected between patients. | ○ Yes<br><br>○ No<br><br>○ Unable to observe | |
| 4.I.12 ORs are terminally cleaned after last procedure of the day (including weekends) and each 24-hour period during regular work week. Terminal cleaning includes wet-vacuuming or mopping floor with an EPA-registered disinfectant. | ○ Yes<br><br>○ No<br><br>○ Unable to observe | |

48

| | | |
|---|---|---|
| 4.I.13 Anesthesia equipment surfaces that are touched by personnel while providing patient care or while handling contaminated items are cleaned and low-level disinfected between use on patients, according to manufacturers' instructions. | ○ Yes<br><br>○ No<br><br>○ Unable to observe | |
| 4.I.14 Exterior surfaces of anesthesia equipment that are not knowingly contaminated during patient care are terminally low-level disinfected at the end of the day, according to manufacturers' instructions. | ○ Yes<br><br>○ No<br><br>○ Unable to observe | |
| 4.I.15 Internal components of the anesthesia machine breathing circuit are cleaned per hospital policy or manufacturer's instructions. | ○ Yes<br><br>○ No<br><br>○ Unable to observe | |
| 4.I.16 Reusable noncritical items (e.g., blood pressure cuffs, ECG leads, tourniquets, oximeter probes) are cleaned and disinfected between patients. | ○ Yes<br><br>○ No<br><br>○ Unable to observe | |
| 4.I.17 Ventilation requirements meet the following:<br>• Positive pressure, ≥15 air exchanges per hour (at least 3 of which are fresh air)<br>• 90% filtration (HEPA is optional), air filters checked regularly and replaced according to hospital policies and procedures<br>• Temperature and relative humidity levels are maintained at required levels<br>• Doors are self-closing<br>• Air vents and grill work are clean and dry. | ○ Yes<br><br>○ No | |
| **If no to any of 4.I.9 to 4.I.17, cite at 42 CFR 482.42(a) [Tag A-0749]** | | |

# APPENDIX – "13"



SAFER·HEALTHIER·PEOPLE

# Guideline for Disinfection and Sterilization in Healthcare Facilities, 2008

William A. Rutala, Ph.D., M.P.H.[1,2], David J. Weber, M.D., M.P.H.[1,2], and the Healthcare

Infection Control Practices Advisory Committee (HICPAC)[3]

[1]Hospital Epidemiology
University of North Carolina Health Care System
Chapel Hill, NC 27514

[2]Division of Infectious Diseases
University of North Carolina School of Medicine
Chapel Hill, NC 27599-7030

[3]HICPAC Members

Robert A. Weinstein, MD (Chair)
Cook County Hospital
Chicago, IL

Jane D. Siegel, MD (Co-Chair)
University of Texas Southwestern Medical Center
Dallas, TX

Michele L. Pearson, MD
(Executive Secretary)
Centers for Disease Control and Prevention
Atlanta, GA

Raymond Y.W. Chinn, MD
Sharp Memorial Hospital
San Diego, CA

Alfred DeMaria, Jr, MD
Massachusetts Department of Public Health
Jamaica Plain, MA

James T. Lee, MD, PhD
University of Minnesota
Minneapolis, MN

William A. Rutala, PhD, MPH
University of North Carolina Health Care System
Chapel Hill, NC

William E. Scheckler, MD
University of Wisconsin
Madison, WI

Beth H. Stover, RN
Kosair Children's Hospital
Louisville, KY

Marjorie A. Underwood, RN, BSN CIC
Mt. Diablo Medical Center
Concord, CA

This guideline discusses use of products by healthcare personnel in healthcare settings such as hospitals, ambulatory care and home care; the recommendations are not intended for consumer use of the products discussed.

**Disinfection and Sterilization in Healthcare Facilities**


Executive Summary
Introduction
Methods
Definition of Terms
Approach to Disinfection and Sterilization
        Critical Items
        Semicritical Items
        Noncritical Items
        Changes in Disinfection and Sterilization Since 1981
Disinfection of Healthcare Equipment
        Concerns with Implementing the Spaulding Scheme
        Reprocessing of Endoscopes
        Laparoscopes and Arthroscopes
        Tonometers, Cervical Diaphragm Fitting Rings, Cryosurgical Instruments, Endocavitary Probes
        Dental Instruments
        Disinfection of HBV, HCV, HIV or Tuberculosis-Contaminated Devices
        Disinfection in the Hemodialysis Unit
        Inactivation of *Clostridium difficile*
        OSHA Bloodborne Pathogen Standard
        Emerging Pathogens (*Cryptosporidium, Helicobacter pylori, E. coli* O157:H7, Rotavirus, Human
        Papilloma Virus, Norovirus, Severe Acute Respiratory Syndrome Coronavirus)
        Inactivation of Bioterrorist Agents
        Toxicological, Environmental, and Occupational Concerns
        Disinfection in Ambulatory Care, Home Care, and the Home
        Susceptibility of Antibiotic-Resistant Bacteria to Disinfectants
        Surface Disinfection: Should We Do It?
        Contact Time for Surface Disinfectants
        Air Disinfection
        Microbial Contamination of Disinfectants
Factors Affecting the Efficacy of Disinfection and Sterilization
        Number and Location of Microorganisms
        Innate Resistance of Microorganisms
        Concentration and Potency of Disinfectants
        Physical and Chemical Factors
        Organic and Inorganic Matter
        Duration of Exposure
        Biofilms
Cleaning
Disinfection
        Chemical Disinfectants
            Alcohol
                Overview
                Mode of Action
                Microbicidal Activity
                Uses
            Chlorine and Chlorine Compounds
                Overview
                Mode of Action
                Microbicidal Activity

Uses
Formaldehyde
    Overview
    Mode of Action
    Microbicidal Activity
    Uses
Glutaraldehyde
    Overview
    Mode of Action
    Microbicidal Activity
    Uses
Hydrogen Peroxide
    Overview
    Mode of Action
    Microbicidal Activity
    Uses
Iodophors
    Overview
    Mode of Action
    Microbicidal Activity
    Uses
Ortho-phthalaldehyde
    Overview
    Mode of Action
    Microbicidal Activity
    Uses
Peracetic Acid
    Overview
    Mode of Action
    Microbicidal Activity
    Uses
Peracetic Acid and Hydrogen Peroxide
    Overview
    Mode of Action
    Microbicidal Activity
    Uses
Phenolics
    Overview
    Mode of Action
    Microbicidal Activity
    Uses
Quaternary Ammonium Compounds
    Overview
    Mode of Action
    Microbicidal Activity
    Uses
Miscellaneous Inactivating Agents
    Other Germicides
    Ultraviolet Radiation
    Pasteurization
    Flushing- and Washer-Disinfectors
Regulatory Framework for Disinfectants and Sterilants
Neutralization of Germicides

Sterilization
    Steam Sterilization
        Overview
        Mode of Action
        Microbicidal Activity
        Uses
    Flash Sterilization
        Overview
        Uses
    Low-Temperature Sterilization Technologies
    Ethylene Oxide "Gas" Sterilization
        Overview
        Mode of Action
        Microbicidal Activity
        Uses
    Hydrogen Peroxide Gas Plasma
        Overview
        Mode of Action
        Microbicidal Activity
        Uses
    Peracetic Acid Sterilization
        Overview
        Mode of Action
        Microbicidal Activity
        Uses
    Microbicidal Activity of Low-Temperature Sterilization Technology
    Bioburden of Surgical Devices
    Effect of Cleaning on Sterilization Efficacy
    Other Sterilization Methods
        Ionizing Radiation
        Dry-Heat Sterilizers
        Liquid Chemicals
        Performic Acid
        Filtration
        Microwave
        Glass Bead "Sterilizer"
        Vaporized Hydrogen Peroxide
        Ozone
        Formaldehyde Steam
        Gaseous Chlorine Dioxide
        Vaporized Peracetic Acid
        Infrared radiation
    Sterilizing Practices
        Overview
        Sterilization Cycle Validation
        Physical Facilities
        Cleaning
        Packaging
        Loading
        Storage
        Monitoring (Mechanical, Chemical, Biological Indicators)
Reuse of Single-Use Medical Devices
Conclusion

Web-Based Disinfection and Sterilization Resources
Recommendations (Category IA, IB, IC, II)
Performance Indicators
Acknowledgements
Glossary
Tables and Figure
References

## EXECUTIVE SUMMARY

The Guideline for Disinfection and Sterilization in Healthcare Facilities, 2008, presents evidence-based recommendations on the preferred methods for cleaning, disinfection and sterilization of patient-care medical devices and for cleaning and disinfecting the healthcare environment. This document supercedes the relevant sections contained in the 1985 Centers for Disease Control (CDC) Guideline for Handwashing and Environmental Control. [1] Because maximum effectiveness from disinfection and sterilization results from first cleaning and removing organic and inorganic materials, this document also reviews cleaning methods. The chemical disinfectants discussed for patient-care equipment include alcohols, glutaraldehyde, formaldehyde, hydrogen peroxide, iodophors, *ortho*-phthalaldehyde, peracetic acid, phenolics, quaternary ammonium compounds, and chlorine. The choice of disinfectant, concentration, and exposure time is based on the risk for infection associated with use of the equipment and other factors discussed in this guideline. The sterilization methods discussed include steam sterilization, ethylene oxide (ETO), hydrogen peroxide gas plasma, and liquid peracetic acid. When properly used, these cleaning, disinfection, and sterilization processes can reduce the risk for infection associated with use of invasive and noninvasive medical and surgical devices. However, for these processes to be effective, health-care workers should adhere strictly to the cleaning, disinfection, and sterilization recommendations in this document and to instructions on product labels.

In addition to updated recommendations, new topics addressed in this guideline include 1) inactivation of antibiotic-resistant bacteria, bioterrorist agents, emerging pathogens, and bloodborne pathogens; 2) toxicologic, environmental, and occupational concerns associated with disinfection and sterilization practices; 3) disinfection of patient-care equipment used in ambulatory settings and home care; 4) new sterilization processes, such as hydrogen peroxide gas plasma and liquid peracetic acid; and 5) disinfection of complex medical instruments (e.g., endoscopes).

## INTRODUCTION

In the United States, approximately 46.5 million surgical procedures and even more invasive medical procedures—including approximately 5 million gastrointestinal endoscopies—are performed each year. [2] Each procedure involves contact by a medical device or surgical instrument with a patient's sterile tissue or mucous membranes. A major risk of all such procedures is the introduction of pathogens that can lead to infection. Failure to properly disinfect or sterilize equipment carries not only risk associated with breach of host barriers but also risk for person-to-person transmission (e.g., hepatitis B virus) and transmission of environmental pathogens (e.g., *Pseudomonas aeruginosa*).

Disinfection and sterilization are essential for ensuring that medical and surgical instruments do not transmit infectious pathogens to patients. Because sterilization of all patient-care items is not necessary, health-care policies must identify, primarily on the basis of the items' intended use, whether cleaning, disinfection, or sterilization is indicated.

Multiple studies in many countries have documented lack of compliance with established guidelines for disinfection and sterilization. [3-6] Failure to comply with scientifically-based guidelines has led to numerous outbreaks. [6-12] This guideline presents a pragmatic approach to the judicious selection and proper use of disinfection and sterilization processes; the approach is based on well-designed studies assessing the efficacy (through laboratory investigations) and effectiveness (through clinical studies) of disinfection and sterilization procedures.

## METHODS

This guideline resulted from a review of all MEDLINE articles in English listed under the MeSH headings of *disinfection* or *sterilization* (focusing on health-care equipment and supplies) from January 1980 through August 2006. References listed in these articles also were reviewed. Selected articles published before 1980 were reviewed and, if still relevant, included in the guideline. The three major peer-reviewed journals in infection control—*American Journal of Infection Control, Infection Control and Hospital Epidemiology,* and *Journal of Hospital Infection*—were searched for relevant articles published from January 1990 through August 2006. Abstracts presented at the annual meetings of the Society for Healthcare Epidemiology of America and Association for professionals in Infection Control and Epidemiology, Inc. during 1997–2006 also were reviewed; however, abstracts were not used to support the recommendations.

## DEFINITION OF TERMS

*Sterilization* describes a process that destroys or eliminates all forms of microbial life and is carried out in health-care facilities by physical or chemical methods. Steam under pressure, dry heat, EtO gas, hydrogen peroxide gas plasma, and liquid chemicals are the principal sterilizing agents used in health-care facilities. Sterilization is intended to convey an absolute meaning; unfortunately, however, some health professionals and the technical and commercial literature refer to "disinfection" as "sterilization" and items as "partially sterile." When chemicals are used to destroy all forms of microbiologic life, they can be called chemical sterilants. These same germicides used for shorter exposure periods also can be part of the disinfection process (i.e., high-level disinfection).

*Disinfection* describes a process that eliminates many or all pathogenic microorganisms, except bacterial spores, on inanimate objects (Tables 1 and 2). In health-care settings, objects usually are disinfected by liquid chemicals or wet pasteurization. Each of the various factors that affect the efficacy of

disinfection can nullify or limit the efficacy of the process.

Factors that affect the efficacy of both disinfection and sterilization include prior cleaning of the object; organic and inorganic load present; type and level of microbial contamination; concentration of and exposure time to the germicide; physical nature of the object (e.g., crevices, hinges, and lumens); presence of biofilms; temperature and pH of the disinfection process; and in some cases, relative humidity of the sterilization process (e.g., ethylene oxide).

Unlike sterilization, disinfection is not sporicidal. A few disinfectants will kill spores with prolonged exposure times (3–12 hours); these are called *chemical sterilants.* At similar concentrations but with shorter exposure periods (e.g., 20 minutes for 2% glutaraldehyde), these same disinfectants will kill all microorganisms except large numbers of bacterial spores; they are called *high-level disinfectants.* *Low-level disinfectants* can kill most vegetative bacteria, some fungi, and some viruses in a practical period of time (≤10 minutes). *Intermediate-level disinfectants* might be cidal for mycobacteria, vegetative bacteria, most viruses, and most fungi but do not necessarily kill bacterial spores. Germicides differ markedly, primarily in their antimicrobial spectrum and rapidity of action.

*Cleaning* is the removal of visible soil (e.g., organic and inorganic material) from objects and surfaces and normally is accomplished manually or mechanically using water with detergents or enzymatic products. Thorough cleaning is essential before high-level disinfection and sterilization because inorganic and organic materials that remain on the surfaces of instruments interfere with the effectiveness of these processes. *Decontamination* removes pathogenic microorganisms from objects so they are safe to handle, use, or discard.

Terms with the suffix *cide* or *cidal* for killing action also are commonly used. For example, a germicide is an agent that can kill microorganisms, particularly pathogenic organisms ("germs"). The term *germicide* includes both antiseptics and disinfectants. *Antiseptics* are germicides applied to living tissue and skin; *disinfectants* are antimicrobials applied only to inanimate objects. In general, antiseptics are used only on the skin and not for surface disinfection, and disinfectants are not used for skin antisepsis because they can injure skin and other tissues. Virucide, fungicide, bactericide, sporicide, and tuberculocide can kill the type of microorganism identified by the prefix. For example, a bactericide is an agent that kills bacteria. [13-18]

## A RATIONAL APPROACH TO DISINFECTION AND STERILIZATION

More than 30 years ago, Earle H. Spaulding devised a rational approach to disinfection and sterilization of patient-care items and equipment.[14] This classification scheme is so clear and logical that it has been retained, refined, and successfully used by infection control professionals and others when planning methods for disinfection or sterilization. [1, 13, 15, 17, 19, 20] Spaulding believed the nature of disinfection could be understood readily if instruments and items for patient care were categorized as critical, semicritical, and noncritical according to the degree of risk for infection involved in use of the items. The CDC *Guideline for Handwashing and Hospital Environmental Control* [21], *Guidelines for the Prevention of Transmission of Human Immunodeficiency Virus (HIV) and Hepatitis B Virus (HBV) to Health-Care and Public-Safety Workers*[22], and *Guideline for Environmental Infection Control in Health-Care Facilities*[23] employ this terminology.

### Critical Items

Critical items confer a high risk for infection if they are contaminated with any microorganism. Thus, objects that enter sterile tissue or the vascular system must be sterile because any microbial contamination could transmit disease. This category includes surgical instruments, cardiac and urinary catheters, implants, and ultrasound probes used in sterile body cavities. Most of the items in this category should be purchased as sterile or be sterilized with steam if possible. Heat-sensitive objects can be treated with EtO, hydrogen peroxide gas plasma; or if other methods are unsuitable, by liquid chemical sterilants. Germicides categorized as chemical sterilants include ≥2.4% glutaraldehyde-based formulations, 0.95% glutaraldehyde with 1.64% phenol/phenate, 7.5% stabilized hydrogen peroxide, 7.35% hydrogen peroxide with 0.23% peracetic acid, 0.2% peracetic acid, and 0.08% peracetic acid with 1.0% hydrogen peroxide. Liquid chemical sterilants reliably produce sterility only if cleaning precedes treatment and if proper guidelines are followed regarding concentration, contact time, temperature, and pH.

### Semicritical Items

Semicritical items contact mucous membranes or nonintact skin. This category includes respiratory therapy and anesthesia equipment, some endoscopes, laryngoscope blades [24], esophageal manometry probes, cystoscopes [25], anorectal manometry catheters, and diaphragm fitting rings. These medical devices should be free from all microorganisms; however, small numbers of bacterial spores are permissible. Intact mucous membranes, such as those of the lungs and the gastrointestinal tract, generally are resistant to infection by common bacterial spores but susceptible to other organisms, such as bacteria, mycobacteria, and viruses. Semicritical items minimally require high-level disinfection using chemical disinfectants. Glutaraldehyde, hydrogen peroxide, *ortho*-phthalaldehyde, and peracetic acid with hydrogen peroxide are cleared by the Food and Drug Administration (FDA) and are dependable high-level disinfectants provided the factors influencing germicidal procedures are met (Table 1). When a disinfectant is selected for use with certain patient-care items, the chemical compatibility after extended use with the items to be disinfected also must be considered.

High-level disinfection traditionally is defined as complete elimination of all microorganisms in or on an instrument, except for small numbers of bacterial spores. The FDA definition of high-level disinfection is a sterilant used for a shorter contact time to achieve a 6-$\log_{10}$ kill of an appropriate *Mycobacterium* species. Cleaning followed by high-level disinfection should eliminate enough pathogens to prevent transmission of infection. [26, 27]

Laparoscopes and arthroscopes entering sterile tissue ideally should be sterilized between patients. However, in the United States, this equipment sometimes undergoes only high-level disinfection between patients. [28-30] As with flexible endoscopes, these devices can be difficult to clean and high-level disinfect or sterilize because of intricate device design (e.g., long narrow lumens, hinges). Meticulous

10

cleaning must precede any high-level disinfection or sterilization process. Although sterilization is preferred, no reports have been published of outbreaks resulting from high-level disinfection of these scopes when they are properly cleaned and high-level disinfected. Newer models of these instruments can withstand steam sterilization that for critical items would be preferable to high-level disinfection.

Rinsing endoscopes and flushing channels with sterile water, filtered water, or tap water will prevent adverse effects associated with disinfectant retained in the endoscope (e.g., disinfectant-induced colitis). Items can be rinsed and flushed using sterile water after high-level disinfection to prevent contamination with organisms in tap water, such as nontuberculous mycobacteria, [10, 31, 32] *Legionella,* [33-35] or gram-negative bacilli such as *Pseudomonas.* [1, 17, 36-38] Alternatively, a tapwater or filtered water (0.2μ filter) rinse should be followed by an alcohol rinse and forced air drying. [28, 38-40] Forced-air drying markedly reduces bacterial contamination of stored endoscopes, most likely by removing the wet environment favorable for bacterial growth. [39] After rinsing, items should be dried and stored (e.g., packaged) in a manner that protects them from recontamination.

Some items that may come in contact with nonintact skin for a brief period of time (i.e., hydrotherapy tanks, bed side rails) are usually considered noncritical surfaces and are disinfected with intermediate-level disinfectants (i.e., phenolic, iodophor, alcohol, chlorine) [23]. Since hydrotherapy tanks have been associated with spread of infection, some facilities have chosen to disinfect them with recommended levels of chlorine [23, 41].

In the past, high-level disinfection was recommended for mouthpieces and spirometry tubing (e.g., glutaraldehyde) but cleaning the interior surfaces of the spirometers was considered unnecessary. [42] This was based on a study that showed that mouthpieces and spirometry tubing become contaminated with microorganisms but there was no bacterial contamination of the surfaces inside the spirometers. Filters have been used to prevent contamination of this equipment distal to the filter; such filters and the proximal mouthpiece are changed between patients.

## Noncritical Items

Noncritical items are those that come in contact with intact skin but not mucous membranes. Intact skin acts as an effective barrier to most microorganisms; therefore, the sterility of items coming in contact with intact skin is "not critical." In this guideline, noncritical items are divided into noncritical patient care items and noncritical environmental surfaces [43, 44]. Examples of noncritical patient-care items are bedpans, blood pressure cuffs, crutches and computers [45]. In contrast to critical and some semicritical items, most noncritical reusable items may be decontaminated where they are used and do not need to be transported to a central processing area. Virtually no risk has been documented for transmission of infectious agents to patients through noncritical items [37] when they are used as noncritical items and do not contact non-intact skin and/or mucous membranes. Table 1 lists several low-level disinfectants that may be used for noncritical items. Most Environmental Protection Agency (EPA)-registered disinfectants have a 10-minute label claim. However, multiple investigators have demonstrated the effectiveness of these disinfectants against vegetative bacteria (e.g., *Listeria, Escherichia coli, Salmonella,* vancomycin-resistant Enterococci, methicillin-resistant *Staphylococcus aureus*), yeasts (e.g., *Candida*), mycobacteria (e.g., *Mycobacterium tuberculosis*), and viruses (e.g. poliovirus) at exposure times of 30–60 seconds[46-64] Federal law requires all applicable label instructions on EPA-registered products to be followed (e.g., use-dilution, shelf life, storage, material compatibility, safe use, and disposal). If the user selects exposure conditions (e.g., exposure time) that differ from those on the EPA-registered products label, the user assumes liability for any injuries resulting from off-label use and is potentially subject to enforcement action under Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) [65].

Noncritcal environmental surfaces include bed rails, some food utensils, bedside tables, patient furniture and floors. Noncritical environmental surfaces frequently touched by hand (e.g., bedside tables,

11

bed rails) potentially could contribute to secondary transmission by contaminating hands of health-care workers or by contacting medical equipment that subsequently contacts patients [13, 46-48, 51, 66, 67]. Mops and reusable cleaning cloths are regularly used to achieve low-level disinfection on environmental surfaces. However, they often are not adequately cleaned and disinfected, and if the water-disinfectant mixture is not changed regularly (e.g., after every three to four rooms, at no longer than 60-minute intervals), the mopping procedure actually can spread heavy microbial contamination throughout the health-care facility [68]. In one study, standard laundering provided acceptable decontamination of heavily contaminated mopheads but chemical disinfection with a phenolic was less effective. [68] Frequent laundering of mops (e.g., daily), therefore, is recommended. Single-use disposable towels impregnated with a disinfectant also can be used for low-level disinfection when spot-cleaning of noncritical surfaces is needed[45].

### Changes in Disinfection and Sterilization Since 1981

The Table in the CDC *Guideline for Environmental Control* prepared in 1981 as a guide to the appropriate selection and use of disinfectants has undergone several important changes (Table 1). [15] First, formaldehyde-alcohol has been deleted as a recommended chemical sterilant or high-level disinfectant because it is irritating and toxic and not commonly used. Second, several new chemical sterilants have been added, including hydrogen peroxide, peracetic acid [58, 69, 70], and peracetic acid and hydrogen peroxide in combination. Third, 3% phenolics and iodophors have been deleted as high-level disinfectants because of their unproven efficacy against bacterial spores, *M. tuberculosis,* and/or some fungi. [55, 71] Fourth, isopropyl alcohol and ethyl alcohol have been excluded as high-level disinfectants [15] because of their inability to inactivate bacterial spores and because of the inability of isopropyl alcohol to inactivate hydrophilic viruses (i.e., poliovirus, coxsackie virus). [72] Fifth, a 1:16 dilution of 2.0% glutaraldehyde-7.05% phenol-1.20% sodium phenate (which contained 0.125% glutaraldehyde, 0.440% phenol, and 0.075% sodium phenate when diluted) has been deleted as a high-level disinfectant because this product was removed from the marketplace in December 1991 because of a lack of bactericidal activity in the presence of organic matter; a lack of fungicidal, tuberculocidal and sporicidal activity; and reduced virucidal activity. [49, 55, 56, 71, 73-79] Sixth, the exposure time required to achieve high-level disinfection has been changed from 10-30 minutes to 12 minutes or more depending on the FDA-cleared label claim and the scientific literature. [27, 55, 69, 76, 80-84] A glutaraldehyde and an ortho-phthalaldehyde have an FDA-cleared label claim of 5 minutes when used at 35°C and 25°C, respectively, in an automated endoscope reprocessor with FDA-cleared capability to maintain the solution at the appropriate temperature. [85]

In addition, many new subjects have been added to the guideline. These include inactivation of emerging pathogens, bioterrorist agents, and bloodborne pathogens; toxicologic, environmental, and occupational concerns associated with disinfection and sterilization practices; disinfection of patient-care equipment used in ambulatory and home care; inactivation of antibiotic-resistant bacteria; new sterilization processes, such as hydrogen peroxide gas plasma and liquid peracetic acid; and disinfection of complex medical instruments (e.g., endoscopes).

## DISINFECTION OF HEALTHCARE EQUIPMENT

### Concerns about Implementing the Spaulding Scheme

One problem with implementing the aforementioned scheme is oversimplification. For example, the scheme does not consider problems with reprocessing of complicated medical equipment that often is heat-sensitive or problems of inactivating certain types of infectious agents (e.g., prions, such as Creutzfeldt-Jakob disease [CJD] agent). Thus, in some situations, choosing a method of disinfection remains difficult, even after consideration of the categories of risk to patients. This is true particularly for a few medical devices (e.g., arthroscopes, laparoscopes) in the critical category because of controversy about whether they should be sterilized or high-level disinfected. [28, 86] Heat-stable scopes (e.g., many rigid scopes) should be steam sterilized. Some of these items cannot be steam sterilized because they are heat-sensitive; additionally, sterilization using ethylene oxide (EtO) can be too time-consuming for routine use between patients (new technologies, such as hydrogen peroxide gas plasma and peracetic acid reprocessor, provide faster cycle times). However, evidence that sterilization of these items improves patient care by reducing the infection risk is lacking[29, 87-91]. Many newer models of these instruments can withstand steam sterilization, which for critical items is the preferred method.

Another problem with implementing the Spaulding scheme is processing of an instrument in the semicritical category (e.g., endoscope) that would be used in conjunction with a critical instrument that contacts sterile body tissues. For example, is an endoscope used for upper gastrointestinal tract investigation still a semicritical item when used with sterile biopsy forceps or in a patient who is bleeding heavily from esophageal varices? Provided that high-level disinfection is achieved, and all microorganisms except bacterial spores have been removed from the endoscope, the device should not represent an infection risk and should remain in the semicritical category [92-94]. Infection with spore-forming bacteria has not been reported from appropriately high-level disinfected endoscopes.

An additional problem with implementation of the Spaulding system is that the optimal contact time for high-level disinfection has not been defined or varies among professional organizations, resulting in different strategies for disinfecting different types of semicritical items (e.g., endoscopes, applanation tonometers, endocavitary transducers, cryosurgical instruments, and diaphragm fitting rings). Until simpler and effective alternatives are identified for device disinfection in clinical settings, following this guideline, other CDC guidelines [1, 22, 95, 96] and FDA-cleared instructions for the liquid chemical sterilants/high-level disinfectants would be prudent.

### Reprocessing of Endoscopes

Physicians use endoscopes to diagnose and treat numerous medical disorders. Even though endoscopes represent a valuable diagnostic and therapeutic tool in modern medicine and the incidence of infection associated with their use reportedly is very low (about 1 in 1.8 million procedures) [97], more healthcare–associated outbreaks have been linked to contaminated endoscopes than to any other medical device [6-8, 12, 98]. To prevent the spread of health-care–associated infections, all heat-sensitive endoscopes (e.g., gastrointestinal endoscopes, bronchoscopes, nasopharygoscopes) must be properly cleaned and, at a minimum, subjected to high-level disinfection after each use. High-level disinfection can be expected to destroy all microorganisms, although when high numbers of bacterial spores are present, a few spores might survive.

Because of the types of body cavities they enter, flexible endoscopes acquire high levels of microbial contamination (bioburden) during each use [99]. For example, the bioburden found on flexible gastrointestinal endoscopes after use has ranged from $10^5$ colony forming units (CFU)/mL to $10^{10}$ CFU/mL, with the highest levels found in the suction channels [99-102]. The average load on bronchoscopes before cleaning was $6.4 \times 10^4$ CFU/mL. Cleaning reduces the level of microbial contamination by 4–6 $\log_{10}$ [83, 103]. Using human immunovirus (HIV)-contaminated endoscopes, several investigators have shown that cleaning completely eliminates the microbial contamination on the scopes [104, 105]. Similarly, other investigators found that EtO sterilization or soaking in 2% glutaraldehyde for 20 minutes was effective only when the device first was properly cleaned [106].

FDA maintains a list of cleared liquid chemical sterilants and high-level disinfectants that can be used to reprocess heat-sensitive medical devices, such as flexible endoscopes (http://www.fda.gov/cdrh/ode/germlab.html). At this time, the FDA-cleared and marketed formulations include: $\geq$2.4% glutaraldehyde, 0.55% ortho-phthalaldehyde (OPA), 0.95% glutaraldehyde with 1.64% phenol/phenate, 7.35% hydrogen peroxide with 0.23% peracetic acid, 1.0% hydrogen peroxide with 0.08% peracetic acid, and 7.5% hydrogen peroxide [85]. These products have excellent antimicrobial activity; however, some oxidizing chemicals (e.g., 7.5% hydrogen peroxide, and 1.0% hydrogen peroxide with 0.08% peracetic acid [latter product is no longer marketed]) reportedly have caused cosmetic and functional damage to endoscopes [69]. Users should check with device manufacturers for information about germicide compatibility with their device. If the germicide is FDA-cleared, then it is safe when used according to label directions; however, professionals should review the scientific literature for newly available data regarding human safety or materials compatibility. EtO sterilization of flexible endoscopes is infrequent because it requires a lengthy processing and aeration time (e.g., 12 hours) and is a potential hazard to staff and patients. The two products most commonly used for reprocessing endoscopes in the United States are glutaraldehyde and an automated, liquid chemical sterilization process that uses peracetic acid [107]. The American Society for Gastrointestinal Endoscopy (ASGE) recommends glutaraldehyde solutions that do not contain surfactants because the soapy residues of surfactants are difficult to remove during rinsing [108]. ortho-phthalaldehyde has begun to replace glutaraldehyde in many health-care facilities because it has several potential advantages over glutaraldehyde: is not known to irritate the eyes and nasal passages, does not require activation or exposure monitoring, and has a 12-minute high-level disinfection claim in the United States [69]. Disinfectants that are not FDA-cleared and should not be used for reprocessing endoscopes include iodophors, chlorine solutions, alcohols, quaternary ammonium compounds, and phenolics. These solutions might still be in use outside the United States, but their use should be strongly discouraged because of lack of proven efficacy against all microorganisms or materials incompatibility.

FDA clearance of the contact conditions listed on germicide labeling is based on the manufacturer's test results (http://www.fda.gov/cdrh/ode/germlab.html). Manufacturers test the product under worst-case conditions for germicide formulation (i.e., minimum recommended concentration of the active ingredient), and include organic soil. Typically manufacturers use 5% serum as the organic soil and hard water as examples of organic and inorganic challenges. The soil represents the organic loading to which the device is exposed during actual use and that would remain on the device in the absence of cleaning. This method ensures that the contact conditions completely eliminate the test mycobacteria (e.g., $10^5$ to $10^6$ Mycobacteria tuberculosis in organic soil and dried on a scope) if inoculated in the most difficult areas for the disinfectant to penetrate and contact in the absence of cleaning and thus provides a margin of safety [109]. For 2.4% glutaraldehyde that requires a 45-minute immersion at 25°C to achieve high-level disinfection (i.e., 100% kill of M. tuberculosis). FDA itself does not conduct testing but relies solely on the disinfectant manufacturer's data. Data suggest that M. tuberculosis levels can be reduced by at least 8 $\log_{10}$ with cleaning (4 $\log_{10}$) [83, 101, 102, 110], followed by chemical disinfection for 20 minutes at 20°C (4 to 6 $\log_{10}$) [83, 93, 111, 112]. On the basis of these data, APIC [113], the Society of Gastroenterology Nurses and Associates (SGNA) [38, 114, 115], the ASGE [108], American College of Chest Physicians [12], and a multi-society guideline [116] recommend alternative contact conditions with 2% glutaraldehyde to achieve high-level disinfection (e.g., that equipment be immersed in 2% glutaraldehyde at 20°C for at least 20 minutes for high-level disinfection). Federal regulations are to follow the FDA-cleared label claim for high-level disinfectants. The FDA-cleared labels for high-level disinfection with >2% glutaraldehyde at 25°C range from 20-90 minutes, depending upon the product based on three tier testing which includes AOAC sporicidal tests, simulated use testing with mycobacterial and in-use testing. The studies supporting the efficacy of >2% glutaraldehyde for 20 minutes at 20°C assume adequate cleaning prior to disinfection, whereas the FDA-cleared label claim incorporates an added margin of safety to accommodate possible lapses in cleaning practices. Facilities that have chosen to apply the 20 minute duration at 20°C have done so based on the IA recommendation in the July 2003 SHEA position paper, "Multi-society Guideline for Reprocessing Flexible Gastrointestinal Endoscopes" [19, 57, 83, 94, 108, 111, 116-121].

Flexible endoscopes are particularly difficult to disinfect [122] and easy to damage because of their intricate design and delicate materials. [123] Meticulous cleaning must precede any sterilization or high-level disinfection of these instruments. Failure to perform good cleaning can result in sterilization or disinfection failure, and outbreaks of infection can occur. Several studies have demonstrated the importance of cleaning in experimental studies with the duck hepatitis B virus (HBV) [106, 124], HIV [125]and *Helicobacter pylori*. [126]

An examination of health-care–associated infections related only to endoscopes through July 1992 found 281 infections transmitted by gastrointestinal endoscopy and 96 transmitted by bronchoscopy. The clinical spectrum ranged from asymptomatic colonization to death. *Salmonella* species and *Pseudomonas aeruginosa* repeatedly were identified as causative agents of infections transmitted by gastrointestinal endoscopy, and *M. tuberculosis*, atypical mycobacteria, and *P. aeruginosa* were the most common causes of infections transmitted by bronchoscopy [12]. Major reasons for transmission were inadequate cleaning, improper selection of a disinfecting agent, and failure to follow recommended cleaning and disinfection procedures [6, 8, 37, 98], and flaws in endoscope design [127, 128] or automated endoscope reprocessors. [7, 98] Failure to follow established guidelines has continued to result in infections associated with gastrointestinal endoscopes [8] and bronchoscopes [7, 12]. Potential device-associated problems should be reported to the FDA Center for Devices and Radiologic Health. One multistate investigation found that 23.9% of the bacterial cultures from the internal channels of 71 gastrointestinal endoscopes grew ≥100,000 colonies of bacteria after completion of all disinfection and sterilization procedures (nine of 25 facilities were using a product that has been removed from the marketplace [six facilities using 1:16 glutaraldehyde phenate], is not FDA-cleared as a high-level disinfectant [an iodophor] or no disinfecting agent) and before use on the next patient[129]. The incidence of postendoscopic procedure infections from an improperly processed endoscope has not been rigorously assessed.

Automated endoscope reprocessors (AER) offer several advantages over manual reprocessing: they automate and standardize several important reprocessing steps[130-132], reduce the likelihood that an essential reprocessing step will be skipped, and reduce personnel exposure to high-level disinfectants or chemical sterilants. Failure of AERs has been linked to outbreaks of infections [133] or colonization [7, 134], and the AER water filtration system might not be able to reliably provide "sterile" or bacteria-free rinse water[135, 136]. Establishment of correct connectors between the AER and the device is critical to ensure complete flow of disinfectants and rinse water [7, 137]. In addition, some endoscopes such as the duodenoscopes (e.g., endoscopic retrograde cholangiopancreatography [ERCP]) contain features (e.g., elevator-wire channel) that require a flushing pressure that is not achieved by most AERs and must be reprocessed manually using a 2- to 5-mL syringe, until new duodenoscopes equipped with a wider elevator-channel that AERs can reliably reprocess become available [132]. Outbreaks involving removable endoscope parts [138, 139] such as suction valves and endoscopic accessories designed to be inserted through flexible endoscopes such as biopsy forceps emphasize the importance of cleaning to remove all foreign matter before high-level disinfection or sterilization. [140] Some types of valves are now available as single-use, disposable products (e.g., bronchoscope valves) or steam sterilizable products (e.g., gastrointestinal endoscope valves).

AERs need further development and redesign [7, 141], as do endoscopes [123, 142], so that they do not represent a potential source of infectious agents. Endoscopes employing disposable components (e.g., protective barrier devices or sheaths) might provide an alternative to conventional liquid chemical high-level disinfection/sterilization[143, 144]. Another new technology is a swallowable camera-in-a-capsule that travels through the digestive tract and transmits color pictures of the small intestine to a receiver worn outside the body. This capsule currently does not replace colonoscopies.

Published recommendations for cleaning and disinfecting endoscopic equipment should be strictly followed [12, 38, 108, 113-116, 145-148]. Unfortunately, audits have shown that personnel do not consistently adhere to guidelines on reprocessing [149-151] and outbreaks of infection continue to occur. [152-154] To ensure

reprocessing personnel are properly trained, each person who reprocesses endoscopic instruments should receive initial and annual competency testing [38, 155].

In general, endoscope disinfection or sterilization with a liquid chemical sterilant involves five steps after leak testing:

1. Clean: mechanically clean internal and external surfaces, including brushing internal channels and flushing each internal channel with water and a detergent or enzymatic cleaners (leak testing is recommended for endoscopes before immersion).
2. Disinfect: immerse endoscope in high-level disinfectant (or chemical sterilant) and perfuse (eliminates air pockets and ensures contact of the germicide with the internal channels) disinfectant into all accessible channels, such as the suction/biopsy channel and air/water channel and expose for a time recommended for specific products.
3. Rinse: rinse the endoscope and all channels with sterile water, filtered water (commonly used with AERs) or tap water (i.e., high-quality potable water that meets federal clean water standards at the point of use).
4. Dry: rinse the insertion tube and inner channels with alcohol, and dry with forced air after disinfection and before storage.

Store: store the endoscope in a way that prevents recontamination and promotes drying (e.g., hung vertically). Drying the endoscope (steps 3 and 4) is essential to greatly reduce the chance of recontamination of the endoscope by microorganisms that can be present in the rinse water [116, 156]. One study demonstrated that reprocessed endoscopes (i.e., air/water channel, suction/biopsy channel) generally were negative (100% after 24 hours; 90% after 7 days [1 CFU of coagulase-negative *Staphylococcus* in one channel]) for bacterial growth when stored by hanging vertically in a ventilated cabinet[157]. Other investigators found all endoscopes were bacteria-free immediately after high-level disinfection, and only four of 135 scopes were positive during the subsequent 5-day assessment (skin bacteria cultured from endoscope surfaces). All flush-through samples remained sterile [158]. Because tapwater can contain low levels of microorganisms[159], some researchers have suggested that only sterile water (which can be prohibitively expensive) [160] or AER filtered water be used. The suggestion to use only sterile water or filtered water is not consistent with published guidelines that allow tapwater with an alcohol rinse and forced air-drying [38, 108, 113] or the scientific literature. [39, 93] In addition, no evidence of disease transmission has been found when a tap water rinse is followed by an alcohol rinse and forced-air drying. AERs produce filtered water by passage through a bacterial filter (e.g., 0.2 μ). Filtered rinse water was identified as a source of bacterial contamination in a study that cultured the accessory and suction channels of endoscopes and the internal chambers of AERs during 1996–2001 and reported 8.7% of samples collected during 1996–1998 had bacterial growth, with 54% being *Pseudomonas* species. After a system of hot water flushing of the piping (60°C for 60 minutes daily) was introduced, the frequency of positive cultures fell to approximately 2% with only rare isolation of >10 CFU/mL [161]. In addition to the endoscope reprocessing steps, a protocol should be developed that ensures the user knows whether an endoscope has been appropriately cleaned and disinfected (e.g., using a room or cabinet for processed endoscopes only) or has not been reprocessed. When users leave endoscopes on movable carts, confusion can result about whether the endoscope has been processed. Although one guideline recommended endoscopes (e.g., duodenoscopes) be reprocessed immediately before use [147], other guidelines do not require this activity [38, 108, 115] and except for the Association of periOperative Registered Nurses (AORN), professional organizations do not recommended that reprocessing be repeated as long as the original processing is done correctly. As part of a quality assurance program, healthcare facility personnel can consider random bacterial surveillance cultures of processed endoscopes to ensure high-level disinfection or sterilization[7, 162-164]. Reprocessed endoscopes should be free of microbial pathogens except for small numbers of relatively avirulent microbes that represent exogenous environmental contamination (e.g., coagulase-negative *Staphylococcus*, *Bacillus* species, diphtheroids). Although recommendations exist for the final rinse water used during endoscope reprocessing to be microbiologically cultured at least monthly [165], a microbiologic standard has not been

set, and the value of routine endoscope cultures has not been shown [166]. In addition, neither the routine culture of reprocessed endoscopes nor the final rinse water has been validated by correlating viable counts on an endoscope to infection after an endoscopic procedure. If reprocessed endoscopes were cultured, sampling the endoscope would assess water quality and other important steps (e.g., disinfectant effectiveness, exposure time, cleaning) in the reprocessing procedure. A number of methods for sampling endoscopes and water have been described [23, 157, 161, 163, 167, 168]. Novel approaches (e.g., detection of adenosine triphosphate [ATP]) to evaluate the effectiveness of endoscope cleaning [169, 170] or endoscope reprocessing [171] also have been evaluated, but no method has been established as a standard for assessing the outcome of endoscope reprocessing.

The carrying case used to transport clean and reprocessed endoscopes outside the health-care environment should not be used to store an endoscope or to transport the instrument within the health-care facility. A contaminated endoscope should never be placed in the carrying case because the case can also become contaminated. When the endoscope is removed from the case, properly reprocessed, and put back in the case, the case could recontaminate the endoscope. A contaminated carrying case should be discarded (Olympus America, June 2002, written communication).

Infection-control professionals should ensure that institutional policies are consistent with national guidelines and conduct infection-control rounds periodically (e.g., at least annually) in areas where endoscopes are reprocessed to ensure policy compliance. Breaches in policy should be documented and corrective action instituted. In incidents in which endoscopes were not exposed to a high-level disinfection process, patients exposed to potentially contaminated endoscopes have been assessed for possible acquisition of HIV, HBV, and hepatitis C virus (HCV). A 14-step method for managing a failure incident associated with high-level disinfection or sterilization has been described [Rutala WA, 2006 #12512]. The possible transmission of bloodborne and other infectious agents highlights the importance of rigorous infection control [172, 173].

### Laparoscopes and Arthroscopes

Although high-level disinfection appears to be the minimum standard for processing laparoscopes and arthroscopes between patients [28, 86, 174, 175], this practice continues to be debated [89, 90, 176]. However, neither side in the high-level disinfection versus sterilization debate has sufficient data on which to base its conclusions. Proponents of high-level disinfection refer to membership surveys [29] or institutional experiences [87] involving more than 117,000 and 10,000 laparoscopic procedures, respectively, that cite a low risk for infection (<0.3%) when high-level disinfection is used for gynecologic laparoscopic equipment. Only one infection in the membership survey was linked to spores. In addition, growth of common skin microorganisms (e.g., *Staphylococcus epidermidis*, diphtheroids) has been documented from the umbilical area even after skin preparation with povidone-iodine and ethyl alcohol. Similar organisms were recovered in some instances from the pelvic serosal surfaces or from the laparoscopic telescopes, suggesting that the microorganisms probably were carried from the skin into the peritoneal cavity [177, 178]. Proponents of sterilization focus on the possibility of transmitting infection by spore-forming organisms. Researchers have proposed several reasons why sterility was not necessary for all laparoscopic equipment: only a limited number of organisms (usually $\leq$10) are introduced into the peritoneal cavity during laparoscopy; minimal damage is done to inner abdominal structures with little devitalized tissue; the peritoneal cavity tolerates small numbers of spore-forming bacteria; equipment is simple to clean and disinfect; surgical sterility is relative; the natural bioburden on rigid lumened devices is low [179]; and no evidence exists that high-level disinfection instead of sterilization increases the risk for infection [87, 89, 90]. With the advent of laparoscopic cholecystectomy, concern about high-level disinfection is justifiable because the degree of tissue damage and bacterial contamination is greater than with laparoscopic procedures in gynecology. Failure to completely dissemble, clean, and high-level disinfect laparoscope parts has led to infections in patients [180]. Data from one study suggested that disassembly, cleaning, and proper reassembly of laparoscopic equipment used in gynecologic procedures before steam sterilization presents no risk for infection [181].

As with laparoscopes and other equipment that enter sterile body sites, arthroscopes ideally should be sterilized before used. Older studies demonstrated that these instruments were commonly (57%) only high-level disinfected in the United States [28, 86]. A later survey (with a response rate of only 5%) reported that high-level disinfection was used by 31% and a sterilization process in the remainder of the health-care facilities[30] High-level disinfection rather than sterilization presumably has been used because the incidence of infection is low and the few infections identified probably are unrelated to the use of high-level disinfection rather than sterilization. A retrospective study of 12,505 arthroscopic procedures found an infection rate of 0.04% (five infections) when arthroscopes were soaked in 2% glutaraldehyde for 15–20 minutes. Four infections were caused by *S. aureus*; the fifth was an anaerobic streptococcal infection [88]. Because these organisms are very susceptible to high-level disinfectants, such as 2% glutaraldehyde, the infections most likely originated from the patient's skin. Two cases of *Clostridium perfringens* arthritis have been reported when the arthroscope was disinfected with glutaraldehyde for an exposure time that is not effective against spores [182, 183].

Although only limited data are available, the evidence does not demonstrate that high-level disinfection of arthroscopes and laparoscopes poses an infection risk to the patient. For example, a prospective study that compared the reprocessing of arthroscopes and laparoscopes (per 1,000 procedures) with EtO sterilization to high-level disinfection with glutaraldehyde found no statistically significant difference in infection risk between the two methods (i.e., EtO, 7.5/1,000 procedures; glutaraldehyde, 2.5/1,000 procedures)[89]. Although the debate for high-level disinfection versus sterilization of laparoscopes and arthroscopes will go unsettled until well-designed, randomized clinical trials are published, this guideline should be followed [1, 17]. That is, laparoscopes, arthroscopes, and other scopes that enter normally sterile tissue should be sterilized before each use; if this is not feasible, they should receive at least high-level disinfection.

**Tonometers, Cervical Diaphragm Fitting Rings, Cryosurgical Instruments, and Endocavitary Probes**

Disinfection strategies vary widely for other semicritical items (e.g., applanation tonometers, rectal/vaginal probes, cryosurgical instruments, and diaphragm fitting rings). FDA requests that device manufacturers include at least one validated cleaning and disinfection/sterilization protocol in the labeling for their devices. As with all medications and devices, users should be familiar with the label instructions. One study revealed that no uniform technique was in use for disinfection of applanation tonometers, with disinfectant contact times varying from <15 sec to 20 minutes [28]. In view of the potential for transmission of viruses (e.g., herpes simplex virus [HSV], adenovirus 8, or HIV) [184] by tonometer tips, CDC recommended that the tonometer tips be wiped clean and disinfected for 5-10 minutes with either 3% hydrogen peroxide, 5000 ppm chlorine, 70% ethyl alcohol, or 70% isopropyl alcohol [95]. However, more recent data suggest that 3% hydrogen peroxide and 70% isopropyl alcohol are not effective against adenovirus capable of causing epidemic keratoconjunctivitis and similar viruses and should not be used for disinfecting applanation tonometers [49, 185, 186]. Structural damage to Schiotz tonometers has been observed with a 1:10 sodium hypochlorite (5,000 ppm chlorine) and 3% hydrogen peroxide[187]. After disinfection, the tonometer should be thoroughly rinsed in tapwater and air dried before use. Although these disinfectants and exposure times should kill pathogens that can infect the eyes, no studies directly support this [188, 189]. The guidelines of the American Academy of Ophthalmology for preventing infections in ophthalmology focus on only one potential pathogen: HIV. [190] Because a short and simple decontamination procedure is desirable in the clinical setting, swabbing the tonometer tip with a 70% isopropyl alcohol wipe sometimes is practiced. [189] Preliminary reports suggest that wiping the tonometer tip with an alcohol swab and then allowing the alcohol to evaporate might be effective in eliminating HSV, HIV, and adenovirus[189, 191, 192]. However, because these studies involved only a few replicates and were conducted in a controlled laboratory setting, further studies are needed before this technique can be recommended. In addition, two reports have found that disinfection of pneumotonometer tips between uses with a 70% isopropyl alcohol wipe contributed to outbreaks of epidemic keratoconjunctivitis caused

by adenovirus type 8[193, 194].

Limited studies have evaluated disinfection techniques for other items that contact mucous membranes, such as diaphragm fitting rings, cryosurgical probes, transesophageal echocardiography probes [195], flexible cystoscopes [196] or vaginal/rectal probes used in sonographic scanning. Lettau, Bond, and McDougal of CDC supported the recommendation of a diaphragm fitting ring manufacturer that involved using a soap-and-water wash followed by a 15-minute immersion in 70% alcohol[96]. This disinfection method should be adequate to inactivate HIV, HBV, and HSV even though alcohols are not classified as high-level disinfectants because their activity against picornaviruses is somewhat limited[72]. No data are available regarding inactivation of human papillomavirus (HPV) by alcohol or other disinfectants because in vitro replication of complete virions has not been achieved. Thus, even though alcohol for 15 minutes should kill pathogens of relevance in gynecology, no clinical studies directly support this practice.

Vaginal probes are used in sonographic scanning. A vaginal probe and all endocavitary probes without a probe cover are semicritical devices because they have direct contact with mucous membranes (e.g., vagina, rectum, pharynx). While use of the probe cover could be considered as changing the category, this guideline proposes use of a new condom/probe cover for the probe for each patient, and because condoms/probe covers can fail [195, 197-199], the probe also should be high-level disinfected. The relevance of this recommendation is reinforced with the findings that sterile transvaginal ultrasound probe covers have a very high rate of perforations even before use (0%, 25%, and 65% perforations from three suppliers). [199] One study found, after oocyte retrieval use, a very high rate of perforations in used endovaginal probe covers from two suppliers (75% and 81%) [199], other studies demonstrated a lower rate of perforations after use of condoms (2.0% and 0.9%) [197 200]. Condoms have been found superior to commercially available probe covers for covering the ultrasound probe (1.7% for condoms versus 8.3% leakage for probe covers)[201]. These studies underscore the need for routine probe disinfection between examinations. Although most ultrasound manufacturers recommend use of 2% glutaraldehyde for high-level disinfection of contaminated transvaginal transducers, the this agent has been questioned [202] because it might shorten the life of the transducer and might have toxic effects on the gametes and embryos [203]. An alternative procedure for disinfecting the vaginal transducer involves the mechanical removal of the gel from the transducer, cleaning the transducer in soap and water, wiping the transducer with 70% alcohol or soaking it for 2 minutes in 500 ppm chlorine, and rinsing with tap water and air drying[204]. The effectiveness of this and other methods [200] has not been validated in either rigorous laboratory experiments or in clinical use. High-level disinfection with a product (e.g., hydrogen peroxide) that is not toxic to staff, patients, probes, and retrieved cells should be used until the effectiveness of alternative procedures against microbes of importance at the cavitary site is demonstrated by well-designed experimental scientific studies. Other probes such as rectal, cryosurgical, and transesophageal probes or devices also should be high-level disinfected between patients.

Ultrasound probes used during surgical procedures also can contact sterile body sites. These probes can be covered with a sterile sheath to reduce the level of contamination on the probe and reduce the risk for infection. However, because the sheath does not completely protect the probe, the probes should be sterilized between each patient use as with other critical items. If this is not possible, at a minimum the probe should be high-level disinfected and covered with a sterile probe cover.

Some cryosurgical probes are not fully immersible. During reprocessing, the tip of the probe should be immersed in a high-level disinfectant for the appropriate time; any other portion of the probe that could have mucous membrane contact can be disinfected by immersion or by wrapping with a cloth soaked in a high-level disinfectant to allow the recommended contact time. After disinfection, the probe should be rinsed with tap water and dried before use. Health-care facilities that use nonimmersible probes should replace them as soon as possible with fully immersible probes.

As with other high-level disinfection procedures, proper cleaning of probes is necessary to ensure the success of the subsequent disinfection [205]. One study demonstrated that vegetative bacteria

inoculated on vaginal ultrasound probes decreased when the probes were cleaned with a towel [206]. No information is available about either the level of contamination of such probes by potential viral pathogens such as HBV and HPV or their removal by cleaning (such as with a towel). Because these pathogens might be present in vaginal and rectal secretions and contaminate probes during use, high-level disinfection of the probes after such use is recommended.

**Dental Instruments**

Scientific articles and increased publicity about the potential for transmitting infectious agents in dentistry have focused attention on dental instruments as possible agents for pathogen transmission[207, 208]. The American Dental Association recommends that surgical and other instruments that normally penetrate soft tissue or bone (e.g., extraction forceps, scalpel blades, bone chisels, periodontal scalers, and surgical burs) be classified as critical devices that should be sterilized after each use or discarded. Instruments not intended to penetrate oral soft tissues or bone (e.g., amalgam condensers, and air/water syringes) but that could contact oral tissues are classified as semicritical, but sterilization after each use is recommended if the instruments are heat-tolerant [43, 209]. If a semicritical item is heat-sensitive, it should, at a minimum, be processed with high-level disinfection [43, 210]. Handpieces can be contaminated internally with patient material and should be heat sterilized after each patient. Handpieces that cannot be heat sterilized should not be used. [211] Methods of sterilization that can be used for critical or semicritical dental instruments and materials that are heat-stable include steam under pressure (autoclave), chemical (formaldehyde) vapor, and dry heat (e.g., 320°F for 2 hours). Dental professionals most commonly use the steam sterilizer [212]. All three sterilization procedures can damage some dental instruments, including steam-sterilized hand pieces [213]. Heat-tolerant alternatives are available for most clinical dental applications and are preferred[43].

CDC has divided noncritical surfaces in dental offices into clinical contact and housekeeping surfaces[43]. Clinical contact surfaces are surfaces that might be touched frequently with gloved hands during patient care or that might become contaminated with blood or other potentially infectious material and subsequently contact instruments, hands, gloves, or devices (e.g., light handles, switches, dental X-ray equipment, chair-side computers). Barrier protective coverings (e.g., clear plastic wraps) can be used for these surfaces, particularly those that are difficult to clean (e.g., light handles, chair switches). The coverings should be changed when visibly soiled or damaged and routinely (e.g., between patients). Protected surfaces should be disinfected at the end of each day or if contamination is evident. If not barrier-protected, these surfaces should be disinfected between patients with an intermediate-disinfectant (i.e., EPA-registered hospital disinfectant with tuberculocidal claim) or low-level disinfectant (i.e., EPA-registered hospital disinfectant with an HBV and HIV label claim) [43, 214, 215].

Most housekeeping surfaces need to be cleaned only with a detergent and water or an EPA-registered hospital disinfectant, depending of the nature of the surface and the type and degree of contamination. When housekeeping surfaces are visibly contaminated by blood or body substances, however, prompt removal and surface disinfection is a sound infection control practice and required by the Occupational Safety and Health Administration (OSHA) [43, 214].

Several studies have demonstrated variability among dental practices while trying to meet these recommendations[216, 217]. For example, 68% of respondents believed they were sterilizing their instruments but did not use appropriate chemical sterilants or exposure times and 49% of respondents did not challenge autoclaves with biological indicators[216]. Other investigators using biologic indicators have found a high proportion (15%–65%) of positive spore tests after assessing the efficacy of sterilizers used in dental offices. In one study of Minnesota dental offices, operator error, rather than mechanical malfunction[218], caused 87% of sterilization failures. Common factors in the improper use of sterilizers include chamber overload, low temperature setting, inadequate exposure time, failure to preheat the sterilizer, and interruption of the cycle.

Mail-return sterilization monitoring services use spore strips to test sterilizers in dental clinics, but

delay caused by mailing to the test laboratory could potentially cause false-negatives results. Studies revealed, however, that the post-sterilization time and temperature after a 7-day delay had no influence on the test results[219]. Delays (7 days at 27°C and 37°C, 3-day mail delay) did not cause any predictable pattern of inaccurate spore tests [220].

## Disinfection of HBV-, HCV-, HIV- or TB-Contaminated Devices

The CDC recommendation for high-level disinfection of HBV-, HCV-, HIV- or TB-contaminated devices is appropriate because experiments have demonstrated the effectiveness of high-level disinfectants to inactivate these and other pathogens that might contaminate semicritical devices [61, 62, 73, 81, 105, 121, 125, 221-238]. Nonetheless, some healthcare facilities have modified their disinfection procedures when endoscopes are used with a patient known or suspected to be infected with HBV, HIV, or *M. tuberculosis* [28, 239]. This is inconsistent with the concept of Standard Precautions that presumes all patients are potentially infected with bloodborne pathogens[228]. Several studies have highlighted the inability to distinguish HBV- or HIV-infected patients from noninfected patients on clinical grounds[240-242]. In addition, mycobacterial infection is unlikely to be clinically apparent in many patients. In most instances, hospitals that altered their disinfection procedure used EtO sterilization on the endoscopic instruments because they believed this practice reduced the risk for infection [28, 239]. EtO is not routinely used for endoscope sterilization because of the lengthy processing time. Endoscopes and other semicritical devices should be managed the same way regardless of whether the patient is known to be infected with HBV, HCV, HIV or *M. tuberculosis*.

An evaluation of a manual disinfection procedure to eliminate HCV from experimentally contaminated endoscopes provided some evidence that cleaning and 2% glutaraldehyde for 20 minutes should prevent transmission [236]. A study that used experimentally contaminated hysteroscopes detected HCV by polymerase chain reaction (PCR) in one (3%) of 34 samples after cleaning with a detergent, but no samples were positive after treatment with a 2% glutaraldehyde solution for 20 minutes [120]. Another study demonstrated complete elimination of HCV (as detected by PCR) from endoscopes used on chronically infected patients after cleaning and disinfection for 3–5 minutes in glutaraldehyde [118]. Similarly, PCR was used to demonstrate complete elimination of HCV after standard disinfection of experimentally contaminated endoscopes [236] and endoscopes used on HCV-antibody–positive patients had no detectable HCV RNA after high-level disinfection [243]. The inhibitory activity of a phenolic and a chlorine compound on HCV showed that the phenolic inhibited the binding and replication of HCV, but the chlorine was ineffective, probably because of its low concentration and its neutralization in the presence of organic matter [244].

## Disinfection in the Hemodialysis Unit

Hemodialysis systems include hemodialysis machines, water supply, water-treatment systems, and distribution systems. During hemodialysis, patients have acquired bloodborne viruses and pathogenic bacteria [245-247]. Cleaning and disinfection are important components of infection control in a hemodialysis center. EPA and FDA regulate disinfectants used to reprocess hemodialyzers, hemodialysis machines, and water-treatment systems.

Noncritical surfaces (e.g., dialysis bed or chair, countertops, external surfaces of dialysis machines, and equipment [scissors, hemostats, clamps, blood pressure cuffs, stethoscopes]) should be disinfected with an EPA-registered disinfectant unless the item is visibly contaminated with blood; in that case a tuberculocidal agent (or a disinfectant with specific label claims for HBV and HIV) or a 1:100 dilution of a hypochlorite solution (500–600 ppm free chlorine) should be used [246, 248]. This procedure accomplishes two goals: it removes soil on a regular basis and maintains an environment that is consistent with good patient care. Hemodialyzers are disinfected with peracetic acid, formaldehyde, glutaraldehyde, heat pasteurization with citric acid, and chlorine-containing compounds [249]. Hemodialysis systems usually are disinfected by chlorine-based disinfectants (e.g., sodium hypochlorite), aqueous

formaldehyde, heat pasteurization, ozone, or peracetic acid [250, 251]. All products must be used according to the manufacturers' recommendations. Some dialysis systems use hot-water disinfection to control microbial contamination.

At its high point, 82% of U.S. chronic hemodialysis centers were reprocessing (i.e., reusing) dialyzers for the same patient using high-level disinfection [249]. However, one of the large dialysis organizations has decided to phase out reuse and, by 2002 the percentage of dialysis facilities reprocessing hemodialyzers had decreased to 63% [252]. The two commonly used disinfectants to reprocess dialyzers were peracetic acid and formaldehyde; 72% used peracetic acid and 20% used formaldehyde to disinfect hemodialyzers. Another 4% of the facilities used either glutaraldehyde or heat pasteurization in combination with citric acid [252]. Infection-control recommendations, including disinfection and sterilization and the use of dedicated machines for hepatitis B surface antigen (HBsAg)-positive patients, in the hemodialysis setting were detailed in two reviews [245, 246]. The Association for the Advancement of Medical Instrumentation(AAMI) has published recommendations for the reuse of hemodialyzers[253].

## Inactivation of *Clostridium difficile*

The source of health-care–associated acquisition of *Clostridium difficile* in nonepidemic settings has not been determined. The environment and carriage on the hands of health-care personnel have been considered possible sources of infection [66, 254]. Carpeted rooms occupied by a patient with *C. difficile* were more heavily contaminated with *C. difficile* than were noncarpeted rooms [255]. Because *C. difficile* spore-production can increase when exposed to nonchlorine-based cleaning agents and the spores are more resistant than vegetative cells to commonly used surface disinfectants[256], some investigators have recommended use of dilute solutions of hypochlorite (1,600 ppm available chlorine) for routine environmental disinfection of rooms of patients with *C. difficile*-associated diarrhea or colitis [257], to reduce the incidence of *C. difficile* diarrhea [258], or in units with high *C. difficile* rates. [259] Stool samples of patients with symptomatic *C. difficile* colitis contain spores of the organism, as demonstrated by ethanol treatment of the stool to reduce the overgrowth of fecal flora when isolating *C. difficile* in the laboratory[260, 261]. *C. difficile*-associated diarrhea rates were shown to have decreased markedly in a bone-marrow transplant unit (from 8.6 to 3.3 cases per 1,000 patient-days) during a period of bleach disinfection (1:10 dilution) of environmental surfaces compared with cleaning with a quaternary ammonium compound. Because no EPA-registered products exist that are specific for inactivating *C. difficile* spores, use of diluted hypochlorite should be considered in units with high *C. difficile* rates. Acidified bleach and regular bleach (5000 ppm chlorine) can inactivate $10^6$ *C. difficile* spores in $\leq$10 minutes [262]. However, studies have shown that asymptomatic patients constitute an important reservoir within the health-care facility and that person-to-person transmission is the principal means of transmission between patients. Thus, combined use of hand washing, barrier precautions, and meticulous environmental cleaning with an EPA-registered disinfectant (e.g., germicidal detergent) should effectively prevent spread of the organism [263].

Contaminated medical devices, such as colonoscopes and thermometers,can be vehicles for transmission of *C. difficile* spores [264]. For this reason, investigators have studied commonly used disinfectants and exposure times to assess whether current practices can place patients at risk. Data demonstrate that 2% glutaraldehyde [79, 265-267] and peracetic acid [267, 268] reliably kill *C. difficile* spores using exposure times of 5–20 minutes. *ortho*-Phthalaldehyde and $\geq$0.2% peracetic acid (WA Rutala, personal communication, April 2006) also can inactivate $\geq$10$^4$ *C. difficile* spores in 10–12 minutes at 20°C [268]. Sodium dichloroisocyanurate at a concentration of 1000 ppm available chlorine achieved lower $\log_{10}$ reduction factors against *C. difficile* spores at 10 min, ranging from 0.7 to 1.5, than 0.26% peracetic acid with $\log_{10}$ reduction factors ranging from 2.7 to 6.0[268].

## OSHA Bloodborne Pathogen Standard

In December 1991, OSHA promulgated a standard entitled "Occupational Exposure to

Bloodborne Pathogens" to eliminate or minimize occupational exposure to bloodborne pathogens [214]. One component of this requirement is that all equipment and environmental and working surfaces be cleaned and decontaminated with an appropriate disinfectant after contact with blood or other potentially infectious materials. Even though the OSHA standard does not specify the type of disinfectant or procedure, the OSHA original compliance document [269] suggested that a germicide must be tuberculocidal to kill the HBV. To follow the OSHA compliance document a tuberculocidal disinfectant (e.g., phenolic, and chlorine) would be needed to clean a blood spill. However, in February 1997, OSHA amended its policy and stated that EPA-registered disinfectants labeled as effective against HIV and HBV would be considered as appropriate disinfectants ". . . provided such surfaces have not become contaminated with agent(s) or volumes of or concentrations of agent(s) for which higher level disinfection is recommended." When bloodborne pathogens other than HBV or HIV are of concern, OSHA continues to require use of EPA-registered tuberculocidal disinfectants or hypochlorite solution (diluted 1:10 or 1:100 with water) [215, 228]. Studies demonstrate that, in the presence of large blood spills, a 1:10 final dilution of EPA-registered hypochlorite solution initially should be used to inactivate bloodborne viruses [63, 235] to minimize risk for infection to health-care personnel from percutaneous injury during cleanup.

**Emerging Pathogens (*Cryptosporidium, Helicobacter pylori, Escherichia coli* O157:H7, Rotavirus, Human Papilloma Virus, Norovirus, Severe Acute Respiratory Syndrome [SARS] Coronavirus)**
Emerging pathogens are of growing concern to the general public and infection-control professionals. Relevant pathogens include *Cryptosporidium parvum, Helicobacter pylori, E. coli* O157:H7, HIV, HCV, rotavirus, norovirus, severe acute respiratory syndrome (SARS) coronavirus, multidrug-resistant *M. tuberculosis*, and nontuberculous mycobacteria (e.g., *M. chelonae*). The susceptibility of each of these pathogens to chemical disinfectants and sterilants has been studied. With the exceptions discussed below, all of these emerging pathogens are susceptible to currently available chemical disinfectants and sterilants [270].

*Cryptosporidium* is resistant to chlorine at concentrations used in potable water. *C. parvum* is not completely inactivated by most disinfectants used in healthcare including ethyl alcohol [271], glutaraldehyde [271, 272], 5.25% hypochlorite [271], peracetic acid [271], ortho-phthalaldehyde [271], phenol [271, 272], povidone-iodine [271, 272], and quaternary ammonium compounds [271]. The only chemical disinfectants and sterilants able to inactivate greater than 3 $\log_{10}$ of *C. parvum* were 6% and 7.5% hydrogen peroxide [271]. Sterilization methods will fully inactivate *C. parvum*, including steam [271], EtO [271, 273], and hydrogen peroxide gas plasma [271]. Although most disinfectants are ineffective against *C. parvum*, current cleaning and disinfection practices appear satisfactory to prevent healthcare-associated transmission. For example, endoscopes are unlikely to be an important vehicle for transmitting *C. parvum* because the results of bacterial studies indicate mechanical cleaning will remove approximately $10^4$ organisms, and drying results in rapid loss of *C. parvum* viability (e.g., 30 minutes, 2.9 $\log_{10}$ decrease; and 60 minutes, 3.8 $\log_{10}$ decrease) [271].

Chlorine at ~1 ppm has been found capable of eliminating approximately 4 $\log_{10}$ of *E. coli* O157:H7 within 1 minute in a suspension test [64]. Electrolyzed oxidizing water at 23°C was effective in 10 minutes in producing a 5-$\log_{10}$ decrease in *E. coli* O157:H7 inoculated onto kitchen cutting boards [274]. The following disinfectants eliminated >5 $\log_{10}$ of *E. coli* O157:H7 within 30 seconds: a quaternary ammonium compound, a phenolic, a hypochlorite (1:10 dilution of 5.25% bleach), and ethanol [53]. Disinfectants including chlorine compounds can reduce *E. coli* O157:H7 experimentally inoculated onto alfalfa seeds or sprouts [275, 276] or beef carcass surfaces [277].

Data are limited on the susceptibility of *H. pylori* to disinfectants. Using a suspension test, one study assessed the effectiveness of a variety of disinfectants against nine strains of *H. pylori* [60]. Ethanol (80%) and glutaraldehyde (0.5%) killed all strains within 15 seconds; chlorhexidine gluconate (0.05%, 1.0%), benzalkonium chloride (0.025%, 0.1%), alkyldiaminoethylglycine hydrochloride (0.1%), povidone-iodine (0.1%), and sodium hypochlorite (150 ppm) killed all strains within 30 seconds. Both ethanol

(80%) and glutaraldehyde (0.5%) retained similar bactericidal activity in the presence of organic matter; the other disinfectants showed reduced bactericidal activity. In particular, the bactericidal activity of povidone-iodine (0.1%) and sodium hypochlorite (150 ppm) markedly decreased in the presence of dried yeast solution with killing times increased to 5 - 10 minutes and 5 - 30 minutes, respectively.

Immersing biopsy forceps in formalin before obtaining a specimen does not affect the ability to culture *H. pylori* from the biopsy specimen [278]. The following methods are ineffective for eliminating *H. pylori* from endoscopes: cleaning with soap and water [119, 279], immersion in 70% ethanol for 3 minutes[280], instillation of 70% ethanol[126], instillation of 30 ml of 83% methanol[279], and instillation of 0.2% Hyamine solution[281]. The differing results with regard to the efficacy of ethyl alcohol against *Helicobacter* are unexplained. Cleaning followed by use of 2% alkaline glutaraldehyde (or automated peracetic acid) has been demonstrated by culture to be effective in eliminating *H. pylori* [119, 279, 282]. Epidemiologic investigations of patients who had undergone endoscopy with endoscopes mechanically washed and disinfected with 2.0%–2.3% glutaraldehyde have revealed no evidence of person-to-person transmission of *H. pylori* [126, 283]. Disinfection of experimentally contaminated endoscopes using 2% glutaraldehyde (10-minute, 20-minute, 45-minute exposure times) or the peracetic acid system (with and without active peracetic acid) has been demonstrated to be effective in eliminating *H. pylori* [119]. *H. pylori* DNA has been detected by PCR in fluid flushed from endoscope channels after cleaning and disinfection with 2% glutaraldehyde [284]. The clinical significance of this finding is unclear. *In vitro* experiments have demonstrated a >3.5-$\log_{10}$ reduction in *H. pylori* after exposure to 0.5 mg/L of free chlorine for 80 seconds[285].

An outbreak of healthcare-associated rotavirus gastroenteritis on a pediatric unit has been reported [286]. Person to person through the hands of health-care workers was proposed as the mechanism of transmission. Prolonged survival of rotavirus on environmental surfaces (90 minutes to >10 days at room temperature) and hands (>4 hours) has been demonstrated. Rotavirus suspended in feces can survive longer [287, 288]. Vectors have included hands, fomites, air, water, and food [288, 289]. Products with demonstrated efficacy (>3 $\log_{10}$ reduction in virus) against rotavirus within 1 minute include: 95% ethanol, 70% isopropanol, some phenolics, 2% glutaraldehyde, 0.35% peracetic acid, and some quaternary ammonium compounds [59, 290-293]. In a human challenge study, a disinfectant spray (0.1% ortho-phenylphenol and 79% ethanol), sodium hypochlorite (800 ppm free chlorine), and a phenol-based product (14.7% phenol diluted 1:256 in tapwater) when sprayed onto contaminated stainless steel disks, were effective in interrupting transfer of a human rotavirus from stainless steel disk to fingerpads of volunteers after an exposure time of 3- 10 minutes. A quaternary ammonium product (7.05% quaternary ammonium compound diluted 1:128 in tapwater) and tapwater allowed transfer of virus [52].

No data exist on the inactivation of HPV by alcohol or other disinfectants because in vitro replication of complete virions has not been achieved. Similarly, little is known about inactivation of noroviruses (members of the family *Caliciviridae* and important causes of gastroenteritis in humans) because they cannot be grown in tissue culture. Improper disinfection of environmental surfaces contaminated by feces or vomitus of infected patients is believed to play a role in the spread of noroviruses in some settings [294-296]. Prolonged survival of a norovirus surrogate (i.e., feline calicivirus virus [FCV], a closely related cultivable virus) has been demonstrated (e.g., at room temperature, FCV in a dried state survived for 21–18 days) [297]. Inactivation studies with FCV have shown the effectiveness of chlorine, glutaraldehyde, and iodine-based products whereas the quaternary ammonium compound, detergent, and ethanol failed to inactivate the virus completely. [297] An evaluation of the effectiveness of several disinfectants against the feline calicivirus found that bleach diluted to 1000 ppm of available chlorine reduced infectivity of FCV by 4.5 logs in 1 minute. Other effective ($\log_{10}$ reduction factor of >4 in virus) disinfectants included accelerated hydrogen peroxide, 5,000 ppm (3 min); chlorine dioxide, 1,000 ppm chlorine (1 min); a mixture of four quaternary ammonium compounds, 2,470 ppm (10 min); 79% ethanol with 0.1% quaternary ammonium compound (3 min); and 75% ethanol (10 min) [298]. A quaternary ammonium compound exhibited activity against feline calicivirus supensions dried on hard surface carriers in 10 minutes [299]. Seventy percent ethanol and 70% 1-propanol reduced FCV by a 3–4-$\log_{10}$

reduction in 30 seconds [300].

CDC announced that a previously unrecognized human virus from the coronavirus family is the leading hypothesis for the cause of a described syndrome of SARS [301]. Two coronaviruses that are known to infect humans cause one third of common colds and can cause gastroenteritis. The virucidal efficacy of chemical germicides against coronavirus has been investigated. A study of disinfectants against coronavirus 229E found several that were effective after a 1-minute contact time; these included sodium hypochlorite (at a free chlorine concentration of 1,000 ppm and 5,000 ppm), 70% ethyl alcohol, and povidone-iodine (1% iodine) [186]. In another study, 70% ethanol, 50% isopropanol, 0.05% benzalkonium chloride, 50 ppm iodine in iodophor, 0.23% sodium chlorite, 1% cresol soap and 0.7% formaldehyde inactivated >3 logs of two animal coronaviruses (mouse hepatitis virus, canine coronavirus) after a 10-minute exposure time [302]. The activity of povidone-iodine has been demonstrated against human coronaviruses 229E and OC43 [303]. A study also showed complete inactivation of the SARS coronavirus by 70% ethanol and povidone-iodine with an exposure times of 1 minute and 2.5% glutaraldehyde with an exposure time of 5 minute [304]. Because the SARS coronavirus is stable in feces and urine at room temperature for at least 1–2 days (WHO, 2003; http://www.who.int/csr/sars/survival_2003_05_04/en/index.html), surfaces might be a possible source of contamination and lead to infection with the SARS coronavirus and should be disinfected. Until more precise information is available, environments in which SARS patients are housed should be considered heavily contaminated, and rooms and equipment should be thoroughly disinfected daily and after the patient is discharged. EPA-registered disinfectants or 1:100 dilution of household bleach and water should be used for surface disinfection and disinfection on noncritical patient-care equipment. High-level disinfection and sterilization of semicritical and critical medical devices, respectively, does not need to be altered for patients with known or suspected SARS.

Free-living amoeba can be pathogenic and can harbor agents of pneumonia such as *Legionella pneumophila*. Limited studies have shown that 2% glutaraldehyde and peracetic acid do not completely inactivate *Acanthamoeba polyphaga* in a 20-minute exposure time for high-level disinfection. If amoeba are found to contaminate instruments and facilitate infection, longer immersion times or other disinfectants may need to be considered [305].

## Inactivation of Bioterrorist Agents

Publications have highlighted concerns about the potential for biological terrorism[306, 307]. CDC has categorized several agents as "high priority" because they can be easily disseminated or transmitted from person to person, cause high mortality, and are likely to cause public panic and social disruption [308]. These agents include *Bacillus anthracis* (the cause of anthrax), *Yersinia pestis* (plague), variola major (smallpox), *Clostridium botulinum* toxin (botulism), *Francisella tularensis* (tularemia), filoviruses (Ebola hemorrhagic fever, Marburg hemorrhagic fever); and arenaviruses (Lassa [Lassa fever], Junin [Argentine hemorrhagic fever]), and related viruses[308].

A few comments can be made regarding the role of sterilization and disinfection of potential agents of bioterrorism[309]. First, the susceptibility of these agents to germicides *in vitro* is similar to that of other related pathogens. For example, variola is similar to vaccinia [72, 310, 311] and *B. anthracis* is similar to *B. atrophaeus* (formerly *B. subtilis*)[312, 313]. *B. subtilis* spores, for instance, proved as resistant as, if not more resistant than, *B. anthracis* spores (>6 $log_{10}$ reduction of *B. anthracis* spores in 5 minutes with acidified bleach [5,250 ppm chlorine])[313]. Thus, one can extrapolate from the larger database available on the susceptibility of genetically similar organisms[314]. Second, many of the potential bioterrorist agents are stable enough in the environment that contaminated environmental surfaces or fomites could lead to transmission of agents such as *B. anthracis*, *F. tularensis*, variola major, *C. botulinum* toxin, and *C. burnetti* [315]. Third, data suggest that current disinfection and sterilization practices are appropriate for managing patient-care equipment and environmental surfaces when potentially contaminated patients are evaluated and/or admitted in a health-care facility after exposure to a bioterrorist agent. For example,

25

sodium hypochlorite can be used for surface disinfection (see http://www.epa.gov/pesticides/factsheets/chemicals/bleachfactsheet.htm). In instances where the health-care facility is the site of a bioterrorist attack, environmental decontamination might require special decontamination procedures (e.g., chlorine dioxide gas for *B. anthracis* spores). Because no antimicrobial products are registered for decontamination of biologic agents after a bioterrorist attack, EPA has granted a crises exemption for each product (see http://www.epa.gov/pesticides/factsheets/chemicals/bleachfactsheet.htm). Of only theoretical concern is the possibility that a bioterrorist agent could be engineered to be less susceptible to disinfection and sterilization processes [309].

### Toxicological, Environmental and Occupational Concerns

Health hazards associated with the use of germicides in healthcare vary from mucous membrane irritation to death, with the latter involving accidental injection by mentally disturbed patients[316]. Although their degrees of toxicity vary [317-320], all disinfectants should be used with the proper safety precautions [321] and only for the intended purpose.

Key factors associated with assessing the health risk of a chemical exposure include the duration, intensity (i.e., how much chemical is involved), and route (e.g., skin, mucous membranes, and inhalation) of exposure. Toxicity can be acute or chronic. Acute toxicity usually results from an accidental spill of a chemical substance. Exposure is sudden and often produces an emergency situation. Chronic toxicity results from repeated exposure to low levels of the chemical over a prolonged period. Employers are responsible for informing workers about the chemical hazards in the workplace and implementing control measures. The OSHA Hazard Communication Standard (29 CFR 1910.1200, 1915.99, 1917.28, 1918.90, 1926.59, and 1928.21) requires manufacturers and importers of hazardous chemicals to develop Material Safety Data Sheets (MSDS) for each chemical or mixture of chemicals. Employers must have these data sheets readily available to employees who work with the products to which they could be exposed.

Exposure limits have been published for many chemicals used in health care to help provide a safe environment and, as relevant, are discussed in each section of this guideline. Only the exposure limits published by OSHA carry the legal force of regulations. OSHA publishes a limit as a time-weighted average (TWA), that is, the average concentration for a normal 8-hour work day and a 40-hour work week to which nearly all workers can be repeatedly exposed to a chemical without adverse health effects. For example, the permissible exposure limit (PEL) for EtO is 1.0 ppm, 8 hour TWA. The CDC National Institute for Occupational Safety and Health (NIOSH) develops recommended exposure limits (RELs). RELs are occupational exposure limits recommended by NIOSH as being protective of worker health and safety over a working lifetime. This limit is frequently expressed as a 40-hour TWA exposure for up to 10 hours per day during a 40-hour work week. These exposure limits are designed for inhalation exposures. Irritant and allergic effects can occur below the exposure limits, and skin contact can result in dermal effects or systemic absorption without inhalation. The American Conference on Governmental Industrial Hygienists (ACGIN) also provides guidelines on exposure limits [322]. Information about workplace exposures and methods to reduce them (e.g., work practices, engineering controls, PPE) is available on the OSHA (http://www.osha.gov) and NIOSH (http://www.cdc.gov/niosh) websites.

Some states have excluded or limited concentrations of certain chemical germicides (e.g., glutaraldehyde, formaldehyde, and some phenols) from disposal through the sewer system. These rules are intended to minimize environmental harm. If health-care facilities exceed the maximum allowable concentration of a chemical (e.g., >5.0 mg/L), they have three options. First, they can switch to alternative products; for example, they can change from glutaraldehyde to another disinfectant for high-level disinfection or from phenolics to quaternary ammonium compounds for low-level disinfection. Second, the health-care facility can collect the disinfectant and dispose of it as a hazardous chemical. Third, the

facility can use a commercially available small-scale treatment method (e.g., neutralize glutaraldehyde with glycine).

Safe disposal of regulated chemicals is important throughout the medical community. For disposal of large volumes of spent solutions, users might decide to neutralize the microbicidal activity before disposal (e.g., glutaraldehyde). Solutions can be neutralized by reaction with chemicals such as sodium bisulfite [323, 324] or glycine [325].

European authors have suggested that instruments and ventilation therapy equipment should be disinfected by heat rather than by chemicals. The concerns for chemical disinfection include toxic side effects for the patient caused by chemical residues on the instrument or object, occupational exposure to toxic chemicals, and recontamination by rinsing the disinfectant with microbially contaminated tap water [326].

## Disinfection in Ambulatory Care, Home Care, and the Home

With the advent of managed healthcare, increasing numbers of patients are now being cared for in ambulatory-care and home settings. Many patients in these settings might have communicable diseases, immunocompromising conditions, or invasive devices. Therefore, adequate disinfection in these settings is necessary to provide a safe patient environment. Because the ambulatory-care setting (i.e., outpatient facility) provides the same risk for infection as the hospital, the Spaulding classification scheme described in this guideline should be followed (Table 1) [17].

The home environment should be much safer than hospitals or ambulatory care. Epidemics should not be a problem, and cross-infection should be rare. The healthcare provider is responsible for providing the responsible family member information about infection-control procedures to follow in the home, including hand hygiene, proper cleaning and disinfection of equipment, and safe storage of cleaned and disinfected devices. Among the products recommended for home disinfection of reusable objects are bleach, alcohol, and hydrogen peroxide. APIC recommends that reusable objects (e.g., tracheostomy tubes) that touch mucous membranes be disinfected by immersion in 70% isopropyl alcohol for 5 minutes or in 3% hydrogen peroxide for 30 minutes. Additionally, a 1:50 dilution of 5.25%–6.15% sodium hypochlorite (household bleach) for 5 minutes should be effective [327-329]. Noncritical items (e.g., blood pressure cuffs, crutches) can be cleaned with a detergent. Blood spills should be handled according to OSHA regulations as previously described (see section on OSHA Bloodborne Pathogen Standard). In general, sterilization of critical items is not practical in homes but theoretically could be accomplished by chemical sterilants or boiling. Single-use disposable items can be used or reusable items sterilized in a hospital [330, 331].

Some environmental groups advocate "environmentally safe" products as alternatives to commercial germicides in the home-care setting. These alternatives (e.g., ammonia, baking soda, vinegar, Borax, liquid detergent) are not registered with EPA and should not be used for disinfecting because they are ineffective against *S. aureus*. Borax, baking soda, and detergents also are ineffective against *Salmonella* Typhi and *E.coli*; however, undiluted vinegar and ammonia are effective against *S.* Typhi and *E.coli* [53, 332, 333]. Common commercial disinfectants designed for home use also are effective against selected antibiotic-resistant bacteria [53].

Public concerns have been raised that the use of antimicrobials in the home can promote development of antibiotic-resistant bacteria [334, 335]. This issue is unresolved and needs to be considered further through scientific and clinical investigations. The public health benefits of using disinfectants in the home are unknown. However, some facts are known: many sites in the home kitchen and bathroom are microbially contaminated [336], use of hypochlorites markedly reduces bacteria [337], and good standards of hygiene (e.g., food hygiene, hand hygiene) can help reduce infections in the home [338, 339]. In addition, laboratory studies indicate that many commercially prepared household disinfectants are effective against common pathogens [53] and can interrupt surface-to-human transmission of pathogens [48]. The "targeted

hygiene concept"—which means identifying situations and areas (e.g., food-preparation surfaces and bathroom) where risk exists for transmission of pathogens—may be a reasonable way to identify when disinfection might be appropriate [340].

### Susceptibility of Antibiotic-Resistant Bacteria to Disinfectants

As with antibiotics, reduced susceptibility (or acquired "resistance") of bacteria to disinfectants can arise by either chromosomal gene mutation or acquisition of genetic material in the form of plasmids or transposons [338, 341-343, 344, 345, 346]. When changes occur in bacterial susceptibility that renders an antibiotic ineffective against an infection previously treatable by that antibiotic, the bacteria are referred to as "resistant." In contrast, reduced susceptibility to disinfectants does not correlate with failure of the disinfectant because concentrations used in disinfection still greatly exceed the cidal level. Thus, the word "resistance" when applied to these changes is incorrect, and the preferred term is "reduced susceptibility" or "increased tolerance"[344, 347]. No data are available that show that antibiotic-resistant bacteria are less sensitive to the liquid chemical germicides than antibiotic-sensitive bacteria at currently used germicide contact conditions and concentrations.

MRSA and vancomycin-resistant *Enterococcus* (VRE) are important health-care–associated agents. Some antiseptics and disinfectants have been known for years to be, because of MICs, somewhat less inhibitory to *S. aureus* strains that contain a plasmid-carrying gene encoding resistance to the antibiotic gentamicin [344]. For example, gentamicin resistance has been shown to also encode reduced susceptibility to propamidine, quaternary ammonium compounds, and ethidium bromide [348], and MRSA strains have been found to be less susceptible than methicillin-sensitive *S. aureus* (MSSA) strains to chlorhexidine, propamidine, and the quaternary ammonium compound cetrimide [349]. In other studies, MRSA and MSSA strains have been equally sensitive to phenols and chlorhexidine, but MRSA strains were slightly more tolerant to quaternary ammonium compounds [350]. Two gene families (*qac*CD [now referred to as *smr*] and *qac*AB) are involved in providing protection against agents that are components of disinfectant formulations such as quaternary ammonium compounds. Staphylococci have been proposed to evade destruction because the protein specified by the *qac*A determinant is a cytoplasmic-membrane–associated protein involved in an efflux system that actively reduces intracellular accumulation of toxicants, such as quaternary ammonium compounds, to intracellular targets [351].

Other studies demonstrated that plasmid-mediated formaldehyde tolerance is transferable from *Serratia marcescens* to *E. coli* [352] and plasmid-mediated quaternary ammonium tolerance is transferable from *S. aureus* to *E. coli*.[353] Tolerance to mercury and silver also is plasmid borne [341, 343-346].

Because the concentrations of disinfectants used in practice are much higher than the MICs observed, even for the more tolerant strains, the clinical relevance of these observations is questionable. Several studies have found antibiotic-resistant hospital strains of common healthcare-associated pathogens (i.e., *Enterococcus, P. aeruginosa, Klebsiella pneumoniae, E. coli, S. aureus,* and *S. epidermidis*) to be equally susceptible to disinfectants as antibiotic-sensitive strains [53, 354-356]. The susceptibility of glycopeptide-intermediate *S. aureus* was similar to vancomycin-susceptible, MRSA [357]. On the basis of these data, routine disinfection and housekeeping protocols do not need to be altered because of antibiotic resistance provided the disinfection method is effective [358, 359]. A study that evaluated the efficacy of selected cleaning methods (e.g., QUAT-sprayed cloth, and QUAT-immersed cloth) for eliminating VRE found that currently used disinfection processes most likely are highly effective in eliminating VRE. However, surface disinfection must involve contact with all contaminated surfaces [358]. A new method using an invisible flurorescent marker to objectively evaluate the thoroughness of cleaning activities in patient rooms might lead to improvement in cleaning of all objects and surfaces but needs further evaluation [360].

Lastly, does the use of antiseptics or disinfectants facilitate the development of disinfectant-tolerant organisms? Evidence and reviews indicate enhanced tolerance to disinfectants can be

developed in response to disinfectant exposure [334, 335, 346, 347, 361]. However, the level of tolerance is not important in clinical terms because it is low and unlikely to compromise the effectiveness of disinfectants of which much higher concentrations are used [347, 362].

The issue of whether low-level tolerance to germicides selects for antibiotic-resistant strains is unsettled but might depend on the mechanism by which tolerance is attained. For example, changes in the permeability barrier or efflux mechanisms might affect susceptibility to both antibiotics and germicides, but specific changes to a target site might not. Some researchers have suggested that use of disinfectants or antiseptics (e.g., triclosan) could facilitate development of antibiotic-resistant microorganisms [334, 335, 363]. Although evidence in laboratory studies indicates low-level resistance to triclosan, the concentrations of triclosan in these studies were low (generally <1 µg/mL) and dissimilar from the higher levels used in antimicrobial products (2,000–20,000 µg/mL) [364, 365]. Thus, researchers can create laboratory-derived mutants that demonstrate reduced susceptibility to antiseptics or disinfectants. In some experiments, such bacteria have demonstrated reduced susceptibility to certain antibiotics [335]. There is no evidence that using antiseptics or disinfectants selects for antibiotic-resistant organisms in nature or that such mutants survive in nature[366]. ). In addition, the action of antibiotics and the action of disinfectants differ fundamentally. Antibiotics are selectively toxic and generally have a single target site in bacteria, thereby inhibiting a specific biosynthetic process. Germicides generally are considered nonspecific antimicrobials because of a multiplicity of toxic-effect mechanisms or target sites and are broader spectrum in the types of microorganisms against which they are effective [344, 347].

The rotational use of disinfectants in some environments (e.g., pharmacy production units) has been recommended and practiced in an attempt to prevent development of resistant microbes [367, 368]. There have been only rare case reports that appropriately used disinfectants have resulted in a clinical problem arising from the selection or development of nonsusceptible microorganisms [369].

## Surface Disinfection
### Is Surface Disinfection Necessary?
The effective use of disinfectants is part of a multibarrier strategy to prevent health-care–associated infections. Surfaces are considered noncritical items because they contact intact skin. Use of noncritical items or contact with noncritical surfaces carries little risk of causing an infection in patients or staff. Thus, the routine use of germicidal chemicals to disinfect hospital floors and other noncritical items is controversial [370-375]. A 1991 study expanded the Spaulding scheme by dividing the noncritical environmental surfaces into housekeeping surfaces and medical equipment surfaces [376]. The classes of disinfectants used on housekeeping and medical equipment surfaces can be similar. However, the frequency of decontaminating can vary (see Recommendations). Medical equipment surfaces (e.g., blood pressure cuffs, stethoscopes, hemodialysis machines, and X-ray machines) can become contaminated with infectious agents and contribute to the spread of health-care–associated infections [248, 375]. For this reason, noncritical medical equipment surfaces should be disinfected with an EPA-registered low- or intermediate-level disinfectant. Use of a disinfectant will provide antimicrobial activity that is likely to be achieved with minimal additional cost or work.

Environmental surfaces (e.g., bedside table) also could potentially contribute to cross-transmission by contamination of health-care personnel from hand contact with contaminated surfaces, medical equipment, or patients [50, 375, 377]. A paper reviews the epidemiologic and microbiologic data (Table 3) regarding the use of disinfectants on noncritical surfaces [378].

Of the seven reasons to use a disinfectant on noncritical surfaces, five are particularly noteworthy and support the use of a germicidal detergent. First, hospital floors become contaminated with microorganisms from settling airborne bacteria: by contact with shoes, wheels, and other objects; and occasionally by spills. The removal of microbes is a component in controling health-care–associated infections. In an investigation of the cleaning of hospital floors, the use of soap and water (80% reduction) was less effective in reducing the numbers of bacteria than was a phenolic disinfectant (94%–99.9%

reduction) [379]. However, a few hours after floor disinfection, the bacterial count was nearly back to the pretreatment level. Second, detergents become contaminated and result in seeding the patient's environment with bacteria. Investigators have shown that mop water becomes increasingly dirty during cleaning and becomes contaminated if soap and water is used rather than a disinfectant. For example, in one study, bacterial contamination in soap and water without a disinfectant increased from 10 CFU/mL to 34,000 CFU/mL after cleaning a ward, whereas contamination in a disinfectant solution did not change (20 CFU/mL) [380]. Contamination of surfaces close to the patient that are frequently touched by the patient or staff (e.g., bed rails) could result in patient exposures0 [381]. In a study, using of detergents on floors and patient room furniture, increased bacterial contamination of the patients' environmental surfaces was found after cleaning (average increase = 103.6 CFU/24cm$^2$) [382]. In addition, a *P. aeruginosa* outbreak was reported in a hematology-oncology unit associated with contamination of the surface cleaning equipment when nongermicidal cleaning solutions instead of disinfectants were used to decontaminate the patients' environment [383] and another study demonstrated the role of environmental cleaning in controlling an outbreak of *Acinetobacter baumannii* [384]. Studies also have shown that, in situations where the cleaning procedure failed to eliminate contamination from the surface and the cloth is used to wipe another surface, the contamination is transferred to that surface and the hands of the person holding the cloth[381, 385]. Third, the CDC Isolation Guideline recommends that noncritical equipment contaminated with blood, body fluids, secretions, or excretions be cleaned and disinfected after use. The same guideline recommends that, in addition to cleaning, disinfection of the bedside equipment and environmental surfaces (e.g., bedrails, bedside tables, carts, commodes, door-knobs, and faucet handles) is indicated for certain pathogens, e.g., enterococci, which can survive in the inanimate environment for prolonged periods [386]. Fourth, OSHA requires that surfaces contaminated with blood and other potentially infectious materials (e.g., amniotic, pleural fluid) be disinfected. Fifth, using a single product throughout the facility can simplify both training and appropriate practice.

Reasons also exist for using a detergent alone on floors because noncritical surfaces contribute minimally to endemic health-care–associated infections [387], and no differences have been found in healthcare–associated infections rates when floors are cleaned with detergent rather than disinfectant [382, 388, 389]. However, these studies have been small and of short duration and suffer from low statistical power because the outcome—healthcare–associated infections—is of low frequency. The low rate of infections makes the efficacy of an intervention statistically difficult to demonstrate. Because housekeeping surfaces are associated with the lowest risk for disease transmission, some researchers have suggested that either detergents or a disinfectant/detergent could be used [376]. No data exist that show reduced healthcare–associated infection rates with use of surface disinfection of floors, but some data demonstrate reduced microbial load associated with the use of disinfectants. Given this information; other information showing that environmental surfaces (e.g., bedside table, bed rails) close to the patient and in outpatient settings [390] can be contaminated with epidemiologically important microbes (such as VRE and MRSA)[47, 390-394]; and data showing these organisms survive on various hospital surfaces [395, 396]; some researchers have suggested that such surfaces should be disinfected on a regular schedule [378]. Spot decontamination on fabrics that remain in hospitals or clinic rooms while patients move in and out (e.g., privacy curtains) also should be considered. One study demonstrated the effectiveness of spraying the fabric with 3% hydrogen peroxide [397]. Future studies should evaluate the level of contamination on noncritical environmental surfaces as a function of high and low hand contact and whether some surfaces (e.g., bed rails) near the patient with high contact frequencies require more frequent disinfection. Regardless of whether a detergent or disinfectant is used on surfaces in a health-care facility, surfaces should be cleaned routinely and when dirty or soiled to provide an aesthetically pleasing environment and to prevent potentially contaminated objects from serving as a source for health-care–associated infections [398]. The value of designing surfaces (e.g. hexyl-polyvinylpyridine) that kill bacteria on contact [399] or have sustained antimicrobial activity [400] should be further evaluated.

Several investigators have recognized heavy microbial contamination of wet mops and cleaning cloths and the potential for spread of such contamination [68, 401]. They have shown that wiping hard surfaces with contaminated cloths can contaminate hands, equipment, and other surfaces [68, 402]. Data

have been published that can be used to formulate effective policies for decontamination and maintenance of reusable cleaning cloths. For example, heat was the most reliable treatment of cleaning cloths as a detergent washing followed by drying at 80°C for 2 hours produced elimination of contamination. However, the dry heating process might be a fire hazard if the mop head contains petroleum-based products or lint builds up within the equipment or vent hose (American Health Care Association, personal communication, March 2003). Alternatively, immersing the cloth in hypochlorite (4,000 ppm) for 2 minutes produced no detectable surviving organisms in 10 of 13 cloths [403]. If reusable cleaning cloths or mops are used, they should be decontaminated regularly to prevent surface contamination during cleaning with subsequent transfer of organisms from these surfaces to patients or equipment by the hands of health-care workers. Some hospitals have begun using a new mopping technique involving microfiber materials to clean floors. Microfibers are densely constructed, polyester and polyamide (nylon) fibers, that are approximately 1/16 the thickness of a human hair. The positively charged microfibers attract dust (which has a negative charge) and are more absorbent than a conventional, cotton-loop mop. Microfiber materials also can be wet with disinfectants, such as quaternary ammonium compounds. In one study, the microfiber system tested demonstrated superior microbial removal compared with conventional string mops when used with a detergent cleaner (94% vs 68%). The use of a disinfectant did not improve the microbial elimination demonstrated by the microfiber system (95% vs 94%). However, use of disinfectant significantly improved microbial removal when a conventional string mop was used (95% vs 68%)(WA Rutala, unpublished data, August 2006). The microfiber system also prevents the possibility of transferring microbes from room to room because a new microfiber pad is used in each room.

**Contact Times for Surface Disinfectants**

An important issue concerning use of disinfectants for noncritical surfaces in health-care settings is that the contact time specified on the label of the product is often too long to be practically followed. The labels of most products registered by EPA for use against HBV, HIV, or *M. tuberculosis* specify a contact time of 10 minutes. Such a long contact time is not practical for disinfection of environmental surfaces in a health-care setting because most health-care facilities apply a disinfectant and allow it to dry (~1 minute). Multiple scientific papers have demonstrated significant microbial reduction with contact times of 30 to 60 seconds[46-56, 58-64]. In addition, EPA will approve a shortened contact time for any product for which the manufacturers will submit confirmatory efficacy data.

Currently, some EPA-registered disinfectants have contact times of one to three minutes. By law, users must follow all applicable label instructions for EPA-registered products. Ideally, product users should consider and use products that have the shortened contact time. However, disinfectant manufacturers also need to obtain EPA approval for shortened contact times so these products will be used correctly and effectively in the health-care environment.

**Air Disinfection**

Disinfectant spray-fog techniques for antimicrobial control in hospital rooms has been used. This technique of spraying of disinfectants is an unsatisfactory method of decontaminating air and surfaces and is not recommended for general infection control in routine patient-care areas[386]. Disinfectant fogging is rarely, if ever, used in U.S. healthcare facilities for air and surface disinfection in patient-care areas. Methods (e.g., filtration, ultraviolet germicidal irradiation, chlorine dioxide) to reduce air contamination in the healthcare setting are discussed in another guideline[23].

**Microbial Contamination of Disinfectants**

Contaminated disinfectants and antiseptics have been occasional vehicles of health-care infections and pseudoepidemics for more than 50 years. Published reports describing contaminated disinfectants and antiseptic solutions leading to health-care-associated infections have been summarized

[404]. Since this summary additional reports have been published [405-408]. An examination of reports of disinfectants contaminated with microorganisms revealed noteworthy observations. Perhaps most importantly, high-level disinfectants/liquid chemical sterilants have not been associated with outbreaks due to intrinsic or extrinsic contamination.Members of the genus *Pseudomonas* (e.g., *P. aeruginosa*) are the most frequent isolates from contaminated disinfectants—recovered from 80% of contaminated products. Their ability to remain viable or grow in use-dilutions of disinfectants is unparalleled. This survival advantage for *Pseudomonas* results presumably from their nutritional versatility, their unique outer membrane that constitutes an effective barrier to the passage of germicides, and/or efflux systems [409]. Although the concentrated solutions of the disinfectants have not been demonstrated to be contaminated at the point of manufacture, an undiluted phenolic can be contaminated by a *Pseudomonas* sp. during use [410]. In most of the reports that describe illness associated with contaminated disinfectants, the product was used to disinfect patient-care equipment, such as cystoscopes, cardiac catheters, and thermometers. Germicides used as disinfectants that were reported to have been contaminated include chlorhexidine, quaternary ammonium compounds, phenolics, and pine oil.

The following control measures should be instituted to reduce the frequency of bacterial growth in disinfectants and the threat of serious healthcare–associated infections from the use of such contaminated products [404] .      First, some disinfectants should not be diluted; those that are diluted must be prepared correctly to achieve the manufacturers' recommended use-dilution. Second, infection-control professionals must learn from the literature what inappropriate activities result in extrinsic contamination (i.e., at the point of use) of germicides and train users to prevent recurrence. Common sources of extrinsic contamination of germicides in the reviewed literature are the water to make working dilutions, contaminated containers, and general contamination of the hospital areas where the germicides are prepared and/or used. Third, stock solutions of germicides must be stored as indicated on the product label. EPA verifies manufacturers' efficacy claims against microorganisms. These measures should provide assurance that products meeting the EPA registration requirements can achieve a certain level of antimicrobial activity when used as directed.

# FACTORS AFFECTING THE EFFICACY OF DISINFECTION AND STERILIZATION

The activity of germicides against microorganisms depends on a number of factors, some of which are intrinsic qualities of the organism, others of which are the chemical and external physical environment. Awareness of these factors should lead to better use of disinfection and sterilization processes and will be briefly reviewed. More extensive consideration of these and other factors is available elsewhere [13, 14, 16, 411-413].

## Number and Location of Microorganisms

All other conditions remaining constant, the larger the number of microbes, the more time a germicide needs to destroy all of them. Spaulding illustrated this relation when he employed identical test conditions and demonstrated that it took 30 minutes to kill 10 *B. atrophaeus* (formerly *Bacillus subtilis*) spores but 3 hours to kill 100,000 *Bacillus atrophaeus* spores. This reinforces the need for scrupulous cleaning of medical instruments before disinfection and sterilization. Reducing the number of microorganisms that must be inactivated through meticulous cleaning, increases the margin of safety when the germicide is used according to the labeling and shortens the exposure time required to kill the entire microbial load. Researchers also have shown that aggregated or clumped cells are more difficult to inactivate than monodispersed cells [414].

The location of microorganisms also must be considered when factors affecting the efficacy of germicides are assessed. Medical instruments with multiple pieces must be disassembled and equipment such as endoscopes that have crevices, joints, and channels are more difficult to disinfect than are flat-surface equipment because penetration of the disinfectant of all parts of the equipment is more difficult. Only surfaces that directly contact the germicide will be disinfected, so there must be no air pockets and the equipment must be completely immersed for the entire exposure period. Manufacturers should be encouraged to produce equipment engineered for ease of cleaning and disinfection.

## Innate Resistance of Microorganisms

Microorganisms vary greatly in their resistance to chemical germicides and sterilization processes (Figure 1) [342] Intrinsic resistance mechanisms in microorganisms to disinfectants vary. For example, spores are resistant to disinfectants because the spore coat and cortex act as a barrier, mycobacteria have a waxy cell wall that prevents disinfectant entry, and gram-negative bacteria possess an outer membrane that acts as a barrier to the uptake of disinfectants [341, 343-345]. Implicit in all disinfection strategies is the consideration that the most resistant microbial subpopulation controls the sterilization or disinfection time. That is, to destroy the most resistant types of microorganisms (i.e., bacterial spores), the user needs to employ exposure times and a concentration of germicide needed to achieve complete destruction. Except for prions, bacterial spores possess the highest innate resistance to chemical germicides, followed by coccidia (e.g., *Cryptosporidium*), mycobacteria (e.g., *M. tuberculosis*), nonlipid or small viruses (e.g., poliovirus, and coxsackievirus), fungi (e.g., *Aspergillus*, and *Candida*), vegetative bacteria (e.g., *Staphylococcus,* and *Pseudomonas*) and lipid or medium-size viruses (e.g., herpes, and HIV). The germicidal resistance exhibited by the gram-positive and gram-negative bacteria is similar with some exceptions (e.g., *P. aeruginosa* which shows greater resistance to some disinfectants) [369, 415, 416]. *P. aeruginosa* also is significantly more resistant to a variety of disinfectants in its "naturally occurring" state than are cells subcultured on laboratory media [415, 417]. *Rickettsiae, Chlamydiae,* and mycoplasma cannot be placed in this scale of relative resistance because information about the efficacy of germicides against these agents is limited [418]. Because these microorganisms contain lipid and are similar in structure and composition to other bacteria, they can be predicted to be inactivated by the same germicides that destroy lipid viruses and vegetative bacteria. A known exception to this supposition is *Coxiella burnetti*, which has demonstrated resistance to disinfectants [419].

## Concentration and Potency of Disinfectants

With other variables constant, and with one exception (iodophors), the more concentrated the

disinfectant, the greater its efficacy and the shorter the time necessary to achieve microbial kill. Generally not recognized, however, is that all disinfectants are not similarly affected by concentration adjustments. For example, quaternary ammonium compounds and phenol have a concentration exponent of 1 and 6, respectively; thus, halving the concentration of a quaternary ammonium compound requires doubling its disinfecting time, but halving the concentration of a phenol solution requires a 64-fold (i.e., $2^6$) increase in its disinfecting time [365, 413, 420].

Considering the length of the disinfection time, which depends on the potency of the germicide, also is important. This was illustrated by Spaulding who demonstrated using the mucin-loop test that 70% isopropyl alcohol destroyed $10^4$ *M. tuberculosis* in 5 minutes, whereas a simultaneous test with 3% phenolic required 2–3 hours to achieve the same level of microbial kill [14].

**Physical and Chemical Factors**
Several physical and chemical factors also influence disinfectant procedures: temperature, pH, relative humidity, and water hardness. For example, the activity of most disinfectants increases as the temperature increases, but some exceptions exist. Furthermore, too great an increase in temperature causes the disinfectant to degrade and weakens its germicidal activity and thus might produce a potential health hazard.

An increase in pH improves the antimicrobial activity of some disinfectants (e.g., glutaraldehyde, quaternary ammonium compounds) but decreases the antimicrobial activity of others (e.g., phenols, hypochlorites, and iodine). The pH influences the antimicrobial activity by altering the disinfectant molecule or the cell surface [413].

Relative humidity is the single most important factor influencing the activity of gaseous disinfectants/sterilants, such as EtO, chlorine dioxide, and formaldehyde.
Water hardness (i.e., high concentration of divalent cations) reduces the rate of kill of certain disinfectants because divalent cations (e.g., magnesium, calcium) in the hard water interact with the disinfectant to form insoluble precipitates [13, 421].

**Organic and Inorganic Matter**
Organic matter in the form of serum, blood, pus, or fecal or lubricant material can interfere with the antimicrobial activity of disinfectants in at least two ways. Most commonly, interference occurs by a chemical reaction between the germicide and the organic matter resulting in a complex that is less germicidal or nongermicidal, leaving less of the active germicide available for attacking microorganisms. Chlorine and iodine disinfectants, in particular, are prone to such interaction. Alternatively, organic material can protect microorganisms from attack by acting as a physical barrier [422, 423].

The effects of inorganic contaminants on the sterilization process were studied during the 1950s and 1960s [424, 425]. These and other studies show the protection by inorganic contaminants of microorganisms to all sterilization processes results from occlusion in salt crystals [426, 427]. This further emphasizes the importance of meticulous cleaning of medical devices before any sterilization or disinfection procedure because both organic and inorganic soils are easily removed by washing [426].

**Duration of Exposure**
Items must be exposed to the germicide for the appropriate minimum contact time. Multiple investigators have demonstrated the effectiveness of low-level disinfectants against vegetative bacteria (e.g., *Listeria*, *E. coli*, *Salmonella*, VRE, MRSA), yeasts (e.g., *Candida*), mycobacteria (e.g., *M. tuberculosis*), and viruses (e.g., poliovirus) at exposure times of 30–60 seconds [46-64]. By law, all applicable label instructions on EPA-registered products must be followed. If the user selects exposure conditions that differ from those on the EPA-registered product label, the user assumes liability for any injuries resulting from off-label use and is potentially subject to enforcement action under the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA)

All lumens and channels of endoscopic instruments must contact the disinfectant. Air pockets interfere with the disinfection process, and items that float on the disinfectant will not be disinfected. The disinfectant must be introduced reliably into the internal channels of the device. The exact times for disinfecting medical items are somewhat elusive because of the effect of the aforementioned factors on disinfection efficacy. Certain contact times have proved reliable (Table 1), but, in general, longer contact times are more effective than shorter contact times.

## Biofilms

Microorganisms may be protected from disinfectants by production of thick masses of cells [428] and extracellular materials, or biofilms [429-435]. Biofilms are microbial communities that are tightly attached to surfaces and cannot be easly removed. Once these masses form, microbes within them can be resistant to disinfectants by multiple mechanisms, including physical characteristics of older biofilms, genotypic variation of the bacteria, microbial production of neutralizing enzymes, and physiologic gradients within the biofilm (e.g., pH). Bacteria within biofilms are up to 1,000 times more resistant to antimicrobials than are the same bacteria in suspension [436]. Although new decontamination methods [437] are being investigated for removing biofilms, chlorine and monochloramines can effectively inactivate biofilm bacteria [431] [438]. Investigators have hypothesized that the glycocalyx-like cellular masses on the interior walls of polyvinyl chloride pipe would protect embedded organisms from some disinfectants and be a reservoir for continuous contamination [429, 430, 439]. Biofilms have been found in whirlpools [440], dental unit waterlines[441], and numerous medical devices (e.g., contact lenses, pacemakers, hemodialysis systems, urinary catheters, central venous catheters, endoscopes) [434, 436, 438, 442]. Their presence can have serious implications for immunocompromised patients and patients who have indwelling medical devices. Some enzymes [436, 443, 444] and detergents [436] can degrade biofilms or reduce numbers of viable bacteria within a biofilm, but no products are EPA-registered or FDA-cleared for this purpose.

# CLEANING

Cleaning is the removal of foreign material (e.g., soil, and organic material) from objects and is normally accomplished using water with detergents or enzymatic products. Thorough cleaning is required before high-level disinfection and sterilization because inorganic and organic materials that remain on the surfaces of instruments interfere with the effectiveness of these processes. Also, if soiled materials dry or bake onto the instruments, the removal process becomes more difficult and the disinfection or sterilization process less effective or ineffective. Surgical instruments should be presoaked or rinsed to prevent drying of blood and to soften or remove blood from the instruments.

Cleaning is done manually in use areas without mechanical units (e.g., ultrasonic cleaners or washer-disinfectors) or for fragile or difficult-to-clean instruments. With manual cleaning, the two essential components are friction and fluidics. Friction (e.g., rubbing/scrubbing the soiled area with a brush) is an old and dependable method. Fluidics (i.e., fluids under pressure) is used to remove soil and debris from internal channels after brushing and when the design does not allow passage of a brush through a channel [445]. When a washer-disinfector is used, care should be taken in loading instruments: hinged instruments should be opened fully to allow adequate contact with the detergent solution; stacking of instruments in washers should be avoided; and instruments should be disassembled as much as possible.

The most common types of mechanical or automatic cleaners are ultrasonic cleaners, washer-decontaminators, washer-disinfectors, and washer-sterilizers. Ultrasonic cleaning removes soil by cavitation and implosion in which waves of acoustic energy are propagated in aqueous solutions to disrupt the bonds that hold particulate matter to surfaces. Bacterial contamination can be present in used ultrasonic cleaning solutions (and other used detergent solutions) because these solutions generally do not make antibacterial label claims [446]. Even though ultrasound alone does not significantly inactivate bacteria, sonication can act synergistically to increase the cidal efficacy of a disinfectant [447]. Users of ultrasonic cleaners should be aware that the cleaning fluid could result in endotoxin contamination of surgical instruments, which could cause severe inflammatory reactions [448]. Washer-sterilizers are modified steam sterilizers that clean by filling the chamber with water and detergent through which steam passes to provide agitation. Instruments are subsequently rinsed and subjected to a short steam-sterilization cycle. Another washer-sterilizer employs rotating spray arms for a wash cycle followed by a steam sterilization cycle at 285°F [449, 450]. Washer-decontaminators/disinfectors act like a dishwasher that uses a combination of water circulation and detergents to remove soil. These units sometimes have a cycle that subjects the instruments to a heat process (e.g., 93°C for 10 minutes) [451]. Washer-disinfectors are generally computer-controlled units for cleaning, disinfecting, and drying solid and hollow surgical and medical equipment. In one study, cleaning (measured as 5–6 $log_{10}$ reduction) was achieved on surfaces that had adequate contact with the water flow in the machine [452]. Detailed information about cleaning and preparing supplies for terminal sterilization is provided by professional organizations [453, 454] and books [455]. Studies have shown that manual and mechanical cleaning of endoscopes achieves approximately a 4-$log_{10}$ reduction of contaminating organisms [83, 104, 456, 457]. Thus, cleaning alone effectively reduces the number of microorganisms on contaminated equipment. In a quantitative analysis of residual protein contamination of reprocessed surgical instruments, median levels of residual protein contamination per instrument for five trays were 267, 260, 163, 456, and 756 μg [458]. In another study, the median amount of protein from reprocessed surgical instruments from different hospitals ranged from 8 μg to 91 μg [459]. When manual methods were compared with automated methods for cleaning reusable accessory devices used for minimally invasive surgical procedures, the automated method was more efficient for cleaning biopsy forceps and ported and nonported laparoscopic devices and achieved a >99% reduction in soil parameters (i.e., protein, carbohydrate, hemoglobin) in the ported and nonported laparoscopic devices [460, 461]

For instrument cleaning, a neutral or near-neutral pH detergent solution commonly is used because such solutions generally provide the best material compatibility profile and good soil removal.

Enzymes, usually proteases, sometimes are added to neutral pH solutions to assist in removing organic material. Enzymes in these formulations attack proteins that make up a large portion of common soil (e.g., blood, pus). Cleaning solutions also can contain lipases (enzymes active on fats) and amylases (enzymes active on starches). Enzymatic cleaners are not disinfectants, and proteinaceous enzymes can be inactivated by germicides. As with all chemicals, enzymes must be rinsed from the equipment or adverse reactions (e.g., fever, residual amounts of high-level disinfectants, proteinaceous residue) could result [462, 463]. Enzyme solutions should be used in accordance with manufacturer's instructions, which include proper dilution of the enzymatic detergent and contact with equipment for the amount of time specified on the label [463]. Detergent enzymes can result in asthma or other allergic effects in users. Neutral pH detergent solutions that contain enzymes are compatible with metals and other materials used in medical instruments and are the best choice for cleaning delicate medical instruments, especially flexible endoscopes [457]. Alkaline-based cleaning agents are used for processing medical devices because they efficiently dissolve protein and fat residues [464]; however, they can be corrosive [457]. Some data demonstrate that enzymatic cleaners are more effective than neutral detergents [465, 466] in removing microorganisms from surfaces but two more recent studies found no difference in cleaning efficiency between enzymatic and alkaline-based cleaners [443, 464]. Another study found no significant difference between enzymatic and non-enzymatic cleaners in terms of microbial cleaning efficacy [467]. A new non-enzyme, hydrogen peroxide-based formulation (not FDA-cleared) was as effective as enzymatic cleaners in removing protein, blood, carbohydrate, and endotoxin from surface test carriers[468] In addition, this product effected a 5-$log_{10}$ reduction in microbial loads with a 3-minute exposure at room temperature [468].

Although the effectiveness of high-level disinfection and sterilization mandates effective cleaning, no "real-time" tests exist that can be employed in a clinical setting to verify cleaning. If such tests were commercially available they could be used to ensure an adequate level of cleaning [469-472]. ). The only way to ensure adequate cleaning is to conduct a reprocessing verification test (e.g., microbiologic sampling), but this is not routinely recommended [473]. Validation of the cleaning processes in a laboratory-testing program is possible by microorganism detection, chemical detection for organic contaminants, radionuclide tagging, and chemical detection for specific ions [426, 471]. During the past few years, data have been published describing use of an artificial soil, protein, endotoxin, X-ray contrast medium, or blood to verify the manual or automated cleaning process [169, 452, 474-478] and adenosine triphosphate bioluminescence and microbiologic sampling to evaluate the effectiveness of environmental surface cleaning[170, 479]. At a minimum, all instruments should be individually inspected and be visibly clean.

## DISINFECTION

Many disinfectants are used alone or in combinations (e.g., hydrogen peroxide and peracetic acid) in the health-care setting. These include alcohols, chlorine and chlorine compounds, formaldehyde, glutaraldehyde, ortho-phthalaldehyde, hydrogen peroxide, iodophors, peracetic acid, phenolics, and quaternary ammonium compounds. Commercial formulations based on these chemicals are considered unique products and must be registered with EPA or cleared by FDA. In most instances, a given product is designed for a specific purpose and is to be used in a certain manner. Therefore, users should read labels carefully to ensure the correct product is selected for the intended use and applied efficiently.

Disinfectants are not interchangeable, and incorrect concentrations and inappropriate disinfectants can result in excessive costs. Because occupational diseases among cleaning personnel have been associated with use of several disinfectants (e.g., formaldehyde, glutaraldehyde, and chlorine), precautions (e.g., gloves and proper ventilation) should be used to minimize exposure [318, 480, 481]. Asthma and reactive airway disease can occur in sensitized persons exposed to any airborne chemical, including germicides. Clinically important asthma can occur at levels below ceiling levels regulated by OSHA or recommended by NIOSH. The preferred method of control is elimination of the chemical (through engineering controls or substitution) or relocation of the worker.

The following overview of the performance characteristics of each provides users with sufficient information to select an appropriate disinfectant for any item and use it in the most efficient way.

## Chemical Disinfectants
## Alcohol

*Overview.* In the healthcare setting, "alcohol" refers to two water-soluble chemical compounds— ethyl alcohol and isopropyl alcohol—that have generally underrated germicidal characteristics [482]. FDA has not cleared any liquid chemical sterilant or high-level disinfectant with alcohol as the main active ingredient. These alcohols are rapidly bactericidal rather than bacteriostatic against vegetative forms of bacteria; they also are tuberculocidal, fungicidal, and virucidal but do not destroy bacterial spores. Their cidal activity drops sharply when diluted below 50% concentration, and the optimum bactericidal concentration is 60%–90% solutions in water (volume/volume) [483, 484].

*Mode of Action.* The most feasible explanation for the antimicrobial action of alcohol is denaturation of proteins. This mechanism is supported by the observation that absolute ethyl alcohol, a dehydrating agent, is less bactericidal than mixtures of alcohol and water because proteins are denatured more quickly in the presence of water [484, 485]. Protein denaturation also is consistent with observations that alcohol destroys the dehydrogenases of *Escherichia coli* [486], and that ethyl alcohol increases the lag phase of *Enterobacter aerogenes* [487] and that the lag phase effect could be reversed by adding certain amino acids. The bacteriostatic action was believed caused by inhibition of the production of metabolites essential for rapid cell division.

*Microbicidal Activity.* Methyl alcohol (methanol) has the weakest bactericidal action of the alcohols and thus seldom is used in healthcare [488]. The bactericidal activity of various concentrations of ethyl alcohol (ethanol) was examined against a variety of microorganisms in exposure periods ranging from 10 seconds to 1 hour [483]. *Pseudomonas aeruginosa* was killed in 10 seconds by all concentrations of ethanol from 30% to 100% (v/v), and *Serratia marcescens, E, coli* and *Salmonella typhosa* were killed in 10 seconds by all concentrations of ethanol from 40% to 100%. The gram-positive organisms *Staphylococcus aureus* and *Streptococcus pyogenes* were slightly more resistant, being killed in 10 seconds by ethyl alcohol concentrations of 60%–95%. Isopropyl alcohol (isopropanol) was slightly more bactericidal than ethyl alcohol for *E. coli* and *S. aureus* [489].

Ethyl alcohol, at concentrations of 60%–80%, is a potent virucidal agent inactivating all of the lipophilic viruses (e.g., herpes, vaccinia, and influenza virus) and many hydrophilic viruses (e.g.,

adenovirus, enterovirus, rhinovirus, and rotaviruses but not hepatitis A virus (HAV) [58] or poliovirus) [49]. Isopropyl alcohol is not active against the nonlipid enteroviruses but is fully active against the lipid viruses [72]. Studies also have demonstrated the ability of ethyl and isopropyl alcohol to inactivate the hepatitis B virus(HBV) [224, 225] and the herpes virus, [490] and ethyl alcohol to inactivate human immunodeficiency virus (HIV) [227], rotavirus, echovirus, and astrovirus [491].

In tests of the effect of ethyl alcohol against *M. tuberculosis*, 95% ethanol killed the tubercle bacilli in sputum or water suspension within 15 seconds [492]. In 1964, Spaulding stated that alcohols were the germicide of choice for tuberculocidal activity, and they should be the standard by which all other tuberculocides are compared. For example, he compared the tuberculocidal activity of iodophor (450 ppm), a substituted phenol (3%), and isopropanol (70%/volume) using the mucin-loop test ($10^6$ *M. tuberculosis* per loop) and determined the contact times needed for complete destruction were 120–180 minutes, 45–60 minutes, and 5 minutes, respectively. The mucin-loop test is a severe test developed to produce long survival times. Thus, these figures should not be extrapolated to the exposure times needed when these germicides are used on medical or surgical material [482].

Ethyl alcohol (70%) was the most effective concentration for killing the tissue phase of *Cryptococcus neoformans*, *Blastomyces dermatitidis*, *Coccidioides immitis*, and *Histoplasma capsulatum* and the culture phases of the latter three organisms aerosolized onto various surfaces. The culture phase was more resistant to the action of ethyl alcohol and required about 20 minutes to disinfect the contaminated surface, compared with <1 minute for the tissue phase [493, 494].

Isopropyl alcohol (20%) is effective in killing the cysts of *Acanthamoeba culbertsoni* (560) as are chlorhexidine, hydrogen peroxide, and thimerosal [496].

*Uses.* Alcohols are not recommended for sterilizing medical and surgical materials principally because they lack sporicidal action and they cannot penetrate protein-rich materials. Fatal postoperative wound infections with *Clostridium* have occurred when alcohols were used to sterilize surgical instruments contaminated with bacterial spores [497]. Alcohols have been used effectively to disinfect oral and rectal thermometers[498, 499], hospital pagers [500], scissors [501], and stethoscopes [502]. Alcohols have been used to disinfect fiberoptic endoscopes [503, 504] but failure of this disinfectant have lead to infection [280, 505]. Alcohol towelettes have been used for years to disinfect small surfaces such as rubber stoppers of multiple-dose medication vials or vaccine bottles. Furthermore, alcohol occasionally is used to disinfect external surfaces of equipment (e.g., stethoscopes, ventilators, manual ventilation bags) [506], CPR manikins [507], ultrasound instruments [508] or medication preparation areas. Two studies demonstrated the effectiveness of 70% isopropyl alcohol to disinfect reusable transducer heads in a controlled environment [509, 510]. In contrast, three bloodstream infection outbreaks have been described when alcohol was used to disinfect transducer heads in an intensive-care setting [511].

The documented shortcomings of alcohols on equipment are that they damage the shellac mountings of lensed instruments, tend to swell and harden rubber and certain plastic tubing after prolonged and repeated use, bleach rubber and plastic tiles [482] and damage tonometer tips (by deterioration of the glue) after the equivalent of 1 working year of routine use [512]. Tonometer biprisms soaked in alcohol for 4 days developed rough front surfaces that potentially could cause corneal damage; this appeared to be caused by weakening of the cementing substances used to fabricate the biprisms [513]. Corneal opacification has been reported when tonometer tips were swabbed with alcohol immediately before measurement of intraocular pressure [514]. Alcohols are flammable and consequently must be stored in a cool, well-ventilated area. They also evaporate rapidly, making extended exposure time difficult to achieve unless the items are immersed.

### Chlorine and Chlorine Compounds
*Overview.* Hypochlorites, the most widely used of the chlorine disinfectants, are available as liquid (e.g., sodium hypochlorite) or solid (e.g., calcium hypochlorite). The most prevalent chlorine

products in the United States are aqueous solutions of 5.25%–6.15% sodium hypochlorite (see glossary), usually called household bleach. They have a broad spectrum of antimicrobial activity, do not leave toxic residues, are unaffected by water hardness, are inexpensive and fast acting [328], remove dried or fixed organisms and biofilms from surfaces[465], and have a low incidence of serious toxicity [515-517]. Sodium hypochlorite at the concentration used in household bleach (5.25-6.15%) can produce ocular irritation or oropharyngeal, esophageal, and gastric burns [318, 518-522]. Other disadvantages of hypochlorites include corrosiveness to metals in high concentrations (>500 ppm), inactivation by organic matter, discoloring or "bleaching" of fabrics, release of toxic chlorine gas when mixed with ammonia or acid (e.g., household cleaning agents) [523-525], and relative stability [327]. The microbicidal activity of chlorine is attributed largely to undissociated hypochlorous acid (HOCl). The dissociation of HOCl to the less microbicidal form (hypochlorite ion OCl⁻) depends on pH. The disinfecting efficacy of chlorine decreases with an increase in pH that parallels the conversion of undissociated HOCl to OCl⁻ [329, 526]. A potential hazard is production of the carcinogen bis(chloromethyl) ether when hypochlorite solutions contact formaldehyde [527] and the production of the animal carcinogen trihalomethane when hot water is hyperchlorinated [528]. After reviewing environmental fate and ecologic data, EPA has determined the currently registered uses of hypochlorites will not result in unreasonable adverse effects to the environment [529].

Alternative compounds that release chlorine and are used in the health-care setting include demand-release chlorine dioxide, sodium dichloroisocyanurate, and chloramine-T. The advantage of these compounds over the hypochlorites is that they retain chlorine longer and so exert a more prolonged bactericidal effect. Sodium dichloroisocyanurate tablets are stable, and for two reasons, the microbicidal activity of solutions prepared from sodium dichloroisocyanurate tablets might be greater than that of sodium hypochlorite solutions containing the same total available chlorine. First, with sodium dichloroisocyanurate, only 50% of the total available chlorine is free (HOCl and OCl⁻), whereas the remainder is combined (monochloroisocyanurate or dichloroisocyanurate), and as free available chlorine is used up, the latter is released to restore the equilibrium. Second, solutions of sodium dichloroisocyanurate are acidic, whereas sodium hypochlorite solutions are alkaline, and the more microbicidal type of chlorine (HOCl) is believed to predominate [530-533]. Chlorine dioxide-based disinfectants are prepared fresh as required by mixing the two components (base solution [citric acid with preservatives and corrosion inhibitors] and the activator solution [sodium chlorite]). In vitro suspension tests showed that solutions containing about 140 ppm chlorine dioxide achieved a reduction factor exceeding $10^6$ of *S. aureus* in 1 minute and of *Bacillus atrophaeus* spores in 2.5 minutes in the presence of 3 g/L bovine albumin. The potential for damaging equipment requires consideration because long-term use can damage the outer plastic coat of the insertion tube [534]. In another study, chlorine dioxide solutions at either 600 ppm or 30 ppm killed *Mycobacterium avium-intracellulare* within 60 seconds after contact but contamination by organic material significantly affected the microbicidal properties[535].

The microbicidal activity of a new disinfectant, "superoxidized water," has been examined The concept of electrolyzing saline to create a disinfectant or antiseptics is appealing because the basic materials of saline and electricity are inexpensive and the end product (i.e., water) does not damage the environment. The main products of this water are hypochlorous acid (e.g., at a concentration of about 144 mg/L) and chlorine. As with any germicide, the antimicrobial activity of superoxidized water is strongly affected by the concentration of the active ingredient (available free chlorine) [536]. One manufacturer generates the disinfectant at the point of use by passing a saline solution over coated titanium electrodes at 9 amps. The product generated has a pH of 5.0–6.5 and an oxidation-reduction potential (redox) of >950 mV. Although superoxidized water is intended to be generated fresh at the point of use, when tested under clean conditions the disinfectant was effective within 5 minutes when 48 hours old [537]. Unfortunately, the equipment required to produce the product can be expensive because parameters such as pH, current, and redox potential must be closely monitored. The solution is nontoxic to biologic tissues. Although the United Kingdom manufacturer claims the solution is noncorrosive and nondamaging to endoscopes and processing equipment, one flexible endoscope manufacturer (Olympus Key-Med, United Kingdom) has voided the warranty on the endoscopes if superoxidized water is used to disinfect them [538]. As with any germicide formulation, the user should check with the device manufacturer for

compatibility with the germicide. Additional studies are needed to determine whether this solution could be used as an alternative to other disinfectants or antiseptics for hand washing, skin antisepsis, room cleaning, or equipment disinfection (e.g., endoscopes, dialyzers) [400, 539, 540]. In October 2002, the FDA cleared superoxidized water as a high-level disinfectant (FDA, personal communication, September 18, 2002).

**Mode of Action.** The exact mechanism by which free chlorine destroys microorganisms has not been elucidated. Inactivation by chlorine can result from a number of factors: oxidation of sulfhydryl enzymes and amino acids; ring chlorination of amino acids; loss of intracellular contents; decreased uptake of nutrients; inhibition of protein synthesis; decreased oxygen uptake; oxidation of respiratory components; decreased adenosine triphosphate production; breaks in DNA; and depressed DNA synthesis [329, 347]. The actual microbicidal mechanism of chlorine might involve a combination of these factors or the effect of chlorine on critical sites [347].

**Microbicidal Activity.** Low concentrations of free available chlorine (e.g., HOCl, OCl⁻, and elemental chlorine-$Cl_2$) have a biocidal effect on mycoplasma (25 ppm) and vegetative bacteria (<5 ppm) in seconds in the absence of an organic load [329, 418]. Higher concentrations (1,000 ppm) of chlorine are required to kill *M. tuberculosis* using the Association of Official Analytical Chemists (AOAC) tuberculocidal test [73]. A concentration of 100 ppm will kill >99.9% of *B. atrophaeus* spores within 5 minutes [541, 542] and destroy mycotic agents in <1 hour [329]. Acidified bleach and regular bleach (5,000 ppm chlorine) can inactivate $10^6$ *Clostridium difficile* spores in ≤10 minutes [262]. One study reported that 25 different viruses were inactivated in 10 minutes with 200 ppm available chlorine [72]. Several studies have demonstrated the effectiveness of diluted sodium hypochlorite and other disinfectants to inactivate HIV [61]. Chlorine (500 ppm) showed inhibition of *Candida* after 30 seconds of exposure [54]. In experiments using the AOAC Use-Dilution Method, 100 ppm of free chlorine killed $10^6$–$10^7$ *S. aureus, Salmonella choleraesuis*, and *P. aeruginosa* in <10 minutes [327]. Because household bleach contains 5.25%–6.15% sodium hypochlorite, or 52,500–61,500 ppm available chlorine, a 1:1,000 dilution provides about 53–62 ppm available chlorine, and a 1:10 dilution of household bleach provides about 5250–6150 ppm.

Data are available for chlorine dioxide that support manufacturers' bactericidal, fungicidal, sporicidal, tuberculocidal, and virucidal label claims [543-546]. A chlorine dioxide generator has been shown effective for decontaminating flexible endoscopes [534] but it is not currently FDA-cleared for use as a high-level disinfectant [85]. Chlorine dioxide can be produced by mixing solutions, such as a solution of chlorine with a solution of sodium chlorite [329]. In 1986, a chlorine dioxide product was voluntarily removed from the market when its use caused leakage of cellulose-based dialyzer membranes, which allowed bacteria to migrate from the dialysis fluid side of the dialyzer to the blood side [547].

Sodium dichloroisocyanurate at 2,500 ppm available chlorine is effective against bacteria in the presence of up to 20% plasma, compared with 10% plasma for sodium hypochlorite at 2,500 ppm [548].

"Superoxidized water" has been tested against bacteria, mycobacteria, viruses, fungi, and spores [537, 539, 549]. Freshly generated superoxidized water is rapidly effective (<2 minutes) in achieving a 5-$log_{10}$ reduction of pathogenic microorganisms (i.e., *M. tuberculosis, M. chelonae*, poliovirus, HIV, multidrug-resistant *S. aureus, E. coli, Candida albicans, Enterococcus faecalis, P. aeruginosa*) in the absence of organic loading. However, the biocidal activity of this disinfectant decreased substantially in the presence of organic material (e.g., 5% horse serum) [537, 549, 550]. No bacteria or viruses were detected on artificially contaminated endoscopes after a 5-minute exposure to superoxidized water [551] and HBV-DNA was not detected from any endoscope experimentally contaminated with HBV-positive mixed sera after a disinfectant exposure time of 7 minutes [552].

**Uses.** Hypochlorites are widely used in healthcare facilities in a variety of settings. [328] Inorganic chlorine solution is used for disinfecting tonometer heads [188] and for spot-disinfection of countertops and floors. A 1:10–1:100 dilution of 5.25%–6.15% sodium hypochlorite (i.e., household bleach) [22, 228, 553, 554] or

41

an EPA-registered tuberculocidal disinfectant [17]has been recommended for decontaminating blood spills. For small spills of blood (i.e., drops of blood) on noncritical surfaces, the area can be disinfected with a 1:100 dilution of 5.25%-6.15% sodium hypochlorite or an EPA-registered tuberculocidal disinfectant. Because hypochlorites and other germicides are substantially inactivated in the presence of blood [63, 548, 555, 556], large spills of blood require that the surface be cleaned before an EPA-registered disinfectant or a 1:10 (final concentration) solution of household bleach is applied [557]. If a sharps injury is possible, the surface initially should be decontaminated [69, 318], then cleaned and disinfected (1:10 final concentration) [63]. Extreme care always should be taken to prevent percutaneous injury. At least 500 ppm available chlorine for 10 minutes is recommended for decontaminating CPR training manikins [558]. Full-strength bleach has been recommended for self-disinfection of needles and syringes used for illicit-drug injection when needle-exchange programs are not available. The difference in the recommended concentrations of bleach reflects the difficulty of cleaning the interior of needles and syringes and the use of needles and syringes for parenteral injection [559]. Clinicians should not alter their use of chlorine on environmental surfaces on the basis of testing methodologies that do not simulate actual disinfection practices [560, 561]. Other uses in healthcare include as an irrigating agent in endodontic treatment [562] and as a disinfectant for manikins, laundry, dental appliances, hydrotherapy tanks [23, 41], regulated medical waste before disposal [328], and the water distribution system in hemodialysis centers and hemodialysis machines [563].

Chlorine long has been used as the disinfectant in water treatment. Hyperchlorination of a *Legionella*-contaminated hospital water system [23] resulted in a dramatic decrease (from 30% to 1.5%) in the isolation of *L. pneumophila* from water outlets and a cessation of healthcare-associated Legionnaires' disease in an affected unit [528, 564]. Water disinfection with monochloramine by municipal water-treatment plants substantially reduced the risk for healthcare–associated Legionnaires disease [565, 566]. Chlorine dioxide also has been used to control *Legionella* in a hospital water supply. [567] Chloramine T [568] and hypochlorites [41] have been used to disinfect hydrotherapy equipment.

Hypochlorite solutions in tap water at a pH >8 stored at room temperature (23°C) in closed, opaque plastic containers can lose up to 40%–50% of their free available chlorine level over 1 month. Thus, if a user wished to have a solution containing 500 ppm of available chlorine at day 30, he or she should prepare a solution containing 1,000 ppm of chlorine at time 0. Sodium hypochlorite solution does not decompose after 30 days when stored in a closed brown bottle [327].

The use of powders, composed of a mixture of a chlorine-releasing agent with highly absorbent resin, for disinfecting spills of body fluids has been evaluated by laboratory tests and hospital ward trials. The inclusion of acrylic resin particles in formulations markedly increases the volume of fluid that can be soaked up because the resin can absorb 200–300 times its own weight of fluid, depending on the fluid consistency. When experimental formulations containing 1%, 5%, and 10% available chlorine were evaluated by a standardized surface test, those containing 10% demonstrated bactericidal activity. One problem with chlorine-releasing granules is that they can generate chlorine fumes when applied to urine [569].

## Formaldehyde
*Overview.* Formaldehyde is used as a disinfectant and sterilant in both its liquid and gaseous states. Liquid formaldehyde will be considered briefly in this section, and the gaseous form is reviewed elsewhere [570]. Formaldehyde is sold and used principally as a water-based solution called formalin, which is 37% formaldehyde by weight. The aqueous solution is a bactericide, tuberculocide, fungicide, virucide and sporicide [72, 82, 571-573]. OSHA indicated that formaldehyde should be handled in the workplace as a potential carcinogen and set an employee exposure standard for formaldehyde that limits an 8-hour time-weighted average exposure concentration of 0.75 ppm [574, 575]. The standard includes a second permissible exposure limit in the form of a short-term exposure limit (STEL) of 2 ppm that is the maximum exposure allowed during a 15-minute period [576]. Ingestion of formaldehyde can be fatal, and long-term exposure to low levels in the air or on the skin can cause asthma-like respiratory problems and skin irritation, such as dermatitis and itching. For these reasons, employees should have limited direct contact

with formaldehyde, and these considerations limit its role in sterilization and disinfection processes. Key provisions of the OSHA standard that protects workers from exposure to formaldehyde appear in Title 29 of the Code of Federal Regulations (CFR) Part 1910.1048 (and equivalent regulations in states with OSHA-approved state plans) [577].

***Mode of Action.*** Formaldehyde inactivates microorganisms by alkylating the amino and sulfhydral groups of proteins and ring nitrogen atoms of purine bases [376].

***Microbicidal Activity.*** Varying concentrations of aqueous formaldehyde solutions destroy a wide range of microorganisms. Inactivation of poliovirus in 10 minutes required an 8% concentration of formalin, but all other viruses tested were inactivated with 2% formalin [72]. Four percent formaldehyde is a tuberculocidal agent, inactivating $10^4$ *M. tuberculosis* in 2 minutes [82], and 2.5% formaldehyde inactivated about $10^7$ *Salmonella* Typhi in 10 minutes in the presence of organic matter [572]. The sporicidal action of formaldehyde was slower than that of glutaraldehyde in comparative tests with 4% aqueous formaldehyde and 2% glutaraldehyde against the spores of *B. anthracis* [82]. The formaldehyde solution required 2 hours of contact to achieve an inactivation factor of $10^4$, whereas glutaraldehyde required only 15 minutes.

***Uses.*** Although formaldehyde-alcohol is a chemical sterilant and formaldehyde is a high-level disinfectant, the health-care uses of formaldehyde are limited by its irritating fumes and its pungent odor even at very low levels (<1 ppm). For these reasons and others—such as its role as a suspected human carcinogen linked to nasal cancer and lung cancer [578], this germicide is excluded from Table 1. When it is used, , direct exposure to employees generally is limited; however, excessive exposures to formaldehyde have been documented for employees of renal transplant units [574, 579], and students in a gross anatomy laboratory [580]. Formaldehyde is used in the health-care setting to prepare viral vaccines (e.g., poliovirus and influenza); as an embalming agent; and to preserve anatomic specimens; and historically has been used to sterilize surgical instruments, especially when mixed with ethanol. A 1997 survey found that formaldehyde was used for reprocessing hemodialyzers by 34% of U.S. hemodialysis centers—a 60% decrease from 1983 [249, 581]. If used at room temperature, a concentration of 4% with a minimum exposure of 24 hours is required to disinfect disposable hemodialyzers reused on the same patient [582, 583]. Aqueous formaldehyde solutions (1%–2%) also have been used to disinfect the internal fluid pathways of dialysis machines [583]. To minimize a potential health hazard to dialysis patients, the dialysis equipment must be thoroughly rinsed and tested for residual formaldehyde before use.

Paraformaldehyde, a solid polymer of formaldehyde, can be vaporized by heat for the gaseous decontamination of laminar flow biologic safety cabinets when maintenance work or filter changes require access to the sealed portion of the cabinet.

## Glutaraldehyde

***Overview.*** Glutaraldehyde is a saturated dialdehyde that has gained wide acceptance as a high-level disinfectant and chemical sterilant [107]. Aqueous solutions of glutaraldehyde are acidic and generally in this state are not sporicidal. Only when the solution is "activated" (made alkaline) by use of alkalinating agents to pH 7.5–8.5 does the solution become sporicidal. Once activated, these solutions have a shelf-life of minimally 14 days because of the polymerization of the glutaraldehyde molecules at alkaline pH levels. This polymerization blocks the active sites (aldehyde groups) of the glutaraldehyde molecules that are responsible for its biocidal activity.

Novel glutaraldehyde formulations (e.g., glutaraldehyde-phenol-sodium phenate, potentiated acid glutaraldehyde, stabilized alkaline glutaraldehyde) produced in the past 30 years have overcome the problem of rapid loss of activity (e.g., use-life 28–30 days) while generally maintaining excellent microbicidal activity [584-588]. However, antimicrobial activity depends not only on age but also on use conditions, such as dilution and organic stress. Manufacturers' literature for these preparations suggests the neutral or alkaline glutaraldehydes possess microbicidal and anticorrosion properties superior to

those of acid glutaraldehydes, and a few published reports substantiate these claims [542, 589, 590]. However, two studies found no difference in the microbicidal activity of alkaline and acid glutaraldehydes [73, 591]. The use of glutaraldehyde-based solutions in health-care facilities is widespread because of their advantages, including excellent biocidal properties; activity in the presence of organic matter (20% bovine serum); and noncorrosive action to endoscopic equipment, thermometers, rubber, or plastic equipment (Tables 4 and 5).

***Mode of Action.*** The biocidal activity of glutaraldehyde results from its alkylation of sulfhydryl, hydroxyl, carboxyl, and amino groups of microorganisms, which alters RNA, DNA, and protein synthesis. The mechanism of action of glutaraldehydes are reviewed extensively elsewhere [592, 593].

***Microbicidal Activity.*** The in vitro inactivation of microorganisms by glutaraldehydes has been extensively investigated and reviewed [592, 593]. Several investigators showed that $\geq$2% aqueous solutions of glutaraldehyde, buffered to pH 7.5–8.5 with sodium bicarbonate effectively killed vegetative bacteria in <2 minutes; *M. tuberculosis*, fungi, and viruses in <10 minutes; and spores of *Bacillus* and *Clostridium* species in 3 hours [542, 592-597]. Spores of *C. difficile* are more rapidly killed by 2% glutaraldehyde than are spores of other species of *Clostridium* and *Bacillus* [79, 265, 266]. Microorganisms with substantial resistance to glutaraldehyde have been reported, including some mycobacteria (*M. chelonae, Mycobacterium avium-intracellulare, M. xenopi*) [598-601], *Methylobacterium mesophilicum* [602], *Trichosporon*, fungal ascospores (e.g., *Microascus cinereus, Cheatomium globosum*), and *Cryptosporidium* [271, 603]. *M. chelonae* persisted in a 0.2% glutaraldehyde solution used to store porcine prosthetic heart valves [604].

Two percent alkaline glutaraldehyde solution inactivated $10^5$ *M. tuberculosis* cells on the surface of penicylinders within 5 minutes at 18°C [589]. However, subsequent studies [82] questioned the mycobactericidal prowess of glutaraldehydes. Two percent alkaline glutaraldehyde has slow action (20 to >30 minutes) against *M. tuberculosis* and compares unfavorably with alcohols, formaldehydes, iodine, and phenol [82]. Suspensions of *M. avium, M. intracellulare,* and *M. gordonae* were more resistant to inactivation by a 2% alkaline glutaraldehyde (estimated time to complete inactivation: ~60 minutes) than were virulent *M. tuberculosis* (estimated time to complete inactivation ~25 minutes) [605]. The rate of kill was directly proportional to the temperature, and a standardized suspension of *M. tuberculosis* could not be sterilized within 10 minutes [84]. An FDA-cleared chemical sterilant containing 2.5% glutaraldehyde uses increased temperature (35°C) to reduce the time required to achieve high-level disinfection (5 minutes) [85, 606], but its use is limited to automatic endoscope reprocessors equipped with a heater. In another study employing membrane filters for measurement of mycobactericidal activity of 2% alkaline glutaraldehyde, complete inactivation was achieved within 20 minutes at 20°C when the test inoculum was $10^6$ *M. tuberculosis* per membrane [81]. Several investigators [55, 57, 73, 76, 80, 81, 84, 605] have demonstrated that glutaraldehyde solutions inactivate 2.4 to >5.0 $\log_{10}$ of *M. tuberculosis* in 10 minutes (including multidrug-resistant *M. tuberculosis*) and 4.0–6.4 $\log_{10}$ of *M. tuberculosis* in 20 minutes. On the basis of these data and other studies, 20 minutes at room temperature is considered the minimum exposure time needed to reliably kill *Mycobacteria* and other vegetative bacteria with $\geq$2% glutaraldehyde [17, 19, 27, 57, 83, 94, 108, 111, 117-121, 607].

Glutaraldehyde is commonly diluted during use, and studies showed a glutaraldehyde concentration decline after a few days of use in an automatic endoscope washer [608, 609]. The decline occurs because instruments are not thoroughly dried and water is carried in with the instrument, which increases the solution's volume and dilutes its effective concentration [610]. This emphasizes the need to ensure that semicritical equipment is disinfected with an acceptable concentration of glutaraldehyde. Data suggest that 1.0%–1.5% glutaraldehyde is the minimum effective concentration for >2% glutaraldehyde solutions when used as a high-level disinfectant [76, 589, 590, 609]. Chemical test strips or liquid chemical monitors [610, 611] are available for determining whether an effective concentration of glutaraldehyde is present despite repeated use and dilution. The frequency of testing should be based on how frequently the solutions are used (e.g., used daily, test daily; used weekly, test before use; used 30 times per day, test each 10th use), but the strips should not be used to extend the use life beyond the expiration date. Data suggest the chemicals in the test strip deteriorate with time [612] and a

44

manufacturer's expiration date should be placed on the bottles. The bottle of test strips should be dated when opened and used for the period of time indicated on the bottle (e.g., 120 days). The results of test strip monitoring should be documented. The glutaraldehyde test kits have been preliminarily evaluated for accuracy and range [612] but the reliability has been questioned [613]. To ensure the presence of minimum effective concentration of the high-level disinfectant, manufacturers of some chemical test strips recommend the use of quality-control procedures to ensure the strips perform properly. If the manufacturer of the chemical test strip recommends a quality-control procedure, users should comply with the manufacturer's recommendations. The concentration should be considered unacceptable or unsafe when the test indicates a dilution below the product's minimum effective concentration (MEC) (generally to ≤1.0%–1.5% glutaraldehyde) by the indicator not changing color.

A 2.0% glutaraldehyde–7.05% phenol–1.20% sodium phenate product that contained 0.125% glutaraldehyde–0.44% phenol–0.075% sodium phenate when diluted 1:16 is not recommended as a high-level disinfectant because it lacks bactericidal activity in the presence of organic matter and lacks tuberculocidal, fungicidal, virucidal, and sporicidal activity [49, 55, 56, 71, 73-79, 614]. In December 1991, EPA issued an order to stop the sale of all batches of this product because of efficacy data showing the product is not effective against spores and possibly other microorganisms or inanimate objects as claimed on the label [615]. FDA has cleared a glutaraldehyde–phenol/phenate concentrate as a high-level disinfectant that contains 1.12% glutaraldehyde with 1.93% phenol/phenate at its use concentration. Other FDA cleared glutaraldehyde sterilants that contain 2.4%–3.4% glutaraldehyde are used undiluted [606].

***Uses.*** Glutaraldehyde is used most commonly as a high-level disinfectant for medical equipment such as endoscopes [69, 107, 504], spirometry tubing, dialyzers [616], transducers, anesthesia and respiratory therapy equipment [617], hemodialysis proportioning and dialysate delivery systems [249, 618], and reuse of laparoscopic disposable plastic trocars [619]. Glutaraldehyde is noncorrosive to metal and does not damage lensed instruments, rubber. or plastics. Glutaraldehyde should not be used for cleaning noncritical surfaces because it is too toxic and expensive.

Colitis believed caused by glutaraldehyde exposure from residual disinfecting solution in endoscope solution channels has been reported and is preventable by careful endoscope rinsing [318, 620-630]. One study found that residual glutaraldehyde levels were higher and more variable after manual disinfection (<0.2 mg/L to 159.5 mg/L) than after automatic disinfection (0.2–6.3 mg/L)[631]. Similarly, keratopathy and corneal decompensation were caused by ophthalmic instruments that were inadequately rinsed after soaking in 2% glutaraldehyde [632, 633].

Healthcare personnel can be exposed to elevated levels of glutaraldehyde vapor when equipment is processed in poorly ventilated rooms, when spills occur, when glutaraldehyde solutions are activated or changed,[634] or when open immersion baths are used. Acute or chronic exposure can result in skin irritation or dermatitis, mucous membrane irritation (eye, nose, mouth), or pulmonary symptoms [318, 635-639]. Epistaxis, allergic contact dermatitis, asthma, and rhinitis also have been reported in healthcare workers exposed to glutaraldehyde [636, 640-647].

Glutaraldehyde exposure should be monitored to ensure a safe work environment. Testing can be done by four techniques: a silica gel tube/gas chromatography with a flame ionization detector, dinitrophenylhydrazine (DNPH)-impregnated filter cassette/high-performance liquid chromatography (HPLC) with an ultraviolet (UV) detector, a passive badge/HPLC, or a handheld glutaraldehyde air monitor [648]. The silica gel tube and the DNPH-impregnated cassette are suitable for monitoring the 0.05 ppm ceiling limit. The passive badge, with a 0.02 ppm limit of detection, is considered marginal at the Americal Council of Governmental Industrial Hygienists (ACGIH) ceiling level. The ceiling level is considered too close to the glutaraldehyde meter's 0.03 ppm limit of detection to provide confidence in the readings [648]. ACGIH does not require a specific monitoring schedule for glutaraldehyde; however, a monitoring schedule is needed to ensure the level is less than the ceiling limit. For example, monitoring

should be done initially to determine glutaraldehyde levels, after procedural or equipment changes, and in response to worker complaints [649]. In the absence of an OSHA permissible exposure limit, if the glutaraldehyde level is higher than the ACGIH ceiling limit of 0.05 ppm, corrective action and repeat monitoring would be prudent [649].

Engineering and work-practice controls that can be used to resolve these problems include ducted exhaust hoods, air systems that provide 7–15 air exchanges per hour, ductless fume hoods with absorbents for the glutaraldehyde vapor, tight-fitting lids on immersion baths, personal protection (e.g., nitrile or butyl rubber gloves but not natural latex gloves, goggles) to minimize skin or mucous membrane contact, and automated endoscope processors [7, 650]. If engineering controls fail to maintain levels below the ceiling limit, institutions can consider the use of respirators (e.g., a half-face respirator with organic vapor cartridge [640] or a type "C" supplied air respirator with a full facepiece operated in a positive pressure mode) [651]. In general, engineering controls are preferred over work-practice and administrative controls because they do not require active participation by the health-care worker. Even though enforcement of the OSHA ceiling limit was suspended in 1993 by the U.S. Court of Appeals [577], limiting employee exposure to 0.05 ppm (according to ACGIH) is prudent because, at this level, glutaraldehyde can irritate the eyes, throat, and nose [318, 577, 639, 652]. If glutaraldehyde disposal through the sanitary sewer system is restricted, sodium bisulfate can be used to neutralize the glutaraldehyde and make it safe for disposal.

## Hydrogen Peroxide

*Overview.* The literature contains several accounts of the properties, germicidal effectiveness, and potential uses for stabilized hydrogen peroxide in the health-care setting. Published reports ascribe good germicidal activity to hydrogen peroxide and attest to its bactericidal, virucidal, sporicidal, and fungicidal properties [653-655]. (Tables 4 and 5) The FDA website lists cleared liquid chemical sterilants and high-level disinfectants containing hydrogen peroxide and their cleared contact conditions.

*Mode of Action.* Hydrogen peroxide works by producing destructive hydroxyl free radicals that can attack membrane lipids, DNA, and other essential cell components. Catalase, produced by aerobic organisms and facultative anaerobes that possess cytochrome systems, can protect cells from metabolically produced hydrogen peroxide by degrading hydrogen peroxide to water and oxygen. This defense is overwhelmed by the concentrations used for disinfection [653, 654].

*Microbicidal Activity.* Hydrogen peroxide is active against a wide range of microorganisms, including bacteria, yeasts, fungi, viruses, and spores [78, 654]. A 0.5% accelerated hydrogen peroxide demonstrated bactericidal and virucidal activity in 1 minute and mycobactericidal and fungicidal activity in 5 minutes [656]. Bactericidal effectiveness and stability of hydrogen peroxide in urine has been demonstrated against a variety of health-care–associated pathogens; organisms with high cellular catalase activity (e.g., *S. aureus*, *S. marcescens*, and *Proteus mirabilis*) required 30–60 minutes of exposure to 0.6% hydrogen peroxide for a $10^8$ reduction in cell counts, whereas organisms with lower catalase activity (e.g., *E. coli*, *Streptococcus* species, and *Pseudomonas* species) required only 15 minutes' exposure [657]. In an investigation of 3%, 10%, and 15% hydrogen peroxide for reducing spacecraft bacterial populations, a complete kill of $10^6$ spores (i.e., *Bacillus* species) occurred with a 10% concentration and a 60-minute exposure time. A 3% concentration for 150 minutes killed $10^6$ spores in six of seven exposure trials [658]. A 10% hydrogen peroxide solution resulted in a $10^3$ decrease in *B. atrophaeus* spores, and a $\geq 10^5$ decrease when tested against 13 other pathogens in 30 minutes at $20°C$ [659, 660]. A 3.0% hydrogen peroxide solution was ineffective against VRE after 3 and 10 minutes exposure times [661] and caused only a 2-$\log_{10}$ reduction in the number of *Acanthamoeba* cysts in approximately 2 hours [662]. A 7% stabilized hydrogen peroxide proved to be sporicidal (6 hours of exposure), mycobactericidal (20 minutes), fungicidal (5 minutes) at full strength, virucidal (5 minutes) and bactericidal (3 minutes) at a 1:16 dilution when a quantitative carrier test was used [655]. The 7% solution of hydrogen peroxide, tested after 14 days of stress (in the form of germ-loaded carriers and respiratory therapy equipment), was sporicidal (>7 $\log_{10}$ reduction in 6 hours), mycobactericidal (>6.5 $\log_{10}$ reduction in 25

minutes), fungicidal (>5 $log_{10}$ reduction in 20 minutes), bactericidal (>6 $log_{10}$ reduction in 5 minutes) and virucidal (5 $log_{10}$ reduction in 5 minutes) [663]. Synergistic sporicidal effects were observed when spores were exposed to a combination of hydrogen peroxide (5.9%–23.6%) and peracetic acid [664]. Other studies demonstrated the antiviral activity of hydrogen peroxide against rhinovirus [665]. The time required for inactivating three serotypes of rhinovirus using a 3% hydrogen peroxide solution was 6–8 minutes; this time increased with decreasing concentrations (18-20 minutes at 1.5%, 50–60 minutes at 0.75%).

Concentrations of hydrogen peroxide from 6% to 25% show promise as chemical sterilants. The product marketed as a sterilant is a premixed, ready-to-use chemical that contains 7.5% hydrogen peroxide and 0.85% phosphoric acid (to maintain a low pH) [69]. The mycobactericidal activity of 7.5% hydrogen peroxide has been corroborated in a study showing the inactivation of >$10^5$ multidrug-resistant *M. tuberculosis* after a 10-minute exposure [666]. Thirty minutes were required for >99.9% inactivation of poliovirus and HAV [667]. Three percent and 6% hydrogen peroxide were unable to inactivate HAV in 1 minute in a carrier test [58]. When the effectiveness of 7.5% hydrogen peroxide at 10 minutes was compared with 2% alkaline glutaraldehyde at 20 minutes in manual disinfection of endoscopes, no significant difference in germicidal activity was observed [668]. ). No complaints were received from the nursing or medical staff regarding odor or toxicity. In one study, 6% hydrogen peroxide (unused product was 7.5%) was more effective in the high-level disinfection of flexible endoscopes than was the 2% glutaraldehyde solution [456]. A new, rapid-acting 13.4% hydrogen peroxide formulation (that is not yet FDA-cleared) has demonstrated sporicidal, mycobactericidal, fungicidal, and virucidal efficacy. Manufacturer data demonstrate that this solution sterilizes in 30 minutes and provides high-level disinfection in 5 minutes[669]. This product has not been used long enough to evaluate material compatibility to endoscopes and other semicritical devices, and further assessment by instrument manufacturers is needed.

Under normal conditions, hydrogen peroxide is extremely stable when properly stored (e.g., in dark containers). The decomposition or loss of potency in small containers is less than 2% per year at ambient temperatures [670].

*Uses.* Commercially available 3% hydrogen peroxide is a stable and effective disinfectant when used on inanimate surfaces. It has been used in concentrations from 3% to 6% for disinfecting soft contact lenses (e.g., 3% for 2–3 hrs) [653, 671, 672], tonometer biprisms [513], ventilators [673], fabrics [397], and endoscopes [456]. Hydrogen peroxide was effective in spot-disinfecting fabrics in patients' rooms [397]. Corneal damage from a hydrogen peroxide-soaked tonometer tip that was not properly rinsed has been reported [674]. Hydrogen peroxide also has been instilled into urinary drainage bags in an attempt to eliminate the bag as a source of bladder bacteriuria and environmental contamination [675]. Although the instillation of hydrogen peroxide into the bag reduced microbial contamination of the bag, this procedure did not reduce the incidence of catheter-associated bacteriuria [675].

A chemical irritation resembling pseudomembranous colitis caused by either 3% hydrogen peroxide or a 2% glutaraldehyde has been reported [621]. An epidemic of pseudomembrane-like enteritis and colitis in seven patients in a gastrointestinal endoscopy unit also has been associated with inadequate rinsing of 3% hydrogen peroxide from the endoscope [676].

As with other chemical sterilants, dilution of the hydrogen peroxide must be monitored by regularly testing the minimum effective concentration (i.e., 7.5%–6.0%). Compatibility testing by Olympus America of the 7.5% hydrogen peroxide found both cosmetic changes (e.g., discoloration of black anodized metal finishes) [69] and functional changes with the tested endoscopes (Olympus, written communication, October 15, 1999).

## Iodophors
*Overview.* Iodine solutions or tinctures long have been used by health professionals primarily as antiseptics on skin or tissue. Iodophors, on the other hand, have been used both as antiseptics and

disinfectants. FDA has not cleared any liquid chemical sterilant or high-level disinfectants with iodophors as the main active ingredient. An iodophor is a combination of iodine and a solubilizing agent or carrier; the resulting complex provides a sustained-release reservoir of iodine and releases small amounts of free iodine in aqueous solution. The best-known and most widely used iodophor is povidone-iodine, a compound of polyvinylpyrrolidone with iodine. This product and other iodophors retain the germicidal efficacy of iodine but unlike iodine generally are nonstaining and relatively free of toxicity and irritancy [677, 678].

Several reports that documented intrinsic microbial contamination of antiseptic formulations of povidone-iodine and poloxamer-iodine [679-681] caused a reappraisal of the chemistry and use of iodophors[682]. "Free" iodine ($I_2$) contributes to the bactericidal activity of iodophors and dilutions of iodophors demonstrate more rapid bactericidal action than does a full-strength povidone-iodine solution. The reason for the observation that dilution increases bactericidal activity is unclear, but dilution of povidone-iodine might weaken the iodine linkage to the carrier polymer with an accompanying increase of free iodine in solution [680]. Therefore, iodophors must be diluted according to the manufacturers' directions to achieve antimicrobial activity.

*Mode of Action.* Iodine can penetrate the cell wall of microorganisms quickly, and the lethal effects are believed to result from disruption of protein and nucleic acid structure and synthesis.

*Microbicidal Activity.* Published reports on the in vitro antimicrobial efficacy of iodophors demonstrate that iodophors are bactericidal, mycobactericidal, and virucidal but can require prolonged contact times to kill certain fungi and bacterial spores [14, 71-73, 290, 683-686]. Three brands of povidone-iodine solution have demonstrated more rapid kill (seconds to minutes) of *S. aureus* and *M. chelonae* at a 1:100 dilution than did the stock solution [683]. The virucidal activity of 75–150 ppm available iodine was demonstrated against seven viruses [72]. Other investigators have questioned the efficacy of iodophors against poliovirus in the presence of organic matter [685] and rotavirus SA-11 in distilled or tapwater [290]. Manufacturers' data demonstrate that commercial iodophors are not sporicidal, but they are tuberculocidal, fungicidal, virucidal, and bactericidal at their recommended use-dilution.

*Uses.* Besides their use as an antiseptic, iodophors have been used for disinfecting blood culture bottles and medical equipment, such as hydrotherapy tanks, thermometers, and endoscopes. Antiseptic iodophors are not suitable for use as hard-surface disinfectants because of concentration differences. Iodophors formulated as antiseptics contain less free iodine than do those formulated as disinfectants [376]. Iodine or iodine-based antiseptics should not be used on silicone catheters because they can adversely affect the silicone tubing [687].

## Ortho-phthalaldehyde (OPA)

*Overview.* Ortho-phthalaldehyde is a high-level disinfectant that received FDA clearance in October 1999. It contains 0.55% 1,2-benzenedicarboxaldehyde (OPA). OPA solution is a clear, pale-blue liquid with a pH of 7.5. (Tables 4 and 5)

*Mode of Action.* Preliminary studies on the mode of action of OPA suggest that both OPA and glutaraldehyde interact with amino acids, proteins, and microorganisms. However, OPA is a less potent cross-linking agent. This is compensated for by the lipophilic aromatic nature of OPA that is likely to assist its uptake through the outer layers of mycobacteria and gram-negative bacteria [688-690]. OPA appears to kill spores by blocking the spore germination process [691].

*Microbicidal Activity.* Studies have demonstrated excellent microbicidal activity in vitro [69, 100, 271, 400, 692-703]. For example, OPA has superior mycobactericidal activity (5-$\log_{10}$ reduction in 5 minutes) to glutaraldehyde. The mean times required to produce a 6-$\log_{10}$ reduction for *M. bovis* using 0.21% OPA was 6 minutes, compared with 32 minutes using 1.5% glutaraldehyde [693]. OPA showed good activity against the mycobacteria tested, including the glutaraldehyde-resistant strains, but 0.5% OPA was not sporicidal with 270 minutes of exposure. Increasing the pH from its unadjusted level (about 6.5) to pH 8 improved the sporicidal activity of OPA [694]. The level of biocidal activity was directly related to the

temperature. A greater than 5-log$_{10}$ reduction of *B. atrophaeus* spores was observed in 3 hours at 35°C, than in 24 hours at 20°C. Also, with an exposure time ≤5 minutes, biocidal activity decreased with increasing serum concentration. However, efficacy did not differ when the exposure time was ≥10 minutes [697]. In addition, OPA is effective (>5-log$_{10}$ reduction) against a wide range of microorganisms, including glutaraldehyde-resistant mycobacteria and *B. atrophaeus* spores [694].

The influence of laboratory adaptation of test strains, such as *P. aeruginosa*, to 0.55% OPA has been evaluated. Resistant and multiresistant strains increased substantially in susceptibility to OPA after laboratory adaptation (log$_{10}$ reduction factors increased by 0.54 and 0.91 for resistant and multiresistant strains, respectively) [704]. Other studies have found naturally occurring cells of *P. aeurginosa* were more resistant to a variety of disinfectants than were subcultured cells [705].

*Uses.* OPA has several potential advantages over glutaraldehyde. It has excellent stability over a wide pH range (pH 3–9), is not a known irritant to the eyes and nasal passages [706], does not require exposure monitoring, has a barely perceptible odor, and requires no activation. OPA, like glutaraldehyde, has excellent material compatibility. A potential disadvantage of OPA is that it stains proteins gray (including unprotected skin) and thus must be handled with caution [69]. However, skin staining would indicate improper handling that requires additional training and/or personal protective equipment (e.g., gloves, eye and mouth protection, and fluid-resistant gowns). OPA residues remaining on inadequately water-rinsed transesophageal echo probes can stain the patient's mouth [707]. Meticulous cleaning, using the correct OPA exposure time (e.g., 12 minutes) and copious rinsing of the probe with water should eliminate this problem. The results of one study provided a basis for a recommendation that rinsing of instruments disinfected with OPA will require at least 250 mL of water per channel to reduce the chemical residue to a level that will not compromise patient or staff safety (<1 ppm) [708]. Personal protective equipment should be worn when contaminated instruments, equipment, and chemicals are handled [400]. In addition, equipment must be thoroughly rinsed to prevent discoloration of a patient's skin or mucous membrane.

In April 2004, the manufacturer of OPA disseminated information to users about patients who reportedly experienced an anaphylaxis-like reaction after cystoscopy where the scope had been reprocessed using OPA. Of approximately 1 million urologic procedures performed using instruments reprocessed using OPA, 24 cases (17 cases in the United States, six in Japan, one in the United Kingdom) of anaphylaxis-like reactions have been reported after repeated cystoscopy (typically after four to nine treatments). Preventive measures include removal of OPA residues by thorough rinsing and not using OPA for reprocessing urologic instrumentation used to treat patients with a history of bladder cancer (Nevine Erian, personal communication, June 4, 2004; Product Notification, Advanced Sterilization Products, April 23, 2004) [709].

A few OPA clinical studies are available. In a clinical-use study, OPA exposure of 100 endoscopes for 5 minutes resulted in a >5-log$_{10}$ reduction in bacterial load. Furthermore, OPA was effective over a 14-day use cycle [100]. Manufacturer data show that OPA will last longer in an automatic endoscope reprocessor before reaching its MEC limit (MEC after 82 cycles) than will glutaraldehyde (MEC after 40 cycles) [400]. High-pressure liquid chromatography confirmed that OPA levels are maintained above 0.3% for at least 50 cycles [706, 710]. OPA must be disposed in accordance with local and state regulations. If OPA disposal through the sanitary sewer system is restricted, glycine (25 grams/gallon) can be used to neutralize the OPA and make it safe for disposal.

The high-level disinfectant label claims for OPA solution at 20°C vary worldwide (e.g., 5 minutes in Europe, Asia, and Latin America; 10 minutes in Canada and Australia; and 12 minutes in the United States). These label claims differ worldwide because of differences in the test methodology and requirements for licensure. In an automated endoscope reprocessor with an FDA-cleared capability to maintain solution temperatures at 25°C, the contact time for OPA is 5 minutes.

## Peracetic Acid

**Overview.** Peracetic, or peroxyacetic, acid is characterized by rapid action against all microorganisms. Special advantages of peracetic acid are that it lacks harmful decomposition products (i.e., acetic acid, water, oxygen, hydrogen peroxide), enhances removal of organic material [711], and leaves no residue. It remains effective in the presence of organic matter and is sporicidal even at low temperatures (Tables 4 and 5). Peracetic acid can corrode copper, brass, bronze, plain steel, and galvanized iron but these effects can be reduced by additives and pH modifications. It is considered unstable, particularly when diluted; for example, a 1% solution loses half its strength through hydrolysis in 6 days, whereas 40% peracetic acid loses 1%–2% of its active ingredients per month [654].

**Mode of Action.** Little is known about the mechanism of action of peracetic acid, but it is believed to function similarly to other oxidizing agents—that is, it denatures proteins, disrupts the cell wall permeability, and oxidizes sulfhydryl and sulfur bonds in proteins, enzymes, and other metabolites [654].

**Microbicidal Activity.** Peracetic acid will inactivate gram-positive and gram-negative bacteria, fungi, and yeasts in $\leq$5 minutes at <100 ppm. In the presence of organic matter, 200–500 ppm is required. For viruses, the dosage range is wide (12–2250 ppm), with poliovirus inactivated in yeast extract in 15 minutes with 1,500–2,250 ppm. In one study, 3.5% peracetic acid was ineffective against HAV after 1-minute exposure using a carrier test [58]. Peracetic acid (0.26%) was effective ($\log_{10}$ reduction factor >5) against all test strains of mycobacteria (*M. tuberculosis, M. avium-intracellulare, M. chelonae, and M. fortuitum*) within 20–30 minutes in the presence or absence of an organic load [607, 712]. With bacterial spores, 500–10,000 ppm (0.05%–1%) inactivates spores in 15 seconds to 30 minutes using a spore suspension test [654, 659, 713-715].

**Uses.** An automated machine using peracetic acid to chemically sterilize medical (e.g., endoscopes, arthroscopes), surgical, and dental instruments is used in the United States [716-718]. As previously noted, dental handpieces should be steam sterilized. The sterilant, 35% peracetic acid, is diluted to 0.2% with filtered water at 50°C. Simulated-use trials have demonstrated excellent microbicidal activity [111, 718-722], and three clinical trials have demonstrated both excellent microbial killing and no clinical failures leading to infection [90, 723, 724]. The high efficacy of the system was demonstrated in a comparison of the efficacies of the system with that of ethylene oxide. Only the peracetic acid system completely killed 6 $\log_{10}$ of *M. chelonae, E. faecalis,* and *B. atrophaeus* spores with both an organic and inorganic challenge [722]. An investigation that compared the costs, performance, and maintenance of urologic endoscopic equipment processed by high-level disinfection (with glutaraldehyde) with those of the peracetic acid system reported no clinical differences between the two systems. However, the use of this system led to higher costs than the high-level disinfection, including costs for processing ($6.11 vs. $0.45 per cycle), purchasing and training ($24,845 vs. $16), installation ($5,800 vs. $0), and endoscope repairs ($6,037 vs. $445) [90]. Furthermore, three clusters of infection using the peracetic acid automated endoscope reprocessor were linked to inadequately processed bronchoscopes when inappropriate channel connectors were used with the system [725]. These clusters highlight the importance of training, proper model-specific endoscope connector systems, and quality-control procedures to ensure compliance with endoscope manufacturer recommendations and professional organization guidelines. An alternative high-level disinfectant available in the United Kingdom contains 0.35% peracetic acid. Although this product is rapidly effective against a broad range of microorganisms [466, 726, 727], it tarnishes the metal of endoscopes and is unstable, resulting in only a 24-hour use life [727].

## Peracetic Acid and Hydrogen Peroxide

**Overview.** Two chemical sterilants are available that contain peracetic acid plus hydrogen peroxide (i.e., 0.08% peracetic acid plus 1.0% hydrogen peroxide [no longer marketed]; and 0.23% peracetic acid plus 7.35% hydrogen peroxide (Tables 4 and 5).

**Microbicidal Activity.** The bactericidal properties of peracetic acid and hydrogen peroxide have been demonstrated [728]. Manufacturer data demonstrated this combination of peracetic acid and

hydrogen peroxide inactivated all microorganisms except bacterial spores within 20 minutes. The 0.08% peracetic acid plus 1.0% hydrogen peroxide product effectively inactivated glutaraldehyde-resistant mycobacteria[729].

*Uses.* The combination of peracetic acid and hydrogen peroxide has been used for disinfecting hemodialyzers [730]. The percentage of dialysis centers using a peracetic acid-hydrogen peroxide-based disinfectant for reprocessing dialyzers increased from 5% in 1983 to 56% in 1997[249]. Olympus America does not endorse use of 0.08% peracetic acid plus 1.0% hydrogen peroxide (Olympus America, personal communication, April 15, 1998) on any Olympus endoscope because of cosmetic and functional damage and will not assume liability for chemical damage resulting from use of this product. This product is not currently available. FDA has cleared a newer chemical sterilant with 0.23% peracetic acid and 7.35% hydrogen peroxide (Tables 4 and 5). After testing the 7.35% hydrogen peroxide and 0.23% peracetic acid product, Olympus America concluded it was not compatible with the company's flexible gastrointestinal endoscopes; this conclusion was based on immersion studies where the test insertion tubes had failed because of swelling and loosening of the black polymer layer of the tube (Olympus America, personal communication, September 13, 2000).

## Phenolics

*Overview.* Phenol has occupied a prominent place in the field of hospital disinfection since its initial use as a germicide by Lister in his pioneering work on antiseptic surgery. In the past 30 years, however, work has concentrated on the numerous phenol derivatives or phenolics and their antimicrobial properties. Phenol derivatives originate when a functional group (e.g., alkyl, phenyl, benzyl, halogen) replaces one of the hydrogen atoms on the aromatic ring. Two phenol derivatives commonly found as constituents of hospital disinfectants are *ortho*-phenylphenol and *ortho*-benzyl-*para*-chlorophenol. The antimicrobial properties of these compounds and many other phenol derivatives are much improved over those of the parent chemical. Phenolics are absorbed by porous materials, and the residual disinfectant can irritate tissue. In 1970, depigmentation of the skin was reported to be caused by phenolic germicidal detergents containing *para*-tertiary butylphenol and *para*-tertiary amylphenol [731].

*Mode of Action.* In high concentrations, phenol acts as a gross protoplasmic poison, penetrating and disrupting the cell wall and precipitating the cell proteins. Low concentrations of phenol and higher molecular-weight phenol derivatives cause bacterial death by inactivation of essential enzyme systems and leakage of essential metabolites from the cell wall [732].

*Microbicidal Activity.* Published reports on the antimicrobial efficacy of commonly used phenolics showed they were bactericidal, fungicidal, virucidal, and tuberculocidal [14, 61, 71, 73, 227, 416, 573, 732-738]. One study demonstrated little or no virucidal effect of a phenolic against coxsackie B4, echovirus 11, and poliovirus 1 [736]. Similarly, 12% *ortho*-phenylphenol failed to inactivate any of the three hydrophilic viruses after a 10-minute exposure time, although 5% phenol was lethal for these viruses [72]. A 0.5% dilution of a phenolic (2.8% *ortho*-phenylphenol and 2.7% *ortho*-benzyl-*para*-chlorophenol) inactivated HIV [227] and a 2% solution of a phenolic (15% ortho-phenylphenol and 6.3% para-tertiary-amylphenol) inactivated all but one of 11 fungi tested [71].

Manufacturers' data using the standardized AOAC methods demonstrate that commercial phenolics are not sporicidal but are tuberculocidal, fungicidal, virucidal, and bactericidal at their recommended use-dilution. Attempts to substantiate the bactericidal label claims of phenolics using the AOAC Use-Dilution Method occasionally have failed [416, 737]. However, results from these same studies have varied dramatically among laboratories testing identical products.

*Uses.* Many phenolic germicides are EPA-registered as disinfectants for use on environmental surfaces (e.g., bedside tables, bedrails, and laboratory surfaces) and noncritical medical devices. Phenolics are not FDA-cleared as high-level disinfectants for use with semicritical items but could be used to preclean or decontaminate critical and semicritical devices before terminal sterilization or high-

51

level disinfection.

The use of phenolics in nurseries has been questioned because of hyperbilirubinemia in infants placed in bassinets where phenolic detergents were used [739]. In addition, bilirubin levels were reported to increase in phenolic-exposed infants, compared with nonphenolic-exposed infants, when the phenolic was prepared according to the manufacturers' recommended dilution [740]. If phenolics are used to clean nursery floors, they must be diluted as recommended on the product label. Phenolics (and other disinfectants) should not be used to clean infant bassinets and incubators while occupied. If phenolics are used to terminally clean infant bassinets and incubators, the surfaces should be rinsed thoroughly with water and dried before reuse of infant bassinets and incubators [17].

### Quaternary Ammonium Compounds

*Overview.* The quaternary ammonium compounds are widely used as disinfectants. Health-care–associated infections have been reported from contaminated quaternary ammonium compounds used to disinfect patient-care supplies or equipment, such as cystoscopes or cardiac catheters [741, 742]. The quaternaries are good cleaning agents, but high water hardness [743] and materials such as cotton and gauze pads can make them less microbicidal because of insoluble precipitates or cotton and gauze pads absorb the active ingredients, respectively. One study showed a significant decline (~40%–50% lower at 1 hour) in the concentration of quaternaries released when cotton rags or cellulose-based wipers were used in the open-bucket system, compared with the nonwoven spunlace wipers in the closed-bucket system [744] As with several other disinfectants (e.g., phenolics, iodophors) gram-negative bacteria can survive or grow in them [404].

Chemically, the quaternaries are organically substituted ammonium compounds in which the nitrogen atom has a valence of 5, four of the substituent radicals (R1-R4) are alkyl or heterocyclic radicals of a given size or chain length, and the fifth (X⁻) is a halide, sulfate, or similar radical [745]. Each compound exhibits its own antimicrobial characteristics, hence the search for one compound with outstanding antimicrobial properties. Some of the chemical names of quaternary ammonium compounds used in healthcare are alkyl dimethyl benzyl ammonium chloride, alkyl didecyl dimethyl ammonium chloride, and dialkyl dimethyl ammonium chloride. The newer quaternary ammonium compounds (i.e., fourth generation), referred to as twin-chain or dialkyl quaternaries (e.g. didecyl dimethyl ammonium bromide and dioctyl dimethyl ammonium bromide), purportedly remain active in hard water and are tolerant of anionic residues [746].

A few case reports have documented occupational asthma as a result of exposure to benzalkonium chloride [747].

*Mode of Action.* The bactericidal action of the quaternaries has been attributed to the inactivation of energy-producing enzymes, denaturation of essential cell proteins, and disruption of the cell membrane [746]. Evidence exists that supports these and other possibilities [745, 748].

*Microbicidal Activity.* Results from manufacturers' data sheets and from published scientific literature indicate that the quaternaries sold as hospital disinfectants are generally fungicidal, bactericidal, and virucidal against lipophilic (enveloped) viruses; they are not sporicidal and generally not tuberculocidal or virucidal against hydrophilic (nonenveloped) viruses [14, 54-56, 58, 59, 61, 71, 73, 186, 297, 748, 749] The poor mycobactericidal activities of quaternary ammonium compounds have been demonstrated [55, 73]. Quaternary ammonium compounds (as well as 70% isopropyl alcohol, phenolic, and a chlorine-containing wipe [80 ppm]) effectively (>95%) remove and/or inactivate contaminants (i.e., multidrug-resistant *S. aureus*, vancomycin-resistant *Entercoccus*, *P. aeruginosa*) from computer keyboards with a 5-second application time. No functional damage or cosmetic changes occurred to the computer keyboards after 300 applications of the disinfectants [45].

Attempts to reproduce the manufacturers' bactericidal and tuberculocidal claims using the AOAC

tests with a limited number of quaternary ammonium compounds occasionally have failed [73, 416, 737]. However, test results have varied extensively among laboratories testing identical products [416, 737].

*Uses.* The quaternaries commonly are used in ordinary environmental sanitation of noncritical surfaces, such as floors, furniture, and walls. EPA-registered quaternary ammonium compounds are appropriate to use for disinfecting medical equipment that contacts intact skin (e.g., blood pressure cuffs).

## MISCELLANEOUS INACTIVATING AGENTS

### Other Germicides

Several compounds have antimicrobial activity but for various reasons have not been incorporated into the armamentarium of health-care disinfectants. These include mercurials, sodium hydroxide, β-propiolactone, chlorhexidine gluconate, cetrimide-chlorhexidine, glycols (triethylene and propylene), and the Tego disinfectants. Two authoritative references examine these agents in detail [16, 412].

A peroxygen-containing formulation had marked bactericidal action when used as a 1% weight/volume solution and virucidal activity at 3% [49], but did not have mycobactericidal activity at concentrations of 2.3% and 4% and exposure times ranging from 30 to 120 minutes [750]. It also required 20 hours to kill *B. atrophaeus* spores [751]. A powder-based peroxygen compound for disinfecting contaminated spill was strongly and rapidly bactericidal [752].

In preliminary studies, nanoemulsions (composed of detergents and lipids in water) showed activity against vegetative bacteria, enveloped viruses and *Candida*. This product represents a potential agent for use as a topical biocidal agent. [753-755].

New disinfectants that require further evaluation include glucoprotamin[756], tertiary amines [703]. and a light-activated antimicrobial coating [757]. Several other disinfection technologies might have potential applications in the healthcare setting [758].

### Metals as Microbicides

Comprehensive reviews of antisepsis [759], disinfection[421], and anti-infective chemotherapy [760] barely mention the antimicrobial activity of heavy metals[761, 762]. Nevertheless, the anti-infective activity of some heavy metals has been known since antiquity. Heavy metals such as silver have been used for prophylaxis of conjunctivitis of the newborn, topical therapy for burn wounds, and bonding to indwelling catheters, and the use of heavy metals as antiseptics or disinfectants is again being explored [763]. Inactivation of bacteria on stainless steel surfaces by zeolite ceramic coatings containing silver and zinc ions has also been demonstrated [764, 765].

Metals such as silver, iron, and copper could be used for environmental control, disinfection of water, or reusable medical devices or incorporated into medical devices (e.g., intravascular catheters) [400, 761-763, 766-770]. A comparative evaluation of six disinfectant formulations for residual antimicrobial activity demonstrated that only the silver disinfectant demonstrated significant residual activity against *S. aureus* and *P. aeruginosa* [763]. Preliminary data suggest metals are effective against a wide variety of microorganisms.

Clinical uses of other heavy metals include copper-8-quinolinolate as a fungicide against *Aspergillus*, copper-silver ionization for *Legionella* disinfection [771-774], organic mercurials as an antiseptic (e.g., mercurochrome) and preservative/disinfectant (e.g., thimerosal [currently being removed from vaccines]) in pharmaceuticals and cosmetics [762].

### Ultraviolet Radiation (UV)

The wavelength of UV radiation ranges from 328 nm to 210 nm (3280 A to 2100 A). Its maximum bactericidal effect occurs at 240–280 nm. Mercury vapor lamps emit more than 90% of their radiation at 253.7 nm, which is near the maximum microbicidal activity [775]. Inactivation of microorganisms results from destruction of nucleic acid through induction of thymine dimers. UV radiation has been employed in the disinfection of drinking water [776], air [775], titanium implants [777], and contact lenses[778]. Bacteria and viruses are more easily killed by UV light than are bacterial spores [775]. UV radiation has several potential applications, but unfortunately its germicidal effectiveness and use is influenced by organic matter; wavelength; type of suspension; temperature; type of microorganism; and UV intensity, which is affected by distance and dirty tubes[779]. The application of UV radiation in the health-care environment (i.e.,

54

operating rooms, isolation rooms, and biologic safety cabinets) is limited to destruction of airborne organisms or inactivation of microorganisms on surfaces. The effect of UV radiation on postoperative wound infections was investigated in a double-blind, randomized study in five university medical centers. After following 14,854 patients over a 2-year period, the investigators reported the overall wound infection rate was unaffected by UV radiation, although postoperative infection in the "refined clean" surgical procedures decreased significantly (3.8%–2.9%) [780]. No data support the use of UV lamps in isolation rooms, and this practice has caused at least one epidemic of UV-induced skin erythema and keratoconjunctivitis in hospital patients and visitors [781].

## Pasteurization

Pasteurization is not a sterilization process; its purpose is to destroy all pathogenic microorganisms. However, pasteurization does not destroy bacterial spores. The time-temperature relation for hot-water pasteurization is generally ~70°C (158°F) for 30 minutes. The water temperature and time should be monitored as part of a quality-assurance program [782]. Pasteurization of respiratory therapy [783, 784] and anesthesia equipment [785] is a recognized alternative to chemical disinfection. The efficacy of this process has been tested using an inoculum that the authors believed might simulate contamination by an infected patient. Use of a large inoculum ($10^7$) of P. aeruginosa or Acinetobacter calcoaceticus in sets of respiratory tubing before processing demonstrated that machine-assisted chemical processing was more efficient than machine-assisted pasteurization with a disinfection failure rate of 6% and 83%, respectively [783]. Other investigators found hot water disinfection to be effective (inactivation factor >5 $\log_{10}$) against multiple bacteria, including multidrug-resistant bacteria, for disinfecting reusable anesthesia or respiratory therapy equipment [784-786].

## Flushing- and Washer-Disinfectors

Flushing- and washer-disinfectors are automated and closed equipment that clean and disinfect objects from bedpans and washbowls to surgical instruments and anesthesia tubes. Items such as bedpans and urinals can be cleaned and disinfected in flushing-disinfectors. They have a short cycle of a few minutes. They clean by flushing with warm water, possibly with a detergent, and then disinfect by flushing the items with hot water or with steam. Because this machine empties, cleans, and disinfects, manual cleaning is eliminated, fewer disposable items are needed, and fewer chemical germicides are used. A microbiologic evaluation of one washer/disinfector demonstrated complete inactivation of suspensions of E. faecalis or poliovirus [787]. Other studies have shown that strains of Enterococcus faecium can survive the British Standard for heat disinfection of bedpans (80°C for 1 minute). The significance of this finding with reference to the potential for enterococci to survive and disseminate in the health-care environment is debatable [788-790]. These machines are available and used in many European countries.

Surgical instruments and anesthesia equipment are more difficult to clean. They are run in washer-disinfectors on a longer cycle of approximately 20–30 minutes with a detergent. These machines also disinfect by hot water at approximately 90°C [791].

## THE REGULATORY FRAMEWORK FOR DISINFECTANTS AND STERILANTS

Before using the guidance provided in this document, health-care workers should be aware of the federal laws and regulations that govern the sale, distribution, and use of disinfectants and sterilants. In particular, health-care workers need to know what requirements pertain to them when they apply these products. Finally, they should understand the relative roles of EPA, FDA, and CDC so the context for the guidance provided in this document is clear.

### EPA and FDA

In the United States, chemical germicides formulated as sanitizers, disinfectants, or sterilants are regulated in interstate commerce by the Antimicrobials Division, Office of Pesticides Program, EPA, under the authority of the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) of 1947, as amended [792]. Under FIFRA, any substance or mixture of substances intended to prevent, destroy, repel, or mitigate any pest (including microorganisms but excluding those in or on living humans or animals) must be registered before sale or distribution. To obtain a registration, a manufacturer must submit specific data about the safety and effectiveness of each product. For example, EPA requires manufacturers of sanitizers, disinfectants, or chemical sterilants to test formulations by using accepted methods for microbiocidal activity, stability, and toxicity to animals and humans. The manufacturers submit these data to EPA along with proposed labeling. If EPA concludes the product can be used without causing "unreasonable adverse effects," then the product and its labeling are registered, and the manufacturer can sell and distribute the product in the United States.

FIFRA also requires users of products to follow explicitly the labeling directions on each product. The following standard statement appears on all labels under the "Directions for Use" heading: "It is a violation of federal law to use this product in a manner inconsistent with its labeling." This statement means a health-care worker must follow the safety precautions and use directions on the labeling of each registered product. Failure to follow the specified use-dilution, contact time, method of application, or any other condition of use is considered a misuse of the product and potentially subject to enforcement action under FIFRA.

In general, EPA regulates disinfectants and sterilants used on environmental surfaces, and not those used on critical or semicritical medical devices; the latter are regulated by FDA. In June 1993, FDA and EPA issued a "Memorandum of Understanding" that divided responsibility for review and surveillance of chemical germicides between the two agencies. Under the agreement, FDA regulates liquid chemical sterilants used on critical and semicritical devices, and EPA regulates disinfectants used on noncritical surfaces and gaseous sterilants [793]. In 1996, Congress passed the Food Quality Protection Act (FQPA). This act amended FIFRA in regard to several types of products regulated by both EPA and FDA. One provision of FQPA removed regulation of liquid chemical sterilants used on critical and semicritical medical devices from EPA's jurisdiction, and it now rests solely with FDA [792, 794]. EPA continues to register nonmedical chemical sterilants. FDA and EPA have considered the impact of FQPA, and in January 2000, FDA published its final guidance document on product submissions and labeling. Antiseptics are considered antimicrobial drugs used on living tissue and thus are regulated by FDA under the Food, Drug and Cosmetic Act. FDA regulates liquid chemical sterilants and high-level disinfectants intended to process critical and semicritical devices. FDA has published recommendations on the types of test methods that manufacturers should submit to FDA for 510[k] clearance for such agents.

### CDC

At CDC, the mission of the Coordinating Center for Infections Diseases is to guide the public on how to prevent and respond to infectious diseases in both health-care settings and at home. With respect to disinfectants and sterilants, part of CDC's role is to inform the public (in this case healthcare personnel) of current scientific evidence pertaining to these products, to comment about their safety and efficacy, and to recommend which chemicals might be most appropriate or effective for specific microorganisms and settings.

**Test Methods**

The methods EPA has used for registration are standardized by the AOAC International; however, a survey of scientific literature reveals a number of problems with these tests that were reported during 1987–1990 [58, 76, 80, 428, 736, 737, 795-800] that cause them to be neither accurate nor reproducible [416, 737]. As part of their regulatory authority, EPA and FDA support development and validation of methods for assessing disinfection claims [801-803]. For example, EPA has supported the work of Dr. Syed Sattar and coworkers who have developed a two-tier quantitative carrier test to assess sporicidal, mycobactericidal, bactericidal, fungicidal, virucidal, and protozoacidal activity of chemical germicides [701, 803]. EPA is accepting label claims against hepatitis B virus (HBV) using a surrogate organism, the duck HBV, to quantify disinfectant activity [124, 804]. EPA also is accepting labeling claims against hepatitis C virus using the bovine viral diarrhea virus as a surrogate.

For nearly 30 years, EPA also performed intramural preregistration and postregistration efficacy testing of some chemical disinfectants in its own laboratories. In 1982, this was stopped, reportedly for budgetary reasons. At that time, manufacturers did not need to have microbiologic activity claims verified by EPA or an independent testing laboratory when registering a disinfectant or chemical sterilant [805]. This occurred when the frequency of contaminated germicides and infections secondary to their use had increased [404]. Investigations demonstrating that interlaboratory reproducibility of test results was poor and manufacturers' label claims were not verifiable [416, 737] and symposia sponsored by the American Society for Microbiology [800] heightened awareness of these problems and reconfirmed the need to improve the AOAC methods and reinstate a microbiologic activity verification program. A General Accounting Office report entitled *Disinfectants: EPA Lacks Assurance They Work* [806] seemed to provide the necessary impetus for EPA to initiate corrective measures, including cooperative agreements to improve the AOAC methods and independent verification testing for all products labeled as sporicidal and disinfectants labeled as tuberculocidal. For example, of 26 sterilant products tested by EPA, 15 were canceled because of product failure. A list of products registered with EPA and labeled for use as sterilants or tuberculocides or against HIV and/or HBV is available through EPA's website at http://www.epa.gov/oppad001/chemregindex.htm. Organizations (e.g., Organization for Economic Cooperation and Development) are working to standardize requirements for germicide testing and registration.

### Neutralization of Germicides

One of the difficulties associated with evaluating the bactericidal activity of disinfectants is prevention of bacteriostasis from disinfectant residues carried over into the subculture media. Likewise, small amounts of disinfectants on environmental surfaces can make an accurate bacterial count difficult to get when sampling of the health-care environment as part of an epidemiologic or research investigation. One way these problems may be overcome is by employing neutralizers that inactivate residual disinfectants [807-809]. Two commonly used neutralizing media for chemical disinfectants are Letheen Media and D/E Neutralizing Media. The former contains lecithin to neutralize quaternaries and polysorbate 80 (Tween 80) to neutralize phenolics, hexachlorophene, formalin, and, with lecithin, ethanol. The D/E Neutralizing media will neutralize a broad spectrum of antiseptic and disinfectant chemicals, including quaternary ammonium compounds, phenols, iodine and chlorine compounds, mercurials, formaldehyde, and glutaraldehyde [810]. A review of neutralizers used in germicide testing has been published [808].

## STERILIZATION

Most medical and surgical devices used in healthcare facilities are made of materials that are heat stable and therefore undergo heat, primarily steam, sterilization. However, since 1950, there has been an increase in medical devices and instruments made of materials (e.g., plastics) that require low-temperature sterilization. Ethylene oxide gas has been used since the 1950s for heat- and moisture-sensitive medical devices. Within the past 15 years, a number of new, low-temperature sterilization systems (e.g., hydrogen peroxide gas plasma, peracetic acid immersion, ozone) have been developed and are being used to sterilize medical devices. This section reviews sterilization technologies used in healthcare and makes recommendations for their optimum performance in the processing of medical devices [1, 18, 811-820].

Sterilization destroys all microorganisms on the surface of an article or in a fluid to prevent disease transmission associated with the use of that item. While the use of inadequately sterilized critical items represents a high risk of transmitting pathogens, documented transmission of pathogens associated with an inadequately sterilized critical item is exceedingly rare [821, 822]. This is likely due to the wide margin of safety associated with the sterilization processes used in healthcare facilities. The concept of what constitutes "sterile" is measured as a probability of sterility for each item to be sterilized. This probability is commonly referred to as the sterility assurance level (SAL) of the product and is defined as the probability of a single viable microorganism occurring on a product after sterilization. SAL is normally expressed a $10^{-n}$. For example, if the probability of a spore surviving were one in one million, the SAL would be $10^{-6}$ [823, 824]. In short, a SAL is an estimate of lethality of the entire sterilization process and is a conservative calculation. Dual SALs (e.g., $10^{-3}$ SAL for blood culture tubes, drainage bags; $10^{-6}$ SAL for scalpels, implants) have been used in the United States for many years and the choice of a $10^{-6}$ SAL was strictly arbitrary and not associated with any adverse outcomes (e.g., patient infections) [823].

Medical devices that have contact with sterile body tissues or fluids are considered critical items. These items should be sterile when used because any microbial contamination could result in disease transmission. Such items include surgical instruments, biopsy forceps, and implanted medical devices. If these items are heat resistant, the recommended sterilization process is steam sterilization, because it has the largest margin of safety due to its reliability, consistency, and lethality. However, reprocessing heat- and moisture-sensitive items requires use of a low-temperature sterilization technology (e.g., ethylene oxide, hydrogen peroxide gas plasma, peracetic acid) [825]. A summary of the advantages and disadvantages for commonly used sterilization technologies is presented in Table 6.

### Steam Sterilization

**Overview.** Of all the methods available for sterilization, moist heat in the form of saturated steam under pressure is the most widely used and the most dependable. Steam sterilization is nontoxic, inexpensive [826], rapidly microbicidal, sporicidal, and rapidly heats and penetrates fabrics (Table 6) [827]. Like all sterilization processes, steam sterilization has some deleterious effects on some materials, including corrosion and combustion of lubricants associated with dental handpieces [212]; reduction in ability to transmit light associated with laryngoscopes [828]; and increased hardening time (5.6 fold) with plaster-cast [829].

The basic principle of steam sterilization, as accomplished in an autoclave, is to expose each item to direct steam contact at the required temperature and pressure for the specified time. Thus, there are four parameters of steam sterilization: steam, pressure, temperature, and time. The ideal steam for sterilization is dry saturated steam and entrained water (dryness fraction $\geq 97\%$) [813, 819]. Pressure serves as a means to obtain the high temperatures necessary to quickly kill microorganisms. Specific temperatures must be obtained to ensure the microbicidal activity. The two common steam-sterilizing temperatures are 121°C (250°F) and 132°C (270°F). These temperatures (and other high temperatures) [830] must be maintained for a minimal time to kill microorganisms. Recognized minimum exposure periods for sterilization of wrapped healthcare supplies are 30 minutes at 121°C (250°F) in a gravity displacement

sterilizer or 4 minutes at 132°C (270°C) in a prevacuum sterilizer (Table 7). At constant temperatures, sterilization times vary depending on the type of item (e.g., metal versus rubber, plastic, items with lumens), whether the item is wrapped or unwrapped, and the sterilizer type.

The two basic types of steam sterilizers (autoclaves) are the gravity displacement autoclave and the high-speed prevacuum sterilizer. In the former, steam is admitted at the top or the sides of the sterilizing chamber and, because the steam is lighter than air, forces air out the bottom of the chamber through the drain vent. The gravity displacement autoclaves are primarily used to process laboratory media, water, pharmaceutical products, regulated medical waste, and nonporous articles whose surfaces have direct steam contact. For gravity displacement sterilizers the penetration time into porous items is prolonged because of incomplete air elimination. This point is illustrated with the decontamination of 10 lbs of microbiological waste, which requires at least 45 minutes at 121°C because the entrapped air remaining in a load of waste greatly retards steam permeation and heating efficiency[831, 832]. The high-speed prevacuum sterilizers are similar to the gravity displacement sterilizers except they are fitted with a vacuum pump (or ejector) to ensure air removal from the sterilizing chamber and load before the steam is admitted. The advantage of using a vacuum pump is that there is nearly instantaneous steam penetration even into porous loads. The Bowie-Dick test is used to detect air leaks and inadequate air removal and consists of folded 100% cotton surgical towels that are clean and preconditioned. A commercially available Bowie-Dick-type test sheet should be placed in the center of the pack. The test pack should be placed horizontally in the front, bottom section of the sterilizer rack, near the door and over the drain, in an otherwise empty chamber and run at 134°C for 3.5 minutes[813, 819]. The test is used each day the vacuum-type steam sterilizer is used, before the first processed load. Air that is not removed from the chamber will interfere with steam contact. Smaller disposable test packs (or process challenge devices) have been devised to replace the stack of folded surgical towels for testing the efficacy of the vacuum system in a prevacuum sterilizer. [833] These devices are "designed to simulate product to be sterilized and to constitute a defined challenge to the sterilization process"[819, 834]. They should be representative of the load and simulate the greatest challenge to the load[835]. Sterilizer vacuum performance is acceptable if the sheet inside the test pack shows a uniform color change. Entrapped air will cause a spot to appear on the test sheet, due to the inability of the steam to reach the chemical indicator. If the sterilizer fails the Bowie-Dick test, do not use the sterilizer until it is inspected by the sterilizer maintenance personnel and passes the Bowie-Dick test[813, 819, 836].

Another design in steam sterilization is a steam flush-pressure pulsing process, which removes air rapidly by repeatedly alternating a steam flush and a pressure pulse above atmospheric pressure. Air is rapidly removed from the load as with the prevacuum sterilizer, but air leaks do not affect this process because the steam in the sterilizing chamber is always above atmospheric pressure. Typical sterilization temperatures and times are 132°C to 135°C with 3 to 4 minutes exposure time for porous loads and instruments[827, 837].

Like other sterilization systems, the steam cycle is monitored by mechanical, chemical, and biological monitors. Steam sterilizers usually are monitored using a printout (or graphically) by measuring temperature, the time at the temperature, and pressure. Typically, chemical indicators are affixed to the outside and incorporated into the pack to monitor the temperature or time and temperature. The effectiveness of steam sterilization is monitored with a biological indicator containing spores of Geobacillus stearothermophilus (formerly Bacillus stearothermophilus). Positive spore test results are a relatively rare event [838] and can be attributed to operator error, inadequate steam delivery[839], or equipment malfunction.

Portable (table-top) steam sterilizers are used in outpatient, dental, and rural clinics[840]. These sterilizers are designed for small instruments, such as hypodermic syringes and needles and dental instruments. The ability of the sterilizer to reach physical parameters necessary to achieve sterilization should be monitored by mechanical, chemical, and biological indicators.

*Microbicidal Activity.* The oldest and most recognized agent for inactivation of microorganisms is heat. D-values (time to reduce the surviving population by 90% or 1 $\log_{10}$) allow a direct comparison of the heat resistance of microorganisms. Because a D-value can be determined at various temperatures, a subscript is used to designate the exposure temperature (i.e., $D_{121C}$). $D_{121C}$-values for *Geobacillus stearothermophilus* used to monitor the steam sterilization process range from 1 to 2 minutes. Heat-resistant nonspore-forming bacteria, yeasts, and fungi have such low $D_{121C}$ values that they cannot be experimentally measured[841].

*Mode of Action.* Moist heat destroys microorganisms by the irreversible coagulation and denaturation of enzymes and structural proteins. In support of this fact, it has been found that the presence of moisture significantly affects the coagulation temperature of proteins and the temperature at which microorganisms are destroyed.

*Uses.* Steam sterilization should be used whenever possible on all critical and semicritical items that are heat and moisture resistant (e.g., steam sterilizable respiratory therapy and anesthesia equipment), even when not essential to prevent pathogen transmission. Steam sterilizers also are used in healthcare facilities to decontaminate microbiological waste and sharps containers [831, 832, 842] but additional exposure time is required in the gravity displacement sterilizer for these items.

## Flash Sterilization

*Overview.* "Flash" steam sterilization was originally defined by Underwood and Perkins as sterilization of an unwrapped object at 132°C for 3 minutes at 27-28 lbs. of pressure in a gravity displacement sterilizer[843]. Currently, the time required for flash sterilization depends on the type of sterilizer and the type of item (i.e., porous vs non-porous items)(see Table 8). Although the wrapped method of sterilization is preferred for the reasons listed below, correctly performed flash sterilization is an effective process for the sterilization of critical medical devices[844, 845]. Flash sterilization is a modification of conventional steam sterilization (either gravity, prevacuum, or steam-flush pressure-pulse) in which the flashed item is placed in an open tray or is placed in a specially designed, covered, rigid container to allow for rapid penetration of steam. Historically, it is not recommended as a routine sterilization method because of the lack of timely biological indicators to monitor performance, absence of protective packaging following sterilization, possibility for contamination of processed items during transportation to the operating rooms, and the sterilization cycle parameters (i.e., time, temperature, pressure) are minimal. To address some of these concerns, many healthcare facilities have done the following: placed equipment for flash sterilization in close proximity to operating rooms to facilitate aseptic delivery to the point of use (usually the sterile field in an ongoing surgical procedure); extended the exposure time to ensure lethality comparable to sterilized wrapped items (e.g., 4 minutes at 132°C)[846, 847]; used biological indicators that provide results in 1 hour for flash-sterilized items[846, 847]; and used protective packaging that permits steam penetration[812, 817-819, 845, 848]. Further, some rigid, reusable sterilization container systems have been designed and validated by the container manufacturer for use with flash cycles. When sterile items are open to air, they will eventually become contaminated. Thus, the longer a sterile item is exposed to air, the greater the number of microorganisms that will settle on it. Sterilization cycle parameters for flash sterilization are shown in Table 8.

A few adverse events have been associated with flash sterilization. When evaluating an increased incidence of neurosurgical infections, the investigators noted that surgical instruments were flash sterilized between cases and 2 of 3 craniotomy infections involved plate implants that were flash sterilized[849]. A report of two patients who received burns during surgery from instruments that had been flash sterilized reinforced the need to develop policies and educate staff to prevent the use of instruments hot enough to cause clinical burns[850]. Staff should use precautions to prevent burns with potentially hot instruments (e.g., transport tray using heat-protective gloves). Patient burns may be prevented by either air-cooling the instruments or immersion in sterile liquid (e.g., saline).

*Uses.* Flash sterilization is considered acceptable for processing cleaned patient-care items that

60

cannot be packaged, sterilized, and stored before use. It also is used when there is insufficient time to sterilize an item by the preferred package method. Flash sterilization should not be used for reasons of convenience, as an alternative to purchasing additional instrument sets, or to save time[817]. Because of the potential for serious infections, flash sterilization is not recommended for implantable devices (i.e., devices placed into a surgically or naturally formed cavity of the human body); however, flash sterilization may be unavoidable for some devices (e.g., orthopedic screw, plates). If flash sterilization of an implantable device is unavoidable, recordkeeping (i.e., load identification, patient's name/hospital identifier, and biological indicator result) is essential for epidemiological tracking (e.g., of surgical site infection, tracing results of biological indicators to patients who received the item to document sterility), and for an assessment of the reliability of the sterilization process (e.g., evaluation of biological monitoring records and sterilization maintenance records noting preventive maintenance and repairs with dates).

### Low-Temperature Sterilization Technologies

Ethylene oxide (ETO) has been widely used as a low-temperature sterilant since the 1950s. It has been the most commonly used process for sterilizing temperature- and moisture-sensitive medical devices and supplies in healthcare institutions in the United States. Two types of ETO sterilizers are available, mixed gas and 100% ETO. Until 1995, ethylene oxide sterilizers combined ETO with a chloroflourocarbon (CFC) stabilizing agent, most commonly in a ratio of 12% ETO mixed with 88% CFC (referred to as 12/88 ETO).

For several reasons, healthcare personnel have been exploring the use of new low-temperature sterilization technologies[825, 851]. First, CFCs were phased out in December 1995 under provisions of the Clean Air Act [852]. CFCs were classified as a Class I substance under the Clean Air Act because of scientific evidence linking them to destruction of the earth's ozone layer. Second, some states (e.g., California, New York, Michigan) require the use of ETO abatement technology to reduce the amount of ETO being released into ambient air from 90 to 99.9% depending on the state. Third, OSHA regulates the acceptable vapor levels of ETO (i.e., 1 ppm averaged over 8 hours) due to concerns that ETO exposure represents an occupational hazard[318]. These constraints have led to the development of alternative technologies for low-temperature sterilization in the healthcare setting.

Alternative technologies to ETO with chlorofluorocarbon that are currently available and cleared by the FDA for medical equipment include 100% ETO; ETO with a different stabilizing gas, such as carbon dioxide or hydrochlorofluorocarbons (HCFC); immersion in peracetic acid; hydrogen peroxide gas plasma; and ozone. Technologies under development for use in healthcare facilities, but not cleared by the FDA, include vaporized hydrogen peroxide, vapor phase peracetic acid, gaseous chlorine dioxide, ionizing radiation, or pulsed light [400, 758, 853]. However, there is no guarantee that these new sterilization technologies will receive FDA clearance for use in healthcare facilities.

These new technologies should be compared against the characteristics of an ideal low-temperature (<60°C) sterilant (Table 9). [851] While it is apparent that all technologies will have limitations (Table 9), understanding the limitations imposed by restrictive device designs (e.g., long, narrow lumens) is critical for proper application of new sterilization technology[854]. For example, the development of increasingly small and complex endoscopes presents a difficult challenge for current sterilization processes. This occurs because microorganisms must be in direct contact with the sterilant for inactivation to occur. Several peer-reviewed scientific publications have data demonstrating concerns about the efficacy of several of the low-temperature sterilization processes (i.e., gas plasma, vaporized hydrogen peroxide, ETO, peracetic acid), particularly when the test organisms are challenged in the presence of serum and salt and a narrow lumen vehicle[469, 721, 825, 855, 856]. Factors shown to affect the efficacy of sterilization are shown in Table 10.

### Ethylene Oxide "Gas" Sterilization

*Overview.* ETO is a colorless gas that is flammable and explosive. The four essential

parameters (operational ranges) are: gas concentration (450 to 1200 mg/l); temperature (37 to 63°C); relative humidity (40 to 80%)(water molecules carry ETO to reactive sites); and exposure time (1 to 6 hours). These influence the effectiveness of ETO sterilization[814, 857, 858]. Within certain limitations, an increase in gas concentration and temperature may shorten the time necessary for achieving sterilization.

The main disadvantages associated with ETO are the lengthy cycle time, the cost, and its potential hazards to patients and staff; the main advantage is that it can sterilize heat- or moisture-sensitive medical equipment without deleterious effects on the material used in the medical devices (Table 6). Acute exposure to ETO may result in irritation (e.g., to skin, eyes, gastrointestinal or respiratory tracts) and central nervous system depression[859-862]. Chronic inhalation has been linked to the formation of cataracts, cognitive impairment, neurologic dysfunction, and disabling polyneuropathies[860, 861, 863-866]. Occupational exposure in healthcare facilities has been linked to hematologic changes [867] and an increased risk of spontaneous abortions and various cancers[318, 868-870]. ETO should be considered a known human carcinogen[871].

The basic ETO sterilization cycle consists of five stages (i.e., preconditioning and humidification, gas introduction, exposure, evacuation, and air washes) and takes approximately 2 1/2 hrs excluding aeration time. Mechanical aeration for 8 to 12 hours at 50 to 60°C allows desorption of the toxic ETO residual contained in exposed absorbent materials. Most modern ETO sterilizers combine sterilization and aeration in the same chamber as a continuous process. These ETO models minimize potential ETO exposure during door opening and load transfer to the aerator. Ambient room aeration also will achieve desorption of the toxic ETO but requires 7 days at 20°C. There are no federal regulations for ETO sterilizer emission; however, many states have promulgated emission-control regulations[814].

The use of ETO evolved when few alternatives existed for sterilizing heat- and moisture-sensitive medical devices; however, favorable properties (Table 6) account for its continued widespread use[872]. Two ETO gas mixtures are available to replace ETO-chlorofluorocarbon (CFC) mixtures for large capacity, tank-supplied sterilizers. The ETO-carbon dioxide ($CO_2$) mixture consists of 8.5% ETO and 91.5% $CO_2$. This mixture is less expensive than ETO-hydrochlorofluorocarbons (HCFC), but a disadvantage is the need for pressure vessels rated for steam sterilization, because higher pressures (28-psi gauge) are required. The other mixture, which is a drop-in CFC replacement, is ETO mixed with HCFC. HCFCs are approximately 50-fold less damaging to the earth's ozone layer than are CFCs. The EPA will begin regulation of HCFC in the year 2015 and will terminate production in the year 2030. Two companies provide ETO-HCFC mixtures as drop-in replacement for CFC-12; one mixture consists of 8.6% ETO and 91.4% HCFC, and the other mixture is composed of 10% ETO and 90% HCFC[872]. An alternative to the pressurized mixed gas ETO systems is 100% ETO. The 100% ETO sterilizers using unit-dose cartridges eliminate the need for external tanks.

ETO is absorbed by many materials. For this reason, following sterilization the item must undergo aeration to remove residual ETO. Guidelines have been promulgated regarding allowable ETO limits for devices that depend on how the device is used, how often, and how long in order to pose a minimal risk to patients in normal product use[814].

ETO toxicity has been established in a variety of animals. Exposure to ETO can cause eye pain, sore throat, difficulty breathing and blurred vision. Exposure can also cause dizziness, nausea, headache, convulsions, blisters and vomiting and coughing[873]. In a variety of *in vitro* and animal studies, ETO has been demonstrated to be carcinogenic. ETO has been linked to spontaneous abortion, genetic damage, nerve damage, peripheral paralysis, muscle weakness, and impaired thinking and memory[873]. Occupational exposure in healthcare facilities has been linked to an increased risk of spontaneous abortions and various cancers[318]. Injuries (e.g., tissue burns) to patients have been associated with ETO residues in implants used in surgical procedures[874]. Residual ETO in capillary flow dialysis membranes has been shown to be neurotoxic in vitro[875]. OSHA has established a PEL of 1 ppm airborne ETO in the workplace, expressed as a TWA for an 8-hour work shift in a 40-hour work week. The "action level" for ETO is 0.5 ppm, expressed as an 8-hour TWA, and the short-term excursion limit is 5 ppm, expressed as

a 15-minute TWA[814]. For details of the requirements in OSHA's ETO standard for occupational exposures, see Title 29 of the Code of Federal Regulations (CFR) Part 1910.1047[873]. Several personnel monitoring methods (e.g., charcoal tubes and passive sampling devices) are in use[814]. OSHA has established a PEL of 5 ppm for ethylene chlorohydrin (a toxic by-product of ETO) in the workplace[876]. Additional information regarding use of ETO in health care facilities is available from NIOSH.

*Mode of Action.* The microbicidal activity of ETO is considered to be the result of alkylation of protein, DNA, and RNA. Alkylation, or the replacement of a hydrogen atom with an alkyl group, within cells prevents normal cellular metabolism and replication[877].

*Microbicidal Activity.* The excellent microbicidal activity of ETO has been demonstrated in several studies [469, 721, 722, 856, 878, 879] and summarized in published reports[877]. ETO inactivates all microorganisms although bacterial spores (especially *B. atrophaeus*) are more resistant than other microorganisms. For this reason *B. atrophaeus* is the recommended biological indicator.

Like all sterilization processes, the effectiveness of ETO sterilization can be altered by lumen length, lumen diameter, inorganic salts, and organic materials[469, 721, 722, 855, 856, 879]. For example, although ETO is not used commonly for reprocessing endoscopes[28], several studies have shown failure of ETO in inactivating contaminating spores in endoscope channels [855]or lumen test units [469, 721, 879] and residual ETO levels averaging 66.2 ppm even after the standard degassing time[456]. Failure of ETO also has been observed when dental handpieces were contaminated with *Streptococcus mutans* and exposed to ETO[880]. It is recommended that dental handpieces be steam sterilized.

*Uses.* ETO is used in healthcare facilities to sterilize critical items (and sometimes semicritical items) that are moisture or heat sensitive and cannot be sterilized by steam sterilization.

## Hydrogen Peroxide Gas Plasma

*Overview.* New sterilization technology based on plasma was patented in 1987 and marketed in the United States in 1993. Gas plasmas have been referred to as the fourth state of matter (i.e., liquids, solids, gases, and gas plasmas). Gas plasmas are generated in an enclosed chamber under deep vacuum using radio frequency or microwave energy to excite the gas molecules and produce charged particles, many of which are in the form of free radicals. A free radical is an atom with an unpaired electron and is a highly reactive species. The proposed mechanism of action of this device is the production of free radicals within a plasma field that are capable of interacting with essential cell components (e.g., enzymes, nucleic acids) and thereby disrupt the metabolism of microorganisms. The type of seed gas used and the depth of the vacuum are two important variables that can determine the effectiveness of this process.

In the late 1980s the first hydrogen peroxide gas plasma system for sterilization of medical and surgical devices was field-tested. According to the manufacturer, the sterilization chamber is evacuated and hydrogen peroxide solution is injected from a cassette and is vaporized in the sterilization chamber to a concentration of 6 mg/l. The hydrogen peroxide vapor diffuses through the chamber (50 minutes), exposes all surfaces of the load to the sterilant, and initiates the inactivation of microorganisms. An electrical field created by a radio frequency is applied to the chamber to create a gas plasma. Microbicidal free radicals (e.g., hydroxyl and hydroperoxyl) are generated in the plasma. The excess gas is removed and in the final stage (i.e., vent) of the process the sterilization chamber is returned to atmospheric pressure by introduction of high-efficiency filtered air. The by-products of the cycle (e.g., water vapor, oxygen) are nontoxic and eliminate the need for aeration. Thus, the sterilized materials can be handled safely, either for immediate use or storage. The process operates in the range of 37-44°C and has a cycle time of 75 minutes. If any moisture is present on the objects the vacuum will not be achieved and the cycle aborts[856, 881-883].

A newer version of the unit improves sterilizer efficacy by using two cycles with a hydrogen

peroxide diffusion stage and a plasma stage per sterilization cycle. This revision, which is achieved by a software modification, reduces total processing time from 73 to 52 minutes. The manufacturer believes that the enhanced activity obtained with this system is due in part to the pressure changes that occur during the injection and diffusion phases of the process and to the fact that the process consists of two equal and consecutive half cycles, each with a separate injection of hydrogen peroxide. [856, 884, 885] This system and a smaller version [400, 882] have received FDA 510[k] clearance with limited application for sterilization of medical devices (Table 6). The biological indicator used with this system is Bacillus atrophaeus spores[851]. The newest version of the unit, which employs a new vaporization system that removes most of the water from the hydrogen peroxide, has a cycle time from 28-38 minutes (see manufacturer's literature for device dimension restrictions).

Penetration of hydrogen peroxide vapor into long or narrow lumens has been addressed outside the United States by the use of a diffusion enhancer. This is a small, breakable glass ampoule of concentrated hydrogen peroxide (50%) with an elastic connector that is inserted into the device lumen and crushed immediately before sterilization[470, 885]. The diffusion enhancer has been shown to sterilize bronchoscopes contaminated with Mycobacteria tuberculosis[886]. At the present time, the diffusion enhancer is not FDA cleared.

Another gas plasma system, which differs from the above in several important ways, including the use of peracetic acid-acetic acid-hydrogen peroxide vapor, was removed from the marketplace because of reports of corneal destruction to patients when ophthalmic surgery instruments had been processed in the sterilizer[887, 888]. In this investigation, exposure of potentially wet ophthalmologic surgical instruments with small bores and brass components to the plasma gas led to degradation of the brass to copper and zinc[888, 889]. The experimenters showed that when rabbit eyes were exposed to the rinsates of the gas plasma-sterilized instruments, corneal decompensation was documented. This toxicity is highly unlikely with the hydrogen peroxide gas plasma process since a toxic, soluble form of copper would not form (LA Feldman, written communication, April 1998).

***Mode of Action.*** This process inactivates microorganisms primarily by the combined use of hydrogen peroxide gas and the generation of free radicals (hydroxyl and hydroproxyl free radicals) during the plasma phase of the cycle.

***Microbicidal Activity.*** This process has the ability to inactivate a broad range of microorganisms, including resistant bacterial spores. Studies have been conducted against vegetative bacteria (including mycobacteria), yeasts, fungi, viruses, and bacterial spores[469, 721, 856, 881-883, 890-893]. Like all sterilization processes, the effectiveness can be altered by lumen length, lumen diameter, inorganic salts, and organic materials[469, 721, 855, 856, 890, 891, 893].

***Uses.*** Materials and devices that cannot tolerate high temperatures and humidity, such as some plastics, electrical devices, and corrosion-susceptible metal alloys, can be sterilized by hydrogen peroxide gas plasma. This method has been compatible with most (>95%) medical devices and materials tested[884, 894, 895].

## Peracetic Acid Sterilization

***Overview.*** Peracetic acid is a highly biocidal oxidizer that maintains its efficacy in the presence of organic soil. Peracetic acid removes surface contaminants (primarily protein) on endoscopic tubing[711, 717]. An automated machine using peracetic acid to sterilize medical, surgical, and dental instruments chemically (e.g., endoscopes, arthroscopes) was introduced in 1988. This microprocessor-controlled, low-temperature sterilization method is commonly used in the United States[107]. The sterilant, 35% peracetic acid, and an anticorrosive agent are supplied in a single-dose container. The container is punctured at the time of use, immediately prior to closing the lid and initiating the cycle. The concentrated peracetic acid is diluted to 0.2% with filtered water (0.2 µm) at a temperature of approximately 50°C. The diluted peracetic acid is circulated within the chamber of the machine and

pumped through the channels of the endoscope for 12 minutes, decontaminating exterior surfaces, lumens, and accessories. Interchangeable trays are available to permit the processing of up to three rigid endoscopes or one flexible endoscope. Connectors are available for most types of flexible endoscopes for the irrigation of all channels by directed flow. Rigid endoscopes are placed within a lidded container, and the sterilant fills the lumens either by immersion in the circulating sterilant or by use of channel connectors to direct flow into the lumen(s) (see below for the importance of channel connectors). The peracetic acid is discarded via the sewer and the instrument rinsed four times with filtered water. Concern has been raised that filtered water may be inadequate to maintain sterility[896]. Limited data have shown that low-level bacterial contamination may follow the use of filtered water in an AER but no data has been published on AERs using the peracetic acid system[161]. Clean filtered air is passed through the chamber of the machine and endoscope channels to remove excess water[719]. As with any sterilization process, the system can only sterilize surfaces that can be contacted by the sterilant. For example, bronchoscopy-related infections occurred when bronchoscopes were processed using the wrong connector[155, 725]. Investigation of these incidents revealed that bronchoscopes were inadequately reprocessed when inappropriate channel connectors were used and when there were inconsistencies between the reprocessing instructions provided by the manufacturer of the bronchoscope and the manufacturer of the automatic endoscope reprocessor[155]. The importance of channel connectors to achieve sterilization was also shown for rigid lumen devices[137, 856].

The manufacturers suggest the use of biological monitors (*G. stearothermophilus* spore strips) both at the time of installation and routinely to ensure effectiveness of the process. The manufacturer's clip must be used to hold the strip in the designated spot in the machine as a broader clamp will not allow the sterilant to reach the spores trapped under it[897]. One investigator reported a 3% failure rate when the appropriate clips were used to hold the spore strip within the machine[718]. The use of biological monitors designed to monitor either steam sterilization or ETO for a liquid chemical sterilizer has been questioned for several reasons including spore wash-off from the filter paper strips which may cause less valid monitoring[898-901]. The processor is equipped with a conductivity probe that will automatically abort the cycle if the buffer system is not detected in a fresh container of the peracetic acid solution. A chemical monitoring strip that detects that the active ingredient is >1500 ppm is available for routine use as an additional process control.

**Mode of Action.** Only limited information is available regarding the mechanism of action of peracetic acid, but it is thought to function as other oxidizing agents, i.e., it denatures proteins, disrupts cell wall permeability, and oxidizes sulfhydral and sulfur bonds in proteins, enzymes, and other metabolites[654, 726].

**Microbicidal Activity.** Peracetic acid will inactivate gram-positive and gram-negative bacteria, fungi, and yeasts in <5 minutes at <100 ppm. In the presence of organic matter, 200-500 ppm is required. For viruses, the dosage range is wide (12-2250 ppm), with poliovirus inactivated in yeast extract in 15 minutes with 1500 to 2250 ppm. Bacterial spores in suspension are inactivated in 15 seconds to 30 minutes with 500 to 10,000 ppm (0.05 to 1%)[654].

Simulated-use trials have demonstrated microbicidal activity [111, 718-722] and three clinical trials have demonstrated both microbial killing and no clinical failures leading to infection[90, 723, 724]. Alfa and co-workers, who compared the peracetic acid system with ETO, demonstrated the high efficacy of the system. Only the peracetic acid system was able to completely kill 6-$\log_{10}$ of *Mycobacterium chelonae*, *Enterococcus faecalis*, and *B. atrophaeus* spores with both an organic and inorganic challenge[722]. Like other sterilization processes, the efficacy of the process can be diminished by soil challenges [902] and test conditions[856].

**Uses.** This automated machine is used to chemically sterilize medical (e.g., GI endoscopes) and surgical (e.g., flexible endoscopes) instruments in the United States. Lumened endoscopes must be connected to an appropriate channel connector to ensure that the sterilant has direct contact with the contaminated lumen. [137, 856, 903] Olympus America has not listed this system as a compatible product for

use in reprocessing Olympus bronchoscopes and gastrointestinal endoscopes (Olympus America, January 30, 2002, written communication).

**Microbicidal Activity of Low-Temperature Sterilization Technologies**

Sterilization processes used in the United States must be cleared by FDA, and they require that sterilizer microbicidal performance be tested under simulated-use conditions[904]. FDA requires that the test article be inoculated with $10^6$ colony-forming units of the most resistant test organism and prepared with organic and inorganic test loads as would occur after actual use. FDA requires manufacturers to use organic soil (e.g., 5% fetal calf serum), dried onto the device with the inoculum, to represent soil remaining on the device following marginal cleaning. However, 5% fetal calf serum as a measure of marginal cleaning has not been validated by measurements of protein load on devices following use and the level of protein removal by various cleaning methods. The inocula must be placed in various locations of the test articles, including those least favorable to penetration and contact with the sterilant (e.g., lumens). Cleaning before sterilization is not allowed in the demonstration of sterilization efficacy[904]. Several studies have evaluated the relative microbicidal efficacy of these low-temperature sterilization technologies (Table 11). These studies have either tested the activity of a sterilization process against specific microorganisms[892, 905, 906], evaluated the microbicidal activity of a singular technology [711, 719, 724, 855, 879, 882-884, 890, 891, 907] or evaluated the comparative effectiveness of several sterilization technologies[271, 426, 469, 721, 722, 856, 908, 909]. Several test methodologies use stainless steel or porcelain carriers that are inoculated with a test organism. Commonly used test organisms include vegetative bacteria, mycobacteria, and spores of *Bacillus* species. The available data demonstrate that low-temperature sterilization technologies are able to provide a 6-$log_{10}$ reduction of microbes when inoculated onto carriers in the absence of salt and serum. However, tests can be constructed such that all of the available sterilization technologies are unable to reliably achieve complete inactivation of a microbial load. [425, 426, 469, 721, 856, 909] For example, almost all of the sterilization processes will fail to reliably inactivate the microbial load in the presence of salt and serum[469, 721, 909].

The effect of salts and serums on the sterilization process were studied initially in the 1950s and 1960s[424, 910]. These studies showed that a high concentration of crystalline-type materials and a low protein content provided greater protection to spores than did serum with a high protein content[426]. A study by Doyle and Ernst demonstrated resistance of spores by crystalline material applied not only to low-temperature sterilization technology but also to steam and dry heat[425]. These studies showed that occlusion of *Bacillus atrophaeus* spores in calcium carbonate crystals dramatically increased the time required for inactivation as follows: 10 seconds to 150 minutes for steam (121°C), 3.5 hours to 50 hours for dry heat (121°C), 30 seconds to >2 weeks for ETO (54°C). Investigators have corroborated and extended these findings[469, 470, 721, 855, 908, 909]. While soils containing both organic and inorganic materials impair microbial killing, soils that contain a high inorganic salt-to-protein ratio favor crystal formation and impair sterilization by occlusion of organisms[425, 426, 881].

Alfa and colleagues demonstrated a 6-$log_{10}$ reduction of the microbial inoculum of porcelain penicylinders using a variety of vegetative and spore-forming organisms (Table 11)[469]. However, if the bacterial inoculum was in tissue-culture medium supplemented with 10% serum, only the ETO 12/88 and ETO-HCFC sterilization mixtures could sterilize 95% to 97% of the penicylinder carriers. The plasma and 100% ETO sterilizer demonstrated significantly reduced activity (Table 11). For all sterilizers evaluated using penicylinder carriers (i.e., ETO 12/88, 100% ETO, hydrogen peroxide gas plasma), there was a 3- to 6-$log_{10}$ reduction of inoculated bacteria even in the presence of serum and salt. For each sterilizer evaluated, the ability to inactivate microorganisms in the presence of salt and serum was reduced even further when the inoculum was placed in a narrow-lumen test object (3 mm diameter by 125 cm long). Although there was a 2- to 4-$log_{10}$ reduction in microbial kill, less than 50% of the lumen test objects were sterile when processed using any of the sterilization methods evaluated except the peracetic acid immersion system (Table 11)[721]. Complete killing (or removal) of 6-$log_{10}$ of *Enterococcus faecalis, Mycobacterium chelonei,* and *Bacillus atrophaeus* spores in the presence of salt and serum and lumen test objects was observed only for the peracetic acid immersion system.

66

With respect to the results by Alfa and coworkers[469], Jacobs showed that the use of the tissue culture media created a technique-induced sterilization failure[426]. Jacobs et al. showed that microorganisms mixed with tissue culture media, used as a surrogate body fluid, formed physical crystals that protected the microorganisms used as a challenge. If the carriers were exposed for 60 sec to nonflowing water, the salts dissolved and the protective effect disappeared. Since any device would be exposed to water for a short period of time during the washing procedure, these protective effects would have little clinical relevance[426].

Narrow lumens provide a challenge to some low-temperature sterilization processes. For example, Rutala and colleagues showed that, as lumen size decreased, increased failures occurred with some low-temperature sterilization technologies. However, some low-temperature processes such as ETO-HCFC and the hydrogen peroxide gas plasma process remained effective even when challenged by a lumen as small as 1 mm in the absence of salt and serum[856].

The importance of allowing the sterilant to come into contact with the inoculated carrier is demonstrated by comparing the results of two investigators who studied the peracetic acid immersion system. Alfa and coworkers demonstrated excellent activity of the peracetic acid immersion system against three test organisms using a narrow-lumen device. In these experiments, the lumen test object was connected to channel irrigators, which ensured that the sterilant had direct contact with the contaminated carriers[722]. This effectiveness was achieved through a combination of organism wash-off and peracetic acid sterilant killing the test organisms[722]. The data reported by Rutala et al. demonstrated failure of the peracetic acid immersion system to eliminate *Geobacillus stearothermophilus* spores from a carrier placed in a lumen test object. In these experiments, the lumen test unit was not connected to channel irrigators. The authors attributed the failure of the peracetic acid immersion system to eliminate the high levels of spores from the center of the test unit to the inability of the peracetic acid to diffuse into the center of 40-cm long, 3-mm diameter tubes. This may be caused by an air lock or air bubbles formed in the lumen, impeding the flow of the sterilant through the long and narrow lumen and limiting complete access to the *Bacillus* spores[137, 856]. Experiments using a channel connector specifically designed for 1-, 2-, and 3-mm lumen test units with the peracetic acid immersion system were completely effective in eliminating an inoculum of $10^6$ *Geobacillus stearothermophilus* spores[7]. The restricted diffusion environment that exists in the test conditions would not exist with flexible scopes processed in the peracetic acid immersion system, because the scopes are connected to channel irrigators to ensure that the sterilant has direct contact with contaminated surfaces. Alfa and associates attributed the efficacy of the peracetic acid immersion system to the ability of the liquid chemical process to dissolve salts and remove protein and bacteria due to the flushing action of the fluid[722].

**Bioburden of Surgical Devices**

In general, used medical devices are contaminated with a relatively low bioburden of organisms[179, 911, 912]. Nystrom evaluated medical instruments used in general surgical, gynecological, orthopedic, and ear-nose-throat operations and found that 62% of the instruments were contaminated with $<10^1$ organisms after use, 82% with $<10^2$, and 91% with $<10^3$. After being washed in an instrument washer, more than 98% of the instruments had $<10^1$ organisms, and none $>10^2$ organisms[911]. Other investigators have published similar findings[179, 912]. For example, after a standard cleaning procedure, 72% of 50 surgical instruments contained $<10^1$ organisms, 86% $<10^2$, and only 6% had $>3 \times 10^2$[912]. In another study of rigid-lumen medical devices, the bioburden on both the inner and outer surface of the lumen ranged from $10^1$ to $10^4$ organisms per device. After cleaning, 83% of the devices had a bioburden $\leq 10^2$ organisms[179]. In all of these studies, the contaminating microflora consisted mainly of vegetative bacteria, usually of low pathogenicity (e.g., coagulase-negative *Staphylococcus*)[179, 911, 912].

An evaluation of the microbial load on used critical medical devices such as spinal anesthesia needles and angiographic catheters and sheaths demonstrated that mesophilic microorganisms were detected at levels of $10^1$ to $10^2$ in only two of five needles. The bioburden on used angiographic

catheters and sheath introducers exceeded $10^3$ CFUs on 14% (3 of 21) and 21% (6 of 28), respectively[907].

## Effect of Cleaning on Sterilization Efficacy

The effect of salt and serum on the efficacy of low-temperature sterilization technologies has raised concern regarding the margin of safety of these technologies. Experiments have shown that salts have the greatest impact on protecting microorganisms from killing[426, 469]. However, other studies have suggested that these concerns may not be clinically relevant. One study evaluated the relative rate of removal of inorganic salts, organic soil, and microorganisms from medical devices to better understand the dynamics of the cleaning process[426]. These tests were conducted by inoculating Alfa soil (tissue-culture media and 10% fetal bovine serum) [469] containing $10^6$ *G. stearothermophilus* spores onto the surface of a stainless-steel scalpel blade. After drying for 30 minutes at 35°C followed by 30 minutes at room temperature, the samples were placed in water at room temperature. The blades were removed at specified times, and the concentration of total protein and chloride ion was measured. The results showed that soaking in deionized water for 60 seconds resulted in a >95% release rate of chloride ion from NaCl solution in 20 seconds, Alfa soil in 30 seconds, and fetal bovine serum in 120 seconds. Thus, contact with water for short periods, even in the presence of protein, rapidly leads to dissolution of salt crystals and complete inactivation of spores by a low-temperature sterilization process (Table 10). Based on these experimental data, cleaning procedures would eliminate the detrimental effect of high salt content on a low-temperature sterilization process.

These articles [426, 469, 721] assessing low-temperature sterilization technology reinforce the importance of meticulous cleaning before sterilization. These data support the critical need for healthcare facilities to develop rigid protocols for cleaning contaminated objects before sterilization[472]. Sterilization of instruments and medical devices is compromised if the process is not preceded by meticulous cleaning.

The cleaning of any narrow-lumen medical device used in patient care presents a major challenge to reprocessing areas. While attention has been focused on flexible endoscopes, cleaning issues related to other narrow-lumen medical devices such as sphinctertomes have been investigated[913]. This study compared manual cleaning with that of automated cleaning with a narrow-lumen cleaner and found that only retro-flushing with the narrow lumen cleaner provided adequate cleaning of the three channels. If reprocessing was delayed for more than 24 hours, retro-flush cleaning was no longer effective and ETO sterilization failure was detected when devices were held for 7 days [913]. In another study involving simulated-use cleaning of laparoscopic devices, Alfa found that minimally the use of retro-flushing should be used during cleaning of non-ported laparoscopic devices[914].

## Other Sterilization Methods

*Ionizing Radiation.* Sterilization by ionizing radiation, primarily by cobalt 60 gamma rays or electron accelerators, is a low-temperature sterilization method that has been used for a number of medical products (e.g., tissue for transplantation, pharmaceuticals, medical devices). There are no FDA-cleared ionizing radiation sterilization processes for use in healthcare facilities. Because of high sterilization costs, this method is an unfavorable alternative to ETO and plasma sterilization in healthcare facilities but is suitable for large-scale sterilization. Some deleterious effects on patient-care equipment associated with gamma radiation include induced oxidation in polyethylene [915] and delamination and cracking in polyethylene knee bearings[916]. Several reviews [917, 918] dealing with the sources, effects, and application of ionizing radiation may be referred to for more detail.

*Dry-Heat Sterilizers.* This method should be used only for materials that might be damaged by moist heat or that are impenetrable to moist heat (e.g., powders, petroleum products, sharp instruments). The advantages for dry heat include the following: it is nontoxic and does not harm the environment; a dry heat cabinet is easy to install and has relatively low operating costs; it penetrates materials; and it is noncorrosive for metal and sharp instruments. The disadvantages for dry heat are the slow rate of heat penetration and microbial killing makes this a time-consuming method. In addition, the high temperatures

68

are not suitable for most materials[919]. The most common time-temperature relationships for sterilization with hot air sterilizers are 170°C (340°F) for 60 minutes, 160°C (320°F) for 120 minutes, and 150°C (300°F) for 150 minutes. *B. atrophaeus* spores should be used to monitor the sterilization process for dry heat because they are more resistant to dry heat than are *G. stearothermophilus* spores. The primary lethal process is considered to be oxidation of cell constituents.

There are two types of dry-heat sterilizers: the static-air type and the forced-air type. The static-air type is referred to as the oven-type sterilizer as heating coils in the bottom of the unit cause the hot air to rise inside the chamber via gravity convection. This type of dry-heat sterilizer is much slower in heating, requires longer time to reach sterilizing temperature, and is less uniform in temperature control throughout the chamber than is the forced-air type. The forced-air or mechanical convection sterilizer is equipped with a motor-driven blower that circulates heated air throughout the chamber at a high velocity, permitting a more rapid transfer of energy from the air to the instruments[920].

***Liquid Chemicals.*** Several FDA-cleared liquid chemical sterilants include indications for sterilization of medical devices (Tables 4 and 5)[69]. The indicated contact times range from 3 hours to 12 hours. However, except for a few of the products, the contact time is based only on the conditions to pass the AOAC Sporicidal Test as a sterilant and not on simulated use testing with devices. These solutions are commonly used as high-level disinfectants when a shorter processing time is required. Generally, chemical liquid sterilants cannot be monitored using a biological indicator to verify sterility[899, 900].

The survival kinetics for thermal sterilization methods, such as steam and dry heat, have been studied and characterized extensively, whereas the kinetics for sterilization with liquid sterilants are less well understood[921]. The information that is available in the literature suggests that sterilization processes based on liquid chemical sterilants, in general, may not convey the same sterility assurance level as sterilization achieved using thermal or physical methods[823]. The data indicate that the survival curves for liquid chemical sterilants may not exhibit log-linear kinetics and the shape of the survivor curve may vary depending of the formulation, chemical nature and stability of the liquid chemical sterilant. In addition, the design of the AOAC Sporicidal Test does not provide quantification of the microbial challenge. Therefore, sterilization with a liquid chemical sterilant may not convey the same sterility assurance as other sterilization methods.

One of the differences between thermal and liquid chemical processes for sterilization of devices is the accessibility of microorganisms to the sterilant. Heat can penetrate barriers, such as biofilm, tissue, and blood, to attain organism kill, whereas liquids cannot adequately penetrate these barriers. In addition, the viscosity of some liquid chemical sterilants impedes their access to organisms in the narrow lumens and mated surfaces of devices[922]. Another limitation to sterilization of devices with liquid chemical germicides is the post-processing environment of the device. Devices cannot be wrapped or adequately contained during processing in a liquid chemical sterilant to maintain sterility following processing and during storage. Furthermore, devices may require rinsing following exposure to the liquid chemical sterilant with water that typically is not sterile. Therefore, due to the inherent limitations of using liquid chemical sterilants, their use should be restricted to reprocessing critical devices that are heat-sensitive and incompatible with other sterilization methods.

Several published studies compare the sporicidal effect of liquid chemical germicides against spores of *Bacillus* and *Clostridium*[78, 659, 660, 715].

***Performic Acid.*** Performic acid is a fast-acting sporicide that was incorporated into an automated endoscope reprocessing system[400]. Systems using performic acid are not currently FDA cleared.

***Filtration.*** Although filtration is not a lethality-based process and is not an FDA-cleared sterilization method, this technology is used to remove bacteria from thermolabile pharmaceutical fluids

69

that cannot be purified by any other means. In order to remove bacteria, the membrane pore size (e.g., 0.22 μm) must be smaller than the bacteria and uniform throughout[923]. Some investigators have appropriately questioned whether the removal of microorganisms by filtration really is a sterilization method because of slight bacterial passage through filters, viral passage through filters, and transference of the sterile filtrate into the final container under aseptic conditions entail a risk of contamination[924].

**Microwave.** Microwaves are used in medicine for disinfection of soft contact lenses, dental instruments, dentures, milk, and urinary catheters for intermittent self-catheterization[925-931]. However, microwaves must only be used with products that are compatible (e.g., do not melt) [931]. Microwaves are radio-frequency waves, which are usually used at a frequency of 2450 MHz. The microwaves produce friction of water molecules in an alternating electrical field. The intermolecular friction derived from the vibrations generates heat and some authors believe that the effect of microwaves depends on the heat produced while others postulate a nonthermal lethal effect[932-934]. The initial reports showed microwaves to be an effective microbicide. The microwaves produced by a "home-type" microwave oven (2.45 GHz) completely inactivate bacterial cultures, mycobacteria, viruses, and *G. stearothermophilus* spores within 60 seconds to 5 minutes depending on the challenge organism[933, 935-937]. Another study confirmed these results but also found that higher power microwaves in the presence of water may be needed for sterilization[932]. Complete destruction of *Mycobacterium bovis* was obtained with 4 minutes of microwave exposure (600W, 2450 MHz)[937]. The effectiveness of microwave ovens for different sterilization and disinfection purposes should be tested and demonstrated as test conditions affect the results (e.g., presence of water, microwave power). Sterilization of metal instruments can be accomplished but requires certain precautions.[926]. Of concern is that home-type microwave ovens may not have even distribution of microwave energy over the entire dry device (there may be hot and cold spots on solid medical devices); hence there may be areas that are not sterilized or disinfected. The use of microwave ovens to disinfect intermittent-use catheters also has been suggested. Researchers found that test bacteria (e.g., *E. coli*, *Klebsiella pneumoniae*, *Candida albicans*) were eliminated from red rubber catheters within 5 minutes [931]. Microwaves used for sterilization of medical devices have not been FDA cleared.

**Glass Bead "Sterilizer".** Glass bead "sterilization" uses small glass beads (1.2-1.5 mm diameter) and high temperature (217 °C -232 °C) for brief exposure times (e.g., 45 seconds) to inactivate microorganisms. These devices have been used for several years in the dental profession[938-940]. FDA believes there is a risk of infection with this device because of potential failure to sterilize dental instruments and their use should be discontinued until the device has received FDA clearance.

**Vaporized Hydrogen Peroxide (VHP®).** Hydrogen peroxide solutions have been used as chemical sterilants for many years. However, the VHP® was not developed for the sterilization of medical equipment until the mid-1980s. One method for delivering VHP to the reaction site uses a deep vacuum to pull liquid hydrogen peroxide (30-35% concentration) from a disposable cartridge through a heated vaporizer and then, following vaporization, into the sterilization chamber. A second approach to VHP delivery is the flow-through approach in which the VHP is carried into the sterilization chamber by a carrier gas such as air using either a slight negative pressure (vacuum) or slight positive pressure. Applications of this technology include vacuum systems for industrial sterilization of medical devices and atmospheric systems for decontaminating for large and small areas[853]. VHP offers several appealing features that include rapid cycle time (e.g., 30-45 minutes); low temperature; environmentally safe by-products ($H_2O$, oxygen [$O_2$]); good material compatibility; and ease of operation, installation and monitoring. VHP has limitations including that cellulose cannot be processed; nylon becomes brittle; and VHP penetration capabilities are less than those of ETO. VHP has not been cleared by FDA for sterilization of medical devices in healthcare facilities.

The feasibility of utilizing vapor-phase hydrogen peroxide as a surface decontaminant and sterilizer was evaluated in a centrifuge decontamination application. In this study, vapor-phase hydrogen peroxide was shown to possess significant sporicidal activity [941]. In preliminary studies, hydrogen

70

peroxide vapor decontamination has been found to be a highly effective method of eradicating MRSA, *Serratia marcescens, Clostridium botulinum spores* and *Clostridium difficile* from rooms, furniture, surfaces and/or equipment; however, further investigation of this method to demonstrate both safety and effectiveness in reducing infection rates are required[942-945].

***Ozone.*** Ozone has been used for years as a drinking water disinfectant. Ozone is produced when $O_2$ is energized and split into two monatomic ($O_1$) molecules. The monatomic oxygen molecules then collide with $O_2$ molecules to form ozone, which is $O_3$. Thus, ozone consists of $O_2$ with a loosely bonded third oxygen atom that is readily available to attach to, and oxidize, other molecules. This additional oxygen atom makes ozone a powerful oxidant that destroys microorganisms but is highly unstable (i.e., half-life of 22 minutes at room temperature).

A new sterilization process, which uses ozone as the sterilant, was cleared by FDA in August 2003 for processing reusable medical devices. The sterilizer creates its own sterilant internally from USP grade oxygen, steam-quality water and electricity; the sterilant is converted back to oxygen and water vapor at the end of the cycle by a passing through a catalyst before being exhausted into the room. The duration of the sterilization cycle is about 4 h and 15 m, and it occurs at 30-35°C. Microbial efficacy has been demonstrated by achieving a SAL of $10^{-6}$ with a variety of microorganisms to include the most resistant microorganism, *Geobacillus stearothermophilus*.

The ozone process is compatible with a wide range of commonly used materials including stainless steel, titanium, anodized aluminum, ceramic, glass, silica, PVC, Teflon, silicone, polypropylene, polyethylene and acrylic. In addition, rigid lumen devices of the following diameter and length can be processed: internal diameter (ID): > 2 mm, length ≤ 25 cm; ID > 3 mm, length ≤ 47 cm; and ID > 4 mm, length ≤ 60 cm.

The process should be safe for use by the operator because there is no handling of the sterilant, no toxic emissions, no residue to aerate, and low operating temperature means there is no danger of an accidental burn. The cycle is monitored using a self-contained biological indicator and a chemical indicator. The sterilization chamber is small, about 4 ft$^3$ (Written communication, S Dufresne, July 2004).

A gaseous ozone generator was investigated for decontamination of rooms used to house patients colonized with MRSA. The results demonstrated that the device tested would be inadequate for the decontamination of a hospital room[946].

***Formaldehyde Steam.*** Low-temperature steam with formaldehyde is used as a low-temperature sterilization method in many countries, particularly in Scandinavia, Germany, and the United Kingdom. The process involves the use of formalin, which is vaporized into a formaldehyde gas that is admitted into the sterilization chamber. A formaldehyde concentration of 8-16 mg/l is generated at an operating temperature of 70-75°C. The sterilization cycle consists of a series of stages that include an initial vacuum to remove air from the chamber and load, followed by steam admission to the chamber with the vacuum pump running to purge the chamber of air and to heat the load, followed by a series of pulses of formaldehyde gas, followed by steam. Formaldehyde is removed from the sterilizer and load by repeated alternate evacuations and flushing with steam and air. This system has some advantages, e.g., the cycle time for formaldehyde gas is faster than that for ETO and the cost per cycle is relatively low. However, ETO is more penetrating and operates at lower temperatures than do steam/formaldehyde sterilizers. Low-temperature steam formaldehyde sterilization has been found effective against vegetative bacteria, mycobacteria, *B. atrophaeus* and *G. stearothermophilus* spores and *Candida albicans*[947-949].

Formaldehyde vapor cabinets also may be used in healthcare facilities to sterilize heat-sensitive medical equipment[950]. Commonly, there is no circulation of formaldehyde and no temperature and humidity controls. The release of gas from paraformaldehyde tablets (placed on the lower tray) is slow and produces a low partial pressure of gas. The microbicidal quality of this procedure is unknown[951].

Reliable sterilization using formaldehyde is achieved when performed with a high concentration of gas, at a temperature between 60° and 80°C and with a relative humidity of 75 to 100%.

Studies indicate that formaldehyde is a mutagen and a potential human carcinogen, and OSHA regulates formaldehyde. The permissible exposure limit for formaldehyde in work areas is 0.75 ppm measured as a 8-hour TWA. The OSHA standard includes a 2 ppm STEL (i.e., maximum exposure allowed during a 15-minute period). As with the ETO standard, the formaldehyde standard requires that the employer conduct initial monitoring to identify employees who are exposed to formaldehyde at or above the action level or STEL. If this exposure level is maintained, employers may discontinue exposure monitoring until there is a change that could affect exposure levels or an employee reports formaldehyde-related signs and symptoms[269, 578]. The formaldehyde steam sterilization system has not been FDA cleared for use in healthcare facilities.

**Gaseous chlorine dioxide.** A gaseous chlorine dioxide system for sterilization of healthcare products was developed in the late 1980s[853, 952, 953]. Chlorine dioxide is not mutagenic or carcinogenic in humans. As the chlorine dioxide concentration increases, the time required to achieve sterilization becomes progressively shorter. For example, only 30 minutes were required at 40 mg/l to sterilize the $10^6$ *B. atrophaeus* spores at 30° to 32°C[954]. Currently, no gaseous chlorine dioxide system is FDA cleared.

**Vaporized Peracetic Acid.** The sporicidal activity of peracetic acid vapor at 20, 40, 60, and 80% relative humidity and 25°C was determined on *Bacillus atrophaeus* spores on paper and glass surfaces. Appreciable activity occurred within 10 minutes of exposure to 1 mg of peracetic acid per liter at 40% or higher relative humidity[955]. No vaporized peracetic acid system is FDA cleared.

**Infrared radiation.** An infrared radiation prototype sterilizer was investigated and found to destroy *B. atrophaeus* spores. Some of the possible advantages of infrared technology include short cycle time, low energy consumption, no cycle residuals, and no toxicologic or environmental effects. This may provide an alternative technology for sterilization of selected heat-resistant instruments but there are no FDA-cleared systems for use in healthcare facilities [956].

The other sterilization technologies mentioned above may be used for sterilization of critical medical items if cleared by the FDA and ideally, the microbicidal effectiveness of the technology has been published in the scientific literature. The selection and use of disinfectants, chemical sterilants and sterilization processes in the healthcare field is dynamic, and products may become available that are not in existence when this guideline was written. As newer disinfectants and sterilization processes become available, persons or committees responsible for selecting disinfectants and sterilization processes should be guided by products cleared by FDA and EPA as well as information in the scientific literature.

## Sterilizing Practices

**Overview.** The delivery of sterile products for use in patient care depends not only on the effectiveness of the sterilization process but also on the unit design, decontamination, disassembling and packaging of the device, loading the sterilizer, monitoring, sterilant quality and quantity, and the appropriateness of the cycle for the load contents, and other aspects of device reprocessing. Healthcare personnel should perform most cleaning, disinfecting, and sterilizing of patient-care supplies in a central processing department in order to more easily control quality. The aim of central processing is the orderly processing of medical and surgical instruments to protect patients from infections while minimizing risks to staff and preserving the value of the items being reprocessed[957]. Healthcare facilities should promote the same level of efficiency and safety in the preparation of supplies in other areas (e.g., operating room, respiratory therapy) as is practiced in central processing.

Ensuring consistency of sterilization practices requires a comprehensive program that ensures operator competence and proper methods of cleaning and wrapping instruments, loading the sterilizer,

operating the sterilizer, and monitoring of the entire process. Furthermore, care must be consistent from an infection prevention standpoint in all patient-care settings, such as hospital and outpatient facilities.

*Sterilization Cycle Verification.* A sterilization process should be verified before it is put into use in healthcare settings. All steam, ETO, and other low-temperature sterilizers are tested with biological and chemical indicators upon installation, when the sterilizer is relocated, redesigned, after major repair and after a sterilization failure has occurred to ensure they are functioning prior to placing them into routine use. Three consecutive empty steam cycles are run with a biological and chemical indicator in an appropriate test package or tray. Each type of steam cycle used for sterilization (e.g., vacuum-assisted, gravity) is tested separately. In a prevacuum steam sterilizer three consecutive empty cycles are also run with a Bowie-Dick test. The sterilizer is not put back into use until all biological indicators are negative and chemical indicators show a correct end-point response[811-814, 819, 958].

Biological and chemical indicator testing is also done for ongoing quality assurance testing of representative samples of actual products being sterilized and product testing when major changes are made in packaging, wraps, or load configuration. Biological and chemical indicators are placed in products, which are processed in a full load. When three consecutive cycles show negative biological indicators and chemical indicators with a correct end point response, you can put the change made into routine use[811-814, 958]. Items processed during the three evaluation cycles should be quarantined until the test results are negative.

*Physical Facilities.* The central processing area(s) ideally should be divided into at least three areas: decontamination, packaging, and sterilization and storage. Physical barriers should separate the decontamination area from the other sections to contain contamination on used items. In the decontamination area reusable contaminated supplies (and possibly disposable items that are reused) are received, sorted, and decontaminated. The recommended airflow pattern should contain contaminates within the decontamination area and minimize the flow of contaminates to the clean areas. The American Institute of Architects [959] recommends negative pressure and no fewer than six air exchanges per hour in the decontamination area (AAMI recommends 10 air changes per hour) and 10 air changes per hour with positive pressure in the sterilizer equipment room. The packaging area is for inspecting, assembling, and packaging clean, but not sterile, material. The sterile storage area should be a limited access area with a controlled temperature (may be as high as 75°F) and relative humidity (30-60% in all works areas except sterile storage, where the relative humidity should not exceed 70%)[819]. The floors and walls should be constructed of materials capable of withstanding chemical agents used for cleaning or disinfecting. Ceilings and wall surfaces should be constructed of non-shedding materials. Physical arrangements of processing areas are presented schematically in four references[811, 819, 920, 957].

*Cleaning.* As repeatedly mentioned, items must be cleaned using water with detergents or enzymatic cleaners [465, 466, 468] before processing. Cleaning reduces the bioburden and removes foreign material (i.e., organic residue and inorganic salts) that interferes with the sterilization process by acting as a barrier to the sterilization agent[179, 426, 457, 911, 912]. Surgical instruments are generally presoaked or prerinsed to prevent drying of blood and tissue. Precleaning in patient-care areas may be needed on items that are heavily soiled with feces, sputum, blood, or other material. Items sent to central processing without removing gross soil may be difficult to clean because of dried secretions and excretions. Cleaning and decontamination should be done as soon as possible after items have been used.

Several types of mechanical cleaning machines (e.g., utensil washer-sanitizer, ultrasonic cleaner, washer-sterilizer, dishwasher, washer-disinfector) may facilitate cleaning and decontamination of most items. This equipment often is automated and may increase productivity, improve cleaning effectiveness, and decrease worker exposure to blood and body fluids. Delicate and intricate objects and heat- or moisture-sensitive articles may require careful cleaning by hand. All used items sent to the central processing area should be considered contaminated (unless decontaminated in the area of origin), handled with gloves (forceps or tongs are sometimes needed to avoid exposure to sharps), and decontaminated by one of the aforementioned methods to render them safer to handle. Items composed

of more than one removable part should be disassembled. Care should be taken to ensure that all parts are kept together, so that reassembly can be accomplished efficiently[811].

Investigators have described the degree of cleanliness by visual and microscopic examination. One study found 91% of the instruments to be clean visually but, when examined microscopically, 84% of the instruments had residual debris. Sites that contained residual debris included junctions between insulating sheaths and activating mechanisms of laparoscopic instruments and articulations and grooves of forceps. More research is needed to understand the clinical significance of these findings [960] and how to ensure proper cleaning.

Personnel working in the decontamination area should wear household-cleaning-type rubber or plastic gloves when handling or cleaning contaminated instruments and devices. Face masks, eye protection such as goggles or full-length faceshields, and appropriate gowns should be worn when exposure to blood and contaminated fluids may occur (e.g., when manually cleaning contaminated devices)[961]. Contaminated instruments are a source of microorganisms that could inoculate personnel through nonintact skin on the hands or through contact with the mucous membranes of eyes, nose, or mouth[214, 811, 813]. Reusable sharps that have been in contact with blood present a special hazard. Employees must not reach with their gloved hands into trays or containers that hold these sharps to retrieve them[214]. Rather, employees should use engineering controls (e.g., forceps) to retrieve these devices.

*Packaging.* Once items are cleaned, dried, and inspected, those requiring sterilization must be wrapped or placed in rigid containers and should be arranged in instrument trays/baskets according to the guidelines provided by the AAMI and other professional organizations[454, 811-814, 819, 836, 962]. These guidelines state that hinged instruments should be opened; items with removable parts should be disassembled unless the device manufacturer or researchers provide specific instructions or test data to the contrary[181]; complex instruments should be prepared and sterilized according to device manufacturer's instructions and test data; devices with concave surfaces should be positioned to facilitate drainage of water; heavy items should be positioned not to damage delicate items; and the weight of the instrument set should be based on the design and density of the instruments and the distribution of metal mass[811, 962]. While there is no longer a specified sterilization weight limit for surgical sets, heavy metal mass is a cause of wet packs (i.e., moisture inside the case and tray after completion of the sterilization cycle)[963]. Other parameters that may influence drying are the density of the wraps and the design of the set[964].

There are several choices in methods to maintain sterility of surgical instruments, including rigid containers, peel-open pouches (e.g., self-sealed or heat-sealed plastic and paper pouches), roll stock or reels (i.e., paper-plastic combinations of tubing designed to allow the user to cut and seal the ends to form a pouch) [454] and sterilization wraps (woven and nonwoven). Healthcare facilities may use all of these packaging options. The packaging material must allow penetration of the sterilant, provide protection against contact contamination during handling, provide an effective barrier to microbial penetration, and maintain the sterility of the processed item after sterilization [965]. An ideal sterilization wrap would successfully address barrier effectiveness, penetrability (i.e., allows sterilant to penetrate), aeration (e.g., allows ETO to dissipate), ease of use, drapeability, flexibility, puncture resistance, tear strength, toxicity, odor, waste disposal, linting, cost, and transparency[966]. Unacceptable packaging for use with ETO (e.g., foil, polyvinylchloride, and polyvinylidene chlorine [kitchen-type transparent wrap]) [814] or hydrogen peroxide gas plasma (e.g., linens and paper) should not be used to wrap medical items.

In central processing, double wrapping can be done sequentially or nonsequentially (i.e., simultaneous wrapping). Wrapping should be done in such a manner to avoid tenting and gapping. The sequential wrap uses two sheets of the standard sterilization wrap, one wrapped after the other. This procedure creates a package within a package. The nonsequential process uses two sheets wrapped at the same time so that the wrapping needs to be performed only once. This latter method provides

multiple layers of protection of surgical instruments from contamination and saves time since wrapping is done only once. Multiple layers are still common practice due to the rigors of handling within the facility even though the barrier efficacy of a single sheet of wrap has improved over the years[966]. Written and illustrated procedures for preparation of items to be packaged should be readily available and used by personnel when packaging procedures are performed[454].

**Loading.** All items to be sterilized should be arranged so all surfaces will be directly exposed to the sterilizing agent. Thus, loading procedures must allow for free circulation of steam (or another sterilant) around each item. Historically, it was recommended that muslin fabric packs should not exceed the maximal dimensions, weight, and density of 12 inches wide x 12 inches high x 20 inches long, 12 lbs, and 7.2 lbs per cubic foot, respectively. Due to the variety of textiles and metal/plastic containers on the market, the textile and metal/plastic container manufacturer and the sterilizer manufacturers should be consulted for instructions on pack preparation and density parameters[819].

There are several important basic principles for loading a sterilizer: allow for proper sterilant circulation; perforated trays should be placed so the tray is parallel to the shelf; nonperforated containers should be placed on their edge (e.g., basins); small items should be loosely placed in wire baskets; and peel packs should be placed on edge in perforated or mesh bottom racks or baskets[454, 811, 836].

**Storage.** Studies in the early 1970s suggested that wrapped surgical trays remained sterile for varying periods depending on the type of material used to wrap the trays. Safe storage times for sterile packs vary with the porosity of the wrapper and storage conditions (e.g., open versus closed cabinets). Heat-sealed, plastic peel-down pouches and wrapped packs sealed in 3-mil (3/1000 inch) polyethylene overwrap have been reported to be sterile for as long as 9 months after sterilization. The 3-mil polyethylene is applied after sterilization to extend the shelf life for infrequently used items[967]. Supplies wrapped in double-thickness muslin comprising four layers, or equivalent, remain sterile for at least 30 days. Any item that has been sterilized should not be used after the expiration date has been exceeded or if the sterilized package is wet, torn, or punctured.

Although some hospitals continue to date every sterilized product and use the time-related shelf-life practice, many hospitals have switched to an event-related shelf-life practice. This latter practice recognizes that the product should remain sterile until some event causes the item to become contaminated (e.g., tear in packaging, packaging becomes wet, seal is broken)[968]. Event-related factors that contribute to the contamination of a product include bioburden (i.e., the amount of contamination in the environment), air movement, traffic, location, humidity, insects, vermin, flooding, storage area space, open/closed shelving, temperature, and the properties of the wrap material[966, 969]. There are data that support the event-related shelf-life practice[970-972]. One study examined the effect of time on the sterile integrity of paper envelopes, peel pouches, and nylon sleeves. The most important finding was the absence of a trend toward an increased rate of contamination over time for any pack when placed in covered storage[971]. Another evaluated the effectiveness of event-related outdating by microbiologically testing sterilized items. During the 2-year study period, all of the items tested were sterile[972]. Thus, contamination of a sterile item is event-related and the probability of contamination increases with increased handling[973].

Following the sterilization process, medical and surgical devices must be handled using aseptic technique in order to prevent contamination. Sterile supplies should be stored far enough from the floor (8 to 10 inches), the ceiling (5 inches unless near a sprinkler head [18 inches from sprinkler head]), and the outside walls (2 inches) to allow for adequate air circulation, ease of cleaning, and compliance with local fire codes (e.g., supplies must be at least 18 inches from sprinkler heads). Medical and surgical supplies should not be stored under sinks or in other locations where they can become wet. Sterile items that become wet are considered contaminated because moisture brings with it microorganisms from the air and surfaces. Closed or covered cabinets are ideal but open shelving may be used for storage. Any package that has fallen or been dropped on the floor must be inspected for damage to the packaging and

contents (if the items are breakable). If the package is heat-sealed in impervious plastic and the seal is still intact, the package should be considered not contaminated. If undamaged, items packaged in plastic need not be reprocessed.

*Monitoring.* The sterilization procedure should be monitored routinely by using a combination of mechanical, chemical, and biological indicators to evaluate the sterilizing conditions and indirectly the microbiologic status of the processed items. The mechanical monitors for steam sterilization include the daily assessment of cycle time and temperature by examining the temperature record chart (or computer printout) and an assessment of pressure via the pressure gauge. The mechanical monitors for ETO include time, temperature, and pressure recorders that provide data via computer printouts, gauges, and/or displays[814]. Generally, two essential elements for ETO sterilization (i.e., the gas concentration and humidity) cannot be monitored in healthcare ETO sterilizers.

Chemical indicators are convenient, are inexpensive, and indicate that the item has been exposed to the sterilization process. In one study, chemical indicators were more likely than biological indicators to inaccurately indicate sterilization at marginal sterilization times (e.g., 2 minutes)[847]. Chemical indicators should be used in conjunction with biological indicators, but based on current studies should not replace them because they indicate sterilization at marginal sterilization time and because only a biological indicator consisting of resistant spores can measure the microbial killing power of the sterilization process.[847, 974]. Chemical indicators are affixed on the outside of each pack to show that the package has been processed through a sterilization cycle, but these indicators do not prove sterilization has been achieved. Preferably, a chemical indicator also should be placed on the inside of each pack to verify sterilant penetration. Chemical indicators usually are either heat-or chemical-sensitive inks that change color when one or more sterilization parameters (e.g., steam-time, temperature, and/or saturated steam; ETO-time, temperature, relative humidity and/or ETO concentration) are present. Chemical indicators have been grouped into five classes based on their ability to monitor one or multiple sterilization parameters[813, 819]. If the internal and/or external indicator suggests inadequate processing, the item should not be used[815]. An air-removal test (Bowie-Dick Test) must be performed daily in an empty dynamic-air-removal sterilizer (e.g., prevacuum steam sterilizer) to ensure air removal.

Biological indicators are recognized by most authorities as being closest to the ideal monitors of the sterilization process [974, 975] because they measure the sterilization process directly by using the most resistant microorganisms (i.e., *Bacillus* spores), and not by merely testing the physical and chemical conditions necessary for sterilization. Since the *Bacillus* spores used in biological indicators are more resistant and present in greater numbers than are the common microbial contaminants found on patient-care equipment, the demonstration that the biological indicator has been inactivated strongly implies that other potential pathogens in the load have been killed[844].

An ideal biological monitor of the sterilization process should be easy to use, be inexpensive, not be subject to exogenous contamination, provide positive results as soon as possible after the cycle so that corrective action may be accomplished, and provide positive results only when the sterilization parameters (e.g., steam-time, temperature, and/or saturated steam; ETO-time, temperature, relative humidity and/or ETO concentration) are inadequate to kill microbial contaminates[847].

Biological indicators are the only process indicators that directly monitor the lethality of a given sterilization process. Spores used to monitor a sterilization process have demonstrated resistance to the sterilizing agent and are more resistant than the bioburden found on medical devices[179, 911, 912]. *B. atrophaeus* spores ($10^6$) are used to monitor ETO and dry heat, and *G. stearothermophilus* spores ($10^5$) are used to monitor steam sterilization, hydrogen peroxide gas plasma, and liquid peracetic acid sterilizers. *G. stearothermophilus* is incubated at 55-60°C, and *B. atrophaeus* is incubated at 35-37°C. Steam and low temperature sterilizers (e.g., hydrogen peroxide gas plasma, peracetic acid) should be monitored at least weekly with the appropriate commercial preparation of spores. If a sterilizer is used frequently (e.g., several loads per day), daily use of biological indicators allows earlier discovery of

equipment malfunctions or procedural errors and thus minimizes the extent of patient surveillance and product recall needed in the event of a positive biological indicator[811]. Each load should be monitored if it contains implantable objects. If feasible, implantable items should not be used until the results of spore tests are known to be negative.

Originally, spore-strip biological indicators required up to 7 days of incubation to detect viable spores from marginal cycles (i.e., when few spores remained viable). The next generation of biological indicator was self-contained in plastic vials containing a spore-coated paper strip and a growth media in a crushable glass ampoule. This indicator had a maximum incubation of 48 hours but significant failures could be detected in ≤24 hours. A rapid-readout biological indicator that detects the presence of enzymes of G. stearothermophilus by reading a fluorescent product produced by the enzymatic breakdown of a nonfluorescent substrate has been marketed for the more than 10 years. Studies demonstrate that the sensitivity of rapid-readout tests for steam sterilization (1 hour for 132°C gravity sterilizers, 3 hrs for 121°C gravity and 132°C vacuum sterilizers) parallels that of the conventional sterilization-specific biological indicators [846, 847, 976, 977] and the fluorescent rapid readout results reliably predict 24- and 48-hour and 7-day growth[978]. The rapid-readout biological indicator is a dual indicator system as it also detects acid metabolites produced during growth of the G. stearothermophilus spores. This system is different from the indicator system consisting of an enzyme system of bacterial origin without spores. Independent comparative data using suboptimal sterilization cycles (e.g., reduced time or temperature) with the enzyme-based indicator system have not been published[979].

A new rapid-readout ETO biological indicator has been designed for rapid and reliable monitoring of ETO sterilization processes. The indicator has been cleared by the FDA for use in the United States[400]. The rapid-readout ETO biological indicator detects the presence of B. atrophaeus by detecting a fluorescent signal indicating the activity of an enzyme present within the B. atrophaeus organism, beta-glucosidase. The fluorescence indicates the presence of an active spore-associated enzyme and a sterilization process failure. This indicator also detects acid metabolites produced during growth of the B. atrophaeus spore. Per manufacturer's data, the enzyme always was detected whenever viable spores were present. This was expected because the enzyme is relatively ETO resistant and is inactivated at a slightly longer exposure time than the spore. The rapid-readout ETO biological indicator can be used to monitor 100% ETO, and ETO-HCFC mixture sterilization cycles. It has not been tested in ETO-$CO_2$ mixture sterilization cycles.

The standard biological indicator used for monitoring full-cycle steam sterilizers does not provide reliable monitoring flash sterilizers[980]. Biological indicators specifically designed for monitoring flash sterilization are now available, and studies comparing them have been published[846, 847, 981].

Since sterilization failure can occur (about 1% for steam)[982], a procedure to follow in the event of positive spore tests with steam sterilization has been provided by CDC and the Association of periOperative Registered Nurses (AORN). The 1981 CDC recommendation is that "objects, other than implantable objects, do not need to be recalled because of a single positive spore test unless the steam sterilizer or the sterilization procedure is defective." The rationale for this recommendation is that single positive spore tests in sterilizers occur sporadically. They may occur for reasons such as slight variation in the resistance of the spores[983], improper use of the sterilizer, and laboratory contamination during culture (uncommon with self-contained spore tests). If the mechanical (e.g., time, temperature, pressure in the steam sterilizer) and chemical (internal and/or external) indicators suggest that the sterilizer was functioning properly, a single positive spore test probably does not indicate sterilizer malfunction but the spore test should be repeated immediately [983]. If the spore tests remain positive, use of the sterilizer should be discontinued until it is serviced[1]. Similarly, AORN states that a single positive spore test does not necessarily indicate a sterilizer failure. If the test is positive, the sterilizer should immediately be rechallenged for proper use and function. Items, other than implantable ones, do not necessarily need to be recalled unless a sterilizer malfunction is found. If a sterilizer malfunction is discovered, the items must be considered nonsterile, and the items from the suspect load(s) should be recalled, insofar as

possible, and reprocessed [984]. A suggested protocol for management of positive biological indicators is shown in Table 12[839]. A more conservative approach also has been recommended [813] in which any positive spore test is assumed to represent sterilizer malfunction and requires that all materials processed in that sterilizer, dating from the sterilization cycle having the last negative biologic indicator to the next cycle showing satisfactory biologic indicator challenge results, must be considered nonsterile and retrieved, if possible, and reprocessed. This more conservative approach should be used for sterilization methods other than steam (e.g., ETO, hydrogen peroxide gas plasma). However, no action is necessary if there is strong evidence for the biological indicator being defective [983] or the growth medium contained a *Bacillus* contaminant[985] .

If patient-care items were used before retrieval, the infection control professional should assess the risk of infection in collaboration with central processing, surgical services, and risk management staff. The factors that should be considered include the chemical indicator result (e.g., nonreactive chemical indicator may indicate temperature not achieved); the results of other biological indicators that followed the positive biological indicator (e.g., positive on Tuesday, negative on Wednesday); the parameters of the sterilizer associated with the positive biological indicator (e.g., reduced time at correct temperature); the time-temperature chart (or printout); and the microbial load associated with decontaminated surgical instruments (e.g., 85% of decontaminated surgical instruments have less than 100 CFU). The margin of safety in steam sterilization is sufficiently large that there is minimal infection risk associated with items in a load that show spore growth, especially if the item was properly cleaned and the temperature was achieved (e.g., as shown by acceptable chemical indicator or temperature chart). There are no published studies that document disease transmission via a nonretrieved surgical instrument following a sterilization cycle with a positive biological indicator.

False-positive biological indicators may occur from improper testing or faulty indicators. The latter may occur from improper storage, processing, product contamination, material failure, or variation in resistance of spores. Gram stain and subculture of a positive biological indicator may determine if a contaminant has created a false-positive result[839, 986]. However, in one incident, the broth used as growth medium contained a contaminant, *B. coagulans,* which resulted in broth turbidity at 55°C[985]. Testing of paired biological indicators from different manufacturers can assist in assessing a product defect[839]. False-positive biological indicators due to extrinsic contamination when using self-contained biological indicators should be uncommon. A biological indicator should not be considered a false-positive indicator until a thorough analysis of the entire sterilization process shows this to be likely.

The size and composition of the biological indicator test pack should be standardized to create a significant challenge to air removal and sterilant penetration and to obtain interpretable results. There is a standard 16-towel pack recommended by AAMI for steam sterilization [813, 819, 987] consisting of 16 clean, preconditioned, reusable huck or absorbent surgical towels each of which is approximately 16 inches by 26 inches. Each towel is folded lengthwise into thirds and then folded widthwise in the middle. One or more biological indicators are placed between the eight and ninth towels in the approximate geometric center of the pack. When the towels are folded and placed one on top of another, to form a stack (approximately 6 inch height) it should weigh approximately 3 pounds and should have a density of approximately 11.3 pounds per cubic foot[813]. This test pack has not gained universal use as a standard pack that simulates the actual in-use conditions of steam sterilizers. Commercially available disposable test packs that have been shown to be equivalent to the AAMI 16 towel test pack also may be used. The test pack should be placed flat in an otherwise fully loaded sterilizer chamber, in the area least favorable to sterilization (i.e., the area representing the greatest challenge to the biological indicator). This area is normally in the front, bottom section of the sterilizer, near the drain[811, 813]. A control biological indicator from the lot used for testing should be left unexposed to the sterilant, and then incubated to verify the presterilization viability of the test spores and proper incubation. The most conservative approach would be to use a control for each run; however, less frequent use may be adequate (e.g., weekly). There also is a routine test pack for ETO where a biological indicator is placed in a plastic syringe with plunger, then placed in the folds of a clean surgical towel, and wrapped. Alternatively, commercially available disposal

test packs that have been shown to be equivalent to the AAMI test pack may be used. The test pack is placed in the center of the sterilizer load[814]. Sterilization records (mechanical, chemical, and biological) should be retained for a time period in compliance with standards (e.g., Joint Commission for the Accreditation of Healthcare Facilities requests 3 years) and state and federal regulations.

In Europe, biological monitors are not used routinely to monitor the sterilization process. Instead, release of sterilizer items is based on monitoring the physical conditions of the sterilization process that is termed "parametric release." Parametric release requires that there is a defined quality system in place at the facility performing the sterilization and that the sterilization process be validated for the items being sterilized. At present in Europe, parametric release is accepted for steam, dry heat, and ionizing radiation processes, as the physical conditions are understood and can be monitored directly[988]. For example, with steam sterilizers the load could be monitored with probes that would yield data on temperature, time, and humidity at representative locations in the chamber and compared to the specifications developed during the validation process.

Periodic infection control rounds to areas using sterilizers to standardize the sterilizer's use may identify correctable variances in operator competence; documentation of sterilization records, including chemical and biological indicator test results; sterilizer maintenance and wrapping; and load numbering of packs. These rounds also may identify improvement activities to ensure that operators are adhering to established standards[989].

## REUSE OF SINGLE-USE MEDICAL DEVICES

The reuse of single-use medical devices began in the late 1970s. Before this time most devices were considered reusable. Reuse of single-use devices increased as a cost-saving measure. Approximately 20 to 30% of U.S. hospitals reported that they reuse at least one type of single-use device. Reuse of single-use devices involves regulatory, ethical, medical, legal and economic issues and has been extremely controversial for more than two decades[990]. The U.S. public has expressed increasing concern regarding the risk of infection and injury when reusing medical devices intended and labeled for single use. Although some investigators have demonstrated it is safe to reuse disposable medical devices such as cardiac electrode catheters, [991-993] additional studies are needed to define the risks [994] and document the benefits. In August 2000, FDA released a guidance document on single-use devices reprocessed by third parties or hospitals[995]. In this guidance document, FDA states that hospitals or third-party reprocessors will be considered "manufacturers" and regulated in the same manner. A reused single-use device will have to comply with the same regulatory requirements of the device when it was originally manufactured. This document presents FDA's intent to enforce premarket submission requirements within 6 months (February 2001) for class III devices (e.g., cardiovascular intra-aortic balloon pump, transluminal coronary angioplasty catheter); 12 months (August 2001) for class II devices (e.g., blood pressure cuff, bronchoscope biopsy forceps); and 18 months (February 2002) for class I devices (e.g., disposable medical scissors, ophthalmic knife). FDA uses two types of premarket requirements for nonexempt class I and II devices, a 510(k) submission that may have to show that the device is as safe and effective as the same device when new, and a premarket approval application. The 510(k) submission must provide scientific evidence that the device is safe and effective for its intended use. FDA allowed hospitals a year to comply with the nonpremarket requirements (registration and listing, reporting adverse events associated with medical devices, quality system regulations, and proper labeling). The options for hospitals are to stop reprocessing single-use devices, comply with the rule, or outsource to a third-party reprocessor. FDA guidance document does not apply to permanently implantable pacemakers, hemodialyzers, opened but unused single-use devices, or healthcare settings other than acute-care hospitals. The reuse of single use medical devices continues to be an evolving area of regulations. For this reason, healthcare workers should refer to FDA for the latest guidance (www.fda.gov)[996].

## CONCLUSION

When properly used, disinfection and sterilization can ensure the safe use of invasive and non-invasive medical devices. However, current disinfection and sterilization guidelines must be strictly followed.

## WED-BASED DISINFECTION AND STERILIZATION RESOURCES

Additional information about disinfection and sterilization is available at the following dedicated websites:
Food and Drug Administration, Rockville, Maryland
http://www.fda.gov/dcrh/ode/germlab.html

Environmental Protection Agency, Washington, D.C.
http://www.epa.gov/oppad001/chemregindex.htm

Centers for Disease Control and Prevention, Atlanta, Georgia
http://www.cdc.gov/ncidod/dhqp/sterile.html

University of North Carolina, Chapel Hill, North Carolina
http://www.disinfectionandsterilization.org

## RECOMMENDATIONS FOR DISINFECTION AND STERILIZATION IN HEALTHCARE FACILITIES

### A. Rationale

The ultimate goal of the Recommendations for Disinfection and Sterilization in Health-Care Facilities, 2008, is to reduce rates of health-care–associated infections through appropriate use of both disinfection and sterilization. Each recommendation is categorized according to scientific evidence, theoretical rationale, applicability, and federal regulations. Examples are included in some recommendations to aid the reader; however, these examples are not intended to define the only method of implementing the recommendation. The CDC system for categorizing recommendations is defined in the following (Rankings) section.

### B. Rankings

*Category IA.* Strongly recommended for implementation and strongly supported by well-designed experimental, clinical, or epidemiologic studies.

*Category IB.* Strongly recommended for implementation and supported by some experimental, clinical, or epidemiologic studies, and by a strong theoretical rationale.

*Category IC.* Required by state or federal regulations. Because of state differences, readers should not assume that the absence of an *IC* recommendation implies the absence of state regulations.

*Category II.* Suggested for implementation and supported by suggestive clinical or epidemiologic studies or by a theoretical rationale.

*No recommendation.* Unresolved issue. These include practices for which insufficient evidence or no consensus exists regarding efficacy.

### C. Recommendations

1. **Occupational Health and Exposure**

   a. Inform each worker of the possible health effects of his or her exposure to infectious agents (e.g., hepatitis B virus [HBV], hepatitis C virus, human immunodeficiency virus [HIV]), and/or chemicals (e.g., EtO, formaldehyde). The information should be consistent with Occupational Safety and Health Administration (OSHA) requirements and identify the areas and tasks in which potential exists for exposure. *Category II, IC*[214, 320, 959, 997, 998]

   b. Educate health-care workers in the selection and proper use of personal protective equipment (PPE). *Category II, IC*

   c. Ensure that workers wear appropriate PPE to preclude exposure to infectious agents or chemicals through the respiratory system, skin, or mucous membranes of the eyes, nose, or mouth. PPE can include gloves, gowns, masks, and eye protection. The exact type of PPE depends on the infectious or chemical agent and the anticipated duration of exposure. The employer is responsible for making such equipment and training available. *Category II, IC.*[214, 997-999]

   d. Establish a program for monitoring occupational exposure to regulated chemicals (e.g., formaldehyde, EtO) that adheres to state and federal regulations. *Category II, IC.*[997, 1000, 1001]

   e. Exclude healthcare workers with weeping dermatitis of hands from direct contact with patient-care equipment. *Category IB.*[1002, 1003]

2. **Cleaning of Patient-Care Devices**

   a. In hospitals, perform most cleaning, disinfection, and sterilization of patient-care devices in a central processing department in order to more easily control quality. *Category II.*[454, 836, 959]

   b. Meticulously clean patient-care items with water and detergent, or with water and enzymatic cleaners before high-level disinfection or sterilization procedures. *Category IB.*[6, 83, 101, 104-106, 124, 179, 424-426, 436, 465, 471, 911-913, 1004]

      i. Remove visible organic residue (e.g., residue of blood and tissue) and inorganic salts with cleaning. Use cleaning agents that are capable of removing visible organic and inorganic residues. *Category IB.*[424-426, 466, 468, 469, 471, 908, 910]

    *ii.*    Clean medical devices as soon as practical after use (e.g., at the point of use) because soiled materials become dried onto the instruments. Dried or baked materials on the instrument make the removal process more difficult and the disinfection or sterilization process less effective or ineffective. *Category IB.* [55, 56, 59, 291, 465, 1005, 1006]

c.    Perform either manual cleaning (i.e., using friction) or mechanical cleaning (e.g., with ultrasonic cleaners, washer-disinfector, washer-sterilizers). *Category IB.* [426, 456, 471, 999]

d.    If using an automatic washer/disinfector, ensure that the unit is used in accordance with the manufacturer's recommendations. *Category IB.* [7, 133, 155, 725]

e.    Ensure that the detergents or enzymatic cleaners selected are compatible with the metals and other materials used in medical instruments. Ensure that the rinse step is adequate for removing cleaning residues to levels that will not interfere with subsequent disinfection/sterilization processes. *Category II.* [836, 1004]

f.    Inspect equipment surfaces for breaks in integrity that would impair either cleaning or disinfection/sterilization. Discard or repair equipment that no longer functions as intended or cannot be properly cleaned, and disinfected or sterilized. *Category II.* [888]

g.

**3.**    *Indications for Sterilization, High-Level Disinfection, and Low-Level Disinfection*

a.    Before use on each patient, sterilize critical medical and surgical devices and instruments that enter normally sterile tissue or the vascular system or through which a sterile body fluid flows (e.g., blood). See recommendation 7g for exceptions. *Category IA.* [179, 497, 821, 822, 907, 911, 912]

b.    Provide, at a minimum, high-level disinfection for semicritical patient-care equipment (e.g., gastrointestinal endoscopes, endotracheal tubes, anesthesia breathing circuits, and respiratory therapy equipment) that touches either mucous membranes or nonintact skin. *Category IA.* [6-8, 17, 20, 99, 101, 108, 113-115, 129, 138, 139, 147, 152-154, 471, 1007]

c.    Perform low-level disinfection for noncritical patient-care surfaces (e.g., bedrails, over-the-bed table) and equipment (e.g., blood pressure cuff) that touch intact skin (see Recommendation 5g). *Category II.* [17, 46-48, 50-52, 67, 68, 372, 373, 378, 382, 401]

**4.**    *Selection and Use of Low-Level Disinfectants for Noncritical Patient-Care Devices*

a.    Process noncritical patient-care devices using a disinfectant and the concentration of germicide listed in Table 1. *Category IB.* [17, 46-48, 50-52, 67, 68, 378, 382, 401]

b.    Disinfect noncritical medical devices (e.g., blood pressure cuff) with an EPA-registered hospital disinfectant using the label's safety precautions and use directions. Most EPA-registered hospital disinfectants have a label contact time of 10 minutes. However, multiple scientific studies have demonstrated the efficacy of hospital disinfectants against pathogens with a contact time of at least 1 minute. By law, all applicable label instructions on EPA-registered products must be followed. If the user selects exposure conditions that differ from those on the EPA-registered product label, the user assumes liability from any injuries resulting from off-label use and is potentially subject to enforcement action under FIFRA. *Category IB.* [17, 47, 48, 50, 51, 53-57, 59, 60, 62-64, 355, 378, 382]

c.    Ensure that, at a minimum, noncritical patient-care devices are disinfected when visibly soiled and on a regular basis (such as after use on each patient or once daily or once weekly). *Category II.* [378, 380, 1008]

d.    If dedicated, disposable devices are not available, disinfect noncritical patient-care equipment after using it on a patient who is on contact precautions before using this equipment on another patient. *Category IB.* [47, 67, 391, 1009]

**5.**    *Cleaning and Disinfecting Environmental Surfaces in Healthcare Facilities*

a.    Clean housekeeping surfaces (e.g., floors, tabletops) on a regular basis, when spills occur, and when these surfaces are visibly soiled. *Category II.* [23, 378, 380, 382, 1008, 1010]

b.    Disinfect (or clean) environmental surfaces on a regular basis (e.g., daily, three times per week) and when surfaces are visibly soiled. *Category II.* [378, 380, 402, 1008]

c.    Follow manufacturers' instructions for proper use of disinfecting (or detergent) products --- such as recommended use-dilution, material compatibility, storage, shelf-life, and safe use and

disposal. *Category II.* [327, 365, 404]

d. Clean walls, blinds, and window curtains in patient-care areas when these surfaces are visibly contaminated or soiled. *Category II.* [1011]

e. Prepare disinfecting (or detergent) solutions as needed and replace these with fresh solution frequently (e.g., replace floor mopping solution every three patient rooms, change no less often than at 60-minute intervals), according to the facility's policy. *Category IB.* [68, 379]

f. Decontaminate mop heads and cleaning cloths regularly to prevent contamination (e.g., launder and dry at least daily). *Category II.* [68, 402, 403]

g. Use a one-step process and an EPA-registered hospital disinfectant designed for housekeeping purposes in patient care areas where 1) uncertainty exists about the nature of the soil on the surfaces (e.g., blood or body fluid contamination versus routine dust or dirt); or 2) uncertainty exists about the presence of multidrug resistant organisms on such surfaces. See 5n for recommendations requiring cleaning and disinfecting blood-contaminated surfaces. *Category II.* [23, 47, 48, 51, 214, 378, 379, 382, 416, 1012]

h. Detergent and water are adequate for cleaning surfaces in nonpatient-care areas (e.g., administrative offices). *Category II.* [23]

i. Do not use high-level disinfectants/liquid chemical sterilants for disinfection of non-critical surfaces. *Category IB.* [23, 69, 318]

j. Wet-dust horizontal surfaces regularly (e.g., daily, three times per week) using clean cloths moistened with an EPA-registered hospital disinfectant (or detergent). Prepare the disinfectant (or detergent) as recommended by the manufacturer. *Category II.* [68, 378, 380, 402, 403, 1008]

k. Disinfect noncritical surfaces with an EPA-registered hospital disinfectant according to the label's safety precautions and use directions. Most EPA-registered hospital disinfectants have a label contact time of 10 minutes. However, many scientific studies have demonstrated the efficacy of hospital disinfectants against pathogens with a contact time of at least 1 minute. By law, the user must follow all applicable label instructions on EPA-registered products. If the user selects exposure conditions that differ from those on the EPA-registered product label, the user assumes liability for any injuries resulting from off-label use and is potentially subject to enforcement action under FIFRA. *Category II, IC.* [17, 47, 48, 50, 51, 53-57, 59, 60, 62-64, 355, 378, 382]

l. Do not use disinfectants to clean infant bassinets and incubators while these items are occupied. If disinfectants (e.g., phenolics) are used for the terminal cleaning of infant bassinets and incubators, thoroughly rinse the surfaces of these items with water and dry them before these items are reused. *Category IB.* [17, 739, 740]

m. Promptly clean and decontaminate spills of blood and other potentially infectious materials. Discard blood-contaminated items in compliance with federal regulations. *Category IB, IC.* [214]

n. For site decontamination of spills of blood or other potentially infectious materials (OPIM), implement the following procedures. Use protective gloves and other PPE (e.g., when sharps are involved use forceps to pick up sharps, and discard these items in a puncture-resistant container) appropriate for this task. Disinfect areas contaminated with blood spills using an EPA-registered tuberculocidal agent, a registered germicide on the EPA Lists D and E (i.e., products with specific label claims for HIV or HBV or freshly diluted hypochlorite solution. *Category II, IC.* [214, 215, 557, 1013] If sodium hypochlorite solutions are selected use a 1:100 dilution (e.g., 1:100 dilution of a 5.25-6.15% sodium hypochlorite provides 525-615 ppm available chlorine) to decontaminate nonporous surfaces after a small spill (e.g., <10 mL) of either blood or OPIM. If a spill involves large amounts (e.g., >10 mL) of blood or OPIM, or involves a culture spill in the laboratory, use a 1:10 dilution for the first application of hypochlorite solution before cleaning in order to reduce the risk of infection during the cleaning process in the event of a sharp injury. Follow this decontamination process with a terminal disinfection, using a 1:100 dilution of sodium hypochlorite. *Category IB, IC.* [63, 215, 557]

o. If the spill contains large amounts of blood or body fluids, clean the visible matter with disposable absorbent material, and discard the contaminated materials in appropriate, labeled containment. *Category II, IC.* [44, 214]

p. Use protective gloves and other PPE appropriate for this task. *Category II, IC.* [44, 214]

85

q. In units with high rates of endemic *Clostridium difficile* infection or in an outbreak setting, use dilute solutions of 5.25%–6.15% sodium hypochlorite (e.g., 1:10 dilution of household bleach) for routine environmental disinfection. Currently, no products are EPA-registered specifically for inactivating *C. difficile* spores. *Category II.* [257-259]

r. If chlorine solution is not prepared fresh daily, it can be stored at room temperature for up to 30 days in a capped, opaque plastic bottle with a 50% reduction in chlorine concentration after 30 days of storage (e.g., 1000 ppm chlorine [approximately a 1:50 dilution] at day 0 decreases to 500 ppm chlorine by day 30). *Category IB.* [327, 1014]

s. An EPA-registered sodium hypochlorite product is preferred, but if such products are not available, generic versions of sodium hypochlorite solutions (e.g., household chlorine bleach) can be used. *Category II.* [44]

**6. Disinfectant Fogging**

a. Do not perform disinfectant fogging for routine purposes in patient-care areas. *Category II.* [23, 228]

**7. High-Level Disinfection of Endoscopes**

a. To detect damaged endoscopes, test each flexible endoscope for leaks as part of each reprocessing cycle. Remove from clinical use any instrument that fails the leak test, and repair this instrument. *Category II.* [113, 115, 116]

b. Immediately after use, meticulously clean the endoscope with an enzymatic cleaner that is compatible with the endoscope. Cleaning is necessary before both automated and manual disinfection. *Category IA.* [83, 101, 104-106, 113, 115, 116, 124, 126, 456, 465, 466, 471, 1015]

c. Disconnect and disassemble endoscopic components (e.g., suction valves) as completely as possible and completely immerse all components in the enzymatic cleaner. Steam sterilize these components if they are heat stable. *Category IB.* [115, 116, 139, 465, 466]

d. Flush and brush all accessible channels to remove all organic (e.g., blood, tissue) and other residue. Clean the external surfaces and accessories of the devices by using a soft cloth or sponge or brushes. Continue brushing until no debris appears on the brush. *Category IA* [6, 17, 108, 113, 115, 116, 137, 145, 147, 725, 856, 903]

e. Use cleaning brushes appropriate for the size of the endoscope channel or port (e.g., bristles should contact surfaces). Cleaning items (e.g., brushes, cloth) should be disposable or, if they are not disposable, they should be thoroughly cleaned and either high-level disinfected or sterilized after each use. *Category II.* [113, 115, 116, 1016]

f. Discard enzymatic cleaners (or detergents) after each use because they are not microbicidal and, therefore, will not retard microbial growth. *Category IB.* [38, 113, 115, 116, 466]

g. Process endoscopes (e.g., arthroscopes, cystoscope, laparoscopes) that pass through normally sterile tissues using a sterilization procedure before each use; if this is not feasible, provide at least high-level disinfection. High-level disinfection of arthroscopes, laparoscopes, and cytoscopes should be followed by a sterile water rinse. *Category IB.* [1, 17, 31, 32, 35, 89, 90, 113, 554]

h. Phase out endoscopes that are critical items (e.g., arthroscopes, laparoscopes) but cannot be steam sterilized. Replace these endoscopes with steam sterilizable instruments when feasible. *Category II.*

i. Mechanically clean reusable accessories inserted into endoscopes (e.g., biopsy forceps or other cutting instruments) that break the mucosal barrier (e.g., ultrasonically clean biopsy forceps) and then sterilize these items between each patient. *Category IA.* [1, 6, 8, 17, 108, 113, 115, 116, 138, 145, 147, 153, 278]

j. Use ultrasonic cleaning of reusable endoscopic accessories to remove soil and organic material from hard-to-clean areas. *Category II.* [116, 145, 148]

k. Process endoscopes and accessories that contact mucous membranes as semicritical items, and use at least high-level disinfection after use on each patient. *Category IA.* [1, 6, 8, 17, 108, 113, 115, 116, 129, 138, 145-148, 152-154, 278]

l. Use an FDA-cleared sterilant or high-level disinfectant for sterilization or high-level disinfection (Table 1). *Category IA.* [1, 6-8, 17, 85, 108, 113, 115, 116, 147]

m. After cleaning, use formulations containing glutaraldehyde, glutaraldehyde with phenol/phenate,

ortho-phthalaldehyde, hydrogen peroxide, and both hydrogen peroxide and peracetic acid to achieve high-level disinfection followed by rinsing and drying (see Table 1 for recommended concentrations). *Category IB.* [1, 6-8, 17, 38, 85, 108, 113, 145-148]

n. Extend exposure times beyond the minimum effective time for disinfecting semicritical patient-care equipment cautiously and conservatively because extended exposure to a high-level disinfectant is more likely to damage delicate and intricate instruments such as flexible endoscopes. The exposure times vary among the Food and Drug Administration (FDA)-cleared high-level disinfectants (Table 2). *Category IB.* [17, 69, 73, 76, 78, 83]

o. Federal regulations are to follow the FDA-cleared label claim for high-level disinfectants. The FDA-cleared labels for high-level disinfection with >2% glutaraldehyde at 25°C range from 20-90 minutes, depending upon the product based on three tier testing which includes AOAC sporicidal tests, simulated use testing with mycobacteria and in-use testing. *Category IC.*

p. Several scientific studies and professional organizations support the efficacy of >2% glutaraldehyde for 20 minutes at 20°C; that efficacy assumes adequate cleaning prior to disinfection, whereas the FDA-cleared label claim incorporates an added margin of safety to accommodate possible lapses in cleaning practices. Facilities that have chosen to apply the 20 minute duration at 20°C have done so based on the IA recommendation in the July 2003 SHEA position paper, "Multi-society Guideline for Reprocessing Flexible Gastrointestinal Endoscopes [12, 17, 19, 26, 27, 49, 55, 57, 58, 60, 73, 76, 79-81, 83-85, 93, 94, 104-106, 110, 111, 115-121, 124, 125, 233, 235, 236, 243, 265, 266, 609]

q. When using FDA-cleared high-level disinfectants, use manufacturers' recommended exposure conditions. Certain products may require a shorter exposure time (e.g., 0.55% ortho-phthalaldehyde for 12 minutes at 20°C, 7.35% hydrogen peroxide plus 0.23% peracetic acid for 15 minutes at 20°C) than glutaraldehyde at room temperature because of their rapid inactivation of mycobacteria or reduced exposure time because of increased mycobactericidal activity at elevated temperature (e.g., 2.5% glutaraldehyde at 5 minutes at 35°C). *Category IB.* [83, 100, 689, 693, 694, 700]

r. Select a disinfectant or chemical sterilant that is compatible with the device that is being reprocessed. Avoid using reprocessing chemicals on an endoscope if the endoscope manufacturer warns against using these chemicals because of functional damage (with or without cosmetic damage). *Category IB.* [69, 113, 116]

s. Completely immerse the endoscope in the high-level disinfectant, and ensure all channels are perfused. As soon as is feasible, phase out nonimmersible endoscopes. *Category IB.* [108, 113-116, 137, 725, 856, 882]

t. After high-level disinfection, rinse endoscopes and flush channels with sterile water, filtered water, or tapwater to prevent adverse effects on patients associated with disinfectant retained in the endoscope (e.g., disinfectant induced colitis). Follow this water rinse with a rinse with 70% - 90% ethyl or isopropyl alcohol. *Category IB.* [17, 31-35, 38, 39, 108, 113, 115, 116, 134, 145-148, 620-622, 624-630, 1017]

u. After flushing all channels with alcohol, purge the channels using forced air to reduce the likelihood of contamination of the endoscope by waterborne pathogens and to facilitate drying. *Category IB.* [39, 113, 115, 116, 145, 147]

v. Hang endoscopes in a vertical position to facilitate drying. *Category II.* [17, 108, 113, 115, 116, 145, 815]

w. Store endoscopes in a manner that will protect them from damage or contamination. *Category II.* [17, 108, 113, 115, 116, 145]

x. Sterilize or high-level disinfect both the water bottle used to provide intraprocedural flush solution and its connecting tube at least once daily. After sterilizing or high-level disinfecting the water bottle, fill it with sterile water. *Category IB.* [10, 31-35, 113, 116, 1017]

y. Maintain a log for each procedure and record the following: patient's name and medical record number (if available), procedure, date, endoscopist, system used to reprocess the endoscope (if more than one system could be used in the reprocessing area), and serial number or other identifier of the endoscope used. *Category II.* [108, 113, 115, 116]

z. Design facilities where endoscopes are used and disinfected to provide a safe environment for healthcare workers and patients. Use air-exchange equipment (e.g., the ventilation system, out-exhaust ducts) to minimize exposure of all persons to potentially toxic vapors (e.g.,

glutaraldehyde vapor). Do not exceed the allowable limits of the vapor concentration of the chemical sterilant or high-level disinfectant (e.g., those of ACGIH and OSHA). *Category IB, IC.* [116, 145, 318, 322, 577, 652]

aa. Routinely test the liquid sterilant/high-level disinfectant to ensure minimal effective concentration of the active ingredient. Check the solution each day of use (or more frequently) using the appropriate chemical indicator (e.g., glutaraldehyde chemical indicator to test minimal effective concentration of glutaraldehyde) and document the results of this testing. Discard the solution if the chemical indicator shows the concentration is less than the minimum effective concentration. Do not use the liquid sterilant/high-level disinfectant beyond the reuse-life recommended by the manufacturer (e.g., 14 days for *ortho*-phthalaldehyde). *Category IA.* [76, 108, 113, 115, 116, 608, 609]

bb. Provide personnel assigned to reprocess endoscopes with device-specific reprocessing instructions to ensure proper cleaning and high-level disinfection or sterilization. Require competency testing on a regular basis (e.g., beginning of employment, annually) of all personnel who reprocess endoscopes. *Category IA.* [6-8, 108, 113, 115, 116, 145, 148, 155]

cc. Educate all personnel who use chemicals about the possible biologic, chemical, and environmental hazards of performing procedures that require disinfectants. *Category IB, IC.* [116, 997, 998, 1018, 1019]

dd. Make PPE(e.g., gloves, gowns, eyewear, face mask or shields, respiratory protection devices) available and use these items appropriately to protect workers from exposure to both chemicals and microorganisms (e.g., HBV). *Category IB, IC.* [115, 116, 214, 961, 997, 998, 1020, 1021]

ee. If using an automated endoscope reprocessor (AER), place the endoscope in the reprocessor and attach all channel connectors according to the AER manufacturer's instructions to ensure exposure of all internal surfaces to the high-level disinfectant/chemical sterilant. *Category IB.* [7, 8, 115, 116, 155, 725, 903]

ff. If using an AER, ensure the endoscope can be effectively reprocessed in the AER. Also, ensure any required manual cleaning/disinfecting steps are performed (e.g., elevator wire channel of duodenoscopes might not be effectively disinfected by most AERs). *Category IB.* [7, 8, 115, 116, 155, 725]

gg. Review the FDA advisories and the scientific literature for reports of deficiencies that can lead to infection because design flaws and improper operation and practices have compromised the effectiveness of AERs. *Category II.* [7, 98, 133, 134, 155, 725]

hh. Develop protocols to ensure that users can readily identify an endoscope that has been properly processed and is ready for patient use. *Category II.*

ii. Do not use the carrying case designed to transport clean and reprocessed endoscopes outside of the healthcare environment to store an endoscope or to transport the instrument within the healthcare environment. *Category II.*

jj. No recommendation is made about routinely performing microbiologic testing of either endoscopes or rinse water for quality assurance purposes. *Unresolved Issue.* [116, 164]

kk. If environmental microbiologic testing is conducted, use standard microbiologic techniques. *Category II.* [23, 116, 157, 161, 167]

ll. If a cluster of endoscopy-related infections occurs, investigate potential routes of transmission (e.g., person-to-person, common source) and reservoirs. *Category IA.* [8, 1022]

mm. Report outbreaks of endoscope-related infections to persons responsible for institutional infection control and risk management and to FDA. *Category IB.* [6, 7, 113, 116, 1023] Notify the local and the state health departments, CDC, and the manufacturer(s). *Category II.*

nn. No recommendation is made regarding the reprocessing of an endoscope again immediately before use if that endoscope has been processed after use according to the recommendations in this guideline. *Unresolved issue.* [157]

oo. Compare the reprocessing instructions provided by both the endoscope's and the AER's manufacturer's instructions and resolve any conflicting recommendations. *Category IB.* [116, 155]

8. ***Management of Equipment and Surfaces in Dentistry***
   a. Dental instruments that penetrate soft tissue or bone (e.g., extraction forceps, scalpel blades, bone chisels, periodontal scalers, and surgical burs) are classified as critical and should be

sterilized after each use or discarded. In addition, after each use, sterilize dental instruments that are not intended to penetrate oral soft tissue or bone (e.g., amalgam condensers, air-water syringes) but that might contact oral tissues and are heat-tolerant, although classified as semicritical. Clean and, at a minimum, high-level disinfect heat-sensitive semicritical items. *Category IA.* [43, 209-211]

b. Noncritical clinical contact surfaces, such as uncovered operatory surfaces (e.g., countertops, switches, light handles), should be barrier-protected or disinfected between patients with an intermediate-disinfectant (i.e., EPA-registered hospital disinfectant with a tuberculocidal claim) or low-level disinfectant (i.e., EPA-registered hospital disinfectant with HIV and HBV claim). *Category IB.* [43, 209-211]

c. Barrier protective coverings can be used for noncritical clinical contact surfaces that are touched frequently with gloved hands during the delivery of patient care, that are likely to become contaminated with blood or body substances, or that are difficult to clean. Change these coverings when they are visibly soiled, when they become damaged, and on a routine basis (e.g., between patients). Disinfect protected surfaces at the end of the day or if visibly soiled. *Category II.* [43, 210]

## 9. Processing Patient-Care Equipment Contaminated with Bloodborne Pathogens (HBV, Hepatitis C Virus, HIV), Antibiotic-Resistant Bacteria (e.g., Vancomycin-Resistant Enterococci, Methicillin-Resistant Staphylococcus aureus, Multidrug Resistant Tuberculosis), or Emerging Pathogens (e.g., Cryptosporidium, Helicobacter pylori, Escherichia coli O157:H7, Clostridium difficile, Mycobacterium tuberculosis, Severe Acute Respiratory Syndrome Coronavirus), or Bioterrorist Agents

a. Use standard sterilization and disinfection procedures for patient-care equipment (as recommended in this guideline), because these procedures are adequate to sterilize or disinfect instruments or devices contaminated with blood or other body fluids from persons infected with bloodborne pathogens or emerging pathogens, with the exception of prions. No changes in these procedures for cleaning, disinfecting, or sterilizing are necessary for removing bloodborne and emerging pathogens other than prions. *Category IA.* [22, 53, 60-62, 73, 79-81, 105, 118-121, 125, 126, 221, 224-234, 236, 244, 265, 266, 271-273, 279, 282, 283, 354-357, 666]

## 10. Disinfection Strategies for Other Semicritical Devices

a. Even if probe covers have been used, clean and high-level disinfect other semicritical devices such as rectal probes, vaginal probes, and cryosurgical probes with a product that is not toxic to staff, patients, probes, and retrieved germ cells (if applicable). Use a high-level disinfectant at the FDA-cleared exposure time. (See Recommendations 7o and 11e for exceptions.) *Category IB.* [6-8, 17, 69]

b. When probe covers are available, use a probe cover or condom to reduce the level of microbial contamination. *Category II.* [197-201] Do not use a lower category of disinfection or cease to follow the appropriate disinfectant recommendations when using probe covers because these sheaths and condoms can fail. *Category IB* [197-201]

c. After high-level disinfection, rinse all items. Use sterile water, filtered water or tapwater followed by an alcohol rinse for semicritical equipment that will have contact with mucous membranes of the upper respiratory tract (e.g., nose, pharynx, esophagus). *Category II.* [10, 31-35, 1017]

d. There is no recommendation to use sterile or filtered water rather than tapwater for rinsing semicritical equipment that contact the mucous membranes of the rectum (e.g., rectal probes, anoscope) or vagina (e.g., vaginal probes). *Unresolved issue.* [11]

e. Wipe clean tonometer tips and then disinfect them by immersing for 5-10 minutes in either 5000 ppm chlorine or 70% ethyl alcohol. None of these listed disinfectant products are FDA-cleared high-level disinfectants. *Category II.* [49, 95, 185, 188, 293]

## 11. Disinfection by Healthcare Personnel in Ambulatory Care and Home Care

a. Follow the same classification scheme described above (i.e., that critical devices require sterilization, semicritical devices require high-level disinfection, and noncritical equipment

requires low-level disinfection) in the ambulatory-care (outpatient medical/surgical facilities) setting because risk for infection in this setting is similar to that in the hospital setting (see Table 1). *Category IB.* [6-8, 17, 330]

b. When performing care in the home, clean and disinfect reusable objects that touch mucous membranes (e.g., tracheostomy tubes) by immersing these objects in a 1:50 dilution of 5.25%-6.15% sodium hypochlorite (household bleach) (3 minutes), 70% isopropyl alcohol (5 minutes), or 3% hydrogen peroxide (30 minutes) because the home environment is, in most instances, safer than either hospital or ambulatory care settings because person-to-person transmission is less likely. *Category II.* [327, 328, 330, 331]

c. Clean noncritical items that would not be shared between patients (e.g., crutches, blood pressure cuffs) in the home setting with a detergent or commercial household disinfectant. *Category II.* [53, 330]

### 12. *Microbial Contamination of Disinfectants*

a. Institute the following control measures to reduce the occurrence of contaminated disinfectants: 1) prepare the disinfectant correctly to achieve the manufacturer's recommended use-dilution; and 2) prevent common sources of extrinsic contamination of germicides (e.g., container contamination or surface contamination of the healthcare environment where the germicide are prepared and/or used). *Category IB.* [404, 406, 1024]

### 13. *Flash Sterilization*

a. Do not flash sterilize implanted surgical devices unless doing so is unavoidable. *Category IB.* [849, 850]

b. Do not use flash sterilization for convenience, as an alternative to purchasing additional instrument sets, or to save time. Category II. [817, 962]

c. When using flash sterilization, make sure the following parameters are met: 1) clean the item before placing it in the sterilizing container (that are FDA cleared for use with flash sterilization) or tray; 2) prevent exogenous contamination of the item during transport from the sterilizer to the patient; and 3) monitor sterilizer function with mechanical, chemical, and biologic monitors. *Category IB.* [812, 819, 846, 847, 962]

d. Do not use packaging materials and containers in flash sterilization cycles unless the sterilizer and the packaging material/container are designed for this use. *Category IB.* [812, 819, 1025]

e. When necessary, use flash sterilization for patient-care items that will be used immediately (e.g., to reprocess an inadvertently dropped instrument). *Category IB.* [812, 817, 819, 845]

f. When necessary, use flash sterilization for processing patient-care items that cannot be packaged, sterilized, and stored before use. *Category IB.* [812, 819]

### 14. *Methods of Sterilization*

a. Steam is the preferred method for sterilizing critical medical and surgical instruments that are not damaged by heat, steam, pressure, or moisture. *Category IA.* [181, 271, 425, 426, 827, 841, 1026, 1027]

b. Cool steam- or heat-sterilized items before they are handled or used in the operative setting. *Category IB.* [850]

c. Follow the sterilization times, temperatures, and other operating parameters (e.g., gas concentration, humidity) recommended by the manufacturers of the instruments, the sterilizer, and the container or wrap used, and that are consistent with guidelines published by government agencies and professional organizations. *Category IB.* [811-814, 819, 825, 827, 841, 1026-1028]

d. Use low-temperature sterilization technologies (e.g., EtO, hydrogen peroxide gas plasma) for reprocessing critical patient-care equipment that is heat or moisture sensitive. *Category IA* [469, 721, 825, 856, 858, 878, 879, 881, 882, 890, 891, 1027]

e. Completely aerate surgical and medical items that have been sterilized in the EtO sterilizer (e.g., polyvinylchloride tubing requires 12 hours at 50°C, 8 hours at 60°C) before using these items in patient care. *Category IB.* [814]

f. Sterilization using the peracetic acid immersion system can be used to sterilize heat-sensitive

immersible medical and surgical items. *Category IB.* [90, 717-719, 721-724]

g. Critical items that have been sterilized by the peracetic acid immersion process must be used immediately (i.e., items are not completely protected from contamination, making long-term storage unacceptable). *Category II.* [817, 825]

h. Dry-heat sterilization (e.g., 340°F for 60 minutes) can be used to sterilize items (e.g., powders, oils) that can sustain high temperatures. *Category IB.* [815, 827]

i. Comply with the sterilizer manufacturer's instructions regarding the sterilizer cycle parameters (e.g., time, temperature, concentration). *Category IB.* [155, 725, 811-814, 819]

j. Because narrow-lumen devices provide a challenge to all low-temperature sterilization technologies and direct contact is necessary for the sterilant to be effective, ensure that the sterilant has direct contact with contaminated surfaces (e.g., scopes processed in peracetic acid must be connected to channel irrigators). *Category IB.* [137, 725, 825, 856, 890, 891, 1029]

### 15. *Packaging*

a. Ensure that packaging materials are compatible with the sterilization process and have received FDA 510[k] clearance. *Category IB.* [811-814, 819, 966]

b. Ensure that packaging is sufficiently strong to resist punctures and tears to provide a barrier to microorganisms and moisture. *Category IB.* [454, 811-814, 819, 966]

### 16. *Monitoring of Sterilizers*

a. Use mechanical, chemical, and biologic monitors to ensure the effectiveness of the sterilization process. *Category IB.* [811-815, 819, 846, 847, 975-977]

b. Monitor each load with mechanical (e.g., time, temperature, pressure) and chemical (internal and external) indicators. If the internal chemical indicator is visible, an external indicator is not needed. *Category II.* [811-815, 819, 846, 847, 975-977, 980]

c. Do not use processed items if the mechanical (e.g., time, temperature, pressure) or chemical (internal and/or external) indicators suggest inadequate processing. *Category IB* [811-814, 819].

d. Use biologic indicators to monitor the effectiveness of sterilizers at least weekly with an FDA-cleared commercial preparation of spores (e.g., *Geobacillus stearothermophilus* for steam) intended specifically for the type and cycle parameters of the sterilizer. *Category IB.* [1, 811, 813-815, 819, 846, 847, 976, 977]

e. After a single positive biologic indicator used with a method other than steam sterilization, treat as nonsterile all items that have been processed in that sterilizer, dating from the sterilization cycle having the last negative biologic indicator to the next cycle showing satisfactory biologic indicator results. These nonsterile items should be retrieved if possible and reprocessed. *Category II.* [1]

f. After a positive biologic indicator with steam sterilization, objects other than implantable objects do not need to be recalled because of a single positive spore test unless the sterilizer or the sterilization procedure is defective as determined by maintenance personnel or inappropriate cycle settings. If additional spore tests remain positive, consider the items nonsterile and recall and reprocess the items from the implicated load(s). *Category II.* [1]

g. Use biologic indicators for every load containing implantable items and quarantine items, whenever possible, until the biologic indicator is negative. *Category IB.* [811-814, 819]

### 17. *Load Configuration.*

a. Place items correctly and loosely into the basket, shelf, or cart of the sterilizer so as not to impede the penetration of the sterilant. *Category IB.* [445, 454, 811, 813, 819, 836]

### 18. *Storage of Sterile Items*

a. Ensure the sterile storage area is a well-ventilated area that provides protection against dust, moisture, insects, and temperature and humidity extremes. *Category II.* [454, 819, 836, 969]

b. Store sterile items so the packaging is not compromised (e.g., punctured, bent). *Category II.* [454, 816, 819, 968, 969, 1030]

c. Label sterilized items with a load number that indicates the sterilizer used, the cycle or load number, the date of sterilization, and, if applicable, the expiration date. *Category IB.* [811, 812, 814, 816, 819]

d. The shelf life of a packaged sterile item depends on the quality of the wrapper, the storage conditions, the conditions during transport, the amount of handling, and other events (moisture) that compromise the integrity of the package. If event-related storage of sterile items is used, then packaged sterile items can be used indefinitely unless the packaging is compromised (see f and g below). *Category IB.* [816, 819, 836, 968, 973, 1030, 1031]

e. Evaluate packages before use for loss of integrity (e.g., torn, wet, punctured). The pack can be used unless the integrity of the packaging is compromised. *Category II.* [819, 968]

f. If the integrity of the packaging is compromised (e.g., torn, wet, or punctured), repack and reprocess the pack before use. *Category II.* [819, 1032]

g. If time-related storage of sterile items is used, label the pack at the time of sterilization with an expiration date. Once this date expires, reprocess the pack. *Category II.* [819, 968]

**19. *Quality Control***

a. Provide comprehensive and intensive training for all staff assigned to reprocess semicritical and critical medical/surgical instruments to ensure they understand the importance of reprocessing these instruments. To achieve and maintain competency, train each member of the staff that reprocesses semicritical and/or critical instruments as follows: 1) provide hands-on training according to the institutional policy for reprocessing critical and semicritical devices; 2) supervise all work until competency is documented for each reprocessing task; 3) conduct competency testing at beginning of employment and regularly thereafter (e.g., annually); and 4) review the written reprocessing instructions regularly to ensure they comply with the scientific literature and the manufacturers' instructions. *Category IB.* [6-8, 108, 114, 129, 155, 725, 813, 819]

b. Compare the reprocessing instructions (e.g., for the appropriate use of endoscope connectors, the capping/noncapping of specific lumens) provided by the instrument manufacturer and the sterilizer manufacturer and resolve any conflicting recommendations by communicating with both manufacturers. *Category IB.* [155, 725]

c. Conduct infection control rounds periodically (e.g., annually) in high-risk reprocessing areas (e.g., the Gastroenterology Clinic, Central Processing); ensure reprocessing instructions are current and accurate and are correctly implemented. Document all deviations from policy. All stakeholders should identify what corrective actions will be implemented. *Category IB.* [6-8, 129]

d. Include the following in a quality control program for sterilized items: a sterilizer maintenance contract with records of service; a system of process monitoring; air-removal testing for prevacuum steam sterilizers; visual inspection of packaging materials; and traceability of load contents. *Category II* [811-814, 819].

e. For each sterilization cycle, record the type of sterilizer and cycle used; the load identification number; the load contents; the exposure parameters (e.g., time and temperature); the operator's name or initials; and the results of mechanical, chemical, and biological monitoring. *Category II* [811-814, 819].

f. Retain sterilization records (mechanical, chemical, and biological) for a time period that complies with standards (e.g., 3 years), statutes of limitations, and state and federal regulations. *Category II, IC.* [1033]

g. Prepare and package items to be sterilized so that sterility can be achieved and maintained to the point of use. Consult the Association for the Advancement of Medical Instrumentation or the manufacturers of surgical instruments, sterilizers, and container systems for guidelines for the density of wrapped packages. *Category II.* [811-814, 819]

h. Periodically review policies and procedures for sterilization. *Category II.* [1033]

i. Perform preventive maintenance on sterilizers by qualified personnel who are guided by the manufacturer's instruction. *Category II.* [811-814, 819]

**20. Reuse of Single-Use Medical Devices**

    a. Adhere to the FDA enforcement document for single-use devices reprocessed by hospitals. FDA considers the hospital that reprocesses a single-use device as the manufacturer of the device and regulates the hospital using the same standards by which it regulates the original equipment manufacturer. *Category II, IC.* [995]

## PERFORMANCE INDICATORS

1. Monitor adherence to high-level disinfection and/or sterilization guidelines for endoscopes on a regular basis. This monitoring should include ensuring the proper training of persons performing reprocessing and their adherence to all endoscope reprocessing steps, as demonstrated by competency testing at commencement of employment and annually.
2. Develop a mechanism for the occupational health service to report all adverse health events potentially resulting from exposure to disinfectants and sterilants; review such exposures; and implement engineering, work practice, and PPE to prevent future exposures.
3. Monitor possible sterilization failures that resulted in instrument recall. Assess whether additional training of personnel or equipment maintenance is required.

**ACKNOWLEDGEMENTS**

The authors gratefully acknowledge Eva P. Clontz, M.S., for her assistance in referencing this guideline. The Healthcare Infection Control Practices Advisory Committee thanks the following experts for reviewing a draft of this guideline: Martin S. Favero, Ph.D., Syed A. Sattar, Ph.D., A. Denver Russell, D.Sc., and Martin Exner, M.D. The opinions of the reviewers might not be reflected in all the recommendations contained in this document.

## GLOSSARY

**Action level**: concentration of a regulated substance (e.g., ethylene oxide, formaldehyde) within the employee breathing zone, above which OSHA requirements apply.

**Activation of a sterilant**: process of mixing the contents of a chemical sterilant that come in two containers (small vial with the activator solution; container of the chemical) Keeping the two chemicals separate until use extends the shelf life of the chemicals.

**Aeration**: method by which ethylene oxide (EtO) is removed from EtO-sterilized items by warm air circulation in an enclosed cabinet specifically designed for this purpose.

**Antimicrobial agent**: any agent that kills or suppresses the growth of microorganisms.

**Antiseptic**: substance that prevents or arrests the growth or action of microorganisms by inhibiting their activity or by destroying them. The term is used especially for preparations applied topically to living tissue.

**Asepsis**: prevention of contact with microorganisms.

**Autoclave**: device that sterilizes instruments or other objects using steam under pressure. The length of time required for sterilization depends on temperature, vacuum, and pressure.

**Bacterial count**: method of estimating the number of bacteria per unit sample. The term also refers to the estimated number of bacteria per unit sample, usually expressed as number of colony-forming units.

**Bactericide**: agent that kills bacteria.

**Bioburden**: number and types of viable microorganisms with which an item is contaminated; also called *bioload* or *microbial load*.

**Biofilm**: accumulated mass of bacteria and extracellular material that is tightly adhered to a surface and cannot be easily removed.

**Biologic indicator**: device for monitoring the sterilization process. The device consists of a standardized, viable population of microorganisms (usually bacterial spores) known to be resistant to the sterilization process being monitored. Biologic indicators are intended to demonstrate whether conditions were adequate to achieve sterilization. A negative biologic indicator does not prove that all items in the load are sterile or that they were all exposed to adequate sterilization conditions.

**Bleach**: Household bleach (5.25% or 6.00%–6.15% sodium hypochlorite depending on manufacturer) usually diluted in water at 1:10 or 1:100. Approximate dilutions are 1.5 cups of bleach in a gallon of water for a 1:10 dilution (~6,000 ppm) and 0.25 cup of bleach in a gallon of water for a 1:100 dilution (~600 ppm). Sodium hypochlorite products that make pesticidal claims, such as sanitization or disinfection, must be registered by EPA and be labeled with an EPA Registration Number.

| Bleach Solution | Dilution | Chlorine (ppm) |
|---|---|---|
| 5.25-6.15% | None | 52,500-61,500 |
| | 1:10 | 5,250-6,150 |
| | 1:100 | 525-615 |
| | 1:1000 | 53-62 |

**Bowie-Dick test**: diagnostic test of a sterilizer's ability to remove air from the chamber of a prevacuum steam sterilizer. The air-removal or Bowie-Dick test is not a test for sterilization.

**Ceiling limit**: concentration of an airborne chemical contaminant that should not be exceeded during any part of the workday. If instantaneous monitoring is not feasible, the ceiling must be assessed as a 15-minute time-weighted average exposure.

**Centigrade** or **Celsius**: a temperature scale ($0^{\circ}C$ = freezing point of water; $100^{\circ}C$ = boiling point of water at sea level). Equivalents mentioned in the guideline are as follows: $20^{\circ}C = 68^{\circ}F$; $25^{\circ}C = 77^{\circ}F$; $121^{\circ}C = 250^{\circ}F$; $132^{\circ}C = 270^{\circ}F$; $134^{\circ}C = 273^{\circ}F$. For other temperatures the formula is: $F^{\circ} = (C^{\circ} \times 9/5) + 32$ or $C^{\circ} = (F^{\circ} -32) \times 5/9$.

**Central processing** or **Central service department**: the department within a health-care facility that processes, issues, and controls professional supplies and equipment, both sterile and nonsterile, for some or all patient-care areas of the facility.

**Challenge test pack**: pack used in installation, qualification, and ongoing quality assurance testing of health-care facility sterilizers.

**Chemical indicator**: device for monitoring a sterilization process. The device is designed to respond with a characteristic chemical or physical change to one or more of the physical conditions within the sterilizing chamber. Chemical indicators are intended to detect potential sterilization failures that could result from incorrect packaging, incorrect loading of the sterilizer, or malfunctions of the sterilizer. The "pass" response of a chemical indicator does not prove the item accompanied by the indicator is necessarily sterile. The Association for the Advancement of Medical Instrumentation has defined five classes of chemical indicators: Class 1 (process indicator); Class 2 (Bowie-Dick test indicator); Class 3 (single-parameter indicator); Class 4 (multi-parameter indicator); and Class 5 (integrating indicator).

**Contact time**: time a disinfectant is in direct contact with the surface or item to be disinfected For surface disinfection, this period is framed by the application to the surface until complete drying has occurred.

**Container system, rigid container**: sterilization containment device designed to hold medical devices for sterilization, storage, transportation, and aseptic presentation of contents.

**Contaminated**: state of having actual or potential contact with microorganisms. As used in health care, the term generally refers to the presence of microorganisms that could produce disease or infection.

**Control, positive**: biologic indicator, from the same lot as a test biologic indicator, that is left unexposed to the sterilization cycle and then incubated to verify the viability of the test biologic indicator.

**Cleaning**: removal, usually with detergent and water or enzyme cleaner and water, of adherent visible soil, blood, protein substances, microorganisms and other debris from the surfaces, crevices, serrations, joints, and lumens of instruments, devices, and equipment by a manual or mechanical process that prepares the items for safe handling and/or further decontamination.

**Culture**: growth of microorganisms in or on a nutrient medium; to grow microorganisms in or on such a medium.

**Culture medium**: substance or preparation used to grow and cultivate microorganisms.

**Cup**: 8 fluid ounces.

**Decontamination**: according to OSHA, "the use of physical or chemical means to remove, inactivate, or destroy bloodborne pathogens on a surface or item to the point where they are no longer capable of transmitting infectious particles and the surface or item is rendered safe for handling, use, or disposal" [29 CFR 1910.1030]. In health-care facilities, the term generally refers to all pathogenic organisms.

**Decontamination area**: area of a health-care facility designated for collection, retention, and cleaning of soiled and/or contaminated items.

**Detergent**: cleaning agent that makes no antimicrobial claims on the label. They comprise a hydrophilic component and a lipohilic component and can be divided into four types: anionic, cationic, amphoteric, and non-ionic detergents.

**Disinfectant**: usually a chemical agent (but sometimes a physical agent) that destroys disease-causing pathogens or other harmful microorganisms but might not kill bacterial spores. It refers to substances applied to inanimate objects. EPA groups disinfectants by product label claims of "limited," "general," or "hospital" disinfection.

**Disinfection**: thermal or chemical destruction of pathogenic and other types of microorganisms. Disinfection is less lethal than sterilization because it destroys most recognized pathogenic microorganisms but not necessarily all microbial forms (e.g., bacterial spores).

**D value**: time or radiation dose required to inactivate 90% of a population of the test microorganism under stated exposure conditions.

**Endoscope**: an instrument that allows examination and treatment of the interior of the body canals and hollow organs.

**Enzyme cleaner:** a solution used before disinfecting instruments to improve removal of organic material (e.g., proteases to assist in removing protein).

**EPA Registration Number** or **EPA Reg. No.**: a hyphenated, two- or three-part number assigned by EPA to identify each germicidal product registered within the United States. The first number is the company identification number, the second is the specific product number, and the third (when present) is the company identification number for a supplemental registrant.

**Exposure time**: period in a sterilization process during which items are exposed to the sterilant at the specified sterilization parameters. For example, in a steam sterilization process, exposure time is the period during which items are exposed to saturated steam at the specified temperature.

**Flash sterilization**: process designed for the steam sterilization of unwrapped patient-care items for immediate use (or placed in a specially designed, covered, rigid container to allow for rapid penetration of steam).

**Fungicide**: agent that destroys fungi (including yeasts) and/or fungal spores pathogenic to humans or other animals in the inanimate environment.

**General disinfectant**: EPA-registered disinfectant labeled for use against both gram-negative and gram-positive bacteria. Efficacy is demonstrated against both *Salmonella choleraesuis* and *Staphylococcus aureus*. Also called *broad-spectrum disinfectant*.

**Germicide**: agent that destroys microorganisms, especially pathogenic organisms.

**Germicidal detergent:** detergent that also is EPA-registered as a disinfectant.

**High-level disinfectant:** agent capable of killing bacterial spores when used in sufficient concentration under suitable conditions. It therefore is expected to kill all other microorganisms.

**Hospital disinfectant:** disinfectant registered for use in hospitals, clinics, dental offices, and any other medical-related facility. Efficacy is demonstrated against *Salmonella choleraesuis*, *Staphylococcus aureus*, and *Pseudomonas aeruginosa*. EPA has registered approximately 1,200 hospital disinfectants.

**Huck towel:** all-cotton surgical towel with a honey-comb weave; both warp and fill yarns are tightly twisted. Huck towels can be used to prepare biologic indicator challenge test packs.

**Implantable device:** according to FDA, "device that is placed into a surgically or naturally formed cavity of the human body if it is intended to remain there for a period of 30 days or more" [21 CFR 812.3(d)].

**Inanimate surface:** nonliving surface (e.g., floors, walls, furniture).

**Incubator:** apparatus for maintaining a constant and suitable temperature for the growth and cultivation of microorganisms.

**Infectious microorganisms:** microorganisms capable of producing disease in appropriate hosts.

**Inorganic and organic load:** naturally occurring or artificially placed inorganic (e.g., metal salts) or organic (e.g., proteins) contaminants on a medical device before exposure to a microbicidal process.

**Intermediate-level disinfectant:** agent that destroys all vegetative bacteria, including tubercle bacilli, lipid and some nonlipid viruses, and fungi, but not bacterial spores.

**Limited disinfectant:** disinfectant registered for use against a specific major group of organisms (gram-negative or gram-positive bacteria). Efficacy has been demonstrated in laboratory tests against either *Salmonella choleraesuis* or *Staphylococcus aureus* bacteria.

**Lipid virus:** virus surrounded by an envelope of lipoprotein in addition to the usual core of nucleic acid surrounded by a coat of protein. This type of virus (e.g., HIV) is generally easily inactivated by many types of disinfectants. Also called *enveloped* or *lipophilic virus*.

**Low-level disinfectant:** agent that destroys all vegetative bacteria (except tubercle bacilli), lipid viruses, some nonlipid viruses, and some fungi, but not bacterial spores.

**Mechanical indicator:** devices that monitor the sterilization process (e.g., graphs, gauges, printouts).

**Medical device:** instrument, apparatus, material, or other article, whether used alone or in combination, including software necessary for its application, intended by the manufacturer to be used for human beings for
- diagnosis, prevention, monitoring treatment, or alleviation of disease;
- diagnosis, monitoring, treatment, or alleviation of or compensation for an injury or handicap;
- investigation, replacement, or modification of the anatomy or of a physiologic process; or
- control of conception

and that does not achieve its primary intended action in or on the human body by pharmacologic, immunologic, or metabolic means but might be assisted in its function by such means.

**Microbicide:** any substance or mixture of substances that effectively kills microorganisms.

**Microorganisms**: animals or plants of microscopic size. As used in health care, generally refers to bacteria, fungi, viruses, and bacterial spores.

**Minimum effective concentration (MEC)**: the minimum concentration of a liquid chemical germicide needed to achieve the claimed microbicidal activity as determined by dose-response testing. Sometimes used interchangeably with *minimum recommended concentration*.

**Muslin**: loosely woven (by convention, 140 threads per square inch), 100% cotton cloth. Formerly used as a wrap for sterile packs or a surgical drape. Fabric wraps used currently consist of a cotton-polyester blend.

**Mycobacteria**: bacteria with a thick, waxy coat that makes them more resistant to chemical germicides than other types of vegetative bacteria.

**Nonlipid viruses**: generally considered more resistant to inactivation than lipid viruses. Also called nonenveloped or hydrophilic viruses.

**One-step disinfection process**: simultaneous cleaning and disinfection of a noncritical surface or item.

**Pasteurization**: process developed by Louis Pasteur of heating milk, wine, or other liquids to 65–77°C (or the equivalent) for approximately 30 minutes to kill or markedly reduce the number of pathogenic and spoilage organisms other than bacterial spores.

**Parametric release**: declaration that a product is sterile on the basis of physical and/or chemical process data rather than on sample testing or biologic indicator results.

**Penicylinder**: carriers inoculated with the test bacteria for in vitro tests of germicides. Can be constructed of stainless steel, porcelain, glass, or other materials and are approximately 8 x 10 mm in diameter.

**Permissible exposure limit (PEL)**: time-weighted average maximum concentration of an air contaminant to which a worker can be exposed, according to OSHA standards. Usually calculated over 8 hours, with exposure considered over a 40-hour work week.

**Personal protective equipment (PPE)**: specialized clothing or equipment worn by an employee for protection against a hazard. General work clothes (e.g., uniforms, pants, shirts) not intended to function as protection against a hazard are not considered to be PPE.

**Parts per million (ppm)**: common measurement for concentrations by volume of trace contaminant gases in the air (or chemicals in a liquid); 1 volume of contaminated gas per 1 million volumes of contaminated air or 1¢ in $10,000 both equal 1 ppm. Parts per million = μg/mL or mg/L.

**Prions**: transmissible pathogenic agents that cause a variety of neurodegenerative diseases of humans and animals, including sheep and goats, bovine spongiform encephalopathy in cattle, and Creutzfeldt-Jakob disease in humans. They are unlike any other infectious pathogens because they are composed of an abnormal conformational isoform of a normal cellular protein, the prion protein (PrP). Prions are extremely resistant to inactivation by sterilization processes and disinfecting agents.

**Process challenge device (PCD)**: item designed to simulate product to be sterilized and to constitute a defined challenge to the sterilization process and used to assess the effective performance of the process. A PCD is a challenge test pack or test tray that contains a biologic indicator, a Class 5 integrating indicator, or an enzyme-only indicator.

**QUAT**: abbreviation for *quaternary ammonium compound*, a surface-active, water-soluble disinfecting

substance that has four carbon atoms linked to a nitrogen atom through covalent bonds.

**Recommended exposure limit (REL):** occupational exposure limit recommended by NIOSH as being protective of worker health and safety over a working lifetime. Frequently expressed as a 40-hour time-weighted-average exposure for up to 10 hours per day during a 40-work week.

**Reprocess:** method to ensure proper disinfection or sterilization; can include: cleaning, inspection, wrapping, sterilizing, and storing.

**Sanitizer:** agent that reduces the number of bacterial contaminants to safe levels as judged by public health requirements. Commonly used with substances applied to inanimate objects. According to the protocol for the official sanitizer test, a sanitizer is a chemical that kills 99.999% of the specific test bacteria in 30 seconds under the conditions of the test.

**Shelf life:** length of time an undiluted or use dilution of a product can remain active and effective. Also refers to the length of time a sterilized product (e.g., sterile instrument set) is expected to remain sterile.

**Spaulding classification:** strategy for reprocessing contaminated medical devices. The system classifies a medical device as critical, semicritical, or noncritical on the basis of risk to patient safety from contamination on a device. The system also established three levels of germicidal activity (sterilization, high-level disinfection, and low-level disinfection) for strategies with the three classes of medical devices (critical, semicritical, and noncritical).

**Spore:** relatively water-poor round or elliptical resting cell consisting of condensed cytoplasm and nucleus surrounded by an impervious cell wall or coat. Spores are relatively resistant to disinfectant and sterilant activity and drying conditions (specifically in the genera *Bacillus* and *Clostridium*).

**Spore strip:** paper strip impregnated with a known population of spores that meets the definition of biological indicators.

**Steam quality:** steam characteristic reflecting the dryness fraction (weight of dry steam in a mixture of dry saturated steam and entrained water) and the level of noncondensable gas (air or other gas that will not condense under the conditions of temperature and pressure used during the sterilization process). The dryness fraction (i.e., the proportion of completely dry steam in the steam being considered) should not fall below 97%.

**Steam sterilization:** sterilization process that uses saturated steam under pressure for a specified exposure time and at a specified temperature, as the sterilizing agent.

**Steam sterilization, dynamic air removal type:** one of two types of sterilization cycles in which air is removed from the chamber and the load by a series of pressure and vacuum excursions (prevacuum cycle) or by a series of steam flushes and pressure pulses above atmospheric pressure (steam-flush-pressure-pulse cycle).

**Sterile** or **Sterility:** state of being free from all living microorganisms. In practice, usually described as a probability function, e.g., as the probability of a microorganism surviving sterilization being one in one million.

**Sterility assurance level (SAL):** probability of a viable microorganism being present on a product unit after sterilization. Usually expressed as $10^{-6}$; a SAL of $10^{-6}$ means $\leq 1/1$ million chance that a single viable microorganism is present on a sterilized item. A SAL of $10^{-6}$ generally is accepted as appropriate for items intended to contact compromised tissue (i.e., tissue that has lost the integrity of the natural body barriers). The sterilizer manufacturer is responsible for ensuring the sterilizer can achieve the desired SAL. The

user is responsible for monitoring the performance of the sterilizer to ensure it is operating in conformance to the manufacturer's recommendations.

**Sterilization**: validated process used to render a product free of all forms of viable microorganisms. In a sterilization process, the presence of microorganisms on any individual item can be expressed in terms of probability. Although this probability can be reduced to a very low number, it can never be reduced to zero.

**Sterilization area**: area of a health-care facility designed to house sterilization equipment, such as steam ethylene oxide, hydrogen peroxide gas plasma, or ozone sterilizers.

**Sterilizer**: apparatus used to sterilize medical devices, equipment, or supplies by direct exposure to the sterilizing agent.

**Sterilizer, gravity-displacement type**: type of steam sterilizer in which incoming steam displaces residual air through a port or drain in or near the bottom (usually) of the sterilizer chamber. Typical operating temperatures are 121–123°C (250–254°F) and 132–135°C (270–275°F).

**Sterilizer, prevacuum type**: type of steam sterilizer that depends on one or more pressure and vacuum excursions at the beginning of the cycle to remove air. This method of operation results in shorter cycle times for wrapped items because of the rapid removal of air from the chamber and the load by the vacuum system and because of the usually higher operating temperature (132–135°C [270–275°F]; 141–144°C [285–291°F]). This type of sterilizer generally provides for shorter exposure time and accelerated drying of fabric loads by pulling a further vacuum at the end of the sterilizing cycle.

**Sterilizer, steam-flush pressure-pulse type**: type of sterilizer in which a repeated sequence consisting of a steam flush and a pressure pulse removes air from the sterilizing chamber and processed materials using steam at above atmospheric pressure (no vacuum is required). Like a prevacuum sterilizer, a steam-flush pressure-pulse sterilizer rapidly removes air from the sterilizing chamber and wrapped items; however, the system is not susceptible to air leaks because air is removed with the sterilizing chamber pressure at above atmospheric pressure. Typical operating temperatures are 121–123°C (250–254°F), 132–135°C (270–275°F), and 141–144°C (285–291°F).

**Surfactant**: agent that reduces the surface tension of water or the tension at the interface between water and another liquid; a wetting agent found in many sterilants and disinfectants.

**Tabletop steam sterilizer**: a compact gravity-displacement steam sterilizer that has a chamber volume of not more than 2 cubic feet and that generates its own steam when distilled or deionized water is added.

**Time-weighted average (TWA)**: an average of all the concentrations of a chemical to which a worker has been exposed during a specific sampling time, reported as an average over the sampling time. For example, the permissible exposure limit for ethylene oxide is 1 ppm as an 8-hour TWA. Exposures above the ppm limit are permitted if they are compensated for by equal or longer exposures below the limit during the 8-hour workday as long as they do not exceed the ceiling limit; short-term exposure limit; or, in the case of ethylene oxide, excursion limit of 5 ppm averaged over a 15-minute sampling period.

**Tuberculocide**: an EPA-classified hospital disinfectant that also kills *Mycobacterium tuberculosis* (tubercle bacilli). EPA has registered approximately 200 tuberculocides. Such agents also are called *mycobactericides*.

**Use-life**: the length of time a diluted product can remain active and effective. The stability of the chemical and the storage conditions (e.g., temperature and presence of air, light, organic matter, or metals)

determine the use-life of antimicrobial products.

**Vegetative bacteria**: bacteria that are devoid of spores and usually can be readily inactivated by many types of germicides.

**Virucide**: an agent that kills viruses to make them noninfective.

---

Adapted from Association for the Advancement of Medical Instrumentation; [811-814, 819] Association of periOperating Registered Nurses (AORN), [815] American Hospital Association, [319] and Block. [16, 1034]

**Table 1.** Methods of sterilization and disinfection.

| | Sterilization | | Disinfection | | |
| | Critical items (will enter tissue or vascular system or blood will flow through them) | | High-level (semicritical items; [except dental] will come in contact with mucous membrane or nonintact skin) | Intermediate-level (some semicritical items[1] and noncritical items) | Low-level (noncritical items; will come in contact with intact skin) |
| Object | Procedure | Exposure time | Procedure (exposure time 12-30 min at ≥20°C)[2,3] | Procedure (exposure time ≥ 1 m)[9] | Procedure (exposure time ≥ 1 m)[9] |
|---|---|---|---|---|---|
| Smooth, hard Surface[1,4] | A | MR | D | K | K |
| | B | MR | E | L[5] | L |
| | C | MR | F | M | M |
| | D | 10 h at 20-25°C | H | N | N |
| | F | 6 h | I[6] | | O |
| | G | 12 m at 50-56°C | J | | |
| | H | 3-8 h | | | |
| Rubber tubing and catheters[3,4] | A | MR | D | | |
| | B | MR | E | | |
| | C | MR | F | | |
| | D | 10 h at 20-25°C | H | | |
| | F | 6 h | I[6] | | |
| | G | 12 m at 50-56°C | J | | |
| | H | 3-8 h | | | |
| Polyethylene tubing and catheters[3,4,7] | A | MR | D | | |
| | B | MR | E | | |
| | C | MR | F | | |
| | D | 10 h at 20-25°C | H | | |
| | F | 6 h | I[6] | | |
| | G | 12 m at 50-56°C | J | | |
| | H | 3-8 h | | | |
| Lensed instruments[4] | A | MR | D | | |
| | B | MR | E | | |
| | C | MR | F | | |
| | D | 10 h at 20-25°C | H | | |
| | F | 6 h | J | | |
| | G | 12 m at 50-56°C | | | |
| | H | 3-8 h | | | |
| Thermometers (oral and rectal)[8] | | | | | K[8] |
| Hinged instruments[4] | A | MR | D | | |
| | B | MR | E | | |
| | C | MR | F | | |
| | D | 10 h at 20-25°C | H | | |
| | F | 6 h | I[6] | | |
| | G | 12 m at 50-56°C | J | | |
| | H | 3-8 h | | | |

Modified from Rutala and Simmons. [15, 17, 18, 421] The selection and use of disinfectants in the healthcare field is dynamic, and products may become available that are not in existence when this guideline was written. As newer disinfectants become available, persons or committees responsible for selecting disinfectants and sterilization processes should be guided by products cleared by the FDA and the EPA as well as information in the scientific literature.

104

A,  Heat sterilization, including steam or hot air (see manufacturer's recommendations, steam sterilization processing time from 3-30 minutes)

B,  Ethylene oxide gas (see manufacturer's recommendations, generally 1-6 hours processing time plus aeration time of 8-12 hours at 50-60°C)

C,  Hydrogen peroxide gas plasma (see manufacturer's recommendations for internal diameter and length restrictions, processing time between 45-72 minutes).

D,  Glutaraldehyde-based formulations ($\geq$2% glutaraldehyde, caution should be exercised with all glutaraldehyde formulations when further in-use dilution is anticipated); glutaraldehyde (1.12%) and 1.93% phenol/phenate. One glutaraldehyde-based product has a high-level disinfection claim of 5 minutes at 35°C.

E,  Ortho-phthalaldehyde (OPA) 0.55%

F,  Hydrogen peroxide 7.5% (will corrode copper, zinc, and brass)

G,  Peracetic acid, concentration variable but 0.2% or greater is sporicidal. Peracetic acid immersion system operates at 50-56°C.

H,  Hydrogen peroxide (7.35%) and 0.23% peracetic acid; hydrogen peroxide 1% and peracetic acid 0.08% (will corrode metal instruments)

I,  Wet pasteurization at 70°C for 30 minutes with detergent cleaning

J,  Hypochlorite, single use chlorine generated on-site by electrolyzing saline containing >650-675 active free chlorine; (will corrode metal instruments)

K,  Ethyl or isopropyl alcohol (70-90%)

L,  Sodium hypochlorite (5.25-6.15% household bleach diluted 1:500 provides >100 ppm available chlorine)

M,  Phenolic germicidal detergent solution (follow product label for use-dilution)

N,  Iodophor germicidal detergent solution (follow product label for use-dilution)

O,  Quaternary ammonium germicidal detergent solution (follow product label for use-dilution)

MR,  Manufacturer's recommendations

NA,  Not applicable

[1]  See text for discussion of hydrotherapy.

[2]  The longer the exposure to a disinfectant, the more likely it is that all microorganisms will be eliminated. Follow the FDA-cleared high-level disinfection claim. Ten-minute exposure is not adequate to disinfect many objects, especially those that are difficult to clean because they have narrow channels or other areas that can harbor organic material and bacteria. Twenty-minute exposure at 20°C is the minimum time needed to reliably kill *M. tuberculosis* and nontuberculous mycobacteria with a 2% glutaraldehyde. Some high-level disinfectants have a reduced exposure time (e.g., ortho-phthalaldehyde at 12 minutes at 20°C) because of their rapid activity against mycobacteria or reduced exposure time due to increased mycobactericidal activity at elevated temperature (e.g., 2.5% glutaraldehyde at 5 minutes at 35°C, 0.55% OPA at 5 min at 25°C in automated endoscope reprocessor).

[3]  Tubing must be completely filled for high-level disinfection and liquid chemical sterilization; care must be taken to avoid entrapment of air bubbles during immersion.

[4]  Material compatibility should be investigated when appropriate.

[5]  A concentration of 1000 ppm available chlorine should be considered where cultures or concentrated preparations of microorganisms have spilled (5.25% to 6.15% household bleach diluted 1:50 provides > 1000 ppm available chlorine). This solution may corrode some surfaces.

[6]  Pasteurization (washer-disinfector) of respiratory therapy or anesthesia equipment is a recognized alternative to high-level disinfection. Some data challenge the efficacy of some pasteurization units.

[7]  Thermostability should be investigated when appropriate.

[8]  Do not mix rectal and oral thermometers at any stage of handling or processing.

[9]  By law, all applicable label instructions on EPA-registered products must be followed. If the user selects exposure conditions that differ from those on the EPA-registered products label, the user assumes liability from any injuries resulting from off-label use and is potentially subject to enforcement action under FIFRA.

**Table 2. Properties of an ideal disinfectant.**

---

Broad spectrum: should have a wide antimicrobial spectrum

Fast acting: should produce a rapid kill

Not affected by environmental factors: should be active in the presence of organic matter (e.g., blood, sputum, feces) and compatible with soaps, detergents, and other chemicals encountered in use

Nontoxic: should not be harmful to the user or patient

Surface compatibility: should not corrode instruments and metallic surfaces and should not cause the deterioration of cloth, rubber, plastics, and other materials

Residual effect on treated surfaces: should leave an antimicrobial    film on the treated surface

Easy to use with clear label directions

Odorless: should have a pleasant odor or no odor to facilitate its routine use

Economical: should not be prohibitively high in cost

Solubility: should be soluble in water

Stability: should be stable in concentrate and use-dilution

Cleaner: should have good cleaning properties

Environmentally friendly: should not damage the environment on disposal

---

Modified from Molinari[1035].

**Table 3. Epidemiologic evidence associated with the use of surface disinfectants or detergents on noncritical environmental surfaces.**

<u>**Justification for Use of Disinfectants for Noncritical Environmental Surfaces**</u>

Surfaces may contribute to transmission of epidemiologically important microbes (e.g., vancomycin-resistant Enterococci, methicillin-resistant *S. aureus*, viruses)

Disinfectants are needed for surfaces contaminated by blood and other potentially infective material

Disinfectants are more effective than detergents in reducing microbial load on floors

Detergents become contaminated and result in seeding the patient's environment with bacteria

Disinfection of noncritical equipment and surfaces is recommended for patients on isolation precautions by the Centers for Disease Control and Prevention.

Advantage of using a single product for decontamination of noncritical surfaces, both floors and equipment

Some newer disinfectants have persistent antimicrobial activity

<u>**Justification for Using a Detergent on Noncritical Environmental Surfaces**</u>

Noncritical surfaces contribute minimally to endemic healthcare-associated infections

No difference in healthcare-associated infection rates when floors are cleaned with detergent versus disinfectant

No environmental impact (aquatic or terrestrial) issues with disposal

No occupational health exposure issues

Lower costs

Use of antiseptics/disinfectants selects for antibiotic-resistant bacteria (?)

More aesthetically pleasing floor

Modified from Rutala[378].

**Figure 1. Decreasing order of resistance of microorganisms to disinfection and sterilization and the level of disinfection or sterilization.**

| Resistant | Level |
|---|---|
| Prions (Creutzfeldt-Jakob Disease) | Prion reprocessing |
| Bacterial spores (*Bacillus atrophaeus*) | Sterilization |
| Coccidia (*Cryptosporidium*) | |
| Mycobacteria (*M. tuberculosis, M. terrae*) | High |
| Nonlipid or small viruses (polio, coxsackie) | Intermediate |
| Fungi (*Aspergillus, Candida*) | |
| Vegetative bacteria (*S. aureus, P. aeruginosa*) | Low |
| Lipid or medium-sized viruses (HIV, herpes, hepatitis B) | |

**Susceptible**

Modified from Russell and Favero [13, 344].

**Table 4. Comparison of the characteristics of selected chemicals used as high-level disinfectants or chemical sterilants.**

| | HP (7.5%) | PA (0.2%) | Glut (≥2.0%) | OPA (0.55%) | HP/PA (7.35%/0.23%) |
|---|---|---|---|---|---|
| HLD Claim | 30 m @ 20°C | NA | 20-90 m @ 20°-25°C | 12 m @ 20°C, 5 m @ 25°C in AER | 15m @ 20°C |
| Sterilization Claim | 6 h @ 20° | 12m @ 50-56°C | 10 h @ 20°-25°C | None | 3 h @ 20°C |
| Activation | No | No | Yes (alkaline glut) | No | No |
| Reuse Life[1] | 21d | Single use | 14-30 d | 14d | 14d |
| Shelf Life Stability[2] | 2 y | 6 mo | 2 y | 2 y | 2 y |
| Disposal Restrictions | None | None | Local[3] | Local[3] | None |
| Materials Compatibility | Good | Good | Excellent | Excellent | No data |
| Monitor MEC[4] | Yes (6%) | No | Yes (1.5% or higher) | Yes (0.3% OPA) | No |
| Safety | Serious eye damage (safety glasses) | Serious eye and skin damage (conc soln)[5] | Respiratory | Eye irritant, stains skin | Eye damage |
| Processing | Manual or automated | Automated | Manual or automated | Manual or automated | Manual |
| Organic material resistance | Yes | Yes | Yes | Yes | Yes |
| OSHA exposure limit | 1 ppm TWA | None | None[6] | None | HP-1 ppm TWA |
| Cost profile (per cycle)[7] | + (manual), ++ (automated) | +++++ (automated) | + (manual), ++ (automated) | ++ (manual) | ++ (manual) |

Modified from Rutala [69].

Abbreviations: HLD=high-level disinfectant; HP=hydrogen peroxide; PA=peracetic acid; glut=glutaraldehyde; PA/HP=peracetic acid and hydrogen peroxide; OPA =ortho-phthalaldehyde (FDA cleared as a high-level disinfectant, included for comparison to other chemical agents used for high-level disinfection); m=minutes; h=hours; NA=not applicable; TWA=time-weighted average for a conventional 8-hour workday.

[1] number of days a product can be reused as determined by re-use protocol
[2] time a product can remain in storage (unused)
[3] no U.S. EPA regulations but some states and local authorities have additional restrictions
[4] MEC=minimum effective concentration is the lowest concentration of active ingredients at which the product is still effective
[5] Conc soln=concentrated solution
[6] The ceiling limit recommended by the American Conference of Governmental Industrial Hygienists is 0.05 ppm.
[7] per cycle cost profile considers cost of the processing solution (suggested list price to healthcare facilities in August 2001) and assumes maximum use life (e.g., 21 days for hydrogen peroxide, 14 days for glutaraldehyde), 5 reprocessing cycles per day, 1-gallon basin for manual processing, and 4-gallon tank for automated processing. + = least expensive; +++++ = most expensive

Table 5. Summary of advantages and disadvantages of chemical agents used as chemical sterilants[1] or as high-level disinfectants.

| Sterilization Method | Advantages | Disadvantages |
|---|---|---|
| Peracetic Acid/Hydrogen Peroxide | • No activation required<br>• Odor or irritation not significant | • Materials compatibility concerns (lead, brass, copper, zinc) both cosmetic and functional<br>• Limited clinical experience<br>• Potential for eye and skin damage |
| Glutaraldehyde | • Numerous use studies published<br>• Relatively Inexpensive<br>• Excellent materials compatibility | • Respiratory irritation from glutaraldehyde vapor<br>• Pungent and irritating odor<br>• Relatively slow mycobactericidal activity<br>• Coagulates blood and fixes tissue to surfaces<br>• Allergic contact dermatitis<br>• Glutaraldehyde vapor monitoring recommended |
| Hydrogen Peroxide | • No activation required<br>• May enhance removal of organic matter and organisms<br>• No disposal issues<br>• No odor or irritation issues<br>• Does not coagulate blood or fix tissues to surfaces<br>• Inactivates Cryptosporidium<br>• Use studies published | • Material compatibility concerns (brass, zinc, copper, and nickel/silver plating) both cosmetic and functional<br>• Serious eye damage with contact |
| Ortho-phthalaldehyde | • Fast acting high-level disinfectant<br>• No activation required<br>• Odor not significant<br>• Excellent materials compatibility claimed<br>• Does not coagulate blood or fix tissues to surfaces claimed | • Stains skin, mucous membranes, clothing, and environmental surfaces<br>• Repeated exposure may result in hypersensitivity in some patients with bladder cancer<br>• More expensive than glutaraldehyde<br>• Eye irritation with contact<br>• Slow sporicidal activity |
| Peracetic Acid | • Rapid sterilization cycle time (30-45 minutes)<br>• Low temperature (50-55°C) liquid immersion sterilization<br>• Environmental friendly by-products (acetic acid, $O_2$, $H_2O$)<br>• Fully automated<br>• Single-use system eliminates need for concentration testing<br>• Standardized cycle<br>• May enhance removal of organic material and endotoxin<br>• No adverse health effects to operators under normal operating conditions<br>• Compatible with many materials and instruments<br>• Does not coagulate blood or fix tissues to surfaces<br>• Sterilant flows through scope facilitating salt, protein, and microbe removal<br>• Rapidly sporicidal<br>• Provides procedure standardization (constant dilution, perfusion of channel, temperatures, exposure) | • Potential material incompatibility (e.g., aluminum anodized coating becomes dull)<br>• Used for immersible instruments only<br>• Biological indicator may not be suitable for routine monitoring<br>• One scope or a small number of instruments can be processed in a cycle<br>• More expensive (endoscope repairs, operating costs, purchase costs) than high-level disinfection<br>• Serious eye and skin damage (concentrated solution) with contact<br>• Point-of-use system, no sterile storage |

Modified from Rutala[68].

[1]All products effective in presence of organic soil, relatively easy to use, and have a broad spectrum of antimicrobial activity (bacteria, fungi, viruses, bacterial spores, and mycobacteria). The above characteristics are documented in the literature; contact the manufacturer of the instrument and sterilant for additional information. All products listed above are FDA-cleared as chemical sterilants except OPA, which is an FDA-cleared high-level disinfectant.

Table 6. Summary of advantages and disadvantages of commonly used sterilization technologies.

| Sterilization Method | Advantages | Disadvantages |
|---|---|---|
| Steam | · Nontoxic to patient, staff, environment<br>· Cycle easy to control and monitor<br>· Rapidly microbicidal<br>· Least affected by organic/inorganic soils among sterilization processes listed<br>· Rapid cycle time<br>· Penetrates medical packing, device lumens | · Deleterious for heat-sensitive instruments<br>· Microsurgical instruments damaged by repeated exposure<br>· May leave instruments wet, causing them to rust<br>• Potential for burns |
| Hydrogen Peroxide Gas Plasma | · Safe for the environment<br>· Leaves no toxic residuals<br>· Cycle time is 28-75 minutes (varies with model type) and no aeration necessary<br>· Used for heat- and moisture-sensitive items since process temperature <50°C<br>· Simple to operate, install (208 V outlet), and monitor<br>· Compatible with most medical devices<br>· Only requires electrical outlet | · Cellulose (paper), linens and liquids cannot be processed<br>· Sterilization chamber size from 1.8-9.4 $ft^3$ total volume (varies with model type)<br>· Some endoscopes or medical devices with long or narrow lumens cannot be processed at this time in the United States (see manufacturer's recommendations for internal diameter and length restrictions)<br>· Requires synthetic packaging (polypropylene wraps, polyolefin pouches) and special container tray<br>• Hydrogen peroxide may be toxic at levels greater than 1 ppmTWA |
| 100% Ethylene Oxide (ETO) | · Penetrates packaging materials, device lumens<br>· Single-dose cartridge and negative-pressure chamber minimizes the potential for gas leak and ETO exposure<br>· Simple to operate and monitor<br>· Compatible with most medical materials | · Requires aeration time to remove ETO residue<br>· Sterilization chamber size from 4.0-7.9 $ft^3$ total volume (varies with model type)<br>· ETO is toxic, a carcinogen, and flammable<br>· ETO emission regulated by states but catalytic cell removes 99.9% of ETO and converts it to $CO_2$ and $H_2O$<br>· ETO cartridges should be stored in flammable liquid storage cabinet<br>· Lengthy cycle/aeration time |
| ETO Mixtures<br><br>8.6% ETO/91.4% HCFC<br>10% ETO/90% HCFC<br>8.5% ETO/91.5% $CO_2$ | · Penetrates medical packaging and many plastics<br>· Compatible with most medical materials<br>· Cycle easy to control and monitor | · Some states (e.g., CA, NY, MI) require ETO emission reduction of 90-99.9%<br>· CFC (inert gas that eliminates explosion hazard) banned in 1995<br>· Potential hazards to staff and patients<br>· Lengthy cycle/aeration time<br>· ETO is toxic, a carcinogen, and flammable |
| Peracetic Acid | · Rapid cycle time (30-45 minutes)<br>· Low temperature (50-55°C liquid immersion sterilization<br>· Environmental friendly by-products<br>· Sterilant flows through endoscope which facilitates salt, protein and microbe removal | · Point-of-use system, no sterile storage<br>· Biological indicator may not be suitable for routine monitoring<br>· Used for immersible instruments only<br>· Some material incompatibility (e.g., aluminum anodized coating becomes dull)<br>· One scope or a small number of instruments processed in a cycle<br>• Potential for serious eye and skin damage (concentrated solution) with contact |

Modified from Rutala. [825]

Abbreviations: CFC=chlorofluorocarbon, HCFC=hydrochlorofluorocarbon.

Table 7. Minimum cycle times for steam sterilization cycles

| Type of sterilizer | Item | Exposure time at 250°F (121°C) | Exposure time at 270°F (132°C) | Drying time |
|---|---|---|---|---|
| Gravity displacement | Wrapped instruments | 30 min | 15 min | **15-30** min |
| | Textile packs | 30 min | 25 min | **15** min |
| | Wrapped utensils | 30 min | 15 min | **15-30** min |
| Dynamic-air-removal (e.g., prevacuum) | Wrapped instruments | | 4 min | **20-30** min |
| | Textile packs | | 4 min | **5-20** min |
| | Wrapped utensils | | 4 min | 20 min |

Modified from Association for the Advancement of Medical Instrumentation. [813, 819]

**Table 8. Examples of flash steam sterilization parameters.**

| Type of sterilizer | Load configuration | Temperature | Time |
|---|---|---|---|
| Gravity displacement | Nonporous items only (i.e., routine metal instruments, no lumens) | 132°C (270°F) | 3 minutes |
| | Nonporous and porous items (e.g., rubber or plastic items, items with lumens) sterilized together | 132°C (270°F) | 10 minutes |
| Prevacuum | Nonporous items only (i.e., routine metal instruments, no lumens) | 132°C (270°F) | 3 minutes |
| | Nonporous and porous items (e.g., rubber or plastic items, items with lumens) sterilized together | 132°C (270°F) | 4 minutes |
| Steam-flush pressure-pulse | Nonporous or mixed nonporous/porous items | 132° (270°F) Manufacturers' instruction | 4 minutes |

Modified from Association for the Advancement of Medical Instrumentation. [812, 819]

**Table 9.  Characteristics of an ideal low-temperature sterilization process.**

---

High efficacy: the agent should be virucidal, bactericidal, tuberculocidal, fungicidal and sporicidal

Rapid activity: ability to quickly achieve sterilization

Strong penetrability: ability to penetrate common medical-device packaging materials and penetrate into the interior of device lumens

Material compatibility: produces only negligible changes in the appearance or the function of processed items and packaging materials even after repeated cycling

Nontoxic: presents no toxic health risk to the operator or the patient and poses no hazard to the environment

Organic material resistance: withstands reasonable organic material challenge without loss of efficacy

Adaptability: suitable for large or small (point of use) installations

Monitoring capability: monitored easily and accurately with physical, chemical, and biological process monitors

Cost effectiveness: reasonable cost for installation and for routine operation

---

Modified from Schneider. [851]

**Table 10. Factors affecting the efficacy of sterilization.**

| Factors | Effect |
| --- | --- |
| Cleaning[1] | Failure to adequately clean instrument results in higher bioburden, protein load, and salt concentration. These will decrease sterilization efficacy. |
| Bioburden[1] | The natural bioburden of used surgical devices is $10^0$ to $10^3$ organisms (primarily vegetative bacteria), which is substantially below the $10^5$-$10^6$ spores used with biological indicators. |
| Pathogen type | Spore-forming organisms are most resistant to sterilization and are the test organisms required for FDA clearance. However, the contaminating microflora on used surgical instruments consists mainly of vegetative bacteria. |
| Protein[1] | Residual protein decreases efficacy of sterilization. However, cleaning appears to rapidly remove protein load. |
| Salt[1] | Residual salt decreases efficacy of sterilization more than does protein load. However, cleaning appears to rapidly remove salt load. |
| Biofilm accumulation[1] | Biofilm accumulation reduces efficacy of sterilization by impairing exposure of the sterilant to the microbial cell. |
| Lumen length | Increasing lumen length impairs sterilant penetration. May require forced flow through lumen to achieve sterilization. |
| Lumen diameter | Decreasing lumen diameter impairs sterilant penetration. May require forced flow through lumen to achieve sterilization. |
| Restricted flow | Sterilant must come into contact with microorganisms. Device designs that prevent or inhibit this contact (e.g., sharp bends, blind lumens) will decrease sterilization efficacy. |
| Device design and construction | Materials used in construction may affect compatibility with different sterilization processes and affect sterilization efficacy. Design issues (e.g., screws, hinges) will also affect sterilization efficacy. |

Modified from Alfa and Rutala. [470, 825]    [1] Factor only relevant for reused surgical/medical devices

**Table 11. Comparative evaluation of the microbicidal activity of low-temperature sterilization technology.**

| Challenge | ETO 12/88 | Carriers Sterilized by Various Low-Temperature Sterilization Technologies | | | | | |
|---|---|---|---|---|---|---|---|
| | | 100% ETO | HCFC-ETO | HPGP 100 | HPGP 100S | PA | Reference |
| No salt or serum[1] | 100% | 100% | 96% | 100% | ND | ND | Alfa [721] |
| 10% serum and 0.65% salt[2] | 97% | 60% | 95% | 37% | ND | ND | Alfa [721] |
| Lumen (125 cm long x 3 mm wide) without serum or salt[1] | ND | 96% | 96% | ND | ND | ND | Alfa [721] |
| Lumen (125 cm long x 3 mm wide) with 10% serum and 0.65% salt[2] | 44% | 40% | 49% | 35% | ND | 100%[1] | Alfa [721] |
| Lumen (40 cm long x 3 mm wide)[3] | ND | ND | 100% | 95% | 100% | 8% | Rutala [856] |
| Lumen (40 cm long x 2 mm wide)[3] | ND | ND | 100% | 93% | 100% | ND | Rutala [856] |
| Lumen (40 cm long x 1 mm wide)[3] | ND | ND | 100% | 26% | 100% | ND | Rutala [856] |
| Lumen (40 cm long x 3 mm wide)[4] | ND | ND | 100% | 100% | 100% | ND | Rutala [856] |

Modified from Rutala. [825]

Abbreviations: ETO=ethylene oxide; HCFC=hydrochlorofluorocarbon; ND=no data; HPGP=hydrogen peroxide gas plasma; PA=peracetic acid.

[1]Test organisms included *Enterococcus faecalis*, *Mycobacterium chelonae*, and *Bacillus atrophaeus* spores.
[2]Test organisms included *E. faecalis*, *P. aeruginosa*, *E. coli*, *M. chelonae*, *B. atrophaeus* spores, *G. stearothermophilus* spores, and *B. circulans* spores.
[3]Test organism was *G. stearothermophilus* spores . The lumen test units had a removable 5 cm center piece (1.2 cm diameter) of stainless steel sealed to the narrower steel tubing by hard rubber septums.
[4]Test organism was *G. stearothermophilus* spores. The lumen test unit was a straight stainless steel tube.

**Table 12. Suggested protocol for management of positive biological indicator in a steam sterilizer.**

1. Take the sterilizer out of service. Notify area supervisor and infection control department.
2. Objects, other than implantable objects, do not need to be recalled because of a single positive spore test unless the sterilizer or the sterilization procedure is defective. As soon as possible, repeat biological indicator test in three consecutive sterilizer cycles. If additional spore tests remain positive, the items should be considered nonsterile, and supplies processed since the last acceptable (negative) biological indicator should be recalled. The items from the suspect load(s) should be recalled and reprocessed.
3. Check to ensure the sterilizer was used correctly (e.g., verify correct time and temperature setting). If not, repeat using appropriate settings and recall and reprocess all inadequately processed items.
4. Check with hospital maintenance for irregularities (e.g., electrical) or changes in the hospital steam supply (i.e., from standard $\geq$97% steam, <3% moisture). Any abnormalities should be reported to the person who performs sterilizer maintenance (e.g., medical engineering, sterilizer manufacturer).
5. Check to ensure the correct biological indicator was used and appropriately interpreted. If not, repeat using appropriate settings.

If steps 1 through 5 resolve the problem

6. If all three repeat biological indicators from three consecutive sterilizer cycles (step 2 above) are negative, put the sterilizer back in service.

If one or both biological indicators are positive, do one or more of the following until problem is resolved.

7. A. Request an inspection of the equipment by sterilizer maintenance personnel.
   B. Have hospital maintenance inspect the steam supply lines.
   C. Discuss the abnormalities with the sterilizer manufacturer.
   D. Repeat the biological indicator using a different manufacturer's indicator.

If step 7 does not resolve the problem

Close sterilizer down until the manufacturer can assure that it is operating properly. Retest at that time with biological indicators in three consecutive sterilizer cycles.

Modified from Bryce. [839]

**Disclosure of Financial Interests and Relationships (2000- July 2004)**

William A. Rutala: Honoraria from Advanced Sterilization Products, Kimberly-Clark; consultation with Advanced Sterilization Products, Aesculap, Clorox, 3M, SC Johnson, Intelligent Biocides, Metrex; and an educational grant from Consumer Specialty Products Association, Kimberly-Clark.

David J. Weber: Honoraria from Consumer Specialty Products Association; consultation with Clorox; and educational grant from Consumer Specialty Products Association.

# REFERENCES

1.  Garner JS, Favero MS. CDC Guideline for handwashing and hospital environmental control, 1985. Infect. Control 1986;7:231-43.
2.  Centers for Disease Control. Ambulatory and inpatient procedures in the United States, 1996. Atlanta, GA, 1998:1-39.
3.  Uttley AH, Simpson RA. Audit of bronchoscope disinfection: a survey of procedures in England and Wales and incidents of mycobacterial contamination. J. Hosp. Infect. 1994;26:301-8.
4.  Zaidi M, Angulo M, Sifuentes-Osornio J. Disinfection and sterilization practices in Mexico. J. Hosp. Infect. 1995;31:25-32.
5.  McCarthy GM, Koval JJ, John MA, MacDonald JK. Infection control practices across Canada: do dentists follow the recommendations? J. Can. Dent. Assoc. 1999;65:506-11.
6.  Spach DH, Silverstein FE, Stamm WE. Transmission of infection by gastrointestinal endoscopy and bronchoscopy. Ann. Intern. Med. 1993;118:117-28.
7.  Weber DJ, Rutala WA. Lessons from outbreaks associated with bronchoscopy. Infect. Control Hosp. Epidemiol. 2001;22:403-8.
8.  Weber DJ, Rutala WA, DiMarino AJ, Jr. The prevention of infection following gastrointestinal endoscopy: the importance of prophylaxis and reprocessing. In: DiMarino AJ, Jr, Benjamin SB, eds. Gastrointestinal diseases: an endoscopic approach. Thorofare, NJ: Slack Inc., 2002:87-106.
9.  Meyers H, Brown-Elliott BA, Moore D, et al. An outbreak of *Mycobacterium chelonae* infection following liposuction. Clin. Infect. Dis. 2002;34:1500-7.
10. Lowry PW, Jarvis WR, Oberle AD, et al. *Mycobacterium chelonae* causing otitis media in an ear-nose-and-throat practice. N. Engl. J. Med. 1988;319:978-82.
11. Centers for Disease Control and Prevention. *Pseudomonas aeruginosa* infections associated with transrectal ultrasound-guided prostate biopsies--Georgia, 2005. MMWR CDC Surveill. Summ. 2006;55:776-7.
12. Mehta AC, Prakash UBS, Garland R, et al. Prevention of flexible bronchoscopy-associated infection. Chest 2006;128:1742-55.
13. Favero MS, Bond WW. Chemical disinfection of medical and surgical materials. In: Block SS, ed. Disinfection, sterilization, and preservation. Philadelphia: Lippincott Williams & Wilkins, 2001:881-917.
14. Spaulding EH. Chemical disinfection of medical and surgical materials. In: Lawrence C, Block SS, eds. Disinfection, sterilization, and preservation. Philadelphia: Lea & Febiger, 1968:517-31.
15. Simmons BP. CDC guidelines for the prevention and control of nosocomial infections. Guideline for hospital environmental control. Am. J. Infect. Control 1983;11:97-120.
16. Block SS. Disinfection, sterilization, and preservation. Philadelphia: Lippincott Williams & Wilkins, 2001.
17. Rutala WA, 1994, 1995, and 1996 APIC Guidelines Committee. APIC guideline for selection and use of disinfectants. Association for Professionals in Infection Control and Epidemiology, Inc. Am. J. Infect. Control 1996;24:313-42.
18. Rutala WA. Disinfection, sterilization and waste disposal. In: Wenzel RP, ed. Prevention and control of nosocomial infections. Baltimore: Williams and Wilkins, 1997:539-93.
19. Rutala WA. APIC guideline for selection and use of disinfectants. Am. J. Infect. Control 1990;18:99-117.
20. Association of peri-Operative Registered Nurses. Recommended practices for high-level disinfection. AORN J. 2005;81:402-12.
21. Garner JS, Favero MS. CDC guidelines for the prevention and control of nosocomial infections. Guideline for handwashing and hospital environmental control, 1985. Supersedes guideline for hospital environmental control published in 1981. Am. J. Infect. Control 1986;14:110-29.
22. Centers for Disease Control. Guidelines for prevention of transmission of human immunodeficiency virus

and hepatitis B virus to health-care and public-safety workers. MMWR 1989;38:1-37.

23. Centers for Disease Control. Guidelines for Environmental Infection Control in Health-Care Facilities, 2003. MMWR 2003;52 (No. RR-10):1-44.

24. Bhattachatyya M, Kepnes LJ. The effectiveness of immersion disinfection for flexible fiberoptic laryngoscopes. Otolaryngol Head Neck 2004;130:681-5.

25. Hamasuna R, Nose K, Sueyoshi T, Nagano M, Hasui Y, Osada Y. High-level disinfection of cystoscopic equipment with ortho-phthalaldehyde solution. J. Hosp. Infect. 2004;57:346-8.

26. Foliente RL KB, Aprecio RM, Bains HJ, Kettering JD, Chen YK. Efficacy of high-level disinfectants for reprocessing gastrointestinal endoscopes in simulated-use testing. Gastrointest. Endosc. 2001;53:456-62.

27. Kovacs BJ, Chen YK, Kettering JD, Aprecio RM, Roy I. High-level disinfection of gastrointestinal endoscopes: are current guidelines adequate? Am. J. Gastroenterol. 1999;94:1546-50.

28. Rutala WA, Clontz EP, Weber DJ, Hoffmann KK. Disinfection practices for endoscopes and other semicritical items. Infect. Control Hosp. Epidemiol. 1991;12:282-8.

29. Phillips J, Hulka B, Hulka J, Keith D, Keith L. Laparoscopic procedures: The American Association of Gynecologic Laparoscopists' Membership Survey for 1975. J. Reprod. Med. 1977;18:227-32.

30. Muscarella LF. Current instrument reprocessing practices: Results of a national survey. Gastrointestinal Nursing 2001;24:253-60.

31. Wright EP, Collins CH, Yates MD. *Mycobacterium xenopi* and *Mycobacterium kansasii* in a hospital water supply. J. Hosp. Infect. 1985;6:175-8.

32. Wallace RJ, Jr., Brown BA, Driffith DE. Nosocomial outbreaks/pseudo-outbreaks caused by nontuberculous mycobacteria. Annu. Rev. Microbiol. 1998;52:453-90.

33. Mitchell DH, Hicks LJ, Chiew R, Montanaro JC, Chen SC. Pseudoepidemic of *Legionella pneumophila* serogroup 6 associated with contaminated bronchoscopes. J. Hosp. Infect. 1997;37:19-23.

34. Meenhorst PL, Reingold AL, Groothuis DG, et al. Water-related nosocomial pneumonia caused by *Legionella pneumophila* serogroups 1 and 10. J. Infect. Dis. 1985;152:356-64.

35. Atlas RM. *Legionella*: from environmental habitats to disease pathology, detection and control. Environ. Microbiol. 1999;1:283-93.

36. Rutala WA, Weber DJ. Water as a reservoir of nosocomial pathogens. Infect. Control Hosp. Epidemiol. 1997;18:609-16.

37. Weber DJ, Rutala WA. Environmental issues and nosocomial infections. In: Wenzel RP, ed. Prevention and control of nosocomial infections. Baltimore: Williams and Wilkins, 1997:491-514.

38. Society of Gastroenterology Nurses and Associates. Standards for infection control and reprocessing of flexible gastrointestinal endoscopes. Gastroenterol. Nurs. 2000;23:172-9.

39. Gerding DN, Peterson LR, Vennes JA. Cleaning and disinfection of fiberoptic endoscopes: evaluation of glutaraldehyde exposure time and forced-air drying. Gastroenterology 1982;83:613-8.

40. Society of Gastroenterology Nurses and Associates. Guideline for the use of high-level disnfectants and sterilants in reprocessing of flexible gastrointestinal endoscopes.

41. Turner AG, Higgins MM, Craddock JG. Disinfection of immersion tanks (Hubbard) in a hospital burn unit. Arch. Environ. Health 1974;28:101-4.

42. Rutala DR, Rutala WA, Weber DJ, Thomann CA. Infection risks associated with spirometry. Infect. Control Hosp. Epidemiol. 1991;12:89-92.

43. Kohn WG, Collins AS, Cleveland JL, Harte JA, Eklund KJ, Malvitz DM. Guidelines for infection control in dental health-care settings-2003. MMWR 2003;52 (no. RR-17):1-67.

44. Sehulster L, Chinn RYW, Healthcare Infection Control Practices Advisory Committee. Guidelines for environmental infection control in health-care facilities. MMWR 2003;52:1-44.

45. Rutala WA, White MS, Gergen MF, Weber DJ. Bacterial contamination of keyboards: Efficacy and functional impact of disinfectants. Infect Control Hosp Epidemiol 2006;27:372-7.

46. Sattar SA, Lloyd-Evans N, Springthorpe VS, Nair RC. Institutional outbreaks of rotavirus diarrhoea: potential role of fomites and environmental surfaces as vehicles for virus transmission. J. Hyg. (Lond). 1986;96:277-89.

47. Weber DJ, Rutala WA. Role of environmental contamination in the transmission of vancomycin-resistant enterococci. Infect. Control Hosp. Epidemiol. 1997;18:306-9.

48. Ward RL, Bernstein DI, Knowlton DR, et al. Prevention of surface-to-human transmission of rotaviruses by treatment with disinfectant spray. J. Clin. Microbiol. 1991;29:1991-6.

49. Tyler R, Ayliffe GA, Bradley C. Virucidal activity of disinfectants: studies with the poliovirus. J. Hosp. Infect. 1990;15:339-45.

50. Gwaltney JM, Jr., Hendley JO. Transmission of experimental rhinovirus infection by contaminated surfaces. Am. J. Epidemiol. 1982;116:828-33.

51. Sattar SA, Jacobsen H, Springthorpe VS, Cusack TM, Rubino JR. Chemical disinfection to interrupt transfer of rhinovirus type 14 from environmental surfaces to hands. Appl. Environ. Microbiol. 1993;59:1579-85.

52. Sattar SA, Jacobsen H, Rahman H, Cusack TM, Rubino JR. Interruption of rotavirus spread through chemical disinfection. Infect. Control Hosp. Epidemiol. 1994;15:751-6.

53. Rutala WA, Barbee SL, Aguiar NC, Sobsey MD, Weber DJ. Antimicrobial activity of home disinfectants and natural products against potential human pathogens. Infect. Control Hosp. Epidemiol. 2000;21:33-8.

54. Silverman J, Vazquez JA, Sobel JD, Zervos MJ. Comparative in vitro activity of antiseptics and disinfectants versus clinical isolates of *Candida* species. Infect. Control Hosp. Epidemiol. 1999;20:676-84.

55. Best M, Sattar SA, Springthorpe VS, Kennedy ME. Efficacies of selected disinfectants against *Mycobacterium tuberculosis*. J. Clin. Microbiol. 1990;28:2234-9.

56. Best M, Kennedy ME, Coates F. Efficacy of a variety of disinfectants against *Listeria* spp. Appl. Environ. Microbiol. 1990;56:377-80.

57. Best M, Springthorpe VS, Sattar SA. Feasibility of a combined carrier test for disinfectants: studies with a mixture of five types of microorganisms. Am. J. Infect. Control 1994;22:152-62.

58. Mbithi JN, Springthorpe VS, Sattar SA. Chemical disinfection of hepatitis A virus on environmental surfaces. Appl. Environ. Microbiol. 1990;56:3601-4.

59. Springthorpe VS, Grenier JL, Lloyd-Evans N, Sattar SA. Chemical disinfection of human rotaviruses: efficacy of commercially-available products in suspension tests. J. Hyg. (Lond). 1986;97:139-61.

60. Akamatsu T, Tabata K, Hironga M, Kawakami H, Uyeda M. Transmission of *Helicobacter pylori* infection via flexible fiberoptic endoscopy. Am. J. Infect. Control 1996;24:396-401.

61. Sattar SA, Springthorpe VS. Survival and disinfectant inactivation of the human immunodeficiency virus: a critical review. Rev. Infect. Dis. 1991;13:430-47.

62. Resnick L, Veren K, Salahuddin SZ, Tondreau S, Markham PD. Stability and inactivation of HTLV-III/LAV under clinical and laboratory environments. JAMA 1986;255:1887-91.

63. Weber DJ, Barbee SL, Sobsey MD, Rutala WA. The effect of blood on the antiviral activity of sodium hypochlorite, a phenolic, and a quaternary ammonium compound. Infect. Control Hosp. Epidemiol. 1999;20:821-7.

64. Rice EW, Clark RM, Johnson CH. Chlorine inactivation of *Escherichia coli* O157:H7. Emerg. Infect. Dis. 1999;5:461-3.

65. Pentella MA, Fisher T, Chandler S, Britt-Ohrmund T, Kwa BH, Yangco BG. Are disinfectants accurately prepared for use in hospital patient care areas? Infect. Control Hosp. Epidemiol. 2000;21:103.

66. Bhalla A, Pultz NJ, Gries DM, et al. Acquisition of nosocomial pathogens on hands after contact with environmental surfaces near hospitalized patients. Infect Control Hosp Epidemiol 2004;25:164-7.

67. Ray AJ, Hoyen CK, Taub TF, Eckstein EC, Donskey CJ. Nosocomial transmission of vancomycin-resistant enterococci from surfaces. JAMA 2002;287:1400-1.

68. Westwood JC, Mitchell MA, Legace S. Hospital sanitation: the massive bacterial contamination of the wet mop. Appl. Microbiol. 1971;21:693-7.

69. Rutala WA, Weber DJ. Disinfection of endoscopes: review of new chemical sterilants used for high-level disinfection. Infect. Control Hosp. Epidemiol. 1999;20:69-76.

70. Russell AD. Bacterial spores and chemical sporicidal agents. Clin. Microbiol. Rev. 1990;3:99-119.

71. Terleckyj B, Axler DA. Quantitative neutralization assay of fungicidal activity of disinfectants. Antimicrob. Agents Chemother. 1987;31:794-8.

72. Klein M, DeForest A. The inactivation of viruses by germicides. Chem. Specialists Manuf. Assoc. Proc. 1963;49:116-8.

73. Rutala WA, Cole EC, Wannamaker NS, Weber DJ. Inactivation of *Mycobacterium tuberculosis* and *Mycobacterium bovis* by 14 hospital disinfectants. Am. J. Med. 1991;91:267S-271S.

74. Robison RA, Bodily HL, Robinson DF, Christensen RP. A suspension method to determine reuse life of chemical disinfectants during clinical use. Appl. Environ. Microbiol. 1988;54:158-64.

75. Isenberg HD, Giugliano ER, France K, Alperstein P. Evaluation of three disinfectants after in-use stress. J.

Hosp. Infect. 1988;11:278-85.

76. Cole EC, Rutala WA, Nessen L, Wannamaker NS, Weber DJ. Effect of methodology, dilution, and exposure time on the tuberculocidal activity of glutaraldehyde-based disinfectants. Appl. Environ. Microbiol. 1990;56:1813-7.

77. Power EG, Russell AD. Sporicidal action of alkaline glutaraldehyde: factors influencing activity and a comparison with other aldehydes. J. Appl. Bacteriol. 1990;69:261-8.

78. Rutala WA, Gergen MF, Weber DJ. Sporicidal activity of chemical sterilants used in hospitals. Infect. Control Hosp. Epidemiol. 1993;14:713-8.

79. Rutala WA, Gergen MF, Weber DJ. Inactivation of *Clostridium difficile* spores by disinfectants. Infect. Control Hosp. Epidemiol. 1993;14:36-9.

80. Ascenzi JM, Ezzell RJ, Wendt TM. A more accurate method for measurement of tuberculocidal activity of disinfectants. Appl. Environ. Microbiol. 1987;53:2189-92.

81. Collins FM. Use of membrane filters for measurement of mycobactericidal activity of alkaline glutaraldehyde solution. Appl. Environ. Microbiol. 1987;53:737-9.

82. Rubbo SD, Gardner JF, Webb RL. Biocidal activities of glutaraldehyde and related compounds. J. Appl. Bacteriol. 1967;30:78-87.

83. Rutala WA, Weber DJ. FDA labeling requirements for disinfection of endoscopes: a counterpoint. Infect. Control Hosp. Epidemiol. 1995;16:231-5.

84. Collins FM. Kinetics of the tuberculocidal response by alkaline glutaraldehyde in solution and on an inert surface. J. Appl. Bacteriol. 1986;61:87-93.

85. Food and Drug Administration. 2005. FDA-cleared sterilants and high-level disinfectants with general claims for processing reusable medical and dental devices, May 13, 2005. www.fda.gov/cdrh/ode/germlab.html.

86. Crow S, Metcalf RW, Beck WC, Birnbaum D. Disinfection or sterilization? Four views on arthroscopes. AORN J. 1983;37:854-9, 862-8.

87. Loffer FD. Disinfection vs. sterilization of gynecologic laparoscopy equipment. The experience of the Phoenix Surgicenter. J. Reprod. Med. 1980;25:263-6.

88. Johnson LL, Shneider DA, Austin MD, Goodman FG, Bullock JM, DeBruin JA. Two per cent glutaraldehyde: a disinfectant in arthroscopy and arthroscopic surgery. J. Bone Joint Surg. 1982;64:237-9.

89. Burns S, Edwards M, Jennings J, et al. Impact of variation in reprocessing invasive fiberoptic scopes on patient outcomes. Infect. Control Hosp. Epidemiol. 1996;17(suppl):P42.

90. Fuselier HA, Jr., Mason C. Liquid sterilization versus high level disinfection in the urologic office. Urology 1997;50:337-40.

91. Muscarella LF. High-level disinfection or "sterilization" of endoscopes? Infect. Control Hosp. Epidemiol. 1996;17:183-7.

92. Miles RS. What standards should we use for the disinfection of large equipment? J. Hosp. Infect. 1991;18:264-73.

93. Lee RM, Kozarek RA, Sumida SE, Raltz SL. Risk of contamination of sterile biopsy forceps in disinfected endoscopes. Gastrointest. Endosc. 1998;47:377-81.

94. Kinney TP, Kozarek RA, Raltz S, Attia F. Contamination of single-use biopsy forceps: A prospective in vitro analysis. Gastrointest. Endosc. 2002;56:209-12.

95. Centers for Disease Control. Recommendations for preventing possible transmission of human T-lymphotropic virus type III/lymphadenopathy-associated virus from tears. MMWR 1985;34:533-4.

96. Lettau LA, Bond WW, McDougal JS. Hepatitis and diaphragm fitting. JAMA 1985;254:752.

97. Schembre DB. Infectious complications associated with gastrointestinal endoscopy. Gastrointest. Endosc. Clin. N. Am. 2000;10:215-32.

98. Nelson DB. Infectious disease complications of GI endoscopy: Part II, exogenous infections. Gastrointest. Endosc. 2003;57:695-711.

99. Chu NS, Favero M. The microbial flora of the gastrointestinal tract and the cleaning of flexible endoscopes. Gastrointest. Endosc. Clin. N. Am. 2000;10:233-44.

100. Alfa MJ, Sitter DL. In-hospital evaluation of orthophthalaldehyde as a high level disinfectant for flexible endoscopes. J. Hosp. Infect. 1994;26:15-26.

101. Vesley D, Melson J, Stanley P. Microbial bioburden in endoscope reprocessing and an in-use evaluation of the high-level disinfection capabilities of Cidex PA. Gastroenterol. Nurs. 1999;22:63-8.

102. Chu NS, McAlister D, Antonoplos PA. Natural bioburden levels detected on flexible gastrointestinal endoscopes after clinical use and manual cleaning. Gastrointest. Endosc. 1998;48:137-42.

103. Rutala WA, Weber DJ. Reprocessing endoscopes: United States perspective. J. Hosp. Infect. 2004;56:S27-S39.

104. Hanson PJ, Gor D, Clarke JR, et al. Contamination of endoscopes used in AIDS patients. Lancet 1989;2:86-8.

105. Hanson PJ, Gor D, Clarke JR, et al. Recovery of the human immunodeficiency virus from fibreoptic bronchoscopes. Thorax 1991;46:410-2.

106. Chaufour X, Deva AK, Vickery K, et al. Evaluation of disinfection and sterilization of reusable angioscopes with the duck hepatitis B model. J. Vasc. Surg. 1999;30:277-82.

107. Cheung RJ, Ortiz D, DiMarino AJ, Jr. GI endoscopic reprocessing practices in the United States. Gastrointest. Endosc. 1999;50:362-8.

108. American Society for Gastrointestinal Endoscopy. Position statement: reprocessing of flexible gastrointestinal endoscopes. Gastrointest. Endosc. 1996;43:541-6.

109. Food and Drug Administration. Content and format of premarket notification [510(k)] submissions for liquid chemical sterilants/high level disinfectants. www.fda.gov/cdrh/ode/397 2000.

110. Urayama S, Kozarek RA, Sumida S, Raltz S, Merriam L, Pethigal P. Mycobacteria and glutaraldehyde: is high-level disinfection of endoscopes possible? Gastrointest. Endosc. 1996;43:451-6.

111. Jackson J, Leggett JE, Wilson DA, Gilbert DN. *Mycobacterium gordonae* in fiberoptic bronchoscopes. Am. J. Infect. Control 1996;24:19-23.

112. Martiny H, Floss H, Zuhlsdorf B. The importance of cleaning for the overall results of processing endoscopes. J. Hosp. Infect. 2004;56:S16-S22.

113. Alvarado CJ, Reichelderfer M. APIC guideline for infection prevention and control in flexible endoscopy. Association for Professionals in Infection Control. Am. J. Infect. Control 2000;28:138-55.

114. Society of Gastroenterology Nurses and Associates. Guideline for the use of high-level disinfectants and sterilants for reprocessing of flexible gastrointestinal endoscopes. Gastroenterol. Nurs. 2000;23:180-7.

115. Society of Gastroenterology Nurses and Associates. Standards of infection control in reprocessing of flexible gastrointestinal endoscopes. Gastroenterol. Nurs. 2006;29:142-8.

116. Nelson DB, Jarvis WR, Rutala WA, et al. Multi-society guideline for reprocessing flexible gastrointestinal endoscopes. Infect Control Hosp Epidemiol 2003;24:532-537.

117. Martin MA, Reichelderfer M, 1991, and 1993 APIC Guidelines Committee. APIC guidelines for infection prevention and control in flexible endoscopy. Am. J. Infect. Control 1994;22:19-38.

118. Rey JF, Halfon P, Feryn JM, Khiri H, Masseyeff MF, Ouzan D. Risk of transmission of hepatitis C virus by digestive endoscopy. Gastroenterol. Clin. Biol. 1995;19:346-9.

119. Cronmiller JR, Nelson DK, Jackson DK, Kim CH. Efficacy of conventional endoscopic disinfection and sterilization methods against *Helicobacter pylori* contamination. Helicobacter 1999;4:198-203.

120. Sartor C, Charrel RN, de Lamballerie X, Sambuc R, De Micco P, Boubli L. Evaluation of a disinfection procedure for hysteroscopes contaminated by hepatitis C virus. Infect. Control Hosp. Epidemiol. 1999;20:434-6.

121. Hanson PJ, Chadwick MV, Gaya H, Collins JV. A study of glutaraldehyde disinfection of fibreoptic bronchoscopes experimentally contaminated with *Mycobacterium tuberculosis*. J. Hosp. Infect. 1992;22:137-42.

122. Merighi A, Contato E, Scagliarini R, et al. Quality improvement in gastrointestinal endoscopy: microbiologic surveillance of disinfection. Gastrointest. Endosc. 1996;43:457-62.

123. Bond WW. Endoscope reprocessing: Problems and solutions. In: Rutala WA, ed. Disinfection, sterilization, and antisepsis in healthcare. Champlain, New York: Polyscience Publications, 1998:151-163.

124. Deva AK, Vickery K, Zou J, West RH, Harris JP, Cossart YE. Establishment of an in-use testing method for evaluating disinfection of surgical instruments using the duck hepatitis B model. J. Hosp. Infect. 1996;33:119-30.

125. Hanson PJ, Gor D, Jeffries DJ, Collins JV. Elimination of high titre HIV from fibreoptic endoscopes. Gut 1990;31:657-9.

126. Wu MS, Wang JT, Yang JC, et al. Effective reduction of *Helicobacter pylori* infection after upper gastrointestinal endoscopy by mechanical washing of the endoscope. Hepatogastroenterology. 1996;43:1660-4.

127. Kirschke DL, Jones TF, Craig AS, et al. *Pseudomonas aeruginosa* and *Serratia marcescens* contamination associated with a manufacturing defect in bronchoscopes. N. Engl. J. Med. 2003;348:214-20.

128. Srinivasan A, Wolfenden LL, Song X, et al. An outbreak of *Pseudomonas aeruginosa* infections associated with flexible bronchoscopes. N. Engl. J. Med. 2003;348:221-7.

129. Kaczmarek RG, Moore RM, Jr., McCrohan J, et al. Multi-state investigation of the actual disinfection/sterilization of endoscopes in health care facilities. Am. J. Med. 1992;92:257-61.

130. Bradley CR, Babb JR. Endoscope decontamination: automated vs. manual. J. Hosp. Infect. 1995;30:537-42.

131. Muscarella LF. Advantages and limitations of automatic flexible endoscope reprocessors. Am. J. Infect. Control 1996;24:304-9.

132. Muscarella LF. Automatic flexible endoscope reprocessors. Gastrointest. Endosc. Clin. N. Am. 2000;10:245-57.

133. Alvarado CJ, Stolz SM, Maki DG. Nosocomial infections from contaminated endoscopes: a flawed automated endoscope washer. An investigation using molecular epidemiology. Am. J. Med. 1991;91:272S-280S.

134. Fraser VJ, Jones M, Murray PR, Medoff G, Zhang Y, Wallace RJ, Jr. Contamination of flexible fiberoptic bronchoscopes with *Mycobacterium chelonae* linked to an automated bronchoscope disinfection machine. Am. Rev. Respir. Dis. 1992;145:853-5.

135. Cooke RP, Whymant-Morris A, Umasankar RS, Goddard SV. Bacteria-free water for automatic washer-disinfectors: an impossible dream? J. Hosp. Infect. 1998;39:63-5.

136. Muscarella LF. Deja Vu...All over again? The importance of instrument drying. Infect. Control Hosp. Epidemiol. 2000;21:628-9.

137. Rutala WA, Weber DJ. Importance of lumen flow in liquid chemical sterilization. Am. J. Infect. Control 1999;20:458-9.

138. Dwyer DM, Klein EG, Istre GR, Robinson MG, Neumann DA, McCoy GA. *Salmonella newport* infections transmitted by fiberoptic colonoscopy. Gastrointest. Endosc. 1987;33:84-7.

139. Wheeler PW, Lancaster D, Kaiser AB. Bronchopulmonary cross-colonization and infection related to mycobacterial contamination of suction valves of bronchoscopes. J. Infect. Dis. 1989;159:954-8.

140. Bond WW. Virus transmission via fiberoptic endoscope: recommended disinfection. JAMA 1987;257:843-4.

141. Lynch DA, Porter C, Murphy L, Axon AT. Evaluation of four commercial automatic endoscope washing machines. Endoscopy 1992;24:766-70.

142. Bond WW. Disinfection and endoscopy: microbial considerations. J. Gastroenterol. Hepatol. 1991;6:31-6.

143. Nelson D. Newer technologies for endoscope disinfection: electrolyzed acid water and disposable-component endoscope systems. Gastrointest. Endosc. Clin. N. Am. 2000;10:319-28.

144. Silberman HD. Non-inflatable sterile sheath for introduction of the flexible nasopharyngolaryngoscope. Ann Otol, Rhinol, Laryngol 2001;110:385-7.

145. Kruse A, Rey JF. Guidelines on cleaning and disinfection in GI endoscopy. Update 1999. The European Society of Gastrointestinal Endoscopy. Endoscopy 2000;32:77-80.

146. British Thoracic Society. British Thoracic Society guidelines on diagnostic flexible bronchoscopy. Thorax 2001;56:1-21.

147. Association of Operating Room Nurses. Recommended practices for use and care of endoscopes. 2000 standards, recommended practices, and guidelines. Denver, CO: AORN, 2000:243-7.

148. British Society of Gastroenterology. Cleaning and disinfection of equipment for gastrointestinal endoscopy. Report of a working party of the British Society of Gastroenterology Endoscope Committee. Gut 1998;42:585-93.

149. Jackson FW, Ball MD. Correction of deficiencies in flexible fiberoptic sigmoidoscope cleaning and disinfection technique in family practice and internal medicine offices. Arch. Fam. Med. 1997;6:578-82.

150. Orsi GB, Filocamo A, Di Stefano L, Tittobello A. Italian National Survey of Digestive Endoscopy Disinfection Procedures. Endoscopy 1997;29:732-8; quiz 739-40.

151. Honeybourne D, Neumann CS. An audit of bronchoscopy practice in the United Kingdom: a survey of adherence to national guidelines. Thorax 1997;52:709-13.

152. Michele TM, Cronin WA, Graham NM, et al. Transmission of *Mycobacterium tuberculosis* by a fiberoptic bronchoscope. Identification by DNA fingerprinting. JAMA 1997;278:1093-5.

153. Bronowicki JP, Venard V, Botte C, et al. Patient-to-patient transmission of hepatitis C virus during colonoscopy. N. Engl. J. Med. 1997;337:237-40.

154. Agerton T, Valway S, Gore B, et al. Transmission of a highly drug-resistant strain (strain W1) of *Mycobacterium tuberculosis*. Community outbreak and nosocomial transmission via a contaminated bronchoscope. JAMA 1997;278:1073-7.

155. Food and Drug Administration, Centers for Disease Control and Prevention. FDA and CDC public health advisory: Infections from endoscopes inadequately reprocessed by an automated endoscope reprocessing system, Food and Drug Administration, Rockville, MD. 1999.

156. Nelson DB, Muscarella LF. Current issues in endoscope reprocessing and infection control during gastrointestinal endoscopy. World J Gastroenterol 2006;12:3953-64.

157. Riley R, Beanland C, Bos H. Establishing the shelf life of flexible colonoscopes. Gastroenterol. Nurs. 2002;25:114-9.

158. Rejchrt S, Cermak P, Pavlatova L, Mickova E, Bures J. Bacteriologic testing of endoscopes after high-level disinfection. Gastrointest. Endosc. 2004;60:76-8.

159. Willis C. Bacteria-free endoscopy rinse water - a realistic aim? Epidemiol. Infect. 2005;134:279-84.

160. Humphreys H, McGrath H, McCormick PA, Walsh C. Quality of final rinse water used in washer-disinfectors for endoscopes. J. Hosp. Infect. 2002;51:151-3.

161. Pang J, Perry P, Ross A, Forbes GM. Bacteria-free rinse water for endoscope disinfection. Gastrointest. Endosc. 2002;56:402-6.

162. Leung J, Vallero R, Wilson R. Surveillance cultures to monitor quality of gastrointestinal endoscope reprocessing. Am. J. Gastroenterol. 2003;98.

163. Moses FM, Lee J. Surveillance cultures to monitor quality of gastrointestinal endoscope reprocessing. Am. J. Gastroenterol. 2003;98:77-81.

164. Tunuguntla A, Sullivan MJ. Monitoring quality of flexible endoscopic disinfection by microbiologic surveillance cultures. Tennessee Med 2004;October:453-6.

165. Muscarella LF. Application of environmental sampling to flexible endoscope reprocessing: The importance of monitoring the rinse water. Infect . Control Hosp. Epidemiol. 2002;23:285-9.

166. Fraser TG, Reiner S, Malcznski M, Yarnold PR, Warren J, Noskin GA. Multidrug-resistant *Pseudomonas aeruginosa* cholangiopancreatography: Failure of routine endoscope cultures to prevent an outbreak. Infect Control Hosp Epidemiol 2004;25:856-9.

167. Bond WW, Hedrick ER. Microbiological culturing of environmental and medical-device surfaces. In: Isenberg HD, and M.J.R. Gilchrist, ed. Clinical Microbiology Procedures Handbook, Section 11, Epidemiologic and Infection Control Microbiology. Washington, DC: American Society for Microbiology, 1992:11.10.1-11.10.9.

168. Murray PR, Baron EJ, Pfaller MA, Jorgensen JH, Yolken RH. Manual of Clinical Microbiology. In: Murray PR, Baron EJ, Pfaller MA, Jorgensen JH, Yolken RH, eds. Washington, D.C.: American Society for Microbiology Press, 2003.

169. Blob R, Kampf G. Test models to determine cleaning efficacy with different types of bioburden and its clinical correlation. J. Hosp. Infect. 2004;56 (suppl):S44-S48.

170. Obee PC, Griffith CJ, Cooper RA, Cooke RP, Bennion NE, Lewis M. Real-time monitoring in managing the decontamination of flexible gastrointestinal endoscopes. Am. J. Infect. Control 2005;33:202-6.

171. Sciortino CV, Xia EL, Mozee A. Assessment of a novel approach to evaluate the outcome of endoscope reprocessing. Infect Control Hosp Epidemiol 2004;25:284-90.

172. Murphy C. Inactivated glutaraldehyde: Lessons for infection control. Am. J. Infect. Control 1998;26:159-60.

173. Carsauw H, Debacker N. Recall of patients after use of inactive batch of Cidex disinfection solution in Belgian hospitals, Fifth International Conference of the Hospital Infection Society, Edinburgh, September 15-18, 2002. Hospital Infections Society.

174. Ad hoc Committee on Infection Control in the Handling of Endoscopic Equipment. Guidelines for preparation of laparoscopic instrumentation. AORN J. 1980;32:65-6, 70, 74, 76.

175. Taylor EW, Mehtar S, Cowan RE, Feneley RC. Endoscopy: disinfectants and health. Report of a meeting held at the Royal College of Surgeons of England, February 1993. J. Hosp. Infect. 1994;28:5-14.

176. Hulka JF, Wisler MG, Bruch C. A discussion: laparoscopic instrument sterilization. Med. Instrum. 1977;11:122-3.

177.    Corson SL, Block S, Mintz C, Dole M, Wainwright A. Sterilization of laparoscopes. Is soaking sufficient? J. Reprod. Med. 1979;23:49-56.

178.    Corson SL, Dole M, Kraus R, Richards L, Logan B. Studies in sterilization of the laparoscope: II. J. Reprod. Med. 1979;23:57-9.

179.    Chan-Myers H, McAlister D, Antonoplos P. Natural bioburden levels detected on rigid lumened medical devices before and after cleaning. Am. J. Infect. Control 1997;25:471-6.

180.    Rodrigues C, Mehta AC, Jha U, Bharucha M, Dastur FD, Udwadia TE. Nosocomial *Mycobacterium chelonae* infection in laparoscopic surgery. Infect . Control Hosp. Epidemiol. 2001;22:474-5.

181.    Marshburn PB, Rutala WA, Wannamaker NS, Hulka JF. Gas and steam sterilization of assembled versus disassembled laparoscopic equipment. Microbiologic studies. J. Reprod. Med. 1991;36:483-7.

182.    Bernhang AM. Clostridium pyoarthrosis following arthroscopy. Arthroscopy 1987;3:56-8.

183.    D'Angelo GL, Ogilvie-Harris DJ. Septic arthritis following arthroscopy, with cost/benefit analysis of antibiotic prophylaxis. Arthroscopy 1988;4:10-4.

184.    Weber DJ, Rutala WA. Nosocomial ocular infections. In: Mayhall CG, ed. Infect. Control and Hosp. Epidemiol. Philadelphia: Lippincott Williams & Wilkins, 1999:287-99.

185.    Rutala WA, Peacock JE, Gergen MF, Sobsey MD, Weber DJ. Efficacy of hospital germicides against adenovirus 8, a common cause of epidemic keratoconjunctivitis in health care facilities. Antimicrob. Agents Chemother. 2006;50:1419-24.

186.    Sattar SA, Springthorpe VS, Karim Y, Loro P. Chemical disinfection of non-porous inanimate surfaces experimentally contaminated with four human pathogenic viruses. Epidemiol. Infect. 1989;102:493-505.

187.    Chronister CL. Structural damage to Schiotz tonometers after disinfection with solutions. Optom. Vis. Sci. 1997;74:164-6.

188.    Nagington J, Sutehall GM, Whipp P. Tonometer disinfection and viruses. Br. J. Ophthalmol. 1983;67:674-6.

189.    Craven ER, Butler SL, McCulley JP, Luby JP. Applanation tonometer tip sterilization for adenovirus type 8. Ophthalmology 1987;94:1538-40.

190.    American Academy of Ophthalmology. Updated recommendations for ophthalmic practice in relation to the human immunodeficiency virus. American Academy of Ophthalmology, San Francisco, CA, 1988.

191.    Pepose JS, Linette G, Lee SF, MacRae S. Disinfection of Goldmann tonometers against human immunodeficiency virus type 1. Arch. Ophthalmol. 1989;107:983-5.

192.    Ventura LM, Dix RD. Viability of herpes simplex virus type 1 on the applanation tonometer. Am. J. Ophthalmol. 1987;103:48-52.

193.    Koo D, Bouvier B, Wesley M, Courtright P, Reingold A. Epidemic keratoconjunctivitis in a university medical center ophthalmology clinic; need for re-evaluation of the design and disinfection of instruments. Infect. Control Hosp. Epidemiol. 1989;10:547-52.

194.    Jernigan JA, Lowry BS, Hayden FG, et al. Adenovirus type 8 epidemic keratoconjunctivitis in an eye clinic: risk factors and control. J. Infect. Dis. 1993;167:1307-13.

195.    Fritz S, Hust MH, Ochs C, Gratwohl I, Staiger M, Braun B. Use of a latex cover sheath for transesophageal echocardiography (TEE) instead of regular disinfection of the echoscope? Clin. Cardiol. 1993;16:737-40.

196.    Lawrentschuk N, Chamberlain M. Sterile disposable sheath sytsem for flexible cytoscopes. Urology 2005;66:1310-3.

197.    Milki AA, Fisch JD. Vaginal ultrasound probe cover leakage: implications for patient care. Fertil. Steril. 1998;69:409-11.

198.    Storment JM, Monga M, Blanco JD. Ineffectiveness of latex condoms in preventing contamination of the transvaginal ultrasound transducer head. South. Med. J. 1997;90:206-8.

199.    Hignett M, Claman P. High rates of perforation are found in endovaginal ultrasound probe covers before and after oocyte retrieval for *in vitro* fertilization-embryo transfer. J. Assist. Reprod. Genet. 1995;12:606-9.

200.    Amis S, Ruddy M, Kibbler CC, Economides DL, MacLean AB. Assessment of condoms as probe covers for transvaginal sonography. J. Clin. Ultrasound 2000;28:295-8.

201.    Rooks VJ, Yancey MK, Elg SA, Brueske L. Comparison of probe sheaths for endovaginal sonography. Obstet. Gynecol. 1996;87:27-9.

202.    Odwin CS, Fleischer AC, Kepple DM, Chiang DT. Probe covers and disinfectants for transvaginal transducers. J. Diagnostic Med. Sonography 1990;6:130-5.

203.    Benson WG. Exposure to glutaraldehyde. J. Soc. Occup. Med. 1984;34:63-4.

204. Garland SM, de Crespigny L. Prevention of infection in obstetrical and gynaecological ultrasound practice. Aust. N. Z. J. Obstet Gynaecol. 1996;36:392-5.

205. Fowler C, McCracken D. US probes: risk of cross infection and ways to reduce it--comparison of cleaning methods. Radiology 1999;213:299-300.

206. Muradali D, Gold WL, Phillips A, Wilson S. Can ultrasound probes and coupling gel be a source of nosocomial infection in patients undergoing sonography? An in vivo and in vitro study. AJR. Am. J. Roentgenol. 1995;164:1521-4.

207. Lewis DL, Arens M, Appleton SS, et al. Cross-contamination potential with dental equipment. Lancet 1992;340:1252-4.

208. Lewis DL, Boe RK. Cross-infection risks associated with current procedures for using high-speed dental handpieces. J. Clin. Microbiol. 1992;30:401-6.

209. American Dental Association. Infection control recommendations for the dental office and the dental laboratory. JADA 1996;127:672-80.

210. Centers for Disease Control. Recommended Infection-Control Practices for Dentistry, 1993. MMWR 1993;41:1-12.

211. Department of Health and Human Services. Food and Drug Administration. Dental handpiece sterilization, Food and Drug Administration, Rockville, MD, 1992.

212. Silverstone SE, Hill DE. Evaluation of sterilization of dental handpieces by heating in synthetic compressor lubricant. Gen. Dent. 1999;47:158-60.

213. Goodman HS, Carpenter RD, Cox MR. Sterilization of dental instruments and devices: an update. Am. J. Infect. Control 1994;22:90-4.

214. Occupational Safety and Health Administration. Occupational exposure to bloodborne pathogens; final rule. Fed. Regist. 1991;56:64003-182.

215. Occupational Safety and Health Administration. OSHA Memorandum from Stephen Mallinger. EPA-registered disinfectants for HIV/HBV. Washington, DC, 1997.

216. Gurevich I, Dubin R, Cunha BA. Dental instrument and device sterilization and disinfection practices. J. Hosp. Infect. 1996;32:295-304.

217. Smith A, Dickson M, Aitken J, Bagg J. Contaminated dental instruments. J. Hosp. Infect. 2002;51:233-5.

218. Hastreiter RJ, Molinari JA, Falken MC, Roesch MH, Gleason MJ, Merchant VA. Effectiveness of dental office instrument sterilization procedures. J. Am. Dent. Assoc. 1991;122:51-6.

219. Andres MT, Tejerina JM, Fierro JF. Reliability of biologic indicators in a mail-return sterilization-monitoring service: a review of 3 years. Quintessence Int. 1995;26:865-70.

220. Miller CH, Sheldrake MA. The ability of biological indicators to detect sterilization failures. Am. J. Dent. 1994;7:95-7.

221. Sarin PS, Scheer DI, Kross RD. Inactivation of human T-cell lymphotropic retrovirus (HTLV-III) by LD. N. Engl. J. Med. 1985;313:1416.

222. Sarin PS, Scheer DI, Kross RD. Inactivation of human T-cell lymphotropic retrovirus. Environ Microbiol 1990;56:1423-8.

223. Ascenzi JM. Standardization of tuberculocidal testing of disinfectants. J. Hosp. Infect. 1991;18:256-63.

224. Bond WW, Favero MS, Petersen NJ, Ebert JW. Inactivation of hepatitis B virus by intermediate-to-high-level disinfectant chemicals. J. Clin. Microbiol. 1983;18:535-8.

225. Kobayashi H, Tsuzuki M. The effect of disinfectants and heat on hepatitis B virus. J. Hosp. Infect. 1984;5:93-4.

226. Spire B, Barre-Sinoussi F, Montagnier L, Chermann JC. Inactivation of lymphadenopathy associated virus by chemical disinfectants. Lancet 1984;2:899-901.

227. Martin LS, McDougal JS, Loskoski SL. Disinfection and inactivation of the human T lymphotropic virus type III/Lymphadenopathy-associated virus. J. Infect. Dis. 1985;152:400-3.

228. Centers for Disease Control. Recommendations for prevention of HIV transmission in health-care settings. MMWR 1987;36:S3-S18.

229. Prince DL, Prince HN, Thraenhart O, Muchmore E, Bonder E, Pugh J. Methodological approaches to disinfection of human hepatitis B virus. J. Clin. Microbiol. 1993;31:3296-304.

230. Prince DL, Prince RN, Prince HN. Inactivation of human immunodeficiency virus type 1 and herpes simplex virus type 2 by commercial hospital disinfectants. Chemical Times and Trends 1990;13:13-16.

231. Sattar SA, Springthorpe VS, Conway B, Xu Y. Inactivation of the human immunodeficiency virus: an

126

update. Rev. Med. Microbiol. 1994;5:139-150.

232. Kaplan JC, Crawford DC, Durno AG, Schooley RT. Inactivation of human immunodeficiency virus by Betadine. Infect. Control 1987;8:412-4.

233. Hanson PJ, Gor D, Jeffries DJ, Collins JV. Chemical inactivation of HIV on surfaces. Br. Med. J. 1989;298:862-4.

234. Hanson PJ, Jeffries DJ, Collins JV. Viral transmission and fibreoptic endoscopy. J. Hosp. Infect. 1991;18:136-40.

235. Payan C, Cottin J, Lemarie C, Ramont C. Inactivation of hepatitis B virus in plasma by hospital in-use chemical disinfectants assessed by a modified HepG2 cell culture. J. Hosp. Infect. 2001;47:282-87.

236. Chanzy B, Duc-Bin DL, Rousset B, et al. Effectiveness of a manual disinfection procedure in eliminating hepatitis C virus from experimentally contaminated endoscopes. Gastrointest. Endosc. 1999;50:147-51.

237. Druce JD, Russell JS, Birch CJ, Yates LA, Harper RW, Smolich JJ. A decontamination and sterilization protocol employed during reuse of cardiac electrophysiology catheters inactivates human immunodeficiency virus. Infect. Control Hosp. Epidemiol. 2003;24:184-90.

238. Payan C, Pivert A, Kampf G, Ramont C, Cottin J, Lemarie C. Assessment of new chemical disinfectants for HBV virucidal activity in a cell culture model. J. Hosp. Infect. 2004;56 (suppl):S58-S63.

239. Reynolds CD, Rhinehart E, Dreyer P, Goldmann DA. Variability in reprocessing policies and procedures for flexible fiberoptic endoscopes in Massachusetts hospitals. Am. J. Infect. Control 1992;20:283-90.

240. Handsfield HH, Cummings MJ, Swenson PD. Prevalence of antibody to human immunodeficiency virus and hepatitis B surface antigen in blood samples submitted to a hospital laboratory. Implications for handling specimens. JAMA 1987;258:3395-7.

241. Baker JL, Kelen GD, Sivertson KT, Quinn TC. Unsuspected human immunodeficiency virus in critically ill emergency patients. JAMA 1987;257:2609-11.

242. Kelen GD, Fritz S, Qaqish B, et al. Unrecognized human immunodeficiency virus infection in emergency department patients. N. Engl. J. Med. 1988;318:1645-50.

243. Ishino Y, Ido K, Sugano K. Contamination with hepatitis B virus DNA in gastrointestinal endoscope channels: Risk of infection on reuse after on-site cleaning. Endoscopy 2005;37:548-51.

244. Agolini G, Russo A, Clementi M. Effect of phenolic and chlorine disinfectants on hepatitis C virus binding and infectivity. Am. J. Infect. Control 1999;27:236-9.

245. Alter MJ, Tokars JI, Arduino MJ, Favero MS. Nosocomial infections with hemodialysis. In: Mayhall CG, ed. Infect. Control and Hosp. Epidemiol. Philadelphia: Lippincott Williams & Wilkins, 2004:1139-60.

246. Centers for Disease Control. Recommendations for preventing transmission of infections among chronic hemodialysis patients. MMWR. 2001;50:1-43.

247. Velandia M, Fridkin SK, Cardenas V, et al. Transmission of HIV in dialysis centre. Lancet 1995;345:1417-22.

248. Guinto CH, Bottone EJ, Raffalli JT, Montecalvo MA, Wormser GP. Evaluation of dedicated stethoscopes as a potential source of nosocomial pathogens. Am. J. Infect. Control 2002;30:499-502.

249. Tokars JI, Miller ER, Alter MJ, Arduino MJ. National surveillance of dialysis-associated diseases in the United States, 1997. Semin. Dialysis 2000;13:75-85.

250. Amato RL, Curtis JM. The practical application of ozone in dialysis. Nephrol. News Issues 2002;September 27-9.

251. Smeets E, Koonman J, van der Sande F, et al. Prevention of biofilm formation in dialysis water treatment systems. Kidney Int. 2003;63:1574-6.

252. Finelli L, Miller JT, Tokars JI, Alter MJ, Arduino MJ. National surveillance of dialysis-associated diseases in the United States, 2002. Semin Dialysis 2005;18:52-61.

253. Association for the Advancement of Medical Instrumentation. Reuse of hemodialyzers: Association for the Advancement of Medical Instrumentation, Arlington VA, 2002/2003:ANSI/AAMI RD47:2002 & RD47:2002/A1:2003; 1-32.

254. Kim KH, Fekety R, Batts DH, et al. Isolation of *Clostridium difficile* from the environment and contacts of patients with antibiotic-associated colitis. J. Infect. Dis. 1981;143:42-50.

255. Skoutelis AT, Westenfelder GO, Beckerdite M, Phair JP. Hospital carpeting and epidemiology of *Clostridium difficile*. Am. J. Infect. Control 1994;22:212-7.

256. Wilcox MH, Fawley WN. Hospital disinfectants and spore formation by *Clostridium difficile*. Lancet 2000;356:1324.

257. Kaatz GW, Gitlin SD, Schaberg DR, et al. Acquisition of *Clostridium difficile* from the hospital environment. Am. J. Epidemiol. 1988;127:1289-94.

258. Wilcox MH, Fawley WN, Wigglesworth N, Parnell P, Verity P, Freeman J. Comparison of the effect of detergent versus hypochlorite cleaning on environmental contamination and incidence of *Clostridium difficile* infection. J. Hosp. Infect. 2003;54:109-14.

259. Mayfield JL, Leet T, Miller J, Mundy LM. Environmental control to reduce transmission of *Clostridium difficile*. Clin. Infect. Dis. 2000;31:995-1000.

260. Marler LM, Siders JA, Wolters LC, Pettigrew Y, Skitt BL, Allen SD. Comparison of five cultural procedures for isolation of *Clostridium difficile* from stools. J. Clin. Microbiol. 1992;30:514-6.

261. Brazier JG. The diagnosis of *Clostridium difficile*-associated disease. J. Antimicrob. Chemother. 1998;41 (suppl):29-40.

262. Perez J, Springthorpe S, Sattar SA. Activity of selected oxidizing microbicides against spores of *Clostridium difficile*: Relevance to environmental control. Am. J. Infect. Control 2005;33:320-5.

263. McFarland LV, Mulligan ME, Kwok RY, Stamm WE. Nosocomial acquisition of *Clostridium difficile* infection. N. Engl. J. Med. 1989;320:204-10.

264. Jernigan JA, Siegman-Igra Y, Guerrant RC, Farr BM. A randomized crossover study of disposable thermometers for prevention of *Clostridium difficile* and other nosocomial infections. Infect Control Hosp Epidemiol 1998;19:494-9.

265. Hughes CE, Gebhard RL, Peterson LR, Gerding DN. Efficacy of routine fiberoptic endoscope cleaning and disinfection for killing *Clostridium difficile*. Gastrointest. Endosc. 1986;32:7-9.

266. Dyas A, Das BC. The activity of glutaraldehyde against *Clostridium difficile*. J. Hosp. Infect. 1985;6:41-5.

267. Wullt M, Odenholt I, Walder M. Activity of three disinfectants and acidified nitrite against *Clostridium difficile* spores. Infect Control Hosp Epidemiol 2003;24:765-8.

268. Block C. The effect of Perasafe and sodium dichloroisocyanurate (NaDCC) against spores of *Clostridium difficile* and *Bacillus atrophaeus* on stainless steel and polyvinyl chloride surfaces. J. Hosp. Infect. 2004;57:144-8.

269. Occupational Safety and Health Administration. OSHA instruction CPL 2-2.44C. Office of Health Compliance Assistance. Washington, DC, 1992.

270. Rutala WA, Weber DJ. Infection control: the role of disinfection and sterilization. J. Hosp. Infect. 1999;43:S43-55.

271. Barbee SL, Weber DJ, Sobsey MD, Rutala WA. Inactivation of *Cryptosporidium parvum* oocyst infectivity by disinfection and sterilization processes. Gastrointest. Endosc. 1999;49:605-11.

272. Wilson JA, Margolin AB. The efficacy of three common hospital liquid germicides to inactivate *Cryptosporidium parvum* oocysts. J. Hosp. Infect. 1999;42:231-7.

273. Fayer R, Graczyk TK, Cranfield MR, Trout JM. Gaseous disinfection of *Cryptosporidium parvum* oocysts. Appl. Environ. Microbiol. 1996;62:3908-9.

274. Venkitanarayanan KS, Ezeike GO, Hung YC, Doyle MP. Inactivation of *Escherichia coli* O157:H7 and *Listeria monocytogenes* on plastic kitchen cutting boards by electrolyzed oxidizing water. J. Food Prot. 1999;62:857-60.

275. Taormina PJ, Beuchat LR. Behavior of enterohemorrhagic *Escherichia coli* O157:H7 on alfalfa sprouts during the sprouting process as influenced by treatments with various chemicals. J. Food Prot. 1999;62:850-6.

276. Taormina PJ, Beuchat LR. Comparison of chemical treatments to eliminate enterohemorrhagic *Escherichia coli* O157:H7 on alfalfa seeds. J. Food Prot. 1999;62:318-24.

277. Castillo A, Lucia LM, Kemp GK, Acuff GR. Reduction of *Escherichia coli* O157:H7 and *Salmonella typhimurium* on beef carcass surfaces using acidified sodium chlorite. J. Food Prot. 1999;62:580-4.

278. Graham DY, Osato MS. Disinfection of biopsy forceps and culture of *Helicobacter pylori* from gastric mucosal biopsies. Am. J. Gastroenterol. 1999;94:1422-3.

279. Kaneko H, Mitsuma T, Kotera H, Uchida K, Furusawa A, Morise K. Are routine cleaning methods sufficient to remove *Helicobacter pylori* from endoscopic equipment? Endoscopy 1993;25:435.

280. Langenberg W, Rauws EA, Oudbier JH, Tytgat GN. Patient-to-patient transmission of *Campylobacter pylori* infection by fiberoptic gastroduodenoscopy and biopsy. J. Infect. Dis. 1990;161:507-11.

281. Miyaji H, Kohli Y, Azuma T, et al. Endoscopic cross-infection with *Helicobacter pylori*. Lancet 1995;345:464.

282. Fantry GT, Zheng QX, James SP. Conventional cleaning and disinfection techniques eliminate the risk of endoscopic transmission of *Helicobacter pylori*. Am. J. Gastroenterol. 1995;90:227-32.

283. Shimada T, Terano A, Ota S, Takikawa H, Sumino S. Risk of iatrogenic transmission of *Helicobacter pylori* by gastroscopes. Lancet 1996;347:1342-3.

284. Roosendaal R, Kuipers EJ, van den Brule AJ, et al. Detection of *Helicobacter pylori* DNA by PCR in gastrointestinal equipment. Lancet 1993;341:900.

285. Johnson CH, Rice EW, Reasoner DJ. Inactivation of *Helicobacter pylori* by chlorination. Appl. Environ. Microbiol. 1997;63:4969-70.

286. Chapin M, Yatabe J, Cherry JD. An outbreak of rotavirus gastroenteritis on a pediatric unit. Am. J. Infect. Control 1983;11:88-91.

287. Keswick BH, Pickering LK, DuPont HL, Woodward WE. Survival and detection of rotaviruses on environmental surfaces in day care centers. Appl. Environ. Microbiol. 1983;46:813-16.

288. Ansari SA, Spingthorpe S, Sattar SA. Survival and vehicular spread of human rotaviruses: Possible relation to seasonality of outbreaks. Rev. Infect. Dis. 1991;13:448-61.

289. Ansari SA, Sattar SA, Springthorpe VS, Wells GA, Tostowaryk W. Rotavirus survival on human hands and transfer of infectious virus to animate and nonporous inanimate surfaces. J. Clin. Microbiol. 1988;26:1513-8.

290. Sattar SA, Raphael RA, Lochnan H, Springthorpe VS. Rotavirus inactivation by chemical disinfectants and antiseptics used in hospitals. Can. J. Microbiol. 1983;29:1464-9.

291. Lloyd-Evans N, Springthorpe VS, Sattar SA. Chemical disinfection of human rotavirus-contaminated inanimate surfaces. J. Hyg. (Lond). 1986;97:163-73.

292. Tan JA, Schnagl RD. Inactivation of a rotavirus by disinfectants. Med. J. Aust. 1981;1:19-23.

293. Sattar SA, Springthorpe VS, Karim Y, Loro P. Chemical disinfection of non-porous inanimate surfaces experimentally contaminated with four human pathogenic viruses. Epidemiol Infect 1989;102:493-505.

294. Green J, Wright PA, Gallimore CI, Mitchell O, Morgan-Capner P, Brown DWG. The role of environmental contamination with small round structured viruses in a hospital outbreak investigated by reverse-transcriptase polymerase chain reaction assay. J. Hosp. Infect. 1998;39:39-45.

295. Evans MR, Meldrum R, Lane W, et al. An outbreak of viral gastroenteritis following environmental contamination at a concert hall. Epidemiol & Infect 2002;129:355-360.

296. Marks PJ, Vipond IB, Regan FM, Wedgwood K, Fey RE, Caul EO. A school outbreak of Norwalk-like virus: Evidence for airborne transmission. Epidemiol Infect 2003;131:727-36.

297. Doultree JC, Druce JD, Birch CJ, Bowden DS, Marshall JA. Inactivation of feline calicivirus, a Norwalk virus surrogate. J. Hosp. Infect. 1999;41:51-7.

298. Sattar SA. Microbicides and the environmental control of nosocomial viral infections. J. Hosp. Infect. 2004;56 (suppl):S64-S69.

299. Jimenez L, Chiang M. Virucidal activity of a quaternary ammonium compound disinfectant against feline calicivirus: A surrogate for norovirus. Am. J. Infect. Control 2006;34:269-73.

300. Gehrke C, Steinmann J, Goroncy-Bermes P. Inactivation of feline calicivirus, a surrogate of norovirus (formerly Norwalk-like viruses), by different types of alcohol in vitro and in vivo. J. Hosp. Infect. 2004;56:49-55.

301. Centers for Disease Control and Prevention. Update: Severe acute respiratory syndrome - United States, May 14, 2003. MMWR 2003;52:436-8.

302. Saknimit M, Inatsuki I, Sugiyama Y, Yagami K. Virucidal efficacy of physico-chemical treatments against coronaviruses and parvoviruses of laboratory animals. Jikken Dobutsu. 1988;37:341-5.

303. Sizun J, Yu MW, Talbot PJ. Survival of human coronaviruses 229E and OC43 in suspension and after drying onsurfaces: a possible source ofhospital-acquired infections. J. Hosp. Infect. 2000;46:55-60.

304. Kariwa H, Fujii N, Takashima I. Inactivation of SARS coronavirus by means of povidone-iodine, physical conditions, and chemical reagents. Jpn. J. Vet. Res. 2004;52:105-12.

305. Greub G, Raoult D. Biocides currently used for bronchoscope decontamination are poorly effective against free-living amoebae. Infect Control Hosp Epidemiol 2003;24:784-6.

306. Leggiadro RJ. The threat of biological terrorism: A public health and infection control reality. Infect . Control Hosp. Epidemiol. 2000;21:53-6.

307. Henderson DA. The looming threat of bioterrorism. Science 1999;283:1279-82.

308. Centers for Disease Control. Biological and chemical terrorism: strategic plan for preparedness and

response. MMWR 2000;49 (no. RR-4):1-14.

309. Weber DJ, Rutala WA. Disinfection and sterilization of potential bioterrorism agents. In: Rutala WA, ed. Disinfection, sterilization and antisepsis: Principles, practices and new research. Washington DC: Association for Professionals in Infection Control and Epidemiology, 2004:86-103.

310. Ferrier A, Garin D, Crance JM. Rapid inactivation of vaccinia virus in suspension and dried on surfaces. J. Hosp. Infect. 2004;57:73-9.

311. Butcher W, Ulaeto D. Contact inactivation of orthopoxviruses by household disinfectants. J. Appl. Microbiol. 2005;99:279-84.

312. Brazis AR, Leslie JE, PW K, RL W. The inactivation of spores of *Bacillus globigii* and *Bacillus anthracis* by free available chlorine. Appl. Microbiol. 1958;6:338-342.

313. Sattar SA, Springthorpe VS, Adegbunrin O. Is *Bacillus subtilis* (ATCC 19659) a suitable surrogate for evaluating microbicides against Bacillus anthracis., Association for Official Analytical Chemists International Annual Meeting, St. Louis, Missouri, 2004.

314. Whitney EAS, Beatty ME, Taylor TH Jr, et al. Inactivation of *Bacillus anthracis* spores. Emerg. Infect. Dis. 2003;9:623-7.

315. Weber DJ, Rutala WA. Risks and prevention of nosocomial transmission of rare zoonotic diseases. Clin. Infect. Dis. 2001;32:446-456.

316. Chataigner D, Garnier R, Sans S, Efthymiou ML. [Acute accidental poisoning with hospital disinfectant. 45 cases of which 13 with fatal outcome]. Presse Med. 1991;20:741-3.

317. Hess JA, Molinari JA, Gleason MJ, Radecki C. Epidermal toxicity of disinfectants. Am. J. Dent. 1991;4:51-6.

318. Weber DJ, Rutala WA. Occupational risks associated with the use of selected disinfectants and sterilants. In: Rutala WA, ed. Disinfection, sterilization, and antisepsis in healthcare. Champlain, New York: Polyscience Publications, 1998:211-26.

319. Cokendolpher JC, Haukos JF. The Practical Application of Disinfection and Sterilization in Health Care Facilities. Chicago: American Hospital Association, 1996.

320. Rideout K, Teschke K, Dimich-Ward H, Kennedy SM. Considering risks to healthcare workers from glutaraldehyde alternatives in high-level dinfection. J. Hosp. Infect. 2005;59:4-11.

321. Oie S, Kamiya A. Assessment of and intervention for the misuse of aldehyde disinfectants in Japan. Infect. Control Hosp. Epidemiol. 2002;23:98-9.

322. American Conference of Governmental Industrial Hygienists (ACGIH). Threshold Limit Values for Chemical Substances and Physical Agents and Biological Exposure Indices. Cincinnati: ACGIH, 2001.

323. Jordan SLP, Russo MR, Blessing RL, Grab LA. Glutaraldehyde safety: inactivation and disposal. Abstract. Am. J. Infect. Control 1997;25:154-55.

324. Jordan SL. The correct use of glutaraldehyde in the healthcare environment. Gastroenterol. Nurs. 1995;18:143-5.

325. Cheung HY, Brown MR. Evaluation of glycine as an inactivator of glutaraldehyde. J Pharmacy Pharmacol 1982;34:211-4.

326. Daschner F. The hospital and pollution: Role of the hospital epidemiologist in protecting the environment. In: Wenzel RP, ed. Prevention and control of nosocomial infections. Baltimore: Williams and Wilkins, 1997:595-605.

327. Rutala WA, Cole EC, Thomann CA, Weber DJ. Stability and bactericidal activity of chlorine solutions. Infect. Control Hosp. Epidemiol. 1998;19:323-7.

328. Rutala WA, Weber DJ. Uses of inorganic hypochlorite (bleach) in health-care facilities. Clin. Microbiol. Rev. 1997;10:597-610.

329. Dychdala GR. Chlorine and chlorine compounds. In: Block SS, ed. Disinfection, sterilization, and preservation. Philadelphia: Lippincott Williams & Wilkins, 2001:135-157.

330. Rutala WA, Weber DJ. Principles of disinfecting patient-care items. In: Rutala WA, ed. Disinfection, sterilization, and antisepsis in healthcare. Champlain, New York: Polyscience Publications, 1998:133-49.

331. Luebbert P. Home care. In: Pfeiffer JA, ed. APIC text of infection control and epidemiology. Vol. 1. Washington: Association for Professionals in Infection control and epidemiology, 2000:44-7.

332. Parnes CA. Efficacy of sodium hypochlorite bleach and "alternative" products in preventing transfer of bacteria to and from inanimate surfaces. Environ. Health 1997;59:14-20.

333. Karapinar M, Gonul SA. Effects of sodium bicarbonate, vinegar, acetic and citric acids on growth and

survival of *Yersinia enterocolitica*. Int. J. Food Microbiol. 1992;16:343-7.

334. McMurry LM, Oethinger M, Levy SB. Triclosan targets lipid synthesis. Nature 1998;394:531-2.

335. Moken MC, McMurry LM, Levy SB. Selection of multiple-antibiotic-resistant (mar) mutants of *Escherichia coli* by using the disinfectant pine oil: roles of the *mar* and *acr*AB loci. Antimicrob. Agents Chemother. 1997;41:2770-2.

336. Scott E, Bloomfield SF, Barlow CG. An investigation of microbial contamination in the home. J. Hyg. (Lond). 1982;89:279-93.

337. Rusin P, Orosz-Coughlin P, Gerba C. Reduction of faecal coliform, coliform and heterotrophic plate count bacteria in the household kitchen and bathroom by disinfection with hypochlorite cleaners. J. Appl. Microbiol. 1998;85:819-28.

338. Gilbert P, McBain AJ. Potential impact of increased use of biocides in consumer products on prevalence of antibiotic resistance. Clin Microbiol Reviews 2003;16:189-208.

339. Bueumer R, Bloomfield SF, Exner M, Fara G, Scott EA. The need for a home hygiene policy and guidelines on home hygiene. Ann. Ig. 1999;11:11-26.

340. International Scientific Forum on Home Hygiene. www.ifh-homehygiene.org.

341. Russell AD, Russell NJ. Biocides: activity, action and resistance. In: Hunter PA, Darby GK, Russell NJ, eds. Fifty years of antimicrobials: past perspectives and future trends. England: Cambridge University Press, 1995:327-65.

342. Russell AD. Bacterial resistance to disinfectants: Present knowledge and future problems. J. Hosp. Infect. 1998;43:S57-S68.

343. Russell AD. Plasmids and bacterial resistance to biocides. J. Appl. Microbiol. 1997;83:155-65.

344. Russell AD. Bacterial resistance to disinfectants: present knowledge and future problems. J. Hosp. Infect. 1998;43:S57-68.

345. Russell AD. Principles of antimicrobial activity and resistance. In: Block SS, ed. Disinfection, sterilization, and preservation. Philadelphia: Lippincott Williams & Wilkins, 2001:31-55.

346. McDonnell G, Russell AD. Antiseptics and disinfectants: activity, action, and resistance. Clin. Microbiol. Rev. 1999;12:147-79.

347. Gerba CP, Rusin P. Relationship between the use of antiseptics/disinfectants and the development of antimicrobial resistance. In: Rutala WA, ed. Disinfection, sterilization and antisepsis: principles and practices in healthcare facilities. Washington, DC: Association for Professional in Infection Control and Epidemiology, 2001:187-94.

348. Townsend DE, Ashdown N, Greed LC, Grubb WB. Transposition of gentamicin resistance to staphylococcal plasmids encoding resistance to cationic agents. J. Antimicrob. Chemother. 1984;14:115-24.

349. Brumfitt W, Dixson S, Hamilton-Miller JM. Resistance to antiseptics in methicillin and gentamicin resistant *Staphylococcus aureus*. Lancet 1985;1:1442-3.

350. Al-Masaudi SB, Day MJ, Russell AD. Sensitivity of methicillin-resistant *Staphylococcus aureus* strains to some antibiotics, antiseptics and disinfectants. J. Appl. Bacteriol. 1988;65:329-37.

351. Tennent JM, Lyon BR, Midgley M, Jones IG, Purewal AS, Skurray RA. Physical and biochemical characterization of the qacA gene encoding antiseptic and disinfectant resistance in *Staphylococcus aureus*. J. Gen. Microbiol. 1989;135:1-10.

352. Kaulfers PM, Laufs R. [Transmissible formaldehyde resistance in *Serratia marcescens*]. Zentralblatt fur Bakteriologie, Mikrobiologie und Hygiene - 1 - Abt - Originale B, Hygiene 1985;181:309-19.

353. Tennent JM, Lyon BR, Gillespie MT, May JW, Skurray RA. Cloning and expression of *Staphylococcus aureus* plasmid-mediated quaternary ammonium resistance in *Escherichia coli*. Antimicrob. Agents Chemother. 1985;27:79-83.

354. Rutala WA, Stiegel MM, Sarubbi FA, Weber DJ. Susceptibility of antibiotic-susceptible and antibiotic-resistant hospital bacteria to disinfectants. Infect. Control Hosp. Epidemiol. 1997;18:417-21.

355. Anderson RL, Carr JH, Bond WW, Favero MS. Susceptibility of vancomycin-resistant enterococci to environmental disinfectants. Infect. Control Hosp. Epidemiol. 1997;18:195-9.

356. Sakagami Y, Kajimura K. Bactericidal activities of disinfectants against vancomycin-resistant enterococci. J. Hosp. Infect. 2002;50:140-4.

357. Sehulster LM, Anderson RL. Susceptibility of glycopeptide-intermediate resistant *Staphylococcus aureus* (GISA) to surface disinfectants, hand washing chemicals, and a skin antiseptic. Abstract Y-3. 98th General

131

Meeting of American Society for Microbiology, May, 1998:547.

358. Rutala WA, Weber DJ, Gergen MF. Studies on the disinfection of VRE-contaminated surfaces. Infect. Control Hosp. Epidemiol. 2000;21:548.

359. Byers KE, Durbin LJ, Simonton BM, Anglim AM, Adal KA, Farr BM. Disinfection of hospital rooms contaminated with vancomycin-resistant *Enterococcus faecium*. Infect. Control Hosp. Epidemiol. 1998;19:261-4.

360. Carling PC, Briggs JL, Perkins J, Highlander D. Improved cleaning of patient rooms using a new targeting method. Clin Inf Dis 2006;42:385-8.

361. Russell AD, Suller MT, Maillard JY. Do antiseptics and disinfectants select for antibiotic resistance? J. Med. Microbiol. 1999;48:613-5.

362. Russell AD. Bacterial adaptation and resistance to antiseptics, disinfectants and preservatives is not a new phenomenon. J. Hosp. Infect. 2004;57:97-104.

363. Levy SB. The challenge of antibiotic resistance. Scientific Am. 1998;278:46-53.

364. Jones RD, Jampani HB, Newman JL, Lee AS. Triclosan: a review of effectiveness and safety in health care settings. Am. J. Infect. Control 2000;28:184-96.

365. Russell AD, McDonnell G. Concentration: a major factor in studying biocidal action. J. Hosp. Infect. 2000;44:1-3.

366. Russell AD, Maillard JY. Reaction and response-relationship between antibiotic resistance and resistance to antiseptics and disinfectants. Am. J. Infect. Control 2000;28:204-6.

367. Murtough SM, Hiom SJ, Palmer M, Russell AD. Biocide rotation in the healthcare setting: is there a case for policy implementation? J. Hosp. Infect. 2001;48:1-6.

368. Murtough SM, Hiom SJ, Palmer M, Russell AD. A survey of rotational use of biocides in hospital pharmacy aseptic units. J. Hosp. Infect. 2002;50:228-31.

369. Gebel J, Sonntag H-G, Werner H-P, Vavata V, Exner M, Kistemann T. The higher disinfectant resistance of nosocomial isolates of *Klebsiella oxytoca*: How reliable are indicator organisms in disinfectant testing? J. Hosp. Infect. 2002;50:309-11.

370. Ruden H, Daschner F. Should we routinely disinfect floors? J. Hosp. Infect. 2002;51:309.

371. Rutala WA, DJ W. Should we routinely disinfect floors? Reply to Professor F. Daschner. J. Hosp. Infect. 2002;51:309-11.

372. Rutala WA, Weber DJ. The benefits of surface disinfection. Am. J. Infect. Control 2004;32:226-31.

373. Dettenkofer M, Wenzler S, Amthor S, Antes G, Motschall E, Daschner FD. Does disinfection of environmental surfaces influence nosocomial infection rates? A systematic review. Am. J. Infect. Control 2004;32:84-9.

374. Daschner F, Schuster A. Disinfection and the prevention of infectious disease-no adverse effects? Am. J. Infect. Control 2004;32:224-5.

375. Cozad A, Jones RD. Disinfection and the prevention of infectious disease. Am. J. Infect. Control 2003;31:243-54.

376. Favero MS, Bond WW. Chemical disinfection of medical and surgical materials. In: Block SS, ed. Disinfection, sterilization, and preservation. Philadelphia: Lea & Febiger, 1991:617-41.

377. Rheinbaben FV, Schunemann S, Grob T, Wolff MH. Transmission of viruses via contact in a household setting: experiments using bacteriophage OX174 as a model virus. J. Hosp. Infect. 2000;46:61-66.

378. Rutala WA, Weber DJ. Surface disinfection: should we do it? J. Hosp. Infect. 2001;48 (supplement A):S64-S68.

379. Ayliffe GAJ, Collins DM, Lowbury EJL. Cleaning and disinfection of hospital floors. Brit. Med. J. 1966;2:442-5.

380. Ayliffe GA, Collins BJ, Lowbury EJ, Babb JR, Lilly HA. Ward floors and other surfaces as reservoirs of hospital infection. J. Hyg. (Lond). 1967;65:515-36.

381. Exner M, Vacata V, Hornei B, Dietlein E, Gebel J. Household cleaning and surface disinfection: New insights and strategies. J. Hosp. Infect. 2004;56 (suppl):S70-S75.

382. Dharan S, Mourouga P, Copin P, Bessmer G, Tschanz B, Pittet D. Routine disinfection of patients' environmental surfaces. Myth or reality? J. Hosp. Infect. 1999;42:113-7.

383. Engelhart S KL, Glasmacher A, Fischnaller E, Marklein G, Exner M. *Pseudomonas aeruginosa* outbreak in a haematology-oncology unit associated with contaminated surface cleaning equipment. J. Hosp. Infect. 2002;52:93-98.

384. Denton M, Wilcox MH, Parnell P, et al. Role of environmental cleaning in controlling an outbreak of *Acinetobacter baumanni* on a neurosurgical intensive care unit. J. Hosp. Infect. 2004;56:106-10.

385. Barker J, Vipond IB, Bloomfield SF. Effects of cleaning and disinfection in reducing the spread of Norovirus contamination via environmental surfaces. J. Hosp. Infect. 2004;58:42-9.

386. Garner JS. Guideline for isolation precautions in hospitals. The Hospital Infection Control Practices Advisory Committee. Infect. Control Hosp. Epidemiol. 1996;17:53-80.

387. Maki DG, Alvarado CJ, Hassemer CA, Zilz MA. Relation of the inanimate hospital environment to endemic nosocomial infection. N. Engl. J. Med. 1982;307:1562-6.

388. Daschner F, Rabbenstein G, Langmaack H. [Surface decontamination in the control of hospital infections: comparison of different methods (author's transl)]. Dtsch. Med. Wochenschr. 1980;105:325-9.

389. Danforth D, Nicolle LE, Hume K, Alfieri N, Sims H. Nosocomial infections on nursing units with floors cleaned with a disinfectant compared with detergent. J. Hosp. Infect. 1987;10:229-35.

390. Smith TL, Iwen PC, Olson SB, Rupp ME. Environmental contamination with vancomycin-resistant enterococci in an outpatient setting. Infect. Control Hosp. Epidemiol. 1998;19:515-8.

391. Boyce JM, Potter-Bynoe G, Chenevert C, King T. Environmental contamination due to methicillin-resistant *Staphylococcus aureus*: possible infection control implications. Infect. Control Hosp. Epidemiol. 1997;18:622-7.

392. Bonten MJM, Hayden MJ, Nathan C, et al. Epidemiology of colonisation of patients and environment with vancomycin-resistant enterococci. Lancet 1996;348:1615-9.

393. Hardy KJ, Oppenheim BA, Gossain S, Gao F, Hawkey PM. A study of the relationship between environmental contamination with methicillin-resistant *Staphylococcus aureus* (MRSA) and patients' acquisition of MRSA. Infect Control Hosp Epidemiol 2006;27:127-32.

394. Hota B. Contamination, disinfection, and cross-contamination: Are hospital surfaces reservoirs for nosocomial infection? Clin. Infect. Dis. 2004;39:1182-9.

395. Neely AN, Maley MP. Survival of enterococci and staphylococci on hospital fabrics and plastic. J. Clin. Microbiol. 2000;38:724-6.

396. Wendt C, Wiensenthal B, Dietz E, Ruden H. Survival of enterococci on dry surfaces. J. Clin. Microbiol. 1998;36:3734-6.

397. Neely AN, Maley MP. The 1999 Lindberg award. 3% hydrogen peroxide for the gram-positive disinfection of fabrics. J. Burn Care Rehabil. 1999;20:471-7.

398. Griffith CJ, Cooper RA, Gilmore J, Davies C, Lewis M. An evaluation of hospital cleaning regimes and standards. J. Hosp. Infect. 2000;45:19-28.

399. Tiller JC, Liao CJ, Lewis K, Klibanov AM. Designing surfaces that kill bacteria on contact. Proc. Natl. Acad. Sci. 2001;98:5981-5.

400. Rutala WA, Weber DJ. New disinfection and sterilization methods. Emerg. Inf. Dis. 2001;7:348-53.

401. Whitby JL, Rampling A. *Pseudomonas aeruginosa* contamination in domestic and hospital environments. Lancet 1972;1:15-7.

402. Scott E, Bloomfield SF. The survival and transfer of microbial contamination via cloths, hand and utensils. J. Appl. Bacteriol. 1990;68:271-8.

403. Scott E, Bloomfield SF. Investigations of the effectiveness of detergent washing, drying and chemical disinfection on contamination of cleaning cloths. J. Appl. Bacteriol. 1990;68:279-83.

404. Rutala WA, Cole EC. Antiseptics and disinfectants--safe and effective? Infect. Control 1984;5:215-8.

405. Oie S, Huang Y, Kamiya A, Konishi H, Nakazawa T. Efficacy of disinfectants against biofilm cells of methicillin-resistant *Staphylococcus aureus*. Microbios 1996;85:223-30.

406. Sartor C, Jacomo V, Duvivier C, Tissot-Dupont H, Sambuc R, Drancourt M. Nosocomial *Serratia marcescens* infections associated with extrinsic contamination of a liquid nonmedicated soap. Infect. Control Hosp. Epidemiol. 2000;21:196-9.

407. Reiss I, Borkhardt A, Fussle R, Sziegoleit A, Gortner L. Disinfectant contaminated with *Klebsiella oxytoca* as a source of sepsis in babies. Lancet 2000;356:310.

408. O'Rourke E, Runyan D, O'Leary J, Stern J. Contaminated iodophor in the operating room. Am. J. Infect. Control 2003;31:255-6.

409. Chuanchuen R, Karkhoff-Schweizer RR, Schweizer HP. High-level triclosan resistance in *Pseudomonas aeruginosa* is solely a result of efflux. Am. J. Infect. Control 2003;31:124-7.

410. Newman KA, Tenney JH, Oken HA, Moody MR, Wharton R, Schimpff SC. Persistent isolation of an

unusual *Pseudomonas* species from a phenolic disinfectant system. Infect. Control 1984;5:219-22.

411. Bean HS. Types and characteristics of disinfectants. J. Appl. Bacteriol. 1967;30:6-16.

412. Russell AD, Hugo WB, Ayliffe GAJ. Principles and Practice of Disinfection, Preservation and Sterilization. Oxford, England: Blackwell Scientific Publications, 1999.

413. Russell AD. Factors influencing the efficacy of germicides. In: Rutala WA, ed. Disinfection, sterilization and antisepsis: Principles, practices, challenges, and new research. Washington DC: Association for Professionals in Infection Control and Epidemiology, 2004:162-70.

414. Gillis RJ, Schmidt WC. Scanning electron microscopy of spores on inoculated product surfaces. MD 1983:46-9.

415. Favero MS, Petersen NJ, Carson LA, Bond WW, Hindman SH. Gram-negative water bacteria in hemodialysis systems. Health Lab. Sci. 1975;12:321-34.

416. Rutala WA, Cole EC. Ineffectiveness of hospital disinfectants against bacteria: a collaborative study. Infect. Control 1987;8:501-6.

417. Favero MS. Naturally occurring microrganisms and their resistance to physical and chemical agents. In: Rutala WA, ed. Disinfection, sterilization and antisepsis: Principles, practices, challenges, and new research. Washington DC: Association for Professionals in Infection Control and Epidemiology, 2004:1-14.

418. Lee DH, Miles RJ, Perry BF. The mycoplasmacidal properties of sodium hypochlorite. J. Hyg. (Lond). 1985;95:243-53.

419. Scott GH, Williams JC. Susceptibility of *Coxiella burnetii* to chemical disinfectants. Ann. N. Y. Acad. Sci. 1990;590:291-6.

420. Russell AD. Factors influencing the efficacy of antimicrobial agents. In: Russell AD, Hugo WB, Ayliffe GAJ, eds. Principles and practice of disinfection, preservation and sterilization. Oxford: Blackwell Science, 1999:95-123.

421. Rutala WA. Selection and use of disinfectants in healthcare. In: Mayhall CG, ed. Infect. Control and Hosp. Epidemiol. Philadelphia: Lippincott Williams & Wilkins, 1999:1161-87.

422. Lewis DL, Arens M. Resistance of microorganisms to disinfection in dental and medical devices. Nat. Med. 1995;1:956-8.

423. Muscarella LF. Sterilizing dental equipment. Nat. Med. 1995;1:1223-5.

424. Abbott CF, Cockton J, Jones W. Resistance of crystalline substances to gas sterilization. J. Pharm. Pharmacol. 1956;8:709-20.

425. Doyle JE, Ernst RR. Resistance of *Bacillus subtilis* var. *niger* spores occluded in water-insoluble crystals to three sterilization agents. Appl. Microbiol. 1967;15:726-30.

426. Jacobs P. Cleaning: Principles, methods and benefits. In: Rutala WA, ed. Disinfection, sterilization, and antisepsis in healthcare. Champlain, New York: Polyscience Publications, 1998:165-81.

427. Gorham RA, Jacobs P, Roberts CG. Laboratory artifacts due to protein and salt crystals on the inactivation of *Bacillus stearothermophilus*. J. Hosp. Infect. 1998;40:abstract P.9.2.2.

428. Cole EC, Rutala WA, Carson JL, Alfano EM. *Pseudomonas* pellicle in disinfectant testing: electron microscopy, pellicle removal, and effect on test results. Appl. Environ. Microbiol. 1989;55:511-3.

429. Anderson RL, Holland BW, Carr JK, Bond WW, Favero MS. Effect of disinfectants on pseudomonads colonized on the interior surface of PVC pipes. Am. J. Public Health 1990;80:17-21.

430. Anderson RL, Vess RW, Carr JH, Bond WW, Panlilio AL, Favero MS. Investigations of intrinsic *Pseudomonas cepacia* contamination in commercially manufactured povidone-iodine. Infect. Control Hosp. Epidemiol. 1991;12:297-302.

431. LeChevallier MW, Cawthon CD, Lee RG. Inactivation of biofilm bacteria. Appl. Environ. Microbiol. 1988;54:2492-9.

432. LeChevallier MW, Cawthon CD, Lee RG. Factors promoting survival of bacteria in chlorinated water supplies. Appl. Environ. Microbiol. 1988;54:649-54.

433. Costerton JS, Steward PS, Greenberg EP. Bacterial biofilms: a common cause of persistent infections. Science 1999;284:1318-22.

434. Donlan RM, Costerton JW. Biofilms: Survival mechanisms of clinically relevant mirocorganisms. Clin. Microbiol. Rev. 2002;15:167-93.

435. Dunne WM. Bacterial adhesion: Seen any good biofilms lately? Clin. Microbiol. Rev. 2002;15:155-66.

436. Vickery K, Pajkos A, Cossart Y. Removal of biofilm from endoscopes: Evaluation of detergent efficiency.

Am. J. Infect. Control 2004;32:170-6.

437. Marion K, Freney J, James G, Bergeron E, Renaud FNR, Costerton JW. Using an efficient biofilm detaching agent: An essential step for the improvement of endoscope reprocessing protocols. J. Hosp. Infect. 2006;In press.

438. Marion-Ferey K, Pasmore M, Stoodley P, Wilson S, Husson GP, Costerton JW. Biofilm removal from silicone tubing: an assessment of the efficacy of dialysis machine decontamination procedures using an in vitro model. J. Hosp. Infect. 2003;53:64-71.

439. Brown ML, Aldrich HC, Gauthier JJ. Relationship between glycocalyx and povidone-iodine resistance in *Pseudomonas aeruginosa* (ATCC 27853) biofilms. Appl. Environ. Microbiol. 1995;61:187-93.

440. Price D, Ahearn DG. Incidence and persistence of *Pseudomonas aeruginosa* in whirlpools. J. Clin. Microbiol. 1988;26:1650-4.

441. Anonymous. Dental Unit Waterlines: Approaching the Year 2000. ADA Council on Scientific Affairs. JADA 1999;130:1653-64.

442. Donlan RM. Biofilms: a source of infection? In: Rutala WA, ed. Disinfection, sterilization and antisepsis: principles and practices in healthcare facilities. Washington, DC: Association for Professional in Infection Control and Epidemiology, 2001:219-26.

443. Loukili NH, Zink E, Grandadam S, Bientz M, Meunier O. Effectiveness of detergent-disinfecting agents on *Escherichia coli* 54127 biofilm. J. Hosp. Infect. 2004;57:175-8.

444. Johansen C, Falholt P, Gram L. Enzymatic removal and disinfection of bacterial biofilms. Appl. Environ. Microbiol. 1997;63:3724-8.

445. Reichert M. Preparation of supplies for terminal sterilization. In: Reichert M, Young JH, eds. Sterilization technology for the health care facility. Gaithersburg, MD: Aspen Publication, 1997:36-50.

446. Miller CH, Riggen SD, Sheldrake MA, Neeb JM. Presence of microorganisms in used ultrasonic cleaning solutions. Am. J. Dent. 1993;6:27-31.

447. Jatzwauk L, Schone H, Pietsch H. How to improve instrument disinfection by ultrasound. J. Hosp. Infect. 2001;48 (Supple):S80-S83.

448. Richburg FA, Reidy JJ, Apple DJ, Olson RJ. Sterile hypopyon secondary to ultrasonic cleaning solution. J. Cataract Refract. Surg. 1986;12:248-51.

449. Schultz JK. Decontamination alternative. Infect. Control Hosp. Epidemiol. 1990;11:8-9.

450. Rutala WA, Shafer KM. General information on cleaning, disinfection, and sterilization. In: Pfeiffer JA, ed. APIC infection control and applied epidemiology: principles and practice,. St. Louis: Mosby, 1996:15.1-15.17.

451. Leonard DL, Mills SE. Comparison of automated instrument cleaning: preliminary results. Infect. Control Steril. Technol. 1997:20-23, 26-28.

452. Ransjo U, Engstrom L, Hakansson P, et al. A test for cleaning and disinfection processes in a washer-disinfector. APMIS 2001;109:299-304.

453. American Society for Hospital Central Service Personnel. Training manual for central service technicians. Chicago: American Hospital Association, 2001:1-271.

454. Ninemeier JD. Central service technical manual. Chicago: International Association of Healthcare Central Service Materiel Management, 1998.

455. Reichert M, Young JH. Sterilization technology for the health care facility. Gaithersburg: Aspen Publication, 1997:307.

456. Vesley D, Norlien KG, Nelson B, Ott B, Streifel AJ. Significant factors in the disinfection and sterilization of flexible endoscopes. Am. J. Infect. Control 1992;20:291-300.

457. Roberts CG. Studies on the bioburden on medical devices and the importance of cleaning. In: Rutala WA, ed. Disinfection, sterilization and antisepsis: principles and practices in healthcare facilities. Washington, DC: Association for Professional in Infection Control and Epidemiology, 2001:63-9.

458. Baxter RL, Baxter HC, Campbell GA, et al. Quantitaive analysis of residual protein contamination on reprocessed surgical instruments. J. Hosp. Infect. 2006;63:439-44.

459. Murdoch H, Taylor D, Dickinson J, et al. Surface decontamination of surgical instruments: An ongoing dilemma. J. Hosp. Infect. 2006;63:432-8.

460. Alfa MJ, Nemes R. Manual versus automated methods for cleaning reusable accessory devices used for minimally invasine surgical procedures. J. Hosp. Infect. 2004;58:50-8.

461. Alfa MJ, Nemes R, Olson N, Mulaire A. Manual methods are suboptimal compared with automated

methods for cleaning of single-use biopsy forceps. Infect Control Hosp Epidemiol 2006;27:841-6.

462. Lee CH, Cheng SM, Humar A, et al. Acute febrile reactions with hypotension temporally associated with the introduction of a concentrated bioenzyme preparation in the cleaning and sterilization process of endomyocardial bioptones. Infect. Control Hosp. Epidemiol. 2000;21:102.

463. Hutchisson B, LeBlanc C. The truth and consequences of enzymatic detergents. Gastroenterol. Nurs. 2005;28:372-6.

464. Zuhlsdorf B EM, Floss H, Martiny H,. Cleaning efficacy of nine different cleaners in a washer-disinfector designed for flexible endoscopes. J. Hosp. Infect. 2002;52:206-11.

465. Merritt K, Hitchins VM, Brown SA. Safety and cleaning of medical materials and devices. J. Biomed. Mater. Res. 2000;53:131-6.

466. Babb JR, Bradley CR. Endoscope decontamination: where do we go from here? J. Hosp. Infect. 1995;30:543-51.

467. Zuhlsdorf B, Floss H, Martiny H. Efficacy of 10 different cleaning processes in a washer-disinfector for flexible endoscopes. J. Hosp. Infect. 2004;56:305-11.

468. Alfa MJ, Jackson M. A new hydrogen peroxide-based medical-device detergent with germicidal properties: Comparison with enzymatic cleaners. Am. J. Infect. Control 2001;29:168-77.

469. Alfa MJ, DeGagne P, Olson N, Puchalski T. Comparison of ion plasma, vaporized hydrogen peroxide and 100% ethylene oxide sterilizers to the 12/88 ethylene oxide gas sterilizer. Infect. Control Hosp. Epidemiol. 1996;17:92-100.

470. Alfa MJ. Flexible endoscope reprocessing. Infect. Control Steril. Technol. 1997;3:26-36.

471. Alfa MJ, Degagne P, Olson N. Worst-case soiling levels for patient-used flexible endoscopes before and after cleaning. Am. J. Infect. Control 1999;27:392-401.

472. Rutala WA, Weber DJ. Low-temperature sterilization technology: Do we need to redefine sterilization? Infect. Control Hosp. Epidemiol. 1996;17:89-91.

473. Dancer SJ. How do we assess hospital cleaning? A proposal for microbiological standards for surface hygiene in hospitals. J. Hosp. Infect. 2004;56:10-5.

474. Pfeifer M. Standardised test soil blood 1:Composition, preparation, application. Zentr. Steril. 1998;6:381-5.

475. Pfeifer M. Blood as a soil on surgical instruments: Chemical profile, cleaning, detection. Zentr. Steril. 1998;6:304-10.

476. Fengier TW, Pahike H, Bisson S, Michels W. Are processed surgical instruments free of protein? Zentr. Steril. 2001;9:20-32.

477. Takashina M. Application of a bioluminescent method for checking cleaning results. Zentr. Steril. 2001;9:248-58.

478. Lipscomb IP, Sihota AK, Botham M, Harris KL, Keevil CW. Rapid method for the sensitive detection of protein contamination on surgical instruments. J. Hosp. Infect. 2006;62:141-8.

479. Malik RE, Cooper RA, Griffith CJ. Use of audit tools to evaluate the efficacy of cleaning systems in hospitals. Am. J. Infect. Control 2003;31:181-7.

480. Hansen KS. Occupational dermatoses in hospital cleaning women. Contact Dermatitis 1983;9:343-51.

481. Melli MC, Giorgini S, Sertoli A. Sensitization from contact with ethyl alcohol. Contact Dermatitis 1986;14:315.

482. Spaulding EH. Alcohol as a surgical disinfectant. AORN J. 1964;2:67-71.

483. Morton HE. The relationship of concentration and germicidal efficiency of ethyl alcohol. Ann N.Y. Acad. Sci. 1950;53:191-96.

484. Ali Y, Dolan MJ, Fendler EJ, Larson EL. Alcohols. In: Block SS, ed. Disinfection, sterilization, and preservation. Philadelphia: Lippincott Williams & Wilkins, 2001:229-54.

485. Morton HE. Alcohols. In: Block SS, ed. Disinfection, sterilization, and preservation. Philadelphia: Lea & Febiger, 1983:225-239.

486. Sykes G. The influence of germicides on the dehydrogenases of *Bact. coli*. Part I. The succinic acid dehydrogenase of *Bact. coli*. J. Hyg. (Camb) 1939;39:463-69.

487. Dagley S, Dawes EA, Morrison GA. Inhibition of growth of *Aerobacter aerogenes*: the mode of action of phenols, alcohols, acetone and ethyl acetate. J. Bacteriol. 1950;60:369-78.

488. Tilley FW, Schaffer JM. Relation between the chemical constitution and germicidal activity of the monohydric alcohols and phenols. J. Bacteriol. 1926;12:303-9.

489. Coulthard CE, Sykes G. The germicidal effect of alcohol with special reference to its action on bacterial

spores. Pharmaceutical J. 1936;137:79-81.

490. Tyler R, Ayliffe GA. A surface test for virucidal activity of disinfectants: preliminary study with herpes virus. J. Hosp. Infect. 1987;9:22-9.

491. Kurtz JB, Lee TW, Parsons AJ. The action of alcohols on rotavirus, astrovirus and enterovirus. J. Hosp. Infect. 1980;1:321-5.

492. Smith CR. Alcohol as a disinfectant against the tubercle bacillus. Public Health Rep. 1947;62:1285-95.

493. Kruse RH, Green TD, Chambers RC, Jones MW. Disinfection of aerosolized pathogenic fungi on laboratory surfaces. 1. Tissue phase. Appl. Microbiol. 1963;11:436-45.

494. Kruse RH, Green TD, Chambers RC, Jones MW. Disinfection of aerosolized pathogenic fungi on laboratory surfaces. II Culture phase. Appl. Microbiol. 1964;12:155-60.

495. Connor CG, Hopkins SL, Salisbury RD. Effectivity of contact lens disinfection systems against *Acanthamoeba culbertsoni*. Optom. Vis. Sci. 1991;68:138-41.

496. Turner NA, Russell AD, Furr JR, Lloyd D. *Acanthamoeba* spp., antimicrobial agents and contact lenses. Sci. Prog. 1999;82:1-8.

497. Nye RN, Mallory TB. A note on the fallacy of using alcohol for the sterilization of surgical instruments. Boston Med. Surg. J. 1923;189:561-3.

498. Frobisher M, Sommermeyer L, Blackwell MJ. Studies on disinfection of clinical thermometers. I. Oral thermometers. Appl. Microbiol. 1973;1:187-94.

499. Sommermeyer L, Frobisher M. Laboratory studies on disinfection of rectal thermometers. Nurs. Res. 1973;2:85-9.

500. Singh D, Kaur H, Gardner WG, Treen LB. Bacterial contamination of hospital pagers. Infect . Control Hosp. Epidemiol. 2002;23:274-6.

501. Embil JM, Zhanel GG, Plourde J, Hoban D. Scissors: A potential source of nosocomial infection. Infect . Control Hosp. Epidemiol. 2002;23:147-51.

502. Zachary KC, Bayne PS, Morrison VJ, Ford DS, Silver LC, Hooper DC. Contamination of gowns, gloves, and stethoscopes with vancomycin-resistant enterococci. Infect . Control Hosp. Epidemiol. 2001;22:560-4.

503. Babb JR, Bradley CR, Deverill CE, Ayliffe GA, Melikian V. Recent advances in the cleaning and disinfection of fibrescopes. J. Hosp. Infect. 1981;2:329-40.

504. Garcia de Cabo A, Martinez Larriba PL, Checa Pinilla J, Guerra Sanz F. A new method of disinfection of the flexible fibrebronchoscope. Thorax 1978;33:270-2.

505. Elson CO, Hattori K, Blackstone MO. Polymicrobial sepsis following endoscopic retrograde cholangiopancreatography. Gastroenterology 1975;69:507-10.

506. Weber DJ, Wilson MB, Rutala WA, Thomann CA. Manual ventilation bags as a source for bacterial colonization of intubated patients. Am. Rev. Respir. Dis. 1990;142:892-4.

507. Cavagnolo RZ. Inactivation of herpesvirus on CPR manikins utilizing a currently recommended disinfecting procedure. Infect. Control 1985;6:456-8.

508. Ohara T, Itoh Y, Itoh K. Ultrasound instruments as possible vectors of staphylococcal infection. J. Hosp. Infect. 1998;40:73-7.

509. Talbot GH, Skros M, Provencher M. 70% alcohol disinfection of transducer heads: experimental trials. Infect. Control 1985;6:237-9.

510. Platt R, Lehr JL, Marino S, Munoz A, Nash B, Raemer DB. Safe and cost-effective cleaning of pressure-monitoring transducers. Infect. Control Hosp. Epidemiol. 1988;9:409-16.

511. Beck-Sague CM, Jarvis WR. Epidemic bloodstream infections associated with pressure transducers: a persistent problem. Infect. Control Hosp. Epidemiol. 1989;10:54-9.

512. Chronister CL, Russo P. Effects of disinfecting solutions on tonometer tips. Optom. Vis. Sci. 1990;67:818-21.

513. Lingel NJ, Coffey B. Effects of disinfecting solutions recommended by the Centers for Disease Control on Goldmann tonometer biprisms. J. Am. Optom. Assoc. 1992;63:43-8.

514. Soukiasian SH, Asdourian GK, Weiss JS, Kachadoorian HA. A complication from alcohol-swabbed tonometer tips. Am. J. Ophthalmol. 1988;105:424-5.

515. Jakobsson SW, Rajs J, Jonsson JA, Persson H. Poisoning with sodium hypochlorite solution. Report of a fatal case, supplemented with an experimental and clinico-epidemiological study. Am. J. Forensic Med. Pathol. 1991;12:320-7.

516. Heidemann SM, Goetting MG. Treatment of acute hypoxemic respiratory failure caused by chlorine

exposure. Pediatr. Emerg. Care 1991;7:87-8.

517. Hoy RH. Accidental systemic exposure to sodium hypochlorite (Clorox) during hemodialysis. Am. J. Hosp. Pharm. 1981;38:1512-4.

518. Landau GD, Saunders WH. The effect of chlorine bleach on the esophagus. Arch. Otolaryngol. 1964;80:174-6.

519. French RJ, Tabb HG, Rutledge LJ. Esophageal stenosis produced by ingestion of bleach: report of two cases. South. Med. J. 1970;63:1140-4.

520. Ward MJ, Routledge PA. Hypernatraemia and hyperchloraemic acidosis after bleach ingestion. Hum. Toxicol. 1988;7:37-8.

521. Ingram TA. Response of the human eye to accidental exposure to sodium hypochlorite. J Endodontics 1990;16:235-8.

522. Haag JR, Gieser RG. Effects of swimming pool water on the cornea. JAMA 1983;249:2507-8.

523. Mrvos R, Dean BS, Krenzelok EP. Home exposures to chlorine/chloramine gas: review of 216 cases. South. Med. J. 1993;86:654-7.

524. Reisz GR, Gammon RS. Toxic pneumonitis from mixing household cleaners. Chest 1986;89:49-52.

525. Gapany-Gapanavicius M, Yellin A, Almog S, Tirosh M. Pneumomediastinum. A complication of chlorine exposure from mixing household cleaning agents. JAMA 1982;248:349-50.

526. Hoffman PN, Death JE, Coates D. The stability of sodium hypochlorite solutions. In: Collins CH, Allwood MC, Bloomfield SF, Fox A, eds. Disinfectants: their use and evaluation of effectiveness. London: Academic Press, 1981:77-83.

527. Gamble MR. Hazard: formaldehyde and hypochlorites. Lab. Anim. 1977;11:61.

528. Helms C, Massanari R, Wenzel R, et al. Control of epidemic nosocomial legionellosis: a 5 year progress report on continuous hyperchlorination of a water distribution system. Abstracts of 27th Interscience Conference of Antimicrobial Agents and Chemotherapy, 1987:349, p.158.

529. Environmental Protection Agency. R.E.D. Facts sodium and calcium hypochlorite salts. 1991.

530. Coates D. Comparison of sodium hypochlorite and sodium dichloroisocyanurate disinfectants: neutralization by serum. J. Hosp. Infect. 1988;11:60-7.

531. Coates D. A comparison of sodium hypochlorite and sodium dichloroisocyanurate products. J. Hosp. Infect. 1985;6:31-40.

532. Coates D, Wilson M. Use of sodium dichloroisocyanurate granules for spills of body fluids. J. Hosp. Infect. 1989;13:241-51.

533. Bloomfield SF, Uso EE. The antibacterial properties of sodium hypochlorite and sodium dichloroisocyanurate as hospital disinfectants. J. Hosp. Infect. 1985;6:20-30.

534. Coates D. An evaluation of the use of chlorine dioxide (Tristel One-Shot) in an automated washer/disinfector (Medivator) fitted with a chlorine dioxide generator for decontamination of flexible endoscopes. J. Hosp. Infect. 2001;48:55-65.

535. Isomoto H, Urata M, Kawazoe K, et al. Endoscope disinfection using chlorine dioxide in an automated washer-disinfector. J. Hosp. Infect. 2006;63:298-305.

536. Sampson MN MA. Not all super-oxidized waters are the same. J. Hosp. Infect. 2002;52:227-8.

537. Selkon JB, Babb JR, Morris R. Evaluation of the antimicrobial activity of a new super-oxidized water, Sterilox®, for the disinfection of endoscopes. J. Hosp. Infect. 1999;41:59-70.

538. Fraise AP. Choosing disinfectants. J. Hosp. Infect. 1999;43:255-64.

539. Tanaka H, Hirakata Y, Kaku M, et al. Antimicrobial activity of superoxidized water. J. Hosp. Infect. 1996;34:43-9.

540. Tanaka N, Fujisawa T, Daimon T, Fujiwara K, Yamamoto M, Abe T. The use of electrolyzed solutions for the cleaning and disinfecting of dialyzers. Artif. Organs 2000;24:921-8.

541. Williams ND, Russell AD. The effects of some halogen-containing compounds on *Bacillus subtilis* endospores. J. Appl. Bacteriol. 1991;70:427-36.

542. Babb JR, Bradley CR, Ayliffe GAJ. Sporicidal activity of glutaraldehydes and hypochlorites and other factors influencing their selection for the treatment of medical equipment. J. Hosp. Infect. 1980;1:63-75.

543. Brown DG, Skylis TP, Fekety FR. Comparison of chemical sterilant/disinfectant solutions against spores of *Clostridium difficile*. Abstracts of the American Society for Microbiology, 1983:Q39,267.

544. Grant D, Venneman M, Burns RM. Mycobactericidal activity of Alcide an experimental liquid sterilant. Abstracts of the Annual Meeting of the American Society of Microbiology, 1982: Q101,226.

545. Korich DG, Mead JR, Madore MS, Sinclair NA, Sterling CR. Effects of ozone, chlorine dioxide, chlorine, and monochloramine on *Cryptosporidium parvum* oocyst viability. Appl. Environ. Microbiol. 1990;56:1423-8.

546. Griffiths PA, Babb JR, Fraise AP. Mycobactericidal activity of selected disinfectants using a quantitative suspension test. J. Hosp. Infect. 1999;41:111-21.

547. Centers for Disease Control. Bacteremia associated with reuse of disposable hollow-fiber hemodialyzers. MMWR 1986;35:417-8.

548. Bloomfield SF, Miller EA. A comparison of hypochlorite and phenolic disinfectants for disinfection of clean and soiled surfaces and blood spillages. J. Hosp. Infect. 1989;13:231-9.

549. Shetty N, Srinivasan S, Holton J, Ridgway GL. Evaluation of microbicidal activity of a new disinfectant: Sterilox® 2500 against *Clostridium difficile* spores, *Helicobacter pylori*, vancomycin resistant *Enterococcus* species, *Candida albicans* and several *Mycobacterium* species. J. Hosp. Infect. 1999;41:101-5.

550. Urata M, Isomot H, Murase K, et al. Comparison of the microbicidal activities of superoxidized and ozonated water in the disinfection of endoscopes. J Intern Med Res 2003;31:299-306.

551. Tsuji S, Kawano S, Oshita M, et al. Endoscope disinfection using acidic electrolytic water. Endoscopy 1999;31:528-35.

552. Lee JH, Rhee PL, Kim JH, et al. Efficacy of electolyzed acid water in reprocessing patient-used flexible upper endoscopes: Comparison with 2% alkaline glutaraldehyde. J. Gastroenterol. Hepatol. 2004;19:897-904.

553. Centers for Disease Control. Acquired immune deficiency syndrome (AIDS): precautions for clinical and laboratory staffs. MMWR 1982;31:577-80.

554. Garner JS, Simmons BP. Guideline for isolation precautions in hospitals. Infect. Control 1983;4:245-325.

555. Van Bueren J, Simpson RA, Salman H, Farrelly HD, Cookson BD. Inactivation of HIV-1 by chemical disinfectants: sodium hypochlorite. Epidemiol. Infect. 1995;115:567-79.

556. Coates D. Disinfection of spills of body fluids: how effective is a level of 10,000 ppm available chlorine? J. Hosp. Infect. 1991;18:319-22.

557. Chitnis V, Chitnis S, Patil S, Chitnis D. Practical limitations of disinfection of body fluid spills with 10,000 ppm sodium hypochlorite (NaOCl). Am. J. Infect. Control 2004;32:306-8.

558. Anonymous. Recommendations for decontaminating manikins used in cardiopulmonary resuscitation training, 1983 update. Infect . Control 1984;5:399-401.

559. Centers for Disease Control. Use of bleach for disinfection of drug injection equipment. MMWR 1993;42:418-9.

560. Shapshak P, McCoy CB, Rivers JE, et al. Inactivation of human immunodeficiency virus-1 at short time intervals using undiluted bleach. J. Acquir. Immune Defic. Syndr. 1993;6:218-9.

561. Shapshak P, McCoy CB, Shah SM, et al. Preliminary laboratory studies of inactivation of HIV-1 in needles and syringes containing infected blood using undiluted household bleach. J. Acquir. Immune Defic. Syndr. 1994;7:754-9.

562. Brystrom A, Sundqvist G. Bacteriologic evaluation of the effect of 0.5 percent sodium hypochlorite in endodontic therapy. Oral Surg. Oral Med. Oral Pathol. 1983;55:307-12.

563. Favero MJ, Tokars JI, Arduino MJ, Alter MJ. Nosocomial infections associated with hemodialysis. In: Mayhall CG, ed. Infect. Control and Hosp. Epidemiol. Philadelphia: Lippincott Williams & Wilkins, 1999:897-917.

564. Helms CM, Massanari RM, Zeitler R, et al. Legionnaires' disease associated with a hospital water system: a cluster of 24 nosocomial cases. Ann. Intern. Med. 1983;99:172-8.

565. Heffelfinger JD, Kool JL, Fridkin S, et al. Risk of hospital-acquired legionnaires' disease in cities using monchloramine versus other water disinfectants. Infect Control Hosp Epidemiol 2003;24:569-74.

566. Moore MR, Pryor M, Fields B, Lucas C, Phelan M, Besser RE. Introduction of monochloramine into a municipal water system: Impact on colonization of buildings by *Legionella spp.* Appl. Environ. Microbiol. 2006;72:378-83.

567. Srinivasan A, Bova G, Ross T, et al. A 17-month evaluation of a chlorine dioxide water treatment system to control *Legionella* species in a hospital water supply. Infect Control Hosp Epidemiol 2003;24:575-9.

568. Steve L, Goodhart P, Alexander J. Hydrotherapy burn treatment: use of chloramine-T against resistant microorganisms. Arch. Phys. Med. Rehabilit. 1979;60:301-3.

569. Coates D, Wilson M. Powders, composed of chlorine-releasing agent acrylic resin mixtures or based on peroxygen compounds, for spills of body fluids. J. Hosp. Infect. 1992;21:241-52.

570. Tulis JJ. Formaldehyde as a gas. In: Phillips GB, Miller WS, eds. Industrial Sterilization. Durham: Duke University Press, 1972:209-38.

571. Emmons CW. Fungicidal action of some common dsinfectants on two dermatophytes. Arch. Dermatol. Syphil. 1933;28:15-21.

572. McCulloch EC, Costigan S. A comparison of the efficiency of phenol, liquor cresolis, formaldehyde, sodium hypochlorite and sodium hydroxide against *Eberthella typhi* at various temperatures. J. Infect. Dis. 1936;59:281-4.

573. Sagripanti JL, Eklund CA, Trost PA, et al. Comparative sensitivity of 13 species of pathogenic bacteria to seven chemical germicides. Am. J. Infect. Control 1997;25:335-9.

574. NIOSH. Formaldehyde: evidence of carcinogenicity. NIOSH Current Intelligence Bulletin 34. DHEW (NIOSH) Publication No. 81-111. 1981.

575. Occupational Safety and Health Administration. OSHA amends formaldehyde standard. Occupational Safety and Health News 1991:1.

576. Occupational Health and Safety Administration. OSHA Fact Sheet: Formaldehyde: Occupational Safety and Health Administration, U.S. Department of Labor, 2002.

577. Occupational Safety and Health Administration. Air Contaminants Final Rule. Fed. Regist. 1993;58:35338-51.

578. Occupational Safety and Health Administration. Formaldehyde: OSHA Fact Sheet: Occupational Safety and Health Administration, 2002.

579. Centers for Disease Control. Occupational exposures to formaldehyde in dialysis units. MMWR 1986;35:399-01.

580. Centers for Disease Control. Formaldehyde exposures in a gross anatomy laboratory - Colorado. MMWR 1983;52:698-700.

581. Tokars JI, Miller ER, Alter MJ, Arduino MJ. National surveillance of dialysis associated diseases in the United States, 1995. ASAIO J. 1998;44:98-107.

582. Favero MS, Alter MJ, Tokars JI, Bland LA. Dialysis-associated disease and their control. In: Bennett JV, Brachman PS, eds. Hospital Infections. Boston: Little, Brown and Company, 1998:357-80.

583. Bland LA, Favero MS. Microbial contamination control strategies for hemodialysis system. Plant, Technology & Safety Management Series: infection control issues in PTSM 1990. Oakbrook Terrace, Illinois.

584. Boucher RM. Potentiated acid 1,5 pentanedial solution--a new chemical sterilizing and disinfecting agent. Am. J. Hosp. Pharm. 1974;31:546-57.

585. Miner NA, McDowell JW, Willcockson GW, Bruckner NI, Stark RL, Whitmore EJ. Antimicrobial and other properties of a new stabilized alkaline glutaraldehyde disinfectant/sterilizer. Am. J. Hosp. Pharm. 1977;34:376-82.

586. Pepper RE. Comparison of the activities and stabilities of alkaline glutaraldehyde sterilizing solutions. Infect. Control 1980;1:90-2.

587. Leach ED. A new synergized glutaraldehyde-phenate sterilizing solution and concentrated disinfectant. Infect. Control 1981;2:26-30.

588. Miner NA, Ross C. Clinical evaluation of ColdSpor, a glutaraldehyde-phenolic disinfectant. Respir. Care 1991;36:104-9.

589. Collins FM, Montalbine V. Mycobactericidal activity of glutaraldehyde solutions. J. Clin. Microbiol. 1976;4:408-12.

590. Masferrer R, Marquez R. Comparison of two activated glutaraldehyde solutions: Cidex Solution and Sonacide. Respir. Care 1977;22:257-62.

591. Jette LP, Ringuette L, Ishak M, Miller M, Saint-Antoine P. Evaluation of three glutaraldehyde-based disinfectants used in endoscopy. J. Hosp. Infect. 1995;30:295-303.

592. Scott EM, Gorman SP. Glutaraldehyde. In: Block SS, ed. Disinfection, sterilization, and preservation. Philadelphia: Lippincott Williams & Wilkins, 2001:361-81.

593. Scott EM, Gorman SP. Glutaraldehyde. In: Block SS, ed. Disinfection, Sterilization, and Preservation. Philadelphia: Lea & Febiger, 1991:596-616.

594. Stonehill AA, Krop S, Borick PM. Buffered glutaraldehyde - a new chemical sterilizing solution. Am. J.

Hosp. Pharm. 1963;20:458-65.

595. Borick PM, Dondershine FH, Chandler VL. Alkalinized glutaraldehyde, a new antimicrobial agent. J. Pharm. Sci. 1964;53:1273-5.

596. Russell AD. Glutaraldehyde: current status and uses. Infect. Control Hosp. Epidemiol. 1994;15:724-33.

597. Hanson PJ, Bennett J, Jeffries DJ, Collins JV. Enteroviruses, endoscopy and infection control: an applied study. J. Hosp. Infect. 1994;27:61-7.

598. van Klingeren B, Pullen W. Glutaraldehyde resistant mycobacteria from endoscope washers. J. Hosp. Infect. 1993;25:147-9.

599. Griffiths PA, Babb JR, Bradley CR, Fraise AP. Glutaraldehyde-resistant *Mycobacterium chelonae* from endoscope washer disinfectors. J. Appl. Microbiol. 1997;82:519-26.

600. Dauendorffer JN, Laurain C, Weber M, Dailloux M. Evaluation of the bactericidal efficiency of a 2% alkaline glutaraldehyde solution on *Mycobacterium xenopi*. J. Hosp. Infect. 2000;46:73-6.

601. Nomura K, Ogawa M, Miyamoto H, Muratani T, Taniguchi H. Antibiotic susceptibility of glutaraldehyde-tolerant *Mycobacterium chelonae* from bronchoscope washing machines. J. Hosp. Infect. 2004;32:185-8.

602. Webster E, Ribner B, Streed LL, Hutton N. Microbial contamination of activated 2% glutaraldehyde used in high-level disinfection of endoscopes (abstract). Am. J. Infect. Control 1996;24:153.

603. Casemore DP, Blewett DA, Wright SE. Cleaning and disinfection of equipment for gastrointestinal flexible endoscopy: interim recommendations of a Working Party of the British Society of Gastroenterology. Gut 1989;30:1156-7.

604. Laskowski LF, Marr JJ, Spernoga JF, et al. Fastidious mycobacteria grown from porcine prosthetic-heart-valve cultures. N. Engl. J. Med. 1977;297:101-2.

605. Collins FM. Bactericidal activity of alkaline glutaraldehyde solution against a number of atypical mycobacterial species. J. Appl. Bacteriol. 1986;61:247-51.

606. Food and Drug Administration. Sterilants and high level disinfectants cleared by FDA in a 510(k) as of January 30, 2002 with general claims for processing reusable medical and dental devices, htpp://www.fda.gov/cdrh/ode/germlab.html., 2001.

607. Hernandez A, Martro E, Pizo C, et al. In-use evaluation of Perasafe compared with Cidex in fibreoptic bronchoscope disinfection. J. Hosp. Infect. 2003;54:46-52.

608. Leong D, Dorsey G, Klapp M. Dilution of glutaraldehyde by automatic endoscope machine washers: the need for a quality control program. Abstracts of the 14th Annual Educational Conference of Association for Practitioners in Infection Control, 1987:108, p.130.

609. Mbithi JN, Springthorpe VS, Sattar SA, Pacquette M. Bactericidal, virucidal, and mycobactericidal activities of reused alkaline glutaraldehyde in an endoscopy unit. J. Clin. Microbiol. 1993;31:2988-95.

610. Kleier DJ, Averbach RE. Glutaraldehyde nonbiologic monitors. Infect. Control Hosp. Epidemiol. 1990;11:439-41.

611. Kleier DJ, Tucker JE, Averbach RE. Clinical evaluation of glutaraldehyde nonbiologic monitors. Quintessence Int. 1989;20:271-7.

612. Overton D, Burgess JO, Beck B, Matis B. Glutaraldehyde test kits: evaluation for accuracy and range. Gen. Dent. 1989;37:126, 128.

613. Cooke RPD, Goddard SV, Chatterley R, Whymant-Morris A, Cheale J. Monitoring glutaraldehyde dilution in automated washer/disinfectors. J. Hosp. Infect. 2001;48:242-6.

614. Ayliffe GA, Babb JR, Bradley CR. Disinfection of endoscopes. J. Hosp. Infect. 1986;7:296-9.

615. Centers for Disease Control. Federal regulatory action against sporicidin cold sterilizing solution. MMWR 1991;40:880-1.

616. Husni L, Kale E, Climer C, Bostwick B, Parker TF, 3rd. Evaluation of a new disinfectant for dialyzer reuse. Am. J. Kidney Dis. 1989;14:110-8.

617. Townsend TR, Wee SB, Koblin B. An efficacy evaluation of a synergized glutaraldehyde-phenate solution in disinfecting respiratory therapy equipment contaminated during patient use. Infect. Control 1982;3:240-4.

618. Petersen NJ, Carson LA, Doto IL, Aguero SM, Favero MS. Microbiologic evaluation of a new glutaraldehyde-based disinfectant for hemodialysis systems. Trans. Am. Soc. Artif. Intern. Organs 1982;28:287-90.

619. Gundogdu H, Ocal K, Caglikulekci M, Karabiber N, Bayramoglu E, Karahan M. High-level disinfection with 2% alkalinized glutaraldehyde solution for reuse of laparoscopic disposable plastic trocars. J.

Laparoendosc. Adv. Surg. Techniques. Part A 1998;8:47-52.

620. Castelli M, Qizilbash A, Seaton T. Post-colonoscopy proctitis. Am. J. Gastroenterol. 1986;81:887.

621. Jonas G, Mahoney A, Murray J, Gertler S. Chemical colitis due to endoscope cleaning solutions: a mimic of pseudomembranous colitis. Gastroenterology 1988;95:1403-8.

622. Levine DS. Proctitis following colonoscopy. Gastrointest. Endosc. 1988;34:269-72.

623. Riney S, Grimes M, Khalife K, Warbasse L, Massanari M. Diarrhea associated with disinfection of sigmoidoscopes. [abstract]. Am J Infect Control 1991;19:109.

624. Durante L, Zulty JC, Israel E, et al. Investigation of an outbreak of bloody diarrhea: association with endoscopic cleaning solution and demonstration of lesions in an animal model. Am. J. Med. 1992;92:476-80.

625. Burtin P, Ruget O, Petit R, Boyer J. Glutaraldehyde-induced proctitis after endorectal ultrasound examination: a higher risk of incidence than expected? Gastrointest. Endosc. 1993;39:859-60.

626. Babb RR, Paaso BT. Glutaraldehyde proctitis. West. J. Med. 1995;163:477-8.

627. Ryan CK, Potter GD. Disinfectant colitis. Rinse as well as you wash. J. Clin. Gastroenterol. 1995;21:6-9.

628. Rozen P, Somjen GJ, Baratz M, Kimel R, Arber N, Gilat T. Endoscope-induced colitis: description, probable cause by glutaraldehyde, and prevention. Gastrointest. Endosc. 1994;40:547-53.

629. West AB, Kuan SF, Bennick M, Lagarde S. Glutaraldehyde colitis following endoscopy: clinical and pathological features and investigation of an outbreak. Gastroenterology 1995;108:1250-5.

630. Dolce P, Gourdeau M, April N, Bernard PM. Outbreak of glutaraldehyde-induced proctocolitis. Am. J. Infect. Control 1995;23:34-9.

631. Farina A, Fievet MH, Plassart F, Menet MC, Thuillier A. Residual glutaraldehyde levels in fiberoptic endoscopes: measurement and implications for patient toxicity. J. Hosp. Infect. 1999;43:293-7.

632. Dailey JR, Parnes RE, Aminlari A. Glutaraldehyde keratopathy. Am. J. Ophthalmol. 1993;115:256-8.

633. Courtright P, Lewallen S, Holland SP, Wendt TM. Corneal decompensation after cataract surgery. An outbreak investigation in Asia. Ophthalmology 1995;102:1461-5.

634. Leinster P, Baum JM, Baxter PJ. An assessment of exposure to glutaraldehyde in hospitals: typical exposure levels and recommended control measures. Br. J. Ind. Med. 1993;50:107-11.

635. Beauchamp RO, St Clair MB, Fennell TR, Clarke DO, Morgan KT. A critical review of the toxicology of glutaraldehyde. Crit. Rev. Toxicol. 1992;22:143-74.

636. Corrado OJ, Osman J, Davies RJ. Asthma and rhinitis after exposure to glutaraldehyde in endoscopy units. Hum. Toxicol. 1986;5:325-8.

637. Norback D. Skin and respiratory symptoms from exposure to alkaline glutaraldehyde in medical services. Scand. J. Work, Environ. Health 1988;14:366-71.

638. Mwaniki DL, Guthua SW. Occupational exposure to glutaraldehyde in tropical climates. Lancet 1992;340:1476-7.

639. Centers for Disease Control. Symptoms of irritation associated with exposure to glutaraldehyde. MMWR 1987;36:190-1.

640. Wiggins P, McCurdy SA, Zeidenberg W. Epistaxis due to glutaraldehyde exposure. J. Occup. Med. 1989;31:854-6.

641. Di Prima T, De Pasquale R, Nigro M. Contact dermatitis from glutaraldehyde. Contact Dermatitis 1988;19:219-20.

642. Fowler JF, Jr. Allergic contact dermatitis from glutaraldehyde exposure. J. Occup. Med. 1989;31:852-3.

643. Fisher AA. Allergic contact dermatitis of the hands from Sporicidin (glutaraldehyde-phenate) used to disinfect endoscopes. Cutis 1990;45:227-8.

644. Nethercott JR, Holness DL, Page E. Occupational contact dermatitis due to glutaraldehyde in health care workers. Contact Dermatitis 1988;18:193-6.

645. Gannon PF, Bright P, Campbell M, O'Hickey SP, Burge PS. Occupational asthma due to glutaraldehyde and formaldehyde in endoscopy and x ray departments. Thorax 1995;50:156-9.

646. Chan-Yeung M, McMurren T, Catonio-Begley F, Lam S. Occupational asthma in a technologist exposed to glutaraldehyde. J. Allergy Clin. Immunol. 1993;91:974-8.

647. Schnuch A, Uter W, Geier J, Frosch PJ, Rustemeyer T. Contact allergies in healthcare workers. Results from the IVDK. Acta Derm. Venereol. 1998;78:358-63.

648. Wellons SL, Trawick EG, Stowers MF, Jordan SL, Wass TL. Laboratory and hospital evaluation of four personal monitoring methods for glutaraldehyde in ambient air. Am. Ind. Hyg. Assoc. J. 1998;59:96-103.

649.    Newman MA, Kachuba JB. Glutaraldehyde: a potential health risk to nurses. Gastroenterol. Nurs. 1992;14:296-300, discussion 300-1.

650.    Association for the Advancement of Medical Instrumentation. Safe use and handling of glutaraldehyde-based products in healthcare facilities. Arlington, VA: AAMI, 1995.

651.    Anonymous. Glutaraldehyde. New York: Occupational Health Services, Inc., 1992.

652.    Rutala WA, Hamory BH. Expanding role of hospital epidemiology: employee health--chemical exposure in the health care setting. Infect. Control Hosp. Epidemiol. 1989;10:261-6.

653.    Turner FJ. Hydrogen peroxide and other oxidant disinfectants. In: Block SS, ed. Disinfection, sterilization, and preservation. Philadelphia: Lea & Febiger, 1983:240-50.

654.    Block SS. Peroxygen compounds. In: Block SS, ed. Disinfection, sterilization, and preservation. Philadelphia: Lippincott Williams & Wilkins, 2001:185-204.

655.    Sattar SA, Springthorpe VS, Rochon M. A product based on accelerated and stabilized hydrogen peroxide: Evidence for broad-spectrum germicidal activity. Canadian J Infect Control 1998 (Winter):123-30.

656.    Omidbakhsh N, Sattar SA. Broad-spectrum microbicidal activity, toxicologic assessment, and materials compatibility of a new generation of accelerated hydrogen peroxide-based environmental surface disinfectant. Am. J. Infect. Control 2006;34:251-7.

657.    Schaeffer AJ, Jones JM, Amundsen SK. Bacterial effect of hydrogen peroxide on urinary tract pathogens. Appl. Environ. Microbiol. 1980;40:337-40.

658.    Wardle MD, Renninger GM. Bactericidal effect of hydrogen peroxide on spacecraft isolates. Appl. Microbiol. 1975;30:710-1.

659.    Sagripanti JL, Bonifacino A. Comparative sporicidal effect of liquid chemical germicides on three medical devices contaminated with spores of *Bacillus subtilis*. Am. J. Infect. Control 1996;24:364-71.

660.    Sagripanti JL, Bonifacino A. Effects of salt and serum on the sporicidal activity of liquid disinfectants. J. AOAC Int. 1997;80:1198-207.

661.    Saurina G, Landman D, Quale JM. Activity of disinfectants against vancomycin-resistant *Enterococcus faecium*. Infect. Control Hosp. Epidemiol. 1997;18:345-7.

662.    Kilvington S. Moist-heat disinfection of *Acanthamoeba* cysts. Rev. Infect. Dis. 1991;13:S418.

663.    Sattar SA, Adegbunrin O, Ramirez J. Combined application of simulated reuse and quantitative carrier test to assess high-level disinfection: Experiments with an accelerated hydrogen peroxide-based formulation. Am. J. Infect. Control 2002;30:449-57.

664.    Leaper S. Influence of temperature on the synergistic sporicidal effect of peracetic acid plus hydrogen peroxide in *Bacillus subtilis* SA22(NCA 72-52). Food Microbiol. 1984;1:199-203.

665.    Mentel R, Schmidt J. Investigations on rhinovirus inactivation by hydrogen peroxide. Acta Virol. 1973;17:351-4.

666.    Sattar SA. Effect of liquid chemical germicides on mycobacteria including multi-drug resistant isolates of *Mycobacteria tuberculosis*. Abstracts of the 37th Interscience Conference on Antimicrobial Agents of Chemotherapy; September 28-October 1, 1997; Toronto, Ontario, Canada; E166., 1997.

667.    Reckitt & Colman. Sporox sterilant and high-level disinfectant technical report. Montvale, NJ: Reckitt & Colman, 1997:1-12.

668.    Sattar SA, Taylor YE, Paquette M, Rubino J. In-hospital evaluation of 7.5% hydrogen peroxide as a disinfectant for flexible endoscopes. Can. J. Infect. Control 1996;11:51-4.

669.    Hobson DW, Seal LA. Evaluation of a novel, rapid-acting, sterilizing solution at room temperature. Am. J. Infect. Control 2000;28:370-5.

670.    Anonymous. Hydrogen peroxide, ACS reagent. Vol. 2001: Sigma Product Information Sheet, http://www.sigma.sial.com/sigma/proddata/h0904.htm.

671.    Silvany RE, Dougherty JM, McCulley JP, Wood TS, Bowman RW, Moore MB. The effect of currently available contact lens disinfection systems on *Acanthamoeba castellanii* and *Acanthamoeba polyphaga*. Ophthalmology 1990;97:286-90.

672.    Moore MB. *Acanthamoeba keratitis* and contact lens wear: the patient is at fault. Cornea 1990;9:S33-5; discussion S39-40.

673.    Judd PA, Tomlin PJ, Whitby JL, Inglis TC, Robinson JS. Disinfection of ventilators by ultrasonic nebulisation. Lancet 1968;2:1019-20.

674.    Levenson JE. Corneal damage from improperly cleaned tonometer tips. Arch. Ophthalmol. 1989;107:1117.

675.    Thompson RL, Haley CE, Searcy MA, et al. Catheter-associated bacteriuria. Failure to reduce attack rates

using periodic instillations of a disinfectant into urinary drainage systems. JAMA 1984;251:747-51.

676. Bilotta JJ, Waye JD. Hydrogen peroxide enteritis: the "snow white" sign. Gastrointest. Endosc. 1989;35:428-30.

677. Gottardi W. Iodine and iodine compounds. In: Block SS, ed. Disinfection, sterilization, and preservation. Philadelphia: Lea & Febiger, 1991:152-66.

678. Gottardi W. Iodine and iodine compounds. In: Block SS, ed. Disinfection, sterilization, and preservation. Philadelphia: Lippincott Williams & Wilkins, 2001:159-84.

679. Craven DE, Moody B, Connolly MG, Kollisch NR, Stottmeier KD, McCabe WR. Pseudobacteremia caused by povidone-iodine solution contaminated with *Pseudomonas cepacia*. N. Engl. J. Med. 1981;305:621-3.

680. Berkelman RL, Lewin S, Allen JR, et al. Pseudobacteremia attributed to contamination of povidone-iodine with *Pseudomonas cepacia*. Ann. Intern. Med. 1981;95:32-6.

681. Parrott PL, Terry PM, Whitworth EN, et al. *Pseudomonas aeruginosa* peritonitis associated with contaminated poloxamer-iodine solution. Lancet 1982;2:683-5.

682. Favero MS. Iodine--champagne in a tin cup. Infect. Control 1982;3:30-2.

683. Berkelman RL, Holland BW, Anderson RL. Increased bactericidal activity of dilute preparations of povidone-iodine solutions. J. Clin. Microbiol. 1982;15:635-9.

684. Chang SL. Modern concept of disinfection. J. Sanit. Eng. Div. Proc. Am. Soc. Civ. Eng. 1971:689-705.

685. Wallbank AM, Drulak M, Poffenroth L, Barnes C, Kay C, Lebtag I. Wescodyne: lack of activity against poliovirus in the presence of organic matter. Health Lab. Sci. 1978;15:133-7.

686. Carson JA, Favero MS. Comparative resistance of nontuberculous mycobacteria to iodophor germicides. Abstracts of the Annual Meeting of the American Society for Microbiology, 1984:Q101, p.221.

687. Medcom. Medcom Frequently Asked Questions. www.medcompnet.com/faq/faq/html, 2000.

688. Simons C, Walsh SE, Maillard JY, Russell AD. A note: ortho-phthalaldehyde: proposed mechanism of action of a new antimicrobial agent. Lett. Appl. Microbiol. 2000;31:299-302.

689. Walsh SE, Maillard JY, Simons C, Russell AD. Studies on the mechanisms of the antibacterial action of ortho-phthalaldehyde. J. Appl. Microbiol. 1999;87:702-10.

690. Fraud S, Hann AC, Maillard J-Y, Russell AD. Effects of ortho-phthalaldehyde, glutaraldehyde and chlorhexidine diacetate on *Mycobacterium chelonae* and *Mycobacterium abscessus* strains with modified permeability. J. Antimicrob. Chemother. 2003;51:575-84.

691. Cabrera-Martinez RM, Setlow B, Setlow P. Studies on the mechanisms of the sporicidal action of ortho-phthalaldehyde. J. Appl. Microbiol. 2002;92:675-80.

692. Gordon MD, Ezzell RJ, Bruckner NI, Ascenzi JM. Enhancement of mycobactericidal activity of glutaraldehyde with α,ß-unsaturated and aromatic aldehydes. J. Indust. Microbiol. 1994;13:77-82.

693. Gregory AW, Schaalje GB, Smart JD, Robison RA. The mycobactericidal efficacy of ortho-phthalaldehyde and the comparative resistances of *Mycobacterium bovis, Mycobacterium terrae*, and *Mycobacterium chelonae*. Infect. Control Hosp. Epidemiol. 1999;20:324-30.

694. Walsh SE, Maillard JY, Russell AD. Ortho-phthalaldehyde: a possible alternative to glutaraldehyde for high level disinfection. J. Appl. Microbiol. 1999;86:1039-46.

695. Roberts CG, Chan Myers H. Mycobactericidal activity of dilute ortho-phthalaldehyde solutions. In: Abstracts in Environmental and General Applied Microbiology, Q-265, ASM 98th General Meeting, Atlanta, Georgia, USA, 1998:464-5.

696. Chan-Myers H. Sporicidal activity of ortho-phthalaldehyde as a function of temperature (abstract). Infect. Control Hosp. Epidemiol. 2000;21:101.

697. Chan-Myers H, Roberts C. Effect of temperature and organic soil concentration on biocidal activity of ortho-phthalaldehyde solution (abstract). 2000 Education Meeting of the Association for Professional in Infection Control and Epidemiology, Minneapolis, MN, 2000:31.

698. Bruckner NI, Gordon MD, Howell RG. Odorless aromatic dialdehyde disinfecting and sterilizing composition. US Patent 4,851,449. July, 1989.

699. McDonnell G, Pretzer D. New and developing chemical antimicrobials. In: Block SS, ed. Disinfection, sterilization, and preservation. Philadelphia: Lippincott Williams & Wilkins, 2001:431-43.

700. Fraud S, Maillard J-Y, Russell AD. Comparison of the mycobactericidal activity of ortho-phthalaldehyde, glutaraldehyde, and other dialdehydes by a quantitative suspension test. J. Hosp. Infect. 2001;48:214-21.

144

701. Sattar SA, Springthorpe VS. New methods for efficacy testing of disinfectants and antiseptics. In: Rutala WA, ed. Disinfection, sterilization and antisepsis: principles and practices in healthcare facilities. Washington, DC: Association for Professional in Infection Control and Epidemiology, 2001:174-86.

702. Walsh SE, Maillard J-Y, Russell AD, Hann AC. Possible mechanisms for the relative efficiacies of ortho-phthalaldehyde and glutaraldehyde aganst glutaradehyde-resistant *Mycobacterium chelonae*. J. Appl. Microbiol. 2001;91:80-92.

703. Herruzo-Cabrera R, Vizcaino-Alcaide MJ, Rodriquez J. Comparison of the microbicidal efficacy on germ carriers of several tertiary amine compounds with ortho-phthalaldehyde and Perasafe. J. Hosp. Infect. 2006;63:73-8.

704. Herruzo-Cabrera R, Vizcaino-Alcaide MJ, Fernandez-Acenero MJ. The influence of laboratory adaptation on test strains, such as *Pseudomonas aeruginosa*, in the evaluation of the antimicrobial efficacy of ortho-phthalaldehyde. J. Hosp. Infect. 2004;57:217-22.

705. Favero MS. Naturally occurring microorganisms and their resistance to physical and chemical agents. In: Rutala WA, ed. Disinfection, sterilization and antisepsis: Principles, practices, challenges, and new research. Washington, DC: Association for Professionals in Infection Control and Epidemiology, 2004:1-15.

706. Cooke RPD, Goddard SV, Whymant-Morris A, Sherwood J, Chatterly R. An evaluation of Cidex OPA (0.55% ortho-phthalaldehyde) as an alternative to 2% glutaraldehyde for high-level disinfection of endoscopes. J. Hosp. Infect. 2003;54:226-31.

707. Streckenbach SC, Alston TA. Perioral stains after ortho-phthalaldehyde disinfectioon of echo probes. Anesthesiol 2003;99:1032.

708. Wardle E, Jones D. Determination of rinsing volumes following manual endoscope disinfection with ortho-phthalaldehyde (OPA). J Gastroenterol Nurses College Australia 2003;January:7-9.

709. Sokol WN. Nine episodes of anaphylaxis following cytoscopy caused by Cidex OPA (ortho-phthalaldehyde) high-level disinfectant in 4 patients after cystoscopy. J. Allergy Clin. Immunol. 2004;114:392-7.

710. Hession SM. Endoscopic disinfection by ortho-phthalaldehyde in a clinical setting: An evaluation of reprocessing time and costs compared with glutaraldehyde. Gastroenterol. Nurs. 2003;26:110-4.

711. Tucker RC, Lestini BJ, Marchant RE. Surface analysis of clinically used expanded PTFE endoscopic tubing treated by the STERIS PROCESS. ASAIO J. 1996;42:306-13.

712. Hernandez A, Martro E, Matas L, Ausina V. In-vitro evaluation of Pearsafe compared with 2% alkaline glutaraldehyde against *Mycobacterium* spp. J. Hosp. Infect. 2003;54:52-6.

713. Vizcaino-Alcaide MJ, Herruzo-Cabrera R, Fernandez-Acenero MJ. Comparison of the disinfectant efficacy of Persafe and 2% glutaraldehyde in in vitro tests. J. Hosp. Infect. 2003;53:124-8.

714. Lensing HH, Oei HL. Investigations on the sporicidal and fungicidal activity of disinfectants. Zentralblatt fur Bakteriologie, Mikrobiologie und Hygiene - 1 - Abt - Originale B, Hygiene 1985;181:487-95.

715. Sagripanti JL, Bonifacino A. Comparative sporicidal effects of liquid chemical agents. Appl. Environ. Microbiol. 1996;62:545-51.

716. Crow S. Peracetic acid sterilization: a timely development for a busy healthcare industry. Infect. Control Hosp. Epidemiol. 1992;13:111-3.

717. Malchesky PS. Medical applications of peracetic acid. In: Block SS, ed. Disinfection, sterilization, and preservation. Philadelphia: Lippincott Williams & Wilkins, 2001:979-96.

718. Mannion PT. The use of peracetic acid for the reprocessing of flexible endoscopes and rigid cystoscopes and laparoscopes. J. Hosp. Infect. 1995;29:313-5.

719. Bradley CR, Babb JR, Ayliffe GA. Evaluation of the Steris System 1 Peracetic Acid Endoscope Processor. J. Hosp. Infect. 1995;29:143-51.

720. Duc DL, Ribiollet A, Dode X, Ducel G, Marchetti B, Calop J. Evaluation of the microbicidal efficacy of Steris System I for digestive endoscopes using GERMANDE and ASTM validation protocols. J. Hosp. Infect. 2001;48:135-41.

721. Alfa MJ, Olson N, Degagne P, Hizon R. New low temperature sterilization technologies: microbicidal activity and clinical efficacy. In: Rutala WA, ed. Disinfection, sterilization, and antisepsis in healthcare. Champlain, New York: Polyscience Publications, 1998:67-78.

722. Alfa MJ, DeGagne P, Olson N, Hizon R. Comparison of liquid chemical sterilization with peracetic acid and ethylene oxide sterilization for long narrow lumens. Am. J. Infect. Control 1998;26:469-77.

723. Seballos RJ, Walsh AL, Mehta AC. Clinical evaluation of a liquid chemical sterilization system for flexible bronchoscopes. J. Bronch. 1995;2:192-99.

724. Wallace CG, Agee PM, Demicco DD. Liquid chemical sterilization using peracetic acid. An alternative approach to endoscope processing. ASAIO J. 1995;41:151-4.

725. Centers for Disease Control and Prevention. Bronchoscopy-related infections and pseudoinfections - New York, 1996 and 1998. MMWR 1999;48:557-60.

726. Middleton AM, Chadwick MV, Gaya H. Disinfection of bronchoscopes, contaminated in vitro with *Mycobacterium tuberculosis, Mycobacterium avium-intracellulare* and *Mycobacterium chelonae* in sputum, using stabilized, buffered peracetic acid solution ('Nu-Cidex'). J. Hosp. Infect. 1997;37:137-43.

727. Holton J, Shetty N. In-use stability of Nu-Cidex. J. Hosp. Infect. 1997;35:245-8.

728. Alasri A, Roques C, Michel G, Cabassud C, Aptel P. Bactericidal properties of peracetic acid and hydrogen peroxide, alone and in combination, and chlorine and formaldehyde against bacterial water strains. Can. J. Microbiol. 1992;38:635-42.

729. Stanley P. Destruction of a glutaraldehyde-resistant mycobacterium by a per-oxygen disinfectant. (Abstract). Am. J. Infect. Control 1998;26:185.

730. Fleming SJ, Foreman K, Shanley K, Mihrshahi R, Siskind V. Dialyser reprocessing with Renalin. Am. J. Nephrol. 1991;11:27-31.

731. Kahn G. Depigmentation caused by phenolic detergent germicides. Arch. Dermatol. 1970;102:177-87.

732. Prindle RF. Phenolic compounds. In: Block SS, ed. Disinfection, sterilization, and preservation. Philadelphia: Lea & Febiger, 1983:197-224.

733. Hegna IK. A comparative investigation of the bactericidal and fungicidal effects of three phenolic disinfectants. J. Appl. Bacteriol. 1977;43:177-81.

734. Hegna IK. An examination of the effect of three phenolic disinfectants on *Mycobacterium tuberculosis*. J. Appl. Bacteriol. 1977;43:183-7.

735. Bergan T, Lystad A. Antitubercular action of disinfectants. J. Appl. Bacteriol. 1971;34:751-6.

736. Narang HK, Codd AA. Action of commonly used disinfectants against enteroviruses. J. Hosp. Infect. 1983;4:209-12.

737. Cole EC, Rutala WA, Samsa GP. Disinfectant testing using a modified use-dilution method: collaborative study. J. Assoc. Off. Anal. Chem. 1988;71:1187-94.

738. Goddard PA, McCue KA. Phenolic compounds. In: Block SS, ed. Disinfection, sterilization, and preservation. Philadelphia: Lippincott Williams & Wilkins, 2001:255-81.

739. Wysowski DK, Flynt JW, Jr., Goldfield M, Altman R, Davis AT. Epidemic neonatal hyperbilirubinemia and use of a phenolic disinfectant detergent. Pediatrics 1978;61:165-70.

740. Doan HM, Keith L, Shennan AT. Phenol and neonatal jaundice. Pediatrics 1979;64:324-5.

741. Shickman MD, Guze LB, Pearce ML. Bacteremia following cardiac catheterization. N. Engl. J. Med. 1959;260:1164-6.

742. Ehrenkranz NJ, Bolyard EA, Wiener M, Cleary TJ. Antibiotic-sensitive *Serratia marcescens* infections complicating cardiopulmonary operations: contaminated disinfectant as a reservoir. Lancet 1980;2:1289-92.

743. Shere L. Some comparisons of the disinfecting properties of hypochlorites and quaternary ammonium compounds. Milk Plant Monthly March 1948:66-9.

744. MacDougall KD, Morris C. Optimizing disinfectant application in healthcare facilities. Infect Control Today 2006;June:62-7.

745. Sykes G. Disinfection and sterilization. London: E & FN Spon Ltd, 1965.

746. Merianos JJ. Surface-active agents. In: Block SS, ed. Disinfection, sterilization, and preservation. Philadelphia: Lippincott Williams & Wilkins, 2001:283-320.

747. Purohit A, Kopferschmitt-Kubler MC, Moreau C, Popin E, Blaumeiser M, Pauli G. Quaternary ammonium compounds and occupational asthma. International Archives of Occupational & Environmental Health 2000;73:423-7.

748. Petrocci AN. Surface active agents: quaternary ammonium compounds. In: Block SS, ed. Disinfection, sterilization, and preservation. Philadelphia: Lea & Febiger, 1983:309-29.

749. Smith CR, Nishihara H, Golden F, Hoyt A, Guss CO, Kloetzel MC. The bactericidal effect of surface-active agents on tubercle bacilli. Public Health Rep. 1950;48:1588-1600.

750. Broadley SJ, Furr JR, Jenkins PA, Russell AD. Antimycobacterial activity of 'Virkon'. J. Hosp. Infect.

1993;23:189-97.

751. Angelillo IF, Bianco A, Nobile CG, Pavia M. Evaluation of the efficacy of glutaraldehyde and peroxygen for disinfection of dental instruments. Lett. Appl. Microbiol. 1998;27:292-6.

752. Coates D. Disinfectants and spills of body fluids. Nurs. RSA 1992;7:25-7.

753. Hamouda T, Hayes MM, Cao ZH, et al. A novel surfactant nanoemulsion with broad-spectrum sporicidal activity against *Bacillus* species. J. Infect. Dis. 1999;180:1939-49.

754. Hamouda T, Myc A, Donovan B, Shih AY, Reuter JD, Baker JR. A novel surfactant nanoemulsion with a unique non-irritant topical antimicrobial activity against bacteria, enveloped viruses and fungi. Microbiol. Res. 2001;156:1-7.

755. Hamouda T, Baker JR, Jr. Antimicrobial mechanism of action of surfactant lipid preparations in enteric Gram-negative bacilli. J. Appl. Microbiol. 2000;89:397-403.

756. Widmer AF, Frei R. Antimicrobial activity of glucoprotamin: A clinical study of a new disinfectant for instruments. Infect Control Hosp Epidemiol 2003;24:762-4.

757. Wilson M. Light-activated antimicrobial coating for the continuous disinfection of surfaces. Infect Control Hosp Epidemiol 2003;24:782-4.

758. Schneider PM. New technologies for disinfection and sterilization. In: Rutala WA, ed. Disinfection, sterilization and antisepsis: Principles, practices, challenges, and new research. Washington DC: Association for Professionals in Infection Control and Epidemiology, 2004:127-39.

759. Rotter ML. Handwashing, hand disinfection, and skin disinfection. In: Wenzel RP, ed. Prevention and control of nosocomial infections. Baltimore: Williams and Wilkins, 1997:691-709.

760. Mandel GL, Bennett JE, Dolin R. Principles and practices of infectious diseases. New York: Livingstone, 2000.

761. Weber DJ, Rutala WA. Use of metals and microbicides in the prevention of nosocomial infections. In: Rutala W, ed. Disinfection, sterilization, and antisepsis in healthcare. Champlain, New York: Polyscience Publications, 1995:271-85.

762. Weber DJ, Rutala WA. Use of metals as microbicides in preventing infections in healthcare. In: Block SS, ed. Disinfection, sterilization, and preservation. Philadelphia: Lippincott Williams & Wilkins, 2001:415-30.

763. Brady MJ, Lisay CM, Yurkovetskiy AV, Sawan SP. Persistent silver disinfectant for the environmental control of pathogenic bacteria. Am. J. Infect. Control 2003;31:208-214.

764. Rusin P, Bright K, Gerba C. Rapid reduction of *Legionella pneumophila* on stainless steel with zeolite coatings containing silver and zinc ions. Lett. Appl. Microbiol. 2003;36:69-72.

765. Bright KR, Gerba CP, Rusin PA. Rapid reduction of *Staphylococcus aureus* populations on stainless stell surfaces by zeolite ceramic coatings containing silver and zinc ions. J. Hosp. Infect. 2002;52:307-9.

766. Landeen LK, Yahya MT, Gerba CP. Efficacy of copper and silver ions and reduced levels of free chlorine in inactivation of *Legionella pneumophila*. Appl. Environ. Microbiol. 1989;55:3045-50.

767. Pyle BH, Broadaway SC, McFeters GA. Efficacy of copper and silver ions with iodine in the inactivation of *Pseudomonas cepacia*. J. Appl. Bacteriol. 1992;72:71-9.

768. Yahya MT, Landeen LK, Messina MC, Kutz SM, Schulze R, Gerba CP. Disinfection of bacteria in water systems by using electrolytically generated copper:silver and reduced levels of free chlorine. Can. J. Microbiol. 1990;36:109-16.

769. Liu Z, Stout JE, Tedesco L, et al. Controlled evaluation of copper-silver ionization in eradicating *Legionella pneumophila* from a hospital water distribution system. J. Infect. Dis. 1994;169:919-22.

770. Noyce JO, Michels H, Keevil CW. Potential use of copper surfaces to reduce survival of epidemic methicillin-resistant *Staphylococcus aureus* in the healthcare environment. J. Hosp. Infect. 2006;63:289-97.

771. Goetz A, Yu VL. Copper-silver ionization: cautious optimism for *Legionella* disinfection and implications for environmental culturing. Am. J. Infect. Control 1997;25:449-51.

772. Miuetzner S, Schwille RC, Farley A, et al. Efficacy of thermal treatment and copper-silver ionization for controlling *Legionella pneumophila* in high-volume hot water plumbing systems in hospitals. Am. J. Infect. Control 1997;25:452-7.

773. Stout JE, Lin YS, Goetz AM, Muder RR. Controlling *Legionella* in hospital water systems: experience with the superheat-and-flush method and copper-silver ionization. Infect. Control Hosp. Epidemiol. 1998;19:911-4.

774. Stout JE, Yu VL. Experience of the first 16 hospitals using copper-silver ionization for *Legionella* control: Implications for the evaluation of other disinfection modalities. Infect Control Hosp Epidemiol 2003;24:563-8.

775. Russell AD. Ultraviolet radiation. In: Russell AD, Hugo WB, Ayliffe GAJ, eds. Principles and practices of disinfection, preservation and sterilization. Oxford: Blackwell Science, 1999:688-702.

776. Hall KK, Giannetta ET, Getchell-White SI, Durbin LJ, Farr BM. Ultraviolet light disinfection of hospital water for preventing nosocomial *Legionella* infection: A 13-year follow-up. Infect Control Hosp Epidemiol 2003;24:580-3.

777. Singh S, Schaaf NG. Dynamic sterilization of titanium implants with ultraviolet light. Internat. J. Oral Maxillofac. Implants 1989;4:139-46.

778. Dolman PJ, Dobrogowski MJ. Contact lens disinfection by ultraviolet light. Am. J. Ophthalmol. 1989;108:665-9.

779. Shechmeister IL. Sterilization by ultraviolet irradiation. In: Block SS, ed. Disinfection, sterilization, and preservation. Philadelphia: Lea & Febiger, 1991:553-65.

780. National Research Council. Postoperative wound infections - the influence of ultraviolet irradiation of the operating room and of various other factors. Ann. Surg. 1964;160:1-125.

781. Sensakovic JW, Smith LG. Nosocomial ultraviolet keratoconjunctivitis. Infect. Control 1982;3:475-6.

782. Cefai C, Richards J, Gould FK, McPeake P. An outbreak of respiratory tract infection resulting from incomplete disinfection of ventilatory equipment. J. Hosp. Infect. 1990;15:177-82.

783. Gurevich I, Tafuro P, Ristuccia P, Herrmann J, Young AR, Cunha BA. Disinfection of respirator tubing: a comparison of chemical versus hot water machine-assisted processing. J. Hosp. Infect. 1983;4:199-208.

784. Rutala WA, Weber DJ, Gergen MF, Gratta AR. Efficacy of a washer-pasteurizer for disinfection of respiratory-care equipment. Infect. Control Hosp. Epidemiol. 2000;21:333-6.

785. Jette LP, Lambert NG. Evaluation of two hot water washer disinfectors for medical instruments. Infect. Control Hosp. Epidemiol. 1988;9:194-9.

786. Wang C-Y, Wu H-D, Lee L-N, et al. Pasteurization is effective against multidrug-resistant bacteria. Am. J. Infect. Control 2006;34:320-2.

787. Dempsey KM, Chiew RF, McKenzie JA, Mitchell DH. Evaluation of the cleaning and disinfection efficacy of the DEKO-190; award-based automated washer/disinfector. J. Hosp. Infect. 2000;46:50-4.

788. Kearns AM, Freeman R, Lightfoot NF. Nosocomial enterococci: resistance to heat and sodium hypochlorite. J. Hosp. Infect. 1995;30:193-9.

789. Bradley CR, Fraise AP. Heat and chemical resistance of enterococci. J. Hosp. Infect. 1996;34:191-6.

790. Chadwick PR, Oppenheim BA. Vancomycin-resistant enterococci and bedpan washer machines. Lancet 1994;344:685.

791. Nystrom B. New technology for sterilization and disinfection. Am. J. Med. 1991;91:264S-266S.

792. Sanders FT, Morrow MS. The EPA's role in the regulation of antimicrobial pesticides in the United States. In: Rutala WA, ed. Disinfection, sterilization and antisepsis: Principles, practices, challenges, and new research. Washington, DC: Association for Professionals in Infection Control and Epidemiology, 2004:29-41.

793. Anonymous. Memorandum of understanding between the Food and Drug Administration, Public Health Service, and the Environmental Protection Agency, 1993.

794. Ulatowski TA. Current activities concerning the premarket evaluation of infection control devices at the Food and Drug Administration. In: Rutala WA, ed. Disinfection, sterilization, and antisepsis in healthcare. Champlain, New York: Polyscience Publications, 1998:1-7.

795. Cole EC, Rutala WA. Bacterial numbers on penicylinders used in disinfectant testing: use of 24 hour adjusted broth cultures. J. Assoc. Off. Anal. Chem. 1988;71:9-11.

796. Cole EC, Rutala WA, Alfano EM. Comparison of stainless steel penicylinders used in disinfectant testing. J. Assoc. Off. Anal. Chem. 1988;71:288-9.

797. Cole EC, Rutala WA, Carson JL. Evaluation of penicylinders used in disinfectant testing: bacterial attachment and surface texture. J. Assoc. Off. Anal. Chem. 1987;70:903-6.

798. Cole EC, Rutala WA, Samsa GP. Standardization of bacterial numbers of penicylinders used in disinfectant testing: interlaboratory study. J. Assoc. Off. Anal. Chem. 1987;70:635-7.

799. Alfano EM, Cole EC, Rutala WA. Quantitative evaluation of bacteria washed from stainless steel penicylinders during AOAC use-dilution method. J. Assoc. Off. Anal. Chem. 1988;71:868-71.

800.  Favero MS, Groschel DHM. Chemical germicides in the health care field: current status and evaluation of efficacy and research needs. Washington, DC: American Society for Microbiology, 1987.

801.  Sattar SA. Microbicidal testing of germicides: an update. In: Rutala WA, ed. Disinfection, sterilization, and antisepsis in healthcare. Champlain, New York: Polyscience Publications, 1998:227-40.

802.  Best M. Development of a combined carrier test for disinfectant efficacy. Ottawa, Canada: University of Ottawa, 1994.

803.  Sattar SA, Springthorpe VS. Recent developments in methods for testing the germicidal activity of disinfectants and antiseptics. In: Rutala WA, ed. Disinfection, sterilization and antisepsis: Principles, practices, challenges, and new research. Washington, DC: Association for Professionals in Infection Control and Epidemiology, 2004:180-8.

804.  Sanders FT. Environmental protection agency's role in the regulation of antimicrobial pesticides in the United States. In: Rutala WA, ed. Disinfection, Sterilization and Antisepsis: principles and practices in healthcare facilities. Washington, DC: Association for Professional in Infection Control and Epidemiology, 2001:28-40.

805.  Groschel DHM. Caveat emptor: do your disinfectants work? Infect. Control 1983;4:144.

806.  United States General Accounting Office. Disinfectants: EPA lacks assurance they work., 1990.

807.  Johnston MD, Lambert RJW, Hanlon GW, Denyer SP. A rapid method for assessing the suitability of quenching agents for individual biocides as well as combinations. J. Appl. Microbiol. 2002;92:784-9.

808.  Russell AD. Neutralization procedures in the evaluation of bactericidal activity. In: Collins CH, Allwood MC, Bloomfield SF, Fox A, eds. Disinfectants: their use and evaluation of effectiveness. London: Academic Press, 1981:45-59.

809.  Russell AD, Ahonkhai I, Rogers DT. Microbiological applications of the inactivation of antibiotics and other antimicrobial agents. J. Appl. Bacteriol. 1979;46:207-45.

810.  Engley FB, Jr, Dey BP. A universal neutralizing medium for antimicrobial chemicals. Chem. Specialists Manuf. Assoc. Proc. 1970:100-6.

811.  Association for the Advancement of Medical Instrumentation. Good hospital practice: Steam sterilization and sterility assurance. AAMI. Arlington, VA, 1993.

812.  Association for the Advancement of Medical Instrumentation. Flash sterilization: Steam sterilization of patient care items for immediate use. AAMI. Arlington, VA, 1996.

813.  Association for the Advancement of Medical Instrumentation. Steam sterilization and sterility assurance in health care facilities. ANSI/AAMI ST46. Arlington, VA, 2002:ANSI/AAMI ST46:2002.

814.  Association for the Advancement of Medical Instrumentation. Ethylene oxide sterilization in health care facilities: Safety and effectiveness. AAMI. Arlington, VA, 1999.

815.  Association of Operating Room Nurses. Recommended practices for sterilization in perioperative practice settings. 2000 Standards, Recommended Practices, and Guidelines. Denver, CO: AORN, 2000:347-58.

816.  Association for peri-Operative Registered Nurses. Recommended practices for cleaning and caring for surgical instruments and powered equipment. AORN J. 2002;75:727-41.

817.  Mangram AJ, Horan TC, Pearson ML, Silver LC, Jarvis WR. Guideline for prevention of surgical site infection, 1999. Hospital Infection Control Practices Advisory Committee. Infect. Control Hosp. Epidemiol. 1999;20:250-78.

818.  Education Design. Best practices for the prevention of surgical site infection. Denver Colorado: Education Design, 1998.

819.  Association for the Advancement of Medical Instrumentation. Comprehensive guide to steam sterilization and sterility assurance in health care facilities, ANSI/AAMI ST79. 2006.

820.  Association for peri-Operative Registered Nurses. Recommended pracice for sterilization in the perioperative practice setting. AORN J. 2006;83:700-22.

821.  Singh J, Bhatia R, Gandhi JC, et al. Outbreak of viral hepatitis B in a rural community in India linked to inadequately sterilized needles and syringes. Bull. World Health Organ. 1998;76:93-8.

822.  Eickhoff TC. An outbreak of surgical wound infections due to *Clostridium perfringens*. Surg. Gynecol. Obstet. 1962;114:102-8.

823.  Favero MS. Sterility assurance: Concepts for patient safety. In: Rutala WA, ed. Disinfection, sterilization and antisepsis: principles and practices in healthcare facilities. Washington, DC: Association for Professional in Infection Control and Epidemiology, 2001:110-9.

824.  Oxborrow GS, Berube R. Sterility testing-validation of sterilization processes, and sporicide testing. In:

Block SS, ed. Disinfection, sterilization, and preservation. Philadelphia: Lea & Febiger, 1991:1047-57.

825. Rutala WA, Weber DJ. Clinical effectiveness of low-temperature sterilization technologies. Infect. Control Hosp. Epidemiol. 1998;19:798-804.

826. Adler S, Scherrer M, Daschner FD. Costs of low-temperature plasma sterilization compared with other sterilization methods. J. Hosp. Infect. 1998;40:125-34.

827. Joslyn L. Sterilization by heat. In: Block SS, ed. Disinfection, sterilization, and preservation. Philadelphia: Lippincott Williams & Wilkins, 2001:695-728.

828. Bucx MJ, Veldman DJ, Beenhakker MM, Koster R. The effect of steam sterilization at 134 degrees C on light intensity provided by fibrelight Macintoch laryngoscopes. Anaesthesia 2000;55:185-6.

829. Gilbert JA, Phillips HO. The effect of steam sterilization on plaster casting material. Clinical Orthopaed Rel Res 1984:241-4.

830. Agalloco JP, Akers JE, Madsen RE. Moist heat sterilization--myths and realities. PDA J. Pharmaceutical Sci. Technol. 1998;52:346-50.

831. Rutala WA, Stiegel MM, Sarubbi FA, Jr. Decontamination of laboratory microbiological waste by steam sterilization. Appl. Environ. Microbiol. 1982;43:1311-6.

832. Lauer JL, Battles DR, Vesley D. Decontaminating infectious laboratory waste by autoclaving. Appl. Environ. Microbiol. 1982;44:690-4.

833. Rhodes P, Zelner L, Laufman H. A new disposable bowie-Dick-type test pack for prevacuum high-temperature sterilizers. Med. Instrum. 1982;16:117-20.

834. Association for the Advancement of Medical Instrumentation. Technical Information Report on process challenge devices/test packs for use in health care facilities, 2003.

835. Young M. Sterilization process monitoring. Managing Infect Control 2004;August:70-6.

836. American Society for Healthcare Central Service Professionals. Training Manual for Health Care Central Service Technicians. In: Association AH, ed. Chicago: The Jossey-Bass/American Hospital Association Press Series, 2001:1-271.

837. Crow S. Steam sterilizers: an evolution in design. Infect. Control Hosp. Epidemiol. 1993;14:488-90.

838. Gurevich I, Jacobsen E, Cunha BA. Pseudoautoclave failure caused by differences in spore test steam sensitivities. Am. J. Infect. Control 1996;24:402-4.

839. Bryce EA, Roberts FJ, Clements B, MacLean S. When the biological indicator is positive: investigating autoclave failures. Infect. Control Hosp. Epidemiol. 1997;18:654-6.

840. Barone MA, Faisel AJ, Andrews L, Ahmed J, Rashida B, Kristensen D. Adaptation and validation of a portable steam sterilizer for processing intrauterine device insertion instruments and supplies in low-resource settings. Am. J. Infect. Control 1997;25:350-6.

841. Young JH. Sterilization with steam under pressure. In: Morrissey RF, Phillips GB, eds. Sterilization technology: a practical guide for manufacturers and users of health care product. New York: Van Nostrand Reinhold, 1993:81-119.

842. Palenik CJ, Cumberlander ND. Effects of steam sterilization on the contents of sharps containers. Am. J. Infect. Control 1993;21:28-33.

843. Rutala WA. Disinfection and flash sterilization in the operating room. J. Ophthal. Nurs. Technol. 1991;10:106-15.

844. Maki DG, Hassemer CA. Flash sterilization: carefully measured haste. Infect. Control 1987;8:307-10.

845. Barrett T. Flash sterilization: What are the risks? In: Rutala WA, ed. Disinfection, sterilization and antisepsis: principles and practices in healthcare facilities. Washington, DC: Association for Professional in Infection Control and Epidemiology, 2001:70-6.

846. Vesley D, Langholz AC, Rohlfing SR, Foltz WE. Fluorimetric detection of a *Bacillus stearothermophilus* spore-bound enzyme, α-D-glucosidase, for rapid identification of flash sterilization failure. Appl. Environ. Microbiol. 1992;58:717-9.

847. Rutala WA, Gergen MF, Weber DJ. Evaluation of a rapid readout biological indicator for flash sterilization with three biological indicators and three chemical indicators. Infect. Control Hosp. Epidemiol. 1993;14:390-4.

848. Strzelecki LR, Nelson JH. Evaluation of closed container flash sterilization system. Orthoped. Nurs. 1989;8:21-4.

849. Hood E, Stout N, Catto B. Flash sterilization and neurosurgical site infections: Guilt by association. Am. J.

Infect. Control 1997;25:156.

850. Rutala WA, Weber DJ, Chappell KJ. Patient injury from flash-sterilized instruments. Infect. Control Hosp. Epidemiol. 1999;20:458.

851. Schneider PM. Low-temperature sterilization alternatives in the 1990s. Tappi J. 1994;77:115-9.

852. Environmental Protection Agency. Protection of stratospheric ozone; Proposed Rule. 40 CFR Part 82. Fed. Regist. 1993.

853. Schneider PM. Emerging low temperature sterilization technologies (non-FDA approved). In: Rutala WA, ed. Disinfection, sterilization, and antisepsis in healthcare. Champlain, New York: Polyscience Publications, 1998:79-92.

854. Gross D. Ethylene oxide sterilization and alternative methods. Surg. Serv. Management 1995;1:16-7.

855. Holler C, Martiny H, Christiansen B, Ruden H, Gundermann KO. The efficacy of low temperature plasma (LTP) sterilization, a new sterilization technique. Zentralbl. Hyg. Umweltmed. 1993;194:380-91.

856. Rutala WA, Gergen MF, Weber DJ. Comparative evaluation of the sporicidal activity of new low-temperature sterilization technologies: ethylene oxide, 2 plasma sterilization systems, and liquid peracetic acid. Am. J. Infect. Control 1998;26:393-8.

857. Ernst RR, Doyle JE. Sterilization with gaseous ethylene oxide: a review of chemical and physical factors. Biotech. Bioeng. 1968;10.

858. Joslyn L. Gaseous chemical sterilization. In: Block SS, ed. Disinfection, sterilization, and preservation. Philadelphia: Lippincott Williams & Wilkins, 2001:337-60.

859. Fisher AA. Ethylene oxide dermatitis. Cutis 1984;34:20, 22, 24.

860. Jay WM, Swift TR, Hull DS. Possible relationship of ethylene oxide exposure to cataract formation. Am. J. Ophthalmol. 1982;93:727-32.

861. Salinas E, Sasich L, Hall DH, Kennedy RM, Morriss H. Acute ethylene oxide intoxication. Drug Intell. Clin. Pharm. 1981;15:384-6.

862. Marchand M, Delesvonx R, Claeys C. The toxicity of ethylene oxide and a report on three fatal cases of poisoning. Am. Arch. Indust. Health 1958;18:60.

863. Finelli PF, Morgan TF, Yaar I, Granger CV. Ethylene oxide-induced polyneuropathy. A clinical and electrophysiologic study. Arch. Neurol. 1983;40:419-21.

864. Estrin WJ, Becker CE. Evidence of neurologic dysfunction related to long-term ethylene oxide exposure. Arch. Neurol. 1987;44:1283-6.

865. Estrin WJ, Bowler RM, Lash A, Becker CE. Neurotoxicological evaluation of hospital sterilizer workers exposed to ethylene oxide. J. Toxicol. Clin. Toxicol. 1990;28:1-20.

866. Crystal HA, Schaumburg HH, Grober E, Fuld PA, Lipton RB. Cognitive impairment and sensory loss associated with chronic low-level ethylene oxide exposure. Neurology 1988;38:567-9.

867. Shaham J, Levi Z, Gurvich R, Shain R, Ribak J. Hematological changes in hospital workers due to chronic exposure to low levels of ethylene oxide. J. Occup. Environ. Med. 2000;42:843-50.

868. Lindbohm ML, Hemminki K, Bonhomme MG, et al. Effects of paternal occupational exposure on spontaneous abortions. Am. J. Public Health 1991;81:1029-33.

869. Hemminki K, Mutanen P, Saloniemi I, Niemei M-L, Vainio H. Spontaneous abortions in hospital staff engaged in sterilising instruments with chemical agents. Br. Med. J. 1982;285:1461-3.

870. Rowland AS, Baird DD, Shore DL, Darden B, Wilcox AJ. Ethylene oxide exposure may increase the risk of spontaneous abortion, preterm birth, and postterm birth. Epidemiology 1996;7:363-8.

871. National Toxicology Program. http://ntp-server.niehs.nih.gov/.

872. Anonymous. Ethylene oxide sterilization: How hospitals can adapt to the changes. Health Devices 1994;23:485-92.

873. Occupational Safety and Health Administration. Ethylene Oxide: OSHA Fact Sheet: Occupational Safety and Health Administration, 2002.

874. Cardenas-Camarena L. Ethylene oxide burns from improperly sterilized mammary implants. Ann. Plast. Surg. 1998;41:361-9.

875. Windebank AJ, Blexrud MD. Residual ethylene oxide in hollow fiber hemodialysis units is neurotoxic in vitro. Ann. Neurol. 1989;26:63-8.

876. Occupational Health and Safety Administration. Chemical sampling information-Ethylene chlorohydrin: Occupational Safety and Health Administration, 2002.

877. Parisi AN, Young WE. Sterilization with ethylene oxide and other gases. In: Block SS, ed. Disinfection,

sterilization, and preservation. Philadelphia: Lea & Febiger, 1991:580-95.

878.    Ries MD, Weaver K, Beals N. Safety and efficacy of ethylene oxide sterilized polyethylene in total knee arthroplasty. Clin. Orthop. 1996:159-63.

879.    Alfa MJ, DeGagne P, Olson N. Bacterial killing ability of 10% ethylene oxide plus 90% hydrochlorofluorocarbon sterilizing gas. Infect. Control Hosp. Epidemiol. 1997;18:641-5.

880.    Parker HH, Johnson RB. Effectiveness of ethylene oxide for sterilization of dental handpieces. J. Dent. 1995;23:113-5.

881.    Jacobs PT, Lin SM. Sterilization processes utilizing low-temperature plasma. In: Block SS, ed. Disinfection, sterilization, and preservation. Philadelphia: Lippincott Williams & Wilkins, 2001:747-63.

882.    Rutala WA, Gergen MF, Weber DJ. Sporicidal activity of a new low-temperature sterilization technology: the Sterrad 50 sterilizer. Infect. Control Hosp. Epidemiol. 1999;20:514-6.

883.    Kyi MS, Holton J, Ridgway GL. Assessment of the efficacy of a low temperature hydrogen peroxide gas plasma sterilization system. J. Hosp. Infect. 1995;31:275-84.

884.    Jacobs PT, Smith D. The new Sterrad 100S sterilization system: Features and advantages. Zentr. Steril. 1998;6:86-94.

885.    Rudolph H, Hilbert M. Practical testing of the new plasma sterilizer "Sterrad 100S" in the Diakonkrankenhaus Rotenburg. Zentr. Steril. 1997;5:207-15.

886.    Bar W, Marquez de Bar G, Naumann A, Rusch-Gerdes S. Contamination of bronchoscopes with *Mycobacterium tuberculosis* and successful sterilization by low-temperature hydrogen peroxide plasma sterilization. Am. J. Infect. Control 2001;29:306-11.

887.    Centers for Disease Control and Prevention. Corneal decompensation after intraocular ophthalmic surgery-Missouri, 1998. MMWR 1998;47:306-9.

888.    Duffy RE, Brown SE, Caldwell KL, et al. An epidemic of corneal destruction caused by plasma gas sterilization. Arch. Ophthalmol. 2000;118:1167-76.

889.    Jarvis WR. Hospital Infections Program, Centers for Disease Control and Prevention: On-site outbreak investigations, 1990-1999: How often are germicides or sterilants the source? In: Rutala WA, ed. Disinfection, sterilization and antisepsis: principles and practices in healthcare facilities. Washington, DC: Association for Professional in Infection Control and Epidemiology, 2001:41-8.

890.    Borneff M, Ruppert J, Okpara J, et al. Efficacy testing of low-temperature plasma sterilization (LTP) with test object models simulating practice conditions. Zentr. Steril. 1995;3:361-71.

891.    Borneff-Lipp M, Okpara J, Bodendorf M, Sonntag HG. Validation of low-temperature-plasma (LPT) sterilization systems: Comparison of two technical versions, the Sterrad 100, 1.8 and the 100S. Hygiene und Mikrobiologie 1997;3:21-8.

892.    Roberts C, Antonoplos P. Inactivation of human immunodeficiency virus type 1, hepatitis A virus, respiratory syncytial virus, vaccinia virus, herpes simplex virus type 1, and poliovirus type 2 by hydrogen peroxide gas plasma sterilization. Am. J. Infect. Control 1998;26:94-101.

893.    Okpara-Hofmann J, Knoll M, Durr M, Schmitt B, Borneff-Lipp M. Comparison of low-temperature hydrogen peroxide gas plasma sterilization for endoscopes using various Sterrad models. J. Hosp. Infect. 2005;59:280-5.

894.    Timm D, Gonzales D. Effect of sterilization on microstructure and function of microsurgical scissors. Surg. Serv. Management 1997;3:47-9.

895.    Feldman LA, Hui HK. Compatibility of medical devices and materials with low-temperature hydrogen peroxide gas plasma. Med. Dev. Diag. Indust. 1997;19:57-62.

896.    Muscarella LF. Leading a horse to water: Are crucial lessons in endoscopy and outbreak investigations being learned? Infect . Control Hosp. Epidemiol. 2002;23:358-60.

897.    Gurevich I, Qadri SMH, Cunha BA. False-positive results of spore tests from improper clip use with the Steris chemical sterilant system. Infect. Control Hosp. Epidemiol. 1992;21:42-3.

898.    Kralovic RC. Use of biological indicators designed for steam or ethylene oxide to monitor a liquid chemical sterilization process. Infect. Control Hosp. Epidemiol. 1993;14:313-9.

899.    Bond WW. Biological indicators for a liquid chemical sterilizer. Infect. Control Hosp. Epidemiol. 1993;14:565.

900.    Bond WW. Biological indicators for a liquid chemical sterilizer: a solution to the instrument reprocessing problem? Infect. Control Hosp. Epidemiol. 1993;14:309-12.

901.    Malchesky PS. Biological indicators for a liquid chemical sterilizer. Infect. Control Hosp. Epidemiol.

1993;14:563-6.

902. Daschner F. STERIS SYSTEM 1 in Germany. Infect. Control Hosp. Epidemiol. 1994;15:294, 296.

903. Sorin M, Segal-Maurer S, Urban C, Combest A, Rahal JJ. Nosocomial transmission of imipenem-resistant *Pseudomonas aeruginosa* following bronchoscopy associated with improper connection to the STERIS System 1 Processor. Infect. Control Hosp. Epidemiol. 2001;22:409-13.

904. Food and Drug Administration, Division of General and Restorative Devices. Guidance on Premarket Notification [510(k)] Submissions for Sterilizers Intended for Use in Health Care Facilities. Rockville, MD. 1993.

905. Vickery K, Deva AK, Zou J, Kumaradeva P, Bissett L, Cossart YE. Inactivation of duck hepatitis B virus by a hydrogen peroxide gas plasma sterilization system: laboratory and 'in use' testing. J. Hosp. Infect. 1999;41:317-22.

906. Vassal S, Favennec L, Ballet JJ, Brasseur P. Hydrogen peroxide gas plasma sterilization is effective against *Cryptosporidium parvum* oocysts. Am. J. Infect. Control 1998;26:136-8.

907. Penna TC, Ferraz CA, Cassola MA. The presterilization microbial load on used medical devices and the effectiveness of hydrogen peroxide gas plasma against *Bacillus subtilis* spores. Infect. Control Hosp. Epidemiol. 1999;20:465-72.

908. Bryce EA, Chia E, Logelin G, Smith JA. An evaluation of the AbTox Plazlyte Sterilization System. Infect. Control Hosp. Epidemiol. 1997;18:646-53.

909. Graham GS, Riley R. Sterilization manufacturers: Interactions with regulatory agencies. In: Rutala WA, ed. Disinfection, sterilization, and antisepsis in healthcare. Champlain, New York: Polyscience Publications, 1998:41-8.

910. Royce A, Bowler C. Ethylene oxide sterilisation-some experiences and some practical limitations. J. Pharm. Pharmacol. 1961;13:87t-94t.

911. Nystrom B. Disinfection of surgical instruments. J. Hosp. Infect. 1981;2:363-8.

912. Rutala WA, Gergen MF, Jones JF, Weber DJ. Levels of microbial contamination on surgical instruments. Am. J. Infect. Control 1998;26:143-5.

913. Alfa MJ, Nemes R. Inadequacy of manual cleaning for reprocessing single-use, triple-lumen sphinctertomes: Simulated-use testing comparing manual with automated cleaning methods. Am. J. Infect. Control 2003;31:193-207.

914. Alfa MJ, Nemes R. Reprocessing of lumened instruments. In: Rutala WA, ed. Disinfection, sterilization and antisepsis: Principles, practices, challenges, and new research. Washington DC: Association for Professionals in Infection Control and Epidemiology, 2004:189-99.

915. Bargmann LS, Bargmann BC, Collier JP, Currier BH, Mayor MB. Current sterilization and packaging methods for polyethylene. Clin. Orthop. 1999:49-58.

916. Williams IR, Mayor MB, Collier JP. The impact of sterilization method on wear in knee arthroplasty. Clin. Orthop. 1998:170-80.

917. Russell AD. Ionizing radiation. In: Russell AD, Hugo WB, Ayliffe GAJ, eds. Principles and practices of disinfection, preservation and sterilization. Oxford: Blackwell Science, 1999:675-87.

918. Hansen JM, Shaffer HL. Sterilization and preservation by radiation sterilization. In: Block SS, ed. Disinfection, sterilization, and preservation. Philadelphia: Lippincott Williams & Wilkins, 2001:729-46.

919. Lagergren ER. Recent advances in sterilization. J Infect Control (Asia) 1998;1:11-3.

920. Perkins JJ. Principles and methods of sterilization in health sciences. Springfield, IL: Charles C Thomas, 1969.

921. Favero MS, Bond WW. The use of liquid chemical germicides. In: Morrissey RF, Phillips GB, eds. Sterilization technology: A practical guide for manufacturers and users of health care products. New York: Van Nostrand Reinhold, 1993:309-334.

922. Muscarella LF. Are all sterilization processes alike? AORN J. 1998;67:966-70, 973-6.

923. Levy RV. Sterile filtration of liquids and gases. In: Block SS, ed. Disinfection, sterilization, and preservation. Philadelphia: Lippincott Williams & Wilkins, 2001:795-822.

924. Wallhausser KH. Is the removal of microorganisms by filtration really a sterilization method? J. Parenter. Drug Assoc. 1979;33:156-70.

925. Webb BC, Thomas CJ, Harty DW, Willcox MD. Effectiveness of two methods of denture sterilization. J. Oral Rehabil. 1998;25:416-23.

926. Rohrer MD, Bulard RA. Microwave sterilization. J. Am. Dent. Assoc. 1985;110:194-8.

927. Rohrer MD, Terry MA, Bulard RA, Graves DC, Taylor EM. Microwave sterilization of hydrophilic contact lenses. Am. J. Ophthalmol. 1986;101:49-57.

928. Douglas C, Burke B, Kessler DL, Cicmanec JF, Bracken RB. Microwave: practical cost-effective method for sterilizing urinary catheters in the home. Urology 1990;35:219-22.

929. Kindle G, Busse A, Kampa D, Meyer-Konig U, Daschner FD. Killing activity of microwaves in milk. J. Hosp. Infect. 1996;33:273-8.

930. Harris MG, Rechberger J, Grant T, Holden BA. In-office microwave disinfection of soft contact lenses. Optom. Vis. Sci. 1990;67:129-32.

931. Mervine J, Temple R. Using a microwave oven to disinfect intermittent-use catheters. Rehabil. Nurs. 1997;22:318-20.

932. Najdovski L, Dragas AZ, Kotnik V. The killing activity of microwaves on some non-sporogenic and sporogenic medically important bacterial strains. J. Hosp. Infect. 1991;19:239-47.

933. Rosaspina S, Salvatorelli G, Anzanel D, Bovolenta R. Effect of microwave radiation on *Candida albicans*. Microbios 1994;78:55-9.

934. Welt BA, Tong CH, Rossen JL, Lund DB. Effect of microwave radiation on inactivation of *Clostridium sporogenes* (PA 3679) spores. Appl. Environ. Microbiol. 1994;60:482-8.

935. Latimer JM, Matsen JM. Microwave oven irradiation as a method for bacterial decontamination in a clinical microbiology laboratory. J. Clin. Microbiol. 1977;6:340-2.

936. Sanborn MR, Wan SK, Bulard R. Microwave sterilization of plastic tissue culture vessels for reuse. Appl. Environ. Microbiol. 1982;44:960-4.

937. Rosaspina S, Salvatorelli G, Anzanel D. The bactericidal effect of microwaves on *Mycobacterium bovis* dried on scalpel blades. J. Hosp. Infect. 1994;26:45-50.

938. Engelhardt JP, Grun L, Dahl HJ. Factors affecting sterilization in glass bead sterilizers. J. Endod. 1984;10:465-70.

939. Smith GE. Glass bead sterilization of orthodontic bands. Am. J. Orthod. Dentofacial Orthop. 1986;90:243-9.

940. Sisco V, Winters LL, Zange LL, Brennan PC. Efficacy of various methods of sterilization of acupuncture needles. J. Manip. Physiol. Therap. 1988;11:94-7.

941. Klapes NA, Vesley D. Vapor-phase hydrogen peroxide as a surface decontaminant and sterilant. Appl. Environ. Microbiol. 1990;56:503-6.

942. French GL, Otter JA, Shannon KP, Adams NMT, Watling D, Parks MJ. Tackling contamination of the hospital environment by methicillin-resistant *Staphylococcus aureus* (MRSA): A comparison between conventional terminal cleaning and hydrogen peroxide vapour decontamination. J. Hosp. Infect. 2004;57:31-7.

943. Jeanes A, Rao G, Osman M, Merrick P. Eradication of persistent environmental MRSA. J. Hosp. Infect. 2005;61:85-6.

944. Bates CJ, Pearse R. Use of hydrogen peroxide vapour for environmental control during a *Serratia* outbreak in a neonatal intensive care unit. J. Hosp. Infect. 2005;61:364-6.

945. Boyce JM, Havill NL, Otter JA, et al. Impact of hydrogen peroxide vapor room bio-decontamination on environmental contamination and nosocomial transmission of *Clostridium difficile*. The Society of Healthcare Epidemiology of America, 2006;Abstract 155:109.

946. Berrington AW, Pedler SJ. Investigation of gaseous ozone for MRSA decontamination of hospital side-rooms. J. Hosp. Infect. 1998;40:61-5.

947. Gaspar MC, Pelaez B, Fernandez C, Fereres J. Microbiological efficacy of Sterrad 100S and LTSF sterilisation systems compared to ethylene oxide. Zentr. Steril. 2002;10:91-9.

948. Kanemitsu K, Kunishima H, Imasaka T, et al. Evaluation of a low-temperature steam and formaldehyde sterilizer. J. Hosp. Infect. 2003;55:47-52.

949. Kanemitsu K, Imasaka T, Ishikawa S, et al. A comparative study of ethylene oxide gas, hydrogen peroxide gas plasma, and low-temperature steam formaldehyde sterilization. Infect Control Hosp Epidemiol 2005;26:486-9.

950. Roncoroni AJ, Casewell MW, Phillips I. The disinfection of clinically contaminated Matburn suction pumps and baby incubators in an 'Aseptor' formalin cabinet. J. Hosp. Infect. 1980;1:251-9.

951. Cumberland NS, Botting FG. Formaldehyde vapour cabinets. J. Hosp. Infect. 1991;19:67-70.

952. Jeng DK, Woodworth AG. Chlorine dioxide gas sterilization of oxygenators in an industrial scale

sterilizer: a successful model. Artif. Organs 1990;14:361-8.

953.  Knapp JE, Battisti DL. Chloride dioxide. In: Block SS, ed. Disinfection, sterilization, and preservation. Philadelphia: Lippincott Williams & Wilkins, 2001:215-27.

954.  Kowalski JB. Sterilization of medical devices, pharmaceutical components, and barrier isolation systems with gaseous chlorine dioxide. In: Morrissey RF, Kowalski JB, eds. Sterilization of medical products,. Champlain, NY: Polyscience Publications, 1998:313-23.

955.  Portner DM, Hoffman RK. Sporicidal effect of peracetic acid vapor. Appl. Microbiol. 1968;16:1782-5.

956.  Mata-Portuguez VH, Perez LS, Acosta-Gio E. Sterilization of heat-resistant instruments with infrared radiation. Infect . Control Hosp. Epidemiol. 2002;23.

957.  Frey R. The structural and functional prerequisites for a central sterile supply department (CSSD). Zentr. Steril. 2000;8:128-40.

958.  Reich RR, Fleming W, Burgess DJ. Sterilization validation: it's not just for industry. Infect. Control Steril. Technol. 1996;2.

959.  American Institute of Architects. Guidelines for design and construction of hospital and health care facilities. Washington, DC: The American Institute of Architects Press, 2001.

960.  DesCoteaux JG, Poulin EC, Julien M, Guidoin R. Residual organic debris on processed surgical instruments. AORN J. 1995;62:23-30.

961.  Rutala WA, Weber DJ. A review of the use of gowns and drapes (single use and reusable) in healthcare. Infect. Control Hosp. Epidemiol. 2001;22:248-57.

962.  Association of peri-Operative Registered Nurses. Recommended practices for sterilization in the perioperative practice setting. AORN J. 2006;83:700-22.

963.  Taurasi R. Comfortable PPE? Maximum tray weight? Healthcare Purchasing News 2004;July:48.

964.  Chobin N, Furr D, Nuyttens A. Wet packs and plastic accessory cases. Infect Control Today 2004;August:24, 28-30.

965.  Dunkelberg H, Fleitmann-Glende F. Measurement of the microbial barrier effectiveness of sterilization containers in terms of the log reduction value for prevention of nosocomial infections. Am. J. Infect. Control 2006;34:285-9.

966.  Rutala WA, Weber DJ. Choosing a sterilization wrap. Infect. Control Today 2000;4:64,70.

967.  Maloney JM, Kohut RD. Infection control, barrier protection and the treatment environment. Dent. Hyg. (Chic). 1987;61:310-3.

968.  Mayworm D. Sterile shelf life and expiration dating. J. Hosp. Supply, Process. Distri. 1984;2:32-5.

969.  Cardo DM, Sehulster LM. Central sterile supply. In: Mayhall CG, ed. Infect. Control and Hosp. Epidemiol. Philadelphia: Lippincott Williams & Wilkins, 1999:1023-30.

970.  Klapes NA, Greene VW, Langholz AC. Microbial contamination associated with routine aseptic practice. J. Hosp. Infect. 1987;10:299-304.

971.  Butt WE, Bradley DV, Jr., Mayhew RB, Schwartz RS. Evaluation of the shelf life of sterile instrument packs. Oral Surg. Oral Med. Oral Pathol. 1991;72:650-4.

972.  Webster J, Lloyd W, Ho P, Burridge C, George N. Rethinking sterilization practices: Evidence for event-related outdating. Infect Control Hosp Epidemiol 2003;24:622-4.

973.  Widmer AF, Houston A, Bollinger E, Wenzel RP. A new standard for sterility testing for autoclaved surgical trays. J. Hosp. Infect. 1992;21:253-60.

974.  Schneider PM, Reich RR, Kirckof SS, Foltz WG. Perfomance of various steam sterilization indicators under optimum and sub-optimum exposure conditions. In: Rutala WA, ed. Disinfection, sterilization and antisepsis: Principles, practices, challenges, and new research. Washington DC: Association for Professionals in Infection Control and Epidemiology, 2004:200-23.

975.  Greene VW. Control of sterilization process. In: Russell AD, Hugo WB, Ayliffe GAJ, eds. Principles and practice of disinfection, preservation and sterilization. Oxford, England: Blackwell Scientific Publications, 1992:605-24.

976.  Vesley D, Nellis MA, Allwood PB. Evaluation of a rapid readout biological indicator for 121°C gravity and 132°C vacuum-assisted steam sterilization cycles. Infect. Control Hosp. Epidemiol. 1995;16:281-6.

977.  Rutala WA, Jones SM, Weber DJ. Comparison of a rapid readout biological indicator for steam sterilization with four conventional biological indicators and five chemical indicators. Infect. Control Hosp. Epidemiol. 1996;17:423-8.

978.  Alfa MJ, Olson N, DeGagne P, Jackson M. Evaluation of rapid readout biological indicators for 132°C

gravity and 132°C vacuum-assisted steam sterilization cycles using a new automated fluorescent reader. Infect . Control Hosp. Epidemiol. 2002;23:388-92.

979.    Koncur P, Janes JE, Ortiz PA. 20 second sterilization indicator tests equivalent to BIs. Infect. Control Steril. Technol. 1998:26-8, 30, 32-4.

980.    Perkins RE, Bodman HA, Kundsin RB, Walter CW. Monitoring steam sterilization of surgical instruments: a dilemma. Appl. Environ. Microbiol. 1981;42:383-7.

981.    Kotilainen HR, Gantz NM. An evaluation of three biological indicator systems in flash sterilization. Infect. Control 1987;8:311-6.

982.    Kleinegger CL, Yeager DL, Huling JK, Drake DR. The effects of contamination on biological monitoring. Infect. Control Hosp. Epidemiol. 2001;22:391-2.

983.    Centers for Disease Control. False-positive results of spore tests in ethylene oxide sterilizers - Wisconsin. MMWR 1981;30:238-40.

984.    Association of Operating Room Nurses. AORN standards and recommended practices for perioperative nursing. 1987:Section III:14.1-III:14.11, AORN, Denver, CO.

985.    Gurevich I, Holmes JE, Cunha BA. Presumed autoclave failure due to false-positive spore strip tests. Infect. Control 1982;3:388-92.

986.    Epstein BJ, Lattimer JM, Matsen JM, Garibaldi RA. False positive spore strip sterility tests with steam sterilization. Am. J. Infect. Control 1983;11:71-3.

987.    Association for the Advancement of Medical Instrumentation. Good hospital practice: steam sterilization and sterility assurance. Arlington, VA: AAMI, 1988.

988.    Baird RM. Sterility assurance: Concepts, methods and problems. In: Russell AD, Hugo WB, Ayliffe GAJ, eds. Principles and practice of disinfection, preservation and sterilization. Oxford, England: Blackwell Scientific Publications, 1999:787-99.

989.    Coulter WA, Chew-Graham CA, Cheung SW, Burke FJT. Autoclave performance and operator knowledge of autoclave use in primary care: a survey of UK practices. J. Hosp. Infect. 2001;48:180-5.

990.    Greene VW. Reuse of disposable devices. In: Mayhall CG, ed. Infect. Control and Hosp. Epidemiol. Philadelphia: Lippincott Williams & Wilkins, 1999:1201-8.

991.    Avitall B, Khan M, Krum D, Jazayeri M, Hare J. Repeated use of ablation catheters: a prospective study. J. Am. Coll. Cardiol. 1993;22:1367-72.

992.    Dunnigan A, Roberts C, McNamara M, Benson DW, Jr., Benditt DG. Success of re-use of cardiac electrode catheters. Am. J. Cardiol. 1987;60:807-10.

993.    Aton EA, Murray P, Fraser V, Conaway L, Cain ME. Safety of reusing cardiac electrophysiology catheters. Am. J. Cardiol. 1994;74:1173-5.

994.    Brown SA, Merritt K, Woods TO, McNamee SG, Hitchins VM. Effects of different disinfection and sterilization methods on tensile strength of materials used for single-use devices. Biomed. Instrum. Technol 2002;January/February:23-7.

995.    Food and Drug Administration. Enforcement Priorities for Single-Use Devices Reprocessed by Third Parties and Hospitals, Rockville, MD., 2000.

996.    Ulatowski TA. FDA: Reuse of Single-Use Devices. In: Rutala WA, ed. Disinfection, sterilization and antisepsis: Principles, practices, challenges, and new research. Washington, DC: Association for Professionals in Infection Control and Epidemiology, 2004:15-23.

997.    Occupational Health and Safety Administration. Hazard Communication Standard.29 CFR 1910.1200, OSHA, Washington, DC.

998.    Edens AL. Occupational Safety and Health Administration: Regulations affecting healthcare facilities. In: Rutala WA, ed. Disinfection, Sterilization and Antisepsis: Principles and practices in healthcare facilities. Washington, D.C,: Association for Professionals in Infection Control and Epidemiology, Inc., 2001:49-58.

999.    Schultz JK. Decontamination: recommended practices. In: Reichert M, Young JH, eds. Sterilization technology for the health care facility. Gaithersburg, MD: Aspen Publication, 1997:10-20.

1000.   Occupational Health and Safety Administration. Ethylene Oxide Standard. Vol. 29 CFR 1910.1047, OSHA, Washington, DC.

1001.   Occupational Safety and Health Administration. Formaldehyde Standard. Vol. 29 CFR 1910.1048, Washington, DC.

1002.   Buxton AE, Anderson RL, Werdegar D, Atlas E. Nosocomial respiratory tract infection and colonization with *Acinetobacter calcoaceticus*. Epidemiologic characteristics. Am. J. Med. 1978;65:507-13.

156

1003.  Snydman DR. Hepatitis B infection from medical personnel. JAMA 1976;236:1009.
1004.  Martiny H, Floss H. Residuals on medical devices following reprocessing. J. Hosp. Infect. 2001;48 (Supplement):S88-S92.
1005.  Taylor DM. Inactivation of prions by physical and chemical means. J. Hosp. Infect. 1999;43 (supplement):S69-S76.
1006.  Best M, Sattar SA, Springthorpe VS, Kennedy ME. Comparative mycobactericidal efficacy of chemical disinfectants in suspension and carrier tests. Appl. Environ. Microbiol. 1988;54:2856-8.
1007.  Weber DJ, Rutala WA. Environmental issues and nosocomial infections. In: Wenzel RP, ed. Prevention and control of nosocomial infections. Baltimore: Williams and Wilkins, 1991:1042-64.
1008.  Palmer PH, Yeoman DM. A study to assess the value of disinfectants when washing ward floors. Med. J. Aust. 1972;2:1237-9.
1009.  Centers for Disease Control and Prevention. Preventing the spread of vancomycin resistance - report from the Hospital Infection Control Practices Advisory Committee. Fed. Regist. 1994:25758-63.
1010.  Ayliffe GA, Collins BJ, Lowbury EJ. Cleaning and disinfection of hospital floors. BMJ 1966;5511:442-5.
1011.  Neely AN. A survey of gram-negative bacteria survival on hospital fabrics and plastics. J. Burn Care Rehabil. 2000;21:523-7.
1012.  Rutala WA. Disinfection and sterilization of patient-care items. Infect. Control Hosp. Epidemiol. 1996;17:377-84.
1013.  Environmental Protection Agency. Pesticides: Regulating Pesticides. http ://www.epa.gov/oppad001/chemregindex.htm, 2003.
1014.  Hoffman PN, Layzell SK. Household bleach as disinfectant for use by injecting drug users. Lancet 1993;342:743.
1015.  Chu NS, Chan-Myers H, Ghazanfari N, Antonoplos P. Levels of naturally occurring microorganisms on surgical instruments after clinical use and after washing. Am. J. Infect. Control 1999;27:315-9.
1016.  Hoffmann KK, Weber DJ, Rutala WA. Pseudoepidemic of Rhodotorula rubra in patients undergoing fiberoptic bronchoscopy. Infect. Control Hosp. Epidemiol. 1989;10:511-4.
1017.  Lowry PW, Jarvis WR. Use of tap water and disinfection practices in outpatient settings. A survey of otolaryngologists. Arch. Otolaryngol. Head Neck Surg. 1991;117:886-8.
1018.  Fahey BJ, Koziol DE, Banks SM, Henderson DK. Frequency of nonparenteral occupational exposures to blood and body fluids before and after universal precautions training. Am. J. Med. 1991;90:145-53.
1019.  Beekmann SE, Vlahov D, Koziol DE, McShalley ED, Schmitt JM, Henderson DK. Temporal association between implementation of universal precautions and a sustained, progressive decrease in percutaneous exposures to blood. Clin. Infect. Dis. 1994;18:562-9.
1020.  Gerberding JL, Littell C, Tarkington A, Brown A, Schecter WP. Risk of exposure of surgical personnel to patients' blood during surgery at San Francisco General Hospital. N. Engl. J. Med. 1991;324:1788-93.
1021.  Mast ST, Woolwine JD, Gerdberding JL. Efficacy of gloves in reducing blood volumes transferred during simulated needlestick injury. J. Infect. Dis. 1993;168:1589-92.
1022.  Wendt C, Herwaldt LA. Epidemics: Identification and Management. In: Wenzel RP, ed. Prevention and Control of Nosocomial Infections. Baltimore: Williams & Wilkins, 1997:175-214.
1023.  Feigal DW, Gardner SN, McClellan M. Ensuring safe and effective medical devices. N. Engl. J. Med. 2003;348:191-2.
1024.  Oie S, Kamiya A. Microbial contamination of antiseptics and disinfectants. Am. J. Infect. Control 1996;24:389-95.
1025.  Strzelecki LR, Nelson JH. Evaluation of closed container flash sterilization system. Orthop. Nurs. 1989;8:21-4.
1026.  Burgess DJ, Reich RR. Industrial ethylene oxide sterilization. In: Morrissey RF, Phillips GB, eds. Sterilization technology: a practical guide for manufacturers and users of health care product. New York: Van Nostrand Reinhold, 1993:120-51.
1027.  Conviser CA, C W. Ethylene oxide sterilization: sterilant alternatives. In: Reichert M, Young JH, eds. Sterilization technology for the health care facility. Gaithersburg, MD: Aspen Publication, 1997:189-99.
1028.  Young JH. Steam sterilization: scientific principles. In: Reichert M, Young JH, eds. Sterilization technology for the health care facility. Gaithersburg, MD: Aspen Publication, 1997:123-144.
1029.  Alfa MJ. Importance of lumen flow in liquid chemical sterilization. Am. J. Infect. Control 1999;27:373-5.
1030.  Mallison GF, Standard PG. Safe storage times for sterile packs. Hospitals 1974;48:77-8, 80.

1031. Klapes NA, Greene VW, Langholz AC, Hunstiger C. Effect of long-term storage on sterile status of devices in surgical packs. Infect. Control 1987;8:289-93.
1032. Japp NF. Packaging: Shelf life. In: Reichert M, Young JH, eds. Sterilization Technology. Gaithersburg, Maryland: Aspen, 1997:99-102.
1033. Joint Commission for the Accreditation of Healthcare Organizations. Comprehensive accreditation manual for hospitals, JCAHO, Chicago, IL. 2003.
1034. Block SS. Definition of terms. In: Block SS, ed. Disinfection, sterilization, and preservation. Philadelphia: Lippincott Williams & Wilkins, 2001:19-28.
1035. Molinari JA, Gleason MJ, Cottone JA, Barrett ED. Comparison of dental surface disinfectants. Gen. Dent. 1987;35:171-5.

# APPENDIX – "14"

The recommendations in this guideline for Ebola Virus Disease has been superseded by CDC's Infection Prevention and Control Recommendations for Hospitalized Patients with Known or Suspected Ebola Virus Disease in U.S. Hospitals and by CDC's Interim Guidance for Environmental Infection Control in Hospitals for Ebola Virus issued on August 1, 2014.

This information is on pages 12, 13, 113 and 124.

Click here for current information on how Ebola virus is transmitted.

# Guidelines for Environmental Infection Control in Health-Care Facilities

## Recommendations of CDC and the Healthcare Infection Control Practices Advisory Committee (HICPAC)

U.S. Department of Health and Human Services
Centers for Disease Control and Prevention (CDC)
Atlanta, GA 30333

2003

*Suggested Citations:*

*Available from the CDC Internet Site:*

The full-text version of the guidelines appears as a web-based document at the CDC's Division of Healthcare Quality Promotion's Internet site at: www.cdc.gov/ncidod/hip/enviro/guide.htm

The full-text version of the guidelines should be cited when reference is made primarily to material in Parts I and IV. The print version of the guidelines appears as:

Sehulster LM, Chinn RYW, Arduino MJ, Carpenter J, Donlan R, Ashford D, Besser R, Fields B, McNeil MM, Whitney C, Wong S, Juranek D, Cleveland J. Guidelines for environmental infection control in health-care facilities. Recommendations from CDC and the Healthcare Infection Control Practices Advisory Committee (HICPAC). Chicago IL; American Society for Healthcare Engineering/American Hospital Association; 2004.

*Part II of these guidelines appeared in the CDC's "Morbidity and Mortality Weekly Report:"*

Centers for Disease Control and Prevention. Guidelines for environmental infection control in health-care facilities: recommendations of CDC and the Healthcare Infection Control Practices Advisory Committee (HICPAC). MMWR 2003; 52 (No. RR-10): 1–48.

Updates to the Part II recommendations also appeared in the MMWR in 2003 as "Errata: Vol. 52 (No. RR-10)" (MMWR Vol. 52 [42]: 1025–6) on October 24, 2003 and as a "Notice to Readers" scheduled to appear in February 2004. The full-text version of these guidelines (this document) incorporates these updates.

# Centers for Disease Control and Prevention
# Healthcare Infection Control Practices Advisory Committee (HICPAC)

# Guidelines for Environmental Infection Control in Health-Care Facilities

## *Abstract*

### Background:

Although the environment serves as a reservoir for a variety of microorganisms, it is rarely implicated in disease transmission except in the immunocompromised population. Inadvertent exposures to environmental opportunistic pathogens (e.g., *Aspergillus* spp. and *Legionella* spp.) or airborne pathogens (e.g., *Mycobacterium tuberculosis* and varicella-zoster virus) may result in infections with significant morbidity and/or mortality. Lack of adherence to established standards and guidance (e.g., water quality in dialysis, proper ventilation for specialized care areas such as operating rooms, and proper use of disinfectants) can result in adverse patient outcomes in health-care facilities.

### Objective:

The objective is to develop an environmental infection-control guideline that reviews and reaffirms strategies for the prevention of environmentally-mediated infections, particularly among health-care workers and immunocompromised patients. The recommendations are evidence-based whenever possible.

### Search Strategies:

The contributors to this guideline reviewed predominantly English-language articles identified from MEDLINE literature searches, bibliographies from published articles, and infection-control textbooks.

### Criteria for Selecting Citations and Studies for This Review:

Articles dealing with outbreaks of infection due to environmental opportunistic microorganisms and epidemiological- or laboratory experimental studies were reviewed. Current editions of guidelines and standards from organizations (i.e., American Institute of Architects [AIA], Association for the Advancement of Medical Instrumentation [AAMI], and American Society of Heating, Refrigeration, and Air-Conditioning Engineers [ASHRAE]) were consulted. Relevant regulations from federal agencies (i.e., U.S. Food and Drug Administration [FDA]; U.S. Department of Labor, Occupational Safety and Health Administration [OSHA]; U.S. Environmental Protection Agency [EPA]; and U.S. Department of Justice) were reviewed. Some topics did not have well-designed, prospective studies nor reports of outbreak investigations. Expert opinions and experience were consulted in these instances.

### Types of Studies:

Reports of outbreak investigations, epidemiological assessment of outbreak investigations with control strategies, and *in vitro* environmental studies were assessed. Many of the recommendations are derived

from empiric engineering concepts and reflect industry standards. A few of the infection-control measures proposed cannot be rigorously studied for ethical or logistical reasons.

## Outcome Measures:

Infections caused by the microorganisms described in this guideline are rare events, and the effect of these recommendations on infection rates in a facility may not be readily measurable. Therefore, the following steps to measure performance are suggested to evaluate these recommendations:

1. Document whether infection-control personnel are actively involved in all phases of a health-care facility's demolition, construction, and renovation. Activities should include performing a risk assessment of the necessary types of construction barriers, and daily monitoring and documenting of the presence of negative airflow within the construction zone or renovation area.
2. Monitor and document daily the negative airflow in airborne infection isolation rooms (AII) and positive airflow in protective environment rooms (PE), especially when patients are in these rooms.
3. Perform assays at least once a month by using standard quantitative methods for endotoxin in water used to reprocess hemodialyzers, and for heterotrophic, mesophilic bacteria in water used to prepare dialysate and for hemodialyzer reprocessing.
4. Evaluate possible environmental sources (e.g., water, laboratory solutions, or reagents) of specimen contamination when nontuberculous mycobacteria (NTM) of unlikely clinical importance are isolated from clinical cultures. If environmental contamination is found, eliminate the probable mechanisms.
5. Document policies to identify and respond to water damage. Such policies should result in either repair and drying of wet structural materials within 72 hours, or removal of the wet material if drying is unlikely within 72 hours.

## Main Results:

Infection-control strategies and engineering controls, when consistently implemented, are effective in preventing opportunistic, environmentally-related infections in immunocompromised populations. Adherence to proper use of disinfectants, proper maintenance of medical equipment that uses water (e.g., automated endoscope reprocessors and hydrotherapy equipment), water-quality standards for hemodialysis, and proper ventilation standards for specialized care environments (i.e., airborne infection isolation [AII], protective environment [PE], and operating rooms [ORs]), and prompt management of water intrusion into facility structural elements will minimize health-care–associated infection risks and reduce the frequency of pseudo-outbreaks. Routine environmental sampling is not advised except in the few situations where sampling is directed by epidemiologic principles and results can be applied directly to infection control decisions, and for water quality determinations in hemodialysis.

## Reviewers' Conclusions:

Continued compliance with existing environmental infection control measures will decrease the risk of health-care–associated infections among patients, especially the immunocompromised, and health-care workers.

# Centers for Disease Control and Prevention
## Healthcare Infection Control Practices Advisory Committee (HICPAC)

## *Guidelines for Environmental Infection Control in Health-Care Facilities*

## Table of Contents

Executive Summary.................................................................................................................. 1
Part I. Background Information: Environmental Infection Control in Health-Care Facilities..................................................................................................................................... 3
  A. Introduction................................................................................................................... 3
  B. Key Terms Used in this Guideline ............................................................................... 5
  C. Air ................................................................................................................................. 6
    1. Modes of Transmission of Airborne Diseases....................................................... 6
    2. Airborne Infectious Diseases in Health-Care Facilities........................................ 7
    3. Heating, Ventilation, and Air Conditioning Systems in Health-Care Facilities.... 13
    4. Construction, Renovation, Remediation, Repair, and Demolition ........................ 21
    5. Environmental Infection-Control Measures for Special Health-Care Settings...... 34
    6. Other Aerosol Hazards in Health-Care Facilities .................................................. 40
  D. Water............................................................................................................................. 40
    1. Modes of Transmission of Waterborne Diseases .................................................. 40
    2. Waterborne Infectious Diseases in Health-Care Facilities .................................... 41
    3. Water Systems in Health-Care Facilities............................................................... 46
    4. Strategies for Controlling Waterborne Microbial Contamination ......................... 53
    5. Cooling Towers and Evaporative Condensers....................................................... 57
    6. Dialysis Water Quality and Dialysate.................................................................... 59
    7. Ice Machines and Ice ............................................................................................. 65
    8. Hydrotherapy Tanks and Pools.............................................................................. 67
    9. Miscellaneous Medical/Dental Equipment Connected to Main Water Systems .... 69
  E. Environmental Services ................................................................................................ 71
    1. Principles of Cleaning and Disinfecting Environmental Surfaces.......................... 71
    2. General Cleaning Strategies for Patient-Care Areas.............................................. 74
    3. Cleaning Strategies for Spills of Blood and Body Substances .............................. 77
    4. Carpeting and Cloth Furnishings ........................................................................... 78
    5. Flowers and Plants in Patient-Care Areas ............................................................. 80
    6. Pest Control ............................................................................................................ 81
    7. Special Pathogen Concerns.................................................................................... 82
  F. Environmental Sampling .............................................................................................. 88
    1. General Principles: Microbiologic Sampling of the Environment ......................... 88
    2. Air Sampling.......................................................................................................... 89
    3. Water Sampling ..................................................................................................... 94
    4. Environmental Surface Sampling........................................................................... 95
  G. Laundry and Bedding................................................................................................... 98
    1. General Information ............................................................................................... 98
    2. Epidemiology and General Aspects of Infection Control....................................... 98
    3. Collecting, Transporting, and Sorting Contaminated Textiles and Fabrics............ 99

4. Parameters of the Laundry Process ........................................................................... 100
5. Special Laundry Situations...................................................................................... 102
6. Surgical Gowns, Drapes, and Disposable Fabrics................................................... 103
7. Antimicrobial-Impregnated Articles and Consumer Items Bearing Antimicrobial Labeling .. 103
8. Standard Mattresses, Pillows, and Air-Fluidized Beds .......................................... 104

**H. Animals in Health-Care Facilities**................................................................................. 105
1. General Information ................................................................................................. 105
2. Animal-Assisted Activities, Animal-Assisted Therapy, and Resident Animals ...... 106
3. Service Animals ...................................................................................................... 108
4. Animals as Patients in Human Health-Care Facilities ........................................... 110
5. Research Animals in Health-Care Facilities ........................................................... 111

**I. Regulated Medical Waste**............................................................................................. 112
1. Epidemiology .......................................................................................................... 112
2. Categories of Medical Waste .................................................................................. 112
3. Management of Regulated Medical Waste in Health-Care Facilities ..................... 113
4. Treatment of Regulated Medical Waste.................................................................. 113
5. Discharging Blood, Fluids to Sanitary Sewers or Septic Tanks.............................. 116
6. Medical Waste and CJD.......................................................................................... 116

**Part II. Recommendations for Environmental Infection Control in Health-Care Facilities** ................................................................................................................................ **117**
A. Rationale for Recommendations ............................................................................. 117
B. Rating Categories.................................................................................................... 117
C. Recommendations—Air........................................................................................ 118
D. Recommendations—Water .................................................................................... 125
E. Recommendations—Environmental Services ........................................................ 133
F. Recommendations—Environmental Sampling ....................................................... 138
G. Recommendations—Laundry and Bedding............................................................ 138
H. Recommendations—Animals in Health-Care Facilities......................................... 141
I. Recommendations—Regulated Medical Waste....................................................... 143

**Part III. References**........................................................................................................**145**

**Part IV. Appendices**.......................................................................................................**201**
Appendix A. Glossary of Terms ................................................................................. 201
Appendix B. Air .......................................................................................................... 210
1. Airborne Contaminant Removal ............................................................................. 210
2. Air Sampling for Aerosols Containing Legionellae................................................ 210
3. Calculation of Air Sampling Results....................................................................... 211
4. Ventilation Specifications for Health-Care Facilities............................................. 212
Appendix C. Water...................................................................................................... 220
1. Biofilms.................................................................................................................. 220
2. Water and Dialysate Sampling Strategies in Dialysis ............................................ 222
3. Water Sampling Strategies and Culture Techniques for Detecting Legionellae...... 223
4. Procedure for Cleaning Cooling Towers and Related Equipment .......................... 225
5. Maintenance Procedures Used to Decrease Survival and Multiplications of *Legionella* spp. in Potable-Water Distribution Systems ................................................................................... 227
Appendix D. Insects and Microorganisms.................................................................. 228
Appendix E. Information Resources............................................................................ 229
Appendix F. Areas of Future Research ...................................................................... 230

**Index—Parts I and IV** ...................................................................................................**231**

# List of Figures, Boxes, and Tables

## Figures

Figure 1. Diagram of a ventilation system ........................................................................................ 14
Figure 2. Example of positive-pressure room control for protection from airborne environmental
microbes (PE) .......................................................................................................................... 35
Figure 3. Example of negative-pressure room control for airborne infection isolation (AII) ................ 36
Figure 4. Example of airborne infection isolation (AII) room with anteroom and neutral anteroom ..... 37
Figure 5. Diagram of a typical air conditioning (induced draft) cooling tower ..................................... 58
Figure 6. Dialysis water treatment system ......................................................................................... 60

## Boxes

Box 1. Environmental infection control: performance measures ........................................................... 2
Box 2. Eight criteria for evaluating the strength of evidence for environmental sources of infection ...... 4
Box 3. Chain of infection components ................................................................................................ 4
Box 4. Suggested members and functions of a multi-disciplinary coordination team for construction,
renovation, repair, and demolition projects ............................................................................. 24
Box 5. Construction design and function considerations for environmental infection control .............. 25
Box 6. Unresolved issues associated with microbiologic air sampling ................................................ 28
Box 7. Construction/repair projects that require barrier structures .................................................... 32
Box 8. Strategy for managing TB patients and preventing airborne transmission in operating rooms ... 39
Box 9. Recovery and remediation measures for water-related emergencies ........................................ 52
Box 10. Contingency planning for flooding ....................................................................................... 53
Box 11. Steps in an epidemiologic investigation for legionellosis ...................................................... 56
Box 12. General steps for cleaning and maintaining ice machines, dispensers, and storage chests ....... 66
Box 13. Preliminary concerns for conducting air sampling ................................................................ 90
Box 14. Selecting an air sampling device .......................................................................................... 93
Box 15. Undertaking environmental-surface sampling ....................................................................... 95
Box C.1. Potential sampling sites for *Legionella* spp. in health-care facilities ................................. 224
Box C.2. Procedures for collecting and processing environmental specimens for *Legionella* spp. ....... 225

## Tables

Table 1. Clinical and epidemiologic characteristics of aspergillosis ..................................................... 7
Table 2. Environmental fungal pathogens: entry into and contamination of the health-care facility ........ 8
Table 3. Clinical and epidemiologic characteristics of tuberculosis (TB) ........................................... 10
Table 4. Microorganisms associated with airborne transmission ....................................................... 13
Table 5. Filtration methods .............................................................................................................. 15
Table 6. Engineered specifications for positive- and negative pressure rooms .................................... 19
Table 7. Ventilation hazards in health-care facilities that may be associated with increased potential of
airborne disease transmission ................................................................................................. 22
Table 8. Strategies to reduce dust and moisture intrusion during external demolition and construction 30

Table 9. Infection-control measures for internal construction and repair projects ................................ 32

Table 10. Summary of ventilation specifications in selected areas of health-care facilities.................. 39

Table 11. Clinical and epidemiologic characteristics of legionellosis/Legionnaires disease................. 41

Table 12. *Pseudomonas aeruginosa* infections in health-care facilities ...................................... 42

Table 13. Other gram-negative bacteria associated with water and moist environments ...................... 43

Table 14. Nontuberculous mycobacteria—environmental vehicles ...................................... 45

Table 15. Water and point-of-use fixtures as sources and reservoirs of waterborne pathogens ............ 47

Table 16. Water demand in health-care facilities during water disruption emergencies ...................... 50

Table 17. Additional infection-control measures to prevent exposure of high-risk patients to waterborne pathogens.................................................................................................................................. 57

Table 18. Microbiologic limits for hemodialysis fluids................................................................. 62

Table 19. Factors influencing microbial contamination in hemodialysis systems................................. 63

Table 20. Microorganisms and their sources in ice and ice machines ...................................... 65

Table 21. Infections associated with use of hydrotherapy equipment ...................................... 67

Table 22. Levels of disinfection by type of microorganism ...................................... 72

Table 23. Air sampling methods and examples of equipment................................................ 91

Table 24. Examples of eluents and diluents for environmental-surface sampling................................. 96

Table 25. Methods of environmental-surface sampling.................................................................. 97

Table 26. Examples of diseases associated with zoonotic transmission............................................. 105

Table 27. Microorganisms and biologicals identified as select agents ...................................... 115

Table B.1. Air changes/hour (ACH) and time required for airborne-contaminant removal efficiencies of 99% and 99.9% ..................................................................................................................... 210

Table B.2. Ventilation requirements for areas affecting patient care in hospitals and outpatient facilities .............................................................................................................................................. 212

Table B.3. Pressure relationships and ventilation of certain areas of nursing facilities........................ 217

Table B.4. Filter efficiencies for central ventilation and air conditioning systems in general hospitals .............................................................................................................................................. 219

Table B.5. Filter efficiencies for central ventilation and air conditioning systems in outpatient facilities .............................................................................................................................................. 219

Table B.6. Filter efficiencies for central ventilation and air conditioning systems in nursing facilities .............................................................................................................................................. 220

Table B.7. Filter efficiencies for central ventilation and air conditioning systems in psychiatric hospitals .............................................................................................................................................. 220

Table D.1. Microorganisms isolated from arthropods in health-care settings ...................................... 228

## List of Abbreviations Used in This Publication

| | |
|---|---|
| AAA | animal-assisted activity |
| AAMI | Association for the Advancement of Medical Instrumentation |
| AAT | animal-assisted therapy |
| ACGIH | American Council of Governmental Industrial Hygienists |
| ACH | air changes per hour |
| ADA | Americans with Disabilities Act |
| AER | automated endoscope reprocessor |
| AFB | acid-fast bacilli |
| AHA | American Hospital Association |
| AHJ | authorities having jurisdiction |
| AIA | American Institute of Architects |
| AII | airborne infection isolation |
| AmB | amphotericin B |
| ANC | absolute neutrophil count |
| ANSI | American National Standards Institute |
| AORN | Association of periOperative Registered Nurses |
| ASHE | American Society for Healthcare Engineering |
| ASHRAE | American Society of Heating, Refirgeration, and Air-Conditioning Engineers |
| BCG | Bacille Calmette-Guérin |
| BCYE | buffered charcoal yeast extract medium |
| BHI | brain-heart infusion |
| BMBL | CDC/NIH publication "Biosafety in Microbiological and Biomedical Laboratories" |
| BOD | biological oxygen demand |
| BSE | bovine spongiform encephalopathy |
| BSL | biosafety level |
| C | Centigrade |
| CAPD | continuous ambulatory peritoneal dialysis |
| CCPD | continual cycling peritoneal dialysis |
| CMAD | count median aerodynamic diameter |
| CDC | U.S. Centers for Disease Control and Prevention |
| CFR | Code of Federal Regulations |
| CFU | colony-forming unit |
| CJD | Creutzfeldt-Jakob disease |
| cm | centimeter |
| CMS | U.S. Centers for Medicare and Medicaid Services |
| CPL | compliance document (OSHA) |
| CT/EC | cooling tower/evaporative condenser |
| DFA | direct fluorescence assay; direct fluorescent antibody |
| DHHS | U.S. Department of Health and Human Services |
| DHBV | duck hepatitis B virus |
| DNA | deoxyribonucleic acid |
| DOP | dioctylphthalate |
| DOT | U.S. Department of Transportation |
| EC | environment of care (JCAHO) |
| ELISA | enzyme-linked immunosorbent assay |
| EPA | U.S. Environmental Protection Agency |
| ESRD | end-stage renal disease |

| | |
|---|---|
| **EU** | endotoxin unit |
| **F** | Fahrenheit |
| **FDA** | U.S. Food and Drug Administration |
| **FIFRA** | Federal Insecticide, Fungicide, and Rodenticide Act |
| **FRC** | free residual chlorine |
| **ft** | foot (feet) |
| **FTC** | U.S. Federal Trade Commission |
| **GISA** | glycopeptide intermediate resistant *Staphylococcus aureus* |
| **HBV** | hepatitis B virus |
| **HCV** | hepatitis C virus |
| **HEPA** | high efficiency particulate air |
| **HICPAC** | Healthcare Infection Control Practices Advisory Committee |
| **HIV** | human immunodeficiency virus |
| **HPV** | human papilloma virus |
| **HSCT** | hematopoietic stem cell transplant |
| **HVAC** | heating, ventilation, air conditioning |
| **ICRA** | infection control risk assessment |
| **ICU** | intensive care unit |
| **ID$_{50}$** | 50% median infectious dose |
| **IPD** | intermittent peritoneal dialysis |
| **JCAHO** | Joint Commission on Accreditation of Healthcare Organizations |
| **kg** | kilogram |
| **L** | liter |
| **MAC** | *Mycobacterium avium* complex; also used to denote MacConkey agar |
| **MDRO** | multiple-drug resistant organism |
| **MIC** | minimum inhibitory concentration |
| **µm** | micrometer; micron |
| **mL** | milliliter |
| **min** | minute |
| **mg** | milligram |
| **MMAD** | mass median aerodynamic diameter |
| **MMWR** | "Morbidity and Mortality Weekly Report" |
| **MRSA** | methicillin-resistant *Staphylococcus aureus* |
| **MSDS** | material safety data sheet |
| **N** | Normal |
| **NaCl** | sodium chloride |
| **NaOH** | sodium hydroxide |
| **NCID** | National Center for Infectious Diseases |
| **NCCDPHP** | National Center for Chronic Disease Prevention and Health Promotion |
| **NCCLS** | National Committee for Clinical Laboratory Standards |
| **ng** | nanogram |
| **NICU** | neonatal intensive care unit |
| **NIH** | U.S. National Institutes of Health |
| **NIOSH** | National Institute for Occupational Safety and Health |
| **nm** | nanometer |
| **NNIS** | National Nosocomial Infection Surveillance |
| **NTM** | nontuberculous mycobacteria |
| **OPL** | on-premises laundry |
| **OSHA** | U.S. Occupational Safety and Health Administration |
| **Pa** | Pascal |
| **PCP** | *Pneumocystis carinii* pneumonia |

| | |
|---|---|
| **PCR** | polymerase chain reaction |
| **PD** | peritoneal dialysis |
| **PE** | protective environment |
| **PEL** | permissible exposure limit |
| **PPE** | personal protective equipment |
| **ppm** | parts per million |
| **PVC** | polyvinylchloride |
| **RAPD** | randomly amplified polymorphic DNA |
| **RODAC** | replicate organism direct agar contact |
| **RSV** | respiratory syncytial virus |
| **RO** | reverse osmosis |
| **SARS** | severe acute respiratory syndrome |
| **SARS-CoV** | SARS coronavirus |
| **sec** | second |
| **spp** | species |
| **SSI** | surgical site infection |
| **TB** | tuberculosis |
| **TLV®-TWA** | threshold limit value-time weighted average |
| **TSA** | tryptic soy agar |
| **TSB** | tryptic soy broth |
| **TSE** | transmissible spongiform encephalopathy |
| **U.S.** | United States |
| **USC** | United States Code |
| **USDA** | U.S. Department of Agriculture |
| **USPS** | U.S. Postal Service |
| **UV** | ultraviolet |
| **UVGI** | ultraviolet germicidal irradiation |
| **VAV** | variable air ventilation |
| **vCJD** | variant Creutzfeldt-Jakob disease |
| **VISA** | vancomycin intermediate resistant *Staphylococcus aureus* |
| **VRE** | vancomycin-resistant *Enterococcus* |
| **VRSA** | vancomycin-resistant *Staphylococcus aureus* |
| **v/v** | volume/volume |
| **VZV** | varicella-zoster virus |

**Note: Use of trade names and commercial sources is for identification only and does not imply endorsement by the U.S. Department of Health and Human Services. References to non-CDC sites on the Internet are provided as a service to the reader and does not constitute or imply endorsement of these organization s or their programs by CDC or the U.S. Department of Health and Human Services. CDC is not responsible for the content of pages found at these sites.**

*The following CDC staff member and HICPAC member prepared this report:*

Lynne Sehulster, PhD
Division of Healthcare Quality Promotion
National Center for Infectious Diseases

Raymond Y.W. Chinn, MD
HICPAC Advisor
Sharp Memorial Hospital
San Diego, California

**Disclosure of Relationship:** Raymond Y.W. Chinn is a private-practice physician and salaried employee of Sharp Memorial Hospital in San Diego, California. Dr. Chinn received no research funds from commercial sources either directly, or indirectly through awards made to the hospital, before or during the development of these guidelines.

*Contributions were made by the following CDC staff members:*

Matthew Arduino, DrPH
Joe Carpenter, PE
Rodney Donlan, PhD
Lynne Sehulster, PhD
Division of Healthcare Quality Promotion
National Center for Infectious Diseases

David Ashford, DVM, Dsc, MPH
Richard Besser, MD
Barry Fields, PhD
Michael M. McNeil, MBBS, MPH
Cynthia Whitney, MD, MPH
Stephanie Wong, DMV, MPH
Division of Bacterial and Mycotic Diseases
National Center for Infectious Diseases

Dennis Juranek, DVM, MSC
Division of Parasitic Diseases
National Center for Infectious Diseases

Jennifer Cleveland, DDS, MPH
Division of Oral Health
National Center for Chronic Disease Prevention and Health Promotion

*In collaboration with the Healthcare Infection Control Practices Advisory Committee (HICPAC)*

## HICPAC Members, February 2002

Robert A. Weinstein, MD
Chair
Cook County Hospital
Chicago, IL

Jane D. Siegel, MD
Co-Chair
University of Texas Southwestern Medical Center
Dallas, TX

Michele L. Pearson, MD
Executive Secretary
Centers for Disease Control and Prevention
Atlanta, GA

Raymond Y.W. Chinn, MD
Sharp Memorial Hospital
San Diego, CA

Alfred DeMaria, Jr., MD
Massachusetts Department of Public Health
Jamaica Plain, MA

Elaine L. Larson, RN, PhD
Columbia University School of Nursing
New York, NY

James T. Lee, MD, PhD
University of Minnesota
VA Medical Center
St. Paul, MN

Ramon E. Moncada, MD
Coronado Physician's Medical Center
Coronado, CA

William A. Rutala, PhD, MPH, CIC
University of North Carolina School of
 Medicine
Chapel Hill, NC

William E. Scheckler, MD
University of Wisconsin Medical School
Madison, WI

Beth H. Stover, RN, CIC
Kosair Children's Hospital
Louisville, KY

Marjorie A. Underwood, RN, BSN, CIC
Mt. Diablo Medical Center
Concord, CA

## Liaison Members

Loretta L. Fauerbach, MS, CIC
Association for Professionals in Infection
 Control and Epidemiology (APIC)
Washington, DC

Sandra L. Fitzler, RN
American Health Care Association
Washington, DC

Dorothy M. Fogg, RN, BSN, MA
Association of periOperative Registered
 Nurses (AORN)
Denver, CO

Stephen F. Jencks, MD, MPH
U.S. Centers for Medicare and Medicaid
 Services
Baltimore, MD

Chiu S. Lin, PhD
U.S. Food and Drug Administration
Rockville, MD

James P. Steinberg, MD
Society for Healthcare Epidemiology of America,
 Inc. (SHEA)
Atlanta, GA

## *Liaison Members (continued)*

Michael L. Tapper, MD
Advisory Committee for the Elimination of
  Tuberculosis (ACET)
New York, NY

## *Expert Reviewers*

Trisha Barrett, RN, MBA, CIC
Alta Bates Medical Center
Berkeley, CA

Michael Berry
University of North Carolina
Chapel Hill, NC

Walter W. Bond, MS
RCSA, Inc.
Lawrenceville, GA

Douglas Erickson, FASHE
American Society for Healthcare
  Engineering (ASHE)
Park Ridge, IL

Richard Miller, MD
University of Louisville School of Medicine
Louisville, KY

Gina Pugliese, RN, MS
Premier Safety Institute
Oak Brook, IL

James D. Scott, PE
Michigan Department of Consumer and
  Industry Services
Lansing, MI

Dale Woodin
American Society for Healthcare Engineering
  (ASHE)
Chicago, IL

Judene Bartley, MS, MPH, CIC
Epidemiology Consulting Services, Inc.
Beverly Hills, MI

Col. Nancy Bjerke, BSN, MA, MEd, MPH, CIC
  (USAF, Retired)
Infection Control Associates (ICA)
San Antonio, TX

Cheryl Carter, RN
University of Iowa Health Center
Iowa City, IA

Martin S. Favero, PhD
Advanced Sterilization Products, Johnson and
  Johnson
Irvine, CA

Col. Shannon E. Mills, DDS
HQ USAF / Surgeon General Detail
Bolin AFB, DC

Craig E. Rubens, MD, PhD
Children's Hospital and Medical Center
Seattle, WA

Andrew J. Streifel, MPH, REHS
University of Minnesota
Minneapolis, MN

# Executive Summary

The *Guidelines for Environmental Infection Control in Health-Care Facilities* is a compilation of recommendations for the prevention and control of infectious diseases that are associated with health-care environments. This document a) revises multiple sections from previous editions of the Centers for Disease Control and Prevention [CDC] document titled *Guideline for Handwashing and Hospital Environmental Control;*[1,2] b) incorporates discussions of air and water environmental concerns from CDC's *Guideline for the Prevention of Nosocomial Pneumonia;*[3] c) consolidates relevant environmental infection-control measures from other CDC guidelines;[4–9] and d) includes two topics not addressed in previous CDC guidelines — infection-control concerns related to animals in health-care facilities and water quality in hemodialysis settings.

Part I of this report, *Background Information: Environmental Infection Control in Health-Care Facilities*, provides a comprehensive review of the scientific literature. Attention is given to engineering and infection-control concerns during construction, demolition, renovation, and repairs of health-care facilities. Use of an infection-control risk assessment is strongly supported before the start of these or any other activities expected to generate dust or water aerosols. Also reviewed in Part I are infection-control measures used to recover from catastrophic events (e.g., flooding, sewage spills, loss of electricity and ventilation, and disruption of the water supply) and the limited effects of environmental surfaces, laundry, plants, animals, medical wastes, cloth furnishings, and carpeting on disease transmission in healthcare facilities.

Part II of this guideline, *Recommendations for Environmental Infection Control in Health-Care Facilities*, outlines environmental infection control in health-care facilities, describing measures for preventing infections associated with air, water, and other elements of the environment. These recommendations represent the views of different divisions within CDC's National Center for Infectious Diseases (NCID) (e.g., the Division of Healthcare Quality Promotion [DHQP] and the Division of Bacterial and Mycotic Diseases [DBMD]) and the consensus of the Healthcare Infection Control Practices Advisory Committee (HICPAC), a 12-member group that advises CDC on concerns related to the surveillance, prevention, and control of health-care–associated infections, primarily in U.S. health-care facilities.[10] In 1999, HICPAC's infection-control focus was expanded from acute-care hospitals to all venues where health care is provided (e.g., outpatient surgical centers, urgent care centers, clinics, outpatient dialysis centers, physicians' offices, and skilled nursing facilities). The topics addressed in this guideline are applicable to the majority of health-care venues in the United States. This document is intended for use primarily by infection-control professionals (ICPs), epidemiologists, employee health and safety personnel, information system specialists, administrators, engineers, facility managers, environmental service professionals, and architects for health-care facilities.

Key recommendations include a) infection-control impact of ventilation system and water system performance; b) establishment of a multidisciplinary team to conduct infection-control risk assessment; c) use of dust-control procedures and barriers during construction, repair, renovation, or demolition; d) environmental infection-control measures for special care areas with patients at high risk; e) use of airborne particle sampling to monitor the effectiveness of air filtration and dust-control measures; f) procedures to prevent airborne contamination in operating rooms when infectious tuberculosis [TB] patients require surgery; g) guidance regarding appropriate indications for routine culturing of water as part of a comprehensive control program for legionellae; h) guidance for recovering from water system disruptions, water leaks, and natural disasters [e.g., flooding]; i) infection-control concepts for equipment that uses water from main lines [e.g., water systems for hemodialysis, ice machines, hydrotherapy equipment, dental unit water lines, and automated endoscope reprocessors]); j) environmental surface cleaning and disinfection strategies with respect to antibiotic-resistant

2

microorganisms; k) infection-control procedures for health-care laundry; l) use of animals in health care for activities and therapy; m) managing the presence of service animals in health-care facilities; n) infection-control strategies for when animals receive treatment in human health-care facilities; and o) a call to reinstate the practice of inactivating amplified cultures and stocks of microorganisms on-site during medical waste treatment.

Whenever possible, the recommendations in Part II are based on data from well-designed scientific studies. However, certain of these studies were conducted by using narrowly defined patient populations or for specific health-care settings (e.g., hospitals versus long-term care facilities), making generalization of findings potentially problematic. Construction standards for hospitals or other health-care facilities may not apply to residential home-care units. Similarly, infection-control measures indicated for immunosuppressed patient care are usually not necessary in those facilities where such patients are not present. Other recommendations were derived from knowledge gained during infectious disease investigations in health-care facilities, where successful termination of the outbreak was often the result of multiple interventions, the majority of which cannot be independently and rigorously evaluated. This is especially true for construction situations involving air or water.

Other recommendations are derived from empiric engineering concepts and may reflect an industry standard rather than an evidence-based conclusion. Where recommendations refer to guidance from the American Institute of Architects (AIA), the statements reflect standards intended for new construction or renovation. Existing structures and engineered systems are expected to be in continued compliance with the standards in effect at the time of construction or renovation. Also, in the absence of scientific confirmation, certain infection-control recommendations that cannot be rigorously evaluated are based on a strong theoretical rationale and suggestive evidence. Finally, certain recommendations are derived from existing federal regulations. The references and the appendices comprise Parts III and IV of this document, respectively.

Infections caused by the microorganisms described in these guidelines are rare events, and the effect of these recommendations on infection rates in a facility may not be readily measurable. Therefore, the following steps to measure performance are suggested to evaluate these recommendations (Box 1):

## Box 1. Environmental infection control: performance measures

1. Document whether infection-control personnel are actively involved in all phases of a health-care facility's demolition, construction, and renovation. Activities should include performing a risk assessment of the necessary types of construction barriers, and daily monitoring and documenting of the presence of negative airflow within the construction zone or renovation area.
2. Monitor and document daily the negative airflow in airborne infection isolation (AII) rooms and positive airflow in protective environment (PE) rooms, especially when patients are in these rooms.
3. Perform assays at least once a month by using standard quantitative methods for endotoxin in water used to reprocess hemodialyzers, and for heterotrophic and mesophilic bacteria in water used to prepare dialysate and for hemodialyzer reprocessing.
4. Evaluate possible environmental sources (e.g., water, laboratory solutions, or reagents) of specimen contamination when nontuberculous mycobacteria (NTM) of unlikely clinical importance are isolated from clinical cultures. If environmental contamination is found, eliminate the probable mechanisms.
5. Document policies to identify and respond to water damage. Such policies should result in either repair and drying of wet structural or porous materials within 72 hours, or removal of the wet material if drying is unlikely with 72 hours.

Topics outside the scope of this document include a) noninfectious adverse events (e.g., sick building syndrome); b) environmental concerns in the home; c) home health care; d) bioterrorism; and e) health-care-associated foodborne illness. This document includes only limited discussion of a) handwashing/hand hygiene; b) standard precautions; and c) infection-control measures used to prevent instrument or equipment contamination during patient care (e.g., preventing waterborne contamination of nebulizers or ventilator humidifiers). These topics are mentioned only if they are important in minimizing the transfer of pathogens to and from persons or equipment and the environment. Although the document discusses principles of cleaning and disinfection as they are applied to maintenance of environmental surfaces, the full discussion of sterilization and disinfection of medical instruments and direct patient-care devices is deferred for inclusion in the *Guideline for Disinfection and Sterilization in Health-Care Facilities*, a document currently under development. Similarly, the full discussion of hand hygiene is available as the *Guideline for Hand Hygiene in Health-Care Settings: Recommendations of the Healthcare Infection Control Practices Advisory Committee and the HICPAC/SHEA/APIC/IDSA Hand Hygiene Task Force*. Where applicable, the *Guidelines for Environmental Infection Control in Health-Care Facilities* are consistent in content to the drafts available as of October 2002 of both the revised *Guideline for Prevention of Health-Care–Associated Pneumonia* and *Guidelines for Preventing the Transmission of Mycobacterium tuberculosis in Health-Care Facilities*.

This guideline was prepared by CDC staff members from NCID and the National Center for Chronic Disease Prevention and Health Promotion (NCCDPHP) and the designated HICPAC advisor. Contributors to this document reviewed predominantly English-language manuscripts identified from reference searches using the National Library of Medicine's MEDLINE, bibliographies of published articles, and infection-control textbooks. Working drafts of the guideline were reviewed by CDC scientists, HICPAC committee members, and experts in infection control, engineering, internal medicine, infectious diseases, epidemiology, and microbiology. All recommendations in this guideline may not reflect the opinions of all reviewers.

# Part I.  Background Information: Environmental Infection Control in Health-Care Facilities

## A.  Introduction

The health-care environment contains a diverse population of microorganisms, but only a few are significant pathogens for susceptible humans. Microorganisms are present in great numbers in moist, organic environments, but some also can persist under dry conditions. Although pathogenic microorganisms can be detected in air and water and on fomites, assessing their role in causing infection and disease is difficult.[11]  Only a few reports clearly delineate a "cause and effect" with respect to the environment and in particular, housekeeping surfaces.

Eight criteria are used to evaluate the strength of evidence for an environmental source or means of transmission of infectious agents (Box 2).[11, 12]  Applying these criteria to disease investigations allows scientists to assess the contribution of the environment to disease transmission. An example of this application is the identification of a pathogen (e.g., vancomycin-resistant enterococci [VRE]) on an environmental surface during an outbreak. The presence of the pathogen does not establish its causal role; its transmission from source to host could be through indirect means (e.g., via hand transferral).[11] The surface, therefore, would be considered one of a number of potential reservoirs for the pathogen, but not the "de facto" source of exposure. An understanding of how infection occurs after exposure,

4

based on the principles of the "chain of infection," is also important in evaluating the contribution of the environment to health-care–associated disease.[13]  All of the components of the "chain" must be operational for infection to occur (Box 3).

**Box 2.  Eight criteria for evaluating the strength of evidence for environmental sources of infection\* +**

1.  The organism can survive after inoculation onto the fomite.
2.  The organism can be cultured from in-use fomites.
3.  The organism can proliferate in or on the fomite.
4.  Some measure of acquisition of infection cannot be explained by other recognized modes of transmission.
5.  Retrospective case-control studies show an association between exposure to the fomite and infection.
6.  Prospective case-control studies may be possible when more than one similar type of fomite is in use.
7.  Prospective studies allocating exposure to the fomite to a subset of patients show an assication between exposure and infection.
8.  Decontamination of the fomite results in the elimination of infection transmission.

\* These criteria are listed in order of strength of evidence.
+ Adapted from references 11 and 12.

**Box 3.  Chain of infection components\***

1.  Adequate number of pathogenic organisms (dose)
2.  Pathogenic organisms of sufficient virulence
3.  A susceptible host
4.  An appropriate mode of transmission or transferal of the organism in sufficient number from source to host
5.  The correct portal of entry into the host

\* Adapted from reference 13.

The presence of the susceptible host is one of these components that underscores the importance of the health-care environment and opportunistic pathogens on fomites and in air and water.  As a result of advances in medical technology and therapies (e.g., cytotoxic chemotherapy and transplantation medicine), more patients are becoming immunocompromised in the course of treatment and are therefore at increased risk for acquiring health-care–associated opportunistic infections.  Trends in health-care delivery (e.g., early discharge of patients from acute care facilities) also are changing the distribution of patient populations and increasing the number of immunocompromised persons in non-acute-care hospitals.  According to the American Hospital Association (AHA), in 1998, the number of hospitals in the United States totaled 6,021; these hospitals had a total of 1,013,000 beds,[14] representing a 5.5% decrease in the number of acute-care facilities and a 10.2% decrease in the number of beds over the 5-year period 1994–1998.[14] In addition, the total average daily number of patients receiving care in U.S. acute-care hospitals in 1998 was 662,000 (65.4%) – 36.5% less than the 1978 average of 1,042,000.[14]  As the number of acute-care hospitals declines, the length of stay in these facilities is concurrently decreasing, particularly for immunocompetent patients.  Those patients remaining in acute-care facilities are likely to be those requiring extensive medical interventions who therefore at high risk for opportunistic infection.

The growing population of severely immunocompromised patients is at odds with demands on the health-care industry to remain viable in the marketplace; to incorporate modern equipment, new diagnostic procedures, and new treatments; and to construct new facilities. Increasing numbers of health-care facilities are likely to be faced with construction in the near future as hospitals consolidate to reduce costs, defer care to ambulatory centers and satellite clinics, and try to create more "home-like" acute-care settings. In 1998, approximately 75% of health-care–associated construction projects focused on renovation of existing outpatient facilities or the building of such facilities;[15] the number of projects associated with outpatient health care rose by 17% from 1998 through 1999.[16] An aging population is also creating increasing demand for assisted-living facilities and skilled nursing centers. Construction of assisted-living facilities in 1998 increased 49% from the previous year, with 138 projects completed at a cost of $703 million.[16] Overall, from 1998 to 1999, health-care–associated construction costs increased by 28.5%, from $11.56 billion to $14.86 billion.[16]

Environmental disturbances associated with construction activities near health-care facilities pose airborne and waterborne disease threats risks for the substantial number of patients who are at risk for health-care–associated opportunistic infections. The increasing age of hospitals and other health-care facilities is also generating ongoing need for repair and remediation work (e.g., installing wiring for new information systems, removing old sinks, and repairing elevator shafts) that can introduce or increase contamination of the air and water in patient-care environments. Aging equipment, deferred maintenance, and natural disasters provide additional mechanisms for the entry of environmental pathogens into high-risk patient-care areas.

Architects, engineers, construction contractors, environmental health scientists, and industrial hygienists historically have directed the design and function of hospitals' physical plants. Increasingly, however, because of the growth in the number of susceptible patients and the increase in construction projects, the involvement of hospital epidemiologists and infection-control professionals is required. These experts help make plans for building, maintaining, and renovating health-care facilities to ensure that the adverse impact of the environment on the incidence of health-care–associated infections is minimal. The following are examples of adverse outcomes that could have been prevented had such experts been involved in the planning process: a) transmission of infections caused by *Mycobacterium tuberculosis*, varicella-zoster virus (VZV), and measles (i.e., rubeola) facilitated by inappropriate air-handling systems in health-care facilities;[6] b) disease outbreaks caused by *Aspergillus* spp.,[17–19] *Mucoraceae*,[20] and *Penicillium* spp. associated with the absence of environmental controls during periods of health-care facility-associated construction;[21] c) infections and/or colonizations of patients and staff with vancomycin-resistant *Enterococcus faecium* [VRE] and *Clostridium difficile* acquired indirectly from contact with organisms present on environmental surfaces in health-care facilities;[22–25] and d) outbreaks and pseudoepidemics of legionellae,[26, 27] *Pseudomonas aeruginosa*,[28–30] and the nontuberculous mycobacteria (NTM)[31, 32] linked to water and aqueous solutions used in health-care facilities. The purpose of this guideline is to provide useful information for both health-care professionals and engineers in efforts to provide a safe environment in which quality health care may be provided to patients. The recommendations herein provide guidance to minimize the risk for and prevent transmission of pathogens in the indoor environment.

# B. Key Terms Used in this Guideline

Although Appendix A provides definitions for terms discussed in Part I, several terms that pertain to specific patient-care areas and patients who are at risk for health-care–associated opportunistic infections are presented here. Specific engineering parameters for these care areas are discussed more

6

fully in the text. **Airborne Infection Isolation (AII)** refers to the isolation of patients infected with organisms spread via airborne droplet nuclei <5 μm in diameter. This isolation area receives numerous air changes per hour (ACH) (≥12 ACH for new construction as of 2001; ≥6 ACH for construction before 2001), and is under negative pressure, such that the direction of the airflow is from the outside adjacent space (e.g., corridor) into the room. The air in an AII room is preferably exhausted to the outside, but may be recirculated provided that the return air is filtered through a high efficiency particulate air (HEPA) filter. The use of personal respiratory protection is also indicated for persons entering these rooms.

**Protective Environment (PE)** is a specialized patient-care area, usually in a hospital, with a positive airflow relative to the corridor (i.e., air flows from the room to the outside adjacent space). The combination of HEPA filtration, high numbers of air changes per hour (≥12 ACH), and minimal leakage of air into the room creates an environment that can safely accommodate patients who have undergone allogeneic hematopoietic stem cell transplant (HSCT).

**Immunocompromised patients** are those patients whose immune mechanisms are deficient because of immunologic disorders (e.g., human immunodeficiency virus [HIV] infection, congenital immune deficiency syndrome, chronic diseases [such as diabetes, cancer, emphysema, and cardiac failure]) or immunosuppressive therapy (e.g., radiation, cytotoxic chemotherapy, anti-rejection medication, and steroids). Immunocompromised patients who are identified as **high-risk patients** have the greatest risk of infection caused by airborne or waterborne microorganisms. Patients in this subset include those who are severely neutropenic for prolonged periods of time (i.e., an absolute neutrophil count [ANC] of ≤500 cells/mL), allogeneic HSCT patients, and those who have received intensive chemotherapy (e.g., childhood acute myelogenous leukemia patients).

# C. Air

## 1. Modes of Transmission of Airborne Diseases

A variety of airborne infections in susceptible hosts can result from exposures to clinically significant microorganisms released into the air when environmental reservoirs (i.e., soil, water, dust, and decaying organic matter) are disturbed. Once these materials are brought indoors into a health-care facility by any of a number of vehicles (e.g., people, air currents, water, construction materials, and equipment), the attendant microorganisms can proliferate in various indoor ecological niches and, if subsequently disbursed into the air, serve as a source for airborne health-care–associated infections.

Respiratory infections can be acquired from exposure to pathogens contained either in droplets or droplet nuclei. Exposure to microorganisms in droplets (e.g., through aerosolized oral and nasal secretions from infected patients[33]) constitutes a form of direct contact transmission. When droplets are produced during a sneeze or cough, a cloud of infectious particles >5 μm in size is expelled, resulting in the potential exposure of susceptible persons within 3 feet of the source person.[6] Examples of pathogens spread in this manner are influenza virus, rhinoviruses, adenoviruses, and respiratory syncytial virus (RSV). Because these agents primarily are transmitted directly and because the droplets tend to fall out of the air quickly, measures to control air flow in a health-care facility (e.g., use of negative pressure rooms) generally are not indicated for preventing the spread of diseases caused by these agents. Strategies to control the spread of these diseases are outlined in another guideline.[3]

The spread of airborne infectious diseases via droplet nuclei is a form of indirect transmission.[34] Droplet nuclei are the residuals of droplets that, when suspended in air, subsequently dry and produce

particles ranging in size from 1–5 μm. These particles can a) contain potentially viable microorganisms, b) be protected by a coat of dry secretions, c) remain suspended indefinitely in air, and d) be transported over long distances. The microorganisms in droplet nuclei persist in favorable conditions (e.g., a dry, cool atmosphere with little or no direct exposure to sunlight or other sources of radiation). Pathogenic microorganisms that can be spread via droplet nuclei include *Mycobacterium tuberculosis*, VZV, measles virus (i.e., rubeola), and smallpox virus (i.e., variola major).[6] Several environmental pathogens have life-cycle forms that are similar in size to droplet nuclei and may exhibit similar behavior in the air. The spores of *Aspergillus fumigatus* have a diameter of 2–3.5 μm, with a settling velocity estimated at 0.03 cm/second (or about 1 meter/hour) in still air. With this enhanced buoyancy, the spores, which resist desiccation, can remain airborne indefinitely in air currents and travel far from their source.[35]

## 2. Airborne Infectious Diseases in Health-Care Facilities

### a. Aspergillosis and Other Fungal Diseases

Aspergillosis is caused by molds belonging to the genus *Aspergillus*. *Aspergillus* spp. are prototype health-care–acquired pathogens associated with dusty or moist environmental conditions. Clinical and epidemiologic aspects of aspergillosis (Table 1) are discussed extensively in another guideline.[3]

**Table 1. Clinical and epidemiologic characteristics of aspergillosis**

|  |  | References |
|---|---|---|
| Causative agents | *Aspergillus fumigatus* (90%–95% of *Aspergillus* infections among hematopoietic stem cell transplant (HSCT) patients; *A. flavus, A. niger, A. terreus, A. nidulans* | 36–43 |
| Modes of transmission | Airborne transmission of fungal spores; direct inhalation; direct inoculation from environmental sources (rare) | 37 |
| Activities associated with infection | Construction, renovation, remodeling, repairs, building demolition; rare episodes associated with fomites | 44–51 |
| Clinical syndromes and diseases | *Acute invasive:* pneumonia; ulcerative tracheobronchitis; osteomyelitis; abscesses (aspergillomas) of the lungs, brain, liver, spleen, and kidneys; thrombosis of deep blood vessels; necrotizing skin ulcers; endophthalmitis; and sinusitis<br>*Chronic invasive:* chronic pneumonitis<br>*Hypersensity:* allergic bronchopulmonary aspergillosis<br>*Cutaneous:* primary skin and burn-wound infections | 44, 45, 52–58 |
| Patient populations at greatest risk | Hematopoietic stem cell transplant patients (HSCT); immunocompromised patients (i.e., those with underlying disease), patients undergoing chemotherapy, organ transplant recipients, preterm neonates, hemodialysis patients, patients with identifiable immune system deficiencies who receive care in general intensive care units (ICUs), and cystic fibrosis patients (may be colonized, occasionally become infected) | 36, 59–78 |
| Factors affecting severity and outcomes | The immune status of the patient and the duration of severe neutropenia | 79, 80 |
| Occurrence | Rare and sporadic, but increasing as proportion of immunocompromised patients increases; 5% of HSCT patients infected, <5% of solid organ transplant recipients infected | 36, 37, 81–88 |
| Mortality rate | Rate can be as high as 100% if severe neutropenia persists; 13%–80% mortality among leukemia patients | 58, 83, 89, 90 |

*Aspergillus* spp. are ubiquitous, aerobic fungi that occur in soil, water, and decaying vegetation; the organism also survives well in air, dust, and moisture present in health-care facilities.[91–93] The presence of aspergilli in the health-care facility environment is a substantial extrinsic risk factor for opportunistic invasive aspergillosis (invasive aspergillosis being the most serious form of the disease).[69, 94] Site renovation and construction can disturb *Aspergillus*-contaminated dust and produce bursts of airborne

8

fungal spores. Increased levels of atmospheric dust and fungal spores have been associated with clusters of health-care–acquired infections in immunocompromised patients.[17, 20, 44, 47, 49, 50, 95–98] Absorbent building materials (e.g., wallboard) serve as an ideal substrate for the proliferation of this organism if they become and remain wet, thereby increasing the numbers of fungal spores in the area. Patient-care items, devices, and equipment can become contaminated with *Aspergillus* spp. spores and serve as sources of infection if stored in such areas.[57]

Most cases of aspergillosis are caused by *Aspergillus fumigatus*, a thermotolerant/thermophilic fungus capable of growing over a temperature range from 53.6°F–127.4°F (12°C–53°C); optimal growth occurs at approximately 104°F (40°C), a temperature inhibitory to most other saprophytic fungi.[99] It can use cellulose or sugars as carbon sources; because its respiratory process requires an ample supply of carbon, decomposing organic matter is an ideal substrate.

Other opportunistic fungi that have been occasionally linked with health-care–associated infections are members of the order *Mucorales* (e.g., *Rhizopus* spp.) and miscellaneous moniliaceous molds (e.g., *Fusarium* spp. and *Penicillium* spp.) (Table 2). Many of these fungi can proliferate in moist environments (e.g., water-damaged wood and building materials). Some fungi (e.g., *Fusarium* spp. and *Pseudoallescheria* spp.) also can be airborne pathogens.[100] As with aspergillosis, a major risk factor for disease caused by any of these pathogens is the host's severe immunosuppression from either underlying disease or immunosuppressive therapy.[101, 102]

**Table 2. Environmental fungal pathogens: entry into and contamination of the health-care facility**

| Implicated environmental vehicle | References |
|---|---|
| ***Aspergillus* spp.** | |
| Improperly functioning ventilation systems | 20, 46, 47, 97, 98, 103, 104 |
| Air filters[*+] | 17, 18, 105–107 |
| Air filter frames | 17, 18 |
| Window air conditioners | 96 |
| Backflow of contaminated air | 107 |
| Air exhaust contamination[+] | 104 |
| False ceilings | 48, 57, 97, 108 |
| Fibrous insulation and perforated metal ceilings | 66 |
| Acoustic ceiling tiles, plasterboard | 18, 109 |
| Fireproofing material | 48, 49 |
| Damp wood building materials | 49 |
| Opening doors to construction site | 110 |
| Construction | 69 |
| Open windows | 20, 108, 111 |
| Disposal conduit door | 68 |
| Hospital vacuum cleaner | 68 |
| Elevator | 112 |
| Arm boards | 57 |
| Walls | 113 |
| Unit kitchen | 114 |
| Food | 21 |
| Ornamental plants | 21 |
| ***Mucorales / Rhizopus* spp.** | |
| Air filter | 20, 115 |
| False ceilings | 97 |
| Heliport | 115 |
| ***Scedosporium* spp.** | |
| Construction | 116 |

**(Table 2. continued)**

| Implicated environmental vehicles | References |
|---|---|
| ***Penicillium* spp.** | |
| Rotting cabinet wood, pipe leak | 21 |
| Ventilation duct fiberglass insulation | 112 |
| Air filters | 105 |
| Topical anesthetic | 117 |
| ***Acremonium* spp.** | |
| Air filters | 105 |
| ***Cladosporium* spp.** | |
| Air filters | 105 |
| ***Sporothrix*** | |
| Construction (pseudoepidemic) | 118 |

*. Pigeons, their droppings and roosts are associated with spread of *Aspergillus, Cryptococcus,* and *Histoplasma* spp. There have been at least three outbreaks linked to contamination of the filtering systems from bird droppings[98, 103, 104] Pigeon mites may gain access into a health-care facility through the ventilation system.[119]

+. The American Institute of Architects (AIA) standards stipulate that for new or renovated construction a) exhaust outlets are to be placed >25 feet from air intake systems, b) the bottom of outdoor air intakes for HVAC systems should be 6 feet above ground or 3 feet above roof level, and c) exhaust outlets from contaminated areas are situated above the roof level and arranged to minimize the recirculation of exhausted air back into the building.[120]

Infections due *Cryptococcus neoformans, Histoplasma capsulatum,* or *Coccidioides immitis* can occur in health-care settings if nearby ground is disturbed and a malfunction of the facility's air-intake components allows these pathogens to enter the ventilation system. *C. neoformans* is a yeast usually 4–8 µm in size. However, viable particles of <2 µm diameter (and thus permissive to alveolar deposition) have been found in soil contaminated with bird droppings, particularly from pigeons.[98, 103, 104, 121] *H. capsulatum,* with the infectious microconidia ranging in size from 2–5 µm, is endemic in the soil of the central river valleys of the United States. Substantial numbers of these infectious particles have been associated with chicken coops and the roosts of blackbirds.[98, 103, 104, 122] Several outbreaks of histoplasmosis have been associated with disruption of the environment; construction activities in an endemic area may be a potential risk factor for health-care–acquired airborne infection.[123, 124] *C. immitis,* with arthrospores of 3–5 µm diameter, has similar potential, especially in the endemic southwestern United States and during seasons of drought followed by heavy rainfall. After the 1994 earthquake centered near Northridge, California, the incidence of coccidioidomycosis in the surrounding area exceeded the historical norm.[125]

Emerging evidence suggests that *Pneumocystis carinii,* now classified as a fungus, may be spread via airborne, person-to-person transmission.[126] Controlled studies in animals first demonstrated that *P. carinii* could be spread through the air.[127] More recent studies in health-care settings have detected nucleic acids of *P. carinii* in air samples from areas frequented or occupied by *P. carinii*-infected patients but not in control areas that are not occupied by these patients.[128, 129] Clusters of cases have been identified among immunocompromised patients who had contact with a source patient and with each other. Recent studies have examined the presence of *P. carinii* DNA in oropharyngeal washings and the nares of infected patients, their direct contacts, and persons with no direct contact.[130, 131] Molecular analysis of the DNA by polymerase chain reaction (PCR) provides evidence for airborne transmission of *P. carinii* from infected patients to direct contacts, but immunocompetent contacts tend to become transiently colonized rather than infected.[131] The role of colonized persons in the spread of *P. carinii* pneumonia (PCP) remains to be determined. At present, specific modifications to ventilation systems to control spread of PCP in a health-care facility are not indicated. Current recommendations

10

outline isolation procedures to minimize or eliminate contact of immunocompromised patients not on PCP prophylaxis with PCP-infected patients.[6, 132]

### b. Tuberculosis and Other Bacterial Diseases

The bacterium most commonly associated with airborne transmission is *Mycobacterium tuberculosis*. A comprehensive review of the microbiology and epidemiology of *M. tuberculosis* and guidelines for tuberculosis (TB) infection control have been published.[4, 133, 134] A summary of the clinical and epidemiologic information from these materials is provided in this guideline (Table 3).

**Table 3. Clinical and epidemiologic characteristics of tuberculosis (TB)\***

| Causative agents | *Mycobacterium tuberculosis, M. bovis, M. africanum* |
|---|---|
| Mode of transmission | Airborne transmission via droplet nuclei 1–5 μm in diameter |
| Patient factors associated with infectivity and transmission | • Disease of the lungs, airways, or larynx; presence of cough or other forceful expiratory measures<br>• Presence of acid-fast bacilli (AFB) in the sputum<br>• Failure of the patient to cover the mouth and nose when coughing or sneezing<br>• Presence of cavitation on chest radiograph<br>• Inappropriate or shortened duration of chemotherapy |
| Activities associated with infections | • Exposures in relatively small, enclosed spaces<br>• Inadequate ventilation resulting in insufficient removal of droplet nuclei<br>• Cough-producing procedures done in areas without proper environmental controls<br>• Recirculation of air containing infectious droplet nuclei<br>• Failure to use respiratory protection when managing open lesions for patients with suspected extrapulmonary TB[135] |
| Clinical syndromes and disease | Pulmonary TB; extrapulmonary TB can affect any organ system or tissue; laryngeal TB is highly contagious |
| Populations at greatest risk | • Immunocompromised persons (e.g., HIV-infected persons)<br>• Medically underserved persons, urban poor, homeless persons, elderly persons, migrant farm workers, close contacts of known patients<br>• Substance abusers, present and former prison inmates<br>• Foreign-born persons from areas with high prevalence of TB<br>• Health-care workers |
| Factors affecting severity and outcomes | • Concentration of droplet nuclei in air, duration of exposure<br>• Age at infection<br>• Immunosuppression due to therapy or disease, underlying chronic medical conditions, history of malignancies or lesions or the lungs |
| Occurrence | Worldwide; incidence in the United States is 5.6 cases/100,000 population (2001)[136] |
| Mortality | 930 deaths in the United States (1999)[136] |
| Chemoprophylaxis / treatment | Treatment of latent infection includes isoniazid (INH) or rifampin (RIF).[4, 134, 137-139] Directly observed therapy (DOT) for active cases as indicated: INH, RIF, pyrazinamide (PZA), ethambutol (EMB), streptomycin (SM) in various combinations determined by prevalent levels of specific resistance.[4, 134, 137-139] Consult therapy guidelines for specific treatment indications.[139] |

\* Material in this table is compiled from references 4, 133–141.

*M. tuberculosis* is carried by droplet nuclei generated when persons (primarily adults and adolescents) who have pulmonary or laryngeal TB sneeze, cough, speak, or sing;[139] normal air currents can keep these particles airborne for prolonged periods and spread them throughout a room or building.[142] However, transmission of TB has occurred from mycobacteria aerosolized during provision of care (e.g., wound/lesion care or during handling of infectious peritoneal dialysis fluid) for extrapulmonary TB patients.[135, 140]

Gram-positive cocci (i.e., *Staphylococcus aureus*, group A beta-hemolytic streptococci), also important health-care–associated pathogens, are resistant to inactivation by drying and can persist in the

environment and on environmental surfaces for extended periods. These organisms can be shed from heavily colonized persons and discharged into the air. Airborne dispersal of *S. aureus* is directly associated with the concentration of the bacterium in the anterior nares.[143] Approximately 10% of healthy carriers will disseminate *S. aureus* into the air, and some persons become more effective disseminators of *S. aureus* than others.[144-148] The dispersal of *S. aureus* into air can be exacerbated by concurrent viral upper respiratory infection, thereby turning a carrier into a "cloud shedder."[149] Outbreaks of surgical site infections (SSIs) caused by group A beta-hemolytic streptococci have been traced to airborne transmission from colonized operating-room personnel to patients.[150-153] In these situations, the strain causing the outbreak was recovered from the air in the operating room[150, 151, 154] or on settle plates in a room in which the carrier exercised.[151-153] *S. aureus* and group A streptococci have not been linked to airborne transmission outside of operating rooms, burn units, and neonatal nurseries.[155, 156] Transmission of these agents occurs primarily via contact and droplets.

Other gram-positive bacteria linked to airborne transmission include *Bacillus* spp. which are capable of sporulation as environmental conditions become less favorable to support their growth. Outbreaks and pseudo-outbreaks have been attributed to *Bacillus cereus* in maternity, pediatric, intensive care, and bronchoscopy units; many of these episodes were secondary to environmental contamination.[157-160]

Gram-negative bacteria rarely are associated with episodes of airborne transmission because they generally require moist environments for persistence and growth. The main exception is *Acinetobacter* spp., which can withstand the inactivating effects of drying. In one epidemiologic investigation of bloodstream infections among pediatric patients, identical *Acinetobacter* spp. were cultured from the patients, air, and room air conditioners in a nursery.[161]

Aerosols generated from showers and faucets may potentially contain legionellae and other gram-negative waterborne bacteria (e.g., *Pseudomonas aeruginosa*). Exposure to these organisms is through direct inhalation. However, because water is the source of the organisms and exposure occurs in the vicinity of the aerosol, the discussion of the diseases associated with such aerosols and the prevention measures used to curtail their spread is discussed in another section of the Guideline (see Part I: Water).

### c. Airborne Viral Diseases

Some human viruses are transmitted from person to person via droplet aerosols, but very few viruses are consistently airborne in transmission (i.e., are routinely suspended in an infective state in air and capable of spreading great distances), and health-care–associated outbreaks of airborne viral disease are limited to a few agents. Consequently, infection-control measures used to prevent spread of these viral diseases in health-care facilities primarily involve patient isolation, vaccination of susceptible persons, and antiviral therapy as appropriate rather than measures to control air flow or quality.[6] Infections caused by VZV frequently are described in health-care facilities. Health-care–associated airborne outbreaks of VZV infections from patients with primary infection and disseminated zoster have been documented; patients with localized zoster have, on rare occasions, also served as source patients for outbreaks in health-care facilities.[162-166] VZV infection can be prevented by vaccination, although patients who develop a rash within 6 weeks of receiving varicella vaccine or who develop breakthrough varicella following exposure should be considered contagious.[167]

Viruses whose major mode of transmission is via droplet contact rarely have caused clusters of infections in group settings through airborne routes. The factors facilitating airborne distribution of these viruses in an infective state are unknown, but a presumed requirement is a source patient in the early stage of infection who is shedding large numbers of viral particles into the air. Airborne transmission of measles has been documented in health-care facilities.[168-171] In addition, institutional outbreaks of influenza virus infections have occurred predominantly in nursing homes,[172-176] and less frequently in medical and neonatal intensive care units, chronic-care areas, HSCT units, and pediatric

12

wards.[177-180] Some evidence supports airborne transmission of influenza viruses by droplet nuclei,[181, 182] and case clusters in pediatric wards suggest that droplet nuclei may play a role in transmitting certain respiratory pathogens (e.g., adenoviruses and respiratory syncytial virus [RSV]).[177, 183, 184] Some evidence also supports airborne transmission of enteric viruses. An outbreak of a Norwalk-like virus infection involving more than 600 staff personnel over a 3-week period was investigated in a Toronto, Ontario hospital in 1985; common sources (e.g., food and water) were ruled out during the investigation, leaving airborne spread as the most likely mode of transmission.[185]

Smallpox virus, a potential agent of bioterrorism, is spread predominantly via direct contact with infectious droplets, but it also can be associated with airborne transmission.[186, 187] A German hospital study from 1970 documented the ability of this virus to spread over considerable distances and cause infection at low doses in a well-vaccinated population; factors potentially facilitating transmission in this situation included a patient with cough and an extensive rash, indoor air with low relative humidity, and faulty ventilation patterns resulting from hospital design (e.g., open windows).[188] Smallpox patients with extensive rash are more likely to have lesions present on mucous membranes and therefore have greater potential to disseminate virus into the air.[188] In addition to the smallpox transmission in Germany, two cases of laboratory-acquired smallpox virus infection in the United Kingdom in 1978 also were thought to be caused by airborne transmission.[189]

Airborne transmission may play a role in the natural spread of hantaviruses and certain hemorrhagic fever viruses (e.g., Ebola, Marburg, and Lassa), but evidence for airborne spread of these agents in health-care facilities is inconclusive.[190] Although hantaviruses can be transmitted when aerosolized from rodent excreta,[191, 192] person-to-person spread of hantavirus infection from source patients has not occurred in health-care facilities.[193-195] Nevertheless, health-care workers are advised to contain potentially infectious aerosols and wear National Institute of Occupational Safety and Health (NIOSH) approved respiratory protection when working with this agent in laboratories or autopsy suites.[196] Lassa virus transmission via aerosols has been demonstrated in the laboratory and incriminated in health-care–associated infections in Africa,[197-199] but airborne spread of this agent in hospitals in developed nations likely is inefficient.[200, 201] Yellow fever is considered to be a viral hemorrhagic fever agent with high aerosol infectivity potential, but health-care–associated transmission of this virus has not been described.[202] Viral hemorrhagic fever diseases primarily occur after direct exposure to infected blood and body fluids, and the use of standard and droplet precautions prevents transmission early in the course of these illnesses.[203, 204] However, whether these viruses can persist in droplet nuclei that might remain after droplet production from coughs or vomiting in the latter stages of illness is unknown.[205] Although the use of a negative-pressure room is not required during the early stages of illness, its use might be prudent at the time of hospitalization to avoid the need for subsequent patient transfer. Current CDC guidelines recommend negative-pressure rooms with anterooms for patients with hemorrhagic fever and use of HEPA respirators by persons entering these rooms when the patient has prominent cough, vomiting, diarrhea, or hemorrhage.[6, 203] Face shields or goggles will help to prevent mucous-membrane exposure to potentially-aerosolized infectious material in these situations. If an anteroom is not available, portable, industrial-grade high efficiency particulate air (HEPA) filter units can be used to provide the equivalent of additional air changes per hour (ACH).

Table 4. Microorganisms associated with airborne transmission*

| | Fungi | Bacteria | Viruses |
|---|---|---|---|
| Numerous reports in health-care facilities | *Aspergillus* spp.+ *Mucorales (Rhizopus* spp.)[97, 115] | *Mycobacterium tuberculosis*+ | Measles (rubeola) virus[168-170] Varicella-zoster virus[162-166] |
| Atypical, occasional reports | *Acremonium* spp.[105, 206] *Fusarium* spp.[102] *Pseudoallescheria boydii*[100] *Scedosporium* spp.[116] *Sporothrix cyanescens*¶[118] | *Acinetobacter* spp.[161] *Bacillus* spp.¶[160, 207] *Brucella* spp.**[208-211] *Staphylococcus aureus*[148, 156] Group A *Streptococcus*[151] | Smallpox virus (variola)§[188, 189] Influenza viruses[181, 182] Respiratory syncytial virus[183] Adenoviruses[184] Norwalk-like virus[185] |
| Airborne in nature; airborne transmission in health care settings not described | *Coccidioides immitis*[125] *Cryptococcus* spp.[121] *Histoplasma capsulatum*[124] | *Coxiella burnetii* (Q fever)[212] | Hantaviruses[193, 195] Lassa virus[205] Marburg virus[205] Ebola virus[205] Crimean-Congo virus[205] |
| Under investigation | *Pneumocystis carinii*[131] | — | — |

\* This list excludes microorganisms transmitted from aerosols derived from water.
+ Refer to the text for references for these disease agents.
§ Airborne transmission of smallpox is infrequent. Potential for airborne transmission increases with patients who are effective disseminators present in facilities with low relative humidity in the air and faulty ventilation.
¶ Documentation of pseudoepidemic during construction.
** Airborne transmission documented in the laboratory but not in patient-care areas

## 3. Heating, Ventilation, and Air Conditioning Systems in Health-Care Facilities

### *a. Basic Components and Operations*

Heating, ventilation, and air conditioning (HVAC) systems in health-care facilities are designed to a) maintain the indoor air temperature and humidity at comfortable levels for staff, patients, and visitors; b) control odors; c) remove contaminated air; d) facilitate air-handling requirements to protect susceptible staff and patients from airborne health-care–associated pathogens; and e) minimize the risk for transmission of airborne pathogens from infected patients.[35, 120] An HVAC system includes an outside air inlet or intake; filters; humidity modification mechanisms (i.e., humidity control in summer, humidification in winter); heating and cooling equipment; fans; ductwork; air exhaust or out-takes; and registers, diffusers, or grilles for proper distribution of the air (Figure 1).[213, 214] Decreased performance of healthcare facility HVAC systems, filter inefficiencies, improper installation, and poor maintenance can contribute to the spread of health-care–associated airborne infections.

The American Institute of Architects (AIA) has published guidelines for the design and construction of new health-care facilities and for renovation of existing facilities. These AIA guidelines address indoor air-quality standards (e.g., ventilation rates, temperature levels, humidity levels, pressure relationships, and minimum air changes per hour [ACH]) specific to each zone or area in health-care facilities (e.g., operating rooms, laboratories, diagnostic areas, patient-care areas, and support departments).[120] These guidelines represent a consensus document among authorities having jurisdiction (AHJ), governmental regulatory agencies (i.e., Department of Health and Human Services [DHHS]; Department of Labor, Occupational Safety and Health Administration [OSHA]), health-care professionals, professional organizations (e.g., American Society of Heating, Refrigeration, and Air-Conditioning Engineers [ASHRAE], American Society for Healthcare Engineering [ASHE]), and accrediting organizations (i.e., Joint Commission on Accreditation of Healthcare Organizations [JCAHO]). More than 40 state agencies that license health-care facilities have either incorporated or adopted by reference these

14

guidelines into their state standards. JCAHO, through its surveys, ensures that facilities are in compliance with the ventilation guidelines of this standard for new construction and renovation.

**Figure 1. Diagram of a ventilation system***

Outdoor air and recirculated air pass through air cleaners (e.g., filter banks) designed to reduce the concentration of airborne contaminants. Air is conditioned for temperature and humidity before it enters the occupied space as supply air. Infiltration is air leakage inward through cracks and interstitial spaces of walls, floors, and ceilings. Exfiltration is air leakage outward through these same cracks and spaces. Return air is largely exhausted from the system, but a portion is recirculated with fresh, incoming air.
* Used with permission of the publisher of reference 214 (ASHRAE)

Engineering controls to contain or prevent the spread of airborne contaminants center on a) local exhaust ventilation [i.e., source control], b) general ventilation, and c) air cleaning.[4] General ventilation encompasses a) dilution and removal of contaminants via well-mixed air distribution of filtered air, b) directing contaminants toward exhaust registers and grilles via uniform, non-mixed airflow patterns, c) pressurization of individual spaces relative to all other spaces, and d) pressurization of buildings relative to the outdoors and other attached buildings.

A centralized HVAC system operates as follows. Outdoor air enters the system, where low-efficiency or "roughing" filters remove large particulate matter and many microorganisms. The air enters the distribution system for conditioning to appropriate temperature and humidity levels, passes through an additional bank of filters for further cleaning, and is delivered to each zone of the building. After the conditioned air is distributed to the designated space, it is withdrawn through a return duct system and delivered back to the HVAC unit. A portion of this "return air" is exhausted to the outside while the remainder is mixed with outdoor air for dilution and filtered for removal of contaminants.[215] Air from toilet rooms or other soiled areas is usually exhausted directly to the atmosphere through a separate duct exhaust system. Air from rooms housing tuberculosis patients is exhausted to the outside if possible, or passed through a HEPA filter before recirculation. Ultraviolet germicidal irradiation (UVGI) can be used as an adjunct air-cleaning measure, but it cannot replace HEPA filtration.

*b. Filtration*
    i. Filter Types and Methods of Filtration

Filtration, the physical removal of particulates from air, is the first step in achieving acceptable indoor air quality. Filtration is the primary means of cleaning the air. Five methods of filtration can be used (Table 5). During filtration, outdoor air passes through two filter beds or banks (with efficiencies of 20%–40% and ≥90%, respectively) for effective removal of particles 1–5 μm in diameter.[35, 120] The low-to-medium efficiency filters in the first bank have low resistance to airflow, but this feature allows some small particulates to pass onto heating and air conditioning coils and into the indoor environment.[35] Incoming air is mixed with recirculated air and reconditioned for temperature and humidity before being filtered by the second bank of filters. The performance of filters with ≤90% efficiency is measured using either the dust-spot test or the weight-arrestance test.[35, 216]

**Table 5. Filtration methods\***

| Basic method | Principle of performance | Filtering efficiency |
|---|---|---|
| Straining | Particles in the air are larger than the openings between the filter fibers, resulting in gross removal of large particles. | Low |
| Impingement | Particles collide with filter fibers and remain attached to the filter. Fibers may be coated with adhesive. | Low |
| Interception | Particles enter into the filter and become entrapped and attached to the filter fibers. | Medium |
| Diffusion | Small particles, moving in erratic motion, collide with filter fibers and remain attached. | High |
| Electrostatic | Particles bearing negative electrostatic charge are attracted to the filter with positively charged fibers. | High |

\* Material in this table was compiled from information in reference 217.

The second filter bank usually consists of high-efficiency filters. This filtration system is adequate for most patient-care areas in ambulatory-care facilities and hospitals, including the operating room environment and areas providing central services.[120] Nursing facilities use 90% dust-spot efficient filters as the second bank of filters,[120] whereas a HEPA filter bank may be indicated for special-care areas of hospitals. HEPA filters are at least 99.97% efficient for removing particles ≥0.3 μm in diameter. (As a reference, *Aspergillus* spores are 2.5–3.0 μm in diameter.) Examples of care areas where HEPA filters are used include PE rooms and those operating rooms designated for orthopedic implant procedures.[35]

Maintenance costs associated with HEPA filters are high compared with other types of filters, but use of in-line disposable prefilters can increase the life of a HEPA filter by approximately 25%. Alternatively, if a disposable prefilter is followed by a filter that is 90% efficient, the life of the HEPA filter can be extended ninefold. This concept, called progressive filtration, allows HEPA filters in special care areas to be used for 10 years.[213] Although progressive filtering will extend the mechanical ability of the HEPA filter, these filters may absorb chemicals in the environment and later desorb those chemicals, thereby necessitating a more frequent replacement program. HEPA filter efficiency is monitored with the dioctylphthalate (DOP) particle test using particles that are 0.3 μm in diameter.[218]

HEPA filters are usually framed with metal, although some older versions have wood frames. A metal frame has no advantage over a properly fitted wood frame with respect to performance, but wood can compromise the air quality if it becomes and remains wet, allowing the growth of fungi and bacteria. Hospitals are therefore advised to phase out water-damaged or spent wood-framed filter units and replace them with metal-framed HEPA filters.

16

HEPA filters are usually fixed into the HVAC system; however, portable, industrial grade HEPA units are available that can filter air at the rate of 300–800 ft³/min. Portable HEPA filters are used to a) temporarily recirculate air in rooms with no general ventilation, b) augment systems that cannot provide adequate airflow, and c) provide increased effectiveness in airflow.[4] Portable HEPA units are useful engineering controls that help clean the air when the central HVAC system is undergoing repairs,[219] but these units do not satisfy fresh-air requirements.[214] The effectiveness of the portable unit for particle removal is dependent on a) the configuration of the room, b) the furniture and persons in the room, c) the placement of the units relative to the contents and layout of the room, and d) the location of the supply and exhaust registers or grilles. If portable, industrial-grade units are used, they should be capable of recirculating all or nearly all of the room air through the HEPA filter, and the unit should be designed to achieve the equivalent of $\geq$12 ACH.[4] (An average room has approximately 1,600 ft³ of airspace.) The hospital engineering department should be contacted to provide ACH information in the event that a portable HEPA filter unit is necessary to augment the existing fixed HVAC system for air cleaning.

ii. Filter Maintenance

Efficiency of the filtration system is dependent on the density of the filters, which can create a drop in pressure unless compensated by stronger and more efficient fans, thus maintaining air flow. For optimal performance, filters require monitoring and replacement in accordance with the manufacturer's recommendations and standard preventive maintenance practices.[220] Upon removal, spent filters can be bagged and discarded with the routine solid waste, regardless of their patient-care area location.[221] Excess accumulation of dust and particulates increases filter efficiency, requiring more pressure to push the air through. The pressure differential across filters is measured by use of manometers or other gauges. A pressure reading that exceeds specifications indicates the need to change the filter. Filters also require regular inspection for other potential causes of decreased performance. Gaps in and around filter banks and heavy soil and debris upstream of poorly maintained filters have been implicated in health-care–associated outbreaks of aspergillosis, especially when accompanied by construction activities at the facility.[17, 18, 106, 222]

c. *Ultraviolet Germicidal Irradiation (UVGI)*

As a supplemental air-cleaning measure, UVGI is effective in reducing the transmission of airborne bacterial and viral infections in hospitals, military housing, and classrooms, but it has only a minimal inactivating effect on fungal spores.[223–228] UVGI is also used in air handling units to prevent or limit the growth of vegetative bacteria and fungi. Most commercially available UV lamps used for germicidal purposes are low-pressure mercury vapor lamps that emit radiant energy predominantly at a wave-length of 253.7 nm.[229, 230] Two systems of UVGI have been used in health-care settings – duct irradiation and upper-room air irradiation. In duct irradiation systems, UV lamps are placed inside ducts that remove air from rooms to disinfect the air before it is recirculated. When properly designed, installed, and maintained, high levels of UVGI can be attained in the ducts with little or no exposure of persons in the rooms.[231, 232] In upper-room air irradiation, UV lamps are either suspended from the ceiling or mounted on the wall.[4] Upper air UVGI units have two basic designs: a) a "pan" fixture with UVGI unshielded above the unit to direct the irradiation upward and b) a fixture with a series of parallel plates to columnize the irradiation outward while preventing the light from getting to the eyes of the room's occupants. The germicidal effect is dependent on air mixing via convection between the room's irradiated upper zone and the lower patient-care zones.[233, 234]

Bacterial inactivation studies using BCG mycobacteria and *Serratia marcescens* have estimated the effect of UVGI as equivalent to 10 ACH–39 ACH.[235, 236] Another study, however, suggests that UVGI may result in fewer equivalent ACH in the patient-care zone, especially if the mixing of air between zones is insufficient.[234] The use of fans or HVAC systems to generate air movement may increase the effectiveness of UVGI if airborne microorganisms are exposed to the light energy for a sufficient length

of time.[233, 235, 237–239] The optimal relationship between ventilation and UVGI is not known.

Because the clinical effectiveness of UV systems may vary, UVGI is not recommended for air management prior to air recirculation from airborne isolation rooms. It is also not recommended as a substitute for HEPA filtration, local exhaust of air to the outside, or negative pressure.[4] The use of UV lamps and HEPA filtration in a single unit offers only minimal infection-control benefits over those provided by the use of a HEPA filter alone.[240] Duct systems with UVGI are not recommended as a substitute for HEPA filters if the air from isolation rooms must be recirculated to other areas of the facility.[4] Regular maintenance of UVGI systems is crucial and usually consists of keeping the bulbs free of dust and replacing old bulbs as necessary. Safety issues associated with the use of UVGI systems are described in other guidelines.[4]

### d. Conditioned Air in Occupied Spaces
Temperature and humidity are two essential components of conditioned air. After outside air passes through a low- or medium-efficiency filter, the air undergoes conditioning for temperature and humidity control before it passes through high-efficiency or HEPA filtration.

#### i. Temperature
HVAC systems in health-care facilities are often single-duct or dual-duct systems.[35, 241] A single-duct system distributes cooled air (55°F [12.8°C]) throughout the building and uses thermostatically controlled reheat boxes located in the terminal ductwork to warm the air for individual or multiple rooms. The dual-duct system consists of parallel ducts, one with a cold air stream and the other with a hot air stream. A mixing box in each room or group of rooms mixes the two air streams to achieve the desired temperature. Temperature standards are given as either a single temperature or a range, depending on the specific health-care zone. Cool temperature standards (68°F–73°F [20°C–23°C]) usually are associated with operating rooms, clean workrooms, and endoscopy suites.[120] A warmer temperature (75°F [24°C]) is needed in areas requiring greater degrees of patient comfort. Most other zones use a temperature range of 70°F–75°F (21°C–24°C).[120] Temperatures outside of these ranges may be needed occasionally in limited areas depending on individual circumstances during patient care (e.g., cooler temperatures in operating rooms during specialized operations).

#### ii. Humidity
Four measures of humidity are used to quantify different physical properties of the mixture of water vapor and air. The most common of these is relative humidity, which is the ratio of the amount of water vapor in the air to the amount of water vapor air can hold at that temperature.[242] The other measures of humidity are specific humidity, dew point, and vapor pressure.[242]

Relative humidity measures the percentage of saturation. At 100% relative humidity, the air is saturated. For most areas within health-care facilities, the designated comfort range is 30%–60% relative humidity.[120, 214] Relative humidity levels >60%, in addition to being perceived as uncomfortable, promote fungal growth.[243] Humidity levels can be manipulated by either of two mechanisms.[244] In a water-wash unit, water is sprayed and drops are taken up by the filtered air; additional heating or cooling of this air sets the humidity levels. The second mechanism is by means of water vapor created from steam and added to filtered air in humidifying boxes. Reservoir-type humidifiers are not allowed in health-care facilities as per AIA guidelines and many state codes.[120] Cool-mist humidifiers should be avoided, because they can disseminate aerosols containing allergens and microorganisms.[245] Additionally, the small, personal-use versions of this equipment can be difficult to clean.

18

### iii. Ventilation

The control of air pollutants (e.g., microorganisms, dust, chemicals, and smoke) at the source is the most effective way to maintain clean air. The second most effective means of controlling indoor air pollution is through ventilation. Ventilation rates are voluntary unless a state or local government specifies a standard in health-care licensing or health department requirements. These standards typically apply to only the design of a facility, rather than its operation.[220, 246] Health-care facilities without specific ventilation standards should follow the AIA guideline specific to the year in which the building was built or the ANSI/ASHRAE Standard 62, *Ventilation for Acceptable Indoor Air Quality.*[120, 214, 241]

Ventilation guidelines are defined in terms of air volume per minute per occupant and are based on the assumption that occupants and their activities are responsible for most of the contaminants in the conditioned space.[215] Most ventilation rates for health-care facilities are expressed as room ACH. Peak efficiency for particle removal in the air space occurs between 12 ACH–15 ACH.[35, 247, 248] Ventilation rates vary among the different patient-care areas of a health-care facility (Appendix B).[120]

Health-care facilities generally use recirculated air.[35, 120, 241, 249, 250] Fans create sufficient positive pressure to force air through the building duct work and adequate negative pressure to evacuate air from the conditioned space into the return duct work and/or exhaust, thereby completing the circuit in a sealed system (Figure 1). However, because gaseous contaminants tend to accumulate as the air recirculates, a percentage of the recirculated air is exhausted to the outside and replaced by fresh outdoor air. In hospitals, the delivery of filtered air to an occupied space is an engineered system design issue, the full discussion of which is beyond the scope of this document.

Hospitals with areas not served by central HVAC systems often use through-the-wall or fan coil air conditioning units as the sole source of room ventilation. AIA guidelines for newly installed systems stipulate that through-the-wall fan-coil units be equipped with permanent (i.e., cleanable) or replaceable filters with a minimum efficiency of 68% weight arrestance.[120] These units may be used only as recirculating units; all outdoor air requirements must be met by a separate central air handling system with proper filtration, with a minimum of two outside air changes in general patient rooms (D. Erickson, ASHE, 2000).[120] If a patient room is equipped with an individual through-the-wall fan coil unit, the room should not be used as either AII or as PE.[120] These requirements, although directed to new HVAC installations also are appropriate for existing settings. Non-central air-handling systems are prone to problems associated with excess condensation accumulating in drip pans and improper filter maintenance; health-care facilities should clean or replace the filters in these units on a regular basis while the patient is out of the room.

Laminar airflow ventilation systems are designed to move air in a single pass, usually through a bank of HEPA filters either along a wall or in the ceiling, in a one-way direction through a clean zone with parallel streamlines. Laminar airflow can be directed vertically or horizontally; the unidirectional system optimizes airflow and minimizes air turbulence.[63, 241] Delivery of air at a rate of 0.5 meters per second (90 ± 20 ft/min) helps to minimize opportunities for microorganism proliferation.[63, 251, 252] Laminar airflow systems have been used in PE to help reduce the risk for health-care–associated airborne infections (e.g., aspergillosis) in high-risk patients.[63, 93, 253, 254] However, data that demonstrate a survival benefit for patients in PE with laminar airflow are lacking. Given the high cost of installation and apparent lack of benefit, the value of laminar airflow in this setting is questionable.[9, 37] Few data support the use of laminar airflow systems elsewhere in a hospital.[255]

### iv. Pressurization

Positive and negative pressures refer to a pressure differential between two adjacent air spaces (e.g., rooms and hallways). Air flows away from areas or rooms with positive pressure (pressurized), while

air flows into areas with negative pressure (depressurized). AII rooms are set at negative pressure to prevent airborne microorganisms in the room from entering hallways and corridors. PE rooms housing severely neutropenic patients are set at positive pressure to keep airborne pathogens in adjacent spaces or corridors from coming into and contaminating the airspace occupied by such high-risk patients. Self-closing doors are mandatory for both of these areas to help maintain the correct pressure differential.[4, 6, 120] Older health-care facilities may have variable pressure rooms (i.e., rooms in which the ventilation can be manually switched between positive and negative pressure). These rooms are no longer permitted in the construction of new facilities or in renovated areas of the facility,[120] and their use in existing facilities has been discouraged because of difficulties in assuring the proper pressure differential, especially for the negative pressure setting, and because of the potential for error associated with switching the pressure differentials for the room. Continued use of existing variable pressure rooms depends on a partnership between engineering and infection control. Both positive- and negative-pressure rooms should be maintained according to specific engineering specifications (Table 6).

**Table 6. Engineered specifications for positive- and negative pressure rooms***

| | Positive pressure areas (e.g., protective environments [PE]) | Negative pressure areas (e.g., airborne Infection isolation [AII]) |
|---|---|---|
| Pressure differentials | > +2.5 Pa§ (0.01″ water gauge) | > -2.5 Pa (0.01″ water gauge) |
| Air changes per hour (ACH) | >12 | ≥12 (for renovation or new construction) |
| Filtration efficiency | Supply: 99.97% @ 0.3 μm DOP¶ Return: none required** | Supply: 90% (dust spot test) Return: 99.97% @ 0.3 μm DOP¶ † |
| Room airflow direction | Out to the adjacent area | In to the room |
| Clean-to-dirty airflow in room | Away from the patient (high-risk patient, immunosuppressed patient) | Towards the patient (airborne disease patient) |
| Ideal pressure differential | > + 8 Pa | > - 2.5 Pa |

\* Material in this table was compiled from references 35 and 120. Table adapted from and used with permission of the publisher of reference 35 (Lippincott Williams and Wilkins).

§ Pa is the abbreviation for Pascal, a metric unit of measurement for pressure based on air velocity; 250 Pa equals 1.0 inch water gauge.

¶ DOP is the abbreviation for dioctylphthalate particles of 0.3 μm diameter.

\*\* If the patient requires both PE and AII, return air should be HEPA-filtered or otherwise exhausted to the outside.

† HEPA filtration of exhaust air from AII rooms should not be required, providing that the exhaust is properly located to prevent re-entry into the building.

Health-care professionals (e.g., infection control, hospital epidemiologists) must perform a risk assessment to determine the appropriate number of AII rooms (negative pressure) and/or PE rooms (positive pressure) to serve the patient population. The AIA guidelines require a certain number of AII rooms as a minimum, and it is important to refer to the edition under which the building was built for appropriate guidance.[120]

In large health-care facilities with central HVAC systems, sealed windows help to ensure the efficient operation of the system, especially with respect to creating and maintaining pressure differentials. Sealing the windows in PE areas helps minimize the risk of airborne contamination from the outside. One outbreak of aspergillosis among immunosuppressed patients in a hospital was attributed in part to an open window in the unit during a time when both construction and a fire happened nearby; sealing the window prevented further entry of fungal spores into the unit from the outside air.[111] Additionally, all emergency exits (e.g., fire escapes and emergency doors) in PE wards should be kept closed (except during emergencies) and equipped with alarms.

*e. Infection Control Impact of HVAC System Maintenance and Repair*
A failure or malfunction of any component of the HVAC system may subject patients and staff to discomfort and exposure to airborne contaminants. Only limited information is available from formal

20

studies on the infection-control implications of a complete air-handling system failure or shutdown for maintenance. Most experience has been derived from infectious disease outbreaks and adverse outcomes among high-risk patients when HVAC systems are poorly maintained. (See Table 7 for potential ventilation hazards, consequences, and correction measures.)

AIA guidelines prohibit U.S. hospitals and surgical centers from shutting down their HVAC systems for purposes other than required maintenance, filter changes, and construction.[120] Airflow can be reduced; however, sufficient supply, return, and exhaust must be provided to maintain required pressure relationships when the space is not occupied. Maintaining these relationships can be accomplished with special drives on the air-handling units (i.e., a variable air ventilation [VAV] system).

Microorganisms proliferate in environments wherever air, dust, and water are present, and air-handling systems can be ideal environments for microbial growth.[35] Properly engineered HVAC systems require routine maintenance and monitoring to provide acceptable indoor air quality efficiently and to minimize conditions that favor the proliferation of health-care–associated pathogens.[35, 249] Performance monitoring of the system includes determining pressure differentials across filters, regular inspection of system filters, DOP testing of HEPA filters, testing of low- or medium efficiency filters, and manometer tests for positive- and negative-pressure areas in accordance with nationally recognized standards, guidelines, and manufacturers' recommendations. The use of hand-held, calibrated equipment that can provide a numerical reading on a daily basis is preferred for engineering purposes (A.Streifel, University of Minnesota, 2000).[256] Several methods that provide a visual, qualitative measure of pressure differentials (i.e., airflow direction) include smoke-tube tests or placing flutter strips, ping-pong balls, or tissue in the air stream.

Preventive filter and duct maintenance (e.g., cleaning ductwork vents, replacing filters as needed, and properly disposing spent filters into plastic bags immediately upon removal) is important to prevent potential exposures of patients and staff during HVAC system shut-down. The frequency of filter inspection and the parameters of this inspection are established by each facility to meet their unique needs. Ductwork in older health-care facilities may have insulation on the interior surfaces that can trap contaminants. This insulation material tends to break down over time to be discharged from the HVAC system. Additionally, a malfunction of the air-intake system can overburden the filtering system and permit aerosolization of fungal pathogens. Keeping the intakes free from bird droppings, especially those from pigeons, helps to minimize the concentration of fungal spores entering from the outside.[98]

Accumulation of dust and moisture within HVAC systems increases the risk for spread of health-care– associated environmental fungi and bacteria. Clusters of infections caused by *Aspergillus* spp., *P. aeruginosa*, *S. aureus*, and *Acinetobacter* spp. have been linked to poorly maintained and/or malfunctioning air conditioning systems.[68, 161, 257, 258] Efforts to limit excess humidity and moisture in the infrastructure and on air-stream surfaces in the HVAC system can minimize the proliferation and dispersion of fungal spores and waterborne bacteria throughout indoor air.[259–262] Within the HVAC system, water is present in water-wash units, humidifying boxes, or cooling units. The dual-duct system may also create conditions of high humidity and excess moisture that favor fungal growth in drain pans as well as in fibrous insulation material that becomes damp as a result of the humid air passing over the hot stream and condensing.

If moisture is present in the HVAC system, periods of stagnation should be avoided. Bursts of organisms can be released upon system start-up, increasing the risk of airborne infection.[206] Proper engineering of the HVAC system is critical to preventing dispersal of airborne organisms. In one hospital, endophthalmitis caused by *Acremonium kiliense* infection following cataract extraction in an ambulatory surgical center was traced to aerosols derived from the humidifier water in the ventilation system.[206] The organism proliferated because the ventilation system was turned off routinely when the

center was not in operation; the air was filtered before humidification, but not afterwards.

Most health-care facilities have contingency plans in case of disruption of HVAC services. These plans include back-up power generators that maintain the ventilation system in high-risk areas (e.g., operating rooms, intensive-care units, negative- and positive-pressure rooms, transplantation units, and oncology units). Alternative generators are required to engage within 10 seconds of a loss of main power. If the ventilation system is out of service, rendering indoor air stagnant, sufficient time must be allowed to clean the air and re-establish the appropriate number of ACH once the HVAC system begins to function again. Air filters may also need to be changed, because reactivation of the system can dislodge substantial amounts of dust and create a transient burst of fungal spores.

Duct cleaning in health-care facilities has benefits in terms of system performance, but its usefulness for infection control has not been conclusively determined. Duct cleaning typically involves using specialized tools to dislodge dirt and a high-powered vacuum cleaner to clean out debris.[263] Some duct-cleaning services also apply chemical biocides or sealants to the inside surfaces of ducts to minimize fungal growth and prevent the release of particulate matter. The U.S. Environmental Protection Agency (EPA), however, has concerns with the use of sanitizers and/or disinfectants to treat the surfaces of ductwork, because the label indications for most of these products may not specifically include the use of the product in HVAC systems.[264] Further, EPA has not evaluated the potency of disinfectants in such applications, nor has the agency examined the potential attendant health and safety risks. The EPA recommends that companies use only those chemical biocides that are registered for use in HVAC systems.[264] Although infrequent cleaning of the exhaust ducts in AII areas has been documented as a cause of diminishing negative pressure and a decrease in the air exchange rates,[214] no data indicate that duct cleaning, beyond what is recommended for optimal performance, improves indoor air quality or reduces the risk of infection. Exhaust return systems should be cleaned as part of routine system maintenance. Duct cleaning has not been shown to prevent any health problems,[265] and EPA studies indicate that airborne particulate levels do not increase as a result of dirty air ducts, nor do they diminish after cleaning, presumably because much of the dirt inside air ducts adheres to duct surfaces and does not enter the conditioned space.[265] Additional research is needed to determine if air-duct contamination can significantly increase the airborne infection risk in general areas of health-care facilities.

## 4. Construction, Renovation, Remediation, Repair, and Demolition

### a. General Information

Environmental disturbances caused by construction and/or renovation and repair activities (e.g., disruption of the above-ceiling area, running cables through the ceiling, and structural repairs) in and near health-care facilities markedly increase the airborne *Aspergillus* spp. spore counts in the indoor air of such facilities, thereby increasing the risk for health-care–associated aspergillosis among high-risk patients. Although one case of health-care–associated aspergillosis is often difficult to link to a specific environmental exposure, the occurrence of temporarily clustered cases increase the likelihood that an environmental source within the facility may be identified and corrected.

22

**Table 7. Ventilation hazards in health-care facilities that may be associated with increased potential of airborne disease transmission\***

| Problem§ | Consequences | Possible solutions |
|---|---|---|
| Water-damaged building materials (18, 266) | Water leaks can soak wood, wall board, insulation, wall coverings. ceiling tiles, and carpeting. All of these materials can provide microbial habitat when wet. This is especially true for fungi growing on gypsum board. | 1. Replace water-damaged materials. 2. Incorporate fungistatic compounds into building materials in areas at risk for moisture problems. 3. Test for all moisture and dry in less than 72 hours. Replace if the material cannot dry within 72 hours. |
| Filter bypasses (17) | Rigorous air filtration requires air flow resistance. Air stream will elude filtration if openings are present because of filter damage or poor fit. | 1. Use pressure gauges to ensure that filters are performing at proper static pressure. 2. Make ease of installation and maintenance criteria for filter selection. 3. Properly train maintenance personnel in HVAC concerns. 4. Design system with filters down-stream from fans. 5. Avoid water on filters or insulation. |
| Improper fan setting (267) | Air must be delivered at design voume to maintain pressure balances. Air flow in special vent rooms reverses. | 1. Routinely monitor air flow and pressure balances throughout critical parts of HVAC system. 2. Minimize or avoid using rooms that switch between positive and negative pressure. |
| Ductwork disconnections (268) | Dislodged or leaky supply duct runs can spill into and leaky returns may draw from hidden areas. Pressure balance will be interrupted, and infectious material may be disturbed and entrained into hospital air supply. | 1. Design a ductwork system that is easy to access, maintain, and repair. 2. Train maintenance personnel to regularly monitor air flow volumes and pressure balances throughout the system. 3. Test critical areas for appropriate air flow |
| Air flow impedance (213) | Debris, structural failure, or improperly adjusted dampers can block duct work and prevent designed air flow. | 1. Design and budget for a duct system that is easy to inspect, maintain, and repair. 2. Alert contractors to use caution when working around HVAC systems during the construction phase. 3. Regularly clean exhaust grilles. 4. Provide monitoring for special ventilation areas. |
| Open windows (96, 247) | Open windows can alter fan-induced pressure balance and allow dirty-to-clean air flow. | 1. Use sealed windows. 2. Design HVAC systems to deliver sufficient outdoor dilution ventilation. 3. Ensure that OSHA indoor air quality standards are met. |
| Dirty window air conditioners (96, 269) | Dirt, moisture, and bird droppings can contaminate window air conditioners, which can then introduce infectious material into hospital rooms. | 1. Eliminate such devices in plans for new construction. 2. Where they must be used, make sure that they are routinely cleaned and inspected. |

| Problem§ | Consequences | Possible solutions |
|---|---|---|
| Inadequate filtration (270) | Infectious particles may pass through filters into vulnerable patient areas. | 1. Specify appropriate filters during new construction design phase. <br> 2. Make sure that HVAC fans are sized to overcome pressure demands of filter system. <br> 3. Inspect and test filters for proper installation. |
| Maintenance disruptions (271) | Fan shut-offs, dislodged filter cake material contaminates downstream air supply and drain pans. This may compromise air flow in special ventilation areas. | 1. Budget for a rigorous maintenance schedule when designing a facility. <br> 2. Design system for easy maintenance. <br> 3. Ensure communication between engineering and maintenance personnel. <br> 4. Institute an ongoing training program for all involved staff members. |
| Excessive moisture in the HVAC system (120) | Chronically damp internal lining of the HVAC system, excessive condensate, and drip pans with stagnant water may result from this problem. | 1. Locate duct humidifiers upstream of the final filters. <br> 2. Identify a means to remove water from the system. <br> 3. Monitor humidity; all duct take-offs should be downstream of the humidifiers so that moisture is absorbed completely. <br> 4. Use steam humidifiers in the HVAC system. |
| Duct contamination (18, 272) | Debris is released during maintenance or cleaning. | 1. Provide point-of-use filtration in the critical areas. <br> 2. Design air-handling systems with insulation of the exterior of the ducts. <br> 3. Do not use fibrous sound attenuators. <br> 4. Decontaminate or encapsulate contamination. |

\* Reprinted with permission of the publisher of reference 35 (Lippincott Williams and Wilkins).
§ Numbers in parentheses are reference citations.

Construction, renovation, repair, and demolition activities in health-care facilities require substantial planning and coordination to minimize the risk for airborne infection both during projects and after their completion. Several organizations and experts have endorsed a multi-disciplinary team approach (Box 4) to coordinate the various stages of construction activities (e.g., project inception, project implementation, final walk-through, and completion).[120, 249, 250, 273–276] Environmental services, employee health, engineering, and infection control must be represented in construction planning and design meetings should be convened with architects and design engineers. The number of members and disciplines represented is a function of the complexity of a project. Smaller, less complex projects and maintenance may require a minimal number of members beyond the core representation from engineering, infection control, environmental services, and the directors of the specialized departments.

24

**Box 4. Suggested members and functions of a multi-disciplinary coordination team for construction, renovation, repair, and demolition projects**

---

*Members*

---

Infection-control personnel, including hospital epidemiologists
Laboratory personnel
Facility administrators or their designated representatives, facility managers
Director of engineering
Risk-management personnel
Directors of specialized programs (e.g., transplantation, oncology and ICU* programs)
Employee safety personnel, industrial hygienists, and regulatory affairs personnel
Environmental services personnel
Information systems personnel
Construction administrators or their designated representatives
Architects, design engineers, project managers, and contractors

---

*Functions and responsibilities*

---

Coordinate members' input in developing a comprehensive project management plan.
Conduct a risk assessment of the project to determine potential hazards to susceptible patients.
Prevent unnecessary exposures of patients, visitors, and staff to infectious agents.
Oversee all infection-control aspects of construction activities.
Establish site-specific infection-control protocols for specialized areas.
Provide education about the infection-control impact of construction to staff and construction workers.
Ensure compliance with technical standards, contract provisions, and regulations.
Establish a mechanism to address and correct problems quickly.
Develop contingency plans for emergency response to power failures, water supply disruptions, and fires.
Provide a water-damage management plan (including drying protocols) for handling water intrusion from floods, leaks, and condensation.
Develop a plan for structural maintenance.

---

* ICU is intensive care unit.

Education of maintenance and construction workers, health-care staff caring for high-risk patients, and persons responsible for controlling indoor air quality heightens awareness that minimizing dust and moisture intrusion from construction sites into high-risk patient-care areas helps to maintain a safe environment.[120, 250, 271, 275-278] Visual and printed educational materials should be provided in the language spoken by the workers. Staff and construction workers also need to be aware of the potentially catastrophic consequences of dust and moisture intrusion when an HVAC system or water system fails during construction or repair; action plans to deal quickly with these emergencies should be developed in advance and kept on file. Incorporation of specific standards into construction contracts may help to prevent departures from recommended practices as projects progress. Establishing specific lines of communication is important to address problems (e.g., dust control, indoor air quality, noise levels, and vibrations), resolve complaints, and keep projects moving toward completion. Health-care facility staff should develop a mechanism to monitor worker adherence to infection-control guidelines on a daily basis in and around the construction site for the duration of the project.

*b. Preliminary Considerations*

The three major topics to consider before initiating any construction or repair activity are as follows: a) design and function of the new structure or area, b) assessment of environmental risks for airborne disease and opportunities for prevention, and c) measures to contain dust and moisture during construction or repairs. A checklist of design and function considerations can help to ensure that a planned structure or area can be easily serviced and maintained for environmental infection control (Box 5) .[17, 250, 273, 275-277] Specifications for the construction, renovation, remodeling, and maintenance of health-care facilities are outlined in the AIA document, *Guidelines for Design and Construction of Hospitals and Health Care Facilities*.[120, 275]

**Box 5. Construction design and function considerations for environmental infection control**

Location of sinks and dispensers for handwashing products and hand hygiene products
Types of faucets (e.g., aerated vs. non-aerated)
Air-handling systems engineered for optimal performance, easy maintenance, and repair
ACH and pressure differentials to accommodate special patient-care areas
Location of fixed sharps containers
Types of surface finishes (e.g., porous vs. non-porous)
Well-caulked walls with minimal seams
Location of adequate storage and supply areas
Appropriate location of medicine preparations areas (e.g., $\geq 3$ ft. from a sink)
Appropriate location and type of ice machines (e.g., preferably ice dispensers rather than ice bins)
Appropriate materials for sinks and wall coverings
Appropriate traffic flow (e.g., no "dirty" movement through "clean" areas)
Isolation rooms with anterooms as appropriate
Appropriate flooring (e.g., seamless floors in dialysis units)
Sensible use carpeting (e.g., avoiding use of carpeting in special care areas or areas likely to become wet)*
Convenient location of soiled utility areas
Properly engineered areas for linen services and solid waste management
Location of main generator to minimize the risk of system failure from flooding or other emergency
Installation guidelines for sheetrock

* Use of carpet cleaning methods (e.g., "bonneting") that disperse microorganisms into the air may increase the risk of airborne infection among at-risk patients, especially if they are in the vicinity of the cleaning activity.[111]

Proactive strategies can help prevent environmentally mediated airborne infections in health-care facilities during demolition, construction, and renovation. The potential presence of dust and moisture and their contribution to health-care–associated infections must be critically evaluated early in the planning of any demolition, construction, renovation, and repairs.[120, 250, 251, 273, 274, 276-279] Consideration must extend beyond dust generated by major projects to include dust that can become airborne if disturbed during routine maintenance and minor renovation activities (e.g., exposure of ceiling spaces for inspection; installation of conduits, cable, or sprinkler systems; rewiring; and structural repairs or replacement).[273, 276, 277] Other projects that can compromise indoor air quality include construction and repair jobs that inadvertently allow substantial amounts of raw, unfiltered outdoor air to enter the facility (e.g., repair of elevators and elevator shafts) and activities that dampen any structure, area, or item made of porous materials or characterized by cracks and crevices (e.g., sink cabinets in need of repair, carpets, ceilings, floors, walls, vinyl wall coverings, upholstery, drapes, and countertops).[18, 273, 277] Molds grow and proliferate on these surfaces when they become and remain wet.[21, 120, 250, 266, 270, 272, 280] Scrubbable

26

materials are preferred for use in patient-care areas.

Containment measures for dust and/or moisture control are dictated by the location of the construction site. Outdoor demolition and construction require actions to keep dust and moisture out of the facility (e.g., sealing windows and vents and keeping doors closed or sealed). Containment of dust and moisture generated from construction inside a facility requires barrier structures (either pre-fabricated or constructed of more durable materials as needed) and engineering controls to clean the air in and around the construction or repair site.

### c. Infection-Control Risk Assessment

An infection-control risk assessment (ICRA) conducted before initiating repairs, demolition, construction, or renovation activities can identify potential exposures of susceptible patients to dust and moisture and determine the need for dust and moisture containment measures. This assessment centers on the type and extent of the construction or repairs in the work area but may also need to include adjacent patient-care areas, supply storage, and areas on levels above and below the proposed project. An example of designing an ICRA as a matrix, the policy for performing an ICRA and implementing its results, and a sample permit form that streamlines the communication process are available.[281] Knowledge of the air flow patterns and pressure differentials helps minimize or eliminate the inadvertent dispersion of dust that could contaminate air space, patient-care items, and surfaces.[57, 282, 283] A recent aspergillosis outbreak among oncology patients was attributed to depressurization of the building housing the HSCT unit while construction was underway in an adjacent building. Pressure readings in the affected building (including 12 of 25 HSCT-patient rooms) ranged from 0.1 Pa–5.8 Pa. Unfiltered outdoor air flowed into the building through doors and windows, exposing patients in the HSCT unit to fungal spores.[283] During long-term projects, providing temporary essential services (e.g., toilet facilities) and conveniences (e.g., vending machines) to construction workers within the site will help to minimize traffic in and out of the area. The type of barrier systems necessary for the scope of the project must be defined.[12, 120, 250, 279, 284]

Depending on the location and extent of the construction, patients may need to be relocated to other areas in the facility not affected by construction dust.[51, 285] Such relocation might be especially prudent when construction takes place within units housing immunocompromised patients (e.g., severely neutropenic patients and patients on corticosteroid therapy). Advance assessment of high-risk locations and planning for the possible transport of patients to other departments can minimize delays and waiting time in hallways.[51] Although hospitals have provided immunocompromised patients with some form of respiratory protection for use outside their rooms, the issue is complex and remains unresolved until more research can be done. Previous guidance on this issue has been inconsistent.[9] Protective respirators (i.e., N95) were well tolerated by patients when used to prevent further cases of construction-related aspergillosis in a recent outbreak.[283] The routine use of the N95 respirator by patients, however, has not been evaluated for preventing exposure to fungal spores during periods of non-construction. Although health-care workers who would be using the N95 respirator for personal respiratory protect must be fit-tested, there is no indication that either patients or visitors should undergo fit-testing.

Surveillance activities should augment preventive strategies during construction projects.[3, 4, 20, 110, 286, 287] By determining baseline levels of health-care–acquired airborne and waterborne infections, infection-control staff can monitor changes in infection rates and patterns during and immediately after construction, renovations, or repairs.[3]

### d. Air Sampling

Air sampling in health-care facilities may be conducted both during periods of construction and on a periodic basis to determine indoor air quality, efficacy of dust-control measures, or air-handling system performance via parametric monitoring. Parametric monitoring consists of measuring the physical

performance of the HVAC system in accordance with the system manufacturer's specifications. A periodic assessment of the system (e.g., air flow direction and pressure, ACH, and filter efficiency) can give assurance of proper ventilation, especially for special care areas and operating rooms.[288]

Air sampling is used to detect aerosols (i.e., particles or microorganisms). Particulate sampling (i.e., total numbers and size range of particulates) is a practical method for evaluating the infection-control performance of the HVAC system, with an emphasis on filter efficiency in removing respirable particles (<5 μm in diameter) or larger particles from the air. Particle size is reported in terms of the mass median aerodynamic diameter (MMAD), whereas count median aerodynamic diameter (CMAD) is useful with respect to particle concentrations.

Particle counts in a given air space within the health-care facility should be evaluated against counts obtained in a comparison area. Particle counts indoors are commonly compared with the particulate levels of the outdoor air. This approach determines the "rank order" air quality from "dirty" (i.e., the outdoor air) to "clean" (i.e., air filtered through high-efficiency filters [90%–95% filtration]) to "cleanest" (i.e., HEPA-filtered air).[288] Comparisons from one indoor area to another may also provide useful information about the magnitude of an indoor air-quality problem. Making rank-order comparisons between clean, highly-filtered areas and dirty areas and/or outdoors is one way to interpret sampling results in the absence of air quality and action level standards.[35, 289]

In addition to verifying filter performance, particle counts can help determine if barriers and efforts to control dust dispersion from construction are effective. This type of monitoring is helpful when performed at various times and barrier perimeter locations during the project. Gaps or breaks in the barriers' joints or seals can then be identified and repaired. The American Conference of Governmental Industrial Hygienists (ACGIH) has set a threshold limit value-time weighted average (TLV®-TWA) of 10 mg/m³ for nuisance dust that contains no asbestos and <1% crystalline silica.[290] Alternatively, OSHA has set permissible exposure limits (PELs) for inert or nuisance dust as follows: respirable fraction at 5 mg/m³ and total dust at 15 mg/m³.[291] Although these standards are not measures of a bioaerosol, they are used for indoor air quality assessment in occupational settings and may be useful criteria in construction areas. Application of ACGIH guidance to health-care settings has not been standardized, but particulate counts in health-care facilities are likely to be well below this threshold value and approaching clean-room standards in certain care areas (e.g., operating rooms).[100]

Particle counters and anemometers are used in particulate evaluation. The anemometer measures air flow velocity, which can be used to determine sample volumes. Particulate sampling usually does not require microbiology laboratory services for the reporting of results.

Microbiologic sampling of air in health-care facilities remains controversial because of currently unresolved technical limitations and the need for substantial laboratory support (Box 6). Infection-control professionals, laboratorians, and engineers should determine if microbiologic and/or particle sampling is warranted and assess proposed methods for sampling. The most significant technical limitation of air sampling for airborne fungal agents is the lack of standards linking fungal spore levels with infection rates. Despite this limitation, several health-care institutions have opted to use microbiologic sampling when construction projects are anticipated and/or underway in efforts to assess the safety of the environment for immunocompromised patients.[35, 289] Microbiologic air sampling should be limited to assays for airborne fungi; of those, the thermotolerant fungi (i.e., those capable of growing at 95°F–98.6°F [35°C–37°C]) are of particular concern because of their pathogenicity in immunocompromised hosts.[35] Use of selective media (e.g., Sabouraud dextrose agar and inhibitory mold agar) helps with the initial identification of recovered organisms.

Microbiologic sampling for fungal spores performed as part of various airborne disease outbreak

28

investigations has also been problematic.[18, 49, 106, 111, 112, 289] The precise source of a fungus is often difficult to trace with certainty, and sampling conducted after exposure may neither reflect the circumstances that were linked to infection nor distinguish between health-care–acquired and community-acquired infections. Because fungal strains may fluctuate rapidly in the environment, health-care–acquired *Aspergillus* spp. infection cannot be confirmed or excluded if the infecting strain is not found in the health-care setting.[287] Sensitive molecular typing methods (e.g., randomly amplified polymorphic DNA (RAPD) techniques and a more recent DNA fingerprinting technique that detects restriction fragment length polymorphisms in fungal genomic DNA) to identify strain differences among *Aspergillus* spp., however, are becoming increasingly used in epidemiologic investigations of health-care–acquired fungal infection (A.Streifel, University of Minnesota, 2000).[68, 110, 286, 287, 292-296] During case cluster evaluation, microbiologic sampling may provide an isolate from the environment for molecular typing and comparison with patient isolates. Therefore, it may be prudent for the clinical laboratory to save *Aspergillus* spp. isolated from colonizations and invasive disease cases among patients in PE, oncology, and transplant services for these purposes.

**Box 6. Unresolved issues associated with microbiologic air sampling***

Lack of standards linking fungal spore levels with infection rates (i.e., no safe level of exposure)
Lack of standard protocols for testing (e.g., sampling intervals, number of samples, sampling locations)
Need for substantial laboratory support
Culture issues (e.g., false negatives, insensitivity, lag time between sampling and recording the results)
New, complex polymerase chain reaction (PCR) analytical methods
Unknown incubation period for *Aspergillus* spp. infection
Variability of sampler readings
Sensitivity of the sampler used (i.e., the volumes of air sampled)
Lack of details in the literature about describing sampling circumstances (e.g., unoccupied rooms vs. ongoing activities in rooms, expected fungal concentrations, and rate of outdoor air penetration)
Lack of correlation between fungal species and strains from the environment and clinical specimens
Confounding variables with high-risk patients (e.g., visitors and time spent outside of protective environment [PE] without respiratory protection)
Need for determination of ideal temperature for incubating fungal cultures (95°F [35°C] is the most commonly used temperature)

* Material in this box is compiled from references 35, 100, 222, 289, and 297.

Sedimentation methods using settle plates and volumetric sampling methods using solid impactors are commonly employed when sampling air for bacteria and fungi. Settle plates have been used by numerous investigators to detect airborne bacteria or to measure air quality during medical procedures (e.g., surgery).[17, 60, 97, 151, 161, 287] Settle plates, because they rely on gravity during sampling, tend to select for larger particles and lack sensitivity for respirable particles (e.g., individual fungal spores), especially in highly-filtered environments. Therefore, they are considered impractical for general use.[35, 289, 298-301] Settle plates, however, may detect fungi aerosolized during medical procedures (e.g., during wound dressing changes), as described in a recent outbreak of aspergillosis among liver transplant patients.[302]

The use of slit or sieve impactor samplers capable of collecting large volumes of air in short periods of time are needed to detect low numbers of fungal spores in highly filtered areas.[35, 289] In some

outbreaks, aspergillosis cases have occurred when fungal spore concentrations in PE ambient air ranged as low as 0.9–2.2 colony-forming units per cubic meter (CFU/m$^3$) of air.[18, 94] On the basis of the expected spore counts in the ambient air and the performance parameters of various types of volumetric air samplers, investigators of a recent aspergillosis outbreak have suggested that an air volume of at least 1000 L (1 m$^3$) should be considered when sampling highly filtered areas.[283] Investigators have also suggested limits of 15 CFU/m$^3$ for gross colony counts of fungal organisms and <0.1 CFU/m$^3$ for *Aspergillus fumigatus* and other potentially opportunistic fungi in heavily filtered areas ($\geq$12 ACH and filtration of $\geq$99.97% efficiency).[120] No correlation of these values with the incidence of health-care–associated fungal infection rates has been reported.

Air sampling in health-care facilities, whether used to monitor air quality during construction, to verify filter efficiency, or to commission new space prior to occupancy, requires careful notation of the circumstances of sampling. Most air sampling is performed under undisturbed conditions. However, when the air is sampled during or after human activity (e.g., walking and vacuuming), a higher number of airborne microorganisms likely is detected.[297] The contribution of human activity to the significance of air sampling and its impact on health-care–associated infection rates remain to be defined. Comparing microbiologic sampling results from a target area (e.g., an area of construction) to those from an unaffected location in the facility can provide information about distribution and concentration of potential airborne pathogens. A comparison of microbial species densities in outdoor air versus indoor air has been used to help pinpoint fungal spore bursts. Fungal spore densities in outdoor air are variable, although the degree of variation with the seasons appears to be more dramatic in the United States than in Europe.[92, 287, 303]

Particulate and microbiologic air sampling have been used when commissioning new HVAC system installations; however, such sampling is particularly important for newly constructed or renovated PE or operating rooms. Particulate sampling is used as part of a battery of tests to determine if a new HVAC system is performing to specifications for filtration and the proper number of ACH.[268, 288, 304] Microbiologic air sampling, however, remains controversial in this application, because no standards for comparison purposes have been determined. If performed, sampling should be limited to determining the density of fungal spores per unit volume of air space. High numbers of spores may indicate contamination of air-handling system components prior to installation or a system deficiency when culture results are compared with known filter efficiencies and rates of air exchange.

### e. External Demolition and Construction

External demolition, planned building implosions, and dirt excavation generate considerable dust and debris that can contain airborne microorganisms. In one study, peak concentrations in outdoor air at grade level and HVAC intakes during site excavation averaged 20,000 CFU/m$^3$ for all fungi and 500 CFU/m$^3$ for *Aspergillus fumigatus*, compared with 19 CFU/m$^3$ and 4 CFU/m$^3$, respectively, in the absence of construction.[280] Many health-care institutions are located in large, urban areas; building implosions are becoming a more frequent concern. Infection-control risk assessment teams, particularly those in facilities located in urban renewal areas, would benefit by developing risk management strategies for external demolition and construction as a standing policy. In light of the events of 11 September 2001, it may be necessary for the team to identify those dust exclusion measures that can be implemented rapidly in response to emergency situations (Table 8). Issues to be reviewed prior to demolition include a) proximity of the air intake system to the work site, b) adequacy of window seals and door seals, c) proximity of areas frequented by immunocompromised patients, and d) location of the underground utilities (D. Erickson, ASHE, 2000).[120, 250, 273, 276, 277, 280, 305]

30

**Table 8. Strategies to reduce dust and moisture intrusion during external demolition and construction**

| Item | Recommendation |
|---|---|
| Demolition site | • Shroud the site if possible to reduce environmental contamination. |
| Dust-generating equipment | • Prior to placing dust-generating equipment, evaluate the location to ensure that dust produced by the equipment will not enter the building through open doorways or windows, or through ventilation air intakes. |
| Construction materials storage | • Locate this storage away from the facility and ventilation air intakes. |
| Adjacent air intakes | • Seal off affected intakes, if possible, or move if funds permit. |
| HVAC system | • Consult with the facility engineer about pressure differentials and air recirculation options; keep facility air pressure positive to outside air. |
| Filters | • Ensure that filters are properly installed; change roughing filters frequently to prevent dust build-up on high-efficiency filters. |
| Windows | • Seal and caulk to prevent entry of airborne fungal spores. |
| Doors | • Keep closed as much as possible; do not prop open; seal and caulk unused doors (i.e., those that are not designated as emergency exits); use mats with tacky surfaces at outside entrances. |
| Water utilities | • Note location relative to construction area to prevent intrusion of dust into water systems.* |
| Medical gas piping | • Ensure that these lines/pipes are insulated during periods of vibration. |
| Rooftops | • Temporarily close off during active demolition/construction those rooftop areas that are normally open to the public (e.g., rooftop atrium). |
| Dust generation | • Provide methods (e.g., misting the area with water) to minimize dust. |
| Immunocompromised patients | • Use walk-ways protected from demolition/construction sites; avoid outside areas close to these sites; avoid rooftops. |
| Pedestrian traffic | • Close off entry ways as needed to minimize dust intrusion. |
| Truck traffic | • Reroute if possible, or arrange for frequent street cleaning. |
| Education and awareness+ | • Encourage reporting of hazardous or unsafe incidents associated with construction. |

* Contamination of water pipes during demolition activities has been associated with health-care–associated transmission of *Legionella* spp.[305]
+ When health-care facilities have immunosuppressed patients in their census, telephoning the city building department each month to find out if buildings are scheduled for demolition is prudent.

Minimizing the entry of outside dust into the HVAC system is crucial in reducing the risk for airborne contaminants. Facility engineers should be consulted about the potential impact of shutting down the system or increasing the filtration. Selected air handlers, especially those located close to excavation sites, may have to be shut off temporarily to keep from overloading the system with dust and debris. Care is needed to avoid significant facility-wide reductions in pressure differentials that may cause the building to become negatively pressured relative to the outside. To prevent excessive particulate overload and subsequent reductions in effectiveness of intake air systems that cannot be shut off temporarily, air filters must be inspected frequently for proper installation and function. Excessive dust

penetration can be avoided if recirculated air is maximally utilized while outdoor air intakes are shut down. Scheduling demolition and excavation during the winter, when *Aspergillus* spp. spores may be present in lower numbers, can help, although seasonal variations in spore density differ around the world.[92, 287, 303] Dust control can be managed by misting the dirt and debris during heavy dust-generating activities. To decrease the amount of aerosols from excavation and demolition projects, nearby windows, especially in areas housing immunocompromised patients, can be sealed and window and door frames caulked or weather-stripped to prevent dust intrusion.[50, 301, 306] Monitoring for adherence to these control measures throughout demolition or excavation is crucial. Diverting pedestrian traffic away from the construction sites decreases the amount of dust tracked back into the health-care facility and minimizes exposure of high-risk patients to environmental pathogens. Additionally, closing entrances near construction or demolition sites might be beneficial; if this is not practical, creating an air lock (i.e., pressurizing the entry way) is another option.

### f. Internal Demolition, Construction, Renovations, and Repairs

The focus of a properly implemented infection-control program during interior construction and repairs is containment of dust and moisture. This objective is achieved by a) educating construction workers about the importance of control measures; b) preparing the site; c) notifying and issuing advisories for staff, patients, and visitors; d) moving staff and patients and relocating patients as needed; e) issuing standards of practice and precautions during activities and maintenance; f) monitoring for adherence to control measures during construction and providing prompt feedback about lapses in control; g) monitoring HVAC performance; h) implementing daily clean-up, terminal cleaning and removal of debris upon completion; and i) ensuring the integrity of the water system during and after construction. These activities should be coordinated with engineering staff and infection-control professionals.

Physical barriers capable of containing smoke and dust will confine dispersed fungal spores to the construction zone.[279, 284, 307, 308] The specific type of physical barrier required depends on the project's scope and duration and on local fire codes. Short-term projects that result in minimal dust dispersion (e.g., installation of new cables or wiring above ceiling tiles) require only portable plastic enclosures with negative pressure and HEPA filtration of the exhaust air from the enclosed work area. The placement of a portable industrial-grade HEPA filter device capable of filtration rate of 300–800 ft$^3$/min. adjacent to the work area will help to remove fungal spores, but its efficacy is dependent on the supplied ACH and size of the area. If the project is extensive but short-term, dust-abatement, fire-resistant plastic curtains (e.g., Visqueen®) may be adequate. These should be completely airtight and sealed from ceiling to floor with overlapping curtains;[276, 277, 309] holes, tears, or other perforations should be repaired promptly with tape. A portable, industrial-grade HEPA filter unit on continuous operation is needed within the contained area, with the filtered air exhausted to the outside of the work zone. Patients should not remain in the room when dust-generating activities are performed. Tools to assist the decision-making process regarding selection of barriers based on an ICRA approach are available.[281]

More elaborate barriers are indicated for long-term projects that generate moderate to large amounts of dust. These barrier structures typically consist of rigid, noncombustible walls constructed from sheet rock, drywall, plywood, or plaster board and covered with sheet plastic (e.g., Visqueen®). Barrier requirements to prevent the intrusion of dust into patient-care areas include a) installing a plastic dust abatement curtain before construction of the rigid barrier; b) sealing and taping all joint edges including the top and bottom; c) extending the barrier from floor to floor, which takes into account the space [approximately 2–8 ft.] above the finished, lay-down ceiling; and d) fitting or sealing any temporary doors connecting the construction zone to the adjacent area. (See Box 7 for a list of the various construction and repair activities that require the use of some type of barrier.)

32

## Box 7. Construction/repair projects that require barrier structures*

Demolition of walls, wallboard, plaster, ceramic tiles, ceiling tiles, and ceilings
Removal of flooring and carpeting, windows and doors, and casework
Working with sinks and plumbing that could result in aerosolization of water in high-risk areas
Exposure of ceiling spaces for demolition and for installation or rerouting of utility services (e.g., rewiring, electrical conduction installation, HVAC ductwork, and piping)
Crawling into ceiling spaces for inspection in a manner that may dislodge dust
Demolition, repair, or construction of elevator shafts
Repairing water damage

* Material for this box was compiled from references 120, 250, 273, 276, and 277.

Dust and moisture abatement and control rely primarily on the impermeable barrier containment approach; as construction continues, numerous opportunities can lead to dispersion of dust to other areas of the health-care facility. Infection-control measures that augment the use of barrier containment should be undertaken (Table 9).

Dust-control measures for clinical laboratories are an essential part of the infection-control strategy during hospital construction or renovation. Use of plastic or solid barriers may be needed if the ICRA determines that air flow from construction areas may introduce airborne contaminants into the laboratory space. In one facility, pseudofungemia clusters attributed to *Aspergillus* spp. and *Penicillium* spp. were linked to improper air flow patterns and construction projects adjacent to the laboratory; intrusion of dust and spores into a biological safety cabinet from construction activity immediately next to the cabinet resulted in a cluster of cultures contaminated with *Aspergillus niger*.[310, 311] Reportedly, no barrier containment was used and the HEPA filtration system was overloaded with dust. In addition, an outbreak of pseudobacteremia caused by *Bacillus* spp. occurred in another hospital during construction above a storage area for blood culture bottles.[207] Airborne spread of *Bacillus* spp. spores resulted in contamination of the bottles' plastic lids, which were not disinfected or handled with proper aseptic technique prior to collection of blood samples.

## Table 9. Infection-control measures for internal construction and repair projects*+

| Infection-control measure | Steps for implementation |
|---|---|
| Prepare for the project. | 1. Use a multi-disciplinary team approach to incorporate infection control into the project.<br>2. Conduct the risk assessment and a preliminary walk-through with project managers and staff. |
| Educate staff and construction workers. | 1. Educate staff and construction workers about the importance of adhering to infection-control measures during the project.<br>2. Provide educational materials in the language of the workers.<br>3. Include language in the construction contract requiring construction workers and subcontractors to participate in infection-control training. |
| Issue hazard and warning notices. | 1. Post signs to identify construction areas and potential hazards.<br>2. Mark detours requiring pedestrians to avoid the work area. |
| Relocate high-risk patients as needed, especially if the construction is in or adjacent to a PE area. | 1. Identify target patient populations for relocation based on the risk assessment.<br>2. Arrange for the transfer in advance to avoid delays.<br>3. At-risk patients should wear protective respiratory equipment (e.g., a high-efficiency mask) when outside their PE rooms. |
| Establish alternative traffic patterns for staff, patients, visitors, and construction workers. | 1. Determine appropriate alternate routes from the risk assessment.<br>2. Designate areas (e.g., hallways, elevators, and entrances/exits) for construction-worker use.<br>3. Do not transport patients on the same elevator with construction materials and debris. |

| Infection-control measure | Steps for implementation |
|---|---|
| Erect appropriate barrier containment. | 1. Use prefabricated plastic units or plastic sheeting for short-term projects that will generate minimal dust.<br>2. Use durable rigid barriers for ongoing, long-term projects. |
| Establish proper ventilation. | 1. Shut off return air vents in the construction zone, if possible, and seal around grilles.<br>2. Exhaust air and dust to the outside, if possible.<br>3. If recirculated air from the construction zone is unavoidable, use a pre-filter and a HEPA filter before the air returns to the HVAC system.<br>4. When vibration-related work is being done that may dislodge dust in the ventilation system or when modifications are made to ductwork serving occupied spaces, install filters on the supply air grilles temporarily.<br>5. Set pressure differentials so that the contained work area is under negative pressure.<br>6. Use air flow monitoring devices to verify the direction of the air pattern.<br>7. Exhaust air and dust to the outside, if possible.<br>8. Monitor temperature, air changes per hour (ACH), and humidity levels (humidity levels should be <65%).<br>9. Use portable, industrial grade HEPA filters in the adjacent area and/or the construction zone for additional ACH.<br>10. Keep windows closed, if possible. |
| Control solid debris. | 1. When replacing filters, place the old filter in a bag prior to transport and dispose as a routine solid waste.<br>2. Clean the construction zone daily or more often as needed.<br>3. Designate a removal route for small quantities of solid debris.<br>4. Mist debris and cover disposal carts before transport (i.e., leaving the construction zone).<br>5. Designate an elevator for construction crew use.<br>6. Use window chutes and negative pressure equipment for removal of larger pieces of debris while maintaining pressure differentials in the construction zone.<br>7. Schedule debris removal to periods when patient exposures to dust is minimal. |
| Control water damage. | 1. Make provisions for dry storage of building materials.<br>2. Do not install wet, porous building materials (i.e., sheet rock).<br>3. Replace water-damaged porous building materials if they cannot be completely dried out within 72 hours. |
| Control dust in air and on surfaces. | 1. Monitor the construction area daily for compliance with the infection-control plan.<br>2. Protective outer clothing for construction workers should be removed before entering clean areas.<br>3. Use mats with tacky surfaces within the construction zone at the entry; cover sufficient area so that both feet make contact with the mat while walking through the entry.<br>4. Construct an anteroom as needed where coveralls can be donned and removed.<br>5. Clean the construction zone and all areas used by construction workers with a wet mop.<br>6. If the area is carpeted, vacuum daily with a HEPA-filtered-equipped vacuum.<br>7. Provide temporary essential services (e.g., toilets) and worker conveniences (e.g, vending machines) in the construction zone as appropriate.<br>8. Damp-wipe tools if removed from the construction zone or left in the area.<br>9. Ensure that construction barriers remain well sealed; use particle sampling as needed.<br>10. Ensure that the clinical laboratory is free from dust contamination. |

34

| Infection-control measure | Steps for implementation |
|---|---|
| Complete the project. | 1. Flush the main water system to clear dust-contaminated lines. |
| | 2. Terminally clean the construction zone before the construction barriers are removed. |
| | 3. Check for visible mold and mildew and eliminate (i.e., decontaminate and remove), if present. |
| | 4. Verify appropriate ventilation parameters for the new area as needed. |
| | 5. Do not accept ventilation deficiencies, especially in special care areas. |
| | 6. Clean or replace HVAC filters using proper dust-containment procedures. |
| | 7. Remove the barriers and clean the area of any dust generated during this work. |
| | 8. Ensure that the designated air balances in the operating rooms (OR) and protective environments (PE) are achieved before occupancy. |
| | 9. Commission the space as indicated, especially in the OR and PE, ensuring that the room's required engineering specifications are met. |

* Material in this table includes information from D. Erickson, ASHE, 2000.
+ Material in this table was compiled from references 19, 51, 67, 80, 106, 120, 250, 266, 273, 276–278, 280, 285, and 309, 312–315.

# 5. Environmental Infection-Control Measures for Special Health-Care Settings

Areas in health-care facilities that require special ventilation include a) operating rooms; b) PE rooms used by high-risk, immunocompromised patients; and c) AII rooms for isolation of patients with airborne infections (e.g., those caused by *M. tuberculosis*, VZV, or measles virus). The number of rooms required for PE and AII are determined by a risk assessment of the health-care facility.[6] Continuous, visual monitoring of air flow direction is required for new or renovated pressurized rooms.[120, 256]

## *a. Protective Environments (PE)*

Although the exact configuration and specifications of PEs might differ among hospitals, these care areas for high-risk, immunocompromised patients are designed to minimize fungal spore counts in air by maintaining a) filtration of incoming air by using central or point-of-use HEPA filters; b) directed room air flow [i.e., from supply on one side of the room, across the patient, and out through the exhaust on the opposite side of the room]; c) positive room air pressure of 2.5 Pa [0.01" water gauge] relative to the corridor; d) well-sealed rooms; and e) $\geq$12 ACH.[44, 120, 251, 254, 316–319] Air flow rates must be adjusted accordingly to ensure sufficient ACH, and these rates vary depending on certain factors (e.g., room air leakage area). For example, to provide $\geq$12 ACH in a typical patient room with 0.5 sq. ft. air leakage, the air flow rate will be minimally 125 cubic feet/min (cfm).[320, 321] Higher air flow rates may be needed. A general ventilation diagram for a positive-pressure room is given in Figure 2. Directed room air flow in PE rooms is not laminar; parallel air streams are not generated. Studies attempting to demonstrate patient benefit from laminar air flow in a PE setting are equivocal.[316, 318, 319, 322-327]

Air flow direction at the entrances to these areas should be maintained and verified, preferably on a daily basis, using either a visual means of indication (e.g., smoke tubes and flutter strips) or manometers. Permanent installation of a visual monitoring device is indicated for new PE construction and renovation.[120] Facility service structures can interfere with the proper unidirectional air flow from the patients' rooms to the adjacent corridor. In one outbreak investigation, *Aspergillus* spp. infections in a critical care unit may have been associated with a pneumatic specimen transport system, a textile disposal duct system, and central vacuum lines for housekeeping, all of which disrupted proper air flow from the patients' rooms to the outside and allowed entry of fungal spores into the unit (M.McNeil, CDC, 2000).

**Figure 2. Example of positive-pressure room control for protection from airborne environmental microbes (PE)\* + §**



\* Stacked black boxes represent patient's bed. Long open box with cross-hatch represents supply air. Open boxes with single, diagonal slashes represent air exhaust registers. Arrows indicate directions of air flow.

+ Possible uses include immunocompromised patient rooms (e.g., hematopoietic stem cell transplant or solid organ transplant procedure rooms) and orthopedic operating rooms.

§ Positive-pressure room engineering features include
  • positive pressure (greater supply than exhaust air volume);
  • pressure differential range of 2.5–8 Pa (0.01–0.03-in. water gauge), ideal at 8 Pa;
  • air flow volume differential >125-cfm supply versus exhaust;
  • sealed room, approximately 0.5-sq. ft. leakage;
  • clean to dirty air flow;
  • monitoring;
  • ≥12 air changes per hour (ACH); and
  • return air if refiltered.

¶ This diagram is a generic illustration of air flow in a typical installation. Alternative air flow arrangements are recognized. Adapted and used with permission from A. Streifel and the publisher of reference 328 (Penton Media, Inc.)

The use of surface fungicide treatments is becoming more common, especially for building materials.[329] Copper-based compounds have demonstrated anti-fungal activity and are often applied to wood or paint. Copper-8-quinolinolate was used on environmental surfaces contaminated with *Aspergillus* spp. to control one reported outbreak of aspergillosis.[310] The compound was also incorporated into the fireproofing material of a newly constructed hospital to help decrease the environmental spore burden.[316]

*b. Airborne Infection Isolation (AII)*

Acute-care inpatient facilities need at least one room equipped to house patients with airborne infectious disease. Every health-care facility, including ambulatory and long-term care facilities, should undertake an ICRA to identify the need for AII areas. Once the need is established, the appropriate ventilation equipment can be identified. Air handling systems for this purpose need not be restricted to central systems. Guidelines for the prevention of health-care–acquired TB have been published in response to multiple reports of health-care–associated transmission of multi-drug resistant strains.[4, 330] In reports documenting health-care–acquired TB, investigators have noted a failure to comply fully with prevention measures in established guidelines.[331 - 345] These gaps highlight the importance of prompt recognition of the disease, isolation of patients, proper treatment, and engineering controls. AII rooms

36

are also appropriate for the care and management of smallpox patients.[6] Environmental infection control with respect to smallpox is currently being revisited (see Appendix E).

Salient features of engineering controls for AII areas include a) use of negative pressure rooms with close monitoring of air flow direction using manometers or temporary or installed visual indicators [e.g., smoke tubes and flutter strips] placed in the room with the door closed; b) minimum 6 ACH for existing facilities, ≥12 ACH for areas under renovation or for new construction; and c) air from negative pressure rooms and treatment rooms exhausted directly to the outside if possible.[4, 120, 248] As with PE, airflow rates need to be determined to ensure the proper numbers of ACH.[320, 321] AII rooms can be constructed either with (Figure 3) or without (Figure 4) an anteroom. When the recirculation of air from AII rooms is unavoidable, HEPA filters should be installed in the exhaust duct leading from the room to the general ventilation system. In addition to UVGI fixtures in the room, UVGI can be placed in the ducts as an adjunct measure to HEPA filtration, but it can not replace the HEPA filter.[4, 346] A UVGI fixture placed in the upper room, coupled with a minimum of 6 ACH, also provides adequate air cleaning.[248]

**Figure 3. Example of negative-pressure room control for airborne infection isolation (AII)\* + §¶**



\* Stacked black boxes represent patient's bed. Long open box with cross-hatch represents supply air. Open boxes with single, diagonal slashes represent air exhaust registers. Arrows indicate direction of air flow.
+ Possible uses include treatment or procedure rooms, bronchoscopy rooms, and autopsy.
§ Negative-pressure room engineering features include
  • negative pressure (greater exhaust than supply air volume);
  • pressure differential of 2.5 Pa (0.01-in. water gauge);
  • air flow volume differential >125-cfm exhaust versus supply;
  • sealed room, approximately 0.5-sq. ft. leakage;
  • clean to dirty air flow;
  • monitoring;
  • ≥12 air changes per hour (ACH) new or renovation, 6 ACH existing; and
  • exhaust to outside or HEPA-filtered if recirculated.
¶ This diagram is a generic illustration of air flow in a typical installation. Alternative air flow arrangements are recognized. Adapted and used with permission from A. Streifel and the publisher of reference 328 (Penton Media, Inc.)

One of the components of airborne infection isolation is respiratory protection for health-care workers and visitors when entering AII rooms.[4, 6, 347] Recommendations of the type of respiratory protection are dependent on the patient's airborne infection (indicating the need for AII) and the risk of infection to

persons entering the AII room. A more in-depth discussion of respiratory protection in this instance is presented in the current isolation guideline;[6] a revision of this guideline is in development. Cough-inducing procedures (e.g., endotracheal intubation and suctioning of known or suspected TB patients, diagnostic sputum induction, aerosol treatments, and bronchoscopy) require similar precautions.[348-350]

Additional engineering measures are necessary for the management of patients requiring PE (i.e., allogeneic HSCT patients) who concurrently have airborne infection. For this type of patient treatment, an anteroom (Figure 4) is required in new construction and renovation as per AIA guidelines.[120]

**Figure 4. Example of airborne infection isolation (AII) room with anteroom and neutral anteroom\* + §**



\* The top diagram indicates air flow patterns when patient with only airborne infectious disease occupies room. Middle and bottom diagrams indicate recommended air flow patterns when room is occupied by immunocompromised patient with airborne infectious disease. Stacked black boxes represent patient beds. Long open boxes with cross-hatches represent supply air. Open boxes with single, diagonal slashes represent air exhaust registers. Arrows indicate directions of air flow.

+ AII isolation room with anteroom engineering features include
  • pressure differential of 2.5 Pa (0.01-in. water gauge) measured at the door between patient room and anteroom;
  • air flow volume differential >125-cfm. depending on anteroom air flow direction (pressurized versus depressurized);

38

- sealed room with approximately 0.5-sq. ft. leakage;
- clean to dirty air flow
- monitoring;
- ≥12 air changes per hour (ACH) new or renovation, 6 ACH existing; and
- anteroom air flow patterns. The small ■ in panels 1 and 2 indicate the anteroom is pressurized (supply versus exhaust), while the small ● in panel 3 indicates the anteroom is depressurized (exhaust versus supply).

§ Used with permission of A. Streifel, University of Minnesota

The pressure differential of an anteroom can be positive or negative relative to the patient in the room.[120] An anteroom can act as an airlock (Figure 4). If the anteroom is positive relative to the air space in the patient's room, staff members do not have to mask prior to entry into the anteroom if air is directly exhausted to the outside and a minimum of 10 ACH (Figure 4, top diagram).[120] When an anteroom is negative relative to both the AII room and the corridor, health-care workers must mask prior to entering the anteroom (Figure 4, bottom diagram). If an AII room with an anteroom is not available, use of a portable, industrial-grade HEPA filter unit may help to increase the number of ACHs while facilitating the removal of fungal spores; however, a fresh air source must be present to achieve the proper air exchange rate. Incoming ambient air should receive HEPA filtration.

### c. Operating Rooms

Operating room air may contain microorganisms, dust, aerosol, lint, skin squamous epithelial cells, and respiratory droplets. The microbial level in operating room air is directly proportional to the number of people moving in the room.[351] One study documented lower infection rates with coagulase-negative staphylococci among patients when operating room traffic during the surgical procedure was limited.[352] Therefore, efforts should be made to minimize personnel traffic during operations. Outbreaks of SSIs caused by group A beta-hemolytic streptococci have been traced to airborne transmission from colonized operating-room personnel to patients.[150-154] Several potential health-care–associated pathogens (e.g., *Staphylococcus aureus* and *Staphylococcus epidermidis*) and drug-resistant organisms have also been recovered from areas adjacent to the surgical field,[353] but the extent to which the presence of bacteria near the surgical field influences the development of postoperative SSIs is not clear.[354]

Proper ventilation, humidity (<68%), and temperature control in the operating room is important for the comfort of surgical personnel and patients, but also in preventing environmental conditions that encourage growth and transmission of microorganisms.[355] Operating rooms should be maintained at positive pressure with respect to corridors and adjacent areas.[356] Operating rooms typically do not have a variable air handling system. Variable air handling systems are permitted for use in operating rooms only if they continue to provide a positive pressure with respect to the corridors and adjacent areas and the proper ACHs are maintained when the room is occupied. Conventional operating-room ventilation systems produce a minimum of about 15 ACH of filtered air for thermal control, three (20%) of which must be fresh air.[120, 357, 358] Air should be introduced at the ceiling and exhausted near the floor.[357, 359]

Laminar airflow and UVGI have been suggested as adjunct measures to reduce SSI risk for certain operations. Laminar airflow is designed to move particle-free air over the aseptic operating field at a uniform velocity (0.3–0.5 m/sec), sweeping away particles in its path. This air flow can be directed vertically or horizontally, and recirculated air is passed through a HEPA filter.[360-363] Neither laminar airflow nor UV light, however, has been conclusively shown to decrease overall SSI risk.[356, 364-370]

Elective surgery on infectious TB patients should be postponed until such patients have received adequate drug therapy. The use of general anesthesia in TB patients poses infection-control challenges because intubation can induce coughing, and the anesthesia breathing circuit apparatus potentially can become contaminated.[371] Although operating room suites at 15 ACH exceed the air exchanges required

for TB isolation, the positive air flow relative to the corridor could result in health-care–associated transmission of TB to operating-room personnel. If feasible, intubation and extubation of the TB surgical patient should be performed in AII. AIA currently does not recommend changing pressure from positive to negative or setting it to neutral; most facilities lack the capability to do so.[120] When emergency surgery is indicated for a suspected/diagnosed infectious TB patient, taking specific infection-control measures is prudent (Box 8).

### Box 8. Strategy for managing TB patients and preventing airborne transmission in operating rooms*

1. If emergency surgery is indicated for a patient with active TB, schedule the TB patient as the last surgical case to provide maximum time for adequate ACH.
2. Operating room personnel should use NIOSH-approved N95 respirators without exhalation valves.[347]
3. Keep the operating room door closed after the patient is intubated, and allow adequate time for sufficient ACH to remove 99% of airborne particles (Appendix B, Table B.1.):
   a) after the patient is intubated and particularly if intubation produces coughing;
   b) if the door to the operating suite must be opened, and intubation induces coughing in the patient; or
   c) after the patient is extubated and suctioned [unless a closed suctioning system is present].
4. Extubate the patient in the operating room or allow the patient to recover in AII rather than in the regular open recovery facilities.
5. Temporary use of a portable, industrial grade HEPA filter may expedite removal of airborne contaminants (fresh-air exchange requirements for proper ventilation must still be met).+
6. Breathing circuit filters with 0.1–0.2 μm pore size can be used as an adjunct infection-control measure.[373, 374]

* Material in this table was compiled from references 4, 347, and 372–374.
+ The placement of portable HEPA filter units in the operating room must be carefully evaluated for potential disruptions in normal air flow. The portable unit should be turned off while the surgical procedure is underway and turned on following extubation. Portable HEPA filter units previously placed in construction areas may be used in subsequent patient care, provided that all internal and external surfaces are cleaned and the filter's performance is verified with appropriate particle testing and is changed, if needed.

### Table 10. Summary of ventilation specifications in selected areas of health-care facilities*

| Specifications | AII room+ | PE room | Critical care room§ | Isolation anteroom | Operating room |
|---|---|---|---|---|---|
| Air pressure¶ | Negative | Positive | Positive, negative, or neutral | Positive or negative | Positive |
| Room air changes | ≥6 ACH (for existing rooms); ≥12 ACH (for renovation or new construction) | ≥12 ACH | ≥6 ACH | ≥10 ACH | ≥15 ACH |
| Sealed** | Yes | Yes | No | Yes | Yes |
| Filtration supply | 90% (dust-spot ASHRAE 52.1 1992) | 99.97%++ | ≥90% | ≥90% | 90% |
| Recirculation | No§§ | Yes | Yes | No | Yes |

* Material in this table is compiled from references 35 and 120.
+ Includes bronchoscopy suites.
§ Positive pressure and HEPA filters may be preferred in some rooms in intensive care units (ICUs) caring for large numbers of immunocompromised patients.
¶ Clean-to-dirty: negative to an infectious patient, positive away from an immunocompromised patient.
** Minimized infiltration for ventilation control; pertains to windows, closed doors, and surface joints.
++ Fungal spore filter at point of use (HEPA at 99.97% of 0.3 μm particles).

40

§§ Recirculated air may be used if the exhaust air is first processed through a HEPA filter.
¶¶ Table used with permission of the publisher of reference 35 (Lippincott Williams and Wilkins).

## 6. Other Aerosol Hazards in Health-Care Facilities

In addition to infectious bioaerosols, several crucial non-infectious, indoor air-quality issues must be addressed by health-care facilities. The presence of sensitizing and allergenic agents and irritants in the workplace (e.g., ethylene oxide, glutaraldehyde, formaldehyde, hexachlorophene, and latex allergens[375]) is increasing. Asthma and dermatologic and systemic reactions often result with exposure to these chemicals. Anesthetic gases and aerosolized medications (e.g., ribavirin, pentamidine, and aminoglycosides) represent some of the emerging potentially hazardous exposures to health-care workers. Containment of the aerosol at the source is the first level of engineering control, but personal protective equipment (e.g., masks, respirators, and glove liners) that distances the worker from the hazard also may be needed.

Laser plumes and surgical smoke represent another potential risk for health-care workers.[376–378] Lasers transfer electromagnetic energy into tissues, resulting in the release of a heated plume that includes particles, gases, tissue debris, and offensive smells. One concern is that aerosolized infectious material in the laser plume might reach the nasal mucosa of surgeons and adjacent personnel. Although some viruses (i.e., varicella-zoster virus, pseudorabies virus, and herpes simplex virus) do not aerosolize efficiently,[379, 380] other viruses and bacteria (e.g., human papilloma virus [HPV], HIV, coagulase-negative *Staphylococcus, Corynebacterium* spp., *and Neisseria* spp.) have been detected in laser plumes.[381–387] The presence of an infectious agent in a laser plume may not, however, be sufficient to cause disease from airborne exposure, especially if the normal mode of transmission for the agent is not airborne. No evidence indicated that HIV or hepatitis B virus (HBV) has been transmitted via aerosolization and inhalation.[388]

Although continuing studies are needed to fully evaluate the risk of laser plumes to surgical personnel, the prevention measures in these other guidelines should be followed: a) NIOSH recommendations,[378] b) the *Recommended Practices for Laser Safety in Practice Settings* developed by the Association of periOperative Registered Nurses [AORN],[389] c) the assessments of ECRI,[390–392] and d) the ANSI standard.[393] These guidelines recommend the use of a) respirators (N95 or N100) or full face shields and masks,[260] b) central wall-suction units with in-line filters to collect particulate matter from minimal plumes, and c) dedicated mechanical smoke exhaust systems with a high-efficiency filter to remove large amounts of laser plume. Although transmission of TB has occurred as a result of abscess management practices that lacked airborne particulate control measures and respiratory protection, use of a smoke evacuator or needle aspirator and a high degree of clinical awareness can help protect health-care workers when excising and draining an extrapulmonary TB abscess.[137]

# D. Water

## 1. Modes of Transmission of Waterborne Diseases

Moist environments and aqueous solutions in health-care settings have the potential to serve as reservoirs for waterborne microorganisms. Under favorable environmental circumstances (e.g., warm temperature and the presence of a source of nutrition), many bacterial and some protozoal microorganisms can either proliferate in active growth or remain for long periods in highly stable, environmentally resistant (yet infectious) forms. Modes of transmission for waterborne infections

include a) direct contact [e.g., that required for hydrotherapy]; b) ingestion of water [e.g., through consuming contaminated ice]; c) indirect-contact transmission [e.g., from an improperly reprocessed medical device];[6] d) inhalation of aerosols dispersed from water sources;[3] and e) aspiration of contaminated water. The first three modes of transmission are commonly associated with infections caused by gram-negative bacteria and nontuberculous mycobacteria (NTM). Aerosols generated from water sources contaminated with *Legionella* spp. often serve as the vehicle for introducing legionellae to the respiratory tract.[394]

## 2. Waterborne Infectious Diseases in Health-Care Facilities

### a. Legionellosis

Legionellosis is a collective term describing infection produced by *Legionella* spp., whereas Legionnaires disease is a multi-system illness with pneumonia.[395] The clinical and epidemiologic aspects of these diseases (Table 11) are discussed extensively in another guideline.[3] Although Legionnaires disease is a respiratory infection, infection-control measures intended to prevent health-care–associated cases center on the quality of water—the principal reservoir for *Legionella* spp.

**Table 11. Clinical and epidemiologic characteristics of legionellosis/Legionnaires disease**

| | | References |
|---|---|---|
| Causative agent | *Legionella pneumophila* (90% of infections); *L. micdadei, L. bozemanii, L. dumoffii, L. longbeachii*, (14 additional species can cause infection in humans) | 395–399 |
| Mode of transmission | Aspiration of water, direct inhalation or water aerosols | 3, 394–398, 400 |
| Source of exposure | Exposure to environmental sources of *Legionella* spp. (i.e., water or water aerosols) | 31, 33, 401–414 |
| Clinical syndromes and diseases | Two distinct illnesses: a) Pontiac fever [a milder, influenza-like illness]; and b) progressive pneumonia that may be accompanied by cardiac, renal, and gastrointestinal involvement | 3, 397–399, 415–422 |
| Populations at greatest risk | Immunosuppressed patients (e.g., transplant patients, cancer patients, and patients receiving corticosteroid therapy); immunocompromised patients (e.g., surgical patients, patients with underlying chronic lung disease, and dialysis patients); elderly persons; and patients who smoke | 395–397, 423–433 |
| Occurrence | Proportion of community-acquired pneumonia caused by *Legionella* spp. ranges from 1%–5%; estimated annual incidence among the general population is 8,000–18,000 cases in the United States; the incidence of health-care–associated pneumonia (0%–14%) may be underestimated if appropriate laboratory diagnostic methods are unavailable. | 396, 397, 434–444 |
| Mortality rate | Mortality declined markedly during 1980–1998, from 34% to 12% for all cases; the mortality rate is higher among persons with health-care–associated pneumonia compared with the rate among community-acquired pneumonia patients (14% for health-care–associated pneumonia versus 10% for community-acquired pneumonia [1998 data]). | 395–397, 445 |

*Legionella* spp. are commonly found in various natural and man-made aquatic environments[446,447] and can enter health-care facility water systems in low or undetectable numbers.[448,449] Cooling towers, evaporative condensers, heated potable water distribution systems, and locally-produced distilled water can provide environments for multiplication of legionellae.[450–454] In several hospital outbreaks, patients have been infected through exposure to contaminated aerosols generated by cooling towers, showers, faucets, respiratory therapy equipment, and room-air humidifiers.[401–410,455] Factors that enhance

42

colonization and amplification of legionellae in man-made water environments include a) temperatures of 77°F–107.6°F [25°C–42°C],[456–460] b) stagnation,[461] c) scale and sediment,[462] and d) presence of certain free-living aquatic amoebae that can support intracellular growth of legionellae.[462, 463] The bacteria multiply within single-cell protozoa in the environment and within alveolar macrophages in humans.

*b. Other Gram-Negative Bacterial Infections*

Other gram-negative bacteria present in potable water also can cause health-care–associated infections. Clinically important, opportunistic organisms in tap water include *Pseudomonas aeruginosa*, *Pseudomonas* spp., *Burkholderia cepacia*, *Ralstonia pickettii*, *Stenotrophomonas maltophilia*, and *Sphingomonas* spp. (Tables 12 and 13). Immunocompromised patients are at greatest risk of developing infection. Medical conditions associated with these bacterial agents range from colonization of the respiratory and urinary tracts to deep, disseminated infections that can result in pneumonia and bloodstream bacteremia. Colonization by any of these organisms often precedes the development of infection. The use of tap water in medical care (e.g., in direct patient care, as a diluent for solutions, as a water source for medical instruments and equipment, and during the final stages of instrument disinfection) therefore presents a potential risk for exposure. Colonized patients also can serve as a source of contamination, particularly for moist environments of medical equipment (e.g., ventilators).

In addition to *Legionella* spp., *Pseudomonas aeruginosa* and *Pseudomonas* spp. are among the most clinically relevant, gram-negative, health-care–associated pathogens identified from water. These and other gram-negative, non-fermentative bacteria have minimal nutritional requirements (i.e., these organisms can grow in distilled water) and can tolerate a variety of physical conditions. These attributes are critical to the success of these organisms as health-care–associated pathogens. Measures to prevent the spread of these organisms and other waterborne, gram-negative bacteria include hand hygiene, glove use, barrier precautions, and eliminating potentially contaminated environmental reservoirs.[464, 465]

**Table 12.** *Pseudomonas aeruginosa* **infections in health-care facilities**

| | | References |
|---|---|---|
| **Clinical syndromes and diseases** | Septicemia, pneumonia (particularly ventilator-associated), chronic respiratory infections among cystic fibrosis patients, urinary tract infections, skin and soft-tissue infections (e.g., tissue necrosis and hemorrhage), burn-wound infections, folliculitis, endocarditis, central nervous system infections (e.g., meningitis and abscess), eye infections, and bone and joint infections | 466–503 |
| **Modes of transmission** | Direct contact with water, aerosols: aspiration of water and inhalation of water aerosols; and indirect transfer from moist environmental surfaces via hands of health-care workers | 28, 502–506 |
| **Environmental sources of pseudomonads in health-care settings** | Potable (tap) water, distilled water, antiseptic solutions contaminated with tap water, sinks, hydrotherapy pools, whirlpools and whirlpool spas, water baths, lithotripsy therapy tanks, dialysis water, eyewash stations, flower vases, and endoscopes with residual moisture in the channels | 28, 29, 466, 468, 507–520 |
| **Environmental sources of pseudomonads in the community** | Fomites (e.g., drug injection equipment stored in contaminated water) | 494, 495 |
| **Populations at greatest risk** | Intensive care unit (ICU) patients (including neonatal ICU), transplant patients (organ and hematopoietic stem cell), neutropenic patients, burn therapy and hydrotherapy patients, patients with malignancies, cystic fibrosis patients, patients with underlying medical conditions, and dialysis patients | 28, 466, 467, 472, 477, 493, 506–508, 511, 512, 521–526 |

**Table 13. Other gram-negative bacteria associated with water and moist environments**

| Implicated contaminated environmental vehicle | References |
|---|---|
| ***Burkholderia cepacia*** | |
| Distilled water | 527 |
| Contaminated solutions and disinfectants | 528, 529 |
| Dialysis machines | 527 |
| Nebulizers | 530–532 |
| Water baths | 533 |
| Intrinsically-contaminated mouthwash* | 534 |
| Ventilator temperature probes | 535 |
| ***Stenotrophomonas maltophlia, Sphingomonas* spp.** | |
| Distilled water | 536, 537 |
| Contaminated solutions and disinfectants | 529 |
| Dialysis machines | 527 |
| Nebulizers | 530–532 |
| Water | 538 |
| Ventilator temperature probes | 539 |
| ***Ralstonia pickettii*** | |
| Fentanyl solutions | 540 |
| Chlorhexidine | 541 |
| Distilled water | 541 |
| Contaminated respiratory therapy solution | 541, 542 |
| ***Serratia marcescens*** | |
| Potable water | 543 |
| Contaminated antiseptics (i.e., benzalkonium chloride and chlorhexidine) | 544–546 |
| Contaminated disinfectants (i.e., quaternary ammonium compounds and glutaraldehyde) | 547, 548 |
| ***Acinetobacter* spp.** | |
| Medical equipment that collects moisture (e.g., mechanical ventilators, cool mist humidifiers, vaporizers, and mist tents) | 549–556 |
| Room humidifiers | 553, 555 |
| Environmental surfaces | 557–564 |
| ***Enterobacter* spp.** | |
| Humidifier water | 565 |
| Intravenous fluids | 566–578 |
| Unsterilized cotton swabs | 573 |
| Ventilators | 565, 569 |
| Rubber piping on a suctioning machine | 565, 569 |
| Blood gas analyzers | 570 |

* This report describes intrinsic contamination (i.e., occurring during manufacture) prior to use by the health-care facility staff. All other entries reflect extrinsic sources of contamination.

Two additional gram-negative bacterial pathogens that can proliferate in moist environments are *Acinetobacter* spp. and *Enterobacter* spp.[571, 572] Members of both genera are responsible for health-care–associated episodes of colonization, bloodstream infections, pneumonia, and urinary tract infections among medically compromised patients, especially those in ICUs and burn therapy units.[566, 572–583] Infections caused by *Acinetobacter* spp. represent a significant clinical problem. Average infection rates are higher from July through October compared with rates from November through June.[584] Mortality rates associated with *Acinetobacter* bacteremia are 17%–52%, and rates as high as 71% have been reported for pneumonia caused by infection with either *Acinetobacter* spp. or

44

*Pseudomonas* spp.[574-576] Multi-drug resistance, especially in third generation cephalosporins for *Enterobacter* spp., contributes to increased morbidity and mortality.[569, 572]

Patients and health-care workers contribute significantly to the environmental contamination of surfaces and equipment with *Acinetobacter* spp. and *Enterobacter* spp., especially in intensive care areas, because of the nature of the medical equipment (e.g., ventilators) and the moisture associated with this equipment.[549, 571, 572, 585] Hand carriage and hand transfer are commonly associated with health-care–associated transmission of these organisms and for *S. marcescens*.[586] *Enterobacter* spp. are primarily spread in this manner among patients by the hands of health-care workers.[567, 587] *Acinetobacter* spp. have been isolated from the hands of 4%–33% of health-care workers in some studies,[585-590] and transfer of an epidemic strain of *Acinetobacter* from patients' skin to health-care workers' hands has been demonstrated experimentally.[591] *Acinetobacter* infections and outbreaks have also been attributed to medical equipment and materials (e.g., ventilators, cool mist humidifiers, vaporizers, and mist tents) that may have contact with water of uncertain quality (e.g., rinsing a ventilator circuit in tap water).[549-556] Strict adherence to hand hygiene helps prevent the spread of both *Acinetobacter* spp. and *Enterobacter* spp.[577, 592]

*Acinetobacter* spp. have also been detected on dry environmental surfaces (e.g., bed rails, counters, sinks, bed cupboards, bedding, floors, telephones, and medical charts) in the vicinity of colonized or infected patients; such contamination is especially problematic for surfaces that are frequently touched.[557-564] In two studies, the survival periods of *Acinetobacter baumannii* and *Acinetobacter calcoaceticus* on dry surfaces approximated that for *S. aureus* (e.g., 26–27 days).[593, 594] Because *Acinetobacter* spp. may come from numerous sources at any given time, laboratory investigation of health-care–associated *Acinetobacter* infections should involve techniques to determine biotype, antibiotype, plasmid profile, and genomic fingerprinting (i.e., macrorestriction analysis) to accurately identify sources and modes of transmission of the organism(s).[595]

### c. Infections and Pseudo-Infections Due to Nontuberculous Mycobacteria

NTM are acid-fast bacilli (AFB) commonly found in potable water. NTM include both saprophytic and opportunistic organisms. Many NTM are of low pathogenicity, and some measure of host impairment is necessary to enhance clinical disease.[596] The four most common forms of human disease associated with NTM are a) pulmonary disease in adults; b) cervical lymph node disease in children; c) skin, soft tissue, and bone infections; and d) disseminated disease in immunocompromised patients.[596, 597] Person-to-person acquisition of NTM infection, especially among immunocompetent persons, does not appear to occur, and close contacts of patients are not readily infected, despite the high numbers of organisms harbored by such patients.[596, 598-600] NTM are spread via all modes of transmission associated with water. In addition to health-care–associated outbreaks of clinical disease, NTM can colonize patients in health-care facilities through consumption of contaminated water or ice or through inhalation of aerosols.[601-605] Colonization following NTM exposure, particularly of the respiratory tract, occurs when a patient's local defense mechanisms are impaired; overt clinical disease does not develop.[606] Patients may have positive sputum cultures in the absence of clinical disease.

Using tap water during patient procedures and specimen collection and in the final steps of instrument reprocessing can result in pseudo-outbreaks of NTM contamination.[607-609] NTM pseudo-outbreaks of *Mycobacterium chelonae, M. gordonae,* and *M. xenopi* have been associated with both bronchoscopy and gastrointestinal endoscopy when a) tap water is used to provide irrigation to the site or to rinse off the viewing tip *in situ* or b) the instruments are inappropriately reprocessed with tap water in the final steps.[610-612]

## Table 14. Nontuberculous mycobacteria—environmental vehicles

| Vehicles associated with infections or colonizations | References |
| --- | --- |
| *Mycobacterium abscessus* | |
| Inadequately sterilized medical instruments | 613 |
| *Mycobacterium avium* complex (MAC) | |
| Potable water | 614–616 |
| *Mycobacterium chelonae* | |
| Dialysis, reprocessed dialyzers | 31, 32 |
| Inadequately-sterilized medical instruments, jet injectors | 617, 618 |
| Contaminated solutions | 619, 620 |
| Hydrotherapy tanks | 621 |
| *Mycobacterium fortuitum* | |
| Aerosols from showers or other water sources | 605, 606 |
| Ice | 602 |
| Inadequately sterilized medical instruments | 603 |
| Hydrotherapy tanks | 622 |
| *Mycobacterium marinum* | |
| Hydrotherapy tanks | 623 |
| *Mycobacterium ulcerans* | |
| Potable water | 624 |

| Vehicles associated with pseudo-outbreaks | References |
| --- | --- |
| *Mycobacterium chelonae* | |
| Potable water used during bronchoscopy and instrument reprocessing | 610 |
| *Mycobacterium fortuitum* | |
| Ice | 607 |
| *Mycobacterium gordonae* | |
| Deionized water | 611 |
| Ice | 603 |
| Laboratory solution (intrinsically contaminated) | 625 |
| Potable water ingestion prior to sputum specimen collection | 626 |
| *Mycobacterium kansasii* | |
| Potable water | 627 |
| *Mycobacterium terrae* | |
| Potable water | 608 |
| *Mycobacterium xenopi* | |
| Potable water | 609, 612, 627 |

NTM can be isolated from both natural and man-made environments. Numerous studies have identified various NTM in municipal water systems and in hospital water systems and storage tanks.[615, 616, 624, 627–632] Some NTM species (e.g., *Mycobacterium xenopi*) can survive in water at 113°F (45°C), and can be isolated from hot water taps, which can pose a problem for hospitals that lower the temperature of their hot water systems.[627] Other NTM (e.g., *Mycobacterium kansasii*, *M. gordonae*, *M. fortuitum*, and *M. chelonae*) cannot tolerate high temperatures and are associated more often with cold water lines and taps.[629]

NTM have a high resistance to chlorine; they can tolerate free chlorine concentrations of 0.05–0.2 mg/L (0.05–0.2 ppm) found at the tap.[598, 633, 634] They are 20–100 times more resistant to chlorine compared with coliforms; slow-growing strains of NTM (e.g., *Mycobacterium avium* and *M. kanasii*) appear to be

46

more resistant to chorine inactivation compared to fast-growing NTM.[635] Slow-growing NTM species have also demonstrated some resistance to formaldehyde and glutaraldehyde, which has posed problems for reuse of hemodialyzers.[31] The ability of NTM to form biofilms at fluid-surface interfaces (e.g., interior surfaces of water pipes) contributes to the organisms' resistance to chemical inactivation and provides a microenvironment for growth and proliferation.[636, 637]

### d. Cryptosporidiosis

*Cryptosporidium parvum* is a protozoan parasite that causes self-limiting gastroenteritis in normal hosts but can cause severe, life-threatening disease in immunocompromised patients. First recognized as a human pathogen in 1976, *C. parvum* can be present in natural and finished waters after fecal contamination from either human or animal sources.[638–641]

The health risks associated with drinking potable water contaminated with minimal numbers of *C. parvum* oocysts are unknown.[642] It remains to be determined if immunosuppressed persons are more susceptible to lower doses of oocysts than are immunocompetent persons. One study demonstrated that a median 50% infectious dose ($ID_{50}$) of 132 oocysts of calf origin was sufficient to cause infection among healthy volunteers.[643] In a second study, the same researchers found that oocysts obtained from infected foals (newborn horses) were infectious for human volunteers at median $ID_{50}$ of 10 oocysts, indicating that different strains or species of *Cryptosporidium* may vary in their infectivity for humans.[644] In a small study population of 17 healthy adults with pre-existing antibody to *C. parvum*, the $ID_{50}$ was determined to be 1,880 oocysts, more than 20-fold higher than in seronegative persons.[645] These data suggest that pre-existing immunity derived from previous exposures to *Cryptosporidium* offers some protection from infection and illness that ordinarily would result from exposure to low numbers of oocysts.[645, 646]

Oocysts, particularly those with thick walls, are environmentally resistant, but their survival under natural water conditions is poorly understood. Under laboratory conditions, some oocysts remain viable and infectious in cold (41°F [5°C]) for months.[641] The prevalence of *Cryptosporidium* in the U.S. drinking water supply is notable. Two surveys of approximately 300 surface water supplies revealed that 55%–77% of the water samples contained *Cryptosporidium* oocysts.[647, 648] Because the oocysts are highly resistant to common disinfectants (e.g., chlorine) used to treat drinking water, filtration of the water is important in reducing the risk of waterborne transmission. Coagulation-flocculation and sedimentation, when used with filtration, can collectively achieve approximately a 2.5 $log_{10}$ reduction in the number of oocysts.[649] However, outbreaks have been associated with both filtered and unfiltered drinking water systems (e.g., the 1993 outbreak in Milwaukee, Wisconsin that affected 400,000 people).[641, 650–652] The presence of oocysts in the water is not an absolute indicator that infection will occur when the water is consumed, nor does the absence of detectable oocysts guarantee that infection will not occur. Health-care–associated outbreaks of cryptosporidiosis primarily have been described among groups of elderly patients and immunocompromised persons.[653]

## 3. Water Systems in Health-Care Facilities

### a. Basic Components and Point-of-Use Fixtures

Treated municipal water enters a health-care facility via the water mains and is distributed throughout the building(s) by a network of pipes constructed of galvanized iron, copper, and polyvinylchloride (PVC). The pipe runs should be as short as is practical. Where recirculation is employed, the pipe runs should be insulated and long dead legs avoided in efforts to minimize the potential for water stagnation, which favors the proliferation of *Legionella* spp. and NTM. In high-risk applications (e.g., PE areas for severely immunosuppressed patients), insulated recirculation loops should be incorporated as a design

feature. Recirculation loops prevent stagnation and insulation maintains return water temperature with minimal loss.

Each water service main, branch main, riser, and branch (to a group of fixtures) has a valve and a means to reach the valves via an access panel.[120] Each fixture has a stop valve. Valves permit the isolation of a portion of the water system within a facility during repairs or maintenance. Vacuum breakers and other similar devices in the lines prevent water from back-flowing into the system. All systems that supply water should be evaluated to determine risk for potential back siphonage and cross connections.

Health-care facilities generate hot water from municipal water using a boiler system. Hot water heaters and storage vessels for such systems should have a drainage facility at the lowest point, and the heating element should be located as close as possible to the bottom of the vessel to facilitate mixing and to prevent water temperature stratification. Those hot or cold water systems that incorporate an elevated holding tank should be inspected and cleaned annually. Lids should fit securely to exclude foreign materials.

The most common point-of-use fixtures for water in patient-care areas are sinks, faucets, aerators, showers, and toilets; eye-wash stations are found primarily in laboratories. The potential for these fixtures to serve as a reservoir for pathogenic microorganisms has long been recognized (Table 15).[509, 654-656] Wet surfaces and the production of aerosols facilitate the multiplication and dispersion of microbes. The level of risk associated with aerosol production from point-of-use fixtures varies. Aerosols from shower heads and aerators have been linked to a limited number of clusters of gram-negative bacterial colonizations and infections, including Legionnaires disease, especially in areas where immunocompromised patients are present (e.g., surgical ICUs, transplant units, and oncology units).[412, 415, 656-659] In one report, clinical infection was not evident among immunocompetent persons (e.g., hospital staff) who used hospital showers when Legionella pneumophila was present in the water system.[660] Given the infrequency of reported outbreaks associated with faucet aerators, consensus has not been reached regarding the disinfection of or removal of these devices from general use. If additional clusters of infections or colonizations occur in high-risk patient-care areas, it may be prudent to clean and decontaminate the aerators or to remove them.[658, 659] ASHRAE recommends cleaning and monthly disinfection of aerators in high-risk patient-care areas as part of Legionella control measures.[661] Although aerosols are produced with toilet flushing,[662, 663] no epidemiologic evidence suggests that these aerosols pose a direct infection hazard.

Although not considered a standard point-of-use fixture, decorative fountains are being installed in increasing numbers in health-care facilities and other public buildings. Aerosols from a decorative fountain have been associated with transmission of Legionella pneumophila serogroup 1 infection to a small cluster of older adults.[664] This hotel lobby fountain had been irregularly maintained, and water in the fountain may have been heated by submersed lighting, all of which favored the proliferation of Legionella in the system.[664] Because of the potential for generations of infectious aerosols, a prudent prevention measure is to avoid locating these fixtures in or near high-risk patient-care areas and to adhere to written policies for routine fountain maintenance.[120]

Table 15. Water and point-of-use fixtures as sources and reservoirs of waterborne pathogens*

| Reservoir | Associated pathogens | Transmission | Strength of evidence† | Prevention and control | References |
|---|---|---|---|---|---|
| Potable water | Pseudomonas, gram-negative bacteria, NTM | Contact | Moderate | Follow public health guidelines. | (See Tables 12–14) |

48

| Reservoir | Associated pathogens | Transmission | Strength of evidence+ | Prevention and control | References |
|---|---|---|---|---|---|
| Potable water | *Legionella* | Aerosol inhalation | Moderate | Provide supplemental treatment for water. | (See Table 11) |
| Holy water | Gram-negative bacteria | Contact | Low | Avoid contact with severe burn injuries. Minimize use among immunocompromised patients. | 665 |
| Dialysis water | Gram-negative bacteria | Contact | Moderate | Dialysate should be ≤2,000 cfu/mL; water should be ≤200 cfu/mL. | 2, 527, 666–668 |
| Automated endoscope reprocessors and rinse water | Gram-negative bacteria | Contact | Moderate | Use and maintain equipment according to instructions; eliminate residual moisture by drying the channels (e.g., through alcohol rinse and forced air drying). | 669–675 |
| Water baths | *Pseudomonas, Burkholderia, Acinetobacter* | Contact | Moderate | Add germicide to the water; wrap transfusion products in protective plastic wrap if using the bath to modulate the temperature of these products. | 29, 533, 676, 677 |
| Tub immersion | *Pseudomonas, Enterobacter, Acinetobacter* | Contact | Moderate | Drain and disinfect tub after each use; consider adding germicide to the water; water in large hydrotherapy pools should be properly disinfected and filtered. | 678–683 |
| Ice and ice machines | NTM, *Enterobacter, Pseudomonas, Cryptosporidium* Legionella | Ingestion, contact | Moderate Low | Clean periodically; use automatic dispenser (avoid open chest storage compartments in patient areas). | 601, 684–687 |
| Faucet aerators | *Legionella* | Aerosol inhalation | Moderate | Clean and disinfect monthly in high-risk patient areas; consider removing if additional infections occur. | 415, 661 |
| Faucet aerators | *Pseudomonas, Acinetobacter, Stenotrophomonas, Chryseobacterium* | Contact, droplet | Low | No precautions are necessary at present in immunocompetent patient-care areas. | 658, 659, 688, 689 |
| Sinks | *Pseudomonas* | Contact, droplet | Moderate | Use separate sinks for handwashing and disposal of contaminated fluids. | 509, 653, 685–693 |
| Showers | *Legionella* | Aerosol inhalation | Low | Provide sponge baths for hematopoietic stem cell transplant patients; avoid shower use for immunocompromised patients when *Legionella* is detected in facility water. | 656 |

| Reservoir | Associated pathogens | Transmission | Strength of evidence+ | Prevention and control | References |
|---|---|---|---|---|---|
| Dental unit water lines | *Pseudomonas, Legionella, Sphingomonas, Acinetobacter* | Contact | Low | Clean water systems according to system manufacturer's instructions. | 636, 694–696 |
| Ice baths for thermodilution catheters | *Ewingella, Staphylococcus* | Contact | Low | Use sterile water. | 697, 698 |
| Decorative fountains | *Legionella* | Aerosol inhalation | Low | Perform regular maintenance, including water disinfection; avoid use in or near high-risk patient-care areas. | 664 |
| Eyewash stations | *Pseudomonas,* amoebae, *Legionella* | Contact | Low<br><br>Minimum | Flush eyewash stations weekly; have sterile water available for eye flushes. | 518, 699, 700 |
| Toilets | Gram-negative bacteria | – | Minimum | Clean regularly; use good hand hygiene. | 662 |
| Flowers | Gram-negative bacteria, *Aspergillus* | – | Minimum | Avoid use in intensive care units and in immunocompromised patient-care settings. | 515, 701, 702 |

* Modified from reference 654 and used with permission of the publisher (Slack, Inc.)
+ Moderate: occasional well-described outbreaks. Low: few well-described outbreaks. Minimal: actual infections not demonstrated.

### b. Water Temperature and Pressure

Hot water temperature is usually measured at the point of use or at the point at which the water line enters equipment requiring hot water for proper operation.[120] Generally, the hot water temperature in hospital patient-care areas is no greater than a temperature within the range of 105°F–120°F (40.6°C–49°C), depending on the AIA guidance issued at the year in which the facility was built.[120] Hot water temperature in patient-care areas of skilled nursing-care facilities is set within a slightly lower range of 95°F–110°F (35°C–43.3°C) depending on the AIA guidance at the time of facility construction.[120] Many states have adopted a temperature setting in these ranges into their health-care regulations and building codes. ASHRAE, however, has recommended higher settings.[661] Steam jets or booster heaters are usually needed to meet the hot water temperature requirements in certain service areas of the hospital (e.g., the kitchen [120°F (49°C)] or the laundry [160°F (71°C)]).[120] Additionally, water lines may need to be heated to a particular temperature specified by manufacturers of specific hospital equipment. Hot-water distribution systems serving patient-care areas are generally operated under constant recirculation to provide continuous hot water at each hot-water outlet.[120] If a facility is or has a hemodialysis unit, then continuously circulated, cold treated water is provided to that unit.[120]

To minimize the growth and persistence of gram-negative waterborne bacteria (e.g., thermophilic NTM and *Legionella* spp.),[627, 703–709] cold water in health-care facilities should be stored and distributed at temperatures below 68°F (20°C); hot water should be stored above 140°F (60°C) and circulated with a minimum return temperature of 124°F (51°C),[661] or the highest temperature specified in state regulations and building codes. If the return temperature setting of 124°F (51°C) is permitted, then installation of preset thermostatic mixing valves near the point-of-use can help to prevent scalding. Valve maintenance is especially important in preventing valve failure, which can result in scalding. New shower systems in large buildings, hospitals, and nursing homes should be designed to permit mixing of hot and cold water near the shower head. The warm water section of pipe between the control valve and shower head should be self-draining. Where buildings can not be retrofitted, other

50

approaches to minimize the growth of *Legionella* spp. include a) periodically increasing the temperature to at least 150°F [66°C] at the point of use [i.e., faucets] and b) adding additional chlorine and flushing the water.[661, 710, 711] Systems should be inspected annually to ensure that thermostats are functioning properly.

Adequate water pressure ensures sufficient water supplies for a) direct patient care; b) operation of water-cooled instruments and equipment [e.g., lasers, computer systems, telecommunications systems, and automated endoscope reprocessors[712]]; c) proper function of vacuum suctioning systems; d) indoor climate control; and e) fire-protection systems. Maintaining adequate pressure also helps to ensure the integrity of the piping system.

*c. Infection-Control Impact of Water System Maintenance and Repair*

Corrective measures for water-system failures have not been studied in well-designed experiments; these measures are instead based on empiric engineering and infection-control principles. Health-care facilities can occasionally sustain both intentional cut-offs by the municipal water authority to permit new construction project tie-ins and unintentional disruptions in service when a water main breaks as a result of aging infrastructure or a construction accident. Vacuum breakers or other similar devices can prevent backflow of water in the facility's distribution system during water-disruption emergencies.[11] To be prepared for such an emergency, all health-care facilities need contingency plans that identify a) the total demand for potable water, b) the quantity of replacement water [e.g., bottled water] required for a minimum of 24 hours when the water system is down, c) mechanisms for emergency water distribution, and 4) procedures for correcting drops in water pressure that affect operation of essential devices and equipment that are driven or cooled by a water system [Table 16].[713]

**Table 16. Water demand in health-care facilities during water disruption emergencies**

| | Potable water | Bottled, sterile water |
|---|---|---|
| Water use needs | Drinking water<br>Handwashing<br>Cafeteria services<br>Ice<br>Manual flushing of toilets<br>Patient baths, hygiene<br>Hemodialysis<br>Hydrotherapy<br>Fire prevention (e.g., sprinkler systems)<br>Surgery and critical care areas<br>Laboratory services<br>Laundry and central sterile services*<br>Cooling towers+<br>Steam generation | Surgical scrub<br>Emergency surgical procedures<br>Pharmaceutical preparations<br>Patient-care equipment (e.g., ventilators)§ |

\* Arrange to have a contingency provision of these services from another resource, if possible (e.g., another health-care facility or contractor).
+ Some cooling towers may use a potable water source, but most units use non-potable water.
§ This item is included in the table under the assumption that electrical power is available during the water emergency.

Detailed, up-to-date plans for hot and cold water piping systems should be readily available for maintenance and repair purposes in case of system problems. Opening potable water systems for repair or construction and subjecting systems to water-pressure changes can result in water discoloration and dramatic increases in the concentrations of *Legionella* spp. and other gram-negative bacteria. The maintenance of a chlorine residual at all points within the piping system also offers some protection from entry of contamination to the pipes in the event of inadvertent cross-connection between potable and non-potable water lines. As a minimum preventive measure, ASHRAE recommends a thorough flushing of the system.[661] High-temperature flushing or hyperchlorination may also be appropriate

strategies to decrease potentially high concentrations of waterborne organisms. The decision to pursue either of these remediation strategies, however, should be made on a case-by-case basis. If only a portion of the system is involved, high temperature flushing or chlorination can be used on only that portion of the system.[661]

When shock decontamination of hot water systems is necessary (e.g., after disruption caused by construction and after cross-connections), the hot water temperature should be raised to 160°F–170°F (71°C–77°C) and maintained at that level while each outlet around the system is progressively flushed. A minimum flush time of 5 minutes has been recommended;[3] the optimal flush time is not known, however, and longer flush times may be necessary.[714] The number of outlets that can be flushed simultaneously depends on the capacity of the water heater and the flow capability of the system. Appropriate safety procedures to prevent scalding are essential. When possible, flushing should be performed when the fewest building occupants are present (e.g., during nights and weekends).

When thermal shock treatment is not possible, shock chlorination may serve as an alternative method.[661] Experience with this method of decontamination is limited, however, and high levels of free chlorine can corrode metals. Chlorine should be added, preferably overnight, to achieve a free chlorine residual of at least 2 mg/L (2 ppm) throughout the system.[661] This may require chlorination of the water heater or tank to levels of 20–50 mg/L (20–50 ppm). The pH of the water should be maintained at 7.0–8.0.[661] After completion of the decontamination, recolonization of the hot water system is likely to occur unless proper temperatures are maintained or a procedure such as continuous supplemental chlorination is continued.

Interruptions of the water supply and sewage spills are situations that require immediate recovery and remediation measures to ensure the health and safety of patients and staff.[715] When delivery of potable water through the municipal distribution system has been disrupted, the public water supplier must issue a "boil water" advisory if microbial contamination presents an immediate public health risk to customers. The hospital engineer should oversee the restoration of the water system in the facility and clear it for use when appropriate. Hospitals must maintain a high level of surveillance for waterborne disease among patients and staff after the advisory is lifted.[642]

Flooding from either external (e.g., from a hurricane) or internal sources (e.g., a water system break) usually results in property damage and a temporary loss of water and sanitation.[716–718] JCAHO requires all hospitals to have plans that address facility response for recovery from both internal and external disasters.[713, 719] The plans are required to discuss a) general emergency preparedness, b) staffing, c) regional planning among area hospitals, d) emergency supply of potable water, e) infection control and medical services needs, f) climate control, and g) remediation. The basic principles of structural recovery from flooding are similar to those for recovery from sewage contamination (Box 9 and 10). Following a major event (e.g., flooding), facilities may elect to conduct microbial sampling of water after the system is restored to verify that water quality has been returned to safe levels (<500 CFU/mL, heterotrophic plate count). This approach may help identify point-of-use fixtures that may harbor contamination as a result of design or engineering features.[720] Medical records should be allowed to dry and then either photocopied or placed in plastic covers before returning them to the record.

Moisture meters can be used to assess water-damaged structural materials. If porous structural materials for walls have a moisture content of >20% after 72 hours, the affected material should be removed.[266, 278, 313] The management of water-damaged structural materials is not strictly limited to major water catastrophes (e.g., flooding and sewage intrusions); the same principles are used to evaluate the damage from leaking roofs, point-of-use fixtures, and equipment. Additional sources of moisture include condensate on walls from boilers and poorly engineered humidification in HVAC systems.

52

## Box 9. Recovery and remediation measures for water-related emergencies*

**Potable water disruptions**

**Contingency plan items**

Ensure access to plumbing network so that repairs can be easily made.

Provide sufficient potable water, either from bottled sources or truck delivery.

Post advisory notices against consuming tap water, ice, or beverages made with water.

Rope off or bag drinking fountains to designate these as being "out of service" until further notice.

Rinse raw foods as needed in disinfected water.

Disconnect ice machines whenever possible.+

Postpone laundry services until after the water system is restored.

**Water treatment**

Heat water to a rolling boil for $\geq 1$ minute.

**Remediation of the water system after the "boil water" advisory is rescinded**

Flush fixtures (e.g., faucets and drinking fountains) and equipment for several minutes and restart.

Run water softeners through a regeneration cycle.

Drain, disinfect, and refill water storage tanks, if needed.

Change pretreatment filters and disinfect the dialysis water system.

**Sewage spills/malfunction**

**Overall strategy**

Move patients and clean/sterile supplies out of the area.

Redirect traffic away from the area.

Close the doors or use plastic sheeting to isolate the area prior to clean-up.

Restore sewage system function first, then the potable water system (if both are malfunctioning).

Remove sewage solids, drain the area, and let dry.

**Remediation of the structure**

Hard surfaces: clean with detergent/disinfectant after the area has been drained.

Carpeting, loose tiles, buckled flooring: remove and allow the support surface to dry; replace the items; wet down carpeting with a low-level disinfectant or sanitizer prior to removal to minimize dust dispersion to the air.

Wallboard and other porous structural materials: remove and replace if they cannot be cleaned and dried within 72 hours.§

**Furniture**

Hard surface furniture (e.g., metal or plastic furniture): clean and allow to dry.

Wood furniture: let dry, sand the wood surface, and reapply varnish.

Cloth furniture: replace.

**Electrical equipment**

Replace if the item cannot be easily dismantled, cleaned, and reassembled.

* Material in this box is compiled from references 266, 278, 315, 713, 716–719, 721–729.

+ Ice machines should always be disconnected from the water source in advance of planned water disruptions.

§ Moisture meter readings should be <20% moisture content.

An exception to these recommendations is made for hemodialysis units where water is further treated either by portable water treatment or large-scale water treatment systems usually involving reverse osmosis (RO). In the United States, >97% of dialysis facilities use RO treatment for their water.[721] However, changing pre-treatment filters and disinfecting the system to prevent colonization of the RO membrane and microbial contamination down-stream of the pre-treatment filter are prudent measures.

## Box 10.  Contingency planning for flooding

**General emergency preparedness**

Ensure that emergency electrical generators are not located in flood-prone areas of the facility.

Develop alternative strategies for moving patients, water containers, medical records, equipment, and supplies in the event that the elevators are inoperable.

Establish in advance a centralized base of operations with batteries, flashlights, and cellular phones.

Ensure sufficient supplies of sandbags to place at the entrances and the area around boilers, incinerators, and generators.

Establish alternative strategies for bringing core employees to the facility if high water prevents travel.

**Staffing Patterns**

Temporarily reassign licensed staff as needed to critical care areas to provide manual ventilation and to perform vital assessments on patients.

Designate a core group of employees to remain on site to keep all services operational if the facility remains open.

Train all employees in emergency preparedness procedures.

**Regional planning among are facilities for disaster management**

Incorporate community support and involvement (e.g., media alerts, news, and transportation).

Develop in advance strategies for transferring patients, as needed.

Develop strategies for sharing supplies and providing essential services among participating facilities (e.g., central sterile department services, and laundry services).

Identify sources for emergency provisions (e.g., blood, emergency vehicles, and bottled water).

**Medical services and infection control**

Use alcohol-based hand rubs in general patient-care areas.

Postpone elective surgeries until full services are restored, or transfer these patients to other facilities.

Consider using portable dialysis machines.+

Provide an adequate supply of tetanus and hepatitis A immunizations for patients and staff.

**Climate control**

Provide adequate water for cooling towers.§

---

\* Material in this box was compiled from references 713, 716–719.

\+ Portable dialysis machines require less water compared to the larger units situated in dialysis settings.

§ Water for cooling towers may need to be trucked in, especially if the tower uses a potable water source.

# 4.  Strategies for Controlling Waterborne Microbial Contamination

### a.  Supplemental Treatment of Water with Heat and/or Chemicals

In addition to using supplemental treatment methods as remediation measures after inadvertent contamination of water systems, health-care facilities sometimes use special measures to control waterborne microorganisms on a sustained basis.  This decision is most often associated with outbreaks of legionellosis and subsequent efforts to control legionellae,[722] although some facilities have tried supplemental measures to better control thermophilic NTM.[627]

The primary disinfectant for both cold and hot water systems is chlorine.  However, chlorine residuals are expected to be low, and possibly nonexistent, in hot water tanks because of extended retention time in the tank and elevated water temperature.  Flushing, especially that which removes sludge from the bottom of the tank, probably provides the most effective treatment of water systems.  Unlike the situation for disinfecting cooling towers, no equivalent recommendations have been made for potable water systems, although specific intervention strategies have been published.[403, 723]  The principal approaches to disinfection of potable systems are heat flushing using temperatures 160°F–170°F (71°–77°C), hyperchlorination, and physical cleaning of hot-water tanks.[3, 403, 661]  Potable systems are easily recolonized and may require continuous intervention (e.g., raising of hot water temperatures or continuous chlorination).[403, 711]  Chlorine solutions lose potency over time, thereby rendering the stocking of large quantities of chlorine impractical.

54

Some hospitals with hot water systems identified as the source of *Legionella* spp. have performed emergency decontamination of their systems by pulse (i.e., one-time) thermal disinfection/superheating or hyperchlorination.[711, 714, 724, 725] After either of these procedures, hospitals either maintain their heated water with a minimum return temperature of 124°F (51°C) and cold water at <68°F (<20°C) or chlorinate their hot water to achieve 1–2 mg/L (1–2 ppm) of free residual chlorine at the tap.[26, 437, 709–711, 726, 727] Additional measures (e.g., physical cleaning or replacement of hot-water storage tanks, water heaters, faucets, and shower heads) may be required to help eliminate accumulations of scale and sediment that protect organisms from the biocidal effects of heat and chlorine.[457, 711] Alternative methods for controlling and eradicating legionellae in water systems (e.g., treating water with chlorine dioxide, heavy metal ions [i.e., copper/silver ions], ozone, and UV light) have limited the growth of legionellae under laboratory and operating conditions.[728–742] Further studies on the long-term efficacy of these treatments are needed before these methods can be considered standard applications.

Renewed interest in the use of chloramines stems from concerns about adverse health effects associated with disinfectants and disinfection by-products.[743] Monochloramine usage minimizes the formation of disinfection by-products, including trihalomethanes and haloacetic acids. Monochloramine can also reach distal points in a water system and can penetrate into bacterial biofilms more effectively than free chlorine.[744] However, monochloramine use is limited to municipal water treatment plants and is currently not available to health-care facilities as a supplemental water-treatment approach. A recent study indicated that 90% of Legionnaires disease outbreaks associated with drinking water could have been prevented if monochloramine rather than free chlorine has been used for residual disinfection.[745] In a retrospective comparison of health-care–associated Legionnaires disease incidence in central Texas hospitals, the same research group documented an absence of cases in facilities located in communities with monochloramine-treated municipal water.[746] Additional data are needed regarding the effectiveness of using monochloramine before its routine use as a disinfectant in water systems can be recommended. No data have been published regarding the effectiveness of monochloramine installed at the level of the health-care facility.

Additional filtration of potable water systems is not routinely necessary. Filters are used in water lines in dialysis units, however, and may be inserted into the lines for specific equipment (e.g., endoscope washers and disinfectors) for the purpose of providing bacteria-free water for instrument reprocessing. Additionally, an RO unit is usually added to the distribution system leading to PE areas.

### b. Primary Prevention of Legionnaires Disease (No Cases Identified)
The primary and secondary environmental infection-control strategies described in this section on the guideline pertain to health-care facilities without transplant units. Infection-control measures specific to PE or transplant units (i.e., patient-care areas housing patients at the highest risk for morbidity and mortality from *Legionella* spp. infection) are described in the subsection titled *Preventing Legionnaires Disease in Protective Environments*.

Health-care facilities use at least two general strategies to prevent health-care–associated legionellosis when no cases or only sporadic cases have been detected. The first is an environmental surveillance approach involving periodic culturing of water samples from the hospital's potable water system to monitor for *Legionella* spp.[747–750] If any sample is culture-positive, diagnostic testing is recommended for all patients with health-care–associated pneumonia.[748, 749] In-house testing is recommended for facilities with transplant programs as part of a comprehensive treatment/management program. If ≥30% of the samples are culture-positive for *Legionella* spp., decontamination of the facility's potable water system is warranted.[748] The premise for this approach is that no cases of health-care–associated legionellosis can occur if *Legionella* spp. are not present in the potable water system, and, conversely, cases of health-care–associated legionellosis could potentially occur if *Legionella* spp. are cultured from the water.[26, 751] Physicians who are informed that the hospital's potable water system is culture-positive

for *Legionella* spp. are more likely to order diagnostic tests for legionellosis.

A potential advantage of the environmental surveillance approach is that periodic culturing of water is less costly than routine laboratory diagnostic testing for all patients who have health-care–associated pneumonia. The primary argument against this approach is that, in the absence of cases, the relationship between water-culture results and legionellosis risk remains undefined.[3] *Legionnella* spp. can be present in the water systems of buildings[752] without being associated with known cases of disease.[437, 707, 753] In a study of 84 hospitals in Québec, 68% of the water systems were found to be colonized with *Legionella* spp., and 26% were colonized at >30% of sites sampled; cases of Legionnaires disease, however, were infrequently reported from these hospitals.[707]

Other factors also argue against environmental surveillance. Interpretation of results from periodic water culturing might be confounded by differing results among the sites sampled in a single water system and by fluctuations in the concentration of *Legionella* spp. at the same site.[709, 754] In addition, the risk for illness after exposure to a given source might be influenced by several factors other than the presence or concentration of organisms, including a) the degree to which contaminated water is aerosolized into respirable droplets, b) the proximity of the infectious aerosol to the potential host, c) the susceptibility of the host, and d) the virulence properties of the contaminating strain.[755–757] Thus, data are insufficient to assign a level of disease risk even on the basis of the number of colony-forming units detected in samples from areas for immunocompetent patients. Conducting environmental surveillance would obligate hospital administrators to initiate water-decontamination programs if *Legionella* spp. are identified. Therefore, periodic monitoring of water from the hospital's potable water system and from aerosol-producing devices is not widely recommended in facilities that have not experienced cases of health-care–associated legionellosis.[661, 758]

The second strategy to prevent and control health-care–associated legionellosis is a clinical approach, in which providers maintain a high index of suspicion for legionellosis and order appropriate diagnostic tests (i.e., culture, urine antigen, and direct fluorescent antibody [DFA] serology) for patients with health-care–associated pneumonia who are at high risk for legionellosis and its complications.[437, 759, 760] The testing of autopsy specimens can be included in this strategy should a death resulting from health-care–associated pneumonia occur. Identification of one case of definite or two cases of possible health-care–associated Legionnaires disease should prompt an epidemiologic investigation for a hospital source of *Legionella* spp., which may involve culturing the facility's water for *Legionella*. Routine maintenance of cooling towers, and use of sterile water for the filling and terminal rinsing of nebulization devices and ventilation equipment can help to minimize potential sources of contamination. Circulating potable water temperatures should match those outlined in the subsection titled *Water Temperature and Pressure*, as permitted by state code.

*c. Secondary prevention of Legionnaires Disease (With Identified Cases)*
The indications for a full-scale environmental investigation to search for and subsequently decontaminate identified sources of *Legionella* spp. in health-care facilities without transplant units have not been clarified; these indications would likely differ depending on the facility. Case categories for health-care–associated Legionnaires disease in facilities without transplant units include definite cases (i.e., laboratory-confirmed cases of legionellosis that occur in patients who have been hospitalized continuously for ≥10 days before the onset of illness) and possible cases (i.e., laboratory-confirmed infections that occur 2–9 days after hospital admission).[3] In settings in which as few as one to three health-care–associated cases are recognized over several months, intensified surveillance for Legionnaires disease has frequently identified numerous additional cases.[405, 408, 432, 453, 739, 759, 760] This finding suggests the need for a low threshold for initiating an investigation after laboratory confirmation of cases of health-care–associated legionellosis. When developing a strategy for responding to such a finding, however, infection-control personnel should consider the level of risk for health-care–

56

associated acquisition of, and mortality from, *Legionella* spp. infection at their particular facility.

An epidemiologic investigation conducted to determine the source of *Legionella* spp. involves several important steps (Box 11). Laboratory assessment is crucial in supporting epidemiologic evidence of a link between human illness and a specific environmental source.[761] Strain determination from subtype analysis is most frequently used in these investigations.[410, 762-764] Once the environmental source is established and confirmed with laboratory support, supplemental water treatment strategies can be initiated as appropriate.

## Box 11. Steps in an epidemiologic investigation for legionellosis

**Review medical and microbiologic records.**
**Initiate active surveillance to identify all recent or ongoing cases.**
**Develop a line listing of cases by time, place, and person.**
**Determine the type of epidemiologic investigation needed for assessing risk factors:**
  • **Case-control study,**
  • **Cohort study.**
**Gather and analyze epidemiologic information:**
  • **Evaluate risk factors associated with potential environmental exposures (e.g., showers, cooling towers, and respiratory-therapy equipment).**
**Collect water samples:**
  • **Sample environmental sources implicated by epidemiologic investigation,**
  • **Sample other potential source of water aerosols.**
**Subtype strains of *Legionella* spp. cultured from both patients and environmental sources.**
**Review autopsy records and include autopsy specimens in diagnostic testing.**

The decision to search for hospital environmental sources of *Legionella* spp. and the choice of procedures to eradicate such contamination are based on several considerations, as follows: a) the hospital's patient population; b) the cost of an environmental investigation and institution of control measures to eradicate *Legionella* spp. from the water supply;[765-768] and c) the differential risk, based on host factors, for acquiring health-care–associated legionellosis and developing severe and fatal infection.

### d. Preventing Legionnaires Disease in Protective Environments
This subsection outlines infection-control measures applicable to those health-care facilities providing care to severely immunocompromised patients. Indigenous microorganisms in the tap water of these facilities may pose problems for such patients. These measures are designed to prevent the generation of potentially infectious aerosols from water and the subsequent exposure of PE patients or other immunocompromised patients (e.g., transplant patients) (Table 17). Infection-control measures that address the use of water with medical equipment (e.g., ventilators, nebulizers, and equipment humidifiers) are described in other guidelines and publications.[3, 455]

If one case of laboratory-confirmed, health-care–associated Legionnaires disease is identified in a patient in a solid-organ transplant program or in PE (i.e., an inpatient in PE for all or part of the 2–10 days prior to onset of illness) or if two or more laboratory-confirmed cases occur among patients who had visited an outpatient PE setting, the hospital should report the cases to the local and state health departments. The hospital should then initiate a thorough epidemiologic and environmental investigation to determine the likely environmental sources of *Legionella* spp.[9] The source of *Legionella* should be decontaminated or removed. Isolated cases may be difficult to investigate. Because transplant recipients are at substantially higher risk for disease and death from legionellosis

compared with other hospitalized patients, periodic culturing for *Legionella* spp. in water samples from the potable water in the solid-organ transplant and/or PE unit can be performed as part of an overall strategy to prevent Legionnaires disease in PE units.[9, 431, 710, 769] The optimal methodology (i.e., frequency and number of sites) for environmental surveillance cultures in PE units has not been determined, and the cost-effectiveness of this strategy has not been evaluated. Because transplant recipients are at high risk for Legionnaires disease and because no data are available to determine a safe concentration of legionellae organisms in potable water, the goal of environmental surveillance for *Legionella* spp. should be to maintain water systems with no detectable organisms.[9, 431] Culturing for legionellae may be used to assess the effectiveness of water treatment or decontamination methods, a practice that provides benefits to both patients and health-care workers.[767, 770]

**Table 17. Additional infection-control measures to prevent exposure of high-risk patients to waterborne pathogens**

| Measures | References |
|---|---|
| • Restrict patients from taking showers if the water is contaminated with *Legionella* spp. | • 407, 412, 654, 655, 658 |
| • Use water that is not contaminated with *Legionella* spp. for patients' sponge baths. | • 9 |
| • Provide sterile water for drinking, tooth brushing, or for flushing nasogastric tubes. | • 9, 412 |
| • Perform supplemental treatment of the water for the unit. | • 732 |
| • Consider periodic monitoring (i.e., culturing) of the unit water supply for *Legionella* spp. | • 9, 431 |
| • Remove shower heads and faucet aerators monthly for cleaning.* | • 661 |
| • Use a 500–600 ppm (1:100 v/v dilution) solution of sodium hypochlorite to disinfect shower heads and faucet aerators.* | • 661 |
| • Do not use large-volume room air humidifiers that create aerosols unless these are subjected to cleaning and high-level disinfection daily and filled with distilled water. | • 3 |
| • Eliminate water-containing bath toys.+ | • 30 |

\* These measures can be considered in settings where legionellosis cases have occurred. These measures are not generally recommended in routine patient-care setting..
+ These items have been associated with outbreaks of *Pseudomonas*.

Protecting patient-care devices and instruments from inadvertent tap water contamination during room cleaning procedures is also important in any immunocompromised patient-care area. In a recent outbreak of gram-negative bacteremias among open-heart-surgery patients, pressure-monitoring equipment that was assembled and left uncovered overnight prior to the next day's surgeries was inadvertently contaminated with mists and splashing water from a hose-disinfectant system used for cleaning.[771]

## 5. Cooling Towers and Evaporative Condensers

Modern health-care facilities maintain indoor climate control during warm weather by use of cooling towers (large facilities) or evaporative condensers (smaller buildings). A cooling tower is a wet-type, evaporative heat transfer device used to discharge to the atmosphere waste heat from a building's air conditioning condensers (Figure 5).[772, 773] Warm water from air-conditioning condensers is piped to the cooling tower where it is sprayed downward into a counter- or cross-current air flow. To accelerate heat transfer to the air, the water passes over the fill, which either breaks water into droplets or causes it to spread into a thin film.[772, 773] Most systems use fans to move air through the tower, although some large industrial cooling towers rely on natural draft circulation of air. The cooled water from the tower is piped back to the condenser, where it again picks up heat generated during the process of chilling the system's refrigerant. The water is cycled back to the cooling tower to be cooled. Closed-circuit cooling towers and evaporative condensers are also evaporative heat-transfer devices. In these systems, the

58

process fluid (e.g., water, ethylene glycol/water mixture, oil, or a condensing refrigerant) does not directly contact the cooling air, but is contained inside a coil assembly.[661]

**Figure 5. Diagram of a typical air conditioning (induced draft) cooling tower\***



Water temperatures are approximate and may differ substantially according to system use and design. Warm water from the condenser (or chiller) is sprayed downward into a counter- or cross-current air flow. Water passes over the fill (a component of the system designed to increase the surface area of the water exposed to air), and heat from the water is transferred to the air. Some of the water becomes aerosolized during this process, although the volume of aerosol discharged to the air can be reduced by the placement of a drift eliminator. Water cooled in the tower returns to the heat source to cool refrigerant from the air conditioning unit.

\* This figure is reprinted with permission of the publisher of reference 773 (Plenum Medical).

Cooling towers and evaporative condensers incorporate inertial stripping devices called drift eliminators to remove water droplets generated within the unit. Although the effectiveness of these eliminators varies substantially depending on design and condition, some water droplets in the size range of <5 μm will likely leave the unit, and some larger droplets leaving the unit may be reduced to ≤5 μm by evaporation. Thus, even with proper operation, a cooling tower or evaporative condenser can generate and expel respirable water aerosols. If either the water in the unit's basin or the make-up water (added to replace water lost to evaporation) contains *Legionella* spp. or other waterborne microorganisms, these organisms can be aerosolized and dispersed from the unit.[774] Clusters of both Legionnaires disease and Pontiac fever have been traced to exposure to infectious water aerosols originating from cooling towers and evaporative condensers contaminated with *Legionella* spp. Although most of these outbreaks have been community-acquired episodes of pneumonia,[775–782] health-care–associated Legionnaires disease

has been linked to cooling tower aerosol exposure.[404, 405] Contaminated aerosols from cooling towers on hospital premises gained entry to the buildings either through open windows or via air handling system intakes located near the tower equipment.

Cooling towers and evaporative condensers provide ideal ecological niches for *Legionella* spp. The typical temperature of the water in cooling towers ranges from 85°F–95°F (29°C–35°C), although temperatures can be above 120°F (49°C) and below 70°F (21°C) depending on system heat load, ambient temperature, and operating strategy.[661] An Australian study of cooling towers found that legionellae colonized or multiplied in towers with basin temperatures above 60.8°F (16°C), and multiplication became explosive at temperatures above 73.4°F (23°C).[783] Water temperature in closed-circuit cooling towers and evaporative condensers is similar to that in cooling towers. Considerable variation in the piping arrangement occurs. In addition, stagnant areas or dead legs may be difficult to clean or penetrate with biocides.

Several documents address the routine maintenance of cooling towers, evaporative condensers, and whirlpool spas.[661, 784–787] They suggest following manufacturer's recommendations for cleaning and biocide treatment of these devices; all health-care facilities should ensure proper maintenance for their cooling towers and evaporative condensers, even in the absence of *Legionella* spp (Appendix C). Because cooling towers and evaporative condensers can be shut down during periods when air conditioning is not needed, this maintenance cleaning and treatment should be performed before starting up the system for the first time in the warm season.[782] Emergency decontamination protocols describing cleaning procedures and hyperchlorination for cooling towers have been developed for towers implicated in the transmission of legionellosis.[786, 787]

## 6. Dialysis Water Quality and Dialysate

### a. Rationale for Water Treatment in Hemodialysis

Hemodialysis, hemofiltration, and hemodiafiltration require special water-treatment processes to prevent adverse patient outcomes of dialysis therapy resulting from improper formulation of dialysate with water containing high levels of certain chemical or biological contaminants. The Association for the Advancement of Medical Instrumentation (AAMI) has established chemical and microbiologic standards for the water used to prepare dialysate, substitution fluid, or to reprocess hemodialyzers for renal replacement therapy.[788–792] The AAMI standards address: a) equipment and processes used to purify water for the preparation of concentrates and dialysate and the reprocessing of dialyzers for multiple use and b) the devices used to store and distribute this water. Future revisions to these standards may include hemofiltration and hemodiafiltration.

Water treatment systems used in hemodialysis employ several physical and/or chemical processes either singly or in combination (Figure 6). These systems may be portable units or large systems that feed several rooms. In the United States, >97% of maintenance hemodialysis facilities use RO alone or in combination with deionization.[793] Many acute-care facilities use portable hemodialysis machines with attached portable water treatment systems that use either deionization or RO. These machines were exempted from earlier versions of AAMI recommendations, but given current knowledge about toxic exposures to and inflammatory processes in patients new to dialysis, these machines should now come into compliance with current AAMI recommendations for hemodialysis water and dialysate quality.[788, 789] Previous recommendations were based on the assumption that acute-care patients did not experience the same degree of adverse effects from short-term, cumulative exposures to either chemicals or microbiologic agents present in hemodialysis fluids compared with the effects encountered by patients during chronic, maintenance dialysis.[788, 789] Additionally, JCAHO is reviewing inpatient

60

practices and record-keeping for dialysis (acute and maintenance) for adherence to AAMI standards and recommended practices.

**Figure 6. Dialysis water treatment system***



\* See text for description of the placement and function of these components.

Neither the water used to prepare dialysate nor the dialysate itself needs to be sterile, but tap water can not be used without additional treatment. Infections caused by rapid-growing NTM (e.g., *Mycobacterium chelonae* and *M. abscessus*) present a potential risk to hemodialysis patients (especially those in hemodialyzer reuse programs) if disinfection procedures to inactivate mycobacteria in the water (low-level disinfection) and the hemodialyzers (high-level disinfection) are inadequate.[31, 32, 633] Other factors associated with microbial contamination in dialysis systems could involve the water treatment system, the water and dialysate distribution systems, and the type of hemodialyzer.[666, 667, 794–799] Understanding the various factors and their influence on contamination levels is the key to preventing high levels of microbial contamination in dialysis therapy.

In several studies, pyrogenic reactions were demonstrated to have been caused by lipopolysaccharide or endotoxin associated with gram-negative bacteria.[794, 800–803] Early studies demonstrated that parenteral exposure to endotoxin at a concentration of 1 ng/kg body weight/hour was the threshold dose for producing pyrogenic reactions in humans, and that the relative potencies of endotoxin differ by bacterial species.[804, 805] Gram-negative water bacteria (e.g., *Pseudomonas* spp.) have been shown to multiply rapidly in a variety of hospital-associated fluids that can be used as supply water for hemodialysis (e.g., distilled water, deionized water, RO water, and softened water) and in dialysate (a balanced salt solution made with this water).[806] Several studies have demonstrated that the attack rates of pyrogenic reactions are directly associated with the number of bacteria in dialysate.[666, 667, 807] These studies provided the rationale for setting the heterotrophic bacteria standards in the first AAMI hemodialysis guideline at ≤2,000 CFU/mL in dialysate and one log lower (≤200 CFU/mL) for the water used to prepare dialysate.[668, 788] If the level of bacterial contamination exceeded 200 CFU/mL in water, this level could be amplified in the system and effectively constitute a high inoculum for dialysate at the start of a

dialysis treatment.[807, 808] Pyrogenic reactions did not appear to occur when the level of contamination was below 2,000 CFU/mL in dialysate unless the source of the endotoxin was exogenous to the dialysis system (i.e., present in the community water supply). Endotoxins in a community water supply have been linked to the development of pyrogenic reactions among dialysis patients.[794]

Whether endotoxin actually crosses the dialyzer membrane is controversial. Several investigators have shown that bacteria growing in dialysate-generated products that could cross the dialyzer membrane.[809, 810] Gram-negative bacteria growing in dialysate have produced endotoxins that in turn stimulated the production of anti-endotoxin antibodies in hemodialysis patients;[801, 811] these data suggest that bacterial endotoxins, although large molecules, cross dialyzer membranes either intact or as fragments. The use of the very permeable membranes known as high-flux membranes (which allow large molecules [e.g., $\beta_2$ microglobulin] to traverse the membrane) increases the potential for passage of endotoxins into the blood path. Several studies support this contention. In one such study, an increase in plasma endotoxin concentrations during dialysis was observed when patients were dialyzed against dialysate containing $10^3$–$10^4$ CFU/mL *Pseudomonas* spp.[812] *In vitro* studies using both radiolabeled lipopolysaccharide and biologic assays have demonstrated that biologically active substances derived from bacteria found in dialysate can cross a variety of dialyzer membranes.[802, 813–816] Patients treated with high-flux membranes have had higher levels of anti-endotoxin antibodies than subjects or patients treated with conventional membranes.[817] Finally, since 1989, 19%–22% of dialysis centers have reported pyrogenic reactions in the absence of septicemia.[818, 819]

Investigations of adverse outcomes among patients using reprocessed dialyzers have demonstrated a greater risk for developing pyrogenic reactions when the water used to reprocess these devices contained >6 ng/mL endotoxin and >$10^4$ CFU/mL bacteria.[820] In addition to the variability in endotoxin assays, host factors also are involved in determining whether a patient will mount a response to endotoxin.[803] Outbreak investigations of pyrogenic reactions and bacteremias associated with hemodialyzer reuse have demonstrated that pyrogenic reactions are prevented once the endotoxin level in the water used to reprocess the dialyzers is returned to below the AAMI standard level.[821]

Reuse of dialyzers and use of bicarbonate dialysate, high-flux dialyzer membranes, or high-flux dialysis may increase the potential for pyrogenic reactions if the water in the dialysis setting does not meet standards.[796–798] Although investigators have been unable to demonstrate endotoxin transfer across dialyzer membranes,[803, 822, 823] the preponderance of reports now supports the ability of endotoxin to transfer across at least some high-flux membranes under some operating conditions. In addition to the acute risk of pyrogenic reactions, indirect evidence in increasingly demonstrating that chronic exposure to low amounts of endotoxin may play a role in some of the long-term complications of hemodialysis therapy. Patients treated with ultrafiltered dialysate for 5–6 months have demonstrated a decrease in serum $\beta_2$ microglobulin concentrations and a decrease in markers of an inflammatory response.[824–826] In studies of longer duration, use of microbiologically ultrapure dialysate has been associated with a decreased incidence of $\beta_2$ microglobulin-associated amyloidosis.[827, 828]

Although patient benefit likely is associated with the use of ultrapure dialysate, no consensus has been reached regarding the potential adoption of this as standard in the United States. Debate continues regarding the bacterial and endotoxin limits for dialysate. As advances in water treatment and hemodialysis processes occur, efforts are underway to move improved technology from the manufacturer out into the user community. Cost-benefit studies, however, have not been done, and substantially increased costs to implement newer water treatment modalities are anticipated.

To reconcile AAMI documents with current International Organization for Standardization (ISO) format, AAMI has determined that its hemodialysis standards will be discussed in the following four installments: RD 5 for hemodialysis equipment, RD 62 for product water quality, RD 47 for dialyzer

reprocessing, and RD 52 for dialysate quality. The Renal Diseases and Dialysis Committee of AAMI is expected to finalize and promulgated the dialysate standard pertinent to the user community (RD 52), adopting by reference the bacterial and endotoxin limits in product water as currently outlined in the AAMI standard that applies to systems manufacturers (RD 62). At present, the user community should continue to observe water quality and dialysate standards as outlined in AAMI RD 5 (Hemodialysis Systems, 1992) and AAMI RD 47 (Reuse of Hemodialyzers, 1993) until the new RD 52 standard becomes available (Table 18).[789, 791]

### Table 18. Microbiologic limits for hemodialysis fluids*

| Hemodialysis fluid | Maximum total heterotrophs (CFU/mL)+ | Maximum endotoxin level (EU/mL)§ |
|---|---|---|
| *Present standard* | | |
| Product water¶ | | |
|    Used to prepare dialysate | 200 | No standard |
|    Used to reprocess dialyzers | 200 | 5 |
| Dialysate | 2,000 | No standard |
| *Proposed standard*** | | |
| Product water | 200 | 2 |
| Dialysate | 200 | 2 |

\* The material in this table was compiled from references 789 and 791 (ANSI/AAMI standards RD 5-1992 and ANSI/AAMI RD 47-1993).
+ Colony forming units per milliliter.
§ Endotoxin units per milliliter.
¶ Product water presently includes water used to prepare dialysate and water used to reprocess dialyzers.
\*\* Dialysate for hemodialysis, RD 52, under development, American National Standards Institute, Association for the Advancement of Medical Instrumentation (AAMI).

The current AAMI standard directed at systems manufacturers (RD 62 [Water Treatment Equipment for Hemodialysis Applications, 2001]) now specifies that all product water used to prepare dialysate or to reprocess dialyzers for multiple use should contain <2 endotoxin units per milliliter (EU/mL).[792] A level of 2 EU/mL was chosen as the upper limit for endotoxin because this level is easily achieved with contemporary water treatment systems using RO and/or ultrafiltration. CDC has advocated monthly endotoxin testing along with microbiologic assays of water, because endotoxin activity may not correspond to the total heterotrophic plate counts.[829] Additionally, the current AAMI standard RD 62 for manufacturers includes action levels for product water. Because 48 hours can elapse between the time of sampling water for microbial contamination and the time when results are received, and because bacterial proliferation can be rapid, action levels for microbial counts and endotoxin concentrations are reported as 50 CFU/mL and 1 EU/mL, respectively, in this revision of the standard.[792] These recommendations will allow users to initiate corrective action before levels exceed the maximum levels established by the standard.

In hemodialysis, the net movement of water is from the blood to the dialysate, although within the dialyzer, local movement of water from the dialysate to the blood through the phenomenon of back-filtration may occur, particularly in dialyzers with highly permeable membranes.[830] In contrast, hemofiltration and hemodiafiltration feature infusion of large volumes of electrolyte solution (20–70 L) into the blood. Increasingly, this electrolyte solution is being prepared on-line from water and concentrate. Because of the large volumes of fluid infused, AAMI considered the necessity of setting more stringent requirements for water to be used in this application, but this organization has not yet established these because of lack of expert consensus and insufficient experience with on-line therapies in the United States. On-line hemofiltration and hemodiafiltration systems use sequential ultrafiltration as the final step in the preparation of infusion fluid. Several experts from AAMI concur that these

point-of-use ultrafiltration systems should be capable of further reducing the bacteria and endotoxin burden of solutions prepared from water meeting the requirements of the AAMI standard to a safe level for infusion.

### b. Microbial Control Strategies

The strategy for controlling massive accumulations of gram-negative water bacteria and NTM in dialysis systems primarily involves preventing their growth through proper disinfection of water-treatment systems and hemodialysis machines. Gram-negative water bacteria, their associated lipopolysaccharides (bacterial endotoxins), and NTM ultimately come from the community water supply, and levels of these bacteria can be amplified depending on the water treatment system, dialysate distribution system, type of dialysis machine, and method of disinfection (Table 19).[634, 794, 831] Control strategies are designed to reduce levels of microbial contamination in water and dialysis fluid to relatively low levels but not to completely eradicate it.

### Table 19. Factors influencing microbial contamination in hemodialysis systems

| Factors | Comments |
|---|---|
| *Water supply* | |
| Source of community water | |
| Ground water | Contains endotoxin and bacteria |
| Surface water | Contains high levels of endotoxin and bacteria |
| *Water treatment at the dialysis center* | |
| None | Not recommended |
| Filtration | |
| Prefilter | Particulate filter to protect equipment; does not remove microorganisms |
| Absolute filter (depth or membrane filter) | Removes bacteria, however, unless the filter is changed frequently or disinfected, bacteria will accumulate and grow through the filter; acts as a significant reservoir of bacteria and endotoxin |
| Activated carbon filter | Removes organics and available chlorine or chloramines; acts as a significant reservoir of bacteria and endotoxin |
| *Water treatment devices* | |
| Deionization/ion-exchange softener | Both softeners and deionizers are significant reservoirs of bacteria and do not remove endotoxin. |
| Reverse osmosis (RO) | Removes bacteria and endotoxin, but must be disinfected; operates at high water pressure |
| Ultraviolet light | Kills some bacteria, but there is no residual; ultraviolet-resistant bacteria can develop if the unit is not properly maintained |
| Ultrafilter | Removes bacteria and endotoxin; operates on normal line pressure; can be positioned distal to deionizer; must be disinfected |
| *Water and dialysate distribution system* | |
| Distribution pipes | |
| Size | Oversized diameter and length decrease fluid flow and increase bacterial reservoir for both treated water and centrally-prepared dialysate. |
| Construction | Rough joints, dead ends, unused branches, and polyvinyl chloride (PVC) piping can act as bacterial reservoirs. |
| Elevation | Outlet taps should be located at the highest elevation to prevent loss of disinfectant; keep a recirculation loop in the system; flush unused ports routinely. |
| Storage tanks | Tanks are undesirable because they act as a reservoir for water bacteria; if tanks are present, they must be routinely scrubbed and disinfected. |
| *Dialysis machines* | |
| Single-pass | Disinfectant should have contact with *all* parts of the machine that are exposed to water or dialysis fluid. |
| Recirculating single-pass or recirculating (batch) | Recirculating pumps and machine design allow for massive contamination levels if not properly disinfected; overnight chemical germicide treatment is recommended. |

64

Two components of hemodialysis water distribution systems – pipes (particularly those made of polyvinyl chloride [PVC]) and storage tanks – can serve as reservoirs of microbial contamination. Hemodialysis systems frequently use pipes that are wider and longer than are needed to handle the required flow, which slows the fluid velocity and increases both the total fluid volume and the wetted surface area of the system. Gram-negative bacteria in fluids remaining in pipes overnight multiply rapidly and colonize the wet surfaces, producing bacterial populations and endotoxin quantities in proportion to the volume and surface area. Such colonization results in formation of protective biofilm that is difficult to remove and protects the bacteria from disinfection.[832] Routine (i.e., monthly), low-level disinfection of the pipes can help to control bacterial contamination of the distribution system. Additional measures to protect pipes from contaminations include a) situating all outlet taps at equal elevation and at the highest point of the system so that the disinfectant cannot drain from pipes by gravity before adequate contact time has elapsed and b) eliminating rough joints, dead-end pipes, and unused branches and taps that can trap fluid and serve as reservoirs of bacteria capable of continuously inoculating the entire volume of the system.[800] Maintain a flow velocity of 3–5 ft/sec.

A storage tank in the distribution system greatly increases the volume of fluid and surface area available and can serve as a niche for water bacteria. Storage tanks are therefore not recommended for use in dialysis systems unless they are frequently drained and adequately disinfected, including scrubbing the sides of the tank to remove bacterial biofilm. An ultrafilter should be used distal to the storage tank.[808, 833]

Microbiologic sampling of dialysis fluids is recommended because gram-negative bacteria can proliferate rapidly in water and dialysate in hemodialysis systems; high levels of these organisms place patients at risk for pyrogenic reactions or health-care–associated infection.[667, 668, 808]

Health-care facilities are advised to sample dialysis fluids at least monthly using standard microbiologic assay methods for waterborne microorganisms.[788, 793, 799, 834-836] Product water used to prepare dialysate and to reprocess hemodialyzers for reuse on the same patient should also be tested for bacterial endotoxin on a monthly basis.[792, 829, 837] (See Appendix C for information about water sampling methods for dialysis.)

Cross-contamination of dialysis machines and inadequate disinfection measures can facilitate the spread of waterborne organisms to patients. Steps should be taken to ensure that dialysis equipment is performing correctly and that all connectors, lines, and other components are specific for the equipment, in good repair, and properly in place. A recent outbreak of gram-negative bacteremias among dialysis patients was attributed to faulty valves in a drain port of the machine that allowed backflow of saline used to flush the dialyzer before patient use.[838, 839] This backflow contaminated the drain priming connectors, which contaminated the blood lines and exposed the patients to high concentrations of gram-negative bacteria. Environmental infection control in dialysis settings also includes low-level disinfection of housekeeping surfaces and spot decontamination of spills of blood (see Environmental Services in Part I of this guideline for further information).

### c. Infection-Control Issues in Peritoneal Dialysis
Peritoneal dialysis (PD), most commonly administered as continuous ambulatory peritoneal dialysis (CAPD) and continual cycling peritoneal dialysis (CCPD), is the third most common treatment for end-stage renal disease (ESRD) in the United States, accounting for 12% of all dialysis patients.[840] Peritonitis is the primary complication of CAPD, with coagulase-negative staphylococci the most clinically significant causative organisms.[841] Other organisms that have been found to produce peritonitis include *Staphylococcus aureus, Mycobacterium fortuitum, M. mucogenicum, Stenotrophomonas maltophilia, Burkholderia cepacia, Corynebacterium jeikeium, Candida* spp., and

other fungi.[842-850] Substantial morbidity is associated with peritoneal dialysis infections. Removal of peritoneal dialysis catheters usually is required for treatment of peritonitis caused by fungi, NTM, or other bacteria that are not cleared within the first several days of effective antimicrobial treatment. Furthermore, recurrent episodes of peritonitis may lead to fibrosis and loss of the dialysis membrane.

Many reported episodes of peritonitis are associated with exit-site or tunneled catheter infections. Risk factors for the development of peritonitis in PD patients include a) under dialysis, b) immune suppression, c) prolonged antimicrobial treatment, d) patient age [more infections occur in younger patients and older hospitalized patients], e) length of hospital stay, and f) hypoalbuminemia.[844, 851, 852] Concern has been raised about infection risk associated with the use of automated cyclers in both inpatient and outpatient settings; however, studies suggest that PD patients who use automated cyclers have much lower infection rates.[853] One study noted that a closed-drainage system reduced the incidence of system-related peritonitis among intermittent peritoneal dialysis (IPD) patients from 3.6 to 1.5 cases/100 patient days.[854] The association of peritonitis with management of spent dialysate fluids requires additional study. Therefore, ensuring that the tip of the waste line is not submerged beneath the water level in a toilet or in a drain is prudent.

# 7. Ice Machines and Ice

Microorganisms may be present in ice, ice-storage chests, and ice-making machines. The two main sources of microorganisms in ice are the potable water from which it is made and a transferral of organisms from hands (Table 20). Ice from contaminated ice machines has been associated with patient colonization, blood stream infections, pulmonary and gastrointestinal illnesses, and pseudoinfections.[602, 603, 683, 684, 854, 855] Microorganisms in ice can secondarily contaminate clinical specimens and medical solutions that require cold temperatures for either transport or holding.[601, 620] An outbreak of surgical-site infections was interrupted when sterile ice was used in place of tap water ice to cool cardioplegia solutions.[601]

**Table 20. Microorganisms and their sources in ice and ice machines**

| Sources of microorganisms | References |
|---|---|
| **From potable water** | |
| *Legionella* spp. | 684, 685, 857, 858 |
| Nontuberculous mycobacteria (NTM) | 602, 603, 859 |
| *Pseudomonas aeruginosa* | 859 |
| *Burkholderia cepacia* | 859, 860 |
| *Stenotrophomonas maltophilia* | 860 |
| *Flavobacterium* spp. | 860 |
| **From fecally-contaminated water** | |
| Norwalk virus | 861–863 |
| *Giardia lamblia* | 864 |
| *Cryptosporidium parvum* | 685 |
| **From hand-transfer of organisms** | |
| *Acinetobacter* spp. | 859 |
| Coagulase-negative staphylococci | 859 |
| *Salmonella enteriditis* | 865 |
| *Cryptosporidium parvum* | 685 |

66

In a study comparing the microbial populations of hospital ice machines with organisms recovered from ice samples gathered from the community, samples from 27 hospital ice machines yielded low numbers (<10 CFU/mL) of several potentially opportunistic microorganisms, mainly gram-negative bacilli.[859] During the survey period, no health-care–associated infections were attributed to the use of ice. Ice from community sources had higher levels of microbial contamination (75%–95% of 194 samples had total heterotrophic plate counts <500 CFU/mL, with the proportion of positive cultures dependent on the incubation temperature) and showed evidence of fecal contamination from the source water.[859] Thus, ice machines in health-care settings are no more heavily contaminated compared with ice machines in the community. If the source water for ice in a health-care facility is not fecally contaminated, then ice from clean ice machines and chests should pose no increased hazard for immunocompetent patients. Some waterborne bacteria found in ice could potentially be a risk to immunocompromised patients if they consume ice or drink beverages with ice. For example, *Burkholderia cepacia* in ice could present an infection risk for cystic fibrosis patients.[859, 860] Therefore, protecting immunosuppressed and otherwise medically at-risk patients from exposure to tap water and ice potentially contaminated with opportunistic pathogens is prudent.[9]

No microbiologic standards for ice, ice-making machines, or ice storage equipment have been established, although several investigators have suggested the need for such standards.[859, 866] Culturing of ice machines is not routinely recommended, but it may be useful as part of an epidemiologic investigation.[867–869] Sampling might also help determine the best schedule for cleaning open ice-storage chests. Recommendations for a regular program of maintenance and disinfection have been published.[866–869] Health-care facilities are advised to clean ice-storage chests on a regular basis. Open ice chests may require a more frequent cleaning schedule compared with chests that have covers. Portable ice chests and containers require cleaning and low-level disinfection before the addition of ice intended for consumption. Ice-making machines may require less frequent cleaning, but their maintenance is important to proper performance. The manufacturer's instructions for both the proper method of cleaning and/or maintenance should be followed. These instructions may also recommend an EPA-registered disinfectant to ensure chemical potency, materials compatibility, and safety. In the event that instructions and suitable EPA-registered disinfectants are not available for this process, then a generic approach to cleaning, disinfecting, and maintaining ice machines and dispensers can be used (Box 12).

Ice and ice-making machines also may be contaminated via improper storage or handling of ice by patients and/or staff.[684–686, 855–858, 870] Suggested steps to avoid this means of contamination include a) minimizing or avoiding direct hand contact with ice intended for consumption, b) using a hard-surface scoop to dispense ice, and c) installing machines that dispense ice directly into portable containers at the touch of a control.[687, 869]

**Box 12. General steps for cleaning and maintaining ice machines, dispensers, and storage chests*+**

1. Disconnect unit from power supply.
2. Remove and discard ice from bin or storage chest.
3. Allow unit to warm to room temperature.
4. Disassemble removable parts of machine that make contact with water to make ice.
5. Thoroughly clean machine and parts with water and detergent.
6. Dry external surfaces of removable parts before reassembling.
7. Check for any needed repair.
8. Replace feeder lines, as appropriate (e.g., when damaged, old, or difficult to clean).
9. Ensure presence of an air space in tubing leading from water inlet into water distribution system of machine.

**(Box 12. continued)**

10. Inspect for rodent or insect infestations under the unit and treat, as needed.
11. Check door gaskets (open compartment models) for evidence of leakage or dripping into the storage chest.
12. Clean the ice-storage chest or bin with fresh water and detergent; rinse with fresh tap water.
13. Sanitize machine by circulating a 50–100 parts per million (ppm) solution of sodium hypochlorite (i.e., 4–8 mL sodium hypochlorite/gallon of water) through the ice-making and storage systems for 2 hours (100 ppm solution), or 4 hours (50 ppm solution).
14. Drain sodium hypochlorite solutions and flush with fresh tap water.
15. Allow all surfaces of equipment to dry before returning to service.

---

\* Material in this box is adapted from reference 869.
+ These general guidelines should be used only where manufacturer-recommended methods and EPA-registered disinfectants are not available.

## 8. Hydrotherapy Tanks and Pools

### a. General Information

Hydrotherapy equipment (e.g., pools, whirlpools, whirlpool spas, hot tubs, and physiotherapy tanks) traditionally has been used to treat patients with certain medical conditions (e.g., burns,[871, 872] septic ulcers, lesions, amputations,[873] orthopedic impairments and injuries, arthritis,[874] and kidney lithotripsy).[654] Wound-care medicine is increasingly moving away from hydrotherapy, however, in favor of bedside pulsed-lavage therapy using sterile solutions for cleaning and irrigation.[492, 875–878] Several episodes of health-care–associated infections have been linked to use of hydrotherapy equipment (Table 21). Potential routes of infection include incidental ingestion of the water, sprays and aerosols, and direct contact with wounds and intact skin (folliculitis). Risk factors for infection include a) age and sex of the patient, b) underlying medical conditions, c) length of time spent in the hydrotherapy water, and d) portals of entry.[879]

**Table 21. Infections associated with use of hydrotherapy equipment**

| Microorganisms | Medical conditions | References |
|---|---|---|
| *Acinetobacter baumanii* | Sepsis | 572 |
| *Citrobacter freundii* | Cellulitis | 880 |
| *Enterobacter cloacae* | Sepsis | 881 |
| *Legionella* spp. | Legionellosis | 882 |
| *Mycobacterium abscessus, Mycobacterium fortuitum, Mycobacterium marinum* | Skin ulcers and soft tissue infections | 621–623, 883 |
| *Pseudomonas aeruginosa* | Sepsis, soft tissue infections, folliculitis, and wound infections | 492, 493, 506, 679, 884–888 |
| Adenovirus, adeno-associated virus | Conjunctivitis | 889 |

Infection control for hydrotherapy tanks, pools, or birthing tanks presents unique challenges because indigenous microorganisms are always present in the water during treatments. In addition, some studies have found free living amoebae (i.e., *Naegleria lovaniensis*), which are commonly found in association with *Naegleria fowleri*, in hospital hydrotherapy pools.[890] Although hydrotherapy is at times appropriate for patients with wounds, burns, or other types of non-intact skin conditions (determined on a case-by-case basis), this equipment should not be considered "semi-critical" in accordance with the Spaulding classification.[891] Microbial data to evaluate the risk of infection to patients using hydrotherapy pools and birthing tanks are insufficient. Nevertheless, health-care facilities should maintain stringent cleaning and disinfection practices in accordance with the manufacturer's instructions

68

and with relevant scientific literature until data supporting more rigorous infection-control measures become available. Factors that should be considered in therapy decisions in this situation would include a) availability of alternative aseptic techniques for wound management and b) a risk-benefit analysis of using traditional hydrotherapy.

### b. Hydrotherapy Tanks

Hydrotherapy tanks (e.g., whirlpools, Hubbard tanks and whirlpool bath tubs) are shallow tanks constructed of stainless steel, plexiglass, or tile. They are closed-cycle water systems with hydrojets to circulate, aerate, and agitate the water. The maximum water temperature range is 50°F–104°F (10°C–40°C). The warm water temperature, constant agitation and aeration, and design of the hydrotherapy tanks provide ideal conditions for bacterial proliferation if the equipment is not properly maintained, cleaned, and disinfected. The design of the hydrotherapy equipment should be evaluated for potential infection-control problems that can be associated with inaccessible surfaces that can be difficult to clean and/or remain wet in between uses (i.e., recessed drain plates with fixed grill plates).[887] Associated equipment (e.g., parallel bars, plinths, Hoyer lifts, and wheelchairs) can also be potential reservoirs of microorganisms, depending on the materials used in these items (i.e., porous vs. non-porous materials) and the surfaces that may become wet during use. Patients with active skin colonizations and wound infections can serve as sources of contamination for the equipment and the water. Contamination from spilled tub water can extend to drains, floors, and walls.[680–683] Health-care–associated colonization or infection can result from exposure to endogenous sources of microorganisms (autoinoculation) or exogenous sources (via cross-contamination from other patients previously receiving treatment in the unit).

Although some facilities have used tub liners to minimize environmental contamination of the tanks, the use of a tub liner does not eliminate the need for cleaning and disinfection. Draining these small pools and tanks after each patient use, thoroughly cleaning with a detergent, and disinfecting according to manufacturers' instructions have reduced bacterial contamination levels in the water from $10^4$ CFU/mL to <10 CFU/mL.[892] A chlorine residual of 15 ppm in the water should be obtained prior to the patient's therapy session (e.g., by adding 15 grams of calcium hypochlorite 70% [e.g., HTH®] per 100 gallons of water).[892] A study of commercial and residential whirlpools found that superchlorination or draining, cleaning, disinfection, and refilling of whirlpools markedly reduced densities of *Pseudomonas aeruginosa* in whirlpool water.[893] The bacterial populations were rapidly replenished, however, when disinfectant concentrations dropped below recommended levels for recreational use (i.e., chlorine at 3.0 ppm or bromine at 6.0 ppm). When using chlorine, however, knowing whether the community drinking-water system is disinfected with chloramine is important, because municipal utilities adjust the pH of the water to the basic side to enhance chloramine formation. Because chlorine is not very effective at pH levels above 8, it may be necessary to re-adjust the pH of the water to a more acidic level.[894]

A few reports describe the addition of antiseptic chemicals to hydrotherapy tank water, especially for burn patient therapy.[895–897] One study involving a minimal number of participants demonstrated a reduction in the number of *Pseudomonas* spp. and other gram-negative bacteria from both patients and equipment surfaces when chloramine-T ("chlorazene") was added to the water.[898] Chloramine-T has not, however, been approved for water treatment in the United States.

### c. Hydrotherapy Pools

Hydrotherapy pools typically serve large numbers of patients and are usually heated to 91.4°F–98.6°F (31°C–37°C). The temperature range is more narrow (94°F–96.8°F [35°C–36°C]) for pediatric and geriatric patient use.[899] Because the size of hydrotherapy pools precludes draining after patient use, proper management is required to maintain the proper balance of water conditioning (i.e., alkalinity, hardness, and temperature) and disinfection. The most widely used chemicals for disinfection of pools

are chlorine and chlorine compounds – calcium hypochlorite, sodium hypochlorite, lithium hypochlorite, chloroisocyanurates, and chlorine gas. Solid and liquid formulations of chlorine chemicals are the easiest and safest to use.[900] Other halogenated compounds have also been used for pool-water disinfection, albeit on a limited scale. Bromine, which forms bactericidal bromamines in the presence of ammonia, has limited use because of its association with contact dermatitis.[901] Iodine does not bleach hair, swim suits, or cause eye irritation, but when introduced at proper concentrations, it gives water a greenish-yellowish cast.[892]

In practical terms, maintenance of large hydrotherapy pools (e.g., those used for exercise) is similar to that for indoor public pools (i.e., continuous filtration, chlorine residuals no less than 0.4 ppm, and pH of 7.2–7.6).[902, 903] Supply pipes and pumps also need to be maintained to eliminate the possibility of this equipment serving as a reservoir for waterborne organisms.[904] Specific standards for chlorine residual and pH of the water are addressed in local and state regulations. Patients who are fecally incontinent or who have draining wounds should refrain from using these pools until their condition improves.

### d. Birthing Tanks and Other Equipment

The use of birthing tanks, whirlpool spas, and whirlpools is a recent addition to obstetrical practice.[905] Few studies on the potential risks associated with these pieces of equipment have been conducted. In one study of 32 women, a newborn contracted a *Pseudomonas* infection after being birthed in such a tank, the strain of which was identical to the organism isolated from the tank water.[906] Another report documented identical strains of *P. aeruginosa* isolates from a newborn with sepsis and on the environmental surfaces of a tub that the mother used for relaxation while in labor.[907] Other studies have shown no significant increases in the rates of post-immersion infections among mothers and infants.[908, 909]

Because the water and the tub surfaces routinely become contaminated with the mother's skin flora and blood during labor and delivery, birthing tanks and other tub equipment must be drained after each patient use and the surfaces thoroughly cleaned and disinfected. Health-care facilities are advised to follow the manufacturer's instructions for selection of disinfection method and chemical germicide. The range of chlorine residuals for public whirlpools and whirlpool spas is 2–5 ppm.[910] Use of an inflatable tub is an alternative solution, but this item must be cleaned and disinfected between patients if it is not considered a single-use unit.

Recreational tanks and whirlpool spas are increasingly being used as hydrotherapy equipment. Although such home equipment appears to be suitable for hydrotherapy, they are neither designed nor constructed to function in this capacity. Additionally, manufacturers generally are not obligated to provide the health-care facility with cleaning and disinfecting instructions appropriate for medical equipment use, and the U.S. Food and Drug Administration (FDA) does not evaluate recreational equipment. Health-care facilities should therefore carefully evaluate this "off-label" use of home equipment before proceeding with a purchase.

## 9. Miscellaneous Medical/Dental Equipment Connected to Main Water Systems

### a. Automated Endoscope Reprocessors

The automated endoscopic reprocessor (AER) is classified by the FDA as an accessory for the flexible endoscope.[654] A properly operating AER can provide a more consistent, reliable method of decontaminating and terminal reprocessing for endoscopes between patient procedures than manual reprocessing methods alone.[911] An endoscope is generally subjected to high-level disinfection using a

70

liquid chemical sterilant or a high-level disinfectant. Because the instrument is a semi-critical device, the optimal rinse fluid for a disinfected endoscope would be sterile water.[3] Sterile water, however, is expensive and difficult to produce in sufficient quantities and with adequate quality assurance for instrument rinsing in an AER.[912, 913] Therefore, one option to be used for AERs is rinse water that has been passed through filters with a pore size of 0.1–0.2 µm to render the water "bacteria-free." These filters usually are located in the water line at or near the port where the mains water enters the equipment. The product water (i.e., tap water passing through these filters) in these applications is not considered equivalent in microbial quality to that for membrane-filtered water as produced by pharmaceutical firms. Membrane filtration in pharmaceutical applications is intended to ensure the microbial quality of polished product water.

Water has been linked to the contamination of flexible fiberoptic endoscopes in the following two scenarios: a) rinsing a disinfected endoscope with unfiltered tap water, followed by storage of the instrument without drying out the internal channels and b) contamination of AERs from tap water inadvertently introduced into the equipment. In the latter instance, the machine's water reservoirs and fluid circuitry become contaminated with waterborne, heterotrophic bacteria (e.g., *Pseudomonas aeruginosa* and NTM), which can survive and persist in biofilms attached to these components.[914–917] Colonization of the reservoirs and water lines of the AER becomes problematic if the required cleaning, disinfection, and maintenance are not performed on the equipment as recommended by the manufacturer.[669, 916, 917] Use of the 0.1–0.2-µm filter in the water line helps to keep bacterial contamination to a minimum,[670, 911, 917] but filters may fail and allow bacteria to pass through to the equipment and then to the instrument undergoing reprocessing.[671–674, 913, 918] Filters also require maintenance for proper performance.[670, 911, 912, 918, 919] Heightened awareness of the proper disinfection of the connectors that hook the instrument to the AER may help to further reduce the potential for contaminating endoscopes during reprocessing.[920] An emerging issue in the field of endoscopy is that of the possible role of rinse water monitoring and its potential to help reduce endoscopy/bronchoscopy-associated infections.[918]

Studies have linked deficiencies in endoscope cleaning and/or disinfecting processes to the incidence of post-endoscopic adverse outcomes.[921–924] Several clusters have been traced to AERs of older designs and these were associated with water quality.[675, 914–916] Regardless of whether manual or automated terminal reprocessing is used for endoscopes, the internal channels of the instrument should be dried before storage.[925] The presence of residual moisture in the internal channels encourages the proliferation of waterborne microorganisms, some of which may be pathogenic. One of the most frequently used methods employs 70% isopropyl alcohol to flush the internal channels, followed by forced air drying of these channels and hanging the endoscope vertically in a protected cabinet; this method ensures internal drying of the endoscope, lessens the potential for proliferation of waterborne microorganisms,[669, 913, 917, 922, 926, 927] and is consistent with professional organization guidance for endoscope reprocessing.[928]

An additional problem with waterborne microbial contamination of AERs centers on increased microbial resistance to alkaline glutaraldehyde, a widely used liquid chemical sterilant/high-level disinfectant.[669, 929] Opportunistic waterborne microorganisms (e.g., *Mycobacterium chelonae*, *Methylobacterium* spp.) have been associated with pseudo-outbreaks and colonization; infection caused by these organisms has been associated with procedures conducted in clinical settings (e.g., bronchoscopy).[669, 913, 929–931] Increasing microbial resistance to glutaraldehyde has been attributed to improper use of the disinfectant in the equipment, allowing the dilution of glutaraldehyde to fall below the manufacturer's recommended minimal use concentration.[929]

*b. Dental Unit Water Lines*

Dental unit water lines (DUWLs) consist of small-bore plastic tubing that delivers water used for general, non-surgical irrigation and as a coolant to dental handpieces, sonic and ultrasonic scalers, and air-water syringes; municipal tap water is the source water for these lines. The presence of biofilms of waterborne bacteria and fungi (e.g., *Legionella* spp., *Pseudomonas aeruginosa,* and NTM) in DUWLs has been established.[636, 637, 694, 695, 932–934] Biofilms continually release planktonic microorganisms into the water, the titers of which can exceed $1\times10^6$ CFU/mL.[694] However, scientific evidence indicates that immunocompetent persons are only at minimal risk for substantial adverse health effects after contact with water from a dental unit. Nonetheless, exposing patients or dental personnel to water of uncertain microbiological quality is not consistent with universally accepted infection-control principles.[935]

In 1993, CDC issued guidelines relative to water quality in a dental setting. These guidelines recommend that all dental instruments that use water (including high-speed handpieces) should be run to discharge water for 20–30 seconds after each patient and for several minutes before the start of each clinic day.[936] This practice can help to flush out any patient materials that many have entered the turbine, air, or waterlines.[937, 938] The 1993 guidance also indicated that waterlines be flushed at the beginning of the clinic day. Although these guidelines are designed to help reduce the number of microorganisms present in treatment water, they do not address the issue of reducing or preventing biofilm formation in the waterlines. Research published subsequent to the 1993 dental infection control guideline suggests that flushing the lines at the beginning of the day has only minimal effect on the status of the biofilm in the lines and does not reliably improve the quality of water during dental treatment.[939–941] Updated recommendations on infection-control practices for water line use in dentistry will be available in late 2003.[942]

The numbers of microorganisms in water used as coolant or irrigant for non-surgical dental treatment should be as low as reasonably achievable and, at a minimum, should meet nationally recognized standards for safe drinking water.[935, 943] Only minimal evidence suggests that water meeting drinking water standards poses a health hazard for immunocompetent persons. The EPA, the American Public Health Association (APHA), and the American Water Works Association (AWWA) have set a maximum limit of 500 CFU/mL for aerobic, heterotrophic, mesophilic bacteria in drinking water in municipal distribution systems.[944, 945] This standard is achievable, given improvements in water-line technology. Dentists should consult with the manufacturer of their dental unit to determine the best equipment and method for maintaining and monitoring good water quality.[935, 946]

# E. Environmental Services

## 1. Principles of Cleaning and Disinfecting Environmental Surfaces

Although microbiologically contaminated surfaces can serve as reservoirs of potential pathogens, these surfaces generally are not directly associated with transmission of infections to either staff or patients. The transferral of microorganisms from environmental surfaces to patients is largely via hand contact with the surface.[947, 948] Although hand hygiene is important to minimize the impact of this transfer, cleaning and disinfecting environmental surfaces as appropriate is fundamental in reducing their potential contribution to the incidence of healthcare-associated infections.

The principles of cleaning and disinfecting environmental surfaces take into account the intended use of the surface or item in patient care. CDC retains the Spaulding classification for medical and surgical instruments, which outlines three categories based on the potential for the instrument to transmit infection if the instrument is microbiologically contaminated before use.[949, 950] These categories are

72

"critical," "semicritical," and "noncritical." In 1991, CDC proposed an additional category designated "environmental surfaces" to Spaulding's original classification[951] to represent surfaces that generally do not come into direct contact with patients during care. Environmental surfaces carry the least risk of disease transmission and can be safely decontaminated using less rigorous methods than those used on medical instruments and devices. Environmental surfaces can be further divided into medical equipment surfaces (e.g., knobs or handles on hemodialysis machines, x-ray machines, instrument carts, and dental units) and housekeeping surfaces (e.g., floors, walls, and tabletops).[951]

The following factors influence the choice of disinfection procedure for environmental surfaces: a) the nature of the item to be disinfected, b) the number of microorganisms present, c) the innate resistance of those microorganisms to the inactivating effects of the germicide, d) the amount of organic soil present, e) the type and concentration of germicide used, f) duration and temperature of germicide contact, and g) if using a proprietary product, other specific indications and directions for use.[952, 953]

Cleaning is the necessary first step of any sterilization or disinfection process. Cleaning is a form of decontamination that renders the environmental surface safe to handle or use by removing organic matter, salts, and visible soils, all of which interfere with microbial inactivation.[954-960] The physical action of scrubbing with detergents and surfactants and rinsing with water removes large numbers of microorganisms from surfaces.[957] If the surface is not cleaned before the terminal reprocessing procedures are started, the success of the sterilization or disinfection process is compromised.

Spaulding proposed three levels of disinfection for the treatment of devices and surfaces that do not require sterility for safe use. These disinfection levels are "high-level," "intermediate-level," and "low-level."[949, 950] The basis for these levels is that microorganisms can usually be grouped according to their innate resistance to a spectrum of physical or chemical germicidal agents (Table 22). This information, coupled with the instrument/surface classification, determines the appropriate level of terminal disinfection for an instrument or surface.

**Table 22. Levels of disinfection by type of microorganism***

| Disinfection level | Bacteria | | | Fungi+ | Viruses | |
| --- | --- | --- | --- | --- | --- | --- |
| | Vegetative | Tubercle bacillus | Spores | | Lipid and medium size | Nonlipid and small size |
| High | +§ | + | +¶ | + | + | + |
| Intermediate | + | + | —** | + | + | ±++ |
| Low | + | — | — | ± | + | ± |

* Material in this table compiled from references 2 and 951.
+ This class of microorganisms includes asexual spores but not necessarily chlamydospores or sexual spores.
§ The "plus" sign indicates that a killing effect can be expected when the normal use-concentrations of chemical disinfectants or pasteurization are properly employed; a "negative" sign indicates little or no killing effect.
¶ Only with extended exposure times are high-level disinfectant chemicals capable of killing high numbers of bacterial spores in laboratory tests; they are, however, capable of sporicidal activity.
** Some intermediate-level disinfectants (e.g., hypochlorites) can exhibit some sporicidal activity; others (e.g., alcohols and phenolics) have no demonstrable sporicidal activity.
++ Some intermediate-level disinfectants, although they are tuberculocidal, may have limited virucidal activity.

The process of high-level disinfection, an appropriate standard of treatment for heat-sensitive, semi-critical medical instruments (e.g., flexible, fiberoptic endoscopes), inactivates all vegetative bacteria, mycobacteria, viruses, fungi, and some bacterial spores. High-level disinfection is accomplished with powerful, sporicidal chemicals (e.g., glutaraldehyde, peracetic acid, and hydrogen peroxide) that are not appropriate for use on housekeeping surfaces. These liquid chemical sterilants/high-level disinfectants

are highly toxic.[961-963] Use of these chemicals for applications other than those indicated in their label instructions (i.e., as immersion chemicals for treating heat-sensitive medical instruments) is not appropriate.[964] Intermediate-level disinfection does not necessarily kill bacterial spores, but it does inactivate *Mycobacterium tuberculosis* var. *bovis*, which is substantially more resistant to chemical germicides than ordinary vegetative bacteria, fungi, and medium to small viruses (with or without lipid envelopes). Chemical germicides with sufficient potency to achieve intermediate-level disinfection include chlorine-containing compounds (e.g., sodium hypochlorite), alcohols, some phenolics, and some iodophors. Low-level disinfection inactivates vegetative bacteria, fungi, enveloped viruses (e.g., human immunodeficiency virus [HIV], and influenza viruses), and some non-enveloped viruses (e.g., adenoviruses). Low-level disinfectants include quaternary ammonium compounds, some phenolics, and some iodophors. Sanitizers are agents that reduce the numbers of bacterial contaminants to safe levels as judged by public health requirements, and are used in cleaning operations, particularly in food service and dairy applications. Germicidal chemicals that have been approved by FDA as skin antiseptics are not appropriate for use as environmental surface disinfectants.[951]

The selection and use of chemical germicides are largely matters of judgment, guided by product label instructions, information, and regulations. Liquid sterilant chemicals and high-level disinfectants intended for use on critical and semi-critical medical/dental devices and instruments are regulated exclusively by the FDA as a result of recent memoranda of understanding between FDA and the EPA that delineates agency authority for chemical germicide regulation.[965, 966] Environmental surface germicides (i.e., primarily intermediate- and low-level disinfectants) are regulated by the EPA and labeled with EPA registration numbers. The labels and technical data or product literature of these germicides specify indications for product use and provide claims for the range of antimicrobial activity. The EPA requires certain pre-registration laboratory potency tests for these products to support product label claims. EPA verifies (through laboratory testing) manufacturers' claims to inactivate microorganisms for selected products and organisms. Germicides labeled as "hospital disinfectant" have passed the potency tests for activity against three representative microorganisms — *Pseudomonas aeruginosa, Staphylococcus aureus,* and *Salmonella cholerae suis.* Low-level disinfectants are often labeled "hospital disinfectant" without a tuberculocidal claim, because they lack the potency to inactivate mycobacteria. Hospital disinfectants with demonstrated potency against mycobacteria (i.e., intermediate-level disinfectants) may list "tuberculocidal" on the label as well. Other claims (e.g., "fungicidal," "pseudomonicidal," and "virucidal") may appear on labels of environmental surface germicides, but the designations of "tuberculocidal hospital disinfectant" and "hospital disinfectant" correlate directly to Spaulding's assessment of intermediate-level disinfectants and low-level disinfectants, respectively.[951]

A common misconception in the use of surface disinfectants in health-care settings relates to the underlying purpose for use of proprietary products labeled as a "tuberculocidal" germicide. Such products will not interrupt and prevent the transmission of TB in health-care settings because TB is not acquired from environmental surfaces. The tuberculocidal claim is used as a benchmark by which to measure germicidal potency. Because mycobacteria have the highest intrinsic level of resistance among the vegetative bacteria, viruses, and fungi, any germicide with a tuberculocidal claim on the label (i.e., an intermediate-level disinfectant) is considered capable of inactivating a broad spectrum of pathogens, including much less resistant organisms such the bloodborne pathogens (e.g., hepatitis B virus [HBV], hepatitis C virus [HCV], and HIV). It is this broad spectrum capability, rather than the product's specific potency against mycobacteria, that is the basis for protocols and OSHA regulations indicating the appropriateness of using tuberculocidal chemicals for surface disinfection.[967]

74

## 2. General Cleaning Strategies for Patient-Care Areas

The number and types of microorganisms present on environmental surfaces are influenced by the following factors: a) number of people in the environment, b) amount of activity, c) amount of moisture, d) presence of material capable of supporting microbial growth, e) rate at which organisms suspended in the air are removed, and f) type of surface and orientation [i.e., horizontal or vertical].[968] Strategies for cleaning and disinfecting surfaces in patient-care areas take into account a) potential for direct patient contact, b) degree and frequency of hand contact, and c) potential contamination of the surface with body substances or environmental sources of microorganisms (e.g., soil, dust, and water).

### a. Cleaning of Medical Equipment
Manufacturers of medical equipment should provide care and maintenance instructions specific to their equipment. These instructions should include information about a) the equipments' compatibility with chemical germicides, b) whether the equipment is water-resistant or can be safely immersed for cleaning, and c) how the equipment should be decontaminated if servicing is required.[967] In the absence of manufacturers' instructions, non-critical medical equipment (e.g., stethoscopes, blood pressure cuffs, dialysis machines, and equipment knobs and controls) usually only require cleansing followed by low- to intermediate-level disinfection, depending on the nature and degree of contamination. Ethyl alcohol or isopropyl alcohol in concentrations of 60%–90% (v/v) is often used to disinfect small surfaces (e.g., rubber stoppers of multiple-dose medication vials, and thermometers)[952, 969] and occasionally external surfaces of equipment (e.g., stethoscopes and ventilators). However, alcohol evaporates rapidly, which makes extended contact times difficult to achieve unless items are immersed, a factor that precludes its practical use as a large-surface disinfectant.[951] Alcohol may cause discoloration, swelling, hardening, and cracking of rubber and certain plastics after prolonged and repeated use and may damage the shellac mounting of lenses in medical equipment.[970]

Barrier protection of surfaces and equipment is useful, especially if these surfaces are a) touched frequently by gloved hands during the delivery of patient care, b) likely to become contaminated with body substances, or c) difficult to clean. Impervious-backed paper, aluminum foil, and plastic or fluid-resistant covers are suitable for use as barrier protection. An example of this approach is the use of plastic wrapping to cover the handle of the operatory light in dental-care settings.[936, 942] Coverings should be removed and discarded while the health-care worker is still gloved.[936, 942] The health-care worker, after ungloving and performing hand hygiene, must cover these surfaces with clean materials before the next patient encounter.

### b. Cleaning Housekeeping Surfaces
Housekeeping surfaces require regular cleaning and removal of soil and dust. Dry conditions favor the persistence of gram-positive cocci (e.g., coagulase-negative *Staphylococcus* spp.) in dust and on surfaces, whereas moist, soiled environments favor the growth and persistence of gram-negative bacilli.[948, 971, 972] Fungi are also present on dust and proliferate in moist, fibrous material.

Most, if not all, housekeeping surfaces need to be cleaned only with soap and water or a detergent/disinfectant, depending on the nature of the surface and the type and degree of contamination. Cleaning and disinfection schedules and methods vary according to the area of the health-care facility, type of surface to be cleaned, and the amount and type of soil present. Disinfectant/detergent formulations registered by EPA are used for environmental surface cleaning, but the actual physical removal of microorganisms and soil by wiping or scrubbing is probably as important, if not more so, than any antimicrobial effect of the cleaning agent used.[973] Therefore, cost, safety, product-surface compatibility, and acceptability by housekeepers can be the main criteria for selecting a registered agent. If using a proprietary detergent/disinfectant, the manufacturers' instructions for appropriate use

of the product should be followed.[974]  Consult the products' material safety data sheets (MSDS) to determine appropriate precautions to prevent hazardous conditions during product application.  Personal protective equipment (PPE) used during cleaning and housekeeping procedures should be appropriate to the task.

Housekeeping surfaces can be divided into two groups – those with minimal hand-contact (e.g., floors, and ceilings) and those with frequent hand-contact ("high touch surfaces").  The methods, thoroughness, and frequency of cleaning and the products used are determined by health-care facility policy.[6]  However, high-touch housekeeping surfaces in patient-care areas (e.g., doorknobs, bedrails, light switches, wall areas around the toilet in the patient's room, and the edges of privacy curtains) should be cleaned and/or disinfected more frequently than surfaces with minimal hand contact.  Infection-control practitioners typically use a risk-assessment approach to identify high-touch surfaces and then coordinate an appropriate cleaning and disinfecting strategy and schedule with the housekeeping staff.

Horizontal surfaces with infrequent hand contact (e.g., window sills and hard-surface flooring) in routine patient-care areas require cleaning on a regular basis, when soiling or spills occur, and when a patient is discharged from the facility.[6]  Regular cleaning of surfaces and decontamination, as needed, is also advocated to protect potentially exposed workers.[967]  Cleaning of walls, blinds, and window curtains is recommended when they are visibly soiled.[972, 973, 975]  Disinfectant fogging is not recommended for general infection control in routine patient-care areas.[2, 976]  Further, paraformaldehyde, which was once used in this application, is no longer registered by EPA for this purpose.  Use of paraformaldehyde in these circumstances requires either registration or an exemption issued by EPA under the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA).  Infection control, industrial hygienists, and environmental services supervisors should assess the cleaning procedures, chemicals used, and the safety issues to determine if a temporary relocation of the patient is needed when cleaning in the room.

Extraordinary cleaning and decontamination of floors in health-care settings is unwarranted.  Studies have demonstrated that disinfection of floors offers no advantage over regular detergent/water cleaning and has minimal or no impact on the occurrence of health-care–associated infections.[947, 948, 977–980]  Additionally, newly cleaned floors become rapidly recontaminated from airborne microorganisms and those transferred from shoes, equipment wheels, and body substances.[971, 975, 981]  Nevertheless, health-care institutions or contracted cleaning companies may choose to use an EPA-registered detergent/disinfectant for cleaning low-touch surfaces (e.g., floors) in patient-care areas because of the difficulty that personnel may have in determining if a spill contains blood or body fluids (requiring a detergent/disinfectant for clean-up) or when a multi-drug resistant organism is likely to be in the environment.  Methods for cleaning non-porous floors include wet mopping and wet vacuuming, dry dusting with electrostatic materials, and spray buffing.[973, 982–984]  Methods that produce minimal mists and aerosols or dispersion of dust in patient-care areas are preferred.[9, 20, 109, 272]

Part of the cleaning strategy is to minimize contamination of cleaning solutions and cleaning tools.  Bucket solutions become contaminated almost immediately during cleaning, and continued use of the solution transfers increasing numbers of microorganisms to each subsequent surface to be cleaned.[971, 981, 985]  Cleaning solutions should be replaced frequently.  A variety of "bucket" methods have been devised to address the frequency with which cleaning solutions are replaced.[986, 987]  Another source of contamination in the cleaning process is the cleaning cloth or mop head, especially if left soaking in dirty cleaning solutions.[971, 988–990]  Laundering of cloths and mop heads after use and allowing them to dry before re-use can help to minimize the degree of contamination.[990]  A simplified approach to cleaning involves replacing soiled cloths and mop heads with clean items each time a bucket of detergent/disinfectant is emptied and replaced with fresh, clean solution (B. Stover, Kosair Children's Hospital, 2000).  Disposable cleaning cloths and mop heads are an alternative option, if costs permit.

76

Another reservoir for microorganisms in the cleaning process may be dilute solutions of the detergents or disinfectants, especially if the working solution is prepared in a dirty container, stored for long periods of time, or prepared incorrectly.[547] Gram-negative bacilli (e.g., *Pseudomonas* spp. and *Serratia marcescens*) have been detected in solutions of some disinfectants (e.g., phenolics and quaternary ammonium compounds).[547, 991] Contemporary EPA registration regulations have helped to minimize this problem by asking manufacturers to provide potency data to support label claims for detergent/disinfectant properties under real- use conditions (e.g., diluting the product with tap water instead of distilled water). Application of contaminated cleaning solutions, particularly from small-quantity aerosol spray bottles or with equipment that might generate aerosols during operation, should be avoided, especially in high-risk patient areas.[992, 993] Making sufficient fresh cleaning solution for daily cleaning, discarding any remaining solution, and drying out the container will help to minimize the degree of bacterial contamination. Containers that dispense liquid as opposed to spray-nozzle dispensers (e.g., quart-sized dishwashing liquid bottles) can be used to apply detergent/disinfectants to surfaces and then to cleaning cloths with minimal aerosol generation. A pre-mixed, "ready-to-use" detergent/disinfectant solution may be used if available.

### c. Cleaning Special Care Areas

Guidelines have been published regarding cleaning strategies for isolation areas and operating rooms.[6, 7] The basic strategies for areas housing immunosuppressed patients include a) wet dusting horizontal surfaces daily with cleaning cloths pre-moistened with detergent or an EPA-registered hospital disinfectant or disinfectant wipes;[94, 98463] b) using care when wet dusting equipment and surfaces above the patient to avoid patient contact with the detergent/disinfectant; c) avoiding the use of cleaning equipment that produces mists or aerosols; d) equipping vacuums with HEPA filters, especially for the exhaust, when used in any patient-care area housing immunosuppressed patients;[9, 94, 986] and e) regular cleaning and maintenance of equipment to ensure efficient particle removal. When preparing the cleaning cloths for wet-dusting, freshly prepared solutions of detergents or disinfectants should be used rather than cloths that have soaked in such solutions for long periods of time. Dispersal of microorganisms in the air from dust or aerosols is more problematic in these settings than elsewhere in health-care facilities. Vacuum cleaners can serve as dust disseminators if they are not operating properly.[994] Doors to immunosuppressed patients' rooms should be closed when nearby areas are being vacuumed.[9] Bacterial and fungal contamination of filters in cleaning equipment is inevitable, and these filters should be cleaned regularly or replaced as per equipment manufacturer instructions.

Mats with tacky surfaces placed in operating rooms and other patient-care areas only slightly minimize the overall degree of contamination of floors and have little impact on the incidence rate of health-care–associated infection in general.[351, 971, 983] An exception, however, is the use of tacky mats inside the entry ways of cordoned-off construction areas inside the health-care facility; these mats help to minimize the intrusion of dust into patient-care areas.

Special precautions for cleaning incubators, mattresses, and other nursery surfaces have been recommended to address reports of hyperbilirubinemia in newborns linked to inadequately diluted solutions of phenolics and poor ventilation.[995-997] These medical conditions have not, however, been associated with the use of properly prepared solutions of phenolics. Non-porous housekeeping surfaces in neonatal units can be disinfected with properly diluted or pre-mixed phenolics, followed by rinsing with clean water.[997] However, phenolics are not recommended for cleaning infant bassinets and incubators during the stay of the infant. Infants who remain in the nursery for an extended period should be moved periodically to freshly cleaned and disinfected bassinets and incubators.[997] If phenolics are used for cleaning bassinets and incubators after they have been vacated, the surfaces should be rinsed thoroughly with water and dried before either piece of equipment is reused. Cleaning

and disinfecting protocols should allow for the full contact time specified for the product used. Bassinet mattresses should be replaced, however, if the mattress cover surface is broken.[997]

## 3. Cleaning Strategies for Spills of Blood and Body Substances

Neither HBV, HCV, nor HIV has ever been transmitted from a housekeeping surface (i.e., floors, walls, or countertops). Nonetheless, prompt removal and surface disinfection of an area contaminated by either blood or body substances are sound infection-control practices and OSHA requirements.[967]

Studies have demonstrated that HIV is inactivated rapidly after being exposed to commonly used chemical germicides at concentrations that are much lower than those used in practice.[998–1003] HBV is readily inactivated with a variety of germicides, including quaternary ammonium compounds.[1004] Embalming fluids (e.g., formaldehyde) are also capable of completely inactivating HIV and HBV.[1005, 1006] OSHA has revised its regulation for disinfecting spills of blood or other potentially infectious material to include proprietary products whose label includes inactivation claims for HBV and HIV, provided that such surfaces have not become contaminated with agent(s) or volumes of or concentrations of agent(s) for which a higher level of disinfection is recommended.[1007] These registered products are listed in EPA's List D – *Registered Antimicrobials Effective Against Hepatitis B Virus and Human HIV-1*, which may include products tested against duck hepatitis B virus (DHBV) as a surrogate for HBV.[1008, 1009] Additional lists of interest include EPA's List C – *Registered Antimicrobials Effective Against Human HIV-1* and EPA's List E – *Registered Antimicrobials Effective Against Mycobacterium spp., Hepatitis B Virus, and Human HIV-1*.

Sodium hypochlorite solutions are inexpensive and effective broad-spectrum germicidal solutions.[1010, 1011] Generic sources of sodium hypochlorite include household chlorine bleach or reagent grade chemical. Concentrations of sodium hypochlorite solutions with a range of 5,000–6,150 ppm (1:10 v/v dilution of household bleaches marketed in the United States) to 500–615 ppm (1:100 v/v dilution) free chlorine are effective depending on the amount of organic material (e.g., blood, mucus, and urine) present on the surface to be cleaned and disinfected.[1010, 1011] EPA-registered chemical germicides may be more compatible with certain materials that could be corroded by repeated exposure to sodium hypochlorite, especially the 1:10 dilution. Appropriate personal protective equipment (e.g., gloves and goggles) should be worn when preparing and using hypochlorite solutions or other chemical germicides.[967]

Despite laboratory evidence demonstrating adequate potency against bloodborne pathogens (e.g., HIV and HBV), many chlorine bleach products available in grocery and chemical-supply stores are not registered by the EPA for use as surface disinfectants. Use of these chlorine products as surface disinfectants is considered by the EPA to be an "unregistered use." EPA encourages the use of registered products because the agency reviews them for safety and performance when the product is used according to label instructions. When unregistered products are used for surface disinfection, users do so at their own risk.

Strategies for decontaminating spills of blood and other body fluids differ based on the setting in which they occur and the volume of the spill.[1010] In patient-care areas, workers can manage small spills with cleaning and then disinfecting using an intermediate-level germicide or an EPA-registered germicide from the EPA List D or E.[967, 1007] For spills containing large amounts of blood or other body substances, workers should first remove visible organic matter with absorbent material (e.g., disposable paper towels discarded into leak-proof, properly labeled containment) and then clean and decontaminate the area.[1002, 1003, 1012] If the surface is nonporous and a generic form of a sodium hypochlorite solution is used (e.g., household bleach), a 1:100 dilution is appropriate for decontamination assuming that a) the

78

worker assigned to clean the spill is wearing gloves and other personal protective equipment appropriate to the task, b) most of the organic matter of the spill has been removed with absorbent material, and c) the surface has been cleaned to remove residual organic matter. A recent study demonstrated that even strong chlorine solutions (i.e., 1:10 dilution of chlorine bleach) may fail to totally inactivate high titers of virus in large quantities of blood, but in the absence of blood these disinfectants can achieve complete viral inactivation.[1011] This evidence supports the need to remove most organic matter from a large spill before final disinfection of the surface. Additionally, EPA-registered proprietary disinfectant label claims are based on use on a pre-cleaned surface.[951, 954]

Managing spills of blood, body fluids, or other infectious materials in clinical, public health, and research laboratories requires more stringent measures because of a) the higher potential risk of disease transmission associated with large volumes of blood and body fluids and b) high numbers of microorganisms associated with diagnostic cultures. The use of an intermediate-level germicide for routine decontamination in the laboratory is prudent.[954] Recommended practices for managing large spills of concentrated infectious agents in the laboratory include a) confining the contaminated area, b) flooding the area with a liquid chemical germicide before cleaning, and c) decontaminating with fresh germicidal chemical of at least intermediate-level disinfectant potency.[1010] A suggested technique when flooding the spill with germicide is to lay absorbent material down on the spill and apply sufficient germicide to thoroughly wet both the spill and the absorbent material.[1013] If using a solution of household chlorine bleach, a 1:10 dilution is recommended for this purpose. EPA-registered germicides should be used according to the manufacturers' instructions for use dilution and contact time. Gloves should be worn during the cleaning and decontamination procedures in both clinical and laboratory settings. PPE in such a situation may include the use of respiratory protection (e.g., an N95 respirator) if clean-up procedures are expected to generate infectious aerosols. Protocols for cleaning spills should be developed and made available on record as part of good laboratory practice.[1013] Workers in laboratories and in patient-care areas of the facility should receive periodic training in environmental-surface infection-control strategies and procedures as part of an overall infection-control and safety curriculum.

## 4. Carpeting and Cloth Furnishings

### a. Carpeting

Carpeting has been used for more than 30 years in both public and patient-care areas of health-care facilities. Advantages of carpeting in patient-care areas include a) its noise-limiting characteristics; b) the "humanizing" effect on health care; and c) its contribution to reductions in falls and resultant injuries, particularly for the elderly.[1014–1016] Compared to hard-surface flooring, however, carpeting is harder to keep clean, especially after spills of blood and body substances. It is also harder to push equipment with wheels (e.g., wheelchairs, carts, and gurneys) on carpeting.

Several studies have documented the presence of diverse microbial populations, primarily bacteria and fungi, in carpeting;[111, 1017–1024] the variety and number of microorganisms tend to stabilize over time. New carpeting quickly becomes colonized, with bacterial growth plateauing after about 4 weeks.[1019] Vacuuming and cleaning the carpeting can temporarily reduce the numbers of bacteria, but these populations soon rebound and return to pre-cleaning levels.[1019, 1020, 1023] Bacterial contamination tends to increase with higher levels of activity.[1018–1020, 1025] Soiled carpeting that is or remains damp or wet provides an ideal setting for the proliferation and persistence of gram-negative bacteria and fungi.[1026] Carpeting that remains damp should be removed, ideally within 72 hours.

Despite the evidence of bacterial growth and persistence in carpeting, only limited epidemiologic evidence demonstrates that carpets influence health-care–associated infection rates in areas housing

immunocompetent patients.[1023, 1025, 1027] This guideline, therefore, includes no recommendations against the use of carpeting in these areas. Nonetheless, avoiding the use of carpeting is prudent in areas where spills are likely to occur (e.g., laboratories, areas around sinks, and janitor closets) and where patients may be at greater risk of infection from airborne environmental pathogens (e.g., HSCT units, burn units, ICUs, and ORs).[111, 1028] An outbreak of aspergillosis in an HSCT unit was recently attributed to carpet contamination and a particular method of carpet cleaning.[111] A window in the unit had been opened repeatedly during the time of a nearby building fire, which allowed fungal spore intrusion into the unit. After the window was sealed, the carpeting was cleaned using a "bonnet buffing" machine, which dispersed *Aspergillus* spores into the air.[111] Wet vacuuming was instituted, replacing the dry cleaning method used previously; no additional cases of invasive aspergillosis were identified.

The care setting and the method of carpet cleaning are important factors to consider when attempting to minimize or prevent production of aerosols and dispersal of carpet microorganisms into the air.[94, 111] Both vacuuming and shampooing or wet cleaning with equipment can disperse microorganisms to the air.[111, 994] Vacuum cleaners should be maintained to minimize dust dispersal in general, and be equipped with HEPA filters, especially for use in high-risk patient-care areas.[9, 94, 986] Some formulations of carpet-cleaning chemicals, if applied or used improperly, can be dispersed into the air as a fine dust capable of causing respiratory irritation in patients and staff.[1029] Cleaning equipment, especially those that engage in wet cleaning and extraction, can become contaminated with waterborne organisms (e.g., *Pseudomonas aeruginosa*) and serve as a reservoir for these organisms if this equipment is not properly maintained. Substantial numbers of bacteria can then be transferred to carpeting during the cleaning process.[1030] Therefore, keeping the carpet cleaning equipment in good repair and allowing such equipment to dry between uses is prudent.

Carpet cleaning should be performed on a regular basis determined by internal policy. Although spills of blood and body substances on non-porous surfaces require prompt spot cleaning using standard cleaning procedures and application of chemical germicides,[967] similar decontamination approaches to blood and body substance spills on carpeting can be problematic from a regulatory perspective.[1031] Most, if not all, modern carpet brands suitable for public facilities can tolerate the activity of a variety of liquid chemical germicides. However, according to OSHA, carpeting contaminated with blood or other potentially infectious materials can not be fully decontaminated.[1032] Therefore, facilities electing to use carpeting for high-activity patient-care areas may choose carpet tiles in areas at high risk for spills.[967, 1032] In the event of contamination with blood or other body substances, carpet tiles can be removed, discarded, and replaced. OSHA also acknowledges that only minimal direct skin contact occurs with carpeting, and therefore, employers are expected to make reasonable efforts to clean and sanitize carpeting using carpet detergent/cleaner products.[1032]

Over the last few years, some carpet manufacturers have treated their products with fungicidal and/or bactericidal chemicals. Although these chemicals may help to reduce the overall numbers of bacteria or fungi present in carpet, their use does not preclude the routine care and maintenance of the carpeting. Limited evidence suggests that chemically treated carpet may have helped to keep health-care–associated aspergillosis rates low in one HSCT unit,[111] but overall, treated carpeting has not been shown to prevent the incidence of health-care–associated infections in care areas for immunocompetent patients.

### b. Cloth Furnishings

Upholstered furniture and furnishings are becoming increasingly common in patient-care areas. These furnishings range from simple cloth chairs in patients' rooms to a complete decorating scheme that gives the interior of the facility more the look of an elegant hotel.[1033] Even though pathogenic microorganisms have been isolated from the surfaces of cloth chairs, no epidemiologic evidence suggests that general patient-care areas with cloth furniture pose increased risks of health-care–

80

associated infection compared with areas that contain hard-surfaced furniture.[1034, 1035] Allergens (e.g., dog and cat dander) have been detected in or on cloth furniture in clinics and elsewhere in hospitals in concentrations higher than those found on bed linens.[1034, 1035] These allergens presumably are transferred from the clothing of visitors. Researchers have therefore suggested that cloth chairs should be vacuumed regularly to keep the dust and allergen levels to a minimum. This recommendation, however, has generated concerns that aerosols created from vacuuming could place immunocompromised patients or patients with preexisting lung disease (e.g., asthma) at risk for development of health-care–associated, environmental airborne disease.[9, 20, 109, 988] Recovering worn, upholstered furniture (especially the seat cushion) with covers that are easily cleaned (e.g., vinyl), or replacing the item is prudent; minimizing the use of upholstered furniture and furnishings in any patient-care areas where immunosuppressed patients are located (e.g., HSCT units) reduces the likelihood of disease.[9]

## 5. Flowers and Plants in Patient-Care Areas

Fresh flowers, dried flowers, and potted plants are common items in health-care facilities. In 1974, clinicians isolated an *Erwinia* sp. post mortem from a neonate diagnosed with fulminant septicemia, meningitis, and respiratory distress syndrome.[1038] Because *Erwinia* spp. are plant pathogens, plants brought into the delivery room were suspected to be the source of the bacteria, although the case report did not definitively establish a direct link. Several subsequent studies evaluated the numbers and diversity of microorganisms in the vase water of cut flowers. These studies revealed that high concentrations of bacteria, ranging from $10^4$–$10^{10}$ CFU/mL, were often present, especially if the water was changed infrequently.[515, 702, 1039] The major group of microorganisms in flower vase water was gram-negative bacteria, with *Pseudomonas aeruginosa* the most frequently isolated organism.[515, 702, 1039, 1040] *P. aeruginosa* was also the primary organism directly isolated from chrysanthemums and other potted plants.[1041, 1042] However, flowers in hospitals were not significantly more contaminated with bacteria compared with flowers in restaurants or in the home.[702] Additionally, no differences in the diversity and degree of antibiotic resistance of bacteria have been observed in samples isolated from hospital flowers versus those obtained from flowers elsewhere.[702]

Despite the diversity and large numbers of bacteria associated with flower-vase water and potted plants, minimal or no evidence indicates that the presence of plants in immunocompetent patient-care areas poses an increased risk of health-care–associated infection.[515] In one study involving a limited number of surgical patients, no correlation was observed between bacterial isolates from flowers in the area and the incidence and etiology of postoperative infections among the patients.[1040] Similar conclusions were reached in a study that examined the bacteria found in potted plants.[1042] Nonetheless, some precautions for general patient-care settings should be implemented, including a) limiting flower and plant care to staff with no direct patient contact, b) advising health-care staff to wear gloves when handling plants, c) washing hands after handling plants, d) changing vase water every 2 days and discharging the water into a sink outside the immediate patient environment, and e) cleaning and disinfecting vases after use.[702]

Some researchers have examined the possibility of adding a chemical germicide to vase water to control bacterial populations. Certain chemicals (e.g., hydrogen peroxide and chlorhexidine) are well tolerated by plants.[1040, 1043, 1044] Use of these chemicals, however, was not evaluated in studies to assess impact on health-care–associated infection rates. Modern florists now have a variety of products available to add to vase water to extend the life of cut flowers and to minimize bacterial clouding of the water.

Flowers (fresh and dried) and ornamental plants, however, may serve as a reservoir of *Aspergillus* spp., and dispersal of conidiospores into the air from this source can occur.[109] Health-care–associated outbreaks of invasive aspergillosis reinforce the importance of maintaining an environment as free of

*Aspergillus* spp. spores as possible for patients with severe, prolonged neutropenia. Potted plants, fresh-cut flowers, and dried flower arrangements may provide a reservoir for these fungi as well as other fungal species (e.g., *Fusarium* spp.).[109, 1045, 1046] Researchers in one study of bacteria and flowers suggested that flowers and vase water should be avoided in areas providing care to medically at-risk patients (e.g., oncology patients and transplant patients), although this study did not attempt to correlate the observations of bacterial populations in the vase water with the incidence of health-care–associated infections.[515] Another study using molecular epidemiology techniques demonstrated identical *Aspergillus terreus* types among environmental and clinical specimens isolated from infected patients with hematological malignancies.[1046] Therefore, attempts should be made to exclude flowers and plants from areas where immunosuppressed patients are be located (e.g., HSCT units).[9, 1046]

## 6. Pest Control

Cockroaches, flies and maggots, ants, mosquitoes, spiders, mites, midges, and mice are among the typical arthropod and vertebrate pest populations found in health-care facilities. Insects can serve as agents for the mechanical transmission of microorganisms, or as active participants in the disease transmission process by serving as a vector.[1047–1049] Arthropods recovered from health-care facilities have been shown to carry a wide variety of pathogenic microorganisms.[1050–1056] Studies have suggested that the diversity of microorganisms associated with insects reflects the microbial populations present in the indoor health-care environment; some pathogens encountered in insects from hospitals were either absent from or present to a lesser degree in insects trapped from residential settings.[1057–1060] Some of the microbial populations associated with insects in hospitals have demonstrated resistance to antibiotics.[1048, 1059, 1061–1063]

Insect habitats are characterized by warmth, moisture, and availability of food.[1064] Insects forage in and feed on substrates, including but not limited to food scraps from kitchens/cafeteria, foods in vending machines, discharges on dressings either in use or discarded, other forms of human detritis, medical wastes, human wastes, and routine solid waste.[1057–1061] Cockroaches, in particular, have been known to feed on fixed sputum smears in laboratories.[1065, 1066] Both cockroaches and ants are frequently found in the laundry, central sterile supply departments, and anywhere in the facility where water or moisture is present (e.g., sink traps, drains and janitor closets). Ants will often find their way into sterile packs of items as they forage in a warm, moist environment.[1057] Cockroaches and other insects frequent loading docks and other areas with direct access to the outdoors.

Although insects carry a wide variety of pathogenic microorganisms on their surfaces and in their gut, the direct association of insects with disease transmission (apart from vector transmission) is limited, especially in health-care settings; the presence of insects in itself likely does not contribute substantially to health-care–associated disease transmission in developed countries. However, outbreaks of infection attributed to microorganisms carried by insects may occur because of infestation coupled with breaks in standard infection-control practices.[1063] Studies have been conducted to examine the role of houseflies as possible vectors for shigellosis and other forms of diarrheal disease in non-health–care settings.[1046, 1067] When control measures aimed at reducing the fly population density were implemented, a concomitant reduction in the incidence of diarrheal infections, carriage of *Shigella* organisms, and mortality caused by diarrhea among infants and young children was observed.

Myiasis is defined as a parasitosis in which the larvae of any of a variety of flies use living or necrotic tissue or body substances of the host as a nutritional source.[1068] Larvae from health-care–acquired myiasis have been observed in nares, wounds, eyes, ears, sinuses, and the external urogenital structures.[1069–1071] Patients with this rare condition are typically older adults with underlying medical conditions (e.g., diabetes, chronic wounds, and alcoholism) who have a decreased capacity to ward off

82

the flies. Persons with underlying conditions who live or travel to tropical regions of the world are especially at risk.[1070, 1071] Cases occur in the summer and early fall months in temperate climates when flies are most active.[1071] An environmental assessment and review of the patient's history are necessary to verify that the source of the myiasis is health-care–acquired and to identify corrective measures.[1069, 1072] Simple prevention measures (e.g., installing screens on windows) are important in reducing the incidence of myiasis.[1072]

From a public health and hygiene perspective, arthropod and vertebrate pests should be eradicated from all indoor environments, including health-care facilities.[1073, 1074] Modern approaches to institutional pest management usually focus on a) eliminating food sources, indoor habitats, and other conditions that attract pests; b) excluding pests from the indoor environments; and c) applying pesticides as needed.[1075] Sealing windows in modern health-care facilities helps to minimize insect intrusion. When windows need to be opened for ventilation, ensuring that screens are in good repair and closing doors to the outside can help with pest control. Insects should be kept out of all areas of the health-care facility, especially ORs and any area where immunosuppressed patients are located. A pest-control specialist with appropriate credentials can provide a regular insect-control program that is tailored to the needs of the facility and uses approved chemicals and/or physical methods. Industrial hygienists can provide information on possible adverse reactions of patients and staff to pesticides and suggest alternative methods for pest control, as needed.

## 7. Special Pathogen Concerns

### a. Antibiotic-Resistant Gram-Positive Cocci

Vancomycin-resistant enterococci (VRE), methicillin-resistant *Staphylococcus aureus* (MRSA), and *S. aureus* with intermediate levels of resistance to glycopeptide antibiotics (vancomycin intermediate resistant *S. aureus* [VISA] or glycopeptide intermediate resistant *S. aureus* [GISA]) represent crucial and growing concerns for infection control. Although the term GISA is technically a more accurate description of the strains isolated to date (most of which are classified as having intermediate resistance to both vancomycin and teicoplanin), the term "glycopeptide" may not be recognized by many clinicians. Thus, the label of VISA, which emphasizes a change in minimum inhibitory concentration (MICs) to vancomycin, is similar to that of VRE and is more meaningful to clinicians.[1076] According to National Nosocomial Infection Surveillance (NNIS) statistics for infections acquired among ICU patients in the United States in 1999, 52.3% of infections resulting from *S. aureus* were identified as MRSA infections, and 25.2% of enterococcal infections were attributed to VRE. These figures reflect a 37% and a 43% increase, respectively, since 1994–1998.[1077]

People represent the primary reservoir of *S. aureus*.[1078] Although *S. aureus* has been isolated from a variety of environmental surfaces (e.g., stethoscopes, floors, charts, furniture, dry mops, and hydrotherapy tanks), the role of environmental contamination in transmission of this organism in health care appears to be minimal.[1079–1082] *S. aureus* contamination of surfaces and tanks within burn therapy units, however, may be a major factor in the transmission of infection among burn patients.[1083]

Colonized patients are the principal reservoir of VRE, and patients who are immunosuppressed (e.g., transplant patients) or otherwise medically at-risk (e.g., ICU patients, cardio-thoracic surgical patients, patients previously hospitalized for extended periods, and those having received multi-antimicrobial or vancomycin therapy) are at greatest risk for VRE colonization.[1084–1087] The mechanisms by which cross-colonization take place are not well defined, although recent studies have indicated that both MRSA and VRE may be transmitted either a) directly from patient to patient, b) indirectly by transient carriage on the hands of health-care workers,[1088–1091] or c) by hand transfer of these gram-positive organisms from contaminated environmental surfaces and patient-care equipment.[1084, 1087, 1092–1097] In

one survey, hand carriage of VRE in workers in a long-term care facility ranged from 13%–41%.[1098] Many of the environmental surfaces found to be contaminated with VRE in outbreak investigations have been those that are touched frequently by the patient or the health-care worker.[1099] Such high-touch surfaces include bedrails, doorknobs, bed linens, gowns, overbed tables, blood pressure cuffs, computer table, bedside tables, and various medical equipment.[22, 1087, 1094, 1095, 1100–1102] Contamination of environmental surfaces with VRE generally occurs in clinical laboratories and areas where colonized patients are present,[1087, 1092, 1094, 1095, 1103] but the potential for contamination increases when such patients have diarrhea[1087] or have multiple body-site colonization.[1104] Additional factors that can be important in the dispersion of these pathogens to environmental surfaces are misuse of glove techniques by health-care workers (especially when cleaning fecal contamination from surfaces) and patient, family, and visitor hygiene.

Interest in the importance of environmental reservoirs of VRE increased when laboratory studies demonstrated that enterococci can persist in a viable state on dry environmental surfaces for extended periods of time (7 days to 4 months)[1099, 1105] and multiple strains can be identified during extensive periods of surveillance.[1104] VRE can be recovered from inoculated hands of health-care workers (with or without gloves) for up to 60 minutes.[22] The presence of either MRSA, VISA, or VRE on environmental surfaces, however, does not mean that patients in the contaminated areas will become colonized. Strict adherence to hand hygiene/handwashing and the proper use of barrier precautions help to minimize the potential for spread of these pathogens. Published recommendations for preventing the spread of vancomycin resistance address isolation measures, including patient cohorting and management of patient-care items.[5] Direct patient-care items (e.g., blood pressure cuffs) should be disposable whenever possible when used in contact isolation settings for patients with multiply resistant microorganisms.[1102]

Careful cleaning of patient rooms and medical equipment contributes substantially to the overall control of MRSA, VISA, or VRE transmission. The major focus of a control program for either VRE or MRSA should be the prevention of hand transfer of these organisms. Routine cleaning and disinfection of the housekeeping surfaces (e.g., floors and walls) and patient-care surfaces (e.g., bedrails) should be adequate for inactivation of these organisms. Both MRSA and VRE are susceptible to several EPA-registered low- and intermediate-level disinfectants (e.g., alcohols, sodium hypochlorite, quaternary ammonium compounds, phenolics, and iodophors) at recommended use dilutions for environmental surface disinfection.[1103, 1106–1109] Additionally, both VRE and vancomycin-sensitive enterococci are equally sensitive to inactivation by chemical germicides,[1106, 1107, 1109] and similar observations have been made when comparing the germicidal resistance of MRSA to that of either methicillin-sensitive *S. aureus* (MSSA) or VISA.[1110] The use of stronger solutions of disinfectants for inactivation of either VRE, MRSA, or VISA is not recommended based on the organisms' resistance to antibiotics.[1110–1112] VRE from clinical specimens have exhibited some measure of increased tolerance to heat inactivation in temperature ranges <212°F (<100°C);[1106, 1113] however, the clinical significance of these observations is unclear because the role of cleaning the surface or item prior to heat treatment was not evaluated. Although routine environmental sampling is not recommended, laboratory surveillance of environmental surfaces during episodes when VRE contamination is suspected can help determine the effectiveness of the cleaning and disinfecting procedures. Environmental culturing should be approved and supervised by the infection-control program in collaboration with the clinical laboratory.[1084, 1087, 1088, 1092, 1096]

Two cases of wound infections associated with vancomycin-resistant *Staphylococcus aureus* (VRSA) determined to be resistant by NCCLS standards for sensitivity/resistance testing were identified in Michigan and Pennsylvania in 2002.[1114, 1115] These represented isolated cases, and neither the family members nor the health-care providers of these case-patients had evidence of colonization or infection with VRSA. Conventional environmental infection-control measures (i.e., cleaning and then

84

disinfecting surfaces using EPA-registered disinfectants with label claims for *S. aureus*) were used during the environmental investigation of these two cases;[1110–1112] however, studies have yet to evaluate the potential intrinsic resistance of these VRSA strains to surface disinfectants.

Standard procedures during terminal cleaning and disinfection of surfaces, if performed incorrectly, may be inadequate for the elimination of VRE from patient rooms.[1113, 1116–1118] Given the sensitivity of VRE to hospital disinfectants, current disinfecting protocols should be effective if they are diligently carried out and properly performed. Health-care facilities should be sure that housekeeping staff use correct procedures for cleaning and disinfecting surfaces in VRE-contaminated areas, which include using sufficient amounts of germicide at proper use dilution and allowing adequate contact time.[1118]

### b. Clostridium difficile

*Clostridium difficile* is the most frequent etiologic agent for health-care–associated diarrhea.[1119, 1120] In one hospital, 30% of adults who developed health-care–associated diarrhea were positive for *C. difficile*.[1121] One recent study employing PCR-ribotyping techniques demonstrated that cases of *C. difficile*-acquired diarrhea occurring in the hospital included patients whose infections were attributed to endogenous *C. difficile* strains and patients whose illnesses were considered to be health-care–associated infections.[1122] Most patients remain asymptomatic after infection, but the organism continues to be shed in their stools. Risk factors for acquiring *C. difficile*-associated infection include a) exposure to antibiotic therapy, particularly with beta-lactam agents;[1123] b) gastrointestinal procedures and surgery;[1124] c) advanced age; and d) indiscriminate use of antibiotics.[1125–1128] Of all the measures that have been used to prevent the spread of *C. difficile*-associated diarrhea, the most successful has been the restriction of the use of antimicrobial agents.[1129, 1130]

*C. difficile* is an anaerobic, gram-positive bacterium. Normally fastidious in its vegetative state, it is capable of sporulating when environmental conditions no longer support its continued growth. The capacity to form spores enables the organism to persist in the environment (e.g., in soil and on dry surfaces) for extended periods of time. Environmental contamination by this microorganism is well known, especially in places where fecal contamination may occur.[1131] The environment (especially housekeeping surfaces) rarely serves as a direct source of infection for patients.[1024, 1132–1136] However, direct exposure to contaminated patient-care items (e.g., rectal thermometers) and high-touch surfaces in patients' bathrooms (e.g., light switches) have been implicated as sources of infection.[1130, 1135, 1136, 1138]

Transfer of the pathogen to the patient via the hands of health-care workers is thought to be the most likely mechanism of exposure.[24, 1133, 1139] Standard isolation techniques intended to minimize enteric contamination of patients, health-care–workers' hands, patient-care items, and environmental surfaces have been published.[1140] Handwashing remains the most effective means of reducing hand contamination. Proper use of gloves is an ancillary measure that helps to further minimize transfer of these pathogens from one surface to another.

The degree to which the environment becomes contaminated with *C. difficile* spores is proportional to the number of patients with *C. difficile*-associated diarrhea,[24, 1132, 1135] although asymptomatic, colonized patients may also serve as a source of contamination. Few studies have examined the use of specific chemical germicides for the inactivation of *C. difficile* spores, and no well-controlled trials have been conducted to determine efficacy of surface disinfection and its impact on health-care–associated diarrhea. Some investigators have evaluated the use of chlorine-containing chemicals (e.g., 1,000 ppm hypochlorite at recommended use-dilution, 5,000 ppm sodium hypochlorite [1:10 v/v dilution], 1:100 v/v dilutions of unbuffered hypochlorite, and phosphate-buffered hypochlorite [1,600 ppm]). One of the studies demonstrated that the number of contaminated environmental sites was reduced by half,[1135] whereas another two studies demonstrated declines in health-care–associated *C. difficile* infections in a HSCT unit[1141] and in two geriatric medical units[1142] during a period of hypochlorite use. The presence

of confounding factors, however, was acknowledged in one of these studies.[1142] The recommended approach to environmental infection control with respect to *C. difficile* is meticulous cleaning followed by disinfection using hypochlorite-based germicides as appropriate.[952, 1130, 1143] However, because no EPA-registered surface disinfectants with label claims for inactivation of *C. difficile* spores are available, the recommendation is based on the best available evidence from the scientific literature.

*c. Respiratory and Enteric Viruses in Pediatric-Care Settings*
Although the viruses mentioned in this guideline are not unique to the pediatric-care setting in health-care facilities, their prevalence in these areas, especially during the winter months, is substantial. Children (particularly neonates) are more likely to develop infection and substantial clinical disease from these agents compared with adults and therefore are more likely to require supportive care during their illness.

Common respiratory viruses in pediatric-care areas include rhinoviruses, respiratory syncytial virus (RSV), adenoviruses, influenza viruses, and parainfluenza viruses. Transmission of these viruses occurs primarily via direct contact with small-particle aerosols or via hand contamination with respiratory secretions that are then transferred to the nose or eyes. Because transmission primarily requires close personal contact, contact precautions are appropriate to interrupt transmission.[6] Hand contamination can occur from direct contact with secretions or indirectly from touching high-touch environmental surfaces that have become contaminated with virus from large droplets. The indirect transfer of virus from one persion to other via hand contact with frequently-touched fomites was demonstrated in a study using a bacteriophage whose environmental stability approximated that of human viral pathogens (e.g., poliovirus and parvovirus).[1144] The impact of this mode of transmission with respect to human respiratory- and enteric viruses is dependent on the ability of these agents to survive on environmental surfaces. Infectious RSV has been recovered from skin, porous surfaces, and non-porous surfaces after 30 minutes, 1 hour, and 7 hours, respectively.[1145] Parainfluenza viruses are known to persist for up to 4 hours on porous surfaces and up to 10 hours on non-porous surfaces.[1146] Rhinoviruses can persist on porous surfaces and non-porous surfaces for approximately 1 and 3 hours respectively; study participants in a controlled environment became infected with rhinoviruses after first touching a surface with dried secretions and then touching their nasal or conjunctival mucosa.[1147] Although the efficiency of direct transmission of these viruses from surfaces in uncontrolled settings remains to be defined, these data underscore the basis for maintaining regular protocols for cleaning and disinfecting of high-touch surfaces.

The clinically important enteric viruses encountered in pediatric care settings include enteric adenovirus, astroviruses, caliciviruses, and rotavirus. Group A rotavirus is the most common cause of infectious diarrhea in infants and children. Transmission of this virus is primarily fecal-oral, however, the role of fecally contaminated surfaces and fomites in rotavirus transmission is unclear. During one epidemiologic investigation of enteric disease among children attending day care, rotavirus contamination was detected on 19% of inanimate objects in the center.[1148, 1149] In an outbreak in a pediatric unit, secondary cases of rotavirus infection clustered in areas where children with rotaviral diarrhea were located.[1150] Astroviruses cause gastroenteritis and diarrhea in newborns and young children and can persist on fecally contaminated surfaces for several months during periods of relatively low humidity.[1151, 1152] Outbreaks of small round-structured viruses (i.e., caliciviruses [Norwalk virus and Norwalk-like viruses]) can affect both patients and staff, with attack rates of ≥50%.[1153] Routes of person-to-person transmission include fecal-oral spread and aerosols generated from vomiting.[1154–1156] Fecal contamination of surfaces in care settings can spread large amounts of virus to the environment. Studies that have attempted to use low- and intermediate-level disinfectants to inactivate rotavirus suspended in feces have demonstrated a protective effect of high concentrations of organic matter.[1157, 1158] Intermediate-level disinfectants (e.g., alcoholic quaternary ammonium compounds, and chlorine solutions) can be effective in inactivating enteric viruses provided that a cleaning step to remove most of

86

the organic matter precedes terminal disinfection.[1158]  These findings underscore the need for proper cleaning and disinfecting procedures where contamination of environmental surfaces with body substances is likely.  EPA-registered surface disinfectants with label claims for these viral agents should be used in these settings.  Using disposable, protective barrier coverings may help to minimize the degree of surface contamination.[936]

### d. Severe Acute Respiratory Syndrome (SARS) Virus
In November 2002 an atypical pneumonia of unknown etiology emerged in Asia and subsequently developed into an international outbreak of respiratory illness among persons in 29 countries during the first six months of 2003.  "Severe acute respiratory syndrome" (SARS) is a viral upper respiratory infection associated with a newly described coronavirus (SARS-associated Co-V [SARS-CoV]).  SARS-CoV is an enveloped RNA virus.  It is present in high titers in respiratory secretions, stool, and blood of infected persons.  The modes of transmission determined from epidemiologic investigations were primarily forms of direct contact (i.e., large droplet aerosolization and person-to-person contact).  Respiratory secretions were presumed to be the major source of virus in these situations; airborne transmission of virus has not been completely ruled out.  Little is known about the impact of fecal-oral transmission and SARS.

The epidemiology of SARS-CoV infection is not completely understood, and therefore recommended infection control and prevention measures to contain the spread of SARS will evolve as new information becomes available.[1159]  At present there is no indication that established strategies for cleaning (i.e., to remove the majority of bioburden) and disinfecting equipment and environmental surfaces need to be changed for the environmental infection control of SARS.  In-patient rooms housing SARS patients should be cleaned and disinfected at least daily and at the time of patient transfer or discharge.  More frequent cleaning and disinfection may be indicated for high-touch surfaces and following aerosol-producing procedures (e.g., intubation, bronchoscopy, and sputum production).  While there are presently no disinfectant products registered by EPA specifically for inactivation of SARS-CoV, EPA-registered hospital disinfectants that are equivalent to low- and intermediate-level germicides may be used on pre-cleaned, hard, non-porous surfaces in accordance with manufacturer's instructions for environmental surface disinfection.  Monitoring adherence to guidelines established for cleaning and disinfection is an important component of environmental infection control to contain the spread of SARS.

### e. Creutzfeldt-Jakob Disease (CJD) in Patient-Care Areas
Creutzfeldt-Jakob disease (CJD) is a rare, invariably fatal, transmissible spongiform encephalopathy (TSE) that occurs worldwide with an average annual incidence of 1 case per million population.[1160–1162]  CJD is one of several TSEs affecting humans; other diseases in this group include kuru, fatal familial insomnia, and Gerstmann-Sträussler-Scheinker syndrome.  A TSE that affects a younger population (compared to the age range of CJD cases) has been described primarily in the United Kingdom since 1996.[1163]  This variant form of CJD (vCJD) is clinically and neuropathologically distinguishable from classic CJD; epidemiologic and laboratory evidence suggests a causal association for bovine spongiform encephalopathy (BSE [Mad Cow disease]) and vCJD.[1163–1166]

The agent associated with CJD is a prion, which is an abnormal isoform of a normal protein constituent of the central nervous system.[1167–1169]  The mechanism by which the normal form of the protein is converted to the abnormal, disease-causing prion is unknown.  The tertiary conformation of the abnormal prion protein appears to confer a heightened degree of resistance to conventional methods of sterilization and disinfection.[1170, 1171]

Although about 90% of CJD cases occur sporadically, a limited number of cases are the result of a direct exposure to prion-containing material (usually central nervous system tissue or pituitary

hormones) acquired as a result of health care (iatrogenic cases). These cases have been linked to a) pituitary hormone therapy [from human sources as opposed to hormones prepared through the use of recombinant technology],[1170-1174] b) transplants of either dura mater or corneas,[1175-1181] and c) neurosurgical instruments and depth electrodes.[1182-1185] In the cases involving instruments and depth electrodes, conventional cleaning and terminal reprocessing methods of the day failed to fully inactivate the contaminating prions and are considered inadequate by today's standards.

Prion inactivation studies involving whole tissues and tissue homogenates have been conducted to determine the parameters of physical and chemical methods of sterilization or disinfection necessary for complete inactivation;[1170, 1186-1191] however, the application of these findings to environmental infection control in health-care settings is problematic. No studies have evaluated the effectiveness of medical instrument reprocessing in inactivating prions. Despite a consensus that abnormal prions display some extreme measure of resistance to inactivation by either physical or chemical methods, scientists disagree about the exact conditions needed for sterilization. Inactivation studies utilizing whole tissues present extraordinary challenges to any sterilizing method.[1192] Additionally, the experimental designs of these studies preclude the evaluation of surface cleaning as a part of the total approach to pathogen inactivation.[951, 1192]

Some researchers have recommended the use of either a 1:2 v/v dilution of sodium hypochorite (approximately 20,000 ppm), full-strength sodium hypochlorite (50,000–60,000 ppm), or 1–2 N sodium hydroxide (NaOH) for the inactivation of prions on certain surfaces (e.g., those found in the pathology laboratory).[1170, 1188] Although these chemicals may be appropriate for the decontamination of laboratory, operating-room, or autopsy-room surfaces that come into contact with central nervous system tissue from a known or suspected patient, this approach is not indicated for routine or terminal cleaning of a room previously occupied by a CJD patient. Both chemicals pose hazards for the health-care worker doing the decontamination. NaOH is caustic and should not make contact with the skin. Sodium hypochlorite solutions (i.e., chlorine bleach) can corrode metals (e.g., aluminum). MSDS information should be consulted when attempting to work with concentrated solutions of either chemical. Currently, no EPA-registered products have label claims for prion inactivation; therefore, this guidance is based on the best available evidence from the scientific literature.

Environmental infection-control strategies must based on the principles of the "chain of infection," regardless of the disease of concern.[13] Although CJD is transmissible, it is not highly contagious. All iatrogenic cases of CJD have been linked to a direct exposure to prion-contaminated central nervous system tissue or pituitary hormones. The six documented iatrogenic cases associated with instruments and devices involved neurosurgical instruments and devices that introduced residual contamination directly to the recipient's brain. No evidence suggests that vCJD has been transmitted iatrogenically or that either CJD or vCJD has been transmitted from environmental surfaces (e.g., housekeeping surfaces). Therefore, routine procedures are adequate for terminal cleaning and disinfection of a CJD patient's room. Additionally, in epidemiologic studies involving highly transfused patients, blood was not identified as a source for prion transmission.[1193-1198] Routine procedures for containing, decontaminating, and disinfecting surfaces with blood spills should be adequate for proper infection control in these situations.[951, 1199]

Guidance for environmental infection control in ORs and autopsy areas has been published.[1197, 1199] Hospitals should develop risk-assessment procedures to identify patients with known or suspected CJD in efforts to implement prion-specific infection-control measures for the OR and for instrument reprocessing.[1200] This assessment also should be conducted for older patients undergoing non-lesionous neurosurgery when such procedures are being done for diagnosis. Disposable, impermeable coverings should be used during these autopsies and neurosurgeries to minimize surface contamination. Surfaces that have become contaminated with central nervous system tissue or cerebral spinal fluid should be

cleaned and decontaminated by a) removing most of the tissue or body substance with absorbent materials, b) wetting the surface with a sodium hypochlorite solution containing ≥5,000 ppm or a 1 N NaOH solution, and c) rinsing thoroughly.[951, 1197–1199, 1201] The optimum duration of contact exposure in these instances is unclear. Some researchers recommend a 1-hour contact time on the basis of tissue-inactivation studies,[1197, 1198, 1201] whereas other reviewers of the subject draw no conclusions from this research.[1199] Factors to consider before cleaning a potentially contaminated surface are a) the degree to which gross tissue/body substance contamination can be effectively removed and b) the ease with which the surface can be cleaned.

# F. Environmental Sampling

This portion of Part I addresses the basic principles and methods of sampling environmental surfaces and other environmental sources for microorganisms. The applied strategies of sampling with respect to environmental infection control have been discussed in the appropriate preceding subsections.

## 1. General Principles: Microbiologic Sampling of the Environment

Before 1970, U.S. hospitals conducted regularly scheduled culturing of the air and environmental surfaces (e.g., floors, walls, and table tops).[1202] By 1970, CDC and the American Hospital Association (AHA) were advocating the discontinuation of routine environmental culturing because rates of health-care–associated infection had not been associated with levels of general microbial contamination of air or environmental surfaces, and because meaningful standards for permissible levels of microbial contamination of environmental surfaces or air did not exist.[1203–1205] During 1970–1975, 25% of U.S. hospitals reduced the extent of such routine environmental culturing — a trend that has continued.[1206, 1207]

Random, undirected sampling (referred to as "routine" in previous guidelines) differs from the current practice of targeted sampling for defined purposes.[2, 1204] Previous recommendations against routine sampling were not intended to discourage the use of sampling in which sample collection, culture, and interpretation are conducted in accordance with defined protocols.[2] In this guideline, targeted microbiologic sampling connotes a monitoring process that includes a) a written, defined, multidisciplinary protocol for sample collection and culturing; b) analysis and interpretation of results using scientifically determined or anticipatory baseline values for comparison; and c) expected actions based on the results obtained. Infection control, in conjunction with laboratorians, should assess the health-care facility's capability to conduct sampling and determine when expert consultation and/or services are needed.

Microbiologic sampling of air, water, and inanimate surfaces (i.e., environmental sampling) is an expensive and time-consuming process that is complicated by many variables in protocol, analysis, and interpretation. It is therefore indicated for only four situations.[1208] The first is to support an investigation of an outbreak of disease or infections when environmental reservoirs or fomites are implicated epidemiologically in disease transmission.[161, 1209, 1210] It is important that such culturing be supported by epidemiologic data. Environmental sampling, as with all laboratory testing, should not be conducted if there is no plan for interpreting and acting on the results obtained.[11, 1211, 1212] Linking microorganisms from environmental samples with clinical isolates by molecular epidemiology is crucial whenever it is possible to do so.

The second situation for which environmental sampling may be warranted is in research. Well-designed and controlled experimental methods and approaches can provide new information about the spread of health-care–associated diseases.[126, 129] A classic example is the study of environmental microbial

contamination that compared health-care–associated infection rates in an old hospital and a new facility before and shortly after occupancy.[947]

The third indication for sampling is to monitor a potentially hazardous environmental condition, confirm the presence of a hazardous chemical or biological agent, and validate the successful abatement of the hazard. This type of sampling can be used to: a) detect bioaerosols released from the operation of health-care equipment (e.g., an ultrasonic cleaner) and determine the success of repairs in containing the hazard,[1213] b) detect the release of an agent of bioterrorism in an indoor environmental setting and determine its successful removal or inactivation, and c) sample for industrial hygiene or safety purposes (e.g., monitoring a "sick building").

The fourth indication is for quality assurance to evaluate the effects of a change in infection-control practice or to ensure that equipment or systems perform according to specifications and expected outcomes. Any sampling for quality-assurance purposes must follow sound sampling protocols and address confounding factors through the use of properly selected controls. Results from a single environmental sample are difficult to interpret in the absence of a frame of reference or perspective. Evaluations of a change in infection-control practice are based on the assumption that the effect will be measured over a finite period, usually of short duration. Conducting quality-assurance sampling on an extended basis, especially in the absence of an adverse outcome, is usually unjustified. A possible exception might be the use of air sampling during major construction periods to qualitatively detect breaks in environmental infection-control measures. In one study, which began as part of an investigation of an outbreak of health-care–associated aspergillosis, airborne concentrations of *Aspergillus* spores were measured in efforts to evaluate the effectiveness of sealing hospital doors and windows during a period of construction of a nearby building.[50] Other examples of sampling for quality-assurance purposes may include commissioning newly constructed space in special care areas (i.e., ORs and units for immunosuppressed patients) or assessing a change in housekeeping practice. However, the only types of routine environmental microbiologic sampling recommended as part of a quality-assurance program are a) the biological monitoring of sterilization processes by using bacterial spores[1214] and b) the monthly culturing of water used in hemodialysis applications and for the final dialysate use dilution. Some experts also advocate periodic environmental sampling to evaluate the microbial/particulate quality for regular maintenance of the air handling system (e.g., filters) and to verify that the components of the system meet manufacturer's specifications (A. Streifel, University of Minnesota, 2000). Certain equipment in health-care settings (e.g., biological safety cabinets) may also be monitored with air flow and particulate sampling to determine performance or as part of adherence to a certification program; results can then be compared with a predetermined standard of performance. These measurements, however, usually do not require microbiologic testing.

## 2. Air Sampling

Biological contaminants occur in the air as aerosols and may include bacteria, fungi, viruses, and pollens.[1215, 1216] Aerosols are characterized as solid or liquid particles suspended in air. Talking for 5 minutes and coughing each can produce 3,000 droplet nuclei; sneezing can generate approximately 40,000 droplets which then evaporate to particles in the size range of 0.5–12 µm.[137, 1217] Particles in a biological aerosol usually vary in size from <1 µm to ≥50 µm. These particles may consist of a single, unattached organism or may occur in the form of clumps composed of a number of bacteria. Clumps can also include dust and dried organic or inorganic material. Vegetative forms of bacterial cells and viruses may be present in the air in a lesser number than bacterial spores or fungal spores. Factors that determine the survival of microorganisms within a bioaerosol include a) the suspending medium, b) temperature, c) relative humidity, d) oxygen sensitivity, and e) exposure to UV or electromagnetic radiation.[1215] Many vegetative cells will not survive for lengthy periods of time in the air unless the

relative humidity and other factors are favorable for survival and the organism is enclosed within some protective cover (e.g., dried organic or inorganic matter).[1216] Pathogens that resist drying (e.g., *Staphylococcus* spp., *Streptococcus* spp., and fungal spores) can survive for long periods and can be carried considerable distances via air and still remain viable. They may also settle on surfaces and become airborne again as secondary aerosols during certain activities (e.g., sweeping and bed making).[1216, 1218]

Microbiologic air sampling is used as needed to determine the numbers and types of microorganisms, or particulates, in indoor air.[289] Air sampling for quality control is, however, problematic because of lack of uniform air-quality standards. Although airborne spores of *Aspergillus* spp. can pose a risk for neutropenic patients, the critical number (i.e., action level) of these spores above which outbreaks of aspergillosis would be expected to occur has not been defined. Health-care professionals considering the use of air sampling should keep in mind that the results represent indoor air quality at singular points in time, and these may be affected by a variety of factors, including a) indoor traffic, b) visitors entering the facility, c) temperature, d) time of day or year, e) relative humidity, f) relative concentration of particles or organisms, and g) the performance of the air-handling system components. To be meaningful, air-sampling results must be compared with those obtained from other defined areas, conditions, or time periods.

Several preliminary concerns must be addressed when designing a microbiologic air sampling strategy (Box 13). Because the amount of particulate material and bacteria retained in the respiratory system is largely dependent on the size of the inhaled particles, particle size should be determined when studying airborne microorganisms and their relation to respiratory infections. Particles >5 μm are efficiently trapped in the upper respiratory tract and are removed primarily by ciliary action.[1219] Particles ≤5 μm in diameter reach the lung, but the greatest retention in the alveoli is of particles 1–2 μm in diameter.[1220–1222]

## Box 13. Preliminary concerns for conducting air sampling

- **Consider the possible characteristics and conditions of the aerosol, including size range of particles, relative amount of inert material, concentration of microorganisms, and environmental factors.**
- **Determine the type of sampling instruments, sampling time, and duration of the sampling program.**
- **Determine the number of samples to be taken.**
- **Ensure that adequate equipment and supplies are available.**
- **Determine the method of assay that will ensure optimal recovery of microorganisms.**
- **Select a laboratory that will provide proper microbiologic support.**
- **Ensure that samples can be refrigerated if they cannot be assayed in the laboratory promptly.**

Bacteria, fungi, and particulates in air can be identified and quantified with the same methods and equipment (Table 23). The basic methods include a) impingement in liquids, b) impaction on solid surfaces, c) sedimentation, d) filtration, e) centrifugation, f) electrostatic precipitation, and g) thermal precipitation.[1218] Of these, impingement in liquids, impaction on solid surfaces, and sedimentation (on settle plates) have been used for various air-sampling purposes in health-care settings.[289]

Several instruments are available for sampling airborne bacteria and fungi (Box 14). Some of the samplers are self-contained units requiring only a power supply and the appropriate collecting medium, but most require additional auxiliary equipment (e.g., a vacuum pump and an airflow measuring device [i.e., a flowmeter or anemometer]). Sedimentation or depositional methods use settle plates and

therefore need no special instruments or equipment. Selection of an instrument for air sampling requires a clear understanding of the type of information desired and the particular determinations that must be made (Box 14). Information may be needed regarding a) one particular organism or all organisms that may be present in the air, b) the concentration of viable particles or of viable organisms, c) the change in concentration with time, and d) the size distribution of the collected particles. Before sampling begins, decisions should be made regarding whether the results are to be qualitative or quantitative. Comparing quantities of airborne microorganisms to those of outdoor air is also standard operating procedure. Infection-control professionals, hospital epidemiologists, industrial hygienists, and laboratory supervisors, as part of a multidisciplinary team, should discuss the potential need for microbial air sampling to determine if the capacity and expertise to conduct such sampling exists within the facility and when it is appropriate to enlist the services of an environmental microbiologist consultant.

**Table 23. Air sampling methods and examples of equipment***

| Method | Principle | Suitable for measuring: | Collection media or surface | Rate of collection (L/min.) | Auxilliary equipment needed+ | Points to consider | Prototype samplers§ |
|---|---|---|---|---|---|---|---|
| Impingement in liquids | Air drawn through a small jet and directed against a liquid surface | Viable organisms, and concentration over time. Example use: sampling water aerosols to *Legionella* spp. | Buffered gelatin, tryptose saline, peptone, nutrient broth | 12.5 | Yes | Antifoaming agent may be needed. Ambient temperature and humidity will influence length of collection time | Chemical Corps. All Glass Impinger (AGI) |
| Impaction on solid surfaces | Air drawn into the sampler; particles deposited on a dry surface | Viable particles; viable organisms (on non-nutrient surfaces, limited to organisms that resist drying and spores); size measurement, and concentration over time. Example use: sampling air for *Aspergillus* spp., fungal spores | Dry surface, coated surfaces, and agar | 28 (sieve) 30–800 (slit) | Yes | Available as sieve impactors or slit impactors. Sieve impactors can be set up to measure particle size. Slit impactors have a rotating support stage for agar plates to allow for measurement of concentration over time. | Andersen Air Sampler (sieve impactor); TDL, Cassella MK-2 (slit impactors) |
| Sedimentation | Particles and micro-organisms settle onto surfaces via gravity | Viable particles. Example uses: sampling air for bacteria in the vicinity of and during a medical procedure; general measurements of microbial air quality. | Nutrient media (agars) on plates or slides | — | No | Simple and inexpensive; best suited for qualitative sampling; significant airborne fungal spores are too buoyant to settle efficiently for collection using this method. | Settle plates |

92

| Method | Principle | Suitable for measuring: | Collection media or surface | Rate of collection (L/min.) | Auxilliary equipment needed+ | Points to consider | Prototype samplers§ |
|---|---|---|---|---|---|---|---|
| Filtration | Air drawn through a filter unit; particles trapped; 0.2 µm pore size | Viable particles; viable organisms (on non-nutrient surfaces, limited to spores and organisms that resist drying); concentration over time. Example use: air sampling for *Aspergillus* spp., fungal spores, and dust | Paper, cellulose, glass wool, gelatin foam, and membrane filters | 1–50 | Yes | Filter must be agitated first in rinse fluid to remove and disperse trapped micro-organisms; rinse fluid is assayed; used more for sampling dust and chemicals. | — |
| Centrifugation | Aerosols subjected to centrifugal force; particles impacted onto a solid surface | Viable particles; viable organisms (on non-nutrient surfaces, limited to spores and organisms that resist drying); concentration over time. Example use: air sampling for *Aspergillus* spp., and fungal spores | Coated glass or plastic slides, and agar surfaces | 40–50 | Yes | Calibration is difficult and is done only by the factory; relative comparison of airborne contamination is its general use. | Biotest RCS Plus |
| Electrostatic precipitation | Air drawn over an electro-statically charged surface; particles become charged | Viable particles; viable organisms (on non-nutrient surfaces, limited to spores and organisms that resist drying); concentration over time | Solid collecting surfaces (glass, and agar) | 85 | Yes | High volume sampling rate, but equipment is complex and must be handled carefully; not practical for use in health-care settings. | — |
| Thermal precipitation | Air drawn over a thermal gradient; particles repelled from hot surfaces, settle on colder surfaces | Size measurements | Glass coverslip, and electron microscope grid | 0.003–0.4 | Yes | Determine particle size by direct observation; not frequently used because of complex adjustments and low sampling rates. | — |

* Material in this table is compiled from references 289, 1218, 1223, and 1224.
+ Most samplers require a flow meter or anemometer and a vacuum source as auxiliary equipment.
§ Trade names listed are for identification purposes only and are not intended as endorsements by the U.S. Public Health Service.

**Box 14.  Selecting an air sampling device\***

---

**The following factors must be considered when choosing an air sampling instrument:**

- Viability and type of the organism to be sampled
- Compatibility with the selected method of analysis
- Sensitivity of particles to sampling
- Assumed concentrations and particle size
- Whether airborne clumps must be broken (i.e., total viable organism count vs. particle count)
- Volume of air to be sampled and length of time sampler is to be continuously operated
- Background contamination
- Ambient conditions
- Sampler collection efficiency
- Effort and skill required to operate sampler
- Availability and cost of sampler, plus back-up samplers in case of equipment malfunction
- Availability of auxiliary equipment and utilities (e.g., vacuum pumps, electricity, and water)

---

\* Material in this box is compiled from reference 1218.

Liquid impinger and solid impactor samplers are the most practical for sampling bacteria, particles, and fungal spores, because they can sample large volumes of air in relatively short periods of time.[289]  Solid impactor units are available as either "slit" or "sieve" designs.  Slit impactors use a rotating disc as support for the collecting surface, which allows determinations of concentration over time.  Sieve impactors commonly use stages with calibrated holes of different diameters.  Some impactor-type samplers use centrifugal force to impact particles onto agar surfaces.  The interior of either device must be made sterile to avoid inadvertent contamination from the sampler.  Results obtained from either sampling device can be expressed as organisms or particles per unit volume of air (CFU/m$^3$).

Sampling for bacteria requires special attention, because bacteria may be present as individual organisms, as clumps, or mixed with or adhering to dust or covered with a protective coating of dried organic or inorganic substances.  Reports of bacterial concentrations determined by air sampling therefore must indicate whether the results represent individual organisms or particles bearing multiple cells.  Certain types of samplers (e.g., liquid impingers) will completely or partially disintegrate clumps and large particles; the sampling result will therefore reflect the total number of individual organisms present in the air.

The task of sizing a bioaerosol is simplified through the use of sieves or slit impactors because these samplers will separate the particles and microorganisms into size ranges as the sample is collected.  These samplers must, however, be calibrated first by sampling aerosols under similar use conditions.[1225]

The use of settle plates (i.e., the sedimentation or depositional method) is not recommended when sampling air for fungal spores, because single spores can remain suspended in air indefinitely.[289]  Settle plates have been used mainly to sample for particulates and bacteria either in research studies or during epidemiologic investigations.[161, 1226–1229]  Results of sedimentation sampling are typically expressed as numbers of viable particles or viable bacteria per unit area per the duration of sampling time (i.e., CFU/area/time); this method can not quantify the volume of air sampled.  Because the survival of microorganisms during air sampling is inversely proportional to the velocity at which the air is taken into the sampler,[1215] one advantage of using a settle plate is its reliance on gravity to bring organisms and particles into contact with its surface, thus enhancing the potential for optimal survival of collected organisms.  This process, however, takes several hours to complete and may be impractical for some situations.

Air samplers are designed to meet differing measurement requirements. Some samplers are better suited for one form of measurement than others. No one type of sampler and assay procedure can be used to collect and enumerate 100% of airborne organisms. The sampler and/or sampling method chosen should, however, have an adequate sampling rate to collect a sufficient number of particles in a reasonable time period so that a representative sample of air is obtained for biological analysis. Newer analytical techniques for assaying air samples include PCR methods and enzyme-linked immunosorbent assays (ELISAs).

## 3. Water Sampling

A detailed discussion of the principles and practices of water sampling has been published.[945] Water sampling in health-care settings is used detect waterborne pathogens of clinical significance or to determine the quality of finished water in a facility's distribution system. Routine testing of the water in a health-care facility is usually not indicated, but sampling in support of outbreak investigations can help determine appropriate infection-control measures. Water-quality assessments in dialysis settings have been discussed in this guideline (see Water, Dialysis Water Quality and Dialysate, and Appendix C).

Health-care facilities that conduct water sampling should have their samples assayed in a laboratory that uses established methods and quality-assurance protocols. Water specimens are not "static specimens" at ambient temperature; potential changes in both numbers and types of microbial populations can occur during transport. Consequently, water samples should be sent to the testing laboratory cold (i.e., at approximately 39.2°F [4°C]) and testing should be done as soon as practical after collection (preferably within 24 hours).

Because most water sampling in health-care facilities involves the testing of finished water from the facility's distribution system, a reducing agent (i.e., sodium thiosulfate [$Na_2S_2O_3$]) needs to be added to neutralize residual chlorine or other halogen in the collected sample. If the water contains elevated levels of heavy metals, then a chelating agent should be added to the specimen. The minimum volume of water to be collected should be sufficient to complete any and all assays indicated; 100 mL is considered a suitable minimum volume. Sterile collection equipment should always be used.

Sampling from a tap requires flushing of the water line before sample collection. If the tap is a mixing faucet, attachments (e.g., screens and aerators) must be removed, and hot and then cold water must be run through the tap before collecting the sample.[945] If the cleanliness of the tap is questionable, disinfection with 500–600 ppm sodium hypochlorite (1:100 v/v dilution of chlorine bleach) and flushing the tap should precede sample collection.

Microorganisms in finished or treated water often are physically damaged ("stressed") to the point that growth is limited when assayed under standard conditions. Such situations lead to false-negative readings and misleading assessments of water quality. Appropriate neutralization of halogens and chelation of heavy metals are crucial to the recovery of these organisms. The choice of recovery media and incubation conditions will also affect the assay. Incubation temperatures should be closer to the ambient temperature of the water rather than at 98.6°F (37°C), and recovery media should be formulated to provide appropriate concentrations of nutrients to support organisms exhibiting less than rigorous growth.[945] High-nutrient content media (e.g., blood agar and tryptic soy agar [TSA]) may actually inhibit the growth of these damaged organisms. Reduced nutrient media (e.g., diluted peptone and R2A) are preferable for recovery of these organisms.[945]

Use of aerobic, heterotrophic plate counts allows both a qualitative and quantitative measurement for water quality. If bacterial counts in water are expected to be high in number (e.g., during waterborne outbreak investigations), assaying small quantities using pour plates or spread plates is appropriate.[945] Membrane filtration is used when low-count specimens are expected and larger sampling volumes are required ($\geq$100 mL). The sample is filtered through the membrane, and the filter is applied directly face-up onto the surface of the agar plate and incubated.

Unlike the testing of potable water supplies for coliforms (which uses standardized test and specimen collection parameters and conditions), water sampling to support epidemiologic investigations of disease outbreaks may be subjected to modifications dictated by the circumstances present in the facility. Assay methods for waterborne pathogens may also not be standardized. Therefore, control or comparison samples should be included in the experimental design. Any departure from a standard method should be fully documented and should be considered when interpreting results and developing strategies. Assay methods specific for clinically significant waterborne pathogens (e.g., *Legionella* spp., *Aeromonas* spp, *Pseudomonas* spp., and *Acinetobacter* spp.) are more complicated and costly compared with both methods used to detect coliforms and other standard indicators of water quality.

## 4. Environmental Surface Sampling

Routine environmental-surface sampling (e.g., surveillance cultures) in health-care settings is neither cost-effective nor warranted.[951, 1225] When indicated, surface sampling should be conducted with multidisciplinary approval in adherence to carefully considered plans of action and policy (Box 15).

**Box 15. Undertaking environmental-surface sampling***

---

**The following factors should be considered before engaging in environmental-surface sampling:**

- **Background information from the literature and present activities (i.e., preliminary results from an epidemiologic investigation)**
- **Location of surfaces to be sampled**
- **Method of sample collection and the appropriate equipment for this task**
- **Number of replicate samples needed and which control or comparison samples are required**
- **Parameters of the sample assay method and whether the sampling will be qualitative, quantitative, or both**
- **An estimate of the maximum allowable microbial numbers or types on the surface(s) sampled (refer to the Spaulding classification for devices and surfaces)**
- **Some anticipation of a corrective action plan**

---

\* The material in this box is compiled from reference 1214.

Surface sampling is used currently for research, as part of an epidemiologic investigation, or as part of a comprehensive approach for specific quality assurance purposes. As a research tool, surface sampling has been used to determine a) potential environmental reservoirs of pathogens,[564, 1230–1232] b) survival of microorganisms on surfaces,[1232, 1233] and c) the sources of the environmental contamination.[1023] Some or all of these approaches can also be used during outbreak investigations.[1232] Discussion of surface sampling of medical devices and instruments is beyond the scope of this document and is deferred to future guidelines on sterilization and disinfection issues.

Meaningful results depend on the selection of appropriate sampling and assay techniques.[1214] The media, reagents, and equipment required for surface sampling are available from any well-equipped

96

microbiology laboratory and laboratory supplier. For quantitative assessment of surface organisms, non-selective, nutrient-rich agar media and broth (e.g., TSA and brain-heart infusion broth [BHI] with or without 5% sheep or rabbit blood supplement) are used for the recovery of aerobic bacteria. Broth media are used with membrane-filtration techniques. Further sample work-up may require the use of selective media for the isolation and enumeration of specific groups of microorganisms. Examples of selective media are MacConkey agar (MAC [selects for gram-negative bacteria]), Cetrimide agar (selects for *Pseudomonas aeruginosa*), or Sabouraud dextrose- and malt extract agars and broths (select for fungi). Qualitative determinations of organisms from surfaces require only the use of selective or non-selective broth media.

Effective sampling of surfaces requires moisture, either already present on the surface to be sampled or via moistened swabs, sponges, wipes, agar surfaces, or membrane filters.[1214, 1234-1236] Dilution fluids and rinse fluids include various buffers or general purpose broth media (Table 24). If disinfectant residuals are expected on surfaces being sampled, specific neutralizer chemicals should be used in both the growth media and the dilution or rinse fluids. Lists of the neutralizers, the target disinfectant active ingredients, and the use concentrations have been published.[1214, 1237] Alternatively, instead of adding neutralizing chemicals to existing culture media (or if the chemical nature of the disinfectant residuals is unknown), the use of either a) commercially available media including a variety of specific and non-specific neutralizers or b) double-strength broth media will facilitate optimal recovery of microorganisms. The inclusion of appropriate control specimens should be included to rule out both residual antimicrobial activity from surface disinfectants and potential toxicity caused by the presence of neutralizer chemicals carried over into the assay system.[1214]

**Table 24. Examples of eluents and diluents for environmental-surface sampling\* +**

| Solutions | Concentration in water |
|---|---|
| Ringer | ¼ strength |
| Peptone water | 0.1%–1.0% |
| Buffered peptone water | 0.067 M phosphate, 0.43% NaCl, 0.1% peptone |
| Phosphate-buffered saline | 0.02 M phosphate, 0.9% NaCl |
| Sodium chloride (NaCl) | 0.25%–0.9% |
| Calgon Ringer§ | ¼ strength |
| Thiosulfate Ringer¶ | ¼ strength |
| Water | – |
| Tryptic soy broth (TSB) | – |
| Brain-heart infusion broth (BHI) supplemented with 0.5% beef extract | – |

\* Material in this table is compiled from references 1214 and 1238.
+ A surfactant (e.g., polysorbate [i.e., Tween® 80]) may be added to eluents and diluents. A concentration ranging from 0.01%–0.1% is generally used, depending on the specific application. Foaming may occur during use.
§ This solution is used for dissolution of calcium alginate swabs.
¶ This solution is used for neutralization of residual chlorine.

Several methods can be used for collecting environmental surface samples (Table 25). Specific step-by-step discussions of each of the methods have been published.[1214, 1239] For best results, all methods should incorporate aseptic techniques, sterile equipment, and sterile recovery media.

## Table 25. Methods of environmental-surface sampling

| Method | Suitable for appropriate surface(s) | Assay technique | Procedural notes | Points of Interpretation | Available standards | References |
|---|---|---|---|---|---|---|
| Sample/rinse Moistened swab/rinse | Non-absorbent surfaces, corners, crevices, devices, and instruments | Dilutions; qualitative or quantitative assays | Assay multiple measures areas or devices with separate swabs | Report results per measured areas or if assaying an object, per the entire sample site | YES – food industry; NO – heath care | 1214, 1239–1242 |
| Moistened sponge/rinse | Large areas and housekeeping surfaces (e.g., floors or walls) | Dilutions; qualitative or quantitative assays | Vigorously rub a sterile sponge over the surface | Report results per measured area | YES – food industry; NO – health care | 1214, 1239–1242 |
| Moistened wipe/rinse | Large areas and housekeeping surfaces (e.g., countertops) | Dilutions; qualitative or quantitative assays | Use a sterile wipe | Report results per measured area | YES – food industry; NO – health care | 1214, 1239–1242 |
| Direct immersion | Small items capable of being immersed | Dilutions; qualitative or quantitative assays | Use membrane filtration if rinse volume is large and anticipated microbiological concentration is low | Report results per item | NO | 1214 |
| Containment | Interior surfaces of containers, tubes, or bottles | Dilutions; qualitative or quantitative assays | Use membrane filtration if rinse volume is large | Evaluate both the types and numbers of microorganisms | YES – food and industrial applications for containers prior to fill | 1214 |
| RODAC* | Previously cleaned and sanitized flat, non-absorbent surfaces; not suitable for irregular surfaces | Direct assay | Overgrowth occurs if used on heavily contaminated surfaces; use neutralizers in the agar if surface disinfectant residuals are present | Provides direct, quantitative results; use a minimum of 15 plates per an average hospital room | NO | 1214, 1237, 1239, 1243, 1244 |

* RODAC stands for "replicate organism direct agar contact."

Sample/rinse methods are frequently chosen because of their versatility. However, these sampling methods are the most prone to errors caused by manipulation of the swab, gauze pad, or sponge.[1238] Additionally, no microbiocidal or microbiostatic agents should be present in any of these items when used for sampling.[1238] Each of the rinse methods requires effective elution of microorganisms from the item used to sample the surface. Thorough mixing of the rinse fluids after elution (e.g., via manual or mechanical mixing using a vortex mixer, shaking with or without glass beads, and ultrasonic bath) will help to remove and suspend material from the sampling device and break up clumps of organisms for a more accurate count.[1238] In some instances, the item used to sample the surface (e.g., gauze pad and sponge) may be immersed in the rinse fluids in a sterile bag and subjected to stomaching.[1238] This technique, however, is suitable only for soft or absorbent items that will not puncture the bag during the elution process.

If sampling is conducted as part of an epidemiologic investigation of a disease outbreak, identification of isolates to species level is mandatory, and characterization beyond the species level is preferred.[1214] When interpreting the results of the sampling, the expected degree of microbial contamination

98

associated with the various categories of surfaces in the Spaulding classification must be considered. Environmental surfaces should be visibly clean; recognized pathogens in numbers sufficient to result in secondary transfer to other animate or inanimate surfaces should be absent from the surface being sampled.[1214] Although the interpretation of a sample with positive microbial growth is self-evident, an environmental surface sample, especially that obtained from housekeeping surfaces, that shows no growth does not represent a "sterile" surface. Sensitivities of the sampling and assay methods (i.e., level of detection) must be taken into account when no-growth samples are encountered. Properly collected control samples will help rule out extraneous contamination of the surface sample.

# G. Laundry and Bedding

## 1. General Information

Laundry in a health-care facility may include bed sheets and blankets, towels, personal clothing, patient apparel, uniforms, scrub suits, gowns, and drapes for surgical procedures.[1245] Although contaminated textiles and fabrics in health-care facilities can be a source of substantial numbers of pathogenic microorganisms, reports of health-care–associated diseases linked to contaminated fabrics are so few in number that the overall risk of disease transmission during the laundry process likely is negligible. When the incidence of such events are evaluated in the context of the volume of items laundered in health-care settings (estimated to be 5 billion pounds annually in the United States),[1246] existing control measures (e.g., standard precautions) are effective in reducing the risk of disease transmission to patients and staff. Therefore, use of current control measures should be continued to minimize the contribution of contaminated laundry to the incidence of health-care–associated infections. The control measures described in this section of the guideline are based on principles of hygiene, common sense, and consensus guidance; they pertain to laundry services utilized by health-care facilities, either in-house or contract, rather than to laundry done in the home.

## 2. Epidemiology and General Aspects of Infection Control

Contaminated textiles and fabrics often contain high numbers of microorganisms from body substances, including blood, skin, stool, urine, vomitus, and other body tissues and fluids. When textiles are heavily contaminated with potentially infective body substances, they can contain bacterial loads of $10^6$–$10^8$ CFU/100 cm$^2$ of fabric.[1247] Disease transmission attributed to health-care laundry has involved contaminated fabrics that were handled inappropriately (i.e., the shaking of soiled linens). Bacteria (*Salmonella* spp., *Bacillus cereus*), viruses (hepatitis B virus [HBV]), fungi (*Microsporum canis*), and ectoparasites (scabies) presumably have been transmitted from contaminated textiles and fabrics to workers via a) direct contact or b) aerosols of contaminated lint generated from sorting and handling contaminated textiles.[1248–1252] In these events, however, investigations could not rule out the possibility that some of these reported infections were acquired from community sources. Through a combination of soil removal, pathogen removal, and pathogen inactivation, contaminated laundry can be rendered hygienically clean. Hygienically clean laundry carries negligible risk to health-care workers and patients, provided that the clean textiles, fabric, and clothing are not inadvertently contaminated before use.

OSHA defines contaminated laundry as "laundry which has been soiled with blood or other potentially infectious materials or may contain sharps."[967] The purpose of the laundry portion of the standard is to protect the worker from exposure to potentially infectious materials during collection, handling, and sorting of contaminated textiles through the use of personal protective equipment, proper work practices, containment, labeling, hazard communication, and ergonomics.

Experts are divided regarding the practice of transporting clothes worn at the workplace to the health-care worker's home for laundering. Although OSHA regulations prohibit home laundering of items that are considered personal protective apparel or equipment (e.g., laboratory coats),[967] experts disagree about whether this regulation extends to uniforms and scrub suits that are not contaminated with blood or other potentially infectious material. Health-care facility policies on this matter vary and may be inconsistent with recommendations of professional organizations.[1253, 1254] Uniforms without blood or body substance contamination presumably do not differ appreciably from street clothes in the degree and microbial nature of soilage. Home laundering would be expected to remove this level of soil adequately. However, if health-care facilities require the use of uniforms, they should either make provisions to launder them or provide information to the employee regarding infection control and cleaning guidelines for the item based on the tasks being performed at the facility. Health-care facilities should address the need to provide this service and should determine the frequency for laundering these items. In a recent study examining the microbial contamination of medical students' white coats, the students perceived the coats as "clean" as long as the garments were not visibly contaminated with body substances, even after wearing the coats for several weeks.[1255] The heaviest bacterial load was found on the sleeves and the pockets of these garments; the organisms most frequently isolated were *Staphylococcus aureus*, diphtheroids, and *Acinetobacter* spp.[1255] Presumably, the sleeves of the coat may make contact with a patient and potentially serve to transfer environmentally stable microorganisms among patients. In this study, however, surveillance was not conducted among patients to detect new infections or colonizations. The students did, however, report that they would likely replace their coats more frequently and regularly if clean coats were provided.[1255] Apart from this study, which documents the presence of pathogenic bacteria on health-care facility clothing, reports of infections attributed to either the contact with such apparel or with home laundering have been rare.[1256, 1257]

Laundry services for health-care facilities are provided either in-house (i.e., on-premise laundry [OPL]), co-operatives (i.e., those entities owned and operated by a group of facilities), or by off-site commercial laundries. In the latter, the textiles may be owned by the health-care facility, in which case the processor is paid for laundering only. Alternatively, the textiles may be owned by the processor who is paid for every piece laundered on a "rental" fee. The laundry facility in a health-care setting should be designed for efficiency in providing hygienically clean textiles, fabrics, and apparel for patients and staff. Guidelines for laundry construction and operation for health-care facilities, including nursing facilities, have been published.[120, 1258] The design and engineering standards for existing facilities are those cited in the AIA edition in effect during the time of the facility's construction.[120] A laundry facility is usually partitioned into two separate areas - a "dirty" area for receiving and handling the soiled laundry and a "clean" area for processing the washed items.[1259] To minimize the potential for recontaminating cleaned laundry with aerosolized contaminated lint, areas receiving contaminated textiles should be at negative air pressure relative to the clean areas.[1260-1262] Laundry areas should have handwashing facilities readily available to workers. Laundry workers should wear appropriate personal protective equipment (e.g., gloves and protective garments) while sorting soiled fabrics and textiles.[967] Laundry equipment should be used and maintained according to the manufacturer's instructions to prevent microbial contamination of the system.[1250, 1263] Damp textiles should not be left in machines overnight.[1250]

## 3. Collecting, Transporting, and Sorting Contaminated Textiles and Fabrics

The laundry process starts with the removal of used or contaminated textiles, fabrics, and/or clothing from the areas where such contamination occurred, including but not limited to patients' rooms, surgical/operating areas, and laboratories. Handling contaminated laundry with a minimum of agitation

100

can help prevent the generation of potentially contaminated lint aerosols in patient-care areas.[967, 1259] Sorting or rinsing contaminated laundry at the location where contamination occurred is prohibited by OSHA.[967] Contaminated textiles and fabrics are placed into bags or other appropriate containment in this location; these bags are then securely tied or otherwise closed to prevent leakage.[967] Single bags of sufficient tensile strength are adequate for containing laundry, but leak-resistant containment is needed if the laundry is wet and capable of soaking through a cloth bag.[1264] Bags containing contaminated laundry must be clearly identified with labels, color-coding, or other methods so that health-care workers handle these items safely, regardless of whether the laundry is transported within the facility or destined for transport to an off-site laundry service.[967]

Typically, contaminated laundry originating in isolation areas of the hospital is segregated and handled with special practices; however, few, if any, cases of health-care–associated infection have been linked to this source.[1265] Single-blinded studies have demonstrated that laundry from isolation areas is no more heavily contaminated with microorganisms than laundry from elsewhere in the hospital.[1266] Therefore, adherence to standard precautions when handling contaminated laundry in isolation areas and minimizing agitation of the contaminated items are considered sufficient to prevent the dispersal of potentially infectious aerosols.[6]

Contaminated textiles and fabrics in bags can be transported by cart or chute.[1258, 1262] Laundry chutes require proper design, maintenance, and use, because the piston-like action of a laundry bag traveling in the chute can propel airborne microbial contaminants throughout the facility.[1267–1269] Laundry chutes should be maintained under negative air pressure to prevent the spread of microorganisms from floor to floor. Loose, contaminated pieces of laundry should not be tossed into chutes, and laundry bags should be closed or otherwise secured to prevent the contents from falling out into the chute.[1270] Health-care facilities should determine the point in the laundry process at which textiles and fabrics should be sorted. Sorting after washing minimizes the exposure of laundry workers to infective material in soiled fabrics, reduces airborne microbial contamination in the laundry area, and helps to prevent potential percutaneous injuries to personnel.[1271] Sorting laundry before washing protects both the machinery and fabrics from hard objects (e.g., needles, syringes, and patients' property) and reduces the potential for recontamination of clean textiles.[1272] Sorting laundry before washing also allows for customization of laundry formulas based on the mix of products in the system and types of soils encountered. Additionally, if work flow allows, increasing the amount of segregation by specific product types will usually yield the greatest amount of work efficiency during inspection, folding, and pack-making operations.[1253] Protective apparel for the workers and appropriate ventilation can minimize these exposures.[967, 1258–1260] Gloves used for the task of sorting laundry should be of sufficient thickness to minimize sharps injuries.[967] Employee safety personnel and industrial hygienists can help to determine the appropriate glove choice.

## 4. Parameters of the Laundry Process

Fabrics, textiles, and clothing used in health-care settings are disinfected during laundering and generally rendered free of vegetative pathogens (i.e., hygienically clean), but they are not sterile.[1273] Laundering cycles consist of flush, main wash, bleaching, rinsing, and souring.[1274] Cleaned wet textiles, fabrics, and clothing are then dried, pressed as needed, and prepared (e.g., folded and packaged) for distribution back to the facility. Clean linens provided by an off-site laundry must be packaged prior to transport to prevent inadvertent contamination from dust and dirt during loading, delivery, and unloading. Functional packaging of laundry can be achieved in several ways, including a) placing clean linen in a hamper lined with a previously unused liner, which is then closed or covered; b) placing clean linen in a properly cleaned cart and covering the cart with disposable material or a properly cleaned reusable textile material that can be secured to the cart; and c) wrapping individual bundles of clean

textiles in plastic or other suitable material and sealing or taping the bundles.

The antimicrobial action of the laundering process results from a combination of mechanical, thermal, and chemical factors.[1271, 1275, 1276] Dilution and agitation in water remove substantial quantities of microorganisms. Soaps and detergents function to suspend soils and also exhibit some microbiocidal properties. Hot water provides an effective means of destroying microorganisms.[1277] A temperature of at least 160°F (71°C) for a minimum of 25 minutes is commonly recommended for hot-water washing.[2] Water of this temperature can be provided by steam jet or separate booster heater.[120] The use of chlorine bleach assures an extra margin of safety.[1278, 1279] A total available chlorine residual of 50–150 ppm is usually achieved during the bleach cycle.[1277] Chlorine bleach becomes activated at water temperatures of 135°F–145°F (57.2°C–62.7°C). The last of the series of rinse cycles is the addition of a mild acid (i.e., sour) to neutralize any alkalinity in the water supply, soap, or detergent. The rapid shift in pH from approximately 12 to 5 is an effective means to inactivate some microorganisms.[1247] Effective removal of residual alkali from fabrics is an important measure in reducing the risk for skin reactions among patients.

Chlorine bleach is an economical, broad-spectrum chemical germicide that enhances the effectiveness of the laundering process. Chlorine bleach is not, however, an appropriate laundry additive for all fabrics. Traditionally, bleach was not recommended for laundering flame-retardant fabrics, linens, and clothing because its use diminished the flame-retardant properties of the treated fabric.[1273] However, some modern-day flame retardant fabrics can now tolerate chlorine bleach. Flame-retardant fabrics, whether topically treated or inherently flame retardant, should be thoroughly rinsed during the rinse cycles, because detergent residues are capable of supporting combustion. Chlorine alternatives (e.g., activated oxygen-based laundry detergents) provide added benefits for fabric and color safety in addition to antimicrobial activity. Studies comparing the antimicrobial potencies of chlorine bleach and oxygen-based bleach are needed. Oxygen-based bleach and detergents used in health-care settings should be registered by EPA to ensure adequate disinfection of laundry. Health-care workers should note the cleaning instructions of textiles, fabrics, drapes, and clothing to identify special laundering requirements and appropriate hygienic cleaning options.[1278]

Although hot-water washing is an effective laundry disinfection method, the cost can be substantial. Laundries are typically the largest users of hot water in hospitals. They consume 50%–75% of the total hot water,[1280] representing an average of 10%–15% of the energy used by a hospital. Several studies have demonstrated that lower water temperatures of 71°F–77°F (22°C–25°C) can reduce microbial contamination when the cycling of the washer, the wash detergent, and the amount of laundry additive are carefully monitored and controlled.[1247, 1281–1285] Low-temperature laundry cycles rely heavily on the presence of chlorine- or oxygen-activated bleach to reduce the levels of microbial contamination. The selection of hot- or cold-water laundry cycles may be dictated by state health-care facility licensing standards or by other regulation. Regardless of whether hot or cold water is used for washing, the temperatures reached in drying and especially during ironing provide additional significant microbiocidal action.[1247] Dryer temperatures and cycle times are dictated by the materials in the fabrics. Man-made fibers (i.e., polyester and polyester blends) require shorter times and lower temperatures.

After washing, cleaned and dried textiles, fabrics, and clothing are pressed, folded, and packaged for transport, distribution, and storage by methods that ensure their cleanliness until use.[2] State regulations and/or accrediting standards may dictate the procedures for this activity. Clean/sterile and contaminated textiles should be transported from the laundry to the health-care facility in vehicles (e.g., trucks, vans, and carts) that allow for separation of clean/sterile and contaminated items. Clean/sterile textiles and contaminated textiles may be transported in the same vehicle, provided that the use of physical barriers and/or space separation can be verified to be effective in protecting the clean/sterile items from

contamination. Clean, uncovered/unwrapped textiles stored in a clean location for short periods of time (e.g., uncovered and used within a few hours) have not been demonstrated to contribute to increased levels of health-care–acquired infection. Such textiles can be stored in convenient places for use during the provision of care, provided that the textiles can be maintained dry and free from soil and body-substance contamination.

In the absence of microbiologic standards for laundered textiles, no rationale exists for routine microbiologic sampling of cleaned health-care textiles and fabrics.[1286] Sampling may be used as part of an outbreak investigation if epidemiologic evidence suggests that textiles, fabrics, or clothing are a suspected vehicle for disease transmission. Sampling techniques include aseptically macerating the fabric into pieces and adding these to broth media or using contact plates (RODAC plates) for direct surface sampling.[1271, 1286] When evaluating the disinfecting properties of the laundering process specifically, placing pieces of fabric between two membrane filters may help to minimize the contribution of the physical removal of microorganisms.[1287]

Washing machines and dryers in residential-care settings are more likely to be consumer items rather than the commercial, heavy-duty, large volume units typically found in hospitals and other institutional health-care settings. Although all washing machines and dryers in health-care settings must be properly maintained for performance according to the manufacturer's instructions, questions have been raised about the need to disinfect washers and dryers in residential-care settings. Disinfection of the tubs and tumblers of these machines is unnecessary when proper laundry procedures are followed; these procedures involve a) the physical removal of bulk solids (e.g., feces) before the wash/dry cycle and b) proper use of temperature, detergent, and laundry additives. Infection has not been linked to laundry procedures in residential-care facilities, even when consumer versions of detergents and laundry additives are used.

## 5. Special Laundry Situations

Some textile items (e.g., surgical drapes and reusable gowns) must be sterilized before use and therefore require steam autoclaving after laundering.[7] Although the American Academy of Pediatrics in previous guidelines recommended autoclaving for linens in neonatal intensive care units (NICUs), studies on the microbial quality of routinely cleaned NICU linen have not identified any increased risk for infection among the neonates receiving care.[1288] Consequently, hygienically clean linens are suitable for use in this setting.[997] The use of sterile linens in burn therapy units remains unresolved.

Coated or laminated fabrics are often used in the manufacture of PPE. When these items become contaminated with blood or other body substances, the manufacturer's instructions for decontamination and cleaning take into account the compatibility of the rubber backing with the chemical germicides or detergents used in the process. The directions for decontaminating these items should be followed as indicated; the item should be discarded when the backing develops surface cracks.

Dry cleaning, a cleaning process that utilizes organic solvents (e.g., perchloroethylene) for soil removal, is an alternative means of cleaning fabrics that might be damaged in conventional laundering and detergent washing. Several studies, however, have shown that dry cleaning alone is relatively ineffective in reducing the numbers of bacteria and viruses on contaminated linens;[1289, 1290] microbial populations are significantly reduced only when dry-cleaned articles are heat pressed. Dry cleaning should therefore not be considered a routine option for health-care facility laundry and should be reserved for those circumstances in which fabrics can not be safely cleaned with water and detergent.[1291]

## 6. Surgical Gowns, Drapes, and Disposable Fabrics

An issue of recent concern involves the use of disposable (i.e., single use) versus reusable (i.e., multiple use) surgical attire and fabrics in health-care settings.[1292] Regardless of the material used to manufacture gowns and drapes, these items must be resistant to liquid and microbial penetration.[7, 1293–1297] Surgical gowns and drapes must be registered with FDA to demonstrate their safety and effectiveness. Repellency and pore size of the fabric contribute to gown performance, but performance capability can be influenced by the item's design and construction.[1298, 1299] Reinforced gowns (i.e., gowns with double-layered fabric) generally are more resistant to liquid strike-through.[1300, 1301] Reinforced gowns may, however, be less comfortable. Guidelines for selection and use of barrier materials for surgical gowns and drapes have been published.[1302] When selecting a barrier product, repellency level and type of barrier should be compatible for the exposure expected.[967] However, data are limited regarding the association between gown or drape characteristics and risk for surgical site infections.[7, 1303] Health-care facilities must ensure optimal protection of patients and health-care workers. Not all fabric items in health care lend themselves to single-use. Facilities exploring options for gowns and drapes should consider the expense of disposable items and the impact on the facility's waste-management costs once these items are discarded. Costs associated with the use of durable goods involve the fabric or textile items; staff expenses to collect, sort, clean, and package the laundry; and energy costs to operate the laundry if on-site or the costs to contract with an outside service.[1304, 1305]

## 7. Antimicrobial-Impregnated Articles and Consumer Items Bearing Antimicrobial Labeling

Manufacturers are increasingly incorporating antibacterial or antimicrobial chemicals into consumer and health-care items. Some consumer products bearing labels that indicate treatment with antimicrobial chemicals have included pens, cutting boards, toys, household cleaners, hand lotions, cat litter, soaps, cotton swabs, toothbrushes, and cosmetics. The "antibacterial" label on household cleaning products, in particular, gives consumers the impression that the products perform "better" than comparable products without this labeling, when in fact all household cleaners have antibacterial properties.

In the health-care setting, treated items may include children's pajamas, mattresses, and bed linens with label claims of antimicrobial properties. These claims require careful evaluation to determine whether they pertain to the use of antimicrobial chemicals as preservatives for the fabric or other components or whether they imply a health claim.[1306, 1307] No evidence is available to suggest that use of these products will make consumers and patients healthier or prevent disease. No data support the use of these items as part of a sound infection-control strategy, and therefore, the additional expense of replacing a facility's bedding and sheets with these treated products is unwarranted.

EPA has reaffirmed its position that manufacturers who make public health claims for articles containing antimicrobial chemicals must provide evidence to support those claims as part of the registration process.[1308] Current EPA regulations outlined in the Treated Articles Exemption of the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) require manufacturers to register both the antimicrobial chemical used in or on the product and the finished product itself if a public health claim is maintained for the item. The exemption applies to the use of antimicrobial chemicals for the purpose of preserving the integrity of the product's raw material(s). The U.S. Federal Trade Commission (FTC) is evaluating manufacturer advertising of products with antimicrobial claims.[1309]

104

## 8. Standard Mattresses, Pillows, and Air-Fluidized Beds

Standard mattresses and pillows can become contaminated with body substances during patient care if the integrity of the covers of these items is compromised. The practice of sticking needles into the mattress should be avoided. A mattress cover is generally a fitted, protective material, the purpose of which is to prevent the mattress from becoming contaminated with body fluids and substances. A linen sheet placed on the mattress is not considered a mattress cover. Patches for tears and holes in mattress covers do not provide an impermeable surface over the mattress. Mattress covers should be replaced when torn; the mattress should be replaced if it is visibly stained. Wet mattresses, in particular, can be a substantial environmental source of microorganisms. Infections and colonizations caused by *Acinetobacter* spp., MRSA, and *Pseudomonas aeruginosa* have been described, especially among burn patients.[1310-1315] In these reports, the removal of wet mattresses was an effective infection-control measure. Efforts were made to ensure that pads and covers were cleaned and disinfected between patients using disinfectant products compatible with mattress-cover materials to ensure that these covers remained impermeable to fluids.[1310-1314] Pillows and their covers should be easily cleanable, preferably in a hot water laundry cycle.[1315] These should be laundered between patients or if contaminated with body substances.

Air-fluidized beds are used for the care of patients immobilized for extended periods of time because of therapy or injury (e.g., pain, decubitus ulcers, and burns).[1316] These specialized beds consist of a base unit filled with microsphere beads fluidized by warm, dry air flowing upward from a diffuser located at the bottom of the unit. A porous, polyester filter sheet separates the patient from direct contact with the beads but allows body fluids to pass through to the beads. Moist beads aggregate into clumps which settle to the bottom where they are removed as part of routine bed maintenance.

Because the beads become contaminated with the patient's body substances, concerns have been raised about the potential for these beds to serve as an environmental source of pathogens. Certain pathogens (e.g., *Enterococcus* spp., *Serratia marcescens*, *Staphylococcus aureus*, and *Streptococcus fecalis*) have been recovered either from the microsphere beads or the polyester sheet after cleaning.[1317, 1318] Reports of cross-contamination of patients, however, are few.[1318] Nevertheless, routine maintenance and between-patient decontamination procedures can minimize potential risks to patients. Regular removal of bead clumps, coupled with the warm, dry air of the bed, can help to minimize bacterial growth in the unit.[1319-1321] Beads are decontaminated between patients by high heat (113°F–194°F [45°C–90°C], depending on the manufacturer's specifications) for at least 1 hour; this procedure is particularly important for the inactivation of *Enterococcus* spp. which are relatively resistant to heat.[1322, 1323] The polyester filter sheet requires regular changing and thorough cleaning and disinfection, especially between patients.[1317, 1318, 1322, 1323]

Microbial contamination of the air space in the immediate vicinity of a properly maintained air-fluidized bed is similar to that found in air around conventional bedding, despite the air flow out of the base unit and around the patient.[1320, 1324, 1325] An operational air-fluidized bed can, however, interfere with proper pressure differentials, especially in negative-pressure rooms;[1326] the effect varies with the location of the bed relative to the room's configuration and supply and exhaust vent locations. Use of an air-fluidized bed in a negative-pressure room requires consultation with a facility engineer to determine appropriate placement of the bed.

# H. Animals in Health-Care Facilities

## 1. General Information

Animals in health-care facilities traditionally have been limited to laboratories and research areas. However, their presence in patient-care areas is now more frequent, both in acute-care and long-term care settings, prompting consideration for the potential transmission of zoonotic pathogens from animals to humans in these settings. Although dogs and cats may be commonly encountered in health-care settings, other animals (e.g., fish, birds, non-human primates, rabbits, rodents, and reptiles) also can be present as research, resident, or service animals. These animals can serve as sources of zoonotic pathogens that could potentially infect patients and health-care workers (Table 26).[1327–1340] Animals potentially can serve as reservoirs for antibiotic-resistant microorganisms, which can be introduced to the health-care setting while the animal is present. VRE have been isolated from both farm animals and pets,[1341] and a cat in a geriatric care center was found to be colonized with MRSA.[1342]

**Table 26. Examples of diseases associated with zoonotic transmission\*+**

| Infectious disease | Cats | Dogs | Fish | Birds | Rabbits | Reptiles§ | Primates | Rodents§ |
|---|---|---|---|---|---|---|---|---|
| *Virus* | | | | | | | | |
| Lymphocytic choriomeningitis | | | | | | | | +¶ |
| Rabies | + | + | | | | | | |
| *Bacteria* | | | | | | | | |
| Campylobacteriosis | + | + | | | | + | + | + |
| *Capnocytophaga canimorsus* infection | + | + | | | | | | |
| Cat scratch disease (*Bartonella henselae*) | + | | | | | | | |
| Leptospirosis | + | | | | | | + | + |
| Mycobacteriosis | | | + | + | | | | |
| Pasteurellosis | + | + | | | + | | | |
| Plague | + | | | + | | | + | + |
| Psittacosis | | | | + | | | | |
| Q fever (*Coxiella burnetti*) | + | | | | | | | |
| Rat bite fever (*Spirrillum minus, Streptobacillus moniliformis*) | | | | | | | | + |
| Salmonellosis | + | + | | + | + | + | + | + |
| Tularemia | + | | | | + | | | + |
| Yersiniosis | | | | | + | + | + | + |
| *Parasites* | | | | | | | | |
| Ancylostomiasis | + | + | | | | | + | |
| Cryptosporidiosis | + | | | | | | | |
| Giardiasis | + | + | | | | | + | |
| Toxocariasis | + | + | | | | | + | |
| Toxoplasmosis | + | + | | | | | + | |
| *Fungi* | | | | | | | | |
| Blastomycosis | | + | | | | | | |
| Dermatophytosis | | + | | | + | | + | + |

\* Material in this table is adapted from reference 1331 and used with permission of the publisher (Lippincott Williams and Wilkins).
+ This table does not include vectorborne diseases.
§ Reptiles include lizards, snakes, and turtles. Rodents include hamsters, mice, and rats.
¶ The + symbol indicates that the pathogen associated with the infection has been isolated from animals and is considered to pose potential risk to humans.

Zoonoses can be transmitted from animals to humans either directly or indirectly via bites, scratches, aerosols, ectoparasites, accidental ingestion, or contact with contaminated soil, food, water, or unpasteurized milk.[1331, 1332, 1343-1345] Colonization and hand transferral of pathogens acquired from pets in health-care workers' homes represent potential sources and modes of transmission of zoonotic pathogens in health-care settings. An outbreak of infections caused by a yeast (*Malassezia pachydermatis*) among newborns was traced to transfer of the yeast from the hands of health-care workers with pet dogs at home.[1346] In addition, an outbreak of ringworm in a NICU caused by *Microsporum canis* was associated with a nurse and her cat,[1347] and an outbreak of *Rhodococcus (Gordona) bronchialis* sternal SSIs after coronary-artery bypass surgery was traced to a colonized nurse whose dogs were culture-positive for the organism.[1348] In the latter outbreak, whether the dogs were the sole source of the organism and whether other environmental reservoirs contributed to the outbreak are unknown. Nonetheless, limited data indicate that outbreaks of infectious disease have occurred as a result of contact with animals in areas housing immunocompetent patients. However, the low frequency of outbreaks may result from a) the relatively limited presence of the animals in health-care facilities and b) the immunocompetency of the patients involved in the encounters. Formal scientific studies to evaluate potential risks of transmission of zoonoses in health-care settings outside of the laboratory are lacking.

## 2. Animal-Assisted Activities, Animal-Assisted Therapy, and Resident Animals

Animal-Assisted Activities (AAA) are those programs that enhance the patients' quality of life. These programs allow patients to visit animals in either a common, central location in the facility or in individual patient rooms. A group session with the animals enhances opportunities for ambulatory patients and facility residents to interact with caregivers, family members, and volunteers.[1349-1351] Alternatively, allowing the animals access to individual rooms provides the same opportunity to non-ambulatory patients and patients for whom privacy or dignity issues are a consideration. The decision to allow this access to patients' rooms should be made on a case-by-case basis, with the consultation and consent of the attending physician and nursing staff.

Animal-Assisted Therapy (AAT) is a goal-directed intervention that incorporates an animal into the treatment process provided by a credentialed therapist.[1330, 1331] The concept for AAT arose from the observation that some patients with pets at home recover from surgical and medical procedures more rapidly than patients without pets.[1352, 1353] Contact with animals is considered beneficial for enhancing wellness in certain patient populations (e.g., children, the elderly, and extended-care hospitalized patients).[1349, 1354-1357] However, evidence supporting this benefit is largely derived from anecdotal reports and observations of patient/animal interactions.[1357-1359] Guidelines for establishing AAT programs are available for facilities considering this option.[1360]

The incorporation of non-human primates into an AAA or AAT program is not encouraged because of concerns regarding potential disease transmission from and unpredictable behavior of these animals.[1361, 1362] Animals participating in either AAA or AAT sessions should be in good health and up-to-date with recommended immunizations and prophylactic medications (e.g., heartworm prevention) as determined by a licensed veterinarian based on local needs and recommendations. Regular re-evaluation of the animal's health and behavior status is essential.[1360] Animals should be routinely screened for enteric parasites and/or have evidence of a recently completed antihelminthic regimen.[1363] They should also be free of ectoparasites (e.g., fleas and ticks) and should have no sutures, open wounds, or obvious dermatologic lesions that could be associated with bacterial, fungal, or viral infections or parasitic infestations. Incorporating young animals (i.e., those aged <1 year) into these programs is not encouraged because of issues regarding unpredictable behavior and elimination control. Additionally,

the immune systems of very young puppies and kittens is not completely developed, thereby placing the health of these animals at risk. Animals should be clean and well-groomed. The visits must be supervised by persons who know the animals and their behavior. Animal handlers should be trained in these activities and receive site-specific orientation to ensure that they work efficiently with the staff in the specific health-care environment.[1360] Additionally, animal handlers should be in good health.[1360]

The most important infection-control measure to prevent potential disease transmission is strict enforcement of hand-hygiene measures (e.g., using either soap and water or an alcohol-based hand rub) for all patients, staff, and residents after handling the animals.[1355, 1364] Care should also be taken to avoid direct contact with animal urine or feces. Clean-up of these substances from environmental surfaces requires gloves and the use of leak-resistant plastic bags to discard absorbent material used in the process.[2] The area must be cleaned after visits according to standard cleaning procedures.

The American Academy of Allergy, Asthma, and Immunology estimates that dog or cat allergies occur in approximately 15% of the population.[1365] Minimizing contact with animal saliva, dander, and/or urine helps to mitigate allergic responses.[1365–1367] Some facilities may not allow animal visitation for patients with a) underlying asthma, b) known allergies to cat or dog hair, c) respiratory allergies of unknown etiology, and d) immunosuppressive disorders. Hair shedding can be minimized by processes that remove dead hair (e.g., grooming) and that prevent the shedding of dead hair (e.g., therapy capes for dogs). Allergens can be minimized by bathing therapy animals within 24 hours of a visit.[1333, 1368]

Animal therapists and handlers must take precautions to prevent animal bites. Common pathogens associated with animal bites include *Capnocytophaga canimorsus, Pasteurella* spp., *Staphylococcus* spp., and *Streptococcus* spp. Selecting well-behaved and well-trained animals for these programs greatly decreases the incidence of bites. Rodents, exotic species, wild/domestic animals (i.e., wolf-dog hybrids), and wild animals whose behavior is unpredictable should be excluded from AAA or AAT programs. A well-trained animal handler should be able to recognize stress in the animal and to determine when to terminate a session to minimize risk. When an animal bites a person during AAA or AAT, the animal is to be permanently removed from the program. If a bite does occur, the wound must be cleansed immediately and monitored for subsequent infection. Most infections can be treated with antibiotics, and antibiotics often are prescribed prophylactically in these situations.

The health-care facility's infection-control staff should participate actively in planning for and coordinating AAA and AAT sessions. Many facilities do not offer AAA or AAT programs for severely immunocompromised patients (e.g., HSCT patients and patients on corticosteroid therapy).[1339] The question of whether family pets or companion animals can visit terminally-ill HSCT patients or other severely immunosuppressed patients is best handled on a case-by-case basis, although animals should not be brought into the HSCT unit or any other unit housing severely immunosuppressed patients. An in-depth discussion of this issue is presented elsewhere.[1366]

Immunocompromised patients who have been discharged from a health-care facility may be at higher risk for acquiring some pet-related zoonoses. Although guidelines have been developed to minimize the risk of disease transmission to HIV-infected patients,[8] these recommendations may be applicable for patients with other immunosuppressive disorders. In addition to handwashing or hand hygiene, these recommendations include avoiding contact with a) animal feces and soiled litter box materials, b) animals with diarrhea, c) very young animals (i.e., dogs <6 months of age and cats <1 year of age), and d) exotic animals and reptiles.[8] Pets or companion animals with diarrhea should receive veterinary care to resolve their condition.

Many health-care facilities are adopting more home-like environments for residential-care or extended-stay patients in acute-care settings, and resident animals are one element of this approach.[1369] One

concept, the "Eden Alternative," incorporates children, plants, and animals (e.g., dogs, cats, fish, birds, rabbits, and rodents) into the daily care setting.[1370, 1371] The concept of working with resident animals has not been scientifically evaluated. Several issues beyond the benefits of therapy must be considered before embarking on such a program, including a) whether the animals will come into direct contact with patients and/or be allowed to roam freely in the facility; b) how the staff will provide care for the animals; c) the management of patients' or residents' allergies, asthma, and phobias; d) precautionary measures to prevent bites and scratches; and e) measures to properly manage the disposal of animal feces and urine, thereby preventing environmental contamination by zoonotic microorganisms (e.g., *Toxoplasma* spp., *Toxocara* spp., and *Ancylostoma* spp.).[1372, 1373] Few data document a link between health-care–acquired infection rates and frequency of cleaning fish tanks or rodent cages. Skin infections caused by *Mycobacterium marinum* have been described among persons who have fish aquariums at home.[1374, 1375] Nevertheless, immunocompromised patients should avoid direct contact with fish tanks and cages and the aerosols that these items produce. Further, fish tanks should be kept clean on a regular basis as determined by facility policy, and this task should be performed by gloved staff members who are not responsible for patient care. The use of the infection-control risk assessment can help determine whether a fish tank poses a risk for patient or resident safety and health in these situations. No evidence, however, links the incidence of health-care–acquired infections among immunocompetent patients or residents with the presence of a properly cleaned and maintained fish tank, even in dining areas. As a general preventive measure, resident animal programs are advised to restrict animals from a) food preparation kitchens, b) laundries, c) central sterile supply and any storage areas for clean supplies, and d) medication preparation areas. Resident-animal programs in acute-care facilities should not allow the animals into the isolation areas, protective environments, ORs, or any area where immunocompromised patients are housed. Patients and staff routinely should wash their hands or use waterless, alcohol-based hand-hygiene products after contact with animals.

## 3. Service Animals

Although this section provides an overview about service animals in health-care settings, it cannot address every situation or question that may arise (see Appendix E - Information Resources). A service animal is any animal individually trained to do work or perform tasks for the benefit of a person with a disability.[1366, 1376] A service animal is not considered a pet but rather an animal trained to provide assistance to a person because of a disability. Title III of the "Americans with Disabilities Act" (ADA) of 1990 mandates that persons with disabilities accompanied by service animals be allowed access with their service animals into places of public accommodation, including restaurants, public transportation, schools, and health-care facilities.[1366, 1376] In health-care facilities, a person with a disability requiring a service animal may be an employee, a visitor, or a patient.

An overview of the subject of service animals and their presence in health-care facilities has been published.[1366] No evidence suggests that animals pose a more significant risk of transmitting infection than people; therefore, service animals should not be excluded from such areas, unless an individual patient's situation or a particular animal poses greater risk that cannot be mitigated through reasonable measures. If health-care personnel, visitors, and patients are permitted to enter care areas (e.g., in-patient rooms, some ICUs, and public areas) without taking additional precautions to prevent transmission of infectious agents (e.g., donning gloves, gowns, or masks), a clean, healthy, well-behaved service animal should be allowed access with its handler.[1366] Similarly, if immunocompromised patients are able to receive visitors without using protective garments or equipment, an exclusion of service animals from this area would not be justified.[1366]

Because health-care facilities are covered by the ADA or the Rehabilitation Act, a person with a disability may be accompanied by a service animal within the facility unless the animal's presence or

behavior creates a fundamental alteration in the nature of a facility's services in a particular area or a direct threat to other persons in a particular area.[1366]    A "direct threat" is defined as a significant risk to the health or safety of others that cannot be mitigated or eliminated by modifying policies, practices, or procedures.[1376]    The determination that a service animal poses a direct threat in any particular health-care setting must be based on an individualized assessment of the service animal, the patient, and the health-care situation.  When evaluating risk in such situations, health-care personnel should consider the nature of the risk (including duration and severity); the probability that injury will occur; and whether reasonable modifications of policies, practices, or procedures will mitigate the risk (J. Wodatch, U.S. Department of Justice, 2000).  The person with a disability should contribute to the risk-assessment process as part of a pre-procedure health-care provider/patient conference.

Excluding a service animal from an OR or similar special care areas (e.g., burn units, some ICUs, PE units, and any other area containing equipment critical for life support) is appropriate if these areas are considered to have "restricted access" with regards to the general public.  General infection-control measures that dictate such limited access include a) the area is required to meet environmental criteria to minimize the risk of disease transmission, b) strict attention to hand hygiene and absence of dermatologic conditions, and c) barrier protective measures [e.g., using gloves, wearing gowns and masks] are indicated for persons in the affected space.  No infection-control measures regarding the use of barrier precautions could be reasonably imposed on the service animal.  Excluding a service animal that becomes threatening because of a perceived danger to its handler during treatment also is appropriate; however, exclusion of such an animal must be based on the actual behavior of the particular animal, not on speculation about how the animal might behave.

Another issue regarding service animals is whether to permit persons with disabilities to be accompanied by their service animals during all phases of their stay in the health-care facility.  Health-care personnel should discuss all aspects of anticipatory care with the patient who uses a service animal.  Health-care personnel may not exclude a service animal because health-care staff may be able to perform the same services that the service animal does (e.g., retrieving dropped items and guiding an otherwise ambulatory person to the restroom).  Similarly, health-care personnel can not exclude service animals because the health-care staff perceive a lack of need for the service animal during the person's stay in the health-care facility.  A person with a disability is entitled to independent access (i.e., to be accompanied by a service animal unless the animal poses a direct threat or a fundamental alteration in the nature of services); "need" for the animal is not a valid factor in either analysis.  For some forms of care (e.g., ambulation as physical therapy following total hip replacement or knee replacement), the service animal should not be used in place of a credentialed health-care worker who directly provides therapy.  However, service animals need not be restricted from being in the presence of its handler during this time; in addition, rehabilitation and discharge planning should incorporate the patient's future use of the animal.  The health-care personnel and the patient with a disability should discuss both the possible need for the service animal to be separated from its handler for a period of time during non-emergency care and an alternate plan of care for the service animal in the event the patient is unable or unwilling to provide that care.  This plan might include family members taking the animal out of the facility several times a day for exercise and elimination, the animal staying with relatives, or boarding off-site.  Care of the service animal, however, remains the obligation of the person with the disability, not the health-care staff.

Although animals potentially carry zoonotic pathogens transmissible to man, the risk is minimal with a healthy, clean, vaccinated, well-behaved, and well-trained service animal, the most common of which are dogs and cats.  No reports have been published regarding infectious disease that affects humans originating in service dogs.  Standard cleaning procedures are sufficient following occupation of an area by a service animal.[1366]    Clean-up of spills of animal urine, feces, or other body substances can be accomplished with blood/body substance procedures outlined in the Environmental Services section of

110

this guideline. No special bathing procedures are required prior to a service animal accompanying its handler into a health-care facility.

Providing access to exotic animals (e.g., reptiles and non-human primates) that are used as service animals is problematic. Concerns about these animals are discussed in two published reviews.[1331, 1366] Because some of these animals exhibit high-risk behaviors that may increase the potential for zoonotic disease transmission (e.g., herpes B infection), providing health-care facility access to nonhuman primates used as service animals is discouraged, especially if these animals might come into contact with the general public.[1361, 1362] Health-care administrators should consult the Americans with Disabilities Act for guidance when developing policies about service animals in their facilities.[1366, 1376]

Requiring documentation for access of a service animal to an area generally accessible to the public would impose a burden on a person with a disability. When health-care workers are not certain that an animal is a service animal, they may ask the person who has the animal if it is a service animal required because of a disability; however, no certification or other documentation of service animal status can be required.[1377]

## 4. Animals as Patients in Human Health-Care Facilities

The potential for direct and indirect transmission of zoonoses must be considered when rooms and equipment in human health-care facilities are used for the medical or surgical treatment or diagnosis of animals.[1378] Inquiries should be made to veterinary medical professionals to determine an appropriate facility and equipment to care for an animal.

The central issue associated with providing medical or surgical care to animals in human health-care facilities is whether cross-contamination occurs between the animal patient and the human health-care workers and/or human patients. The fundamental principles of infection control and aseptic practice should differ only minimally, if at all, between veterinary medicine and human medicine. Health-care–associated infections can and have occurred in both patients and workers in veterinary medical facilities when lapses in infection-control procedures are evident.[1379-1384] Further, veterinary patients can be at risk for acquiring infection from veterinary health-care workers if proper precautions are not taken.[1385]

The issue of providing care to veterinary patients in human health-care facilities can be divided into the following three areas of infection-control concerns: a) whether the room/area used for animal care can be made safe for human patients, b) whether the medical/surgical instruments used on animals can be subsequently used on human patients, and c) which disinfecting or sterilizing procedures need to be done for these purposes. Studies addressing these concerns are lacking. However, with respect to disinfection or sterilization in veterinary settings, only minimal evidence suggests that zoonotic microbial pathogens are unusually resistant to inactivation by chemical or physical agents (with the exception of prions). Ample evidence supports the contrary observation (i.e., that pathogens from human- and animal sources are similar in their relative instrinsic resistance to inactivation).[1386-1391] Further, no evidence suggests that zoonotic pathogens behave differently from human pathogens with respect to ventilation. Despite this knowledge, an aesthetic and sociologic perception that animal care must remain separate from human care persists. Health-care facilities, however, are increasingly faced with requests from the veterinary medical community for access to human health-care facilities for reasons that are largely economical (e.g., costs of acquiring sophisticated diagnostic technology and complex medical instruments). If hospital guidelines allow treatment of animals, alternate veterinary resources (including veterinary hospitals, clinics, and universities) should be exhausted before using human health-care settings. Additionally, the hospital's public/media relations should be notified of the situation. The goal is to develop policies and procedures to proactively and positively discuss and

disclose this activity to the general public.

An infection-control risk assessment (ICRA) must be undertaken to evaluate the circumstances specific to providing care to animals in a human health-care facility. Individual hospital policies and guidelines should be reviewed before any animal treatment is considered in such facilities. Animals treated in human health-care facilities should be under the direct care and supervision of a licensed veterinarian; they also should be free of known infectious diseases, ectoparasites, and other external contaminants (e.g., soil, urine, and feces). Measures should be taken to avoid treating animals with a known or suspected zoonotic disease in a human health-care setting (e.g., lambs being treated for Q fever).

If human health-care facilities must be used for animal treatment or diagnostics, the following general infection-control actions are suggested: a) whenever possible, the use of ORs or other rooms used for invasive procedures should be avoided [e.g., cardiac catheterization labs and invasive nuclear medicine areas]; b) when all other space options are exhausted and use of the aforementioned rooms is unavoidable, the procedure should be scheduled late in the day as the last procedure for that particular area such that patients are not present in the department/unit/area; c) environmental surfaces should be thoroughly cleaned and disinfected using procedures discussed in the Environmental Services portion of this guideline after the animal is removed from the care area; d) sufficient time should be allowed for ACH to help prevent allergic reactions by human patients [Table B.1. in Appendix B]; e) only disposable equipment or equipment that can be thoroughly and easily cleaned, disinfected, or sterilized should be used; f) when medical or surgical instruments, especially those invasive instruments that are difficult to clean [e.g., endoscopes], are used on animals, these instruments should be reserved for future use only on animals; and g) standard precautions should be followed.

## 5. Research Animals in Health-Care Facilities

The risk of acquiring a zoonotic infection from research animals has decreased in recent years because many small laboratory animals (e.g., mice, rats, and rabbits) come from quality stock and have defined microbiologic profiles.[1392] Larger animals (e.g., nonhuman primates) are still obtained frequently from the wild and may harbor pathogens transmissible to humans. Primates, in particular, benefit from vaccinations to protect their health during the research period provided the vaccination does not interfere with the study of the particular agent. Animals serving as models for human disease studies pose some risk for transmission of infection to laboratory or health-care workers from percutaneous or mucosal exposure. Exposures can occur either through a) direct contact with an infected animal or its body substances and secretions or b) indirect contact with infectious material on equipment, instruments, surfaces, or supplies.[1392] Uncontained aerosols generated during laboratory procedures can also transmit infection.

Infection-control measures to prevent transmission of zoonotic infections from research animals are largely derived from the following basic laboratory safety principles: a) purchasing pathogen-free animals, b) quarantining incoming animals to detect any zoonotic pathogens, c) treating infected animals or removing them from the facility, d) vaccinating animal carriers and high-risk contacts if possible, e) using specialized containment caging or facilities, and f) using protective clothing and equipment [e.g., gloves, face shields, gowns, and masks].[1392] An excellent resource for detailed discussion of these safety measures has been published.[1013]

The animal research unit within a health-care facility should be engineered to provide a) adequate containment of animals and pathogens; b) daily decontamination and transport of equipment and waste; c) proper ventilation and air filtration, which prevents recirculation of the air in the unit to other areas of the facility; and d) negative air pressure in the animal rooms relative to the corridors. To ensure

adequate security and containment, no through traffic to other areas of the health-care facility should flow through this unit; access should be restricted to animal-care staff, researchers, environmental services, maintenance, and security personnel.

Occupational health programs for animal-care staff, researchers, and maintenance staff should take into consideration the animals' natural pathogens and research pathogens. Components of such programs include a) prophylactic vaccines, b) TB skin testing when primates are used, c) baseline serums, and d) hearing and respiratory testing. Work practices, PPE, and engineering controls specific for each of the four animal biosafety levels have been published.[1013, 1393] The facility's occupational or employee health clinic should be aware of the appropriate post-exposure procedures involving zoonoses and have available the appropriate post-exposure biologicals and medications.

Animal-research-area staff should also develop standard operating procedures for a) daily animal husbandry [e.g., protection of the employee while facilitating animal welfare]; b) pathogen containment and decontamination; c) management, cleaning, disinfecting and/or sterilizing equipment and instruments; and d) employee training for laboratory safety and safety procedures specific to animal research worksites.[1013] The federal Animal Welfare Act of 1966 and its amendments serve as the regulatory basis for ensuring animal welfare in research.[1394, 1395]

# I. Regulated Medical Waste

## 1. Epidemiology

No epidemiologic evidence suggests that most of the solid- or liquid wastes from hospitals, other health-care facilities, or clinical/research laboratories is any more infective than residential waste. Several studies have compared the microbial load and the diversity of microorganisms in residential wastes and wastes obtained from a variety of health-care settings.[1399-1402] Although hospital wastes had a greater number of different bacterial species compared with residential waste, wastes from residences were more heavily contaminated.[1397, 1398] Moreover, no epidemiologic evidence suggests that traditional waste-disposal practices of health-care facilities (whereby clinical and microbiological wastes were decontaminated on site before leaving the facility) have caused disease in either the health-care setting or the general community.[1400, 1401] This statement excludes, however, sharps injuries sustained during or immediately after the delivery of patient care before the sharp is "discarded." Therefore, identifying wastes for which handling and disposal precautions are indicated is largely a matter of judgment about the relative risk of disease transmission, because no reasonable standards on which to base these determinations have been developed. Aesthetic and emotional considerations (originating during the early years of the HIV epidemic) have, however, figured into the development of treatment and disposal policies, particularly for pathology and anatomy wastes and sharps.[1402-1405] Public concerns have resulted in the promulgation of federal, state, and local rules and regulations regarding medical waste management and disposal.[1406-1414]

## 2. Categories of Medical Waste

Precisely defining medical waste on the basis of quantity and type of etiologic agents present is virtually impossible. The most practical approach to medical waste management is to identify wastes that represent a sufficient potential risk of causing infection during handling and disposal and for which some precautions likely are prudent.[2] Health-care facility medical wastes targeted for handling and disposal precautions include microbiology laboratory waste (e.g., microbiologic cultures and stocks of microorganisms), pathology and anatomy waste, blood specimens from clinics and laboratories, blood

products, and other body-fluid specimens.[2]  Moreover, the risk of either injury or infection from certain sharp items (e.g., needles and scalpel blades) contaminated with blood also must be considered. Although any item that has had contact with blood, exudates, or secretions may be potentially infective, treating all such waste as infective is neither practical nor necessary.  Federal, state, and local guidelines and regulations specify the categories of medical waste that are subject to regulation and outline the requirements associated with treatment and disposal.  The categorization of these wastes has generated the term "regulated medical waste."  This term emphasizes the role of regulation in defining the actual material and as an alternative to "infectious waste," given the lack of evidence of this type of waste's infectivity.  State regulations also address the degree or amount of contamination (e.g., blood-soaked gauze) that defines the discarded item as a regulated medical waste.  The EPA's *Manual for Infectious Waste Management* identifies and categorizes other specific types of waste generated in health-care facilities with research laboratories that also require handling precautions.[1406]

## 3.  Management of Regulated Medical Waste in Health-Care Facilities

Medical wastes require careful disposal and containment before collection and consolidation for treatment.  OSHA has dictated initial measures for discarding regulated medical-waste items.  These measures are designed to protect the workers who generate medical wastes and who manage the wastes from point of generation to disposal.[967]  A single, leak-resistant biohazard bag is usually adequate for containment of regulated medical wastes, provided the bag is sturdy and the waste can be discarded without contaminating the bag's exterior.  The contamination or puncturing of the bag requires placement into a second biohazard bag.  All bags should be securely closed for disposal.  Puncture-resistant containers located at the point of use (e.g., sharps containers) are used as containment for discarded slides or tubes with small amounts of blood, scalpel blades, needles and syringes, and unused sterile sharps.[967]  To prevent needlestick injuries, needles and other contaminated sharps should not be recapped, purposefully bent, or broken by hand.  CDC has published general guidelines for handling sharps.[6, 1415]  Health-care facilities may need additional precautions to prevent the production of aerosols during the handling of blood-contaminated items for certain rare diseases or conditions (e.g., Lassa fever and Ebola virus infection).[203]

Transporting and storing regulated medical wastes within the health-care facility prior to terminal treatment is often necessary.  Both federal and state regulations address the safe transport and storage of on- and off-site regulated medical wastes.[1406-1408]  Health-care facilities are instructed to dispose medical wastes regularly to avoid accumulation.  Medical wastes requiring storage should be kept in labeled, leak-proof, puncture-resistant containers under conditions that minimize or prevent foul odors. The storage area should be well ventilated and be inaccessible to pests.  Any facility that generates regulated medical wastes should have a regulated medical waste management plan to ensure health and environmental safety as per federal, state, and local regulations.

## 4.  Treatment of Regulated Medical Waste

Regulated medical wastes are treated or decontaminated to reduce the microbial load in or on the waste and to render the by-products safe for further handling and disposal.  From a microbiologic standpoint, waste need not be rendered "sterile" because the treated waste will not be deposited in a sterile site.  In addition, waste need not be subjected to the same reprocessing standards as are surgical instruments. Historically, treatment methods involved steam-sterilization (i.e., autoclaving), incineration, or interment (for anatomy wastes).  Alternative treatment methods developed in recent years include chemical disinfection, grinding/shredding/disinfection methods, energy-based technologies (e.g., microwave or radiowave treatments), and disinfection/encapsulation methods.[1409]  State medical waste regulations specify appropriate treatment methods for each category of regulated medical waste.

Of all the categories comprising regulated medical waste, microbiologic wastes (e.g., untreated cultures, stocks, and amplified microbial populations) pose the greatest potential for infectious disease transmission, and sharps pose the greatest risk for injuries. Untreated stocks and cultures of microorganisms are subsets of the clinical laboratory or microbiologic waste stream. If the microorganism must be grown and amplified in culture to high concentration to permit work with the specimen, this item should be considered for on-site decontamination, preferably within the laboratory unit. Historically, this was accomplished effectively by either autoclaving (steam sterilization) or incineration. If steam sterilization in the health-care facility is used for waste treatment, exposure of the waste for up to 90 minutes at 250°F (121°C) in a autoclave (depending on the size of the load and type container) may be necessary to ensure an adequate decontamination cycle.[1416-1418] After steam sterilization, the residue can be safely handled and discarded with all other nonhazardous solid waste in accordance with state solid-waste disposal regulations. On-site incineration is another treatment option for microbiologic, pathologic, and anatomic waste, provided the incinerator is engineered to burn these wastes completely and stay within EPA emissions standards.[1410] Improper incineration of waste with high moisture and low energy content (e.g., pathology waste) can lead to emission problems. State medical-waste regulatory programs identify acceptable methods for inactivating amplified stocks and cultures of microorganisms, some of which may employ technology rather than steam sterilization or incineration.

Concerns have been raised about the ability of modern health-care facilities to inactivate microbiologic wastes on-site, given that many of these institutions have decommissioned their laboratory autoclaves. Current laboratory guidelines for working with infectious microorganisms at biosafety level (BSL) 3 recommend that all laboratory waste be decontaminated before disposal by an approved method, preferably within the laboratory.[1013] These same guidelines recommend that all materials removed from a BSL 4 laboratory (unless they are biological materials that are to remain viable) are to be decontaminated before they leave the laboratory.[1013] Recent federal regulations for laboratories that handle certain biological agents known as "select agents" (i.e., those that have the potential to pose a severe threat to public health and safety) require these agents (and those obtained from a clinical specimen intended for diagnostic, reference, or verification purposes) to be destroyed on-site before disposal.[1412] Although recommendations for laboratory waste disposal from BSL 1 or 2 laboratories (e.g., most health-care clinical and diagnostic laboratories) allow for these materials to be decontaminated off-site before disposal, on-site decontamination by a known effective method is preferred to reduce the potential of exposure during the handling of infectious material.

A recent outbreak of TB among workers in a regional medical-waste treatment facility in the United States demonstrated the hazards associated with aerosolized microbiologic wastes.[1419, 1420] The facility received diagnostic cultures of *Mycobacterium tuberculosis* from several different health-care facilities before these cultures were chemically disinfected; this facility treated this waste with a grinding/shredding process that generated aerosols from the material.[1419, 1420] Several operational deficiencies facilitated the release of aerosols and exposed workers to airborne *M. tuberculosis*. Among the suggested control measures was that health-care facilities perform on-site decontamination of laboratory waste containing live cultures of microorganisms before release of the waste to a waste management company.[1419, 1420] This measure is supported by recommendations found in the CDC/NIH guideline for laboratory workers.[1013] This outbreak demonstrates the need to avoid the use of any medical-waste treatment method or technology that can aerosolize pathogens from live cultures and stocks (especially those of airborne microorganisms) unless aerosols can be effectively contained and workers can be equipped with proper PPE.[1419-1421] Safe laboratory practices, including those addressing waste management, have been published.[1013, 1422]

In an era when local, state, and federal health-care facilities and laboratories are developing bioterrorism

response strategies and capabilities, the need to reinstate in-laboratory capacity to destroy cultures and stocks of microorganisms becomes a relevant issue.[1423]   Recent federal regulations require health-care facility laboratories to maintain the capability of destroying discarded cultures and stocks on-site if these laboratories isolate from a clinical specimen any microorganism or toxin identified as a "select agent" from a clinical specimen (Table 27).[1412, 1413]   As an alternative, isolated cultures of select agents can be transferred to a facility registered to accept these agents in accordance with federal regulations.[1412] State medical waste regulations can, however, complicate or completely prevent this transfer if these cultures are determined to be medical waste, because most states regulate the inter-facility transfer of untreated medical wastes.

### Table 27. Microorganisms and biologicals identified as select agents*+

| *HHS Non-overlap select agents and toxins (42 CFR Part 73 §73.4)* | |
|---|---|
| **Viruses** | Crimean-Congo hemorrhagic fever virus; Ebola viruses; Cercopithecine herpesvirus 1 (herpes B virus); Lassa fever virus; Marburg virus; monkeypox virus; South American hemorrhagic fever viruses (Junin, Machupo, Sabia, Flexal, Guanarito); tick-borne encephalitis complex (flavi) viruses (Central European tick-borne encephalitis, Far Eastern tick-borne encephalitis [Russian spring and summer encephalitis, Kyasnaur Forest disease, Omsk hemorrhagic fever]); variola major virus (smallpox virus); and variola minor virus (alastrim) |
| **Exclusions¶** | Vaccine strain of Junin virus (Candid, #1) |
| **Bacteria** | *Rickettsia prowazekii, R. rickettsii, Yersinia pestis* |
| **Fungi** | *Coccidioides posadasii* |
| **Toxins** | Abrin; conotoxins; diacetoxyscirpenol; ricin; saxitoxin; Shiga-like ribosome inactivating proteins; tetrodotoxin |
| **Exclusions¶** | The following toxins (in purified form or in combinations of pure and impure forms) if the aggregate amount under the control of a principal investigator does not, at any time, exceed the amount specified: 100 mg of abrin; 100 mg of conotoxins; 1,000 mg of diacetoxyscirpenol; 100 mg of ricin; 100 mg of saxitoxin; 100 mg of Shiga-like ribosome inactivating proteins; or 100 mg of tetrodotoxin |
| **Genetic elements, recombinant nucleic acids, and recombinant organisms¶** | • Select agent viral nucleic acids (synthetic or naturally-derived, contiguous or fragmented, in host chromosomes or in expression vectors) that can encode infectious and/or replication competent forms of any of the select agent viruses;<br>• Nucleic acids (synthetic or naturally-derived) that encode for the functional form(s) of any of the toxins listed in this table if the nucleic acids: a) are in a vector or host chromosome; b) can be expressed *in vivo* or *in vitro*; or c) are in a vector or host chromosome and can be expressed *in vivo* or *in vitro*;<br>• Viruses, bacteria, fungi, and toxins listed in this table that have been genetically modified. |
| *High consequence livestock pathogens and toxins/select agents (overlap agents) (42 CFR Part 73 §73.5 and USDA regulation 9 CFR Part 121)* | |
| **Viruses** | Eastern equine encephalitis virus; Nipah and Hendra complex viruses; Rift Valley fever virus; Venezuelan equine encephalitis virus |
| **Exclusions¶** | MP-12 vaccine strain of Rift Valley fever virus; TC-83 vaccine strain of Venezuelan equine encephalitis virus |
| **Bacteria** | *Bacillus anthracis; Brucella abortus, B. melitensis, B. suis; Burkholderia mallei* (formerly *Pseudomonas mallei). B. pseudomallei* (formerly *P. pseudomallei*); botulinum neurotoxin-producing species of *Clostridium; Coxiella burnetii; Francisella tularensis* |
| **Fungi** | *Coccidioides immitis* |
| **Toxins** | Botulinum neurotoxins; *Clostridium perfringens* epsilon toxin; Shigatoxin; staphylococcal enterotoxins; T-2 toxin |
| **Exclusions¶** | The following toxins (in purified form or in combinations of pure and impure forms) if the aggregate amount under the control of a principal investigator does not, at any time, exceed the amount specified: 0.5 mg of botulinum neurotoxins; 100 mg of *Clostridium perfringens* epsilon toxin; 100 mg of Shigatoxin; 5 mg of staphylococcal enterotoxins; or 1,000 mg of T-2 toxin |

116

| High consequence livestock pathogens and toxins/select agents (overlap agents) (42 CFR Part 73 §73.5 and USDA regulation 9 CFR Part 121) (continued) | |
| --- | --- |
| Genetic elements, recombinant nucleic acids, and recombinant organisms¶ | • Select agent viral nuclei acids (synthetic or naturally derived, contiguous or fragmented, in host chromosomes or in expression vectors) thatcan encode infectious and/or replication competent forms of any of the select agent viruses;<br>• Nucleic acids (synthetic or naturally derived) that encode for the functional form(s) of any of the toxins listed in this table if the nucleic acids: a) are in a vector or host chromosome; b) can be expressed *in vivo* or *in vitro*; or c) are in a vector or host chromosome and can be expressed *in vivo* or *in vitro*;<br>• Viruses, bacteria, fungi, and toxins listed in this table that have been genetically modified |

\* Material in this table is compiled from references 1412, 1413, and 1424. Reference 1424 also contains lists of select agents that include plant pathogens and pathogens affecting livestock.

+ 42 CFR 73 §§73.4 and 73.5 do not include any select agent or toxin that is in its naturally-occurring environment, provided it has not been intentionally introduced, cultivated, collected, or otherwise extracted from its natural source. These sections also do not include non-viable select agent organisms or nonfunctional toxins. This list of select agents is current as of 3 October 2003 and is subject to change pending the final adoption of 42 CFR Part 73.

¶ These table entries are listed in reference 1412 and 1413, but were not included in reference 1424.


# 5. Discharging Blood, Fluids to Sanitary Sewers or Septic Tanks

The contents of all vessels that contain more than a few milliliters of blood remaining after laboratory procedures, suction fluids, or bulk blood can either be inactivated in accordance with state-approved treatment technologies or carefully poured down a utility sink drain or toilet.[1414] State regulations may dictate the maximum volume allowable for discharge of blood/body fluids to the sanitary sewer. No evidence indicates that bloodborne diseases have been transmitted from contact with raw or treated sewage. Many bloodborne pathogens, particularly bloodborne viruses, are not stable in the environment for long periods of time;[1425, 1426] therefore, the discharge of small quantities of blood and other body fluids to the sanitary sewer is considered a safe method of disposing of these waste materials.[1414] The following factors increase the likelihood that bloodborne pathogens will be inactivated in the disposal process: a) dilution of the discharged materials with water; b) inactivation of pathogens resulting from exposure to cleaning chemicals, disinfectants, and other chemicals in raw sewage; and c) effectiveness of sewage treatment in inactivating any residual bloodborne pathogens that reach the treatment facility. Small amounts of blood and other body fluids should not affect the functioning of a municipal sewer system. However, large quantities of these fluids, with their high protein content, might interfere with the biological oxygen demand (BOD) of the system. Local municipal sewage treatment restrictions may dictate that an alternative method of bulk fluid disposal be selected. State regulations may dictate what quantity constitutes a small amount of blood or body fluids.

Although concerns have been raised about the discharge of blood and other body fluids to a septic tank system, no evidence suggests that septic tanks have transmitted bloodborne infections. A properly functioning septic system is adequate for inactivating bloodborne pathogens. System manufacturers' instructions specify what materials may be discharged to the septic tank without jeopardizing its proper operation.


# 6. Medical Waste and CJD

Concerns also have been raised about the need for special handling and treatment procedures for wastes generated during the care of patients with CJD or other transmissible spongiform encephalopathies (TSEs). Prions, the agents that cause TSEs, have significant resistance to inactivation by a variety of physical, chemical, or gaseous methods.[1427] No epidemiologic evidence, however, links acquisition of CJD with medical-waste disposal practices. Although handling neurologic tissue for pathologic examination and autopsy materials with care, using barrier precautions, and following specific

procedures for the autopsy are prudent measures,[1197] employing extraordinary measures once the materials are discarded is unnecessary. Regulated medical wastes generated during the care of the CJD patient can be managed using the same strategies as wastes generated during the care of other patients. After decontamination, these wastes may then be disposed in a sanitary landfill or discharged to the sanitary sewer, as appropriate.

# Part II. Recommendations for Environmental Infection Control in Health-Care Facilities

## A. Rationale for Recommendations

As in previous CDC guidelines, each recommendation is categorized on the basis of existing scientific data, theoretic rationale, applicability, and possible economic benefit. The recommendations are evidence-based wherever possible. However, certain recommendations are derived from empiric infection-control or engineering principles, theoretic rationale, or from experience gained from events that cannot be readily studied (e.g., floods).

The HICPAC system for categorizing recommendations has been modified to include a category for engineering standards and actions required by state or federal regulations. Guidelines and standards published by the American Institute of Architects (AIA), American Society of Heating, Refrigeration, and Air-Conditioning Engineers (ASHRAE), and the Association for the Advancement in Medical Instrumentation (AAMI) form the basis of certain recommendations. These standards reflect a consensus of expert opinions and extensive consultation with agencies of the U.S. Department of Health and Human Services. Compliance with these standards is usually voluntary. However, state and federal governments often adopt these standards as regulations. For example, the standards from AIA regarding construction and design of new or renovated health-care facilities, have been adopted by reference by >40 states. Certain recommendations have two category ratings (e.g., Categories IA and IC or Categories IB and IC), indicating the recommendation is evidence-based as well as a standard or regulation.

## B. Rating Categories

Recommendations are rated according to the following categories:

- **Category IA.** Strongly recommended for implementation and strongly supported by well-designed experimental, clinical, or epidemiologic studies.
- **Category IB.** Strongly recommended for implementation and supported by certain experimental, clinical, or epidemiologic studies and a strong theoretical rationale.
- **Category IC.** Required by state or federal regulation, or representing an established association standard. (Note: Abbreviations for governing agencies and regulatory citations are listed, where appropriate. Recommendations from regulations adopted at state levels are also noted. Recommendations from AIA guidelines cite the appropriate sections of the standard).
- **Category II.** Suggested for implementation and supported by suggestive clinical or epidemiologic studies, or a theoretical rationale.
- **Unresolved Issue.** No recommendation is offered. No consensus or insufficient evidence exists regarding efficacy.

# C. Recommendations—Air

**I.** **Air-Handling Systems in Health-Care Facilities**

A. Use AIA guidelines as minimum standards where state or local regulations are not in place for design and construction of ventilation systems in new or renovated health-care facilities. Ensure that existing structures continue to meet the specifications in effect at the time of construction.[120]   *Category IC*   (AIA: 1.1.A, 5.4)

B. Monitor ventilation systems in accordance with engineers' and manufacturers' recommendations to ensure preventive engineering, optimal performance for removal of particulates, and elimination of excess moisture.[18, 35, 106, 120, 220, 222, 333, 336]   *Category IB, IC* (AIA: 7.2, 7.31.D, 8.31.D, 9.31.D, 10.31.D, 11.31.D, EPA guidance)

1. Ensure that heating, ventilation, air conditioning (HVAC) filters are properly installed and maintained to prevent air leakages and dust overloads.[17, 18, 106, 222]   *Category IB*

2. Monitor areas with special ventilation requirements (e.g., AII or PE) for ACH, filtration, and pressure differentials.[21, 120, 249, 250, 273–275, 277, 333–344]   *Category IB, IC* (AIA: 7.2.C7, 7.2.D6)

   a. Develop and implement a maintenance schedule for ACH, pressure differentials, and filtration efficiencies using facility-specific data as part of the multidisciplinary risk assessment. Take into account the age and reliability of the system.

   b. Document these parameters, especially the pressure differentials.

3. Engineer humidity controls into the HVAC system and monitor the controls to ensure proper moisture removal.[120]   *Category IC*   (AIA: 7.31.D9)

   a. Locate duct humidifiers upstream from the final filters.

   b. Incorporate a water-removal mechanism into the system.

   c. Locate all duct takeoffs sufficiently down-stream from the humidifier so that moisture is completely absorbed.

4. Incorporate steam humidifiers, if possible, to reduce potential for microbial proliferation within the system, and avoid use of cool mist humidifiers.   *Category II*

5. Ensure that air intakes and exhaust outlets are located properly in construction of new facilities and renovation of existing facilities.[3, 120]   *Category IC*   (AIA: 7.31.D3, 8.31.D3, 9.31.D3, 10.31.D3, 11.31.D3)

   a. Locate exhaust outlets >25 ft. from air-intake systems.

   b. Locate outdoor air intakes ≥6 ft. above ground or ≥3 ft. above roof level.

   c. Locate exhaust outlets from contaminated areas above roof level to minimize recirculation of exhausted air.

6. Maintain air intakes and inspect filters periodically to ensure proper operation.[3, 120, 249, 250, 273–275, 277]   *Category IC*   (AIA: 7.31.D8)

7. Bag dust-filled filters immediately upon removal to prevent dispersion of dust and fungal spores during transport within the facility.[106, 221]   *Category IB*

   a. Seal or close the bag containing the discarded filter.

   b. Discard spent filters as regular solid waste, regardless of the area from which they were removed.[221]

8. Remove bird roosts and nests near air intakes to prevent mites and fungal spores from entering the ventilation system.[3, 98, 119]   *Category IB*

9. Prevent dust accumulation by cleaning air-duct grilles in accordance with facility-specific procedures and schedules when rooms are not occupied by patients.[21, 120, 249, 250, 273–275, 277]   *Category IC, II*   (AIA: 7.31.D10)

10. Periodically measure output to monitor system function; clean ventilation ducts as part of routine HVAC maintenance to ensure optimum performance.[120, 263, 264]
    *Category II*  (AIA: 7.31 D10)

C. Use portable, industrial-grade HEPA filter units capable of filtration rates in the range of 300–800 ft³/min. to augment removal of respirable particles as needed.[219]  *Category II*

1. Select portable HEPA filters that can recirculate all or nearly all of the room air and provide the equivalent of $\geq$12 ACH.[4]  *Category II*

2. Portable HEPA filter units previously placed in construction zones can be used later in patient-care areas, provided all internal and external surfaces are cleaned, and the filter's performance verified by appropriate particle testing.  *Category II*

3. Situate portable HEPA units with the advice of facility engineers to ensure that all room air is filtered.[4]  *Category II*

4. Ensure that fresh-air requirements for the area are met.[214, 219]  *Category II*

D. Follow appropriate procedures for use of areas with through-the-wall ventilation units.[120]
    *Category IC*  (AIA: 8.31.D1, 8.31.D8, 9.31.D23, 10.31.D18, 11.31.D15)

1. Do not use such areas as PE rooms.[120]  *Category IC*  (AIA: 7.2.D3)

2. Do not use a room with a through-the-wall ventilation unit as an AII room unless it can be demonstrated that all required AII engineering controls required are met.[4, 120]
    *Category IC*  (AIA: 7.2.C3)

E. Conduct an infection-control risk assessment (ICRA) and provide an adequate number of AII and PE rooms (if required) or other areas to meet the needs of the patient population.[4, 6, 9, 18, 19, 69, 94, 120, 142, 331–334, 336–338]  *Category IA, IC*  (AIA: 7.2.C, 7.2.D)

F. When UVGI is used as a supplemental engineering control, install fixtures 1) on the wall near the ceiling or suspended from the ceiling as an upper air unit; 2) in the air-return duct of an AII room; or 3) in designated enclosed areas or booths for sputum induction.[4]
    *Category II*

G. Seal windows in buildings with centralized HVAC systems and especially with PE areas.[35, 111, 120]  *Category IB, IC*  (AIA: 7.2.D3)

H. Keep emergency doors and exits from PE rooms closed except during an emergency; equip emergency doors and exits with alarms.  *Category II*

I. Develop a contingency plan for backup capacity in the event of a general power failure.[713]
    *Category IC*  (Joint Commission on Accreditation of Healthcare Organizations [JCAHO]: Environment of Care [EC] 1.4)

1. Emphasize restoration of proper air quality and ventilation conditions in AII rooms, PE rooms, operating rooms, emergency departments, and intensive care units.[120, 713]
    *Category IC*  (AIA: 1.5.A1; JCAHO: EC 1.4)

2. Deploy infection-control procedures to protect occupants until power and systems functions are restored.[6, 120, 713]  *Category IC*  (AIA: 5.1, 5.2; JCAHO: EC 1.4)

J. Do not shut down HVAC systems in patient-care areas except for maintenance, repair, testing of emergency backup capacity, or new construction.[120, 206]  *Category IB, IC*  (AIA: 5.1, 5.2.B, C)

1. Coordinate HVAC system maintenance with infection-control staff to allow for relocation of immunocompromised patients if necessary.[120]  *Category IC*  (AIA: 5.1, 5.2)

2. Provide backup emergency power and air-handling and pressurization systems to maintain filtration, constant ACH, and pressure differentials in PE rooms, AII rooms, operating rooms, and other critical-care areas.[9, 120, 278]  *Category IC*  (AIA: 1.5, 5.1, 5.2)

3. For areas not served by installed emergency ventilation and backup systems, use portable units and monitor ventilation parameters and patients in those areas.[219]
    *Category II*

4. Coordinate system startups with infection-control staff to protect patients in PE rooms from bursts of fungal spores.[9, 35, 120, 278]  *Category IC*  (AIA: 5.1, 5.2)

5. Allow sufficient time for ACH to clean the air once the system is operational (Appendix B, Table B.1).[4, 120] *Category IC* (AIA: 5.1, 5.2)

K. HVAC systems serving offices and administration areas may be shut down for energy conservation purposes, but the shutdown must not alter or adversely affect pressure differentials maintained in laboratories or critical-care areas with specific ventilation requirements (i.e., PE rooms, AII rooms, operating rooms). *Category II*

L. Whenever possible, avoid inactivating or shutting down the entire HVAC system at one time, especially in acute-care facilities. *Category II*

M. Whenever feasible, design and install fixed backup ventilation systems for new or renovated construction for PE rooms, AII rooms, operating rooms, and other critical care areas identified by ICRA.[120] *Category IC* (AIA: 1.5.A1)

## II. Construction, Renovation, Remediation, Repair, and Demolition

A. Establish a multidisciplinary team that includes infection-control staff to coordinate demolition, construction, and renovation projects and consider proactive preventive measures at the inception; produce and maintain summary statements of the team's activities.[17, 19, 20, 97, 109, 120, 249, 250, 273–277] *Category IB, IC* (AIA: 5.1)

B. Educate both the construction team and the health-care staff in immunocompromised patient-care areas regarding the airborne infection risks associated with construction projects, dispersal of fungal spores during such activities, and methods to control the dissemination of fungal spores.[3, 249, 250, 273–277, 1428–1432] *Category IB*

C. Incorporate mandatory adherence agreements for infection control into construction contracts, with penalties for noncompliance and mechanisms to ensure timely correction of problems.[3, 120, 249, 273–277] *Category IC* (AIA: 5.1)

D. Establish and maintain surveillance for airborne environmental disease (e.g., aspergillosis) as appropriate during construction, renovation, repair, and demolition activities to ensure the health and safety of immunocompromised patients.[3, 64, 65, 79] *Category IB*

1. Using active surveillance, monitor for airborne fungal infections in immunocompromised patients.[3, 9, 64, 65] *Category IB*

2. Periodically review the facility's microbiologic, histopathologic, and postmortem data to identify additional cases.[3, 9, 64, 65] *Category IB*

3. If cases of aspergillosis or other health-care–associated airborne fungal infections occur, aggressively pursue the diagnosis with tissue biopsies and cultures as feasible.[3, 64, 65, 79, 249, 273–277] *Category IB*

E. Implement infection-control measures relevant to construction, renovation, maintenance, demolition, and repair.[96, 97, 120, 276, 277] *Category IB, IC* (AIA: 5.1, 5.2)

1. Before the project gets underway, perform an ICRA to define the scope of the project and the need for barrier measures.[96, 97, 120, 249, 273–277] *Category IB, IC* (AIA: 5.1)

   a. Determine if immunocompromised patients may be at risk for exposure to fungal spores from dust generated during the project.[20, 109, 273–275, 277]

   b. Develop a contingency plan to prevent such exposures.[20, 109, 273–275, 277]

2. Implement infection-control measures for external demolition and construction activities.[50, 249, 273–277, 283] *Category IB*

   a. Determine if the facility can operate temporarily on recirculated air; if feasible, seal off adjacent air intakes.

   b. If this is not possible or practical, check the low-efficiency (roughing) filter banks frequently and replace as needed to avoid buildup of particulates.

   c. Seal windows and reduce wherever possible other sources of outside air intrusion (e.g., open doors in stairwells and corridors), especially in PE areas.

3. Avoid damaging the underground water distribution system (i.e., buried pipes) to prevent soil and dust contamination of the water.[120, 305] *Category IB, IC* (AIA: 5.1)

4.  Implement infection-control measures for internal construction activities.[20, 49, 97, 120, 249, 273–277] *Category IB, IC* (AIA: 5.1, 5.2)

    a.  Construct barriers to prevent dust from construction areas from entering patient-care areas; ensure that barriers are impermeable to fungal spores and in compliance with local fire codes.[20, 49, 97, 120, 284, 312, 713, 1431]

    b.  Block and seal off return air vents if rigid barriers are used for containment.[120, 276, 277]

    c.  Implement dust control measures on surfaces and by diverting pedestrian traffic away from work zones.[20, 49, 97, 120]

    d.  Relocate patients whose rooms are adjacent to work zones, depending upon their immune status, the scope of the project, the potential for generation of dust or water aerosols, and the methods used to control these aerosols.[49, 120, 281]

5.  Perform those engineering and work-site related infection-control measures as needed for internal construction, repairs, and renovations:[20, 49, 97, 109, 120, 312] *Category IB, IC* (AIA: 5.1, 5.2)

    a.  Ensure proper operation of the air-handling system in the affected area after erection of barriers and before the room or area is set to negative pressure.[49, 69, 276, 278] *Category IB*

    b.  Create and maintain negative air pressure in work zones adjacent to patient-care areas and ensure that required engineering controls are maintained.[20, 49, 97, 109, 120, 312]

    c.  Monitor negative air flow inside rigid barriers.[120, 281]

    d.  Monitor barriers and ensure the integrity of the construction barriers; repair gaps or breaks in barrier joints.[120, 284, 307, 312]

    e.  Seal windows in work zones if practical; use window chutes for disposal of large pieces of debris as needed, but ensure that the negative pressure differential for the area is maintained.[20, 120, 273]

    f.  Direct pedestrian traffic from construction zones away from patient-care areas to minimize the dispersion of dust.[20, 49, 97, 109, 111, 120, 273–277]

    g.  Provide construction crews with 1) designated entrances, corridors, and elevators whenever practical; 2) essential services [e.g., toilet facilities], and convenience services [e.g., vending machines]; 3) protective clothing [e.g., coveralls, footgear, and headgear] for travel to patient-care areas; and 4) a space or anteroom for changing clothing and storing equipment.[120, 249, 273–277]

    h.  Clean work zones and their entrances daily by 1) wet-wiping tools and tool carts before their removal from the work zone; 2) placing mats with tacky surfaces inside the entrance; and 3) covering debris and securing this covering before removing debris from the work zone.[120, 249, 273–277]

    i.  In patient-care areas, for major repairs that include removal of ceiling tiles and disruption of the space above the false ceiling, use plastic sheets or prefabricated plastic units to contain dust; use a negative pressure system within this enclosure to remove dust; and either pass air through an industrial grade, portable HEPA filter capable of filtration rates ranging from 300–800 ft³/min., or exhaust air directly to the outside.[49, 276, 277, 281, 309]

    j.  Upon completion of the project, clean the work zone according to facility procedures, and install barrier curtains to contain dust and debris before removal of rigid barriers.[20, 97, 120, 249, 273–277]

    k.  Flush the water system to clear sediment from pipes to minimize waterborne microorganism proliferation.[120, 305]

    l.  Restore appropriate ACH, humidity, and pressure differential; clean or replace air filters; dispose of spent filters.[35, 106, 221, 278]

F. Use airborne-particle sampling as a tool to evaluate barrier integrity.[35, 100] *Category II*

G. Commission the HVAC system for newly constructed health-care facilities and renovated spaces before occupancy and use, with emphasis on ensuring proper ventilation for operating rooms, AII rooms, and PE areas.[100, 120, 288, 304] *Category IC* (AIA: 5.1; ASHRAE: 1-1996)

H. **No recommendation is offered** on routine microbiologic air sampling before, during, or after construction or before or during occupancy of areas housing immunocompromised patients.[17, 20, 49, 97, 109, 272, 1433] *Unresolved issue*

I. If a case of health-care–acquired aspergillosis or other opportunistic environmental airborne fungal disease occurs during or immediately after construction, implement appropriate follow-up measures.[20, 55, 62, 77, 94, 95] *Category IB*

   1. Review pressure differential monitoring documentation to verify that pressure differentials in the construction zone and in PE rooms were appropriate for their settings.[94, 95, 120] *Category IB, IC* (AIA: 5.1)

   2. Implement corrective engineering measures to restore proper pressure differentials as needed.[94, 95, 120] *Category IB, IC* (AIA: 5.1)

   3. Conduct a prospective search for additional cases and intensify retrospective epidemiologic review of the hospital's medical and laboratory records.[3, 20, 62, 63, 104] *Category IB*

   4. If there is no evidence of ongoing transmission, continue routine maintenance in the area to prevent health-care–acquired fungal disease.[3, 55] *Category IB*

J. If there is epidemiologic evidence of ongoing transmission of fungal disease, conduct an environmental assessment to determine and eliminate the source.[3, 96, 97, 109, 111, 115, 249, 273–277] *Category IB*

   1. Collect environmental samples from potential sources of airborne fungal spores, preferably using a high-volume air sampler rather than settle plates.[3, 18, 44, 48, 49, 97, 106, 111, 112, 115, 249, 254, 273–277, 292, 312] *Category IB*

   2. If either an environmental source of airborne fungi or an engineering problem with filtration or pressure differentials is identified, promptly perform corrective measures to eliminate the source and route of entry.[96, 97] *Category IB*

   3. Use an EPA-registered anti-fungal biocide (e.g., copper-8-quinolinolate) for decontaminating structural materials.[50, 277, 312, 329] *Category IB*

   4. If an environmental source of airborne fungi is not identified, review infection control measures, including engineering controls, to identify potential areas for correction or improvement.[73, 117] *Category IB*

   5. If possible, perform molecular subtyping of *Aspergillus* spp. isolated from patients and the environment to establish strain identities.[252, 293–296] *Category II*

K. If air-supply systems to high-risk areas (e.g., PE rooms) are not optimal, use portable, industrial-grade HEPA filters on a temporary basis until rooms with optimal air-handling systems become available.[3, 120, 273–277] *Category II*

## III. Infection-Control and Ventilation Requirements for PE Rooms

A. Minimize exposures of severely immunocompromised patients (e.g., solid organ transplant patients or allogeneic neutropenic patients) to activities that might cause aerosolization of fungal spores (e.g., vacuuming or disruption of ceiling tiles).[9, 20, 109, 272] *Category IB*

B. Minimize the length of time that immunocompromised patients in PE are outside their rooms for diagnostic procedures and other activities.[9, 283] *Category IB*

C. Provide respiratory protection for severely immunocompromised patients when they must leave PE for diagnostic studies and other activities; consult the most recent revision of CDC's *Guidelines for Prevention of Health-Care–Associated Pneumonia* for information regarding the appropriate type of respiratory protection.[3, 9] *Category II*

D. Incorporate ventilation engineering specifications and dust-controlling processes into the planning and construction of new PE units. *Category IB, IC*

    1. Install central or point-of-use HEPA filters for supply (incoming) air.[3, 18, 20, 44, 99–104, 120, 254, 316–318, 1432, 1434] *Category IB, IC* (AIA: 5.1, 5.2, 7.2.D)

    2. Ensure that rooms are well sealed by 1) properly constructing windows, doors, and intake and exhaust ports; 2) maintaining ceilings that are smooth and free of fissures, open joints, and crevices; 3) sealing walls above and below the ceiling, and 4) monitoring for leakage and making necessary repairs.[3, 111, 120, 317, 318] *Category IB, IC* (AIA: 7.2.D3)

    3. Ventilate the room to maintain $\geq$12 ACH.[3, 9, 120, 241, 317, 318] *Category IC* (AIA: 7.2.D)

    4. Locate air supply and exhaust grilles so that clean, filtered air enters from one side of the room, flows across the patient's bed, and exits from the opposite side of the room.[3, 120, 317, 318] *Category IC* (AIA: 7.31.D1)

    5. Maintain positive room air pressure ($\geq$2.5 Pa [0.01-inch water gauge]) in relation to the corridor.[3, 35, 120, 317, 318] *Category IB, IC* (AIA: Table 7.2)

    6. Maintain airflow patterns and monitor these on a daily basis by using permanently installed visual means of detecting airflow in new or renovated construction, or using other visual methods (e.g., flutter strips, or smoke tubes) in existing PE units. Document the monitoring results.[120, 273] *Category IC* (AIA: 7.2.D6)

    7. Install self-closing devices on all room exit doors in protective environments.[120] *Category IC* (AIA: 7.2.D4)

E. Do not use laminar air flow systems in newly constructed PE rooms.[316, 318] *Category II*

F. Take measures to protect immunocompromised patients who would benefit from a PE room and who also have an airborne infectious disease (e.g., acute VZV infection or tuberculosis).

    1. Ensure that the patient's room is designed to maintain positive pressure.

    2. Use an anteroom to ensure appropriate air balance relationships and provide independent exhaust of contaminated air to the outside, or place a HEPA filter in the exhaust duct if the return air must be recirculated.[120, 317] *Category IC* (AIA: 7.2.D1, A7.2.D)

    3. If an anteroom is not available, place the patient in AII and use portable, industrial-grade HEPA filters to enhance filtration of spores in the room.[219] *Category II*

G. Maintain backup ventilation equipment (e.g., portable units for fans or filters) for emergency provision of ventilation requirements for PE areas and take immediate steps to restore the fixed ventilation system function.[9, 120, 278] *Category IC* (AIA: 5.1)

## IV. Infection-Control and Ventilation Requirements for AII Rooms

A. Incorporate certain specifications into the planning, and construction or renovation of AII units.[4, 107, 120, 317, 318] *Category IB, IC*

    1. Maintain continuous negative air pressure (2.5 Pa [0.01-inch water gauge]) in relation to the air pressure in the corridor; monitor air pressure periodically, preferably daily, with audible manometers or smoke tubes at the door (for existing AII rooms) or with a permanently installed visual monitoring mechanism. Document the results of monitoring.[120, 317, 318] *Category IB, IC* (AIA: 7.2.C7, Table 7.2)

    2. Ensure that rooms are well-sealed by properly constructing windows, doors, and air-intake and exhaust ports; when monitoring indicates air leakage, locate the leak and make necessary repairs.[120, 317, 318] *Category IB, IC* (AIA: 7.2.C3)

    3. Install self-closing devices on all AII room exit doors.[120] *Category IC* (AIA: 7.2.C4)

    4. Provide ventilation to ensure $\geq$12 ACH for renovated rooms and new rooms, and $\geq$6 ACH for existing AII rooms.[4, 107, 120] *Category IC* (AIA: Table 7.2)

    5.    Direct exhaust air to the outside, away from air-intake and populated areas. If this is not practical, air from the room can be recirculated after passing through a HEPA filter.[4, 120]   *Category IC*  (AIA: Table 7.2)

B.    Where supplemental engineering controls for air cleaning are indicated from a risk assessment of the AII area, install UVGI units in the exhaust air ducts of the HVAC system to supplement HEPA filtration or install UVGI fixtures on or near the ceiling to irradiate upper room air.[4]   *Category II*

C.    Implement environmental infection-control measures for persons with known or suspected airborne infectious diseases.

    1.    Use AII rooms for patients with or suspected of having an airborne infection who also require cough-inducing procedures, or use an enclosed booth that is engineered to provide 1) $\geq$12 ACH; 2) air supply and exhaust rate sufficient to maintain a 2.5 Pa [0.01-inch water gauge] negative pressure difference with respect to all surrounding spaces with an exhaust rate of $\geq$50 ft$^3$/min.; and 3) air exhausted directly outside away from air intakes and traffic or exhausted after HEPA filtration prior to recirculation.[4, 120, 348–350]   *Category IB, IC*  (AIA: 7.15.E, 7.31.D23, 9.10, Table 7.2)

    2.    Although airborne spread of viral hemorrhagic fever (VHF) has not been documented in a health-care setting, prudence dictates placing a VHF patient in an AII room, preferably with an anteroom to reduce the risk of occupational exposure to aerosolized infectious material in blood, vomitus, liquid stool, and respiratory secretions present in large amounts during the end stage of a patient's illness.[202–204]   *Category II*

        a.    If an anteroom is not available, use portable, industrial-grade HEPA filters in the patient's room to provide additional ACH equivalents for removing airborne particulates.

        b.    Ensure that health-care workers wear face shields or goggles with appropriate respirators when entering the rooms of VHF patients with prominent cough, vomiting, diarrhea, or hemorrhage.[203]

    3.    Place smallpox patients in negative pressure rooms at the onset of their illness, preferably using a room with an anteroom if available.[6]   *Category II*

D.    **No recommendation is offered** regarding negative pressure or isolation rooms for patients with *Pneumocystis carinii* pneumonia.[126, 131, 132]   *Unresolved issue*

E.    Maintain back-up ventilation equipment (e.g., portable units for fans or filters) for emergency provision of ventilation requirements for AII rooms and take immediate steps to restore the fixed ventilation system function.[4, 120, 278]   *Category IC*  (AIA: 5.1)

**V.**    **Infection-Control and Ventilation Requirements for Operating Rooms**

A.    Implement environmental infection-control and ventilation measures for operating rooms.

    1.    Maintain positive-pressure ventilation with respect to corridors and adjacent areas.[7, 120, 356]   *Category IB, IC*  (AIA: Table 7.2)

    2.    Maintain $\geq$15 ACH, of which $\geq$3 ACH should be fresh air.[120, 357, 358]   *Category IC* (AIA: Table 7.2)

    3.    Filter all recirculated and fresh air through the appropriate filters, providing 90% efficiency (dust-spot testing) at a minimum.[120, 362]   *Category IC*  (AIA: Table 7.3)

    4.    In rooms not engineered for horizontal laminar airflow, introduce air at the ceiling and exhaust air near the floor.[120, 357, 359]   *Category IC*  (AIA: 7.31.D4)

    5.    Do not use UV lights to prevent surgical-site infections.[356, 364–370]   *Category IB*

    6.    Keep operating room doors closed except for the passage of equipment, personnel, and patients, and limit entry to essential personnel.[351, 352]   *Category IB*

B.    Follow precautionary procedures for TB patients who also require emergency surgery.[4, 347, 371]   *Category IB, IC*

1. Use an N95 respirator approved by the National Institute for Occupational Safety and Health (NIOSH) without exhalation valves in the operating room.[347, 372] *Category IC* (Occupational Safety and Health Administration [OSHA]; 29 Code of Federal Regulations [CFR] 1910.134,139)

2. Intubate the patient in either the AII room or the operating room; if intubating the patient in the operating room, do not allow the doors to open until 99% of the airborne contaminants are removed (Appendix B, Table B.1).[4, 358] *Category IB*

3. When anesthetizing a patient with confirmed or suspected TB, place a bacterial filter between the anesthesia circuit and patient's airway to prevent contamination of anesthesia equipment or discharge of tubercle bacilli into the ambient air.[371, 373] *Category IB*

4. Extubate and allow the patient to recover in an AII room.[4, 358] *Category IB*

5. If the patient has to be extubated in the operating room, allow adequate time for ACH to clean 99% of airborne particles from the air (Appendix B, Table B.1) because extubation is a cough-producing procedure.[4, 358] *Category IB*

C. Use portable, industrial-grade HEPA filters temporarily for supplemental air cleaning during intubation and extubation for infectious TB patients who require surgery.[4, 219, 358] *Category II*

1. Position the units appropriately so that all room air passes through the filter; obtain engineering consultation to determine the appropriate placement of the unit.[4] *Category II*

2. Switch the portable unit off during the surgical procedure. *Category II*

3. Provide fresh air as per ventilation standards for operating rooms; portable units do not meet the requirements for the number of fresh ACH.[120, 215, 219] *Category II*

D. If possible, schedule infectious TB patients as the last surgical cases of the day to maximize the time available for removal of airborne contamination. *Category II*

E. **No recommendation is offered** for performing orthopedic implant operations in rooms supplied with laminar airflow.[362, 364] *Unresolved issue*

F. Maintain backup ventilation equipment (e.g., portable units for fans or filters) for emergency provision of ventilation requirements for operating rooms, and take immediate steps to restore the fixed ventilation system function.[68, 120, 278, 372] *Category IB, IC* (AIA: 5.1)

### VI. Other Potential Infectious Aerosol Hazards in Health-Care Facilities

A. In settings where surgical lasers are used, wear appropriate personal protective equipment, including N95 or N100 respirators, to minimize exposure to laser plumes.[347, 378, 389] *Category IC* (OSHA; 29 CFR 1910.134,139)

B. Use central wall suction units with in-line filters to evacuate minimal laser plumes.[378, 382, 386, 389] *Category II*

C. Use a mechanical smoke evacuation system with a high-efficiency filter to manage the generation of large amounts of laser plume, when ablating tissue infected with human papilloma virus (HPV) or performing procedures on a patient with extrapulmonary TB.[4, 382, 389–392] *Category II*

# D. Recommendations—Water

### I. Controlling the Spread of Waterborne Microoganisms

A. Practice hand hygiene to prevent the hand transfer of waterborne pathogens, and use barrier precautions (e.g., gloves) as defined by other guidelines.[6, 464, 577, 586, 592, 1364] *Category IA*

126

B. Eliminate contaminated water or fluid environmental reservoirs (e.g., in equipment or solutions) wherever possible.[464, 465] *Category IB*

C. Clean and disinfect sinks and wash basins on a regular basis by using an EPA-registered product as set by facility policies. *Category II*

D. Evaluate for possible environmental sources (e.g., potable water) of specimen contamination when waterborne microorganisms (e.g., NTM) of unlikely clinical importance are isolated from clinical cultures (e.g., specimens collected aseptically from sterile sites or, if post-procedural, colonization occurs after use of tap water in patient care).[607, 610–612] *Category IB*

E. Avoid placing decorative fountains and fish tanks in patient-care areas; ensure disinfection and fountain maintenance if decorative fountains are used in the public areas of the health-care facility.[664] *Category IB*

II. **Routine Prevention of Waterborne Microbial Contamination Within the Distribution System**

A. Maintain hot water temperature at the return at the highest temperature allowable by state regulations or codes, preferably ≥124°F (≥51°C), and maintain cold water temperature at <68°F (<20°C).[3, 661] *Category IC* (States; ASHRAE: 12:2000)

B. If the hot water temperature can be maintained at ≥124°F (≥51°C), explore engineering options (e.g., install preset thermostatic valves in point-of-use fixtures) to help minimize the risk of scalding.[661] *Category II*

C. When state regulations or codes do not allow hot water temperatures above the range of 105°F–120°F (40.6°C–49°C) for hospitals or 95°F–110°F (35°C–43.3°C) for nursing care facilities or when buildings cannot be retrofitted for thermostatic mixing valves, follow either of these alternative preventive measures to minimize the growth of *Legionella* spp. in water systems. *Category II*

    1. Periodically increase the hot water temperature to ≥150°F (≥66°C) at the point of use.[661] *Category II*

    2. Alternatively, chlorinate the water and then flush it through the system.[661, 710, 711] *Category II*

D. Maintain constant recirculation in hot-water distribution systems serving patient-care areas.[120] *Category IC* (AIA: 7.31.E.3)

III. **Remediation Strategies for Distribution System Repair or Emergencies**

A. Whenever possible, disconnect the ice machine before planned water disruptions. *Category II*

B. Prepare a contingency plan to estimate water demands for the entire facility in advance of significant water disruptions (i.e., those expected to result in extensive and heavy microbial or chemical contamination of the potable water), sewage intrusion, or flooding.[713, 719] *Category IC* (JCAHO: EC 1.4)

C. When a significant water disruption or an emergency occurs, adhere to any advisory to boil water issued by the municipal water utility.[642] *Category IB, IC* (Municipal order)

    1. Alert patients, families, staff, and visitors not to consume water from drinking fountains, ice, or drinks made from municipal tap water, while the advisory is in effect, unless the water has been disinfected (e.g., by bringing to a rolling boil for ≥1 minute).[642] *Category IB, IC* (Municipal order)

    2. After the advisory is lifted, run faucets and drinking fountains at full flow for ≥5 minutes, or use high-temperature water flushing or chlorination.[642, 661] *Category IC, II* (Municipal order; ASHRAE 12:2000)

D. Maintain a high level of surveillance for waterborne disease among patients after a boil water advisory is lifted. *Category II*

E. Corrective decontamination of the hot water system might be necessary after a disruption in service or a cross-connection with sewer lines has occurred.
  1. Decontaminate the system when the fewest occupants are present in the building (e.g., nights or weekends).[3, 661] *Category IC* (ASHRAE: 12:2000)
  2. If using high-temperature decontamination, raise the hot-water temperature to 160°F–170°F (71°C–77°C) and maintain that level while progressively flushing each outlet around the system for ≥5 minutes.[3, 661] *Category IC* (ASHRAE: 12:2000)
  3. If using chlorination, add enough chlorine, preferably overnight, to achieve a free chlorine residual of ≥2 mg/L (≥2 ppm) throughout the system.[661] *Category IC* (ASHRAE: 12:2000)
     a. Flush each outlet until chlorine odor is detected.
     b. Maintain the elevated chlorine concentration in the system for ≥2 hrs (but ≤24 hrs).
  4. Use a very thorough flushing of the water system instead of chlorination if a highly chlorine-resistant microorganism (e.g., *Cryptosporidium* spp.) is suspected as the water contaminant. *Category II*
F. Flush and restart equipment and fixtures according to manufacturers' instructions. *Category II*
G. Change the pretreatment filter and disinfect the dialysis water system with an EPA-registered product to prevent colonization of the reverse osmosis membrane and downstream microbial contamination.[721] *Category II*
H. Run water softeners through a regeneration cycle to restore their capacity and function. *Category II*
I. If the facility has a water-holding reservoir or water-storage tank, consult the facility engineer or local health department to determine whether this equipment needs to be drained, disinfected with an EPA-registered product, and refilled. *Category II*
J. Implement facility management procedures to manage a sewage system failure or flooding (e.g., arranging with other health-care facilities for temporary transfer of patients or provision of services), and establish communications with the local municipal water utility and the local health department to ensure that advisories are received in a timely manner upon release.[713, 719] *Category IC* (JCAHO: EC 1.4; Municipal order)
K. Implement infection-control measures during sewage intrusion, flooding, or other water-related emergencies.
  1. Relocate patients and clean or sterilize supplies from affected areas. *Category II*
  2. If hands are not visibly soiled or contaminated with proteinaceous material, include an alcohol-based hand rub in the hand hygiene process 1) before performing invasive procedures; 2) before and after each patient contact; and 3) whenever hand hygiene is indicated.[1364] *Category II*
  3. If hands are visibly soiled or contaminated with proteinaceous material, use soap and bottled water for handwashing.[1364] *Category II*
  4. If the potable water system is not affected by flooding or sewage contamination, process surgical instruments for sterilization according to standard procedures. *Category II*
  5. Contact the manufacturer of the automated endoscope reprocessor (AER) for specific instructions on the use of this equipment during a water advisory. *Category II*
L. Remediate the facility after sewage intrusion, flooding, or other water-related emergencies.
  1. Close off affected areas during cleanup procedures. *Category II*
  2. Ensure that the sewage system is fully functional before beginning remediation so contaminated solids and standing water can be removed. *Category II*

128

3. If hard-surface equipment, floors, and walls remain in good repair, ensure that these are dry within 72 hours; clean with detergent according to standard cleaning procedures. *Category II*

4. Clean wood furniture and materials (if still in good repair); allow them to dry thoroughly before restoring varnish or other surface coatings. *Category II*

5. Contain dust and debris during remediation and repair as outlined in air recommendations (Air: II G 4, 5). *Category II*

M. Regardless of the original source of water damage (e.g., flooding versus water leaks from point-of-use fixtures or roofs), remove wet, absorbent structural items (e.g., carpeting, wallboard, and wallpaper) and cloth furnishings if they cannot be easily and thoroughly cleaned and dried within 72 hours (e.g., moisture content ≤20% as determined by moisture meter readings); replace with new materials as soon as the underlying structure is declared by the facility engineer to be thoroughly dry.[18, 266, 278, 1026] *Category IB*

## IV. Additional Engineering Measures as Indicated by Epidemiologic Investigation for Controlling Waterborne, Health-Care–Associated Legionnaires Disease

A. When using a pulse or one-time decontamination method, superheat the water by flushing each outlet for ≥5 minutes with water at 160°F–170°F (71°C–77°C) or hyperchlorinate the system by flushing all outlets for ≥5 minutes with water containing ≥2 mg/L (≥2 ppm) free residual chlorine using a chlorine-based product registered by the EPA for water treatment (e.g., sodium hypochlorite [chlorine bleach]).[661, 711, 714, 724, 764, 766] *Category IB* (ASHRAE: 12:2000)

B. After a pulse treatment, maintain both the heated water temperature at the return and the cold water temperature as per the recommendation (Water: IIA) wherever practical and permitted by state codes, or chlorinate heated water to achieve 1–2 mg/L (1–2 ppm) free residual chlorine at the tap using a chlorine-based product registered by the EPA for water treatment (e.g., sodium hypochlorite [bleach]).[26, 437, 661, 709, 726, 727] *Category IC* (States; ASHRAE: 12:2000)

C. Explore engineering or educational options (e.g., install preset thermostatic mixing valves in point-of-use fixtures or post warning signs at each outlet) to minimize the risk of scalding for patients, visitors, and staff. *Category II*

D. **No recommendation is offered** for treating water in the facility's distribution system with chlorine dioxide, heavy-metal ions (e.g., copper or silver), monochloramine, ozone, or UV light.[728–746] *Unresolved issue*

## V. General Infection-Control Strategies for Preventing Legionnaires Disease

A. Conduct an infection-control risk assessment of the facility to determine if patients at risk or severely immunocompromised patients are present.[3, 431, 432] *Category IB*

B. Implement general strategies for detecting and preventing Legionnaires disease in facilities that do not provide care for severely immunocompromised patients (i.e., facilities that do not have HSCT or solid organ transplant programs).[3, 431, 432] *Category IB*

1. Establish a surveillance process to detect health-care–associated Legionnaires disease.[3, 431, 432] *Category IB*

2. Inform health-care personnel (e.g., infection control, physicians, patient-care staff, and engineering) regarding the potential for Legionnaires disease to occur and measures to prevent and control health-care–associated legionellosis.[437, 759] *Category IB*

3. Establish mechanisms to provide clinicians with laboratory tests (e.g., culture, urine antigen, direct fluorescence assay [DFA], and serology) for the diagnosis of Legionnaires disease.[3, 431] *Category IB*

C.  Maintain a high index of suspicion for health-care–associated Legionnaires disease, and perform laboratory diagnostic tests for legionellosis on suspected cases, especially in patients at risk who do not require a PE for care (e.g., patients receiving systemic steroids; patients aged ≥65 years; or patients with chronic underlying disease [e.g., diabetes mellitus, congestive heart failure, or chronic obstructive lung disease]).[3, 395, 417, 423–425, 432, 435, 437, 453] *Category IA*

D.  Periodically review the availability and clinicians' use of laboratory diagnostic tests for Legionnaires disease in the facility; if clinicians' use of the tests on patients with diagnosed or suspected pneumonia is limited, implement measures (e.g., an educational campaign) to enhance clinicians' use of the test(s).[453] *Category IB*

E.  If one case of laboratory-confirmed, health-care–associated Legionnaires disease is identified, or if two or more cases of laboratory-suspected, health-care–associated Legionnaires disease occur during a 6-month period, certain activities should be initiated.[405, 408, 431, 453, 739, 759] *Category IB*

  1.  Report the cases to the state and local health departments where required. *Category IC* (States)

  2.  If the facility does not treat severely immunocompromised patients, conduct an epidemiologic investigation, including retrospective review of microbiologic, serologic, and postmortem data to look for previously unidentified cases of health-care–associated Legionnaires disease, and begin intensive prospective surveillance for additional cases.[3, 405, 408, 431, 453, 739, 759] *Category IB*

  3.  If no evidence of continued health-care–associated transmission exists, continue intensive prospective surveillance for ≥2 months after the initiation of surveillance.[3, 405, 408, 431, 453, 739, 759] *Category IB*

F.  If there is evidence of continued health-care–associated transmission (i.e., an outbreak), conduct an environmental assessment to determine the source of *Legionella* spp.[403–410, 455] *Category IB*

  1.  Collect water samples from potential aerosolized water sources (Appendix C).[1209] *Category IB*

  2.  Save and subtype isolates of *Legionella* spp. obtained from patients and the environment.[403–410, 453, 763, 764] *Category IB*

  3.  If a source is identified, promptly institute water system decontamination measures per recommendations (see Water IV).[766, 767] *Category IB*

  4.  If *Legionella* spp. are detected in ≥1 cultures (e.g., conducted at 2-week intervals during 3 months), reassess the control measures, modify them accordingly, and repeat the decontamination procedures; consider intensive use of techniques used for initial decontamination, or a combination of superheating and hyperchlorination.[3, 767, 768] *Category IB*

G.  If an environmental source is not identified during a Legionnaires disease outbreak, continue surveillance for new cases for ≥2 months. Either defer decontamination pending identification of the source of *Legionella* spp., or proceed with decontamination of the hospital's water distribution system, with special attention to areas involved in the outbreak. *Category II*

H.  **No recommendation is offered** regarding routine culturing of water systems in health-care facilities that do not have patient-care areas (i.e., PE or transplant units) for persons at high risk for *Legionella* spp. infection.[26, 453, 707, 709, 714, 747, 753] *Unresolved issue*

I.  **No recommendation is offered** regarding the removal of faucet aerators in areas for immunocompetent patients. *Unresolved issue*

J.  Keep adequate records of all infection-control measures and environmental test results for potable water systems. *Category II*

130

**VI. Preventing Legionnaires Disease in Protective Environments and Transplant Units**

A. When implementing strategies for preventing Legionnaires disease among severely immunosuppressed patients housed in facilities with HSCT or solid-organ transplant programs, incorporate these specific surveillance and epidemiologic measures in addition to the steps previously outlined (Water: V and Appendix C).

    1. Maintain a high index of suspicion for legionellosis in transplant patients even when environmental surveillance cultures do not yield legionellae.[430, 431] *Category IB*

    2. If a case occurs in a severely immunocompromised patient, or if severely immunocompromised patients are present in high-risk areas of the hospital (e.g., PE or transplant units) and cases are identified elsewhere in the facility, conduct a combined epidemiologic and environmental investigation to determine the source of *Legionella* spp.[431, 767] *Category IB*

B. Implement culture strategies and potable water and fixture treatment measures in addition to those previously outlined (Water: V). *Category II*

    1. Depending on state regulations on potable water temperature in public buildings,[725] hospitals housing patients at risk for health-care–associated legionellosis should either maintain heated water with a minimum return temperature of $\geq124°F$ [$\geq51°C$] and cold water at <68°F [<20°C]), or chlorinate heated water to achieve 1–2 mg/L (1–2 ppm) of free residual chlorine at the tap.[26, 441, 661, 709–711, 726, 727] *Category II*

    2. Periodic culturing for legionellae in potable water samples from HSCT or solid-organ transplant units can be performed as part of a comprehensive strategy to prevent Legionnaires disease in these units.[9, 431, 710, 769] *Category II*

    3. **No recommendation is offered** regarding the optimal methodology (i.e., frequency or number of sites) for environmental surveillance cultures in HSCT or solid organ transplant units. *Unresolved issue*

    4. In areas with patients at risk, when *Legionella* spp. are not detectable in unit water, remove, clean, and disinfect shower heads and tap aerators monthly by using a chlorine-based, EPA-registered product. If an EPA-registered chlorine disinfectant is not available, use a chlorine bleach solution (500–615 ppm [1:100 v/v dilution]).[661, 745] *Category II*

C. If *Legionella* spp. are determined to be present in the water of a transplant unit, implement certain measures until *Legionella* spp. are no longer detected by culture.

    1. Decontaminate the water supply as outlined previously (Water: IV).[3, 9, 661, 766, 767] *Category IB*

    2. Do not use water from the faucets in patient-care rooms to avoid creating infectious aerosols.[9, 412] *Category IB*

    3. Restrict severely immunocompromised patients from taking showers.[9, 412] *Category IB*

    4. Use water that is not contaminated with *Legionella* spp. for HSCT patients' sponge baths.[9, 412] *Category IB*

    5. Provide patients with sterile water for tooth brushing, drinking, and for flushing nasogastric tubing during legionellosis outbreaks.[9, 412] *Category IB*

D. Do not use large-volume room air humidifiers that create aerosols (e.g., by Venturi principle, ultrasound, or spinning disk) unless they are subjected to high-level disinfection and filled only with sterile water.[3, 9, 402, 455] *Category IB*

**VII. Cooling Towers and Evaporative Condensers**

A. When planning construction of new health-care facilities, locate cooling towers so that the drift is directed away from the air-intake system, and design the towers to minimize the volume of aerosol drift.[404, 661, 786] *Category IC* (ASHRAE: 12:2000)

B.    Implement infection-control procedures for operational cooling towers.[404, 661, 784] *Category IC* (ASHRAE: 12:2000)

    1.   Install drift eliminators.[404, 661, 784] *Category IC* (ASHRAE: 12:2000)

    2.   Use an effective EPA-registered biocide on a regular basis.[661] *Category IC* (ASHRAE: 12:2000)

    3.   Maintain towers according to manufacturers' recommendations, and keep detailed maintenance and infection control records, including environmental test results from legionellosis outbreak investigations.[661] *Category IC* (ASHRAE: 12:2000)

C.    If cooling towers or evaporative condensers are implicated in health-care–associated legionellosis, decontaminate the cooling-tower system.[404, 405, 786, 787] *Category IB*

## VIII. Dialysis Water Quality and Dialysate

A.    Adhere to current AAMI standards for quality assurance performance of devices and equipment used to treat, store, and distribute water in hemodialysis centers (both acute and maintenance [chronic] settings) and for the preparation of concentrates and dialysate.[31, 32, 666–668, 789, 791, 800, 807, 809, 1454, 1455] *Category IA, IC* (AAMI: ANSI/AAMI RD5:1992, ANSI/AAMI RD 47:1993)

B.    **No recommendation is offered** regarding whether more stringent requirements for water quality should be imposed in hemofiltration and hemodiafiltration. *Unresolved issue*

C.    Conduct microbiological testing specific to water in dialysis settings.[789, 791, 792, 834, 835] *Category IA, IC* (AAMI: ANSI/AAMI RD 5: 1992, ANSI/AAMI RD 47: 1993, ANSI/AAMI RD 62:2001)

    1.   Perform bacteriologic assays of water and dialysis fluids at least once a month and during outbreaks using standard quantitative methods.[792, 834, 835] *Category IA, IC* (AAMI: ANSI/AAMI RD 62:2001)

       a.   Assay for heterotrophic, mesophilic bacteria (e.g., *Pseudomonas* spp).

       b.   Do not use nutrient-rich media (e.g., blood agar or chocolate agar).

    2.   In conjunction with microbiological testing, perform endotoxin testing on product water used to reprocess dialyzers for multiple use.[789, 791, 806, 811, 816, 829] *Category IA, IC* (AAMI: ANSI/AAMI RD 5:1992, ANSI/AAMI RD 47:1993)

    3.   Ensure that water does not exceed the limits for microbial counts and endotoxin concentrations outlined in Table 18.[789, 791, 800] *Category IA, IC* (AAMI: ANSI/AAMI RD 5:1992, ANSI/AAMI RD 47:1993)

D.    Disinfect water distribution systems in dialysis settings on a regular schedule. Monthly disinfection is recommended.[666–668, 792, 800] *Category IA, IC* (AAMI: ANSI/AAMI RD62:2001)

E.    Whenever practical, design and engineer water systems in dialysis settings to avoid incorporating joints, dead-end pipes, and unused branches and taps that can harbor bacteria.[666–668, 792, 800] *Category IA, IC* (AAMI: ANSI/AAMI RD62:2001)

F.    When storage tanks are used in dialysis systems, they should be routinely drained, disinfected with an EPA-registered product, and fitted with an ultrafilter or pyrogenic filter (membrane filter with a pore size sufficient to remove small particles and molecules ≥1 kilodalton) installed in the water line distal to the storage tank.[792] *Category IC* (AAMI: ANSI/AAMI RD62:2001)

## IX. Ice Machines and Ice

A.    Do not handle ice directly by hand, and wash hands before obtaining ice. *Category II*

B.    Use a smooth-surface ice scoop to dispense ice.[680, 863] *Category II*

    1.   Keep the ice scoop on a chain short enough the scoop cannot touch the floor, or keep the scoop on a clean, hard surface when not in use.[680, 863] *Category II*

    2.   Do not store the ice scoop in the ice bin. *Category II*

C.    Do not store pharmaceuticals or medical solutions on ice intended for consumption; use sterile ice to keep medical solutions cold, or use equipment specifically manufactured for this purpose.[600, 863] *Category IB*

D. Machines that dispense ice are preferred to those that require ice to be removed from bins or chests with a scoop.[687, 869]   *Category II*

E. Limit access to ice-storage chests, and keep the container doors closed except when removing ice.[863]   *Category II*

F. Clean, disinfect, and maintain ice-storage chests on a regular basis.   *Category II*
   1. Follow the manufacturer's instructions for cleaning.   *Category II*
   2. Use an EPA-registered disinfectant suitable for use on ice machines, dispensers, or storage chests in accordance with label instructions.   *Category II*
   3. If instructions and EPA-registered disinfectants suitable for use on ice machines are not available, use a general cleaning/disinfecting regimen as outlined in Box 12.[863]   *Category II*
   4. Flush and clean the ice machines and dispensers if they have not been disconnected before anticipated lengthy water disruptions.   *Category II*

G. Install proper air gaps where the condensate lines meet the waste lines.   *Category II*

H. Conduct microbiologic sampling of ice, ice chests, and ice-making machines and dispensers where indicated during an epidemiologic investigation.[861–863]   *Category IB*


**X. Hydrotherapy Tanks and Pools**

A. Drain and clean hydrotherapy equipment (e.g., Hubbard tanks, tubs, whirlpools, whirlpool spas, or birthing tanks) after each patient's use, and disinfect equipment surfaces and components by using an EPA-registered product in accordance with the manufacturer's instructions.   *Category II*

B. In the absence of an EPA-registered product for water treatment, add sodium hypochlorite to the water:
   1. Maintain a 15-ppm chlorine residual in the water of small hydrotherapy tanks, Hubbard tanks, and tubs.[889]   *Category II*
   2. Maintain a 2–5 ppm chlorine residual in the water of whirlpools and whirlpool spas.[905]   *Category II*
   3. If the pH of the municipal water is in the basic range (e.g., when chloramine is used as the primary drinking water disinfectant in the community), consult the facility engineer regarding the possible need to adjust the pH of the water to a more acid level before disinfection, to enhance the biocidal activity of chlorine.[894]   *Category II*

C. Clean and disinfect hydrotherapy equipment after using tub liners.   *Category II*

D. Clean and disinfect inflatable tubs unless they are single-use equipment.   *Category II*

E. **No recommendation is offered** regarding the use of antiseptic chemicals (e.g., chloramine-T) in the water during hydrotherapy sessions.   *Unresolved issue*

F. Conduct a risk assessment of patients prior to their use of large hydrotherapy pools, deferring patients with draining wounds or fecal incontinence from pool use until their condition resolves.   *Category II*

G. For large hydrotherapy pools, use pH and chlorine residual levels appropriate for an indoor pool as provided by local and state health agencies.   *Category IC*   (States)

H. **No recommendation is offered** regarding the use in health care of whirlpools or spa equipment manufactured for home or recreational use.   *Unresolved issue*


**XI. Miscellaneous Medical Equipment Connected to Water Systems**

A. Clean, disinfect, and maintain AER equipment according to the manufacturer's instructions and relevant scientific literature to prevent inadvertent contamination of endoscopes and bronchoscopes with waterborne microorganisms.[911–915]   *Category IB*
   1. To rinse disinfected endoscopes and bronchoscopes, use water of the highest quality practical for the system's engineering and design (e.g., sterile water or

bacteriologically-filtered water [water filtered through 0.1–0.2-µm filters]).[912, 914, 915, 918] *Category IB*

2. Dry the internal channels of the reprocessed endoscope or bronchoscope using a proven method (e.g., 70% alcohol followed by forced-air treatment) to lessen the potential for the proliferation of waterborne microorganisms and to help prevent biofilm formation.[671, 921, 923, 925, 928] *Category IB*

B. Use water that meets nationally recognized standards set by the EPA for drinking water (<500 CFU/mL for heterotrophic plate count) for routine dental treatment output water.[935, 936, 943, 944] *Category IB, IC* (EPA: 40 CFR 1 Part 141, Subpart G).

C. Take precautions to prevent waterborne contamination of dental unit water lines and instruments.

1. After each patient, discharge water and air for a minimum of 20–30 seconds from any dental device connected to the dental water system that enters the patient's mouth (e.g., handpieces, ultrasonic scalers, and air/water syringe).[936, 937] *Category II*

2. Consult with dental water-line manufacturers to 1) determine suitable methods and equipment to obtain the recommended water quality; and 2) determine appropriate methods for monitoring the water to ensure quality is maintained.[936, 946] *Category II*

3. Consult with the dental unit manufacturer on the need for periodic maintenance of anti-retraction mechanisms.[937, 946] *Category IB*

# E. Recommendations—Environmental Services

**I. Cleaning and Disinfecting Strategies for Environmental Surfaces in Patient-Care Areas**

A. Select EPA-registered disinfectants, if available, and use them in accordance with the manufacturer's instructions.[2, 974, 983] *Category IB, IC* (EPA: 7 United States Code [USC] § 136 et seq)

B. Do not use high-level disinfectants/liquid chemical sterilants for disinfection of either noncritical instrument/devices or any environmental surfaces; such use is counter to label instructions for these toxic chemicals.[951, 952, 961–964] *Category IB, IC* (FDA: 21 CFR 801.5, 807.87.e)

C. Follow manufacturers' instructions for cleaning and maintaining noncritical medical equipment. *Category II*

D. In the absence of a manufacturer's cleaning instructions, follow certain procedures.

1. Clean noncritical medical equipment surfaces with a detergent/disinfectant. This may be followed with an application of an EPA-registered hospital disinfectant with or without a tuberculocidal claim (depending on the nature of the surface and the degree of contamination), in accordance with disinfectant label instructions.[952] *Category II*

2. Do not use alcohol to disinfect large environmental surfaces.[951] *Category II*

3. Use barrier protective coverings as appropriate for noncritical equipment surfaces that are 1) touched frequently with gloved hands during the delivery of patient care; 2) likely to become contaminated with blood or body substances; or 3) difficult to clean (e.g., computer keyboards).[936] *Category II*

E. Keep housekeeping surfaces (e.g., floors, walls, and tabletops) visibly clean on a regular basis and clean up spills promptly.[954] *Category II*

1. Use a one-step process and an EPA-registered hospital disinfectant/detergent designed for general housekeeping purposes in patient-care areas when 1) uncertainty exists as to the nature of the soil on these surfaces [e.g., blood or body fluid contamination versus routine dust or dirt]; or 2) uncertainty exists regarding the presence or absence of multi-drug resistant organisms on such surfaces.[952, 983, 986, 987] *Category II*

      2.    Detergent and water are adequate for cleaning surfaces in nonpatient-care areas (e.g., administrative offices).   *Category II*

      3.    Clean and disinfect high-touch surfaces (e.g., doorknobs, bed rails, light switches, and surfaces in and around toilets in patients' rooms) on a more frequent schedule than minimal touch housekeeping surfaces.   *Category II*

      4.    Clean walls, blinds, and window curtains in patient-care areas when they are visibly dusty or soiled.[2, 971, 972, 982]   *Category II*

F.    Do not perform disinfectant fogging in patient-care areas.[2, 976]   *Category IB*

G.    Avoid large-surface cleaning methods that produce mists or aerosols or disperse dust in patient-care areas.[9, 20, 109, 272]   *Category IB*

H.    Follow proper procedures for effective use of mops, cloths, and solutions.   *Category II*

      1.    Prepare cleaning solutions daily or as needed, and replace with fresh solution frequently according to facility policies and procedures.[986, 987]   *Category II*

      2.    Change the mop head at the beginning of the day and also as required by facility policy, or after cleaning up large spills of blood or other body substances.   *Category II*

      3.    Clean mops and cloths after use and allow to dry before reuse; or use single-use, disposable mop heads and cloths.[971, 988–990]   *Category II*

I.    After the last surgical procedure of the day or night, wet vacuum or mop operating room floors with a single-use mop and an EPA-registered hospital disinfectant.[7]   *Category IB*

J.    Do not use mats with tacky surfaces at the entrance to operating rooms or infection-control suites.[7]   *Category IB*

K.    Use appropriate dusting methods for patient-care areas designated for immunocompromised patients (e.g., HSCT patients):[9, 94, 986]   *Category IB*

      1.    Wet-dust horizontal surfaces daily by moistening a cloth with a small amount of an EPA-registered hospital detergent/disinfectant.[9, 94, 986]   *Category IB*

      2.    Avoid dusting methods that disperse dust (e.g., feather-dusting).[94]   *Category IB*

L.    Keep vacuums in good repair, and equip vacuums with HEPA filters for use in areas with patients at risk.[9, 94, 986, 994]   *Category IB*

M.    Close the doors of immunocompromised patients' rooms when vacuuming, waxing, or buffing corridor floors to minimize exposure to airborne dust.[9, 94, 994]   *Category IB*

N.    When performing low- or intermediate-level disinfection of environmental surfaces in nurseries and neonatal units, avoid unnecessary exposure of neonates to disinfectant residues on environmental surfaces by using EPA-registered disinfectants in accordance with manufacturers' instructions and safety advisories.[974, 995–997]   *Category IB, IC*   (EPA: 7 USC § 136 et seq.).

      1.    Do not use phenolics or any other chemical germicide to disinfect bassinets or incubators during an infant's stay.[952, 995–997]   *Category IB*

      2.    Rinse disinfectant-treated surfaces, especially those treated with phenolics, with water.[995–997]   *Category IB*

O.    When using phenolic disinfectants in neonatal units, prepare solutions to correct concentrations in accordance with manufacturers' instructions, or use premixed formulations.[974, 995–997]   *Category IB, IC*   (EPA: 7 USC § 136 et seq.)

## II.   Cleaning Spills of Blood and Body Substances

A.    Promptly clean and decontaminate spills of blood or other potentially infectious materials.[967, 998–1004]   *Category IB, IC*   (OSHA: 29 CFR 1910.1030 §d.4.ii.A)

B.    Follow proper procedures for site decontamination of spills of blood or blood-containing body fluids.[967, 998–1004]   *Category IC*   (OSHA: 29 CFR 1910.1030 § d.4.ii.A)

      1.    Use protective gloves and other PPE appropriate for this task.[967]   *Category IC*   (OSHA: 29 CFR 1910.1030 § d.3.i, ii)

2. If the spill contains large amounts of blood or body fluids, clean the visible matter with disposable absorbent material, and discard the contaminated materials in appropriate, labeled containment.[967, 1002, 1003, 1010, 1012] *Category IC* (OSHA: 29 CFR 1910.1030 § d.4.iii.B)

3. Swab the area with a cloth or paper towels moderately wetted with disinfectant, and allow the surface to dry.[967, 1010] *Category IC* (OSHA: 29 CFR 1910.1030 § d.4.ii.A)

C. Use EPA-registered hospital disinfectants labeled tuberculocidal or registered germicides on the EPA Lists D and E (products with specific label claims for HIV or hepatitis B virus [HBV]) in accordance with label instructions to decontaminate spills of blood and other body fluids.[967, 1007, 1010] *Category IC* (OSHA 29 CFR 1910.1030 § d.4.ii.A memorandum 2/28/97; compliance document CPL 2-2.44D [11/99])

D. An EPA-registered sodium hypochlorite product is preferred, but if such products are not available, generic versions of sodium hypochlorite solutions (e.g., household chlorine bleach) may be used.

1. Use a 1:100 dilution (500–615 ppm available chlorine) to decontaminate nonporous surfaces after cleaning a spill of either blood or body fluids in patient-care settings.[1010, 1011] *Category II*

2. If a spill involves large amounts of blood or body fluids, or if a blood or culture spill occurs in the laboratory, use a 1:10 dilution (5,000–6,150 ppm available chlorine) for the first application of germicide before cleaning.[954, 1010] *Category II*

**III. Carpeting and Cloth Furnishings**

A. Vacuum carpeting in public areas of health-care facilities and in general patient-care areas regularly with well-maintained equipment designed to minimize dust dispersion.[986] *Category II*

B. Periodically perform a thorough, deep cleaning of carpeting as determined by facility policy by using a method that minimizes the production of aerosols and leaves little or no residue.[111] *Category II*

C. Avoid use of carpeting in high-traffic zones in patient-care areas or where spills are likely (e.g., burn therapy units, operating rooms, laboratories, and intensive care units).[111, 1023, 1028] *Category IB*

D. Follow proper procedures for managing spills on carpeting.

1. Spot-clean blood or body substance spills promptly.[967, 1010, 1011, 1032] *Category IC* (OSHA: 29 CFR 1910.1030 § d.4.ii.A, interpretation)

2. If a spill occurs on carpet tiles, replace any tiles contaminated by blood and body fluids or body substances.[1032] *Category IC* (OSHA 29 CFR 1910.1030 § d.4.ii interpretation)

E. Thoroughly dry wet carpeting to prevent the growth of fungi; replace carpeting that remains wet after 72 hours.[9, 1026] *Category IB*

F. **No recommendation is offered** regarding the routine use of fungicidal or bactericidal treatments for carpeting in public areas of a health-care facility or in general patient-care areas. *Unresolved issue*

G. Do not use carpeting in hallways and patient rooms in areas housing immunosuppressed patients (e.g., PE areas).[9, 111] *Category IB*

H. Avoid the use of upholstered furniture and furnishings in high-risk patient-care areas and in areas with increased potential for body substance contamination (e.g., pediatrics units).[9] *Category II*

I. **No recommendation is offered** regarding whether upholstered furniture and furnishings should be avoided in general patient-care areas. *Unresolved issue*

J. Maintain upholstered furniture in good repair. *Category II*

1. Maintain the surface integrity of the upholstery by repairing tears and holes. *Category II*

136

2. If upholstered furniture in a patient's room requires cleaning to remove visible soil or body substance contamination, move that item to a maintenance area where it can be adequately cleaned with a process appropriate for the type of upholstery and the nature of the soil. *Category II*

**IV. Flowers and Plants in Patient-Care Areas**

A. Flowers and potted plants need not be restricted from areas for immunocompetent patients.[515, 702, 1040, 1042] *Category II*

B. Designate care and maintenance of flowers and potted plants to staff not directly involved with patient care.[702] *Category II*

C. If plant or flower care by patient-care staff is unavoidable, instruct the staff to wear gloves when handling the plants and flowers and perform hand hygiene after glove removal.[702] *Category II*

D. Do not allow fresh or dried flowers, or potted plants in patient-care areas for immunosuppressed patients.[9, 109, 515, 1046] *Category II*

**V. Pest Control**

A. Develop pest-control strategies, with emphasis on kitchens, cafeterias, laundries, central sterile supply areas, operating rooms, loading docks, construction activities, and other areas prone to infestations.[1050, 1072, 1075] *Category II*

B. Install screens on all windows that open to the outside; keep screens in good repair.[1072] *Category IB*

C. Contract for routine pest control service by a credentialed pest-control specialist who will tailor the application to the needs of a health-care facility.[1075] *Category II*

D. Place laboratory specimens (e.g., fixed sputum smears) in covered containers for overnight storage.[1065, 1066] *Category II*

**VI. Special Pathogens**

A. Use appropriate hand hygiene, PPE (e.g., gloves), and isolation precautions during cleaning and disinfecting procedures.[5, 952, 1130, 1364] *Category IB*

B. Use standard cleaning and disinfection protocols to control environmental contamination with antibiotic-resistant gram-positive cocci (e.g., methicillin-resistant *Staphylococcus aureus*, vancomycin intermediate-resistant *Staphylococcus aureus*, or vancomycin-resistant *Enterococcus* [VRE] ).[5, 1116–1118] *Category IB*

1. Pay close attention to cleaning and disinfection of high-touch surfaces in patient-care areas (e.g., bed rails, carts, bedside commodes, bedrails, doorknobs, or faucet handles).[5, 1116–1118] *Category IB*

2. Ensure compliance by housekeeping staff with cleaning and disinfection procedures.[5, 1116–1118] *Category IB*

3. Use EPA-registered hospital disinfectants appropriate for the surface to be disinfected (e.g., either low- or intermediate-level disinfection) as specified by the manufacturers' instructions.[974, 1106–1110, 1118] *Category IB, IC* (EPA: 7 USC § 136 et seq.)

4. When contact precautions are indicated for patient care, use disposable patient-care items (e.g., blood pressure cuffs) whenever possible to minimize cross-contamination with multiple-resistant microorganisms.[1102] *Category IB*

5. Follow these same surface cleaning and disinfecting measures for managing the environment of VRSA patients.[1110, 1116–1118] *Category II*

C. Environmental-surface culturing can be used to verify the efficacy of hospital policies and procedures before and after cleaning and disinfecting rooms that house patients with VRE.[5, 1084, 1087, 1088, 1092, 1096] *Category II*

1. Obtain prior approval from infection-control staff and the clinical laboratory before performing environmental surface culturing. *Category II*

2. Infection-control staff, with clinical laboratory consultation, must supervise all environmental culturing. *Category II*

D. Thoroughly clean and disinfect environmental and medical equipment surfaces on a regular basis using EPA-registered disinfectants in accordance with manufacturers' instructions.[952, 974, 1130, 1143] *Category IB, IC* (EPA: 7 USC § 136 et seq.)

E. Advise families, visitors, and patients about the importance of hand hygiene to minimize the spread of body substance contamination (e.g., respiratory secretions or fecal matter) to surfaces.[952] *Category II*

F. Do not use high-level disinfectants (i.e., liquid chemical sterilants) on environmental surfaces; such use is inconsistent with label instructions and because of the toxicity of the chemicals.[2, 951, 952, 964] *Category IC* (FDA: 21 CFR 801.5, 807.87.e)

G. Because no EPA-registered products are specific for inactivating *Clostridium difficile* spores, use hypochlorite-based products for disinfection of environmental surfaces in those patient-care areas where surveillance and epidemiology indicate ongoing transmission of *C. difficile*.[952, 1130, 1141] *Category II*

H. **No recommendation is offered** regarding the use of specific EPA-registered hospital disinfectants with respect to environmental control of *C. difficile*. *Unresolved issue*

I. Apply standard cleaning and disinfection procedures to control environmental contamination with respiratory and enteric viruses in pediatric-care units and care areas for immunocompromised patients.[986, 1158] *Category IC* (EPA: 7 USC § 136 et seq.)

J. Clean surfaces that have been contaminated with body substances; perform low- to intermediate-level disinfection on cleaned surfaces with an EPA-registered disinfectant in accordance with the manufacturer's instructions.[967, 974, 1158] *Category IC* (OSHA: 29 CFR 1910.1030 § d.4.ii.A; EPA: 7 USC § 136 et seq.)

K. Use disposable barrier coverings as appropriate to minimize surface contamination. *Category II*

L. Develop and maintain cleaning and disinfection procedures to control environmental contamination with agents of Creutzfeldt-Jakob disease (CJD), for which no EPA-registered product exists. *Category II*

1. In the absence of contamination with central nervous system tissue, extraordinary measures (e.g., use of 2N sodium hydroxide [NaOH] or applying full-strength sodium hypochlorite) are not needed for routine cleaning or terminal disinfection of a room housing a confirmed or suspected CJD patient.[951, 1199] *Category II*

2. After removing gross tissue from the surface, use either 1N NaOH or a sodium hypochlorite solution containing approximately 10,000–20,000 ppm available chlorine (dilutions of 1:5 to 1:3 v/v, respectively, of U.S. household chlorine bleach; contact the manufacturers of commercially available sodium hypochlorite products for advice) to decontaminate operating room or autopsy surfaces with central nervous system or cerebral spinal fluid contamination from a diagnosed or suspected CJD patient.[951, 1170, 1188, 1191, 1197–1199, 1201] *Category II*

   a. The contact time for the chemical used during this process should be 30 min–1 hour.[1191, 1197, 1201]

   b. Blot up the chemical with absorbent material and rinse the treated surface thoroughly with water.

   c. Discard the used, absorbent material into appropriate waste containment.

3. Use disposable, impervious covers to minimize body substance contamination to autopsy tables and surfaces.[1197, 1201] *Category IB*

M.   Use standard procedures for containment, cleaning, and decontamination of blood spills on surfaces as previously described (Environmental Services: II).[967]   *Category IC*   (OSHA: 29 CFR 1910.1030 §d.4.ii.A)

   1.   Wear PPE appropriate for a surface decontamination and cleaning task.[967, 1199] *Category IC*   (OSHA 29 CFR 1910.1030 §d.3.i, ii)

   2.   Discard used PPE by using routine disposal procedures or decontaminate reusable PPE as appropriate.[967, 1199]   *Category IC*   (OSHA 29 CFR 1910.1030 §d.3.viii)

# F.  Recommendations—Environmental Sampling

I.   **General Information**

   A.   Do not conduct random, undirected microbiologic sampling of air, water, and environmental surfaces in health-care facilities.[2, 1214]   *Category IB*

   B.   When indicated, conduct microbiologic sampling as part of an epidemiologic investigation or during assessment of hazardous environmental conditions to detect contamination and verify abatement of a hazard.[2, 1214]   *Category IB*

   C.   Limit microbiologic sampling for quality assurance purposes to 1) biological monitoring of sterilization processes; 2) monthly cultures of water and dialysate in hemodialysis units; and 3) short-term evaluation of the impact of infection-control measures or changes in infection-control protocols.[2, 1214]   *Category IB*

II.   **Air, Water, and Environmental-Surface Sampling**

   A.   When conducting any form of environmental sampling, identify existing comparative standards and fully document departures from standard methods.[945, 1214, 1223, 1224, 1238] *Category II*

   B.   Select a high-volume air sampling device if anticipated levels of microbial airborne contamination are expected to be low.[290, 1218, 1223, 1224]   *Category II*

   C.   Do not use settle plates to quantify the concentration of airborne fungal spores.[290] *Category II*

   D.   When sampling water, choose growth media and incubation conditions that will facilitate the recovery of waterborne organisms.[945]   *Category II*

   E.   When using a sample/rinse method for sampling an environmental surface, develop and document a procedure for manipulating the swab, gauze, or sponge in a reproducible manner so that results are comparable.[1238]   *Category II*

   F.   When environmental samples and patient specimens are available for comparison, perform the laboratory analysis on the recovered microorganisms down to the species level at a minimum and beyond the species level if possible.[1214]   *Category II*

# G.  Recommendations—Laundry and Bedding

I.   **Employer Responsibilities**

   A.   Employers must launder workers' personal protective garments or uniforms that are contaminated with blood or other potentially infectious materials.[967]   *Category IC*   (OSHA: 29 CFR 1910.1030 § d.3.iv)

**II. Laundry Facilities and Equipment**

    A.    Maintain the receiving area for contaminated textiles at negative pressure compared with the clean areas of the laundry in accordance with AIA construction standards in effect during the time of facility construction.[120, 1260–1262]   ***Category IC***  (AIA: 7.23.B1, B2)

    B.    Ensure that laundry areas have handwashing facilities and products and appropriate PPE available for workers.[120, 967]   ***Category IC***  (AIA: 7.23.D4; OSHA: 29 CFR 1910.1030 § d.2.iii)

    C.    Use and maintain laundry equipment according to manufacturers' instructions.[1250, 1263]   ***Category II***

    D.    Do not leave damp textiles or fabrics in machines overnight.[1250]   ***Category II***

    E.    Disinfection of washing and drying machines in residential care is not needed as long as gross soil is removed before washing and proper washing and drying procedures are used. ***Category II***

**III. Routine Handling of Contaminated Laundry**

    A.    Handle contaminated textiles and fabrics with minimum agitation to avoid contamination of air, surfaces, and persons.[6, 967, 1258, 1259]   ***Category IC***  (OSHA: 29 CFR 1910.1030 § d.4.iv)

    B.    Bag or otherwise contain contaminated textiles and fabrics at the point of use.[967] ***Category IC***  (OSHA: 29 CFR 1910.1030 § d.4.iv)

        1.    Do not sort or prerinse contaminated textiles or fabrics in patient-care areas.[967] ***Category IC***  (OSHA: 29 CFR 1910.1030 §d.4.iv)

        2.    Use leak-resistant containment for textiles and fabrics contaminated with blood or body substances.[967, 1258]   ***Category IC***  (OSHA: 29 CFR 1910.1030 § d.4.iv)

        3.    Identify bags or containers for contaminated textiles with labels, color coding, or other alternative means of communication as appropriate.[967]   ***Category IC***  (OSHA: 29 CFR 1910.1030 § d.4.iv)

    C.    Covers are not needed on contaminated textile hampers in patient-care areas.   ***Category II***

    D.    If laundry chutes are used, ensure that they are properly designed, maintained, and used in a manner to minimize dispersion of aerosols from contaminated laundry.[1253, 1267–1270] ***Category IC***  (AAMI: ANSI/AAMI ST65:2000)

        1.    Ensure that laundry bags are closed before tossing the filled bag into the chute. ***Category II***

        2.    Do not place loose items in the chute.   ***Category II***

    E.    Establish a facility policy to determine when textiles or fabrics should be sorted in the laundry facility (i.e., before or after washing).[1271, 1272]   ***Category II***

**IV. Laundry Process**

    A.    If hot-water laundry cycles are used, wash with detergent in water $\geq160°F$ ($\geq71°C$) for $\geq25$ minutes.[2, 120]   ***Category IC***  (AIA: 7.31.E3)

    B.    **No recommendation is offered** regarding a hot-water temperature setting and cycle duration for items laundered in residence-style health-care facilities.   ***Unresolved issue***

    C.    Follow fabric-care instructions and special laundering requirements for items used in the facility.[1278]   ***Category II***

    D.    Choose chemicals suitable for low-temperature washing at proper use concentration if low-temperature ($<160°F$ [$<71°C$]) laundry cycles are used.[1247, 1281–1285]   ***Category II***

    E.    Package, transport, and store clean textiles and fabrics by methods that will ensure their cleanliness and protect them from dust and soil during interfacility loading, transport, and unloading.[2]   ***Category II***

**V. Microbiologic Sampling of Textiles**

    A.    Do not conduct routine microbiological sampling of clean textiles.[2, 1286]   ***Category IB***

B.    Use microbiological sampling during outbreak investigations if epidemiologic evidence suggests a role for health-care textiles and clothing in disease transmission.[1286]  *Category IB*

**VI.  Special Laundry Situations**

A.    Use sterilized textiles, surgical drapes, and gowns for situations requiring sterility in patient care.[7]  *Category IB*

B.    Use hygienically clean textiles (i.e., laundered, but not sterilized) in neonatal intensive care units.[997, 1288]  *Category IB*

C.    Follow manufacturers' recommendations for cleaning fabric products including those with coated or laminated surfaces.  *Category II*

D.    Do not use dry cleaning for routine laundering in health-care facilities.[1289-1291]  *Category II*

E.    Use caution when considering the use of antimicrobial mattresses, textiles, and clothing as replacements for standard bedding and other fabric items; EPA has not approved public health claims asserting protection against human pathogens for treated articles.[1306]  *Category II*

F.    **No recommendation is offered** regarding using disposable fabrics and textiles versus durable goods. *Unresolved issue*

**VII.  Mattresses and Pillows**

A.    Keep mattresses dry; discard them if they become and remain wet or stained, particularly in burn units.[1310-1315]  *Category IB*

B.    Clean and disinfect mattress covers using EPA-registered disinfectants, if available, that are compatible with the cover materials to prevent the development of tears, cracks, or holes in the cover.[1310-1315]  *Category IB*

C.    Maintain the integrity of mattress and pillow covers.  *Category II*

    1.    Replace mattress and pillow covers if they become torn or otherwise in need of repair. *Category II*

    2.    Do not stick needles into the mattress through the cover.  *Category II*

D.    Clean and disinfect moisture-resistant mattress covers between patients using an EPA-registered product, if available.[1310-1315]  *Category IB*

E.    If using a mattress cover completely made of fabric, change these covers and launder between patients.[1310-1315]  *Category IB*

F.    Launder pillow covers and washable pillows in the hot-water cycle between patients or when they become contaminated with body substances.[1315]  *Category IB*

**VIII.  Air-Fluidized Beds**

A.    Follow manufacturers' instructions for bed maintenance and decontamination.  *Category II*

B.    Change the polyester filter sheet at least weekly or as indicated by the manufacturer.[1317, 1318, 1322, 1323]  *Category II*

C.    Clean and disinfect the polyester filter sheet thoroughly, especially between patients, using an EPA-registered product, if available.[1317, 1318, 1322, 1323]  *Category IB*

D.    Consult the facility engineer to determine the proper location of air-fluidized beds in negative-pressure rooms.[1326]  *Category II*

# H. Recommendations—Animals in Health-Care Facilities

I. **General Infection-Control Measures for Animal Encounters**
   A. Minimize contact with animal saliva, dander, urine, and feces.[1365–1367] *Category II*
   B. Practice hand hygiene after any animal contact.[2, 1364] *Category IB*
      1. Wash hands with soap and water, especially if hands are visibly soiled.[1364] *Category IB*
      2. Use either soap and water or alcohol-based hand rubs when hands are not visibly soiled.[1364] *Category IB*

II. **Animal-Assisted Activities, Animal-Assisted Therapy, and Resident Animal Programs**
   A. Avoid selection of nonhuman primates and reptiles in animal-assisted activities, animal-assisted therapy, or resident animal programs.[1360–1362] *Category IB*
   B. Enroll animals that are fully vaccinated for zoonotic diseases and that are healthy, clean, well-groomed, and negative for enteric parasites or otherwise have completed recent antihelminthic treatment under the regular care of a veterinarian.[1349, 1360] *Category II*
   C. Enroll animals that are trained with the assistance or under the direction of individuals who are experienced in this field.[1360] *Category II*
   D. Ensure that animals are handled by persons trained in providing activities or therapies safely, and who know the animals' health status and behavior traits.[1349, 1360] *Category II*
   E. Take prompt action when an incident of biting or scratching by an animal occurs during an animal-assisted activity or therapy.
      1. Remove the animal permanently from these programs.[1360] *Category II*
      2. Report the incident promptly to appropriate authorities (e.g., infection-control staff, animal program coordinator, or local animal control).[1360] *Category II*
      3. Promptly clean and treat scratches, bites, or other accidental breaks in the skin. *Category II*
   F. Perform an ICRA and work actively with the animal handler prior to conducting an animal-assisted activity or therapy to determine if the session should be held in a public area of the facility or in individual patient rooms. [1349, 1360] *Category II*
   G. Take precautions to mitigate allergic responses to animals. *Category II*
      1. Minimize shedding of animal dander by bathing animals <24 hours before a visit.[1360] *Category II*
      2. Groom animals to remove loose hair before a visit, or using a therapy animal cape.[1358] *Category II*
   H. Use routine cleaning protocols for housekeeping surfaces after therapy sessions. *Category II*
   I. Restrict resident animals, including fish in fish tanks, from access to or placement in patient-care areas, food preparation areas, dining areas, laundry, central sterile supply areas, sterile and clean supply storage areas, medication preparation areas, operating rooms, isolation areas, and PE areas. *Category II*
   J. Establish a facility policy for regular cleaning of fish tanks, rodent cages, bird cages, and any other animal dwellings and assign this cleaning task to a nonpatient-care staff member; avoid splashing tank water or contaminating environmental surfaces with animal bedding. *Category II*

III. **Protective Measures for Immunocompromised Patients**
   A. Advise patients to avoid contact with animal feces and body fluids such as saliva, urine, or solid litter box material.[8] *Category II*

B. Promptly clean and treat scratches, bites, or other wounds that break the skin.[8]   *Category II*

C. Advise patients to avoid direct or indirect contact with reptiles.[1340]   *Category IB*

D. Conduct a case-by-case assessment to determine if animal-assisted activities or animal-assisted therapy programs are appropriate for immunocompromised patients.[1349]   *Category II*

E. **No recommendation is offered** regarding permitting pet visits to terminally ill immunosuppressed patients outside their PE units.   *Unresolved issue*

IV. **Service Animals**

A. Avoid providing access to nonhuman primates and reptiles as service animals.[1340, 1362]   *Category IB*

B. Allow service animals access to the facility in accordance with the Americans with Disabilities Act of 1990, unless the presence of the animal creates a direct threat to other persons or a fundamental alteration in the nature of services.[1366, 1376]   *Category IC*   (U.S. Department of Justice: 28 CFR § 36.302)

C. When a decision must be made regarding a service animal's access to any particular area of the health-care facility, evaluate the service animal, the patient, and the health-care situation on a case-by-case basis to determine whether significant risk of harm exists and whether reasonable modifications in policies and procedures will mitigate this risk.[1376]   *Category IC*   (Justice: 28 CFR § 36.208 and App.B)

D. If a patient must be separated from his or her service animal while in the health-care facility 1) ascertain from the person what arrangements have been made for supervision or care of the animal during this period of separation; and 2) make appropriate arrangements to address the patient's needs in the absence of the service animal.   *Category II*

V. **Animals as Patients in Human Health-Care Facilities**

A. Develop health-care facility policies to address the treatment of animals in human health-care facilities.

1. Use the multidisciplinary team approach to policy development, including public media relations in order to disclose and discuss these activities.   *Category II*

2. Exhaust all veterinary facility, equipment, and instrument options before undertaking the procedure.   *Category II*

3. Ensure that the care of the animal is supervised by a licensed veterinarian.   *Category II*

B. When animals are treated in human health-care facilities, avoid treating animals in operating rooms or other patient-care areas where invasive procedures are performed (e.g., cardiac catheterization laboratories, or invasive nuclear medicine areas).   *Category II*

C. Schedule the animal procedure for the last case of the day for the area, at a time when human patients are not scheduled to be in the vicinity.   *Category II*

D. Adhere strictly to standard precautions.   *Category II*

E. Clean and disinfect environmental surfaces thoroughly using an EPA-registered product in the room after the animal is removed.   *Category II*

F. Allow sufficient ACH to clean the air and help remove airborne dander, microorganisms, and allergens [Appendix B, Table B.1.]).   *Category II*

G. Clean and disinfect using EPA-registered products or sterilize equipment that has been in contact with animals, or use disposable equipment.   *Category II*

H. If reusable medical or surgical instruments are used in an animal procedure, restrict future use of these instruments to animals only.   *Category II*

**VI. Research Animals in Health-Care Facilities**

   A.    Use animals obtained from quality stock, or quarantine incoming animals to detect zoonotic diseases.   *Category II*

   B.    Treat sick animals or remove them from the facility.   *Category II*

   C.    Provide prophylactic vaccinations, as available, to animal handlers and contacts at high risk. *Category II*

   D.    Ensure proper ventilation through appropriate facility design and location.[1395]   *Category IC*   (U.S. Department of Agriculture [USDA]: 7 USC 2131)

        1.    Keep animal rooms at negative pressure relative to corridors.[1395]   *Category IC* (USDA: 7 USC 2131)

        2.    Prevent air in animal rooms from recirculating elsewhere in the health-care facility.[1395]   *Category IC*   (USDA: 7 USC 2131)

   E.    Keep doors to animal research rooms closed.   *Category II*

   F.    Restrict access to animal facilities to essential personnel.   *Category II*

   G.    Establish employee occupational health programs specific to the animal research facility, and coordinate management of postexposure procedures specific for zoonoses with occupational health clinics in the health-care facility.[1013, 1378]   *Category IC*   (U.S. Department of Health and Human Services [DHHS]: BMBL; OSHA: 29 CFR 1910.1030.132-139)

   H.    Document standard operating procedures for the unit.[1013]   *Category IC*   (DHHS: BMBL)

   I.    Conduct routine employee training on worker safety issues relevant to the animal research facility (e.g., working safely with animals and animal handling).[1013, 1393]   *Category IC* (DHHS: BMBL; OSHA: 29 CFR 1910.1030.132-139)

   J.    Use precautions to prevent the development of animal-induced asthma in animal workers.[1013]   *Category IC*   (DHHS: BMBL)

# I. Recommendations—Regulated Medical Waste

**I. Categories of Regulated Medical Waste**

   A.    Designate the following as major categories of medical waste that require special handling and disposal precautions: 1) microbiology laboratory wastes [e.g., cultures and stocks of microorganisms]; 2) bulk blood, blood products, blood, and bloody body fluid specimens; 3) pathology and anatomy waste; and 4) sharps [e.g., needles and scalpels].[2]   *Category II*

   B.    Consult federal, state, and local regulations to determine if other waste items are considered regulated medical wastes.[967, 1407, 1408]   *Category IC*   (States; Authorities having jurisdiction [AHJ]; OSHA: 29 CFR 1910.1030 §g.2.1; U.S. Department of Transportation [DOT]: 49 CFR 171-180; U.S. Postal Service: CO23.8)

**II. Disposal Plan for Regulated Medical Wastes**

   A.    Develop a plan for the collection, handling, predisposal treatment, and terminal disposal of regulated medical wastes.[967, 1409]   *Category IC*   (States; AHJ; OSHA: 29 CFR 1910 1030 §g.2.i;)

   B.    Designate a person or persons to be responsible for establishing, monitoring, reviewing, and administering the plan.   *Category II*

**III. Handling, Transporting, and Storing Regulated Medical Wastes**

   A.    Inform personnel involved in the handling and disposal of potentially infective waste of the possible health and safety hazards; ensure that they are trained in appropriate handling and disposal methods.[967]   *Category IC*   (OSHA: 29 CFR 1910.1030 § g.2.i)

   B.    Manage the handling and disposal of regulated medical wastes generated in isolation areas by using the same methods as for regulated medical wastes from other patient-care areas.[2] *Category II*

   C.    Use proper sharps disposal strategies.[967]   *Category IC*   (OSHA: 29 CFR 1910.1030 § d.4.iii.A)

      1.    Use a sharps container capable of maintaining its impermeability after waste treatment to avoid subsequent physical injuries during final disposal.[967] *Category IC*   (OSHA: 29 CFR 1910.1030 § d.4.iii.A)

      2.    Place disposable syringes with needles, including sterile sharps that are being discarded, scalpel blades, and other sharp items into puncture-resistant containers located as close as practical to the point of use.[967] *Category IC*   (OSHA: 29 CFR 1910.1030 § d.4.iii.A)

      3.    Do not bend, recap, or break used syringe needles before discarding them into a container.[6, 967, 1415] *Category IC*   (OSHA: 29 CFR 1910 1030 § d.2.vii and § d.2.vii.A)

D.    Store regulated medical wastes awaiting treatment in a properly ventilated area that is inaccessible to vertebrate pests; use waste containers that prevent the development of noxious odors. *Category IC*   (States; AHJ)

E.    If treatment options are not available at the site where the medical waste is generated, transport regulated medical wastes in closed, impervious containers to the on-site treatment location or to another facility for treatment as appropriate. *Category IC*   (States; AHJ)

**IV.   Treatment and Disposal of Regulated Medical Wastes**

A.    Treat regulated medical wastes by using a method (e.g., steam sterilization, incineration, interment, or an alternative treatment technology) approved by the appropriate authority having jurisdiction (AHJ) (e.g., states, Indian Health Service [IHS], Veterans Affairs [VA]) before disposal in a sanitary landfill. *Category IC*   (States, AHJ)

B.    Follow precautions for treating microbiological wastes (e.g., amplified cultures and stocks of microorganisms).[1013] *Category IC*   (DHHS: BMBL)

      1.    Biosafety level 4 laboratories must inactivate microbiological wastes in the laboratory by using an approved inactivation method (e.g., autoclaving) before transport to and disposal in a sanitary landfill.[1013] *Category IC*   (DHHS: BMBL)

      2.    Biosafety level 3 laboratories must inactivate microbiological wastes in the laboratory by using an approved inactivation method (e.g., autoclaving) or incinerate them at the facility before transport to and disposal in a sanitary landfill.[1013] *Category IC* (DHHS: BMBL)

C.    Biosafety levels 1 and 2 laboratories should develop strategies to inactivate amplified microbial cultures and stocks onsite by using an approved inactivation method (e.g., autoclaving) instead of packaging and shipping untreated wastes to an offsite facility for treatment and disposal.[1013, 1419-1421] *Category II*

D.    Laboratories that isolate select agents from clinical specimens must comply with federal regulations for the receipt, transfer, management, and appropriate disposal of these agents.[1412] *Category IC*   (DHHS: 42 CFR 73 § 73.6)

E.    Sanitary sewers may be used for the safe disposal of blood, suctioned fluids, ground tissues, excretions, and secretions, provided that local sewage discharge requirements are met and that the state has declared this to be an acceptable method of disposal.[1414] *Category II*

**V.   Special Precautions for Wastes Generated During Care of Patients with Rare Diseases**

A.    When discarding items contaminated with blood and body fluids from VHF patients, contain these regulated medical wastes with minimal agitation during handling.[6, 203] *Category II*

B.    Manage properly contained wastes from areas providing care to VHF patients in accordance with recommendations for other isolation areas (Regulated Medical Waste: III B).[2, 6, 203] *Category II*

C.    Decontaminate bulk blood and body fluids from VHF patients using approved inactivation methods (e.g., autoclaving or chemical treatment) before disposal.[6, 203] *Category IC, II* (States; AHJ)

D.  When discarding regulated medical waste generated during the routine (i.e., non-surgical) care of CJD patients, contain these wastes and decontaminate them using approved inactivation methods (e.g., autoclaving or incineration) appropriate for the medical waste category (e.g., blood, sharps, pathological waste).[2, 6, 948, 1199]   *Category IC, II*   (States; AHJ)

E.  Incinerate medical wastes (e.g., central nervous system tissues or contaminated disposable materials) from brain autopsy or biopsy procedures of diagnosed or suspected CJD patients.[1197, 1201]   *Category IB*

# Part III.  References

**Note:  The bold item in parentheses indicated the citation number or the location of this reference listed in the MMWR version of this guideline.**

1.  Simmons BP.  Guideline for hospital environmental control.  Atlanta, GA: U.S. Department of Health and Human Services, Public Health Service, Centers for Disease Control, 1981.

2.  **(270)** Garner JS, Favero MS.  Guideline for handwashing and hospital environmental control.  Atlanta, GA: U.S. Department of Health and Human Services, Public Health Service, Centers for Disease Control, 1985.  Document No. 99–1117 (Also available at Infect Control 1986; 7: 231–43.)

3.  **(27)** CDC.  Guidelines for prevention of nosocomial pneumonia.  MMWR 1997;46(No. RR-1):1–79.

4.  **(34)** CDC.  Guidelines for preventing the transmission of *Mycobacterium tuberculosis* in health-care facilities.  MMWR 1994;43(No. RR-13):1–132.

5.  **(318)** CDC.  Recommendations for preventing the spread of vancomycin resistance.  Recommendations of the Hospital Infection Control Practices Advisory Committee (HICPAC).  MMWR 1995;44(No. RR-12):1–13.

6.  **(36)** Garner JS, Hospital Infection Control Practices Advisory Committee.  Guideline for isolation precautions in hospitals.  Infect Control Hosp Epidemiol 1996;17:53–80.

7.  **(114)** Mangram AJ, Horan TC, Pearson ML, Silver LC, Jarvis WR, Hospital Infection Control Practices Advisory Committee.  Guideline for prevention of surgical site infection, 1999.  Infect Control Hosp Epidemiol 1999;20:247–80.

8.  **(396)** CDC.  USPHS/IDSA guidelines for the prevention of opportunistic infections in persons infected with human immunodeficiency virus.  MMWR 1999;48(No. RR-10):1–66.

9.  **(37, Appendix; 5)** CDC.  CDC/IDSA/ASBMT guidelines for the prevention of opportunistic infections in hematopoietic stem cell transplant recipients.  MMWR 2000;49(No. RR-10):1–128.

10.  Garner JS.  The CDC Hospital Infection Control Practice Advisory Committee.  Am J Infect Control 1993;21:160–2.

11.  Bennett JV, Brachman PS, eds.  The inanimate environment.  In: Rhame FS. Hospital Infections, 4th ed.  Philadelphia, PA: Lippincott-Raven, 1998;299–324.

12.  Weber DJ, Rutala WA.  Environmental issues and nosocomial infections.  In: Wenzel RP, ed. Prevention and control of nosocomial infections, 3rd ed.  Baltimore, MD: Williams & Wilkins,1997;491–514.

13.  Greene VW.  Microbiological contamination control in hospitals.  Hospitals JAHA 1969;43:78–88.

14.  American Hospital Association.  Hospital statistics, 2000 ed.Historical trends in utilization, personnel, and finances for selected years from 1946 through 1998 [Table].  Chicago, IL: Health Forum LLC, 2000;2–3.

15.  McKee B.  Neither bust nor boom.  Architecture 1998. Available at: www.britannica.com/bcom/magazine/article/0,5744,39579,00.html

16.  Croswell CL.  Better, not bigger: construction costs soar on wings of patient demand, construction and design survey finds.  Mod Healthc 1999;29:23–6, 28–34, 36–8.

17.  **(9)** Sarubbi FA Jr, Kopf BB, Wilson NO, McGinnis MR, Rutala WA.  Increased recovery of *Aspergillus flavus* from respiratory specimens during hospital construction.  Am Rev Respir Dis 1982;125:33–8.

18.  **(2)** Arnow PM, Sadigh MC, Weil D, Chudy R.  Endemic and epidemic aspergillosis associated with inhospital replication of *Aspergillus* organisms.  J Infect Dis 1991;164:998–1002.

146

19. **(38)** Flynn PM, Williams BG, Hethrington SV, Williams BF, Giannini MA, Pearson TA. *Aspergillus terreus* during hospital renovation [letter]. Infect Control Hosp Epidemiol 1993;14:363–5.

20. **(48)** Weems JJ Jr, Davis BJ, Tablan OC, Kaufman L, Martone WJ. Construction activity: an independent risk factor for invasive aspergillosis and zygomycosis in patients with hematologic malignancy. Infect Control 1987;8:71–5.

21. **(10)** Streifel AJ, Stevens PP, Rhame FS. In-hospital source of airborne *Penicillium* species spores. J Clin Microbiol 1987;25:1–4.

22. Noskin GA, Stosor V, Cooper J, Peterson L. Recovery of vancomycin-resistant enterococci on fingertips and environmental surfaces. Infect Control Hosp Epidemiol 1995;16:577–81.

23. Manian FA, Meyer L, Jenne J. *Clostridium difficile* contamination of blood pressure cuffs: a call for a closer look at gloving practices in the era of universal precautions. Infect Control Hosp Epidemiol 1996;17:180–2.

24. McFarland LV, Mulligan NE, Kwok RYY, et al. Nosocomial acquisition of *Clostridium difficile* infection. N Engl J Med 1989;320:204–10.

25. Nath SK, Thomely JH, Kelly M, et al. A sustained outbreak of *Clostridium difficile* in a general hospital: persistence of a toxigenic clone in four units. Infect Control Hosp Epidemiol 1994;15:382–9.

26. **(165)** Johnson JT, Yu VL, Best MG, et al. Nosocomial legionellosis in surgical patients with head and neck cancer: implications for epidemiological reservoir and mode of transmission. Lancet 1985;2:298–300.

27. Blatt SP, Parkinson MD, Pace E, et al. Nosocomial Legionnaires' disease: aspiration as a primary mode of disease acquisition. Am J Med 1993;95:16–22

28. Bert F, Maubec E, Bruneau B, Berry P, Lambert-Zechovsky N. Multi-resistant *Pseudomonas aeruginosa* associated with contaminated tap-water in a neurosurgery intensive care unit. J Hosp Infect 1998;39:53–62.

29. Muyldermans G, de Smet F, Perrard D, et al. Neonatal infections with *Pseudomonas aeruginosa* associated with a water-bath used to thaw fresh frozen plasma. J Hosp Infect 1998;39:309–14.

30. Buttery JP, Alabaster SJ, Heine FG, et al. Multi-resistant *Pseudomonas aeruginosa* outbreak in a pediatric oncology ward related to bath toys. Pediatr Infect Dis J 1998;17:509–13.

31. **(224)** Bolan G, Reingold AL, Carson LA, et al. Infections with *Mycobacterium chelonae* in patients receiving dialysis and using processed hemodialyzers. J Infect Dis 1985;152:1013–9.

32. **(225)** Lowry PW, Beck-Sague CM, Bland LA, et al. *Mycobacterium chelonae* infection among patients receiving high-flux dialysis in a hemodialysis clinic in California. J Infect Dis 1990;161:85–90.

33. Schaal KP. Medical and microbiological problems arising from airborne infection in hospitals. J Hosp Infect 1991;18 (Suppl A):451–9.

34. Osterholm MT, Hedberg CW, Moore KA. Epidemiology of infectious diseases. In: Mandell GL, Bennett JE, Dolin R, eds. Principles and practice of infectious diseases, 5th ed. Philadelphia, PA: Churchill Livingstone, 2000;156–67.

35. **(3)** Streifel AJ. Design and maintenance of hospital ventilation systems and prevention of airborne nosocomial infections. In: Mayhall CG, ed. Hospital epidemiology and infection control, 2nd ed. Philadelphia, PA: Lippincott Williams & Wilkins, 1999:1211–21.

36. Bodey GP, Vartivarian S. Aspergillosis. Eur J Clin Microbiol Infect Dis 1989;8:413–37.

37. Latgé JP. *Aspergillus fumigatus* and aspergillosis. Clin Microbiol Rev 1999;12:310–50.

38. Derouin F. Special issue on aspergillosis. Pathol Biol 1990;42:625–736.

39. Dixon DD, Walsh TJ. Human pathogenesis. In: Bennett JW, Klich MA, eds. *Aspergillus*, biology and industrial application. Boston, MA: Butterworth-Heinemann,1992;249–67.

40. Kurup VP, Kumar A. Immunodiagnosis of aspergillosis. Clin Microbiol Rev 1991;4:439–56.

41. Latgé JP, Paris S, Sarfati J, et al. Infectivity of *Aspergillus fumigatus*. In: Vanden Bossche H, Stevens DA, Odds FC, eds Host-Fungus Interplay. Bethesda, MD: National Foundation for Infectious Diseases, 1997;99–110.

42. Schaffner A. Host defense in aspergillosis. In: Bennett E, Hay RJ, Peterson PK, eds. New Strategies in Fungal Disease. Edinburgh, United Kingdom: Churchill Livingstone, 1992;98–112.

43. Vanden Bossche H, Mackenzie DWR, Cauwenbergh G, eds. *Aspergillus* and aspergillosis. New York, NY: Plenum Press, 1988.

44. **(82)** Sherertz RJ, Belani A, Kramer BS, et al. Impact of air filtration on nosocomial *Aspergillus* infections: unique risk of bone marrow transplant recipients. Am J Med 1987;83:709–18.

45. Young RC, Bennett JE, Vogel CL, Carbone PP, DeVita VT. Aspergillosis: the spectrum of the disease in 98 patients. Medicine 1970;49:147–73.

46. Rhame FS. Lessons from the Roswell Park bone marrow transplant aspergillosis outbreak. Infect Control 1985;6:345–6.

47. Rotsein C, Cummings KM, Tidings J, et al. An outbreak of invasive aspergillosis among allogeneic bone marrow transplants: a case-control study. Infect Control 1985;6:347–55.
48. **(83)** Aisner J, Schimpff SC, Bennett JE, Young VM, Wiernik PH. Aspergillus infections in cancer patients: association with fireproofing materials in a new hospital. JAMA 1976;235:411–2.
49. **(64)** Arnow PM, Anderson RL, Mainous PD, Smith EJ. Pulmonary aspergillosis during hospital renovation. Am Rev Respir Dis 1978;118:49–53.
50. **(61)** Streifel AJ, Lauer JL, Vesley D, Juni B, Rhame FS. *Aspergillus fumigatus* and other thermotolerant fungi generated by hospital building demolition. Appl Environ Microbiol 1983;46:375–8.
51. Hopkins CC, Weber DJ, Rubin RH. Invasive aspergillosis infection: possible non-ward common source within the hospital environment. J Hosp Infect 1989;13:19–25.
52. Denning DW. Invasive aspergillosis. Clin Infect Dis 1998;26:781–805.
53. Manuel RJ, Kibbler CC. The epidemiology and prevention of invasive aspergillosis. J Hosp Infect 1998;39:95–109.
54. Kennedy HF, Simpson EM, Wilson N, Richardson MD, Michie JR. *Aspergillus flavus* endocarditis in a child with neuroblastoma. J Infect 1998;36:126–7.
55. **(75)** McCarty JM, Flam MS, Pullen G, Jones R, Kassel SH. Outbreak of primary cutaneous aspergillosis related to intravenous arm boards. J Pediatr 1986;108(Pt.1):721–4.
56. Goldberg B, Eversmann WW, Eitzen EM Jr. Invasive aspergillosis of the hand. J Hand Surg 1982;7:38–42.
57. Grossman ME, Fithian EC, Behrens C, Bissinger J, Fracaro M, Neu HC. Primary cutaneous aspergillosis in six leukemic children. J Am Acad Dermatol 1985;12:313–8.
58. Panke TW, McManus AT, Spebar MJ. Infection of a burn wound by *Aspergillus niger*: gross appearance simulating ecthyma gangrenosa. Am J Clin Pathol 1979;72:230–2.
59. Fraser DW, Ward JL, Ajello L, Plikaytis BD. Aspergillosis and other systemic mycoses: the growing problem. JAMA 1979;242:1631–5.
60. Iwen PC, Reed EC, Armitage JO, et al. Nosocomial invasive aspergillosis in lymphoma patients treated with bone marrow or peripheral stem cell transplants. Infect Control Hosp Epidemiol 1993;14:131–9.
61. Cordonnier C, Bernaudin JF, Bierling P, Huet Y, Vernant JP. Pulmonary complications occurring after allogeneic bone marrow transplantation: a study of 130 consecutively transplanted patients. Cancer 1986;58:1047–54.
62. **(76)** Klimowski LL, Rotstein C, Cummings KM. Incidence of nosocomial aspergillosis in patients with leukemia over a twenty-year period. Infect Control Hosp Epidemiol 1989;10:299–305.
63. **(79)** Walmsley S, Devi S, King S, Schneider R, Richardson S, Ford-Jones L. Invasive *Aspergillus* infections in a pediatric hospital: a ten-year review. Pediatr Infect Dis 1993;12:673–82.
64. **(57)** Pannuti CS, Gingrich RD, Pfaller MA, Wenzel RP. Nosocomial pneumonia in adult patients undergoing bone marrow transplantation: a 9-year study. J Clin Oncol 1991;9:77–84.
65. **(58)** Wingard JR, Beals SU, Santos GW, Mertz WG, Saral R. *Aspergillus* infections in bone marrow transplant recipients. Bone Marrow Transplant 1987;2:175–81.
66. Humphreys H, Johnson EM, Warnock DW, Willatts SM, Winter RJ, Speller DCE. An outbreak of aspergillosis in a general ITU. J Hosp Infect 1991;18:167–77.
67. Sessa A, Meroni M, Battini G, et al. Nosocomial outbreak of *Aspergillus fumigatus* infection among patients in a renal unit? Nephrol Dial Transplant 1996;11:1322–4.
68. **(134)** Anderson K, Morris G, Kennedy H, et al. Aspergillosis in immunocompromised pediatric patients: associations with building hygiene, design, and indoor air. Thorax 1996;51:256–61.
69. **(39)** Tabbara KF, al Jabarti A. Hospital construction-associated outbreak of ocular aspergillosis after cataract surgery. Ophthalmology 1998;105:522–26.
70. Ferre A, Domingo P, Alonso C, Franquet T, Gurgui M, Verger G. Invasive pulmonary aspergillosis: A study of 33 cases. Med Clin (Barc) 1998;110:421–5. (Spanish)
71. Ewig S, Paar WD, Pakos E et al. Nosocomial ventilator-associated pneumonias caused by *Aspergillus fumigatus* in non-immunosuppressed, non-neutropenic patients. Pneumologie 1998;52:85–90. (German)
72. Singer S, Singer D, Ruchel R, Mergeryan H, Schmidt U, Harms K. Outbreak of systemic aspergillosis in a neonatal intensive care unit. Mycoses 1998;41:223–7.
73. **(88)** Allo MD, Miller J, Townsend T, Tan C. Primary cutaneous aspergillosis associated with Hickman intravenous catheters. N Engl J Med 1987;317:1105–8.
74. Boon AP, Adams DH, Buckels J, McMaster P. Cerebral aspergillosis in liver transplantation. J Clin Pathol 1990;43:114–8.

148

75. Pla MP, Berenguer J, Arzuaga JA, Banares R, Polo JR, Bouza E. Surgical wound infection by *Aspergillus fumigatus* in liver transplant recipients. Diagn Microbiol Infect Dis 1992;15:703–6.

76. Kanj SS, Welty-Wolf K, Madden J, et al. Fungal infections in lung and heart-lung transplant recipients: report of 9 cases and review of the literature. Medicine 1996;75:142–56.

77. (77) Pfundstein J. *Aspergillus* infection among solid organ transplant recipients: a case study. J Transpl Coord 1997;7:187–9.

78. Brenier-Pinchart MP, Lebeau B, Devouassoux G, et al. *Aspergillus* and lung transplant recipients: a mycologic and molecular epidemiologic study. J Heart Lung Transplant 1998;17:972–9.

79. (59) Gerson SL, Talbot GH, Hurwitz S, Strom B, Lusk EJ, Cassileth PA. Prolonged granulocytopenia: the major risk factor for invasive pulmonary aspergillosis in patients with leukemia. Ann Intern Med 1984;100:345–51.

80. Weber SF, Peacock JE Jr, Do KA, Cruz JM, Powell BL, Capizzi RL. Interaction of granulocytopenia and construction activity as risk factors for nosocomial invasive filamentous fungal disease in patients with hematologic disorders. Infect Control Hosp Epidemiol 1990;11:235–42.

81. Rees JR, Pinner RW, Hajjeh RA, Brandt ME, Reingold AL. The epidemiological features of invasive mycotic infections in the San Francisco Bay area, 1992–1993: results of population-based laboratory active surveillance. Clin Infect Dis 1998;27:1138–47.

82. McNeil MM, Nash SL, Hajjeh RA, Conn LA, Plikaytis BD. Trends in mortality due to invasive mycoses in the United States [abstract]. In: Program & Abstracts of the International Conference on Emerging Infectious Diseases. Atlanta, GA, 1998. Abstract No. S7.3.

83. Wald A, Leisenring W, van Burik JA, Bowden RA. Epidemiology of *Aspergillus* infections in a large cohort of patients undergoing bone marrow transplantation. J Infect Dis 1997;175:1459–66.

84. Gurwith MJ, Stinson EB, Remington JS. *Aspergillus* infection complicating cardiac transplantation: Report of five cases. Arch Intern Med 1971;128:541–5.

85. Weiland D, Ferguson RM, Peterson PK, Snover DC, Simmons RL, Najarian JS. Aspergillosis in 25 renal transplant patients. Ann Surg 1983;198:622–9.

86. Hofflin JM, Potasman I, Baldwin JC, Oyster PE, Stinson EB, Remington JS. Infectious complications in heart transplant recipients receiving cyclosporine and corticosteroids. Ann Intern Med 1987;106:209–16.

87. Schulman LL, Smith CR, Drusin R, Rose EA, Enson Y, Reemtsma K. Respiratory complications of cardiac transplantation. Am J Med Sci 1988;296:1–10.

88. Gustafson TL, Schaffner W, Lavely GB, Stratton CW, Johnson HK, Hutcheson RH. Invasive aspergillosis in renal transplant recipients: correlation with corticosteroid therapy. J Infect Dis 1983;148:230–8.

89. Denning DW, Stevens DA. Antifungal and surgical treatment of invasive aspergillosis: review of 2121 published cases. Rev Infect Dis 1990;12:1147–201.

90. Weinberger M, Elattaar I, Marshall D, et al. Patterns of infection in patients with aplastic anemia and the emergence of *Aspergillus* as a major cause of death. Medicine 1992;71:24–43.

91. Noble WC, Clayton YM. Fungi in the air of hospital wards. J Gen Microbiol 1963;32:397–402.

92. Solomon WR, Burge HP, Boise JR. Airborne *Aspergillus fumigatus* levels outside and within a large clinical center. J Allergy Clin Immunol 1978;62:56–60.

93. Streifel AJ, Rhame FS. Hospital air filamentous fungal spore and particle counts in a specially designed hospital. In: Indoor Air '93: Proceedings of the Sixth International Conference on Indoor Air and Climate, Vol. 4. Helsinki, Finland:161–5.

94. (40) Rhame FS, Streifel AJ, Kersey JH Jr, McGlave PB. Extrinsic risk factors for pneumonia in the patient at high risk for infection. Am J Med 1984;76(5A):42–52.

95. (78) Rhame FS, Streifel A, Stevens P, et al. Endemic *Aspergillus* airborne spore levels are a major risk factor for aspergillosis in bone marrow transplant patients [abstract]. In: Abstracts of the 25th Interscience Conference on Antimicrobial Agents and Chemotherapy 1985. Abstract No. 147.

96. (60) Lentino JR, Rosenkranz MA, Michaels JA, Kurup VP, Rose HD, Rytel MW. Nosocomial aspergillosis: a retrospective review of airborne disease secondary to road construction and contaminated air conditioners. Am J Epidemiol 1982;116:430–7.

97. (49) Krasinski K, Holzman RS, Hanna B, Greco MA, Graff M, Bhogal M. Nosocomial fungal infection during hospital renovation. Infect Control 1985;6:278–82.

98. (29) Gage AA, Dean DC, Schimert G, Minsley N. *Aspergillus* infection after cardiac surgery. Arch Surg 1970;101:384–87.

149

99. **(95)** Siegler L, Kennedy MJ. *Aspergillus, Fusarium,* and other opportunistic moniliaceous fungi. In: Murray PR, Baron EJ, Pfaller MA, Tenover FC, Yolken RH, eds. Manual of clinical microbiology, 7th ed. Washington, DC: American Society for Microbiology Press, 1999;1212–41.

100. **(70)** Overberger PA, Wadowsky RM, Schaper MM. Evaluation of airborne particulates and fungi during hospital renovation. Am Ind Hyg Assoc J 1995;56:706–12.

101. **(96)** Breton P, Germaud P, Morin O, Audoin AF, Milpied N, Harousseau JL. Unusual pulmonary mycoses in patients with hematologic disease. Rev Pneumol Clin 1998;54:253–7. (French)

102. **(97)** Guarro J, Nucci M, Akiti T, Gené J, Barreiro MDGC, Gonçalves RT. Fungemia due to *Fusarium sacchari* in an immunosuppressed patient. J Clin Microbiol 2000;38:419–21.

103. **(98)** Burton JR, Zachery JB, Bessin R, et al. Aspergillosis in four renal transplant patients: diagnosis and effective treatment with amphotericin B. Ann Intern Med 1972;77:383–8.

104. **(80)** Kyriakides GK, Zinneman HHA, Hall WH, et al. Immunologic monitoring and aspergillosis in renal transplant patients. Am J Surg 1976;131:246–52.

105. Simmons RB, Price DL, Noble JA, Crow SA, Ahearn DG. Fungal colonization of air filters from hospitals. Am Ind Hyg Assoc J 1997;58:900–4.

106. **(4)** Pittet D, Huguenin T, Dharan S, et al. Unusual case of lethal pulmonary aspergillosis in patients with chronic obstructive pulmonary disease. Am J Respir Crit Care Med 1996;154(2 Pt 1):541–4.

107. **(104)** Mahoney DH Jr, Steuber CP, Starling KA, Barrett FF, Goldberg J, Fernbach DJ. An outbreak of aspergillosis in children with acute leukemia. J Pediatr 1979;95:70–2.

108. Ruutu P, Valtonen V, Tiitanen L, et al. An outbreak of invasive aspergillosis in a hematologic unit. Scand J Infect Dis 1987;19:347–51.

109. **(51)** Walsh TJ, Dixon DM. Nosocomial aspergillosis: environmental microbiology, hospital epidemiology, diagnosis, and treatment. Eur J Epidemiol 1989;5:131–42.

110. Buffington J, Reporter R, Lasker BA, et al. Investigation of an epidemic of invasive aspergillosis: utility of molecular typing with the use of random amplified polymorphic DNA probes. Pediatr Infect Dis J 1994;13:386–93.

111. **44)** Gerson SL, Parker P, Jacobs MR, Creger R, Lazarus HM. Aspergillosis due to carpet contamination [letter]. Infect Control Hosp Epidemiol 1994;15:221–3.

112. **(84)** Fox BC, Chamberlin L, Kulich P, Rae EJ, Webster LR. Heavy contamination of operating room air by *Penicillium* species: identification of the source and attempts at decontamination. Am J Infect Control 1990;18:300–6.

113. Chazalet V, Debeaupuis J-P, Sarfati J, et al. Molecular typing of environmental and patient isolates of *Aspergillus fumigatus* from various hospital settings. J Clin Microbiol 1998;36:1494–500.

114. Loudon KW, Coke AP, Burnie JP, Shaw AJ, Oppenheim BA, Morris CQ. Kitchens as a source of *Aspergillus niger* infection. J Hosp Infect 1996;32:191–8.

115. **(81)** Abzug MJ, Gardner S, Glode MP, Cymanski M, Roe MH, Odom LF. Heliport-associated nosocomial mucormycoses [letter]. Infect Control Hosp Epidemiol 1992;13:325–6.

116. Alvarez M, Lopez Ponga B, Rayon C, et al. Nosocomial outbreak caused by *Scedosporium prolificans (inflatum)*: four fatal cases in leukemic patients. J Clin Microbiol 1995;33:3290–5.

117. **(89)** Schleupner CJ, Hamilton JR. A pseudoepidemic of pulmonary fungal infections related to fiberoptic bronchoscopy. Infect Control 1980;1:38–42.

118. Jackson L, Klotz SA, Normand RE. A pseudoepidemic of *Sporothrix cyanescens* pneumonia occurring during renovation of a bronchoscopy suite. J Med Vet Mycol 1990;28:455–9.

119. **(30)** Vargo JA, Ginsberg MM, Mizrahi M. Human infestation by the pigeon mite: a case report. Am J Infect Control 1983;11:24–5.

120. **(1)** American Institute of Architects. Guidelines for design and construction of hospital and health care facilities, 2001. Washington, DC: American Institute of Architects Press, 2001.

121. Diamond RD. *Cryptococcus neoformans.* In: Mandell GL, Bennett JE, Dolin R, eds. Principles and practice of Infectious Diseases, 5th Ed. Philadelphia, PA: Churchill Livingstone, 2000;2707–18.

122. Deepe GS Jr. *Histoplasma capsulatum.* In: Mandell GL, Bennett JE, Dolin R. eds. Principles and practice of Infectious Diseases, 5th ed. Philadelphia, PA: Churchill Livingstone, 2000;2718–33.

123. Brodsky AL, Gregg MB, Loewenstein MS, et al. Outbreak of histoplasmosis associated with the 1970 earth day activities. Am J Med 1973;54:333–42.

124. Ward JI, Weeks M, Allen D, et al. Acute histoplasmosis: clinical, epidemiologic, and serologic findings of an outbreak associated with exposure to a fallen tree. Am J Med 1979;66:587–95.

150

125. Galgiani JN. Coccidioidomycoses. In: Remington JS, Swartz MN, eds. Current clinical topics in infectious disease. Malden, MA: Blackwell Science, 1997;188–204.

126. **(111)** Gerberding JL. Nosocomial transmission of opportunistic infections. Infect Control Hosp Epidemiol 1998;19:574–7.

127. Hughes WT. Natural mode of acquisition for de novo infection with *Pneumocystis carinii*. J Infect Dis 1982;145:842–8.

128. Olsson M, Sukura A, Lindberg LA, et al. Detections of *Pneumocystis carinii* DNA by filtration of air. Scand J Infect Dis 1996;28:279–82.

129. Bartlett MS, Vermund SH, Jacobs R, et al. Detection of *Pneumocystis carinii* DNA in air samples: likely environmental risk to susceptible persons. J Clin Microbiol 1997;35:2511–3.

130. Lundgren B, Elvin K, Rothman LP, Ljungstrom I, Lidman C, Lundgren JD. Transmission of *Pneumocystis carinii* from patients to hospital staff. Thorax 1997;52:422–4.

131. **(112)** Vargas SL, Ponce CA, Gigliotti F, et al. Transmission of *Pneumocystis carinii* DNA from a patient with *P. carinii* pneumonia to immunocompetent contact health care workers. J Clin Microbiol 2000;38:1536–8.

132. **(113)** Walzer PD. *Pneumocystis carinii*. In: Mandell GL, Bennett JE, Dolin R. eds. Principles and practice of infectious diseases, 5th ed. Philadelphia, PA: Churchill Livingstone, 2000;2781–95.

133. CDC. Screening for tuberculosis and tuberculosis infection in high-risk populations: recommendations of the Advisory Committee for Elimination of Tuberculosis. MMWR 1995;44(No. RR-11):18–34.

134. CDC. Targeted tuberculin testing and treatment of latent tuberculosis infection. MMWR 2000;49(No. RR-6):1–51.

135. D'Agata EMC, Wise S, Stewart A, Lefkowitz LB Jr. Nosocomial transmission of *Mycobacterium tuberculosis* from an extrapulmonary site. Infect Control Hosp Epidemiol 2001;22:10–2.

136. CDC. Summary of notifiable diseases, United States 2001. MMWR 2001;50(53):1–108.

137. Haas DW. *Mycobacterium tuberculosis*. In: Mandell GL, Bennett JE, Dolin R. eds. Principles and practice of infectious diseases, 5th ed. Philadelphia, PA: Churchill Livingstone, 2000;2576–607.

138. American Public Health Association. Tuberculosis. In: Chin J, ed. Control of communicable diseases manual, 17th ed. Washington, DC: American Public Health Association Press, 2000:521–30.

139. American Thoracic Society/CDC. Treatment of tuberculosis. Am J Respir Crit Care Med 2003;167:603–62.

140. Matlow AG, Jarrison A, Monteath A, Roach P, Balfe JW. Nosocomial transmission of tuberculosis (TB) associated with care of an infant with peritoneal TB. Infect Control Hosp Epidemiol 2000;21:222–3.

141. Jensen PA. Airborne *Mycobacterium* spp. In: Hurst CJ, Knudsen GR, McInerney MJ, Stetzenbach LD, Walter MV, eds. Manual of environmental microbiology. Washington, DC: American Society for Microbiology Press, 1997;676–81.

142. **(41)** Wells WF. Aerodynamics of droplet nuclei. In: Airborne contagion and air hygiene. Cambridge, MA: Harvard University Press,1955;13–9.

143. White A. Relation between quantitative nasal cultures and dissemination of staphylococci. J Lab Clin Med 1961;58:273–7.

144. Huijsmans-Evers AG. Results of routine tests for the detection of dispersers of *Staphylococcus aureus*. Arch Chir Neerl 1978;30:141–50.

145. Boyce JM, Opal SM, Potter-Bynoe G, Medeiros AA. Spread of methicillin-resistant *Staphylococcus aureus* in a hospital after exposure to a healthcare worker with chronic sinusitis. Clin Infect Dis 1993;17:496–504.

146. Hambraeus A, Sanderson HF. The control of ventilation of airborne bacterial transfer between hospital patients, and its assessment by means of a particle tracer. 3. Studies with an airborne-particle tracer in an isolation ward for burned patients. J Hyg (Lond) 1972;70:299–312.

147. Nakashima AK, Allen JR, Martone WJ, et al. Epidemic bullous impetigo in a nursery due to a nasal carrier of *Staphylococcus aureus*: role of epidemiology and control measures. Infect Control 1984;5:326–31.

148. Bethune DW, Blowers R, Parker M, Pask EA. Dispersal of *Staphylococcus aureus* by patients and surgical staff. Lancet 1965;1:480–3.

149. Sherertz RJ, Reagan DR, Hampton KD, et al. A cloud adult: the *Staphylococcus aureus* — virus interaction revisited. Ann Intern Med 1996;124:539–47.

150. Gryska PF, O'Dea AE. Postoperative streptococcal wound infection: the anatomy of an epidemic. JAMA 1970;213:1189–91.

151. Stamm WE, Feeley JC, Facklam RR. Wound infection due to group A *Streptococcus* traced to a vaginal carrier. J Infect Dis 1978;138:287–92.

152. Berkelman RL, Martin D, Graham DR. Streptococcal wound infection caused by a vaginal carrier. JAMA 1982;247:2680–2.

153. McIntyre DM. An epidemic of *Streptococcus pyogenes* puerpural and postoperative sepsis with an unusual site — the anus. Am J Obstet Gynecol 1968;101:308–14.

154. Gaynes RP, Horan TC. Surveillance of nosocomial infections. In: Mayhall CG, ed. Hospital epidemiology and infection control, 2nd ed. Philadelphia, PA: Lippincott Williams & Wilkins, 1999;1285–318.

155. Wenzel RP, Veazey JM Jr, Townsend TR. Role of the inanimate environment in hospital-acquired infections. In: Cundy KR, Ball W, eds. Infection control in healthcare facilities: microbiological surveillance. Baltimore, MD: University Park Press, 1977;71–98.

156. Mortimer EA Jr, Wolinsky E, Gonzaga AJ, Rammelkamp CH Jr. Role of airborne transmission in staphylococcal infections. Br Med J 1966;5483:319–22.

157. Youngs ER, Roberts C, Kramer JM, Gilbert RJ. Dissemination of *Bacillus cereus* in a maternity unit. J Infect 1985;10:228–32.

158. Richardson AJ, Rothburn MM, Roberts C. Pseudo-outbreak of *Bacillus* species: related to fiberoptic bronchoscopy. J Hosp Infect 1986;7:208–10.

159. Bryce EA, Smith JA, Tweeddale M, Andruschak BJ, Maxwell MR. Dissemination of *Bacillus cereus* in an intensive care unit. Infect Control Hosp Epidemiol 1993;14:459–62.

160. Lie PY-F, Ke S-C, Chen S-L. Use of pulsed-field gel electrophoresis to investigate a pseudo-outbreak of *Bacillus cereus* in a pediatric unit. J Clin Microbiol 1997;35:1533–5.

161. McDonald LC, Walker M, Carson L, et al. Outbreak of *Acinetobacter* spp. bloodstream infections in a nursery associated with contaminated aerosols and air conditioners. Pediatr Infect Dis J 1998;17:716–22.

162. Leclair JM, Zaia JA, Levin MJ, Congdon RG, Goldmann DA. Airborne transmission of chickenpox in a hospital. N Engl J Med 1980;302:450–3.

163. Gustafson TL, Lavely GB, Brawner ERJ, Hutcheson RHJ, Wright PF, Schaffner W. An outbreak of airborne nosocomial varicella. Pediatrics 1982;70:550–6.

164. Josephson A, Gombert ME. Airborne transmission of nosocomial varicella from localized zoster. J Infect Dis 1988;158:238–41.

165. Sawyer MJ, Chamberlin CJ, Wu YN, Aintablian N, Wallace MR. Detection of varicella-zoster virus DNA in air samples from hospital rooms. J Infect Dis 1994;169:91–4.

166. Menkhaus NA, Lamphear B, Linnemann CC. Airborne transmission of varicella-zoster virus in hospitals. Lancet 1990;226:1315.

167. CDC. Prevention of varicella: recommendations of the advisory committee on immunization practices (ACIP). MMWR 1996;45(No. RR-11):1–36.

168. Davis RM, Orenstein WA, Frank JAJ, et al. Transmission of measles in medical settings: 1980 through 1984. JAMA 1986;255:1295–8.

169. Watkins NM, Smith RPJ, St Germain DL, Mackay DN. Measles infection in a hopsital setting. Am J Infect Control 1987;15:201–6.

170. Revera ME, Mason WH, Ross LA, Wright HT Jr. Nosocomial measles infection in a pediatric hospital during a community-wide epidemic. J Pediatr 1991;119:183–6.

171. Atkinson WL, Markowitz LE, Adams NC, Seastrom GR. Transmission of measles in medical settings — United States, 1985–1989. Am J Med 1991;91(suppl):320S–4S.

172. Patriarca PA, Weber JA, Parker RA, et al. Efficacy of influenza vaccine in nursing homes: reduction in illness and complications during influenza A (H3N2) epidemics. JAMA 1985;253:1136–9.

173. Arden NH, Patriarca PA, Fasano MB, et al. The roles of vaccination and amantadine prophylaxis in controlling an outbreak of influenza A (H3N2) in a nursing home. Arch Intern Med 1988;148:865–8.

174. CDC. Influenza A outbreaks — Louisiana, August 1993. MMWR 1993;42:132–4.

175. Drinka PJ, Gravenstein S, Krause P, Schilling M, Miller BA, Shult P. Outbreaks of influenza A and B in a highly immunized nursing home population. J Family Practice 1997;45:509–14.

176. Schilling M, Povinelli L, Krause P, et al. Efficacy of zanamivir for chemoprophylaxis of nursing home influenza outbreaks. Vaccine 1998;16:1771–4.

177. Hall CB. Nosocomial viral infections: perennial weeds on pediatric wards. Am J Med 1981;70:670–6.

178. Whimbey E, Elting LS, Couch RB, et al. Influenza A virus infections among hospitalized adult bone marrow transplant recipients. Bone Marrow Transpl 1994;13:437–40.

179. Evans ME, Hall KL, Berry SE. Influenza control in acute care hospitals. Am J Infect Control 1997;25:357–62.

152

180. Munoz FM, Campbell JR, Atmar RL, et al. Influenza A virus outbreak in a neonatal intensive care unit. Pediatr Infect Dis J 1999;18:811–5.
181. Alford RH, Kasel JA, Gerone PJ, Knight V. Human influenza resulting from aerosol inhalation. Proc Soc Exp Biol Med 1966;122:800–4.
182. Moser MR, Bender TR, Margolis HS, Noble GR, Kendal AP, Ritter DG. An outbreak of influenza aboard a commercial airliner. Am J Epidemiol 1979;110:1–6.
183. Chanock RW, Kim HW, Vargosko AJ, et al. Respiratory syncytial virus 1: virus recovery and other observations during 1960 — outbreak of bronchiolitis, pneumonia, and other minor respiratory illness in children. JAMA 1961;176:647–53.
184. Gardner DS, Court SDM, Brocklebank JT, et al. Virus cross-infection in paediatric wards. Br Med J 1973;2:571–75.
185. Sawyer LA, Murphy JJ, Kaplan JE, et al. 25–30 nm virus particle associated with a hospital outbreak of acute gastroenteritis with evidence for airborne transmission. Am J Epidemiol 1988;127:1261–71.
186. Baxby D. Poxviruses. In: Belshe RB, ed. Textbook of human virology, 2nd ed. St. Louis, MO: Mosby Year Book, 1991;930–46.
187. Neff JM. Variola (smallpox) and monkeypox viruses. In: Mandell GL, Bennett JE, Dolin R. eds. Principles and practice of infectious diseases, 5th ed. Philadelphia, PA: Churchill Livingstone, 2000;1555–6.
188. Wehrle PF, Posch J, Richter KH, Henderson DA. An airborne outbreak of smallpox in a German hospital and its significance with respect to other recent outbreaks in Europe. Bull WHO 1970;43:669–79.
189. Hawkes N. Science in Europe: smallpox death in Britain challenges presumption of laboratory safety. Science 1979;203:855–6.
190. Eickhoff TC. Airborne nosocomial infection: a contemporary perspective. Infect Control Hosp Epidemiol 1994;15:663–72.
191. Nuzum EO, Rossi CA, Stephenson EH, LeDuc JW. Aerosol tranmission of Hantaan and related viruses to laboratory rats. Am J Trop Med Hyg 1988;38:636–40.
192. CDC. Hantavirus infection — southwestern United States: Interim recommendations for risk reduction. CDC. MMWR 1993;42(No. RR-11):1–13.
193. Vitek CR, Breiman RF, Ksiazek TG, et al. Evidence against person-to-person transmission of hantavirus to health care workers. Clin Infect Dis 1996;22:824–6.
194. Wells RM, Young J, Williams RJ, et al. Hantavirus transmission in the United States. Emerg Infect Dis 1997;3:361–5.
195. Chaparro J, Vega J, Terry W, et al. Assessment of person-to-person transmission of hantavirus pulmonary syndrome in a Chilean hospital setting. J Hosp Infect 1998;40:281–5.
196. Nolte KB, Foucar K, Richmond JY. Hantaviral biosafety issues in the autopsy room and laboratory: Concerns and recommendations. Hum Pathol 1996;27:1253–4.
197. Stephenson EH, Larson EW, Dominik JW. Effect of environmental factors on aerosol-induced Lassa virus infection. J Med Virol 1984;14:295–303.
198. Monath TP. Lassa fever: review of epidemiology and epizootiology. Bull World Health Organ 1975;52:577–92.
199. Monath TP, Casals J. Diagnosis of Lassa fever and the isolation and management of patients. Bull WHO 1975;52:707–15.
200. Zweighaft RM, Fraser DW, Hattwick MA, et al. Lassa fever: response to an imported case. N Engl J Med 1977;297:803–7.
201. Cooper CB, Gransden WR, Webster M, et al. A case of Lassa fever: experience at St Thomas' hospital. Br Med J (Clin Res Ed) 1982;285:1003–5.
202. (108) Monath TP. Yellow fever: Victor, victoria? Conqueror, conquest? Epidemics and research in the last forty years and prospects for the future. Am J Trop Med Hyg 1991;45:1–43.
203. (109) CDC. Update: management of patients with suspected viral hemorrhagic fever — United States. MMWR 1995;44:475–9.
204. (110) Weber DJ, Rutala WA. Risks and prevention of nosocomial transmission rare zoonotic diseases. Clin Infect Dis 2001;32:446–56.
205. Decker MD, Schaffner W. Nosocomial diseases of healthcare workers spread by the airborne or contact routes (other than tuberculosis). In: Mayhall CG, ed. Hospital epidemiology and infection control, 2nd ed. Philadelphia, PA: Lippincott Williams & Wilkins, 1999;1101–26.

206. **(46)** Fridkin SK, Kremer FB, Bland LA, Padhye A, McNeil MM, Jarvis WR. *Acremonium kiliense* endophthalmitis that occurred after cataract extraction in an ambulatory surgical center and was traced to an environmental reservoir. Clin Infect Dis 1996;22:222–7.

207. Loeb M, Wilcox L, Thornley D, et al. *Bacillus* species pseudobacteremia following hospital construction. Can J Infect Control 1995;10:37–40.

208. Olle-Goig JE, Canela-Soler J. An outbreak of *Brucella melitensis* infection by airborne transmission among laboratory workers. Am J Public Health 1987;77:335–8.

209. Kiel FW, Khan MY. Brucellosis among hospital employees in Saudi Arabia. Infect Control Hosp Epidemiol 1993;14:268–72.

210. Staszkiewicz J, Lewis CM, Colville J, Zervos M, Band J. Outbreak of *Brucella melitensis* among microbiology laboratory workers in a community hospital. J Clin Microbiol 1991;20:287–90.

211. Fiori PL, Mastrandrea S, Rappelli P, Cappuccinelli P. *Brucella abortus* infection acquired in microbiology laboratories. J Clin Microbiol 2000;38:2005–6.

212. Spinelli JS, Ascher MS, Brooks DL, et al. Q fever crisis in San Francisco: controlling a sheep zoonosis in a lab animal facility. Lab Anim 1981;10:29–38.

213. **(Table 1)** American Conference of Governmental Industrial Hygienists (ACGIH). HVAC components, functions and malfunctions (topic 8-4). In: Industrial ventilation: a Manual of recommended practice, 24th ed. Cincinnati, OH : American Conference of Governmental Industrial Hygienists, Inc., 2001.

214. **(35)** American Society of Heating, Refrigerating and Air-conditioning Engineers, Inc. Ventilation for Indoor Air Quality. ASHRAE Standard 62-1999. Atlanta, GA: ASHRAE 1999;1–27.

215. **(133)** Burroughs HEB. Sick building syndrome: fact, fiction, or facility? In: Hansen W, ed. A guide to managing indoor air quality in health care organizations. Oakbrook Terrace, IL: Joint Commission on Accreditation of Health Care Organizations, 1997;3–13.

216. American Society of Heating, Refrigerating and Air-conditioning Engineers, Inc. Gravimetric and dust spot procedures for testing air cleaning devices used in general ventilation for removing particulate matter. ANSI/ASHRAE Standard 52-1–1999. Atlanta, GA: ASHRAE 1999;1–25.

217. Robinson TJ, Ouellet AE. Filters and filtration. ASHRAE J 1999;65–70.

218. Dryden GE, Dryden SR, Brown DG, Schatzle KC, Godzeski C. Performance of bacteria filters. Respir Care 1980;25:1127–35.

219. **(33)** Rutala WA, Jones SM, Worthington JM, Reist PC, Weber DJ. Efficacy of portable filtration units in reducing aerosolized particles in the size range of *Mycobacterium tuberculosis*. Infect Control Hosp Epidemiol 1995;16:391–8.

220. **(5)** U.S. Environmental Protection Agency, Office of Air and Radiation and U.S. Department of Health & Human Services, National Institute of Occupational Safety and Health. Building air quality: a guide for building owners and facilities managers. Washington, DC: USEPA, 1991. EPA/400/1-91/033, or NIOSH 91-114. Available at: www.cdc.gov/niosh/baqtoc html

221. **(28)** Ko G, Burge HA, Muileberg M, Rudnick S, First M. Survival of mycobacteria on HEPA filter material. J Am Biol Safety Assoc 1998;3:65–78.

222. **(6)** Rao CY, Burge HA, Chang JCS. Review of quantitative standards and guidelines for fungi in indoor air. J Air & Waste Manage Assoc 1996;46:899–906.

223. Riley RL, Wells WF, Mills CC, Nyka W, McLean RL. Air hygiene in tuberculosis: quantitative studies of infectivity and control in a pilot ward. Am Rev Tuberc 1957;75:420–31.

224. Riley RL, Nardell EA. Cleaning the air: the theory and application of UV air disinfection. Am Rev Respir Dis 1989;139:1286–94.

225. Riley RL. Ultraviolet air disinfection for control of respiratory contagion. In: Kundsin RB, ed. Architectural design and indoor microbial pollution.New York, NY: Oxford University Press, 1988;174–97.

226. Willmon TL, Hollaender A, Langmuir AD. Studies of the control of acute respiratory diseases among naval recruits. I. A review of a four-year experience with ultraviolet irradiation and dust suppressive measures, 1943 to 1947. Am J Hyg 1948;48:227–32.

227. Wells WF, Wells MW, Wilder TS. The environmental control of epidemic contagion. I. An epidemiologic study of radiant disinfection of air in day schools. Am J Hyg 1942;35:97–121.

228. Perkins JE, Bahlke AM, Silverman HF. Effect of ultra-violet irradiation of classrooms on spread of measles in large rural central schools. Am J Public Health Nations Health 1947;37:529–37.

229. Nagy R. Application and measurement of ultraviolet radiation. Am Ind Hyg Assoc J 1964;25:274–81.

230. Illuminating Engineering Society. IES Lighting handbook, 4th ed. New York, NY: Illuminating Engineering Society, 1966;25–7.

154

231. Riley RL. Indoor spread of respiratory infection by recirculation of air. Bull Physiopathol Respir 1979;15:699–705.

232. Menzies D, Pasztor J, Rand T, Bourbeau J. Germicidal ultraviolet irradiation in air conditioning systems: effect on office worker health and wellbeing — a pilot study. Occup Environ Med 1999;56:397–402.

233. Riley RL, Permutt S. Room air disinfection by ultraviolet irradiation of upper air: air mixing and germicidal effectiveness. Arch Environ Health 1971;22:208–19.

234. Nicas M, Miller SL. A multi-zone model evaluation of the efficacy of upper-room air ultraviolet germicidal irradiation. Appl Occup Environ Hyg 1999;14:317–28.

235. Kethley TW, Branch K. Ultraviolet lamps for room air disinfection: effect of sampling location and particle size of bacterial aerosol. Arch Environ Health 1972;25:205–14.

236. Riley RL, Knight M, Middlebrook G. Ultraviolet susceptibility of BCG and virulent tubercle bacilli. Am Rev Respir Dis 1976;113:413–8.

237. Collins FM. Relative susceptibility of acid-fast and non-acid-fast bacteria to ultraviolet light. Appl Microbiol 1971;21:411–3.

238. Riley RL, Permutt S, Kaufman JE. Convection, air mixing, and ultraviolet air disinfection in rooms. Arch Environ Health 1971;22:200–7.

239. Nardell EA. Fans, filters, or rays? Pros and cons of the current environmental tuberculosis control technologies. Infect Control Hosp Epidemiol 1993;14:681–5.

240. ECRI. Health devices evaluation of mobile high efficiency filter air cleaners (MHEFACs). ECRI 1997;26:367–88.

241. (103) American Society of Heating, Refrigerating, and Air-Conditioning Engineers. 1999 ASHRAE Handbook: heating, ventilating, and air-conditioning applications. Chapter 7: Health care facilities. Atlanta, GA: ASHRAE, 1999;7.1–7.13.

242. Elovitz KM. Understanding what humidity does and why. ASHRAE J 1999;April:84–90.

243. Orme I. Patient impact. In: Hansen W, ed. A guide to managing indoor air quality in health care organizations: Oakbrook Terrace, IL: Joint Commission on Accreditation of Healthcare Organizations Publications, 1997:43–52.

244. Gundermann KO. Spread of microorganisms by air-conditioning systems — especially in hospitals. Ann NY Acad Sci 1980;209–17.

245. Arundel AV, Sterling EM, Biggin JH, Sterling TD. Indirect health effects of relative humidity in indoor environments. Environ Health Perspect 1986;65:351–61.

246. U.S. Environmental Protection Agency. Ventilation and air quality in offices. Washington, DC: EPA Document #402-F-94-003, Revision: July 1990.

247. Hermans RD, Streifel AJ. Ventilation design. In: Bierbaum PJ, Lippman M, eds. Workshop on engineering controls for preventing airborne infections in workers in health care and related facilities. Cincinnatti, OH: NIOSH and CDC, 1993;107–46.

248. Memarzadeh F, Jiang J. A methodology for minimizing risk from airborne organisms in hospital isolation rooms. ASHRAE Trans 2000;106:731–47.

249. (11) Hansen W. The need for an integrated indoor air quality program. In: Hansen W, ed. A guide to managing indoor air quality in health care organizations. Oakbrook Terrace, IL: Joint Commission on Accreditation of Healthcare Organizations Publications, 1997;xiii – xviii.

250. (12) Bartley J. Ventilation. In: Pfeiffer J, ed. APIC Text of infection control and epidemiology. Washington, DC; Association for Professionals in Infection Control and Epidemiology, Inc (APIC), 2000;77.1–77.11.

251. Levine AS, Siegel SE, Schreiber AD, et al. Protected environments and prophylactic antibiotics. N Engl J Med 1973;288:477–483.

252. (90) Denning DW, Clemons KV, Hanson LH, Stevens DA. Restriction endonuclease analysis of total cellular DNA of *Aspergillus fumigatus* isolates of geographically and epidemiologically diverse origin. J Infect Dis 1990;162:1151–8.

253. Rhame FS. Prevention of nosocomial aspergillosis. J Hosp Infect 1991;18 (Suppl. A):466–72.

254. (85) Barnes RA, Rogers TR. Control of an outbreak of nosocomial aspergillosis by laminar air-flow isolation. J Hosp Infect 1989;14:89–94.

255. Roy M-C. The operating theater: a special environmental area. In: Wenzel RP, ed. Prevention and control of nosocomial infections, 3rd ed. Baltimore, MD: William & Wilkins, 1997;515–38.

256. Pavelchak N, DePersis RP, London M, et al. Identification of factors that disrupt negative air pressurization of respiratory isolation rooms. Infect Control Hosp Epidemiol 2000;21:191–5.

257. Anderson K. *Pseudomonas pyocyanea* disseminated from an air cooling apparatus. Med J Austr 1959;529–32.

258. Shaffer JG, McDade JJ. Airborne *Staphylococcus aureus*: a possible source in air control equipment. Arch Environ Health 1963;5:547–51.

259. Morey PR. Building-related illness with a focus on fungal issues. In: Hansen W, ed. A guide to managing indoor air quality in health care organizations. Oakbrook Terrace, IL: Joint Commission on Accreditation of Healthcare Organizations Publications, 1997;15–25.

260. Streifel AJ. Recognizing IAQ risk and implementing an IAQ program. In: Hansen W, ed. A guide to managing indoor air quality in health care organizations; Oakbrook Terrace, IL: Joint Commission on Accreditation of Healthcare Organizations Publications, 1997;75–91.

261. Morey PR. Appendix B. Fungal growth checklist. In: Hansen W. ed. A guide to managing indoor air quality in health care organizations. Oakbrook Terrace, IL: Joint Commission on Accreditation of Health Care Organizations Publications, 1997;129–35.

262. Brock DL, Jiankang J, Rinaldi MG, Wickes BL, Huycke MM. Outbreak of invasive *Aspergillus* infection in surgical patients, associated with a contaminated air-handling system. Clin Inf Dis 2003;37:786–93.

263. (31) National Air Duct Cleaners Association. General specifications for the cleaning of commercial HVAC systems. Washington, DC: NADCA, 2002. Publication No. NAD-06. Available at: www nadca.com/standards/standards.asp

264. (32) U.S. Environmental Protection Agency. Use of disinfectants and sanitizers in heating, ventilation, air conditioning, and refrigeration systems [letter]. March 14, 2002. Available at: www.epa.gov/oppad001/hvac htm

265. U.S. Environmental Protection Agency. Should you have the air ducts in your home cleaned? Washington, DC: EPA, 1997. EPA Document No. 402-K-97-002.

266. (159) Vujanovic V, Smoragiewicz W, Krzysztyniak K. Airborne fungal ecological niche determination as one of the possibilities for indirect mycotoxin risk assessment in indoor air. Environ Toxicol 2001;16:1–8.

267. Soules WJ. Airflow management techniques. Clean Rooms 1993;2:18–20.

268. Lawson CN. Commissioning hospitals for compliance. ASHRAE Trans 1993;99(2).

269. Wadowsky R, Benner S. Distribution of the genus *Aspergillus* in hospital room air conditioners. Infect Control 1987;8:516–8.

270. Streifel AJ. Aspergillosis and construction. In: Kundsin RB, ed. Architectural design and indoor microbial pollution. New York, NY: Oxford University Press, 1988;198–217.

271. Streifel AJ, Vesley D, Rhame FS. Occurrence of transient high levels of airborne fungal spores. Proceedings of the 6th Conference on Indoor Air Quality and Climate. Toronto, ON: 1990.

272. (73) Morey R, Williams C. Porous insulation in buildings: a potential source of microorganisms. Proceedings - Indoor Air '90, 5th International Conference. Toronto, ON: 1990;1–6.

273. (13) Bartley J. Construction and renovation. In: Pfeiffer J, ed. APIC Text of infection control and epidemiology. Washington, DC: Association for Professionals in Infection Control and Epidemiology, Inc., 2000; 72.1–72.11.

274. (14) Harvey MA. Critical-care-unit design and furnishing: Impact on nosocomial infections. Infect Control Hosp Epidemiol 1998;19:597–601.

275. (15) National Association of Children's Hospitals and Related Institutions. Patient Care Focus Groups 1998. Assessing organizational readiness for infection control issues related to construction, renovation, and physical plant projects.

276. (50) Bartley JM. APIC State-of-the-art report: the role of infection control during construction in health care facilities. Am J Infect Control 2000;28:156–9.

277. (16) Carter CD, Barr BA. Infection control issues in construction and renovation. Infect Control Hosp Epidemiol 1997;18:587–96.

278. (47) Streifel AJ. Maintenance and engineering. In: Pfeiffer J, ed. APIC Text of Infection Control and Epidemiology. Washington, DC: Association for Professionals in Infection Control and Epidemiology, Inc., 2000;76.1-76.8.

279. Kennedy V, Barnard B, Hackett B. Use of a risk matrix to determine the level of barrier protection during construction activities. Atlanta, GA : Peachtree Publications, 1997;27–8.

280. Morey PR. Building-related illness with a focus on fungal issues. In: Hansen W, ed. A auide to managing indoor air quality in health care organizations. Oakbrook Terrace, IL: Joint Commission on Accreditation of Healthcare Organizations Publications, 1997;15–25.

156

281. **(67)** Bartley J, ed. Infection control tool kit series – construction and renovation. Washington, DC: Association for Professionals in Infection Control and Epidemiology, 1999.

282. Bryce EA, Walker M, Scharf S, et al. An outbreak of cutaneous aspergillosis in a tertiary-care hospital. Infect Control Hosp Epidemiol 1996;17:170–2.

283. **(62)** Thio CL, Smith D, Merz WG, et al. Refinements of environmental assessment during an outbreak investigation of invasive aspergillosis in a leukemia and bone marrow transplant unit. Infect Control Hosp Epidemiol 2000;21:18–23.

284. **(65)** Kuehn TH, Gacek B, Yang CH, et al. Final report: ASHRAE 804-RP Phase I identification of contaminants, exposures effects, and control options for construction/renovation activities. Atlanta, GA;ASHRAE, Inc. 1995.

285. Kennedy HF, Michie JR, Richardson MD. Air sampling for *Aspergillus* spp. during building activity in a paediatric hospital ward. J Hosp Infect 1995;31:322–25.

286. Leenders ACAP, van Belkum A, Behrendt M, Luijendijk AD, Verbrugh HA. Density and molecular epidemiology of *Aspergillus* in air and relationship to outbreaks of *Aspergillus* infection. J Clin Microbiol 1999;37:1752–7.

287. Rath PM, Ansorg R. Value of environmental sampling and molecular typing of aspergilli to assess nosocomial sources of aspergillosis. J Hosp Infect 1997;37:47–53.

288. **(71)** Streifel AJ, Marshall JW. Parameters for ventilation controlled environments in hospitals. In: Design, Construction, and Operation of Healthy Buildings. Atlanta, GA: ASHRAE Press, 1998.

289. **(348)** Streifel AJ. Air cultures for fungi. In: Gilcrist M, ed. Clinical microbiology procedures handbook. Washington, DC: American Society for Microbiology Press,1992;11.8.1–11.8.7.

290. American Conference of Governmental Industrial Hygienists (ACGIH). 2000 Threshold limit Values and biological exposure indices. Cincinnati, OH: American Conference of Governmental Industrial Hygienists, Inc., 2000;1–184.

291. U.S. Department of Labor, Occupational Safety and Health Administration. Air contaminants standard. 29 CFR 1910.1000, §1910.1000, Tables Z-1, Z-3. Federal Register 1993;58:35338–51.

292. **(86)** Leenders A, vanBelkum A, Janssen S, et al. Molecular epidemiology of apparent outbreaks of invasive *Aspergillus* in a hematology ward. J Clin Microbiol 1996;34:345–51.

293. **(91)** James MJ, Lasker BA, McNeil MM, Shelton M, Warnock DW, Reiss E. Use of a repetitive DNA probe to type clinical and environmental isolates of *Aspergillus flavus* from a cluster of cutaneous infections in a neonatal intensive care unit. J Clin Microbiol 2000;38:3612–8.

294. **(92)** Skladny H, Buchheidt D, Baust C, et al. Specific detection of *Aspergillus* species in blood and bronchoalveolar lavage samples of immunocompromised patients by two-step PCR. J Clin Microbiol 1999;37:3865–71.

295. **(93)** Symoens F, Bouchara J–P, Heinemann S, Nolard N. Molecular typing of *Aspergillus terreus* isolates by random amplification of polymorphic DNA. J Hosp Infect 2000;44:273–80.

296. **(94)** Diaz-Guerra TM, Mellado E, Cuenca-Estrella M, Gaztelurrutia L, Villate Navarro JI, Rodríguez Tudela JL. Genetic similarity among one *Aspergillus flavus* strain isolated from a patient who underwent heart surgery and two environmental strains obtained from the operating room. J Clin Microbiol 2000;38:2419–22.

297. Buttner MP, Stetzenbach LD. Monitoring airborne fungal spores in an experimental indoor environment to evaluate sampling methods and the effects of human activity on air sampling. Appl Environ Microbiol 1993;59:219–26.

298. Sayer WJ, Shean DB, Ghosseiri J. Estimation of airborne fungal flora by the Anderson sampler versus the gravity settling culture plate. J Allerg 1969;44:214–27.

299. Hay RJ, Clayton YM, Goodley JM. Fungal aerobiology: how, when and where? J Hosp Infect 1995;30(Suppl):S352–7.

300. Morris G, Kokki MH, Anderson K, Richardson MD. Sampling of *Aspergillus* spores in air. J Hosp Infect 2000;44:81–92.

301. Iwen PC, Davis JC, Reed EC, Winfield BA, Hinrichs SH. Airborne fungal spore monitoring in a protective environment during hospital construction and correlation with an outbreak of invasive aspergillosis. Infect Control Hosp Epidemiol 1994;15:303–6.

302. Pegues DA, Lasker BA, McNeil MM, Hamm PM, Lundal JL, Kubak BM. Cluster of cases of invasive aspergillosis in a transplant intensive care unit: evidence of person-to-person airborne transmission. Clin Infect Dis 2002;34:412–6.

303. Goodley JM, Clayton YM, Hay RJ. Environmental sampling for aspergilli during building construction on a hospital site. J Hosp Infect 1994;26:27–35.

304. (72) American Society of Heating, Refrigerating, and Air-Conditioning Engineers (ASHRAE). The HVAC commissioning process. Atlanta, GA: ASHRAE, 1996;1–48. ASHRAE Guideline 1.

305. 63) Mermel LA, Josephson SL, Giorgio CH, Dempsey J, Parenteau S. Association of Legionnaires' disease with construction: contamination of potable water? Infect Control Hosp Epidemiol 1995;16:76–81.

306. Loo VG, Bertrand C, Dixon C, et al. Control of construction-associated nosocomial aspergillosis in an antiquated hematology unit. Infect Control Hosp Epidemiol 1996;17:360–4.

307. (68) Ottney TC. Particle management for HVAC systems. ASHRAE J 1993;35:26–28, 30, 32, 34.

308. Rautiala S, Reponen T, Nevalainen A, et al. Control of exposure to airborne viable microorganisms during remediation of moldy buildings: report of three case studies. Am Ind Hyg Assoc J 1998;59:455–60.

309. (69) Finkelstein LE, Mendelson MH. Infection control challenges during hospital renovation. Am J Nursing 1997;97:60–1.

310. Hruszkewycz V, Ruben B, Hypes CM, Bostic GD, Staszkiewicz J, Band JD. A cluster of pseudofungemia associated with hospital renovation adjacent to the microbiology laboratory. Infect Control Hosp Epidemiol 1992;13:147–50.

311. Laurel VL, Meier PA, Astorga A, Dolan D, Brockett R, Rinaldi MG. Pseudoepidemic of *Aspergillus niger* infections traced to specimen contamination in the microbiology laboratory. J Clin Microbiol 1999;37:1612–6.

312. (66) Opal SM, Asp AA, Cannady PB Jr, Morse PL, Burton LJ, Hammer II PG. Efficacy of infection control measures during a nosocomial outbreak of disseminated aspergillosis associated with hospital construction. J Infect Dis 1986;153: 634–7.

313. Fitzpatrick F, Prout S, Gilleece A, Fenelon LE, Murphy OM. Nosocomial aspergillosis during building work — a multidisciplinary approach. J Hosp Infect 1999;42:170–1.

314. Garrett DO, Jochimsen E, Jarvis W. Invasive *Aspergillus* spp. infections in rheumatology patients. J Rheumatol 1999;26:146–9.

315. Larsson L, Larsson PF. Analysis of chemical markers as a means of characterizing airborne micro-organisms in indoor environments: a case study. Indoor Built Environ 2001;10:232–7.

316. (99) Buckner CD, Clift RA, Sanders JE, et al. Protective environment for marrow transplant recipients: a prospective study. Ann Intern Med 1978;89:893–901.

317. (100) Murray WA, Streifel AJ, O'Dea TJ, Rhame FS. Ventilation for protection of immune compromised patients. ASHRAE Trans 1988;94:1185–91.

318. (101) Streifel AJ, Vesley D, Rhame FS, Murray B. Control of airborne fungal spores in a university hospital. Environment International 1989;12:441–4.

319. Perry S, Penland WZ. The portable laminar flow isolator: new unit for patient protection in a germ-free environment. In: Recent Results in Cancer Research. New York, NY: Springer-Verlag, 1970.

320. Hayden CS, Fischbach, M, Johnston OE. A model for calculating air leakage in negative pressure isolation areas. Cincinnati, OH: DHHS, 1997. NIOSH Report ECTR 212-05c.

321. DeLuga GF. Differential airflow, pressure, have key relationship in pressurization. Lab Design 1997:2:6–7.

322. Rhame FS. Nosocomial aspergillosis: How much protection for which patients? Infect Control Hosp Epidemiol 1989;10:296–8.

323. Hofflin JM, Potasman I, Baldwin JC, Oyster PE, Stinson EB, Remington JS. Infectious complications in heart transplant recipients receiving cyclosporine and corticosteroids. Ann Intern Med 1987;106:209–16.

324. Schulman LL, Smith CR, Drusin R, Rose EA, Enson Y, Reemtsma K. Respiratory complications of cardiac transplantation. Am J Med Sci 1988;296:1–10.

325. Dummer JS, Ho M. Risk factors and approaches to infections in transplant recipients. In: Mandell GL, Bennett JE, Dolin R, eds. Principles and practice of infectious diseases, 5th ed. Philadelphia, PA; Churchill Livingstone, 2000;3126–35.

326. Dummer JS, Ho M. Infections in solid organ transplant recipients. In: Mandell GL, Bennett JE, Dolin R, eds. Principles and practice of infectious diseases, 5th ed. Philadelphia, PA: Churchill Livingstone, 2000;3148–58.

327. Walsh TR, Guttendorf J, Dummer S, et al. The value of protective isolation procedures in cardiac transplant recipients. Ann Thorac Surg 1989;47:539–45.

328. Streifel AJ. Health-care IAQ: guidance for infection control. HPAC Heating/Piping/Air Cond Eng 2000; Oct:28–30, 33, 34, 36.

158

329. **(87)** Yeager CC. Copper and zinc preservatives. In: Block SS, ed. Disinfection, sterilization, and preservation, 4th ed. Philadelphia, PA: Lea & Febiger, 1991;358–61.

330. Cookson ST, Jarvis WR. Prevention of nosocomial transmission of *Mycobacterium tuberculosis*. Infect Dis Clin North Am 1997;11:367–409.

331. **(42)** CDC. Nosocomial transmission of multidrug-resistant tuberculosis among HIV-infected persons: Florida and New York, 1988–1991. MMWR 1991;40:585–91.

332. **(43)** CDC. Outbreak of multidrug-resistant tuberculosis at a hospital — New York City, 1991. MMWR 1993;42:427–34.

333. **(7)** Beck-Sague CM, Dooley SW, Hutton MD, et al. Hospital outbreak of multidrug-resistant *Mycobacterium tuberculosis*. JAMA 1992;268:1280–6.

334. **(17)** Coronado VG, Beck-Sague CM, Hutton MD, et al. Transmission of multidrug-resistant *Mycobacterium tuberculosis* among persons with human immunodeficiency virus infection in an urban hospital: Epidemiologic and restriction fragment length polymorphism analysis. J Infect Dis 1993;168:1052–5.

335. **(18)** Coronado VG, Valway S, Finelli L, et al. Nosocomial transmission of multidrug-resistant *Mycobacterium tuberculosis* among intravenous drug users with human immunodeficiency virus infection [abstract]. In: Abstracts of the Third Annual Meeting of the Society for Hospital Epidemiology of America. Chicago, IL: Infect Control Hosp Epidemiol 1993;14:428.

336. **(8)** Dooley SW, Villarino ME, Lawrence M, et al. Tuberculosis in a hospital unit for patients infected with the human immunodeficiency virus (HIV): evidence of nosocomial transmission. JAMA 1992;267:2632–4.

337. **(19)** Edlin BR, Tokars JI, Grieco MH, et al. An outbreak of multidrug-resistant tuberculosis among hospitalized patients with the acquired immunodeficiency syndrome: epidemiologic studies and restriction fragment length polymorphism analysis. N Engl J Med 1992;326:1514–22.

338. **(20)** Fischl MA, Uttamchandani RB, Daikos GL, et al. An outbreak of tuberculosis caused by multiple-drug-resistant tubercle bacilli among patients with HIV infection. Ann Intern Med 1992;117:177–83.

339. **(21)** Ikeda ARM, Birkhead GS, DeFerdinando Jr GT, et al. Nosocomial tuberculosis: an outbreak of a strain resistant to seven drugs. Infect Control Hosp Epidemiol 1995;16:152–9.

340. **(22)** Jarvis WR. Nosocomial transmission of multidrug-resistant *Mycobacterium tuberculosis*. Res Microbiol 1992;144:117–22.

341. **(23)** Jarvis WR. Nosocomial transmission of multidrug-resistant *Mycobacterium tuberculosis*. Am J Infect Control 1995;23:146–51.

342. **(24)** Jereb JA, Klevens RM, Privett TD, et al. Tuberculosis in health care workers at a hospital with an outbreak of multidrug-resistant *Mycobacterium tuberculosis*. Arch Intern Med 1995;155:854–9.

343. **(25)** Moran GJ, McCabe F, Morgan MT, Talan DA. Delayed recognition and infection control for tuberculosis patients in the emergency department. Ann Emerg Med 1995;26:283–9.

344. **(26)** Pearson ML, Jereb JA, Frieden TR, et al. Nosocomial transmission of multidrug-resistant *Mycobacterium tuberculosis*: a risk to hospitalized patients and health-care workers. Ann Intern Med 1992;117:191–6.

345. Tokars JI, Jarvis WR, Edlin BR, et al. Tuberculin skin testing of hospital employees during an outbreak of multidrug-resistant tuberculosis in human immunodeficiency virus (HIV) infected patients. Infect Control Hosp Epidemiol 1992;13:509–10.

346. Macher JM. The use of germicidal lamps to control tuberculosis in healthcare facilities. Infect Control Hosp Epidemiol 1993;14:723–9.

347. **(129)** U.S. Department of Labor, Occupational Safety and Health Administration. Respiratory Protection, 29 CFR 1910.139. Federal Register 1998;63:1152–300.

348. **(105)** Ehrenkranz NJ, Kicklighter JL. Tuberculosis outbreak in a general hospital: evidence for airborne spread of infection. Ann Intern Med 1972;77:377–82.

349. **(106)** Calder RA, Duclos P, Wilder MH, et al. *Mycobacterium tuberculosis* transmission in a health clinic. Bull Int Union Tuberc Lung Dis 1991;66:103–6.

350. **(107)** Jereb JA, Burwen DR, Dooley SW, et al. Nosocomial outbreak of tuberculosis in a renal transplant unit: application of a new technique for restriction fragment length polymorphism analysis of *Mycobacterium tuberculosis* isolates. J Infect Dis 1993;168:1219–24.

351. **(127)** Ayliffe GAJ. Role of the environment of the operating suite in surgical wound infection. Rev Infect Dis 1991;13(suppl):S800–S804.

352. **(128)** Choux M, Genitori L, Lang D, Lena G. Shunt implantation: reducing the incidence of shunt infection. J Neurosurg 1992;77:875–80.

353. Edmiston CE Jr, Sinski S, Seabrook GR, Simons D, Goheen MP. Airborne particulates in the OR environment. AORN J 1999;69:1169–72.

354. Duhaime AC, Bonner K, McGowan KL, Schut L, Sutton LN, Plotkin S. Distribution of bacteria in the operating room environment and its relation to ventricular shunt infections: a prospective study. Childs Nerv Syst 1991;7:211–4.

355. Everett WD, Kipp H. Epidemiologic observations of operating room infections resulting from variations in ventilation and temperature. Am J Infect Control 1991;19:277–82.

356. (115) Lidwell OM. Clean air at operation and subsequent sepsis in the joint. Clin Orthop 1986;211;91–02.

357. (116) Nichols RL. The operating room. In: Bennett JV, Brachman PS, eds. Hospital infections, 3rd ed. Boston, MA: Little, Brown and Company, 1992;461–73.

358. (117) Clark RP, Reed PJ, Seal DV, Stephenson ML. Ventilation conditions and air-borne bacteria and particles in operating theatres: proposed safe economies. J Hyg (Lond) 1985;95:325–35.

359. (119) Laufman H. The operating room. In: Bennett JV, Brachman PS, eds. Hospital infections, 2nd ed. Boston, MA/Toronto, ON: Little, Brown and Company, 1986;315–23.

360. Pittet D, Ducel G. Infectious risk factors related to operating rooms. Infect Control Hosp Epidemiol 1994;15:456–62.

361. Hambraeus A. Aerobiology in the operating room — a review. J Hosp Infect 1988;11(suppl. A):68–76.

362. (118) Babb JR, Lynam P, Ayliffe GAJ. Risk of airborne transmission in an operating theater containing four ultraclean air units. J Hosp Infect 1995;31:159–68.

363. Velesco, E, Thuler LCS, Martins CAS, deCastroDias LM, Conalves VMSC. Risk factors for infectious complications after abdominal surgery for malignant disease. Am J Infect Control 1996;24:1–6.

364. (120) National Academy of Sciences, National Research Council, Division of Medical Sciences, Ad Hoc Committee on Trauma. Postoperative wound infections: the influence of ultraviolet irradiation of the operating room and of various other factors. Ann Surg 1964;160 (suppl.):1–192.

365. (121) Charnley J. A clean-air operating enclosure. Br J Surg 1964;51:202–5.

366. (122) Lidwell OM, Lowbury EJL, Whyte W, Blowers R, Stanley SJ, Lowe D. Effect of ultraclean air in operating rooms on deep sepsis in the joint after total hip or knee replacement: a randomized study. Br Med J 1982;285:10–4.

367. (123) Hill C, Flamant R, Mazas F, Evrard J. Prophylactic cefazolin versus placebo in total hip replacement: report of a multicentre double-blind randomized trial. Lancet 1981;1:795–6.

368. (124) Ha'eri GB, Wiley AM. Total hip replacement in a laminar flow environment with special reference to deep infections. Clin Orthop 1980;148:163–8.

369. (125) Collins DK, Steinhaus K. Total hip replacement without deep infection in a standard operating room. J Bone Joint Surg 1976;58A:446–50.

370. (126) Taylor GD, Bannister GC, Leeming JP. Wound disinfection with ultraviolet radiation. J Hosp Infect 1995;30:85–93.

371. (130) Langevin PB, Rand KH, Layton AJ. The potential for dissemination of *Mycobacterium tuberculosis* through the anesthesia breathing circuit. Chest 1999;115:1107–14.

372. (131) U.S. Department of Labor, Occupational Safety and Health Administration. Occupational exposure to tuberculosis: proposed rule. (29 CFR 1910). Federal Register 1997;62:54159–209.

373. (132) Aranha-Creado H, Prince D, Greene K, Brandwein H. Removal of *Mycobacterium* species by breathing circuit filters. Infect Control Hosp Epidemiol 1997;18:252–254.

374. Anesthesiology Society of America. Infection Control for Practice of Anesthesisology. 1999. Available at: www.asahq.org/Profinfo/Infection/Infection_TOC html

375. McCarthy JF. Risk factors for occupational exposures in healthcare professionals. In: Hansen W, ed. A guide to managing indoor air quality in health care organizations. Oakbrook Terrace IL: Joint Commission on Accreditation of Healthcare Organizations, 1997;27–41.

376. National Institute for Occupational Safety and Health. NIOSH Health Hazard Evaluation and Technical Assistance Report: HETA 85-126-1932;1988.

377. National Institute for Occupational Safety and Health. NIOSH Health Hazard Evaluation and Technical Assistance Report: HETA 88-101-2008;1990.

378. (135) National Institute for Occupational Safety and Health. Control of smoke from laser/electric surgical procedures. DHHS (NIOSH) Publication 96-128;1996. Available at: www.cdc.gov/niosh/hc11.html

379. Taravella MJ, Weinberg A, Blackburn P, May M. Do intact viral particles survive excimer laser ablation? Arch Ophthalmol 1997;115:1028–30.

160

380. Hagen KB, Kettering JD, Aprecio RM, et al. Lack of virus transmission by the excimer laser plume. Am J Ophthalmol 1997;124:206–11.

381. Kunachak S, Sithisarn P, Kulapaditharom B. Are laryngeal papilloma virus-infected cells viable in the plume derived from a continuous mode carbon dioxide laser, and are they infectious? A preliminary report on one laser mode. J Laryng Otol 1996;110:1031–3.

382. **(137)** Hughes PS, Hughes AP. Absence of human papillomavirus DNA in the plume of erbium:YAG laser-treated warts. J Am Acad Dermatol 1998;38:426–8.

383. Garden JM, O'Bannion K, Sheinitz LS, et al. Papillomavirus in the vapor of carbon dioxide laser treated verrucase. JAMA 1988;125:1199–202.

384. Sawchuck WS, Weber JP, Lowry DR, et al. Infectious papillomavirus in the vapour of warts treated with carbon dioxide laser or electrocoagulation: detection and protection. J Am Acad Dermatol 1989;21:41–9.

385. Baggish MS, Poiesz BJ, Joret D, et al. Presence of human immunodeficiency virus DNA in laser smoke. Lasers Surg Med 1991;11:197–203.

386. **(138)** Capizzi PJ, Clay RP, Battey MJ. Microbiologic activity in laser resurfacing plume and debris. Lasers Surg Med 1998;23:172–4.

387. McKinley IB Jr, Ludlow MO. Hazards of laser smoke during endodontic therapy. J Endodont 1994;20:558.

388. Favero MS, Bolyard EA. Microbiologic considerations: disinfection and sterilization strategies and the potential for airborne transmission of bloodborne pathogens. Surg Clin North Am 1995;75:1071–89.

389. **(136)** Association of periOperative Registered Nurses. Recommended practices for laser safety in practice settings. In: Standards, Recommended Practices and Guidelines. Denver CO; AORN;2003;301–5.

390. **(139)** ECRI. Surgical smoke evacuation systems. Health Devices 1997;26:132–72.

391. **(140)** ECRI. Update evaluation: Surgical smoke evacuation systems. Health Devices 1999;28:333–62.

392. **(141)** ECRI. Stationary surgical smoke evacuation systems. Health Devices 2001;30:73–86.

393. American National Standards Institute. ANSI National standard for safe use of lasers in health care facilities. ANSI Z136.3-1996.

394. Kaufman AF, McDade J, Patton C, et al. Pontiac fever: isolation of the etiologic agent (*Legionella pneumophila*) and demonstration of its mode of transmission. Am J Epidemiol 1981;114:337–47.

395. **(192)** Marston BJ, Lipman HB, Breiman RF. Surveillance for Legionnaires' disease: risk factors for morbidity and mortality related to infection with *Legionella*. Arch Intern Med 1994;154:2417–22.

396. **(Appendix; 4)** Hoge CW, Breiman RF. Advances in the epidemiology and control of *Legionella* infections. Epidemiol Rev 1991;13:329–40.

397. Breiman RF, Butler JC. Legionnaires' disease: clinical, epidemiological, and public health perspectives. Semin Respir Infect 1998;13:84–9.

398. Yu, VL. *Legionella pneumophila* (Legionnaires' disease). In: Mandell GL, Bennett JE, Dolin R, eds. Principles and practice of infectious diseases, 5th ed. Philadelphia, PA: Churchill Livingstone, 2000;2424–35.

399. Muder RR. Other *Legionella* species. In: Mandell GL, Bennett JE, Dolin R, eds. Principles and practice of infectious diseases, 5th ed. Philadelphia, PA: Churchill Livingstone, 2000;2435–41.

400. Yu VL. Could aspiration be the major mode of transmission for *Legionella*? Am J Med 1993;95:13–5.

401. Jimenez P, Torres A, Rodriguez-Roisin R, et al. Incidence and etiology of pneumonia acquired during mechanical ventilation. Crit Care Med 1989;17:882–5.

402. **(220)** Zuravleff JJ, Yu VL, Shonnard JW, Rihs JD, Best M. *Legionella pneumophila* contamination of a hospital humidifier: demonstration of aerosol transmission and subsequent subclinical infection in exposed guinea pigs. Am Rev Respir Dis 1983;128:657–61.

403. **(202)** Mastro TD, Fields BS, Breiman RF, Campbell J, Plikaytis BD, Spika JS. Nosocomial Legionnaires' disease and use of medication nebulizers. J Infect Dis 1991;163:667–70.

404. **(203)** Dondero TJ Jr, Rendtorff RC, Mallison GF, et al. An outbreak of Legionnaires' disease associated with a contaminated air-conditioning cooling tower. N Engl J Med 1980;302:365–70.

405. **(199)** Garbe PL, Davis BJ, Weisfield JS, et al. Nosocomial Legionnaires' disease: epidemiologic demonstration of cooling towers as a source. JAMA 1985;254:521–4.

406. **(204)** O'Mahony MC, Stanwell-Smith RE, Tillett HE, et al. The Stafford outbreak of Legionnaires' disease. Epidemiol Infect 1990;104:361–80.

407. **(205)** Breiman RF, Fields BS, Sanden G, Volmer L, Meier A, Spika J. An outbreak of Legionnaires' disease associated with shower use: possible role of amoebae. JAMA 1990;263:2924–6.

408. (200) Hanrahan JP, Morse DL, Scharf VB, et al. A community hospital outbreak of legionellosis: transmission by potable hot water. Am J Epidemiol 1987;125:639–9.

409. (206) Breiman RF, VanLoock FL, Sion JP, et al. Association of "sink bathing" and Legionnaires' disease [abstract]. In: Abstracts of the 91st Meeting of the American Society for Microbiology, 1991.

410. (207) Struelens MJ, Maes N, Rost F, et al. Genotypic and phenotypic methods for the investigation of a nosocomial *Legionella pneumophila* outbreak and efficacy of control measures. J Infect Dis 1992;166:22–30.

411. Terranova W, Cohen ML, Fraser DW. Outbreak of Legionnaires' disease diagnosed in 1977. Lancet 1978;2:122–4.

412. (219) Marrie TJ, Haldane D, MacDonald S, et al. Control of endemic nosocomial Legionnaires' disease by using sterile potable water for high risk patients. Epidemiol Infect 1991;107:591–605.

413. Nechwatal R, Ehret W, Klatte OJ, et al. Nosocomial outbreak of legionellosis in a rehabilitation center: demonstration of potable water as a source. Infection 1993;21:235–40.

414. Hoebe CJP, Cluitmanans JJM, Wagenvoort JHT. Two fatal cases of nosocomial *Legionella pneumophila* pneumonia associated with a contaminated cold water supply. Eur J Clin Microbiol Infect Dis 1998;17:740–9.

415. Helms CM, Viner JP, Sturm RH, et al. Comparative features of pneumococcal, *Mycoplasma*, and Legionnaires' disease pneumonias. Ann Intern Med 1979;90:543–7.

416. Yu V, Kroboth FJ, Shonnard J, Brown A, McDearman S, Magnussen M. Legionnaires' disease: new clinical perspectives from a prospective pneumonia study. Am J Med 1982;73:357–61.

417. (194) Jimenez ML, Aspa J, Padilla B, et al. Fiberoptic bronchoscopic diagnosis of pulmonary disease in 151 HIV-infected patients with pneumonitis. Eur J Clin Microbiol Infect Dis 1991;10:491–6.

418. Lowry PW, Blankenship RJ, Gridley W, et al. A cluster of *Legionella* sternal wound infections due to postoperative topical exposure to contaminated tap water. N Engl J Med 1991;324:109–12.

419. Shah A, Check F, Baskin S. Legionnaires' disease and acute renal failure: case report and review. Clin Infect Dis 1992;14:204–7.

420. Lowry PW, Tompkins LS. Nosocomial legionellosis: a review of pulmonary and extrapulmonary syndromes. Am J Infect Control 1993;21:21–7.

421. Schlanger G, Lutwick LI, Kurzman M, et al. Sinusitis caused by *L. pneumophila* in a patient with acquired immune deficiency syndrome. Am J Med 1984;77:957–60.

422. Tompkins LS, Roessler BJ, Redd SC, et al. *Legionella* prosthetic-valve endocarditis. N Engl J Med 1988;318:530–5.

423. (195) Bock BV, Kirby BD, Edelstein PH, et al. Legionnaires' disease in renal transplant recipients. Lancet 1978;1:410–3.

424. (196) Kirby BD, Snyder KM, Meyer RD, Finegold SM. Legionnaires' disease: report of 65 nosocomially acquired cases and review of the literature. Medicine 1980;59:188–205.

425. (197) Brady MT. Nosocomial Legionnaires' disease in a children's hospital. J Pediatr 1989;115:46–50.

426. Horie H, Kawakami H, Minoshima K, et al. Neonatal Legionnaires' disease: histologic findings in an autopsied neonate. Acta Pathol Jpn 1992;42:427–31.

427. Roig J, Aguilar X, Ruiz J, et al. Comparative study of *Legionella pneumophila* and other nosocomial pneumonias. Chest 1991;99:344–50.

428. Redd SC, Schuster DM, Quan J, et al. Legionellosis cardiac transplant recipients: results of a nationwide survey. J Infect Dis 1988;158:651–3.

429. Seu P, Winston DJ, Olthoft KM, et al. Legionnaires' disease in liver transplant recipients. Infect Dis Clin Pract 1993;2:109–13.

430. (215) Chow JW, Yu VL. *Legionella*: a major opportunistic pathogen in transplant recipients. Semin Respir Infect 1998;13:132–9.

431. (189) Kool JL, Fiore AE, Kioski CM, et al. More than ten years of unrecognized nosocomial transmission of Legionnaires' disease among transplant patients. Infect Control Hosp Epidemiol 1998;19:898–904.

432. (190) Le Saux NM, Sekla L, McLeod J, et al. Epidemic of nosocomial Legionnaires' disease in renal transplant recipients: a case-control and environmental study. Can Med Assoc J 1989;140:1047–53.

433. Berendt RF, Young HW, Allen RG, Knutsen GL. Dose-response of guinea pigs experimentally infected with aerosols of *Legionella pneumophila*. J Infect Dis 1980;141:186–92.

434. Marston BJ, Plouffe JF, File TM, et al. Incidence of community-acquired pneumonia requiring hospitalization — results of a population-based active surveillance study in Ohio. Arch Intern Med 1997;157:1709–18.

162

435. **(198)** Muder RR, Yu VL, McClure JK, Kroboth FJ, Kominos SD, Lumish RN. Nosocomial Legionnaires' disease uncovered in a prospective pneumonia study: implications for underdiagnosis. JAMA 1983;249:3184–8.

436. Brennen C, Vickers JP, Yu VL, Puntereri A, Yee YC. Discovery of occult *Legionella pneumonia* in a long-stay hospital: Results of prospective serologic survey. Br Med J 1987;295:306–7.

437. **(166)** Marrie TJ, MacDonald S, Clarke K, Haldane D. Nosocomial Legionnaires' disease: lessons from a four-year prospective study. Am J Infect Control 1991;19:79–85.

438. Stout JE, Yu, VL. Current concepts: legionellosis. N Engl J Med 1997;337:682–7.

439. Vergis EN, Yu VL. Macrolides are ideal for empiric therapy of community-acquired pneumonia in the immunocompromised host. Semin Respir Infect 1998;13:322–8.

440. Sopena N, Sabria-Leal M, Pedro-Botet ML, et al. Comparative study of the clinical presentation of *Legionella pneumonia* and other community-acquired pneumonias. Chest 1998;113:1195–200.

441. **(217)** Hirani NA, MacFarlane JT. Impact of management guidelines on the outcome of severe community acquired pneumonia. Thorax 1997;52:17–21.

442. Lieberman D, Porath A, Schlaeffer F, Boldur L. *L. pneumophila* species community-acquired pneumonia: a review of 56 hospitalized patients. Chest 1996;109:1243–9.

443. Ewig S, Bauer T, Hasper E, et al. Value of routine microbial investigation in community-acquired pneumonia treated in a tertiary care center. Respiration 1996;63:164–9.

444. Marrie TJ, Peeling RW, Fine MJ, et al. Ambulatory patients with community-acquired pneumonia: the frequency of atypical agents and clinical course. Am J Med 1996;101:508–15.

445. Benin AI, Benson RF, Besser RE. Trends in Legionnaires' disease, 1980–1998: declining mortality and new patterns of diagnosis. Clin Infect Dis 2002;35:1039–46.

446. Fliermans CD, Cherry WB, Orrison LH, Smith SJ, Tison DL, Pope DH. Ecologic distribution of *Legionella pneumophila*. Appl Environ Microbiol 1981;41:9–16.

447. Morris GK, Patton CM, Feeley JC, et al. Isolation of the Legionnaires' disease bacterium from environmental samples. Ann Intern Med 1979;90:664–6.

448. Hsu SC, Martin R, Wentworth BB. Isolation of *Legionella* species from drinking water. Appl Environ Microbiol 1984;48:830–2.

449. Tison DL, Seidler RJ. *Legionella* incidence and density in potable drinking water. Appl Environ Microbiol 1983;45:337–9.

450. Parry MF, Stampleman L, Hutchinson JH, et al. Waterborne *Legionella bozemanii* and nosocomial pneumonia in immunosuppressed patients. Ann Intern Med 1985;103:205–10.

451. England AC, Fraser DW. Sporadic and epidemic nosocomial legionellosis in the United States: epidemiologic features. Am J Med 1981;70:707–11.

452. Cohen ML, Broome CV, Paris AL, et al. Fatal nosocomial Legionnaires' disease: clinical and epidemiological characteristics. Ann Intern Med 1979;90:611–3.

453. **(193)** Haley CE, Cohen ML, Halter J, Meyer RD. Nosocomial Legionnaires' disease: a continuing common-source epidemic at Wadsworth Medical Center. Ann Intern Med 1979;90:583–6.

454. Stout JE, Yu VL, Vickers RM, Shonnard J. Potable water supply as the hospital reservoir for Pittsburgh pneumonia agent. Lancet 1982;1:471–2.

455. **(201)** Arnow PM, Chou T, Weil D, Shapiro EN, Kretzschmar C. Nosocomial Legionnaires' disease caused by aerosolized tap water from respiratory devices. J Infect Dis 1982;146:460–7.

456. Farrell ID, Barker JE, Miles EP, Hutchinson JCP. A field study of the survival of *Legionella pneumophila* in a hospital hot-water system. Epidemiol Infect 1990;104:381–7.

457. Stout JE, Yu VL, Best MG. Ecology of *Legionella pneumophila* within water distribution systems. Appl Environ Microbiol 1985;49:221–8.

458. Sanden GN, Fields BS, Barbaree JM, et al. Viability of *Legionella pneumophila* in chlorine-free water at elevated temperatures. Curr Microbiol 1989;61–5.

459. Schulze-Röbbecke R, Rodder M, Exner M. Multiplication and killing temperatures of naturally occurring legionellae. Zbl Bakt Hyg B 1987;184:495–500.

460. Habicht W, Muller HE. Occurrence and parameters of frequency of *Legionella* in warm water systems of hospitals and hotels in Lower Saxony. Zbl Bakt Hyg B 1988;186:79–88.

461. Ciesielski CA, Blaser MJ, Wang WL. Role of stagnation and obstruction of water flow in isolation of *Legionella pneumophila* from hospital plumbing. Appl Environ Microbiol 1984;48:984–7.

462. Rowbotham TJ. Preliminary report on the pathogenicity of *Legionella pneumophila* for freshwater and soil amoebae. J Clin Path 1980;33:179–83.

463. Fields BS, Sanden GN, Barbaree JM, et al. Intracellular multiplication of *Legionella pneumophila* in amoebae isolated from hospital hot water tanks. Curr Microbiol 1989;18:131–7.

464. (142) Villarino ME, Stevens LE, Schable B, et al. Risk factors for epidemic *Xanthomonas maltophilia* infection/colonization in intensive care unit patients. Infect Control Hosp Epidemiol 1992;13:201–6.

465. (147) Burdge DR, Nakielna EM, Noble MA. Case-control and vector studies of nosocomial acquisition of *Pseudomonas cepacia* in adult patients with cystic fibrosis. Infect Control Hosp Epidemiol 1993;14:127–30.

466. Stephenson JR, Heard SR, Richards MA, Tabaqchali S. Gastrointestinal colonization and septicaemia with *Pseudomonas aeruginosa* due to contaminated thymol mouthwash in immunocompromised patients. J Hosp Infect 1985;6:369–78.

467. Kolmos HJ, Thusen B, Neilsen SV, Lohmann M, Kristoffersen K, Rosdahl VT. Outbreak of infection in a burns unit due to *Pseudomonas aeruginosa* originating from contaminated tubing used for irrigating patients. J Hosp Infect 1993;24:11–21.

468. Vanholder R, Vanhaecke E, Ringoir S. Waterborne *Pseudomonas* septicemia. ASAIO Trans 1990;36:M215–6.

469. Ehni WF, Reller LB, Ellison RT III. Bacteremia in granulocytopenic patients in a tertiary-care general hospital. Rev Infect Dis 1991;13:613–9.

470. Gallagher PG, Watanakunakorn C. *Pseudomonas* bacteremia in a community teaching hospital, 1980–1984. Rev Infect Dis 1989;11:846–52.

471. Centers for Disease Control. Nosocomial infection and pseudoinfection from contaminated endoscopes and bronchoscopes — Wisconsin and Missouri. MMWR 1991;40:675–8.

472. Kerr JR, Moore JE, Curran MD, et al. Investigation of a nosocomial outbreak of *Pseudomonas aeruginosa* pneumonia in an intensive care unit by random amplification of polymorphic DNA assay. J Hosp Infect 1995;30:125–31.

473. Brewer SC, Wunderink RG, Jones CB, Leeper KV. Ventilator-associated pneumonia due to *Pseudomonas aeruginosa*. Chest 1996;109:1019–22.

474. Rello J, Jubert P, Valles J, et al. Evaluation of outcome for intubated patients with pneumonia due to *Pseudomonas aeruginosa*. Clin Infect Dis 1996;23:973–8.

475. Henderson A, Kelly W, Wright M. Fulminant primary *Pseudomonas aeruginosa* pneumonia and septicaemia in previously well adults. Intensive Care Med 1992;18:430–2.

476. Torres A, Serra-Battles J, Ferrer A, et al. Severe community acquired pneumonia: epidemiology and prognostic factors. Am Rev Respir Dis 1991;144:312–8.

477. Pedersen SS, Koch C, Høiby N, Rosendal K. An epidemic spread of multiresistant *Pseudomonas aeruginosa* in a cystic fibrosis center. J Antimicrob Chemother 1986;17:505–6.

478. Kubesch P, Dörk T, Wulbrand U, et al. Genetic determinants of airways' colonization with *Pseudomonas aeruginosa* in cystic fibrosis. Lancet 1993;341:189–93.

479. Koch C, Høiby N. Pathogenesis of cystic fibrosis. Lancet 1993;341:1065–9.

480. Worlitzsch D, Wolz C. Botzenart K, et al. Molecular epidemiology of *Pseudomonas aeruginosa* – urinary tract infections in paraplegic patients. Zentrabl Hyg Umweltmed 1989;189:175–84.

481. Glenister H, Holton J, Teall A. Urinary tract pressure recording equipment as a source for infection. J Hosp Infect 1985;6:224–6.

482. Ferroni A., Nguyen L, Pron B, Quense G, Brusset MC, Berche P. Outbreak of nosocomial urinary tract infections due to *Pseudomonas aeruginosa* in a paediatric surgical unit associated with tap water contamination. J Hosp infect 1998;39:301–7.

483. Marrie TJ, Major H, Gurwith M, et al. Prolonged outbreak of nosocomial urinary tract infection with a single strain of *Pseudomonas aeruginosa*. Can Med Assoc J 1978;119:593–8.

484. Moore B, Forman A. An outbreak of urinary *Pseudomonas aeruginosa* infection acquired during urological operations. Lancet 1966;2:929–31.

485. Anderson RJ, Schafer LA, Olin DB, Eickhoff TC. Septicemia in renal transplant recipients. Arch Surg 1973;106:692–4.

486. Fang G, Brennen C, Wagener M, et al. Use of ciprofloxacin versus use of aminoglycosides for therapy of complicated urinary tract infection: prospective, randomized clinical and pharmacokinetic study. Antimicrob Agents Chemother 1991;35:1849–55.

487. Dorff GJ, Beimer NF, Rosenthal DR, Rytel MW. *Pseudomonas* septicemia: illustrated evolution of its skin lesions. Arch Intern Med 1971;128:591–5.

488. Teplitz C. Pathogenesis of *Pseudomonas vasculitis* and septic lesions. Arch Pathol 1965;80:297–307.

164

489. Roberts R, Tarpay MM, Marks MI, Nitschke R. Erysipelas-like lesions and hyperesthesia as manifestations of *Pseudomonas aeruginosa* sepsis. JAMA 1982;248:2156–7.

490. Duncan BW, Adzick NS, deLorimier AA, et al. Necrotizing fasciitis in childhood. J Pediatr Surg 1992;27:668–71.

491. McManus AT, Mason AD Jr, McManus WF, Pruitt BA Jr. Twenty-five year review of *Pseudomonas aeruginosa* bacteremia in a burn center. Eur J Clin Microbiol 1985;4:219–23.

492. Tredget EE, Shankowsky HA, Joffe AM, et al. Epidemiology of infections with *Pseudomonas aeruginosa* in burn patients: the role of hydrotherapy. Clin Infect Dis 1992;15:941–9.

493. Schlech WF III, Simosen N, Sumarah R, Martin RS. Nosocomial outbreak of *Pseudomonas aeruginosa* folliculitis associated with a physiotherapy pool. Can Med Assoc J 1986;134:909–13.

494. Fang G, Keys TF, Gentry LO, et al. Prosthetic valve endocarditis resulting from nosocomial bacteremia: a prospective, multicenter study. Ann Intern Med 1993;119:560–7.

495. Cohen PS, Maguire JH, Weinstein L. Infective endocarditis caused by gram-negative bacteria: a review of the literature, 1945–1977. Prog Cardiovasc Dis 1980;22:205–42.

496. Wise BL, Mathis JL, Jawetz E. Infections of the central nervous system due to *Pseudomonas aeruginosa*. J Neurosurg 1969;31:432–4.

497. Bray DA, Calcaterra TC. *Pseudomonas* meningitis complicating head and neck surgery. Laryngoscope 1976;86:1386–90.

498. Schein OD, Wasson PJ, Boruchoff SA, Kenyon KR. Microbial keratitis associated with contaminated ocular medications. Am J Ophthalmol 1988;105:361–5.

499. Procope JA. Delayed-onset *Pseudomonas* keratitis after radial keratotomy. J Cataract Refract Surg 1997;23:1271–2.

500. Sapico FL, Montgomerie JZ. Vertebral osteomyelitis in intravenous drug abusers: report of three cases and review of the literature. Rev Infect Dis 1980;2:196–206.

501. Tindel JR, Crowder JG. Septic arthritis due to *Pseudomonas aeruginosa*. JAMA 1971;218:559–61.

502. Martone WJ, Tablan OC, Jarvis WR. The epidemiology of nosocomial epidemic *Pseudomonas cepacia* infections. Eur J Epidemiol 1987;3:222–32.

503. Goldmann DA, Klinger JD. *Pseudomonas cepacia*: biology, mechanisms of virulence, epidemiology. J Pediatr 1986;108:806–12.

504. Widmer AF, Wenzel RP, Trilla A, et al. Outbreak of *Pseudomonas aeruginosa* infections in a surgical intensive care unit: probable transmission via hands of a health care worker. Clin Infect Dis 1993;16: 372–6.

505. Döring G, Hörz M, Ortelt J, et al. Molecular epidemiology of *Pseudomonas aeruginosa* in an intensive care unit. Epidemiol Infect 1993;110:427–36.

506. Hollyoak V, Allison D, Summers J. *Pseudomonas aeruginosa* wound infection associated with a nursing home whirlpool bath. CDR Review 1995;5:R100–2.

507. Grundmann H, Kropec A, Hartung D, Berner R, Daschner F. *Pseudomonas aeruginosa* in a neonatal intensive care unit: reservoirs and ecology of the nosocomial pathogen. J Infect Dis 1993;168:943–7.

508. Martino P, Venditti M, Papa G, Orefici G, Serra P. Water supply as a source of *Pseudomonas aeruginosa* in a hospital for hematological malignancies. Bollettino dell Istituto Sieroterapico Milanese 1985;64:109–14.

509. Ayliffe GAJ, Babb JR, Collins BJ, Lowbury EJ, Newsom SWB. *Pseudomonas aeruginosa* in hospital sinks. Lancet 1974;2:578–81.

510. Kluyver AJ. *Pseudomonas aureofaciens* nov. spec and its pigments. J Bacteriol 1956;72:406–11.

511. Romling U, Fiedler B, Bosshammer J, et al. Epidemiology of chronic *Pseudomonas aeruginosa* infections in cystic fibrosis. J Infect Dis 1994:170:1616–21.

512. Jones F, Bartlett CL. Infections associated with whirlpools and spas. Soc Appl Bacteriol Symp Series 1985;14:61S–6S.

513. Casewell MW, Slater NG, Cooper JE. Operating theater water-baths as a cause of *Pseudomonas* septicemia. J Hosp Infect 1981;2:237–47.

514. Rechsteiner J, Landheer JE, de Jong J, van Kregten E, Lindner JG. [Kidney lithotriptor as a possible source of hospital infection]. Nederlands Tijdschrift voor Geneeskunde 1988;132:1849–59. (Dutch)

515. (308) Taplin D, Mertz PM. Flower vases in hospitals as reservoirs for pathogens. Lancet 1973;2: 1279–1281.

516. Kaiser AB. Humidifiers and *Pseudomonas* infections. N Engl J Med 1970;283:708.

517. Levin MH, Olson B, Nathan C, et al. *Pseudomonas* in the sinks in an intensive care unit: relation to patients. J Clin Pathol 1984;37:424–7.

518. Paszko-Kolva C, Yamamoto H, Shahamat M, Sawyer TK, Morris G, Colwell RR. Isolation of amoebae and *Pseudomonas* and *Legionella* spp. from eyewash stations. Appl Environ Microbiol 1991;57:163–7.

519. Struelens MJ, Rost F, Deplano A, et al. *Pseudomonas aeruginosa* and *Enterobacteriaceae* bacteremia after biliary endoscopy: an outbreak investigation using DNA macrorestriction analysis. Am J Med 1993;95:489–98.

520. Blanc DS, Parret T, Janin B, Raselli P, Francioli P. Nosocomial infections and pseudoinfections from contaminated bronchoscopes: two-year follow up using molecular markers. Infect Control Hosp Epidemiol 1997;18:134–6.

521. Boukadida J, de Montalembert M, Gaillard JL, et al. Outbreak of gut colonization by *Pseudomonas aeruginosa* in immunocompromised children undergoing total digestive decontamination: analysis by pulsed-field electrophoresis. J Clin Microbiol 1991;29:2068–71.

522. Grigis A, Goglio A, Parea M, Gnecchi F, Minetti B, Barbui T. Nosocomial outbreak of severe *Pseudomonas aeruginosa* infections in haematological patients. Eur J Epidemiol 1993;9:390–5.

523. Gupta AK, Shashi S, Mohan M, Lamba IM, Gupta R. Epidemiology of *Pseudomonas aeruginosa* infections in a neonatal intensive care unit. J Trop Pediatr 1993;39:32–6.

524. Sader HS Pignatari AC, Leme IL, et al. Epidemiologic typing of multiply drug-resistant *Pseudomonas aeruginosa* isolated from an outbreak in an intensive care unit. Diagn Microbiol Infect Dis 1993;17:13–8.

525. Krecmery V, Trupl J. Nosocomial outbreak of meropenem-resistant *Pseudomonas aeruginosa* infections in a cancer center. J Hosp Infect 1994;28:209–18.

526. Jumaa P, Chattopadhyay B. Outbreak of gentamicin, ciprofloxacin-resistant *Pseudomonas aeruginosa* in an intensive care unit, traced to contaminated quivers. J Hosp Infect 1994;28:209–18.

527. Carson LA, Favero MS, Bond WW, Petersen NJ. Morphological, biochemical, and growth characteristics of *Pseudomonas cepacia* from distilled water. Appl Microbiol 1973;25:476–83.

528. Bassett DC, Stokes KJ, Thomas WR. Wound infection with *Pseudomonas multivorans*: a waterborne contaminant of disinfectant solutions. Lancet 1970;1:1188–91.

529. Wishart MM, Riley TV. Infection with *Pseudomonas maltophilia*: hospital outbreak due to contaminated disinfectant. Med J Aust 1976;2:710–2.

530. Conly JM, Klass L, Larson L. *Pseudomonas cepacia* colonization and infection in intensive care units. Can Med Assoc J 1986;134:363–6.

531. Bosshammer J, Fielder B, Gudowis P, von der Hardt H, Romling U, Tummler B. Comparative hygienic surveillance of contamination with pseudomonads in a cystic fibrosis ward over a 4-year period. J Hosp Infect 1995;31:261–74.

532. Hutchinson GR, Parker S, Pryor JA, et al. Home-use nebulizers: a potential primary source of *B. cepacia* and other colistin-resistant, gram-negative bacteria in patients with cystic fibrosis. J Clin Microbiol 1996;34:584–7.

533. Pegues DA, Carson LA, Anderson RL, et al. Outbreak of *Pseudomonas cepacia* bacteremia in oncology patients. Clin Infect Dis 1993;16:407–11.

534. CDC. Nosocomial *Burkholderia cepacia* infection and colonization with intrinsically contaminated mouthwash — Arizona, 1998. MMWR 1998;47:926–8.

535. Berthelot P, Grattard F, Mahul P, et al. Ventilator temperature sensors: an unusual source of *Pseudomonas cepacia* in nosocomial infection. J Hosp Infect 1993;25:33–43.

536. Khardori N, Elting L, Wong E, et al. Nosocomial infections due to *Xanthomonas maltophilia* (*Pseudomonas maltophilia*) in patients with cancer. Rev Infect Dis 1990;12:997–1003.

537. Oie S, Oomaki M, Yorioka K, et al. Microbial contamination of "sterile water" used in Japanese hospitals. J Hosp Infect 1998;38:61–5.

538. Crane LR, Tagle LC, Palutke WA. Outbreak of *Pseudomonas paucimobilis* in an intensive care facility. JAMA 1981;246:985–7.

539. Lemaitre D, Elaichouni A, Hundhausen M, et al. Tracheal colonization with *Sphingomonas paucimobilis* in mechanically-ventilated neonates due to contaminated ventilator temperature probes. J Hosp Infect 1996;32:199–206.

540. Maki DG, Klein BS, McCormick RD, et al. Nosocomial *Pseudomonas pickettii* bacteremias traced to narcotic tampering. A case for selective drug screening of health care personnel. JAMA 1991;265:981–6.

541. Maroye P, Doermann HP, Rogues AM, Gachie JP, Mégraud F. Investigation of an outbreak of *Ralstonia pickettii* in a paediatric hospital by RAPD. J Hosp Infection 2000:44;267–72.

166

542. McNeil MM, Solomon SL, Anderson RL, et al. Nosocomial *Pseudomonas pickettii* colonization associated with a contaminated respiratory therapy solution in a special care nursery. J Clin Microbiol 1985;22:903–7.

543. Lamka KG, LeChevallier MW, Seidler RJ. Bacterial contamination of drinking water supplies in a modern rural neighborhood. Appl Environ Microbiol 1980;39:734–8.

544. Nakashima AK, McCarthy MA, Martone WJ, Anderson RL. Epidemic septic arthritis caused by *Serratia marcescens* and associated with a benzalkonium chloride antiseptic. J Clin Microbiol 1987;25:1014–8.

545. Nakashima AK, Highsmith AK, Martone WJ. Survival of *Serratia marcescens* in benzalkonium chloride and in multiple-dose medication vials: relationship to epidemic septic arthritis. J Clin Microbiol 1987;25: 1019–21.

546. Bosi C, Davin-Regli A, Charrel R, Rocca B, Monnet D, Bollet C. *Serratia marcescens* nosocomial outbreak due to contamination of hexetidine solution. J Hosp Infect 1996;33:217–24.

547. Ehrenkranz NJ, Bolyard EA, Wiener M, Cleary TJ. Antibiotic-sensitive *Serratia marcescens* infections complicating cardiopulmonary operations: contaminated disinfectant as a reservoir. Lancet 1980;2:1289–92.

548. Cimolai N, Trombley C, Wensley D, LeBlanc J. Heterogeneous *Serratia marcescens* genotypes from a nosocomial pediatric outbreak. Chest 1997;111:194–7.

549. Hartstein AI, Rashad AL, Liebler JM, et al. Multiple intensive care unit outbreaks of *Acinetobacter calcoaceticus* subspecies anitratus respiratory infection and colonization associated with contaminated, reusable ventilator circuits and resuscitation bags. Am J Med 1988;85:624–31.

550. Stone JW, Das BC. Investigation of an outbreak of infection with *Acinetobacter calcoaceticus* in a special care baby unit. J Hosp Infect 1986;7:42–8.

551. Vandenbroucke-Grauls CMJE, Kerver AJH, Rommes JH, Jansen R, den Dekker C, Verhoef J. Endemic *Acinetobacter anitratus* in a surgical intensive care unit: mechanical ventilators as reservoir. Eur J Clin Microbiol Infect Dis 1988;7:485–9.

552. Cefai C, Richards J, Gould FK, McPeake P. An outbreak of *Acinetobacter* respiratory infection resulting from incomplete disinfection of ventilatory equipment. J Hosp Infect 1990;15:177–82.

553. Gervich DH, Grout CS. An outbreak of nosocomial *Acinetobacter* infections from humidifiers. Am J Infect Control 1985;13:210–5.

554. Castle M, Tenney JH, Weinstein MP, Eickhoff TC. Outbreak of a multiply resistant *Acinetobacter* in a surgical intensive care unit. Heart Lung 1978;7:641–4.

555. Smith PW, Massanari RM. Room humidifiers as a source of *Acinetobacter* infections. JAMA 1977;237: 795–7.

556. Snydman DR, Maloy MF, Brock SM, Lyons RW, Rubin SJ. Pseudobacteremia: false-positive blood cultures from mist tent contamination. Am J Epidemiol 1977;106:154–9.

557. Rosenthal SL. Sources of *Pseudomonas* and *Acinetobacter* species found in human culture materials. Am J Clin Pathol 1974;62:807–11.

558. Allen KD, Green HT. Hospital outbreak of multi-resistant *Acinetobacter anitratus*: an airborne mode of spread. J Hosp Infect 1987;9:169–75.

559. Crombach WHJ, Dijkshoorn L, van Noort-Klaassen M, Niessen J, van Knippenbert-Gordebeke G. Control of an epidemic spread of multi-resistant *Acinetobacter calcoaceticus* in a hospital. Intensive Care Med 1989;15: 166–170.

560. Catalano M, Quelle LS, Jeric PE, Di Martino A, Maimone SM. Survival of *Acinetobacter baumannii* on bed rails during an outbreak and during sporadic cases. J Hosp Infect 1999;42:27–35.

561. D'Agata EMC, Venkataraman L, DeGirolami P, Samore M. Molecular epidemiology of ceftazidime-resistant gram-negative bacilli on inanimate surfaces and their role in cross-transmission during non-outbreak periods. J Clin Microbiol 1999;37:3065–7.

562. Jawad A, Snelling AM, Heritage J, Hawkey PM. Exceptional desiccation tolerance of *Acinetobacter radioresistens*. J Hosp Infect 1998;39:235–40.

563. Jawad A, Seifert H, Snelling AM, Heritage J, Hawkey PM. Survival of *Acinetobacter baumannii* on dry surfaces: comparison of outbreak and sporadic isolates. J Clin Microbiol 1998;36:1938–41.

564. Getschell-White, SI, Donowitz LG, Groschel DHM. The inanimate environment of an intensive care unit as a potential source of nosocomial bacteria: evidence for long survival of *Acinetobacter calcoaceticus*. Infect Control Hosp Epidemiol 1989;10:402–6.

565. Loiwal V, Kumar A, Gupta P, Gomber S, Ramachandran VG. *Enterobacter aerogenes* outbreak in a neonatal intensive care unit. Pediatr Int 1999;41:157–61.

566. Matsaniotis NS, Syriopoulou VP, Theodoridou MC, Tzanetou KG, Mostrou GI. *Enterobacter* sepsis in infants and children due to contaminated intravenous fluids. Infect Control 1984;5:471–7.
567. Zembrzuska-Sadlowska E. The dangers of infections of the hospitalized patients with the microorganisms present in preparations and in the hospital environment. Acta Pol Pharm 1995;52:173–8.
568. Felts SK, Schaffner W, Melly MA, Koenig MG. Sepsis caused by contaminated intravenous fluids. Ann Intern Med 1972;77:881–90.
569. Modi N, Damjanovic V, Cooke RW. Outbreak of cephalosporin resistant *Enterobacter cloacae* infection in a neonatal intensive care unit. Arch Dis Child 1987;62:148–51.
570. Graham DR, Wu E, Highsmith AK, Ginsburg ML. An outbreak of pseudobacteremia caused by *Enterobacter cloacae* from a phlebotomist's vial of thrombin. Ann Intern Med 1981;95:585–8.
571. Andersen BM, Sorlie D, Hotvedt R, et al. Multiply beta-lactam-resistant *Enterobacter cloacae* infections linked to the environmental flora in a unit for cardiothoracic and vascular surgery. Scand J Infect Dis 1989;21:181–91.
572. Wisplinghoff H, Perbix W, Seifert H. Risk factors for nosocomial bloodstream infections due to *Acinetobacter baumannii*: a case-control study of adult burn patients. Clin Infect Dis 1999;28:59–66.
573. Crowe M, Towner KJ, Humphreys H. Clinical and epidemiological features of an outbreak of *Acinetobacter* infection in an intensive therapy unit. J Med Microbiol 1995;43:55–62.
574. National Nosocomial Infections Surveillance (NNIS) Report: Data summary from October 1986–April 1996, issued May 1996. Am J Infect Control 1996;24:380–8.
575. Bergogne-Bérézin E, Joly-Guillou ML. Hospital infection with *Acinetobacter* spp.: an increasing problem. J Hosp Infect 1991;18 (suppl A):250–5.
576. Fagon JY, Chastre J, Hance AJ, Montravers P, Novara A, Gibert C. Nosocomial pneumonia in ventilated patients: a cohort study evaluating attributable mortality and hospital stay. Am J Med 1993;94: 281–8.
577. (143) Seifert H, Strate A, Pulverer G. Nosocomial bacteremia due to *Acinetobacter baumanii*: clinical features, epidemiology, and predictors of mortality. Medicine 1995;74:340–9.
578. Cisneros JM, Reyes MJ, Pachón J, et al. Bacteremia due to *Acinetobacter baumanii*: epidemiology, clinical findings, and prognostic features. Clin Infect Dis 1996;22:1026–32.
579. Schaberg DR, Culver DH, Gaynes RP. Major trends in the microbial ecology of nosocomial infections. Am J Med 1991;91(suppl 3B):72S–5S.
580. Wang CC, Chu ML, Ho LJ, Hwang RC. Analysis of plasmid pattern in pediatric intensive care outbreaks of nosocomial infection due to *Enterobacter cloacae*. J Hosp Infect 1991;19:33–40.
581. Acolet D, Ahmet Z, Houang E, Hurley R, Kaufman ME. *Enterobacter cloacae* in a neonatal intensive care unit: account of an outbreak and its relationship to use of third generation cephalosporins. J Hosp Infect 1994;28:273–86.
582. Mayhall CG, Lamb VA, Gayle WE Jr, Haynes BW Jr. *Enterobacter cloacae* septicemia in a burn center: epidemiology and control of an outbreak. J Infect Dis 1979;139:166–71.
583. John JF Jr, Sharbaugh RJ, Bannister ER. *Enterobacter cloacae*: bacteremia, epidemiology, and antibiotic resistance. Rev Infect Dis 1982;4:13–28.
584. McDonald C, Banerjee SN, Jarvis WR, NNIS. Seasonal variation of *Acinetobacter* infections: 1987–1996. Clin Infect Dis 1999;29:1133–7.
585. Beck-Sague CM, Jarvis WR, Brook JH, et al. Epidemic bacteremia due to *Acinetobacter baumanii* in five intensive care units. Am J Epidemiol 1990;132:723–33.
586. (144) Yu VL. *Serratia marcescens*: historical perspective and clinical review. N Engl J Med 1979;300:887–93.
587. Wenger PN, Tokars JI, Brennan P, et al. An outbreak of *Enterobacter hormaechei* infection and colonization in an intensive care nursery. Clin Infect Dis 1997;24:1243–4.
588. Buxton AE, Anderson RL, Wedegar D, Atlas E. Nosocomial respiratory tract infection and colonization with *Acinetobacter calcoaceticus*. Am J Med 1978;65:507–13.
589. French GL, Casewell MW, Roncoroni AJ, Knight S, Philipps I. A hospital outbreak of antibiotic-resistant *Acinetobacter anitratus*: epidemiology and control. J Hosp Infect 1980;1:125–31.
590. Guenter SH, Hendley JO, Wenzel RP. Gram-negative bacilli as nontransient flora on the hands of hospital personnel. J Clin Microbiol 1987;25:488–90.
591. Dreyfuss D Djedaini K, Weber P, et al. Prospective study of nosocomial pneumonia and of patient and circuit colonization during mechanical ventilation with circuit changes every 48 hours versus no change. Am Rev Respir Dis 1991;143:738–43.

168

592. **(145)** Go SE, Urban C, Burns J, et al. Clinical and molecular epidemiology of *Acinetobacter* infections sensitive only to polymixin B and sublactam. Lancet 1994;344:1329–32.

593. Musa EK, Desai N, Casewell MW. The survival of *Acinetobacter calcoaceticus* inoculated on fingertips and on formica. J Hosp Infect 1990;15:219–27.

594. Jawad A, Heritage J, Snelling AM, Gascoyne-Binzi DM, Hawkey PM. Influence of relative humidity and suspending menstrua on survival of *Acinetobacter* spp. on dry surfaces. J Clin Microbiol 1996;34:2881–7.

595. Mulin B, Talon D, Viel JF, et al. Risk factors for nosocomial colonization with multiresistant *Acinetobacter baumanii*. Eur J Clin Microbiol Infect Dis 1995;14:569–76.

596. O'Brien RJ. The epidemiology of nontuberculous mycobacterial disease. Clin Chest Med 1989;10:407–18.

597. Böttger EC, Teske A, Kirschner P, et al. Disseminated "*Mycobacterium genavense*" infection in patients with AIDS. Lancet 1992;340:76–80.

598. Wallace RJ Jr, Brown BA, Griffith DE. Nosocomial outbreaks/pseudo-outbreaks caused by nontuberculous mycobacteria. Ann Rev Microbiol 1998;52:453–90.

599. Chapman JS, Dewlett HJ, Potts WE. Cutaneous reactions to unclassified mycobacterial antigens: a study of children in household contact with patients who excrete unclassified mycobacteria. Am Rev Respir Dis 1962;86:547–52.

600. **(245)** Crow HE, Corpe RF, Smith CE. Is serious pulmonary disease caused by nonphotochromogenic ("atypical") acid-fast mycobacteria communicable? Dis Chest 1961;39:372–81.

601. Kuritsky JM, Bullen MG, Broome CV, Silcox VA, Good RC, Wallace, RJ Jr. Sternal wound infections and endocarditis due to organisms of the *Mycobacterium fortuitum* complex. Ann Intern Med 1983;98:938–9.

602. Laussucq S, Baltch AL, Smith RP, et al. Nosocomial *Mycobacterium fortuitum* colonization from a contaminated ice machine. Am Rev Respir Dis 1988;138:891–4.

603. Panwalker AP, Fuhse E. Nosocomial *Mycobacterium gordonae* pseudoinfection from contaminated ice machines. Infect Control 1986;7:67–70.

604. Wallace RJ Jr, Musser JM, Hull SI, et al. Diversity and sources of rapidly growing mycobacteria associated with infections following cardiac surgery. J Infect Dis 1989;159:708–16.

605. Burns DN, Wallace RJ Jr, Schultz ME, et al. Nosocomial outbreak of respiratory tract colonization with *Mycobacterium fortuitum*: demonstration of the usefulness of pulsed-field gel electrophoresis in an epidemiologic investigation. Am Rev Respir Dis 1991;144:1153–9.

606. Lessing MPA, Walker MM. Fatal pulmonary infection due to *Mycobacterium fortuitum*. J. Clin Pathol 1993;46:271–2.

607. **(149)** Hoy J, Rolston K, Hopfer RL. Pseudoepidemic of *Mycobacterium fortuitum* in bone marrow cultures. Am J Infect Control 1987;15:268–71.

608. Lockwood WW, Friedman C, Bus N, Pierson C, Gaynes R. An outbreak of *Mycobacterium terrae* in clinical specimens associated with a hospital potable water supply. Am Rev Respir Dis 1989;140:1614–7.

609. Sniadack DH, Ostroff SM, Karlix MA, et al. A nosocomial pseudo-outbreak of *Mycobacterium xenopi* due to a contaminated water supply: lessons in prevention. Infect Control Hosp Epidemiol 1993;14:636–41.

610. **(148)** Cox R, deBorja K, Bach MC. A pseudo-outbreak of *Mycobacterium chelonae* infections related to bronchoscopy. Infect Control Hosp Epidemiol 1997;18:136–7.

611. **(150)** Stine TM, Harris AA, Levin S, Rivera N, Kaplan, RL. A pseudoepidemic due to atypical mycobacteria in a hospital water supply. JAMA 1987;258:809–11.

612. **(151)** Bennett SN, Peterson DE, Johnson DR, Hall WN, Robinson-Dunn B, Dietrich S. Bronchoscopy-associated *Mycobacterium xenopi* pseudoinfections. Am J Respir Crit Care Med 1994;150:245–50.

613. Chadha R, Grover M, Sharma A, et al. An outbreak of post-surgical wound infections due to *Mycobacterium abscessus*. Pediatr Surg Int 1998;13:406–10.

614. Von Reyn CF, Maslow JN, Barber TW, Falkinham JO III, Arbeit RD. Persistent colonization of potable water as a source of *Mycobacterium avium* infection in AIDS. Lancet 1994;343:1137–41.

615. du Moulin GC, Stottmeier KD, Pelletier PA, Tsang AY, Hedley-Whyte J. Concentration of *Mycobacterium avium* by hospital hot water systems. JAMA 1988;260:1599–601.

616. Peters M, Müller C, Rüsch-Gerdes S, et al. Isolation of atypical mycobacteria from tap water in hospitals and homes: Is this a possible source of disseminated MAC infection in AIDS patients? J Infect 1995;31:39–44.

617. Soto LE, Bobadilla M, Villalobos Y, et al. Post-surgical nasal cellulitis outbreak due to *Mycobacterium chelonae*. J Hosp Infect 1991;19:99–106.

618. Wenger JD, Spika JS, Smithwick RW, et al. Outbreak of *Mycobacterium chelonae* infection associated with use of jet injectors. JAMA 1990;264:373–6.

619. Safranek TJ, Jarvis WR, Carson LA, et al. *Mycobacterium chelonae* wound infections after plastic surgery employing contaminated gentian violet skin-marking solution. N Eng J Med 1987;317:197–201.

620. Gremillion DH, Mursch SB, Lerner CJ. Injection site abscesses caused by *Mycobacterium chelonae*. Infect Control 1983;4:25–8.

621. Begg N, O'Mahoney M, Penny P, Richardson AE. *Mycobacterium chelonae* associated with a hospital hydrotherapy pool. Community Med 1986;8:348–50.

622. Aubuchon C, Hill JJ Jr, Graham DR. Atypical mycobacterial infection of soft tissue associated with use of a hot tub. A case report. J Bone Joint Surg 1986;68–A:766–8.

623. Kirk J, Kaminski GW. *Mycobacterium marinum* infection. Aust J Dermatol 1976;17:111–6.

624. Ross BC, Johnson PDR, Oppedisano F, et al. Detection of *Mycobacterium ulcerans* in environmental samples during an outbreak of ulcerative disease. Appl Environ Microbiol 1997;63:4135–8.

625. Tokars JI, McNeil MM, Tablan OC, et al. *Mycobacterium gordonae* pseudoinfection associated with a contaminated antimicrobial solution. J Clin Microbiol 1990;28:2765–9.

626. Arnow PM, Bakir M, Thompson K, Bova JL. Endemic contamination of clinical specimens by *Mycobacterium gordonae*. Clin Infect Dis 2000;31:472–6.

627. Wright EP, Collins CH, Yates MD. *Mycobacterium xenopi* and *Mycobacterium kansasii* in a hospital water supply. J Hosp Infect 1985;6:175–8.

628. du Moulin GC, Stottmeier KD. Waterborne mycobacteria: an increasing threat to health. ASM News 1986;10:525–9.

629. Engel HWB, Berwald LG. The occurrence of *Mycobacterium kansasii* in tapwater. Tubercle 1980;61:21–6.

630. Kubalek I, Mysak J. The prevalence of environmental mycobacteria in drinking water supply systems in a demarcated region in Czech Republic in the period 1984–1989. Eur J Epidemiol 1996;12:471–4.

631. Fox C, Smith F, Brogan O, et al. Non-tuberculous mycobacteria in a hospital's piped water supply. J Hosp Infect 1992;21:152–4.

632. Aronson T, Holtzman A, Glover N, et al. Comparison of large restriction fragments of *Mycobacterium avium* isolates recovered from AIDS and non-AIDS patients with those of isolates from potable water. J Clin Microbiol 1999;37:1008–12.

633. Carson LA, Bland LA, Cusick LB, et al. Prevalence of nontuberculous mycobacteria in water supplies of hemodialysis centers. Appl Environ Microbiol 1988;54:3122–5.

634. Carson LA, Petersen NJ, Favero MS, Aguero SM. Growth characteristics of atypical mycobacteria in water and their comparative resistance to disinfectants. Appl Environ Microbiol 1978;36:839–46.

635. Taylor RH, Falkinham III JO, Norton CD, LeChevallier MW. Chlorine, chloramine, chlorine dioxide, and ozone susceptibility of *Mycobacterium avium*. Appl Environ Microbiol 2000;66:1702–5.

636. Schulze-Röbbecke R, Fischeder R. Mycobacteria in biofilms. Zbl Hyg 1989;188:385–90.

637. Schulze-Röbbecke R, Feldmann C, Fischeder R, Janning B, Exner M, Wahl G. Dental units: an environmental study of sources of potentially pathogenic mycobacteria. Tubercle Lung Dis 1995;76:318–23.

638. Meisel JL, Perera DR, Meligro C, Rublin CE. Overwhelming watery diarrhea associated with *Cryptosporidium* in an immunosuppressed patient. Gastroenterology 1976;70:1156–60.

639. Nime FA, Page DL, Holscher MA, Yardley JH. Acute enterocolitis in a human being infected with the protozoan *Cryptosporidium*. Gastroenterology 1976;70:592–8.

640. Goldstein ST, Juranek DD, Ravenholt O, et al. Cryptosporidiosis: an outbreak associated with drinking water despite state-of-the-art treatment. Ann Intern Med 1996;124:459–68.

641. Rose JB. Enteric waterborne protozoa: hazard and exposure assessment. In: Craun GF, ed. Safety of water disinfection: balancing chemical and microbial risks. Washington, DC: ILSI Press, 1993;115–26.

642. (157) Juranek DD, Addiss D, Bartlett ME, et al. Crytosporidiosis and public health: workshop report. J AWWA 1995;87:69–80.

643. DuPont HL, Chappell CL, Sterling CR, Okhuysen PC, Rose JB, Jakubowski W. The infectivity of *Cryptosporidium parvum* in healthy volunteers. N Engl J Med 1995;332:855–9.

644. Okhuysen PC, Chappell CL, Crabb JH, Sterling CR, DuPont HL. Virulence of three distinct *Cryptosporidium parvum* isolates for healthy adults. J Infect Dis 1999;180:1275–81.

645. Chappell CL, Okhuysen PC, Sterling CR, Wang C, Jakubowski W, DuPont HL. Infectivity of *Cryptosporidium parvum* in healthy adults with pre-existing anti- *C. parvum* serum immunoglobulin G. Am J Trop Med 1999;60:157–64.

170

646. Meinhardt PL, Casemore DP, Miller KB. Epidemiologic aspects of human cryptosporidiosis and the role of waterborne transmission. Epidemiol Rev 1996;18:118–36.
647. Rose JB. Occurrence and significance of *Cryptosporidium* in water. JAWWA 1988;80:53–8.
648. Rose JB, Gerba CP, Jakubowski W. Survey of potable water supplies for *Cryptosporidium* and *Giardia*. Environ Sci Technol 1991;25:1393–400.
649. LeChevallier MW, Norton WD, Lee RG. *Giardia* and *Cryptosporidium* spp. in filtered drinking water supplies. Appl Environ Microbiol 1991;57:2617–21.
650. Mackenzie WR, Hoxie NJ, Proctor ME, et al. A massive outbreak in Milwaukee of *Cryptosporidium* infection transmitted through the public drinking water supply. N Engl J Med 1994;331:161–7.
651. Atherton F, Newman CP, Casemore DP. An outbreak of waterborne cryptosporidiosis associated with a public water supply in the UK. Epidemiol Infect 1995;115:123–31.
652. Hayes EB, Matte TD, O'Brien TR, et al. Large community outbreak of cryptosporidiosis due to contamination of a filtered public water supply. N Engl J Med 1989;320:1372–5.
653. Neill MA, Rice SK, Ahmad NV, Flanigan TP. Cryptosporidiosis: an unrecognized cause of diarrhea in elderly hospitalized patients. Clin Infect Dis 1996;22:168–70.
654. Rutala WA, Weber DJ. Water as a reservoir of nosocomial pathogens. Infect Control Hosp Epidemiol 1997;18:609–16.
655. Chadwick P. The epidemiological significance of *Pseudomonas aeruginosa* in hospital sinks. Can J Public Health 1976;67:323–8.
656. Cordes LG, Wiesenthal AM, Gorman GW, et al. Isolation of *Legionella pneumophila* from hospital shower heads. Ann Intern Med 1981;94:195–7.
657. Bollin GE, Plouffe JF, Para MF, Hackman B. Aerosols containing *Legionella pneumophila* generated by shower heads and hot-water faucets. Appl Environ Microbiol 1985;50:1128–31.
658. Weber DJ, Rutala WA, Blanchet CN, Jordan M, Gergen MF. Faucet aerators: a source of patient colonization with *Stenotrophomonas maltophilia*. Am J Infect Control 1999;27:59–63.
659. Kappstein I, Grundmann H, Hauer T, Niemeyer C. Aerators as a reservoir of *Acinetobacter junii*: an outbreak of bacteraemia in paediatric oncology patients. J Hosp Infect 2000;44:27–30.
660. Dennis PJL, Wright AE, Rutter DA, Death JE, Jones BPC. *Legionella pneumophila* in aerosols from shower baths. J Hyg (Camb) 1984;93:349–53.
661. (153) American Society of Heating, Refrigerating, and Air-Conditioning Engineers. ASHRAE Guideline 12-2000: minimizing the risk of legionellosis associated with building water systems. Atlanta, GA: ASHRAE, Inc., 2000;1–16.
662. Newsom SWB. Microbiology of hospital toilets. Lancet 1972;2:700–3.
663. Gerba CP, Wallis C, Melnick JL. Microbiological hazards of household toilets: droplet production and the fate of residual organisms. Appl Microbiol 1975;30:229–37.
664. (152) Hlady WG, Mullen RC, Mintz CS, Shelton BG, Hopkins RS, Daikos GL. Outbreak of Legionnaires' disease linked to a decorative fountain by molecular epidemiology. Am J Epidemiol 1993;138:555–62.
665. Rees JC, Allen KD. Holy water — A risk factor for hospital-acquired infection. J Hosp Infect 1996;32:51–5.
666. (226) Favero MS, Petersen NJ, Boyer KM, Carson LA, Bond WW. Microbial contamination of renal dialysis systems and associated risks. ASAIO Trans 1974;20:175–83.
667. (227) Favero MS, Petersen NJ, Carson LA, Bond WW, Hindman SH. Gram-negative bacteria in hemodialysis systems. Health Lab Sci 1975;12:321–34.
668. (228) Favero MS, Petersen NJ. Microbiologic guidelines for hemodialysis systems. Dialysis Transplant 1979;6:34–6.
669. Griffiths PA, Babb JR, Bradley CR, Fraise AP. Glutaraldehyde-resistant *Mycobacterium chelonae* from endoscope washer disinfectors. J Appl Microbiol 1997;82:519–26.
670. Phillips G, McEwan H, Butler J. Quality of water in washer-disinfectors. J Hosp Infect 1995;31:152–4.
671. (259) Cooke RPD, Whymant-Morris A, Umasankar RS, Goddard SV. Bacteria-free water for automatic washer-disinfectors: an impossible dream? J Hosp Infect 1998;48:63–5.
672. Humphreys H, Lee JV. Water quality for endoscopy washer-disinfectors. J Hosp Infect 1999;42:76–8.
673. Muscarella LF. Are all sterilization processes alike? AORN J 1998;67:966–70, 973–6.
674. U.S. Food and Drug Administration. MAUDE database. Available at: www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfMAUDE/search.CFM

675. Alvarado CJ, Stolz SM, Maki DG. Nosocomial infections from contaminated endoscopes: a flawed automated endoscope washer — an investigation using molecular epidemiology. Am J Med 1991;91 (Suppl 3b):272–80.

676. Abrutyn E, Goodhart GL, Roos K, Anderson R, Buxton A. *Acinetobacter calcoaceticus* outbreak associated with peritoneal dialysis. Am J Epidemiol 1978;107:328–35.

677. Mader JT, Reinarz JA. Peritonitis during peritoneal dialysis — the role of the preheating water bath. J Chronic Dis 1978;31:635–41.

678. Kosatsky T, Kleeman J. Superficial and systemic illness related to a hot tub. Am J Med 1985;79:10–2.

679. McGuckin MB, Thorpe RJ, Abrutyn E. Hydrotherapy: An outbreak of *Pseudomonas aeruginosa* wound infections related to Hubbard tank treatments. Arch Phys Med Rehabil 1981;62:283–5.

680. (243) Koepke GH, Christopher RP. Contamination of whirlpool baths during treatment of infected wounds. Arch Phys Med Rehabil 1965;46:261–3.

681. Miller JK, LaForest NT, Hedberg M, Chapman V. Surveillance and control of Hubbard tank bacterial contaminants. Phys Ther 1972;50:1482–6.

682. Nelson RM, Reed JR, Kenton DM. Microbiological evaluation of decontamination procedures for hydrotherapy tanks. Phys Ther 1972;52:919–23.

683. Page CF. The whirlpool bath and cross-infection. Arch Phys Med Rehabil 1954;35:97–8.

684. Newsom SWB. Hospital infection from contaminated ice. Lancet 1968;2:620–2.

685. Ravn P, Lundgren JD, Kjaeldgaard P, et al. Nosocomial outbreak of cryptosporidiosis in AIDS patients. Br Med J 1991;302:277–80.

686. Bangsborg JM, Uldum S, Jensen JS, Bruun BG. Nosocomial legionellosis in three heart-lung transplant patients: case reports and environmental observations. Eur J Clin Microbiol Infect Dis 1995;14:99–104.

687. (246) Stout JE, Yu VL, Muraca P. Isolation of *Legionella pneumophila* from the cold water of hospital ice machines: implications for origin and transmission of the organism. Infect Control 1985;6:141–6.

688. Cross DF, Benchimol A, Dimond EG. The faucet aerator — a source of *Pseudomonas* infection. N Engl J Med 1966;274:1430–1.

689. *Chryseobacterium (Flavobacterium) meningosepticum* outbreak associated with colonization of water taps in a neonatal intensive care unit. J Hosp Infect 2001;47:188–92.

690. Brown DG, Baublis J. Reservoirs of *Pseudomonas* in an intensive care unit for newborn infants: Mechanisms of control. J Pediatr 1977;90:453–7.

691. Perryman FA, Flournoy DJ. Prevalence of gentamicin- and amikacin-resistant bacteria in sink drains. J Clin Microbiol 1980;12:79–83.

692. Doring G, Horz M, Ortelt J, Grupp H, Wolz C. Molecular epidemiology of *Pseudomonas aeruginosa* in an intensive care unit. Epidemiol Infect 1993;110:427–36.

693. Teres D, Schweers P, Bushnell LS, Hedley-Whyte J, Feingold DS. Sources of *Pseudomonas aeruginosa* infection in a respiratory/surgical intensive care unit. Lancet 1973;1:415–7.

694. Barbeau J, Tanguay R, Faucher E, et al. Multiparametric analysis of waterline contamination in dental units. Appl Environ Microbiol 1996;62:3954–9.

695. Atlas RM, Williams JF, Huntington MK. *Legionella* contamination of dental-unit waters. Appl Environ Microbiol 1995;61:1208–13.

696. Fayle SA, Pollard MA. Decontamination of dental unit water systems: a review of current recommendations. Br Dent J 1996;181:369–72.

697. Pien FD, Bruce AE. Nosocomial *Ewingella americana* bacteremia in an intensive care unit. Arch Intern Med 1986;146:111–2.

698. Stiles GM, Singh L, Imazaki G, Stiles QR. Thermodilution cardiac output studies as a cause of prosthetic valve bacterial endocarditis. J Thorac Cardiovasc Surg 1984;88:1035–7.

699. Tyndall RL, Lyle MM, Ironside KS. The presence of free-living amoebae in portable and stationary eye wash stations. Am Ind Hyg Assoc J 1987;48:933–4.

700. Bowman EK, Vass AA, Mackowski R, Owen BA, Tyndall RL. Quantitation of free-living amoebae and bacterial populations in eyewash stations relative to flushing frequency. Am Ind Hyg Assoc J 1996;57:626–33.

701. Siegman-Igra Y, Shalem A, Berger SA, Livio S, Michaeli D. Should potted plants be removed from hospital wards? J Hosp Infect 1986;7:82–5.

702. (309) Kates SG, McGinley KJ, Larson EL, Leyden JJ. Indigenous multiresistant bacteria from flowers in hospital and nonhospital environments. Am J Infect Control 1991;19:156–61.

172

703. Zanetti F, Stampi S, De L, et al. Water characteristics associated with the occurrence of *Legionella pneumophila* in dental units. Eur J Oral Sci 2000;108:22–8.
704. Peel MM, Calwell JM, Christopher PJ, Harkness JL, Rouch GJ. *Legionella pneumophila* and water temperatures in Australian hospitals. Aust NZ J Med 1985;15:38–41.
705. Groothuis DG, Veenendaal HR, Dijkstra HL. Influence of temperature on the number of *Legionella pneumophila* in hot water systems. J Appl Bacteriol 1985;59:529–36.
706. Plouffe JF, Webster LR, Hackman B. Relationship between colonization of a hospital building with *Legionella pneumophila* and hot water temperatures. Appl Environ Microbiol 1983;46:769–70.
707. **(212)** Alary Ma, Joly JR. Factors contributing to the contamination of hospital water distribution systems by Legionellae. J Infect Dis 1992;165:565–9.
708. U.K.Health & Safety Executive. The control of legionellosis in hot and cold water systems. Supplement to the control of Legionellosis, including Legionnaires' disease. London: Health & Safety Executive Office, 1998;1–4.
709. **(167)** Marrie TJ, Haldane D, Bezanson G, Peppard R. Each water outlet is a unique ecologic niche for *Legionella pneumophila*. Epidemiol Infect 1992;108:261–70.
710. **(154)** Snyder MB, Siwicki M, Wireman J, et al. Reduction of *Legionella pneumophila* through heat flushing followed by continuous supplemental chlorination of hospital hot water. J Infect Dis 1990;162:127–32.
711. **(155)** Ezzeddine H, Van Ossel C, Delmee M, Wauters G. *Legionella* spp. in a hospital hot water system: effect of control measures. J Hosp Infect 1989;13:121–31.
712. Reichert M. Automatic washers/disinfectors for flexible endoscopes. Infect Control Hosp Epidemiol 1991;12:497–9.
713. **(45)** Joint Commission on Accreditation of Healthcare Organizations. Hospital accreditation standards, 2001: environment of care. Oakbrook Terrace, IL: JCAHO Press, 2001;193–220.
714. **(161)** Best M, Yu VL, Stout J, Goetz A, Muder RR, Taylor F. *Legionellaceae* in the hospital water supply: epidemiologic link with disease and evaluation of a method for control of nosocomial Legionnaires' disease and Pittsburgh pneumonia. Lancet 1983;2:307–10.
715. CDC. Emergency Response Planning and Coordination. Available at: www.cdc.gov/nceh/emergency/emergency.htm
716. McGlown KJ, Fottler MD. The impact of flooding on the delivery of hospital services in the southeastern United States. Health Care Manage Rev 1996;21:55–71.
717. Fisher, HL. Emergency evacuation of the Denver Veteran's Administration Medical Center. Milit Med 1986;151:154–61.
718. Peters, MS. Hospitals respond to water loss during the midwest floods of 1993: preparedness and improvisation. J Emerg Med 1996;14:345–50.
719. **(156)** Joint Commission on Accreditation of Healthcare Organizations. Comprehensive Accreditation manual for hospitals: the official handbook (CAH00SJ). Oakbrook Terrace, IL: JCAHO Press, 2000.
720. Hargreaves J, Shireley L, Hansen S, et al. Bacterial contamination associated with electronic faucets: a new risk for healthcare facilities. Infect Control Hosp Epidemiol 2001;22:202–5.
721. **(158)** CDC. National surveillance of dialysis-associated diseases in the United States, 1997. Atlanta, GA: Public Health Service, U.S. Department of Health and Human Services, 1998.
722. Stout JE, Best ME, Yu VL. Susceptibility of members of the family *Legionellaceae* to thermal stress: implications for heat eradication methods in water distribution systems. Appl Environ Microbiol 1986;52:396–9.
723. Bornstein N, Vieilly C, Nowiki M, Paucod JC, Fleurette J. Epidemiological evidence of legionellosis transmission through domestic hot water supply systems and possibilities of control. Isr J Med Sci 1986;13:39–40.
724. **(162)** Meenhorst PL, Reingold AL, Groothuis DG, et al. Water-related nosocomial pneumonia caused by *Legionella pneumophila* serogroups 1 and 10. J Infect Dis 1985;152:356–64.
725. **(216)** Mandel AS, Sprauer MA, Sniadack DH, Ostroff SM. State regulation in hospital water temperature. Infect Control Hosp Epidemiol 1993;14:642–5.
726. **(168)** Department of Health. The control of *Legionella* in health care premises: a code of practice. London: HMSO, 1991.
727. **(169)** Helms CM, Massanari RM, Wenzel RP, et al. Legionnaires' disease associated with a hospital water system: a five-year progress report on continuous hyperchlorination. JAMA 1988;259:2423–7.

728. (170) Edelstein PH, Whittaker RE, Kreiling RL, Howell, CL. Efficacy of ozone in eradication of *Legionella pneumophila* from hospital plumbing fixtures. Appl Environ Microbiol 1982;44:1330–4.

729. (171) Muraca P, Stout JE, Yu, VL. Comparative assessment of chlorine, heat, ozone, and UV light for killing *Legionella pneumophila* within a model plumbing system. Appl Environ Microbiol 1987;53:447–53.

730. (172) Domingue EL, Tyndall RL, Mayberry WR, Pancorbo OC. Effects of three oxidizing biocides on *Legionella pneumophila* serogroup 1. Appl Environ Microbiol 1988;54:741–7.

731. (173) Landeen LK, Yahya MT, Gerba CP. Efficacy of copper and silver ions and reduced levels of free chlorine in inactivation of *Legionella pneumophila*. Appl Environ Microbiol 1989;55:3045–50.

732. (174) Matulonis U, Rosenfeld CS, Shadduck RK. Prevention of *Legionella* infections in bone marrow transplant unit: multifaceted approach to decontamination of a water system. Infect Control Hosp Epidemiol 1993;14:571–83.

733. (175) Liu Z, Stout JE, Tedesco L, et al. Controlled evaluation of copper-silver ionization in eradicating *Legionella pneumophila* from a hospital water distribution system. J Infect Dis 1994;169:919–22.

734. (176) Margolin AB. Control of microorganisms in source water and drinking water. In: Hurst CJ, Knudsen GR, McInerney MJ, Stetzenback LD, Walter MV, eds. Manual of environmental microbiology. Washington, DC: American Society for Microbiology Press, 1997;195–202.

735. (177) Freije MR. *Legionella* control in health care facilities: a guide for minimizing risk. HC Information Resources, Inc. 1996;65–75.

736. (178) Yu-sen E, Lin R, Vidic D, Stout JE, Yu VL. *Legionella* in water distribution systems. J AWWA 1998;90:112–21.

737. (179) Biurrun A, Caballero L, Pelaz C, Leon E, Gago A. Treatment of a *Legionella pneumophila*-colonized water distribution system using copper-silver ionization and continuous chlorination. Infect Control Hosp Epidemiol 1999;20:426–8.

738. (180) Goetz A, Yu VL. Copper-silver ionization: cautious optimism for *Legionella* disinfection and implications for environmental culturing. Am J Infect Control 1997;25:449–51.

739. (181) Stout JE, Lin YS, Goetz AM, Muder RR. Controlling *Legionella* in hospital water systems: experience with the superheat-and-flush method and copper-silver ionization. Infect Control Hosp Epidemiol 1998;19:911–4.

740. (182) Walker JT, Mackerness CW, Mallon D, Makin T, Williets T, Keevil CW. Control of *Legionella pneumophila* in a hospital water system by chlorine dioxide. J Ind Microbiol 1995;15:384–90.

741. (183) Hambidge A. Reviewing efficacy of alternative water treatment techniques. Health Estate 2001;55:23–5.

742. (184) Rohr U, Senger M, Selenka F, Turley R, Wilhelm M. Four years of experience with silver-copper ionization for control of *Legionella* in a German university hospital hot water plumbing system. Clin Infect Dis 1999;29:1507–11.

743. (185) Cunliffe DA. Inactivation of *Legionella pneumophila* by monochloramine. J Appl Bacteriol 1990;68:453–9.

744. (186) Kirmeyer GJ, Foust GW, Pierson GL, Simmler JJ, LeChevalier MW. Optimizing chloramine treatment. Denver, CO: American Water Works Research Foundation, 1993.

745. (187) Kool JL, Carpenter JC, Fields BS. Effect of monochloramine disinfection of municipal drinking water on risk of nosocomial Legionnaires' disease. Lancet 1999;353:272–7.

746. (188) Kool JL, Bergmire-Sweat D, Butler JC, et al. Hospital characteristics associated with colonization of water systems by *Legionella* and risk of nosocomial Legionnaires' disease: a cohort study of 15 hospitals. Infect Control Hosp Epidemiol 1999;20:798–805.

747. (213) Yu VL, Beam TR Jr, Lumish RM, et al. Routine culturing for *Legionella* in the hospital environment may be a good idea: a three-hospital prospective study. Am J Med Sci 1987;294:97–9.

748. Allegheny County Health Department. Approaches to prevention and control of *Legionella* infection in Allegheny County health care facilities. Pittsburgh, PA: Allegheny County Health Department, 1997;1–13.

749. Goetz AM, Stout JE, Jacobs SL, et al. Nosocomial Legionnaires' disease discovered in community hospitals following cultures of the water system: seek and ye shall find. Am J Infect Control 1998;26:8–11.

750. Maryland Department of Health and Mental Hygiene. Report of the Maryland Scientific Working Group to study *Legionella* in the water systems in healthcare institutions. Available at: www.dhmh.state md.us/html/legionella htm

751. Yu VL. Nosocomial legionellosis: Current epidemiologic issues. In: Remington JS, Swartz MN, eds. Current clinical topics in infectious diseases.. New York, NY: McGraw-Hill, 1986;239–53.

174

752. Vickers RM, Yu VL, Hanna SS. Determinants of *Legionella pneumophila* contamination of water distribution systems: 15-hospital prospective study. Infect Control 1987;8:357–63.

753. **(214)** Tobin JO, Swann RA, Bartlett CLR. Isolation of *Legionella pneumophila* from water systems: methods and preliminary results. Br Med J 1981;282:515–7.

754. Marrie TJ, Bezanson G, Fox J, Kuehn R, Haldane D, Birbridge S. Dynamics of *Legionella pneumophila* in the potable water of one floor of a hospital. In: Barbaree JM, Breiman RF, Dufour AP, eds. *Legionella:* current status and emerging perspectives. Washington, DC: American Society for Microbiology Press, 1993;238–40.

755. Plouffe JF, Para MF, Maher WE, Hackman B, Webster L. Subtypes of *Legionella pneumophila* serogroup 1 associated with different attack rates. Lancet 1983;2:649–50.

756. Fraser DW. Sources of legionellosis. In: Thornsberry C, Balows A, Feeley JC, Jakubowski W, eds. *Legionella:* Proceedings of the 2nd International Symposium. Washington, DC: American Society for Microbiology Press,1994:277–80.

757. Dourmon E, Bibb WF, Rajagopalan P, Desplaces N, McKinney RM. Monoclonal antibody reactivity as a virulence marker for *Legionella pneumophila* serogroup 1 strain. J Infect Dis 1992;165:569–73.

758. Brundrett GW. Guides on avoiding Legionnaires'disease. In: *Legionella* and building services. Oxford, UK: Butterworth Heineman, 1992;346–73.

759. **(191)** Kugler JW, Armitage JO, Helms CM, et al. Nosocomial Legionnaires' disease: occurrence in recipients of bone marrow transplants. Am J Med 1983;74:281–8.

760. Lepine LA, Jernigan DB, Butler JC, et al. A recurrent outbreak of nosocomial Legionnaires' disease detected by urinary antigen testing: evidence for long-term colonization of a hospital plumbing system. Infect Control Hosp Epidemiol 1998;19:905–10.

761. Barbaree JM. Selecting a subtyping technique for use in investigations of legionellosis epidemics. In: Barbaree JM, Breiman RF, Dufour AP, eds. *Legionella:* current status and emerging perspectives. Washington, DC: American Society for Microbiology Press, 1993;169–72.

762. Joly JR, McKinney RM, Tobin JO, Bibb WF, Watkins ID, Ramsay D. Development of a standardized subgrouping scheme for *Legionella pneumophila* serogroup 1 using monoclonal antibodies. J Clin Microbiol 1986;23:768–71.

763. **(209)** Schoonmaker D, Helmberger T, Birkhead G. Comparison of ribotyping and restriction enzyme analysis using pulsed-field gel electrophoresis for distinguishing *Legionella pneumophila* isolates obtained during a nosocomial outbreak. J Clin Microbiol 1992;30:1491–8.

764. **(163)** Johnston JM, Latham RH, Meier FA, et al. Nosocomial outbreak of Legionnaires' disease: molecular epidemiology and disease control measures. Infect Control 1987;853–8.

765. Best MG, Goetz A, Yu VL. Heat eradication measures for control of nosocomial Legionnaires' disease: Implementation, education, and cost analysis. Infect Control 1984;12:26–30.

766. **(164)** Muraca PW, Yu VL, Goetz A. Disinfection of water distribution systems for *Legionella:* a review of application procedures and methodologies. Infect Control Hosp Epidemiol 1990;11:79–88.

767. **(210)** Knirsch CA, Jakob K, Schoonmaker D, et al. An outbreak of *Legionella micdadei* pneumonia in transplant patients: evalutaion, molecular epidemiology, and control. Am J Med 2000;108:290–5.

768. **(211)** CDC. Sustained transmission of nosocomial Legionnaires' Disease — Arizona and Ohio. MMWR 1997;46:416–21.

769. **218)** Patterson WJ, Hay J, Seal DV, McLuckie JC. Colonization of transplant unit water supplies with *Legionella* and protozoa: precautions required to reduce the risk of legionellosis. J Hosp Infect 1997;37:7–17.

770. U.S. Department of Labor, Occupational Safety and Health Administration. OSHA technical manual, Section III, Chapter 7. Legionellosis. Available at: www.osha-slc.gov/dts/osta/otm/otm_iii/otm_iii_7.html

771. Rudnick JR, Beck-Sague CM, Anderson RL, Schable B, Miller JM, Jarvis WR. Gram-negative bacteremia in open-heart surgery patients traced to probable tap-water contamination of pressure-monitoring equipment. Infect Control Hosp Epidemiol 1996;17:281–5.

772. Miller RP. Cooling towers and evaporative condensers. Ann Intern Med 1979;90:667–70.

773. Butler JC, Breiman RF. Legionellosis. In: Evans AS, Brachman PS, eds. Bacterial infections of humans, 3rd ed. New York, NY: Plenum Medical, 1998;355–76.

774. Witherell LE, Novick LF, Stone KM, et al. *Legionella* in cooling towers. J Environ Health 1986;49:134–9.

775. Cordes LG, Fraser DW, Skaliy P, et al. Legionnaires' disease outbreak at an Atlanta, Georgia country club: evidence for spread from an evaporative condenser. Am J Epidemiol 1980;111:425–31.

776. Kaufmann AF, McDade JE, Patton CM, et al. Pontiac fever: isolation of the etiologic agent (*Legionella pneumophila*) and demonstration of its mode of transmission. Am J Epidemiol 1981;114:337–47.

777. Morton S, Bartlett CLR, Bibby LF, Hutchinson DM, Dyer JV, Dennis PJ. Outbreak of Legionnaires' disease from a cooling water system in a power station. Br J Indust Med 1986;43:630–5.

778. Friedman S, Spitalny K, Barbaree J, Faur Y, McKinney R. Pontiac fever outbreak associated with a cooling tower. Am J Public Health 1987;77:568–72.

779. Addiss DG, Davis JP, LaVenture M, Wand PJ, Hutchinson MA, McKinney RM. Community-acquired Legionnaires' disease associated with a cooling tower: evidence for longer-distance transport of *Legionella pneumophila*. Am J Epidemiol 1989;130:557–68.

780. Keller DW, Hajjeh R, DeMaria A Jr, et al. Community outbreak of Legionnaires' disease: an investigation confirming the potential for cooling towers to transmit *Legionella* species. Clin Inf Dis 1996;22:257–61.

781. Pastoris MC, Ciceroni L, Lo Monaco R, et al. Molecular epidemiology of an outbreak of Legionnaires' disease associated with a cooling tower in Genova-Sestri Ponente, Italy. Eur J Clin Microbiol Infect Dis 1997;16:883–92.

782. Brown CM, Nuorti PJ, Breiman RF, et al. A community outbreak of Legionnaires' disease linked to hospital cooling towers: an epidemiological method to calculate dose of exposure. Inter J Epidemiol 1999;28:353–9.

783. Broadbent CR. *Legionella* in cooling towers: Practical research, design, treatment, and control guidelines. In: Barbaree JM, Breiman RF, Dufour AP, eds. *Legionella*: current status and emerging perspectives. Washington, DC: American Society for Microbiology Press,1993;217–22.

784. (222) Bhopal RS, Barr G. Maintenance of cooling towers following two outbreaks of Legionnaires' disease in a city. Epidemiol Infect 1990;104:29–38.

785. CDC. Suggested health and safety guidelines for public spas and hot tubs. Atlanta, GA: Centers for Disease Control, 1985. Publication No. 99–960.

786. (221) World Health Organization. Environmental aspects of the control of Legionellosis, 14th ed. Copenhagen, Denmark: World Health Organization,1986. Schriftenr Ver Wasser Boden Lufthyg 1993;91:249–52. (German)

787. (223) World Health Organization. Epidemiology, prevention, and control of legionellosis: memorandum from a WHO meeting. Bull WHO 1990;68:155–64.

788. Association for the Advancement of Medical Instrumentation. American National Standard Hemodialysis Systems ANSI/AAMI RD5-1981, Association for the Advancement of Medical Instrumentation. Arlington, VA: AAMI, 1982.

789. (229) Association for the Advancement of Medical Instrumentation. American National Standard Hemodialysis Systems ANSI/AAMI RD5-1992, Association for the Advancement of Medical Instrumentation. Arlington, VA: AAMI, 1993.

790. Association for the Advancement of Medical Instrumentation. Reuse of hemodialyzers ROH-1986, Association for the Advancement of Medical Instrumentation. Arlington, VA: AAMI, 1986.

791. (230) Association for the Advancement of Medical Instrumentation. American National Standard Reuse of hemodialyzers ANSI/AAMI RD47-1993, Association for the Advancement of Medical Instrumentation. Arlington, VA: AAMI, 1993.

792. (236) Association for the Advancement of Medical Instrumentation. Water treatment equipment for hemodialysis applications. ANSI/AAMI RD62-2001, Association for the Advancement of Medical Instrumentation. Arlington, VA: AAMI, 2001.

793. Tokars JI, Miller ER, Alter MJ, Arduino MJ. National surveillance of dialysis associated diseases in the United States, 1997. Semin Dialysis 2000;13:75–85.

794. Hindman SH, Carson LA, Petersen NJ, et. al. Pyrogenic reactions during hemodialysis caused by extramural endotoxin. Lancet 1975;2:732–4.

795. Stamm JE, Engelhard WE, Parson JE. Microbiological study of water softener resins. Appl Microbiol 1969;18:376–86.

796. Alter MJ, Favero MS, Miller JK, Coleman BJ, Bland LA. National surveillance of dialysis-associated diseases in the United States, 1988. ASAIO Trans 1990;36:107–18.

797. Tokars JI, Alter MJ, Favero MS, Moyer LA, Bland LA. National surveillance of dialysis-associated diseases in the United States, 1990. ASAIO J 1993;39:71–80.

798. Tokars JI, Alter MJ, Favero MS, Moyer LA, Bland LA. National surveillance of dialysis-associated diseases in the United States, 1991. ASAIO J 1993;39:966–75.

176

799. Tokars JI, Alter MJ, Favero MS, Moyer LA, Bland LA. National surveillance of dialysis-associated diseases in the United States, 1993. ASAIO J 1996;42:219–29.

800. (231) Petersen NJ, Boyer KM, Carson LA, Favero MS. Pyrogenic reactions from inadequate disinfection of a dialysis unit distribution system. Dialysis Transpl 1978;7:52–7.

801. Gazenfeldt-Gazit E, Elaihou HE. Endotoxin antibodies in patients on maintenance hemodialysis. Israel J Med Sci 1969;5:1032–6.

802. Laude-Sharp M, Canoff M, Simard L, Pusineri C, Kazatchkine M, Haeffner-Cavaillon N. Induction of IL-1 during hemodialysis: transmembrane passage of intact endotoxin (LPS). Kidney Int 1990;38:1089–94.

803. Arduino MJ, Bland LA, McAllister SK, Favero MS. The effects of endotoxin contaminated dialysate and polysulfone or cellulosic membranes on the release of TNFα during simulated dialysis. Artif Organs 1995;19:880–6.

804. Greisman SE, Hornick RB. Comparative pyrogenic reactivity of rabbit and man to bacterial endotoxin. Proc Soc Exp Biol Med 1969;131:1154–8.

805. Weary ME, Donohue G, Pearson FC, Story K. Relative potencies of four reference endotoxin standards as measured by the *Limulus* amoebocyte lysate and USP rabbit pyrogen tests. Appl Environ Microbiol 1980;40:1148–51.

806. (239) Bland LA, Ridgeway MR, Aguero SM, Carson LA, Favero MS. Potential bacteriologic and endotoxin hazards associated with liquid bicarbonate concentrate. ASAIO Trans 1987;33:542–5.

807. (232) Dawids SG, Vejlsgaard R. Bacteriological and clinical evaluation of different dialysate delivery systems. Acta Med Scand 1976;199:151–5.

808. Favero MS, Alter MJ, Tokars JI, Arduino MJ. Dialysis-associated infections and their control. In: Bennett JV, Brachman PS, eds. Hospital infections 4th ed. Philadelphia, PA: Lippincott-Raven, 1998;357–80.

809. 233) Kidd EE. Bacterial contamination of dialyzing fluid of artificial kidney. Br Med J 1964;1:880–2.

810. Jones DM, Tobin BM, Harlow GR, et al. Bacteriological studies of the modified kiil dialyzer. Br Med J 1970;3:135–7.

811. (240) Raij L, Shapiro FL, Michael AF. Endotoxemia in febrile reactions during hemodialysis. Kidney Int 1973;4:57–60.

812. Vanholder R, Van Haecke E, Veys N, et al. Endotoxin transfer through dialysis membranes: small versus large-pore membranes. Nephrol Dial Transplant 1992;7:333–9.

813. Evans RC, Holmes CJ. In vitro study of the transfer of cytokine-inducing substances across selected high-flux hemodialysis membranes. Blood Purif 1991;9:92–101.

814. Lonnemann G, Behme TC, Lenzer B, et al. Permeability of dialyzer membranes to TNFα-inducing substances derived from water bacteria. Kidney Int 1992;42:61–8.

815. Ureña P, Herbelin A, Zingraff J, et al. Permeability of cellulosic and non-cellulosic membranes to endotoxin subunits and cytokine production during in-vitro hemodialysis. Nephrol Dial Transplant. 1992;7:16–28.

816. (241) Bommer J, Becker KP, Urbaschek R. Potential transfer of endotoxin across high-flux polysulfone membranes. J Am Soc Nephrol 1996;7:883–8.

817. Yamagami S, Adachi T, Sugimura, T, et al. Detection of endotoxin antibody in long-term dialysis patients. Int J Artif Organs 1990;13:205–10.

818. Arduino MJ. CDC investigations of noninfectious outbreaks of adverse events in hemodialysis facilities, 1979–1999. Semin Dialysis 2000;13:86–91.

819. Roth V, Jarvis WR. Outbreaks of infection and/or pyrogenic reactions in dialysis patients. Semin Dialysis 2000;13:92–100.

820. Gordon SM, Tipple MME, Bland LA, Jarvis WR. Pyrogenic reactions associated with reuse of disposable hollow-fiber hemodialyzers. JAMA 1988;260:2077–81.

821. Alter MJ, Tokars JI, Arduino MJ. Nosocomial infections in hemodialysis units — strategies for control. In: Owen WF, Periera BJG, Sayegh MH, eds. Dialysis and transplantation: a companion to Brenner and Rector's "The Kidney." Orlando, FL: WB Saunders Company, 1999;337–57.

822. Bernick JJ, Port FK, Favero MS, Brown DG. Bacterial and endotoxin permeability of hemodialysis membranes. Kidney Int 1979;16:491–6.

823. Bommer J, Becker KP, Urbaschek R, Ritz E, Urbaschek B. No evidence for endotoxin transfer across high flux polysulfone membranes. Clin Nephrol 1987;27:278–82.

824. Schindler R, Lonnemann G, Schaeffer J, et al. The effect of ultrafiltered dialysate on the cellular content of interleukin-1 receptor antagonist in patients on chronic hemodialysis. Nephron 1994;68:229–33.

825. Akrum RAE, Frolich M, Gerritsen AF, et al. Improvement of chronic inflammatory state in hemodialysis patients by the use of ultrapure water for dialysate. J Am Soc Nephrol 1997;8:226A.

826. Quellhorst E. Methods of Hemodialysis. Nieren U Hochdruck 1998;27:35–41.

827. Baz M, Durand C, Ragon A, et al. Using ultrapure water in hemodialysis delays carpal tunnel syndrome. Int J Artif Organs 1991;14:681–5.

828. Schwalbe S, Holzhauer M, Schaeffer J, et al. β2-Microglobulin associated amyloidosis: a vanishing complication of long-term hemodialysis? Kidney Int 1997;52:1077–83.

829. (242) Arduino MJ, Favero MS. Microbiologic aspects of hemodialysis: water quality for hemodialysis. AAMI Monograph WQD-1998. Arlington, VA: Association for the Advancement of Medical Instrumentation, 1998.

830. Leypoldt JK, Schmidt B, Gurland, HJ. Measurement of backfiltration rates during hemodialysis with highly permeable membranes. Blood Purif 1991;9:74–84.

831. Carson LA, Bland LA, Cusick LB, Collin S, Favero MS, Bolan G. Factors affecting endotoxin levels in fluids associated with hemodialysis procedures. In: Novitsky TJ, Watson SW, eds. Detection of bacterial endotoxins with the Limulus Amoebocyte Lysate Test. New York, NY: Alan R. Liss, 1987;223–4.

832. Anderson RL, Holland BW, Carr JK, Bond WW, Favero MS. Effect of disinfectants on pseudomonads colonized on the interior surface of PVC pipes. Am J Public Health 1990;80:17–21.

833. Bland LA, Favero MS. Microbial contamination control strategies for hemodialysis. JCAHO Plant Tech Manage Series 1989;3:30–6.

834. (237) Bland LA. Microbiological and endotoxin assays of hemodialysis fluids. Adv Renal Replacement Ther 1995;2:70–9.

835. (238) Arduino MJ, Bland LA, Aguero SM, Carson LA, Ridgeway M, Favero MS. Comparison of microbiologic assay methods for hemodialysis fluids. J Clin Microbiol 1991;29:592–4.

836. Association for the Advancement of Medical Instrumentation. American national standard water treatment equipment for hemodialysis applications. ANSI/AAMI RD62-1999. Arlington, VA: Association for the Advancement of Medical Instrumentation, 1999.

837. Arduino MJ. How should dialyzers be reprocessed? Semin Dialysis 1998;11:282–4.

838. Jochimsen EM, Frenette C, Delorme M, et al. A cluster of bloodstream infections and pyrogenic reactions among hemodialysis patients traced to dialysis machine waste-handling option units. Am J Nephrol 1998;18:485–9.

839. Wang SA, Levine RB, Carson LA, et al. An outbreak of gram-negative bacteremia in hemodialysis patients traced to hemodialysis machine waste drain ports. Infect Control Hosp Epidemiol 1999;20:746–51.

840. National Institutes of Health. U.S. Renal Diseases Survey: 1999 Annual Data Report. Bethesda, MD: National Institute of Diabetes, Digestive and Kidney Diseases, Division of Kidney, Urologic, and Hematologic Diseases, 1999.

841. Monsen T, Olofson C, Ronnmark M, Wistrom J. Clonal spread of staphylococci among patients with peritonitis associated with continuous ambulatory peritoneal dialysis. ASAIO J 2000;57:613–8.

842. Band JD, Ward JI, Fraser DW, et al. Peritonitis due to a Mycobacterium chelonae-like organism associates with intermittent chronic peritoneal dialysis. J Infect Dis 1982;145:9–17.

843. Monsen T, Crabtree JH, Siddiqui RA, et al. Dialysis catheter infection related peritonitis: incidence and time dependent risk. ASAIO J 1999;45:574–80.

844. Vera G, Lew SQ. Mycobacterium fortuitum peritonitis in two patients receiving continuous ambulatory peritoneal dialysis. Am J Nephrol 1999;19:586–9.

845. Soriano F, Rodriguez-Tudela JL, Gomez-Garces JL, Velo M. Two possibly related cases of Mycobacterium fortuitum peritonitis in continuous ambulatory peritoneal dialysis. Eur J Clin Microbiol 1989;8:895–7.

846. Szeto CC, Li PK, Leung CB, Yu AW, Lui SF, Lai NK. Xanthomonas maltophila peritonitis in uremic patients receiving ambulatory peritoneal dialysis. Am J Kidney Dis 1997;29:991–5.

847. Panlilio AL, Beck-Sague CM, Siegel JD, et al. Infections and pseudoinfections due to povidone-iodine solution contaminated with Pseudomonas cepacia. Clin Infect Dis 1992;14:1078–83.

848. Riebel W, Frantz N, Adelstein D, Spanguolo PJ. Corynebacterium JK: a cause of nosocomial device-related infection. Rev Infect Dis 1986;8:42–9.

849. Radix AE, Bieluch VM, Graeber CW. Peritonitis caused by Monilia sitophila in a patient undergoing peritoneal dialysis. Int J Artif Organs 1996;19:218–20.

850. Banerjee S, Marwaha RK, Bajwa RP. Fungal peritonitis complicating peritoneal dialysis. Indian Pediatr 1995;32:693–7.

178

851. Bergeson E, Denis R, Cartier P. Peritoneal dialysis: peritonitis and catheter infections. Annales de Chirugie 1996;50:606–12. (French)

852. Troidle L, Kliger AS, Goldie SJ, et al. Continuous peritoneal dialysis-associated peritonitis of nosocomial origin. Perit Dialysis International 1996;16:505–10.

853. Smith CA. Reduced incidence of peritonitis by utilizing "flush before fill" in APD. Adv Perit Dialysis 1997;13:224–6.

854. Valeri A, Radhakrishnan J, Vernocchi L, Carmichael LD, Stern L. The epidemiology of peritonitis in acute peritoneal dialysis: a comparison between open- and closed drainage systems. Am J Kidney Dis 1993;21:300–9.

855. Stamm WE, Colelle JJ, Anderson RL, Dixon RE. Indwelling arterial catheters as a source of nosocomial bacteremia: an outbreak caused by *Flavobacterium* species. N Engl J Med 1975;292:1099-102.

856. Schimpff SC. Gram negative bacteremia. Support Care Cancer 1993;1:5–18.

857. Graman PS, Quinlan GA, Rank JA. Nosocomial legionellosis traced to contaminated ice. Infect Control Hosp Epidemiol 1997;18:637–40.

858. Gahrn-Hansen B, Uldum SA, Schmidt J, Nielsen B, Birkeland SA, Jorgensen KA. [Nosocomial *Legionella pneumophila* infection in a nephrology department]. Ugeskrift for Laeger 1995;157:590-4. (German)

859. Wilson IG, Hogg GM, Barr JG. Microbiological quality of ice in hospital and community. J Hosp Infect 1997;36:171–80.

860. Spencer RC. The emergence of epidemic, multiple-antibiotic-resistant *Stenotrophomonas* (*Xanthomonas*) *maltophilia* and *Burkholderia* (*Pseudomonas*) *cepacia*. J Hosp Infect 1995;30(suppl):453–64.

861. (248) Cannon RO, Poliner JR, Hirschhorn RB, et al. A multistate outbreak of Norwalk virus gastroenteritis associated with consumption of commercial ice. J Infect Dis 1991;164:860-3.

862. (249) Khan AS, Moe CL, Glass RI, et al. Norwalk virus-associated gastroenteritis traced to ice consumption aboard a cruise ship in Hawaii: comparison and application of molecular method-based assays. J Clin Microbiol 1994;32:318-22.

863. (244) CDC. Outbreak of viral gastroenteritis — Pennsylvania and Delaware. MMWR 1987;36:709-11.

864. Quick R, Paugh K, Addiss D, Kobayashi J, Baron R. Restaurant-associated outbreak of giardiasis. J Infect Dis 1992;166:673-6.

865. Hedberg CW, White KE, Johnson JA, et al. An outbreak of *Salmonella enteritidis* infection at a fast food restaurant: implications for foodhandler-associated transmission. J Infect Dis 1991;164:1135–40.

866. Burnett IA, Weeks GR, Harris DM. A hospital study of ice-making machines: their bacteriology, design, usage, and upkeep. J Hosp Infect 1994;28:305–13.

867. Petersen NJ. Don't culture the ice machines. Hosp Infect Control 1982;9:8–9.

868. CDC. Sanitary care and maintenance of ice chests and ice machines. Atlanta, GA: CDC, 1979. Publication No. 00-2384.

869. (247) Manangan LP, Anderson RL, Arduino MJ, Bond WW. Sanitary care and maintenance of ice-storage chests and ice-making machines in healthcare facilities. Am J Infect Control 1998;26:111–2.

870. Anonymous. Ice as a source of infection. CDR Weekly 1993;3:241.

871. Cardaney CR, Rodeheaver GT, Horowitz, JH, Kenney JG, Edlich RF. Influence of hydrotherapy and antiseptic agents on burn wound bacteria contamination. J Burn Care Rehab 1985;6:230-2.

872. Gruber RP, Laub DR, Vistnes LM. The effect of hydrotherapy on the clinical course and pH of experimental cutaneous chemical burns. Plastic Reconstruct Surg 1975;55:200-4.

873. Mansell RE, Borchardt KA. Disinfecting hydrotherapy equipment. Arch Phys Med Rehabil 1974;55:318–20.

874. Hall J, Skevington SM, Maddison PH, Chapman K. A randomized and controlled trial of hydrotherapy in rheumatoid arthritis. Arthritis Care Res 1996;9:206–15.

875. Gross A, Cutright DE, Bhaskar SN. Effectiveness of pulsating water jet lavage in treatment of contaminated crush injuries. Am J Surgery 1972;124:373–7.

876. Rodeheaver GT, Paltry D, Thacker JG, Edgerton MT, Edlich RF. Wound cleansing by high pressure irrigation. Surg Gynecol Obstetr 1975;141:357–62.

877. Saxe A, Goldestein E, Dixon S, Ostrup R. Pulsatile lavage in the management of postoperative wound infections. Am Surgeon 1980;46:391–7.

878. Weller K. In search of efficacy and efficiency: an alternative to conventional wound cleansing modalities. Ostomy/Wound Manage 1991;37:23–8.

879. Solomon SL. Host factors in whirlpool-associated *Pseudomonas aeruginosa* skin disease. Infect Control 1985;6:402–6.

880. Hicks CB, Chulay JD. Bacteremic *Citrobacter freundii* cellulitis associated with tub immersion in a patient with the nephrotic syndrome. Mil Med 1988;153:400–1.

881. Mayhall CG, Lamb VA, Gayle WE, Haynes BW. *Enterobacter cloacae* septicemia in a burn center: epidemiology and control of an outbreak. J Infect Dis 1979;139:166–71.

882. Marrie TJ, Gass RSR, Yates L. *Legionella pneumophila* in a physiotherapy pool. Eur J Clin Microbiol 1987;6:212–3.

883. Havelaar AH, Berwald LG, Groothuis DG, Baas JG. Mycobacteria in semi-public swimming pools and whirlpools. Ztb Bakteriol Mikrobiol Hyg [B] 1985;180:505–14.

884. Favero MS. Whirlpool spa-associated infections: are we really in hot water? Am J Public Health 1984;74:653–5.

885. Ratnam S, Hogan K, March SB, Butler RW. Whirlpool-associated folliculitis caused by *Pseudomonas aeruginosa*: report of an outbreak and review. J Clin Microbiol 1986;23:655–9.

886. Stone HH, Kolb LD. The evolution and spread of gentamicin-resistant *Pseudomonas*. J Trauma 1971;11:586–9.

887. Richard P, LeFlock R, Chamoux C, Pannier M, Espaze E, Richet H. *Pseudomonas aeruginosa* outbreak in a burn unit: role of antimicrobials in the emergence of multiply resistant strains. J Infect Dis 1994;170:377–83.

888. Berrouane YF, McNutt L-A, Buschelman BJ, et al. Outbreak of severe *Pseudomonas aeruginosa* infections caused by a contaminated drain in a whirlpool bathtub. Clin Infect Dis 2000;31:1331–7.

889. **(250)** Schmidt OW, Cooney MK, Foy HM. Adeno-associated virus in adenovirus type 3 conjunctivitis. Infect Immun 1975;11:1362–70.

890. DeJonckheere JF. Hospital hydrotherapy pools treated with ultraviolet light: bad bacteriological quality and presence of thermophilic *Naegleria*. J Hyg (Lond) 1982;88:205–14.

891. American Physical Therapy Association. Hydrotherapy/therapeutic pool infection control guidelines. Alexandria, VA: APTA, 1995;112.

892. CDC. Disinfection of hydrotherapy pools and tanks. Atlanta, GA: Centers for Disease Control, Public Health Service, U.S. Department of Health and Human Services, 1974. Publication No. HHS 00-2383.

893. Price D, Ahearn DG. Incidence and persistence of *Pseudomonas aeruginosa* in whirlpools. J Clin Microbiol 1988;26:1650–4.

894. **(252)** White CG. Chemistry of chlorination. In: Handbook of chlorination and alternative disinfectants, 3rd ed. New York, NY: Van Nostrand Reinhold, 1992;184–249.

895. Mayhall CG. Burn patients. In: Pfeiffer J, ed. APIC Text of infection control and epidemiology. Washington, DC: Association for Professionals in Infection Control and Epidemiology, Inc (APIC), 2000;32.1–32.8.

896. Smith RF, Blasi D, Dayton SL, Chipps DD. Effects of sodium hypochlorite on the microbial flora of burns and normal skin. J Trauma 1974;14:938–44.

897. Cardany CR, Rodeheaver GT, Horowitz JH, Kenney JG, Edlich RF. Influence of hydrotherapy and antiseptic agents on burn wound bacterial contamination. J Burn Care Rehabil 1985;6:230–2.

898. Steve L, Goodhart P, Alexander J. Hydrotherapy burn treatment: use of chloramine-T against resistant microorganisms. Arch Phys Med Rehabil 1979;60:301–3.

899. Golland A. Basic hydrotherapy. Physiotherapy 1981;67:258–62.

900. Edlich RF, Becker DG, Phung D, McClelland WA, Day SG. Water treatment of hydrotherapy exercise pools. J Burn Care Rehabil 1988;9:9510–5.

901. Penny PT. Hydrotherapy pools of the future — the avoidance of health problems. J Hosp Infect 1991;18:535–42.

902. CDC. Swimming pools: safety and disease control through proper design and operation. Atlanta, GA: U.S. Department of Health and Human Services, 1976. Publication No. HHS No. 88–8319.

903. Linneman CC Jr. Nosocomial infections associated with physical therapy, including hydrotherapy. In: Mayhall CG, ed. Hospital epidemiology and infection control, 2nd ed. Philadelphia, PA: Lippincott Williams & Wilkins, 1999;931–6.

904. Aspinall ST, Graham R. Two sources of contamination of a hydrotherapy pool by environmental organisms. J Hosp Infect 1989;14:285–92.

905. **(251)** McCandlish R, Renfrew M. Immersion in water during labor and birth: the need for evaluation. Birth 1993;20:79–85.

906. Hawkins S. Water vs conventional births: Infection rates compared. Nursing Times 1995;91:38–40.

180

907. Vochem M, Vogt M, Doring G. Sepsis in a newborn due to *Pseudomonas aeruginosa* from a contaminated tub bath. N Engl J Med 2001;345:378–9.

908. Eriksson M, Ladfors L, Mattsson LA, Fall O. Warm tub bath during labor: a study of 1385 women with prelabor rupture of the membranes after 34 weeks of gestation. Acta Obstet Gynaecol Scand 1996;75:642–4.

909. Rush J, Burlock S, Lambert K, Loosley-Millman M, Hutchinson B, Enkin M. The effects of whirlpool baths in labor: a randomized, controlled trial. Birth 1996;23:136–3.

910. Davis BJ. Whirlpool operation and the prevention of infection. Infect Control 1985;6:394–7.

911. **(253)** Muscarella LF. Automatic flexible endoscope reprocessors. Gastrointest Endosc Clin N Am 2000;10:245–57.

912. **(254)** Muscarella LF. Anticipated reliability of liquid chemical sterilants [letter]. Am J Infect Control 1998;26:155–6.

913. **(255)** Muscarella LF. Déjà vu... all over again? The importance of instrument drying [letter]. Infect Control Hosp Epidemiol 2000;21:628–9.

914. **(256)** Gubler JGH, Salfinger M, von Graevenitz A. Pseudoepidemic of nontuberculous mycobacteria due to a contaminated bronchoscope cleaning machine: report of an outbreak and review of the literature. Chest 1992;101:1245–9.

915. **(257)** Fraser VJ, Jones M, Murray PR, Medoff G, Zhang Y, Wallace RJ Jr. Contamination of flexible fiberoptic bronchoscopes with *Mycobacterium chelonae* linked to an automated bronchoscope disinfection machine. Am Rev Respir Dis 1992;145:853–5.

916. Maloney S, Welbel S, Daves B, et al. *Mycobacterium abscessus* pseudoinfection traced to an automated endoscope washer: utility of epidemiologic and laboratory investigation. J Infect Dis 1994;169:1166–9.

917. Merighi A, Contato E, Scagliarini R, et al. Quality improvement in gastrointestinal endoscopy: microbiologic surveillance of disinfection. Gastrointest Endosc 1996;43:457–62.

918. **(258)** Muscarella LF. Application of environmental sampling to flexible endoscope reprocessing: the importance of monitoring the rinse water. Infect Control Hosp Epidemiol 2002;23:285–9.

919. Mitchell DH, Hicks LJ, Chiew R, Montanaro JC, Chen SC. Pseudoepidemic of *Legionella pneumophila* serogroup 6 associated with contaminated bronchoscopes. J Hosp Infect 1997;37:19–23.

920. Ido K, Ishino Y, Ota Y, et al. Deficiencies of automatic endoscopic reprocessors: a method to achieve high-grade disinfection of endoscopes. Gastrointest Endosc 1996;44:583–6.

921. **(260)** Allen JJ, Allen MO, Olsen MM, et al. *Pseudomonas* infection of the biliary system resulting from the use of a contaminated endoscope. Gastroenterology 1987;92:759–63.

922. Agerton T, Valway S, Gore B, et al. Transmission of a highly drug-resistant strain (Strain W-1) of *Mycobacterium tuberculosis*: community outbreak and nosocomial transmission via a contaminated bronchoscope. JAMA 1997;278:1073–7.

923. **(261)** Michele TM, Cronin WA, Graham NMH, et al. Transmission of *Mycobacterium tuberculosis* by a fiberoptic bronchoscope: identification by DNA fingerprinting. JAMA 1997;278:1093–5.

924. Bronowicki J-P, Venard V, Botte C, et al. Patient-to-patient transmission of hepatitis C virus during colonoscopy. N Engl J Med 1997;337:237–40.

925. **(262)** U.S. Food and Drug Administration, CDC. FDA and CDC Public health advisory: infection from endoscopes inadequately reprocessed by an automated endoscope reprocessing system. September 10, 1999. Available at: www.fda.gov/cdrh/safety.html

926. Rey JF. Endoscopic disinfection. A worldwide problem. J Clin Gastroenterol 1999;28:291–7.

927. Wang HC, Liaw YS, Yang PC, Kuo SH, Luh KT. A pseudoepidemic of *Mycobacterium chelonae* infection caused by contamination of a fibreoptic bronchoscope suction channel. Eur Respir J 1995;8:1259–62.

928. **(263)** Alvarado CJ, Reichelderfer M. APIC guideline for infection prevention and control in flexible endoscopy. Am J Infect Control 2000;28:138–55.

929. Van Klingeren B, Pullen W. Glutaraldehyde resistant mycobacteria from endoscope washers. J Hosp Infect 1993;25:147–9.

930. Flournoy DJ, Petrone RL, Voth DW. A pseudo-outbreak of *Methylobacterium mesophilica* isolated from patients undergoing bronchoscopy. Eur J Clin Microbiol Infect Dis 1992;11:240–3.

931. Reeves DS, Brown NM. Mycobacterial contamination of fibreoptic bronchoscopes. J Hosp Infect 1995;30(suppl):S531–S536.

932. Kelstrup J, Funder-Nielsen T, Theilade J. Microbial aggregate contamination of water lines in dental equipment and its control. Acta Path Scand 1977;85:177–83.

933. Challacombe SJ, Fernandes LL. Detecting *Legionella pneumophila* in water systems: a comparison of various dental units. J Am Dent Assoc 1995;126:603–8.

934. Singh R, Stine OC, Smith DL, Spitznagel JK Jr, Labib ME, Williams HN. Microbial diversity of biofilms in dental unit water systems. Appl Environ Microbiol 2003;69:3412–20.

935. (264) CDC. Statement from the Centers for Disease Control and Prevention (CDC) regarding biofilm and dental unit water quality. Atlanta, GA: U.S. Public Health Service, Department of Health and Human Services, 1999. Available at: www.cdc.gov/nccdphp/oh/ic-fs-biofilm.htm

936. (265) CDC. Recommended infection control practices for dentistry, 1993. MMWR 1993;42(No. RR-8):1–12.

937. (268) Bagga BS, Murphy RA, Anderson AW, Punwani I. Contamination of dental unit cooling water with oral microorganisms and its prevention. J AM Dent Assoc 1984;109:712–6.

938. Scheid RC, Rosen S, Beck FM. Reduction of CFUs in high-speed handpiece water lines over time. Clin Prev Dent 1990;12:9–12.

939. Williams JF, Johnston AM, Johnson B, Huntington MK, Mackenzie CD. Microbial contamination of dental unit waterlines: prevalence, intensity, and microbiological characteristics. J Am Dent Assoc 1993;124:59–65.

940. Santiago JI, Huntington MK, Johnston AM, Quinn RS, Williams JF. Microbial contamination of dental unit waterlines: short- and long-term effects of flushing. Gen Dent 1994;42:528–35.

941. Williams HN, Johnson A, Kelley JI, et al. Bacterial contamination of the water supply in newly installed dental units. Quintessence Int 1995;26:331–7.

942. CDC. Guideline for infection control in dental health-care settings. MMWR 2003;52:in press.

943. (266) Office of Safety and Asepsis Procedures Research Foundation. Position paper on dental unit waterlines. Annapolis, MD: OSAPRF, 2000. Available at: www.osap.org/issues/pages/water/duwl htm

944. (267) U.S. Environmental Protection Agency. National primary drinking water regulations, 40 CFR 1, Part 141, Subpart G;1999. At: www.epa.gov/safewater/mcl.html

945. (344) Eaton AD, Clesceri LS, Greenberg AE, eds. Standard methods for the examination of water and wastewater, 20th ed. Washington, DC: American Public Health Association, 1998;9–1 through 9–41.

946. (269) Shearer BG. Biofilm and the dental office. J Am Dent Assoc 1996;127:181–9.

947. Maki DG, Alvarado CJ, Hassemer CA, Zilz MA. Relation of the inanimate hospital environment to endemic nosocomial infection. N Engl J Med 1982;307:1562–6.

948. Danforth D, Nicolle LE, Hume K, Alfieri N, Sims H. Nosocomial infections on nursing units with floors cleaned with a disinfectant compared with detergent. J Hosp Infect 1987;10:229–35.

949. Spaulding EH. Role of chemical disinfection in the prevention of nosocomial infections. In: Brachman PS, Eickhoff TC, eds. Proceedings of the International Conference on Nosocomial Infections, 1970. Chicago, IL: American Hospital Association, 1971;247–54.

950. Spaulding EH. Chemical disinfection and antisepsis in the hospital. J Hosp Res 1972;9:5–31.

951. (273) Favero MS, Bond WW. Chemical disinfection of medical and surgical materials. In: Block SS, ed. Disinfection, sterilization, and preservation, 5th ed. Philadelphia, PA: Lippincott Williams & Wilkins, 2001;881–917.

952. (274) Rutala WA. APIC guideline for selection and use of disinfectants. Am J Infect Control 1996;24:313–42.

953. Agolini G, Russo A, Clementi M. Effect of phenolic and chlorine disinfectants on hepatitis on hepatitis C virus binding and infectivity. Am J Infect Control 1999;27:236–9.

954. (279) Favero MS, Bond WW. Sterilization, disinfection, and antisepsis in the hospital. In: Balows A, Hausler WJ Jr, Herrmann KL, Isenberg HD, Shadomy HJ, eds. Manual of clinical microbiology, 5th ed. Washington, DC: American Society for Microbiology, 1991;183–200.

955. Nyström B. Bioburden of non-disposable surgical instruments and operating room textiles. In: Gaughran ERL, Morrissey RF, eds. Sterilization of medical products, Vol II. Montreal, Québec: Multiscience Publications Ltd., 1981;156–63.

956. Nyström B. Disinfection of surgical instruments. J Hosp Infect 1981;2:3636–8.

957. Rutala WA, Weber DJ. FDA labeling requirements for disinfection of endoscopes: a counterpoint. Infect Control Hosp Epidemiol 1995;16:231–5.

958. Parker HH IV, Johnson RD. Effectiveness of ethylene oxide for sterilization of dental handpieces. J Dent 1995;1:1–3.

182

959. Alfa MJ, DeGagne P, Olson N, Puchalski T. Comparison of ion plasma, vaporized hydrogen peroxide, and 100% ethylene oxide sterilizers to the 12/88 ethylene oxide gas sterilizer. Infect Control Hosp Epidemiol 1996;17:92–100.

960. Rutala WA, Gergen MF, Jones JF, Weber DJ. Levels of microbial contamination on surgical instruments. Am J Infect Control 1998;26:143–5.

961. **(275)** Stingeni L, Lapomarda V, Lisi P. Occupational hand dermatitis in hospital environments. Contact Dermatitis 1995;33:172–6.

962. **(276)** Ashdown BC, Stricof DD, May ML, Sherman SJ, Carmody RF. Hydrogen peroxide poisoning causing brain infarction: neuroimaging findings. AM J Roentgenol 1998;170:1653–5.

963. **(277)** Busch A, Werner E. [Animal tolerance to peracetic acid. 1. Experimental results rollowing the application of peracetic acid solutions on the skin of pigs]. Monatshefte für Veterinaermedizin 1974;29:494–8. (German)

964. **(278)** U.S. Food and Drug Administration. Medical devices: adequate directions for use. 21 CFR Part 801.5, 807.87.e.

965. U.S. Food and Drug Administration (FDA) and U.S. Environmental Protection Agency (EPA). Memorandum of understanding between the Food and Drug Administration, Public Health Service, Department of Health and Human Services, and the Environmental Protection Agency: Notice regarding matters of mutual responsibility — regulation of liquid chemical germicides intended for use on medical devices, 1993. Available from FDA, Center for Devices and Radiological Health (CDRH), Office of Health and Industry Programs, Division of Small Manufacturers Assistance, Rockville MD 20850, or EPA, Registration Division, Antimicrobial Program Branch, 401 M St., SW, Washington DC 20460.

966. U.S. Food and Drug Administration (FDA). Interim measures for the registration of antimicrobial products/liquid chemical germicides with medical device use claims under the memorandum of understanding between EPA and FDA, 1994. CDRH Facts on Demand, Shelf #851, p. 14;June 30, 1994. Available from FDA, CDRH, Office of Health and Industry Programs, Division of Small Manufacturers Assistance, Rockville MD 20850.

967. **(293)** U.S. Department of Labor, Occupational Safety and Health Administration. Occupational Exposure to Bloodborne Pathogens: final rule (29 CFR 1910.1030). Federal Register 1991;56:64004–182.

968. Collins BJ. The hospital environment: how clean should a hospital be? J Hosp Infect 1988;11 (Suppl A): 53–6.

969. Van den Berg RWA, Claahsen HL, Niessen M, Muytjens HL, Liem K, Voss A. *Enterobacter cloacae* outbreak in the NICU related to disinfected thermometers. J Hosp Infect 2000;45:29–34.

970. Spaulding EH. Alcohol as a surgical disinfectant. AORN J 1964;2:67–71.

971. **(282)** Ayliffe GAJ, Collins BJ, Lowbury EJL, Babb JR, Lilly HA. Ward floors and other surfaces as reservoirs of hospital infection. J Hyg (Camb) 1967;65:515–37.

972. **(283)** Dancer SJ. Mopping up hospital infection. J Hosp Infect 1999;43:85–100.

973. Gable TS. Bactericidal effectiveness of floor cleaning methods in a hospital environment. Hospitals JAHA 1966;40:107–11.

974. **(271)** U.S. Environmental Protection Agency. Federal Insecticide, Fungicide, and Rodenticide Act. 7 USC 6 § 136 et seq.;1972. Available at: www4.law.cornell.edu/uscode/7/ch6schII html

975. Petersen NJ, Marshall JH, Collins DE. Why wash walls in hospital isolation rooms? Health Lab Sci 1973;10:23–7.

976. **(285)** Mallison GF. Decontamination, disinfection, and sterilization. Nurs Clin North Am 1980;15:757–67.

977. Ayliffe GAJ, Collins BJ, Lowbury EJL. Cleaning and disinfection of hospital floors. Br Med J 1966;2:442–5.

978. Vesley D, Pryor AK, Walter WG, Shaffer JG. A cooperative microbiological evaluation of floor-cleaning procedures in hospital patient rooms. Health Lab Sci 1970;7:256–64.

979. Daschner J, Rabbenstein G, Langmaack H. [Fla chendekontamination zur verhutung und bekampfund von drakenhaus infectionen.] Deutsche Medizische Wochenschrift 1980;10:325–9. (German)

980. Dharan S, Mourouga P, Copin P, Bessmer G, Tschanz B, Pittet D. Routine disinfection of patients' environmental surfaces: Myth or reality? J Hosp Infect 1999;42:113–7.

981. Palmer PH, Yeoman DM. A study to assess the value of disinfectants when washing ward floors. Med J Australia 1972;2:1237–9.

982. **(284)** Schmidt EA, Coleman DL, Mallison GF. Improved system for floor cleaning in health care facilities. Appl Environ Microbiol 1984;47:942–6.

983. (272) Mallison GF. Hospital disinfectants for housekeeping: floors and tables. Infect Control 1984;5:537.

984. Vesley D, Klapes NA, Benzow K, Le CT. Microbiological evaluation of wet and dry floor sanitization systems in hospital patient rooms. Appl Environ Microbiol 1987;53:1042–5.

985. Werry C, Lawrence JM, Sanderson PJ. Contamination of detergent cleaning solutions during hospital cleaning. J Hosp Infect 1988;11:44–9.

986. (280) Chou T. Environmental services. In: APIC Text of Infection Control and Epidemiology. Pfeiffer J, ed. Washington, DC: Association for Professionals in Infection Control and Epidemiology, Inc.;2000;73.1–73.8.

987. (281) Rutala WA, Weber D. General information on cleaning, disinfection, and sterilization. In: Pfeiffer J, ed. APIC Text of infection control and epidemiology. Washington, DC: Association for Professionals in Infection Control and Epidemiology, Inc (APIC);2000:55.1–55.6.

988. (286) Walter CW, Kundsin RB. The floor as a reservoir of hospital infections. Surg Gynec Obstet 1960;111:412–22.

989. (287) Scott E, Bloomfield SF. The survival and transfer of microbial contamination via cloths, hands and utensils. J Appl Bacteriol 1990;68:271–8.

990. (288) Scott E, Bloomfield SF. Investigations of the effectiveness of detergent washing, drying and chemical disinfection on contamination of cleaning cloths. J Appl Bacteriol 1990;68:279–83.

991. Givan KF, Black BL, Williams PF. Multiplication of *Pseudomonas* species in phenolic germicidal detergent solution. Can J Pub Health 1971;62:72.

992. Thomas MEM, Piper E, Maurer IM. Contamination of an operating theater by gram-negative bacteria: examination of water supplies, cleaning methods, and wound infections. J Hyg (Camb) 1972;70:63–73.

993. Medcraft JW, Hawkins JM, Fletcher BN, Dadswell JV. Potential hazard from spray cleaning of floors in hospital wards. J Hosp Infect 1987;9:151–7.

994. (289) Brown DG, Schaltzle K, Gable T. The hospital vacuum cleaner: mechanism for redistributing microbial contaminants. J Environ Health 1980;42:192–6.

995. (290) Wysowski DK, Flynt JW, Goldfield M, et al. Epidemic hyperbilirubinemia and use of a phenolic disinfectant detergent. Pediatrics 1978;61:165–70.

996. (291) Doan HM, Keith L, Shennan AT. Phenol and neonatal jaundice. Pediatrics 1979;64:324–5.

997. (292) American Academy of Pediatrics, American College of Obstetricians and Gynecologists. Infection control. In: Guidelines for perinatal care, 4th ed. Evanston, IL: AAP, ACOG, 1997;269–74.

998. (294) Spire B, Montagnier L, Barré-Sinoussi F, Chermann JC. Inactivation of lymphadenopathy associated virus by chemical disinfectants. Lancet 1984;2:899–901.

999. (295) Martin LS, McDougal JS, Loskoski SL. Disinfection and inactivation of the human T lymphotrophic virus type-III/lymphadenopathy-associated virus. J Infect Dis 1985;152:400–3.

1000. (296) Hanson PJ, Gor D, Jeffries DJ, Collins JV. Chemical inactivation of HIV on surfaces. Br Med J 1989;298:862–4.

1001. (297) Bloomfield SF, Smith-Burchnell CA, Dalgleish AG. Evaluation of hypochlorite-releasing disinfectants against the human immunodeficiency virus (HIV). J Hosp Infect 1990;15:273–8.

1002. (298) Druce JD, Jardine D, Locarnini SA, Birch CJ. Susceptibility of HIV to inactivation by disinfectants and ultraviolet light. J Hosp Infect 1995;30:167–80.

1003. (299) Van Bueren J, Simpson RA, Salman H, Farrelly HD, Cookson BD. Inactivation of HIV-1 by chemical disinfectants: sodium hypochlorite. Epidemiol Infect 1995;115:567–79.

1004. (300) Prince DL, Prince HN, Thraehart O, et al. Methodological approaches to disinfection of human hepatitis viruses. J Clin Microbiol 1993;31:3296–304.

1005. Tabor E, Gerety RJ. A survey of formalin inactivation of hepatitis A virus, hepatitis B virus, and a non-A, non-B hepatitis agent. In: Second International Max von Pettenkofer Symposium on Viral Hepatitis. Munich, Germany: October 1982.

1006. Thraenhart O, Kuwert EK, Scheiermann N, et al. Comparison of the morphological alteration and disintegration test (MADT) and the chimpanzee infectivity test for determination of hepatitis B virucidal activity of chemical disinfectants. Zentralbl Bakteriol Mikrobiol Hyg (B) 1982;176:472–84.

1007. (303) U.S. Department of Labor, Occupational Safety and Health Administration. EPA-registered disinfectants for HIV/HBV. [Memorandum 2/28/97]. Available at: www.osha-slc.gov/OshDoc/Interp_data/I19970228C.html

1008. U.S. Environmental Protection Agency. Lists A, B, C, D, E, and F: EPA registered disinfectants, sanitizers and sterilants. Available at: www.epa.gov/oppad001/chemregindex.htm

184

1009. U.S. Environmental Protection Agency. Protocols for testing the efficacy of disinfectants against hepatitis B. Federal Register 2000;65:51828–30.

1010. (301) CDC. Recommendations for prevention of HIV transmission in health-care settings. MMWR 1987;36(No.2S):1S–18S.

1011. (304) Weber DJ, Barbee SL, Sobsey MD, Rutala WA. The effect of blood on the antiviral activity of sodium hypochlorite, a phenolic, and a quaternary ammonium compound. Infect Control Hosp Epidemiol 1999;20:821–7.

1012. (302) Sattar SA, Springthorpe VS. Survival and disinfectant inactivation of the human immunodeficiency virus: a critical review. Rev Infect Dis 1991;13:430–47.

1013. (400) CDC, National Institutes of Health. Biosafety in microbiological and biomedical laboratories, 4th ed. Washington, DC: U.S. Government Printing Office, 1999.

1014. Lee R. The advantages of carpets in mental hospitals. Ment Hosp 1965;16:324–5

1015. Simmons D, Reizenstein J, Grant M. Considering carpets in hospital use. Dimensions 1982;June:18–21.

1016. Willmott M. The effect of a vinyl floor surface and a carpeted floor surface upon walking in elderly hospital in-patients. Age Ageing 1986;15:119–20.

1017. Shaffer J, Key I. The microbiological effects of carpeting on the hospital environment. Hospitals JAHA 1966;40:126–39.

1018. Walter W, Stober A. Quantitative and qualitative microbial studies of hospital carpets. J Environ Health 1967;30:293–300.

1019. Anderson RL. Biological evaluation of carpeting. Appl Microbiol 1969;18:180–7.

1020. Lanese RR, Keller MD, Macpherson CR, Covey RC. A study of microflora on tiled and carpeted surfaces in a hospital nursery. Am J Public Health 1973;63:174–8.

1021. Bonde GJ. Bacterial flora of synthetic carpets in hospitals. Health Lab Sci 1973;10:308–18.

1022. Rylander R, Myrback K, Verner-Carlson B, Ohrstrom M. Bacteriological investigation of wall-to-wall carpeting. Am J Public Health 1974;64:163–8.

1023. (305) Suzuki A, Namba Y, Matsuura M, Horisawa A. Bacterial contamination of floors and other surfaces in operating rooms: a five-year survey. J Hyg (Camb) 1984;93:559–66.

1024. Skoutelis AT, Westenfelder GO, Beckerdite M, Phair JP. Hospital carpeting and epidemiology of *Clostridium difficile*. Am J Infect Control 1993;22:212–7.

1025. Anderson RL, Mackel DC, Stoler BS, Mallison GF. Carpeting in hospitals: an epidemiological evaluation. J Clin Microbiol 1982;15:408–15.

1026. (160) Vesper S, Dearborn DG, Yike I, et al. Evaluation of *Stachybotrys chartarum* in the house of an infant with pulmonary hemorrhage: quantitative assessment before, during, and after remediation. J Urban Health 2000;77:68–85.

1027. Bakker PGH, Faoagali JL. The effect of carpet on the number of microbes in the hospital environment. N Zeal Med J 1977;85:88–92.

1028. (306) Richet H, McNeil M, Pewters W, et al. *Aspergillus flavus* in a bone marrow transplant unit (BMTU): Pseudofungemia traced to hallway carpeting [abstract]. In: Abstracts of the 89th Annual Meeting of the American Society for Microbiology, 1989.

1029. CDC. Respiratory illness associated with carpet cleaning at a hospital clinic — Virginia. MMWR 1983;32:378,383–4.

1030. Maley MP. Bacterial threats to new hospitals. Lancet 1997;350:223–4.

1031. U.S. Environmental Protection Agency. Office of Toxic Substances. Efficacy data requirements. Supplemental recommendations DIS/TSS-2;1/25/79.

1032. 307) U.S. Department of Labor, Occupational Safety and Health Administration. OSHA Standards Interpretation and Compliance Letters;6/10/94: Decontamination of a plush carpet surface after a spill. Available at: www.osha-slc.gov/OshDoc/Interp_data/I19940610 html

1033. Richards K. New York City: special suites — Memorial Sloan Kettering. Interiors 1998;157:56–9.

1034. Noskin BA, Bednarz P, Suriano T, Reiner S, Peterson LR. Persistent contamination of fabric-covered furniture by vancomycin-resistant enterococci: implications for upholstery selection in hospitals. Am J Infect Control 2000;28:311–3.

1035. Sanderson PJ, Alshafi KM. Environmental contamination by organisms causing urinary tract infection. J Hosp Infect 1995;29:301–3.

1036. Babe KS Jr, Arlian LG, Confer PD, Kim R. House dust mite (*Dermatophagoides farinae* and *Dermatophagoides pteronyssinus*) prevalence in the rooms and hallways of a tertiary care hospital. J Allergy Clin Immunol 1995;95:801–5.

1037. Custovic A, Fletcher A, Pickering CAC, et al. Domestic allergens in public places III: house dust mite, cat, dog, and cockroach allergens in British hospitals. Clin Exper Allergy 1998;28:53–9.

1038. Ansorg R, Thomssen R, Stubbe P. Erwinia species causing fatal septicemia in a newborn. Med Microbiol Immunol (Berl) 1974;159:161–70.

1039. Trust TJ, Bartlett KH. Isolation of *Pseudomonas aeruginosa* and other bacterial species from ornamental aquarium plants. Appl Environ Microbiol 1976;31:992–4.

1040. **(310)** Bartzokas CA, Holley MP, Sharp CA. Bacteria in flower vase water: incidence and significance in general ward practice. Br J Surg 1975;62:295–7.

1041. Watson AG, Koons CE. *Pseudomonas* on the chrysanthemums. Lancet 1973;2:91.

1042. **(311)** Siegman-Igra Y, Shalem A, Berger SA, Livio S, Michaeli D. Should potted plants be removed from hospital wards? J Hosp Infect 1986;7:82–5.

1043. Rosenzweig AL. Contaminated flower vases. Lancet 1973;2:568–9.

1044. Johansen KS, Laursen H, Wilhjelm BJ. Flower vases as reservoirs of pathogens. Lancet 1974;1:359.

1045. Rogues AM, Quesnel C, Revel P, Saric J, Gachie JP. Potted plants as a potential reservoir of *Fusarium* species. J Hosp Infect 1997;35:163–4.

1046. **(312)** Lass-Flörl C, Rath P, Niederwieser D, et al. *Aspergillus terreus* infections in haematological malignancies: molecular epidemiology suggests association with in-hospital plants. J Hosp Infect 2000;46:31–5.

1047. Levine OS, Levine MM. Houseflies (*Musca domestica*) as mechanical vectors of shigellosis. Rev Infect Dis 1991;13:688–96.

1048. Šrámová H, Daniel M, Absolonová V, Dědičová D, Jedličková Z, Lhotová H, Petráš P, Subertová V. Epidemiological role of arthropods detectable in health facilities. J Hosp Infect 1992;20:281–92.

1049. Tan SW, Yap KL, Lee HL. Mechanical transport of rotavirus by the legs and wings of Musca domestica (Diptera: *Muscidae*). J Med Entomol 1997;34:527–31.

1050. **(313)** Burgess NR. Hospital design and cockroach control. Trans R Soc Trop Med Hyg 1984;78:293–4.

1051. Ash N, Greenberg B. Vector potential for the German cockroach (Dictyoptera: *Blattellidae*) in dissemination of *Salmonella enteritidis* serotype typhimurium. J Med Entomol 1980;17:417–23.

1052. Fotedar R, Banerjee U. Nosocomial fungal infections — study of the possible role of cockroaches (*Blattella germanica*) as vectors. Acta Trop 1992;50:339–43.

1053. Rosef O, Kapperud G. House flies (*Musca domestica*) as possible vectors of *Campylobacter fetus* subsp. jejuni. Appl Environ Microbiol 1983;45:381–3.

1054. Forsey T, Darougar S. Transmission of chlamydiae by the housefly. Br J Ophthalmol 1981;65:147–50.

1055. Grübel P, Hoffman JS, Chong FK, Burstein NA, Mepani C, Cave DR. Vector potential of houseflies (*Musca domestica*) for *Helicobacter pylori*. J Clin Microbiol 1997;35:1300–3.

1056. Oothuman P, Jeffery J, Aziz, AHA, Bakar EA, Jegathesan M. Bacterial pathogens isolated from cockroaches trapped from pediatric wards in peninsular Malaysia. Trans R Soc Trop Med Hyg 1989;83:133–5.

1057. Beatson SH. Pharaoh's ants as pathogen vectors in hospitals. Lancet 1972;1:425–7.

1058. LeGuyader A, Rivault C, Chaperon J. Microbial organisms carried by brown-banded cockroaches in relation to their spatial distribution in a hospital. Epidemiol Infect 1989;102:485–92.

1059. Fotedar R, Banerjee U, Shriniwas, Verma A. Cockroaches (*Blattella germanica*) as carriers of microorganisms of medical importance in hospitals. Epidemiol Infect 1991;107:181–7.

1060. Fotedar R, Banerjee U, Singh S, Shriniwas, Verma AK. The housefly (*Musca domestica*) as a carrier of pathogenic microorganisms in a hospital environment. J Hosp Infect 1992;20:209–15.

1061. Fotedar R, Shriniwas, Banerjee U, Samantray JC, Nayar E, Verma A. Nosocomial infections: cockroaches as possible vectors of drug-resistant *Klebsiella*. J Hosp Infect 1991;18:155–9.

1062. Devi SJN, Murray CJ. Cockroaches (*Blatta* and *Periplaneta* species) as reservoirs of drug-resistant salmonellas. Epidemiol Infect 1991;107:357–64.

1063. Cotton MF, Wasserman E, Pieper CH, et al. Invasive disease due to extended spectrum beta-lactamase-producing *Klebsiella pneumoniae* in a neonatal unit: the possible role of cockroaches. J Hosp Infect 2000;44:13–7.

1064. Baker LF. Pests in hospitals. J Hosp Infect 1981;2:5–9.

1065. **(316)** Allen BW. Excretion of viable tubercle bacilli by *Blatta orientalis* (the oriental cockroach) following ingestion of heat-fixed sputum smears: a laboratory investigation. Trans R Soc Trop Med Hyg 1987;81:98–9.

1066.  (317) Laszlo A. Technical guide: sputum examination for tuberculosis by direct microscopy in low income countries, 5th ed. Paris, France: International Union Against Tuberculosis and Lung Disease, 2000. Available at: www.iuatld.org/html/body_guides htm

1067.  Cohen D, Green M, Block C, et al. Reduction of transmission of shigellosis by control of houseflies (*Musca domestica*). Lancet 1991;337:993–7.

1068.  Daniel M, Šrámová H, Zálabská E. *Lucilia sericata* (Diptera: *Calliphoridae*) causing hospital-acquired myiasis of a traumatic wound. J Hosp Infect 1994;28:149–52.

1069.  Jacobson JA, Kolts RL, Conti M, Burke JP. Hospital-acquired myiasis. Infect Control 1980;1:319–20.

1070.  Mielke U. Nosocomial myiasis. J Hosp Infect 1997;37:1–5.

1071.  Sherman RA. Wound myiasis in urban and suburban United States. Arch Intern Med 2000;160:2004–14.

1072.  (314) Lukin LG. Human cutaneous myiasis in Brisbane: a prospective study. Med J Aust 1989;150:237–40.

1073.  Watkins M, Wyatt T. A ticklish problem: pest infestation in hospitals. Prof Nurse 1989;4:389–92.

1074.  Schoninger S. Pest control and extermination in health care facilities. Prof Sanit Manage 1978;9:24–7.

1075.  (315) Bruesch J. Institutional pest management: current trends. Exec Housekeep Today 1994;15:6–12.

1076.  Tenover FC. VRSA, VISA, GISA: the dilemma behind the name game. Clin Microbiol Newsletter 2000;22:49–53.

1077.  CDC. National Nosocomial Infections Surveillance System (NNIS): Semiannual report. December 1999. Available at: www.cdc.gov/ncidod/hip/SURVEILL/NNIS.HTM

1078.  Hartstein AI, Mulligan ME. Methicillin-resistant *Staphylococcus aureus*. In: Mayhall CG, ed. Hospital epidemiology and infection control, 2nd ed. Philadelphia, PA: Lippincott Williams & Wilkins, 1999;347–64.

1079.  Walsh TJ, Vlahov D, Hansen SL, et al. Prospective microbiologic surveillance in control of nosocomial methicillin-resistant *Staphylococcus aureus*. Infect Control 1987;8:7–14.

1080.  Walsh TJ, Auger F, Tatem BA, Hansen SL, Standford HJ. Novobiocin and rifampin in combination against methicillin-resistant *Staphylococcus aureus*: an in vitro comparison with vancomycin plus rifampin. J Antimicrob Chemother 1986;17:75–82.

1081.  McNeil MM, Solomon SL. The epidemiology of MRSA. Antimicrobiol Newsl 1985;2:49–56.

1082.  Oie S, Kamiya A. Survival of methicillin-resistant *Staphylococcus aureus* (MRSA) on naturally contaminated dry mops. J Hosp Infect 1996;34:145–9.

1083.  Arnow PM, Allyn PA, Nichols EM, Hill DL, Pezzlo M, Bartlett RH. Control of methicillin-resistant *Staphylococcus aureus* in a burn unit: role of nurse staffing. J Trauma 1982;22:954–9.

1084.  (329) Karanfil LV, Murphy M, Josephson A, et al. A cluster of vancomycin-resistant *Enterococcus faecium* in an intensive care unit. Infect Control Hosp Epidemiol 1992;13:195–200.

1085.  Handwerger S, Raucher B, Altarac D, et al. Nosocomial outbreak due to *Enterococcus faecium* highly resistant to vancomycin, penicillin, and gentamicin. Clin Infect Dis 1993;16:750–5.

1086.  Boyle JF, Soumakis SA, Rendo A, et al. Epidemiologic analysis and genotypic characterization of a nosocomial outbreak of vancomycin-resistant enterococci. J Clin Microbiol 1993;31:1280–5.

1087.  (330) Boyce JM, Opal SM, Chow JW, et al. Outbreak of multidrug-resistant *Enterococcus faecium* with transferable vanB class vancomycin resistance. J Clin Microbiol 1994;32:1148–53.

1088.  (331) Rhinehart E, Smith NE, Wennerstein C, et al. Rapid dissemination of beta-lactamase-producing, aminoglycoside-resistant *Enterococcus faecalis* among patients and staff on an infant-toddler surgical ward. N Engl J Med 1990;323:1814–8.

1089.  Crossley K, Landesman B, Zaske D. An outbreak of infections caused by strains of *Staphylococcus aureus* resistant to methicillin and aminoglycosides. II. epidemiologic studies. J Infect Dis 1979;139:280–7.

1090.  Peacock JE Jr, Marsik FJ, Wenzel RP. Methicillin-resistant *Staphylococcus aureus*: introduction and spread within a hospital. Ann Intern Med 1980;93:526–32.

1091.  Walsh TJ, Hansen SL, Tatem BA, Auger F, Standiford HJ. Activity of novobiocin against methicillin-resistant *Staphylococcus aureus*. J Antimicrob Chemother 1985;15:435–40.

1092.  (332) Livornese LL Jr, Sias S, Samel C, et al. Hospital-acquired infection with vancomycin-resistant *Enterococcus faecium* transmitted by electronic thermometers. Ann Intern Med 1992;117:112–6.

1093.  Gould FK, Freeman R. Nosocomial infection with microsphere beds. Lancet 1993;342:241–2.

1094. Morris JG, Shay DK, Hebden JN, et al. *Enterococci* resistant to multiple antimicrobial agents, including vancomycin: establishment of endemicity in a university medical center. Ann Intern Med 1995;123:250–9.

1095. Edmond MB, Ober JS, Weinbaum DL, et al. Vancomycin-resistant *Enterococcus faecium* bacteremia: risk factors for infection. Clin Infect Dis 1995;20:1126–33.

1096. (333) Zervos MJ, Kauffman CA, Therasse PM, Bergman AG, Mikesell TS, Schaberg DR. Nosocomial infection by gentamicin-resistant *Streptococcus faecalis*: an epidemiologic study. Ann Intern Med 1987;106:687–91.

1097. Zervos MJ, Dembinski S, Mikesell T, Schaberg DR. High-level resistance to gentamicin in *Streptococcus faecalis*: risk factors and evidence for exogenous acquisition of infection. J Infect Dis 1986;153: 1075–83.

1098. Bonilla HF, Zervos MA, Lyons MJ, et al. Colonization with vancomycin-resistant *Enterococcus faecium*: comparison of a long-term-care unit with an acute-care hospital. Infect Control Hosp Epidemiol 1997;18:333–9.

1099. Bonilla HF, Zervos MJ, Kauffman CA. Long-term survival of vancomycin-resistant *Entercoccus faecium* on a contaminated surface. Infect Control Hosp Epidemiol 1996;17:770–1.

1100. Boyce JM, Bermel LA, Zervos MJ, et al. Controlling vancomycin-resistant enterococci. Infect Control Hosp Epidemiol 1995;16:634–7.

1101. Boyce JM, Potter-Bynoe G, Chenevert C, King T. Environmental contamination due to methicillin-resistant *Staphylococcus aureus*: possible infection control implications. Infect Control Hosp Epidemiol 1997;18:622–7.

1102. (328) Layton MC, Perez M, Heald P, Patterson JE. An outbreak of mupirocin-resistant *Staphylococcus aureus* on a dermatology ward associated with an environmental reservoir. Infect Control Hosp Epidemiol 1993;14:369–75.

1103. Collins SM, Hacek DM, Degen LA, Wright MP, Noskin GA, Peterson LR. Contamination of the clinical microbiology laboratory with vancomycin-resistant enterococci and multidrug-resistant *Enterobacteriaceae*: implications for hospital and laboratory workers. J Clin Microbiol 2001;39:3772–4.

1104. Bonten MJM, Hayden MK, Nathan C, et al. Epidemiology of colonisation of patients and environment with vancomycin-resistant enterococci. Lancet 1996;348:1615–9.

1105. Wendt C, Wiesenthal B, Dietz E, Rüden H. Survival of vancomycin-resistant and vancomycin-susceptible enterococci on dry surfaces. J Clin Microbiol 1998;36:3734–46.

1106. (323) Bradley CR, Fraise AP. Heat and chemical resistance of enterococci. J Hosp Infect 1996;34:191–6.

1107. (324) Anderson RL, Carr JH, Bond WW, Favero MS. Susceptibility of vancomycin-resistant enterococci to environmental disinfectants. Infect Control Hosp Epidemiol 1997;18:195–9.

1108. (325) Saurina G, Landman D, Quale JM. Activity of disinfectants against vancomycin-resistant *Enterococcus faecium*. Infect Control Hosp Epidemiol 1997;18:345–7.

1109. (326) Rutala WA, Stiegel MM, Sarubbi FA, Weber DJ. Susceptibility of antibiotic-susceptible and antibiotic-resistant hospital bacteria to disinfectants. Infect Control Hosp Epidemiol 1997;18:417–21.

1110. (327) Sehulster LM, Anderson RL. Susceptibility of glycopeptide-intermediate resistant *Staphylococcus aureus* (GISA) to surface disinfectants, hand washing chemicals, and a skin antiseptic [abstract Y-3]. In: Abstracts of the 98th General Meeting, American Society for Microbiology. 1998.

1111. Armstrong-Evans M, Litt M, McArthur MA, et al. Control of transmission of vancomycin-resistant *Enterococcus faecium* in a long-term-care facility. Infect Control Hosp Epidemiol 1999;20:312–17.

1112. Global Consensus Conference: Final Recommendations. Global Consensus Conference on Infection Control Issues Related to Antimicrobial Resistance. Am J Infect Control 1999;27:503–13.

1113. Freeman R, Kearns AM, Lightfoot NF. Heat resistance of nosocomial enterococci. Lancet 1994;345:64–5.

1114. CDC. *Staphylococcus aureus* resistant to vancomycin — United States. MMWR 2002;51:565–7.

1115. CDC. Vancomycin resistant *Staphylococcus aureus* — Pennsylvania, 2002. MMWR 2002;51:902.

1116. (320) Weber DJ, Rutala WA. Role of environmental contamination in the transmission of vancomycin-resistant enterococci. Infect Control Hosp Epidemiol 1997;18:306–9.

1117. (321) Lai KK, Kelley AL, Melvin ZS, Belliveau PP, Fontecchio SA. Failure to eradicate vacomycin-resistant enterococci in a university hospital and the cost of barrier precautions. Infect Control Hosp Epidemiol 1998;19:647–2.

188

1118. (322) Byers KE, Durbin LJ, Simonton BM, Anglim AM, Adal KA, Farr BM. Disinfection of hospital rooms contaminated with vancomycin-resistant *Enterococcus faecium*. Infect Control Hosp Epidemiol 1998;19:261–4.

1119. Siegel DL, Edelstein PH, Nachamkin I. Inappropriate testing for diarrheal diseases in the hospital. JAMA 1990;263:979–82.

1120. Yannelli B, Gurevich I, Schoch PE, Cunha BA. Yield of stool cultures, ova and parasite tests, and *Clostridium difficile* determination in nosocomial diarrhea. Am J Infect Control 1988;16:246–9.

1121. Gerding DN, Olson MM, Peterson LR, et al. *Clostridium difficile*-associated diarrhea and colitis in adults: a prospective case-controlled epidemiologic study. Arch Intern Med 1986;146:95–100.

1122. Svenungsson B, Burman LG, Jalakas-Pörnull K, Lagergren Å, Struwe J, Åkerlund T. Epidemiology and molecular characterization of *Clostridium difficile* strains from patients with diarrhea: low disease incidence and evidence of limited cross-infection in a Swedish teaching hospital. J Clin Microbiol 2003;41:4031–7.

1123. Barlett JG. Antibiotic-associated colitis. Dis Mon 1984;30:1–55.

1124. Pierce PF Jr, Wilson R, Silva J Jr, et al. Antibiotic-associated pseudomembranous colitis: an epidemiologic investigation of a cluster of cases. J Infect Dis 1982;145:269–74.

1125. Aronsson B, Möllby, Nord C-E. Antimicrobial agents and *Clostridium difficile* in acute enteric disease: epidemiologic data from Sweden, 1980–1982. J Infect Dis 1985;151:476–81.

1126. Thibault A, Miller MA, Gaese C. Risk factors for the development of *Clostridium difficile*-associated diarrhea during a hospital outbreak. Infect Control Hosp Epidemiol 1991;12:345–8.

1127. McFarland LV, Surawicz CM, Stamm WE. Risk factors for *Clostridium difficile* carriage and *Clostridium difficile*-associated diarrhea in a cohort of hospitalized patients. J Infect Dis 1990;162:678–84.

1128. Zadik PM, Moore AP. Antimicrobial associations of an outbreak of diarrhoea due to *Clostridium difficile*. J Hosp Infect 1998;39:189–93.

1129. Johnson S, Homann SR, Bettin KM, et al. Treatment of asymptomatic *Clostridium difficile* carriers (fecal excretors) with vancomycin or metronidazole: a randomized, placebo controlled trial. Ann Intern Med 1992;117:297–302.

1130. (319) Gerding DN, Johnson S, Peterson LR, Mulligan ME, Silva J Jr. *Clostridium difficile*-associated diarrhea and colitis. Infect Control Hosp Epidemiol 1995;16:459–77.

1131. Titov L, Lebedkova N, Shabanov A, Tang YJ, Cohen SH, Silva J Jr. Isolation and molecular characterization of *Clostridium difficile* strains from patients and the hospital environment in Belarus. J Clin Microbiol 2000;38:1200–2.

1132. Mulligan ME, Rolfe RD, Finegold SM, George WL. Contamination of a hospital environment by *Clostridium difficile*. Curr Microbiol 1979;3:173–5.

1133. Fekety R, Kim KH, Brown D, Batts DH, Cudmore M, Silva J Jr. Epidemiology of antibiotic-associated colitis: isolation of *Clostridium difficile* from the hospital environment. Am J Med 1981;70:906–8.

1134. Malamou-Ladas H, Farrell SO, Nash JO, Tabaqchali S. Isolation of *Clostridium difficile* from patients and the evironment of hospital wards. J Clin Pathol 1983;6:88–92.

1135. Kaatz GW, Gitlin SD, Schaberg DR, et al. Acquisition of *Clostridium difficile* from the hospital environment. Am J Epidemiol 1988;127:1289–94.

1136. Cohen SH, Tang YJ, Muenzer J, Gumerlock PH, Silva J Jr. Isolation of various genotypes of *Clostridium difficile* from patients and the environment in an oncology ward. J Infect Dis 1997;889–93.

1137. Savage AM. Nosocomial spread of *Clostridium difficile*. Infect Control 1983;4:31–3.

1138. Brooks SE, Veal RO, Kramer M, Dore L, Schupf N, Adachi M. Reduction in the incidence of *Clostridium difficile*-associated diarrhea in an acute care hospital and a skilled nursing facility following replacement of electronic thermometers with single-use disposables. Infect Control Hosp Epidemiol 1992;13:98–103.

1139. Johnson S, Gerding DN, Olson MM, et al. Prospective, controlled study of vinyl glove use to interrupt *Clostridium difficile* nosocomial transmission. Am J Med 1990;88:137–40.

1140. McFarland LV, Mulligan ME, Kwok RYY, Stamm WE. Nosocomial acquisition of *Clostridium difficile* infection. New Engl J Med 1989;320:204–10.

1141. Mayfield JL, Leet T, Miller J, Mundy LM. Environmental control to reduce transmission of *Clostridium difficile*. Clin Inf Dis 2000;31:995–1000.

1142. Wilcox MH, Fawley WN, Wigglesworth N, Parnell P, Verity P, Freeman J. Comparison of the effect of detergent versus hypochlorite cleaning on environmental contamination and incidence of *Clostridium difficile* infection. J Hosp Infect 2003;54:109–14.

1143. (334) Worsley MA. Infection control and prevention of *Clostridium difficile* infection. J Antimicrobial Chemother 1998;41 (Suppl. C):59–66.

1144. von Rheinbaben F, Schünemann S, Groß T, Wolff MH. Transmission of viruses via contact in a household setting: experiments using bacteriophage φX174 as a model virus. J Hosp Infect 2000;46:61–6.

1145. Hall CB, Douglas G Jr, Gelman JM. Possible transmission by fomites of respiratory syncytial virus. J Infect Dis 1980;141:98–102.

1146. Brady MT, Evans J, Cuartas J. Survival and disinfection of parainfluenza viruses on environmental surfaces. Am J Infect Control 1990;18:18–23.

1147. Hendley JO, Wenzel RP, Gwaltney JM Jr. Transmission of rhinovirus colds by self-inoculation. N Engl J Med 1973;288:1361–4.

1148. Butz AM, Fosarelli P, Dick J, Cusack T, Yolken R. Prevalence of rotavirus on high-risk fomites in day-care facilities. Pediatrics 1993;92:202–5.

1149. Wilde J, Van R, Pickering LK, Eiden J, Yolken R. Detection of rotaviruses in the day care environment — detection by reverse transcriptase polymerase chain reaction. J Infect Dis 1992;166:507–11.

1150. Chapin M, Yatabe J, Cherry JD. An outbreak of rotavirus gastroenteritis on a pediatric unit. Am J Infect Control 1983;11:88–91.

1151. Appleton H, Higgins PG. Viruses and gastroenteritis in infants. Lancet 1975;i:1297.

1152. Abad FX, Villena C, Guix S, Caballero S, Pintó RM, Bosch A. Potential role of fomites in the vehicular transmission of human astroviruses. Appl Environ Microbiol 2001;67:3904–7.

1153. Chadwick PR, Beards G, Brown D, et al. Management of hospital outbreaks of gastro-enteritis due to small round structured viruses. Report of the Public Health Laboratory Service, Viral Gastroenteritis Working Group. J Hosp Infect 2000;45:1–10.

1154. Spender QW, Lewis D, Price EH. Norwalk-like viruses: study of an outbreak. Arch Dis Child 1986;61:142–7.

1155. Storr J, Rice S, Phillips AD, Price E, Walker Smith JA. Clinical associations of Norwalk-like virus in the stools of children. J Pediatr Gastroenterol Nutr 1986;5:576–80.

1156. Russo PL, Spelman DW, Harrington GA, et al. Hospital outbreak of Norwalk-like virus. Infect Control Hosp Epidemiol 1997;17:1374–8.

1157. Springthorpe VS, Grenier JL, Lloyd-Evans N, Sattar SA. Chemical disinfection of human rotaviruses: efficacy of commercially-available products in suspension tests. J Hyg (Camb) 1986;97:139–61.

1158. (335) Lloyd-Evans N, Springthorpe VS, Sattar SA. Chemical disinfection of human rotavirus-contaminated inanimate surfaces. J Hyg (Camb) 1986;97:163–73.

1159. CDC. Interim recommendations for cleaning and disinfection of the SARS patient environment. At: www.cdc.gov/ncidod/sars/cleaningpatientenviro.htm

1160. Brown P, Gajdusek DC. The human spongiform encephalopathies: Kuru, Creutzfeldt-Jakob disease, and Gerstmann-Sträussler-Scheinker syndrome. Curr Top Microbiol Immunol 1991;172:1–20.

1161. Will RG. Epidemiology of Creutzfeldt-Jakob disease. Br Med Bull 1993;49:960–70.

1162. Holman RC, Khan AS, Belay ED, Schonberger LB. Creutzfeldt-Jakob disease in the United States, 1979–1994: using national mortality data to assess the possible occurrence of variant cases. Emerg Infect Dis 1996;2:333–7.

1163. Will RG, Ironside JW, Zeidler M, et al. A new variant of Creutzfeldt-Jakob disease in the U.K. Lancet 1996;347:921–5.

1164. Lasmézas CI, Deslys JP, Demaimay R, et al. BSE transmission to macaques. Nature 1996;381:743–4.

1165. Collinge J, Sidle KCL, Heads J, Ironside J, Hill AF. Molecular analysis of prion strain variation and the aetiology of "new variant" CJD. Nature 1996;383:685–90.

1166. Bruce ME, Will RG, Ironside JW, et al. Transmission to mice indicates that "new variant" CJD is caused by the BSE agent. Nature 1997;389:498–501.

1167. Prusiner SB. Biology and genetics of prion diseases. Ann Rev Microbiol 1994;48:655–86.

1168. Prusiner SB. Human prion diseases. In: Zuckerman AJ, Banatvala JE, Pattison JR, eds. Principles and practice of clinical virology, 3rd ed. Chichester, UK: John Wiley & Sons, 1995;703–29.

1169. Prusiner SB. Prions. Proc Natl Acad Sci USA 1998;95:13363–83.

190

1170. **(337)** Kimberlin RH, Walker CA, Millson GC, et al. Disinfection studies with two strains of mouse-passaged scrapie agent. Guidelines for Creutzfeldt-Jakob and related agents. J Neurol Sci 1983;59:349–55.

1171. Sklaviadis TK, Manuelidis L, Manuelidis EE. Physical properties of the Creutzfeldt-Jakob disease agent. J Virol 1989;63:1212–22.

1172. Brown P, Gajdusek DC, Gibbs CJ Jr, Asher DM. Potential epidemic of Creutzfeldt-Jakob disease from human growth hormone therapy. N Engl J Med 1985;12:728–33.

1173. Brown P, Preece MA, Will RG. "Friendly fire" in medicine: hormones, homografts and Creutzfeldt-Jakob disease. Lancet 1992;340:24–7. Brown P, Preece MA, Will RG. "Friendly fire" in medicine: hormones, homografts and Creutzfeldt-Jakob disease. Lancet 1992;340:24–7.

1174. Frasier D, Foley TP Jr. Creutzfeldt-Jakob disease in recipients of pituitary hormones. J Clin Endocrinol Metabol 1994;78:1277–9.

1175. Centers for Disease Control. Epidemiologic notes and reports: rapidly progressive dementia in a patient who received a cadaveric dura mater graft. MMWR 1987;36:49–50, 55.

1176. Centers for Disease Control. Epidemiologic notes and reports update: Creutzfeldt-Jakob disease in a patient receiving cadaveric dura mater graft. MMWR 1987;36:324–5.

1177. Centers for Disease Control. Epidemiologic notes and reports update: Creutzfeldt-Jakob disease in a second patient who received a cadaveric dura mater graft. MMWR 1989;38:37–8, 43.

1178. CDC. Creutzfeldt-Jakob disease in patients who received a cadaveric dura mater graft — Spain, 1985–1992. MMWR 1993;42:560–3.

1179. Martinez-Lage JF, Poza M, Sola J, et al. Accidental transmission of Creutzfeldt-Jakob disease by dural cadaveric grafts. J Neurol Neurosurg Psychiatry 1994;57:1091–4.

1180. CDC. Creutzfeldt-Jakob disease associated with cadaveric dura mater grafts — Japan, January 1979–May 1997. MMWR 1997;46:1066–9.

1181. Lang CLG, Heckmann JG, Neundörfer B. Creutzfeldt-Jakob disease via dural and corneal transplants. J Neurol Sci 1998;160:128–39.

1182. Nevin S, McMenemey WH, Behrman S, Jones DP. Subacute spongiform encephalopathy — a subacute form of encephalopathy attributable to vascular dysfunction (spongiform cerebral atrophy). Brain 1960;83:519–69.

1183. Bernoulli C, Siegfried J, Baumgartner G, et al. Danger of accidental person-to-person transmission of Creutzfeldt-Jakob disease by surgery. Lancet 1977;1:478–9.

1184. Will RG, Matthews WB. Evidence for case-to-case transmission of Creutzfeldt-Jakob disease. J Neurol Neurosurg Psychiatry 1982;45:235–8.

1185. El Hachimi KH, Chaunu M-P, Cervenakova L, Brown P, Foncin J-F. Putative neurosurgical transmission of Creutzfeldt-Jakob disease with analysis of donor and recipient: agent strains. Comp Rendus Acad Sci Iii: Science de la vie 1997;320:319–28.

1186. Brown P, Gibbs CJ, Amyx HL, et al. Chemical disinfection of Creutzfeldt-Jakob disease virus. N Engl J Med 1982;306:1279–82.

1187. Brown P, Rohwer RG, Gajdusek DC. Newer data on the inactivation of scrapie virus or Creutzfeldt-Jakob disease virus in brain tissue. J Infect Dis 1986;153:1145–8.

1188. **(338)** Rosenberg RN, White CL, Brown P, Gajdusek DC, Volpe JJ, Dyck PJ. Precautions in handling tissues, fluids, and other contaminated materials from patients with documented or suspected Creutzfeldt-Jakob disease. Ann Neurol 1986;19:75–7.

1189. Taylor DM. Resistance of the ME7 scrapie agent to peracetic acid. Vet Microbiol 1991;27:19–24.

1190. Taguchi F, Tamai Y, Uchida K, et al. Proposal for a procedure for complete inactivation of the Creutzfeldt-Jakob disease agent. Arch Virol 1991;119:297–301.

1191. **(339)** Taylor D. Inactivation of the unconventional agents of scrapie, bovine spongiform encephalopathy, and Creutzfeldt-Jakob disease. J Hosp Infect 1991;18 (Suppl A):141–6.

1192. Favero MS. Current issues in hospital hygiene and sterilization technology. J Infect Control (Asia Pacific Edition) 1998;1:8–10.

1193. Ricketts MN, Cashman NR, Stratton EE, El Saadany S. Is Creutzfeldt-Jakob disease transmitted in blood? Emerg Infect Dis 1997;3:155–63.

1194. Will RG, Kimberlin RH. Creutzfeldt-Jakob disease and the risk from blood or blood products. Vox Sang 1998;75:178–80.

1195. Evatt B, Austin H, Barnhart E, et al. Surveillance for Creutzfeldt-Jakob disease among persons with hemophilia. Transfusion 1998;38:817–20.

1196. Patry D, Curry B, Easton D, Mastrianni JA, Hogan DB. Creutzfeldt-Jakob disease (CJD) after blood product transfusion from a donor with CJD. Neurology 1998;50:1872–3.

1197. **(340)** Budka H, Aguzzi A, Brown P, et al. Tissue handling in suspected Creutzfeldt-Jakob disease (CJD) and other human spongiform encephalopathies (prion diseases). Brain Pathol 1995;5:319–22.

1198. **(341)** Ironside JW, Bell JE. The "high-risk" neuropathological autopsy in AIDS and Creutzfeldt-Jakob disease: principles and practice. Neuropathol Appl Neurobiol 1996;22:388–93.

1199. **(336)** Rutala WA, Weber DJ. Creutzfeldt-Jakob disease: recommendations for disinfection and sterilization. Clin Infect Dis 2001;32:1348–56.

1200. Joint Commission for the Accreditation of Healthcare Organizations. Exposure to Creutzfeldt-Jakob Disease. Sentinel Alert, Issue 20; June 2001. Available at: www.jcaho.org/edu_pub/sealert/sea20 html

1201. **(342)** World Health Organization. WHO Infection control guideline for transmissible spongiform encephalopathies: report of a WHO consultation. Geneva, Switzerland: WHO, 1999. Available at: www.who.int/emc-documents/tse/whocdscsraph2003c.html

1202. Litsky BY. Results of bacteriological surveys highlight problem areas in hospitals. Hospital Management 1966;101:82–8.

1203. Eickhoff TC. Microbiologic sampling. Hospitals 1970;44:86–7.

1204. American Hospital Association Committee on Infections Within the Hospitals. Statement on microbiologic sampling in the hospital 1974;48:125–6.

1205. Rafferty KM, Pancoast SJ. Brief report: bacteriological sampling of telephones and other hospital staff-hand contact objects. Infect Control 1984;5:533–5.

1206. Haley RW, Shachtman RS. The emergence of infection control programs in U.S. hospitals: an assessment, 1976. Am J Epidemiol 1980;111:574–91.

1207. Mallison GF, Haley RW. Microbiologic sampling of the inanimate environment in U.S. hospitals, 1976–1977. Am J Med 1981;70:941–6.

1208. Gröschel DHM. Air sampling in hospitals. Ann NY Acad Sci 1980;353:230–40.

1209. **(208, Appendix; 6)** Barbaree JM, Gorman GW, Martin WT, Fields BS, Morrill WE. Protocol for sampling environmental sites for legionellae. Appl Environ Microbiol 1987;53:1454–8.

1210. Eickhoff TC. Microbiologic sampling of the hospital environment. Health Lab Sci 1974;11:73–5.

1211. Isenberg HD. Significance of environmental microbiology in nosocomial infections and the care of hospitalized patients. In: Lorian V, ed. Significance of medical microbiology in the care of patients. Baltimore, MD: Williams & Wilkins, 1977;220–34.

1212. McGowan JE Jr, Weinstein RA. The role of the laboratory in control of nosocomial infection. In: Bennett JV, Brachman PS, eds. Hospital infections, 4th ed. Philadelphia, PA: Lippincott Raven, 1998;143–64.

1213. Turner AG, Wilkins JR, Craddock JG. Bacterial aerosolization from an ultrasonic cleaner. J Clin Microbiol 1975;1:289–93.

1214. **(343)** Bond WW, Sehulster LM. Microbiological culturing of environmental and medical-device surfaces. In: Isenberg HD, Miller JM, Bell M, eds. Clinical microbiology procedures handbook, section 11. Washington, DC: American Society for Microbiology Press, 2004 (in press).

1215. Cole EC, Cook CE. Characterization of infectious aerosols in health care facilities: an aid to effective engineering controls and preventive strategies. Am J Infect Control 1998;26:452–64.

1216. Nevalainen A, Willeke K, Liebhaber F, Pastuszka J, Burge H, Henningson E. Bioaerosol sampling. In: Willeke K, Baron PA, eds. Aerosol management. New York, NY: Van Nostrand Reinhold, 1993;471–92.

1217. Cox CS. The aerobiological pathway of microorganisms. Chichester UK: John Wiley & Sons, 1987.

1218. **(349)** Wolf HW, Skaliy P, Hall LB, et al. Sampling microbiological aerosols. Public Health Service publication No. 686. Government Printing Office, Washington, DC: 1964.

1219. Zeterberg JM. A review of respiratory virology and the spread of virulent and possible antigenic viruses via air conditioning systems. Ann Allergy 1973;31:228–34.

1220. Randall CW, Ledbetter JO. Bacterial air pollution from activated sludge units. Am Ind Hyg Assoc J 1966;Nov/Dec:506–19.

1221. Salem H, Gardner DE. Health aspects of bioaerosols. In: Lighthart B, Mohr AJ, eds. Atmospheric microbial aerosols, theory and applications. New York, NY: Chapman and Hall, 1985;304–30.

1222. Sattar SA, Ijaz MK. Spread of viral infections by aerosols. Crit Rev Environ Control 1987;17:89–131.

1223. **(345)** Buttner MP, Willeke K, Grinshpun SA. Sampling and analysis of airborne microorganisms. In: Hurst CJ, Knudsen GR, McInerney MJ, Stetzenbach LD, Walter MV, eds. Manual of environmental microbiology. Washington, DC: American Society for Microbiology Press, 1997;629–40.

192

1224. **(346)** Jensen PA, Schafer MP. Sampling and characterization of bioaerosols. In: NIOSH Manual of Analytical Methods;Cincinnati OH;CDC;1998: p. 82–112. Available at: www.cdc.gov/niosh/nmam/pdfs/chapter-j.pdf

1225. Jolley AE. The value of surveillance cultures on neonatal intensive care units. J Hosp Infect 1993;25:153–9.

1226. Hardy KA, McGowan KL, Fisher MC, Schidlow DV. *Pseudomonas cepacia* in the hospital setting: lack of transmission between cystic fibrosis patients. J Pediatr 1986;109:51–4.

1227. Hambraeus A, Lagerqvist-Widh A, Zettersten U, Engberg S, Sedin G, Sjoberg L. Spread of *Klebsiella* in a neonatal ward. Scand J Infect Dis 1991;23:189–94.

1228. Humphreys H, Peckham D, Patel P, Knox A. Airborne dissemination of *Burkholderia* (*Pseudomonas*) *cepacia* from adult patients with cystic fibrosis. Thorax 1994;49:1157–9.

1229. Pankhurst CL, Harrison VE, Philpott-Howard J. Evaluation of contamination of the dentist and dental surgery environment with *Burkholderia* (*Pseudomonas*) *cepacia* during treatment of children with cystic fibrosis. Int J Paediatr Dent 1995;5:243–7.

1230. Weber DO, Gooch JJ, Wood WR, Britt EM, Kraft RO. Influence of operating room surface contamination on surgical wounds: a prospective study. Arch Surg 1976;111:484–8.

1231. Pfeiffer EH, Wittig JR, Dunkelberg H, Werner HP. Hygienic and bacteriological comparative studies in 50 hospitals. V. Bacterial contamination of hospital surfaces. Zentralbl Bakteriol [B] 1978;167:11–21. (German)

1232. Sattar SA, Lloyd-Evans N, Springthorpe VS. Institutional outbreaks of rotavirus diarrhea: potential role of fomites and environmental surfaces as vehicles for virus transmission. J Hyg (Camb) 1986;96:277–89.

1233. Smith SM, Eng RH, Padberg FT Jr. Survival of nosocomial pathogenic bacteria at ambient temperature. J Med 1996;27:293–302.

1234. Craythorn JM, Barbour AG, Matsen JM, Britt MR, Garibaldi RA. Membrane filter contact technique for bacteriological sampling of moist surfaces. J Clin Microbiol 1980;12:250–5.

1235. Scott E, Bloomfield SF, Barlow CG. A comparison of contact plate and calcium alginate swab techniques for quantitative assessment of bacteriological contamination of environmental surfaces. J Appl Bacteriol 1984;56:317–20.

1236. Poletti L, Pasquarella C, Pitzurra M, Savino A. Comparative efficiency of nitrocellulose membranes versus RODAC plates in microbial sampling on surfaces. J Hosp Infect 1999;41:195–201.

1237. Russell AD. Factors influencing the efficacy of antimicrobial agents. In: Russell AD, Hugo WB, Ayliffe GAJ, eds. Principles and practices of disinfection, preservation and sterilization. Oxford, UK: Blackwell Science, 1999;95–123.

1238. **(347)** International Organization for Standardization (ISO). Sterilization of medical devices — microbiological methods, Part 1. ISO Standard 11737-1. Paramus, NJ: International Organization for Standardization, 1995.

1239. Favero MS, Gabis DA, Vesley D. Environmental monitoring procedures. In: Speck ML, ed. Compendium of methods for the microbiological examination of foods, 2nd ed. Washington, DC: American Public Health Association;1984;47–61.

1240. Favero MS, Bond WW, Petersen NJ, Berquist KR, Maynard JE. Detection methods for study of the stability of hepatitis B antigen on surfaces. J Infect Dis 1974;129:210–2.

1241. Favero MS, McDade JJ, Robertsen JA, Hoffmann RK, Edwards RW. Microbiological sampling of surfaces. J Appl Bacteriol 1968;31:336–43.

1242. Petersen NJ, Collins DE, Marshall JH. Evaluation of skin cleansing procedures using the wipe-rinse technique. Health Lab Sci 1974;11:182–97.

1243. Schalkowsky S, Hall LB, Kline RC. Potential effects of recent findings on spacecraft sterilization requirements. Space Life Sci 1969;1:520–30.

1244. Hall LB, Lyle RG. Foundations of planetary quarantine. Environ Biol Med 1971;1:5–8.

1245. Rutala WA, Weber DJ. Uses of inorganic hypochlorite (bleach) in health-care facilities. Clin Microbiol Rev 1997;10:597–610.

1246. Mallison GF. Central services and linens and laundry. In: Bennett JV, Brachman PS, eds. Hospital infections. Boston, MA: Little, Brown, & Co, 1986;251–6.

1247. **(365)** Blaser MJ, Smith PE, Cody HJ, Wang W-LL, LaForce FM. Killing of fabric-associated bacteria in hospital laundry by low-temperature washing. J Infect Dis 1984;149:48–57.

1248. Centers for Disease Control. Outbreak of viral hepatitis in the staff of a pediatric ward — California. MMWR 1977;28:77–9.

1249. Shah PC, Krajden S, Kane J, Summerbell RC. Tinea corporis caused by *Microsporum canis*: report of a nosocomial outbreak. Eur J Epidemiol 1988;4:33–7.

1250. (353) Barrie D, Hoffman PN, Wilson JA, Kramer JM. Contamination of hospital linen by *Bacillus cereus*. Epidemiol Infect 1994;113:297–306.

1251. Standaert SM, Hutcheson RH, Schaffner W. Nosocomial transmission of *Salmonella gastroenteritis* to laundry workers in a nursing home. Infect Control Hosp Epidemiol 1994;15:22–6.

1252. Pasternak J, Richtmann R, Ganme APP, et al. Scabies epidemic: price and prejudice. Infect Control Hosp Epidemiol 1994;15:540–2.

1253. (357) Association for the Advancement of Medical Instrumentation. Processing of reusable surgical textiles for use in health care facilities: ANSI/AAMI recommended practice ST65. Arlington, VA: Association for the Advancement of Medical Instrumentation, 2000;16.

1254. Association of Operating Room Nurses. Recommended practices for surgical attire: AORN standards and rrecommended practices. AORN J 1995;62:141–2.

1255. Loh W, Ng VV, Holton J. Bacterial flora on the white coats of medical students. J Hosp Infect 2000;45:65–8.

1256. Belkin NL. Use of scrubs and related apparel in healthcare facilities. Am J Infect Control 1997;25:401–4.

1257. Belkin NL. Home laundering of soiled surgical scrubs: surgical site infections and the home environment. Am J Infect Control 2000;29:58–64.

1258. (355) Joint Committee on Healthcare Laundry Guidelines. Guidelines for healthcare linen service. Hallendale, FL: Textile Rental Service Association of America, 1999.

1259. (356) Greene VW. Microbiological contamination control in hospitals: part 6 — roles of central service and the laundry. Hospitals JAHA 1970;44:98–103.

1260. (350) Wagner RA. Partitioned laundry improves bacteria control. Hospitals JAHA 1966;40:148–51.

1261. (351) Hambraeus A, Malmborg AS. Is a bed centre in a hospital a hygienic hazard? J Hyg (Camb) 1982;88:143–7.

1262. (352) McDonald LL, Pugliese G. Textile processing service. In: Mayhall CG, ed. Hospital epidemiology and infection control, 2nd ed. Philadelphia, PA: Lippincott Williams & Wilkins, 1999;1031–4.

1263. (354) Legnani PP, Leoni E. Factors affecting the bacteriological contamination of commercial washing machines. Zentralbl Hyg Umweltmed 1997;200:319–33.

1264. Maki DG, Alvarado C, Hassemer C. Double-bagging of items from isolation rooms is unnecessary as an infection control measure: a comparative study of surface contamination with single- and double-bagging. Infect Control 1986;7:535–7.

1265. Garner JS, Simmons BP. CDC guideline for isolation precautions in hospitals. Infect Control 1983;4: 245–325 and Am J Infect Control 1984;12:103–63.

1266. Weinstein SA, Gantz NM, Pelletier C, Hibert D. Bacterial surface contamination of patients' linen: isolation precautions versus standard care. Am J Infect Control 1989;17:264–7.

1267. (358) Hughes HG. Chutes in hospitals. Can Hosp 1964;41:56–7, 87.

1268. (359) Michaelsen GS. Designing linen chutes to reduce spread of infectious organisms. Hospitals JAHA 1965;39 (3):116–9.

1269. (360) Hoch KW. Laundry chute cleaning recommendations [letter]. Infect Control 1982;3:360.

1270. (361) Whyte W, Baird G, Annand R. Bacterial contamination on the surface of hospital linen chutes. J Hyg (Camb) 1969;67:427–35.

1271. (363) Walter WG, Schillinger JE. Bacterial survival in laundered fabrics. Appl Microbiol 1975;29:368–73.

1272. (362) Taylor LJ. Segregation, collection, and disposal of hospital laundry and waste. J Hosp Infect 1988;11 (Suppl. A):57–63.

1273. Barrie D. How hospital linen and laundry services are provided. J Hosp Infect 1994;27:219–35.

1274. Riggs CH, Sherrill JC. Textile laundering technology. Hallendale FL: Textile Rental Service Association; 1999;92–7.

1275. Mouton RP, Bekkers JH. Bacteriological results of routine procedures in a hospital laundry. Folia Med Neerl 1967;10:71–6.

1276. Nicholes PS. Bacteria in laundered fabrics. Am J Public Health 1970;60:2175–80.

1277. Arnold L. A sanitary study of commercial laundry practices. Am J Public Health 1938;28:839–44.

194

1278. (364) Belkin NL. Aseptics and aesthetics of chlorine bleach: can its use in laundering be safely abandoned? Am J Infect Control 1998;26:149–51.

1279. Jordan WE, Jones DV. Antiviral effectiveness of chlorine bleach in household laundry use. Am J Dis Child 1969;117:313–6.

1280. Hittman Associates, Inc. Energy efficient water use in hospitals [Final summary report (H-W8000-78-756FR)]. Prepared for the University of California, Lawrence Berkeley Laboratory, 1979. Contract No. P.O. 4627702.

1281. (366) Jaska JM, Fredell DL. Impact of detergent systems on bacterial survival on laundered fabrics. Appl Environ Microbiol 1980;39:743–8.

1282. (367) Battles DR, Vesley D. Wash water temperature and sanitation in the hospital laundry. J Environ Health 1981;43:244–50.

1283. (368) Christian RR, Manchester JT, Mellor MT. Bacteriological quality of fabrics washed at lower-than-standard temperatures in a hospital laundry facility. Appl Environ Microbiol 1983;45:591–7.

1284. (369) Smith JA, Neil KR, Davidson CG, Davidson RW. Effect of water temperature on bacterial killing in laundry. Infect Control 1987;8:204–9.

1285. (370) Tompkins DS, Johnson P, Fittall BR. Low-temperature washing of patients' clothing: effects of detergent with disinfectant and a tunnel drier on bacterial survival. J Hosp Infect 1988;12:51–8.

1286. (371) Ayliffe GAJ, Collins BJ, Taylor LJ. Laundering. In: Wright PSG, ed. Hospital-acquired Infection: principles and Prevention. Bristol, UK: 1982;101–6.

1287. Koller W, Wewalka G. A new method for microbiological evaluation of disinfecting laundering processes. Zbl Bakt Hyg I Abt Orig B 1982;176:463–71.

1288. (372) Meyer CL, Eitzen HE, Schreiner RL, Gfell MA, Moye L, Kleiman MB. Should linen in newborn intensive care units be autoclaved? Pediatrics 1981;67:362–4.

1289. (373) Wagg RE. Disinfection of textiles in laundering and dry cleaning. Chem Ind 1965;44:1830–4.

1290. (374) Bates CJ, Wilcox MH, Smith TL, Spencer RC. The efficacy of a hospital dry cleaning cycle in disinfecting material contaminated with bacteria and viruses. J Hosp Infect 1993;23:255–62.

1291. (375) Oehnel E. Drycleaning in the hospital laundry. Can Hosp 1971;September:66–7.

1292. DiGacomo JC, Odom JW, Ritoto PC, Swan KC. Cost containment in the operating room: use of reusables versus disposable clothing. Am Surg 1992;58:654–6.

1293. American Society for Testing Materials. Standard test method for resistance of materials used in protective clothing to penetration by synthetic blood. ASTM, 1998;F1670–98.

1294. American Society for Testing Materials. Standard test method for resistance of materials used in protective clothing to penetration by bloodborne pathogens using phi-X174 bacteriophage penetration as a test system. ASTM 1997;F1671–976.

1295. Belkin NL. Are "impervious" surgical gowns really liquid-proof? Bull Am Col Surgeons 1999;84:19–36.

1296. Belkin NL. OR gowns — even a "pass" can fail. AORN J 1999;70:302–4.

1297. Laufman H, Belkin NL, Meyer KK. A critical review of a century's progress in surgical apparel: how far have we come? J Am Col Surgeons 2000;191:554–68.

1298. Leonas KK, Jinkins RS. The relationship of selected fabric characteristics and the barrier effectiveness of surgical gown fabrics. Am J Infect Control 1997;25:16–23.

1299. Meyer KK, Beck WC. Gown-glove interface: a possible solution to the danger zone. Infect Control Hosp Epidemiol 1995;16:488–90.

1300. McCullough EA. Methods for determining the barrier efficacy of surgical gowns. Am J Infect Control 1993;21:368–74.

1301. Pissiotis CA, Komborozos V, Papoutsi C, Skrekas G. Factors that influence the effectiveness of surgical gowns in the operating theater. Eur J Surg 1997;163:597–604.

1302. Association of Operating Room Nurses (AORN). Recommended practices for use and selection of barrier materials for surgical gowns and drapes. Association of Operating Room Nurses. AORN J 1996;63:650, 653–4.

1303. Belkin NL, Koch FT. OR barrier materials — Necessity or extravagance? AORN J 1998;67:443–5.

1304. Rutala WA, Weber DJ. A review of single-use and reusable gowns and drapes in health care. Infect Control Hosp Epidemiol 2001;22:248–57.

1305. Murphy L. Cost/benefit study of reusable and disposable OR draping materials. J Healthc Mater Manage 1993;11:44–8.

1306. (376) U.S. Environmental Protection Agency. Consumer products treated with pesticides. Office of Pesticide Programs. Available at: www.epa.gov/opp00001/citizens/treatart htm

1307. Kalyon BD, Olgun U. Antibacterial efficacy of triclosan-incorporated polymers. Am J Infect Control 2001;29:124–5.

1308. U.S. Environmental Protection Agency. Clarification of treated articles exemption. Availability of draft PR notice. Federal Register 1998;63:19256–8.

1309. Mayer CE. FTC Challenges antibacterial product. Washington, DC: Washington Post, September 17,1999;A09.

1310. (377) Fujita K, Lilly HA, Kidson A, Ayliffe GAJ. Gentamicin-resistant *Pseudomonas aeruginosa* infection from mattresses in a burns unit. Br Med J 1981;283:219–20.

1311. (378) Grubb DJ, Watson KC. *Pseudomonas* septicaemia from plastic mattresses [letter]. Lancet 1982;1:518.

1312. (379) Sherertz RJ, Sullivan ML. An outbreak of infections with *Acinetobacter calcoaceticus* in burn patients: contamination of patients' mattresses. J Infect Dis 1985;151:252–8.

1313. (380) Ndawula EM, Brown L. Mattresses as reservoirs of epidemic methicillin-resistant *Staphylococcus aureus* [letter]. Lancet 1991;337:488.

1314. (381) O'Donoghue MAT, Allen KD. Costs of an outbreak of wound infections in an orthopaedic ward. J Hosp Infect 1992;22:73–9.

1315. (382) Weernink A, Severin WPJ, Thernberg T, Dijkshoorn L. Pillows, an unexpected source of *Acinetobacter.* J Hosp Infect 1995;29:189–99.

1316. Newsome TW, Johns LA, Pruitt BA Jr. Use of an air-fluidized bed in the care of patients with extensive burns. Am J Surg 1972;124:52–6.

1317. (383) Scheidt A, Drusin LM. Bacteriologic contamination in an air-fluidized bed. J Trauma 1983;23:241–2.

1318. (384) Freeman R, Gould FK, Ryan DW, Chamberlain J, Sisson PR. Nosocomial infection due to enterococci attributed to a fluidized microsphere bed: the value of pyrolysis mass spectrometry. J Hosp Infect 1994;27:187–93.

1319. Sharbaugh RJ, Hargest TS. Bactericidal effect of the air-fluidized bed. Am Surgeon 1971;37:583–6.

1320. Sharbaugh RJ, Hargest TS, Wright FA. Further studies on the bactericidal effect of the air-fluidized bed. Am Surgeon 1973;39:253–6.

1321. Winters WD. A new perspective of microbial survival and dissemination in a prospectively contaminated air-fluidized bed model. Am J Infect Control 1990;18:307–15.

1322. (385) Clancy MJ. Nosocomial infection and microsphere beds [letter]. Lancet 1993;342:680–1.

1323. (386) Clancy MJ. Nosocomial infection due to enterococci attributed to a fluidized microsphere bed [letter]. J Hosp Infect 1994;28:324–5.

1324. Vesley D, Hankinson SE, Lauer JL. Microbial survival and dissemination associated with an air-fluidized therapy unit. Am J Infect Control 1986;14:35–40.

1325. Bolyard EA, Townsend TR, Horan T. Airborne contamination associated with in-use air-fluidized beds: a descriptive study. Am J Infect Control 1987;15:75–8.

1326. (387) Jacobsen E, Gurevich I, Cunha BA. Air-fluidized beds and negative-pressure isolation rooms [letter]. Am J Infect Control 1993;21:217–8.

1327. Cooper JE. Pets in hospitals. Br Med J 1976;1:698–700.

1328. Egerton JR. Pets and zoonoses. Med J Aust 1982;2:311.

1329. Yamauchi T. Pet programs in hospitals. Pediatr Infect Dis J 1993;12:707.

1330. Khan MA, Farrag N. Animal-assisted activity and infection control implications in a healthcare setting. J Hosp Infect 2000;46:4–11.

1331. Weber DJ, Rutala WA. Epidemiology and prevention of nosocomial infections associated with animals in the hospital. In: Mayhall CG, ed. Hospital epidemiology and infection control, 2nd ed. Philadelphia, PA: Lippincott Williams & Wilkins, 1999;1399–421.

1332. Acha PN, Szyfres B. Zoonoses and communicable diseases common to man and animals, 2nd ed. Washington, DC: Pan American Health Organization, 1987. Scientific publication No. 503.

1333. Elliot DL, Tolle SW, Goldberg L, Miller JB. Pet-associated illness. N Engl J Med 1985;313:985–95.

1334. Marx MB. Parasites, pets, and people. Primary Care 1991;18:153–65.

1335. Goldstein EJ. Household pets and human infections. Infect Dis Clin North Am 1991;5:117–30.

1336. Chomel BB. Zoonoses of house pets other than dogs, cats, and birds. Pediatr Infect Dis J 1992;11:479–87.

196

1337.   Gnann JW Jr, Bressler GS, Bodet CA III, Avent CK. Human blastomycosis after a dog bite. Ann Intern Med 1983;98:48–9.

1338.   Garcia VF. Animal bites and *Pasteurella* infections. Pediatr Rev 1997;18:127–30.

1339.   Crowder HR, Dorn CR, Smith RE. Group A *Streptococcus* in pets and group A streptococcal disease in man. Int J Zoonoses 1978;5:45–54.

1340.   (397) CDC. Reptile-associated salmonellosis — selected states, 1996–1998. MMWR 1999;48:1009–13.

1341.   Devriese LA, Ieven M, Goossens H, et al. Presence of vancomycin-resistant enterococci in farm and pet animals. Antimicrob Agent Chemother 1996;40:2285–7.

1342.   Scott GM, Thomson R, Malone-Lee J, Ridgway GL. Cross-infection between animals and man: Possible feline tranmission of *Staphylococcus aureus* infection in humans? J Hosp Infect 1988;12:29–34.

1343.   Weinberg A. Ecology and epidemiology of zoonotic pathogens. Infect Dis Clin North Am 1991;5:1–6.

1344.   Yu V, Meissner C. Zoonoses. In: Schaechter M, Medoff G, Schlessinger D, eds. Mechanisms of microbial diseases. Baltimore, MD: Williams & Wilkins, 1989;749–64.

1345.   Ryan KJ. Some bacteria causing zoonotic diseases. In: Sherris JC, ed. Medical microbiology, 2nd ed. New York, NY: Elsevier, 1990;489–98.

1346.   Chang HJ, Miller HL, Watkins N, et al. An epidemic of *Malassezia pachydermatis* in an intensive care nursery associated with colonization of healthcare workers' pet dog. N Engl J Med 1998;338:706–11.

1347.   Drusin LM, Ross BG, Rhodes KH, Krause AN, Scott RA. Nosocomial ringworm in a neonatal intensive care unit: a nurse and her cat. Infect Control Hosp Epidemiol 2000;21:605–7.

1348.   Richet HM, Craven PC, Brown JM, et al. A cluster of *Rhodococcus* (*Gordona*) *bronchialis* sternal-wound infections after coronary-artery bypass surgery. N Engl J Med 1991;324:104–9.

1349.   (394) Saylor K. Pet visitation program. J Gerontol Nurs 1998;24:36–8.

1350.   Corson SA, O'Leary Corson E. Pets as mediators of therapy. Curr Psychiatr Ther 1978;18:195–205.

1351.   Fick KM. The influence of an animal on social interactions of nursing home residents in a group setting. Am J Occup Ther 1993;47:529–34.

1352.   Gunby P. Patient progressing well? He must have a pet. JAMA 1979;241:438.

1353.   Culliton BJ. Take two pets and call me in the morning. Science 1987;237:1560–1.

1354.   Wilkes CN, Shalko TK, Trahan M. Pet Rx: Implications for good health. Health Educ 1989;20:6–9.

1355.   Doyle K, Kukowski T. Utilization of pets in a hospice program. Health Educ 1989;20:10–1.

1356.   Teeter LM. Pet therapy program. J Amer Vet Med Assoc 1997;210:1435–8.

1357.   Gammonley J, Yates J. Pet projects: animal assisted therapy in nursing homes. J Gerontol Nurs 1991;17:12–5.

1358.   (395) Draper RJ, Gerber GJ, Layng EM. Defining the role of pet animals in psychotherapy. Psychiat J Univ Ottawa 1990;15:169–72.

1359.   Allen DT. Effects of dogs on human health. J Amer Vet Med Assoc 1997;210:1136–9.

1360.   (391) Delta Society. Standards of practice for animal-assisted activities and animal-assisted therapy. Renton, WA: Delta Society, 1996.

1361.   (392) Fox JG. Transmissible drug resistance in *Shigella* and *Salmonella* isolated from pet monkeys and their owners. J Med Primatol 1975;4:165–71.

1362.   (393) Ostrowski SR, Leslie MJ, Parrott T, Abelt S, Piercy PE. B-virus from pet macaque monkeys: an emerging threat in the United States? Emerg Infect Dis 1998;4:117–21.

1363.   CDC. How to prevent transmission of intestinal roundworms from pets to people. Available at: www.cdc.gov/ncidod/diseases/roundwrm/roundwrm htm

1364.   (146) Boyce JM, Pittet D. Guideline for hand hygiene in health-care settings: recommendations of the Healthcare Infection Control Practices Advisory Committee and the HICPAC/SHEA/APIC/IDSA Hand Hygiene Task Force. Infect Control Hosp Epidemiol 2002;23 (Suppl):S1–S40.

1365.   (388) American Academy of Allergy, Asthma, and Immunology. Tips to remember: indoor allergens. Available at: www.aaaai.org/patients/publicedmat/tips/indoorallergens.stm

1366.   (389) Duncan SL, APIC Guideline Committee. APIC State-of-the-art report: the implications of service animals in healthcare settings. Am J Infect Control 2000;28:170–80.

1367.   (390) Murray AB, Ferguson A, Morrison BJ. The frequency and severity of cat allergy vs. dog allergy in atopic children. J Allergy Clin Immunol 1983;72:145–9.

1368.   Hodson T, Custovic A, Simpson A, Chapman M, Woodcock A, Green R. Washing the dog reduces dog allergen levels, but the dog needs to be washed twice a week. J Allergy Clin Immunol 1999;103:581–5.

1369.   Brickel CN. The therapeutic roles of cat mascots with a hospital based population: a staff survey. Gerontologist 1979;19:368–72.

1370. Thomas W, Stermer M. Eden alternative principles hold promise for the future of long-term care. Balance 1999;3:14–7.

1371. Tavormina CE. Embracing the Eden alternative in long-term care environments. Geriatr Nurs 1999;20:158–61.

1372. Brook I, Fish CH, Schantz PM, Cotton DD. Toxocariasis in an institution for the mentally retarded. Infect Control 1981;2:317–9.

1373. Huminer D, Symon R, Groskopf I, et al. Seroepidemiological study of toxocariasis and strongyloidiasis in adult mentally retarded institutionalized subjects. Am J Trop Med Hyg 1992;46:278–81.

1374. Huminer D, Pitlik SD, Block C, Kaufman L, Amit S, Rosenfeld JB. Aquarium-borne *Mycobacterium marinum* skin infection: report of a case and review of the literature. Arch Dermatol 1986;122:698–703.

1375. Lewis FMT, Marsh BJ, von Reyn CF. Fish tank exposure and cutaneous infections due to *Mycobacterium marinum*: tuberculin skin testing, treatment, and prevention. Clin Infect Dis 2003;37:390–7.

1376. **(398)** U.S. Department of Justice. Americans with Disabilities Act. Public Law 101-336 (28 CFR 36.101 et seq.). Title III, Public Accomodations Operated by Private Entities, Sect. 302, Prohibition of Discrimination by Public Accomodations;42 USC 12101 et seq. July 26, 1990.

1377. U.S. Department of Justice, Civil Rights Division, Disability Rights Section. Commonly asked questions about service animals in places of business, 1996.

1378. Schachter J, Sung M, Meyer KF. Potential danger of Q fever in a university hospital environment. J Infect Dis 1971;123:301–4.

1379. Konkle DM, Nelson KN, Lunn DP. Nosocomial transmission of *Cryptosporidium* in a veterinary hospital. J Vet Intern Med 1997;11:340–3.

1380. House JK, Mainar-Jaime RC, Smith BP, House AM, Kamiya DY. Risk factors for nosocomial *Salmonella* infection among hospitalized horses. J Am Vet Med Assoc 1999;214:1511–6.

1381. Weese JS, Staempfli HR, Prescott JF. Isolation of environmental *Clostridium difficile* from a veterinary teaching hospital. J Vet Diagn Invest 2000;12:449–52.

1382. Boerlin P, Eugster S, Gaschen F, Straub R, Schawalder P. Transmission of opportunistic pathogens in a veterinary teaching hospital. Vet Microbiol 2001;82:347–9.

1383. Schott HC II, Ewart SL, Walker RD, et al. An outbreak of salmonellosis among horses at a veterinary teaching hospital. J Am Vet Med Assoc 2001;218:1152–9,1170.

1384. Kim LM, Morley PS, Traub-Dargatz JL, Salman MD, Gentry-Weeks C. Factors associated with *Salmonella* shedding among equine colic patients at a veterinary teaching hospital. J Am Vet Med Assoc 2001;218:740–8.

1385. Seguin JC, Walker RD, Caron JP, et al. Methicillin-resistant *Staphylococcus aureus* outbreak in a veterinary teaching hospital: potential human-to-animal transmission. J Clin Microbiol 1999;37:1459–63.

1386. Shen DT, Crawford TB, Gorham JR, et al. Inactivation of equine infectious anemia virus by chemical disinfectants. Am J Vet Res 1977;38:1217–9.

1387. Scott FW. Virucidal disinfectants and feline viruses. Am J Vet Res 1980;41:410–4.

1388. Brown TT. Laboratory evaluation of selected disinfectants as virucidal agents against porcine parvovirus, pseudorabies virus, and transmissible gastroenteritis virus. Am J Vet Res 1981;42:1033–6.

1389. Saknimit M, Inatsuki I, Sugiyama Y, et al. Virucidal efficacy of physico-chemical treatments against coronaviruses and parvoviruses of laboratory animals. Exp Anim 1988;37:341–5.

1390. Bruins G, Dyer JA. Environmental considerations of disinfectants used in agriculture. Rev Sci Tech 1995;14:81–94.

1391. Quinn PJ, Markey BK. Disinfection and disease prevention in veterinary medicine. In: Block SS, ed. Disinfection, sterilization, and preservation, 5th ed. Philadelphia, PA: Lippincott Williams & Wilkins, 2001;1069–103.

1392. Fox JG, Lipman NS. Infections transmitted by large and small laboratory animals. Infect Dis Clin North Am 1991;5:131–63.

1393. **(401)** U.S. Department of Labor, Occupational Safety and Health Administration. Personal Protective Equipment for General Industry, Final Rule (29 CFR 1910 §1910.132, 1910.138). Federal Register 1994;59:16334–64.

1394. U.S. Department of Agriculture. Public Law 89-544 (The Animal Welfare Act of 1966). 7 USC § 2131-2156.

198

1395. **(399)** U.S. Department of Agriculture. Public Law 99-198 Food Security Act of 1985, Subtitle F - Animal Welfare. 7 USC § 2131.

1396. Althaus H, Sauerwald M, Schrammeck E. Waste from hospitals and sanatoria. Zbl Bakteriol Hyg I Abt Orig B 1983;178:1–29.

1397. Kalnowski G, Wiegand H, Henning R. The microbial contamination of hospital waste. Zbl Bakteriol Hyg I Abt Orig B 1983;178:364–79.

1398. Mose JR, Reinthaler F. Microbial contamination of hospital waste and household refuse. Zbl Bakteriol Hyg I Abt Orig B 1985;181:98–110.

1399. Collins CH, Kennedy DA. The microbiological hazards of municipal and clinical wastes. J Appl Bacteriol 1992;73:1–6.

1400. Rutala WA, Odette RL, Samsa GP. Management of infectious waste by U.S. hospitals. JAMA 1989;262:1635–40.

1401. Agency for Toxic Substances and Disease Registry. The public health implications of medical waste: a report to Congress. Atlanta, GA: U.S. Department of Health and Human Services, Public Health Service, 1990.

1402. Hedrick ER. Infectious waste management — will science prevail? Infect Control Hosp Epidemiol 1988;9:488–90.

1403. Keene J. Medical waste management: public pressure vs. sound science. Hazard Mat Control 1989;Sept/Oct:29–36.

1404. Keene J. Medical waste: a minimal hazard. Infect Control Hosp Epidemiol 1991;12:682–5.

1405. Rutala WA, Weber DJ. Mismatch between science and policy. N Engl J Med 1991;325:578–82.

1406. U.S. Environmental Protection Agency. EPA guide for infectious waste management. Washington, DC: U.S. Government Printing Office, 1986. EPA Publication No. 530SW86014.

1407. **(402)** U.S. Department of Transportation. Hazardous materials regulations. 49 CFR Parts 171–180, Division 6.2;and Hazardous Materials: Revision to Standards for Infectious Substances and Genetically–Modified Microorganisms: Proposed Rule. Federal Register 1998;63:46843–59.

1408. **(403)** U.S. Postal Service. C 023.8.0 Infectious substances (Hazard Class 6, Division 6.2) et seq. At: http://pe.usps.gov/text/dmm/c023.htm

1409. **(404)** Greene R, Miele DJ, Slavik NS. Technical assistance manual: state regulatory oversight of medical waste treatment technologies, 2nd ed: a report of the State and Territorial Association on Alternative Treatment Technologies, 1994.

1410. U.S. Environmental Protection Agency (EPA). 40 CFR Part 60. Standards of performance for new stationary sources and emission guidelines for existing sources: hospital/medical/infectious waste incinerators; Final Rule. Federal Register 1997;62:48347–91.

1411. CDC/National Institutes of Health. Biosafety in microbiological and biomedical laboratories. Washington, DC: U.S. Government Printing Office, 1985. DHHS Publication No. (CDC) 93–8395.

1412. **(409)** U.S. Department of Health and Human Services, Office of Inspector General, CDC. Possession, use, and transfer of select agents and toxins, interim final rule (42 CFR Part 73). Federal Register, December 13, 2002;67(240):76885–905.

1413. U.S. Department of Agriculture, Animal and Plant Health Inspection Service. Agricultural Bioterrorism Protection Act of 2002; Possession, use, and transfer of biological agents and toxins: interim final rule (9 CFR Part 121). Federal Register. December 13, 2002;67(240):76907–38.

1414. **(410)** CDC. Recommendations on infective waste. Atlanta, GA: Office of Biosafety and Hospital Infections Program, 1988;1–6.

1415. **(405)** CDC. National Institute for Occupational Safety and Health. NIOSH Alert: Preventing needlestick injuries in health care settings. Cincinnati, OH: DHHS, 1999. DHHS-NIOSH Publication No. 2000–108.

1416. Rutala WA, Stiegel MM, Sarubbi FA. Decontamination of laboratory microbiological waste by steam sterilization. Appl Environ Microbiol 1982;43:1311–6.

1417. Lauer JL, Battles DR, Vesley D. Decontaminating infectious laboratory waste by autoclaving. Appl Environ Microbiol 1982;44:690–4.

1418. Palenik CJ, Cumberlander ND. Effects of steam sterilization on the contents of sharps containers. Am J Infect Control 1993;21:28–33.

1419. **(406)** Weber AM, Boudreau Y, Mortimer VD. Stericycle, Inc., Morton, WA. HETA 98-0027-2709. NIOSH, CDC, Cincinnati, OH, 1998.

1420.   (407) Johnson KR, Braden CR, Cairns KL, et al. Transmission of *Mycobacterium tuberculosis* from medical waste. JAMA 2000;284:1683–8.

1421.   (408) Emery R, Sprau D, Lao YJ, Pryor W. Release of bacterial aerosols during infectious waste compaction: An initial hazard evaluation for health care workers. Am Ind Hyg Assoc J 1992;53:339–45.

1422.   National Committee for Clinical Laboratory Standards (NCCLS). Protection of laboratory workers from instrument biohazards and infectious disease transmitted by blood, body fluids, and tissue. Approved guideline. 1997, NCCLS Document M29-A (ISBN1-56238-339-6).

1423.   Snyder JW, Check W. Bioterrorism threats to our future: the role of the clinical microbiology laboratory in detection, identification, and confirmation of biological agents. Report of the October 27–29, 2000 Colloquium, American Academy of Microbiology, American College of Microbiology. Available at: www.asm.org

1424.   CDC. List of select agents and biological toxins. At: www.cdc.gov/od/sap/docs/salist.pdf

1425.   Bond WW. Survival of hepatitis B virus in the environment. JAMA 1984;252:397–8.

1426.   Slade JE, Pike EB, Eglin RP, Colbourne JS, Kurtz JB. The survival of human immunodeficiency virus in water, sewage, and sea water. Water Sci Technol 1989;21:55–9.

1427.   Geertsma RE, Van Asten JAAM. Sterilization of prions. Zentr Steril 1995;3:385–94.

1428.   (52) Johnson MW, Mitch WE, Heller AH, Spector R. The impact of an educational program on gentamicin use in a teaching hospital. Am J Med 1982;73:9–14.

1429.   (53) Soumerai SB, Salem-Schatz S, Avorn J, Casteris CS, Ross-Degnan D, Popovsky MA. A controlled trial of educational outreach to improve blood transfusion practice. JAMA 1993;270:961–6.

1430.   (54) Eisenberg JM. An education program to modify laboratory use by house staff. J Med Educ 1977;52:578–81.

1431.   (55) Rello J, Quintana E, Ausina V, Puzo V, Puzo C, Net A, Prats G. Risk factors for *Staphylococcus aureus* nosocomial pneumonia in critically ill patients. Am Rev Respir Dis 1990;142:1320–4.

1432.   (56) McWhinney PHM, Kibbler CC, Hamon MD, et al. Progress in the diagnosis and management of aspergillosis in bone marrow transplantation: 13 years' experience. Clin Infect Dis 1993;17:397–404.

1433.   (74) Aisner J, Murillo J, Schimpff SC, Steere AC. Invasive aspergillosis in acute leukemia: Correlation with nose cultures and antibiotic use. Ann Intern Med 1979;90:4–9.

1434.   (102) Rhame FS. Endemic nosocomial filamentous fungal disease: a proposed structure for conceptualizing and studying the environmental hazard. Infect Control 1986;7S:124–5.

1435.   (Table 1) Mutchler JE. Principles of ventilation. In: NIOSH. The industrial environment — its evaluation and control. Washington, DC: U.S. Department of Health, Education, and Welfare, Public Health Service, NIOSH, 1973. Publication #74-117. Available at: www.cdc.gov/niosh/74-117 html

1436.   Breiman RF, Cozen W, Fields BS, et al. Role of air sampling in investigation of an outbreak of Legionnaires' disease associated with exposure to aerosols from an evaporative condenser. J Infect Dis 1990;161:1257–61.

1437.   (Appendix; 9) CDC. Procedures for the recovery of *Legionella* from the environment. Atlanta, GA: U.S. Department of Health and Human Services, Public Health Service, CDC, 1992;1–13.

1438.   Costerton JW, Lewandowski Z, Caldwell DE, Korber DR, Lappin-Scott HM. Microbial biofilms. Ann Rev Microbiol 1995;49:711–45.

1439.   LeChevallier MW, Babcock TM, Lee RG. Examination and characterization of distribution system biofilms. Appl Environ Microbiol 1987;53:2714–24.

1440.   Nagy LA, Olson BH. Occurrence and significance of bacteria, fungi, and yeasts associated with distribution pipe surfaces. Proceeds of the Water Quality Technology Conference. Portland, OR: 1985;213–38.

1441.   Maki DG, Martin WT. Nationwide epidemic of septicemia caused by contaminated infusion products. IV growth of microbial pathogens in fluids for intravenous infusion. J Infect Dis 1975;131:267–72.

1442.   Costerton JW, Stewart PS, Greenberg EP. Bacterial biofilms: a common cause of persistent infections. Science 1999;284:1318–22.

1443.   Costerton JW, Khoury AE, Ward KH, Anwar H. Practical measures to control device-related bacterial infections. Int J Artif Organs 1993;16:765–70.

1444.   Nickel JC, Costerton JW, McLean RJC, Olson M. Bacterial biofilms: influence on the pathogenesis, diagnosis, and treatment of urinary tract infections. J Antimicrobial Chemother 1994;33 (Suppl. A):31–41.

1445.   LeChevallier MW, Cawthon CD, Lee RG. Inactivation of biofilm bacteria. Appl Environ Microbiol 1988;54:2492–9.

200

1446.   Anwar J, Strap JL, Costerton JW. Establishment of aging biofilms: possible mechanism of bacterial resistance to antimicrobial therapy. Antimicrobiol Agents Chemotherapy 1992;36:1347–51.

1447.   Stewart PS. Biofilm accumulation model that predicts antibiotic resistance to *Pseudomonas aeruginosa* biofilms. Antimicrobiol Agents Chemotherapy 1994;38:1052–8.

1448.   Chen X, Stewart PS. Chlorine penetration into artificial biofilm is limited by a reaction-diffusion interaction. Environ Sci Technol 1996;30:2078–83.

1449.   Huang C-T, Yu FP, McFeters GA, Stewart PS. Non-uniform spatial patterns of respiratory activity with biofilms during disinfection. Appl Environ Microbiol 1995;61:2252–6.

1450.   Donlan RM, Pipes WO. Selected drinking water characteristics and attached microbial population density. J AWWA 1988;80:70–6.

1451.   Reasoner DJ, Geldreich EE. A new medium for the enumeration and subculture of bacteria from potable water. Appl Environ Microbiol 1985;49:1–7.

1452.   Pass T, Wright R, Sharp B, Harding GB. Culture of dialysis fluids on nutrient-rich media for short periods at elevated temperatures underestimates microbial contamination. Blood Purif 1996;14:136–45.

1453.   Arduino MJ, Bland LA, Aguero SM, et al. Effects of incubation time and temperature on microbiologic sampling procedures for hemodialysis fluids. J Clin Microbiol 1991;29:1462–5.

1454.   (234) Klein E, Pass T, Harding GB, Wright R, Million C. Microbial and endotoxin contamination in water and dialysate in the central United States. Artif Organs 1990;14:85–94.

1455.   (235) Man N-K, Degremont A, Darbord J-C, Collet M, Vaillant P. Evidence of bacterial biofilm in tubing from hydraulic pathway of hemodialysis system. Artif Organs 1998;22:596–600.

1456.   Pearson FC, Weary ME, Sargent HE, et al. Comparison of several control standard endotoxins to the National Reference Standard Endotoxin — an HIMA collaborative study. Appl Environ Microbiol 1985;50:91–3.

1457.   (Appendix; 1) Arnow PM, Weil D, Para MF. Prevalence of significance of *Legionella pneumophila* contamination of residential hot-tap water systems. J Infect Dis 1985;152:145–51.

1458.   (Appendix; 2) Shelton BG, Morris GK, Gorman GW. Reducing risks associated with *Legionella* bacteria in building water systems. In: Barbaree JM, Breiman RF, Dufour AP, eds. *Legionella*: current status and emerging perspectives. Washington, DC: American Society for Microbiology Press, 1993;279–81.

1459.   (Appendix; 3) Joly JR. Monitoring for the presence of *Legionella*: where, when, and how? In: Barbaree JM, Breiman RF, Dufour AP, eds. *Legionella*: current status and emerging perspectives. Washington, DC: American Society for Microbiology Press, 1993;211–6.

1460.   (Appendix; 7) Brenner DJ, Feeley JC, Weaver RE. Family VII. *Legionellaceae*. In: Krieg NR, Holt JG, eds. Bergey's manual of systemic bacteriology, volume 1. Baltimore, MD: Williams & Wilkins, 1984;279–88.

1461.   (Appendix; 8) Katz SM, Hammel JM. The effect of drying, heat, and pH on the survival of *Legionella pneumophila*. Ann Clin Lab Sci 1987;17:150–6.

1462.   (Box 2) Alary MA, Joly JR. Comparison of culture methods and an immunofluorescence assay for the detection of *Legionella pneumophila* in domestic hot water devices. Curr Microbiol 1992;25:19–25.

1463.   (Box 2) Vickers RM, Stout JE, Yu VL. Failure of a diagnostic monoclonal immunofluorescent reagent to detect *Legionella pneumophila* in environmental samples. Appl Environ Microbiol 1990;56:2912–4.

1464.   (Box 2) Flournoy DJ, Belobraydic KA, Silberg SL, Lawrence CH, Guthrie PJ. False postive *Legionella pneumophila* direct immunofluorscence monoclonal antibody test caused by *Bacillus cereus* spores. Diag Microbiol Infect Dis 1988;9:123–5.

1465.   (Box 2) Bej AK, Majbubani MH, Atlas RM. Detection of viable *Legionella pneumophila* in water by polymerase chain reaction and gene probe methods. Appl Environ Microbiol 1991;57:597–600.

1466.   Schulze-Röbbecke R, Jung KD, Pullman H, Hundgeburth J. Control of *Legionella pneumophila* in a hospital hot water system. Zbl Hyg 1990;190:84–100.

1467.   Colbourne JS, Pratt DJ, Smith MG, Fisher-Hoch SP, Harper D. Water fittings as sources of *Legionella pneumophila* in a hospital plumbing system. Lancet 1984;1:210–3.

1468.   U.S. Environmental Protection Agency. National interim primary drinking water regulations: control of trihalomethanes in drinking water: final rules. Federal Register 1979;44:68624–705.

1469.   U.S. Environmental Protection Agency. National interim primary drinking water regulations: Trihalomethanes. Federal Register 1983;48:8406–14.

# Part IV. Appendices

## Appendix A. Glossary of Terms

**Acceptable indoor air quality:** air in which there are no known contaminants at harmful concentrations as determined by knowledgeble authorities and with which a substantial majority ($\geq$80%) of the people exposed do not express dissatisfaction.

**ACGIH:** American Conference of Governmental Industrial Hygienists.

**Action level:** the concentration of a contaminant at which steps should be taken to interrupt the trend toward higher, unacceptable levels.

**Aerosol:** particles of respirable size generated by both humans and environmental sources and that have the capability of remaining viable and airborne for extended periods in the indoor environment.

**AIA:** American Institute of Architects, a professional group responsible for publishing the *Guidelines for Design and Construction of Hospitals and Healthcare Facilities*, a consensus document for design and construction of health-care facilities endorsed by the U.S. Department of Health and Human Services, health-care professionals, and professional organizations.

**Air changes per hour (ACH):** the ratio of the volume of air flowing through a space in a certain period of time (the airflow rate) to the volume of that space (the room volume). This ratio is expressed as the number of air changes per hour (ACH).

**Air mixing:** the degree to which air supplied to a room mixes with the air already in the room, usually expressed as a mixing factor. This factor varies from 1 (for perfect mixing) to 10 (for poor mixing). It is used as a multiplier to determine the actual airflow required (i.e., the recommended ACH multiplied by the mixing factor equals the actual ACH required).

**Airborne transmission:** a means of spreading infection when airborne droplet nuclei (small particle residue of evaporated droplets $\leq$5 µm in size containing microorganisms that remain suspended in air for long periods of time) are inhaled by the susceptible host.

**Air-cleaning system:** a device or combination of devices applied to reduce the concentration of airborne contaminants (e.g., microorganisms, dusts, fumes, aerosols, other particulate matter, and gases).

**Air conditioning:** the process of treating air to meet the requirements of a conditioned space by controlling its temperature, humidity, cleanliness, and distribution.

**Allogeneic:** non-twin, non-self. The term refers to transplanted tissue from a donor closely matched to a recipient but not related to that person.

**Ambient air:** the air surrounding an object.

**Anemometer:** a flow meter which measures the wind force and velocity of air. An anemometer is often used as a means of determining the volume of air being drawn into an air sampler.

**Anteroom:** a small room leading from a corridor into an isolation room. This room can act as an airlock, preventing the escape of contaminants from the isolation room into the corridor.

**ASHE:** American Society for Healthcare Engineering, an association affiliated with the American Hospital Association.

**ASHRAE:** American Society of Heating, Refrigerating, and Air-Conditioning Engineers Inc.

**Autologous:** self. The term refers to transplanted tissue whose source is the same as the recipient, or an identical twin.

**Automated cycler:** a machine used during peritoneal dialysis which pumps fluid into and out of the patient while he/she sleeps.

**Biochemical oxygen demand (BOD):** a measure of the amount of oxygen removed from aquatic environments by aerobic microorganisms for their metabolic requirements. Measurement of BOD is used to determine the level of organic pollution of a stream or lake. The greater the BOD, the greater

the degree of water pollution. The term is also referred to as Biological Oxygen Demand (BOD).

**Biological oxygen demand (BOD):** an indirect measure of the concentration of biologically degradable material present in organic wastes (pertaining to water quality). It usually reflects the amount of oxygen consumed in five days by biological processes breaking down organic waste (BOD5).

**Biosafety level:** a combination of microbiological practices, laboratory facilities, and safety equipment determined to be sufficient to reduce or prevent occupational exposures of laboratory personnel to the microbiological agents they work with. There are four biosafety levels based on the hazards associated with the various microbiological agents.

**BOD5:** the amount of dissolved oxygen consumed in five days by biological processes breaking down organic matter.

**Bonneting:** a floor cleaning method for either carpeted or hard surface floors that uses a circular motion of a large fibrous disc to lift and remove soil and dust from the surface.

**Capped spur:** a pipe leading from the water recirculating system to an outlet that has been closed off ("capped"). A capped spur cannot be flushed, and it might not be noticed unless the surrounding wall is removed.

**CFU/m³:** colony forming units per cubic meter (of air).

**Chlamydospores:** thick-walled, typically spherical or ovoid resting spores asexually produced by certain types of fungi from cells of the somatic hyphae.

**Chloramines:** compounds containing nitrogen, hydrogen, and chlorine. These are formed by the reaction between hypochlorous acid (HOCl) and ammonia ($NH_3$) and/or organic amines in water. The formation of chloramines in drinking water treatment extends the disinfecting power of chlorine. The term is also referred to as Combined Available Chlorine.

**Cleaning:** the removal of visible soil and organic contamination from a device or surface, using either the physical action of scrubbing with a surfactant or detergent and water, or an energy-based process (e.g., ultrasonic cleaners) with appropriate chemical agents.

**Coagulation-flocculation:** coagulation is the clumping of particles that results in the settling of impurities. It may be induced by coagulants (e.g., lime, alum, and iron salts). Flocculation in water and wastewater treatment is the agglomeration or clustering of colloidal and finely-divided suspended matter after coagulation by gentle stirring by either mechanical or hydraulic means, such that they can be separated from water or sewage.

**Commissioning (a room):** testing a system or device to ensure that it meets the pre-use specifications as indicated by the manufacturer or predetermined standard, or air sampling in a room to establish a pre-occupancy baseline standard of microbial or particulate contamination. The term is also referred to as benchmarking at 77°F (25°C).

**Completely packaged:** functionally packaged, as for laundry.

**Conidia:** asexual spores of fungi borne externally.

**Conidiophores:** specialized hyphae that bear conidia in fungi.

**Conditioned space:** that part of a building that is heated or cooled, or both, for the comfort of the occupants.

**Contaminant:** an unwanted airborne constituent that may reduce the acceptibility of air.

**Convection:** the transfer of heat or other atmospheric properties within the atmosphere or in the airspace of an enclosure by the circulation of currents from one region to another, especially by such motion directed upward.

**Cooling tower:** a structure engineered to receive accumulated heat from ventilation systems and equipment and transfer this heat to water, which then releases the stored heat to the atmosphere through evaporative cooling.

**Critical item (medical instrument):** a medical instrument or device that contacts normally sterile areas of the body or enters the vascular system. There is a high risk of infection from such devices if they are microbiologically contaminated prior to use. These devices must be sterilized before use.

**Dead legs:** areas in the water system where water stagnates. A dead leg is a pipe or spur, leading from the water recirculating system to an outlet that is used infrequently, resulting in inadequate flow of

water from the recirculating system to the outlet. This inadequate flow reduces the perfusion of heat or chlorine into this part of the water distribution system, thereby adversely affecting the disinfection of the water system in that area.

**Deionization:** removal of ions from water by exchange with other ions associated with fixed charges on a resin bed. Cations are usually removed and $H^+$ ions are exchanged; $OH^-$ ions are exchanged for anions.

**Detritis:** particulate matter produced by or remaining after the wearing away or disintegration of a substance or tissue.

**Dew point:** the temperature at which a gas or vapor condenses to form a liquid; the point at which moisture begins to condense out of the air. At dew point, air is cooled to the point where it is at 100% relative humidity or saturation.

**Dialysate:** the aqueous electrolyte solution, usually containing dextrose, used to make a concentration gradient between the solution and blood in the hemodialyzer (dialyzer).

**Dialyzer:** a device that consists of two compartments (blood and dialysate) separated by a semipermeable membrane. A dialyzer is usually referred to as an artificial kidney.

**Diffuser:** the grille plate that disperses the air stream coming into the conditioned air space.

**Direct transmission:** involves direct body surface-to-body surface contact and physical transfer of microorganisms between a susceptible host and an infected/colonized person, or exposure to cloud of infectious particles within 3 feet of the source; the aerosolized particles are >5 μm in size.

**Disability:** as defined by the Americans with Disabilities Act, a disability is any physical or mental impairment that substantially limits one or more major life activities, including but not limited to walking, talking, seeing, breathing, hearing, or caring for oneself.

**Disinfection:** a generally less lethal process of microbial inactivation (compared to sterilization) that eliminates virtually all recognized pathogenic microorganisms but not necessarily all microbial forms (e.g., bacterial spores).

**Drain pans:** pans that collect water within the HVAC system and remove it from the system. Condensation results when air and steam come together.

**Drift:** circulating water lost from the cooling tower in the form as liquid droplets entrained in the exhaust air stream (i.e., exhaust aerosols from a cooling tower).

**Drift eliminators:** an assembly of baffles or labyrinth passages through which the air passes prior to its exit from the cooling tower. The purpose of a drift eliminator is to remove entrained water droplets from the exhaust air.

**Droplets:** particles of moisture, such as are generated when a person coughs or sneezes, or when water is converted to a fine mist by a device such as an aerator or shower head. These particles may contain infectious microorganisms. Intermediate in size between drops and droplet nuclei, these particles tend to quickly settle out from the air so that any risk of disease transmission is generally limited to persons in close proximity to the droplet source.

**Droplet nuclei:** sufficiently small particles (1–5 μm in diameter) that can remain airborne indefinitely and cause infection when a susceptible person is exposed at or beyond 3 feet of the source of these particles.

**Dual duct system:** an HVAC system that consists of parallel ducts that produce a cold air stream in one and a hot air stream in the other.

**Dust:** an air suspension of particles (aerosol) of any solid material, usually with particle sizes ≤100 μm in diameter.

**Dust-spot test:** a procedure that uses atmospheric air or a defined dust to measure a filter's ability to remove particles. A photometer is used to measure air samples on either side of the filter, and the difference is expressed as a percentage of particles removed.

**Effective leakage area:** the area through which air can enter or leave the room. This does not include supply, return, or exhaust ducts. The smaller the effective leakage area, the better isolated the room.

**Endotoxin:** the lipopolysaccharides of gram-negative bacteria, the toxic character of which resides in the lipid portion. Endotoxins generally produce pyrogenic reactions in persons exposed to these

204

bacterial components.

**Enveloped virus:** a virus whose outer surface is derived from a membrane of the host cell (either nuclear or the cell's outer membrane) during the budding phase of the maturation process. This membrane-derived material contains lipid, a component that makes these viruses sensitive to the action of chemical germicides.

**Evaporative condenser:** a wet-type, heat-rejection unit that produces large volumes of aerosols during the process of removing heat from conditioned space air.

**Exhaust air:** air removed from a space and not reused therein.

**Exposure:** the condition of being subjected to something (e.g., infectious agents) that could have a harmful effect.

**Fastidious:** having complex nutritional requirements for growth, as in microorganisms.

**Fill:** that portion of a cooling tower which makes up its primary heat transfer surface. Fill is alternatively known as "packing."

**Finished water:** treated, or potable water.

**Fixed room-air HEPA recirculation systems:** nonmobile devices or systems that remove airborne contaminants by recirculating air through a HEPA filter. These may be built into the room and permanently ducted or may be mounted to the wall or ceiling within the room. In either situation, they are fixed in place and are not easily movable.

**Fomite:** an inanimate object that may be contaminated with microorganisms and serves in their transmission.

**Free and available chlorine:** the term applied to the three forms of chlorine that may be found in solution (i.e., chlorine $[Cl_2]$, hypochlorite $[OCl^-]$, and hypochlorous acid $[HOCl]$).

**Germicide:** a chemical that destroys microorganisms. Germicides may be used to inactivate microorganisms in or on living tissue (antiseptics) or on environmental surfaces (disinfectants).

**Health-care–associated:** an outcome, usually an infection, that occurs in any health-care facility as a result of medical care. The term "health-care–associated" replaces "nosocomial," the latter term being limited to adverse infectious outcomes occurring only in hospitals.

**Hemodiafiltration:** a form of renal replacement therapy in which waste solutes in the patient's blood are removed by both diffusion and convection through a high-flux membrane.

**Hemodialysis:** a treatment for renal replacement therapy in which waste solutes in the patient's blood are removed by diffusion and/or convection through the semipermeable membrane of an artificial kidney or dialyzer.

**Hemofiltration:** cleansing of waste products or other toxins from the blood by convection across a semipermeable, high-flux membrane where fluid balance is maintained by infusion of sterile, pyrogen-free substitution fluid pre- or post-hemodialyzer.

**HEPA filter:** High Efficiency Particulate Air filters capable of removing 99.97% of particles 0.3 µm in diameter and may assist in controlling the transmission of airborne disease agents. These filters may be used in ventilation systems to remove particles from the air or in personal respirators to filter air before it is inhaled by the person wearing the respirator. The use of HEPA filters in ventilation systems requires expertise in installation and maintenance. To test this type of filter, 0.3 µm particles of dioctylphthalate (DOP) are drawn through the filter. Efficiency is calculated by comparing the downstream and upstream particle counts. The optimal HEPA filter allows only three particles to pass through for every 10,000 particles that are fed to the filter.

**Heterotrophic (heterotroph):** that which requires some nutrient components from exogenous sources. Heterotrophic bacteria cannot synthesize all of their metabolites and therefore require certain nutrients from other sources.

**High-efficiency filter:** a filter with a particle-removal efficiency of 90%–95%.

**High flux:** a type of dialyzer or hemodialysis treatment in which large molecules (>8,000 daltons [e.g., β2 microglobulin]) are removed from blood.

**High-level disinfection:** a disinfection process that inactivates vegetative bacteria, mycobacteria, fungi, and viruses, but not necessarily high numbers of bacterial spores.

**Housekeeping surfaces:** environmental surfaces (e.g., floors, walls, ceilings, and tabletops) that are not involved in direct delivery of patient care in health-care facilities.

**Hoyer lift:** an apparatus that facilitates the repositioning of the non-ambulatory patient from bed to wheelchair or gurney and subsequently to therapy equipment (immersion tanks).

**Hubbard tank:** a tank used in hydrotherapy that may accomodate whole-body immersion (e.g., as may be indicated for burn therapy). Use of a Hubbard tank has been replaced largely by bedside post-lavage therapy for wound care management.

**HVAC:** Heating, Ventilation, Air Conditioning.

**Iatrogenic:** induced in a patient by a physician's activity, manner, or therapy. The term is used especially in reference to an infectious complication or other adverse outcome of medical treatment.

**Impactor:** an air-sampling device in which particles and microorganisms are directed onto a solid surface and retained there for assay.

**Impingement:** an air-sampling method during which particles and microorganisms are directed into a liquid and retained there for assay.

**Indirect transmission:** involves contact of a susceptible host with a contaminated intermediate object, usually inanimate (a fomite).

**Induction unit:** the terminal unit of an in-room ventilation system. Induction units take centrally conditioned air and further moderate its temperature. Induction units are not appropriate for areas with high exhaust requirements (e.g., research laboratories).

**Intermediate-level disinfection:** a disinfection process that inactivates vegetative bacteria, most fungi, mycobacteria, and most viruses (particularly the enveloped viruses), but does not inactivate bacterial spores.

**Isoform:** a possible configuration (tertiary structure) of a protein molecule. With respect to prion proteins, the molecules with large amounts of $\alpha$-conformation are the normal isoform of that particular protein, whereas those prions with large amounts of $\beta$-sheet conformation are the proteins associated with the development of spongiform encephalopathy (e.g., Creutzfeldt-Jakob disease [CJD]).

**Laminar flow:** HEPA-filtered air that is blown into a room at a rate of $90 \pm 10$ feet/min in a unidirectional pattern with 100 ACH–400 ACH.

**Large enveloped virus:** viruses whose particle diameter is >50 nm and whose outer surface is covered by a lipid-containing structure derived from the membranes of the host cells. Examples of large enveloped viruses include influenza viruses, herpes simplex viruses, and poxviruses.

**Laser plume:** the transfer of electromagnetic energy into tissues which results in a release of particles, gases, and tissue debris.

**Lipid-containing viruses:** viruses whose particle contains lipid components. The term is generally synonymous with enveloped viruses whose outer surface is derived from host cell membranes. Lipid-containing viruses are sensitive to the inactivating effects of liquid chemical germicides.

**Lithotriptors:** instruments used for crushing caliculi (i.e., calcified stones, and sand) in the bladder or kidneys.

**Low efficiency filter:** the prefilter with a particle-removal efficiency of approximately 30% through which incoming air first passes. See also Prefilter.

**Low-level disinfection:** a disinfection process that will inactivate most vegetative bacteria, some fungi, and some viruses, but cannot be relied upon to inactivate resistant microorganisms (e.g., mycobacteria or bacterial spores).

**Makeup air:** outdoor air supplied to the ventilation system to replace exhaust air.

**Makeup water:** a cold water supply source for a cooling tower.

**Manometer:** a device that measures the pressure of liquids and gases. A manometer is used to verify air filter performance by measuring pressure differentials on either side of the filter.

**Membrane filtration:** an assay method suitable for recovery and enumeration of microorganisms from liquid samples. This method is used when sample volume is large and anticipated microbial contamination levels are low.

**Mesophilic:** that which favors a moderate temperature. For mesophilic bacteria, a temperature range of

206

68°F–131°F (20°C–55°C) is favorable for their growth and proliferation.

**Mixing box:** the site where the cold and hot air streams mix in the HVAC system, usually situated close to the air outlet for the room.

**Mixing faucet:** a faucet that mixes hot and cold water to produce water at a desired temperature.

**MMAD:** Mass Median Aerodynamic Diameter. This is the unit used by ACGIH to describe the size of particles when particulate air sampling is conducted.

**Moniliaceous:** hyaline or brightly colored. This is a laboratory term for the distinctive characteristics of certain opportunistic fungi in culture (e.g., *Aspergillus* spp. and *Fusarium* spp.).

**Monochloramine:** the result of the reaction between chlorine and ammonia that contains only one chlorine atom. Monochloramine is used by municipal water systems as a water treatment.

**Natural ventilation:** the movement of outdoor air into a space through intentionally provided openings (i.e., windows, doors, or nonpowered ventilators).

**Negative pressure:** air pressure differential between two adjacent airspaces such that air flow is directed into the room relative to the corridor ventilation (i.e., room air is prevented from flowing out of the room and into adjacent areas).

**Neutropenia:** a medical condition in which the patient's concentration of neutrophils is substantially less than that in the normal range. Severe neutropenia occurs when the concentration is <1,000 polymorphonuclear cells/µL for 2 weeks or <100 polymorphonuclear cells /mL for 1 week, particularly for hematopoietic stem cell transplant (HSCT) recipients.

**Noncritical devices:** medical devices or surfaces that come into contact with only intact skin. The risk of infection from use of these devices is low.

**Non-enveloped virus:** a virus whose particle is not covered by a structure derived from a membrane of the host cell. Non-enveloped viruses have little or no lipid compounds in their biochemical composition, a characteristic that is significant to their inherent resistance to the action of chemical germicides.

**Nosocomial:** an occurrence, usually an infection, that is acquired in a hospital as a result of medical care.

**NTM:** nontuberculous mycobacteria. These organisms are also known as atypical mycobacteria, or as "Mycobacteria other than tuberculosis" (MOTT). This descriptive term refers to any of the fast- or slow-growing *Mycobacterium* spp. found in primarily in natural or man-made waters, but it excludes *Mycobacterium tuberculosis* and its variants.

**Nuisance dust:** generally innocuous dust, not recognized as the direct cause of serious pathological conditions.

**Oocysts:** a cyst in which sporozoites are formed; a reproductive aspect of the life cycle of a number of parasitic agents (e.g., *Cryptosporidium* spp., and *Cyclospora* spp.).

**Outdoor air:** air taken from the external atmosphere and, therefore, not previously circulated through the ventilation system.

**Parallel streamlines:** a unidirectional airflow pattern achieved in a laminar flow setting, characterized by little or no mixing of air.

**Particulate matter (particles):** a state of matter in which solid or liquid substances exist in the form of aggregated molecules or particles. Airborne particulate matter is typically in the size range of 0.01–100 µm diameter.

**Pasteurization:** a disinfecting method for liquids during which the liquids are heated to 140°F (60°C) for a short time (≥30 mins.) to significantly reduce the numbers of pathogenic or spoilage microorganisms.

**Plinth:** a treatment table or a piece of equipment used to reposition the patient for treatment.

**Portable room-air HEPA recirculation units:** free-standing portable devices that remove airborne contaminants by recirculating air through a HEPA filter.

**Positive pressure:** air pressure differential between two adjacent air spaces such that air flow is directed from the room relative to the corridor ventilation (i.e., air from corridors and adjacent areas is prevented from entering the room).

**Potable (drinking) water:** water that is fit to drink. The microbiological quality of this water as defined by EPA microbiological standards from the Surface Water Treatment Rule: a) *Giardia lamblia*: 99.9% killed/inactivated; b) viruses: 99.9% inactivated; c) *Legionella* spp.: no limit, but if *Giardia* and viruses are inactivated, *Legionella* will also be controlled; d) heterotrophic plate count [HPC]: ≤500 CFU/mL; and e) >5% of water samples total coliform-positive in a month.

**PPE:** Personal Protective Equipment.

**ppm:** parts per million. The term is a measure of concentration in solution. Chlorine bleaches (undiluted) that are available in the U.S. (5.25%–6.15% sodium hypochlorite) contain approximately 50,000–61,500 parts per million of free and available chlorine.

**Prefilter:** the first filter for incoming fresh air in a HVAC system. This filter is approximately 30% efficient in removing particles from the air. See also Low-Efficiency Filter.

**Prion:** a class of agent associated with the transmission of diseases knowns as transmissible spongiform encephalopathies (TSEs). Prions are considered to consist of protein only, and the abnormal isoform of this protein is thought to be the agent that causes diseases such as Creutzfeldt-Jakob disease (CJD), kuru, scrapie, bovine spongiform encephalopathy (BSE), and the human version of BSE which is variant CJD (vCJD).

**Product water:** water produced by a water treatment system or individual component of that system.

**Protective environment:** a special care area, usually in a hospital, designed to prevent transmission of opportunistic airborne pathogens to severely immunosuppressed patients.

**Pseudoepidemic (pseudo-outbreak):** a cluster of positive microbiologic cultures in the absence of clinical disease. A pseudoepidemic usually results from contamination of the laboratory apparatus and process used to recover microorganisms.

**Pyrogenic:** an endotoxin burden such that a patient would receive ≥5 endotoxin units (EU) per kilogram of body weight per hour, thereby causing a febrile response. In dialysis this usually refers to water or dialysate having endotoxin concentrations of ≥5 EU/mL.

**Rank order:** a strategy for assessing overall indoor air quality and filter performance by comparing airborne particle counts from lowest to highest (i.e., from the best filtered air spaces to those with the least filtration).

**RAPD:** a method of genotyping microorganisms by randomly amplified polymorphic DNA. This is one version of the polymerase chain reaction method.

**Recirculated air:** air removed from the conditioned space and intended for reuse as supply air.

**Relative humidity:** the ratio of the amount of water vapor in the atmosphere to the amount necessary for saturation at the same temperature. Relative humidity is expressed in terms of percent and measures the percentage of saturation. At 100% relative humidity, the air is saturated. The relative humidity decreases when the temperature is increased without changing the amount of moisture in the air.

**Reprocessing (of medical instruments):** the procedures or steps taken to make a medical instrument safe for use on the next patient. Reprocessing encompasses both cleaning and the final or terminal step (i.e., sterilization or disinfection) which is determined by the intended use of the instrument according to the Spaulding classification.

**Residuals:** the presence and concentration of a chemical in media (e.g., water) or on a surface after the chemical has been added.

**Reservoir:** a nonclinical source of infection.

**Respirable particles:** those particles that penetrate into and are deposited in the nonciliated portion of the lung. Particles >10 μm in diameter are not respirable.

**Return air:** air removed from a space to be then recirculated.

**Reverse osmosis (RO):** an advanced method of water or wastewater treatment that relies on a semi-permeable membrane to separate waters from pollutants. An external force is used to reverse the normal osmotic process resulting in the solvent moving from a solution of higher concentration to one of lower concentration.

**Riser:** water piping that connects the circulating water supply line, from the level of the base of the tower or supply header, to the tower's distribution system.

**RODAC:** Replicate Organism Direct Agar Contact. This term refers to a nutrient agar plate whose convex agar surface is directly pressed onto an environmental surface for the purpose of microbiologic sampling of that surface.

**Room-air HEPA recirculation systems and units:** devices (either fixed or portable) that remove airborne contaminants by recirculating air through a HEPA filter.

**Routine sampling:** environmental sampling conducted without a specific, intended purpose and with no action plan dependent on the results obtained.

**Sanitizer:** an agent that reduces microbial contamination to safe levels as judged by public health standards or requirements.

**Saprophytic:** a naturally-occurring microbial contaminant.

**Sedimentation:** the act or process of depositing sediment from suspension in water. The term also refers to the process whereby solids settle out of wastewater by gravity during treatment.

**Semicritical devices:** medical devices that come into contact with mucous membranes or non-intact skin.

**Service animal:** any animal individually trained to do work or perform tasks for the benefit of a person with a disability.

**Shedding:** the generation and dispersion of particles and spores by sources within the patient area, through activities such as patient movement and airflow over surfaces.

**Single-pass ventilation:** ventilation in which 100% of the air supplied to an area is exhausted to the outside.

**Small, non-enveloped viruses:** viruses whose particle diameter is <50 nm and whose outer surface is the protein of the particle itself and not that of host cell membrane components. Examples of small, non-enveloped viruses are polioviruses and hepatitis A virus.

**Spaulding Classification:** the categorization of inanimate medical device surfaces in the medical environment as proposed in 1972 by Dr. Earle Spaulding. Surfaces are divided into three general categories, based on the theoretical risk of infection if the surfaces are contaminated at time of use. The categories are "critical," "semicritical," and "noncritical."

**Specific humidity:** the mass of water vapor per unit mass of moist air. It is expressed as grains of water per pound of dry air, or pounds of water per pound of dry air. The specific humidity changes as moisture is added or removed. However, temperature changes do not change the specific humidity unless the air is cooled below the dew point.

**Splatter:** visible drops of liquid or body fluid that are expelled forcibly into the air and settle out quickly, as distinguished from particles of an aerosol which remain airborne indefinitely.

**Steady state:** the usual state of an area.

**Sterilization:** the use of a physical or chemical procedure to destroy all microbial life, including large numbers of highly-resistant bacterial endospores.

**Stop valve:** a valve that regulates the flow of fluid through a pipe. The term may also refer to a faucet.

**Substitution fluid:** fluid that is used for fluid management of patients receiving hemodiafiltration. This fluid can be prepared on-line at the machine through a series of ultrafilters or with the use of sterile peritoneal dialysis fluid.

**Supply air:** air that is delivered to the conditioned space and used for ventilation, heating, cooling, humidification, or dehumidification.

**Tensile strength:** the resistance of a material to a force tending to tear it apart, measured as the maximum tension the material can withstand without tearing.

**Therapy animal:** an animal (usually a personal pet) that, with their owners or handlers, provide supervised, goal-directed intervention to clients in hospitals, nursing homes, special-population schools, and other treatment sites.

**Thermophilic:** capable of growing in environments warmer than body temperature.

**Thermotolerant:** capable of withstanding high temperature conditions.

**TLV®:** an exposure level under which most people can work consistently for 8 hours a day, day after day, without adverse effects. The term is used by the ACGIH to designate degree of exposure to

contaminants. TLV® can be expressed as approximate milligrams of particulate per cubic meter of air (mg/m$^3$). TLVs® are listed as either an 8-hour TWA (time weighted average) or a 15-minute STEL (short term exposure limit).

**TLV-TWA:** Threshold Limit Value-Time Weighted Average. The term refers to the time-weighted average concentration for a normal 8-hour workday and a 40-hour workweek to which nearly all workers may be exposed repeatedly, day after day, without adverse effects. The TLV-TWA for "particulates (insoluble) not otherwise classified" (PNOC) - (sometimes referred to as nuisance dust) - are those particulates containing no asbestos and <1% crystalline silica. A TLV-TWA of 10 mg/m$^3$ for inhalable particulates and a TLV-TWA of 3 mg/m$^3$ for respirable particulates (particulates $\leq$5 $\mu$m in aerodynamic diameter) have been established.

**Total suspended particulate matter:** the mass of particles suspended in a unit of volume of air when collected by a high-volume air sampler.

**Transient:** a change in the condition of the steady state that takes a very short time compared with the steady state. Opening a door, and shaking bed linens are examples of transient activities.

**TWA:** average exposure for an individual over a given working period, as determined by sampling at given times during the period. TWA is usually presented as the average concentration over an 8-hour workday for a 40-hour workweek.

**Ultraclean air:** air in laminar flow ventilation that has also passed through a bank of HEPA filters.

**Ultrafilter:** a membrane filter with a pore size in the range of 0.001–0.05 $\mu$m, the performance of which is usually rated in terms of a nominal molecular weight cut-off (defined as the smallest molecular weight species for which the filter membrance has more than 90% rejection).

**Ultrafiltered dialysate:** the process by which dialysate is passed through a filter having a molecular weight cut-off of approximately 1 kilodalton for the purpose of removing bacteria and endotoxin from the bath.

**Ultraviolet germicidal irradiation (UVGI):** the use of ultraviolet radiation to kill or inactivate microorganisms.

**Ultraviolet germicidal irradiation lamps:** lamps that kill or inactivate microorganisms by emitting ultraviolet germicidal radiation, predominantly at a wavelength of 254 nm. UVGI lamps can be used in ceiling or wall fixtures or within air ducts of ventilation systems.

**Vapor pressure:** the pressure exerted by free molecules at the surface of a solid or liquid. Vapor pressure is a function of temperature, increasing as the temperature rises.

**Vegetative bacteria:** bacteria that are actively growing and metabolizing, as opposed to a bacterial state of quiescence that is achieved when certain bacteria (gram-positive bacilli) convert to spores when the environment can no longer support active growth.

**Vehicle:** any object, person, surface, fomite, or media that may carry and transfer infectious microorganisms from one site to another.

**Ventilation:** the process of supplying and removing air by natural or mechanical means to and from any space. Such air may or may not be conditioned.

**Ventilation air:** that portion of the supply air consisting of outdoor air plus any recirculated air that has been treated for the purpose of maintaining acceptable indoor air quality.

**Ventilation, dilution:** an engineering control technique to dilute and remove airborne contaminants by the flow of air into and out of an area. Air that contains droplet nuclei is removed and replaced by contaminant-free air. If the flow is sufficient, droplet nuclei become dispersed, and their concentration in the air is diminished.

**Ventilation, local exhaust:** ventilation used to capture and removed airborne contaminants by enclosing the contaminant source (the patient) or by placing an exhaust hood close to the contaminant source.

**v/v:** volume to volume. This term is an expression of concentration of a percentage solution when the principle component is added as a liquid to the diluent.

**w/v:** weight to volume. This term is an expression of concentration of a percentage solution when the principle component is added as a solid to the diluent.

210

**Weight-arrestance:** a measure of filter efficiency, used primarily when describing the performance of low- and medium-efficiency filters. The measurement of weight-arrestance is performed by feeding a standardized synthetic dust to the filter and weighing the fraction of the dust removed.

# Appendix B.  Air

## 1.  Airborne Contaminant Removal

**Table B.1.  Air changes/hour (ACH) and time required for airborne-contaminant removal efficiencies of 99% and 99.9%\***

| ACH+ § ¶ | Time (mins.) required for removal: | |
| --- | --- | --- |
| | 99% efficiency | 99.9% efficiency |
| 2 | 138 | 207 |
| 4 | 69 | 104 |
| 6 | 46 | 69 |
| 8 | 35 | 52 |
| 10 | 28 | 41 |
| 12 | 23 | 35 |
| 15 | 18 | 28 |
| 20 | 14 | 21 |
| 50 | 6 | 8 |

\* This table is revised from Table S3-1 in reference 4 and has been adapted from the formula for the rate of purging airborne contaminants presented in reference 1435.

+ Shaded entries denote frequently cited ACH for patient-care areas.

§ Values were derived from the formula:

$$t_2 - t_1 = -[\ln(C_2 / C_1) / (Q / V)] \times 60, \text{ with } t_1 = 0 \text{ and where}$$

$t_1$ = initial timepoint in minutes   $t_2$ = final timepoint in minutes
$C_1$ = initial concentration of contaminant   $C_2$ = final concentration of contaminant
$C_2 / C_1 = 1 - (\text{removal efficiency} / 100)$   $Q$ = air flow rate in cubic feet/hour
$V$ = room volume in cubic feet   $Q / V = ACH$

¶ Values apply to an empty room with no aerosol-generating source. With a person present and generating aerosol, this table would not apply. Other equations are available that include a constant generating source. However, certain diseases (e.g., infectious tuberculosis) are not likely to be aerosolized at a constant rate. The times given assume perfect mixing of the air within the space (i.e., mixing factor = 1). However, perfect mixing usually does not occur. Removal times will be longer in rooms or areas with imperfect mixing or air stagnation.[213] Caution should be exercised in using this table in such situations. For booths or other local ventilation enclosures, manufacturers' instructions should be consulted.

## 2.  Air Sampling for Aerosols Containing Legionellae

Air sampling is an insensitive means of detecting *Legionella pneumophila*, and is of limited practical value in environmental sampling for this pathogen. In certain instances, however, it can be used to a) demonstrate the presence of legionellae in aerosol droplets associated with suspected bacterial

reservoirs; b) define the role of certain devices [e.g., showers, faucets, decorative fountains, or evaporate condensers] in disease transmission; and c) quantitate and determine the size of the droplets containing legionellae.[1436] Stringent controls and calibration are necessary when sampling is used to determine particle size and numbers of viable bacteria.[1437] Samplers should be placed in locations where human exposure to aerosols is anticipated, and investigators should wear a NIOSH-approved respirator (e.g., N95 respirator) if sampling involves exposure to potentially infectious aerosols.

Methods used to sample air for legionellae include impingement in liquid, impaction on solid medium, and sedimentation using settle plates.[1436] The Chemical Corps.-type all-glass impingers (AGI) with the stem 30 mm from the bottom of the flask have been used successfully to sample for legionellae.[1436] Because of the velocity at which air samples are collected, clumps tend to become fragmented, leading to a more accurate count of bacteria present in the air. The disadvantages of this method are a) the velocity of collection tends to destroy some vegetative cells; b) the method does not differentiate particle sizes; and c) AGIs are easily broken in the field. Yeast extract broth (0.25%) is the recommended liquid medium for AGI sampling of legionellae;[1437] standard methods for water samples can be used to culture these samples.

Andersen samplers are viable particle samplers in which particles pass through jet orifices of decreasing size in cascade fashion until they impact on an agar surface.[1218] The agar plates are then removed and incubated. The stage distribution of the legionellae should indicate the extent to which the bacteria would have penetrated the respiratory system. The advantages of this sampling method are a) the equipment is more durable during use; b) the sampler can cetermine the number and size of droplets containing legionellae; c) the agar plates can be placed directly in an incubator with no further manipulations; and d) both selective and nonselective BCYE agar can be used. If the samples must be shipped to a laboratory, they should be packed and shipped without refrigeration as soon as possible.

## 3. Calculation of Air Sampling Results

Assuming that each colony on the agar plate is the growth from a single bacteria-carrying particle, the contamination of the air being sampled is determined from the number of colonies counted. The airborne microorganisms may be reported in terms of the number per cubic foot of air sampled. The following formulas can be applied to convert colony counts to organisms per cubic foot of air sampled.[1218]

For solid agar impactor samplers:

$$C / (R \times P) = N$$ where  N = number of organisms collected per cubic foot of air sampled
C = total plate count
R = airflow rate in cubic feet per minute
P = duration of sampling period in minutes

For liquid impingers:

$$(C \times V) / (Q \times P \times R) = N$$ where  C = total number of colonies from all aliquots plated
V = final volume in mL of collecting media
Q = total number of mL plated
P, R, and N are defined as above

212

# 4. Ventilation Specifications for Health-Care Facilities

The following tables from the AIA *Guidelines for Design and Construction of Hospitals and Health-Care Facilities, 2001* are reprinted with permission of the American Institute of Architects and the publisher (The Facilities Guidelines Institute).[120]

## Table B.2. Ventilation requirements for areas affecting patient care in hospitals and outpatient facilities[1]

Notes: This table is Table 7.2 in the AIA guidelines, 2001 edition. Superscripts used in this table refer to notes following the table.

| Area designation | Air movement relationship to adjacent area[2] | Minimum air changes of outdoor air per hour[3] | Minimum total air changes per hour[4,5] | All air exhausted directly to outdoors[6] | Recirculated by means of room units[7] | Relative humidity[8] (%) | Design temperature[9] (degrees F [C]) |
|---|---|---|---|---|---|---|---|
| **Surgery and critical care** | | | | | | | |
| Operating/surgical cystoscopic rooms[10,11] | Out | 3 | 15 | — | No | 30–60 | 68–73 (20–23)[12] |
| Delivery room[10] | Out | 3 | 15 | — | No | 30–60 | 68–73 (20–23) |
| Recovery room[10] | | 2 | 6 | — | No | 30–60 | 70–75 (21–24) |
| Critical and intensive care | — | 2 | 6 | — | No | 30–60 | 70–75 (21–24) |
| Newborn intensive care | — | 2 | 6 | — | No | 30–60 | 72–78 (22–26) |
| Treatment room[13] | — | — | 6 | — | — | — | 75 (24) |
| Trauma room[13] | Out | 3 | 15 | — | No | 30–60 | 70–75 (21–24) |
| Anesthesia gas storage | In | — | 8 | Yes | — | — | — |
| Endoscopy | In | 2 | 6 | — | No | 30–60 | 68–73 (20–23) |
| Bronchoscopy[11] | In | 2 | 12 | Yes | No | 30–60 | 68–73 (20–23) |
| ER waiting rooms | In | 2 | 12 | Yes[14,15] | — | — | 70–75 (21–24) |
| Triage | | 2 | 12 | Yes[14] | | — | 70–75 (21–24) |
| Radiology waiting rooms | In | 2 | 12 | Yes[14,15] | — | — | 70–75 (21–24) |
| Procedure room | Out | 3 | 15 | — | No | 30–60 | 70–75 (21–24) |
| | | | | | | | |
| **Nursing** | | | | | | | |
| Patient room | — | 2 | 6[16] | — | — | — | 70–75 (21–24) |
| Toilet room | In | — | 10 | Yes | — | — | — |
| Newborn nursery suite | — | 2 | 6 | — | No | 30–60 | 72–78 (22–26) |
| Protective environment room[11,17] | Out | 2 | 12 | — | No | — | 75 (24) |
| Airborne infection isolation room[17,18] | | 2 | 12 | Yes[15] | | — | 75 (24) |
| Isolation alcove or anteroom[17,18] | In/Out | — | 10 | Yes | No | — | — |
| Labor/delivery/recovery | | 2 | 6[16] | | — | — | 70–75 (21–24) |
| Labor/delivery/recovery/postpartum | | 2 | 6[16] | | — | — | 70–75 (21–24) |
| Patient corridor | In | — | 2 | — | — | — | — |

In

No

In

—

—

—

—

| Area designation | Air movement relationship to adjacent area[2] | Minimum air changes of outdoor air per hour[3] | Minimum total air changes per hour[4,5] | All air exhausted directly to outdoors[6] | Recirculated by means of room units[7] | Relative humidity[8] (%) | Design temperature[9] (degrees F [C]) |
|---|---|---|---|---|---|---|---|
| **Ancillary** | | | | | | | |
| Radiology[19] | | | | | | | |
| X-ray (surgical/critical care and catheterization) | Out | 3 | 15 | – | No | 30-60 | 70–75 (21–24) |
| X-ray (diagnostic & treatment) | – | – | 6 | – | – | – | 75 (24) |
| Darkroom | In | – | 10 | Yes | No | – | – |
| Laboratory | | | | | | | |
| General[19] | – | – | 6 | – | – | – | 75 (24) |
| Biochemistry[19] | Out | – | 6 | – | No | – | 75 (24) |
| Cytology | In | – | 6 | Yes | No | – | 75 (24) |
| Glass washing | In | – | 10 | Yes | – | – | – |
| Histology | In | – | 6 | Yes | No | – | 75 (24) |
| Microbiology[19] | In | – | 6 | Yes | No | – | 75 (24) |
| Nuclear medicine | In | – | 6 | Yes | No | – | 75 (24) |
| Pathology | In | – | 6 | Yes | No | – | 75 (24) |
| Serology | Out | – | 6 | – | No | – | 75 (24) |
| Sterilizing | In | – | 10 | Yes | – | – | – |
| Autopsy room[11] | | – | 12 | Yes | No | – | – |
| Nonrefrigerated body-holding room | In | – | 10 | Yes | – | – | 70 (21) |
| Pharmacy | Out | – | 4 | – | – | – | – |
| | | | | | | | |
| **Diagnostic and treatment** | | | | | | | |
| Examination room | – | – | 6 | – | – | – | 75 (24) |
| Medication room | Out | – | 4 | – | – | – | – |
| Treatment room | – | – | 6 | – | – | – | 75 (24) |
| Physical therapy and hydrotherapy | In | – | 6 | – | – | – | 75 (24) |
| Soiled workroom or soiled holding | In | – | 10 | Yes | No | – | – |
| Clean workroom or clean holding | Out | – | 4 | – | – | – | – |
| | | | | | | | |
| **Sterilizing and supply** | | | | | | | |
| ETO-sterilizer room | In | – | 10 | Yes | No | 30-60 | 75 (24) |
| Sterilizer equipment room | In | – | 10 | Yes | – | – | – |
| Central medical and surgical supply | | | | | | | |
| Soiled or decontamination room | In | – | 6 | Yes | No | – | 68–73 (20–23) |
| Clean workroom | Out | – | 4 | – | No | 30-60 | 75 (24) |
| Sterile storage | Out | – | 4 | – | – | (Max.) 70 | – |

214

| Area designation | Air movement relationship to adjacent area[2] | Minimum air changes of outdoor air per hour[3] | Minimum total air changes per hour[4,5] | All air exhausted directly to outdoors[6] | Recirculated by means of room units[7] | Relative humidity[8] (%) | Design temperature[9] (degrees F [C]) |
|---|---|---|---|---|---|---|---|
| **Service** | | | | | | | |
| Food preparation center[20] | – | – | 10 | – | No | – | – |
| Ware washing | In | – | 10 | Yes | No | – | – |
| Dietary day storage | In | – | 2 | – | – | – | – |
| Laundry, general | – | – | 10 | Yes | – | – | – |
| Soiled linen (sorting and storage) | In | – | 10 | Yes | No | – | – |
| Clean linen storage | Out | – | 2 | – | – | – | – |
| Soiled linen and trash chute room | In | – | 10 | Yes | No | – | – |
| Bedpan room | In | – | 10 | Yes | – | – | – |
| Bathroom | In | – | 10 | – | – | – | 75 (24) |
| Janitor's closet | In | – | 10 | Yes | No | – | – |

**Notes:**

1. The ventilation rates in this table cover ventilation for comfort, as well as for asepsis and odor control in areas of acute care hospitals that directly affect patient care and are determined based on health-care facilities being predominantly "No Smoking" facilities. Where smoking may be allowed, ventilation rates will need adjustment. Areas where specific ventilation rates are not given in the table shall be ventilated in accordance with ASHRAE Standard 62, *Ventilation for Acceptable Indoor Air Quality*, and ASHRAE *Handbook - HVAC Applications*. Specialized patient care areas, including organ transplant units, burn units, specialty procedure rooms, etc., shall have additional ventilation provisions for air quality control as may be appropriate. OSHA standards and/or NIOSH criteria require special ventilation requirements for employee health and safety within health-care facilities.

2. Design of the ventilation system shall provide air movement which is generally from clean to less clean areas. If any form of variable air volume or load shedding system is used for energy conservation, it must not compromise the corridor-to-room pressure balancing relationships or the minimum air changes required by the table.

3. To satisfy exhaust needs, replacement air from the outside is necessary. Table B2 does not attempt to describe specific amounts of outside air to be supplied to individual spaces except for certain areas such as those listed. Distribution of the outside air, added to the system to balance required exhaust, shall be as required by good engineering practice. Minimum outside air quantities shall remain constant while the system is in operation.

4. Number of air changes may be reduced when the room is unoccupied if provisions are made to ensure that the number of air changes indicated is reestablished any time the space is being utilized. Adjustments shall include provisions so that the direction of air movement shall remain the same when the number of air changes is reduced. Areas not indicated as having continuous directional control may have ventilation systems shut down when space is unoccupied and ventilation is not otherwise needed, if the maximum infiltration or exfiltration permitted in Note 2 is not exceeded and if adjacent pressure balancing relationships are not compromised. Air quantity calculations must account for filter loading such that the indicated air change rates are provided up until the time of filter change-out.

5. Air change requirements indicated are minimum values. Higher values should be used when required to maintain indicated room conditions (temperature and jumidity), based on the cooling load of the space (lights, equipment, people, exterior walls and windows, etc.).

6. Air from areas with contamination and/or odor problems shall be exhausted to the outside and not recirculated to other areas. Note that individual circumstances may require special consideration for air exhaust to the outside, (e.g., in intensive care units in which patients with pulmonary infection are treated) and rooms for burn patients.

7. Recirculating room HVAC units refer to those local units that are used primarily for heating and cooling of air, and not disinfection of air. Because of cleaning difficulty and potential for buildup of contamination, recirculating room units shall not be used in areas marked "No." However, for airborne infection control, air may be recirculated within individual isolation rooms if HEPA filters are used. Isolation and intensive care unit rooms may be ventilated by reheat induction units in which only the primary air supplied from a central system passes through the reheat unit. Gravity-type heating or cooling units such as radiators or convectors shall not be used in operating rooms and other special care areas. See this table's Appendix I for a description of recirculation units to be used in isolation rooms (A7).

8. The ranges listed are the minimum and maximum limits where control is specifically needed. The maximum and minimum limits are not intended to be independent of a space's associated temperature. The humidity is expected to be at the higher end of the range when the temperature is also at the higher end, and vice versa.

9. Where temperature ranges are indicated, the systems shall be capable of maintaining the rooms at any point within the range during normal operation. A single figure indicates a heating or cooling capacity of at least the indicated temperature. This is usually applicable when patients may be undressed and require a warmer environment. Nothing in these guidelines shall be construed as precluding the use of temperatures lower than those noted when the patients' comfort and medical conditions make lower temperatures desirable. Unoccupied areas such as storage rooms shall have temperatures appropriate for the function intended.

10. National Institute for Occupational Safety and Health (NIOSH) criteria documents regarding "Occupational Exposure to Waste Anesthetic Gases and Vapors," and "Control of Occupational Exposure to Nitrous Oxide" indicate a need for both local exhaust (scavenging) systems and general ventilation of the areas in which the respective gases are utilized.

11. Differential pressure shall be a minimum of 0.01" water gauge (2.5 Pa). If alarms are installed, allowances shall be made to prevent nuisance alarms of monitoring devices.

12. Some surgeons may require room temperatures which are outside of the indicated range. All operating room design conditions shall be developed in consultation with surgeons, anesthesiologists, and nursing staff.

13. The term "trauma room" as used here is the operating room space in the emergency department or other trauma reception area that is used for emergency surgery. The "first aid room" and/or "emergency room" used for initial treatment of accident victims may be ventilated as noted for the "treatment room." Treatment rooms used for bronchoscopy shall be treated as Bronchoscopy rooms. Treatment rooms used for cryosurgery procedures with nitrous oxide shall contain provisions for exhausting waste gases.

14. In a ventilation system that recirculates air, HEPA filters can be used in lieu of exhausting the air from these spaces to the outside. In this application, the return air shall be passed through the HEPA filters before it is introduced into any other spaces.

15. If it is not practical to exhaust the air from the airborne infection isolation room to the outside, the air may be returned through HEPA filters to the air-handling system exclusively serving the isolation room.

16. Total air changes per room for patient rooms, labor/delivery/recovery rooms, and labor/delivery/recovery/postpartum rooms may be reduced to 4 when supplemental heating and/or cooling systems (radiant heating and cooling, baseboard heating, etc.) are used.

17. The protective environment airflow design specifications protect the patient from common environmental airborne infectious microbes (i.e., *Aspergillus* spores). These special ventilation areas shall be designed to provide directed airflow from the cleanest patient care area to less clean areas. These rooms shall be protected with HEPA filters at 99.97 percent efficiency for a 0.3 μm sized particle in the supply airstream. These interrupting filters protect patient rooms from maintenance-derived release of environmental microbes from the ventilation system components. Recirculation HEPA filters can be used to increase the equivalent room air exchanges. Constant volume airflow is required for consistent ventilation for the protected environment. If the facility determines that airborne infection isolation is necessary for protective environment patients, an anteroom should be

216

provided. Rooms with reversible airflow provisions for the purpose of switching between protective environment and airborne infection isolation functions are not acceptable.

18. The infectious disease isolation room described in these guidelines is to be used for isolating the airborne spread of infectious diseases, such as measles, varicella, or tuberculosis. The design of airborne infection isolation (AII) rooms should include the provision for normal patient care during periods not requiring isolation precautions. Supplemental recirculating devices may be used in the patient room to increase the equivalent room air exchanges; however, such recirculating devices do not provide the outside air requirements. Air may be recirculated within individual isolation rooms if HEPA filters are used. Rooms with reversible airflow provisions for the purpose of switching between protective environment and AII functions are not acceptable.

19. When required, appropriate hoods and exhaust devices for the removal of noxious gases or chemical vapors shall be provided (see Section 7.31.D14 and 7.31.D15 in the AIA guideline [reference 120] and NFPA 99).

20. Food preparation centers shall have ventilation systems whose air supply mechanisms are interfaced appropriately with exhaust hood controls or relief vents so that exfiltration or infiltration to or from exit corridors does not compromise the exit corridor restrictions of NFPA 90A, the pressure requirements of NFPA 96, or the maximum defined in the table. The number of air changes may be reduced or varied to any extent required for odor control when the space is not in use. See Section 7.31.D1.p in the AIA guideline (reference 120).

**Appendix I:**

A7. Recirculating devices with HEPA filters may have potential uses in existing facilities as interim, supplemental environmental controls to meet requirements for the control of airborne infectious agents. Limitations in design must be recognized. The design of either portable or fixed systems should prevent stagnation and short circuiting of airflow. The supply and exhaust locations should direct clean air to areas where health-care workers are likely to work, across the infectious source, and then to the exhaust, so that the health-care worker is not in position between the infectious source and the exhaust location. The design of such systems should also allow for easy access for scheduled preventative maintenance and cleaning.

A11. The verification of airflow direction can include a simple visual method such as smoke trail, ball-in-tube, or flutterstrip. These devices will require a minimum differential air pressure to indicate airflow direction.

## Table B.3. Pressure relationships and ventilation of certain areas of nursing facilities[1]

Notes: This table is Table 8.1 in the AIA guidelines, 2001 edition. Superscripts used in this table refer to notes following the table.

| Area designation | Air movement relationship to adjacent area[2] | Minimum air changes of outdoor air per hour[3] | Minimum total air changes per hour[4] | All air exhausted directly to outdoors[5] | Recirculated by means of room units[6] | Relative humidity[7] (%) | Design temperature[8] (degrees F [C]) |
|---|---|---|---|---|---|---|---|
| Resident room | – | 2 | 2 | – | – | [9] | 70–75 (21–24) |
| Resident unit corridor | – | – | 4 | – | – | [9] | |
| Resident gathering areas | – | 4 | 4 | – | – | – | – |
| Toilet room | In | – | 10 | Yes | No | – | – |
| Dining rooms | – | 2 | 4 | – | – | – | 75 (24) |
| Activity rooms, if provided | – | 4 | 4 | – | – | – | – |
| Physical therapy | In | 2 | 6 | – | – | – | 75 (24) |
| Occupational therapy | In | 2 | 6 | – | – | – | 75.(24) |
| Soiled workroom or soiled holding | In | 2 | 10 | Yes | No | – | – |
| Clean workroom or clean holding | Out | 2 | 4 | – | – | (Max. 70) | 75 (24) |
| Sterilizer exhaust room | In | – | 10 | Yes | No | – | – |
| Linen and trash chute room, if provided | In | – | 10 | Yes | No | – | – |
| Laundry, general, if provided | – | 2 | 10 | Yes | No | – | – |
| Soiled linen sorting and storage | In | – | 10 | Yes | No | – | – |
| Clean linen storage | Out | – | 2 | Yes | No | – | – |
| Food preparation facilities[10] | – | 2 | 10 | Yes | No | – | – |
| Dietary warewashing | In | – | 10 | Yes | No | – | – |
| Dietary storage areas | – | – | 2 | Yes | No | – | – |
| Housekeeping rooms | In | – | 10 | Yes | No | – | – |
| Bathing rooms | In | – | 10 | Yes | No | – | 75 (24) |

**Notes:**

1. The ventilation rates in this table cover ventilation for comfort, as well as for asepsis and odor control in areas of nursing facilities that directly affect resident care and are determined based on nursing facilities being predominantly "No Smoking" facilities. Where smoking may be allowed, ventilation rates will need adjustment. Areas where specific ventilation rates are not given in the table shall be ventilated in accordance with ASHRAE Standard 62, *Ventilation for Acceptable Indoor Air Quality*, and ASHRAE *Handbook - HVAC Applications*. OSHA standards and/or NIOSH criteria require special ventilation requirements for employee health and safety within nursing facilities.

2. Design of the ventilation system shall, insofar as possible, provide that air movement is from clean to less clean areas. However, continuous compliance may be impractical with full utilization of some forms of variable air volume and load shedding systems that may be used for energy conservation. Areas that do require positive and continuous control are noted with "Out" or "In" to indicate the required direction of air movement in relation to the space named. Rate of air movement may, of course, be varied as needed

218

within the limits required for positive control. Where indication of air movement direction is enclosed in parentheses, continuous directional control is required only when the specialized equipment or device is in use or where room use may otherwise compromise the intent of movement from clean to less clean. Air movement for rooms with dashes and nonpatient areas may vary as necessary to satisfy the requirements of those spaces. Additional adjustments may be needed when space is unused or unoccupied and air systems are deenergized or reduced.

3. To satisfy exhaust needs, replacement air from outside is necessary. Table B.3 does not attempt to describe specific amounts of outside air to be supplied to individual spaces except for certain areas such as those listed. Distribution of the outside air, added to the system to balance required exhaust, shall be as required by good engineering practice.

4. Number of air changes may be reduced when the room is unoccupied if provisions are made to ensure that the number of air changes indicated is reestablished any time the space is being utilized. Adjustments shall include provisions so that the direction of air movement shall remain the same when the number of air changes is reduced. Areas not indicated as having continuous directional control may have ventilation systems shut down when space is unoccupied and ventilation is not otherwise needed.

5. Air from areas with contamination and/or odor problems shall be exhausted to the outside and not recirculated to other areas. Note that individual circumstances may require special consideration for air exhaust to outside.

6. Because of cleaning difficulty and potential for buildup of contamination, recirculating room units shall not be used in areas marked "No." Isolation rooms may be ventilated by reheat induction units in which only the primary air supplied from a central system passes through the reheat unit. Gravity-type heating or cooling units such as radiators or convectors shall not be used in special care areas.

7. The ranges listed are the minimum and maximum limits where control is specifically needed. See A8.31.D in the AIA guideline (reference 120) for additional information.

8. Where temperature ranges are indicated, the systems shall be capable of maintaining the rooms at any point within the range. A single figure indicates a heating or cooling capacity of at least the indicated temperature. This is usually applicable where residents may be undressed and require a warmer environment. Nothing in these guidelines shall be construed as precluding the use of temperatures lower than those noted when the residents' comfort and medical conditions make lower temperatures desirable. Unoccupied areas such as storage rooms shall have temperatures appropriate for the function intended.

9. See A8.31.D1 in the AIA guideline (reference 120).

10. Food preparation facilities shall have ventilation systems whose air supply mechanisms are interfaced appropriately with exhaust hood controls or relief vents so that exfiltration or infiltration to or from exit corridors does not compromise the exit corridor restrictions of NFPA 90A, the pressure requirements of NFPA 96, or the maximum defined in the table. The number of air changes may be reduced or varied to any extent required for odor control when the space is not in use.

### Table B.4. Filter efficiencies for central ventilation and air conditioning systems in general hospitals*

Note: This table is Table 7.3 in the AIA guidelines, 2001 edition.

| Area designation | Number of filter beds | Filter bed No.1 (%) | Filter bed No. 2 (%) |
|---|---|---|---|
| All areas for inpatient care, treatment, and diagnosis, and those areas providing direct service or clean supplies, such as sterile and clean processing, etc. | 2 | 30 | 90 |
| Protective environment room | 2 | 30 | 99.97 |
| Laboratories | 1 | 80 | – |
| Administrative, bulk storage, soiled holding areas, food preparation areas, and laundries | 1 | 30 | – |

\* Additional roughing or prefilters should be considered to reduce maintenance required for filters with efficiency higher than 75 percent. The filtration efficiency ratings are based on average dust sopt efficiency per ASHRAE 52.1–1992.

### Table B.5. Filter efficiencies for central ventilation and air conditioning systems in outpatient facilities*

Note: This table is Table 9.1 in the AIA guidelines, 2001 edition.

| Area designation | Number of filter beds | Filter bed No. 1 (%) | Filter bed No. 2+ (%) |
|---|---|---|---|
| All areas for patient care, treatment, and/or diagnosis, and those areas providing direct service or clean supplies such as sterile and clean processing, etc. | 2 | 30 | 90 |
| Laboratories | 1 | 80 | – |
| Administrative, bulk storage, soiled holding areas, food preparation areas, and laundries | 1 | 30 | – |

\* Additional roughing or prefilters should be considered to reduce maintenance required for main filters. The filtration efficiency ratings are based on dust spot efficiency per ASHRAE 52.1–1992.

+ These requirements do not apply to small primary (e.g., neighborhood) outpatient facilities or outpatient facilities that do not perform invasive applications or procedures.

220

### Table B.6. Filter efficiencies for central ventilation and air conditioning systems in nursing facilities

Note: This table is Table 8.2 in the AIA guidelines, 2001 edition.

| Area designation | Minimum number of filter beds | Filter bed No. 1 (%)* | Filter bed No. 2 (%)* |
|---|---|---|---|
| All areas for inpatient care, treatment, and/or diagnosis, and those areas providing direct service or clean supplies | 2 | 30 | 80 |
| Administrative, bulk storage, soiled holding, laundries, and food preparation areas | 1 | 30 | — |

* The filtration efficiency ratings are based on average dust spot efficiency as per ASHRAE 52.1–1992.

### Table B.7. Filter efficiencies for central ventilation and air conditioning systems in psychiatric hospitals

Note: This table is Table 11.1 in the AIA guidelines, 2001 edition.

| Area designation | Minimum number of filter beds | Filter bed No. 1 (%)* | Filter bed No. 2 (%)* |
|---|---|---|---|
| All areas for inpatient care, treatment, and diagnosis, and those areas providing direct services | 2 | 30 | 90 |
| Administrative, bulk storage, soiled holding, laundries, and food preparation areas | 1 | 30 | — |

* The filtration efficiency ratings are based on average dust spot efficiency as per ASHRAE 52.1–1992.

# Appendix C. Water

## 1. Biofilms

Microorganisms have a tendency to associate with and stick to surfaces. These adherent organisms can initiate and develop biofilms, which are comprised of cells embedded in a matrix of extracellularly produced polymers and associated abiotic particles.[1438] It is inevitable that biofilms will form in most water systems. In the health-care facility environment, biofilms may be found in the potable water supply piping, hot water tanks, air conditioning cooling towers, or in sinks, sink traps, aerators, or shower heads. Biofilms, especially in water systems, are not present as a continuous slime or film, but

are more often scanty and heterogeneous in nature.[1439]  Biofilms may form under stagnant as well as flowing conditions, so storage tanks, in addition to water system piping, may be vulnerable to the development of biofilm, especially if water temperatures are low enough to allow the growth of thermophilic bacteria (e.g., *Legionella* spp.). Favorable conditions for biofilm formation are present if these structures and equipment are not cleaned for extended periods of time.[1440]

Algae, protozoa, and fungi may be present in biofilms, but the predominant microorganisms of water system biofilms are gram-negative bacteria. Although most of these organisms will not normally pose a problem for healthy individuals, certain biofilm bacteria (e.g., *Pseudomonas aeruginosa, Klebsiella* spp., *Pantoea agglomerans*, and *Enterobacter cloacae*) all may be agents for opportunistic infections for immunocompromised individuals.[1441, 1442]  These biofilm organisms may easily contaminate indwelling medical devices or intravenous (IV) fluids, and they could be transferred on the hands of health-care workers.[1441–1444]  Biofilms may potentially provide an environment for the survival of pathogenic organisms, such as *Legionella pneumophila* and *E. coli* O157:H7. Although the association of biofilms and medical devices provides a plausible explanation for a variety of health-care–associated infections, it is not clear how the presence of biofilms in the water system may influence the rates of health-care–associated waterborne infection.

Organisms within biofilms behave quite differently than their planktonic (i.e., free floating) counterparts. Research has shown that biofilm-associated organisms are more resistant to antibiotics and disinfectants than are planktonic organisms, either because the cells are protected by the polymer matrix, or because they are physiologically different.[1445–1450]  Nevertheless, municipal water utilities attempt to maintain a chlorine residual in the distribution system to discourage microbiological growth. Though chlorine in its various forms is a proven disinfectant, it has been shown to be less effective against biofilm bacteria.[1448]  Higher levels of chlorine for longer contact times are necessary to eliminate biofilms.

Routine sampling of health-care facility water systems for biofilms is not warranted. If an epidemiologic investigation points to the water supply system as a possible source of infection, then water sampling for biofilm organisms should be considered so that prevention and control strategies can be developed. An established biofilm is is difficult to remove totally in existing piping. Strategies to remediate biofilms in a water system would include flushing the system piping, hot water tank, dead legs, and those areas of the facility's water system subject to low or intermittent flow. The benefits of this treatment would include a) elimination of corrosion deposits and sludge from the bottom of hot water tanks, b) removal of biofilms from shower heads and sink aerators, and c) circulation of fresh water containing elevated chlorine residuals into the health-care facility water system.

The general strategy for evaluating water system biofilm depends on a comparision of the bacteriological quality of the incoming municipal water and that of water sampled from within facility's distribution system. Heterotrophic plate counts and coliform counts, both of which are routinely run by the municipal water utility, will at least provide in indication of the potential for biofilm formation. Heterotrophic plate count levels in potable water should be <500 CFU/mL. These levels may increase on occasion, but counts consistently >500 CFU/mL would indicate a general decrease in water quality. A direct correlation between heterotrophic plate count and biofilm levels has been demonstrated.[1450]  Therefore, an increase in heterotrophic plate count would suggest a greater rate and extent of biofilm formation in a health-care facility water system. The water supplied to the facility should also contain <1 coliform bacteria/100 mL. Coliform bacteria are organisms whose presence in the distribution system could indicate fecal contamination. It has been shown that coliform bacteria can colonize biofilms within drinking water systems. Intermittant contamination of a water system with these organisms could lead to colonization of the system.

Water samples can be collected from throughout the health-care facility system, including both hot and cold water sources; samples should be cultured by standard methods.[945] If heterotrophic plate counts in samples from the facility water system are higher than those from samples collected at the point of water entry to the building, it can be concluded that the facility water quality has diminished. If biofilms are detected in the facility water system and determined by an epidemiologic and environmental investigation to be a reservoir for health-care–associated pathogens, the municipal water supplier could be contacted with a request to provide higher chlorine residuals in the distribution system, or the health-care facility could consider installing a supplemental chlorination system.

Sample collection sites for biofilm in health-care facilities include a) hot water tanks; b) shower heads; and c) faucet aerators, especially in immunocompromised patient-care areas. Swabs should be placed into tubes containing phosphate buffered water, pH 7.2 or phosphate buffered saline, shipped to the laboratory under refrigeration and processed within 24 hrs. of collection. Samples are suspended by vortexing with sterile glass beads and plated onto a nonselective medium (e.g., Plate Count Agar or R2A medium) and selective media (e.g., media for *Legionella* spp. isolation) after serial dilution. If the plate counts are elevated above levels in the water (i.e. comparing the plate count per square centimeter of swabbed surface to the plate count per milliliter of water), then biofilm formation can be suspected. In the case of an outbreak, it would be advisable to isolate organisms from these plates to determine whether the suspect organisms are present in the biofilm or water samples and compare them to the organisms isolated from patient specimens.

## 2. Water and Dialysate Sampling Strategies in Dialysis

In order to detect the low, total viable heterotrophic plate counts outlined by the current AAMI standards for water and dialysate in dialysis settings, it is necessary to use standard quantitative culture techniques with appropriate sensitivity levels.[792, 832, 833] The membrane filter technique is particularly suited for this application because it permits large volumes of water to be assayed.[792, 834] Since the membrane filter technique may not be readily available in clinical laboratories, the spread plate assay can be used as an alternative.[834] If the spread plate assay is used, however, the standard prohibits the use of a calibrated loop when applying sample to the plate.[792] The prohibition is based on the low sensitivity of the calibrated loop. A standard calibrated loop transfers 0.001 mL of sample to the culture medium, so that the minimum sensitivity of the assay is 1,000 CFU/mL. This level of sensitivity is unacceptable when the maximum allowable limit for microorganisms is 200 CFU/mL. Therefore, when the spread plate method is used, a pipette must be used to place 0.1–0.5 mL of water on the culture medium.

The current AAMI standard specifically prohibits the use of nutrient-rich media (e.g., blood agar, and chocolate agar) in dialysis water and dialysate assays because these culture media are too rich for growth of the naturally occurring organisms found in water.[792] Debate continues within AAMI, however, as to the most appropriate culture medium and incubation conditions to be used. The original clinical observations on which the microbiological requirements of this standard were based used Standard Methods Agar (SMA), a medium containing relatively few nutrients.[666] The use of tryptic soy agar (TSA), a general purpose medium for isolating and cultivating microorganisms was recommended in later versions of the standard because it was thought to be more appropriate for culturing bicarbonate-containing dialysate.[788, 789, 835] Moreover, culturing systems based on TSA are readily available from commercial sources. Several studies, however, have shown that the use of nutrient-poor media, such as R2A, results in an increased recovery of bacteria from water.[1451, 1452] The original standard also specified incubation for 48 hours at 95°F–98.6°F (35°C–37°C) before enumeration of bacterial colonies. Extending the culturing time up to 168 hours, or 7 days and using incubation temperatures of 73.4°F–82.4°F (23°C–28°C) have also been shown to increase the recovery of bacteria.[1451, 1452] Other

investigators, however, have not found such clear cut differences between culturing techniques.[835, 1453] After considerable discussion, the AAMI Committee has not reached a consensus regarding changes in the assay technique, and the use of TSA or its equivalent for 48 hours at 95°F–98.6°F (35°C–37°C) remains the recommended method. It should be recognized, however, that these culturing conditions may underestimate the bacterial burden in the water and fail to identify the presence of some organisms. Specifically, the recommended method may not detect the presence of various NTM that have been associated with several outbreaks of infection in dialysis units.[31, 32] In these instances, however, the high numbers of mycobacteria in the water were related to the total heterotrophic plate counts, each of which was significantly greater than that allowable by the AAMI standard. Additionally, the recommended method will not detect fungi and yeast, which have been shown to contaminate water used for hemodialysis applications.[1454] Biofilm on the surface of the pipes may hide viable bacterial colonies, even though no viable colonies are detected in the water using sensitive culturing techniques.[1455] Many disinfection processes remove biofilm poorly, and a rapid increase in the level of bacteria in the water following disinfection may indicate significant biofilm formation. Therefore, although the results of microbiological surveillance obtained using the test methods outlined above may be useful in guiding disinfection schedules and in demonstrating compliance with AAMI standards, they should not be taken as an indication of the absolute microbiological purity of the water.[792]

Endotoxin can be tested by one of two types of assays a) a kinetic test method [e.g., colorimetric or turbidimetric] or b) a gel-clot assay. Endotoxin units are assayed by the *Limulus* Amebocyte Lysate (LAL) method. Because endotoxins differ in their activity on a mass basis, their activity is referred to a standard *Escherichia coli* endotoxin. The current standard (EC-6) is prepared from *E. coli* O113:H10. The relationship between mass of endotoxin and its activity varies with both the lot of LAL and the lot of control standard endotoxin used. Since standards for endotoxin were harmonized in 1983 with the introduction of EC-5, the relationship between mass and activity of endotoxin has been approximately 5–10 EU/ng. Studies to harmonize standards have led to the measurement of endotoxin units (EU) where 5 EU is equivalent to 1 ng *E. coli* O55:B5 endotoxin.[1456]

In summary, water used to prepare dialysate and to reprocess hemodialyzers should not contain a total microbial count >200 CFU/mL as determined by assay on TSA agar for 48 hrs. at 96.8°F (36°C), and ≤2 endotoxin units (EU) per mL. The dialysate at the end of a dialysis treatment should not contain >2,000 CFU/mL.[31, 32, 668, 789, 792]

## 3. Water Sampling Strategies and Culture Techniques for Detecting Legionellae

*Legionella* spp. are ubiquitous and can be isolated from 20%–40% of freshwater environments, including man-made water systems.[1457, 1458] In health-care facilities, where legionellae in potable water rarely result in disease among immunocompromised patients, courses of remedial action are unclear.

Scheduled microbiologic monitoring for legionellae remains controversial because the presence of legionellae is not necessarily evidence of a potential for causing disease.[1459] CDC recommends aggressive disinfection measures for cleaning and maintaining devices known to transmit legionellae, but does not recommend regularly scheduled microbiologic assays for the bacteria.[396] However, scheduled monitoring of potable water within a hospital might be considered in certain settings where persons are highly susceptible to illness and mortality from *Legionella* infection (e.g., hematopoietic stem cell transplantation units and solid organ transplant units).[9] Also, after an outbreak of

224

legionellosis, health officials agree monitoring is necessary to identify the source and to evaluate the efficacy of biocides or other prevention measures.

Examination of water samples is the most efficient microbiologic method for identifying sources of legionellae and is an integral part of an epidemiologic investigation into health-care–associated Legionnaires disease. Because of the diversity of plumbing and HVAC systems in health-care facilities, the number and types of sites to be tested must be determined before collection of water samples. One environmental sampling protocol that addresses sampling site selection in hospitals might serve as a prototype for sampling in other institutions.[1209] Any water source that might be aerosolized should be considered a potential source for transmission of legionellae. The bacteria are rarely found in municipal water supplies and tend to colonize plumbing systems and point-of-use devices. To colonize, legionellae usually require a temperature range of 77°F–108°F (25°C–42.2°C) and are most commonly located in hot water systems.[1460] Legionellae do not survive drying. Therefore, air-conditioning equipment condensate, which frequently evaporates, is not a likely source.[1461]

Water samples and swabs from point-of-use devices or system surfaces should be collected when sampling for legionellae (Box C.1).[1437] Swabs of system surfaces allow sampling of biofilms, which frequently contain legionellae. When culturing faucet aerators and shower heads, swabs of surface areas should be collected first; water samples are collected after aerators or shower heads are removed from their pipes. Collection and culture techniques are outlined (Box C.2). Swabs can be streaked directly onto buffered charcoal yeast extract agar (BCYE) plates if the pates are available at the collection site. If the swabs and water samples must be transported back to a laboratory for processing, immersing individual swabs in sample water minimizes drying during transit. Place swabs and water samples in insulated coolers to protect specimens from temperature extremes.

**Box C.1. Potential sampling sites for *Legionella* spp. in health-care facilities***

- **Potable water systems**
     incoming water main, water softener unit, holding tanks, cisterns, water heater tanks
        (at the inflows and outflows)

- **Potable water outlets, especially those in or near patient rooms**
     faucets or taps, showers

- **Cooling towers and evaporative condensers**
     makeup water (e.g., added to replace water lost because of evaporation, drift, or leakage),
        basin (i.e., area under the tower for collection of cooled water), sump (i.e., section of basin
        from which cooled water returns to heat source), heat sources (e.g., chillers)

- **Humidfiers (e.g., nebulizers)**
     bubblers for oxygen, water used for respiratory therapy equipment

- **Other sources**
     decorative fountains, irrigation equipment, fire sprinkler system (if recently used), whirlpools,
        spas

* Material in this box is adapted from reference 1209.

**Box C.2. Procedures for collecting and processing environmental specimens for *Legionella* spp.***

---

1. Collect water (1-liter samples, if possible) in sterile, screw-top bottles.

2. Collect culture swabs of internal surfaces of faucets, aerators, and shower heads in a sterile, screw-top container (e.g., 50 mL plastic centrifuge tube). Submerge each swab in 5–10 mL of sample water taken from the same device from which the sample was obtained.

3. Transport samples and process in a laboratory proficient at culturing water specimens for *Legionella* spp. as soon as possible after collection.+

4. Test samples for the presence of *Legionella* spp. by using semiselective culture media using procedures specific to the cultivation and detection of *Legionella* spp.§¶

---

\* Material in this table is compiled from references1209, 1437, 1462–1465.
+ Samples may be transported at room temperature but must be protected from temperature extremes. Samples not processed within 24 hours of collection should be refrigerated.
§ Detection of *Legionella* spp. antigen by the direct fluorescent antibody technique is not suitable for environmental samples.
¶ Use of polymerase chain reaction for identification of *Legionella* spp. is not recommended until more data regading the sensitivity and specificity of this procedure are available.


# 4. Procedure for Cleaning Cooling Towers and Related Equipment

I. Perform these steps prior to chemical disinfection and mechanical cleaning.

   A. Provide protective equipment to workers who perform the disinfection, to prevent their exposure to chemicals used for disinfection and aerosolized water containing *Legionella* spp. Protective equipment may include full-length protective clothing, boots, gloves, goggles, and a full- or half-face mask that combines a HEPA filter and chemical cartridges to protect against airborne chlorine levels of up to 10 mg/L.

   B. Shut off cooling tower.
   1. Shut off the heat source, if possible.
   2. Shut off fans, if present, on the cooling tower/evaporative condenser (CT/EC).
   3. Shut off the system blowdown (i.e., purge) valve.
   4. Shut off the automated blowdown controller, if present, and set the system controller to manual.
   5. Keep make-up water valves open.
   6. Close building air-intake vents within at least 30 meters of the CT/EC until after the cleaning procedure is complete.
   7. Continue operating pumps for water circulation through the CT/EC.

II. Perform these chemical disinfection procedures.

   A. Add fast-release, chlorine-containing disinfectant in pellet, granular, or liquid form, and follow safety instructions on the product label. Use EPA-registered products, if available. Examples of disinfectants include sodium hypochlorite (NaOCl) or calcium hypochlorite (Ca[OCl]$_2$), calculated to achieve initial free residual chlorine (FRC) of 50 mg/L: either a) 3.0 lbs [1.4 kg] industrial grade NaOCl [12%–15% available Cl] per 1,000 gallons of CT/EC water; b) 10.5 lbs [4.8 kg] domestic grade NaOCl [3%–5% available Cl] per 1,000 gallons of CT/EC water; or c)

0.6 lb [0.3 kg] Ca[OCl]$_2$ per 1,000 gallons of CT/EC water. If significant biodeposits are present, additional chlorine may be required. If the volume of water in the CT/EC is unknown, it can be estimated (in gallons) by multiplying either the recirculation rate in gallons per minute by 10 or the refrigeration capacity in tons by 30. Other appropriate compounds may be suggested by a water-treatment specialist.

B. Record the type and quality of all chemicals used for disinfection, the exact time the chemicals were added to the system, and the time and results of FRC and pH measurements.

C. Add dispersant simultaneously with or within 15 minutes of adding disinfectant. The dispersant is best added by first dissolving it in water and adding the solution to a turbulent zone in the water system. Automatic-dishwasher compounds are examples of low- or nonfoaming, silicate-based dispersants. Dispersants are added at 10–25 lbs (4.5–11.25 kg) per 1,000 gallons of CT/EC water.

D. After adding disinfectant and dispersant, continue circulating the water through the system. Monitor the FRC by using an FRC-measuring device with the DPD method (e.g., a swimming-pool test kit), and measure the pH with a pH meter every 15 minutes for 2 hours. Add chlorine as needed to maintain the FRC at $\geq$10 mg/L. Because the biocidal effect of chlorine is reduced at a higher pH, adjust the pH to 7.5–8.0. The pH may be lowered by using any acid (e.g., nuriatic acid or sulfuric acid used for maintenance of swimming pools) that is compatible with the treatment chemicals.

E. Two hours after adding disinfectant and dispersant or after the FRC level is stable at $\geq$10 mg/L, monitor at 2-hour intervals and maintain the FRC at $\geq$10 mg/L for 24 hours.

F. After the FRC level has been maintained at $\geq$10 mg/L for 24 hours, drain the system. CT/EC water may be drained safely into the sanitary sewer. Municipal water and sewerage authorities should be contacted regarding local regulations. If a sanitary sewer is not available, consult local or state authorities (e.g., a department of natural resources or environmental protection) regarding disposal of water. If necessary, the drain-off may be dechlorinated by dissipation or chemical neutralization with sodium bisulfite.

G. Refill the system with water and repeat the procedure outline in steps 2–7 in I-B above.

III. Perform mechanical cleaning.

A. After water from the second chemical disinfection has been drained, shut down the CT/EC.

B. Inspect all water-contact areas for sediment, sludge, and scale. Using brushes and/or a low-pressure water hose, thoroughly clean all CT/EC water-contact areas, including the basin, sump, fill, spray nozzles, and fittings. Replace components as needed.

C. If possible, clean CT/EC water-contact areas within the chillers.

IV. Perform these procedures after mechanical cleaning.

A. Fill the system with water and add chlorine to achieve an FRC level of 10 mg/L.

B. Circulate the water for 1 hour, then open the blowdown valve and flush the entire system until the water is free of turbidity.

C. Drain the system.

D. Open any air-intake vents that were closed before cleaning.

E. Fill the system with water. The CT/EC may be put back into service using an effective water-treatment program.

## 5. Maintenance Procedures Used to Decrease Survival and Multiplications of *Legionella* spp. in Potable-Water Distribution Systems

Wherever allowable by state code, provide water at $\geq$124°F ($\geq$51°C) at all points in the heated water system, including the taps. This requires that water in calorifiers (e.g., water heaters) be maintained at $\geq$140°F ($\geq$60°C). In the United Kingdom, where maintenance of water temperatures at $\geq$122°F ($\geq$50°C) in hospitals has been mandated, installation of blending or mixing valves at or near taps to reduce the water temperature to $\leq$109.4°F ($\leq$63°C) has been recommended in certain settings to reduce the risk for scald injury to patients, visitors, and health care workers.[726] However, *Legionella* spp. can multiply even in short segments of pipe containing water at this temperature. Increasing the flow rate from the hot-water-circulation system may help lessen the likelihood of water stagnation and cooling.[711, 1465] Insulation of plumbing to ensure delivery of cold (<68°F [<20°C]) water to water heaters (and to cold-water outlets) may diminish the opportunity for bacterial multiplication.[456] Both dead legs and capped spurs within the plumbing system provide areas of stagnation and cooling to <122°F (<50°C) regardless of the circulating water temperature; these segments may need to be removed to prevent colonization.[704] Rubber fittings within plumbing systems have been associated with persistent colonization, and replacement of these fittings may be required for *Legionella* spp. eradication.[1467]

Continuous chlorination to maintain concentrations of free residual chlorine at 1–2 mg/L (1–2 ppm) at the tap is an alternative option for treatment. This requires the placement of flow-adjusted, continuous injectors of chlorine throughout the water distribution system. Adverse effects of continuous chlorination can include accelerated corrosion of plumbing (resulting in system leaks) and production of potentially carcinogenic trihalomethanes. However, when levels of free residual chlorine are below 3 mg/L (3 ppm), trihalomethane levels are kept below the maximum safety level recommended by the EPA.[727, 1468, 1469]

# Appendix D. Insects and Microorganisms

## Table D.1. Microorganisms isolated from arthropods in health-care settings

| Insect | Microorganism category | Microorganisms | References |
|---|---|---|---|
| Cockroaches | Gram-negative bacteria | *Acinetobacter* spp.; *Citrobacter freundii*; *Enterobacter* spp., *E. cloacae*; *Escherichia coli*; *Flavobacterium* spp.; *Klebsiella* spp.; *Proteus* spp.; *Pseudomonas* spp., *P. aeruginosa*, *P. fluorescens*, *P. putida*; *Salmonella* spp.; *Serratia* spp., *S. marcescens*; *Shigella boydii* | 1048, 1051, 1056, 1058. 1059. 1062 |
| | Gram-positive bacteria | *Bacillus* spp.; *Enterococcus faecalis*; *Micrococcus* spp.; *Staphylococcus aureus*, *S. epidermidis*; *Streptococcus* spp., *S. viridans* | 1056, 1058, 1059 |
| | Acid-fast bacteria | *Mycobacterium tuberculosis* | 1065 |
| | Fungi | *Aspergillus niger*; *Mucor* spp.; *Rhizopus* spp. | 1052, 1059 |
| | Parasites | *Endolimax nana*; *Entamoeba coli* | 1059 |
| Houseflies | Gram-negative bacteria | *Acinetobacter* spp.; *Campylobacter fetus* subsp. *Jejuni*; *Chlamydia* spp.; *Citrobacter fruendii*; *Enterobacter* spp.; *Escherichia coli*; *Helicobacter pylori*; *Klebsiella* spp.; *Proteus* spp.; *Pseudomonas aeruginosa*; *Serratia marcescens*; *Shigella* spp. | 1047, 1048, 1050, 1053–1055. 1060 |
| | Gram-positive bacteria | *Bacillus* spp.; *Enterococcus faecalis*; *Micrococcus* spp.; *Staphylococcus* spp. (coagulase-negative), *S. aureus*; *Streptococcus* spp., *S. viridans* | 1048. 1060 |
| | Fungi / yeasts | *Candida* spp.; *Geotrichum* spp. | 1060 |
| | Parasites | *Endolimax nana*; *Entamoeba coli* | 1060 |
| | Viruses | Rotaviruses | 1049 |
| Ants | Gram-negative bacteria | *Acinetobacter* spp.; *Escherichia coli*; *Klebsiella* spp.; *Neisseria sicca*; *Proteus* spp.; *Providencia* spp.; *Pseudomonas aeruginosa*, *P. fluorescens* | 1057 |
| | Gram-positive bacteria | *Bacillus* spp., *B. cereus*, *B. pumilis*; *Clostridium cochlearium*, *C. welchii*; *Enterococcus faecalis*; *Staphylococcus* spp. (coagulase-negative), *S. aureus*; *Streptococcus pyogenes* | 1057. |
| Spiders | Gram-negative bacteria | *Acinetobacter* spp.; *Citrobacter freundii*; *Enterobacter aerogenes*; *Morganella morganii* | 1048 |
| | Gram-positive bacteria | *Staphylococcus* spp. (coagulase-negative) | 1048 |
| Mites, midges | Bram-negative bacteria | *Acinetobacter* spp.; *Burkholderia cepacia*; *Enterbacter agglomerans*, *E. aerogenes*; *Hafnia alvei*; *Pseudomonas aeruginosa* | 1048 |
| | Gram-positive bacteria | *Staphylococcus* spp. (coagulase-negative) | 1048 |
| Mosquitoes | Gram-negative bacteria | *Acinetobacter calcoaceticus*; *Enteobacter cloacae* | 1048 |
| | Gram-positive bacteria | *Enterococcus* spp.; *Staphylococcus* spp. (coagulase-negative) | 1048 |

# Appendix E. Information Resources

The following sources of information may be helpful to the reader. Some of these are available at no charge, while others are available for purchase from the publisher.

## *Air and Water*
- Jensen PA, Schafer MP. Sampling and characterization of bioaerosols. NIOSH Manual of Analytical Methods; revised 6/99. www.cdc.gov/niosh/nmam/pdfs/chapter-j.pdf
- American Institutes of Architects. *Guidelines for Design and Construction of Hospital and Health Care Facilities.* Washington DC; American Institute of Architects Press; 2001. AIA, 1735 New York Avenue, NW, Washington DC 20006. 1-800-AIA-3837 or (202) 626-7541
- ASHRAE. Standard 62, and Standard 12-2000. These documents may be purchased from: American Society of Heating, Refrigerating, and Air-Conditioning Engineers, Inc. 1791 Tullie Circle, NE, Atlanta GA 30329 1-800-527-4723 or (404) 636-8400.
- University of Minnesota websites: www.dehs.umn.edu      Indoor air quality site: www.dehs.umn.edu/resources.htm#indoor      Water infiltration and use of the wet test (moisture) meter:      www.dehs.umn.edu/remangi.html
- The CDC website for bioterrorism information contains the interim intervention plan for smallpox. The plan discusses infection control issues both for home-based care and hospital-based patient management. www.bt.cdc.gov/agent/smallpox/response-plan/index.asp

## *Environmental Sampling*
- ISO. Sterilization of medical devices – microbiological methods, Part 1. ISO standard 11737-1. Paramus NJ; International Organization for Standardization; 1995.

## *Animals in Health-Care Facilities*
- Service animal information with respect to the Americans with Disabilities Act. Contact the U.S. Department of Justice ADA Information Line at (800) 514-0301 (voice) or (800) 514-0383 (TDD), or visit the ADA website at: www.usdoj.gov/crt/ada/adahom1.htm

## *Regulated Medical Waste*
- U.S. Environmental Protection Agency. This is the Internet address on their Internet web site that will link to any state for information about medical waste rules and regulations at the state level: www.epa.gov/epaoswer/other/medical/stregs.htm

## *General Resources*
- APIC Text of Infection Control and Epidemiology. Association for Professionals in Infection Control and Epidemiology, Inc. Washington DC; 2000. (Two binder volumes, or CD-ROM)
- Abrutyn E, Goldmann DA, Scheckler WE. Saunders Infection Control Reference Service, 2nd Edition. Philadelphia PA; WB Saunders; 2000.
- ECRI publications are available on a variety of healthcare topics. Contact ECRI at (610) 825-6000. CRI, 5200 Butler Pike, Plymouth Meeting, PA 19462-1298.

# Appendix F.  Areas of Future Research

*Air*
- Standardize the methodology and interpretation of microbiologic air sampling (e.g., determine action levels or minimum infectious dose for aspergillosis, and evaluate the significance of airborne bacteria and fungi in the surgical field and the impact on postoperative SSI).
- Develop new molecular typing methods to better define the epidemiology of health-care–associated outbreaks of aspergillosis and to associate isolates recovered from both clinical and environmental sources.
- Develop new methods for the diagnosis of aspergillosis that can lead reliably to early recognition of infection.
- Assess the value of laminar flow technology for surgeries other than for joint replacement surgery.
- Determine if particulate sampling can be routinely performed in lieu of microbiologic sampling for purposes such as determining air quality of clean environments (e.g., operating rooms, HSCT units).

*Water*
- Evaluate new methods of water treatment, both in the facility and at the water utility (e.g., ozone, chlorine dioxide, copper/silver/monochloramine) and perform cost-benefit analyses of treatment in preventing health-care–associated legionellosis.
- Evaluate the role of biofilms in overall water quality and determine the impact of water treatments for the control of biofilm in distribution systems.
- Determine if the use of ultrapure fluids in dialysis is feasible and warranted, and determine the action level for the final bath.
- Develop quality assurance protocols and validated methods for sampling filtered rinse water used with AERs and determine acceptable microbiologic quality of AER rinse water.

*Environmental Services*
- Evaluate the innate resistance of microorganisms to the action of chemical germicides, and determine what, if any, linkage there may be between antibiotic resistance and resistance to disinfectants.

*Laundry and Bedding*
- Evaluate the microbial inactivation capabilities of new laundry detergents, bleach substitutes, other laundry additives, and new laundry technologies.

*Animals in Health-Care Facilities*
- Conduct surveillance to monitor incidence of infections among patients in facilities that use animal programs, and conduct investigations to determine new infection control strategies to prevent these infections.
- Evaluate the epidemiologic impact of performing procedures on animals (e.g., surgery or imaging) in human health-care facilities.

*Regulated Medical Waste*
- Determine the efficiency of current medical waste treatment technologies to inactivate emerging pathogens that may be present in medical waste (e.g., SARS-coV).
- Explore options to enable health-care facilities to reinstate the capacity to inactivate microbiological cultures and stocks on-site.

# Index—Parts I and IV

## A

AAMI standards ...................................59, 60, 62, 222, 223
*Acinetobacter* spp. ...........................11, 20, 43, 44, 99, 104
aerators ................................47, 48, 94, 220–222, 224, 225
aerosols... 12, 27, 41, 47, 56, 59, 67, 75, 76, 78, 80, 85, 89, 90, 98, 106, 111, 113, 114
AIA guidelines..............................17, 18, 19, 25, 37, 39, 99
AII rooms ................................................................ 35–37
air changes per hour (ACH).......6, 12, 16, 18, 31, 111, 210
air conditioners..................................................... 8, 22
air conditioning systems ............................. 13, 20, 57, 59
air filtration.............................................................. 111
air intakes ......................................................... 31, 226
air sampling...............................26, 29, 89, 90, 91, 93, 210
airborne infection isolation (AII)............................. 6, 19
airborne transmission................................................ 12
air-fluidized beds...................................................... 104
alcohol-based hand rubs ............................................. 53
alkaline glutaraldehyde............................................... 70
allergens........................................................ 17, 80, 107
American Institute of Architects (AIA) ......................... 13
Americans with Disabilities Act......................... 108, 110
amplified stocks and cultures.............................. 114, 115
Animal Assisted Activities ................................... 106, 107
Animal Assisted Therapy ..................................... 106, 107
animal bites............................................................... 107
animal handler .......................................................... 107
animal patient ........................................................... 110
Animal Welfare Act.................................................... 112
anterooms .................................................12, 25, 33, 36–38
ants ............................................................................. 81
ASHRAE............................................................ 13, 47, 49
aspergillosis...............................7, 8, 16, 19, 21, 35, 79, 80
*Aspergillus fumigatus* ........................................... 7, 8, 29
*Aspergillus* spp. ..........................5, 7, 20, 21, 28, 32, 34, 81
automated cyclers......................................................... 65
automated endoscope reprocessor...................... 50, 69, 70
autopsy suites/rooms.............................................. 12, 87

## B

bacterial spores..................................................... 73, 84, 89
bank of filters............................................................... 14
barrier ......................................................................... 34
barrier precautions/protection.......................... 74, 109, 116
barriers.............................................................. 27, 31, 33
bassinets....................................................................... 76
biofilms.............................46, 54, 64, 71, 220–222, 224
biosafety level.............................................................. 114
bioterrorism .......................................................... 89, 114
bird droppings................................................... 9, 20, 22
birthing tanks......................................................... 67, 69

blood.. 12, 64, 69, 75, 77–79, 86, 87, 98, 99, 102, 113, 116
bloodborne pathogens............................................. 73, 116
boil water advisory .................................................. 51, 52

## C

calibrated loop ........................................................... 222
carpet cleaning............................................................ 79
carpet tiles................................................................... 79
carpeting .......................................................22, 25, 52, 78, 79
cats.........................................................105, 106, 108, 109
chain of infection ................................................... 4, 87
chemical germicides ..............................73, 74, 77, 80, 84
chloramine/chloramine-T ........................................... 68
chlorine.............................46, 50, 53, 69, 84, 221, 226
chlorine bleach................................................... 78, 101
chlorine residual ..........................50, 68, 69, 94, 101, 221
cleaning .. 68, 70–72, 74, 78, 80, 83, 85, 86, 107, 109, 112, 225
cleaning cloths............................................................. 75
cleaning solutions ................................................... 75, 76
*Clostridium difficile* ................................................... 5, 84
cloth chairs................................................................... 79
cockroaches ................................................................ 81
coliform bacteria........................................................ 221
colonization .....................42–44, 68, 70, 83, 99, 106, 227
colony counts.............................................................. 211
commissioning....................................................... 29, 89
construction .....7, 13, 14, 21, 23, 26, 27, 29, 31, 37, 76, 89
construction workers........................................... 24, 26, 31
contact precautions ..................................................... 85
contact time ................................................. 74, 84, 88, 221
contaminants..............................................14, 18, 19, 59, 210
contaminated fabrics...................................... 98, 101, 102
contingency plans .................................................. 21, 50
continuous chlorination ............................................. 227
cooling tower............................41, 53, 55, 57–59, 220, 225
copper/silver ions........................................................ 54
copper-8-quinolinolate................................................ 35
Creutzfeldt-Jakob disease ..................................... 86, 116
*Cryptosporidium parvum* ........................................... 46

## D

dead legs.............................................................. 59, 64, 221
decorative fountains.......................................... 47, 49, 224
demolition........................................................ 23, 25, 26, 29
dental unit water lines.................................................. 71
detergent/disinfectant............................................. 74–76
dialysate.............................................................. 59–62
dialysis machines......................................................... 64
dialysis water ............................................................. 222
dialyzer....................................................................... 62
dialyzer membranes.................................................... 61

232

dialyzer reprocessing ....................................... 59
dioctylphthalate (DOP) particle test ............................... 15
direct contact .........................6, 41, 67, 85, 86, 98, 108, 111
direct threat ....................................... 109
disinfectant fogging ....................................... 75
disinfectant residuals ....................................... 96
disinfectants ....................................... 21, 76, 225
disinfecting ........................71, 74, 80, 83, 85, 86, 112, 226
disinfection ....................................... 63, 64, 68, 70
dispersant ....................................... 226
disposal (of medical waste) ....................................... 113
distribution system ....................................... 94, 221
dogs ....................................... 105, 106, 108, 109
drift eliminators ....................................... 58
drinking water ....................................... 71
droplet nuclei ....................................... 6, 7, 10, 12, 89
droplets ....................................... 6, 55, 85, 86, 89
dry cleaning ....................................... 102
drying ....................................... 11
dual-duct system ....................................... 20
duct cleaning ....................................... 21
ductwork ....................................... 20, 22
dust ....................................8, 20, 24, 27, 30, 32, 74, 79, 93
dust-spot test ....................................... 15

**E**

education ....................................... 24
electrical generators ....................................... 53
emergency ....................................... 53
endotoxin ....................................... 60–62, 64, 223
engineering controls ....................................... 36
enteric viruses ....................................... 85
environmental cultures ....................................... 83, 88
Environmental Protection Agency (EPA) .... 21, 73–75, 77, 103, 227
environmental sampling ....................................... 88, 95
environmental surfaces ... 11, 44, 71, 72, 74, 82–86, 88, 98, 107
environmental surveillance ....................................... 54, 55
EPA registration ....................................... 73, 76, 83
EPA-registered germicides ....................................... 75, 78, 85, 86
evaporative condensers ....................................... 41, 57–59
exclusion (of a service animal) ....................................... 109
exotic animals ....................................... 110

**F**

fan-coil units ....................................... 18
faucets ....................................47, 54, 94, 222, 224, 225
fecal contamination ....................................... 84
FIFRA ....................................... 75, 103
filter efficiency ....................................... 27, 29
filtration ....................................... 15
fire codes ....................................... 31
fish ....................................... 105, 108
fish tanks ....................................... 108
flies ....................................... 81
flooding ....................................... 51

floors ....................................... 25, 75, 82, 83
flowers ....................................... 80
flush times ....................................... 51
flutter strips ....................................... 20, 34, 36
fomites ....................................... 3, 4, 7, 85
Food and Drug Administration (FDA) ............. 69, 73, 103
free residual chlorine ....................................... 51, 54, 225–227
fungal spores ... 8, 15, 16, 19–21, 26–28, 31, 34, 38, 79, 89, 93
fungi ....................................... 8
furniture ....................................... 52, 79, 82

**G**

gram-negative bacteria ... 11, 41, 42, 48, 50, 60, 63, 64, 221
gram-positive bacteria ....................................... 11, 84

**H**

hand hygiene ....................................... 25, 71, 107, 109
hand transferral ....................................3, 44, 65, 82–84, 106, 221
handwashing ....................................... 25, 80, 84, 99, 107
hantaviruses ....................................... 12
hematopoietic stem cell transplant ....................................... 6
hemodiafiltration ....................................... 62
hemodialysis ....................................... 59, 60, 62, 64, 223
hemodialysis patients ....................................... 7
hemofiltration ....................................... 62
HEPA filtration/filters .........6, 12, 14, 15, 17, 31, 32, 36, 76
hepatitis B virus ....................................... 40, 73, 98
heterotrophic plate counts ............. 51, 62, 66, 95, 221–223
high-flux membranes ....................................... 61
high-level disinfectants ....................................... 73
high-level disinfection ....................................... 60, 69, 72
high-temperature flushing ....................................... 50
high-touch surfaces ....................................... 75, 83–85
holding tank ....................................... 47
hospital disinfectant ....................................... 73
hot water system ....................................... 51, 54
hot water tanks ....................................... 53, 220–222
hot water temperature ....................................... 49
housekeeping surfaces ....................... 3, 64, 72, 74–77, 83
HSCT patients ....................................... 6, 37
HSCT units ....................................... 11, 26, 79, 80, 107
Hubbard tanks ....................................... 68
human health-care facilities ....................................... 110, 111
human immunodeficiency virus ....................................... 73
humidifiers ....................................... 17, 23, 41
humidity ....................................... 13, 14, 17, 20, 38, 90
HVAC systems ................ 13, 14, 16, 17, 19–21, 27, 30, 51
hydrotherapy equipment ....................................... 67–69
hydrotherapy pools ....................................... 68
hydrotherapy tanks ....................................... 67, 68, 82
hygienically-clean laundry ....................................... 98–100, 102
hyperchlorination ....................................... 50, 53, 54, 59

## I, J

iatrogenic cases.................................................................. 87
ice machines and ice...................................... 25, 48, 65, 66
ice-storage chests.............................................................. 66
immunocompromised patients....6, 7, 9, 26, 29–31, 34, 42,
47, 56, 66, 80, 107, 108, 223
impaction ............................................................... 90, 211
impactors ................................................................... 28, 93
impingement............................................... 90, 93, 211
impingers ....................................................................... 211
inactivation studies ......................................................... 87
incineration ............................................................ 113, 114
incubators (nursery)......................................................... 76
indirect transmission.......................................................... 6
indirect contact ................................................................ 41
indoor air .....................................21, 24, 26, 27, 90
industrial-grade HEPA filter........................ 16, 31, 38, 39
infection-control risk assessment (ICRA).... 26, 29, 31, 35,
108, 111
influenza viruses............................................. 6, 12, 73, 85
innate resistance.................................................. 72, 73, 84
insects ....................................................................... 67, 81
insulation material ........................................................... 20
intermediate-level disinfectants ...............73, 78, 83, 85, 86
intermediate-level disinfection ....................................... 72
isolation/isolation areas .................................. 11, 36, 100

JCAHO......................................................... 13, 14, 51, 59

## L

laboratories . 12, 13, 32, 47, 78, 79, 83, 105, 111, 112, 114,
222
laboratory confirmation ................................................. 55
laminar airflow ................................................. 18, 34, 38
laser plumes.................................................................... 40
laundry............................................................................ 49
laundry bags ................................................................. 100
laundry chutes............................................................... 100
laundry cycles............................................................... 101
laundry disinfection ...................................................... 101
laundry facility................................................................ 99
laundry packaging................................................. 100, 101
laundry process.................................................. 98, 99, 102
laundry services............................................................... 99
laundry transport.................................................... 100, 101
*Legionella pneumophila* ......................................... 210, 221
*Legionella* spp. ...41, 42, 50, 54–57, 59, 71, 222, 223, 225,
227
legionellae ....................................................41, 54, 211, 223
legionellosis...................................................... 53–56, 224
Legionnaires disease..............................41, 47, 57, 58, 224
liquid chemical sterilant................................................. 70
low-level disinfectants.................................... 72, 73, 83, 86
low-level disinfection ................................................. 60, 64

## M

manufacturer's instructions...........67, 69, 74, 86, 102, 116
material safety data sheets (MSDS)......................... 75, 87
mattress cover............................................................ 77, 104
mattresses ................................................................ 77, 104
medical equipment................................................... 74, 83
medical equipment surfaces............................................ 72
medical gas piping........................................................... 30
medical records.............................................................. 51
medical waste ..................................................... 112, 113, 117
medical waste management .......................................... 112
membrane filtration ..................................... 70, 95, 96, 222
methicillin-resistant *Staphylococcus aureus* (MRSA) ... 82,
83, 104, 105
microbial inactivation ..................................................... 72
microbial resistance ......................................................... 70
microbiologic air sampling ............................................. 27
microbiologic cultures and stocks................................ 112
microbiologic sampling ................................................... 64
microbiologic sampling of laundry............................... 102
microbiological wastes ........................................... 112, 114
moisture .................................................20, 24, 32, 51, 70, 96
moisture meters................................................................ 51
molecular typing............................................................. 28
monochloramine............................................................ 54
mop heads....................................................................... 75
multidisciplinary team ............................................... 23, 91
municipal water ..................................................... 47, 50, 224
municipal water systems/utilities............................. 45, 221
*Mycobacterium tuberculosis*..................... 5, 7, 10, 73, 114
myiasis............................................................................. 81

## N

negative air pressure .....6, 12, 18, 19, 21, 36, 99, 100, 104,
111
neutralizer chemicals ...................................................... 96
NIOSH............................................................................ 40
nontuberculous mycobacteria (NTM).5, 41, 44–46, 60, 63,
70, 71, 223

## O

operating rooms ..... 13, 15, 17, 34, 38, 76, 82, 87, 109, 111
opportunistic infections ............................................... 4, 5
organic matter................................................................. 78
OSHA .................................... 13, 73, 77, 79, 98, 100, 113
outdoor air .................................................14, 15, 18, 25, 91
oxygen-based laundry detergents................................. 101

## P

particle sampling...............................................27, 33, 89
performance measures ...................................................... 2
periodic culturing........................................................... 57
peritoneal dialysis ..................................................... 64, 65

234

personal protective equipment .....77, 98, 99, 112, 114, 225
persons with disabilities.......................................... 108, 109
person-to-person transmission ................................. 12, 85
pest control ................................................................... 82
phenolics........................................................................ 76
pillows ......................................................................... 104
pipes.......................................................... 64, 69, 221, 223, 224
planktonic organisms .................................................. 221
plastic enclosures .......................................................... 31
plastic wrapping............................................................ 74
*Pneumocystis carinii*......................................................9
pneumonia ............................................................... 42, 55
point-of-use fixtures............................................ 47, 51, 224
polyvinylchloride (PVC)............................................ 46, 64
pools .............................................................................. 67
positive air pressure ................................................. 18, 38
potable water................................................................ 220
potted plants............................................................... 8, 80
pressure differentials........................... 18, 19, 25, 30, 38
primates ....................................................... 105, 106, 111
prions ..................................................................... 86, 116
privacy curtains............................................................. 75
product water........................................................... 64, 70
protective environment (PE)............. 6, 18, 19, 34, 56, 108
*Pseudomonas aeruginosa* .5, 11, 20, 42, 68, 70, 71, 73, 79, 80, 96, 104, 221
pseudo-outbreaks ..................................................... 44, 70
pyrogenic reactions ................................................. 60, 61

## Q

quality assurance............................................... 89, 94, 95

## R

R2A media.................................................................... 222
rank order...................................................................... 27
recirculation ............................................................. 16, 18
recirculation loops ........................................................ 46
recreational equipment.................................................. 69
reduced nutrient media.................................................. 94
reducing agent............................................................... 94
relative humidity ........................................................... 17
renovation ,.................................................. 13, 14, 23, 37
repairs ........................................................................... 31
reprocess hemodialyzers........................................... 61, 223
research animals........................................................... 111
reservoirs ..................3, 6, 41, 42, 71, 79, 83, 95, 105, 211
resident animals ......................................................... 107
respirable particles.............................................. 27, 28, 90
respirators ............................................................... 26, 40
respiratory protection............................................... 36, 78
respiratory syncytial virus (RSV) ......................... 6, 12, 85
respiratory therapy equipment ................................... 224
return air ....................................................................... 14
return temperature......................................................... 54
reverse osmosis (RO)............................. 52, 54, 59, 60, 63
rewiring.......................................................................... 25
rinse water monitoring .................................................. 70

RODAC plates............................................................. 102
rodents .......................................................................... 67
rooftops......................................................................... 30

## S

Sabouraud dextrose agar................................................ 96
sample/rinse methods..................................................... 97
sanitary sewer ...................................................... 116, 117
SARS ............................................................................ 86
SARS-CoV .................................................................... 86
scalding..................................................................... 49, 51
screens .......................................................................... 82
scrub suits ................................................................ 98, 99
sealed windows.................................... 19, 26, 29, 89
sedimentation............................................... 90, 93, 211
select agents...................................................... 114, 115
self-closing doors.......................................................... 19
semicritical device ........................................................ 70
service animal.................................... 105, 108–110
settle plates ...................................... 28, 90, 93, 211
sewage spills .................................................................. 51
sharps containers.......................................................... 113
shock decontamination .................................................. 51
shower heads................ 47, 49, 54, 220, 221, 222, 224, 225
showers .................................................................... 47, 48
skin antiseptics.............................................................. 73
smallpox........................................................................ 36
smallpox virus........................................................... 7, 12
smoke tubes ................................................ 20, 34, 36
sodium hydroxide ......................................................... 87
sodium hypochlorite 67, 69, 73, 77, 83, 84, 87, 88, 94, 225
solid-organ transplant program ..................................... 56
sorting (laundry) ..................................................... 98, 100
Spaulding classification ............................................ 71, 98
spills....................................................................... 75, 77, 79
standard precautions .............................................. 100, 111
standards ...................................2, 14, 71, 88, 90, 112, 223
*Staphylococcus aureus*...............10, 11, 38, 64, 73, 99, 104
state codes/regulations .............................................. 55, 69
steam jet...................................................................... 101
steam sterilization (of medical waste).................... 113, 114
sterile water.................................................................... 55
storage tanks ............................................................ 63, 64
streptococci ............................................................... 10, 38
supplemental treatment methods................................... 53
surgical gowns and drapes ......................................... 103
surgical site infections (SSI) ............................... 11, 38, 65
surgical smoke ............................................................... 40
surveillance................................................ 26, 51, 57, 99, 223
swabs .......................................................................... 224

## T

tacky mats...................................................................... 76
tap water ........................................... 42, 44, 57, 65, 66, 70
TB patients.................................................................... 38
temperature (air) ........................................... 13, 14, 17, 89
temperature (water)................40, 45, 49, 68, 101, 221, 227

thermostatic mixing valves ............................................. 49
transport and storage (of medical waste) ...................... 113
treated items/products ............................................. 79, 103
tryptic soy agar ................................................ 94, 96, 222
tub liners ................................................................... 68
tuberculocidal claim ...................................................... 73
tuberculosis (TB) ......................................................... 35

## U

ultrapure dialysate ....................................................... 61
ultraviolet germicidal irradiation (UVGI) 14, 16, 17, 36, 38
uniforms ............................................................... 98, 99

## V

vacuum breakers ...................................................... 47, 50
vacuum cleaners ...................................................... 76, 79
vacuuming ................................................................... 79
vancomycin-resistant enterococci (VRE) ..3, 5, 82, 83, 105
vancomycin-resistant *Staphylococcus aureus* (VRSA)... 83
variable air ventilation ............................................. 20, 38
varicella-zoster virus (VZV) .................................. 5, 7, 40
vase water ................................................................... 81
vegetative bacteria ....................................................... 73
ventilation rates ........................................................... 18
ventilation systems ............................................... 8, 9, 111
viable particles ....................................................... 9, 91

viral hemorrhagic fever ................................................. 12
viral particles ............................................................... 11
viruses .................................................................. 11, 85
visual monitoring device ............................................... 34
volumetric air samplers ................................................. 29
volumetric sampling methods ......................................... 28

## W

wallboard ........................................................... 8, 22, 52
walls .......................................................................... 25
washing machines and dryers ....................................... 102
water conditioning ....................................................... 68
water distribution systems ............................... 64, 221, 227
water droplets .............................................................. 58
water pipes .................................................................. 46
water pressure .............................................................. 50
water quality .......................................................... 71, 94
water sampling ..................................... 54, 94, 221, 224
water stagnation ......................................................... 227
water treatment system ................................................. 63
waterborne transmission ................................................ 46
weight-arrestance test ................................................... 15
wet cleaning ................................................................ 79
whirlpool spas ..................................................... 59, 67, 69
whirlpools ............................................................. 68, 69
window chutes ............................................................. 33
windows ............................................................... 22, 59
wood ............................................................ 8, 9, 15, 35

# APPENDIX – "15"



**OSHA**

SHARE  OSHA **QuickTakes** Newsletter  RSS Feeds  RSS Feeds

Occupational Safety & Health Administration     We Can Help

What's New | Offices
OSHA

| Home | Workers | Regulations | Enforcement | Data & Statistics | Training | Publications | Newsroom | Small Business |

| Anti-Retaliation |

eTools Home : Hospital                                      Scope | Glossary | References | Site Map | Credits



Hospital eTool

## Hospital eTool

Administration

Central Supply

Clinical Services

Dietary

Emergency

Engineering

Healthcare Wide
Hazards

Heliport

Housekeeping

ICU

Laboratory

Laundry

Pharmacy

Surgical Suite

Expert Systems



The OSH Act of 1970 strives to "assure safe and healthful working conditions" for today's workers, and mandates that employers provide a safe work environment for employees. Hospitals and personal care facilities employ approximately 1.6 million workers at 21,000 work sites. There are many occupational health and safety hazards throughout the hospital. This eTool* focuses on some of the hazards and controls found in the hospital setting, and describes standard requirements as well as recommended safe work practices for employee safety and health.

This eTool addresses the following areas:

- Administration
- Central Supply
- Clinical Services
- Dietary
- Emergency
- Engineering
- Heliport
- Housekeeping

- ICU
- Laboratory
- Laundry
- Pharmacy
- Surgical Suite
- Healthcare Wide Hazards
- Other Healthcare Wide Hazards

---

**How do I find out about employer responsibilities and worker rights?**

Workers have a right to a safe workplace. The law requires employers to provide their employees with working conditions that are free of known dangers. The OSHA law also prohibits employers from retaliating against employees for exercising their rights under the law (including the right to raise a health and safety concern or report an injury). For more information see www.whistleblowers.gov or worker rights.

OSHA has a great deal of information to assist employers in complying with their responsibilities under the OSHA law.

OSHA can help answer questions or concerns from employers and workers. To reach your regional or area OSHA office, go to OSHA's Regional & Area Offices webpage or call 1-800-321-OSHA (6742).

Small business employers may contact OSHA's free and confidential on-site consultation service to help determine whether there are hazards at their worksites and work with OSHA on correcting any identified hazards. On-site consultation services are separate from enforcement activities and do not result in penalties or citations. To contact OSHA's free consultation service, go to OSHA's On-site Consultation webpage or call 1-800-321-OSHA (6742) and press number 4.

Workers may file a complaint to have OSHA inspect their workplace if they believe that their employer is not following OSHA standards or that there are serious hazards. Employees can file a complaint with OSHA by calling 1-800-321-OSHA (6742), online via eCompliant Form, or by printing the complaint form and mailing or faxing it to your local OSHA area office. Complaints that are signed by an employee are more likely to result in an inspection.

If you think your job is unsafe or you have questions, contact OSHA at 1-800-321-OSHA (6742). It's confidential. We can help. For other valuable worker protection information, such as Workers' Rights, Employer Responsibilities, and other services OSHA offers, visit OSHA's Workers' page.

*eTools are "stand-alone", interactive, Web-based training tools on occupational safety and health topics. They are highly illustrated and utilize graphical menus as well as expert system modules. These modules enable the user to answer questions, and receive reliable advice on how OSHA regulations apply to their work site. As indicated in the disclaimer, eTools do not create new OSHA requirements.*

Administration | Central Supply | Clinical Services | Dietary | Emergency | Engineering | Healthcare Wide Hazards
Heliport | Housekeeping | ICU | Laboratory | Laundry | Pharmacy | Surgical Suite | Expert Systems

eTools Home : Hospital

Scope | Glossary | References | Site Map | Credits

Freedom of Information Act | Privacy & Security Statement | Disclaimers | Important Web Site Notices | International | Contact Us

U.S. Department of Labor | Occupational Safety & Health Administration | 200 Constitution Ave., NW, Washington, DC 20210
Telephone: 800-321-OSHA (6742) | TTY
www.OSHA.gov

# APPENDIX – "16"





**Hospital eTool**

Administration
Central Supply
Clinical Services
Dietary
Emergency
Engineering
Healthcare Wide
Hazards
Heliport
Housekeeping
ICU
Laboratory
Laundry
Pharmacy
Surgical Suite
Expert Systems

**Healthcare Wide Hazards**
# Slips, Trips and Falls



**Potential Hazard**

Employee exposure to wet floors or spills and clutter that can lead to slips/trips/falls and other possible injuries.

**Possible Solutions**

- Keep floors clean and dry [29 CFR 1910.22(a)(2)]. In addition to being a slip hazard, continually wet surfaces promote the growth of mold, fungi, and bacteria, that can cause infections.

- Provide warning signs for wet floor areas [29 CFR 1910.145(c)(2)].

- Where wet processes are used, maintain drainage and provide false floors, platforms, mats, or other dry standing places where practicable, or provide appropriate waterproof footgear [29 CFR 1910.141(a)(3)(ii)].

- Walking/Working Surfaces Standard requires [29 CFR 1910.22(a)(1)]: Keep all places of employment clean and orderly and in a sanitary condition.

- Keep aisles and passageways clear and in good repair, with no obstruction across or in aisles that could create a hazard [29 CFR 1910.22(b)(1)]. Provide floor plugs for equipment, so power cords need not run across pathways.

- Keep exits free from obstruction. Access to exits must remain clear of obstructions at all times [29 CFR 1910.36(b)(4)].

**Other Recommended Good Work Practices:**

- Ensure spills are reported and cleaned up immediately.

- Use no-skid waxes and surfaces coated with grit to create non-slip surfaces in slippery areas such as toilet and shower areas.

- Use waterproof footgear to decrease slip/fall hazards.

- Use only properly maintained ladders to reach items. Do not use stools, chairs, or boxes as substitutes for ladders.

- Re-lay or stretch carpets that bulge or have become bunched to prevent tripping hazards.

- Aisles and passageways should be sufficiently wide for easy movement and should be kept clear at all times. Temporary electrical cords that cross aisles should be taped or anchored to the floor.

- Eliminate cluttered or obstructed work areas.

- Nurses station countertops or medication carts should be free of sharp, square corners.

- Use prudent housekeeping procedures such as cleaning only one side of a passageway at a time, and provide good lighting for all halls and stairwells, to help reduce accidents.

- Provide adequate lighting especially during night hours. You can use flashlights or low-level lighting when entering patient rooms.

- Instruct workers to use the handrail on stairs, to avoid undue speed, and to maintain an unobstructed view of the stairs ahead of them even if that means requesting help to manage a bulky load.

- Eliminate uneven floor surfaces.

- Promote safe work in cramped working spaces. Avoid awkward positions, and use equipment that makes lifts less awkward.

**Additional Information:**

- Walking/Working Surfaces, OSHA Safety and Health Topics Page.

- 29 CFR 1910.22, General Requirements (Walking/Working Surfaces). OSHA Standard.

- Small Business Handbook. OSHA Publication 2209-02R, (2005). Also available as a 260 KB PDF, 56 pages.
  - Walkways
  - Floor and Wall Openings
  - Stairs and Stairways
  - Elevated Surfaces

Back to Top

**Accessibility Assistance:** Contact the OSHA Directorate of Technical Support and Emergency Management at (202) 693-2300 for assistance accessing PDF materials.

Administration | Central Supply | Clinical Services | Dietary | Emergency | Engineering | Healthcare Wide Hazards
Heliport | Housekeeping | ICU | Laboratory | Laundry | Pharmacy | Surgical Suite | Expert Systems

eTools Home : Hospital

Scope | Glossary | References | Site Map | Credits

Freedom of Information Act | Privacy & Security Statement | Disclaimers | Important Web Site Notices | International | Contact Us

U.S. Department of Labor | Occupational Safety & Health Administration | 200 Constitution Ave., NW, Washington, DC 20210
Telephone: 800-321-OSHA (6742) | TTY
www.OSHA.gov

# APPENDIX – "17"



A to Z Index | Newsroom | Contact Us | FAQs | About OSHA

**OSHA**

☐ SHARE  ☐ ☑ ☐  **OSHA QuickTakes** Newsletter   📧 RSS Feeds  RSS Feeds

Occupational Safety & Health Administration     We Can Help

What's New | Offices
OSHA

| Home | Workers | Regulations | Enforcement | Data & Statistics | Training | Publications | Newsroom | Small Business |

| Anti-Retaliation |

eTools Home : Hospital                          Scope | Glossary | References | Site Map | Credits



**Hospital eTool**

## Housekeeping



Click on the area for more specific information.

- Administration
- Central Supply
- Clinical Services
- Dietary
- Emergency
- Engineering
- Healthcare Wide Hazards
- Heliport
- Housekeeping
- ICU
- Laboratory
- Laundry
- Pharmacy
- Surgical Suite
- Expert Systems

**Common safety and health topics:**

- Contaminated Work Environments
- Appropriate Disinfectants
- Contaminated Equipment
- Contaminated Laundry

- Sharps and Containers
- Hazardous Chemicals
- Latex Allergy
- Slips/Trips/Falls

---

**Virtual Reality**
Review the hazards and then tour the virtual reality room.

---

**Contaminated Work Environments**

**Potential Hazard**

Exposure of housekeeping staff to blood or Other Potentially Infectious Materials (OPIM) through contaminated work environments. OPIM is defined in 29 CFR 1901.1030 (b).

**Possible Solutions**

**OSHA requires:**

Clean and sanitary work environments to prevent contact with blood or OPIM. Bloodborne Pathogens Standard [29 CFR 1910.1030(d)(4)(i)].

**The employer must:**

- Determine and implement an appropriate written schedule for cleaning and methods of decontamination.

- This written schedule must be based on the:

    - Location within the facility.

    - Type of surfaces to be cleaned.

    - Type of soil present.

    - The tasks or procedures to be performed in the area.

Back to Top

---

## Appropriate Disinfectants

The CDC states that hepatitis B virus can survive for at least one week in dried blood on environmental surfaces or contaminated needles and instruments.

**Potential Hazard**

Exposure of housekeeping staff to blood or OPIM by not using an appropriate or approved disinfectant.

**Possible Solutions**

**Who determines which disinfectants are appropriate?**

Appropriate or approved disinfectants are determined by the EPA (US Environmental Protection Agency), which oversees the registration of anti-microbial products. A list maintained by the Office of Pesticide Programs provides the most recent information available from the EPA on registered anti-microbials.

**What disinfectants does OSHA recommend?**

- OSHA requires that work surfaces be cleaned with an "appropriate disinfectant." Appropriate disinfectants include a diluted bleach solution and EPA-registered antimicrobial products such as tuberculocides (List B), sterilants (List A), products registered against HIV/HBV (List E), and Sterilants/ High Level Disinfectants for equipment sterilization.

  - Fresh solutions of diluted household bleach made up every 24 hours are also considered appropriate for disinfection of environmental surfaces and for decontamination of sites. Contact time for bleach is generally considered to be the time it takes the product to air dry.

  - NOTE: Products registered by the EPA as HIV effective are not necessarily effective against tuberculosis (tuberculocidal) or against the hepatitis B virus (HBV).

- Any of the above products are considered effective when used according to the manufacturer's instructions, provided the surfaces have not become contaminated with agents or volumes of or concentrations of agents for which higher level disinfection is recommended.

- It is important to emphasize the EPA-approved label section titled "SPECIAL INSTRUCTIONS FOR CLEANING AND DECONTAMINATION AGAINST HIV-1 AND HBV OF SURFACES\OBJECTS SOILED WITH BLOOD\BODY FLUIDS." On the labels that OSHA has seen, these instructions require: 1) personal protection devices for the worker performing the task; 2) that all the blood must be cleaned thoroughly before applying the disinfectant; 3) that the disposal of the infectious waste is in accordance with federal, state, or local regulations; 4) that the disposal of the infectious waste is in accordance with federal, state, or local regulations; and 5) that the surface is left wet with the disinfectant for 30 seconds for HIV-1 and 10 minutes for HBV. OSHA would expect all such disinfectants to be used in accordance with their EPA-approved label instructions. OSHA Directive CPL 02-02-069, Enforcement Procedures for the Occupational Exposure to Bloodborne Pathogens.

- OSHA has commented on disinfectants in the following interpretation letters and documents:

  - Disinfectants claiming efficacy against the Hepatitis B virus. (1997, April 1).

  - OSHA's policy regarding the use of EPA-registered disinfectants. (1999, July 15).

  - Quick Reference Guide to the Bloodborne Pathogens Standard. OSHA.

Back to Top

---

## Contaminated Equipment

**Potential Hazard**

**Employee exposure to blood or OPIM through contact with contaminated:**

- Equipment and working surfaces

- Protective coverings

- Reusable containers

- Glassware

**Possible Solutions**

**OSHA requires:**

**Equipment and working surfaces:**

All equipment and environmental and working surfaces shall be cleaned and decontaminated after contact with blood or other potentially infectious materials [29 CFR 1910.1030(d)(4)(ii)].

- Contaminated equipment, such as IV poles, require labels or tags in accordance with 29 CFR 1910.1030(g)(1)(i)(H). The labels must also identify which portions of the equipment are contaminated.

    - Some equipment, if grossly contaminated, must be cleaned with a soap and water solution prior to decontamination, as some anti-microbial products will not work in the presence of blood, which interferes with the sterilizing process.

**Protective coverings:**

- Protective coverings, such as plastic wrap or aluminum foil, shall be removed and replaced as soon as possible, when they become overtly contaminated, or at the end of a work shift if they may have become contaminated during the shift [29 CFR 1910.1030(d)(4)(ii)(B)].

**Reusable Containers:**

- All bins, pails, cans, and similar receptacles intended for reuse which have a reasonable likelihood for becoming contaminated with blood or other potentially infectious material shall be inspected and decontaminated on a regularly scheduled basis and cleaned and decontaminated immediately or as soon as feasible upon visible contamination [29 CFR 1910.1030(d)(4)(ii)(C)].

**Glassware:**

- Broken glassware which may be contaminated, must not be picked up directly with hands; use mechanical means, such as use a brush and dustpan, tongs or forceps [29 CFR 1910.1030(d)(4)(ii)(D)].

For more information, see **Healthcare Wide Hazards - Needlestick/Sharps Injuries.**

**Note:** Some healthcare facilities who rent or lease medical equipment or devices from third parties or other institutions need to be aware that these devices may not be properly cleaned, disinfected and/or sterilized prior to delivery to the health care facility.

- Potential Infection Problem With Medical Devices Rented or Leased by Health Care Facilities. FDA Safety Notice, (1997, April). Outlines FDA recommendations to prevent this hazard.

Back to Top

---

### Contaminated Laundry

**Potential Hazard**

**Employee exposure to blood and other potentially infectious agents from handling contaminated laundry during rinsing in utility rooms.** Some facilities allow employees to rinse contaminated laundry (i.e., laundry contaminated with blood or Other Potentially Infectious Materials (OPIM) or that might contain sharps, in dirty utility "hopper" rooms, instead of simply containerizing it and then transporting it to the laundry.

**Possible Solutions**

The Bloodborne Pathogens Standard requires:

- Bagging and handling of contaminated laundry, with a minimal amount of agitation, at the location where it was used [29 CFR 1910.1030(d)(4)(iv)(A)].

- Contaminated laundry shall not be sorted or rinsed in the location of use [29 CFR 1910.1030 (d)(4)(iv)(A)(1)], and must be transported to the laundry for decontamination in bags or containers labeled or color-coded in accordance with 29 CFR 1910.1030(g)(1)(i). When universal precautions are used in the handling of all soiled laundry alternative labeling or color-coding is sufficient if it permits all employees to recognize the containers as requiring compliance with universal precautions.

**Other Recommended Good Practices:**

- Melt away bags for the bagging process. Melt away bags can be thrown directly into washers without having to unload or remove contaminated laundry from bags.

- Rinsing soiled laundry in utility rooms is acceptable, if it is not contaminated with blood, OPIM, or does not contain sharps.

    - The ergonomic stressors that can occur with lifting, reaching, rinsing, and transporting wet heavy laundry must also be addressed. A lift or transfer device for the lifting of these materials is recommended.

- To avoid punctures from improperly discarded syringes/sharps, do not hold contaminated laundry bags close to the body or squeeze when transporting.

For additional information, see **Healthcare Wide Hazards - Laundry.**

Back to Top

---

### Sharps and Containers

**Potential Hazard**

**Exposure of housekeeping staff to contaminated sharps and containers from:**

- Lack of training in proper procedures and poor handling practices of health care workers

  - Sharps that are not discarded promptly/properly and are left in bedding and accidentally sent to laundry.

- Improper handling or disposal of sharps containers

  - Allowing containers to overfill, or transporting incorrectly.

**Possible Solutions**

Implement work practice and engineering controls to help prevent exposure to sharps.

**OSHA requires:**

**Sharps handling:**

- Sharps must be properly disposed of immediately or as soon as feasible into the appropriate containers [29 CFR 1910.1030(d)(4)(iii)(A)(1)].

**Handling sharps containers:**

- Contaminated sharps must be properly disposed of immediately or as soon as feasible in containers that are closable, puncture resistant, leak-proof, [29 CFR 1910.1030(d)(4)(iii)(A) (1)], and labeled with the biohazard symbol or color coded in accordance with [29 CFR 1910.1030(g)(1)(i)].

  - Containers must be replaced routinely and not be allowed to overfill [29 CFR 1910.1030(d)(4)(iii)(A)(2)].

**Disposal of Sharps Containers:**

Employees should be trained in proper handling/disposal of sharps and containers, such as:

When moving containers of contaminated sharps or Other Regulated Wastes, from the area of use, the containers shall be [29 CFR 1910.1030(d)(4)(iii)(A)(3)]:

- Closed immediately prior to removal or replacement to prevent spillage or protrusion of contents during handling, storage, transport, or shipping.

- Placed in a secondary container, if leakage is possible. The secondary container must meet the requirements of 29 CFR 1910.1030(d)(4)(A)(3)(ii).

- Disposed of in accordance with EPA, state, territorial, and local regulations [29 CFR 1910.1030(d)(4)(iii)(C)].

**Reusable sharps containers:**

- Shall not be opened, emptied or cleaned manually or in any other manner that would expose employees to the risk of percutaneous injury.

For additional information, see **Healthcare Wide Hazards - Needlestick/Sharps Injuries.**

Back to Top

---

**Hazardous Chemicals**

**Potential Hazard**

Exposure to hazardous cleaning chemicals found and used in the laundry or housekeeping process.

- Soaps and detergents may cause allergic reactions and dermatitis.

- Broken skin from soap or detergent irritation may provide an avenue for infection or injury if exposed to chemical or biological hazards.

- Mixing cleaning solutions that contain ammonia and chlorine will form a deadly gas.

**Possible Solutions**

Implement a written program which meets the requirements of the Hazard Communication Standard (HCS) to provide for worker training, warning labels, and access to Material Safety Data Sheets (MSDS).

- The Hazard Communication Standard ensures employee awareness of the hazardous chemicals they are exposed to in the workplace.

**Provide appropriate PPE:** (e.g., gloves, goggles, splash aprons), when handling hazardous dishwashing detergents and chemicals [29 CFR 1910.132]. For more information see **Healthcare Wide Hazards - PPE.**

**Medical Services and First Aid:** Where the eyes or body of any person may be exposed to injurious corrosive materials, suitable facilities for quick drenching or flushing of the

eyes and body shall be provided within the work area for immediate emergency use [29 CFR 1910.151(c)].

For additional information, see **Healthcare Wide Hazards - Hazardous Chemicals**.

Back to Top

---

**Latex Allergy**

**Potential Hazard**

Exposure to latex allergy from wearing latex gloves, during housekeeping processes.

**Example Controls**

- Employers must provide appropriate gloves when exposure to blood or other potentially infectious materials (OPIM) exists [29 CFR 1910.1030, Bloodborne Pathogens Standard].

    - Alternatives shall be readily accessible to those employees who are allergic to the gloves normally provided [29 CFR 1910.1030(d)(3)(iii)].

- Eliminate the unnecessary use of latex gloves when no risk of exposure to Blood or Other Potentially Infectious Materials (OPIM) exists.

For additional information, see **Healthcare Wide Hazards - Latex Allergy**.

Back to Top

---

**Slips/Trips/Falls**

**Potential Hazard**

Exposure to wet floors, and possible slips, trips, and falls.

**Possible Solutions**

- Maintain floors in a clean and, so far as possible, dry condition, and mats provided where practicable. Walking/Working Surfaces Standard [29 CFR 1910.22(a)(2)].

- Provide warning signs for wet floor areas [29 CFR 1910.145(c)(2)].

**Other Recommended Good Practices:**

- Implement a program to provide safe, immediate, clean-up of floor spills.

- Housekeeping procedures such as only cleaning one side of a passageway at a time, providing good lighting for all halls and stairwells can help reduce accidents.

- Instruct workers to use the handrail on stairs, to avoid undue speed, and to maintain an unobstructed view of the stairs ahead of them-even if that means requesting help to manage a bulky load.

- Eliminate uneven floor surfaces.

For additional information, see **Healthcare Wide Hazards - Slips/Trips/Falls**.

Back to Top

---

Administration | Central Supply | Clinical Services | Dietary | Emergency | Engineering | Healthcare Wide Hazards
Heliport | Housekeeping | ICU | Laboratory | Laundry | Pharmacy | Surgical Suite | Expert Systems

eTools Home :   Hospital                                                                      Scope | Glossary | References | Site Map | Credits

Freedom of Information Act  |  Privacy & Security Statement  |  Disclaimers  |  Important Web Site Notices  |  International  |  Contact Us

U.S. Department of Labor  |  Occupational Safety & Health Administration  |  200 Constitution Ave., NW, Washington, DC 20210
Telephone: 800-321-OSHA (6742)  |  TTY
www.OSHA.gov

# APPENDIX – "18"

 The Joint Commission
E-dition

Effective Date: July 1, 2015

**Program: Hospital**

**Chapter: Environment of Care**

**EC.01.01.01: The hospital plans activities to minimize risks in the environment of care.**
**Note: One or more persons can be assigned to manage risks associated with the management plans described in this standard.**

**Rationale:** Risks are inherent in the environment because of the types of care provided and the equipment and materials that are necessary to provide that care. The best way to manage these risks is through a systematic approach that involves the proactive evaluation of the harm that could occur. By identifying one or more individuals to coordinate and manage risk assessment and reduction activities—and to intervene when conditions immediately threaten life and health—organizations can be more confident that they have minimized the potential for harm.

Risks in the environment include safety and security for people, equipment, and other material; the handling of hazardous materials and waste; the potential for fire; the use of medical equipment; and utility systems. High-level written management plans help the hospital manage risks. These plans are not the same as operational plans, but they do provide a framework for managing the environment of care. These plans should also address the scope and objectives of risk assessment and management, describe the responsibilities of individuals or groups, and give time frames for specific activities identified in the plan.

Note: It is not necessary to have a separate plan for each of the areas identified in the standard; the plans may all be contained in a single document.

**Introduction:** Not applicable

**Elements of Performance**

1  Leaders identify an individual(s) to manage risk, coordinate risk reduction activities in the physical environment, collect deficiency information, and disseminate summaries of actions and results.
Note: Deficiencies include injuries, problems, or use errors.
**EP Attributes**

| New | FSA | CMS | MOS | CR | DOC | SC | ESP |
|-----|-----|-----|-----|-----|-----|-----|-----|
|  | - Diagnostic Imaging |  |  |  |  | A | ESP-1 |

2  Leaders identify an individual(s) to intervene whenever environmental conditions immediately threaten life or health or threaten to damage equipment or buildings.
**EP Attributes**

| New | FSA | CMS | MOS | CR | DOC | SC | ESP |
|-----|-----|-----|-----|-----|-----|-----|-----|
|  | - Diagnostic Imaging |  |  |  |  | A | ESP-1 |

3  The hospital has a written plan for managing the following: The environmental safety of patients and everyone else who enters the hospital's facilities. (See also EC.04.01.01, EP 15)
**EP Attributes**

| New | FSA | CMS | MOS | CR | DOC | SC | ESP |
|-----|-----|-----|-----|-----|-----|-----|-----|
|  | - Diagnostic Imaging | §482.26(b) §482.41(a) |  |  | D | A | ESP-1 |

4  The hospital has a written plan for managing the following: The security of everyone who enters the hospital's facilities. (See also EC.04.01.01, EP 15)
**EP Attributes**

| New | FSA | CMS | MOS | CR | DOC | SC | ESP |
|-----|-----|-----|-----|-----|-----|-----|-----|
|  |  | §482.13(c)(2) |  |  | D | A | ESP-1 |

5  The hospital has a written plan for managing the following: Hazardous materials and waste. (See also EC.04.01.01, EP 15)
**EP Attributes**

| New | FSA | CMS | MOS | CR | DOC | SC | ESP |
|-----|-----|-----|-----|-----|-----|-----|-----|
|  | - Diagnostic Imaging | §482.26(b) §482.41(a) |  |  | D | A | ESP-1 |

6  The hospital has a written plan for managing the following: Fire safety. (See also EC.04.01.01, EP 15)
**EP Attributes**

| New | FSA | CMS | MOS | CR | DOC | SC | ESP |
|-----|-----|-----|-----|-----|-----|-----|-----|
|  |  | §482.41(a) |  |  | D | A | ESP-1 |

7  The hospital has a written plan for managing the following: Medical equipment. (See also EC.04.01.01, EP 15)

**EP Attributes**

| New | FSA | CMS | MOS | CR | DOC | SC | ESP |
|-----|-----|-----|-----|-----|-----|-----|-----|
|  | - Diagnostic Imaging | §482.41(a)<br>§482.41(c)(2) |  |  | D | A | ESP-1 |

8  The hospital has a written plan for managing the following: Utility systems. (See also EC.04.01.01, EP 15)

**EP Attributes**

| New | FSA | CMS | MOS | CR | DOC | SC | ESP |
|-----|-----|-----|-----|-----|-----|-----|-----|
|  | - Diagnostic Imaging | §482.41(a)<br>§482.41(c)(2) |  |  | D | A | ESP-1 |

© 2015 The Joint Commission, © 2015 Joint Commission Resources
E-dition is a registered trademark of The Joint Commission


The Joint Commission
E-dition

Effective Date: July 1, 2015

**Program: Hospital**

### Chapter: Environment of Care

**EC.02.01.01: The hospital manages safety and security risks.**

**Rationale:** Safety and security risks are present in most health care environments. These risks affect all individuals in the organization—patients, visitors, and those who work in the hospital. It is important to identify these risks in advance so that the hospital can prevent or effectively respond to incidents. In some organizations, safety and security are treated as a single function, although in others they are treated as separate functions.

Safety risks may arise from the structure of the physical environment, from the performance of everyday tasks, or from situations beyond the hospital's control, such as the weather. Safety incidents are most often accidental. On the other hand, security incidents are often intentional. Security protects individuals and property against harm or loss. Examples of security risks include workplace violence, theft, infant abduction, and unrestricted access to medications. Security incidents are caused by individuals from either outside or inside the hospital.

**Introduction:** Not applicable

**Elements of Performance**

1 The hospital identifies safety and security risks associated with the environment of care that could affect patients, staff, and other people coming to the hospital's facilities. (See also EC.04.01.01, EP 14)
Note: Risks are identified from internal sources such as ongoing monitoring of the environment, results of root cause analyses, results of proactive risk assessments of high-risk processes, and from credible external sources such as Sentinel Event Alerts.

**EP Attributes**

| New | FSA | CMS | MOS | CR | DOC | SC | ESP |
|-----|-----|-----|-----|-----|-----|-----|-----|
| | | §482.13(c)(2) §482.26(b) §482.41(a) | | | | A | |

3 The hospital takes action to minimize or eliminate identified safety and security risks in the physical environment.

**EP Attributes**

| New | FSA | CMS | MOS | CR | DOC | SC | ESP |
|-----|-----|-----|-----|-----|-----|-----|-----|
| | - FSA Direct Impact EPs | §482.13(c)(2) §482.26(b) §482.41(a) | M | ⚠ | | C | |

5 The hospital maintains all grounds and equipment.

**EP Attributes**

| New | FSA | CMS | MOS | CR | DOC | SC | ESP |
|-----|-----|-----|-----|-----|-----|-----|-----|
| | | §482.41(a) | M | | | C | |

7 The hospital identifies individuals entering its facilities.
Note: The hospital determines which of those individuals require identification and how to do so.

**EP Attributes**

| New | FSA | CMS | MOS | CR | DOC | SC | ESP |
|-----|-----|-----|-----|-----|-----|-----|-----|
| | | §482.13(c)(2) | | | | C | |

8 The hospital controls access to and from areas it identifies as security sensitive.

**EP Attributes**

| New | FSA | CMS | MOS | CR | DOC | SC | ESP |
|-----|-----|-----|-----|-----|-----|-----|-----|
| | - FSA Direct Impact EPs | §482.13(c)(2) §482.53(b) | | ⚠ | | A | |

9 The hospital has written procedures to follow in the event of a security incident, including an infant or pediatric abduction.

**EP Attributes**

| New | FSA | CMS | MOS | CR | DOC | SC | ESP |
|-----|-----|-----|-----|-----|-----|-----|-----|
| | | §482.13(c)(2) | | | D | A | ESP-1 |

10 When a security incident occurs, the hospital follows its identified procedures.

**EP Attributes**

| New | FSA | CMS | MOS | CR | DOC | SC | ESP |
|-----|-----|-----|-----|-----|-----|-----|-----|
| | | §482.13(c)(2) | | ⚠ | | A | |

11 The hospital responds to product notices and recalls. (See also MM.05.01.17, EPs 1-4)

**EP Attributes**

| New | FSA | CMS | MOS | CR | DOC | SC | ESP |
|-----|-----|-----|-----|-----|-----|-----|-----|
| | | §482.25(b)<br>§482.41(a) | | | | C | |

14 The hospital manages magnetic resonance imaging (MRI) safety risks associated with the following:
- Patients who may experience claustrophobia, anxiety, or emotional distress
- Patients who may require urgent or emergent medical care
- Patients with medical implants, devices, or imbedded metallic foreign objects (such as shrapnel)
- Ferromagnetic objects entering the MRI environment
- Acoustic noise

**EP Attributes**

| New | FSA | CMS | MOS | CR | DOC | SC | ESP |
|-----|-----|-----|-----|-----|-----|-----|-----|
| New | | | | | | A | ESP-1 |

16 The hospital manages magnetic resonance imaging (MRI) safety risks by doing the following:
- Restricting access of everyone not trained in MRI safety or screened by staff trained in MRI safety from the scanner room and the area that immediately precedes the entrance to the MRI scanner room.
- Making sure that these restricted areas are controlled by and under the direct supervision of staff trained in MRI safety.
- Posting signage at the entrance to the MRI scanner room that conveys that potentially dangerous magnetic fields are present in the room. Signage should also indicate that the magnet is always on except in cases where the MRI system, by its design, can have its magnetic field routinely turned on and off by the operator.

**EP Attributes**

| New | FSA | CMS | MOS | CR | DOC | SC | ESP |
|-----|-----|-----|-----|-----|-----|-----|-----|
| New | | | | ⚠ | | A | ESP-1 |

© 2015 The Joint Commission, © 2015 Joint Commission Resources
E-dition is a registered trademark of The Joint Commission